# EXHIBIT D

the question.

A. I don't know. In 2010, I don't know if they had their own that was called Newark homicide. I don't know.

Q. Do you know if they had detectives who were homicide detectives back in 2010, whatever label you want to put on their unit?

MR. LIPSHUTZ: Objection.

MR. BOWENS: Objection, speculation.

MR. LIPSHUTZ: Objection to the form.

A. They've always -- they always have detectives. I just don't know what their titles are.

Q. Okay. Obviously, I don't want you to speculate, but I'm going to assume that, as someone who's spent their entire career in the Essex County Prosecutor's Office, including many years in a homicide unit, you have some familiarity with the Newark Police Department by virtue of your -- as you pointed out earlier, you had worked with them on cases, correct?

A. Yes.

MR. BOWENS: Okay. I'm going to object to that statement.

You can't ask her to speculate about

anything. Just because she had a particular position does not give you the right to infer that she has knowledge about other units and other police agencies.

MS. BONJEAN: Well, I'm going to object to your speaking objection.

Q. And I'm not asking you to speculate. I'm asking you, as someone who has vast experience as a prosecutor, who hopefully knows a little something about how Newark Police Department operates having spent a career with -- prosecuting cases, just to tell me based on your experience, not on speculation, but experience, okay, and if you don't know an answer, certainly don't guess. Okay?

Now, in 2004, when you first came to the homicide unit, would you say that that was a period of time where the Newark Police Department was leading or directing homicide cases or you just don't know?

A. I don't remember.

Q. Okay. Does the Essex County Prosecutor's Office or did the Essex County Prosecutor's Office back in 2008, let's call it, have policies and practices and protocols for its investigators?

A. Policies in what regard? I don't know what you mean.
Q. Okay. Well, you understand that police officers are obligated to follow policies, right?
A. Right.
Q. They can't just go out and do whatever the heck they want in the course of a investigation, right?
A. Right.
Q. They got to follows constitutional law. They can't beat people up. They can't coerce confessions. They can't lie to people under certain circumstances. Under some certain circumstances maybe they can. There's rules they must follow. Can we agree on that?
A. Yes.
Q. And you've now just told me that the Essex County Prosecutor's investigators conducted homicide investigations, in fact, were lead investigators in homicide investigations, correct?
A. Yes.
Q. Did they have written policies that they followed when they conducted those investigations that guided them so that they didn't violate people's constitutional rights?

MR. BOWENS: Objection, asked and answered. The witness can answer if she understands the question.

MR. VOMACKA: I'll object to just the form. You can answer.

A. If they have specific policies, I'm not familiar with them. We have standard operating procedures in our office that pertain to attorneys and to detectives, but, you know, they have a separate chain of command, and I have a separate chain of command, and I don't partake in their training. They don't partake in the lawyer's training.

So I can only say that I don't know what goes on on their end of the office as far as their policies and their training. I don't know anything about that.

I only know what my policies and my training are, but I don't know what they have to do as far as their policies and their training, what they have to do and don't have to do.

Q. Well, I didn't really ask you for any detail. I asked did they have procedures and policies? Do you know whether they have them period?

A. The office has standard operating procedures for everybody.
Q. Okay. That's good. Now we're getting somewhere.
So it's your understanding that they had standard operating procedures and that you, as an attorney, had standard operating procedures. Is that right?
A. Yes.
Q. And are these written procedures that they're on a piece of paper that you have to read and be familiar with?
A. Yes.
Q. And I know you are familiar with your own standard operating procedures as a prosecutor.
Is it your testimony that you have no knowledge and no understanding of the standard operating procedures of the investigators who work the investigative -- worked in the homicide unit when you were there between 2004 and 2012?
MR. LIPSHUTZ: Objection to the form.
A. Yeah. I couldn't say anything about -- I couldn't say what their policies and procedures were.
Q. So it sounds like you're agreeing. You

don't have any information or knowledge about the standard operating procedures of the investigators that worked in the homicide unit between 2004 and 2012?

A. Right.

Q. So you wouldn't, for instance, be able to tell an investigator, you know, I don't think you're following some standard operating procedure correctly, and I'm not saying you would do that either way, but it doesn't sound like you would have been able to do that because you're not familiar with their standard operating procedures, right?

MR. BOWENS: Objection, mischaracterizes the witness's testimony, calls for speculation. You can answer.

A. I agree. That wasn't what I was saying.

What I was saying was I'm not familiar with their exact policies and procedures, but we would work together on cases, and we worked in conjunction with each other all the time.

I mean, if I wanted them to do something, I asked them. If they wanted me to do something, they asked me, but I don't know -- I don't know what you're getting at.

Q. So you don't understand the question. Is that right?
A. Right.
Q. I want to make sure we're working with the same vocabulary here. When I say standard operating procedures, I'm actually referring to documents, a document or a booklet or whatever may exist.
Does that exist as far as you know as it relates to the investigators that worked in the homicide unit during the time period that you were there?
A. Yeah.
Q. If I wanted to subpoena it, for example, could I get my hands on it?
A. I don't know. I guess I don't know. I have no idea.
MR. BOWENS: Don't speculate if you don't know the answer.
A. I don't know.
Q. But it exists. That's all I'm asking. Does it exist?
You seem unsure whether this document exists. So I'm trying to get clarity so we don't keep going around.

A. I said yes like 17 times. I said there's standard operating procedures. I did not say it didn't exist.

Q. It exists. You just -- have you ever read it?

A. I've read the portions that pertain to me.

Q. Have you read the standard operating procedures that pertain to the investigators who investigate homicides in the homicide unit during the time period you were there?

MR. LIPSHUTZ: Objection, lack of foundation for that question.

A. No.

Q. You said no?

A. No.

Q. You mentioned that the investigators had their own chain of command. Is that right?

A. Yes.

Q. Okay. Were you part of the chain of command as a line prosecutor?

A. I was not part of the detective chain of command.

Q. Okay. Did you have any ability to direct the investigators that were investigating

homicides during your time there in the homicide unit?
A. Yes.
Q. I'm sorry?
A. Yes.
Q. And when I say direct, are you able to either ask them to do something or tell them to stop doing something?
A. I could ask them to do something.
Q. Okay. Was it more of a collaborative thing or was there -- did direction ultimately end with the prosecutor meaning the prosecutor decided what the investigators did or didn't do?
MR. BOWENS: Objection, vague and ambiguous.
Q. If you understand. If you don't, I'll rephrase.
A. It was collaborative.
Q. Did you as a prosecutor working with an investigator or investigators in the homicide unit have any supervisory control over the investigators?
A. I don't understand.
Did I have supervisory control? Can you repeat? Can you explain your question?
Q. Sure, absolutely.

When you were in the homicide unit, did you supervise investigators in any way?
A. No.
Q. So if you had a problem with an investigator, would you go to somebody else?
I'm not saying it ever happened, but if you did, would you go to his supervisor? Is that how it worked?
MR. BOWENS: Objection, calls for speculation. You can answer.
A. No. I'd have to go to my boss who is a prosecutor.
Q. Okay. So let's say you have an investigator, and this is a hypothetical, an investigator who is not doing his or her job and you're having problems with him or her.
You're saying that, if you had a complaint about some investigator's work, you would go to your own supervisor. Is that right?
A. Correct.
Q. And then from there, do you know what happened or is that just speculation as well?
A. Yeah, speculation, because that never happened to me in homicide, but if it had, you'd go to your boss and then your boss would take care of

it.
Q. What if you found out, for instance, that an investigator didn't tell you about an exculpatory piece of information? What would you do in that situation?
A. You would go to your boss immediately and report it.
Q. Okay. And then it would go up -- it would be handled by your boss in some capacity as far as you know, right?
A. Right.
Q. Now, do you recall when it was that you first learned that you would be working the five missing boys case out of Newark?
A. Yeah. It was -- I don't recall exactly when, but my boss at the time was primarily dealing with the detectives on the case, and he would mention it to me that he was working with this -- you know, working with detectives to try and solve this old homicide, and he was really the one that was working on the case.
Q. And what was your boss's name?
A. Greg De Mattia.
Q. Can you spell that for the court reporter?

A. G-R-E-G. D-E capital M-A-T-T-I-A.
Q. And would that make him the director of the homicide unit?
A. Yes, he was the director.
Q. And could you just repeat his last name one more time so I have it correct?
A. De Mattia.
Q. De Mattia. Okay. So Greg De Mattia tells you that he is working with the detectives on this old case or cold case. Is that right?
A. Yeah. They were coming to him I think for -- you know, my understanding that they were talking to him about this case. They really -- you know, they had information, and they were going to him, you know, for, I guess, legal guidance and stuff, and that's how I learned about it originally through my boss Greg.
Q. And do you remember what he told you about the case initially?
A. Yeah. That there was five boys who went missing in Newark. I had never -- I never knew about the case, and that was unsolved for many years and that, you know, it's a very interesting case and that they were working on solving it, and that was pretty much it.