# EXHIBIT A

**In The Matter Of:**

*Evans v.*
*Newark City*

---

*William H. Tietjen, Jr.*
*July 22, 2020*
*Video Deposition*

---



66 W. Mt. Pleasant Avenue
Livingston, NJ  07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

---

**Page 1**

```
 1                 UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF NEW JERSEY
                   NEWARK VICINAGE
 3                 14-cv-00120 (KM)(MAH)

 4

 5
    LEE EVANS,                )
 6                            )      VIDEOTAPED
           Plaintiff,         )
 7                            )   DEPOSITION UPON
        v.                    )    ORAL EXAMINATION
 8                            )         OF
    NEWARK CITY; FORMER       ) WILLIAM H. TIETJEN, JR.
 9  MAYOR, CORY A. BOOKER;    )
    FORMER POLICE DIRECTOR,   )   VIA VIDEOCONFERENCE
10  GARRY McCARTHY;           )
    LIEUTENANT LOU CARREGA;   )
11  DETECTIVE JOSEPH HADLEY;  )
    DETECTIVE SGT. WILLIAM    )
12  TIETJEN; SGT. DARNELL     )
    HENRY; OFFICER JOE        )
13  HADLEY,                   )
                              )
14         Defendants.        )

15

16

17         T R A N S C R I P T  of the stenographic

18  notes of AUDREY ZABAWA, a Certified Court Reporter

19  of the State of New Jersey, Certificate No.

20  XI01410, taken via videoconference, on Wednesday,

21  July 22, 2020, commencing at 10:10 a.m.

22

23

24

25
```

---

**Page 2**

```
 1  A P P E A R A N C E S:

 2  BONJEAN LAW GROUP, PLLC
    467 Saint Johns Place
 3  Brooklyn, New York 11238
    718.875.1850
 4  jennifer@bonjeanlaw.com
    ashleys@bonjeanlaw.com
 5  BY:  JENNIFER BONJEAN, ESQ.
         ASHLEY COHEN, ESQ.
 6  Counsel for Plaintiff

 7  KENYATTA STEWART, CORPORATION COUNSEL
    CITY OF NEWARK - DEPARTMENT OF LAW
 8  920 Broad Street, Room 316
    Newark, New Jersey 07102
 9  973.733.5945
    lipshutzg@ci.newark.nj.us
10  BY:  GARY S. LIPSHUTZ, ESQ.
    Assistant Corporation Counsel
11  Attorney for Defendants City of Newark (improperly
    pled as "Newark City" and "Newark Police
12  Department"), Cory A. Booker, Garry McCarthy,
    Darnell Henry, and Joe Hadley
13
    STATE OF NEW JERSEY
14  OFFICE OF THE ATTORNEY GENERAL - DIVISION OF LAW
    STATE POLICE, EMPLOYMENT, AND CORRECTIONS SECTION
15  Richard J. Hughes Justice Complex
    25 Market Street, PO Box 112
16  Trenton, NJ 08625-0112
    609.376.2948
17  Michael.Vomacka@lps.state.nj.us
    Victor.DiFrancesco@njoag.gov
18  BY: VICTOR DiFRANCESCO, JR., DEPUTY ATTORNEY GENERAL
        MICHAEL VOMACKA, DEPUTY ATTORNEY GENERAL
19  Counsel for Defendant William H. Tietjen Jr.

20  SCHENCK, PRICE, SMITH & KING
    220 Park Avenue
21  Florham Park, New Jersey 07932 973.539.1000
    rjr@spskccom
22  BY:  REBECCA J. ROSEN, ESQ.
    Counsel for Defendant Lou Carrega
23
    Also Present:
24
    Joseph Hadley
25  Darnell Henry
```

---

**Page 3**

```
 1                    I N D E X

 2  WITNESS          DIRECT    CROSS   REDIRECT   RECROSS

 3  WILLIAM H. TIETJEN JR.

 4   Ms. Bonjean      4                316

 5   Mr. Lipshutz               303

 6   Ms. Rosen                  311

 7

 8  NOTE:  Reporter retained exhibits.
            (Attached herewith.)
 9
                    E X H I B I T S
10
    NUMBER    DESCRIPTION               FOR IDENT.
11
          Tietjen-1, Tietjen Training Records,    24
12        Bates NJSP EVANS 503 through 506

13        Tietjen-2, Tietjen supplementary report  34
          dated 6/25/09, Bates ECPO 1343 through
14        1361

15        Tietjen-3, Hairston reports, Bates ECPO  70
          003548 through 003586
16
          Tietjen-4, Bates Newark 60 through 62    73
17
          Tietjen-5, transcript of Philander      246
18        Hampton interview 11/13/08, Bates ECPO
          000342 through 426
19
          Tietjen-6, Carrega affidavit in support 294
20        of arrest warrants, Bates ECPO 257
          through 259
21
          Tietjen-7, Tietjen supplemental report  303
22        dated 4/21/10, Bates ECPO 1315 through
          1317
23

24

25
```

---

**Tietjen - Direct/Bonjean**   **Page 4**

```
 1  W I L L I A M  T I E T J E N, JR., called as a

 2  witness, having been first duly sworn,

 3  testified as follows:

 4     DIRECT EXAMINATION BY MS. BONJEAN:

 5  Q.  Good morning, Mr. Tietjen.

 6  A.  Good morning.

 7  Q.  I am in Brooklyn, so there's often

 8  background noise.  I will apologize in advance if

 9  you hear anything in the back that's distracting.

10  I'll do my best to keep the noise to a minimum.

11  And sometimes there are connectivity issues, so

12  don't hesitate to ask me to repeat something if I

13  break up or you need me to repeat.

14     Okay.  But before we get started, I'm

15  going to ask that everyone place their appearances

16  on the record.  So I'll start with myself.

17     My name is Jennifer Bonjean.

18  B-O-N-J-E-A-N.  And I represent the plaintiff, Lee

19  Evans, in this matter.

20     MR. LIPSHUTZ: Good morning.  Is it

21  sergeant, by the way?

22     THE WITNESS: It's sergeant.

23  Detective Sergeant First Class.  DSFC.

24     MR. LIPSHUTZ: Okay.  Detective

25  Sergeant, good morning.  I said hello earlier.  My
```

---

Tietjen - Direct/Bonjean                                    Page 5

1   name is Gary Lipshutz.  I am Assistant Corporation
2   Counsel and Chief of Litigation for the City of
3   Newark.  I represent the City, former Director
4   McCarthy, former Mayor Booker, former Detective
5   Hadley, and Sergeant Henry, now chief of police.
6   Nice to meet you, sir.
7        MR. DiFRANCESCO: Good morning.
8   Victor DiFrancesco, New Jersey Attorney General's
9   Office.  We are appearing on behalf of Sergeant
10  Tietjen, as well as the State of New Jersey.
11       MR. VOMACKA: This is Michael
12  Vomacka.  I am also with Vic in the New Jersey
13  Office of the Attorney General, representing
14  Defendant Tietjen.
15       MS. ROSEN: Good morning.  My name
16  Rebecca Rosen.  I'm at Schenck, Price, Smith &
17  King, and I'm appearing on behalf of Defendant
18  Louis Carrega.
19       MS. BONJEAN: All right.  And, Gary,
20  did you place on the record that your client's
21  were also present?  Do you want to -- I don't know
22  if you did.  I can't remember.
23       MR. LIPSHUTZ: I don't remember if I
24  did either, but present and observing the
25  deposition are the Defendants Henry and Hadley.

---

Tietjen - Direct/Bonjean                                    Page 6

1        MS. BONJEAN: And also, I should
2   point out my associate, Ashley Cohen, who is also
3   an attorney in this case, is present.  She's going
4   to be joining us online, but she's doing some
5   other things at the moment.  So we shall get
6   started.  I'm going to -- there we go.  Okay.
7        BY MS. BONJEAN:
8   Q.  Good morning, Mr. Tietjen.  As I
9   said, my name is Jennifer Bonjean.  I'd like to
10  first begin by asking you whether you have ever had
11  your deposition taken before?
12  A.  Yes, I have.
13  Q.  How many times, sir, have you had
14  your deposition taken?
15  A.  Don't know.  I know I had a civil case, I
16  believe it was an accident, years ago.  I don't
17  know exactly how many times I had a deposition
18  taken.
19  Q.  Have you ever had your deposition
20  taken in connection with your work as a law
21  enforcement officer?
22  A.  Yes, it was that prior civil case.
23  Q.  Okay.  Apart from the prior civil
24  case that you just mentioned, does anything else
25  come to mind in terms of any lawsuits in which you

---

Tietjen - Direct/Bonjean                                    Page 7

1   may have given sworn testimony?
2   A.  No.
3   Q.  Well, I'm still going to go through
4   some ground rules so we can be on the same page
5   today, and hopefully things will go smoothly.
6   Okay.  I'm going to be asking you questions and
7   expecting answers related to allegations that have
8   been raised in a civil complaint that was brought
9   by Lee Evans against yourself as a named defendant
10  and a number of other defendants.  I'm looking for
11  full and complete answers to my questions to the
12  best of your ability.  Do you understand that?
13  A.  Yes.
14  Q.  Okay.  If you do not understand one
15  of my questions, please let me know, and I will
16  rephrase the question so that we are on the same
17  page.  Okay?  Understood?
18  A.  Yes.
19  Q.  All right.  If you answer one of my
20  questions, I am going to assume that you understood
21  the question; is that fair?
22  A.  Yes.
23  Q.  You understand, sir, that you are
24  under oath today; correct?
25  A.  Yes.

---

Tietjen - Direct/Bonjean                                    Page 8

1   Q.  And that's the same oath you would
2   take as if you were in a court of law?
3   A.  Yes.
4   Q.  If you need a break, let us know.
5   I'm happy to oblige you.  Just, if there is a
6   question pending, I'd ask that you answer the
7   question before we break.  Okay?
8   A.  Yes.
9   Q.  Okay.  Can you think of any reasons
10  why you are unable to give full, complete, and
11  truthful testimony here today?
12  A.  No.
13  Q.  Okay.  Can you please state your full
14  name?  I know you did it, but will you please state
15  your full name and spell your name again for the
16  record?
17  A.  William H. Tietjen, Junior.  First name is
18  W-I-L-L-I-A-M.  Middle initial H.  Last name is T,
19  as in Tom, I-E-T-J-E-N.  And I'm a junior.
20  Q.  Also, I should have mentioned, the
21  attorneys may at various points lodge objections,
22  so I would recommend in the Zoom, the Zoom space
23  that we are in here, that maybe take a little, a
24  little pause to see if anyone has an objection
25  before answering.  I know that's easier said than

---

Evans v.
Newark City

Video Deposition

---

Tietjen - Direct/Bonjean                                    Page 9

1  done, but that seems to work best, if you can
2  remember to do that.  One other, I guess,
3  instruction I would give is that it's a natural
4  tendency to anticipate someone's questions and
5  start answering them before they've completed their
6  question, so I am going to ask that you do your
7  very best to let me complete my question even if
8  you know where I'm going with it, and I will do my
9  very best not to step on your answers.  Okay?
10 A.  Yes.
11 Q.  Okay.  Mr. Tietjen, without giving me
12 your address, where do you live?  What part of New
13 Jersey?
14 A.  Northwest New Jersey.
15 Q.  And how long have you lived there?
16 A.  Ten years plus.
17 Q.  I assume you live there with your
18 family?
19 A.  Yes.
20 Q.  Are you currently employed?
21 A.  Yes.
22 Q.  What type of work do you do?
23 A.  I am a Detective Sergeant First Class with
24 the New Jersey State Police.
25 Q.  So you are still employed by the

---

Tietjen - Direct/Bonjean                                    Page 10

1  state police; is that right?  Not retired?
2  A.  Yes.
3  Q.  And how long have you worked for the
4  state police?
5  A.  24 years.
6  Q.  And forgive my math, when did you --
7  what year did you start with the state police?
8  A.  1995.  I am in my 25th year.
9  Q.  Okay.  Did you work in any law
10 enforcement capacities prior to working for the
11 state police?
12 A.  No, I did not.
13 Q.  So as a Detective Sergeant, you said,
14 First Class, was that --
15 A.  Yes.
16 Q.  What does that mean in terms of your
17 duties and responsibilities?
18 A.  I am the assistant unit head of the Missing
19 Persons Unit for the state police.
20 Q.  Has the state police always had a
21 Missing Persons Unit since your tenure there?
22 A.  Yes.
23 Q.  And what does the missing -- I mean,
24 apart from the obvious, but what does the Missing
25 Persons Unit do exactly?

---

Tietjen - Direct/Bonjean                                    Page 11

1  A.  We investigate missing people;
2  unidentified, living, and deceased, Safe Haven
3  infants.  We are also the Amber Alert coordinators
4  for the State of a New Jersey approving any Amber
5  Alerts.  I guess that would cover it.
6  Q.  How long have you been assigned to
7  that unit?
8  A.  I started here in 2006, and I was here
9  through the end of 2008, and I returned in January
10 of 2013, and I've been here since then.
11 Q.  Okay.  Actually, I will probably go
12 through your employment history and assignments a
13 little more closely.  I want to back up a second.
14     Tell me about your educational
15 history.  Graduated high school?
16 A.  Yes.
17 Q.  What high school did you go to?
18 A.  Phillipsburg High School in New Jersey.
19 Q.  Phillipsburg, you said?
20 A.  Yes.  Phillipsburg.
21 Q.  Phillipsburg.  And upon graduation,
22 what did you do by way of either further education
23 or employment?
24 A.  I went on to Rutgers University.
25 Q.  What did you study at Rutgers?

---

Tietjen - Direct/Bonjean                                    Page 12

1  A.  Criminal justice.
2  Q.  And did you graduate Rutgers?
3  A.  Yes.
4  Q.  What type of degree did you earn?
5  A.  It was a Bachelor's of Science in
6  administration of justice.
7  Q.  I'm sorry.  Could you repeat that
8  again?
9  A.  It was a -- my degree was administration of
10 justice.
11 Q.  Was it a bachelor's degree or
12 associate's?
13 A.  Bachelor's.
14 Q.  Did you work while you were in
15 college?
16 A.  Only construction.  Yes, I did.
17 Q.  Okay.  Not law enforcement, but some
18 other type?
19 A.  No, no.  Summer work.
20 Q.  Understood.  And upon graduating from
21 Rutgers -- what year did you graduate, first of
22 all?
23 A.  1995.
24 Q.  Okay.  So, in 1995, then you went and
25 worked for the state police; is that right?

---

Evans v.
Newark City

Video Deposition

Tietjen - Direct/Bonjean                                Page 13

1  A.  Correct.
2  Q.  Okay.  Did you have to take any type
3  of exam to be considered for a position with the
4  state police?
5  A.  Yes.
6  Q.  What type of exam was that?
7  A.  It was a written exam.  And that was in
8  1994 I took that exam.
9  Q.  And is the state police like a civil
10  service jurisdiction type of --
11  A.  It's not a civil service exam.  It's a
12  separate state police exam.
13  Q.  All right.  And did you apply
14  to any other law enforcement agencies other than
15  the state police?
16  A.  I applied.  An application.  I never took
17  any other tests.
18  Q.  Okay.  And what department was that?
19  A.  That was South Brunswick Police Department.
20  Q.  Now, after you took the test, I
21  assume you were offered a position at some point;
22  is that right?
23  A.  Yes.
24  Q.  And you accepted that position?  Tell
25  me about, upon acceptance of that position, did you

Tietjen - Direct/Bonjean                                Page 14

1  go through some type of academy?
2  A.  Yes.
3  Q.  And how long did that academy last?
4  A.  I believe it was 26 weeks.
5  Q.  And as part of the academy, did you
6  get any training, formalized or otherwise, in
7  investigations, conducting investigations?
8  A.  After the academy you're asking?  I don't
9  understand what you're asking.
10  Q.  Yeah, sure.  As part of your police
11  academy training, did you receive any instruction
12  in conducting investigations?
13  A.  In the academy, I believe it was very basic
14  investigating.
15  Q.  And after your 26 weeks at the
16  academy, I assume you were given your first
17  assignment; is that right?
18  A.  Yes.
19  Q.  And where were you assigned?
20  A.  Sussex Station in Troop B.
21  Q.  Okay.  And what was -- what's your
22  rank coming right out of the academy?
23  A.  Trooper.
24  Q.  Trooper.  How long did you hold that
25  assignment?

Tietjen - Direct/Bonjean                                Page 15

1  A.  Approximately six months.
2  Q.  And what was involved in that?
3  A.  It was a general road duty assignment where
4  you were assigned to a squad and you patrolled
5  towns covered by the state police in Sussex
6  County.
7  Q.  And did you do like traffic stops and
8  things like that?
9  A.  Yeah, it was a full police entity.  Traffic
10  stops, accidents, domestics, anything that
11  occurred within those municipalities that we
12  covered.
13  Q.  Okay.  And after that assignment,
14  where did you go?
15  A.  I went on to Hope Station.
16  Q.  Same type of work?
17  A.  Yes.
18  Q.  And from there, where did you head?
19  A.  I went to Perryville Station.
20  Q.  Did there come a time when you held
21  an assignment that was not your trooper duties that
22  you've described, if that makes sense?
23  A.  Yes.
24  Q.  When was that?
25  A.  In May of 1999, I was moved into a

Tietjen - Direct/Bonjean                                Page 16

1  detective position as a station detective.
2  Q.  Okay.  So would it be fair to say
3  that between 1995 and 1999, you worked as a trooper
4  doing, I don't want to say basic, but basic trooper
5  duties?
6  A.  Yes.
7  Q.  And was the May 1999 assignment a
8  promotion?
9  A.  No.  It's just a status change.  You put in
10  for the job.
11  Q.  Okay.  And did you ask for that --
12  ask to be a detective, or how did you do that?
13  A.  You submit a resume, application.  You go
14  before a board, and you're selected after board
15  interviews and a review of your resume.
16  Q.  Is it a competitive process?
17  A.  Yes.
18  Q.  Now, after you were selected for that
19  assignment, did you have to undergo any specific
20  training related to conducting investigations?
21  A.  Yes.
22  Q.  How long did that training last?
23  A.  I think the initial class was about two
24  weeks, and then there were various classes that
25  you would be assigned throughout your different

Evans v.
Newark City

Video Deposition

---

Tietjen - Direct/Bonjean                                  Page 17

1  time in the career.
2  Q.  I see.  So kind of like continuing
3  studies?  Maybe that's the wrong word.  But you had
4  in-services or continuing training after that two
5  weeks; is that right?
6  A.  Yes.
7  Q.  Are you able to, again, to the best
8  of your ability, summarize for me what your
9  training looked like during those two weeks that
10  you were training to be a detective?
11  A.  It's a basic criminal inves school that all
12  detectives have to go to, and it covers all facets
13  of state police investigative entities.  More of
14  like an introduction to, and they provide you with
15  guidance on different cases in going through, and
16  it's required before you can be -- your rank can
17  be designated as detective.
18  Q.  Did you learn, for instance, how to
19  conduct interviews of witnesses or suspects that
20  might be involved in an investigation?
21  A.  I imagine it was in the class, but I also
22  attended, like, interviewing/interrogation school
23  as well.
24  Q.  I see.  Do you remember approximately
25  when you did that?

---

Tietjen - Direct/Bonjean                                  Page 18

1  A.  No.  I would have to look at the
2  transcript.
3  Q.  Fair enough.  I may ask you some more
4  questions about your training later, but we'll move
5  on.
6      After you completed the training, you
7  now are assigned as a detective.  Do you have a
8  particular physical location where you're assigned?
9  A.  Yes.  I was assigned at Washington Station.
10  Q.  Washington Station.  And what were
11  your day-to-day duties as a detective at the
12  Washington Station?
13  A.  It was investigative assistance for the
14  troopers who were on the road assigned to the
15  station, and then we would follow up on
16  investigations that they initiated, needed further
17  assistance.  We reviewed their investigations.
18  And then we would take our own investigations, if
19  someone called directly to us to handle within the
20  communities we patrolled.
21  Q.  I see.  What types of investigations
22  would you say were most common?  Again, we're
23  talking in 1999 when you were working in this
24  detective position.
25  A.  We would get involved in burglaries and

---

Tietjen - Direct/Bonjean                                  Page 19

1  thefts probably would be our most common.
2  Q.  I see.  And how did that work with
3  local municipalities, police departments?  I mean,
4  how did you decide -- or how was it decided whether
5  or not a state trooper would conduct an
6  investigation into say a burglary versus whatever
7  local municipality was, law enforcement agency, was
8  policing the area where -- that's a terrible
9  question -- but I hope you understand what I'm
10  saying.
11      If a burglary occurred in a
12  municipality where there was a law enforcement
13  agency, how was it determined whether you would
14  handle that or the local law enforcement agency
15  would handle it?
16  A.  We would not cover any cases that were
17  handled by a local law enforcement agency.
18  Q.  I see.  So your jurisdiction were
19  areas that were not covered by local law
20  enforcement agencies; is that right?
21  A.  Yes.
22  Q.  Did you stay at Washington Station
23  for a period of time?
24  A.  Yes.
25  Q.  How long?

---

Tietjen - Direct/Bonjean                                  Page 20

1  A.  Approximately a year.
2  Q.  Do you recall where you went after
3  that?
4  A.  Sussex Station.
5  Q.  Again, doing the same type of work?
6  A.  Yes.
7  Q.  And how long were you at Sussex?
8  A.  Approximately a year and a half.
9  Q.  Okay.  So does that bring us to like
10  early 2000s?
11  A.  Yes.
12  Q.  All right.  Again, were you doing the
13  same type of work there?
14  A.  Yes, yes.
15  Q.  Same types of investigations that you
16  were conducting?
17  A.  Yes.
18  Q.  Had you worked on any murder
19  investigations at that point?
20  A.  No.  Oh, when I was at Sussex, I was
21  assigned to like a long-term multi-victim case as
22  part of the task force.
23  Q.  Okay.  Is that how state police
24  usually get involved in serious investigations,
25  like murder investigations, usually as part of a

---

Evans v.
Newark City

Video Deposition

---

Tietjen - Direct/Bonjean                                    Page 21

1   task force?
2   A.   No.  If we had a murder within our station
3   area while I was assigned there, we were the
4   investigating authority for that.  But this was a
5   state police case that our Major Crime Unit was
6   running that grabbed detectives for a task force
7   in furtherance of that investigation.
8   Q.   I see.  After Sussex, where did you
9   go?
10  A.   I went to Newark Station on the New Jersey
11  Turnpike.
12  Q.   Okay.  And how long were you there?
13  A.   From roughly around 2000 -- end of 2001
14  through January of 2006.
15  Q.   Okay.  So for a while?
16  A.   Yes.
17  Q.   Did you still hold the same position
18  while you were at Newark Station?
19  A.   Yes.
20  Q.   And that was as a detective?
21  A.   Yes.  Station detective, yes.
22  Q.   Station detective.  I'm sorry.  I'm
23  not used to the state law enforcement lingo as much
24  as I am other departments, so bear with me if I
25  need clarification or need you to repeat something.

---

Tietjen - Direct/Bonjean                                    Page 22

1       Where did you go after Newark
2   Station?
3   A.   I went to the Missing Persons Unit.
4   Q.   Okay.  And where is the Missing
5   Persons Unit located?
6   A.   Division headquarters in West Trenton, New
7   Jersey.
8   Q.   How many people make up the Missing
9   Persons headquarters?
10  A.   Every year -- it depends.  We've had a high
11  of ten and probably a low of five.
12  Q.   And you said the Missing Persons Unit
13  was in existence since you started in 1995, so it
14  was already very much an operating unit at the time
15  that you joined it; right?
16  A.   Yes.
17  Q.   Did you ask for that position, or
18  were you assigned there?
19  A.   I asked.
20  Q.   Did you have -- what was your
21  interest in working in the Missing Persons Unit?
22  A.   It was a type of investigation that I saw
23  value or enjoyment in furthering.
24  Q.   Okay.  Gotcha.  Is it fair to say
25  you've been there ever since?

---

Tietjen - Direct/Bonjean                                    Page 23

1   A.   I was in two other units in the middle of
2   that time as well.
3   Q.   Yeah.  I think you said in 2006 and
4   2008?
5   A.   Yes.
6   Q.   Where did you go?
7   A.   December 2008, I went on to the Fugitive
8   Unit as a --
9   Q.   Fugitive Unit.  Is that tracking down
10  fugitives?
11  A.   Yes.
12  Q.   Any other assignments since 2001
13  other than the Missing Persons Unit and the
14  Fugitive Unit?
15  A.   The Alcohol Drug Test Unit.
16  Q.   The Alcohol Drug Test Unit?
17  A.   Yes.
18  Q.   What's that?
19  A.   That's -- they do the alcohol drug testing
20  system.  The Breathalyzer is, I guess, the easiest
21  term.
22  Q.   When were you there?
23  A.   September of '12 through January of '13.
24  Q.   You mentioned that in addition to the
25  two-week training that you underwent when you

---

Tietjen - Direct/Bonjean                                    Page 24

1   became a detective that there was additional
2   training that you participated in over the course
3   of your time in the Missing Persons Unit; is that
4   right?
5   A.   Yes.
6   Q.   Can you tell me about what type of
7   training you did apart from that two-week training
8   related to conducting investigations, to the best
9   of your memory?
10  A.   Sex crimes, interview/interrogation,
11  identity theft.  We have a money laundering on
12  there, too.  Trucks and terrorism.  Some narcotics
13  class.
14  Q.   I'm going to have you look at a
15  document.
16  A.   A juvenile interview class I went through
17  as well.
18  Q.   I am going to have you look at a
19  document that we're going to mark.  If you look at
20  the file that you have, I believe it says "Training
21  Records Tietjen."
22       MS. BONJEAN: And I think you have
23  that also, Audrey.
24       (Tietjen-1, Tietjen Training Records,
25  Bates NJSP EVANS 503 through 506, was received and

---

Evans v.
Newark City
Video Deposition

---

Tietjen - Direct/Bonjean                                      Page 25

1  marked for identification.)
2  Q.  Do you see that?
3  A.  Yes.
4  Q.  I have handed you what we are going
5  to mark as Tietjen-1.  Do you recognize that
6  document, Mr. Tietjen?
7  A.  Yes.
8  Q.  I'm sorry.  And I know you are still
9  sworn personnel, so I don't mean to call you
10  Mister.  Sergeant Tietjen.  Is that right?
11  A.  Yes.
12  Q.  What do you recognize that document
13  to be?
14  A.  It's our online list of courses, ranking,
15  and organizations you were part of throughout your
16  career.
17  Q.  Does that reflect the trainings you
18  received over the course of your time with the
19  state police, I guess at least between -- it says
20  '89.  I think -- I don't know if that's accurate.
21  That might be a typo.
22  A.  That's a typo.
23  Q.  Yeah, because I know you said you
24  didn't start there until '95, so... But does this
25  generally reflect the class work and training you

---

Tietjen - Direct/Bonjean                                      Page 26

1  received between '95 and November of 2017?
2  A.  It does, except for portions that were
3  outside of an SP program.
4  Q.  I'm sorry.  Can you repeat that?
5  A.  You could take a course, like I've taken
6  courses, and you have to fill out documentation,
7  either include it into in your resume or not.  So
8  in my recent term, many of my recent classes are
9  not on here at all because it would require me to
10  fill out a form and submit it, and there's -- no,
11  they are not listed.
12  Q.  Okay.  Fair enough.  What about,
13  let's say, would you say it's accurate to the
14  extent that it reflects your training between,
15  we'll say, January of 2007 through October of 2012?
16  A.  Yes.
17  Q.  Okay.  Now, at some point you sought
18  a promotion and received a promotion; am I right?
19  A.  All of my promotions were not sought.  They
20  were -- you're selected.
21  Q.  Gotcha.  And when you were working in
22  the Missing Persons Unit between 2001 and 2006,
23  what was your rank?
24  A.  I was Detective -- I was Detective 1 at the
25  time.

---

Tietjen - Direct/Bonjean                                      Page 27

1  Q.  And are there different levels of
2  being a detective, I assume?  Sounds so.
3  A.  Yes.
4  Q.  Is that based on experience?
5  A.  It's a year of service.
6  Q.  Okay.  And apart from the different
7  levels of detectives, what's the next rank up from
8  there?
9  A.  It would be Detective Sergeant.
10  Q.  And is that what you are?
11  A.  No.  I'm a Detective Sergeant First Class.
12  I'm the next above.
13  Q.  Okay.  And how many detective levels
14  are there, or is it as many as your years are?
15  A.  No, there's -- well, there's -- you could
16  be a Detective, a Detective 2, a Detective 1, a
17  Detective Sergeant, and then a Detective Sergeant
18  First Class.
19  Q.  So you are a Detective Sergeant First
20  Class.  And tell me when did you become first a
21  Detective Sergeant?
22  A.  In 2000 -- well, I was trained through the
23  Fugitive Unit.  Our process is related to you're
24  in an acting capacity.  So I was a Detective
25  Sergeant there, and I was promoted while I was in

---

Tietjen - Direct/Bonjean                                      Page 28

1  the Fugitive Unit to Detective Sergeant.  And that
2  was in, I think -- my promotion came out
3  September 25th of '10.  2010.
4  Q.  And these assignments that are listed
5  in Tietjen-1, does that appear to be an accurate
6  reflection of your assignments?
7  A.  Yes.
8  Q.  Okay.  Great.  You can put that
9  aside.
10      (Videographer joined proceedings.)
11      THE VIDEOGRAPHER: My name is John
12  Edmunds.  I'll be operating the videotape
13  equipment this morning and this afternoon.
14      MS. BONJEAN: I think for the
15  purposes of the video, I'm just going to ask --
16  I'm not going to go back over anything.  I'm just
17  going to ask him to reintroduce himself, spell his
18  name for the record for purposes of the video.
19      THE WITNESS: William Tietjen,
20  Junior.
21      THE VIDEOGRAPHER: Before you do
22  that, sir, let me just put you on the screen.  Who
23  is the witness?  Could you raise your hand,
24  please?  Very good.  You can proceed.
25      MS. BONJEAN: Thank you.

---

Evans v.
Newark City

Video Deposition

Tietjen - Direct/Bonjean                    Page 29

BY MS. BONJEAN:
1    BY MS. BONJEAN:
2  Q.  I am going to ask the deponent to
3    please, for about the fifth time, identify himself
4    for the videographer's purpose, and spell your full
5    name again, sir.
6  A.  William H. Tietjen, Junior.  First name
7    W-I-L-L-I-A-M.  Middle initial is H.  Last name is
8    T-I-E-T-J-E-N.  Junior, J-R.
9  Q.  Thank you.  We just left off talking
10    a little bit about your employment history.  I
11    wanted to move on to ask you what, sir, did you do
12    to prepare for your deposition here today?
13  A.  I reviewed the documents that were provided
14    to me last evening.
15  Q.  And did you take any other actions in
16    preparation for your deposition here today other
17    than looking at the documents that were sent along
18    to you?
19  A.  No, I did not.
20  Q.  And without revealing any
21    communications, can you tell me whether you met
22    with your attorneys in preparation for your
23    deposition here today?
24  A.  I had phone conversations.
25  Q.  How many phone conversations did you

Tietjen - Direct/Bonjean                    Page 30

1    have?
2  A.  A total of three.
3  Q.  Can you estimate how long each of
4    those conversations lasted?
5  A.  I believe the first two were more
6    introductory in setting up previous dates.  And
7    then last night we spoke for about 15 minutes, I
8    guess.
9  Q.  Have you read the complaint in this
10    case, Sergeant Tietjen?
11  A.  I saw a copy of it years ago.  I do not
12    have a copy of it now.
13  Q.  That's fine.  I just wasn't sure if
14    you ever had a chance to look at it.  But it's not
15    something you looked at recently; correct?
16  A.  No.
17  Q.  And what's your understanding of why
18    you have been sued in connection with this case?
19  A.  Because I was part of the investigation.
20  Q.  What is your understanding of why
21    there is a lawsuit being brought in connection with
22    this case for any reason, if you know?
23  A.  I don't know, except for what the complaint
24    stated.
25  Q.  And based on your recollection of the

Tietjen - Direct/Bonjean                    Page 31

1    complaint, what's your understanding of what
2    Mr. Evans is complaining about?
3  A.  I believe he's stating he was wrongfully
4    accused of this crime.
5  Q.  Okay.  Now, you know that there were
6    many defendants that were named along with yourself
7    in this case, and now there is a smaller group of
8    defendants.  I want to ask you about some of them.
9    Well, first let me start, were you
10    the only state police officer who worked on this
11    investigation?
12  A.  No.
13  Q.  Okay.  How many state police
14    personnel worked on this, if you know?
15  A.  I don't know.  I know we had a detective in
16    1988, I guess, and a polygraphist helped as well.
17    (Reporter requested clarification.)
18    MS. BONJEAN: I think he said a --
19    THE WITNESS: He did a polygraph.
20  Q.  I almost said polygamist, but I know
21    that's not what --
22  A.  Polygraphist.  A guy in our Polygraph Unit.
23  Q.  Do you know Mr. Hadley?  Or I don't
24    know if he's retired right now.  But do you know
25    Joe Hadley?

Tietjen - Direct/Bonjean                    Page 32

1  A.  I know him from working with him on this
2    case, yes.
3  Q.  And have you had any contact with him
4    since 2011?
5  A.  Not that I can -- no.
6  Q.  Okay.  Do you remember the last time
7    you spoke to Detective Hadley?
8  A.  Probably around the time of the trial.
9  Q.  But you haven't maintained any
10    contact with him since the trial?
11  A.  No.
12  Q.  And have you had any conversations
13    with Detective Hadley in connection with the civil
14    lawsuit that was brought by Mr. Evans?
15  A.  No.
16  Q.  What about Chief Henry, when is the
17    last time you spoke to Chief Henry about the
18    subject matter of this case?
19  A.  Probably, again, the same time of trial.
20  Q.  So Chief Henry and Detective Hadley
21    are not individuals who you maintain contact with;
22    correct?
23  A.  Correct.
24  Q.  What about Lieutenant Carrega, now
25    retired, I believe, when was the last time you

Evans v.
Newark City

Video Deposition

---

Tietjen - Direct/Bonjean                                    Page 33

1  spoke to him?
2  A.   The trial as well.
3  Q.   All right.  I want to now hone in a
4  little bit about -- in on your work on the five
5  missing boys.  And to the extent that you need to
6  refresh your recollection, that's fine.  I may ask
7  you to try to remember to the best of your ability,
8  and then we'll see how far we get, and then we can
9  refer to your reports, if necessary.  Okay?
10 A.   Yes.
11 Q.   Do you recall when it was that you
12 became involved in the investigation of the missing
13 boys from Newark that went missing in 1978?
14 A.   May of 2008.
15 Q.   And describe for me the circumstances
16 under which you were brought into the case?
17 A.   Lieutenant Carrega from the Essex County
18 Prosecutor's Office contacted my unit looking for
19 any assistance or any reports that we might have
20 had from the prior involvement in this case.
21 Q.   And when Lieutenant Carrega contacted
22 your unit, would that have been the Missing Persons
23 Unit that you were working in?
24 A.   Yes.
25 Q.   And did you speak directly with

---

Tietjen - Direct/Bonjean                                    Page 34

1  Lieutenant Carrega when he called?
2  A.   That -- I have to look and see.  I think I
3  spoke to him later that date and set up a meeting
4  with him.  It was May 2nd when he called here, and
5  then I think -- I would have to turn to the next
6  page to see the exact date when I spoke to him.
7  Q.   Why don't we go ahead and mark your
8  report now so that we can have that at your
9  disposal.
10    MS. BONJEAN: It is going to be, for
11 everyone else, I believe it's, "Tietjen Sup
12 6/25/2009."  And if you could mark that, Audrey,
13 as Tietjen-2, I guess.
14    (Tietjen-2, Tietjen supplementary
15 report dated 6/25/09, Bates ECPO 1343 through
16 1361, was received and marked for identification.)
17 Q.   If you can pull that out and refer to
18 it to the extent you need it.  Okay?
19 A.   Yes.
20 Q.   Okay.  I'm first going to have you
21 looked at what's now been marked as Tietjen-2, and
22 I'm going to represent it bears a Bates stamp at
23 the bottom that says, ECPO 001343 on the first
24 page.  Is that what you're showing as well,
25 Sergeant?

---

Tietjen - Direct/Bonjean                                    Page 35

1  A.   Yes, yes.
2  Q.   Okay.  I just want to make sure that
3  we have the same document.  And it is a report that
4  is 19 pages; is that right?
5  A.   Yes.
6  Q.   Okay.  Can you please identify this
7  report?
8  A.   It's a supplemental investigation report
9  that I authored.
10 Q.   All right.  And this is your report;
11 right?
12 A.   Yes.
13 Q.   And it has your signature on every
14 page actually of this report; correct?
15 A.   Yes.
16 Q.   And you used the New Jersey State
17 Police formatting for reflecting your work in this
18 case; am I correct about that?
19 A.   Yes.
20 Q.   All right.  So I am going to refer
21 you to the first page, and there is some boxes that
22 are on the first half of the page, but at the
23 bottom it looks like it starts sort of a narrative
24 of the work you did in connection with this
25 investigation.  Is that a fair characterization?

---

Tietjen - Direct/Bonjean                                    Page 36

1  A.   Yes.
2  Q.   All right.  And I notice that the
3  report is dated 6/25/2009.  Do you see that?
4  A.   Yes.
5  Q.   Obviously, it reflects work that you
6  did in May of 2008 and dates prior to June of 2009.
7  Do you see that?
8  A.   Yes.
9  Q.   How did this report get prepared?
10 I'll just leave the question as open-ended as that.
11 How did it get prepared?  If you understand.  I can
12 clarify if you don't.
13 A.   I typed the report for areas of the
14 investigation that I was involved in.
15 Q.   Did you type the report on or around
16 June 25th of 2009?
17 A.   Yes.
18 Q.   Okay.  And all of the information
19 that is reflected in this report that reflects law
20 enforcement activity or investigative work that
21 predated June 25th, 2009, did you get that
22 information from your memory, or how did you
23 memorialize information?
24 A.   I had notes.
25 Q.   So there were original notes that you

---

Tietjen - Direct/Bonjean                                      Page 37

1  had?
2  A.  Yes.
3  Q.  How did you take notes back in, I
4  guess, May of 2008?
5  A.  Either on a notepad or in a, like a binder
6  pad.
7  Q.  So it was just like basically a
8  regular notebook with blank pieces of paper?
9  A.  Yes.
10  Q.  And you would memorialize your work
11  in that notebook, handwritten notes; is that --
12  A.  Yes, yes.
13  Q.  And then I assume in and around
14  June 25th, 2009, you referred back to your notes to
15  create this final document or final product; is
16  that right?
17  A.  Yes.
18  Q.  What did you do with your original
19  notes?
20  A.  Don't know.
21  Q.  Okay.  Do you know whether or not you
22  maintained them?
23  A.  Don't know.
24  Q.  Do you recall whether or not you
25  provided those notes to, the original notes, to any

Tietjen - Direct/Bonjean                                      Page 38

1  supervisor or any other individual?
2  A.  No.
3  Q.  You don't recall, or you're sure that
4  you wouldn't have given them to somebody else?
5  A.  I'm pretty positive I didn't give them to
6  anybody else.
7  Q.  Okay.  You don't remember handing
8  them over to the Essex County prosecutor; is that
9  right?
10  A.  No.
11  Q.  So once you put your information into
12  your final report, you kept your notes, but you
13  don't recall what, if anything, you did with them;
14  is that fair?
15  A.  Correct.
16  Q.  Do you know if you still have your
17  notes?
18  A.  Don't know.  I don't know.
19  Q.  Well, do you have any of your
20  notes -- well, strike that.
21      Let me ask you this.  What was your
22  habit back in 2008 in terms of maintaining your
23  original notes, if you had one?
24  A.  I would have some binders that were still
25  from different cases, just in a pile in my office,

Tietjen - Direct/Bonjean                                      Page 39

1  but I haven't looked for original notes on this
2  case.
3  Q.  Okay.  And was it your practice to,
4  once you put information from your handwritten
5  notes into a final report, that you would hold onto
6  your notes for a period of time, and not just in
7  this case, but in any case?
8  A.  No.  It would depend on what they were
9  contained within, whether be a five-subject
10  notepad that I continuously used throughout, or
11  like a pad you keep in your rear pocket or in your
12  coat pocket when you're working a job.
13  Q.  Okay.  Did you eventually destroy or
14  throw away your notes at some point?  Again, I'm
15  just going to direct you to your general habit or
16  practice during this time period of 2008?
17  A.  Notepad, the small notepad, they would have
18  been thrown away.
19  Q.  Okay.  And was there any policy or
20  practice of the department that required you to
21  turn in your handwritten notes to somebody for
22  preservation?
23  A.  Not that I can recall.
24  Q.  As you sit here today, you don't
25  recall specifically what you did with your

Tietjen - Direct/Bonjean                                      Page 40

1  handwritten notes for the missing boys
2  investigation; right?
3  A.  No, I don't recall.
4  Q.  But it sounds like it's possible that
5  you may still have them; is that correct?
6  A.  I don't know.
7  Q.  Okay.  Would you mind looking?
8  A.  I guess I could try to look, yeah.
9  Q.  Right.  Thank you.  I would ask that
10  you, if you could, look for any original
11  handwritten notes that you might have and then let
12  your attorney know so they can let me know.  Okay?
13  A.  Okay.
14  Q.  Looking at Tietjen-2, in the
15  narrative section, you identified the missing young
16  men who were juveniles at the time.
17      Did you have any independent
18  knowledge about this case prior to getting
19  involved?  The missing boys.
20  A.  I think I may have seen a news article on
21  it at some point, or information, but not from my
22  recollection.
23  Q.  And you also saw that there were
24  suspects -- or you also list that there were
25  suspects, Lee Evans and Philander Hampton; right?

Evans v.
Newark City
Video Deposition

Tietjen - Direct/Bonjean                                    Page 41

1  A.  Correct.
2  Q.  And, again, this would have been
3  information that you obtained when you were first
4  assigned to the case, I assume, since it's the
5  start of your narrative; is that right?
6  A.  No.
7  Q.  I'm sorry?
8  A.  No, that's not true.
9  Q.  Okay.  So what -- explain to me how
10  the information got here at the beginning of your
11  narrative?
12  A.  The spot where we would list suspects on
13  our report?
14  Q.  Yeah.
15  A.  So throughout that time from May of 2008
16  through the end of this report, those two
17  individuals became suspects at some point in
18  there.
19  Q.  I see.  So this information that I
20  will say is above the date, May 2nd, 2008, is
21  information for summary information that you
22  included when you prepared the report back in June
23  of 2009, and for the record, that is your
24  collective belief or understanding of the case;
25  right?

Tietjen - Direct/Bonjean                                    Page 42

1  A.  Yes.
2  Q.  All right.
3      (Reporter requested clarification.)
4  Q.  I'm still on the first page of your
5  report.  There is a narrative section that is
6  preceded by the date May 2nd, 2008.  Do you see
7  that?
8  A.  Yes.
9  Q.  Now, what happened on May 2nd, 2008?
10  A.  That is the day that Lieutenant Carrega
11  contacted my unit.
12  Q.  And when you say contacted your unit,
13  do you recall if he spoke to you or someone else?
14  A.  No.  He spoke to my assistant unit head at
15  the time.
16  Q.  And was that Jones?
17  A.  Yes.
18  Q.  And do you know whether or not
19  Mr. Jones -- well, strike that.  I'm sorry.
20      Did you have any conversations with
21  Lieutenant Carrega on May 2nd of 2008?
22  A.  Yes.
23  Q.  Okay.  So what was your understanding
24  of what Carrega told Jones?
25  A.  That he was looking for assistance with

Tietjen - Direct/Bonjean                                    Page 43

1  this investigation and possibly looking to see if
2  he had reports on it.
3  Q.  So was his interest primarily to see
4  what sort of paperwork the state police had
5  generated in connection with the case previously?
6  A.  I don't know.  He contacted for general
7  assistance with the case.
8  Q.  What does general assistance mean to
9  you?
10  A.  It would be somebody just calling, an
11  agency calling to see if we, number one, had
12  anything, if we knew of anything, and then
13  potentially if we could offer them anything, or
14  any assistance on the case.
15  Q.  Okay.  And you said that you did
16  eventually speak with Lieutenant Carrega yourself
17  on May 2nd, 2008?
18  A.  Yes.
19  Q.  And was that in a subsequent
20  conversation, or did Jones hand you the phone, or
21  how did that work?
22  A.  I do not recall that.
23  Q.  Okay.  Tell me what you recall about
24  your conversation with Lieutenant Carrega on May
25  2nd of 2008?

Tietjen - Direct/Bonjean                                    Page 44

1  A.  We set up -- agreed to meet on May 9th at
2  the Essex County Prosecutor's Office.
3  Q.  What else did he tell you about the
4  case?
5  A.  That -- he told me that he had a main
6  suspect in the case of Lee Evans.
7  Q.  Did he tell you anything else about
8  the case?
9  A.  Not on that date, no.
10  Q.  Now, I know you are looking at your
11  report --
12  A.  Sure.
13  Q.  -- to refresh your recollection, and
14  that's fine.  I would just ask, though, that you
15  also think about whether you have any additional,
16  independent recollection of information that may
17  have been communicated that is not reflected here
18  because, for whatever reason, maybe you didn't
19  think it was important to put in here.
20      So, apart from what you have read on
21  this report, can you think of any other information
22  that Lieutenant Carrega provided to you during your
23  phone conversation on May 2nd of 2008?
24  A.  No.
25  Q.  Do you recall whether in that phone

Evans v.
Newark City

Video Deposition

---

Tietjen - Direct/Bonjean                                    Page 45

1  conversation he told you that he wanted you
2  actively involved in the investigation or asked
3  whether you would be interested in being involved
4  in the investigation?
5  A.  No.
6  Q.  Did he explain to you who was in
7  charge of the investigation?
8  A.  He was.
9  Q.  How did you -- well, strike that.
10  He told he was in charge of the
11  investigation or leading the investigation?
12  A.  He was -- he expressed to me he was on the
13  Cold Case Unit for the Essex County Prosecutor's
14  Office looking at this case, so that would mean he
15  was the lead of that aspect.
16  Q.  Did he tell you who else was
17  participating in this cold case investigation?
18  A.  Not that I recall.
19  Q.  Were you aware whether or not the
20  Essex County Prosecutor's Office had a Cold Case
21  Unit?
22  A.  No.
23  Q.  Were you familiar with the concept of
24  a Cold Case Unit back in 2008?
25  A.  Yes.

---

Tietjen - Direct/Bonjean                                    Page 46

1  Q.  Okay.  What was your understanding of
2  what a Cold Case Unit does?
3  A.  That you would review cases that have
4  extended beyond a certain period of time,
5  typically identified by the department, at the
6  time of it.  It would then go into a Cold Case
7  Unit.  Whether it be Cold Case Missing Persons,
8  Homicide, or Unidentified Remains.
9  Q.  And Lieutenant Carrega told you that
10  they had a main suspect Lee Evans.  Did he mention
11  any other suspects in the case other than Lee Evans
12  when he first spoke to you on May 2nd, 2008?
13  A.  No, he did not.
14  Q.  Did he mention how long the
15  investigation had been going on since it had been
16  reopened, if that makes sense?
17  A.  No.
18  Q.  I guess the better way to ask the
19  question is did he tell you how long he had been
20  working on this cold case prior to contacting you?
21  A.  No.
22  Q.  Did he indicate to you any theories
23  about how he thought that the boys had either been
24  murdered or had gone missing during this first
25  conversation?

---

Tietjen - Direct/Bonjean                                    Page 47

1  A.  No.
2  Q.  He just said he believed that Lee
3  Evans was the main suspect, and that was pretty
4  much the extent of his -- the conversation?
5  A.  Well, I can't recall the exact
6  conversation, but he had mentioned that Lee Evans
7  was a suspect in their disappearance.
8  Q.  But you don't recall him mentioning
9  anybody else as a suspect?
10  A.  No.
11  Q.  Now, it looks like that you -- he
12  asked you to do something because you did some
13  investigative work subsequent to that conversation;
14  right?
15  A.  Yes.
16  Q.  What did you do?
17  A.  On May 8th, he contacted me again, and he
18  was looking to speak to a potential witness,
19  Philander Hampton.
20  Q.  I noticed in your report, if you look
21  at page 2, you did do some, I guess, research into
22  the --
23  (Connectivity issues.)
24  MR. VOMACKA: The audio cut off.
25  Would you repeat that?

---

Tietjen - Direct/Bonjean                                    Page 48

1  MS. BONJEAN: Sure, yes.
2  Q.  Sergeant Tietjen, according to your
3  report on page 2, it looks to me as if you did some
4  research looking into the files that the state
5  police may have had related to these missing boys;
6  is that right?
7  A.  Yes.
8  Q.  Okay.  And did you do that because
9  you were asked to do that, or did you do that just
10  on your own as part of your inquiry?
11  A.  That would be on my own.
12  Q.  Did Lieutenant Carrega ask you to
13  confirm, or try to find information that might
14  confirm, whether or not the boys were still alive,
15  or was it assumed that they were dead at that
16  point?
17  A.  I believe we had a conversation at some
18  point.  I don't know which day.  I know I checked
19  Experian, which was a social security number
20  search, as well as reviewing the entries.
21  Q.  Right.  And I see that on the second
22  page of your report, you mention that you looked at
23  Experian.  You said, Refer to Experian search
24  results.  What was the purpose in looking at
25  Experian?

---

Evans v.
Newark City

Video Deposition

---

Tietjen - Direct/Bonjean                                                    Page 49

1  A.  It would list if they had credit, the
2  social security numbers that were included in the
3  missing persons entry, or had like a credit
4  report.
5  Q.  And why would that be important
6  information to develop?
7  A.  That would be potentially indicative of
8  either somebody using their number or them using
9  the number, whether their true name or on another
10 name.
11 Q.  And if they were using their number,
12 what would that tell you?
13 A.  It would just list that they had credit to
14 a specific address.  Potentially a spouse as well.
15 Q.  Would it also give you some
16 indication as to whether they were alive?
17 A.  That their number potentially is alive,
18 yes.
19 Q.  That's the reason you were looking;
20 right?
21 A.  Yes.
22 Q.  Now, it says here that you, on the
23 second page, that you contacted Lieutenant Carrega,
24 and you agreed to meet on May 9th, 2008, at the
25 Essex County Prosecutor's Office.

---

Tietjen - Direct/Bonjean                                                    Page 50

1      It says, "Lieutenant Carrega advised
2  that the main suspect in this investigation is Lee
3  Evans," who you've identified here.
4      You did then have a meeting face to
5  face with Lieutenant Carrega on May 8th; is that
6  right?
7  A.  No.
8  Q.  May 9th?
9  A.  May 9th.
10 Q.  Okay.  Am I correct that even before
11 that meeting on May 9th, you had another
12 conversation with Lieutenant Carrega on May 8th?
13 A.  Yes.
14 Q.  What was the nature of that
15 conversation?
16 A.  He contacted me and he advised he was
17 looking for information on an individual that he
18 wanted to speak to.
19 Q.  And who was that individual that
20 Lieutenant Carrega wanted to speak to when he spoke
21 to --
22 A.  Philander Hampton.
23 Q.  Okay.  I'm going to ask you to let me
24 finish my question just so the record is clear.
25 Don't worry.  It happens all the time.

---

Tietjen - Direct/Bonjean                                                    Page 51

1      One more time.  When you spoke to
2  Lieutenant Carrega on May 8th, 2008, he told you
3  some additional information.  Can you tell me again
4  what that information was?
5  A.  He advised that he was looking to interview
6  a Philander Hampton.
7  Q.  He wanted to interview a Philander
8  Hampton.  And what did he want you to do to
9  facilitate or assist him in interviewing a
10 Philander Hampton?
11 A.  It was just if I had any additional
12 databases that I had access to, to see if he could
13 locate additional information on him.
14 Q.  And did you do that?
15 A.  Yes.
16 Q.  Did Carrega explain to you why he
17 wanted to interview Philander Hampton?
18 A.  No.  Just that his name was part of the
19 investigation.
20 Q.  So at this point, you didn't really
21 have any knowledge about the case in terms of the
22 investigative work that had been conducted; you
23 were just doing some tasks that you were asked to
24 by Lieutenant Carrega up until May 8, 2008; is that
25 right?

---

Tietjen - Direct/Bonjean                                                    Page 52

1  A.  Yes.
2  Q.  On May 8, 2008, I'm going to direct
3  you to this last sentence here, where you wrote, "I
4  also compared the five boys' physical information
5  to that of unidentified human remains recovered in
6  New Jersey, since their disappearance, but was
7  unable to locate any viable matches."
8      How did you do that?
9  A.  Repeat the end of that question?
10 Q.  How did you do that?  What was that
11 work that you did?
12 A.  We maintain a database, both paper and
13 spreadsheets of all our unidentified remains in
14 New Jersey.  And there's data that's collected on
15 the entry that is part of that spreadsheet, so
16 you're able to look through for remains that would
17 be of a potential match to height, weight, year,
18 dates found, date of death, et cetera, and
19 locations of the find as well.
20 Q.  And when you were putting in the
21 information, were you using the boys' physical
22 appearances as of the date they went missing?
23 A.  Yes.  And I'm not putting it in.  I'm
24 looking at that information with that reflective
25 information.

---

Evans v.
Newark City

Video Deposition

Tietjen - Direct/Bonjean                                    Page 53

1  Q.   Okay.  So when you were doing that
2  analysis or that investigative -- strike that
3      When you were looking at this data,
4  you were using the age and date, or the age and
5  physical appearances of the boys from the date that
6  they went missing; correct?
7  A.   Yes.
8  Q.   You were looking for like teenage
9  boys, you weren't looking for grown men; am I
10  right?
11  A.   Yes.
12  Q.   And, again, that would be working
13  under the assumption, of course, that they actually
14  died in and around the time that they went missing;
15  correct?
16  A.   Yes.
17  Q.   All right.  Now, on May 9th, you did
18  have that meeting with Lieutenant Carrega of the
19  Essex County Prosecutor's Office; is that right?
20  A.   Yes.
21  Q.   And just to be clear, the narrative
22  that you have written about that meeting as
23  reflected in your report came from your notes, not
24  from your memory; is that right?
25  A.   Yes.

Tietjen - Direct/Bonjean                                    Page 54

1  Q.   And they came from your notes that
2  had been taken a year earlier; right?
3  A.   Yes.
4  Q.   Did you prepare any reports
5  contemporaneous with your investigative work?
6  A.   I don't know when I started typing this
7  report.  The date reflects the completion of the
8  report.
9  Q.   Um-hum.
10  A.   I don't know when I started typing.  I
11  could have started typing it months before.
12  Q.   But not years before, not a year
13  before?
14  A.   I don't know.
15  Q.   Well, I mean you testified earlier
16  that that the report, which starts off with this
17  "Additional Missing Juveniles" and "Suspects" was
18  information that you put in after June 25th, or
19  around June 25, 2009; right?
20  A.   Well, the report was completed June 25th,
21  2009, yes.
22  Q.   Right.  And I asked you earlier about
23  the first part of the narrative where it says
24  "Suspects" and "Additional Missing Juveniles."
25  Right?

Tietjen - Direct/Bonjean                                    Page 55

1  A.   Yes.
2  Q.   And I asked you was that information
3  that you had as of May of 2008, and you said no,
4  that would have been, you know, after all of the
5  investigative work you did, that's where you
6  included that; is that right?
7  A.   Yes.
8  Q.   So would that lead you to believe
9  that you did not start preparing this report until
10  close in time to June 25th of 2009?
11  A.   Probable somewhere within months of that
12  date.
13  Q.   Okay.  Now, without looking at your
14  report first, let's just go based off memory, tell
15  me what you remember about your meeting on May 9th,
16  2008, with Lieutenant Carrega?
17  A.   I met with Lieutenant Carrega.  He
18  expressed his thoughts on the case, his concerns
19  about Lee Evans, and the early processes of the
20  investigation, that he still felt Lee Evans was a
21  suspect in the case.
22  Q.   Who else was present for that
23  meeting?
24  A.   I don't recall.
25  Q.   Were there other people present?

Tietjen - Direct/Bonjean                                    Page 56

1  A.   I don't believe so.  I'd have to look at
2  the notes -- I mean, I would have to look at my
3  report to see if there was, but I don't believe
4  there was.
5  Q.   Okay.  And did he express to you
6  during that meeting any other leads that he was
7  looking at other than Lee Evans?
8  A.   Not that I recall.
9  Q.   Okay.  How long did the meeting last?
10  A.   I don't know.
11  Q.   Well, was it like a five-minute
12  meeting, or was it a protracted meeting where he
13  explained to you, you know, a little bit about the
14  prior investigation and what they were doing up
15  until that point in May of 2008?
16  A.   It probably would have been about an hour.
17  Q.   All right.  Did you leave the meeting
18  with an understanding of what the case was about?
19  A.   To the best of my ability, yes.
20  Q.   All right.  And, again, what you have
21  contained in your written report, you pulled off
22  your notes that you took during the meeting?
23  A.   Yes.
24  Q.   What did Lieutenant Carrega say to
25  you about why he still believed that Lee Evans was

| Tietjen - Direct/Bonjean | Page 57 |
|---|---|

1 the prime suspect in the case?
2 A.  The case had identified him early on from
3 the date of who the boys were last with and that
4 he still believed that information to be true.
5 Q.  Apart from the fact that Lee Evans
6 was with the boys shortly before they disappeared,
7 was there any other factual information that he
8 provided to support his view that Lee Evans was the
9 main suspect in the case?
10 A.  I mean we discussed other steps throughout
11 the investigation that still pointed to Lee Evans.
12 Q.  Like what?
13 A.  Additional interviews, reviewing of
14 interviews.  He discussed the polygraph that Lee
15 Evans had taken.
16 Q.  Well, what interviews did he identify
17 led him to believe that Lee Evans was responsible
18 for the boys' disappearance and presumed death?
19 A.  I don't recall.  It was a generalization of
20 the case stuff that he had.
21 Q.  Did you take any notes about those
22 specifics?
23 A.  No, not more specific than that.
24 Q.  So as you sit here today, you can't
25 identify for me any specific interview that he

| Tietjen - Direct/Bonjean | Page 58 |
|---|---|

1 referenced that provided a factual basis to believe
2 that Lee Evans was the main suspect, at least as of
3 May 9, 2008?
4 A.  No.
5 Q.  Anything else that sticks out in
6 terms of why Carrega believed that Lee Evans was
7 the prime suspect, again, other than the fact that
8 he was one of the last people to have been seen
9 with the boys allegedly?
10 A.  No.
11 Q.  And you mentioned the polygraph.
12 It's true that Mr. Evans had submitted to a
13 polygraph examination back in 1978; right?
14 A.  I had not seen the report, but that's what
15 I was told, yes.
16 Q.  And, allegedly, he passed that
17 polygraph; correct?
18 A.  Yes.
19 Q.  Now, it says in your report that
20 during your meeting with Carrega on May 9th, 2008,
21 that there was a later examination of this 1978
22 polygraph chart by outside experts and that there
23 was a new view that he actually failed the test; is
24 that right?
25 A.  Yes.

| Tietjen - Direct/Bonjean | Page 59 |
|---|---|

1 Q.  All right.  Okay.  Did you see any
2 reports from any experts that gave this new view
3 that he had failed the test?
4 A.  No.
5 Q.  Did Lieutenant Carrega explain to you
6 how he came to have new experts look at the
7 polygraph results?
8 A.  No.  I believe it was prior to his even
9 involvement in the case that this review was done.
10 Q.  Do you know who conducted the review?
11 A.  I believe it's in one of the reports, but I
12 don't recall.
13 Q.  And do you have an understanding of
14 how polygraph tests work?
15 A.  Yes.
16 Q.  Do you find them to be a useful law
17 enforcement tool?
18 A.  Yes.
19 Q.  You know, of course, that the results
20 are inadmissible; right?
21 A.  Yes.
22 Q.  They were used pretty readily in this
23 investigation; would you agree with that?
24 A.  Yes.
25 Q.  And would you agree that polygraphs,

| Tietjen - Direct/Bonjean | Page 60 |
|---|---|

1 to the extent that they are useful, are only as
2 useful as the competence of the person
3 administering them?
4 A.  Yes.
5 Q.  And how is it that -- or explain to
6 me how is it that a second person could look at a
7 polygraph examination and reach a different result?
8 Is that plausible?
9 A.  I don't know enough about what the results
10 they would look at to say.
11 Q.  But isn't part of reading a polygraph
12 result connected to actually administering the
13 polygraph test?
14 A.  They have some data that's set up from the
15 test, I would imagine.  I've seen non recent
16 polygraphs, and you look at charts of the
17 interview with reference to the questions they
18 asked and by your responses, but I don't know what
19 was done in 1978.
20 Q.  Have you ever heard of a situation
21 where a polygraph examination is conducted and the
22 results are interpreted by the person who
23 administered the test, but then later a different
24 expert reaches a different conclusion about those
25 polygraph results?  Aside from this case, have you

Evans v.
Newark City

Video Deposition

Tietjen - Direct/Bonjean                                    Page 61

1   ever heard of that?
2   A.  I don't recall.
3   Q.  And, again, in your work as 25 years
4   as a law enforcement officer, have you ever heard
5   of a single other circumstance where a polygraph
6   expert who did not administer a test later came and
7   reviewed the reports of a previously-given
8   polygraph and reached a different result?
9   A.  I can't recall a case, no.
10  Q.  Do you know if that's in keeping with
11  law enforcement standards?  National standards,
12  we'll say?
13  A.  I don't know what any of the Polygraph Unit
14  in our agency, and I don't know much about what
15  was done back then.
16  Q.  I'm talking about now.  Is that
17  something that you have seen done in say the last
18  five years?
19  A.  Like I stated, I'm not in our Polygraph
20  Unit, so if the supervisors review their charts to
21  concur or differ -- I've used polygraphs in the
22  past, but I have not administered them, and
23  certainly not every one of the, you know,
24  responses from being truthful and honest or
25  accepted, so that's... I mean, people are trying

Tietjen - Direct/Bonjean                                    Page 62

1   to do tricks to try to alter the test as well.
2   But beyond that, I don't know who reviews or what
3   type of policy there is in place to verify that
4   that polygraphist got a accurate response or came
5   up with an accurate solution to that.
6   Q.  Have you administered a polygraph
7   test yourself?
8   A.  No.
9   Q.  So it sounds like you've used them,
10  you've worked with them, but you wouldn't consider
11  yourself an expert; is that fair?
12  A.  My use has --
13      (Reporter requested clarification.)
14  A.  Just calling one of the polygraphist in our
15  unit to perform the test.  That would be as far as
16  my involvement.
17  Q.  Okay.  You indicate in your police
18  report marked as Tietjen-2 that during this
19  meeting, Lieutenant Carrega indicated that he
20  wanted to re-interview Lee Evans and also
21  re-interview all persons who were involved in the
22  case since 1978; is that accurate?
23  A.  Yes.
24  Q.  And did he indicate during the
25  meeting that he wanted you to participate in those

Tietjen - Direct/Bonjean                                    Page 63

1   interviews?
2   A.  I offered my assistance, and he accepted.
3   Q.  Okay.  And did he explain to you who
4   else was on this team for re-investigating the
5   missing boys?
6   A.  At some point, Detective Joe Hadley and
7   Agent Eutsey were introduced to me, but I don't
8   know what date.
9   Q.  What was your understanding of who
10  had handled the investigation prior to Lou Carrega
11  taking it up?
12      MR. LIPSHUTZ: Objection to the form
13  of the question.  You can answer it, sir.
14  A.  Repeat the question, please.
15  Q.  Yes.  What was your understanding of
16  who had handled the investigation of the missing
17  boys prior to 2007/2008 when Lieutenant Carrega
18  undertook that investigation?
19  A.  The Newark Police Department.
20  Q.  One of your responsibilities, it
21  looks like, was to obtain DNA samples from
22  surviving family members; is that correct?
23  A.  Yes.
24  Q.  What was the purpose in doing that?
25  A.  It's to identify remains of missing people

Tietjen - Direct/Bonjean                                    Page 64

1   that were already recovered that we have DNA
2   samples from.
3   Q.  Would you agree that --
4   A.  Patricia's Law --
5      (Reporter requested clarification.)
6      MS. BONJEAN: I think he said it was
7   Patricia's Law.
8   Q.  Is that right?
9   A.  Patricia's Law was signed in March of that
10  year 2008, which required us to assist or to get
11  DNA for long-term missing persons cases.  And at
12  the time of the signing, it was 30 days is what
13  they termed a long-term case.
14  Q.  Okay.  Would you agree that one of
15  your primary goals, or the team's primary goal, at
16  least as communicated to you by Lieutenant Carrega,
17  was to try to actually find the human remains of
18  these boys, if you could; right?
19  A.  That would be a goal, yes.
20  Q.  Now, after -- strike that.
21      What else, if anything, do you recall
22  about the meeting with Lieutenant Carrega on
23  May 9th, 2008?
24  A.  Not much more than that.
25  Q.  Did he provide you with any materials

Tietjen - Direct/Bonjean                          Page 65

1   to look at?
2   A.  Not on that date, I don't believe.
3   Q.  At some point did he provide you with
4   some?
5   A.  Yes.
6   Q.  Now, I notice your next entry on your
7   report says on May 16, 2008, you conducted an
8   in-depth review of a copy of a case file that was
9   provided to you by Lieutenant Carrega; right?  Is
10  that a yes?
11  A.  Yes.
12  Q.  Okay.  So does that lead you to
13  believe that Lieutenant Carrega provided you with a
14  copy of the case file prior to May 16, 2008?
15  A.  Yes.
16  Q.  And do you remember how he provided
17  that to you?  Was it in paper form, electronic
18  form?
19  A.  I believe it was paper form.
20  Q.  And how large was the case file to
21  best of your recollection?
22  A.  It was whatever, a brown large, like, legal
23  envelope.  You know, like, a file envelope.  It
24  was probably six inches in depth and height.
25  Q.  And what generally was contained

Tietjen - Direct/Bonjean                          Page 66

1   within the case file?
2   A.  Case notes on each of the people
3   identified, any available Newark Police Department
4   reports that were generated from back in 1978 and
5   throughout, some newspaper articles, different
6   statements of individuals as well.
7   Q.  Interviews?
8   A.  Yeah, interviews in written form.
9   Q.  Got it.  And you said you conducted
10  an in-depth review of the case file.  What do you
11  mean by that?  What did you do?
12  A.  I went through it, what was provided to me,
13  to get an understanding of what was done from day
14  one through.
15  Q.  Does that mean you read the reports?
16  A.  Yes.
17  Q.  Looked at the interviews?
18  A.  Yes.
19  Q.  And why did you believe it was
20  important to look at the prior case file in
21  connection with your involvement?
22  A.  Well, my own understanding of the case.
23  Q.  Did you want to know what had been
24  done prior to your involvement in the case?
25  A.  Yes.

Tietjen - Direct/Bonjean                          Page 67

1   Q.  Did you want to see what evidence had
2   been developed prior to May of 2008?
3   A.  Yes.
4   Q.  Were you interested in seeing what
5   evidence specifically had been developed against or
6   related to Lee Evans?
7   A.  Yes.
8   Q.  All right.  Did Lieutenant Carrega
9   tell you during your meeting either on May 9th, or
10  any time prior to your review of the case, any of
11  the other witnesses that he was interested in
12  interviewing or re-interviewing?
13      MS. ROSEN: Objection to form.
14      MS. BONJEAN: I'm sorry.  What did
15  you say?
16      MS. ROSEN: Objection to form.  You
17  can answer it.
18  A.  He advised that he wanted to re-interview
19  all those that were available to re-interview.
20  Q.  Okay.  Did you get the sense in May
21  of 2008 that this was the beginning of his
22  investigation, that he had not done too much work
23  prior to this date?
24  A.  No.  No, he indicated that he had worked on
25  this.

Tietjen - Direct/Bonjean                          Page 68

1   Q.  How long did he independent -- for
2   how long had he worked on it, to the best of your
3   recollection?
4   A.  I do not recall.
5   Q.  But it was your belief that he had
6   been working on it before he spoke with you; is
7   that right?
8   A.  Yes.
9   Q.  Do you know who he was working on the
10  case, investigating the case with?
11  A.  I believe Agent Eutsey, but that's a
12  recollection issue if he was or not.
13  Q.  And that's Detective Jack Eutsey, a
14  Newark police officer; is that correct?
15      MR. LIPSHUTZ: Objection to form.
16  Sorry.  You can answer it, sir.
17  A.  He was an agent of the Essex County
18  Prosecutor's Office at the time.
19  Q.  Right.  So -- and let me clarify.
20  Was it your understanding that Detective Eutsey had
21  retired from the Newark Police Department but had
22  joined the Essex County Prosecutor's Office as an
23  investigator?
24  A.  Yes.
25  Q.  All right.  And so Detective Eutsey

Video Deposition

---

**Tietjen - Direct/Bonjean**                                      Page 69

1   at the time that this investigation had, we'll say,
2   recommenced was already working for the
3   prosecutor's office; correct?
4   A.  Yes.
5   Q.  Did Lieutenant Carrega explain to you
6   what role, if any, Newark Police Department would
7   have in this reinvestigation of the missing boys
8   that started sometime before May of 2008?
9       MR. LIPSHUTZ: I'm going to object to
10  the form of the question.  You can answer it, sir.
11      MR. VOMACKA: I'll join the objection
12  as to form.  You can answer.
13  A.  The role of Newark was --
14      (Reporter requested clarification.)
15  A.  The role of Newark Police Department was
16  explained to me -- I don't know if exactly that
17  date -- that they had a detective from Newark who
18  was going to assist as well, and that was later
19  identified as Joe Hadley.
20  Q.  What about Detective Henry, or
21  Sergeant Henry, I believe, maybe at the time, what
22  was your understanding of what his role would be,
23  if any?
24  A.  Early on, I believe he was Detective
25  Hadley's supervisor, and then he became involved

---

**Tietjen - Direct/Bonjean**                                      Page 70

1   as 2008 progressed.
2   Q.  Okay.  Did you have an understanding
3   of whether or not there had been prior efforts to
4   reinvestigate this case after the initial
5   investigation went cold?
6   A.  There was many entries in the notes, and I
7   knew we didn't have all the reports.  I was
8   advised there were other attempts to investigate,
9   but the reports were not provided.
10      MS. BONJEAN: Okay.  I am going to
11  mark as an exhibit, and if anyone needs a break,
12  let me know.  We can definitely break at any
13  point.  I am going to mark as Tietjen-3 what I
14  believe is listed as the "Hairston reports," and
15  if you could pull that out.
16      (Tietjen-3, Hairston reports, Bates
17  ECPO 003548 through 003586, was received and
18  marked for identification.)
19  Q.  It should have a Bates stamp at the
20  bottom right-hand corner that reflects ECPO 003548.
21  Do you see that collection of materials?
22  A.  No.
23  Q.  Okay.
24  A.  I have a Newark 60 the bottom of the form I
25  have for Hairston.

---

**Tietjen - Direct/Bonjean**                                      Page 71

1   Q.  There is a "Hairston to from" and a
2   "Hairston reports."
3       Yeah, you were looking at the
4   Hairston.  You can keep that handy.  We're going to
5   look at that shortly but...
6   A.  I have ECPO 003548.
7   Q.  Yes.  And that's been marked as
8   Tietjen-3.
9       Sir, do you recognize this collection
10  of materials?
11  A.  Yes.
12  Q.  And what do you recognize this to be?
13  A.  Just materials of the reports dating back
14  to 1978.
15  Q.  Does this appear to you to be a
16  collection of police reports that were prepared
17  from the date on which it was at least reported
18  that the boys had gone missing?
19  A.  Yes.
20  Q.  And can you tell from looking at this
21  report who the lead detective -- or who the
22  detective was that was responsible for preparing
23  these reports?
24  A.  Detective Edward Hairston.
25  Q.  Did you know Detective Edward

---

**Tietjen - Direct/Bonjean**                                      Page 72

1   Hairston?
2   A.  No.
3   Q.  Have you ever met him?
4   A.  No.
5   Q.  I believe he's deceased.  I could be
6   wrong.  Do you know if he's deceased?
7   A.  No.
8   Q.  Now, would these reports be documents
9   that you reviewed in connection with your in-depth
10  review of the case file on May 16, 2008?
11  A.  If they were all complete, the copy in
12  front of me, yes.
13  Q.  And, again, I know you can't say
14  whether or not what you've been provided right this
15  second is exactly what you had in your case file,
16  but do you have a recollection of reviewing reports
17  that were prepared back in 1978 in connection with
18  the missing boys?
19  A.  Yes.
20  Q.  And do you have a recollection of
21  reviewing reports that had been prepared by
22  Detective Hairston?
23  A.  Yes.
24  Q.  Okay.  Now, I'll have you look at the
25  other document you pulled out, which is a Hairston,

---

Evans v.
Newark City

Video Deposition

---

Tietjen - Direct/Bonjean                                                   Page 73

1  I'm going to call it a -- I call it a "to from"
2  report.  Do you have that handy?
3       (Tietjen-4, Bates Newark 60 through
4  62, was received and marked for identification.)
5  Q.  I'm going to have you look at
6  Tietjen-4.  Tell me if you recognize this document?
7  And by the way, the Bates stamp on this is Newark
8  60 through 62.
9  A.  I don't recall reviewing this document.
10 Q.  I'm sorry?
11 A.  I don't recall reviewing this document.
12 Q.  You don't recall ever reviewing this
13 document?
14 A.  No.  I recall hearing about it.  I don't
15 recall reviewing it.
16 Q.  Well, I'm just going to, for the
17 record, indicate that it appears to be, correct me
18 if I'm wrong, a report from Detective Hairston to
19 Lieutenant John Murphy, and it's dated March 15th,
20 1979; right?
21 A.  Yes.
22 Q.  Okay.  I'm going to give you a
23 chance, if you could, if you could just take a look
24 at it and let me know, take as much time as you
25 want --

---

Tietjen - Direct/Bonjean                                                   Page 74

1  A.  I read through it last night.
2  Q.  Okay.  Great.  You're saving yourself
3  and all of us time.  And so, again, I'll ask you,
4  having read it last night, you don't remember ever
5  seeing this report; is that right?
6  A.  Not the -- well, I remember a psychic was
7  involved at some point.
8       (Reporter requested clarification.)
9  A.  I remember at some point in the
10 investigation a psychic had been involved in the
11 case, and it mentioned things, but I don't
12 remember seeing this actual document.
13 Q.  And what do you remember about the
14 psychic being involved in the case?
15 A.  I mean, I read through this last night.  I
16 was intrigued on this.  She mentioned about a fire
17 in here, but I don't recall specifics of what was
18 stated to me early on the case.
19 Q.  When do you first recall hearing
20 about a psychic being used in the case, if you --
21 A.  I don't, I don't know.  No, I can't even
22 recall.
23 Q.  Do you recall having any
24 conversations with Lieutenant Carrega about the
25 psychic being used in the case?

---

Tietjen - Direct/Bonjean                                                   Page 75

1  A.  He was probably the one who told me about
2  it, but I don't recall the conversation.
3  Q.  And do you recall, whenever that
4  conversation took place, that a psychic had been
5  used and had referenced that the boys may have
6  perished in a fire?
7  A.  I don't recall when that conversation would
8  have taken place.
9  Q.  But do you remember at some point
10 hearing that substantive conversation?
11 A.  I don't believe I remember anything about a
12 fire.  Just that a psychic -- I mean, psychics
13 call at the time of missing persons cases, and I
14 don't put much value in what they say.  It's noted
15 typically, but it's so vague and generic.
16 Typically, they cover so many different
17 possibilities that the scenario sometimes can have
18 different links throughout.  You know, they give
19 you so much vague detail.  My thought has always
20 been just in this unit, If you know where they
21 are, why aren't you out to that location pointing
22 that out to us?
23     I mean, pretty much any of our major
24 cases, we have plenty of psychics calling up with
25 all different dreams and stuff, so I don't put too

---

Tietjen - Direct/Bonjean                                                   Page 76

1  much value on what's provided by them.
2  Q.  Okay.  So your personal view is that
3  psychics don't bring a lot of value to an
4  investigation; is that fair?
5  A.  Yes.
6     MS. BONJEAN: Okay.  Give me one
7  second, if you could.  Actually, can we take a
8  two-minute break?  I think I want to pull a
9  document out that I may or may not have already
10 provided, but if we could -- let's take a
11 two-minute break and reconvene, if that's okay.
12     THE VIDEOGRAPHER: The time is 11:39
13 a.m.  Off the record.
14     (Break taken.)
15     THE VIDEOGRAPHER: The time is 11:45
16 a.m.  This begins DVD number two.  Back on the
17 record.
18 Q.  Thank you, Sergeant.  I'm going to
19 have you actually look at that larger collection of
20 Hairston reports, which I believe is marked as
21 Tietjen-3.  Let me know when you're there.
22 A.  Sure.
23 Q.  Again, these are the reports that,
24 again, if you had been provided with them, with the
25 case file, this is what you would have looked at;

---

Rizman Rapaport (973)992-7650
"When every word counts"

Video Deposition

---

1    correct?
2  A.  Yes.
3  Q.  And would you characterize this as a
4    continuation report?
5  A.  It states that on the top.
6  Q.  What is a continuation report to the
7    best of your understanding?
8  A.  It would be similar to my supplementary
9    investigation report indicating that there was a
10   prior report previous to that.
11 Q.  Do you happen to know whether or not
12   the narrative that is contained in these reports,
13   and I know that you did not prepare them, but do
14   you happen to know whether they were prepared
15   contemporaneous with the investigative conduct that
16   was being taken at the time?
17 A.  No.
18 Q.  You don't know?
19 A.  No.
20 Q.  Okay.  You will see, though, at the
21   bottom of the report is, at least on the first
22   page, is a date of September 15th, '78; right?
23 A.  Yes.
24 Q.  And that's at least three, it's at
25   least three, close -- three weeks after the boys

---

1    first are reported missing?  Can we agree on that?
2  A.  Yes.
3  Q.  Okay.  So, and it looks as if the
4    report -- that the reports that are dated 9/15 goes
5    up to page -- the first seven pages of this
6    document.  Do you see that?
7  A.  Yes.
8  Q.  And I'm just going to ask, you see at
9    the very top of first page, it says page 1, and
10   then if you count seven pages in, at the very top,
11   it says page 7?
12 A.  Yes.
13 Q.  And they are all, at least they're
14   approved as of September 15th, 1978; right?
15 A.  Yes.
16 Q.  So would it be fair to say based on
17   your experience that at least the first seven pages
18   were submitted initially at some point prior to
19   September 15th, '78, and reflected investigative
20   work that had been done prior to September 15th,
21   1978?
22      MR. LIPSHUTZ: Objection.
23 A.  Yes.
24 Q.  And is that sort of consistent with
25   how you would prepare your own reports as well, if

---

1    you were conducting a criminal investigation?
2  A.  No.
3  Q.  No?
4  A.  No.
5  Q.  Okay.  How would that differ?
6  A.  Many of our reports in the state police go
7    on months before you would type a report.  We
8    don't have an end-of-shift requirement.  Different
9    city departments will have at the end of your
10   shift, you complete all your reports, and they are
11   checked.  We don't have that.  We never have.  I
12   can type reports several months later and a set of
13   my notes and type them.  That's just the normal.
14 Q.  So it's your practice that you most
15   likely do not prepare a report until the case is
16   cleared?
17 A.  You got to repeat that again.
18 Q.  Is it your practice that you wouldn't
19   prepare a formal report until the case is cleared?
20 A.  No, I wouldn't say that's correct.
21 Q.  Okay.  Then what prompts you to file
22   a formal report in an investigation?
23 A.  It depends at what point you are in it when
24   you want to document it, what value points you
25   have that you need to note.  You know, if you're

---

1    working with other agencies, do they then want
2    that report, and what are you going to cover in
3    your report, and that's decided as well.
4  Q.  Well, I thought you just said --
5    maybe I misunderstood, though -- that an
6    investigation could go on months and months before
7    you prepared a report in a case; is that right?
8  A.  Yes.
9       (Ashley Cohen joined proceedings.)
10 Q.  And would you agree that sometimes
11   information you develop early in an investigation,
12   you may not realize the significance of that
13   information until later in the investigation?
14 A.  Yes.
15 Q.  Okay.  And how do you ensure that you
16   are memorializing all pertinent facts, or facts
17   that may become pertinent, during the course of
18   your investigation?  Is that through your notes?
19 A.  Yes.
20 Q.  And then when you sit down to do your
21   formal report, do you decide what information
22   should go into the formal report?
23 A.  You go through your notes, and you write
24   from your notes as to what you did.
25 Q.  I guess my question is do you put

---

Evans v.
Newark City

Video Deposition

| Tietjen - Direct/Bonjean | Page 81 |
|---|---|

1  everything that is in your handwritten notes into
2  the formal report, or do you decide what you
3  believe to be the relevant factual points that you
4  want to include in the formal report?
5  A.  If I am the only investigator, all of my
6  notes would go in my report.  If I'm working in a
7  group, the reports that I would cover would be the
8  ones that were assigned to me to cover, and some
9  other things --
10  Q.  And when you say assigned?
11  A.  Well, you'll see some other things in here
12  that I was involved with, and I say "refer to a
13  report," where I don't express all the notes that
14  I may have had of that day that someone else is
15  memorializing that day.
16  Q.  But how do you know that if you're
17  not preparing the report until months later?
18  A.  Do I know what?  That they're going to
19  prepare a report?
20  Q.  So what I'm asking is during the
21  course of a multi-month investigation, you are
22  preparing contemporaneous handwritten notes that
23  reflect what you're learning and what you're doing
24  through the investigation; is that right?
25  A.  Yes.

| Tietjen - Direct/Bonjean | Page 82 |
|---|---|

1  Q.  And then at some point, you sit down
2  to formalize your notes in a formalized report;
3  right?
4  A.  Yes.
5  Q.  And is that typically based on
6  somebody saying, We need you to prepare a report?
7  Maybe a supervisor or something like that.
8  A.  Yes.  And they'll be certain occurrences
9  during the inves that I don't have notes on as
10  well that someone else was taking, or taking that
11  responsibility for.
12  Q.  And would you include in your formal
13  report information that comes from someone else's
14  notes, or just your notes?
15  A.  Just my notes.
16  Q.  And correct me if I'm wrong, I think
17  you said, though, that there might be aspects of an
18  investigation that you do have notes on, but
19  because someone else is covering that piece of the
20  investigation, you would not necessarily include
21  those part of your notes into the formal report; is
22  that right?
23  A.  Yes.
24  Q.  Would you refer to the person who was
25  assigned to that part of the investigation to

| Tietjen - Direct/Bonjean | Page 83 |
|---|---|

1  ensure that they prepared a thorough and accurate
2  report based on whatever investigative work had
3  been done?
4     MR. VOMACKA: Objection to form, but
5  you can answer.
6  A.  My report would refer to their report for
7  covering that section.
8  Q.  And do you actually go look at that
9  report that you're referring to in order to make
10  sure that it actually is covering the section that
11  you're --
12  A.  No.
13  Q.  What's that?
14  A.  No.
15  Q.  Why not?
16  A.  I believe it's going to be done, you know.
17  Q.  So you're relying on the fact that
18  your colleagues are going to do their job?  Is that
19  what you're telling me?
20  A.  Yes.
21  Q.  I would like to draw -- I'm going to
22  have you look at that document.  If you could look
23  at -- it's gonna be Bates stamped ECPO 3581, but it
24  also has a little number 34 in the right-hand
25  corner, if that's easier to track.  Actually, 3580.

| Tietjen - Direct/Bonjean | Page 84 |
|---|---|

1  Let's start there.  My apologies.  So page 33.
2  A.  Okay.
3  Q.  I want to draw your attention to the
4  bottom part of the report narrative where it has a
5  date of April 3rd, 1979.  Do you see that?
6  A.  Yes.
7  Q.  And if you just could read that to
8  yourself real quick, and then I'll have some
9  questions for you.
10     Okay.  You see reference to this
11  information from the psychic again, this
12  Mrs. Dorothy Allison?
13  A.  Yes.
14  Q.  And it would appear that back in '79,
15  Detective Hairston was at least talking to her, or
16  they were trying to see what they could develop
17  through her, if anything; right?
18  A.  Yes.
19  Q.  And based on that, they actually, it
20  looks -- according to this report, you would agree
21  that they checked the Newark Fire Department for
22  fires occurring in 1978; right?
23  A.  That line is somewhat distorted.  It looks
24  like they checked one engine possibly.  I can't
25  read the number.

Evans v.
Newark City

| Tietjen - Direct/Bonjean | Page 85 |
|---|---|

1  Q.  I think it says --
2  A.  Engine 117 maybe, for fires.
3  Q.  It says, "Checked with Newark Fire
4  Department Engine" -- whatever number that is --
5  "for all fires" -- I think it says, either,
6  "especially fatalities occurring in August of
7  1978."
8      I don't know if that's accurate, but
9  that's my best guess.  But do you see that?
10  A.  Yes.
11  Q.  And you can turn the page.  And it
12  says, "Checked sites of two multiple-alarm fires.
13  15th Avenue and Bergen Street and 16th Avenue and
14  Littleton Avenue.  No reported fatalities."
15      Do you see that?
16  A.  Yes.
17  Q.  And, again, these are reports that,
18  if you had in your possession, you would have
19  reviewed during your in-depth review of the case;
20  correct?
21  A.  Yes.
22  Q.  Now, after your in-depth review of
23  the case in May of 2008, at least according to your
24  report, you started participating in interviews
25  with witnesses; right?

| Tietjen - Direct/Bonjean | Page 86 |
|---|---|

1  A.  Yes.
2  Q.  And by the way, you can put that
3  aside for now, we may reference it again.
4  A.  If you look at the date on that report,
5  it's a year after last included in that report as
6  well.
7  Q.  You're talking about the Hairston
8  report?
9  A.  Yes.
10  Q.  Uh-huh.
11  A.  So similar, that's in similar fashion as
12  well.
13  Q.  Yeah.  No, no, you're right.  That
14  seems to be the practice.
15      Okay.  Now, after looking at the
16  complete case file, did you have further
17  discussions with Lieutenant Carrega about your
18  impressions about the case?
19  A.  I believe we certainly did.
20  Q.  I'm not suggesting that you would
21  have necessarily notated every time you had a
22  conversation with Lieutenant Carrega about the
23  case, or that you should have done that, but would
24  it be fair to say that you spoke with him and other
25  members of this team on a fairly regular basis

| Tietjen - Direct/Bonjean | Page 87 |
|---|---|

1  during this period of time?
2  A.  Yes.
3      MR. LIPSHUTZ: Objection to the form
4  of that question.
5      MR. VOMACKA: Objection to form.  You
6  can answer.
7  A.  I spoke with them regularly.
8  Q.  And what's regular to you?  Daily,
9  weekly?
10  A.  I'm trying to recall if we were -- at
11  certain points, we might have been working on this
12  a couple times a week.  Sometimes it was sporadic.
13  I still had other unit responsibilities as well.
14  I would characterize it as routine, but I don't
15  know how I can break that down into a daily or a
16  weekly type of occurrence.
17  Q.  Fair enough.  Was this case a big
18  part of your responsibilities during this period of
19  time?
20  A.  It was one of my larger ones.  It took up a
21  majority of my involvement, yes.
22  Q.  And I guess this would be a good time
23  to ask, what was your understanding of how the
24  group operated in terms of -- I know you said
25  Carrega was in charge of the investigation, but who

| Tietjen - Direct/Bonjean | Page 88 |
|---|---|

1  did you report to in connection with this
2  investigation?
3      MR. LIPSHUTZ: I'm sorry, Jen, your
4  first part of your question broke up, so if you're
5  just asking him who he reported to, that's fine.
6  I heard that.  But I wasn't sure what the rest of
7  it was.
8      MS. BONJEAN: It was a bad question.
9  I'll start over.
10  Q.  Did you have to get assigned to this
11  investigation by someone from the state police
12  also?
13  A.  Dave Jones is the one who asked me to
14  contact Lieutenant Carrega.
15  Q.  And you don't have the authority as a
16  state police officer to go work on anyone else's
17  cold cases just because you want to, I assume;
18  correct?
19      MR. LIPSHUTZ: Objection to the form.
20  A.  We are able to contact them, and I can work
21  on any missing persons case right now in the state
22  that I choose to, or any member of my unit does,
23  typically to reach out to the agency by myself.
24  Q.  I mean, if you are working for the
25  state police, you're getting a salary from the

**Rizman Rappaport** (973)992-7650   **(22) Pages 85 - 88**
"When every word counts"

Evans v.
Newark City

Video Deposition

Tietjen - Direct/Bonjean                                    Page 89

1   state police, you don't get to decide which
2   investigations you want to work on without at least
3   getting approval from someone up your chain of
4   command, I assume; right?
5   A.  I don't know if that's necessarily so.
6   You're assigned cases, and then you also look for
7   cases.  Like our work in this unit is a lot of
8   what you become aware of in jobs that you have a
9   personal interest in.  Either, you know, an age
10  group that you tend to like to get involved in.
11  If it's Alzheimer's/dementia, we have members who
12  like to get involved in those cases.  And everyone
13  is allowed to work something.  Certainly,
14  supervisors can be, like, if it's not a case
15  that's worthy of time, as far as, like, if there
16  just isn't enough there, or enough there for you
17  to work, or you have other responsibilities, or
18  other cases come in, you can be both assigned both
19  cases and seek your own cases.
20  Q.  Well, when you seek out a case that
21  you want to work on, who supervises you?
22  A.  That's in our unit.  We all have -- at the
23  time, Dave Jones was my assistant, and then I had
24  Joe Glennon at the time was my sergeant.  So he
25  would be the supervisor that my reports would be

Tietjen - Direct/Bonjean                                    Page 90

1   reviewed by, but he wouldn't be with me on my
2   jobs, though.
3   Q.  Okay.  But you would still have --
4   your supervisor would still have to -- I don't know
5   what word to use -- signing off or agree that this
6   is a case that, you know, is worthy of our time,
7   and go ahead, and I'm gonna supervise you on it;
8   right?
9   A.  Yeah.  They would essentially, I guess you
10  would call it, authorize you to continue, you
11  know, and say that's worthy of our efforts.
12  Q.  Got it.  So there is an authorization
13  process.  And I assume that with this missing
14  investigation case, you did receive authorization
15  to work on this case; correct?
16      MR. LIPSHUTZ: Objection to the form.
17  A.  Yes.
18  Q.  Now, having received authorization to
19  work on the case, what was your understanding of
20  which agency's policies and/or practices you would
21  be following?
22  A.  That's not -- like, I follow my policies
23  with concerns for my stuff.  Cases, when you
24  assist other agencies, there are reporting issues,
25  and that aspect becomes very different, and I'm

Tietjen - Direct/Bonjean                                    Page 91

1   unaware of their policies, so it's whatever is
2   expressed to you.  We assist many agencies on
3   cases where our reporting is rather minimal and
4   vague because they handle all the reporting.  We
5   assist them with investigative guidance
6   essentially is how I would term it.
7   Q.  Which agency was in charge of the
8   missing persons investigation when you became
9   involved?
10      MR. LIPSHUTZ: Objection to the form.
11  A.  It's always been Newark PD's investigation.
12  The individual I was involved with was looking at
13  it from a cold case aspect, so I was reporting
14  back to him.
15  Q.  I'm sorry.  You were reporting back
16  to who?  You cut off for that.
17  A.  I was reporting to Lieutenant Carrega.  He
18  would be the one who would ask me to assist or --
19  those aspects.
20  Q.  Okay.  So would it be fair to say
21  then the policies that the investigation would be
22  subject to would then be Newark Police Department's
23  policies, to the best of your understanding?
24      MR. LIPSHUTZ: Objection to the form
25  of the question.

Tietjen - Direct/Bonjean                                    Page 92

1       MR. VOMACKA: I also object to the
2   form of the question.  You can answer.
3   A.  I don't know.  I was dealing with whatever
4   --
5       (Reporter requested clarification.)
6   A.  Whatever Lieutenant Carrega was doing, how
7   he was handling it.  I was unaware at that point
8   if anyone else was continuing it or looking at it.
9   Q.  Okay.  But you're embarking on an
10  investigation, an important investigation.  Was it
11  important to you to know what policy you should be
12  following in connection with this investigation?
13  A.  I'd go with my own policies as far as the
14  aspects that would concern certain avenues, yes,
15  but I don't read their policies.
16  Q.  Okay.  So when you say you go with
17  your own policies, are you talking about Sergeant
18  Tietjen's policies or the state police policies?
19  A.  State police policies.
20  Q.  Okay.  So when you were doing your
21  work on this case, you were guided by the state
22  police policies in your work; right?
23  A.  Yes.
24  Q.  You didn't read Newark Police
25  Department policies; right?

Evans v.
Newark City

Video Deposition

| Tietjen - Direct/Bonjean | Page 93 |
|---|---|

1  A.  No.
2  Q.  Is that a no?
3  A.  No.
4      MR. LIPSHUTZ: I'm sorry.  It was a
5  negative question.  Did you read Newark's
6  policies?
7      THE WITNESS: No.
8      MR. LIPSHUTZ: Okay.
9  Q.  And were you provided a copy with
10  Newark's policies, at least as they pertained to
11  this missing persons/homicide investigation/cold
12  case investigation?
13      MR. LIPSHUTZ: Objection to the form.
14  A.  No.
15  Q.  Did you review any policies that the
16  Essex County Prosecutor's Office may have had?
17  A.  No.
18  Q.  And when I'm talking about policies,
19  by the way, just so we're on the same page, I'm
20  talking about written policies or orders or
21  anything on a piece of paper that guides law
22  enforcement in their duties and responsibilities.
23  Okay?
24  A.  Yes.
25  Q.  Were you provided with any written

| Tietjen - Direct/Bonjean | Page 94 |
|---|---|

1  policies either by Lieutenant Carrega or anyone
2  else that were prepared by the Essex County
3  Prosecutor's Office?
4  A.  No.
5  Q.  And do you know whether the state
6  police policies differed in any way from the
7  policies of the Newark Police Department or the
8  Essex County Prosecutor's Office?
9  A.  No.
10      MR. LIPSHUTZ: Lack of foundation.
11  Q.  Okay.  Did you ever discuss with
12  Lieutenant Carrega or any other member of this unit
13  that was looking at this case policies that you
14  should take into consideration in your work on this
15  cold case?
16      MR. LIPSHUTZ: Objection to the form.
17  A.  No.
18  Q.  Had you received any training prior
19  to your involvement specific to conducting cold
20  case investigations?
21  A.  I don't believe so, unless there was a
22  block in one.
23  Q.  And do you know whether or not
24  Lieutenant Carrega had received any training in
25  connection with conducting cold case investigations

| Tietjen - Direct/Bonjean | Page 95 |
|---|---|

1  prior to May of 2008, if you know?
2      MS. ROSEN: Objection to the form.
3  A.  I do not.
4  Q.  Now, you participated in a number of
5  interviews with other members of the team,
6  including Lieutenant Carrega; correct?
7      MR. LIPSHUTZ: Objection to the form.
8  A.  Yes.
9  Q.  Tell me what the hierarchy was in
10  terms of who led the interviews when you
11  participated, if you understand what I'm saying?
12  A.  Yes, I do.
13  Q.  I'm sorry?
14  A.  Yes, I understand what you're saying.
15  Q.  Okay.  And who was that?
16  A.  Lieutenant Carrega was the lead on
17  interviews that he was there.
18  Q.  And was there a default for
19  interviews when Carrega was not there?
20  A.  No, I think we all worked well together,
21  and I didn't see any issues.  Everyone who was
22  working on the job worked hand-in-hand, but he was
23  our, in my eyes, the lead of the cold case.
24  Q.  By the way, were you aware of whether
25  or not Essex County or Newark had any embarked on

| Tietjen - Direct/Bonjean | Page 96 |
|---|---|

1  any other cold case investigations prior to this
2  one?
3  A.  Regarding what?  This case or others?
4  Q.  Yeah, no.  My apologies.  Any other
5  cases not related to this Lee Evans or the five
6  boys, any other cold cases that had been
7  investigated by Newark and/or Essex County
8  Prosecutor's?
9  A.  I'm sure they do and did, but, you know,
10  like, I can't recall any that I was involved in a
11  cold case as a missing persons that were cold
12  cases prior to this from Newark that were involved
13  as well.  So, yeah, definitely.
14  Q.  Okay.  Now, before you would go
15  interview someone that was identified as a person,
16  you know, who should be interviewed, did you
17  discuss with your team or Lieutenant Carrega how
18  the interview would be handled and what you wanted
19  to accomplish in the interview?
20      MR. LIPSHUTZ: Objection to the form.
21  A.  That may seem as like --
22      (Connectivity issues.)
23  A.  You may have discussed who is going to do
24  the intro and take the lead at the door, and
25  typically that's who engaged in the conversation

Video Deposition

---

Tietjen - Direct/Bonjean                                    Page 97

1   via phone or, if anything, at first contact, it
2   might have just been decided on the walk-up, Hey,
3   you can knock, and then you go from there, but...
4   Q.  Were there some witnesses, though,
5   you had a plan in place for how you would approach
6   the interview?
7   A.  You certainly would have thoughts of what
8   you want to ask them about from case facts prior,
9   so that would be considered a plan per se.
10  Q.  And did you discuss the plan, if you
11  want to call it that, with your colleagues before
12  the interview typically?
13  A.  Which?  Like, I'm trying to think about,
14  like, if I was going to a parent for a DNA, I
15  would discuss that it would be my thing to discuss
16  the DNA aspect.  There would be an introduction.
17  You certainly have other case facts you want to
18  address, so that would be like -- but who says
19  what and who does what, it wasn't like scripted
20  out, no.
21  Q.  Right.  But in an important interview
22  like a Philander Hampton interview or a Lee Evans
23  interview, presumably, you all wanted to be on the
24  same page about how you -- what you wanted to do
25  during that interview; correct?

---

Tietjen - Direct/Bonjean                                    Page 98

1   A.  We all had the same goal, certainly, and
2   the same information we were trying to deal with.
3   If we're talking about Lee Evans' attempt at the
4   interview after his arrest, it was Detective Joe
5   Hadley and I had a chat with him to initiate the
6   interview, and Detective Hadley read him the
7   Miranda, so that would essentially be the lead.
8   We decide before we go who is going to read the
9   Miranda.
10  Q.  But even prior to his arrest, you all
11  had made multiple efforts to interview Lee again;
12  right?
13  A.  Yes.
14  Q.  And, in fact, I think I saw at some
15  point one person called and then left a message,
16  and another one of you called and left a message,
17  and then someone else called and left a message;
18  right?
19  A.  Yes.
20  Q.  That was all discussed in advance;
21  correct?
22  A.  Oh, certainly.
23  Q.  And you had a plan for trying to get
24  Lee to sit down for a conversation; correct?
25  A.  Yes.

---

Tietjen - Direct/Bonjean                                    Page 99

1   Q.  And I would say, you know, witnesses
2   that at least on their face seemed less important,
3   maybe you didn't have quite a detailed plan, but
4   you would still discuss who would take the lead if
5   Carrega wasn't there; is that fair?
6   A.  I don't know -- there's no written plan.
7   There may have been discussion like, Oh, I'll
8   start off here, but I don't recall each of those
9   specific interviews.
10  Q.  Well, would you agree that some
11  police officers tend to be more active in
12  interrogations or interviews than others?
13  A.  Certainly.  It's a personality.  Some would
14  lead right through and step over others, or some
15  will just simply sit back and allow somebody else
16  to step forward and let the course of the
17  interview go, and sometimes you have a person
18  you're interviewing who does not care for the
19  person who's initiated the initial lead, and then
20  you hope that you're confident enough in your
21  other person with you that they can step forward
22  and engage and elicit responses and engage them in
23  conversation.  And, you know, this group had all
24  very different aspects that somebody might want to
25  talk to each one of us.

---

Tietjen - Direct/Bonjean                                    Page 100

1   Q.  Right.  And different interviewers
2   have different styles; would you agree?
3   A.  Correct, yes.
4   Q.  How would you describe your style?
5   A.  I would say I try to be calm, specific,
6   nonthreatening, you know, and show genuine
7   interest in the information I'm looking for.  I
8   guess that would be -- you know, I don't know if
9   it covers enough, but that's kind of how I would
10  go at it.
11  Q.  You're not an in-your-face
12  pointing-the-finger type?
13  A.  No.
14  Q.  You said you had training in
15  connection with conducting interrogations or
16  interviews; right?
17  A.  Yes.
18  Q.  What type of training was that?  Was
19  that a classroom type of training or --
20  A.  It was a classroom training.
21  Q.  Did you do simulations, like
22  practice?
23  A.  I don't recall practice in there, no.  We
24  watched some videos as well.
25  Q.  So you reviewed videos, critiqued

---

Evans v.
Newark City

Video Deposition

1  videos type of thing?
2  A.  Yes.
3  Q.  And was part of the training, you
4  know, this works, this doesn't work type of thing?
5  A.  Yes.
6  Q.  What did you learn in that training
7  about feeding witnesses or suspects information --
8     (Connectivity issues.)
9  A.  You're unclear.  Please repeat that whole
10  statement.
11  Q.  Sure.  In your training, in your
12  classroom training, or really on-the-job training,
13  did you receive any information about the
14  importance of not feeding details to someone who is
15  being interviewed that they wouldn't already know?
16  A.  Depends.  Like sometimes you have to, like,
17  bring people to the event that you want to discuss
18  because their own style is very all over the
19  place.  I tend not to try to feed them
20  information.  I try to elicit information.  I
21  don't know if that was specifically taught in the
22  class.  It probably was, but we're talking like
23  1999.  But that's my style.  I tend not try to
24  feed unknown information to somebody.  I try to
25  see -- if they've provided it before, I may

1  refresh them.  And after that --
2     (Reporter requested clarification.)
3  A.  If it doesn't come up, and they provide it
4  before, I may refresh them back to that piece of
5  information I want to speak about.  If they're
6  unknowing of the event, I would potentially have
7  to bring them to that event to discuss.  If they
8  say, I don't know, so you may know nothing about
9  this car theft, or whether the car was parked on
10  the corner, and they might say, Oh, I saw the
11  black car on the corner, but I thought nothing of
12  it.  So the information they provide you might
13  have been very vague until you can bring them to
14  that point.
15  Q.  Well, would you agree that if a
16  suspect provides you with information that only the
17  offender would know, this would have good
18  evidentiary value?
19  A.  Yes.
20  Q.  All right.  So with that principle in
21  mind, would you agree that it's important not to
22  feed information to a suspect so you can ensure
23  that if you're getting a piece of information, he's
24  not just regurgitating what you told him but that
25  it actually shows that he has knowledge about the

1  incident?
2  A.  It depends what you're -- if we're
3  referring to a specific statement like on a video
4  or audio, sometimes you have suspects who will
5  tell you information prior to that taped -- after
6  Miranda, post arrest, or even prior to them being
7  arrested, and they already told you, so you have
8  to bring them back to that information.  Just like
9  I said before, you're bringing them back to the
10  point you want to discuss, and many times people
11  will overstep facts when they're going through the
12  interview again, whether it be on video or audio,
13  or when you did sit down.  You know, if I have a
14  street conversation with somebody out on the
15  street, and they tell me information, and, you
16  know, I want to capture this on the video
17  statement.  When I reinitiate that video or audio
18  statement, they tend to step through many aspects
19  of it, and you have to sometimes bring them back.
20  And sometimes the personality issue on the person
21  or like the upbringing, you ask them to tell the
22  whole story, they rush through it.  So it would
23  all depend upon the event.  I think that most of
24  it we're trying to listen to what they have to
25  say.  And sometimes we become aware of statements

1  they've made to us during it that weren't included
2  now or weren't included later, so I don't know
3  what we're...
4  Q.  Well, putting aside that you may want
5  to refresh someone's recollection with something
6  they already told you, I'm talking about when you
7  are conducting an interview for the first time with
8  a suspect, would you agree that it's important not
9  to feed them information that only the offender
10  would know so that you can assure yourself that
11  they're not just regurgitating what you told them
12  but that they actually have firsthand knowledge
13  about the event?
14  A.  I would agree that would be important.
15  Q.  Now, on June 2nd of 2008, you
16  interviewed a Lillie Williams; right?
17  A.  Yes.
18  Q.  And this interview was conducted with
19  Lieutenant Carrega and Detective Hadley; correct?
20  A.  Yes.
21  Q.  And just to be clear, prior to your
22  interview with Lillie Williams, you had developed
23  information that had been known since 1978 that the
24  boys had been seen in and around the time of their
25  disappearance with Lee Evans; right?

Evans v.
Newark City

---

Tietjen - Direct/Bonjean                                    Page 105

1  A.  Yes.
2  Q.  What other information as of
3  June 2nd, 2008, did you possess that would lead you
4  to believe that Lee Evans had any involvement in
5  the disappearance and presumed murders of the boys
6  other than what we just identified?
7      MR. VOMACKA: Objection to form, but
8  you can answer.
9  A.  The identified case from '78 through have
10 him as an involved party and last being seen with
11 them.  So that's what we were working on.
12 Q.  Right.  And I'm trying to put a
13 little finer point on it.
14     I know we've established that the
15 case report, case file, no question, established
16 that the boys had been seen with Lee in and around
17 the time of their disappearance.  But apart from
18 that fact, what other fact can you point me to that
19 would lead a person to believe that Lee was
20 involved in their disappearance and/or presumed
21 murders?
22 A.  The fact they were last with him, and they
23 were never seen after being with him again.  You
24 know, I think, in this case we had other potential
25 sightings throughout the early stages, but they're

---

Tietjen - Direct/Bonjean                                    Page 106

1  always potential.  We get that now on cases as
2  well.  And some have investigates those as well as
3  they -- but as best we knew, Lee Evans was the
4  last one seen with the boys.  They were never seen
5  again, and that would lead us that he's someone of
6  interest.
7  Q.  Okay.  Let's try again.  First of
8  all, you actually were unable to pinpoint when the
9  boys disappeared; right?
10 A.  Well, we knew on or about August 20, 1978.
11 Q.  Right.  That's like a full day,
12 which --
13 A.  No, we knew -- we had at time breakdowns
14 where people last see them, and they're reported
15 in the 1978 reports, so some were closer to that
16 11 o'clock at night, some had seen, the last
17 sightings.
18 Q.  And there were reports that they were
19 seen after that; right?
20 A.  Sure.  I mean, like I said, you're going to
21 get that.  You have to work on that as well and
22 see if that's viable, but that was -- I believe
23 those are sights of not people intimately involved
24 saw him.  None of the family members saw their
25 kids the next day.

---

Tietjen - Direct/Bonjean                                    Page 107

1  Q.  Right.  According to the reports,
2  they went missing in and around August 20th to
3  August 22nd, and they actually weren't even
4  reported missing until August 23rd; right?
5  A.  Correct.
6  Q.  The 1978 reports reflected varying
7  information about when the boys were last seen;
8  would you agree with that?
9  A.  I agree that there are varying times on the
10 20th that they were last seen, yes.
11 Q.  So my point is the reports reflect
12 that Lee Evans was with the boys approximately
13 around the time they left, but the reports didn't
14 conclusively show that he was the last person to
15 see them; would you agree?
16     MR. LIPSHUTZ: Objection.
17 Argumentative.
18     MR. VOMACKA: Objection to form.  You
19 can answer.
20 A.  Of the people that were interviewed in
21 those initial reports, the last time they saw the
22 boys was with Lee Evans.
23 Q.  Okay.
24 A.  You know, I don't know if -- there are
25 probably one or two that might say that when they

---

Tietjen - Direct/Bonjean                                    Page 108

1  say them, they weren't.  But the ones who
2  described them leaving with him in the truck, it
3  was his vehicle.  I think what she said was it was
4  Lee Evans' vehicle.  They didn't see Lee, but it
5  was his truck.
6  Q.  Okay.  And the point is, is that was
7  the last time they saw them, but they were unable
8  to say when the boys actually went missing; right?
9      MR. VOMACKA: Asked and answered.
10     MR. LIPSHUTZ: Objection to form.
11 You can answer.
12 A.  Missing to them is the point they last seen
13 them.  So if your kid goes missing today at -- you
14 last see them at 9:00 a.m., the report is going to
15 say last seen to you at 9:00 a.m.  Someone else
16 may have seen them at 11:00 on the street corner,
17 but we have yet to identify that person who saw
18 them at 11:00, so I don't, you know...
19 Q.  Well, they didn't actually -- they
20 did not actually report them missing until a couple
21 days later, so they -- would you agree that the
22 parents didn't initially at least feel that the
23 boys had been disappeared or murdered or --
24     MR. LIPSHUTZ: Objection to form.
25     MR. VOMACKA: Objection to form.  You

---

Evans v.
Newark City

Video Deposition

Tietjen - Direct/Bonjean                                    Page 109

can answer.

2  A.  1978 is very different than today.
3  Patricia's Law had you put down in writing how
4  quickly you take the report.  Because the issues
5  have been throughout the State of New Jersey
6  routinely where agencies tell families they had to
7  wait 24 hours, they had to wait days, to make a
8  report.  Unknown to me why there was a delay in
9  the reporting.  Whether they made initial attempts
10 and were told to wait for them to return, whether
11 they had experienced the boys staying overnight
12 somewhere, but there is a delay.
13    We, as of last week, had a report
14 where a family member reported a guy who killed
15 himself, and she waited 24 hours because she
16 thought the 24-hour rule was in effect.
17 Q.  Okay.  And I am not disputing that
18 1978 was a very different time, but for whatever
19 reason, the boys allegedly went missing on August
20 20th, and it wasn't reported by the parents, at
21 least as far as we know, until August 22nd;
22 correct?
23 A.  Correct.  We have one mother who drives
24 around looking for them at 3:00 a.m. with her, I
25 guess another family member, I'm trying to think

Tietjen - Direct/Bonjean                                    Page 110

1  of the name.  I think was Floria McDowell or
2  something like that.  Floria McDowell.  Yeah, I
3  think it was her.  She drove around with a
4  relative looking for them at 3:00 a.m., but no
5  reports to police, so they're concerned, and it
6  shows a concern.
7  Q.  I am not suggesting their parents
8  weren't concerned.  I'm just trying to set a time
9  frame here, though, they were not formally reported
10 missing until August 22nd, and then the assignment
11 wasn't actually received until August 23rd;
12 correct?
13 A.  Yes.
14 Q.  Okay.  And the parent could say when
15 the last time they saw their kid was and who they
16 saw them with, if anyone, but no one was able to
17 state at which point the boys were -- well, no one
18 was able to say whether the boys had been injured
19 or hurt; correct?
20 A.  I don't know what you're getting to with
21 that.
22 Q.  No one was able -- my point is no one
23 knows exactly when they were hurt; right?  If they
24 were hurt.
25    MR. VOMACKA: Objection to form.  I'm

Tietjen - Direct/Bonjean                                    Page 111

1  sorry.  You can answer.
2  A.  No one stated that they were hurt on that
3  initial report.  It was unknown from the last
4  point they saw them.
5  Q.  So we're getting a little far afield.
6  I'll bring us back.  But my point is apart from the
7  reports reflecting that Lee Evans may have been one
8  of the last people to see him, or was the last
9  person by some people's account, to see the boys,
10 and not all the boys; right?
11    MR. LIPSHUTZ: Which question are you
12 asking?
13 Q.  The reports did not reflect that Lee
14 Evans was the last person to be seen with all five
15 of the boys; right?
16 A.  Each of the boys is broken down differently
17 throughout the report, so we would have to, like,
18 timeline through that to identify each one in
19 there, but --
20 Q.  I'm just asking if you remember that.
21 If you don't, you don't remember.  The reports will
22 speak for themselves.  But do you recall whether or
23 not Lee Evans was the last person to be seen with
24 every single one of those five boys?
25 A.  It depends on who -- he's the last one seen

Tietjen - Direct/Bonjean                                    Page 112

1  at 11:00 on the reports that the family members
2  are aware of them.  I don't know if they saw
3  anybody else afterwards that I can recall.
4  Q.  My question was different, though.
5  It had to do with whether or not it was all five
6  boys that he was last seen with, or three of the
7  boys, or two of the boys?
8    (Reporter requested clarification.)
9  A.  Lee Evans or his vehicle was seen with all
10 five boys at some point that evening.
11 Q.  At some point within the 24-hour
12 period?
13 A.  No.  At some point that evening, let's even
14 push it from 8 o'clock on until midnight.
15 Q.  Okay.  Fine.  At some point that
16 evening, Lee Evans was seen with, your belief is
17 with all five of the boys; am I right?  Correct?
18 A.  Yes.
19 Q.  Okay.  And apart from that fact that
20 we've just honed in on, what other evidence led you
21 to believe that Lee Evans was involved from those
22 original reports that you reviewed?
23    MR. LIPSHUTZ: Asked and answered.
24 Q.  Anything else?
25 A.  Reading through the report, you have many

Tietjen - Direct/Bonjean                                    Page 113

1    aspects of the report that still continue to
2    identify him as a person of interest throughout
3    it.
4    Q.   That's just gobbledygook.  I'm asking
5    you to identify a fact other than the one you've
6    identified that he was the last one seen with the
7    boys, according to your interpretation of the
8    reports, what other fact did you identify from
9    those reports that led you to believe that Lee
10   Evans was involved in their disappearance?
11   A.   That the boys had stolen marijuana from
12   him.
13   Q.   Okay.
14   A.   That he had a potential motive for getting
15   back at them as well.
16   Q.   I'm sorry.  What was the second part?
17   A.   That there was a potential motive because
18   they had stolen marijuana from him.  There were
19   reports in there that somebody was trying to get
20   marijuana back and money as well, or money for the
21   marijuana.
22   Q.   I'm going to stop you right there.
23   So one other fact that you drew from these reports
24   is that there was some indication that the boys had
25   stolen, or some of the boys, had stolen marijuana

Tietjen - Direct/Bonjean                                    Page 114

1    from Lee; right?
2    A.   Yes.
3    Q.   And in your mind, that was a
4    potential motive for murder; correct?
5    A.   Correct.
6    Q.   Or, I suppose, in your mind as of
7    2008, you're presuming these boys are dead;
8    correct?
9    A.   Yes.
10   Q.   And I know that you indicated just
11   now that there was some reporting that someone was
12   trying to get the marijuana back or get money for
13   the marijuana; right?
14   A.   Yes.
15   Q.   But the reports never connected that
16   piece to Lee Evans; right?
17        MR. LIPSHUTZ: Objection to the form.
18   Q.   Go ahead.  Do you need me to repeat
19   the question?
20   A.   No.  I said the marijuana was connected to
21   Lee.
22   Q.   Right.
23   A.   The boys -- I can review all these old
24   files for hours, if you want, about Hairston's
25   report, and we can go bit by bit and find that

Tietjen - Direct/Bonjean                                    Page 115

1    spot.  I don't recall what changed in there, but
2    the entire time through, Lee Evans was a main
3    person of concern.  He was not arrested.  Until we
4    spoke to Philander Hampton and he provided new
5    information to us, yeah, that's where the big
6    concern takes in our -- he was always a suspect.
7    Q.   You can say he was main suspect from
8    those reports, and that's fine.  I understand
9    that's your view, but that's not -- I'm not looking
10   for your opinion about that.  I'm looking for the
11   underlying factual basis for that opinion.
12       So my question, though, was even
13   though there was reports that the boys had stolen
14   marijuana from Lee, and, in fact, there was some
15   marijuana recovered from one of the boy's rooms;
16   right?
17   A.   Yes.
18   Q.   But you weren't able to come up with
19   the marijuana, or the detectives were not able come
20   up with that specific marijuana from the evidence;
21   correct?
22   A.   She broke up.  I didn't hear her.
23   Q.   The reports did not reflect that the
24   detectives were ever able to connect the specific
25   marijuana that was recovered from the boy's room to

Tietjen - Direct/Bonjean                                    Page 116

1    Lee Evans' stash; right?
2    A.   No.
3    Q.   Okay.  And, in fact, the detectives
4    who were working on the case back in 1978 were
5    never able to actually connect the person who was
6    trying to get money, and that was calling for the
7    money, named Bob; right?  Does that ring a bell?
8    A.   Right, correct.
9        MR. LIPSHUTZ: Objection to the form.
10   Q.   Did you ever see anything in those
11   reports that was able to connect Bob in any way to
12   Lee Evans?
13   A.   No.
14   Q.   Okay.  Apart from the potential
15   motive that the boys may have stolen some marijuana
16   from Lee and the fact that Lee had been with the
17   boys around the time of their disappearance, are
18   you able to identify for me any other facts you
19   developed from the 1978 reports that led you to
20   believe that Lee was part of their disappearance?
21   A.   They broke into his residence, and --
22       (Connectivity issues.)
23   A.   -- and broke a window entering the
24   residence this last time, which caused Ernie
25   Taylor to have a cut on his hand.

Evans v.
Newark City

Video Deposition

---

Tietjen - Direct/Bonjean                                    Page 117

1  Q.  Okay.  And that was to get the
2  marijuana, though; right?
3  A.  Correct.
4  Q.  So that's part of the marijuana
5  motive?  That's the motive; right?  Right?
6  A.  Yes.
7  Q.  Okay.  Apart from that motive
8  evidence you've identified and the fact that he was
9  seen in and around the time with the boys when they
10  disappeared, what else, anything you can point me
11  to from those '78 reports that led --
12  A.  Not that I recall.
13  Q.  Let me finish -- that led you to
14  believe that Lee was the perpetrator?
15  A.  He was last seen, and he has a motive.
16  Not -- that's what we're working on, right.
17  Q.  I'm asking what -- anything else?
18  A.  No, that's -- he's -- they broke into his
19  house.  They stole his marijuana.  He worked with
20  them.  It's a step process.  He was taken.  So
21  the people last seen with the boys would be the
22  people that would be of interest, whether they are
23  named suspects, they are your person of interest
24  to go speak to.  So those facts there lead you to
25  want to speak to them.  Whether they get resolved

---

Tietjen - Direct/Bonjean                                    Page 118

1  at some point or they don't, those are still what
2  we have presented.
3  Q.  Right.  But the period of time --
4  well, strike that.  I'm not going to debate with
5  you about whether or not -- you don't know when the
6  boys were missing.  So whether or not Lee was the
7  last person seen with him, that's just from the
8  parents' accounts from hours earlier; right?
9      MR. VOMACKA: Objection to form, but
10  you can answer.
11      MR. LIPSHUTZ: Objection to the form.
12  A.  Parents and friends and others interviewed
13  that were with them that evening.
14  Q.  Right.  And there were a lot of
15  people that were around Lee Evans in and around
16  that time other than those boys, too; right?
17      MR. VOMACKA: Objection to the form,
18  but you can answer the question.
19      MR. LIPSHUTZ: Same objection.
20  A.  I'm sure.
21  Q.  Okay.  So there was -- supposedly
22  Maurice Olds was around there; correct?
23  A.  Correct.
24  Q.  Royster; right?
25  A.  Yes.

---

Tietjen - Direct/Bonjean                                    Page 119

1  Q.  Okay.  Do you think that stealing
2  marijuana is a motive for killing five children?
3  A.  Certainly.
4  Q.  Really?
5  A.  Yes.
6  Q.  How many other cases have you seen
7  where someone has committed, I don't know, maybe
8  five homicides, a five-person homicide, for the
9  stealing of a small amount of marijuana?
10  A.  Well, some people reported it to be a
11  pound.  But you have multiple break-ins at his
12  house.  And then look at today in the cities,
13  people kill people for a little bit of stuff.  So
14  I don't have any doubt that you could kill
15  somebody for stealing their marijuana and breaking
16  in their house multiple times.  I have no doubts
17  about that at all as being a motive.
18  Q.  Even someone who doesn't have a
19  particularly profound criminal record?
20  A.  Yes.
21  Q.  So in your mind, that was the motive?
22  You were persuaded of that motive.  Did you
23  consider any other motives?
24  A.  You broke up there again.
25  Q.  I said did you consider any other

---

Tietjen - Direct/Bonjean                                    Page 120

1  motives other than the one that you identified when
2  you were looking at this case in June of 2008?
3  A.  Every case I look at, I try to be open to
4  other possibilities as well that present to the
5  case, and then you go where the case will lead you
6  with the information provided to you.  I think
7  there's potentially always several possibilities
8  in every case from the beginning moving.  At no
9  point when I sat down with Phil Hampton when Phil
10  Hampton was willing to take the interview did I
11  think what he told us was ever going to happen.
12  Q.  Okay.  But my question is what other
13  motives did you consider, if any, other than the
14  one of the boys stole some marijuana from Lee?
15  A.  Well, there were many motives that were
16  touched on in the 1978 and later reports that
17  could be a potential.  Did they run away and go to
18  a cult?  There was --
19      (Connectivity issues.)
20  A.  It was, like, did they run away?  Did they
21  go to a cult?  Did they go to the city?  I think
22  somebody -- we got a Washington, D.C. call.  And
23  all of those things were looked at back then.  The
24  underlying open-ended one was still the motive for
25  Lee Evans with the marijuana and the break-ins to

---

Evans v.
Newark City

Video Deposition

---

Tietjen - Direct/Bonjean                                    Page 121

1  his residence.
2  Q.  So you didn't pursue those other
3  possible motives when you got on the case; right?
4  A.  No, no.
5  Q.  You looked at the police reports, and
6  the one motive that you thought made sense was the
7  marijuana motive; right?
8  A.  I looked at the reports and saw what was
9  still open-ended, and that was the Lee Evans
10  marijuana motive.
11  Q.  And you never were able to prove that
12  Lee Evans was involved in narcotics trafficking;
13  right?
14  A.  Only with statements made to us.  That's
15  it.  No -- it's 1978.  I had no proof of his
16  arrest for that.
17  Q.  Who made statements -- well, strike
18  that.
19      You weren't able to corroborate any
20  of those statements that Lee had marijuana in his
21  house and was involved in selling marijuana; right?
22      MR. VOMACKA: Objection to the form,
23  but you can answer.
24  A.  It was -- I wasn't looking to arrest Lee on
25  the marijuana charges.  The information provided

---

Tietjen - Direct/Bonjean                                    Page 122

1  in the statements, and people interviewed later on
2  when we got involved still indicated that he was
3  involved with marijuana.
4  Q.  You had a number of people saying he
5  was involved with marijuana; right?
6  A.  Correct.
7  Q.  You never found out what type of
8  marijuana operation he ran; is that right?
9  A.  Yes.
10      MR. LIPSHUTZ: Objection.
11  Q.  You don't know who his supplier was;
12  correct?
13  A.  No.
14  Q.  He had no arrests for marijuana;
15  correct?
16  A.  No.
17  Q.  And, in fact, you actually spoke to
18  one of the so-called suppliers of marijuana, and
19  he's like, "I've never heard of Lee Evans in my
20  life."  Right?
21  A.  Yes.
22  Q.  Okay.  So when you developed that
23  information, did it make you think, "Hmm, maybe Lee
24  Evans isn't involved really in drug trafficking"?
25  A.  No.

---

Tietjen - Direct/Bonjean                                    Page 123

1  Q.  So the statements from 1978 about him
2  having marijuana in his house was enough to
3  persuade you that Lee Evans was a significant drug
4  dealer who would kill five people for stealing his
5  marijuana; right?
6      MR. LIPSHUTZ: Objection.
7      MR. VOMACKA: Objection.
8      MR. LIPSHUTZ: You can answer.
9  A.  I wouldn't say identified him as a
10  significant drug dealer.  I would say he was a
11  person with marijuana who had his marijuana stolen
12  and his broke house broken into and that he became
13  upset to that, and that that became his motive.
14  Q.  And so upset that he would murder
15  five people over it; right?
16  A.  Yes.
17  Q.  So in June of 2008, you started
18  getting involved in investigations and being more
19  active in this investigation; fair?
20  A.  Yes.
21  Q.  You spoke to Lillie Williams.  But,
22  again, was there anything that came out of that
23  interview that made it more likely that Lee was
24  involved in these presumed murders?
25  A.  Nothing more than previously had been

---

Tietjen - Direct/Bonjean                                    Page 124

1  provided.
2  Q.  Right.  She didn't give you any
3  additional information that advanced your theory
4  that Lee Evans was involved; right?
5  A.  No.
6  Q.  And you also interviewed a Cathy
7  Canady on June 6th, 2008?
8  A.  Yes.
9  Q.  And I notice that you said refer to
10  Lieutenant Carrega's report for details about that?
11  A.  Yes.
12  Q.  Is that because you didn't take notes
13  during that interview?
14  A.  I don't know if I took notes or not on that
15  interview.
16  Q.  Could you have?
17  A.  I could have.  I don't know.
18  Q.  Okay.
19  A.  But that would have been one that it was
20  decided when we who -- was going to cover each
21  aspect, and that was one that Lieutenant Carrega
22  was to be responsible for.
23  Q.  It was your understanding that
24  Lieutenant Carrega would write a report in
25  connection with the interview of Cathy Canady?

---

| Tietjen - Direct/Bonjean | Page 125 |
|---|---|

1 A. Certainly.
2 Q. Did you ever see that report?
3 A. No.
4 Q. Have you ever seen that report?
5 A. No.
6 Q. As you sit here today, are you now
7 aware that no such report was ever made?
8 A. I became aware during the Miranda hearing
9 for Philander Hampton. Actually, the day prior,
10 he testified.
11 Q. Did it trouble you that there had
12 been no report made, even though you referring were
13 to a report in your report?
14 A. Oh, yes.
15 Q. And why was it troubling to you?
16 A. Because you work with a group of people;
17 you cover aspects of an investigation. It's
18 decided who will cover certain aspects. I wrote
19 first, I handed off my report. I believe Bill
20 Hadley wrote his report next, or completed all
21 aspects of his report, whether he had others that
22 written throughout, and then it was passed on to
23 Lieutenant Carrega. So I don't get stuff passed
24 down on that aspect from him. It's passed up
25 through him. And if he choose, chose, not to

| Tietjen - Direct/Bonjean | Page 126 |
|---|---|

1 write a report, that's on him. I knew what my
2 responsible part was, and I found out the day of
3 Miranda that no such report was written, so...
4 Q. Okay. You also interviewed Floria
5 McDowell; right?
6 A. Yes.
7 Q. And I'm on page, I guess it's 5 of
8 your report, Bates stamped ECPO 1347. Do you see
9 that?
10 A. Um-hum.
11 Q. And, again, would this have been
12 Carrega taking the lead in this interview?
13 A. No, this one is one that I documented.
14 Q. Um-hum. Does that mean that you
15 documented it, you took the lead in documenting it,
16 or you took the lead in actually conducting the
17 interview, or one had nothing to do with the other?
18 A. I would say they had nothing to do with
19 another.
20 Q. But because Lieutenant Carrega was
21 present for this interview, would that lead you to
22 believe that he actually took the lead in
23 interviewing Ms. McDowell?
24 A. Yes.
25 Q. How would you describe Lieutenant

| Tietjen - Direct/Bonjean | Page 127 |
|---|---|

1 Carrega's style of interviewing? I know you
2 described your own. But how would you describe
3 his?
4 MS. ROSEN: Objection to the form.
5 You can answer.
6 A. Everyone is different. He's seeking
7 factual basis to events he wants to learn.
8 Q. Right. But stylistically, what was
9 his style? Was he like your style? Would you say
10 you have a similar style?
11 A. I think we have varying differences. I
12 think the three of us, including Joe, who was
13 definitely a great interviewer as well, were able
14 to mesh our styles into something that the
15 majority of people we spoke to, if not all, felt
16 very comfortable speaking with us. So I wouldn't
17 say Carrega's style wasn't offensive to others.
18 He has many years of experience at this point
19 interviewing people. I'd have to watch a video
20 again of his style to recall back 12 years ago if
21 it was drastically different than mine or
22 Detective Hadley. I know we were all meshing up
23 together to do an interview.
24 Q. You don't really remember, though,
25 what the differences were between your style and

| Tietjen - Direct/Bonjean | Page 128 |
|---|---|

1 his style; correct?
2 A. No.
3 Q. Now, and during this interview, you
4 were able to confirm some of the facts that he had
5 previously reported to detectives back in the '70s
6 and then even in the '90s, I believe; right?
7 A. Yes.
8 Q. And one was that she had recovered
9 marijuana from her son's room; right?
10 A. Yes.
11 Q. Just, I want to make sure I got this
12 right. Floria McDowell's son was Mike McDowell?
13 A. No, Alvin Turner.
14 Q. Alvin Turner. Yeah, I always get
15 that mixed up, because you'd think the name is the
16 same. But anyway, it was Alvin that was her son;
17 right?
18 A. Yes.
19 Q. Okay. I'm going to draw your
20 attention to -- and this is the situation where the
21 niece had recovered the marijuana from his room and
22 handed it over to the Newark Police Department at
23 the time; right?
24 A. Yes.
25 Q. All right. And as we indicated

Evans v.
Newark City
Video Deposition

Tietjen - Direct/Bonjean | Page 129

1  earlier, she was unable to say how long that
2  marijuana had been in the house; right?
3  A.  I don't recall.  I don't believe she had a
4  time.
5  Q.  Well, you would agree that if it had
6  been in the house for a month --
7  A.  Well, she didn't know how long it was in
8  the house.
9  Q.  Right.  That's what I said.  If she
10 didn't know, then she wouldn't know how long it was
11 there; correct?
12 A.  Yes.
13 Q.  So, you, therefore, and the
14 detectives back in 1978, had no idea whether that
15 was the same marijuana that was allegedly stolen
16 from Lee Evans' house; correct?
17 A.  Right.
18 Q.  And it wasn't unusual for teenagers
19 to have marijuana even in the 1970s; can we agree
20 on that?
21 A.  I don't know these boys, so I don't know.
22 Q.  I'm not talking about these boys
23 specifically.  I'm saying it wasn't unusual in the
24 '70s for teenagers to possess marijuana; correct?
25 A.  I don't know how -- I'm six at the time,

Tietjen - Direct/Bonjean | Page 130

1  you know.  I'm don't know teens back then so --
2  Q.  Fair enough.
3  A.  Like, I'm going to go with that.  Like, I
4  don't know Newark in 1978.
5  Q.  All right.  Fair.  Fair.  Fair
6  enough.
7      Now, Mrs. McDowell also advised in
8  your interview that there was a black man that
9  "came to her residence on the day Alvin went
10 missing and spoke with Alvin at the front door."
11 Right?
12 A.  Correct.
13 Q.  And she "observed what she thought
14 was a handgun in the man's front pant's pocket.
15 She thought that the man looked like a friend of
16 Lillie Williams, mother of Melvin Pittman, but she
17 was not sure and she did not know his name."
18 Do you remember that?
19 A.  Yes.
20 Q.  And you and your colleagues showed
21 her a picture of Philander Hampton; right?
22 A.  Correct.
23 Q.  And she was unable to identify him as
24 the person who was at the front door talking to
25 Alvin on the day Alvin went missing; right?  Is

Tietjen - Direct/Bonjean | Page 131

1  that correct?
2  A.  Yes.
3  Q.  And this is someone who had a gun,
4  according to her?
5  A.  Yes.
6  Q.  What efforts did you -- what
7  investigative efforts did you take to find out who
8  that person was that came to the door with a gun on
9  the day that Alvin went missing?
10 A.  We asked Lillie -- or Floria McDowell about
11 how Alvin was with the individual, and she
12 indicated he wasn't fearful of the individual with
13 the gun.  So was it necessarily a threat to him?
14 No, she didn't feel that way.  We then went and
15 spoke to Lillie Williams as well about individuals
16 she may have been involved with, whether it be her
17 husband at the time, or if she was involved with
18 another male, and then --
19     (Reported requested clarification.)
20 A.  Yeah, who she was involved with at the
21 time.  Whether it was her husband, it's Nelson
22 Williams, or another male.  And then it was, I
23 believe the name was Nelson Williams, was located
24 at a senior housing complex in Newark, and Agent
25 Eutsey and Lieutenant Carrega interviewed him

Tietjen - Direct/Bonjean | Page 132

1  there, and he denied, as far as I know, any
2  involvement with being that person at the front
3  door.  Beyond that, just as in 1978, that person
4  was never identified.
5  Q.  So you and your predecessors were
6  never able to identify the individual who came to
7  the door of Floria McDowell's residence with a
8  handgun and spoke to her son Alvin; correct?
9  A.  With what she thought was a handgun in his
10 pocket, which you can surmise from there that how
11 good is she at identifying a handgun in a pocket
12 or not, so it's -- you know, we're going to play
13 back to that.  So that person was never identified
14 who may have potentially had a handgun in his
15 pocket.
16 Q.  Right.  You're quick to -- you're
17 quick to dispel any significance of this handgun,
18 because you said she thought it was, but I guess my
19 questions are really just more simple.  Did you
20 ever find out who that person was?
21 A.  No.
22 Q.  And apart from talking to Lillie
23 Williams and any men she may have been linked to,
24 were you able to develop any other information that
25 might shed some light on who that person was?

Video Deposition

---

Tietjen - Direct/Bonjean                              Page 133

1  A.  No.

2  Q.  And you certainly weren't able to

3  connect that person to Lee Evans; right?

4  A.  No.

5  Q.  This question about who appeared at

6  the McDowell home and spoke to Alvin who may have

7  had a gun in his pants is a mystery to this day; is

8  that right?

9  A.  Yes.

10  Q.  And she said she didn't believe it

11  was Philander Hampton because you showed her a

12  photo of Philander Hampton; right?

13  A.  I guess the poor aspect there was that we

14  had a photo that was 30 years newer of Philander

15  Hampton at that point.  I did not have a photo of

16  him from 1978.  Unknown if she would have even

17  been able to identify that of a person who came to

18  her door, but that would have been a better photo

19  to present, certainly.

20  Q.  Sure.  But you worked with what you

21  had --

22  A.  Yes.

23  Q.  -- and as far as you know, this was

24  not Philander Hampton?

25  A.  That's what it revealed, yes.

---

Tietjen - Direct/Bonjean                              Page 134

1  Q.  She also said she found her son's

2  wallet in the hallway to her residence two days

3  after he went missing; right?

4  A.  Yes.

5  Q.  Were you able to develop any

6  information about why Alvin's wallet would have

7  been in the hallway?

8  A.  No.

9  Q.  Is that something you looked into?

10  A.  Something we looked back -- I looked back

11  in the reports to see if anything came up on that.

12  I don't know if there was a --

13  (Reporter requested clarification.)

14  A.  I looked back in the reports to see if I

15  could identify any resolution to that.  I don't

16  recall seeing one as to why it appeared there two

17  days later, or if she missed it in days prior, but

18  I can certainly hypothesize some things, but

19  that's what we had, in any case.

20  Q.  Well, that was a fact that she

21  thought was important to share with you; correct?

22  A.  Yes.

23  Q.  And it was a fact that you thought

24  was important to put in your report; right?

25  A.  Yes.

---

Tietjen - Direct/Bonjean                              Page 135

1  Q.  And why did you think that was a fact

2  that was of evidentiary value or relevance?

3  A.  Because I would have loved someone to tell

4  me that he left his wallet in their car the night

5  they killed him, and they threw it inside his

6  hallway.  I'm going to include those things

7  because who knows what's going to come forward.

8  That was something that she determined was odd in

9  her own thoughts.  Certainly became odd in my own

10  thoughts on this that I would document.

11  Q.  So your working hypothesis was that

12  possibly whoever had taken Alvin had returned his

13  wallet by throwing it at his home?

14  A.  That's probably one of three possibilities.

15  One, the person who was last with him; right?

16  Two, the person who was involved in his demise, it

17  got left in their vehicle, and they threw it; or

18  he simply left it there on his own.  So we still

19  don't know.  And there was probably a fourth as

20  well.  But that would be something that her

21  thought on that, that was odd, so that made it

22  into my report.  And if someone later provided me

23  information about that, that would have been

24  great.

25  Q.  Do you know if that wallet was ever

---

Tietjen - Direct/Bonjean                              Page 136

1  dusted for prints?

2  A.  No clue.

3  Q.  Okay.  And to you it seemed logical

4  that someone who may have killed five people would

5  return the wallet to his home rather than, I don't

6  know, throw it in the river, throw it somewhere

7  else?

8  MR. VOMACKA: Objection to form, but

9  you can answer.

10  A.  People do amazingly crazy things while

11  committing crimes.  I've seen a lot of that, so I

12  am not surprised at anything these days.

13  Q.  Right.  Which is why you have to keep

14  your mind open to all possibilities?

15  A.  Yes.  That's why I laid out three, and we

16  can probably go on four and five.  But one is that

17  somebody involved with him that night returned it

18  when they located it, or it could have been

19  dropped outside that same evening, or two days

20  before, and was found.  You know, she didn't know

21  when he lost his wallet for it to show up there,

22  but --

23  Q.  Right.

24  A.  But it was important enough if someone

25  stated to me later on who was actively involved

---

Video Deposition

---

1  with him that, Oh, yeah, we found his wallet left
2  in the truck, or we found his wallet left on the
3  curb and delivered it to his house and left it
4  there. You know, who knows why people return
5  things or take things or --
6  Q.  But it's also possible that she
7  missed it; right?
8  A.  Certainly.
9  Q.  And it's also possible that it was
10  dropped in the course of perhaps a struggle from
11  there; right? That's a possibility, too; correct?
12  A.  That would be number four.
13  Q.  Right. Is that a possibility you
14  considered?
15  A.  Yes.
16  Q.  Which would have meant that he would
17  have gone missing from outside of his own home
18  potentially; that's one possibility?
19      MR. LIPSHUTZ: Objection. Calls for
20  speculation.
21  A.  It's certainly a possibility because he was
22  last seen at his home leaving. You know, who
23  knows when she observed it, when it was there.
24  Q.  Okay. On June 9th, you received
25  information from -- you interviewed a Rogers

---

1  Taylor; right?
2  A.  Yes.
3  Q.  And you were trying to find out --
4  you guys worked really hard to find out information
5  about Mr. Evans' alleged drug-dealing operation;
6  right?
7      MR. LIPSHUTZ: Objection to the form.
8      MR. VOMACKA: Objection to the form.
9  You can answer.
10  A.  We were trying to find out about all of
11  Mr. Evans' involvement.
12  Q.  Right. You were focused on Lee
13  Evans, that was the focus of the investigation;
14  correct?
15  A.  Yes.
16  Q.  And one bit of information you
17  received is that you heard from Ernest Taylor's
18  brother, Roger Taylor, that Lee Evans drug
19  distribution may have been tied to Wayne "Akbar"
20  Pray; right?
21  A.  Yes.
22  Q.  Would you call that sort of a rumor?
23  A.  Yes.
24  Q.  All right. And that Pray had been
25  his supplier; right?

---

1  A.  Yes.
2  Q.  You were looking for Evans' supplier,
3  if you could find him; right?
4      MR. LIPSHUTZ: Objection to form.
5  A.  Sure.
6  Q.  And you ultimately actually did speak
7  to Mr. Pray; right?
8  A.  Yes.
9  Q.  I think we went through this earlier,
10  but he denied knowing Lee Evans; correct?
11  A.  Yes.
12  Q.  Did you find any other possible
13  suppliers other than Wayne Akbar Pray?
14  A.  No.
15  Q.  You also heard some information from
16  Rogers Taylor that Bob Cutler was looking for the
17  boys at the time of their disappearance; right?
18  A.  That who was?
19  Q.  Bob Cutler?
20  A.  Yes.
21  Q.  And, in fact, that there was also a
22  person named Bob trying to get money from these --
23  some of these families; right? Making phone calls?
24  A.  Yes.
25  Q.  Were you ever able to determine

---

1  whether or not Bob Cutler was the Bob that was
2  calling?
3  A.  No.
4  Q.  Was that a possibility in your mind?
5  A.  A possibility.
6  Q.  Did you look into it?
7  A.  Yes.
8  Q.  And how did you look into it?
9  A.  Bob Cutler was interviewed as well.
10  Q.  Okay. So apart from accusing
11  someone, what other ways did you investigate
12  whether or not it was Bob Cutler who was calling
13  and making threatening phone calls to the family
14  around the time that the boys disappeared?
15  A.  You ask questions related to that, and you
16  receive negative answers.
17  Q.  So that is the extent to which you
18  conducted that aspect of the investigation? You
19  asked Bob, and he said no, and that was the extent
20  of it?
21  A.  I think there's a -- Rogers Taylor is asked
22  that. He's providing information as well. Others
23  are asked it. I don't recall right now how many
24  people were asked about the Bob at the front door,
25  but I know Bob Cutler denied being the Bob that

---

# EXHIBIT A

**In The Matter Of:**

*Evans v.*
*Newark City*

---

*William H. Tietjen, Jr.*
*July 22, 2020*
*Video Deposition*

---



66 W. Mt. Pleasant Avenue
Livingston, NJ  07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

Evans v.
Newark City

Video Deposition

---

Page 1

```
 1              UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
 2               NEWARK VICINAGE
                 14-cv-00120 (KM)(MAH)
 3

 4

 5
    LEE EVANS,                )
 6                            )       VIDEOTAPED
             Plaintiff,       )
 7                            )    DEPOSITION UPON
         v.                   )    ORAL EXAMINATION
 8                            )         OF
    NEWARK CITY; FORMER       ) WILLIAM H. TIETJEN, JR.
 9  MAYOR, CORY A. BOOKER;    )
    FORMER POLICE DIRECTOR,   ) VIA VIDEOCONFERENCE
10  GARRY McCARTHY;           )
    LIEUTENANT LOU CARREGA;   )
11  DETECTIVE JOSEPH HADLEY;  )
    DETECTIVE SGT. WILLIAM    )
12  TIETJEN; SGT. DARNELL     )
    HENRY; OFFICER JOE        )
13  HADLEY,                   )
                              )
14           Defendants.      )

15

16

17          T R A N S C R I P T  of the stenographic

18  notes of AUDREY ZABAWA, a Certified Court Reporter

19  of the State of New Jersey, Certificate No.

20  XI01410, taken via videoconference, on Wednesday,

21  July 22, 2020, commencing at 10:10 a.m.

22

23

24

25
```

---

Page 2

```
 1  A P P E A R A N C E S :

 2  BONJEAN LAW GROUP, PLLC
       467 Saint Johns Place
 3     Brooklyn, New York 11238
       718.875.1850
 4     jennifer@bonjeanlaw.com
       ashley@bonjeanlaw.com
 5  BY:  JENNIFER BONJEAN, ESQ.
         ASHLEY COHEN, ESQ.
 6  Counsel for Plaintiff

 7  KENYATTA STEWART, CORPORATION COUNSEL
       CITY OF NEWARK - DEPARTMENT OF LAW
 8     920 Broad Street, Room 316
       Newark, New Jersey 07102
 9     973.733.5945
       lipshutzg@ci.newark.nj.us
10  BY:  GARY S. LIPSHUTZ, ESQ.
       Assistant Corporation Counsel
11  Attorney for Defendants City of Newark (improperly
       pled as "Newark City" and "Newark Police
12     Department"), Cory A. Booker, Garry McCarthy,
       Darnell Henry, and Joe Hadley
13
    STATE OF NEW JERSEY
14  OFFICE OF THE ATTORNEY GENERAL - DIVISION OF LAW
       STATE POLICE, EMPLOYMENT, AND CORRECTIONS SECTION
15     Richard J. Hughes Justice Complex
       25 Market Street, PO Box 112
16     Trenton, NJ 08625-0112
       609.376.2948
17     Michael.Vomacka@lps.state.nj.us
       Victor.DiFrancesco@njoag.gov
18  BY:  VICTOR DiFRANCESCO, JR., DEPUTY ATTORNEY GENERAL
           MICHAEL VOMACKA, DEPUTY ATTORNEY GENERAL
19  Counsel for Defendant William H. Tietjen Jr.

20  SCHENCK, PRICE, SMITH & KING
       220 Park Avenue
21     Florham Park, New Jersey 07932 973.539.1000
       rjr@spskcom
22  BY:  REBECCA J. ROSEN, ESQ.
       Counsel for Defendant Lou Carrega
23
    Also Present:
24
       Joseph Hadley
25     Darnell Henry
```

---

Page 3

```
 1                   I N D E X

 2  WITNESS      DIRECT   CROSS   REDIRECT   RECROSS

 3  WILLIAM H. TIETJEN JR.

 4  Ms. Bonjean     4                316

 5  Mr. Lipshutz            303

 6  Ms. Rosen              311

 7

 8  NOTE:  Reporter retained exhibits.
           (Attached herewith.)
 9
               E X H I B I T S
10
    NUMBER    DESCRIPTION                 FOR IDENT.
11
    Tietjen-1, Tietjen Training Records,       24
12  Bates NJSP EVANS 503 through 506

13  Tietjen-2, Tietjen supplementary report     34
    dated 6/25/09, Bates ECPO 1343 through
14  1361

15  Tietjen-3, Hairston reports, Bates ECPO     70
    003548 through 003586
16
    Tietjen-4, Bates Newark 60 through 62       73
17
    Tietjen-5, transcript of Philander         246
18  Hampton interview 11/13/08, Bates ECPO
    000342 through 426
19
    Tietjen-6, Carrega affidavit in support    294
20  of arrest warrants, Bates ECPO 257
    through 259
21
    Tietjen-7, Tietjen supplemental report     303
22  dated 4/21/10, Bates ECPO 1315 through
    1317
23

24

25
```

---

Tietjen - Direct/Bonjean                              Page 4

 1  W I L L I A M   T I E T J E N, JR., called as a

 2  witness, having been first duly sworn,

 3  testified as follows:

 4     DIRECT EXAMINATION BY MS. BONJEAN:

 5  Q.  Good morning, Mr. Tietjen.

 6  A.  Good morning.

 7  Q.  I am in Brooklyn, so there's often

 8  background noise.  I will apologize in advance if

 9  you hear anything in the back that's distracting.

10  I'll do my best to keep the noise to a minimum.

11  And sometimes there are connectivity issues, so

12  don't hesitate to ask me to repeat something if I

13  break up or you need me to repeat.

14     Okay.  But before we get started, I'm

15  going to ask that everyone place their appearances

16  on the record.  So I'll start with myself.

17     My name is Jennifer Bonjean.

18  B-O-N-J-E-A-N.  And I represent the plaintiff, Lee

19  Evans, in this matter.

20     MR. LIPSHUTZ: Good morning.  Is it

21  sergeant, by the way?

22     THE WITNESS: It's sergeant.

23  Detective Sergeant First Class.  DSFC.

24     MR. LIPSHUTZ: Okay.  Detective

25  Sergeant, good morning.  I said hello earlier.  My

---

Evans v.
Newark City
Video Deposition

---

Tietjen - Direct/Bonjean                                    Page 5

1   name is Gary Lipshutz.  I am Assistant Corporation
2   Counsel and Chief of Litigation for the City of
3   Newark.  I represent the City, former Director
4   McCarthy, former Mayor Booker, former Detective
5   Hadley, and Sergeant Henry, now chief of police.
6   Nice to meet you, sir.
7        MR. DiFRANCESCO: Good morning.
8   Victor DiFrancesco, New Jersey Attorney General's
9   Office.  We are appearing on behalf of Sergeant
10  Tietjen, as well as the State of New Jersey.
11       MR. VOMACKA: This is Michael
12  Vomacka.  I am also with Vic in the New Jersey
13  Office of the Attorney General, representing
14  Defendant Tietjen.
15       MS. ROSEN: Good morning.  My name
16  Rebecca Rosen.  I'm at Schenck, Price, Smith &
17  King, and I'm appearing on behalf of Defendant
18  Louis Carrega.
19       MS. BONJEAN: All right.  And, Gary,
20  did you place on the record that your client's
21  were also present?  Do you want to -- I don't know
22  if you did.  I can't remember.
23       MR. LIPSHUTZ: I don't remember if I
24  did either, but present and observing the
25  deposition are the Defendants Henry and Hadley.

---

Tietjen - Direct/Bonjean                                    Page 6

1        MS. BONJEAN: And also, I should
2   point out my associate, Ashley Cohen, who is also
3   an attorney in this case, is present.  She's going
4   to be joining us online, but she's doing some
5   other things at the moment.  So we shall get
6   started.  I'm going to -- there we go.  Okay.
7        BY MS. BONJEAN:
8   Q.  Good morning, Mr. Tietjen.  As I
9   said, my name is Jennifer Bonjean.  I'd like to
10  first begin by asking you whether you have ever had
11  your deposition taken before?
12  A.  Yes, I have.
13  Q.  How many times, sir, have you had
14  your deposition taken?
15  A.  Don't know.  I know I had a civil case, I
16  believe it was an accident, years ago.  I don't
17  know exactly how many times I had a deposition
18  taken.
19  Q.  Have you ever had your deposition
20  taken in connection with your work as a law
21  enforcement officer?
22  A.  Yes, it was that prior civil case.
23  Q.  Okay.  Apart from the prior civil
24  case that you just mentioned, does anything else
25  come to mind in terms of any lawsuits in which you

---

Tietjen - Direct/Bonjean                                    Page 7

1   may have given sworn testimony?
2   A.  No.
3   Q.  Well, I'm still going to go through
4   some ground rules so we can be on the same page
5   today, and hopefully things will go smoothly.
6   Okay.  I'm going to be asking you questions and
7   expecting answers related to allegations that have
8   been raised in a civil complaint that was brought
9   by Lee Evans against yourself as a named defendant
10  and a number of other defendants.  I'm looking for
11  full and complete answers to my questions to the
12  best of your ability.  Do you understand that?
13  A.  Yes.
14  Q.  Okay.  If you do not understand one
15  of my questions, please let me know, and I will
16  rephrase the question so that we are on the same
17  page.  Okay?  Understood?
18  A.  Yes.
19  Q.  All right.  If you answer one of my
20  questions, I am going to assume that you understood
21  the question; is that fair?
22  A.  Yes.
23  Q.  You understand, sir, that you are
24  under oath today; correct?
25  A.  Yes.

---

Tietjen - Direct/Bonjean                                    Page 8

1   Q.  And that's the same oath you would
2   take as if you were in a court of law?
3   A.  Yes.
4   Q.  If you need a break, let us know.
5   I'm happy to oblige you.  Just, if there is a
6   question pending, I'd ask that you answer the
7   question before we break.  Okay?
8   A.  Yes.
9   Q.  Okay.  Can you think of any reasons
10  why you are unable to give full, complete, and
11  truthful testimony here today?
12  A.  No.
13  Q.  Okay.  Can you please state your full
14  name?  I know you did it, but will you please state
15  your full name and spell your name again for the
16  record?
17  A.  William H. Tietjen, Junior.  First name is
18  W-I-L-L-I-A-M.  Middle initial H.  Last name is T,
19  as in Tom, I-E-T-J-E-N.  And I'm a junior.
20  Q.  Also, I should have mentioned, the
21  attorneys may at various points lodge objections,
22  so I would recommend in the Zoom, the Zoom space
23  that we are in here, that maybe take a little, a
24  little pause to see if anyone has an objection
25  before answering.  I know that's easier said than

---

Video Deposition

---

Tietjen - Direct/Bonjean                               Page 9

1　done, but that seems to work best, if you can
2　remember to do that.  One other, I guess,
3　instruction I would give is that it's a natural
4　tendency to anticipate someone's questions and
5　start answering them before they've completed their
6　question, so I am going to ask that you do your
7　very best to let me complete my question even if
8　you know where I'm going with it, and I will do my
9　very best not to step on your answers.  Okay?
10　A.  Yes.
11　Q.  Okay.  Mr. Tietjen, without giving me
12　your address, where do you live?  What part of New
13　Jersey?
14　A.  Northwest New Jersey.
15　Q.  And how long have you lived there?
16　A.  Ten years plus.
17　Q.  I assume you live there with your
18　family?
19　A.  Yes.
20　Q.  Are you currently employed?
21　A.  Yes.
22　Q.  What type of work do you do?
23　A.  I am a Detective Sergeant First Class with
24　the New Jersey State Police.
25　Q.  So you are still employed by the

---

Tietjen - Direct/Bonjean                              Page 10

1　state police; is that right?  Not retired?
2　A.  Yes.
3　Q.  And how long have you worked for the
4　state police?
5　A.  24 years.
6　Q.  And forgive my math, when did you --
7　what year did you start with the state police?
8　A.  1995.  I am in my 25th year.
9　Q.  Okay.  Did you work in any law
10　enforcement capacities prior to working for the
11　state police?
12　A.  No, I did not.
13　Q.  So as a Detective Sergeant, you said,
14　First Class, was that --
15　A.  Yes.
16　Q.  What does that mean in terms of your
17　duties and responsibilities?
18　A.  I am the assistant unit head of the Missing
19　Persons Unit for the state police.
20　Q.  Has the state police always had a
21　Missing Persons Unit since your tenure there?
22　A.  Yes.
23　Q.  And what does the missing -- I mean,
24　apart from the obvious, but what does the Missing
25　Persons Unit do exactly?

---

Tietjen - Direct/Bonjean                              Page 11

1　A.  We investigate missing people;
2　unidentified, living, and deceased, Safe Haven
3　infants.  We are also the Amber Alert coordinators
4　for the State of a New Jersey approving any Amber
5　Alerts.  I guess that would cover it.
6　Q.  How long have you been assigned to
7　that unit?
8　A.  I started here in 2006, and I was here
9　through the end of 2008, and I returned in January
10　of 2013, and I've been here since then.
11　Q.  Okay.  Actually, I will probably go
12　through your employment history and assignments a
13　little more closely.  I want to back up a second.
14　　Tell me about your educational
15　history.  Graduated high school?
16　A.  Yes.
17　Q.  What high school did you go to?
18　A.  Phillipsburg High School in New Jersey.
19　Q.  Phillipsburg, you said?
20　A.  Yes.  Phillipsburg.
21　Q.  Phillipsburg.  And upon graduation,
22　what did you do by way of either further education
23　or employment?
24　A.  I went on to Rutgers University.
25　Q.  What did you study at Rutgers?

---

Tietjen - Direct/Bonjean                              Page 12

1　A.  Criminal justice.
2　Q.  And did you graduate Rutgers?
3　A.  Yes.
4　Q.  What type of degree did you earn?
5　A.  It was a Bachelor's of Science in
6　administration of justice.
7　Q.  I'm sorry.  Could you repeat that
8　again?
9　A.  It was a -- my degree was administration of
10　justice.
11　Q.  Was it a bachelor's degree or
12　associate's?
13　A.  Bachelor's.
14　Q.  Did you work while you were in
15　college?
16　A.  Only construction.  Yes, I did.
17　Q.  Okay.  Not law enforcement, but some
18　other type?
19　A.  No, no.  Summer work.
20　Q.  Understood.  And upon graduating from
21　Rutgers -- what year did you graduate, first of
22　all?
23　A.  1995.
24　Q.  Okay.  So, in 1995, then you went and
25　worked for the state police; is that right?

---

Rizman Rappaport (973)992-7650
"When every word counts"

Video Deposition

1  A.  Correct.
2  Q.  Okay.  Did you have to take any type
3  of exam to be considered for a position with the
4  state police?
5  A.  Yes.
6  Q.  What type of exam was that?
7  A.  It was a written exam.  And that was in
8  1994 I took that exam.
9  Q.  And is the state police like a civil
10  service jurisdiction type of --
11  A.  It's not a civil service exam.  It's a
12  separate state police exam.
13  Q.  Okay.  All right.  And did you apply
14  to any other law enforcement agencies other than
15  the state police?
16  A.  I applied.  An application.  I never took
17  any other tests.
18  Q.  Okay.  And what department was that?
19  A.  That was South Brunswick Police Department.
20  Q.  Now, after you took the test, I
21  assume you were offered a position at some point;
22  is that right?
23  A.  Yes.
24  Q.  And you accepted that position?  Tell
25  me about, upon acceptance of that position, did you

1  go through some type of academy?
2  A.  Yes.
3  Q.  And how long did that academy last?
4  A.  I believe it was 26 weeks.
5  Q.  And as part of the academy, did you
6  get any training, formalized or otherwise, in
7  investigations, conducting investigations?
8  A.  After the academy you're asking?  I don't
9  understand what you're asking.
10  Q.  Yeah, sure.  As part of your police
11  academy training, did you receive any instruction
12  in conducting investigations?
13  A.  In the academy, I believe it was very basic
14  investigating.
15  Q.  And after your 26 weeks at the
16  academy, I assume you were given your first
17  assignment; is that right?
18  A.  Yes.
19  Q.  And where were you assigned?
20  A.  Sussex Station in Troop B.
21  Q.  Okay.  And what was -- what's your
22  rank coming right out of the academy?
23  A.  Trooper.
24  Q.  Trooper.  How long did you hold that
25  assignment?

1  A.  Approximately six months.
2  Q.  And what was involved in that?
3  A.  It was a general road duty assignment where
4  you were assigned to a squad and you patrolled
5  towns covered by the state police in Sussex
6  County.
7  Q.  And did you do like traffic stops and
8  things like that?
9  A.  Yeah, it was a full police entity.  Traffic
10  stops, accidents, domestics, anything that
11  occurred within those municipalities that we
12  covered.
13  Q.  Okay.  And after that assignment,
14  where did you go?
15  A.  I went on to Hope Station.
16  Q.  Same type of work?
17  A.  Yes.
18  Q.  And from there, where did you head?
19  A.  I went to Perryville Station.
20  Q.  Did there come a time when you held
21  an assignment that was not your trooper duties that
22  you've described, if that makes sense?
23  A.  Yes.
24  Q.  When was that?
25  A.  In May of 1999, I was moved into a

1  detective position as a station detective.
2  Q.  Okay.  So would it be fair to say
3  that between 1995 and 1999, you worked as a trooper
4  doing, I don't want to say basic, but basic trooper
5  duties?
6  A.  Yes.
7  Q.  And was the May 1999 assignment a
8  promotion?
9  A.  No.  It's just a status change.  You put in
10  for the job.
11  Q.  Okay.  And did you ask for that --
12  ask to be a detective, or how did you do that?
13  A.  You submit a resume, application.  You go
14  before a board, and you're selected after board
15  interviews and a review of your resume.
16  Q.  Is it a competitive process?
17  A.  Yes.
18  Q.  Now, after you were selected for that
19  assignment, did you have to undergo any specific
20  training related to conducting investigations?
21  A.  Yes.
22  Q.  How long did that training last?
23  A.  I think the initial class was about two
24  weeks, and then there were various classes that
25  you would be assigned throughout your different

---

Tietjen - Direct/Bonjean                                      Page 17

1   time in the career.
2   Q.  I see.  So kind of like continuing
3   studies?  Maybe that's the wrong word.  But you had
4   in-services or continuing training after that two
5   weeks; is that right?
6   A.  Yes.
7   Q.  Are you able to, again, to the best
8   of your ability, summarize for me what your
9   training looked like during those two weeks that
10  you were training to be a detective?
11  A.  It's a basic criminal inves school that all
12  detectives have to go to, and it covers all facets
13  of state police investigative entities.  More of
14  like an introduction to, and they provide you with
15  guidance on different cases in going through, and
16  it's required before you can be -- your rank can
17  be designated as detective.
18  Q.  Did you learn, for instance, how to
19  conduct interviews of witnesses or suspects that
20  might be involved in an investigation?
21  A.  I imagine it was in the class, but I also
22  attended, like, interviewing/interrogation school
23  as well.
24  Q.  I see.  Do you remember approximately
25  when you did that?

---

Tietjen - Direct/Bonjean                                      Page 18

1   A.  No.  I would have to look at the
2   transcript.
3   Q.  Fair enough.  I may ask you some more
4   questions about your training later, but we'll move
5   on.
6       After you completed the training, you
7   now are assigned as a detective.  Do you have a
8   particular physical location where you're assigned?
9   A.  Yes.  I was assigned at Washington Station.
10  Q.  Washington Station.  And what were
11  your day-to-day duties as a detective at the
12  Washington Station?
13  A.  It was investigative assistance for the
14  troopers who were on the road assigned to the
15  station, and then we would follow up on
16  investigations that they initiated, needed further
17  assistance.  We reviewed their investigations.
18  And then we would take our own investigations, if
19  someone called directly to us to handle within the
20  communities we patrolled.
21  Q.  I see.  What types of investigations
22  would you say were most common?  Again, we're
23  talking in 1999 when you were working in this
24  detective position.
25  A.  We would get involved in burglaries and

---

Tietjen - Direct/Bonjean                                      Page 19

1   thefts probably would be our most common.
2   Q.  I see.  And how did that work with
3   local municipalities, police departments?  I mean,
4   how did you decide -- or how was it decided whether
5   or not a state trooper would conduct an
6   investigation into say a burglary versus whatever
7   local municipality was, law enforcement agency, was
8   policing the area where -- that's a terrible
9   question -- but I hope you understand what I'm
10  saying.
11      If a burglary occurred in a
12  municipality where there was a law enforcement
13  agency, how was it determined whether you would
14  handle that or the local law enforcement agency
15  would handle it?
16  A.  We would not cover any cases that were
17  handled by a local law enforcement agency.
18  Q.  I see.  So your jurisdiction were
19  areas that were not covered by local law
20  enforcement agencies; is that right?
21  A.  Yes.
22  Q.  Did you stay at Washington Station
23  for a period of time?
24  A.  Yes.
25  Q.  How long?

---

Tietjen - Direct/Bonjean                                      Page 20

1   A.  Approximately a year.
2   Q.  Do you recall where you went after
3   that?
4   A.  Sussex Station.
5   Q.  Again, doing the same type of work?
6   A.  Yes.
7   Q.  And how long were you at Sussex?
8   A.  Approximately a year and a half.
9   Q.  Okay.  So does that bring us to like
10  early 2000s?
11  A.  Yes.
12  Q.  All right.  Again, were you doing the
13  same type of work there?
14  A.  Yes, yes.
15  Q.  Same types of investigations that you
16  were conducting?
17  A.  Yes.
18  Q.  Had you worked on any murder
19  investigations at that point?
20  A.  No.  Oh, when I was at Sussex, I was
21  assigned to like a long-term multi-victim case as
22  part of the task force.
23  Q.  Okay.  Is that how state police
24  usually get involved in serious investigations,
25  like murder investigations, usually as part of a

---

Video Deposition

---

Tietjen - Direct/Bonjean                                    Page 21

1  task force?
2  A.  No.  If we had a murder within our station
3  area while I was assigned there, we would be the
4  investigating authority for that.  But this was a
5  state police case that our Major Crime Unit was
6  running that grabbed detectives for a task force
7  in furtherance of that investigation.
8  Q.  I see.  After Sussex, where did you
9  go?
10  A.  I went to Newark Station on the New Jersey
11  Turnpike.
12  Q.  Okay.  And how long were you there?
13  A.  From roughly around 2000 -- end of 2001
14  through January of 2006.
15  Q.  Okay.  So for a while?
16  A.  Yes.
17  Q.  Did you still hold the same position
18  while you were at Newark Station?
19  A.  Yes.
20  Q.  And that was as a detective?
21  A.  Yes.  Station detective, yes.
22  Q.  Station detective.  I'm sorry.  I'm
23  not used to the state law enforcement lingo as much
24  as I am other departments, so bear with me if I
25  need clarification or need you to repeat something.

---

Tietjen - Direct/Bonjean                                    Page 22

1      Where did you go after Newark
2  Station?
3  A.  I went to the Missing Persons Unit.
4  Q.  Okay.  And where is the Missing
5  Persons Unit located?
6  A.  Division headquarters in West Trenton, New
7  Jersey.
8  Q.  How many people make up the Missing
9  Persons headquarters?
10  A.  Every year -- it depends.  We've had a high
11  of ten and probably a low of five.
12  Q.  And you said the Missing Persons Unit
13  was in existence since you started in 1995, so it
14  was already very much an operating unit at the time
15  that you joined it; right?
16  A.  Yes.
17  Q.  Did you ask for that position, or
18  were you assigned there?
19  A.  I asked.
20  Q.  Did you have -- what was your
21  interest in working in the Missing Persons Unit?
22  A.  It was a type of investigation that I saw
23  value or enjoyment in furthering.
24  Q.  Okay.  Gotcha.  Is it fair to say
25  you've been there ever since?

---

Tietjen - Direct/Bonjean                                    Page 23

1  A.  I was in two other units in the middle of
2  that time as well.
3  Q.  Yeah.  I think you said in 2006 and
4  2008?
5  A.  Yes.
6  Q.  Where did you go?
7  A.  December 2008, I went on to the Fugitive
8  Unit as a --
9  Q.  Fugitive Unit.  Is that tracking down
10  fugitives?
11  A.  Yes.
12  Q.  Any other assignments since 2001
13  other than the Missing Persons Unit and the
14  Fugitive Unit?
15  A.  The Alcohol Drug Test Unit.
16  Q.  The Alcohol Drug Test Unit?
17  A.  Yes.
18  Q.  What's that?
19  A.  That's -- they do the alcohol drug testing
20  system.  The Breathalyzer is, I guess, the easiest
21  term.
22  Q.  When were you there?
23  A.  September of '12 through January of '13.
24  Q.  You mentioned that in addition to the
25  two-week training that you underwent when you

---

Tietjen - Direct/Bonjean                                    Page 24

1  became a detective that there was additional
2  training that you participated in over the course
3  of your time in the Missing Persons Unit; is that
4  right?
5  A.  Yes.
6  Q.  Can you tell me about what type of
7  training you did apart from that two-week training
8  related to conducting investigations, to the best
9  of your memory?
10  A.  Sex crimes, interview/interrogation,
11  identity theft.  We have a money laundering on
12  there, too.  Trucks and terrorism.  Some narcotics
13  class.
14  Q.  I'm going to have you look at a
15  document.
16  A.  A juvenile interview class I went through
17  as well.
18  Q.  I am going to have you look at a
19  document that we're going to mark.  If you look at
20  the file that you have, I believe it says "Training
21  Records Tietjen."
22      MS. BONJEAN: And I think you have
23  that also, Audrey.
24      (Tietjen-1, Tietjen Training Records,
25  Bates NJSP EVANS 503 through 506, was received and

---

| Tietjen - Direct/Bonjean | Page 25 |
|---|---|

1  marked for identification.)
2 Q.  Do you see that?
3 A.  Yes.
4 Q.  I have handed you what we are going
5  to mark as Tietjen-1.  Do you recognize that
6  document, Mr. Tietjen?
7 A.  Yes.
8 Q.  I'm sorry.  And I know you are still
9  sworn personnel, so I don't mean to call you
10  Mister.  Sergeant Tietjen.  Is that right?
11 A.  Yes.
12 Q.  What do you recognize that document
13  to be?
14 A.  It's our online list of courses, ranking,
15  and organizations you were part of throughout your
16  career.
17 Q.  Does that reflect the trainings you
18  received over the course of your time with the
19  state police, I guess at least between -- it says
20  '89.  I think -- I don't know if that's accurate.
21  That might be a typo.
22 A.  That's a typo.
23 Q.  Yeah, because I know you said you
24  didn't start there until '95, so... But does this
25  generally reflect the class work and training you

| Tietjen - Direct/Bonjean | Page 26 |
|---|---|

1  received between '95 and November of 2017?
2 A.  It does, except for portions that were
3  outside of an SP program.
4 Q.  I'm sorry.  Can you repeat that?
5 A.  You could take a course, like I've taken
6  courses, and you have to fill out documentation,
7  either include it into in your resume or not.  So
8  in my recent term, many of my recent classes are
9  not on here at all because it would require me to
10  fill out a form and submit it, and there's -- no,
11  they are not listed.
12 Q.  Okay.  Fair enough.  What about,
13  let's say, would you say it's accurate to the
14  extent that it reflects your training between,
15  we'll say, January of 2007 through October of 2012?
16 A.  Yes.
17 Q.  Okay.  Now, at some point you sought
18  a promotion and received a promotion; am I right?
19 A.  All of my promotions were not sought.  They
20  were -- you're selected.
21 Q.  Gotcha.  And when you were working in
22  the Missing Persons Unit between 2001 and 2006,
23  what was your rank?
24 A.  I was Detective -- I was Detective 1 at the
25  time.

| Tietjen - Direct/Bonjean | Page 27 |
|---|---|

1 Q.  And are there different levels of
2  being a detective, I assume?  Sounds so.
3 A.  Yes.
4 Q.  Is that based on experience?
5 A.  It's a year of service.
6 Q.  Okay.  And apart from the different
7  levels of detectives, what's the next rank up from
8  there?
9 A.  It would be Detective Sergeant.
10 Q.  And is that what you are?
11 A.  No.  I'm a Detective Sergeant First Class.
12  I'm the next above.
13 Q.  Okay.  And how many detective levels
14  are there, or is it as many as your years are?
15 A.  No, there's -- well, there's -- you could
16  be a Detective, a Detective 2, a Detective 1, a
17  Detective Sergeant, and then a Detective Sergeant
18  First Class.
19 Q.  So you are a Detective Sergeant First
20  Class.  And tell me when did you become first a
21  Detective Sergeant?
22 A.  In 2000 -- well, I was trained through the
23  Fugitive Unit.  Our process is related to you're
24  in an acting capacity.  So I was a Detective
25  Sergeant there, and I was promoted while I was in

| Tietjen - Direct/Bonjean | Page 28 |
|---|---|

1  the Fugitive Unit to Detective Sergeant.  And that
2  was in, I think -- my promotion came out
3  September 25th of '10.  2010.
4 Q.  And these assignments that are listed
5  in Tietjen-1, does that appear to be an accurate
6  reflection of your assignments?
7 A.  Yes.
8 Q.  Okay.  Great.  You can put that
9  aside.
10     (Videographer joined proceedings.)
11     THE VIDEOGRAPHER: My name is John
12  Edmunds.  I'll be operating the videotape
13  equipment this morning and this afternoon.
14     MS. BONJEAN: I think for the
15  purposes of the video, I'm just going to ask --
16  I'm not going to go back over anything.  I'm just
17  going to ask him to reintroduce himself, spell his
18  name for the record for purposes of the video.
19     THE WITNESS: William Tietjen,
20  Junior.
21     THE VIDEOGRAPHER: Before you do
22  that, sir, let me just put you on the screen.  Who
23  is the witness?  Could you raise your hand,
24  please?  Very good.  You can proceed.
25     MS. BONJEAN: Thank you.

Evans v.
Newark City

Video Deposition

Tietjen - Direct/Bonjean                                        Page 29

1       BY MS. BONJEAN:
2   Q.  I am going to ask the deponent to
3   please, for about the fifth time, identify himself
4   for the videographer's purpose, and spell your full
5   name again, sir.
6   A.  William H. Tietjen, Junior.  First name
7   W-I-L-L-I-A-M.  Middle initial is H.  Last name is
8   T-I-E-T-J-E-N.  Junior, J-R.
9   Q.  Thank you.  We just left off talking
10  a little bit about your employment history.  I
11  wanted to move on to ask you what, sir, did you do
12  to prepare for your deposition here today?
13  A.  I reviewed the documents that were provided
14  to me last evening.
15  Q.  And did you take any other actions in
16  preparation for your deposition here today other
17  than looking at the documents that were sent along
18  to you?
19  A.  No, I did not.
20  Q.  And without revealing any
21  communications, can you tell me whether you met
22  with your attorneys in preparation for your
23  deposition here today?
24  A.  I had phone conversations.
25  Q.  How many phone conversations did you

Tietjen - Direct/Bonjean                                        Page 30

1   have?
2   A.  A total of three.
3   Q.  Can you estimate how long each of
4   those conversations lasted?
5   A.  I believe the first two were more
6   introductory in setting up previous dates.  And
7   then last night we spoke for about 15 minutes, I
8   guess.
9   Q.  Have you read the complaint in this
10  case, Sergeant Tietjen?
11  A.  I saw a copy of it years ago.  I do not
12  have a copy of it now.
13  Q.  That's fine.  I just wasn't sure if
14  you ever had a chance to look at it.  But it's not
15  something you looked at recently; correct?
16  A.  No.
17  Q.  And what's your understanding of why
18  you have been sued in connection with this case?
19  A.  Because I was part of the investigation.
20  Q.  What is your understanding of why
21  there is a lawsuit being brought in connection with
22  this case for any reason, if you know?
23  A.  I don't know, except for what the complaint
24  stated.
25  Q.  And based on your recollection of the

Tietjen - Direct/Bonjean                                        Page 31

1   complaint, what's your understanding of what
2   Mr. Evans is complaining about?
3   A.  I believe he's stating he was wrongfully
4   accused of this crime.
5   Q.  Okay.  Now, you know that there were
6   many defendants that were named along with yourself
7   in this case, and now there is a smaller group of
8   defendants.  I want to ask you about some of them.
9       Well, first let me start, were you
10  the only state police officer who worked on this
11  investigation?
12  A.  No.
13  Q.  Okay.  How many state police
14  personnel worked on this, if you know?
15  A.  I don't know.  I know we had a detective in
16  1988, I guess, and a polygraphist helped as well.
17      (Reporter requested clarification.)
18      MS. BONJEAN: I think he said a --
19      THE WITNESS: He did a polygraph.
20  Q.  I almost said polygamist, but I know
21  that's not what --
22  A.  Polygraphist.  A guy in our Polygraph Unit.
23  Q.  Do you know Mr. Hadley?  Or I don't
24  know if he's retired right now.  But do you know
25  Joe Hadley?

Tietjen - Direct/Bonjean                                        Page 32

1   A.  I know him from working with him on this
2   case, yes.
3   Q.  And have you had any contact with him
4   since 2011?
5   A.  Not that I can -- no.
6   Q.  Okay.  Do you remember the last time
7   you spoke to Detective Hadley?
8   A.  Probably around the time of the trial.
9   Q.  But you haven't maintained any
10  contact with him since the trial?
11  A.  No.
12  Q.  And have you had any conversations
13  with Detective Hadley in connection with the civil
14  lawsuit that was brought by Mr. Evans?
15  A.  No.
16  Q.  What about Chief Henry, when is the
17  last time you spoke to Chief Henry about the
18  subject matter of this case?
19  A.  Probably, again, the same time of trial.
20  Q.  So Chief Henry and Detective Hadley
21  are not individuals who you maintain contact with;
22  correct?
23  A.  Correct.
24  Q.  What about Lieutenant Carrega, now
25  retired, I believe, when was the last time you

Evans v.
Newark City

Video Deposition

---

Tietjen - Direct/Bonjean                                    Page 33

1  spoke to him?
2  A.  The trial as well.
3  Q.  All right.  I want to now hone in a
4  little bit about -- in on your work on the five
5  missing boys.  And to the extent that you need to
6  refresh your recollection, that's fine.  I may ask
7  you to try to remember to the best of your ability,
8  and then we'll see how far we get, and then we can
9  refer to your reports, if necessary.  Okay?
10  A.  Yes.
11  Q.  Do you recall when it was that you
12  became involved in the investigation of the missing
13  boys from Newark that went missing in 1978?
14  A.  May of 2008.
15  Q.  And describe for me the circumstances
16  under which you were brought into the case?
17  A.  Lieutenant Carrega from the Essex County
18  Prosecutor's Office contacted my unit looking for
19  any assistance or any reports that we might have
20  had from the prior involvement in this case.
21  Q.  And when Lieutenant Carrega contacted
22  your unit, would that have been the Missing Persons
23  Unit that you were working in?
24  A.  Yes.
25  Q.  And did you speak directly with

---

Tietjen - Direct/Bonjean                                    Page 34

1  Lieutenant Carrega when he called?
2  A.  That -- I have to look and see.  I think I
3  spoke to him later that date and set up a meeting
4  with him.  It was May 2nd when he called here, and
5  then I think -- I would have to turn to the next
6  page to see the exact date when I spoke to him.
7  Q.  Why don't we go ahead and mark your
8  report now so that we can have that at your
9  disposal.
10     MS. BONJEAN: It is going to be, for
11  everyone else, I believe it's, "Tietjen Sup
12  6/25/2009."  And if you could mark that, Audrey,
13  as Tietjen-2, I guess.
14     (Tietjen-2, Tietjen supplementary
15  report dated 6/25/09, Bates ECPO 1343 through
16  1361, was received and marked for identification.)
17  Q.  If you can pull that out and refer to
18  it to the extent you need it.  Okay?
19  A.  Yes.
20  Q.  Okay.  I'm first going to have you
21  looked at what's now been marked as Tietjen-2, and
22  I'm going to represent it bears a Bates stamp at
23  the bottom that says, ECPO 001343 on the first
24  page.  Is that what you're showing as well,
25  Sergeant?

---

Tietjen - Direct/Bonjean                                    Page 35

1  A.  Yes, yes.
2  Q.  Okay.  I just want to make sure that
3  we have the same document.  And it is a report that
4  is 19 pages; is that right?
5  A.  Yes.
6  Q.  Okay.  Can you please identify this
7  report?
8  A.  It's a supplemental investigation report
9  that I authored.
10  Q.  All right.  And this is your report;
11  right?
12  A.  Yes.
13  Q.  And it has your signature on every
14  page actually of this report; correct?
15  A.  Yes.
16  Q.  And you used the New Jersey State
17  Police formatting for reflecting your work in this
18  case; am I correct about that?
19  A.  Yes.
20  Q.  All right.  So I am going to refer
21  you to the first page, and there is some boxes that
22  are on the first half of the page, but at the
23  bottom it looks like it starts sort of a narrative
24  of the work you did in connection with this
25  investigation.  Is that a fair characterization?

---

Tietjen - Direct/Bonjean                                    Page 36

1  A.  Yes.
2  Q.  All right.  And I notice that the
3  report is dated 6/25/2009.  Do you see that?
4  A.  Yes.
5  Q.  Obviously, it reflects work that you
6  did in May of 2008 and dates prior to June of 2009.
7  Do you see that?
8  A.  Yes.
9  Q.  How did this report get prepared?
10  I'll just leave the question as open-ended as that.
11  How did it get prepared?  If you understand.  I can
12  clarify if you don't.
13  A.  I typed the report for areas of the
14  investigation that I was involved in.
15  Q.  Did you type the report on or around
16  June 25th of 2009?
17  A.  Yes.
18  Q.  Okay.  And all of the information
19  that is reflected in this report that reflects law
20  enforcement activity or investigative work that
21  predated June 25th, 2009, did you get that
22  information from your memory, or how did you
23  memorialize information?
24  A.  I had notes.
25  Q.  So there were original notes that you

---

Evans v.
Newark City

Video Deposition

Tietjen - Direct/Bonjean                                    Page 37

1 had?
2 A. Yes.
3 Q. How did you take notes back in, I
4 guess, May of 2008?
5 A. Either on a notepad or in a, like a binder
6 pad.
7 Q. So it was just like basically a
8 regular notebook with blank pieces of paper?
9 A. Yes.
10 Q. And you would memorialize your work
11 in that notebook, handwritten notes; is that --
12 A. Yes, yes.
13 Q. And then I assume in and around
14 June 25th, 2009, you referred back to your notes to
15 create this final document or final product; is
16 that right?
17 A. Yes.
18 Q. What did you do with your original
19 notes?
20 A. Don't know.
21 Q. Okay. Do you know whether or not you
22 maintained them?
23 A. Don't know.
24 Q. Do you recall whether or not you
25 provided those notes to, the original notes, to any

Tietjen - Direct/Bonjean                                    Page 39

1 but I haven't looked for original notes on this
2 case.
3 Q. Okay. And was it your practice to,
4 once you put information from your handwritten
5 notes into a final report, that you would hold onto
6 your notes for a period of time, and not just in
7 this case, but in any case?
8 A. No. It would depend on what they were
9 contained within, whether be a five-subject
10 notepad that I continuously used throughout, or
11 like a pad you keep in your rear pocket or in your
12 coat pocket when you're working a job.
13 Q. Okay. Did you eventually destroy or
14 throw away your notes at some point? Again, I'm
15 just going to direct you to your general habit or
16 practice during this time period of 2008?
17 A. Notepad, the small notepad, they would have
18 been thrown away.
19 Q. Okay. And was there any policy or
20 practice of the department that required you to
21 turn in your handwritten notes to somebody for
22 preservation?
23 A. Not that I can recall.
24 Q. As you sit here today, you don't
25 recall specifically what you did with your

Tietjen - Direct/Bonjean                                    Page 38

1 supervisor or any other individual?
2 A. No.
3 Q. You don't recall, or you're sure that
4 you wouldn't have given them to somebody else?
5 A. I'm pretty positive I didn't give them to
6 anybody else.
7 Q. Okay. You don't remember handing
8 them over to the Essex County prosecutor; is that
9 right?
10 A. No.
11 Q. So once you put your information into
12 your final report, you kept your notes, but you
13 don't recall what, if anything, you did with them;
14 is that fair?
15 A. Correct.
16 Q. Do you know if you still have your
17 notes?
18 A. Don't know. I don't know.
19 Q. Well, do you have any of your
20 notes -- well, strike that.
21 Let me ask you this. What was your
22 habit back in 2008 in terms of maintaining your
23 original notes, if you had one?
24 A. I would have some binders that were still
25 from different cases, just in a pile in my office,

Tietjen - Direct/Bonjean                                    Page 40

1 handwritten notes for the missing boys
2 investigation; right?
3 A. No, I don't recall.
4 Q. But it sounds like it's possible that
5 you may still have them; is that correct?
6 A. I don't know.
7 Q. Okay. Would you mind looking?
8 A. I guess I could try to look, yeah.
9 Q. Right. Thank you. I would ask that
10 you, if you could, look for any original
11 handwritten notes that you might have and then let
12 your attorney know so they can let me know. Okay?
13 A. Okay.
14 Q. Looking at Tietjen-2, in the
15 narrative section, you identified the missing young
16 men who were juveniles at the time.
17 Did you have any independent
18 knowledge about this case prior to getting
19 involved? The missing boys.
20 A. I think I may have seen a news article on
21 it at some point, or information, but not from my
22 recollection.
23 Q. And you also saw that there were
24 suspects -- or you also list that there were
25 suspects, Lee Evans and Philander Hampton; right?

Evans v.
Newark City

---

Tietjen - Direct/Bonjean                           Page 41

1  A.  Correct.
2  Q.  And, again, this would have been
3  information that you obtained when you were first
4  assigned to the case, I assume, since it's the
5  start of your narrative; is that right?
6  A.  No.
7  Q.  I'm sorry?
8  A.  No, that's not true.
9  Q.  Okay.  So what -- explain to me how
10 the information got here at the beginning of your
11 narrative?
12 A.  The spot where we would list suspects on
13 our report?
14 Q.  Yeah.
15 A.  So throughout that time from May of 2008
16 through the end of this report, those two
17 individuals became suspects at some point in
18 there.
19 Q.  I see.  So this information that I
20 will say is above the date, May 2nd, 2008, is
21 information for summary information that you
22 included when you prepared the report back in June
23 of 2009, and for the record, that is your
24 collective belief or understanding of the case;
25 right?

---

Tietjen - Direct/Bonjean                           Page 42

1  A.  Yes.
2  Q.  All right.
3      (Reporter requested clarification.)
4  Q.  I'm still on the first page of your
5  report.  There is a narrative section that is
6  preceded by the date May 2nd, 2008.  Do you see
7  that?
8  A.  Yes.
9  Q.  Now, what happened on May 2nd, 2008?
10 A.  That is the day that Lieutenant Carrega
11 contacted my unit.
12 Q.  And when you say contacted your unit,
13 do you recall if he spoke to you or someone else?
14 A.  No.  He spoke to my assistant unit head at
15 the time.
16 Q.  And was that Jones?
17 A.  Yes.
18 Q.  And do you know whether or not
19 Mr. Jones -- well, strike that.  I'm sorry.
20     Did you have any conversations with
21 Lieutenant Carrega on May 2nd of 2008?
22 A.  Yes.
23 Q.  Okay.  So what was your understanding
24 of what Carrega told Jones?
25 A.  That he was looking for assistance with

---

Tietjen - Direct/Bonjean                           Page 43

1  this investigation and possibly looking to see if
2  he had reports on it.
3  Q.  So was his interest primarily to see
4  what sort of paperwork the state police had
5  generated in connection with the case previously?
6  A.  I don't know.  He contacted for general
7  assistance with the case.
8  Q.  What does general assistance mean to
9  you?
10 A.  It would be somebody just calling, an
11 agency calling to see if we, number one, had
12 anything, if we knew of anything, and then
13 potentially if we could offer them anything, or
14 any assistance on the case.
15 Q.  Okay.  And you said that you did
16 eventually speak with Lieutenant Carrega yourself
17 on May 2nd, 2008?
18 A.  Yes.
19 Q.  And was that in a subsequent
20 conversation, or did Jones hand you the phone, or
21 how did that work?
22 A.  I do not recall that.
23 Q.  Okay.  Tell me what you recall about
24 your conversation with Lieutenant Carrega on May
25 2nd of 2008?

---

Tietjen - Direct/Bonjean                           Page 44

1  A.  We set up -- agreed to meet on May 9th at
2  the Essex County Prosecutor's Office.
3  Q.  What else did he tell you about the
4  case?
5  A.  That -- he told me that he had a main
6  suspect in the case of Lee Evans.
7  Q.  Did he tell you anything else about
8  the case?
9  A.  Not on that date, no.
10 Q.  Now, I know you are looking at your
11 report --
12 A.  Sure.
13 Q.  -- to refresh your recollection, and
14 that's fine.  I would just ask, though, that you
15 also think about whether you have any additional,
16 independent recollection of information that may
17 have been communicated that is not reflected here
18 because, for whatever reason, maybe you didn't
19 think it was important to put in here.
20     So, apart from what you have read on
21 this report, can you think of any other information
22 that Lieutenant Carrega provided to you during your
23 phone conversation on May 2nd of 2008?
24 A.  No.
25 Q.  Do you recall whether in that phone

---

Evans v.
Newark City

Video Deposition

| Tietjen - Direct/Bonjean | Page 45 |
|---|---|

1  conversation he told you that he wanted you
2  actively involved in the investigation or asked
3  whether you would be interested in being involved
4  in the investigation?
5  A.  No.
6  Q.  Did he explain to you who was in
7  charge of the investigation?
8  A.  He was.
9  Q.  How did you -- well, strike that.
10  He told you he was in charge of the
11  investigation or leading the investigation?
12  A.  He was -- he expressed to me he was on the
13  Cold Case Unit for the Essex County Prosecutor's
14  Office looking at this case, so that would mean he
15  was the lead of that aspect.
16  Q.  Did he tell you who else was
17  participating in this cold case investigation?
18  A.  Not that I recall.
19  Q.  Were you aware whether or not the
20  Essex County Prosecutor's Office had a Cold Case
21  Unit?
22  A.  No.
23  Q.  Were you familiar with the concept of
24  a Cold Case Unit back in 2008?
25  A.  Yes.

| Tietjen - Direct/Bonjean | Page 46 |
|---|---|

1  Q.  Okay.  What was your understanding of
2  what a Cold Case Unit does?
3  A.  That you would review cases that have
4  extended beyond a certain period of time,
5  typically identified by the department, at the
6  time of it.  It would then go into a Cold Case
7  Unit.  Whether it be Cold Case Missing Persons,
8  Homicide, or Unidentified Remains.
9  Q.  And Lieutenant Carrega told you that
10  they had a main suspect Lee Evans.  Did he mention
11  any other suspects in the case other than Lee Evans
12  when he first spoke to you on May 2nd, 2008?
13  A.  No, he did not.
14  Q.  Did he mention how long the
15  investigation had been going on since it had been
16  reopened, if that makes sense?
17  A.  No.
18  Q.  I guess the better way to ask the
19  question is did he tell you how long he had been
20  working on this cold case prior to contacting you?
21  A.  No.
22  Q.  Did he indicate to you any theories
23  about how he thought that the boys had either been
24  murdered or had gone missing during this first
25  conversation?

| Tietjen - Direct/Bonjean | Page 47 |
|---|---|

1  A.  No.
2  Q.  He just said he believed that Lee
3  Evans was the main suspect, and that was pretty
4  much the extent of his -- the conversation?
5  A.  Well, I can't recall the exact
6  conversation, but he had mentioned that Lee Evans
7  was a suspect in their disappearance.
8  Q.  But you don't recall him mentioning
9  anybody else as a suspect?
10  A.  No.
11  Q.  Now, it looks like that you -- he
12  asked you to do something because you did some
13  investigative work subsequent to that conversation;
14  right?
15  A.  Yes.
16  Q.  What did you do?
17  A.  On May 8th, he contacted me again, and he
18  was looking to speak to a potential witness,
19  Philander Hampton.
20  Q.  I noticed in your report, if you look
21  at page 2, you did do some, I guess, research into
22  the --
23  (Connectivity issues.)
24  MR. VOMACKA:  The audio cut off.
25  Would you repeat that?

| Tietjen - Direct/Bonjean | Page 48 |
|---|---|

1  MS. BONJEAN:  Sure, yes.
2  Q.  Sergeant Tietjen, according to your
3  report on page 2, it looks to me as if you did some
4  research looking into the files that the state
5  police may have had related to these missing boys;
6  is that right?
7  A.  Yes.
8  Q.  Okay.  And did you do that because
9  you were asked to do that, or did you do that just
10  on your own as part of your inquiry?
11  A.  That would be on my own.
12  Q.  Did Lieutenant Carrega ask you to
13  confirm, or try to find information that might
14  confirm, whether or not the boys were still alive,
15  or was it assumed that they were dead at that
16  point?
17  A.  I believe we had a conversation at some
18  point.  I don't know which day.  I know I checked
19  Experian, which was a social security number
20  search, as well as reviewing the entries.
21  Q.  Right.  And I see that on the second
22  page of your report, you mention that you looked at
23  Experian.  You said, Refer to Experian search
24  results.  What was the purpose in looking at
25  Experian?

**Tietjen - Direct/Bonjean** — Page 49

1  A.  It would list if they had credit, the
2  social security numbers that were included in the
3  missing persons entry, or had like a credit
4  report.
5  Q.  And why would that be important
6  information to develop?
7  A.  That would be potentially indicative of
8  either somebody using their number or them using
9  the number, whether their true name or on another
10  name.
11  Q.  And if they were using their number,
12  what would that tell you?
13  A.  It would just list that they had credit to
14  a specific address.  Potentially a spouse as well.
15  Q.  Would it also give you some
16  indication as to whether they were alive?
17  A.  That their number potentially is alive,
18  yes.
19  Q.  That's the reason you were looking;
20  right?
21  A.  Yes.
22  Q.  Now, it says here that you, on the
23  second page, that you contacted Lieutenant Carrega,
24  and you agreed to meet on May 9th, 2008, at the
25  Essex County Prosecutor's Office.

**Tietjen - Direct/Bonjean** — Page 50

1  It says, "Lieutenant Carrega advised
2  that the main suspect in this investigation is Lee
3  Evans," who you've identified here.
4  You did then have a meeting face to
5  face with Lieutenant Carrega on May 8th; is that
6  right?
7  A.  No.
8  Q.  May 9th?
9  A.  May 9th.
10  Q.  Okay.  Am I correct that even before
11  that meeting on May 9th, you had another
12  conversation with Lieutenant Carrega on May 8th?
13  A.  Yes.
14  Q.  What was the nature of that
15  conversation?
16  A.  He contacted me and he advised he was
17  looking for information on an individual that he
18  wanted to speak to.
19  Q.  And who was that individual that
20  Lieutenant Carrega wanted to speak to when he spoke
21  to --
22  A.  Philander Hampton.
23  Q.  Okay.  I'm going to ask you to let me
24  finish my question just so the record is clear.
25  Don't worry.  It happens all the time.

**Tietjen - Direct/Bonjean** — Page 51

1  One more time.  When you spoke to
2  Lieutenant Carrega on May 8th, 2008, he told you
3  some additional information.  Can you tell me again
4  what that information was?
5  A.  He advised that he was looking to interview
6  a Philander Hampton.
7  Q.  He wanted to interview a Philander
8  Hampton.  And what did he want you to do to
9  facilitate or assist him in interviewing a
10  Philander Hampton?
11  A.  It was just if I had any additional
12  databases that I had access to, to see if he could
13  locate additional information on him.
14  Q.  And did you do that?
15  A.  Yes.
16  Q.  Did Carrega explain to you why he
17  wanted to interview Philander Hampton?
18  A.  No.  Just that his name was part of the
19  investigation.
20  Q.  So at this point, you didn't really
21  have any knowledge about the case in terms of the
22  investigative work that had been conducted; you
23  were just doing some tasks that you were asked to
24  by Lieutenant Carrega up until May 8, 2008; is that
25  right?

**Tietjen - Direct/Bonjean** — Page 52

1  A.  Yes.
2  Q.  On May 8, 2008, I'm going to direct
3  you to this last sentence here, where you wrote, "I
4  also compared the five boys' physical information
5  to that of unidentified human remains recovered in
6  New Jersey, since their disappearance, but was
7  unable to locate any viable matches."
8  How did you do that?
9  A.  Repeat the end of that question?
10  Q.  How did you do that?  What was that
11  work that you did?
12  A.  We maintain a database, both paper and
13  spreadsheets of all our unidentified remains in
14  New Jersey.  And there's data that's collected on
15  the entry that is part of that spreadsheet, so
16  you're able to look through for remains that would
17  be of a potential match to height, weight, year,
18  dates found, date of death, et cetera, and
19  locations of the find as well.
20  Q.  And when you were putting in the
21  information, were you using the boys' physical
22  appearances as of the date they went missing?
23  A.  Yes.  And I'm not putting it in.  I'm
24  looking at that information with that reflective
25  information.

Video Deposition

---

Tietjen - Direct/Bonjean | Page 53

1 Q. Okay. So when you were doing that
2 analysis or that investigative -- strike that
3 When you were looking at this data,
4 you were using the age and date, or the age and
5 physical appearances of the boys from the date that
6 they went missing; correct?
7 A. Yes.
8 Q. You were looking for like teenage
9 boys, you weren't looking for grown men; am I
10 right?
11 A. Yes.
12 Q. And, again, that would be working
13 under the assumption, of course, that they actually
14 died in and around the time that they went missing;
15 correct?
16 A. Yes.
17 Q. All right. Now, on May 9th, you did
18 have that meeting with Lieutenant Carrega of the
19 Essex County Prosecutor's Office; is that right?
20 A. Yes.
21 Q. And just to be clear, the narrative
22 that you have written about that meeting as
23 reflected in your report came from your notes, not
24 from your memory; is that right?
25 A. Yes.

---

Tietjen - Direct/Bonjean | Page 54

1 Q. And they came from your notes that
2 had been taken a year earlier; right?
3 A. Yes.
4 Q. Did you prepare any reports
5 contemporaneous with your investigative work?
6 A. I don't know when I started typing this
7 report. The date reflects the completion of the
8 report.
9 Q. Um-hum.
10 A. I don't know when I started typing. I
11 could have started typing it months before.
12 Q. But not years before, not a year
13 before?
14 A. I don't know.
15 Q. Well, I mean you testified earlier
16 that that the report, which starts off with this
17 "Additional Missing Juveniles" and "Suspects" was
18 information that you put in after June 25th, or
19 around June 25, 2009; right?
20 A. Well, the report was completed June 25th,
21 2009, yes.
22 Q. Right. And I asked you earlier about
23 the first part of the narrative where it says
24 "Suspects" and "Additional Missing Juveniles."
25 Right?

---

Tietjen - Direct/Bonjean | Page 55

1 A. Yes.
2 Q. And I asked you was that information
3 that you had as of May of 2008, and you said no,
4 that would have been, you know, after all of the
5 investigative work you did, that's where you
6 included that; is that right?
7 A. Yes.
8 Q. So would that lead you to believe
9 that you did not start preparing this report until
10 close in time to June 25th of 2009?
11 A. Probable somewhere within months of that
12 date.
13 Q. Okay. Now, without looking at your
14 report first, let's just go based off memory, tell
15 me what you remember about your meeting on May 9th,
16 2008, with Lieutenant Carrega?
17 A. I met with Lieutenant Carrega. He
18 expressed his thoughts on the case, his concerns
19 about Lee Evans, and the early processes of the
20 investigation, that he still felt Lee Evans was a
21 suspect in the case.
22 Q. Who else was present for that
23 meeting?
24 A. I don't recall.
25 Q. Were there other people present?

---

Tietjen - Direct/Bonjean | Page 56

1 A. I don't believe so. I'd have to look at
2 the notes -- I mean, I would have to look at my
3 report to see if there was, but I don't believe
4 there was.
5 Q. Okay. And did he express to you
6 during that meeting any other leads that he was
7 looking at other than Lee Evans?
8 A. Not that I recall.
9 Q. Okay. How long did the meeting last?
10 A. I don't know.
11 Q. Well, was it like a five-minute
12 meeting, or was it a protracted meeting where he
13 explained to you, you know, a little bit about the
14 prior investigation and what they were doing up
15 until that point in May of 2008?
16 A. It probably would have been about an hour.
17 Q. All right. Did you leave the meeting
18 with an understanding of what the case was about?
19 A. To the best of my ability, yes.
20 Q. All right. And, again, what you have
21 contained in your written report, you pulled off
22 your notes that you took during the meeting?
23 A. Yes.
24 Q. What did Lieutenant Carrega say to
25 you about why he still believed that Lee Evans was

---

**Rizman Rapaport (973)992-7650**
**"When every word counts"**

Evans v.
Newark City

Video Deposition

| Tietjen - Direct/Bonjean | Page 57 |
| --- | --- |

1 the prime suspect in the case?
2 A.  The case had identified him early on from
3 the date of who the boys were last with and that
4 he still believed that information to be true.
5 Q.  Apart from the fact that Lee Evans
6 was with the boys shortly before they disappeared,
7 was there any other factual information that he
8 provided to support his view that Lee Evans was the
9 main suspect in the case?
10 A.  I mean we discussed other steps throughout
11 the investigation that still pointed to Lee Evans.
12 Q.  Like what?
13 A.  Additional interviews, reviewing of
14 interviews.  He discussed the polygraph that Lee
15 Evans had taken.
16 Q.  Well, what interviews did he identify
17 led him to believe that Lee Evans was responsible
18 for the boys' disappearance and presumed death?
19 A.  I don't recall.  It was a generalization of
20 the case stuff that he had.
21 Q.  Did you take any notes about those
22 specifics?
23 A.  No, not more specific than that.
24 Q.  So as you sit here today, you can't
25 identify for me any specific interview that he

| Tietjen - Direct/Bonjean | Page 58 |
| --- | --- |

1 referenced that provided a factual basis to believe
2 that Lee Evans was the main suspect, at least as of
3 May 9, 2008?
4 A.  No.
5 Q.  Anything else that sticks out in
6 terms of why Carrega believed that Lee Evans was
7 the prime suspect, again, other than the fact that
8 he was one of the last people to have been seen
9 with the boys allegedly?
10 A.  No.
11 Q.  And you mentioned the polygraph.
12 It's true that Mr. Evans had submitted to a
13 polygraph examination back in 1978; right?
14 A.  I had not seen the report, but that's what
15 I was told, yes.
16 Q.  And, allegedly, he passed that
17 polygraph; correct?
18 A.  Yes.
19 Q.  Now, it says in your report that
20 during your meeting with Carrega on May 9th, 2008,
21 that there was a later examination of this 1978
22 polygraph chart by outside experts and that there
23 was a new view that he actually failed the test; is
24 that right?
25 A.  Yes.

| Tietjen - Direct/Bonjean | Page 59 |
| --- | --- |

1 Q.  All right.  Okay.  Did you see any
2 reports from any experts that gave this new view
3 that he had failed the test?
4 A.  No.
5 Q.  Did Lieutenant Carrega explain to you
6 how he came to have new experts look at the
7 polygraph results?
8 A.  No.  I believe it was prior to his even
9 involvement in the case that this review was done.
10 Q.  Do you know who conducted the review?
11 A.  I believe it's in one of the reports, but I
12 don't recall.
13 Q.  And do you have an understanding of
14 how polygraph tests work?
15 A.  Yes.
16 Q.  Do you find them to be a useful law
17 enforcement tool?
18 A.  Yes.
19 Q.  You know, of course, that the results
20 are inadmissible; right?
21 A.  Yes.
22 Q.  They were used pretty readily in this
23 investigation; would you agree with that?
24 A.  Yes.
25 Q.  And would you agree that polygraphs,

| Tietjen - Direct/Bonjean | Page 60 |
| --- | --- |

1 to the extent that they are useful, are only as
2 useful as the competence of the person
3 administering them?
4 A.  Yes.
5 Q.  And how is it that -- or explain to
6 me how is it that a second person could look at a
7 polygraph examination and reach a different result?
8 Is that plausible?
9 A.  I don't know enough about what the results
10 they would look at to say.
11 Q.  But isn't part of reading a polygraph
12 result connected to actually administering the
13 polygraph test?
14 A.  They have some data that's set up from the
15 test, I would imagine.  I've seen two recent
16 polygraphs, and you look at charts of the
17 interview with reference to the questions they
18 asked and by your responses, but I don't know what
19 was done in 1978.
20 Q.  Have you ever heard of a situation
21 where a polygraph examination is conducted and the
22 results are interpreted by the person who
23 administered the test, but then later a different
24 expert reaches a different conclusion about those
25 polygraph results?  Aside from this case, have you

Rizman Rappaport (973)992-7650
"When every word counts"

Evans v.
Newark City

Video Deposition

**Tietjen - Direct/Bonjean**         Page 61

1 ever heard of that?
2 A. I don't recall.
3 Q. And, again, in your work as 25 years
4 as a law enforcement officer, have you ever heard
5 of a single other circumstance where a polygraph
6 expert who did not administer a test later came and
7 reviewed the reports of a previously-given
8 polygraph and reached a different result?
9 A. I can't recall a case, no.
10 Q. Do you know if that's in keeping with
11 law enforcement standards? National standards,
12 we'll say?
13 A. I don't know what any of the Polygraph Unit
14 in our agency, and I don't know much about what
15 was done back then.
16 Q. I'm talking about now. Is that
17 something that you have seen done in say the last
18 five years?
19 A. Like I stated, I'm not in our Polygraph
20 Unit, so if the supervisors review their charts to
21 concur or differ -- I've used polygraphs in the
22 past, but I have not administered them, and
23 certainly not every one of the, you know,
24 responses from being truthful and honest or
25 accepted, so that's... I mean, people are trying

**Tietjen - Direct/Bonjean**         Page 62

1 to do tricks to try to alter the test as well.
2 But beyond that, I don't know who reviews or what
3 type of policy there is in place to verify that
4 that polygraphist got a accurate response or came
5 up with an accurate solution to that.
6 Q. Have you administered a polygraph
7 test yourself?
8 A. No.
9 Q. So it sounds like you've used them,
10 you've worked with them, but you wouldn't consider
11 yourself an expert; is that fair?
12 A. My use has --
13 (Reporter requested clarification.)
14 A. Just calling one of the polygraphist in our
15 unit to perform the test. That would be as far as
16 my involvement.
17 Q. Okay. You indicate in your police
18 report marked as Tietjen-2 that during this
19 meeting, Lieutenant Carrega indicated that he
20 wanted to re-interview Lee Evans and also
21 re-interview all persons who were involved in the
22 case since 1978; is that accurate?
23 A. Yes.
24 Q. And did he indicate during the
25 meeting that he wanted you to participate in those

**Tietjen - Direct/Bonjean**         Page 63

1 interviews?
2 A. I offered my assistance, and he accepted.
3 Q. Okay. And did he explain to you who
4 else was on this team for re-investigating the
5 missing boys?
6 A. At some point, Detective Joe Hadley and
7 Agent Eutsey were introduced to me, but I don't
8 know what date.
9 Q. What was your understanding of who
10 had handled the investigation prior to Lou Carrega
11 taking it up?
12 MR. LIPSHUTZ: Objection to the form
13 of the question. You can answer it, sir.
14 A. Repeat the question, please.
15 Q. Yes. What was your understanding of
16 who had handled the investigation of the missing
17 boys prior to 2007/2008 when Lieutenant Carrega
18 undertook that investigation?
19 A. The Newark Police Department.
20 Q. One of your responsibilities, it
21 looks like, was to obtain DNA samples from
22 surviving family members; is that correct?
23 A. Yes.
24 Q. What was the purpose in doing that?
25 A. It's to identify remains of missing people

**Tietjen - Direct/Bonjean**         Page 64

1 that were already recovered that we have DNA
2 samples from.
3 Q. Would you agree that --
4 A. Patricia's Law --
5 (Reporter requested clarification.)
6 MS. BONJEAN: I think he said it was
7 Patricia's Law.
8 Q. Is that right?
9 A. Patricia's Law was signed in March of that
10 year 2008, which required us to assist or to get
11 DNA for long-term missing persons cases. And at
12 the time of the signing, it was 30 days is what
13 they termed a long-term case.
14 Q. Okay. Would you agree that one of
15 your primary goals, or the team's primary goal, at
16 least as communicated to you by Lieutenant Carrega,
17 was to try to actually find the human remains of
18 these boys, if you could; right?
19 A. That would be a goal, yes.
20 Q. Now, after -- strike that.
21 What else, if anything, do you recall
22 about the meeting with Lieutenant Carrega on
23 May 9th, 2008?
24 A. Not much more than that.
25 Q. Did he provide you with any materials

Evans v.
Newark City
Video Deposition

Tietjen - Direct/Bonjean                                      Page 65

1   to look at?
2   A.  Not on that date, I don't believe.
3   Q.  At some point did he provide you with
4   some?
5   A.  Yes.
6   Q.  Now, I notice your next entry on your
7   report says on May 16, 2008, you conducted an
8   in-depth review of a copy of a case file that was
9   provided to you by Lieutenant Carrega; right?  Is
10  that a yes?
11  A.  Yes.
12  Q.  Okay.  So does that lead you to
13  believe that Lieutenant Carrega provided you with a
14  copy of the case file prior to May 16, 2008?
15  A.  Yes.
16  Q.  And do you remember how he provided
17  that to you?  Was it in paper form, electronic
18  form?
19  A.  I believe it was paper form.
20  Q.  And how large was the case file to
21  best of your recollection?
22  A.  It was whatever, a brown large, like, legal
23  envelope.  You know, like, a file envelope.  It
24  was probably six inches in depth and height.
25  Q.  And what generally was contained

Tietjen - Direct/Bonjean                                      Page 66

1   within the case file?
2   A.  Case notes on each of the people
3   identified, any available Newark Police Department
4   reports that were generated from back in 1978 and
5   throughout, some newspaper articles, different
6   statements of individuals as well.
7   Q.  Interviews?
8   A.  Yeah, interviews in written form.
9   Q.  Got it.  And you said you conducted
10  an in-depth review of the case file.  What do you
11  mean by that?  What did you do?
12  A.  I went through it, what was provided to me,
13  to get an understanding of what was done from day
14  one through.
15  Q.  Does that mean you read the reports?
16  A.  Yes.
17  Q.  Looked at the interviews?
18  A.  Yes.
19  Q.  And why did you believe it was
20  important to look at the prior case file in
21  connection with your involvement?
22  A.  Well, my own understanding of the case.
23  Q.  Did you want to know what had been
24  done prior to your involvement in the case?
25  A.  Yes.

Tietjen - Direct/Bonjean                                      Page 67

1   Q.  Did you want to see what evidence had
2   been developed prior to May of 2008?
3   A.  Yes.
4   Q.  Were you interested in seeing what
5   evidence specifically had been developed against or
6   related to Lee Evans?
7   A.  Yes.
8   Q.  All right.  Did Lieutenant Carrega
9   tell you during your meeting either on May 9th, or
10  any time prior to your review of the case, any of
11  the other witnesses that he was interested in
12  interviewing or re-interviewing?
13      MS. ROSEN: Objection to form.
14      MS. BONJEAN: I'm sorry.  What did
15  you say?
16      MS. ROSEN: Objection to form.  You
17  can answer it.
18  A.  He advised that he wanted to re-interview
19  all those that were available to re-interview.
20  Q.  Okay.  Did you get the sense in May
21  of 2008 that this was the beginning of his
22  investigation, that he had not done too much work
23  prior to this date?
24  A.  No.  No, he indicated that he had worked on
25  this.

Tietjen - Direct/Bonjean                                      Page 68

1   Q.  How long did he independent -- for
2   how long had he worked on it, to the best of your
3   recollection?
4   A.  I do not recall.
5   Q.  But it was your belief that he had
6   been working on it before he spoke with you; is
7   that right?
8   A.  Yes.
9   Q.  Do you know who he was working on the
10  case, investigating the case with?
11  A.  I believe Agent Eutsey, but that's a
12  recollection issue if he was or not.
13  Q.  And that's Detective Jack Eutsey, a
14  Newark police officer; is that correct?
15      MR. LIPSHUTZ: Objection to form.
16  Sorry.  You can answer it, sir.
17  A.  He was an agent of the Essex County
18  Prosecutor's Office at the time.
19  Q.  Right.  So -- and let me clarify.
20  Was it your understanding that Detective Eutsey had
21  retired from the Newark Police Department but had
22  joined the Essex County Prosecutor's Office as an
23  investigator?
24  A.  Yes.
25  Q.  All right.  And so Detective Eutsey

---

Tietjen - Direct/Bonjean     Page 69

1  at the time that this investigation had, we'll say,
2  recommenced was already working for the
3  prosecutor's office; correct?
4  A.  Yes.
5  Q.  Did Lieutenant Carrega explain to you
6  what role, if any, Newark Police Department would
7  have in this reinvestigation of the missing boys
8  that started sometime before May of 2008?
9     MR. LIPSHUTZ: I'm going to object to
10  the form of the question.  You can answer it, sir.
11     MR. VOMACKA: I'll join the objection
12  as to form.  You can answer.
13  A.  The role of Newark was --
14     (Reporter requested clarification.)
15  A.  The role of Newark Police Department was
16  explained to me -- I don't know if exactly that
17  date -- that they had a detective from Newark who
18  was going to assist as well, and that was later
19  identified as Joe Hadley.
20  Q.  What about Detective Henry, or
21  Sergeant Henry, I believe, maybe at the time, what
22  was your understanding of what his role would be,
23  if any?
24  A.  Early on, I believe he was Detective
25  Hadley's supervisor, and then he became involved

---

Tietjen - Direct/Bonjean     Page 70

1  as 2008 progressed.
2  Q.  Okay.  Did you have an understanding
3  of whether or not there had been prior efforts to
4  reinvestigate this case after the initial
5  investigation went cold?
6  A.  There was many entries in the notes, and I
7  knew we didn't have all the reports.  I was
8  advised there were other attempts to investigate,
9  but the reports were not provided.
10     MS. BONJEAN: Okay.  I am going to
11  mark as an exhibit, and if anyone needs a break,
12  let me know.  We can definitely break at any
13  point.  I am going to mark as Tietjen-3 what I
14  believe is listed as the "Hairston reports," and
15  if you could pull that out.
16     (Tietjen-3, Hairston reports, Bates
17  ECPO 003548 through 003586, was received and
18  marked for identification.)
19  Q.  It should have a Bates stamp at the
20  bottom right-hand corner that reflects ECPO 003548.
21  Do you see that collection of materials?
22  A.  No.
23  Q.  Okay.
24  A.  I have a Newark 60 the bottom of the form I
25  have for Hairston.

---

Tietjen - Direct/Bonjean     Page 71

1  Q.  There is a "Hairston to from" and a
2  "Hairston reports."
3     Yeah, you were looking at the
4  Hairston.  You can keep that handy.  We're going to
5  look at that shortly but...
6  A.  I have ECPO 003548.
7  Q.  Yes.  And that's been marked as
8  Tietjen-3.
9     Sir, do you recognize this collection
10  of materials?
11  A.  Yes.
12  Q.  And what do you recognize this to be?
13  A.  Just materials of the reports dating back
14  to 1978.
15  Q.  Does this appear to you to be a
16  collection of police reports that were prepared
17  from the date on which it was at least reported
18  that the boys had gone missing?
19  A.  Yes.
20  Q.  And can you tell from looking at this
21  report who the lead detective -- or who the
22  detective was that was responsible for preparing
23  these reports?
24  A.  Detective Edward Hairston.
25  Q.  Did you know Detective Edward

---

Tietjen - Direct/Bonjean     Page 72

1  Hairston?
2  A.  No.
3  Q.  Have you ever met him?
4  A.  No.
5  Q.  I believe he's deceased.  I could be
6  wrong.  Do you know if he's deceased?
7  A.  No.
8  Q.  Now, would these reports be documents
9  that you reviewed in connection with your in-depth
10  review of the case file on May 16, 2008?
11  A.  If they were all complete, the copy in
12  front of me, yes.
13  Q.  And, again, I know you can't say
14  whether or not what you've been provided right this
15  second is exactly what you had in your case file,
16  but do you have a recollection of reviewing reports
17  that were prepared back in 1978 in connection with
18  the missing boys?
19  A.  Yes.
20  Q.  And do you have a recollection of
21  reviewing reports that had been prepared by
22  Detective Hairston?
23  A.  Yes.
24  Q.  Okay.  Now, I'll have you look at the
25  other document you pulled out, which is a Hairston,

---

    **Rizman Rappaport (973)992-7650**
**"When every word counts"**    

Evans v.
Newark City

Video Deposition

Tietjen - Direct/Bonjean                                          Page 73

1  I'm going to call it a -- I call it a "to from"
2  report.  Do you have that handy?
3           (Tietjen-4, Bates Newark 60 through
4  62, was received and marked for identification.)
5  Q.  I'm going to have you look at
6  Tietjen-4.  Tell me if you recognize this document?
7  And by the way, the Bates stamp on this is Newark
8  60 through 62.
9  A.  I don't recall reviewing this document.
10 Q.  I'm sorry?
11 A.  I don't recall reviewing this document.
12 Q.  You don't recall ever reviewing this
13 document?
14 A.  No.  I recall hearing about it.  I don't
15 recall reviewing it.
16 Q.  Well, I'm just going to, for the
17 record, indicate that it appears to be, correct me
18 if I'm wrong, a report from Detective Hairston to
19 Lieutenant John Murphy, and it's dated March 15th,
20 1979; right?
21 A.  Yes.
22 Q.  Okay.  I'm going to give you a
23 chance, if you could, if you could just take a look
24 at it and let me know, take as much time as you
25 want --

Tietjen - Direct/Bonjean                                          Page 74

1  A.  I read through it last night.
2  Q.  Okay.  Great.  You're saving yourself
3  and all of us time.  And so, again, I'll ask you,
4  having read it last night, you don't remember ever
5  seeing this report; is that right?
6  A.  Not the -- well, I remember a psychic was
7  involved at some point.
8           (Reporter requested clarification.)
9  A.  I remember at some point in the
10 investigation a psychic had been involved in the
11 case, and it mentioned things, but I don't
12 remember seeing this actual document.
13 Q.  And what do you remember about the
14 psychic being involved in the case?
15 A.  I mean, I read through this last night.  I
16 was intrigued on this.  She mentioned about a fire
17 in here, but I don't recall specifics of what was
18 stated to me early on the case.
19 Q.  When do you first recall hearing
20 about a psychic being used in the case, if you --
21 A.  I don't, I don't know.  No, I can't even
22 recall.
23 Q.  Do you recall having any
24 conversations with Lieutenant Carrega about the
25 psychic being used in the case?

Tietjen - Direct/Bonjean                                          Page 75

1  A.  He was probably the one who told me about
2  it, but I don't recall the conversation.
3  Q.  And do you recall, whenever that
4  conversation took place, that a psychic had been
5  used and had referenced that the boys may have
6  perished in a fire?
7  A.  I don't recall when that conversation would
8  have taken place.
9  Q.  But do you remember at some point
10 hearing that substantive conversation?
11 A.  I don't believe I remember anything about a
12 fire.  Just that a psychic -- I mean, psychics
13 call at the time of missing persons cases, and I
14 don't put much value in what they say.  It's noted
15 typically, but it's so vague and generic.
16 Typically, they cover so many different
17 possibilities that the scenario sometimes can have
18 different links throughout.  You know, they give
19 you so much vague detail.  My thought has always
20 been just in this unit, If you know where they
21 are, why aren't you out to that location pointing
22 that out to us?
23      I mean, pretty much any of our major
24 cases, we have plenty of psychics calling up with
25 all different dreams and stuff, so I don't put too

Tietjen - Direct/Bonjean                                          Page 76

1  much value on what's provided by them.
2  Q.  Okay.  So your personal view is that
3  psychics don't bring a lot of value to an
4  investigation; is that fair?
5  A.  Yes.
6      MS. BONJEAN: Okay.  Give me one
7  second, if you could.  Actually, can we take a
8  two-minute break?  I think I want to pull a
9  document out that I may or may not have already
10 provided, but if we could -- let's take a
11 two-minute break and reconvene, if that's okay.
12      THE VIDEOGRAPHER: The time is 11:39
13 a.m.  Off the record.
14      (Break taken.)
15      THE VIDEOGRAPHER: The time is 11:45
16 a.m.  This begins DVD number two.  Back on the
17 record.
18 Q.  Thank you, Sergeant.  I'm going to
19 have you actually look at that larger collection of
20 Hairston reports, which I believe is marked as
21 Tietjen-3.  Let me know when you're there.
22 A.  Sure.
23 Q.  Again, these are the reports that,
24 again, if you had been provided with them, with the
25 case file, this is what you would have looked at;

Evans v.
Newark City
Video Deposition

---

Tietjen - Direct/Bonjean                                    Page 77

1   correct?
2   A.  Yes.
3   Q.  And would you characterize this as a
4   continuation report?
5   A.  It states that on the top.
6   Q.  What is a continuation report to the
7   best of your understanding?
8   A.  It would be similar to my supplementary
9   investigation report indicating that there was a
10  prior report previous to that.
11  Q.  Do you happen to know whether or not
12  the narrative that is contained in these reports,
13  and I know that you did not prepare them, but do
14  you happen to know whether they were prepared
15  contemporaneous with the investigative conduct that
16  was being taken at the time?
17  A.  No.
18  Q.  You don't know?
19  A.  No.
20  Q.  Okay.  You will see, though, at the
21  bottom of the report is, at least on the first
22  page, is a date of September 15th, '78; right?
23  A.  Yes.
24  Q.  And that's at least three, it's at
25  least three, close -- three weeks after the boys

---

Tietjen - Direct/Bonjean                                    Page 78

1   first are reported missing?  Can we agree on that?
2   A.  Yes.
3   Q.  Okay.  So, and it looks as if the
4   report -- that the reports that are dated 9/15 goes
5   up to page -- the first seven pages of this
6   document.  Do you see that?
7   A.  Yes.
8   Q.  And I'm just going to ask, you see at
9   the very top of first page, it says page 1, and
10  then if you count seven pages in, at the very top,
11  it says page 7?
12  A.  Yes.
13  Q.  And they are all, at least they're
14  approved as of September 15th, 1978; right?
15  A.  Yes.
16  Q.  So would it be fair to say based on
17  your experience that at least the first seven pages
18  were submitted initially at some point prior to
19  September 15th, '78, and reflected investigative
20  work that had been done prior to September 15th,
21  1978?
22      MR. LIPSHUTZ: Objection.
23  A.  Yes.
24  Q.  And is that sort of consistent with
25  how you would prepare your own reports as well, if

---

Tietjen - Direct/Bonjean                                    Page 79

1   you were conducting a criminal investigation?
2   A.  No.
3   Q.  No?
4   A.  No.
5   Q.  Okay.  How would that differ?
6   A.  Many of our reports in the state police go
7   on months before you would type a report.  We
8   don't have an end-of-shift requirement.  Different
9   city departments will have at the end of your
10  shift, you complete all your reports, and they are
11  checked.  We don't have that.  We never have.  I
12  can type reports several months later and a set of
13  my notes and type them.  That's just the normal.
14  Q.  So it's your practice that you most
15  likely do not prepare a report until the case is
16  cleared?
17  A.  You got to repeat that again.
18  Q.  Is it your practice that you wouldn't
19  prepare a formal report until the case is cleared?
20  A.  No, I wouldn't say that's correct.
21  Q.  Okay.  Then what prompts you to file
22  a formal report in an investigation?
23  A.  It depends at what point you are in it when
24  you want to document it, what value points you
25  have that you need to note.  You know, if you're

---

Tietjen - Direct/Bonjean                                    Page 80

1   working with other agencies, do they then want
2   that report, and what are you going to cover in
3   your report, and that's decided as well.
4   Q.  Well, I thought you just said --
5   maybe I misunderstood, though -- that an
6   investigation could go on months and months before
7   you prepared a report in a case; is that right?
8   A.  Yes.
9       (Ashley Cohen joined proceedings.)
10  Q.  And would you agree that sometimes
11  information you develop early in an investigation,
12  you may not realize the significance of that
13  information until later in the investigation?
14  A.  Yes.
15  Q.  Okay.  And how do you ensure that you
16  are memorializing all pertinent facts, or facts
17  that may become pertinent, during the course of
18  your investigation?  Is that through your notes?
19  A.  Yes.
20  Q.  And then when you sit down to do your
21  formal report, do you decide what information
22  should go into the formal report?
23  A.  You go through your notes, and you write
24  from your notes as to what you did.
25  Q.  I guess my question is do you put

---

Evans v.
Newark City

Video Deposition

| Tietjen - Direct/Bonjean | Page 81 |
|---|---|

1   everything that is in your handwritten notes into
2   the formal report, or do you decide what you
3   believe to be the relevant factual points that you
4   want to include in the formal report?
5   A.   If I am the only investigator, all of my
6   notes would go in my report.  If I'm working in a
7   group, the reports that I would cover would be the
8   ones that were assigned to me to cover, and some
9   other things --
10  Q.   And when you say assigned?
11  A.   Well, you'll see some other things in here
12  that I was involved with, and I say "refer to a
13  report," where I don't express my actions that
14  I may have had of that day that someone else is
15  memorializing that day.
16  Q.   But how do you know that if you're
17  not preparing the report until months later?
18  A.   Do I know what?  That they're going to
19  prepare a report?
20  Q.   So what I'm asking is during the
21  course of a multi-month investigation, you are
22  preparing contemporaneous handwritten notes that
23  reflect what you're learning and what you're doing
24  through the investigation; is that right?
25  A.   Yes.

| Tietjen - Direct/Bonjean | Page 82 |
|---|---|

1   Q.   And then at some point, you sit down
2   to formalize your notes in a formalized report;
3   right?
4   A.   Yes.
5   Q.   And is that typically based on
6   somebody saying, We need you to prepare a report?
7   Maybe a supervisor or something like that.
8   A.   Yes.  And they'll be certain occurrences
9   during the inves that I don't have notes on as
10  well that someone else was taking, or taking that
11  responsibility for.
12  Q.   And would you include in your formal
13  report information that comes from someone else's
14  notes, or just your notes?
15  A.   Just my notes.
16  Q.   And correct me if I'm wrong, I think
17  you said, though, that there might be aspects of an
18  investigation that you do have notes on, but
19  because someone else is covering that piece of the
20  investigation, you would not necessarily include
21  those part of your notes into the formal report; is
22  that right?
23  A.   Yes.
24  Q.   Would you refer to the person who was
25  assigned to that part of the investigation to

| Tietjen - Direct/Bonjean | Page 83 |
|---|---|

1   ensure that they prepared a thorough and accurate
2   report based on whatever investigative work had
3   been done?
4        MR. VOMACKA:  Objection to form, but
5   you can answer.
6   A.   My report would refer to their report for
7   covering that section.
8   Q.   And do you actually go look at that
9   report that you're referring to in order to make
10  sure that it actually is covering the section that
11  you're --
12  A.   No.
13  Q.   What's that?
14  A.   No.
15  Q.   Why not?
16  A.   I believe it's going to be done, you know.
17  Q.   So you're relying on the fact that
18  your colleagues are going to do their job?  Is that
19  what you're telling me?
20  A.   Yes.
21  Q.   I would like to draw -- I'm going to
22  have you look at that document.  If you could look
23  at -- it's gonna be Bates stamped ECPO 3581, but it
24  also has a little number 34 in the right-hand
25  corner, if that's easier to track.  Actually, 3580.

| Tietjen - Direct/Bonjean | Page 84 |
|---|---|

1   Let's start there.  My apologies.  So page 33.
2   A.   Okay.
3   Q.   I want to draw your attention to the
4   bottom part of the report narrative where it has a
5   date of April 3rd, 1979.  Do you see that?
6   A.   Yes.
7   Q.   And if you just could read that to
8   yourself real quick, and then I'll have some
9   questions for you.
10       Okay.  You see reference to this
11  information from the psychic again, this
12  Mrs. Dorothy Allison?
13  A.   Yes.
14  Q.   And it would appear that back in '79,
15  Detective Hairston was at least talking to her, or
16  they were trying to see what they could develop
17  through her, if anything; right?
18  A.   Yes.
19  Q.   And based on that, they actually, it
20  looks -- according to this report, you would agree
21  that they checked the Newark Fire Department for
22  fires occurring in 1978; right?
23  A.   That line is somewhat distorted.  It looks
24  like they checked one engine possibly.  I can't
25  read the number.

Rizman Rappaport (973)992-7650
"When every word counts"

Evans v.
Newark City

Video Deposition

| Tietjen - Direct/Bonjean | Page 85 |
| --- | --- |

1 Q.  I think it says --
2 A.  Engine 117 maybe, for fires.
3 Q.  It says, "Checked with Newark Fire
4 Department Engine" -- whatever number that is --
5 "for all fires" -- I think it says, either,
6 "especially fatalities occurring in August of
7 1978."
8      I don't know if that's accurate, but
9 that's my best guess.  But do you see that?
10 A.  Yes.
11 Q.  And you can turn the page.  And it
12 says, "Checked sites of two multiple-alarm fires.
13 15th Avenue and Bergen Street and 16th Avenue and
14 Littleton Avenue.  No reported fatalities."
15      Do you see that?
16 A.  Yes.
17 Q.  And, again, these are reports that,
18 if you had in your possession, you would have
19 reviewed during your in-depth review of the case;
20 correct?
21 A.  Yes.
22 Q.  Now, after your in-depth review of
23 the case in May of 2008, at least according to your
24 report, you started participating in interviews
25 with witnesses; right?

| Tietjen - Direct/Bonjean | Page 86 |
| --- | --- |

1 A.  Yes.
2 Q.  And by the way, you can put that
3 aside for now, we may reference it again.
4 A.  If you look at the date on that report,
5 it's a year after last included in that report as
6 well.
7 Q.  You're talking about the Hairston
8 report?
9 A.  Yes.
10 Q.  Uh-huh.
11 A.  So similar, that's in similar fashion as
12 well.
13 Q.  Yeah.  No, no, you're right.  That
14 seems to be the practice.
15      Okay.  Now, after looking at the
16 complete case file, did you have further
17 discussions with Lieutenant Carrega about your
18 impressions about the case?
19 A.  I believe we certainly did.
20 Q.  I'm not suggesting that you would
21 have necessarily notated every time you had a
22 conversation with Lieutenant Carrega about the
23 case, or that you should have done that, but would
24 it be fair to say that you spoke with him and other
25 members of this team on a fairly regular basis

| Tietjen - Direct/Bonjean | Page 87 |
| --- | --- |

1 during this period of time?
2 A.  Yes.
3      MR. LIPSHUTZ: Objection to the form
4 of that question.
5      MR. VOMACKA: Objection to form.  You
6 can answer.
7 A.  I spoke with them regularly.
8 Q.  And what's regular to you?  Daily,
9 weekly?
10 A.  I'm trying to recall if we were -- at
11 certain points, we might have been working on this
12 a couple times a week.  Sometimes it was sporadic.
13 I still had other unit responsibilities as well.
14 I would characterize it as routine, but I don't
15 know how I can break that down into a daily or a
16 weekly type of occurrence.
17 Q.  Fair enough.  Was this case a big
18 part of your responsibilities during this period of
19 time?
20 A.  It was one of my larger ones.  It took up a
21 majority of my involvement, yes.
22 Q.  And I guess this would be a good time
23 to ask, what was your understanding of how the
24 group operated in terms of -- I know you said
25 Carrega was in charge of the investigation, but who

| Tietjen - Direct/Bonjean | Page 88 |
| --- | --- |

1 did you report to in connection with this
2 investigation?
3      MR. LIPSHUTZ: I'm sorry, Jen, your
4 first part of your question broke up, so if you're
5 just asking him who he reported to, that's fine.
6 I heard that.  But I wasn't sure what the rest of
7 it was.
8      MS. BONJEAN: It was a bad question.
9 I'll start over.
10 Q.  Did you have to get assigned to this
11 investigation by someone from the state police
12 also?
13 A.  Dave Jones is the one who asked me to
14 contact Lieutenant Carrega.
15 Q.  And you don't have the authority as a
16 state police officer to go work on anyone else's
17 cold cases just because you want to, I assume;
18 correct?
19      MR. LIPSHUTZ: Objection to the form.
20 A.  We are able to contact them, and I can work
21 on any missing persons case right now in the state
22 that I choose to, or any member of my unit does,
23 typically to reach out to the agency by myself.
24 Q.  I mean, if you are working for the
25 state police, you're getting a salary from the

Tietjen - Direct/Bonjean                          Page 89

 1    state police, you don't get to decide which
 2    investigations you want to work on without at least
 3    getting approval from someone up your chain of
 4    command, I assume; right?
 5  A.   I don't know if that's necessarily so.
 6    You're assigned cases, and then you also look for
 7    cases.  Like our work in this unit is a lot of
 8    what you become aware of in jobs that you have a
 9    personal interest in.  Either, you know, an age
10    group that you tend to like to get involved in.
11    If it's Alzheimer's/dementia, we have members who
12    like to get involved in those cases.  And everyone
13    is allowed to work something.  Certainly,
14    supervisors can be, like, if it's not a case
15    that's worthy of time, as far as, like, if there
16    just isn't enough there, or enough there for you
17    to work, or you have other responsibilities, or
18    other cases come in, you can be both assigned both
19    cases and seek your own cases.
20  Q.   Well, when you seek out a case that
21    you want to work on, who supervises you?
22  A.   That's in our unit.  We all have -- at the
23    time, Dave Jones was my assistant, and then I had
24    Joe Glennon at the time was my sergeant.  So he
25    would be the supervisor that my reports would be

---

Tietjen - Direct/Bonjean                          Page 90

 1    reviewed by, but he wouldn't be with me on my
 2    jobs, though.
 3  Q.   Okay.  But you would still have --
 4    your supervisor would still have to -- I don't know
 5    what word to use -- signing off or agree that this
 6    is a case that, you know, is worthy of our time,
 7    and go ahead, and I'm gonna supervise you on it;
 8    right?
 9  A.   Yeah.  They would essentially, I guess you
10    would call it, authorize you to continue, you
11    know, and say that's worthy of our efforts.
12  Q.   Got it.  So there is an authorization
13    process.  And I assume that with this missing
14    investigation case, you did receive authorization
15    to work on this case; correct?
16       MR. LIPSHUTZ: Objection to the form.
17  A.   Yes.
18  Q.   Now, having received authorization to
19    work on the case, what was your understanding of
20    which agency's policies and/or practices you would
21    be following?
22  A.   That's not -- like, I follow my policies
23    with concerns for my stuff.  Cases, when you
24    assist other agencies, there are reporting issues,
25    and that aspect becomes very different, and I'm

---

Tietjen - Direct/Bonjean                          Page 91

 1    unaware of their policies, so it's whatever is
 2    expressed to you.  We assist many agencies on
 3    cases where our reporting is rather minimal and
 4    vague because they handle all the reporting.  We
 5    assist them with investigative guidance
 6    essentially is how I would term it.
 7  Q.   Which agency was in charge of the
 8    missing persons investigation when you became
 9    involved?
10       MR. LIPSHUTZ: Objection to the form.
11  A.   It's always been Newark PD's investigation.
12    The individual I was involved with was looking at
13    it from a cold case aspect, so I was reporting
14    back to him.
15  Q.   I'm sorry.  You were reporting back
16    to who?  You cut off for that.
17  A.   I was reporting to Lieutenant Carrega.  He
18    would be the one who would ask me to assist or --
19    those aspects.
20  Q.   Okay.  So would it be fair to say
21    then the policies that the investigation would be
22    subject to would then be Newark Police Department's
23    policies, to the best of your understanding?
24       MR. LIPSHUTZ: Objection to the form
25    of the question.

---

Tietjen - Direct/Bonjean                          Page 92

 1       MR. VOMACKA: I also object to the
 2    form of the question.  You can answer.
 3  A.   I don't know.  I was dealing with whatever
 4    --
 5       (Reporter requested clarification.)
 6  A.   Whatever Lieutenant Carrega was doing, how
 7    he was handling it.  I was unaware at that point
 8    if anyone else was continuing it or looking at it.
 9  Q.   Okay.  But you're embarking on an
10    investigation, an important investigation.  Was it
11    important to you to know what policy you should be
12    following in connection with this investigation?
13  A.   I'd go with my own policies as far as the
14    aspects that would concern certain avenues, yes,
15    but I don't read their policies.
16  Q.   Okay.  So when you say you go with
17    your own policies, are you talking about Sergeant
18    Tietjen's policies or the state police policies?
19  A.   State police policies.
20  Q.   Okay.  So when you were doing your
21    work on this case, you were guided by the state
22    police policies in your work; right?
23  A.   Yes.
24  Q.   You didn't read Newark Police
25    Department policies; right?

Evans v.
Newark City

Video Deposition

| Tietjen - Direct/Bonjean | Page 93 |
| --- | --- |

1 A. No.

2 Q. Is that a no?

3 A. No.

4    MR. LIPSHUTZ: I'm sorry. It was a

5 negative question. Did you read Newark's

6 policies?

7    THE WITNESS: No.

8    MR. LIPSHUTZ: Okay.

9 Q. And were you provided a copy with

10 Newark's policies, at least as they pertained to

11 this missing persons/homicide investigation/cold

12 case investigation?

13    MR. LIPSHUTZ: Objection to the form.

14 A. No.

15 Q. Did you review any policies that the

16 Essex County Prosecutor's Office may have had?

17 A. No.

18 Q. And when I'm talking about policies,

19 by the way, just so we're on the same page, I'm

20 talking about written policies or orders or

21 anything on a piece of paper that guides law

22 enforcement in their duties and responsibilities.

23 Okay?

24 A. Yes.

25 Q. Were you provided with any written

| Tietjen - Direct/Bonjean | Page 94 |
| --- | --- |

1 policies either by Lieutenant Carrega or anyone

2 else that were prepared by the Essex County

3 Prosecutor's Office?

4 A. No.

5 Q. And do you know whether the state

6 police policies differed in any way from the

7 policies of the Newark Police Department or the

8 Essex County Prosecutor's Office?

9 A. No.

10    MR. LIPSHUTZ: Lack of foundation.

11 Q. Okay. Did you ever discuss with

12 Lieutenant Carrega or any other member of this unit

13 that was looking at this case policies that you

14 should take into consideration in your work on this

15 cold case?

16    MR. LIPSHUTZ: Objection to the form.

17 A. No.

18 Q. Had you received any training prior

19 to your involvement specific to conducting cold

20 case investigations?

21 A. I don't believe so, unless there was a

22 block in one.

23 Q. And do you know whether or not

24 Lieutenant Carrega had received any training in

25 connection with conducting cold case investigations

| Tietjen - Direct/Bonjean | Page 95 |
| --- | --- |

1 prior to May of 2008, if you know?

2    MS. ROSEN: Objection to the form.

3 A. I do not.

4 Q. Now, you participated in a number of

5 interviews with other members of the team,

6 including Lieutenant Carrega; correct?

7    MR. LIPSHUTZ: Objection to the form.

8 A. Yes.

9 Q. Tell me what the hierarchy was in

10 terms of who led the interviews when you

11 participated, if you understand what I'm saying?

12 A. Yes, I do.

13 Q. I'm sorry?

14 A. Yes, I understand what you're saying.

15 Q. Okay. And who was that?

16 A. Lieutenant Carrega was the lead on

17 interviews that he was there.

18 Q. And was there a default for

19 interviews when Carrega was not there?

20 A. No, I think we all worked well together,

21 and I didn't see any issues. Everyone who was

22 working on the job worked hand-in-hand, but he was

23 our, in my eyes, the lead of the cold case.

24 Q. By the way, were you aware of whether

25 or not Essex County or Newark had any embarked on

| Tietjen - Direct/Bonjean | Page 96 |
| --- | --- |

1 any other cold case investigations prior to this

2 one?

3 A. Regarding what? This case or others?

4 Q. Yeah, no. My apologies. Any other

5 cases not related to this Lee Evans or the five

6 boys, any other cold cases that had been

7 investigated by Newark and/or Essex County

8 Prosecutor's?

9 A. I'm sure they do and did, but, you know,

10 like, I can't recall any that I was involved in a

11 cold case as a missing persons that were cold

12 cases prior to this from Newark that were involved

13 as well. So, yeah, definitely.

14 Q. Okay. Now, before you would go

15 interview someone that was identified as a person,

16 you know, who should be interviewed, did you

17 discuss with your team or Lieutenant Carrega how

18 the interview would be handled and what you wanted

19 to accomplish in the interview?

20    MR. LIPSHUTZ: Objection to the form.

21 A. That may seem so like --

22    (Connectivity issues.)

23 A. You may have discussed who is going to do

24 the intro and take the lead at the door, and

25 typically that's who engaged in the conversation

Tietjen - Direct/Bonjean                    Page 97

1  via phone or, if anything, at first contact, it
2  might have just been decided on the walk-up, Hey,
3  you can knock, and then you go from there, but...
4  Q.  Were there some witnesses, though,
5  you had a plan in place for how you would approach
6  the interview?
7  A.  You certainly would have thoughts of what
8  you want to ask them about from case facts prior,
9  so that would be considered a plan per se.
10  Q.  And did you discuss the plan, if you
11  want to call it that, with your colleagues before
12  the interview typically?
13  A.  Which?  Like, I'm trying to think about,
14  like, if I was going to a parent for a DNA, I
15  would discuss that it would be my thing to discuss
16  the DNA aspect.  There would be an introduction.
17  You certainly have other case facts you want to
18  address, so that would be like -- but who says
19  what and who does what, it wasn't like scripted
20  out, no.
21  Q.  Right.  But in an important interview
22  like a Philander Hampton interview or a Lee Evans
23  interview, presumably, you all wanted to be on the
24  same page about how you -- what you wanted to do
25  during that interview; correct?

Tietjen - Direct/Bonjean                    Page 98

1  A.  We all had the same goal, certainly, and
2  the same information we were trying to deal with.
3  If we're talking about Lee Evans' attempt at the
4  interview after his arrest, it was Detective Joe
5  Hadley and I had a chat with him to initiate the
6  interview, and Detective Hadley read him the
7  Miranda, so that would essentially be the lead.
8  We decide before we go who is going to read the
9  Miranda.
10  Q.  But even prior to his arrest, you all
11  had made multiple efforts to interview Lee again;
12  right?
13  A.  Yes.
14  Q.  And, in fact, I think I saw at some
15  point one person called and then left a message,
16  and another one of you called and left a message,
17  and then someone else called and left a message;
18  right?
19  A.  Yes.
20  Q.  That was all discussed in advance;
21  correct?
22  A.  Oh, certainly.
23  Q.  And you had a plan for trying to get
24  Lee to sit down for a conversation; correct?
25  A.  Yes.

Tietjen - Direct/Bonjean                    Page 99

1  Q.  And I would say, you know, witnesses
2  that at least on their face seemed less important,
3  maybe you didn't have quite a detailed plan, but
4  you would still discuss who would take the lead if
5  Carrega wasn't there; is that fair?
6  A.  I don't know -- there's no written plan.
7  There may have been discussion like, Oh, I'll
8  start off here, but I don't recall each of those
9  specific interviews.
10  Q.  Well, would you agree that some
11  police officers tend to be more active in
12  interrogations or interviews than others?
13  A.  Certainly.  It's a personality.  Some would
14  lead right through and step over others, or some
15  will just simply sit back and allow somebody else
16  to step forward and let the course of the
17  interview go, and sometimes you have a person
18  you're interviewing who does not care for the
19  person who's initiated the initial lead, and then
20  you hope that you're confident enough in your
21  other person with you that they can step forward
22  and engage and elicit responses and engage them in
23  conversation.  And, you know, this group had all
24  very different aspects that somebody might want to
25  talk to each one of us.

Tietjen - Direct/Bonjean                    Page 100

1  Q.  Right.  And different interviewers
2  have different styles; would you agree?
3  A.  Correct, yes.
4  Q.  How would you describe your style?
5  A.  I would say I try to be calm, specific,
6  nonthreatening, you know, and show genuine
7  interest in the information I'm looking for.  I
8  guess that would be -- you know, I don't know if
9  it covers enough, but that's kind of how I would
10  go at it.
11  Q.  You're not an in-your-face
12  pointing-the-finger type?
13  A.  No.
14  Q.  You said you had training in
15  connection with conducting interrogations or
16  interviews; right?
17  A.  Yes.
18  Q.  What type of training was that?  Was
19  that a classroom type of training or --
20  A.  It was a classroom training.
21  Q.  Did you do simulations, like
22  practice?
23  A.  I don't recall practice in there, no.  We
24  watched some videos as well.
25  Q.  So you reviewed videos, critiqued

Evans v.
Newark City
Video Deposition

| Tietjen - Direct/Bonjean | Page 101 |
|---|---|

1   videos type of thing?
2   A.  Yes.
3   Q.  And was part of the training, you
4   know, this works, this doesn't work type of thing?
5   A.  Yes.
6   Q.  What did you learn in that training
7   about feeding witnesses or suspects information --
8        (Connectivity issues.)
9   A.  You're unclear.  Please repeat that whole
10  statement.
11  Q.  Sure.  In your training, in your
12  classroom training, or really on-the-job training,
13  did you receive any information about the
14  importance of not feeding details to someone who is
15  being interviewed that they wouldn't already know?
16  A.  Depends.  Like sometimes you have to, like,
17  bring people to the event that you want to discuss
18  because their own style is very all over the
19  place.  I tend not to try to feed them
20  information.  I try to elicit information.  I
21  don't know if that was specifically taught in the
22  class.  It probably was, but we're talking like
23  1999.  But that's my style.  I tend not try to
24  feed unknown information to somebody.  I try to
25  see -- if they've provided it before, I may

| Tietjen - Direct/Bonjean | Page 102 |
|---|---|

1   refresh them.  And after that --
2        (Reporter requested clarification.)
3   A.  If it doesn't come up, and they provide it
4   before, I may refresh them back to that piece of
5   information I want to speak about.  If they're
6   unknowing of the event, I would potentially have
7   to bring them to that event to discuss.  If they
8   say, I don't know, so you may know nothing about
9   this car theft, or whether the car was parked on
10  the corner, and they might say, Oh, I saw the
11  black car on the corner, but I thought nothing of
12  it.  So the information they provide you might
13  have been very vague until you can bring them to
14  that point.
15  Q.  Well, would you agree that if a
16  suspect provides you with information that only the
17  offender would know, this would have good
18  evidentiary value?
19  A.  Yes.
20  Q.  All right.  So with that principle in
21  mind, would you agree that it's important not to
22  feed information to a suspect so you can ensure
23  that if you're getting a piece of information, he's
24  not just regurgitating what you told him but that
25  it actually shows that he has knowledge about the

| Tietjen - Direct/Bonjean | Page 103 |
|---|---|

1   incident?
2   A.  It depends what you're -- if we're
3   referring to a specific statement like on a video
4   or audio, sometimes you have suspects who will
5   tell you information prior to that taped -- after
6   Miranda, post arrest, or even prior to them being
7   arrested, and they already told you, so you have
8   to bring them back to that information.  Just like
9   I said before, you're bringing them back to the
10  point you want to discuss, and many times people
11  will overstep facts when they're going through the
12  interview again, whether it be on video or audio,
13  or when you did sit down.  You know, if I have a
14  street conversation with somebody out on the
15  street, and they tell me information, and, you
16  know, I want to capture this on the video
17  statement.  When I reinitiate that video or audio
18  statement, they tend to step through many aspects
19  of it, and you have to sometimes bring them back.
20  And sometimes the personality issue on the person
21  or like the upbringing, you ask them to tell the
22  whole story, they rush through it.  So it would
23  all depend upon the event.  I think that most of
24  it we're trying to listen to what they have to
25  say.  And sometimes we become aware of statements

| Tietjen - Direct/Bonjean | Page 104 |
|---|---|

1   they've made to us during it that weren't included
2   now or weren't included later, so I don't know
3   what we're...
4   Q.  Well, putting aside that you may want
5   to refresh someone's recollection with something
6   they already told you, I'm talking about when you
7   are conducting an interview for the first time with
8   a suspect, would you agree that it's important not
9   to feed them information that only the offender
10  would know so that you can assure yourself that
11  they're not just regurgitating what you told them
12  but that they actually have firsthand knowledge
13  about the event?
14  A.  I would agree that would be important.
15  Q.  Now, on June 2nd of 2008, you
16  interviewed a Lillie Williams; right?
17  A.  Yes.
18  Q.  And this interview was conducted with
19  Lieutenant Carrega and Detective Hadley; correct?
20  A.  Yes.
21  Q.  And just to be clear, prior to your
22  interview with Lillie Williams, you had developed
23  information that had been known since 1978 that the
24  boys had been seen in and around the time of their
25  disappearance with Lee Evans; right?

Evans v.
Newark City

---

Tietjen - Direct/Bonjean                                      Page 105

1  A.  Yes.
2  Q.  What other information as of
3  June 2nd, 2008, did you possess that would lead you
4  to believe that Lee Evans had any involvement in
5  the disappearance and presumed murders of the boys
6  other than what we just identified?
7      MR. VOMACKA: Objection to form, but
8  you can answer.
9  A.  The identified case from '78 through have
10  him as an involved party and last being seen with
11  them.  So that's what we were working on.
12 Q.  Right.  And I'm trying to put a
13 little finer point on it.
14     I know we've established that the
15 case report, case file, no question, established
16 that the boys had been seen with Lee in and around
17 the time of their disappearance.  But apart from
18 that fact, what other fact can you point me to that
19 would lead a person to believe that Lee was
20 involved in their disappearance and/or presumed
21 murders?
22 A.  The fact they were last with him, and they
23 were never seen after being with him again.  You
24 know, I think, in this case we had other potential
25 sightings throughout the early stages, but they're

---

Tietjen - Direct/Bonjean                                      Page 106

1  always potential.  We get that now on cases as
2  well.  And some have investigates those as well as
3  they -- but as best we knew, Lee Evans was the
4  last one seen with the boys.  They were never seen
5  again, and that would lead us that he's someone of
6  interest.
7  Q.  Okay.  Let's try again.  First of
8  all, you actually were unable to pinpoint when the
9  boys disappeared; right?
10 A.  Well, we knew on or about August 20, 1978.
11 Q.  Right.  That's like a full day,
12 which --
13 A.  No, we knew -- we had at time breakdowns
14 where people last see them, and they're reported
15 in the 1978 reports, so some were closer to that
16 11 o'clock at night, some had seen, the last
17 sightings.
18 Q.  And there were reports that they were
19 seen after that; right?
20 A.  Sure.  I mean, like I said, you're going to
21 get that.  You have to work on that as well and
22 see if that's viable, but that was -- I believe
23 those are sights of not people intimately involved
24 saw him.  None of the family members saw their
25 kids the next day.

---

Tietjen - Direct/Bonjean                                      Page 107

1  Q.  Right.  According to the reports,
2  they went missing in and around August 20th to
3  August 22nd, and they actually weren't even
4  reported missing until August 23rd; right?
5  A.  Correct.
6  Q.  The 1978 reports reflected varying
7  information about when the boys were last seen;
8  would you agree with that?
9  A.  I agree that there are varying times on the
10 20th that they were last seen, yes.
11 Q.  So my point is the reports reflect
12 that Lee Evans was with the boys approximately
13 around the time they left, but the reports didn't
14 conclusively show that he was the last person to
15 see them; would you agree?
16     MR. LIPSHUTZ: Objection.
17 Argumentative.
18     MR. VOMACKA: Objection to form.  You
19 can answer.
20 A.  Of the people that were interviewed in
21 those initial reports, the last time they saw the
22 boys was with Lee Evans.
23 Q.  Okay.
24 A.  You know, I don't know if -- there are
25 probably one or two that might say that when they

---

Tietjen - Direct/Bonjean                                      Page 108

1  say them, they weren't.  But the ones who
2  described them leaving with him in the truck, it
3  was his vehicle.  I think what she said was it was
4  Lee Evans' vehicle.  They didn't see Lee, but it
5  was his truck.
6  Q.  Okay.  And the point is, is that was
7  the last time they saw them, but they were unable
8  to say when the boys actually went missing; right?
9      MR. VOMACKA: Asked and answered.
10     MR. LIPSHUTZ: Objection to form.
11 You can answer.
12 A.  Missing to them is the point they last seen
13 them.  So if your kid goes missing today at -- you
14 last see them at 9:00 a.m., the report is going to
15 say last seen to you at 9:00 a.m.  Someone else
16 may have seen them at 11:00 on the street corner,
17 but we have yet to identify that person who saw
18 them at 11:00, so I don't, you know...
19 Q.  Well, they didn't actually -- they
20 did not actually report them missing until a couple
21 days later, so they -- would you agree that the
22 parents didn't initially at least feel that the
23 boys had been disappeared or murdered or --
24     MR. LIPSHUTZ: Objection to form.
25     MR. VOMACKA: Objection to form.  You

---

Evans v.
Newark City

Video Deposition

---

Tietjen - Direct/Bonjean                                    Page 109

1   can answer.
2   A.   1978 is very different than today.
3   Patricia's Law had you put down in writing how
4   quickly you take the report.  Because the issues
5   have been throughout the State of New Jersey
6   routinely where agencies tell families they had to
7   wait 24 hours, they had to wait days, to make a
8   report.  Unknown to me why there was a delay in
9   the reporting.  Whether they made initial attempts
10  and were told to wait for them to return, whether
11  they had experienced the boys staying overnight
12  somewhere, but there is a delay.
13       We, as of last week, had a report
14  where a family member reported a guy who killed
15  himself, and she waited 24 hours because she
16  thought the 24-hour rule was in effect.
17  Q.   Okay.  And I am not disputing that
18  1978 was a very different time, but for whatever
19  reason, the boys allegedly went missing on August
20  20th, and it wasn't reported by the parents, at
21  least as far as we know, until August 22nd;
22  correct?
23  A.   Correct.  We have one mother who drives
24  around looking for them at 3:00 a.m. with her, I
25  guess another family member, I'm trying to think

---

Tietjen - Direct/Bonjean                                    Page 110

1   of the name.  I think was Floria McDowell or
2   something like that.  Floria McDowell.  Yeah, I
3   think it was her.  She drove around with a
4   relative looking for them at 3:00 a.m., but no
5   reports to police, so they're concerned, and it
6   shows a concern.
7   Q.   I am not suggesting their parents
8   weren't concerned.  I'm just trying to set a time
9   frame here, though, they were not formally reported
10  missing until August 22nd, and then the assignment
11  wasn't actually received until August 23rd;
12  correct?
13  A.   Yes.
14  Q.   Okay.  And the parent could say when
15  the last time they saw their kid was and who they
16  saw them with, if anyone, but no one was able to
17  state at which point the boys were -- well, no one
18  was able to say whether the boys had been injured
19  or hurt; correct?
20  A.   I don't know what you're getting to with
21  that.
22  Q.   No one was able -- my point is no one
23  knows exactly when they were hurt; right?  If they
24  were hurt.
25       MR. VOMACKA:  Objection to form.  I'm

---

Tietjen - Direct/Bonjean                                    Page 111

1   sorry.  You can answer.
2   A.   No one stated that they were hurt on that
3   initial report.  It was unknown from the last
4   point they saw them.
5   Q.   So we're getting a little far afield.
6   I'll bring us back.  But my point is apart from the
7   reports reflecting that Lee Evans may have been one
8   of the last people to see him, or was the last
9   person by some people's account, to see the boys,
10  and not all the boys; right?
11       MR. LIPSHUTZ:  Which question are you
12  asking?
13  Q.   The reports did not reflect that Lee
14  Evans was the last person to be seen with all five
15  of the boys; right?
16  A.   Each of the boys is broken down differently
17  throughout the report, so we would have to, like,
18  timeline through that to identify each one in
19  there, but --
20  Q.   I'm just asking if you remember that.
21  If you don't, you don't remember.  The reports will
22  speak for themselves.  But do you recall whether or
23  not Lee Evans was the last person to be seen with
24  every single one of those five boys?
25  A.   It depends on who -- he's the last one seen

---

Tietjen - Direct/Bonjean                                    Page 112

1   at 11:00 on the reports that the family members
2   are aware of them.  I don't know if they saw
3   anybody else afterwards that I can recall.
4   Q.   My question was different, though.
5   It had to do with whether or not it was all five
6   boys that he was last seen with, or three of the
7   boys, or two of the boys?
8       (Reporter requested clarification.)
9   A.   Lee Evans or his vehicle was seen with all
10  five boys at some point that evening.
11  Q.   At some point within the 24-hour
12  period?
13  A.   No.  At some point that evening, let's even
14  push it from 8 o'clock on until midnight.
15  Q.   Okay.  Fine.  At some point that
16  evening, Lee Evans was seen with, your belief is
17  with all five of the boys; am I right?  Correct?
18  A.   Yes.
19  Q.   Okay.  And apart from that fact that
20  we've just honed in on, what other evidence led you
21  to believe that Lee Evans was involved from those
22  original reports that you reviewed?
23       MR. LIPSHUTZ:  Asked and answered.
24  Q.   Anything else?
25  A.   Reading through the report, you have many

---

| Tietjen - Direct/Bonjean | Page 113 |
|---|---|

1  aspects of the report that still continue to
2  identify him as a person of interest throughout
3  it.
4  Q.  That's just gobbledygook.  I'm asking
5  you to identify a fact other than the one you've
6  identified that he was the last one seen with the
7  boys, according to your interpretation of the
8  reports, what other fact did you identify from
9  those reports that led you to believe that Lee
10  Evans was involved in their disappearance?
11  A.  That the boys had stolen marijuana from
12  him.
13  Q.  Okay.
14  A.  That he had a potential motive for getting
15  back at them as well.
16  Q.  I'm sorry.  What was the second part?
17  A.  That there was a potential motive because
18  they had stolen marijuana from him.  There were
19  reports in there that somebody was trying to get
20  marijuana back and money as well, or money for the
21  marijuana.
22  Q.  I'm going to stop you right there.
23  So one other fact that you drew from these reports
24  is that there was some indication that the boys had
25  stolen, or some of the boys, had stolen marijuana

| Tietjen - Direct/Bonjean | Page 114 |
|---|---|

1  from Lee; right?
2  A.  Yes.
3  Q.  And in your mind, that was a
4  potential motive for murder; correct?
5  A.  Correct.
6  Q.  Or, I suppose, in your mind as of
7  2008, you're presuming these boys are dead;
8  correct?
9  A.  Yes.
10  Q.  And I know that you indicated just
11  now that there was some reporting that someone was
12  trying to get the marijuana back or get money for
13  the marijuana; right?
14  A.  Yes.
15  Q.  But the reports never connected that
16  piece to Lee Evans; right?
17  MR. LIPSHUTZ: Objection to the form.
18  Q.  Go ahead.  Do you need me to repeat
19  the question?
20  A.  No.  I said the marijuana was connected to
21  Lee.
22  Q.  Right.
23  A.  The boys -- I can review all these old
24  files for hours, if you want, about Hairston's
25  report, and we can go bit by bit and find that

| Tietjen - Direct/Bonjean | Page 115 |
|---|---|

1  spot.  I don't recall what changed in there, but
2  the entire time through, Lee Evans was a main
3  person of concern.  He was not arrested.  Until we
4  spoke to Philander Hampton and he provided new
5  information to us, yeah, that's where the big
6  concern takes in our -- he was always a suspect.
7  Q.  You can say he was main suspect from
8  those reports, and that's fine.  I understand
9  that's your view, but that's not -- I'm not looking
10  for your opinion about that.  I'm looking for the
11  underlying factual basis for that opinion.
12  So my question, though, was even
13  though there was reports that the boys had stolen
14  marijuana from Lee, and, in fact, there was some
15  marijuana recovered from one of the boy's rooms;
16  right?
17  A.  Yes.
18  Q.  But you weren't able to come up with
19  the marijuana, or the detectives were not able come
20  up with that specific marijuana from the evidence;
21  correct?
22  A.  She broke up.  I didn't hear her.
23  Q.  The reports did not reflect that the
24  detectives were ever able to connect the specific
25  marijuana that was recovered from the boy's room to

| Tietjen - Direct/Bonjean | Page 116 |
|---|---|

1  Lee Evans' stash; right?
2  A.  No.
3  Q.  Okay.  And, in fact, the detectives
4  who were working on the case back in 1978 were
5  never able to actually connect the person who was
6  trying to get money, and that was calling for the
7  money, named Bob; right?  Does that ring a bell?
8  A.  Right, correct.
9  MR. LIPSHUTZ: Objection to the form.
10  Q.  Did you ever see anything in those
11  reports that was able to connect Bob in any way to
12  Lee Evans?
13  A.  No.
14  Q.  Okay.  Apart from the potential
15  motive that the boys may have stolen some marijuana
16  from Lee and the fact that Lee had been with the
17  boys around the time of their disappearance, are
18  you able to identify for me any other facts you
19  developed from the 1978 reports that led you to
20  believe that Lee was part of their disappearance?
21  A.  They broke into his residence, and --
22  (Connectivity issues.)
23  A.  -- and broke a window entering the
24  residence this last time, which caused Ernie
25  Taylor to have a cut on his hand.

Evans v.
Newark City

Video Deposition

---

Tietjen - Direct/Bonjean                                    Page 117

1  Q.  Okay.  And that was to get the
2  marijuana, though; right?
3  A.  Correct.
4  Q.  So that's part of the marijuana
5  motive?  That's the motive; right?  Right?
6  A.  Yes.
7  Q.  Okay.  Apart from that motive
8  evidence you've identified and the fact that he was
9  seen in and around the time with the boys when they
10  disappeared, what else, anything you can point me
11  to from those '78 reports that led --
12  A.  Not that I recall.
13  Q.  Let me finish -- that led you to
14  believe that Lee was the perpetrator?
15  A.  He was last seen, and he has a motive.
16  Not -- that's what we're working on, right.
17  Q.  I'm asking what -- anything else?
18  A.  No, that's -- he's -- they broke into his
19  house.  They stole his marijuana.  He worked with
20  them.  It's a step process.  He was known.  So
21  the people last seen with the boys would be the
22  people that would be of interest, whether they are
23  named suspects, they are your person of interest
24  to go speak to.  So those facts there lead you to
25  want to speak to them.  Whether they get resolved

---

Tietjen - Direct/Bonjean                                    Page 118

1  at some point or they don't, those are still what
2  we have presented.
3  Q.  Right.  But the period of time --
4  well, strike that.  I'm not going to debate with
5  you about whether or not -- you don't know when the
6  boys were missing.  So whether or not Lee was the
7  last person seen with him, that's just from the
8  parents' accounts from hours earlier; right?
9     MR. VOMACKA: Objection to form, but
10  you can answer.
11     MR. LIPSHUTZ: Objection to the form.
12  A.  Parents and friends and others interviewed
13  that were with them that evening.
14  Q.  Right.  And there were a lot of
15  people that were around Lee Evans in and around
16  that time other than those boys, too; right?
17     MR. VOMACKA: Objection to the form,
18  but you can answer the question.
19     MR. LIPSHUTZ: Same objection.
20  A.  I'm sure.
21  Q.  Okay.  So there was -- supposedly
22  Maurice Olds was around there; correct?
23  A.  Correct.
24  Q.  Royster; right?
25  A.  Yes.

---

Tietjen - Direct/Bonjean                                    Page 119

1  Q.  Okay.  Do you think that stealing
2  marijuana is a motive for killing five children?
3  A.  Certainly.
4  Q.  Really?
5  A.  Yes.
6  Q.  How many other cases have you seen
7  where someone has committed, I don't know, maybe
8  five homicides, a five-person homicide, for the
9  stealing of a small amount of marijuana?
10  A.  Well, some people reported it to be a
11  pound.  But you have multiple break-ins at his
12  house.  And then look at today in the cities,
13  people kill people for a little bit of stuff.  So
14  I don't have any doubt that you could kill
15  somebody for stealing their marijuana and breaking
16  in their house multiple times.  I have no doubts
17  about that at all as being a motive.
18  Q.  Even someone who doesn't have a
19  particularly profound criminal record?
20  A.  Yes.
21  Q.  So in your mind, that was the motive?
22  You were persuaded of that motive.  Did you
23  consider any other motives?
24  A.  You broke up there again.
25  Q.  I said did you consider any other

---

Tietjen - Direct/Bonjean                                    Page 120

1  motives other than the one that you identified when
2  you were looking at this case in June of 2008?
3  A.  Every case I look at, I try to be open to
4  other possibilities as well that present to the
5  case, and then you go where the case will lead you
6  with the information provided to you.  I think
7  there's potentially always several possibilities
8  in every case from the beginning moment.  At no
9  point when I sat down with Phil Hampton when Phil
10  Hampton was willing to take the interview did I
11  think what he told us was ever going to happen.
12  Q.  Okay.  But my question is what other
13  motives did you consider, if any, other than the
14  one of the boys stole some marijuana from Lee?
15  A.  Well, there were many motives that were
16  touched on in the 1978 and later reports that
17  could be a potential.  Did they run away and go to
18  a cult?  There was --
19     (Connectivity issues.)
20  A.  It was, like, did they run away?  Did they
21  go to a cult?  Did they go to the city?  I think
22  somebody -- we got a Washington, D.C. call.  And
23  all of those things were looked at back then.  The
24  underlying open-ended one was still the motive for
25  Lee Evans with the marijuana and the break-ins to

---

Evans v.
Newark City

Video Deposition

Tietjen - Direct/Bonjean                                Page 121

1  his residence.
2  Q.  So you didn't pursue those other
3  possible motives when you got on the case; right?
4  A.  No, no.
5  Q.  You looked at the police reports, and
6  the one motive that you thought made sense was the
7  marijuana motive; right?
8  A.  I looked at the reports and saw what was
9  still open-ended, and that was the Lee Evans
10  marijuana motive.
11  Q.  And you never were able to prove that
12  Lee Evans was involved in narcotics trafficking;
13  right?
14  A.  Only with statements made to us.  That's
15  it.  No -- it's 1978.  I had no proof of his
16  arrest for that.
17  Q.  Who made statements -- well, strike
18  that.
19     You weren't able to corroborate any
20  of those statements that Lee had marijuana in his
21  house and was involved in selling marijuana; right?
22     MR. VOMACKA: Objection to the form,
23  but you can answer.
24  A.  It was -- I wasn't looking to arrest Lee on
25  the marijuana charges.  The information provided

Tietjen - Direct/Bonjean                                Page 122

1  in the statements, and people interviewed later on
2  when we got involved still indicated that he was
3  involved with marijuana.
4  Q.  You had a number of people saying he
5  was involved with marijuana; right?
6  A.  Correct.
7  Q.  You never found out what type of
8  marijuana operation he ran; is that right?
9  A.  Yes.
10     MR. LIPSHUTZ: Objection.
11  Q.  You don't know who his supplier was;
12  correct?
13  A.  No.
14  Q.  He had no arrests for marijuana;
15  correct?
16  A.  No.
17  Q.  And, in fact, you actually spoke to
18  one of the so-called suppliers of marijuana, and
19  he's like, "I've never heard of Lee Evans in my
20  life."  Right?
21  A.  Yes.
22  Q.  Okay.  So when you developed that
23  information, did it make you think, "Hmm, maybe Lee
24  Evans isn't involved really in drug trafficking"?
25  A.  No.

Tietjen - Direct/Bonjean                                Page 123

1  Q.  So the statements from 1978 about him
2  having marijuana in his house was enough to
3  persuade you that Lee Evans was a significant drug
4  dealer who would kill five people for stealing his
5  marijuana; right?
6     MR. LIPSHUTZ: Objection.
7     MR. VOMACKA: Objection.
8     MR. LIPSHUTZ: You can answer.
9  A.  I wouldn't say identified him as a
10  significant drug dealer.  I would say he was a
11  person with marijuana who had his marijuana stolen
12  and his broke house broken into and that he became
13  upset to that, and that became his motive.
14  Q.  And so upset that he would murder
15  five people over it; right?
16  A.  Yes.
17  Q.  So in June of 2008, you started
18  getting involved in investigations and being more
19  active in this investigation; fair?
20  A.  Yes.
21  Q.  You spoke to Lillie Williams.  But,
22  again, was there anything that came out of that
23  interview that made it more likely that Lee was
24  involved in these presumed murders?
25  A.  Nothing more than previously had been

Tietjen - Direct/Bonjean                                Page 124

1  provided.
2  Q.  Right.  She didn't give you any
3  additional information that advanced your theory
4  that Lee Evans was involved; right?
5  A.  No.
6  Q.  And you also interviewed a Cathy
7  Canady on June 6th, 2008?
8  A.  Yes.
9  Q.  And I notice that you said refer to
10  Lieutenant Carrega's report for details about that?
11  A.  Yes.
12  Q.  Is that because you didn't take notes
13  during that interview?
14  A.  I don't know if I took notes or not on that
15  interview.
16  Q.  Could you have?
17  A.  I could have.  I don't know.
18  Q.  Okay.
19  A.  But that would have been one that it was
20  decided when we who -- was going to cover each
21  aspect, and that was one that Lieutenant Carrega
22  was to be responsible for.
23  Q.  It was your understanding that
24  Lieutenant Carrega would write a report in
25  connection with the interview of Cathy Canady?

Evans v.
Newark City

Tietjen - Direct/Bonjean                                Page 125

1  A.  Certainly.
2  Q.  Did you ever see that report?
3  A.  No.
4  Q.  Have you ever seen that report?
5  A.  No.
6  Q.  As you sit here today, are you now
7  aware that no such report was ever made?
8  A.  I became aware during the Miranda hearing
9  for Philander Hampton.  Actually, the day prior,
10 he testified.
11 Q.  Did it trouble you that there had
12 been no report made, even though you referring were
13 to a report in your report?
14 A.  Oh, yes.
15 Q.  And why was it troubling to you?
16 A.  Because you work with a group of people;
17 you cover aspects of an investigation.  It's
18 decided who will cover certain aspects.  I wrote
19 first, I handed off my report.  I believe Bill
20 Hadley wrote his report next, or completed all
21 aspects of his report, whether he had others that
22 written throughout, and then it was passed on to
23 Lieutenant Carrega.  So I don't get stuff passed
24 down on that aspect from him.  It's passed up
25 through him.  And if he choose, chose, not to

Tietjen - Direct/Bonjean                                Page 126

1  write a report, that's on him.  I knew what my
2  responsible part was, and I found out the day of
3  Miranda that no such report was written, so...
4  Q.  Okay.  You also interviewed Floria
5  McDowell; right?
6  A.  Yes.
7  Q.  And I'm on page, I guess it's 5 of
8  your report, Bates stamped ECPO 1347.  Do you see
9  that?
10 A.  Um-hum.
11 Q.  And, again, would this have been
12 Carrega taking the lead in this interview?
13 A.  No, this one is one that I documented.
14 Q.  Um-hum.  Does that mean that you
15 documented it, you took the lead in documenting it,
16 or you took the lead in actually conducting the
17 interview, or one had nothing to do with the other?
18 A.  I would say they had nothing to do with
19 another.
20 Q.  But because Lieutenant Carrega was
21 present for this interview, would that lead you to
22 believe that he actually took the lead in
23 interviewing Ms. McDowell?
24 A.  Yes.
25 Q.  How would you describe Lieutenant

Tietjen - Direct/Bonjean                                Page 127

1  Carrega's style of interviewing?  I know you
2  described your own.  But how would you describe
3  his?
4      MS. ROSEN: Objection to the form.
5  You can answer.
6  A.  Everyone is different.  He's seeking
7  factual basis to events he wants to learn.
8  Q.  Right.  But stylistically, what was
9  his style?  Was he like your style?  Would you say
10 you have a similar style?
11 A.  I think we have varying differences.  I
12 think the three of us, including Joe, who was
13 definitely a great interviewer as well, were able
14 to mesh our styles into something that the
15 majority of people we spoke to, if not all, felt
16 very comfortable speaking with us.  So I wouldn't
17 say Carrega's style wasn't offensive to others.
18 He has many years of experience at this point
19 interviewing people.  I'd have to watch a video
20 again of his style to recall back 12 years ago if
21 it was drastically different than mine or
22 Detective Hadley.  I know we were all meshing up
23 together to do an interview.
24 Q.  You don't really remember, though,
25 what the differences were between your style and

Tietjen - Direct/Bonjean                                Page 128

1  his style; correct?
2  A.  No.
3  Q.  Now, and during this interview, you
4  were able to confirm some of the facts that he had
5  previously reported to detectives back in the '70s
6  and then even in the '90s, I believe; right?
7  A.  Yes.
8  Q.  And one was that she had recovered
9  marijuana from her son's room; right?
10 A.  Yes.
11 Q.  Just, I want to make sure I got this
12 right.  Floria McDowell's son was Mike McDowell?
13 A.  No, Alvin Turner.
14 Q.  Alvin Turner.  Yeah, I always get
15 that mixed up, because you'd think the name is the
16 same.  But anyway, it was Alvin that was her son;
17 right?
18 A.  Yes.
19 Q.  Okay.  I'm going to draw your
20 attention to -- and this is the situation where the
21 niece had recovered the marijuana from his room and
22 handed it over to the Newark Police Department at
23 the time; right?
24 A.  Yes.
25 Q.  All right.  And as we indicated

Video Deposition

| Tietjen - Direct/Bonjean | Page 129 |
|---|---|

1　earlier, she was unable to say how long that
2　marijuana had been in the house; right?
3　A.  I don't recall.  I don't believe she had a
4　time.
5　Q.  Well, you would agree that if it had
6　been in the house for a month --
7　A.  Well, she didn't know how long it was in
8　the house.
9　Q.  Right.  That's what I said.  If she
10　didn't know, then she wouldn't know how long it was
11　there; correct?
12　A.  Yes.
13　Q.  So, you, therefore, and the
14　detectives back in 1978, had no idea whether that
15　was the same marijuana that was allegedly stolen
16　from Lee Evans' house; correct?
17　A.  Right.
18　Q.  And it wasn't unusual for teenagers
19　to have marijuana even in the 1970s; can we agree
20　on that?
21　A.  I don't know these boys, so I don't know.
22　Q.  I'm not talking about these boys
23　specifically.  I'm saying it wasn't unusual in the
24　'70s for teenagers to possess marijuana; correct?
25　A.  I don't know how -- I'm six at the time,

| Tietjen - Direct/Bonjean | Page 130 |
|---|---|

1　you know.  I'm don't know teens back then so --
2　Q.  Fair enough.
3　A.  Like, I'm going to go with that.  Like, I
4　don't know Newark in 1978.
5　Q.  All right.  Fair.  Fair.  Fair
6　enough.
7　　Now, Mrs. McDowell also advised in
8　your interview that there was a black man that
9　"came to her residence on the day Alvin went
10　missing and spoke with Alvin at the front door."
11　Right?
12　A.  Correct.
13　Q.  And she "observed what she thought
14　was a handgun in the man's front pant's pocket.
15　She thought that the man looked like a friend of
16　Lillie Williams, mother of Melvin Pittman, but she
17　was not sure and she did not know his name."
18　　Do you remember that?
19　A.  Yes.
20　Q.  And you and your colleagues showed
21　her a picture of Philander Hampton; right?
22　A.  Correct.
23　Q.  And she was unable to identify him as
24　the person who was at the front door talking to
25　Alvin on the day Alvin went missing; right?  Is

| Tietjen - Direct/Bonjean | Page 131 |
|---|---|

1　that correct?
2　A.  Yes.
3　Q.  And this is someone who had a gun,
4　according to her?
5　A.  Yes.
6　Q.  What efforts did you -- what
7　investigative efforts did you take to find out who
8　that person was that came to the door with a gun on
9　the day that Alvin went missing?
10　A.  We asked Lillie -- or Floria McDowell about
11　how Alvin was with the individual, and she
12　indicated he wasn't fearful of the individual with
13　the gun.  So was it necessarily a threat to him?
14　No, she didn't feel that way.  We then went and
15　spoke to Lillie Williams as well about individuals
16　she may have been involved with, whether it be her
17　husband at the time, or if she was involved with
18　another male, and then --
19　　(Reported requested clarification.)
20　A.  Yeah, who she was involved with at the
21　time.  Whether it was her husband, it's Nelson
22　Williams, or another male.  And then it was, I
23　believe the name was Nelson Williams, was located
24　at a senior housing complex in Newark, and Agent
25　Eutsey and Lieutenant Carrega interviewed him

| Tietjen - Direct/Bonjean | Page 132 |
|---|---|

1　there, and he denied, as far as I know, any
2　involvement with being that person at the front
3　door.  Beyond that, just as in 1978, that person
4　was never identified.
5　Q.  So you and your predecessors were
6　never able to identify the individual who came to
7　the door of Floria McDowell's residence with a
8　handgun and spoke to her son Alvin; correct?
9　A.  With what she thought was a handgun in his
10　pocket, which you can surmise from there that how
11　good is she at identifying a handgun in a pocket
12　or not, so it's -- you know, we're going to play
13　back to that.  So that person was never identified
14　who may have potentially had a handgun in his
15　pocket.
16　Q.  Right.  You're quick to -- you're
17　quick to dispel any significance of this handgun,
18　because you said she thought it was, but I guess my
19　questions are really just more simple.  Did you
20　ever find out who that person was?
21　A.  No.
22　Q.  And apart from talking to Lillie
23　Williams and any men she may have been linked to,
24　were you able to develop any other information that
25　might shed some light on who that person was?

---

Tietjen - Direct/Bonjean                                      Page 141

1   was there.
2   Q.   So is it your testimony that you did
3   ask other witnesses in your investigation whether
4   or not Bob Cutler may have been the Bob, or whether
5   there was any reason to believe he was the Bob that
6   had come to the front door of the family?
7   A.   To the best of my recollection, I believe
8   we did.
9   Q.   Now, Mr. Taylor also advised that he
10  had heard that Maurice Olds and an unknown cousin
11  had washed bloody clothing in Lee Evans' building
12  after the boys went missing?
13  A.   Yes.
14  Q.   Okay.  I'm assuming that was a bit of
15  information that you wanted to try to get to the
16  bottom of?  Yeah?
17  A.   Yes.
18  Q.   But Maurice Olds was dead.
19  Mr. Taylor, though, did he -- did he say whether or
20  not he had conveyed that information to anybody
21  else previously to speaking to you?
22  A.   I do not recall.
23  Q.   Did you find it odd that this bit of
24  information was being shared, you know, I don't
25  know, 2008, rather than at any prior date?

---

Tietjen - Direct/Bonjean                                      Page 142

1   A.   I don't know if it was provided prior.  I
2   mean, I don't know.
3   Q.   You don't know now, or do you know
4   whether you looked or tried to find out whether
5   that was information that was provided back at the
6   time of the initial investigation?
7   A.   I don't know if in 2008 I took that
8   information and looked through all the pages to
9   see if it was provided previously.  I know that he
10  didn't know who the other cousin was, and Maurice
11  Olds was dead.  It's of interest to me, and it's
12  another piece of information that I hoped if we
13  interviewed somebody that they would be able to
14  discuss that.  Like maybe Phil Hampton was the
15  cousin, because he's Lee Evans cousin as well, it
16  turns out, so, you know...
17  Q.   But you weren't ever able to confirm
18  that bit of information; were you?
19  A.   No.
20  Q.   And, in fact, your theory of the
21  case, it wouldn't even be consistent with your
22  theory of the case; right?
23  A.   How would that be said?  Like, I have no
24  clue at this point of the interview how they met
25  their demise.  My theory at this point is they're

---

Tietjen - Direct/Bonjean                                      Page 143

1   dead, and Lee Evans has the motive as best we know
2   at this point to be the one committing that act.
3   I have no clue at this point how they would have
4   disappeared, whether -- it could have been
5   anything.
6   Q.   Right.  I know at this point you had
7   no idea, and this would have been an important bit
8   of information to try to flesh out.
9   What I'm saying, though, is that now
10  in hindsight, your theory of the case once you
11  cleared and closed this case wouldn't have been
12  consistent with this fact; right?
13  A.   I don't know if I would say that.
14  Q.   Okay.  So --
15  A.   Because I -- people tell you tidbits of
16  case facts and leave out others.  Like, I wouldn't
17  be surprised if the boys were beat before they
18  were put in that closet, which would then infer
19  blood on clothing, which would then infer somebody
20  had to clean clothing, so that was not far off
21  from anything that was provided to us.
22  Q.   So you think the killer would clean
23  the clothing even though they intend to burn the
24  building down?
25  MR. LIPSHUTZ: Objection to form.

---

Tietjen - Direct/Bonjean                                      Page 144

1   A.   People do crazy things.  Like, you know,
2   who wants to give up their jeans?
3   Q.   I mean, yeah, people do crazy things,
4   but I mean, you know, as an investigator, you
5   got -- you still have to use logic, right, to say,
6   you know --
7   A.   I have to use logic and say everything is
8   possible.  If the clothing was there, and they got
9   it bloody, we didn't have DNA back then, so
10  they're going to clean the clothes and not go buy
11  new clothes.  They're going to reuse the clothes,
12  and that's a normal inference.
13  Q.   So you -- I just want to be clear on
14  something.  Even though -- I'm not here to squabble
15  with you, Detective, Oh, anything is possible.
16  Sure, the world is full of freaky people.  Anything
17  is possible.  But as a detective, you're looking at
18  logic and possibilities and trying to put together
19  a narrative that holds together, that makes sense;
20  right?
21  A.   We're going with where the information
22  provided us leads us.  I'm not going to leave out
23  information about this clothing because that's a
24  potential aspect.  If Lee Evans decided to talk
25  and said that Phil washed our clothing in the

---

Evans v.
Newark City

Video Deposition

---

Tietjen - Direct/Bonjean                                    Page 145

1  basement with Maurine Olds after the fact, that
2  would be very important.  And I don't doubt there
3  would be blood potentially on their clothing with
4  whatever happened in the house.
5  Q.  I understand that.  I'm trying to
6  make a different point that I'm trying to see if
7  you agree with.
8      I understand at the time that you
9  received this information, it was very important,
10  and you would -- I would expect, anybody would
11  expect you, to put it in here.  But can you agree
12  that this statement doesn't seem -- it's possible,
13  but it doesn't seem likely to be true if the person
14  who did this burned the children in a home, which
15  is what Philander Hampton says, which is the theory
16  you all went with, unless they stripped them down
17  and took their clothes; right?  I mean, it doesn't
18  match the Philander Hampton story; does it?
19      MR. LIPSHUTZ: Objection.  Lacks
20  foundation.
21      MR. VOMACKA: Objection to the form
22  and foundation, but you can answer.
23  Q.  Is this statement consistent with
24  what Philander Hampton said happened?
25  A.  No.

---

Tietjen - Direct/Bonjean                                    Page 146

1  Q.  Okay.  That's all.  You would agree
2  with that; correct?
3  A.  Correct.
4  Q.  And Philander Hampton is the theory
5  that the investigative team and the prosecution
6  ultimately adopted and embraced; correct?
7      (Connectivity issues.)
8      MR. LIPSHUTZ: Well, I can't hear
9  you, but he obviously froze.
10      MR. VOMACKA: Looks like the camera
11  froze.
12  A.  I got disconnected there.
13  Q.  Do you need a break, or are we good?
14  A.  It just stopped mid-thought from you, and
15  it like rebooted.
16  Q.  No, no problem.  It happens to all of
17  us.  I'm asking now a different question.  If you
18  feel like you would like to take a five-minute
19  break?
20      MS. BONJEAN: Anybody else?
21      THE VIDEOGRAPHER: Let me change the
22  media, so it would be a good time to take a break.
23      MS. BONJEAN: Okay.  We're going to
24  change the media.  We'll take a break.
25      THE VIDEOGRAPHER: The time is 1:14

---

Tietjen - Direct/Bonjean                                    Page 147

1  p.m.  Off the record.
2      (Break taken.)
3      THE VIDEOGRAPHER: The time is 1:27
4  p.m.  This begins DVD number three.  Back on the
5  record.
6  Q.  Sergeant Tietjen, so I want to keep
7  moving through your investigative work on this
8  case, but I do want to confirm that Rogers Taylor,
9  or Taylor Rogers -- I guess it's Rogers Taylor, or
10  maybe it's just Roger, but in any event, you were
11  unable to verify any information that he provided
12  to you that demonstrated that Lee had any role in
13  the disappearance of the young boys; correct?
14  A.  Well, Phil Hampton provides information
15  that Lee was involved that verifies that Rogers
16  Taylor said he was involved.
17      (Reporter requests clarification.)
18  A.  I said Philander Hampton verified Lee
19  Evans' involvement with him, which verified Rogers
20  Taylor telling us that Lee Evans is involved in
21  their death and disappearance.
22  Q.  Okay.  But Mr. Taylor had no
23  firsthand knowledge of Lee Evans' involvement?
24  A.  No.  You asked me if I was able to verify
25  that Roger Taylor said that Lee Evans was

---

Tietjen - Direct/Bonjean                                    Page 148

1  responsible for their murder; correct?
2  Q.  My question was different.  Mr.
3  Taylor gave you no facts, he gave you an opinion,
4  his belief --
5  A.  Yes.
6  Q.  -- his hunch; right?
7  A.  Yes.
8  Q.  And a hunch that you quote,
9  allegedly, believe turned out to be true --
10  although a jury disagreed -- but in any event, he
11  provided you no facts as to Lee Evans' involvement,
12  any facts that turned out to be true and
13  verifiable; right?
14  A.  Yes.
15      MR. VOMACKA: Objection to the form.
16  Q.  His drug distribution lead went
17  nowhere; right?
18  A.  Yes.
19  Q.  And this business about hearing that
20  Maurice and another cousin was washing bloody
21  clothes in Lee Evans' building, that was never
22  verified; correct?
23  A.  Correct.
24  Q.  And, in fact, it contradicts
25  Philander Hampton's statement; correct?

---

Evans v.
Newark City

Video Deposition

Tietjen - Direct/Bonjean                                    Page 149

1   A.  We don't know what that was in relation to
2   either, so that could be another aspect of it as
3   well.  I'm not going to say it contradicts
4   Philander Hampton's -- his information is open for
5   other facts that we presented on that information
6   that could have brought that into it as well, or
7   was that -- or he had bloody clothes from another
8   fight that somebody got into.
9   Q.  Right.  It could be --
10   A.  It could be anything.
11   Q.  Right.  But I'm not interested in
12   anything.  I'm interested in facts that support
13   this theory that Lee Evans was involved.  And I
14   don't understand one thing about what you just
15   said.  Maybe you can clear it up.
16       Philander Hampton testified in his
17   statement that he put the boys in a closet or a
18   room inside that apartment building; right?
19   A.  Correct.
20   Q.  And that they were alive when they
21   put them in there; right?
22   A.  Yes.
23   Q.  And that they used a nail to lock
24   them in there; right?
25   A.  Yes.

Tietjen - Direct/Bonjean                                    Page 150

1   Q.  That is not consistent with doing
2   anything to the boys that would cause their
3   clothing to be bloody and then stripped off their
4   bodies and brought to be washed somewhere else;
5   right?
6       MR. LIPSHUTZ: Objection.
7   A.  It doesn't say here anywhere that clothing
8   was stripped off the victims' bodies.  It just
9   says that bloody clothes, whether they're Lee
10   Evans' and Phil Hamptons' clothes, Maurice Olds'
11   and the cousins' clothes, that they were washed.
12   Q.  Got it.  Understood.  So now there's
13   a theory that you think is possible that Lee Evans
14   and his cousins had bloody clothing that they
15   washed; is that right?
16       MR. VOMACKA: Objection to the form.
17       MR. LIPSHUTZ: Objection to the form.
18   Q.  Correct?
19   A.  Yes.
20   Q.  But Philander Hampton didn't give you
21   any information that would corroborate that there
22   was anything that happened that involved their
23   clothing getting bloody; right?
24   A.  You're not understanding the point of the
25   bloody clothing.  We don't know what day that is.

Tietjen - Direct/Bonjean                                    Page 151

1       We don't know where it is.  The hope is that
2   someone would provide information to us to include
3   or dis-clude [sic] or un-include [sic] that
4   information in there.  So we're back going around
5   this circle 10 million times.
6   Q.  Yeah.  You're trying to tell me your
7   take on it, and I'm not asking for your take.  I'm
8   asking a very specific question.
9       This fact that you've included in
10   your report ultimately does not mesh or link up in
11   any way to Philander's statement?  That's it;
12   right?
13   A.  Right.
14       MR. VOMACKA: Objection to the form.
15   You can answer.
16   Q.  I know there is a world of
17   possibilities out there, but I was simply trying to
18   establish that this statement actually is not
19   consistent with anything that Philander told you
20   about what happened that night; right?
21       MR. VOMACKA: Again, objection to the
22   form.
23   Q.  That's correct; correct?
24   A.  Yes.
25   Q.  All right.  And, again, there was --

Tietjen - Direct/Bonjean                                    Page 152

1   on this June date, Nelson Williams was identified
2   and interviewed by Lieutenant Carrega and Agent
3   Eutsey on June 10th.  Were you present for that
4   interview?
5   A.  No, I was not.
6   Q.  And how is it that you obtained
7   information about that interview?
8   A.  I was outside of that apartment complex in
9   the vehicle.
10   Q.  Okay.  So you were on scene, but you
11   didn't participate in the interview?
12   A.  Yes.
13   Q.  And this interview didn't yield any
14   useful information; correct?
15       MR. VOMACKA: Objection to the form.
16   You can answer.
17   A.  Yes.
18   Q.  And when I say useful, I mean it
19   didn't shed any light on who was responsible for
20   the boys' disappearance; right?
21   A.  Well, the question there was, was he the
22   one at the door with supposedly the gun in his
23   pocket.  It didn't identify that.
24   Q.  It didn't identify anything; correct?
25   A.  Correct.

---

Tietjen - Direct/Bonjean                                   Page 153

1  Q.  And he denied being any type of
2  associate with Lee Evans; right?
3  A.  I believe so, yes.
4  Q.  So, if we wanted to know more, we
5  would just have to go to Lieutenant Carrega's
6  report; correct?
7  A.  Oh, yeah.
8  Q.  But that report does not exist;
9  right?
10  A.  Correct.
11  Q.  All right.  Moving on, you
12  interviewed Kathy Turner, and she was a cousin of
13  Alvin Turner; correct?
14  A.  Yes.
15  Q.  And this was the woman, or the young
16  woman, I think, at the time who obtained the
17  marijuana from her cousin's room; is that right?
18  A.  Yes.
19  Q.  All right.  And it was a paper bag a
20  third full of marijuana.  That doesn't sound like a
21  pound to you; does it?
22  A.  It depends on the size of the paper bag.
23  Q.  I suppose.
24  A.  Which we didn't ask.  But there's reporting
25  here that they split it up.  So that's a pretty

---

Tietjen - Direct/Bonjean                                   Page 154

1  significant amount of marijuana, if you're one of
2  five who split up marijuana.
3  Q.  Right.  But this is all secondhand
4  information; right?
5  A.  Certainly.  She saw it.  She stated she saw
6  the bag.
7  Q.  But back to the point earlier, no one
8  can say where this marijuana came from; right?
9  A.  Correct.
10  Q.  Okay.  I know what the working theory
11  is, but there was no way to establish where the
12  marijuana came from; you would agree with that?  Is
13  that a yes?
14  A.  Yes.
15  Q.  And apparently, she told -- or Alvin
16  told her that he was in some type of trouble;
17  correct?
18  A.  I believe so, correct, yes.
19  Q.  And the last time she saw him was at
20  8 o'clock that night?
21  A.  Yes.
22  Q.  And she didn't say the last time she
23  saw him was with Lee Evans; right?
24  A.  Correct.
25  Q.  So Ms. Turner was able to, I guess,

---

Tietjen - Direct/Bonjean                                   Page 155

1  corroborate that Alvin had marijuana, but that was
2  the extent of her ability to shed light on what
3  happened that evening?
4  A.  Well, she also corroborated that she saw
5  him alive at 8 o'clock at night.
6  Q.  Able to corroborate the day after he
7  went missing; right?
8  A.  Yes.
9  Q.  I think you also interviewed Sarah
10  Johnson, and you yourself admitted that she had
11  nothing to add to this investigation; right?
12  A.  Yes.  She was not in well health, and we
13  met with her family, and she was simply just to
14  provide a DNA sample.
15  Q.  Talk to me about your meeting with
16  Bob Cutler.  Where did that take place?
17  A.  That took place at the Essex County
18  Prosecutor's Office.
19  Q.  And how did that interview take
20  place?
21  A.  How he was brought there or --
22  Q.  Yeah.
23  A.  A DOC guard, I guess the DOC guard
24  transported him there.  I don't know what
25  paperwork was done to request that.

---

Tietjen - Direct/Bonjean                                   Page 156

1  Q.  Well, he was in custody; is that
2  correct?
3  A.  Correct.
4  Q.  And what authority did law
5  enforcement have to bring witnesses, move witnesses
6  for interviews?
7      MR. VOMACKA: Objection to the form,
8  but you can answer.
9  A.  I don't know what paperwork had to be
10  generated or approvals to get him out of a NJDOC
11  facility and transport him to Essex County for the
12  interview.
13  Q.  You don't know what the process was?
14  A.  No.
15  Q.  Is it your understanding that that's
16  a lawful thing to do?
17  A.  It's a what?
18  Q.  Is it your understanding that that is
19  a lawful thing to do?
20  A.  Yes.
21  Q.  Based on what?
22  A.  I had no reason to not believe it wasn't
23  lawful.
24  Q.  Well, would you agree that witnesses
25  don't have an obligation to speak to you?

---

Evans v.
Newark City

Video Deposition

| Tietjen - Direct/Bonjean | Page 157 |
| --- | --- |

1  A.  Correct.
2  Q.  Okay.  And if he's being moved
3  against -- you know, without input into whether
4  he's -- he's a prisoner; right?
5  A.  Correct.
6  Q.  His movement is dependent on third
7  parties?  He doesn't get to decide where he goes or
8  when he goes; right?
9      MR. VOMACKA: Objection to the form,
10  but you can answer.
11  A.  I don't know what preempted his movement,
12  whether he had to agree, whether he had to sign a
13  waiver.  Like I said before, I don't know how he
14  was transported there.  I know he was transported
15  by DOC, but I don't know what led to that.
16  Q.  Do you know whether or not there was
17  consent on his part with knowledge and
18  understanding of why he was being moved from the
19  Department of Corrections to the Essex County
20  Prosecutor's Office prior to this interview?
21      MR. VOMACKA: Objection to the form.
22  You can answer.
23  A.  Like I said before, I don't know anything
24  about his movement to the facility.  He never
25  appeared to be there outside of his own consent in

| Tietjen - Direct/Bonjean | Page 158 |
| --- | --- |

1  the interview.
2  Q.  Well, did you ask him whether he was
3  there because he had been informed of the purpose
4  of the --
5  A.  No.  No, I did not ask him.
6  Q.  And what did you recall about this
7  interview with Bob Cutler, if anything?
8  A.  He went over plenty of things historical.
9  Argued that they had Lee Evans as their suspect,
10  you know, from like day one on.  Was rather upset
11  with police work throughout it.  Did not provide
12  anything that changed statements he made
13  previously.  He seemed very annoyed at law
14  enforcement's response through the years to this
15  case.  He had previously spoken with law
16  enforcement several times.  You know, we spent
17  some serious amount of time with him.  He was
18  hopeful for a resolution.
19  Q.  What was the purpose in interviewing
20  Bob Cutler?
21  A.  Seeing if he had additional information or
22  was willing to make additional statements that he
23  had not made before.  I know they had interviewed
24  him previous to my ever involvement in this, and
25  he had been interviewed by the law enforcement

| Tietjen - Direct/Bonjean | Page 159 |
| --- | --- |

1  throughout, and I think it was an attempt to show
2  that there's others who care about this case
3  actively involved with the hope that you, know, he
4  might like one of us, and he might want to share
5  some other information that had not yet been
6  gleaned in this case.
7  Q.  Did you view Bob Cutler as a
8  potential suspect?
9  A.  Not during this, but I think I keep my
10  thoughts always open.  I mean he was a young man
11  at the time, and I don't think he was going to
12  kill five boys.  He would be like a real low, low
13  level, if he was going to kill them.
14  Q.  You think that he was -- I'm sorry --
15  because of his age, he --
16  A.  No.  I said I would always be open-minded.
17  If events or facts took us that way, I wouldn't
18  exclude that, but the facts did not present to
19  that.
20  Q.  Well, did you ask him about
21  inconsistencies in his first statements to the
22  police and then his subsequent statements to the
23  police?
24  A.  I believe that was -- I can't recall any --
25  we went through a lot of things.  We'd have to

| Tietjen - Direct/Bonjean | Page 160 |
| --- | --- |

1  refer to transcripts.  You'd have to actually
2  listen to the tape to see who's asking the
3  questions.  I know some of the questions in there
4  are certain people because I know we had certain
5  things.  But I think we went over some statements
6  he made previously and a lot of him to just
7  discuss and go over.  A lot of it was spent on
8  what he thought was, like, law enforcement doing
9  wrong, or that we had Lee --
10  Q.  Well, he had a lot of opinions;
11  right?
12  A.  Yes.
13  Q.  He didn't have a lot of facts,
14  though; did he?
15  A.  Correct.
16  Q.  He had a strong opinion that Lee was
17  involved, but he wasn't really able to provide you
18  with any factual basis to support a theory that Lee
19  was responsible for the boys' disappearance; right?
20  A.  Yes.
21      MR. LIPSHUTZ: Objection to the form.
22  Q.  He had some street rumors and that
23  type of thing; correct?
24  A.  Yes.
25  Q.  He couldn't even tell you when the

Evans v.
Newark City

Video Deposition

Tietjen - Direct/Bonjean                                          Page 141

1   was there.
2   Q.   So is it your testimony that you did
3   ask other witnesses in your investigation whether
4   or not Bob Cutler may have been the Bob, or whether
5   there was any reason to believe he was the Bob that
6   had come to the front door of the family?
7   A.   To the best of my recollection, I believe
8   we did.
9   Q.   Now, Mr. Taylor also advised that he
10  had heard that Maurice Olds and an unknown cousin
11  had washed bloody clothing in Lee Evans' building
12  after the boys went missing?
13  A.   Yes.
14  Q.   Okay.  I'm assuming that was a bit of
15  information that you wanted to try to get to the
16  bottom of?  Yeah?
17  A.   Yes.
18  Q.   But Maurice Olds was dead.
19  Mr. Taylor, though, did he -- did he say whether or
20  not he had conveyed that information to anybody
21  else previously to speaking to you?
22  A.   I do not recall.
23  Q.   Did you find it odd that this bit of
24  information was being shared, you know, I don't
25  know, 2008, rather than at any prior date?

Tietjen - Direct/Bonjean                                          Page 142

1   A.   I don't know if it was provided prior.  I
2   mean, I don't know.
3   Q.   You don't know now, or do you know
4   whether you looked or tried to find out whether
5   that was information that was provided back at the
6   time of the initial investigation?
7   A.   I don't know if in 2008 I took that
8   information and looked through all the pages to
9   see if it was provided previously.  I know that he
10  didn't know who the other cousin was, and Maurice
11  Olds was dead.  It's of interest to me, and it's
12  another piece of information that I hoped if we
13  interviewed somebody that they would be able to
14  discuss that.  Like maybe Phil Hampton was the
15  cousin, because he's Lee Evans cousin as well, it
16  turns out, so, you know...
17  Q.   But you weren't ever able to confirm
18  that bit of information; were you?
19  A.   No.
20  Q.   And, in fact, your theory of the
21  case, it wouldn't even be consistent with your
22  theory of the case; right?
23  A.   How would that be said?  Like, I have no
24  clue at this point of the interview how they met
25  their demise.  My theory at this point is they're

Tietjen - Direct/Bonjean                                          Page 143

1   dead, and Lee Evans has the motive as best we know
2   at this point to be the one committing that act.
3   I have no clue at this point how they would have
4   disappeared, whether -- it could have been
5   anything.
6   Q.   Right.  I know at this point you had
7   no idea, and this would have been an important bit
8   of information to try to flesh out.
9   What I'm saying, though, is that now
10  in hindsight, your theory of the case once you
11  cleared and closed this case wouldn't have been
12  consistent with this fact; right?
13  A.   I don't know if I would say that.
14  Q.   Okay.  So --
15  A.   Because I -- people tell you tidbits of
16  case facts and leave out others.  Like, I wouldn't
17  be surprised if the boys were beat before they
18  were put in that closet, which would then infer
19  blood on clothing, which would then infer somebody
20  had to clean clothing, so that was not far off
21  from anything that was provided to us.
22  Q.   So you think the killer would clean
23  the clothing even though they intend to burn the
24  building down?
25          MR. LIPSHUTZ: Objection to form.

Tietjen - Direct/Bonjean                                          Page 144

1   A.   People do crazy things.  Like, you know,
2   who wants to give up their jeans?
3   Q.   I mean, yeah, people do crazy things,
4   but I mean, you know, as an investigator, you
5   got -- you still have to use logic, right, to say,
6   you know --
7   A.   I have to use logic and say everything is
8   possible.  If the clothing was there, and they got
9   it bloody, we didn't have DNA back then, so
10  they're going to clean the clothes and not go buy
11  new clothes.  They're going to reuse the clothes,
12  and that's a normal inference.
13  Q.   So you -- I just want to be clear on
14  something.  Even though -- I'm not here to squabble
15  with you, Detective, Oh, anything is possible.
16  Sure, the world is full of freaky people.  Anything
17  is possible.  But as a detective, you're looking at
18  logic and possibilities and trying to put together
19  a narrative that holds together, that makes sense;
20  right?
21  A.   We're going with where the information
22  provided us leads us.  I'm not going to leave out
23  information about this clothing because that's a
24  potential aspect.  If Lee Evans decided to talk
25  and said that Phil washed our clothing in the

Evans v.
Newark City

Video Deposition

| Tietjen - Direct/Bonjean | Page 145 |
|---|---|

1  basement with Maurine Olds after the fact, that
2  would be very important. And I don't doubt there
3  would be blood potentially on their clothing with
4  whatever happened in the house.
5  Q.  I understand that. I'm trying to
6  make a different point that I'm trying to see if
7  you agree with.
8      I understand at the time that you
9  received this information, it was very important,
10  and you would -- I would expect, anybody would
11  expect you, to put it in here. But can you agree
12  that this statement doesn't seem -- it's possible,
13  but it doesn't seem likely to be true if the person
14  who did this burned the children in a home, which
15  is what Philander Hampton says, which is the theory
16  you all went with, unless they stripped them down
17  and took their clothes; right? I mean, it doesn't
18  match the Philander Hampton story; does it?
19      MR. LIPSHUTZ: Objection. Lacks
20  foundation.
21      MR. VOMACKA: Objection to the form
22  and foundation, but you can answer.
23  Q.  Is this statement consistent with
24  what Philander Hampton said happened?
25  A.  No.

| Tietjen - Direct/Bonjean | Page 146 |
|---|---|

1  Q.  Okay. That's all. You would agree
2  with that; correct?
3  A.  Correct.
4  Q.  And Philander Hampton is the theory
5  that the investigative team and the prosecution
6  ultimately adopted and embraced; correct?
7      (Connectivity issues.)
8      MR. LIPSHUTZ: Well, I can't hear
9  you, but he obviously froze.
10      MR. VOMACKA: Looks like the camera
11  froze.
12  A.  I got disconnected there.
13  Q.  Do you need a break, or are we good?
14  A.  It just stopped mid-thought from you, and
15  it like rebooted.
16  Q.  No, no problem. It happens to all of
17  us. I'm asking now a different question. If you
18  feel like you would like to take a five-minute
19  break?
20      MS. BONJEAN: Anybody else?
21      THE VIDEOGRAPHER: Let me change the
22  media, so it would be a good time to take a break.
23      MS. BONJEAN: Okay. We're going to
24  change the media. We'll take a break.
25      THE VIDEOGRAPHER: The time is 1:14

| Tietjen - Direct/Bonjean | Page 147 |
|---|---|

1  p.m. Off the record.
2      (Break taken.)
3      THE VIDEOGRAPHER: The time is 1:27
4  p.m. This begins DVD number three. Back on the
5  record.
6  Q.  Sergeant Tietjen, so I want to keep
7  moving through your investigative work on this
8  case, but I do want to confirm that Rogers Taylor,
9  or Taylor Rogers -- I guess it's Rogers Taylor, or
10  maybe it's just Roger, but in any event, you were
11  unable to verify any information that he provided
12  to you that demonstrated that Lee had any role in
13  the disappearance of the young boys; correct?
14  A.  Well, Phil Hampton provides information
15  that Lee was involved that verifies that Rogers
16  Taylor said he was involved.
17      (Reporter requests clarification.)
18  A.  I said Philander Hampton verified Lee
19  Evans' involvement with him, which verified Rogers
20  Taylor telling us that Lee Evans is involved in
21  their death and disappearance.
22  Q.  Okay. But Mr. Taylor had no
23  firsthand knowledge of Lee Evans' involvement?
24  A.  No. You asked me if I was able to verify
25  that Roger Taylor said that Lee Evans was

| Tietjen - Direct/Bonjean | Page 148 |
|---|---|

1  responsible for their murder; correct?
2  Q.  My question was different. Mr.
3  Taylor gave you no facts, he gave you an opinion,
4  his belief --
5  A.  Yes.
6  Q.  -- his hunch; right?
7  A.  Yes.
8  Q.  And a hunch that you quote,
9  allegedly, believe turned out to be true --
10  although a jury disagreed -- but in any event, he
11  provided you no facts as to Lee Evans' involvement,
12  any facts that turned out to be true and
13  verifiable; right?
14  A.  Yes.
15      MR. VOMACKA: Objection to the form.
16  Q.  His drug distribution lead went
17  nowhere; right?
18  A.  Yes.
19  Q.  And this business about hearing that
20  Maurice and another cousin was washing bloody
21  clothes in Lee Evans' building, that was never
22  verified; correct?
23  A.  Correct.
24  Q.  And, in fact, it contradicts
25  Philander Hampton's statement; correct?

Evans v.
Newark City

Video Deposition

| Tietjen - Direct/Bonjean | Page 149 |
|---|---|

1 A. We don't know what that was in relation to
2 either, so that could be another aspect of it as
3 well. I'm not going to say it contradicts
4 Philander Hampton's -- his information is open for
5 other facts that we presented on that information
6 that could have brought that into it as well, or
7 was that -- or he had bloody clothes from another
8 fight that somebody got into.
9 Q. Right. It could be --
10 A. It could be anything.
11 Q. Right. But I'm not interested in
12 anything. I'm interested in facts that support
13 this theory that Lee Evans was involved. And I
14 don't understand one thing about what you just
15 said. Maybe you can clear it up.
16     Philander Hampton testified in his
17 statement that he put the boys in a closet or a
18 room inside that apartment building; right?
19 A. Correct.
20 Q. And that they were alive when they
21 put them in there; right?
22 A. Yes.
23 Q. And that they used a nail to lock
24 them in there; right?
25 A. Yes.

| Tietjen - Direct/Bonjean | Page 150 |
|---|---|

1 Q. That is not consistent with doing
2 anything to the boys that would cause their
3 clothing to be bloody and then stripped off their
4 bodies and brought to be washed somewhere else;
5 right?
6     MR. LIPSHUTZ: Objection.
7 A. It doesn't say here anywhere that clothing
8 was stripped off the victims' bodies. It just
9 says that bloody clothes, whether they're Lee
10 Evans' and Phil Hamptons' clothes, Maurice Olds'
11 and the cousins' clothes, that they were washed.
12 Q. Got it. Understood. So now there's
13 a theory that you think is possible that Lee Evans
14 and his cousins had bloody clothing that they
15 washed; is that right?
16     MR. VOMACKA: Objection to the form.
17     MR. LIPSHUTZ: Objection to the form.
18 Q. Correct?
19 A. Yes.
20 Q. But Philander Hampton didn't give you
21 any information that would corroborate that there
22 was anything that happened that involved their
23 clothing getting bloody; right?
24 A. You're not understanding the point of the
25 bloody clothing. We don't know what day that is.

| Tietjen - Direct/Bonjean | Page 151 |
|---|---|

1 We don't know where it is. The hope is that
2 someone would provide information to us to include
3 or dis-clude [sic] or un-include [sic] that
4 information in there. So we're back going around
5 this circle 10 million times.
6 Q. Yeah. You're trying to tell me your
7 take on it, and I'm not asking for your take. I'm
8 asking a very specific question.
9     This fact that you've included in
10 your report ultimately does not mesh or link up in
11 any way to Philander's statement? That's it;
12 right?
13 A. Right.
14     MR. VOMACKA: Objection to the form.
15 You can answer.
16 Q. I know there is a world of
17 possibilities out there, but I was simply trying to
18 establish that this statement actually is not
19 consistent with anything that Philander told you
20 about what happened that night; right?
21     MR. VOMACKA: Again, objection to the
22 form.
23 Q. That's correct; correct?
24 A. Yes.
25 Q. All right. And, again, there was --

| Tietjen - Direct/Bonjean | Page 152 |
|---|---|

1 on this June date, Nelson Williams was identified
2 and interviewed by Lieutenant Carrega and Agent
3 Eutsey on June 10th. Were you present for that
4 interview?
5 A. No, I was not.
6 Q. And how is it that you obtained
7 information about that interview?
8 A. I was outside of that apartment complex in
9 the vehicle.
10 Q. Okay. So you were on scene, but you
11 didn't participate in the interview?
12 A. Yes.
13 Q. And this interview didn't yield any
14 useful information; correct?
15     MR. VOMACKA: Objection to the form.
16 You can answer.
17 A. Yes.
18 Q. And when I say useful, I mean it
19 didn't shed any light on who was responsible for
20 the boys' disappearance; right?
21 A. Well, the question there was, was he the
22 one at the door with supposedly the gun in his
23 pocket. It didn't identify that.
24 Q. It didn't identify anything; correct?
25 A. Correct.

Evans v.
Newark City

Video Deposition

| Tietjen - Direct/Bonjean | Page 153 |
| --- | --- |

1 Q.   And he denied being any type of
2 associate with Lee Evans; right?
3 A.   I believe so, yes.
4 Q.   So, if we wanted to know more, we
5 would just have to go to Lieutenant Carrega's
6 report; correct?
7 A.   Oh, yeah.
8 Q.   But that report does not exist;
9 right?
10 A.   Correct.
11 Q.   All right.  Moving on, you
12 interviewed Kathy Turner, and she was a cousin of
13 Alvin Turner; correct?
14 A.   Yes.
15 Q.   And this was the woman, or the young
16 woman, I think, at the time who obtained the
17 marijuana from her cousin's room; is that right?
18 A.   Yes.
19 Q.   All right.  And it was a paper bag a
20 third full of marijuana.  That doesn't sound like a
21 pound to you; does it?
22 A.   It depends on the size of the paper bag.
23 Q.   I suppose.
24 A.   Which we didn't ask.  But there's reporting
25 here that they split it up.  So that's a pretty

| Tietjen - Direct/Bonjean | Page 154 |
| --- | --- |

1 significant amount of marijuana, if you're one of
2 five who split up marijuana.
3 Q.   Right.  But this is all secondhand
4 information; right?
5 A.   Certainly.  She saw it.  She stated she saw
6 the bag.
7 Q.   But back to the point earlier, no one
8 can say where this marijuana came from; right?
9 A.   Correct.
10 Q.   Okay.  I know what the working theory
11 is, but there was no way to establish where the
12 marijuana came from; you would agree with that?  Is
13 that a yes?
14 A.   Yes.
15 Q.   And apparently, she told -- or Alvin
16 told her that he was in some type of trouble;
17 correct?
18 A.   I believe so, correct, yes.
19 Q.   And the last time she saw him was at
20 8 o'clock that night?
21 A.   Yes.
22 Q.   And she didn't say the last time she
23 saw him was with Lee Evans; right?
24 A.   Correct.
25 Q.   So Ms. Turner was able to, I guess,

| Tietjen - Direct/Bonjean | Page 155 |
| --- | --- |

1 corroborate that Alvin had marijuana, but that was
2 the extent of her ability to shed light on what
3 happened that evening?
4 A.   Well, she also corroborated that she saw
5 him alive at 8 o'clock at night.
6 Q.   Able to corroborate the day after he
7 went missing; right?
8 A.   Yes.
9 Q.   I think you also interviewed Sarah
10 Johnson, and you yourself admitted that she had
11 nothing to add to this investigation; right?
12 A.   Yes.  She was not in well health, and we
13 met with her family, and she was simply just to
14 provide a DNA sample.
15 Q.   Talk to me about your meeting with
16 Bob Cutler.  Where did that take place?
17 A.   That took place at the Essex County
18 Prosecutor's Office.
19 Q.   And how did that interview take
20 place?
21 A.   How he was brought there or --
22 Q.   Yeah.
23 A.   A DOC guard, I guess the DOC guard
24 transported him there.  I don't know what
25 paperwork was done to request that.

| Tietjen - Direct/Bonjean | Page 156 |
| --- | --- |

1 Q.   Well, he was in custody; is that
2 correct?
3 A.   Correct.
4 Q.   And what authority did law
5 enforcement have to bring witnesses, move witnesses
6 for interviews?
7      MR. VOMACKA: Objection to the form,
8 but you can answer.
9 A.   I don't know what paperwork had to be
10 generated or approvals to get him out of a NJDOC
11 facility and transport him to Essex County for the
12 interview.
13 Q.   You don't know what the process was?
14 A.   No.
15 Q.   Is it your understanding that that's
16 a lawful thing to do?
17 A.   It's a what?
18 Q.   Is it your understanding that that is
19 a lawful thing to do?
20 A.   Yes.
21 Q.   Based on what?
22 A.   I had no reason to not believe it wasn't
23 lawful.
24 Q.   Well, would you agree that witnesses
25 don't have an obligation to speak to you?

1  A.   Correct.
2  Q.   Okay.  And if he's being moved
3  against -- you know, without input into whether
4  he's -- he's a prisoner; right?
5  A.   Correct.
6  Q.   His movement is dependent on third
7  parties?  He doesn't get to decide where he goes or
8  when he goes; right?
9      MR. VOMACKA: Objection to the form,
10  but you can answer.
11  A.   I don't know what preempted his movement,
12  whether he had to agree, whether he had to sign a
13  waiver.  Like I said before, I don't know how he
14  was transported there.  I know he was transported
15  by DOC, but I don't know what led to that.
16  Q.   Do you know whether or not there was
17  consent on his part with knowledge and
18  understanding of why he was being moved from the
19  Department of Corrections to the Essex County
20  Prosecutor's Office prior to this interview?
21      MR. VOMACKA: Objection to the form.
22  You can answer.
23  A.   Like I said before, I don't know anything
24  about his movement to the facility.  He never
25  appeared to be there outside of his own consent in

1  the interview.
2  Q.   Well, did you ask him whether he was
3  there because he had been informed of the purpose
4  of the --
5  A.   No.  No, I did not ask him.
6  Q.   And what did you recall about this
7  interview with Bob Cutler, if anything?
8  A.   He went over plenty of things historical.
9  Argued that they had Lee Evans as their suspect,
10  you know, from like day one on.  Was rather upset
11  with police work throughout it.  Did not provide
12  anything that changed statements he made
13  previously.  He seemed very annoyed at law
14  enforcement's response through the years to this
15  case.  He had previously spoken with law
16  enforcement several times.  You know, we spent
17  some serious amount of time with him.  He was
18  hopeful for a resolution.
19  Q.   What was the purpose in interviewing
20  Bob Cutler?
21  A.   Seeing if he had additional information or
22  was willing to make additional statements that he
23  had not made before.  I know they had interviewed
24  him previous to my ever involvement in this, and
25  he had been interviewed by the law enforcement

1  throughout, and I think it was an attempt to show
2  that there's others who care about this case
3  actively involved with the hope that you, know, he
4  might like one of us, and he might want to share
5  some other information that had not yet been
6  gleaned in this case.
7  Q.   Did you view Bob Cutler as a
8  potential suspect?
9  A.   Not during this, but I think I keep my
10  thoughts always open.  I mean he was a young man
11  at the time, and I don't think he was going to
12  kill five boys.  He would be like a real low, low
13  level, if he was going to kill them.
14  Q.   You think that he was -- I'm sorry --
15  because of his age, he --
16  A.   No.  I said I would always be open-minded.
17  If events or facts took us that way, I wouldn't
18  exclude that, but the facts did not present to
19  that.
20  Q.   Well, did you ask him about
21  inconsistencies in his first statements to the
22  police and then his subsequent statements to the
23  police?
24  A.   I believe that was -- I can't recall any --
25  we went through a lot of things.  We'd have to

1  refer to transcripts.  You'd have to actually
2  listen to the tape to see who's asking the
3  questions.  I know some of the questions in there
4  are certain people because I know we had certain
5  things.  But I think we went over some statements
6  he made previously and a lot of him to just
7  discuss and go over.  A lot of it was spent on
8  what he thought was, like, law enforcement doing
9  wrong, or that we had Lee --
10  Q.   Well, he had a lot of opinions;
11  right?
12  A.   Yes.
13  Q.   He didn't have a lot of facts,
14  though; did he?
15  A.   Correct.
16  Q.   He had a strong opinion that Lee was
17  involved, but he wasn't really able to provide you
18  with any factual basis to support a theory that Lee
19  was responsible for the boys' disappearance; right?
20  A.   Yes.
21      MR. LIPSHUTZ: Objection to the form.
22  Q.   He had some street rumors and that
23  type of thing; correct?
24  A.   Yes.
25  Q.   He couldn't even tell you when the

Video Deposition

| Tietjen - Direct/Bonjean | Page 161 |
|---|---|

1 boys disappeared because he was allegedly not
2 around?
3 A. Well, his dates would change as well
4 throughout his conversation with law enforcement,
5 as far as his recollection with his trip to
6 Atlantic City. Like, he also talked about the
7 marijuana and stealing the marijuana and doing it
8 himself as well.
9 Q. Right. But you brought up a good
10 point. His dates changed about when he went to
11 Atlantic City and when he came back from Atlantic
12 City; right?
13 A. Yes.
14 Q. And, in fact, who he was with
15 changed, too? He first told the police he was with
16 his grandmother and then it changed to his
17 girlfriend; right?
18 A. I believe that's correct.
19 Q. And did it trouble you that there
20 were some significant inconsistencies with what Bob
21 Cutler was telling you back in 2008 versus what he
22 had said on prior occasions?
23 A. Not at all. Because just like today, I'm
24 recalling certain things and not recalling others.
25 Certain memories will be there pretty well. But I

| Tietjen - Direct/Bonjean | Page 162 |
|---|---|

1 don't expect him to remember very significant
2 aspects exactly word for word what someone has
3 told before even as far back as 1978. That
4 happens all the time in cases. All the time.
5 Q. And even though you were not able to
6 figure out who the Bob was that was coming to --
7 making the phone calls and demanding the money, did
8 you reach the conclusion that based on Mr. Cutler's
9 denials that it wasn't him?
10 A. I'll always be open to a possibility, but
11 we have nothing that led us that that's going to
12 be him.
13 Q. You had nothing that said it wasn't
14 him either, though?
15 A. Correct. As I said, I'm always open to
16 that possibility.
17 Q. Right. But it seems like whether
18 it's, you know, the inconsistencies in his
19 statements, or the fact that a Bob was going around
20 demanding money, or whether or not, you know,
21 there's some other explanation for the wallet being
22 in the hallway, if it didn't support your theory of
23 Lee Evans, you seem willing to disregard it pretty
24 readily. And if it did support your theory of Lee
25 Evans, you were willing to embrace it. That's my

| Tietjen - Direct/Bonjean | Page 163 |
|---|---|

1 takeaway. Am I wrong?
2    MR. VOMACKA: Objection to the form.
3 You can answer.
4 A. I would say you're completely wrong. It's
5 a characterization. Here, at this point, we have
6 no clue who are guaranteed or who we are going to
7 end up locking up or making an arrest. We have
8 basis throughout the case that identified Lee, but
9 I'll be always welcoming of some other alternate
10 person or some other alternate theory that is out
11 there. If you look at even Lee Evans' own
12 statements throughout changed date, time, and
13 places on numerous occasions, and he's intimately
14 involved from the early-on stages of this case.
15 Q. Right. And you think he did it?
16 A. Oh, yeah.
17 Q. Right. So you're not giving him the
18 benefit of the doubt on the inconsistencies?
19 That's my point.
20    MR. VOMACKA: Objection to the form,
21 but you can answer.
22 A. I don't think there's any not giving him
23 the benefit the doubt. We're looking at the case
24 and looking where the facts lead us, right, and
25 then when we have facts to support an arrest, we

| Tietjen - Direct/Bonjean | Page 164 |
|---|---|

1 do that as well. But up until that point, he
2 still remains the suspect from day one that he was
3 throughout most of this case.
4 Q. Right. You started with the concept
5 of him being the prime suspect?
6    MR. VOMACKA: Objection to the form.
7 You can answer.
8 A. Open to other suspects as well, but he is
9 our lead suspect. As with any case that you get
10 involved in, if a suspect is identified, you have
11 that one, and you work other avenues because you
12 can certainly be wrong.
13 Q. You didn't work any other avenues;
14 you worked the Lee Evans' avenue?
15    MR. LIPSHUTZ: Objection.
16 Argumentative.
17    MR. VOMACKA: Objection.
18 Argumentative. You can answer.
19 Q. Am I incorrect?
20 A. Am I answering that question for you?
21 Q. Yes. Unless your attorney advises
22 you not to answer, you need to answer the question.
23 A. All right. I'm asking the questions, and
24 my concern is for all information provided. If
25 Bob Cutler says that Steve Jones did it, well, now

Evans v.
Newark City

| Tietjen - Direct/Bonjean | Page 165 |
| --- | --- |

1  I'm looking at Steve Jones. But Bob Cutler didn't
2  say that. No one said that. Everyone has
3  provided information that would lead you to Lee
4  Evans.
5  Q. No one said Lee Evans did it. The
6  only --
7  A. Phil Hampton said it.
8  Q. I'm sorry?
9  A. Phil Hampton said it.
10  Q. We're not at Philander yet. We'll
11  get there.
12  A. We're dealing with identifying a suspect.
13  So Lee Evans is identified as a potential suspect.
14  Q. You started with Lee Evans.
15  A. No on said he did it, or they would have
16  solved the case probably back then. They said
17  they believed he is involved.
18  Q. Right. But up until Philander
19  Hampton, you actually didn't develop a single bit
20  of evidence that wasn't already developed in 1978?
21  A. Correct.
22  Q. And, in fact --
23  A. Well, we developed DNA of the bodies -- you
24  know, for the bodies, for an identification. That
25  would be evidence. But not evidence of the crime.

| Tietjen - Direct/Bonjean | Page 166 |
| --- | --- |

1  Q. Did you find the bodies?
2  A. No. Like you said, we didn't have any
3  evidence.
4  Q. Well, that has no evidentiary value
5  if you don't have the bodies; does it?
6    MR. VOMACKA: Objection.
7  Argumentative, but you can answer the question.
8  A. Correct.
9  Q. It's as useful as my DNA. I can get
10  go my toothbrush right now for you. That wouldn't
11  be very useful for anything if you don't find the
12  bodies; right?
13  A. Right.
14    MR. VOMACKA: Same objection. You
15  can answer.
16  Q. So up until Philander Hampton, you
17  also had pursued lines of investigation that
18  weren't backed up, like the drug operation; right?
19    MR. VOMACKA: Objection to the form
20  of the question.
21  A. I wouldn't say they're not backed up.
22  There's statements in there about drug operation
23  that you would see if you could prove otherwise,
24  so they are not backed up because we didn't solve
25  who his dealer was or prove that he was a dealer,

| Tietjen - Direct/Bonjean | Page 167 |
| --- | --- |

1  but everyone indicated that they stole from him
2  the marijuana, that he had marijuana in his
3  apartment, that the marijuana that his friends and
4  family members saw on the boys was from the
5  stealing of his house as well. So, like, we're
6  going to follow those things out with the hope
7  that somebody is going to tell us, Yeah, I sold to
8  him, or I bought from him, and how they bought
9  from him. These boys said they stole from him.
10  And then you have Bob Cutler saying he stole from
11  him as well, so that would be the same as somebody
12  saying, I bought from him, too. But Bob Cutler
13  stole from him.
14  Q. They developed evidence in 1978
15  through some of the young men who did not disappear
16  that they had seen marijuana in Lee's house and
17  that they had stolen marijuana by breaking in;
18  right?
19  A. Yes.
20  Q. But it's not fair to say that you
21  were able to demonstrate that what was recovered
22  from the boys -- Alvin Turner's house was that
23  marijuana?
24  A. No, I didn't say that.
25  Q. I just want to make clear on that.

| Tietjen - Direct/Bonjean | Page 168 |
| --- | --- |

1  And Bob Cutler didn't say that he stole marijuana
2  in and around the time that the boys went missing;
3  did he?
4  A. Yes, he did.
5  Q. On that day? That he was one of
6  them?
7  A. No.
8  Q. Okay. He's saying prior he had done
9  it?
10  A. Yeah, yes.
11  Q. And he's alive; right?
12  A. Yes.
13  Q. So, and I think Mr. Royster said he
14  stole marijuana, even on that day; right?
15  A. I don't know.
16  Q. Well, we can look at his statement.
17  Do you remember interviewing Gregory Royster, I
18  think is his name?
19  A. What day is that? I remember meeting with
20  him at some point.
21  Q. Yeah. You know what, I don't think
22  you were involved, but I think it was an interview
23  that was conducted just prior to you joining the
24  team. Do you remember seeing that interview?
25  A. No, I just remember the name. I just

Video Deposition

| Tietjen - Direct/Bonjean | Page 169 |
|---|---|

1  looked at -- I didn't have any involvement with
2  him.
3  Q.  But you would have wanted to look at
4  that interview potentially to see whether it
5  actually was corroborative of your working theory
6  about the motive; right?
7  A.  I may have.  I don't recall it.
8  Q.  Okay.  But that's something a
9  detective would do; right?
10  A.  Correct.
11  Q.  You, I believe, interviewed --
12     (Connectivity issues.)
13  Q.  -- Akbar Pray.  And Marvin Boykins
14  was another interview, I believe, and he agreed to
15  speak with you all; correct?
16  A.  Yes.
17  Q.  Why did you want to interview
18  Mr. Boykins?
19  A.  Lieutenant Carrega wanted to interview
20  Mr. Boykins about also his potential knowledge of
21  the case, and his name had come up previously, and
22  we were trying to interview everybody who was
23  still alive and available to interview to see if
24  they had any new information.
25  Q.  And what information did you have

| Tietjen - Direct/Bonjean | Page 170 |
|---|---|

1  going into this interview that led you to believe
2  that Boykins could provide some helpful information
3  to aid in determining what happened to the young
4  men?
5  A.  Because he was involved in the
6  investigation early on with interviews as well.
7  Q.  And what did he say; do you remember?
8  A.  No, I don't recall.
9  Q.  But he told you, and as he told -- as
10  he said in the past, that he didn't have any
11  information; correct?
12  A.  I am not looking at a document on that.
13  Q.  Do you want to look at your report?
14  I have it at page 8 of 19.
15  A.  Correct.
16  Q.  Okay.  And he was polygraphed, it
17  looks like; correct?
18  A.  Correct.
19  Q.  Why did you polygraph him?
20  A.  There was concern that whether he was
21  truthful about knowing information in the case.
22     (Reporter requested clarification.)
23  A.  About knowing information in the case.  He
24  denied knowing it, and the polygraph was
25  administered to determine if he was being truthful

| Tietjen - Direct/Bonjean | Page 171 |
|---|---|

1  about denying.
2  Q.  Do you remember what information was
3  asked of him?
4  A.  No.
5  Q.  But it did have to do with Lee Evans;
6  right?
7  A.  Correct.
8  Q.  Were you comfortable with or did you
9  ultimately determine that he was being truthful
10  when he denied having information?
11  A.  Yes.
12  Q.  And you put a lot of stock in the
13  polygraph?
14  A.  Yes.
15  Q.  I guess maybe I'm just -- would like
16  you to elaborate, if you would, why you would put
17  so much stock in a polygraph?
18  A.  Well, I know the polygraph examiner there,
19  and I seen his work before, and I know the
20  training that they've gone through.  So on that
21  aspect of that specific polygraph, I believe that
22  one of the questions asked for in the polygraph
23  were specifically related to his knowledge of the
24  disappearance, if he was telling the truth, and he
25  denied the knowledge, and the indications were

| Tietjen - Direct/Bonjean | Page 172 |
|---|---|

1  that he was being truthful.  I can't speak to any
2  other polygraphs being conducted.
3  Q.  But generally speaking, even though
4  they're deemed unreliable for the purposes of being
5  admissible in court, you find them reliable in
6  directing your investigations?
7  A.  I find it to provide information.
8  Sometimes it does not return any conclusive
9  information.  They use a term, you know, for each
10  of the different steps.  I'm not familiar -- I'm
11  not recalling what they are.  I think one being
12  conclusive.  Whether someone is going to -- how
13  they're going to interpret that or not.  Someone
14  can improperly interpret that based upon the
15  graphs as well based upon their training.
16  Q.  All right.  So now let's now talk
17  about what happens on November 7, 2008.  This is
18  when Mr. Hampton is arrested in connection with a
19  traffic warrant; right?
20  A.  Correct.
21  Q.  So he is in custody because he has a
22  warrant out related to a traffic ticket; is that
23  fair?
24  A.  Correct.
25  Q.  And had there been efforts to find

Tietjen - Direct/Bonjean — Page 173

1 Mr. Hampton prior to November 7, 2008?
2 A. Yes.
3 Q. Okay. And what efforts were made to
4 locate Philander Hampton prior to November 7, 2008?
5 A. We looked for him in known locations where
6 he was known not only to stay but where he was
7 known to hang out.
8 Q. Why did you want to speak with
9 Philander Hampton?
10 A. Because he was a person that potentially
11 had information on this investigation just like
12 any of the other witnesses throughout.
13 Q. But where did you get the idea that
14 he had information about this?
15 A. No, we didn't -- every person we spoke to
16 here, it was the hope that they would be able to
17 provide us something new. There's nothing here
18 that I wrote or read that says he's going to tell
19 me that he was intimately involved in the events
20 that occurred in 1978.
21 Q. Well, back in May 8th of 2008 --
22 A. Um-hum.
23 Q. -- Carrega identified his strong
24 interest in finding Philander Hampton; correct? I
25 mean, you don't deny that; right?

Tietjen - Direct/Bonjean — Page 174

1 A. No.
2 Q. And you made all types of efforts to
3 find him? You identified warrants that were out
4 for him; correct?
5 A. Correct.
6 Q. And why was it that Carrega wanted to
7 find Philander Hampton?
8 MS. ROSEN: Objection to the form.
9 You can answer.
10 A. I believe at that point, we knew that he
11 was potentially a relative of Lee Evans as well.
12 It turns out he's a cousin. But Lou, that was one
13 person he wanted to identify and interview, just
14 like the others. We hadn't been able to come up
15 with information about Philander Hampton.
16 Q. Well, had Philander Hampton to the
17 best of your knowledge been interviewed back in
18 1978?
19 A. He was interviewed at various -- I don't
20 know which report, but I definitely seen his name
21 in previous reports, yes.
22 Q. So you were aware of him, and what
23 you're testifying is he was no different than any
24 other witnesses, he was just one of many on the
25 list that you wanted to talk to?

Tietjen - Direct/Bonjean — Page 175

1 A. Correct.
2 Q. In your mind, he had no specific
3 significance any more than the victims' mothers,
4 for instance, or Marvin Boykins, or anything like
5 that; is that right?
6 A. Yes.
7 Q. You didn't have any feeling that he
8 was -- strike that.
9 You didn't have any basis to believe
10 that he might have firsthand knowledge about the
11 incident or was otherwise involved in the incident?
12 A. No, I did not.
13 Q. And Lieutenant Carrega didn't share
14 his view that Philander definitely had some
15 involvement in this or had some knowledge about it?
16 A. I don't think anyone here was outside of
17 the belief that people involved potentially had
18 more information, and that's why we were
19 interviewing everybody. There was no known to me
20 link to say that he was involved with their actual
21 disappearance and deaths, or whatever.
22 Q. Yeah, forgive me, but as of May 2nd,
23 2008, or May 8, 2008, I understand that there was a
24 general interest in re-interviewing people, but
25 according to your report, there were only two

Tietjen - Direct/Bonjean — Page 176

1 people that were given a -- or identified with
2 specificity as to who you wanted to talk to, and
3 that was Lee Evans and Philander Hampton?
4 A. Where are you getting that generalization?
5 Q. From your report. Would you like --
6 A. He says on May 8th, he wants to locate him.
7 Somebody he was having difficulty locating. The
8 others were easy to find. There was no
9 cat-and-mouse game to find them. So Lieutenant
10 Carrega had done his homework prior to involving
11 me to find people to interview, and he had
12 difficulty locating Philander Hampton and asked me
13 if I would be able to shed any more information to
14 assist in locating him. That's on the 8th.
15 That's before I even met with him.
16 Q. Have you had a chance to read
17 Lieutenant Carrega's testimony from the Miranda
18 hearing regarding how he viewed Philander Hampton?
19 A. No, I did not.
20 Q. And we can look at it, but I just
21 want to make sure that I have your testimony clear
22 first, that as far as you were concerned, he was
23 not -- you had no reason to believe that he had any
24 more information than anybody else, he was just on
25 a list of people to talk to?

| Tietjen - Direct/Bonjean | Page 177 |
|---|---|

1   A.  He was a person that may have information,
2   just like everybody else.  I think he was somebody
3   that Lieutenant Carrega had not been able to
4   interview.  That's why he asked me to look for
5   him.  The hope was that he had information.
6   Q.  And where did you get the idea that
7   he even had any information?
8   A.  I believe there's early reports that
9   indicate his involvement early on with Lee Evans
10   as well and being his relative.  Those were others
11   as well.
12   Q.  I'm going -- I know I'm testing your
13   memory a little bit.
14       Are you talking about reports from
15   the original investigation?
16   A.  Yes.
17   Q.  The 1978 investigation?
18   A.  Yes, '78 through whatever.
19   Q.  Through where?
20   A.  Through whatever date.  I don't have the
21   date it shows up in there.
22   Q.  In those Hairston reports, again, I
23   don't want you to spend too much time, but were you
24   able -- when you reviewed those materials, were you
25   able to, those old reports, were you able to

| Tietjen - Direct/Bonjean | Page 178 |
|---|---|

1   identify where there was a mention of Philander
2   Hampton, or Philander, or anything close to that?
3   A.  There was a Phil Evans in there.  Like, he
4   went by various names.  And I don't know where the
5   Philander Hampton came up.  We looked up for a
6   Phil Evans, too, potentially, but I know there was
7   271 Hunterdon shows up in there somewhere.
8   Q.  Right.  So, again, I'm just wondering
9   how you got to Philander Hampton?
10   A.  I was provided that name by Lieutenant
11   Carrega to look for him.  That's as far as I know.
12   And then on November, the date he was brought in,
13   I wasn't even there until later on in the
14   interview.  I thought that insignificant of his
15   involvement that I didn't choose to be there that
16   day as well.
17   Q.  Well, you would admit that for
18   Mr. Carrega to be advised that he was in custody,
19   there must have been some type of stop order or
20   some type of indication that he was to be notified
21   if Philander was picked up on a warrant; right?
22       MS. ROSEN: Objection to form.
23       MR. VOMACKA: Objection to the form,
24   but you can answer.
25       MR. LIPSHUTZ: I'm going to join the

| Tietjen - Direct/Bonjean | Page 179 |
|---|---|

1   objection.  Go ahead, Sergeant.
2   A.  I don't how he was advised.  Whether he
3   looked up into the county jail system that told
4   him he was there.  I didn't read his testimony.  I
5   didn't see a report from him on it to indicate how
6   he was advised.  So he could have found out
7   multiple ways.  He could have indicated to the
8   jail that if this individual comes down here, tell
9   me, or if he looked into the system to see if he
10   was in the jail system, which is very easy to do.
11   I can do it from this laptop.
12   Q.  Well, if you're looking, I guess,
13   every single day; right?
14   A.  Well, it might have been a day he got
15   lucky.  You know what I'm saying?  Like, if you
16   think about the rush that you're getting at, so on
17   November 7th, he's arrested.  On the 12th is the
18   point of the interview.  There was no attempt to
19   go to the jail -- we can interview somebody at the
20   jail -- to the best of my knowledge.  You know,
21   there was no attempt there.  But somehow he became
22   aware that he was there.  I don't know how he was
23   made aware.  Whether he notified anybody down
24   there, Hey, if the guy comes in.  I don't know.
25   Q.  And just to be clear, he was on a

| Tietjen - Direct/Bonjean | Page 180 |
|---|---|

1   traffic warrant, he wasn't being detained on
2   anything serious; right?
3       MR. VOMACKA: Objection to the form.
4       MR. LIPSHUTZ: Objection to the form.
5   A.  To the best of my knowledge, it was for a
6   traffic warrant.  He originally had a ACS warrant,
7   which is court-generated one as well --
8       (Reporter requested clarification.)
9   A.  It's a warrant out of the courts as far as
10   like a summons complaint.  Not a motor vehicle or
11   traffic summons.
12       MR. LIPSHUTZ: Sergeant, can you
13   repeat the initials because I'm not sure that the
14   reporter got it?
15   A.  ACS, so like Automated Complaint System,
16   and then ATS is like Automatic, like, Traffic
17   System, which shows a motor vehicle summons.
18   Q.  Okay.  And I know you said that there
19   wasn't a rush to go see him, but there was an
20   immediate effort to get in front of a judge to get
21   him over to the Essex County Prosecutor's Office
22   for an interview; right?
23   A.  I don't know anything about that.
24   Q.  That's not something you were privy
25   to; is that right?

1  A.  No.
2  Q.  And is it your testimony that Carrega
3  didn't explain to you how it was that he arranged
4  for Mr. Hampton to get over to the Essex County
5  Prosecutor's Office?
6     MS. ROSEN: Objection to form.
7     MR. VOMACKA: Objection to form.  You
8  can answer.
9  A.  I don't recall if he told me or even if I
10  asked how he was getting him over.
11  Q.  All right.  And I know in your mind,
12  Philander Hampton was no different than other
13  witness, but can you identify any other witness
14  where they were brought into Essex County, writted
15  into, I guess, to the courtroom -- I don't know how
16  it all happened -- but ended up in the Essex County
17  Prosecutor's Office for an interview?
18  A.  Yeah.  Robert Cutler.
19     MR. LIPSHUTZ: Objection to the form
20  of that question.
21  Q.  But Robert Cutler was in the
22  Department of Corrections; right?
23  A.  Correct.
24  Q.  He wasn't hard to find?  He was the
25  easiest to find; right?

1  A.  Correct.
2  Q.  Okay.  He wasn't too hard to find.
3  But --
4  A.  But anybody else was brought to the Essex
5  County Prosecutor's Office.  So we interviewed him
6  --
7  Q.  Okay.  Fair enough.  Apart from
8  Robert Cutler, Philander Hampton, who was not easy
9  to find, who you had trouble finding, all of a
10  sudden ends up in jail, and Carrega arranges to
11  have him brought over, but you don't have any
12  firsthand knowledge of how that happened; right?
13     MR. LIPSHUTZ: Objection.  So many
14  levels of that question is incorrect.  Objection
15  to the form.
16     MR. VOMACKA: Objection.
17     MS. BONJEAN: Incorrect how?
18     MR. LIPSHUTZ: It's speculative.
19  It's argumentative.  It's based on facts that are
20  not in evidence.  So you can rephrase it, but I'm
21  objecting to the form.
22     MR. VOMACKA: Yeah, the same
23  objections.
24     MS. BONJEAN: I'll rephrase.
25  Q.  So we'll start over, Sergeant

1  Tietjen.
2  You don't know, or do you -- I guess
3  you can tell me if you do, but I think you
4  previously testified that you do not know whether
5  or not Carrega was informed that he was in custody
6  or whether he just happened to check and saw that
7  he was in custody?
8  A.  I don't recall being told how he found out.
9  Q.  And you have no firsthand knowledge
10  about how it was and under what authority Philander
11  Hampton was brought to the Essex County
12  Prosecutor's Office; correct?
13     MR. VOMACKA: Objection to the form.
14  If you can answer it, you can answer.
15  A.  Not that I can recall.  We drove him back
16  to the Essex County jail.
17  Q.  Okay.
18  A.  I don't know how he got to the Essex County
19  Prosecutor's Office.
20  Q.  Right.  He didn't get there on his
21  own; right?
22  A.  Yes.
23     MR. VOMACKA: Objection.
24  Q.  And you don't know whether he
25  consented to come over for an interview from the

1  Essex County jail; correct?
2  A.  I have no information.
3     MR. VOMACKA: Objection.  It was
4  asked and answered.  You can answer the question.
5  A.  Like I said, I don't recall how he got
6  over, so I don't know.
7  Q.  But in any event, then he is brought
8  over.  And do you recall what time it was that he
9  was brought over from the Essex County jail to the
10  Essex County Prosecutor's Office?
11  A.  I do not have a time that he was brought
12  over.
13  Q.  Do you have an understanding about
14  what time it was?
15  A.  It was in the afternoon.
16  Q.  Do you know if it was late afternoon
17  or early afternoon?
18  A.  It was probably middle afternoon.  I don't
19  know what time he was brought in, but I know I was
20  given information, whether a phone call from
21  Lieutenant Carrega, or a text, that Philander
22  Hampton was there and going to be interviewed, and
23  then around 4:15, he called me to say that
24  Philander Hampton had taken a polygraph and then
25  provided information of his involvement.  And at

Evans v.
Newark City

Video Deposition

| Tietjen - Direct/Bonjean | Page 185 |
| --- | --- |

1    that point, you know, I remembered at that point,
2    I was on my way home, I got a phone call --
3    Q.  I don't mean to interrupt you, but
4    can you tell me what time it was you said --
5    A.  It was 4:15 when I was advised by
6    Lieutenant Carrega.
7    Q.  4:15.  So you were advised at about
8       4:15 p.m. that he had taken a polygraph; right?
9    A.  Correct.
10   Q.  So obviously, he was brought over --
11   A.  Sometime prior.
12   Q.  -- before?  And when was the first
13   time you set eyes on Philander Hampton?
14   A.  At some point after I arrived at Essex
15   County Prosecutor's Office prior to going over to
16   the Newark Station to make sure we get the
17   videotaped room ready to go in there.  So probably
18   at Essex County around five-something, so sometime
19   between 5 and say 7 o'clock.
20   Q.  So between 5 o'clock and 7 o'clock
21   p.m. is when you first saw Philander Hampton with
22   your own two eyes?
23   A.  Sometime between there, yes.
24   Q.  And that was at the Essex County
25   Prosecutor's Office?

| Tietjen - Direct/Bonjean | Page 186 |
| --- | --- |

1    A.  Yes.
2    Q.  And who was present when you arrived
3    at the Essex County Prosecutor's Office?
4    A.  I don't recall exactly who was present, but
5    I know at some point Detective Hadley was
6    involved.  Sergeant Henry was involved.  Lou
7    Carrega.  I think Jack Eutsey was there that day,
8    too.
9    Q.  Who?
10   A.  Agent Eutsey.  I believe he was there.  But
11   I don't recall who was all there when I arrived,
12   and, you know, especially like who was where
13   and...
14   Q.  Hold on one second, if you would,
15   please.  I wanted to just confirm something before
16   I asked...
17      I know you haven't read the
18   transcripts, but if Lieutenant Carrega testified
19   that Philander Hampton was brought over between 1
20   or 2 o'clock p.m., do you have any reason to
21   quarrel with his prior testimony on that point?
22      MS. ROSEN: Objection to form.  You
23   can answer.
24   A.  Any reason to what on that?
25   Q.  Quarrel with that?

| Tietjen - Direct/Bonjean | Page 187 |
| --- | --- |

1    A.  No, no.
2    Q.  And what Carrega testified to, I
3    know, again, you don't have the transcript in front
4    of you, but let's just assume for the purposes of
5    this question that that's what he testified to.
6    You don't have a recollection to contradict that;
7    right?
8    A.  No, not whatsoever.
9    Q.  Okay.  So assuming that is correct
10   and that Mr. Hampton was brought over to the Essex
11   County Prosecutor's Office between 1 o'clock and 2
12   o'clock p.m. on November 12, 2008, and you arrived
13   somewhere between 5 o'clock and 7 o'clock p.m., is
14   it fair to say that you have no firsthand knowledge
15   about what transpired from 1 o'clock when he was
16   first brought over -- or 1 and 2 -- and 5 o'clock
17   to 7 o'clock when you arrived?
18   A.  Correct.
19   Q.  So you don't know who was present
20   during that period of time, I assume; correct?
21   A.  No.
22   Q.  And you do not know what efforts or
23   what -- strike that.
24      You don't know where people were
25   convened, where Philander and Carrega and any other

| Tietjen - Direct/Bonjean | Page 188 |
| --- | --- |

1    people that were present, had convened; correct?
2    A.  Yes.
3    Q.  Did you get communications from
4    Carrega via text, you said?
5    A.  Either text or phone -- I don't recall --
6    where he told me they had him there to do an
7    interview, and we can --
8       (Connectivity issues.)
9    A.  He advised me that he was there, and they
10   were going to interview him, and at around 4:15,
11   he advised me of the progress of the interview,
12   and that's when I started heading down there.
13   Q.  And did you understand the
14   significance of Philander Hampton being in custody
15   and available to be interviewed as of 4:15 when you
16   were given that update by Carrega?
17   A.  Yes.
18   Q.  What did you understand the
19   significance of it to be?
20   A.  That he had information relative to the
21   missing boys.
22   Q.  And it would be fair to say that
23   Carrega had communicated with you prior to that
24   that Philander Hampton had information; right?
25      MS. ROSEN: Objection to form.  You

Tietjen - Direct/Bonjean                                    Page 189

1  can answer it.
2  A.  No, I did not have information.  I was
3  en route home on 78 coming from out east.  If he
4  had told me that, I would have gone directly
5  there.  At 4:15 is when I became aware that
6  Philander Hampton had information that was
7  relevant.
8  Q.  What I'm saying, though, is you knew
9  prior to November 12, 2008, that Lieutenant Carrega
10  wanted to interview Philander Hampton because he
11  had --
12      MR. LIPSHUTZ: Hold on.  I'm sorry to
13  interrupt.  I didn't really hear your question.
14  You got muffled.  Did the court reporter get the
15  question?
16      COURT REPORTER: No.
17      MS. BONJEAN: Okay.  I'll start over.
18  Q.  Prior to November 12, 2008,
19  Lieutenant Carrega had communicated to you and
20  other members of the team, I assume, that he was
21  interested in speaking to Philander Hampton because
22  he believed that he had information about the case;
23  is that right?
24  A.  Correct.
25      MS. ROSEN: Objection to form.

Tietjen - Direct/Bonjean                                    Page 190

1  Q.  And did he express to you, or to any
2  other members of the team to which you would have
3  be privy, what his belief was about information
4  Philander Hampton might have?
5  A.  No.
6      MS. ROSEN: Objection to form.
7  Q.  I'm sorry?
8  A.  No.
9  Q.  Not even any theory whatsoever was
10  discussed?
11  A.  No, just that Philander Hampton may have
12  knowledge of what Lee might have done with the
13  boys.  We had no clue what occurred to them after
14  they left them.
15  Q.  Why would Philander Hampton have any
16  information about what Lee did with the boys?
17  Where did you get that information from?
18  A.  It's just information of the events.  We
19  had no clue of what occurred.  So could he have?
20  He's a cousin of Lee Evans, so we interviewed him.
21  I would say in the interview, like, luck was there
22  that he decided to provide information.
23  Q.  Your testimony is that just because
24  he was a cousin, it was the view that he might have
25  information?  That's it?  That's all you had?

Tietjen - Direct/Bonjean                                    Page 191

1      MR. VOMACKA: Objection.
2      (Reporter requested clarification.)
3  A.  They were supposed to be known to work
4  together as well.
5  Q.  Okay.  So they were close cousins;
6  they worked together?
7  A.  Yes.  Just like -- just another person to
8  interview.
9  Q.  But no specific belief that he had
10  any unique knowledge?
11  A.  Any what knowledge?
12  Q.  Any unique knowledge?
13  A.  No.
14  Q.  Prior to the interview, did the team
15  discuss any theories about how the boys had died?
16      MR. LIPSHUTZ: Objection to the form.
17  A.  I'm sure we had thoughts about -- it
18  was all -- there was no evidence to back anything
19  up.  So we had thought that they were buried.  We
20  they buried in an abandoned house?  Were they
21  buried in a field, dumped in the trash.  You know,
22  that's all stuff that you're speculating as you go
23  through a case, and I'm sure we had topics of
24  conversations on that but...
25  Q.  And you had information from the '78

Tietjen - Direct/Bonjean                                    Page 192

1  reports that there had been a fire; right?
2      MR. LIPSHUTZ: Objection.
3  Argumentative.
4  A.  A fire when?  And where?  What fire are you
5  talking about?
6  Q.  Well, we read a portion of, I think,
7  Hairston's report where there had been a fire at
8  15th and Bergen Streets?  Yes?
9  A.  Yeah, he determined those fires not to have
10  any fatalities.  I don't have any -- like, that
11  wasn't something that was on my list of things to
12  worry about.  I trusted that he had information
13  back then that proved that it was not involved
14  with our event.
15  Q.  So if I hear you correctly, you were
16  aware of the theory that the boys had -- a theory
17  that the boys could have died in a fire, but you
18  assumed that Hairston had done his investigative
19  work and that that was not on the table any longer?
20      MR. VOMACKA: Objection to the form,
21  but you can answer.
22  A.  I was aware that Hairston looked at fires
23  in the area.  I don't know what led him to the
24  fires, whether if it was just the psychic
25  mentioning the word fire to him.  I think this one

Evans v.
Newark City

Video Deposition

| Tietjen - Direct/Bonjean | Page 193 |
| --- | --- |

1  actually looked like -- I don't know the dates
2  right now without looking at it, whether it was
3  before the psychic or after, but that would be
4  just good case detective work to follow up on
5  fires in the City of Newark to see if there were
6  any with fatalities, because they typically would
7  be unidentified for an extended period of time.
8  Q.  And he did do that?  He did pull, at
9  least what you read from his report, that he did
10 inquire about fires in August of 1978; right?
11 A.  With fatalities, correct.
12 Q.  What's that?
13 A.  With fatalities he looked.  So he didn't
14 inquire about -- right.  He said with fatalities,
15 yeah, so...
16 Q.  It said he was especially interested
17 in fatalities, but he didn't say he was just
18 pulling information about fires with fatalities?
19 A.  I don't know what he got, or if he even got
20 this fire or anything.  I don't know.  I know what
21 he wrote down there.
22 Q.  What's your understanding about where
23 the fire that took place that ultimately led to the
24 death of the boys?
25     MR. VOMACKA: I'm sorry.  Would you

| Tietjen - Direct/Bonjean | Page 194 |
| --- | --- |

1  repeat the question?
2  Q.  What's your understanding as you sit
3  here today about the address of the building where
4  the boys allegedly perished in?
5  A.  256 Camden Street.
6  Q.  And what are the cross streets?  What
7  were the cross streets?
8  A.  Well, the back street is Bergen.  I don't
9  know a cross street offhand.
10 Q.  So Bergen is the back street?
11 A.  Correct.
12 Q.  And do you know whether the cross
13 street was 15th Street?
14 A.  I don't know that.
15 Q.  Okay.  So it's your testimony that
16 the fire wasn't -- the boys dying in a fire was not
17 really a working theory prior to November 12th of
18 2008?
19 A.  Not of mine, no.
20 Q.  Do you know whether it was a theory
21 of anyone else's working on the team?
22 A.  I don't know.
23     MR. LIPSHUTZ: Objection to the form.
24 A.  It's always a possibility.  But they had
25 looked at those fires and had no known fatalities

| Tietjen - Direct/Bonjean | Page 195 |
| --- | --- |

1  in there.
2  Q.  Well, aliens are a possibility, too;
3  right?
4      MR. LIPSHUTZ: Objection.
5      MR. VOMACKA: Objection to the form.
6  You can answer.
7  A.  That's --
8  Q.  I mean, that's not really helpful.  I
9  know anything is a possibility.  I'm asking a
10 different question.
11     Did you consider, you specifically,
12 Sergeant Tietjen, consider that the boys may have
13 perished in a fire prior to November 12, 2008?
14 A.  I would have to say I probably considered
15 it at some point, but I went with the fact of
16 information that the fires that they had at that
17 time had no known fatalities.  I did not realize
18 at that point that a abandoned structure that was
19 lit on fire with the fire department saying there
20 no one thought to be living inside or still stuck
21 inside would not be examined for remains or dug
22 out completely, which we would later learn as
23 well.  So I excluded those fires because no
24 fatalities were uncovered in those fires.  Could
25 they have been in a fire later on?  Possibly.  But

| Tietjen - Direct/Bonjean | Page 196 |
| --- | --- |

1  that wasn't looked at as well.  You know, where
2  somebody pulled them and then covered the remains
3  later on, or burned them in a barrel down under
4  78.  You know, it's all a possibility.
5  Q.  And do you remember having any
6  conversations with your colleagues about the, I'll
7  call it a fire theory, that the boys may have
8  perished in a fire, again, prior to November 12th,
9  2008?
10 A.  I don't recall anything like that.
11 Q.  And just so I'm clear, Carrega told
12 you when he asked you to participate in this case
13 that he wanted to re-interview everybody; right?
14 A.  Correct.
15 Q.  And presumably, he wants to look at
16 all possible leads; correct?
17 A.  Correct.
18     MS. ROSEN: Objection to form.
19 Q.  And that's what you all were doing;
20 right?
21 A.  Correct.
22 Q.  And one of those possible leads was
23 that the boys may have died in a fire; would you
24 agree?
25 A.  I don't know if -- you said is that a

Evans v.
Newark City

Video Deposition

| Tietjen - Direct/Bonjean | Page 197 |
|---|---|

1  possibility before?  Now you're having a lead that
2  the boys died in the fire.  Hairston looked at
3  information about fires.  I am unaware of
4  information saying the boys died in a fire.
5  Q.  Okay.  Well --
6  A.  That I can recall.
7  Q.  What I'm saying, though, is that you
8  would agree that even back in 1979, that was a lead
9  that was looked at; correct?
10 A.  Correct.
11 Q.  All right.  And part of this cold
12 case investigation was to re-look at leads and
13 re-interview witnesses; right?
14 A.  Correct.
15 Q.  And what I'm asking is does that
16 include the theory that the boys had maybe perished
17 in a fire?
18 A.  I didn't take any steps to look at fires in
19 the city beyond what that report says.
20 Q.  So you looked at that and thought
21 fire was off the table?
22 A.  Yeah.
23 Q.  And you had no idea in your mind
24 where the boys' bodies were at that point?  No
25 theory whatsoever?

| Tietjen - Direct/Bonjean | Page 198 |
|---|---|

1  A.  No clue whatsoever.
2  Q.  Okay.  Now, the scene, I think I
3  want to go back to -- so whatever time --
4  A.  Can we take a break here at this point?
5  Q.  Sure.  How much time do you need?
6  A.  Just about four minutes.
7  Q.  Sure.  No problem.
8     THE VIDEOGRAPHER: The time is 2:28
9  p.m.  Off the record.
10    (Break taken.)
11    THE VIDEOGRAPHER: The time is 2:38
12 p.m.  This begins DVD number four.  Back on the
13 record.
14    BY MS. BONJEAN:
15 Q.  Sergeant Tietjen, I'd ask you, if you
16 would, please look at, I guess it's the Hairston
17 reports, but I think it's Tietjen-2.  And if you
18 could look at the page that's Bates stamped
19 ECPO 003569, and it has a 22 also handwritten
20 there, if that helps.
21 A.  I'm on that page.
22 Q.  Are you there?
23 A.  Yes.
24 Q.  And at the bottom, I just want to
25 make sure that we're talking about the same part of

| Tietjen - Direct/Bonjean | Page 199 |
|---|---|

1  the report that references Philander, because I
2  think you mentioned 271 Hunterdon Street; right?
3  A.  Yep.
4  Q.  And there's a reference to an
5  interview with a Philan Williams; right?
6  A.  Correct.
7  Q.  Did it become your understanding, and
8  I'm assuming with your access to the ability to
9  find people based on social security numbers, that
10 this was Philander Hampton?
11 A.  Yes, I believe it's Philander Hampton.
12 Q.  And you knew it was Philander Hampton
13 before November 12, 2008, obviously; right?
14 A.  I imagine so.  I don't recall when I knew
15 that.
16 Q.  Well --
17 A.  I don't recall like that becoming
18 significant to the case; you know what I'm saying?
19 Q.  Well --
20 A.  At some point, I would have seen that that
21 was Philander Hampton.
22 Q.  Right.  But if you had Philander
23 Hampton on your list -- if you had Philander
24 Hampton on your list of people who you wanted to
25 re-interview, that suggests that you had knowledge

| Tietjen - Direct/Bonjean | Page 200 |
|---|---|

1  that there was a prior interview with him, and I'm
2  asking if this is the prior interview that you're
3  referencing?
4  A.  I believe so, yes.
5  Q.  Okay.  And this interview back in
6  1978 with Philander Hampton established that he was
7  Lee Evans' cousin; correct?
8  A.  Correct.
9  Q.  It's pretty hard to read in the
10 bottom section, so I'm not even going to try.  I
11 don't even know what's all there.  But on the next
12 page, Philander, who is being called Williams
13 throughout this, gives a pretty detailed
14 description about the day that the boys went
15 missing; correct?
16 A.  Correct.
17 Q.  And he denies having any information
18 about their disappearance; would you agree?
19 A.  Correct.
20 Q.  And, in fact, he consented to a
21 polygraph and apparently passed that polygraph?  It
22 says, "Results:  No knowledge of where or what
23 happened to missing boys."  Do you see that?
24 A.  Yes.  It happens to be the same
25 polygraphist in question for the other one, too;

---

Tietjen - Direct/Bonjean                               Page 201

1  right?
2  Q.  Which other one?
3  A.  The polygraph that Lee Evans took as well.
4  Q.  Oh, so --
5  A.  You know, what I'm saying is I only know
6  about my polygraphs and their efforts.  I have no
7  clue of how good the Newark was -- this was back
8  in 1978.  Or what type of equipment it was.
9  Because it wasn't computerized back then.  It
10  definitely was probably manhandled as far as --
11      (Reporter requested clarification.)
12  A.  It was definitely man-manipulated.  You
13  know, there was probably some ink and some paper.
14  I have no clue what these looked liked then so...
15  Q.  That's very convenient that the
16  polygraphs that they passed are unreliable, but the
17  polygraphs that you want to be true are reliable;
18  correct?
19      MR. VOMACKA:  Objection to form.
20  Answer the question.
21  Q.  Anyway, but as you sit here today,
22  you don't have any basis whatsoever to question the
23  reliability of this polygraph; right?
24      MR. VOMACKA:  Objection to form.  Are
25  you talking about --

---

Tietjen - Direct/Bonjean                               Page 202

1  A.  I certainly have question now after
2  speaking to Philander Hampton and him admitting
3  his involvement.  I question wholeheartedly about
4  the sergeant's ability to do the polygraph on that
5  date, which calls into Lee Evans' polygraph with
6  that same individual, if he's excluding them
7  shortly after the events of the date, and they're
8  fresh in their mind, and then later on we have the
9  same individual providing information indicating,
10  and we also have a polygraph then.  Yeah, no, I
11  wholeheartedly doubt he was a good polygraphist.
12  Q.  How about just maybe doubting the
13  reliability of polygraphs in general?
14  A.  No, I don't -- it's independent.  I've had
15  good success with them.
16  Q.  Okay.  When it proves your theory of
17  the case?
18  A.  No.
19      MR. VOMACKA:  Objection.
20  Argumentative.  You can answer.
21  Q.  You don't have to.  I'll withdraw the
22  question.  Let's move on.
23      Were you aware of any other statement
24  Philander Hampton had made other than the one that
25  we just looked at in Tietjen-2?

---

Tietjen - Direct/Bonjean                               Page 203

1  A.  I don't recall right now.
2  Q.  Now, do you recall having
3  conversations with Lieutenant Carrega or any other
4  member of the team regarding whether or not
5  Philander Hampton's statement to the police in '78
6  was truthful prior to him coming in?
7  A.  I don't recall us even addressing the
8  statement like that, whether it was truthful or
9  not.  We were trying -- in my eyes, we were trying
10  to interview everybody that was still around to be
11  re-interviewed.
12  Q.  Was there any other witness that you
13  know of that was identified as someone who had
14  active warrants?
15  A.  Not that I recall.
16  Q.  Well, you were asked to look and see
17  whether Philander Hampton had active warrants;
18  correct?
19  A.  No, I was asked to look to see like where I
20  could find --
21      (Reporter requested clarification.)
22  A.  I don't know if I was called to see if
23  there were active warrants because that would be
24  something that Lieutenant Carrega could check as
25  well.  That was just part of my checks to try to

---

Tietjen - Direct/Bonjean                               Page 204

1  find out where he was.  Does he, in fact, have
2  active warrants?
3  Q.  And you did do that with respect to
4  Philander Hampton; right?
5  A.  Correct.
6  Q.  And you did not do that with respect
7  to any other witness; correct?
8  A.  I don't recall if I did or did not.  If I
9  did, and they had active warrants, I would have
10  included their active warrants in there, but I
11  didn't have to do a thorough like lookup
12  computerized to find other people in here.  They
13  were where they said, and they were able to be
14  contacted.
15  Q.  But your report does not reflect that
16  you did any type of skip trace or warrant search or
17  any type of in-depth look for any other witnesses
18  but Philander Hampton; correct?
19  A.  Correct.  And Lee Evans.
20  Q.  And Lee Evans?
21  A.  Yeah.
22  Q.  The two of them?
23  A.  Correct.
24  Q.  That's it.  Okay.  Now, when you
25  arrived at the Essex County Prosecutor's Office,

---

Evans v.
Newark City

Video Deposition

Tietjen - Direct/Bonjean                                    Page 205

1   Philander Hampton was there, and he was located
2   physically where, if you remember?
3   A.  I don't recall.
4   Q.  Do you know if he was in an interview
5   room or some type of --
6   A.  I tried thinking about where it was.  I
7   don't recall where he was.
8   Q.  All right.  Do you have any
9   independent recollection of what you saw with your
10  own two eyes at the Essex County Prosecutor's
11  Office once you arrived?
12  A.  I just remember he was there.  I have no
13  clue -- like, I don't recall where I saw him
14  there.  It wasn't important to me at that point.
15  I wasn't doing an interview there.
16  Q.  Do you recall seeing -- I think you
17  said you recall seeing Detective Hadley there as
18  well?
19  A.  I said I believe I saw him there.  I know
20  we met up at some point that evening, and Sergeant
21  Henry as well, and they all met us at Newark
22  Station to complete the video statement as well.
23  Q.  Yeah, I'm trying to focus in a little
24  more on the Essex County Prosecutor's Office at the
25  moment.

Tietjen - Direct/Bonjean                                    Page 207

1   A.  I think there may have been one in between
2   as well.  Just that he was talking or whatever and
3   just going through the process.  I don't...
4   Q.  Well, that's what I'm talking about.
5   You received another phone call, you think, in
6   between?
7   A.  Yeah, I think I testified to that in my
8   Miranda hearing.  I don't have it in my reports
9   just because the number of calls.  I think
10  somewhere in the middle I got a call that he was
11  willing to take a polygraph.
12  Q.  I thought that was the 4:15 call.
13  That's not the 4:15 --
14  A.  No.  The 4:15 call was that he -- I think
15  it's he was -- had already taken it.
16  Q.  All right.
17  A.  I would have to look at my Miranda hearing
18  stuff.  I didn't write down in my report as far as
19  those times.
20  Q.  Okay.  So sometime between 1:00 and
21  4:15, you got a phone call that he was talking and
22  willing to take a polygraph?
23  A.  Correct.
24  Q.  And did you get any other background
25  information about what he was talking about?

Tietjen - Direct/Bonjean                                    Page 206

1       Do you have a specific recollection
2   of seeing either Detective Hadley or Sergeant Henry
3   there?
4   A.  Not that I could say for sure 100 percent.
5   Q.  Okay.  Certainly, you remember
6   Carrega being there; correct?
7   A.  Correct.
8   Q.  And Eutsey possibly?
9   A.  I believe he was there, yes.
10  Q.  And you said about 4:15 you got
11  either a text or a phone call from Carrega that
12  said -- that gave you an update on what was going
13  on; right?
14  A.  Yes.  I'm pretty positive it was a phone
15  call.
16  Q.  And had you received any information
17  from Carrega or Eutsey, or any other member of the
18  team, about what had transpired from the time that
19  Philander was taken to the Essex County
20  Prosecutor's Office to the time that you received
21  that phone call at 4:15?
22  A.  Just that he was there.
23  Q.  Okay.  So you got the call that he
24  was there, and then the next update you got was at
25  4:15; right?

Tietjen - Direct/Bonjean                                    Page 208

1   A.  Just the case, that he was talking.  Now,
2   the polygraph would have brought in the fact that
3   he advised that he was involved.
4   Q.  Okay.  You essentially had been
5   working this case for several months with really no
6   new factual developments other than what's already
7   known since 1978?
8   A.  Yep.
9   Q.  And now you have Philander Hampton in
10  custody, and you get a phone call from Carrega, and
11  there's a break; right?  It's a break in the case;
12  right?
13  A.  Correct, yep.
14  Q.  So he must have communicated to you,
15  We got a break, he's talking, or something like
16  that; right?
17  A.  Yeah, I'm sure he did, and I wish we had
18  his reports to reflect that what he --
19  Q.  Well, don't we all?
20  A.  Yeah.
21  Q.  But I know your report doesn't
22  reflect what you told me in those phone calls;
23  right?
24  A.  No.
25  Q.  Is there a reason you don't write

Evans v.
Newark City

Video Deposition

Tietjen - Direct/Bonjean                                      Page 209

1   down any contemporaneous notes about what he told
2   you when he reached out to you in those several
3   phone calls?
4   A.  I'm not saying I didn't write down any
5   notes.  I'm saying I didn't write any in my report
6   because Lieutenant Carrega was going to cover the
7   documentation there.
8   Q.  So it's possible that you do have
9   notes that would reflect what Carrega told you?
10  A.  If I find them.  I don't believe I do, but
11  I said before I would look to see if I have them
12  anywhere.
13  Q.  It's possible that you had them at
14  one time?
15  A.  At one time, I would have written down the
16  time of my call.  That's why I believe back during
17  the Miranda, which was much closer in this event,
18  that I recall the times better.  I'm now -- we're
19  talking about 12 years after the fact.
20  Q.  If you had written down in your notes
21  that Carrega called you and the time he called you,
22  and perhaps what he told you, why did you not
23  include that in your written report?
24      MS. ROSEN: Objection to form.
25  A.  Yeah.  Phone calls between detectives

Tietjen - Direct/Bonjean                                      Page 210

1   aren't written down in the reports.  Like, his
2   report will reflect what occurred that day with
3   Philander Hampton.  And I don't even know if
4   per se if I wrote stuff down, because I was
5   driving.  He referred information to me, and then
6   I got approval to turn around and head back down
7   to Newark.  So whether I have or have not, I'm
8   saying I don't recall them.  I don't know where
9   they are.  I'm not saying -- I'll look certainly,
10  but I don't think anything was left.
11  Q.  What's your general memory of what
12  Carrega told you when he essentially communicated
13  that Philander was talking?
14  A.  I believe it was that Philander Hampton was
15  providing information of his involvement with Lee
16  Evans.
17  Q.  And did Lieutenant Carrega give you
18  any more detail than that, or was it just sort of a
19  summary, he's talking, and he's giving --
20  A.  I really don't recall that.  I would have
21  to look at that Miranda hearing if I even stated
22  anything to that fact.
23  Q.  I'm sorry.  I didn't understand?
24  A.  I don't recall facts about it that he was
25  stating to me on the phone.  Just that Philander

Tietjen - Direct/Bonjean                                      Page 211

1   Hampton is advising that he was involved and that
2   I was then going to get permission to see if I
3   could head on down.  I was not part of the event
4   that day.  I didn't get involved until after
5   Philander Hampton was indicating he had now become
6   involved in the events, outside of just being a
7   potential like witness with information, outside
8   of the facts of the deaths.
9   Q.  So I'm just trying to understand, did
10  Carrega indicate just that Philander had admitted
11  in a general way that he was involved, or was it
12  your understanding that he, at that time when he
13  called at sometime before 4:15, was detailing his
14  involvement in the boys' disappearance?
15  A.  I don't recall that.  It was enough of an
16  importance expressed to me that I wanted to be
17  there and be there for the further interview that
18  was done at Newark Station, but I don't recall
19  what was expressed in that phone call.
20  Q.  Well --
21  A.  I didn't have -- I don't have notes or a
22  written-down report of that.
23  Q.  No, I understand.  But I guess I'm
24  asking you to tax your independent memory the best
25  you can that when you received that call from

Tietjen - Direct/Bonjean                                      Page 212

1   Carrega, did Carrega communicate to you that
2   Philander Hampton had provided details about both
3   his and Lee Evans' involvement in the boys'
4   disappearance?
5   A.  Because that's my recollection.  I believe
6   he provided details.  I just don't recall what
7   those details in that phone call were.
8   Q.  So he had provided details about what
9   happened to the boys?
10  A.  No, I can't recall that actual phone call
11  conversation.  It was just enough I know that I
12  turned around and also requested permission from
13  my supervisors to go down.  I mean, to work
14  overtime in the SPI, I got to get approval from my
15  bureau.  So it was something that I had expressed
16  to them was worthwhile of my involvement.
17  Q.  And you then received another phone
18  call at 4:15; is that right?
19  A.  No.  The 4:15 call is the one where I head
20  down.
21  Q.  Okay.  Well, in the call prior to
22  that, did Carrega indicate that Philander had
23  communicated any details about the offense?
24  A.  I don't think there were any details in the
25  call prior, just that he was continuing to talk.

Video Deposition

| Tietjen - Direct/Bonjean | Page 213 |
|---|---|

1 Q. And what did you understand "talk" to
2 me?
3 A. Be interviewed by them, and I believe at
4 some point they were going to do a polygraph with
5 him.
6 Q. So you don't know at that point
7 whether he had provided any information about how
8 the boys disappeared or whether or not he was
9 sticking to his story?
10 A. You're talking the middle call of
11 potentially the three right there, and if I
12 didn't -- I would have gone there. I was down
13 that way. I think I was in like Nutley that day,
14 so I was pretty close.
15 Q. So you're saying if he had given up
16 any critical information at that time, and that was
17 communicated to you, you would have headed there
18 directly; is that right?
19 A. Yeah, probably, yes.
20 Q. But it wasn't until 4:15 that you
21 turned around and went there; correct?
22 A. Correct.
23 Q. And that call at 4:15 is the call
24 that leads you to believe that there's significant
25 information, relevant information, that's being

| Tietjen - Direct/Bonjean | Page 214 |
|---|---|

1 communicated by Philander Hampton; right?
2 A. Correct.
3 Q. And that he's going to be
4 polygraphed; is that correct?
5 A. I wish we could refer to another report on
6 that as the timing, but I think that's the 4:15
7 one is after the polygraph.
8 Q. Okay.
9 A. So I never saw a polygraph being done when
10 I arrived, and I arrived there only like
11 45 minutes or so after.
12 Q. I see. So your best guess because,
13 again, you weren't there, and you haven't seen any
14 report, is that when you get the call at 4:15, the
15 polygraph has already been conducted?
16 A. Like I said, the recollection of those
17 times and what was said on that phone call, I
18 believe that might have been it, but it's not -- I
19 can't say with 100 percent certainty what was
20 said, or if they were going to be testing what was
21 stated to him already with the polygraph. I
22 don't -- I didn't write that down. I was in the
23 car and just turned around right after -- I'd have
24 -- if I looked at my Miranda, maybe I'd say
25 something back in 2010 to that, because I believe

| Tietjen - Direct/Bonjean | Page 215 |
|---|---|

1 I touched on the 4:15 phone call in that hearing
2 as well.
3 Q. Now, in this 4:15 phone call, is this
4 when there's some indication about problems with
5 video or recording equipment?
6 A. Not in that phone call. When I arrive, I'm
7 told there's video issues at the Essex County
8 Prosecutor's Office, and Newark Station on the
9 Turnpike has a room capable of it, and then I take
10 time to reach out to the detective there to see if
11 it's in operation, and can we use it.
12 Q. Did you participate at the Essex
13 County Prosecutor's Office in Philander Hampton's
14 interview in any way, shape, or form?
15 A. Which interview? Not in the interview. I
16 definitely had contact with him there, but I
17 didn't interview him.
18 Q. Okay. So let me ask the question
19 again.
20 Did you participate in the interview
21 of Philander Hampton at the Essex County
22 Prosecutor's Office?
23 A. Not that I recall.
24 Q. And when you say not that you recall,
25 is that because you don't have an independent

| Tietjen - Direct/Bonjean | Page 216 |
|---|---|

1 recollection of it?
2 A. I don't -- like, I don't recall being
3 involved in any interview with Philander Hampton
4 at the Essex County Prosecutor's Office.
5 Q. And if you had been involved directly
6 in the interview of Philander Hampton at the Essex
7 County Prosecutor's Office, do you think you may
8 have memorialized that in your report?
9 A. Yes, I would have put that in my report.
10 Q. And it's not in your report; right?
11 A. That's correct. Correct.
12 Q. Did you -- I'll ask the question
13 slightly differently.
14 Did you observe, either because you
15 were in the room, or had the ability to look inside
16 the room, any portion of the interview that
17 Lieutenant Carrega conducted with Mr. Hampton at
18 the Essex County Prosecutor's Office?
19 A. I don't believe I observed any portion of
20 that interview. It was completed by the time I
21 arrived, to the best of my knowledge.
22 Q. So when you arrived, your
23 understanding was the interview was complete; is
24 that right?
25 A. The interview that took place there.

Evans v.
Newark City

Tietjen - Direct/Bonjean                                    Page 217

1  Q.  Right.
2  A.  They were going to move on to do a
3  videotaped one.
4  Q.  Just to be clear, when you arrived at
5  the Essex County Prosecutor's Office, the interview
6  that had been conducted with Philander Hampton had
7  come to a conclusion to the best of your knowledge?
8      MR. VOMACKA: Objection to form.  And
9  asked and answered.  You can answer the question.
10 A.  I don't know how they ended it, if they
11 expressed to him they wanted to get on it video
12 and continue it.  You know, he was certainly aware
13 of that aspect as well so, but I was not involved
14 in an aspect of the interview at the prosecutor's
15 office that I recall at all.
16 Q.  Well, I don't want to quibble over
17 the word ended.  Obviously, it was continued at a
18 different location.  But my question is when you
19 arrive at the Essex County Prosecutor's Office, do
20 you have any reason to believe there was any
21 additional questioning of him at the Essex County
22 Prosecutor's Office after your arrival?
23 A.  I have no recollection of any occurring.
24 Q.  Explain to me what your understanding
25 of the problems with the videotaping equipment

Tietjen - Direct/Bonjean                                    Page 218

1  were?
2  A.  I don't -- I have no clue of what their
3  equipment entails or what the issues were or what
4  the issues were with the room.  So I just was told
5  it wasn't operating properly and to seek out
6  another location.
7  Q.  Did you find that concerning as a
8  police officer that the video recording equipment
9  had not been operating properly while Mr. Hampton
10 was being interviewed?
11 A.  I don't know if his interview of even done
12 in the room that was capable of the video, but I
13 don't know how the rooms are set up.  So I don't
14 know.  I have no information.  I was told that
15 their system was nonoperational and that they
16 wanted to get Philander Hampton on a video
17 interview.  So I have no information of what was
18 wrong, or if I thought it was odd.  We have our
19 own station interview systems break down as well
20 over the years, some back when they were VHS, and
21 then they went to DVD, and then to hard drives.
22 Q.  Interesting.  What was your
23 understanding about what policy was being followed
24 in connection with what portion of the interview
25 should be recorded?

Tietjen - Direct/Bonjean                                    Page 219

1  A.  I don't know what they -- what policy they
2  were doing or what point they felt or found out
3  that the equipment was not functional or what was
4  done to memorialize beyond any notes at Essex
5  County.  My involvement with the interview was on
6  the video at Newark Station.
7  Q.  Prior to November 12th of 2008, to
8  the best of your knowledge, every interview had
9  been either audio recorded or video recorded of
10 witnesses; right?
11 A.  No every, but most.
12 Q.  Okay.  Can you think of one that
13 wasn't?
14 A.  No, not once -- I knew we were -- we spoke
15 to people, like, over the phone.  Some are a
16 review of their audio statements.  Like fire
17 statements they made that we didn't audiotape.  We
18 had them review and sign a form that they reviewed
19 it, but we still engaged them in conversation, so
20 that's technically an interview as well about the
21 case, but the majority of the interviews were
22 recorded in some fashion.  Mainly taped.  I'm not
23 going to say that every one was done.
24 Q.  Okay.  Well, that's fair.  Maybe not
25 every single interview was recorded, but there was

Tietjen - Direct/Bonjean                                    Page 220

1  an effort on your part to audio record most of the
2  interviews that you conducted prior to November 12,
3  2008; right?
4  A.  Correct.
5  Q.  And was that pursuant to a policy?
6  A.  I don't recall what policy was in play back
7  in 2008, but the policy has changed throughout the
8  years as far as what cases you are investigating
9  and when you have to record and not record.
10 Obviously, when I started, I didn't have to
11 record anything, and that would change throughout
12 the years.  So I don't recall back in 2008 what
13 the policy was that would govern that aspect.
14 Q.  Well, whose policies were being
15 followed in connection with whether or not it was
16 obligatory to record these interviews?
17     MR. VOMACKA: Objection to the form,
18 but you can answer.
19 A.  Well, the witness interviews were recorded
20 to memorialize what they stated in taped fashion
21 in addition to, like, the notes we take and
22 include them in your report.  That's purely a --
23 like, not every case -- I haven't taken a taped
24 statement in years, and I investigate a lot of
25 cases.  So that's purely a decision to do to

Evans v.
Newark City

Video Deposition

Tietjen - Direct/Bonjean                                    Page 221

1   memorialize, you know, what is said during those
2   events.  Now, with these interviews with Essex
3   County, what was done, or what was tried, or what
4   equipment was functional or not functional.  I
5   know that we went to Newark.  We had a working
6   video room that I confirmed before, and then that
7   interview was videotaped.
8   Q.  I appreciate that.  I'm asking a
9   different question.  Are you saying that you're not
10  aware of any policy that required recording the
11  interviews with either witnesses and/or suspects?
12      MR. VOMACKA: Same objection.
13      MR. LIPSHUTZ: I think he did answer
14  that question already.
15      THE WITNESS: I did.
16      MR. LIPSHUTZ: Objection to form.
17      MS. BONJEAN: Okay.  Well --
18      MR. LIPSHUTZ: You can answer it
19  again.  I object to the form.
20      MS. BONJEAN: Yeah, I gotcha.  You
21  made your record.
22  Q.  My question is, is there a -- was
23  there a policy that you were aware of at the time
24  that you were doing your work on this case in 2008
25  that required law enforcement to record interviews

Tietjen - Direct/Bonjean                                    Page 222

1   with suspects?
2   A.  I don't recall what policies were in effect
3   in 2008.  If I see some documents, or something
4   that I signed, as far as initial or anything like
5   that, but I don't recall what was in effect in
6   2008.  That's what I said before.  Like, in 1999
7   when I began, it was very different.  At some
8   point, it changed where we were recording suspect
9   interviews.  And then it was like first and second
10  degree crimes, and then it was third degree and
11  fourth degree.  And I've been removed from having
12  to deal with that for a while, so I'd have to
13  reflect with somebody at a station if I had to do
14  an interview now.  But most of my cases are
15  missing persons.  If we do, it would have to be
16  videotaped because it would be of an indictable
17  offense; typically a sexual assault involving a
18  missing person.  I know that I have to do that
19  now.  But in 2008, I can't recall what the policy
20  --
21  Q.  So you don't know whether there was a
22  policy in place in 2008 that obligated you to
23  record the interviews?
24      MR. VOMACKA: Same objection.  And
25  asked and answered.  You can answer again.

Tietjen - Direct/Bonjean                                    Page 223

1   A.  I don't recall what the policy was then.
2   Q.  And if there was a policy that
3   existed, what agency would be the agency that you
4   would be following?  Do you understand my question?
5   A.  You broke up there.
6   Q.  Let me back up a second.  Obviously
7   the state police had policies; right?
8   A.  Yes.
9   Q.  And Newark Police Department had
10  policies; correct?
11  A.  Yep.
12  Q.  And I'm assuming the Essex County
13  Prosecutor's Office had policies; right?
14  A.  Correct.
15  Q.  Okay.  What's your understanding of
16  which one of those agency policies would be in
17  effect in 2008 that the team was obligated to
18  follow?
19      MR. LIPSHUTZ: Objection.  There's no
20  foundation for that question.
21      MS. BONJEAN: No foundation that
22  Newark Police Department had policies?  That's
23  good to know.
24      MR. LIPSHUTZ: That was not the
25  question, and you're arguing.  The question was

Tietjen - Direct/Bonjean                                    Page 224

1   what policies would they follow, when he has
2   testified four times that he doesn't recall the
3   policies, so there's no foundation for your
4   question.
5   Q.  I am not asking for you to recall the
6   policy.  That's a different question.
7      If you were to actually care to
8   follow a policy, which one would you follow?
9   A.  I would follow my policy.
10      MR. LIPSHUTZ: Objection to form.
11      MR. VOMACKA: Objection to form.  No
12  foundation, and also argumentative.  You can
13  answer the question.
14  Q.  Go ahead.  You can answer.
15  A.  I would follow the policies directed
16  through me by the state, because I would be
17  unaware of the Essex County Prosecutor's policies.
18  If they had other policies, it would upon them and
19  incumbent upon them, to make me aware of that and
20  then abide by their policy.
21  Q.  Okay.  So if the Essex County
22  Prosecutor's Office had a policy that required the
23  taping of an interview from the minute the person
24  steps into the interview room to the minute they
25  leave the interview room, your view is you would

Video Deposition

Tietjen - Direct/Bonjean                                    Page 225

 1  need to have been told about that policy to follow
 2  it; right?
 3      MR. VOMACKA: Objection to form.
 4  Foundation, calls for speculation. You can answer
 5  the question.
 6  A.  That policy may also have been in effect
 7  for us at the time. I'm saying I don't know what
 8  was in effect in 2008 and can't recall. So I
 9  can't help you with that either. If that was the
10  policy they had, someone should have abided by it.
11  I have not looked at the paperwork to explain why
12  what was done was done or why things weren't done.
13  Q.  Do you not recall the policies
14  because you have forgotten them, or you never found
15  out what they were in the first place?
16  A.  No, I'm sure I found out. But to recall
17  what policies were in effect for me on my job in
18  2008, I have no clue what changed there from 2009
19  to 2008. I know what I have to deal with today.
20  Why would I care about what happened in 2008 for a
21  policy like --
22  Q.  Because you're investigating a case,
23  and --
24  A.  No. In 2008, I'm sure I knew what the
25  policy was. Today I can't recall it. Like,

Tietjen - Direct/Bonjean                                    Page 226

 1  enough, geez.
 2  Q.  Okay. Fine. But what I'm saying is
 3  I can't seem to even get a clear answer about
 4  whether or not you believed you would have been
 5  subject to the policies of a different agency other
 6  than the state police?
 7  A.  No. Their policies are subject to them,
 8  and they go under the guidelines of the attorney
 9  general's office and make their policy. They can
10  go above and beyond policy and create their own,
11  which I would be completely unaware of, so I would
12  have no awareness of -- no even knowledge of their
13  policy. Whether they said you had to wear a green
14  tie on Tuesday, I would not know that.
15  Q.  So you don't know whether you
16  complied with Essex County Prosecutor's policies?
17  You can't say whether you did or not?
18  A.  I have no recollection of what was in
19  effect in 2008.
20  Q.  And you can't say whether or not you
21  complied with Newark Police Department policies;
22  right?
23  A.  No, I don't have their policy. I know that
24  we went and did when we were involved, that we got
25  forwarded for a video recorded statement in the

Tietjen - Direct/Bonjean                                    Page 227

 1  room in Newark that had the proper operational
 2  equipment, and I was told that the Essex County
 3  equipment was not operational on that day.
 4  Q.  And you don't know why it wasn't
 5  operational? You just took someone's word for it;
 6  right?
 7  A.  Correct.
 8      MR. VOMACKA: Objection to form.
 9  Asked and answered. You can answer.
10  A.  Correct.
11  Q.  And did you ever ask whether or not
12  the interview of Philander Hampton that took place
13  at the Essex County Prosecutor's Office had been
14  audio taped in some way?
15  A.  I don't recall that I asked that. I may
16  have.
17  Q.  And did you find out an answer to
18  that question?
19  A.  I don't recall. Again, I said I don't even
20  recall asking that question. That was, like, if I
21  had Lieutenant Carrega's report that covered that,
22  that'd be great.
23  Q.  Right. So anything else that sticks
24  out in your head about what transpired at the Essex
25  County Prosecutor's Office after you arrived there,

Tietjen - Direct/Bonjean                                    Page 228

 1  you know, shortly after 5 o'clock, or whenever it
 2  was, other than being informed that the equipment
 3  wasn't working?
 4  A.  No.
 5  Q.  Do you recall anyone telling you
 6  about what Philander had said in the preceding four
 7  hours?
 8  A.  No. He admitted and indicated his
 9  involvement with the case. Indicated events that
10  occurred that night. I don't know what was truly
11  said or not. That's where I would refer to
12  Lieutenant Carrega's documentation of that.
13  Q.  So when you say your understanding
14  that he indicated his involvement, does that mean
15  it was your understanding that he had given some
16  details about what actions he took that evening
17  that would indicate his involvement?
18  A.  Correct.
19  Q.  Okay. And that he also indicated, I
20  assume, Lee Evans' involvement; is that right?
21  A.  Correct.
22  Q.  And that he told Carrega during this
23  four-hour period at some point what Lee Evans had
24  done with the boys during this time period back in
25  August of 1978?

Evans v.
Newark City

---

1 A.  Correct.
2 Q.  And at this point certainly, you all
3 were on all on the same page and understood that
4 Philander has now inculpated himself in the crime;
5 right?
6    MR. VOMACKA: Objection as to form
7 and foundation.  You can answer.
8 A.  I would understand that I was aware.  I
9 would assume that others who had that information
10 as well were aware.
11 Q.  Well, based on what information he
12 provided, he wasn't just a, you know, bystander;
13 right?
14 A.  Correct.
15 Q.  Any other details that you remember
16 being told about what Philander told Carrega during
17 1 o'clock and 4 o'clock, or 5 o'clock, when you
18 arrived?
19 A.  No.
20 Q.  Do you remember any details about the
21 crime itself that was conveyed to Carrega?
22 A.  They would mix into what I have from my
23 video recollection of sitting down with him, so I
24 can't recall what was totally all told to me then
25 or what we were able to listen to in the video.

---

1 Q.  All right.  But shortly after you
2 arrived, you were able to confirm video equipment
3 at the Newark Station is working and operational;
4 right?
5 A.  Correct.
6 Q.  And you get approvals to, I guess, go
7 there to meet Philander Hampton to take his
8 statement?
9 A.  Correct.
10 Q.  Did anyone indicate -- strike that.
11    Was Philander Hampton free to leave
12 at that point?
13 A.  He was still in custody at the Essex County
14 jail on his warrant; so, no, he was not.
15 Q.  Putting aside his warrant, would you
16 say that if he wasn't under -- if there was no
17 warrant, would he have been placed under arrest, or
18 was -- strike that.
19    Was he placed under arrest?
20 A.  He was already under arrest.  He was never
21 charged that night for anything he indicated in
22 any of those statements.  So there were no charges
23 and no arrests for anything he advised us that
24 evening.
25 Q.  Okay.  That's my question.  He was

---

1 not -- I know he was already under arrest and in
2 custody, but he was not placed under arrest
3 separately for any --
4 A.  Sure.
5 Q.  Hold on.  Let me finish, for the
6 record, okay.
7    On November 12, 2008, prior to going
8 to Newark Station, Philander Hampton was not
9 arrested in connection with any charges related to
10 the disappearance of the boys; right?
11 A.  Correct.
12 Q.  So did he give his consent to go to
13 Newark Station?
14 A.  I don't know what he gave.  That would be
15 something that Lieutenant Carrega would testify or
16 write to.
17 Q.  You didn't speak to him directly
18 about that, and you weren't privy --
19 A.  I had some conversation expressing we were
20 going there, because I certainly wanted to make my
21 appearance known to him, instead of just stepping
22 in, because I was going to be in the interview
23 room here.  I, you know, kind of recall having a
24 minimal conversation with him about that we would
25 be going to Newark Station because the video

---

1 camera at Essex County was not operating properly,
2 but I don't have that, you know, written down.  I
3 just remember that occurring.  I don't know what
4 time that was or who was with me or what room I
5 saw him in when I had that conversation with him.
6 Q.  All right.  And then you all depart
7 in different vehicles; is that right?
8 A.  Yes.
9 Q.  Did you drive your own vehicle?
10 A.  I did, yes.
11 Q.  And with whom did Philander Hampton
12 drive?
13 A.  I know he was with Lieutenant Carrega.  I
14 don't know if anyone else was with him.
15 Q.  Do you know whether Philander Hampton
16 was in handcuffs?
17 A.  I imagine he was since he was still under
18 arrest and in custody, but I don't have -- like,
19 that didn't affect my judgment.  It wasn't
20 something burned into my memory, but I imagine
21 when he came in the station, he was still in
22 handcuffs because he was still under arrest for
23 his warrant, but I can't recall whether he was or
24 wasn't to say anything different.  We returned him
25 to the jail under arrest as well.

---

Video Deposition

---

Tietjen - Direct/Bonjean                               Page 233

1  Q.  Okay.  Well, my question is do you
2  recall whether or not he was actually handcuffed
3  when he was placed in Lieutenant Carrega's car?
4  A.  I didn't see him placed in the car, so no.
5  Q.  He wasn't placed in the car?
6  A.  I didn't see him go into the car, no.  I
7  went to the station before they got out to their
8  vehicles and was there, and then they arrived
9  after my arrival, so...
10  Q.  Fair enough.  So you left Essex
11  County Prosecutor's Office a little before them and
12  got to the station --
13  A.  Yes.
14  Q.  So you don't really know how it was
15  all configured, who drove with who, except you
16  later learned he was with Carrega; right?
17  A.  I don't recall being any part of it.
18  Whether I was or not, I don't -- it's not burned
19  in my memory a ride down the elevator with all of
20  us in there.  I just know I got to Newark Station
21  prior to their arrival.
22  Q.  Okay.  According to your report, you
23  met with Detective Velazques at Newark Station at
24  approximately 7:30 p.m., and Philander Hampton
25  arrived shortly after; right?

---

Tietjen - Direct/Bonjean                               Page 234

1  A.  Correct.
2  Q.  So there's a gap of time.  I'm
3  wondering where you were.  Because according to
4  you, you got that phone call at 4:15 p.m., and you
5  probably arrived around 5:00, you said; right?
6  A.  Yeah, five-something.
7  Q.  And you're at Newark Station at about
8  7:30.  What did you do between 5:00 and 7:30?  Part
9  of it was at the Essex County Prosecutor's Office.
10  But what else?
11  A.  Sure.  Certainly trying to find a location
12  to do the video statement.  Christian Velazques,
13  if I recall correctly, he wasn't working.
14      (Reporter requested clarification.)
15  A.  Christian Velazques was the detective at
16  the station.  If I'm recalling correctly, I called
17  him, and he was home and had to get approval to
18  come in and use the system as well.  So I really
19  don't think that's a big delay, because I arrived
20  at Essex County a little after five, that I am now
21  arriving at Newark Station on the Turnpike at
22  7:30.
23  Q.  Well, you suggested earlier that you
24  weren't at Essex County Prosecutor's Office for
25  very long?

---

Tietjen - Direct/Bonjean                               Page 235

1  A.  No, that to me isn't very long.
2  Q.  How long were you at the Essex County
3  Prosecutor's Office?
4  A.  Probably about an hour, hour and 15, hour
5  and 20.
6  Q.  What were you doing during that hour
7  and 20 minutes?
8  A.  Probably to identify where we were going to
9  videotape.  I don't know.  I have no recollection
10  of anything important occurring as far as what I
11  did there.  I was told at some point there that
12  their equipment was inoperational [sic] and to
13  seek out an alternate location.  That's what I
14  did.  Then I went to Newark Station.
15  Q.  You made some phone calls?
16  A.  What?
17  Q.  You made a phone call or two; right?
18  A.  Oh, yeah.  Yeah, yeah.
19  Q.  These weren't in-depth phone calls?
20  They were -- right?
21  A.  No, they were request phone calls and
22  probably a call back indicating if he can respond
23  in to Newark to assist with it as well.  So
24  there's a delay.  Because he would have to get
25  approval from his bosses as well to assist.  So

---

Tietjen - Direct/Bonjean                               Page 236

1  there's -- like, an hour and 20 minutes in police
2  speak is nothing.
3  Q.  And you -- were you in the room where
4  Hampton Philander was, or were in some separate
5  area?
6  A.  No.  It's a large building and large office
7  space.  I don't recall which room Philander was
8  in.
9  Q.  The question is were you in the room
10  with Philander?  I don't care how big that building
11  is.
12  A.  I said before I recall seeing him at some
13  point, having some conversation with him.  I was
14  not in the room when I was dealing with Christian
15  Velazques with Philander.
16  Q.  What conversation did you have with
17  Philander?  I thought you didn't have.
18  A.  No.  I said to you before -- we can reflect
19  back -- I had an introduction with him.  Like I
20  said, I was trying to introduce myself at Newark
21  Station, indicating that we'd be going to Newark
22  Station to do the video because we couldn't do it
23  there, and that's what I previously stated to you.
24  Q.  That's the sum total of the
25  conversation?

---

Video Deposition

Tietjen - Direct/Bonjean                                    Page 237

1  A.  Pretty much.  I don't recall much more
2  occurring.
3  Q.  How long is it the Essex County
4  Prosecutor's Office to Newark Station?  It's not
5  too far?
6  A.  Not too far, but depending traffic.  I
7  mean, you live in Brooklyn.  It's probably about
8  five miles, which can take up to 20 minutes.  So,
9  I don't know, depending, that time of day, you're
10  dealing with rush hour still ending out, you're at
11  least 15 minutes away.
12  Q.  Right.  But other than what you
13  testified to, you can't tell me anything else you
14  were doing during that time period; right?
15  A.  Correct.
16  Q.  You said you went -- you started
17  there before the other officers and Philander
18  arrived.  Were you in contact with them via
19  telephone before they arrived at Newark Station?
20  A.  I don't recall any conversations occurring.
21  Q.  Okay.  You later learned, did you
22  not, that they apparently stopped because Philander
23  Hampton was eager to point out the place where he
24  had participated in the murder of five children?
25  A.  Correct.

Tietjen - Direct/Bonjean                                    Page 238

1  Q.  Did Philander Hampton seem to you to
2  be -- I know you're not an expert on this, but did
3  he seem to you to be mentally disabled in any way?
4  A.  No.  He appeared to be very with it, and I
5  would say he appeared to have like a stress lifted
6  off of him, and he was rather forthcoming in my
7  involvement in the audiotape -- I mean the
8  videotape.  He appeared to be very, like it was
9  just a pressure lifted off of him.
10  Q.  Even though he was essentially
11  implicating himself in the murders of five
12  children?
13  A.  Correct.  He's had this weight for 30 years
14  on him, you know, and...
15  Q.  And he gets picked up on a traffic
16  warrant and, whoop, that's when he decides to give
17  it all up?  I mean, does that seem logical to you?
18  A.  Very.
19  Q.  Okay.  So according to the Lieutenant
20  Carrega, I believe, and, again, you'll have to take
21  my word for it, unless you want to look at the
22  testimony, but that he drove Philander Hampton to
23  the Newark Station in his car with no one else
24  present?
25     MS. ROSEN: Objection to form.  You

Tietjen - Direct/Bonjean                                    Page 239

1  can answer.
2  Q.  I know you haven't reviewed the
3  transcript, but if Lieutenants Carrega testified to
4  that, do you have any reason to doubt that?
5  A.  No.
6     MS. ROSEN: Objection to form.
7  Q.  And would it be fair to say that you
8  have zero idea what was communicated between
9  Philander Hampton and Lieutenant Carrega in his
10  police vehicle between leaving Essex County
11  Prosecutor's Office to arriving in Newark Station?
12     MR. VOMACKA: Objection to form.  But
13  you can answer.
14  A.  No.
15  Q.  You don't know what transpired;
16  correct?
17     MR. VOMACKA: Same objection.
18  A.  No.
19  Q.  You have no idea what Philander said
20  to Lou Carrega, and you have no idea what Lou
21  Carrega said to Philander Hampton in the vehicle;
22  correct?
23     MR. VOMACKA: Same objection.
24  A.  I stated that.
25  Q.  I'm sorry?

Tietjen - Direct/Bonjean                                    Page 240

1  A.  I stated that.  No, I have no idea what
2  occurred in the car.
3  Q.  Did you later learn that they stopped
4  at a location where allegedly Philander Hampton
5  said, "This is where it happened"?
6  A.  Yes.  And I stated that just previously
7  about a minute and a half ago.
8  Q.  Okay.  And how did you learn that
9  information?
10  A.  Lieutenant Carrega told me at Newark
11  Station.
12  Q.  When he arrived, he said, "Oh, he
13  showed us where it was at"?  Something like that?
14  A.  Correct.
15  Q.  And did he give you any other details
16  in that conversation?
17  A.  There was a telephone pole, I think, in the
18  front area of the street that Philander Hampton
19  said it was right in this area.  Whether that's
20  the same location of the pole back in 1978 or not
21  is unknown to me, but he pointed out the new
22  residence that was standing on that property.
23  Q.  So he communicated to you that
24  Hampton had said, "I remember where this happened
25  because, whatever, 30 years earlier, I remember

Evans v.
Newark City

| Tietjen - Direct/Bonjean | Page 241 |
|---|---|

1  this telephone pole here"?
2  A.  Well, Hampton had lived at the residence
3  prior.  So him finding the residence at 256
4  Camden, I don't think would be that difficult for
5  him to pick out on the street where that residence
6  was located.
7  Q.  I don't disagree.  I'm just asking if
8  that's how it happened?
9  A.  Yes, that's what was expressed to me, that
10 he led them there to that location.
11 Q.  And having run the background of
12 Hampton, you knew that that was, had been one of
13 his addresses; right?
14 A.  I don't know if that came up as an address
15 for him in anything that I saw.  I had 271
16 Hunterdon and 256 Camden.  I believe him living
17 there was something he provided to us, but I don't
18 recall if it was mentioned as any prior
19 residences.  I don't recall that address per se
20 coming up in an interview.
21 Q.  Okay.  And 256 Camden, did you go to
22 that location?
23 A.  Not that day.
24 Q.  At some point you did?
25 A.  Yes.

| Tietjen - Direct/Bonjean | Page 242 |
|---|---|

1  Q.  And that is located between 15th and
2  16th Streets?  Do you remember that?
3  A.  I didn't look at a map.  I don't -- that is
4  -- I believe that's probably correct, if you're
5  looking at a map there.
6  Q.  And the back side of the building is
7  on Bergen?
8  A.  Correct.
9  Q.  So did you put together at that
10 point -- well, strike that.  I'll ask that in a
11 minute.
12     So you get to Newark Station, and you
13 get this information from Carrega.  Again, you're
14 assuming Carrega is going to write this all up in
15 his report; right?
16 A.  Correct.
17 Q.  That would be protocol; correct?
18 A.  That would be, like, the normal thing to
19 do.
20 Q.  Not only normal, but a particularly
21 important thing to do, given the fact that someone
22 is confessing to the murder of a five kids in a
23 crime that has gone uninvolved for 30 years; right?
24     MR. LIPSHUTZ: Objection to the form.
25 A.  Correct.

| Tietjen - Direct/Bonjean | Page 243 |
|---|---|

1  Q.  It's kind of stunning; isn't it?
2     MR. LIPSHUTZ: Objection to the form.
3     MR. VOMACKA: Objection to the form.
4  Q.  Do you agree with that?
5  A.  In my opinion, yes.
6  Q.  All right.  So once at Newark
7  Station, did you see the other officers who were
8  involved in the case present as well?
9  A.  Correct.
10 Q.  And that would have been Agent Eutsey
11 was there; right?
12 A.  I believe it was Eutsey, Henry, Hadley,
13 Carrega, and myself.  Philander.
14 Q.  The whole crew; correct?
15 A.  Correct.
16     MR. LIPSHUTZ: Objection to the form.
17 Q.  And where was Hampton taken inside
18 Newark Station, if you know?
19 A.  The upstairs where the offices are on
20 the second floor of the toll building.  He was
21 brought in there, and then he was brought into the
22 interview room.  I don't recall if he was ever put
23 in the cell area there.  It's a large like cell.
24 It can hold like 30 people.  I don't recall if he
25 went there first or went directly into the

| Tietjen - Direct/Bonjean | Page 244 |
|---|---|

1  interview room.
2  Q.  I'm sorry to go back.  I meant to ask
3  this question.  You never saw Miranda warnings
4  given to Hampton at the Essex County Prosecutor's
5  Office; right?
6  A.  I wasn't there for that, no.
7  Q.  So that's a no; correct?
8  A.  Correct.
9  Q.  Did you see Miranda warnings given to
10 him at any point at Newark Station?
11 A.  Yes.
12 Q.  At which point did you observe that?
13 A.  The beginning of the videotaped statement.
14 Q.  Does the beginning of the videotaped
15 statement actually articulate the Miranda warnings?
16 A.  I believe we have a signed form that he
17 goes through and all that.  I haven't seen the
18 tape, if that was picked up on, but I believe at
19 the beginning, we have a form we went through, and
20 I believe it was on video.  We can look at the
21 transcript of the video.
22 Q.  Yeah, we can look real quick.  I just
23 want to confirm that.
24 A.  I'm pretty sure he checked off all the
25 boxes, read through it.

Rizman Rapanort (973)992-7650
"When every word counts"

Tietjen - Direct/Bonjean                              Page 245

1   Q.   Okay.  That's fine.  I see it in the
2   statement, if you want to go ahead and look, you're
3   free to.
4   A.   Right in the beginning of the statement.
5   Q.   Who was present in the room when this
6   recorded statement took place?
7   A.   Lieutenant Carrega, Hadley, and myself.
8   Q.   And was there any conversation that
9   took place between any police officer and Philander
10  Hampton at Newark Station prior to this statement?
11  A.   Well, there's incidental conversations, so
12  yes, like we'll ask him where he's going, do you
13  need anything, do you need to use the bathroom?
14  So, yes, there's conversation, but no interview
15  conversation whatsoever.
16  Q.   So no questions about the substantive
17  nature of the events, but just, you know, bathroom,
18  sort of housekeeping things; right?
19  A.   Correct.
20  Q.   And you're now in -- strike that.
21      You're now in the interview room.
22  And the statement commences at what time; do you
23  know?
24  A.   Look at the statement form there.
25  Q.   I don't know if the transcript

Tietjen - Direct/Bonjean                              Page 246

1   reflects it, or perhaps the video reflects it.  It
2   says 8:18 p.m.
3   A.   Okay.
4   Q.   If you look at --
5       MS. BONJEAN: I don't think we need
6   to -- actually, I guess we can mark it.  Let's
7   mark it.  Hampton's statement -- where are we at,
8   Audrey?
9       COURT REPORTER: Five.
10      MS. BONJEAN: Tietjen-5 is Hampton's
11  statement.
12      (Tietjen-5, transcript of Philander
13  Hampton interview 11/13/08, Bates ECPO 000342
14  through 426, was received and marked for
15  identification.)
16  A.   What page do you see?
17  Q.   Yeah.  On the third page of the
18  statement, which is Bates stamped ECPO 334, and
19  it's at line 16.
20  A.   Okay.
21  Q.   Lieutenant Carrega indicates that
22  it's 8:18 p.m.; right?
23  A.   Right.
24  Q.   So Philander Hampton has been in the
25  custody and care of Lieutenant Carrega since

Tietjen - Direct/Bonjean                              Page 247

1   between 1 or 2 o'clock on November 12, 2018, but
2   this is the first time that there is an audio or
3   video recording taking place that is going to
4   memorialize their conversation; right?
5   A.   To the knowledge that I have, yes.
6   Q.   And, in fact, there's actually not a
7   single note or report or piece of paper with words
8   on it that memorialize what occurred between 1
9   o'clock and 8:18 p.m. that was prepared within a
10  year of the event; right?
11      MR. LIPSHUTZ: Objection to the form.
12  It's very unclear what you're asking.
13      MS. BONJEAN: Well, I'll rephrase.  I
14  mean it doesn't really matter whether you
15  understand it.  It really matters whether he does,
16  but I'll rephrase.
17  Q.   We know that Lieutenant Carrega did
18  eventually prepare a report; right?
19  A.   Correct.
20  Q.   That was after the Miranda hearing;
21  correct?  The commencement of the Miranda hearing;
22  right?
23  A.   Correct.
24  Q.   Putting that aside, are you able to
25  point me to any piece of paper with words on it

Tietjen - Direct/Bonjean                              Page 248

1   that would memorialize what transpired between 1 or
2   2 o'clock in the afternoon on November 12, 2008,
3   and 8:18 p.m. on November 12, 2008, between Carrega
4   and Hampton?
5       MR. LIPSHUTZ: Objection to the form.
6   A.   I have no documents that show that, but he
7   did take a polygraph.  There should be a report
8   related to that in Essex as well.  And I don't
9   know who did it, but I think it was Kelly is his
10  last name.  I think he was one of their
11  polygraphists there.  I don't know if he was the
12  only one.  So that may have some sort of
13  documentation if he did, in fact, administer the
14  polygraph.  But there's nothing in the paperwork
15  provided to me that indicates anything.
16  Q.   Right.  Kelly's polygraph report
17  would reflect what Kelly did in terms of his
18  polygraph test; right?
19  A.   Yeah, I don't know if he does -- I haven't
20  seen it, and I don't know what his style is.  I
21  don't know if he includes, I went there, and the
22  guy was here voluntarily, and he was Mirandized.
23  In some of our reports, we'll just say, as far as
24  our agency has to do with other agencies or
25  whatever, they'll provide some background of what

Evans v.
Newark City

| Tietjen - Direct/Bonjean | Page 249 |
|---|---|

1  they're there for just to cover how they ended up
2  there.
3  Q.  Right.  But you wouldn't expect his
4  polygraph report to memorialize conversations that
5  Hampton had with Carrega that he wasn't present
6  for; right?
7  A.  I don't know what to expect to from that.
8  Q.  And Lieutenant Carrega handled the
9  questioning of Mr. Hampton during the recorded
10  statement that began at 8:18 p.m.; right?
11  A.  Correct.
12  Q.  Was Detective Cassian there as well?
13  A.  I don't know who Detective Cassian is.
14  Q.  I don't either.  I see a reference to
15  that in the statement on --
16  A.  Oh, that's probably me.  Whoever
17  transcribes these statements that we were involved
18  in is horrible, and there's no corrections made.
19  Like, I may be -- I don't know who I'm in there
20  as.
21  Q.  It looks like --
22  A.  Correglia is Lieutenant.  There's Hadley.
23  And then Tietjen, they come up with from Cassian.
24  Q.  So that's you.  Okay.
25  A.  And I don't know, without looking at it, if

| Tietjen - Direct/Bonjean | Page 250 |
|---|---|

1  all of these are truly who they say they are or
2  I'm mixed in with somebody else as well.
3  Q.  When you went into this interview,
4  though, you had no knowledge about what Philander
5  Hampton had already confessed to other than just
6  sort of a general idea; right?
7  A.  I had a general event to it.  The location.
8  You know, especially after getting to the station
9  and pointing out where it was, and what he was
10  advising.  I don't know what -- how far involved I
11  knew.  I probably knew some significant parts of
12  it, but the total event that we wanted to get
13  memorialized on the videotaped statement.
14  Q.  Was November 12, 2008, the first time
15  that -- strike that.
16  As of November 12, 2008, the idea,
17  theory that the boys had died in a fire was
18  reignited -- no pun intended -- right?
19  A.  That was the first that I became aware that
20  it was a concern for us.  We talk about Hairston
21  looked at fires that were active in the city back
22  on that day.  This was like crazy new news to me
23  because I had thought that had been excluded
24  previously.  Granted, they could have been
25  certainly, you always keep that in mind, but

| Tietjen - Direct/Bonjean | Page 251 |
|---|---|

1  nobody had told us that, so this is new to me, and
2  I don't think -- so we took many steps to try to
3  verify that it, in fact, occurred.
4  Q.  And, in fact, Hairston had actually
5  noted the actual fire?
6  A.  I would imagine that fire that he looked up
7  on Camden and 15th, but he uses a different
8  address, the corner of.
9  Q.  He said 15th and Bergen, right.
10  A.  Right.  So I would imagine that's actually,
11  but the fires we looked up, we had 15th and
12  Camden, but I did not readily identify from
13  Hairston's 1970-whatever that this was the same,
14  but I'm not -- you know, I'm not from Newark.  I
15  don't...
16  Q.  Did it give you pause that Philander
17  Hampton was saying that these boys had died in a
18  fire given the fact no bodies had been found?  Did
19  that give you pause or concern?
20  A.  No.  I've been in this unit now for quite a
21  few years, and the destruction that fire causes to
22  human remains is pretty significant.  Even the
23  decomp of remains just that in open air and woods
24  or yards, you can walk past most of a human remain
25  with debris on them and never notice it, so I was

| Tietjen - Direct/Bonjean | Page 252 |
|---|---|

1  not concerned.  My concern personally was did they
2  do any examination of this fire and what was the
3  potential normal course of business of the fire in
4  the city once we, you know, came up with a fire
5  potential that was there a fire.  Newspaper
6  article, and go get the fire logs.
7  Q.  Did you confirm a fire did place at
8  256 Camden Street before you permitted Philander
9  Hampton to --
10  A.  No.
11  Q.  I'm sorry?
12  A.  No.
13  Q.  So when Philander Hampton made this
14  statement, your testimony is you didn't even know
15  whether there had been a fire at 256 Camden?
16  A.  Correct.
17  Q.  Okay.  Do you know how long the
18  statement took?  I guess maybe it reflects --
19  A.  There is an end time on the statement as
20  well so...
21  Q.  The record reflects that the
22  statement ended at 9:23 roughly, so he was in there
23  talking for about an hour; right?
24  A.  Correct.
25  Q.  And after he made this statement, was

Evans v.
Newark City

Tietjen - Direct/Bonjean                                    Page 253

1  he placed under arrest in connection with the
2  disappearance of the boys?
3  A.  No.
4  Q.  Why not?
5  A.  I believe they wanted to verify things that
6  he stated.  This is new information to us, unknown
7  to me at all.  So him making those comments, I
8  want to verify a whole bunch facets to it.
9  Q.  Right.  But you would agree that a
10  video-recorded statement like this definitely gave
11  you probable cause to arrest him; right?
12  A.  Correct.  It wasn't my call.  Like, this
13  was -- I would say in my experience my first time
14  I found somebody who had admitted to something
15  like this and they weren't charged right away, and
16  I had never -- I've interviewed plenty of people
17  before and arrested them based upon their
18  statements, but this one, it's not my case, and it
19  was decided, I guess, outside of me that he
20  wouldn't be charged at this point, to then
21  corroborate the things that he provided in his
22  statement.
23  Q.  He was let go; right?
24  A.  He was brought to Essex County jail and
25  then subsequently released there on bail.

Tietjen - Direct/Bonjean                                    Page 254

1  Q.  Right.  On bail?  For a traffic
2  warrant?
3  A.  Well, that's why you're in jail.  You're in
4  jail in lieu of the bail.  This is before the Bail
5  --
6      (Reporter requested clarification.)
7  A.  He had bail on him.  That's why he was at
8  the county jail.  Whether he appeared before a
9  judge who then said, Your time served in the jail
10  is good enough, let's release you and forego any
11  payment the bail, or he did come forward with the
12  money to remove himself from the jail.
13  Q.  So the three days he was in there
14  before he was dragged into the Essex County
15  Prosecutor's Office, he couldn't make the bail on
16  the traffic warrant ticket, but he did the day
17  after you brought him?
18  A.  I don't know if he made bail or had an
19  appearance or what.
20  Q.  All right.  But he was released into
21  the public --
22  A.  Correct.
23  Q.  -- after giving a video-recorded
24  statement in which he played a direct role in the
25  murders of five children; right?

Tietjen - Direct/Bonjean                                    Page 255

1  A.  Right.
2      MR. LIPSHUTZ: Objection.
3  Argumentative.
4  Q.  But you're not disagreeing that there
5  was sufficient evidence to arrest and charge him at
6  that point if somebody wanted to?
7  A.  No, I don't make that determination.  I
8  would present those factual things to a judge who
9  would make the determination of probable cause, so
10  I would think that an admission to that with
11  pointing out a location would be something I would
12  write down and present to a judge, but that's me,
13  and that's my -- this is a very different case
14  with the amount of time and involvement.
15  Q.  Yeah, it's ultimately a judge that
16  would make a probable cause determination, but
17  before you can even get in front of a judge, an
18  arrest usually has to be made, and that requires a
19  police officer to make the probable cause
20  determination.
21      As a police officer, you would agree
22  that a confession, this confession, hour-long
23  confession, would have given you probable cause to
24  arrest Philander Hampton; correct?
25  A.  I would think possible, yes.

Tietjen - Direct/Bonjean                                    Page 256

1  Q.  But I understand it wasn't your
2  decision to make, but you're not disagreeing that
3  the proofs were there for an arrest to be made if
4  that was the decision of the decision-maker?
5  A.  I would agree with that.  Definitely if he
6  was free there sitting there and came in to speak
7  with me, and he admits to it, he's not going home
8  that day.
9  Q.  Right.
10  A.  That's my -- that's how I would handle it.
11  Q.  I understand.  I understand.  That's
12  not what happened, and you returned him to the
13  Essex County jail?
14  A.  Correct.
15  Q.  And at some point, he was released.
16  We don't know exactly how.  And he remained out for
17  some time; right?
18  A.  Correct.
19  Q.  Do you know how long he was out
20  before he was arrested and charged?
21  A.  We arrested him in March of 2010.  I don't
22  know if he was arrested for other crimes in the
23  interim there, but that's when we arrested him
24  again.
25  Q.  So he was literally out after

Evans v.
Newark City                                          Video Deposition

---

Tietjen - Direct/Bonjean                                 Page 257

1   confessing in his court-reported statement for --
2   my math isn't good -- but for a year and a half
3   about; right?
4   A.   Correct.
5        MR. LIPSHUTZ: Objection to the form.
6   Q.   And it didn't take you that long to
7   corroborate what he said in that statement; right?
8        MR. LIPSHUTZ: Objection to the form.
9   A.   There were many steps being done.  If you
10  see that my involvement became -- I was
11  transferred to the Fugitive Unit for a promotion
12  in December of that year, so my involvement
13  started to drop off.  And then at the time of the
14  arrest, I was fully in the Fugitive Unit as well.
15  So I don't know what steps.  They were looking for
16  other witnesses, if they trying to look at
17  neighbors, find reports of the fire.  I think they
18  were concerned about -- I'd say it's a large case,
19  a 30-year-old case, so you're trying to get all
20  the information.  There was no true fear that he
21  was going to beat feet.
22      (Reporter requested clarification.)
23  A.   You know, like, I would see him in the
24  city.  I worked for the Task Force at the time,
25  for the marshals, and I would see Philander

---

Tietjen - Direct/Bonjean                                 Page 258

1   Hampton on the street and stop and talk to him.
2   It was very odd to me, but I would pull up on him
3   and see him.  I can't say how many times I saw
4   him, but I definitely saw him at different times.
5   Q.   So let me get this straight.  Carrega
6   is looking for him for a good long bit of time, for
7   months.  Can't find him anywhere, until he gets
8   picked up in this traffic warrant.  And then after
9   he confesses for being involved in the murders of
10  five children, you just see him walking down the
11  street, he's very easy to find; is that --
12  A.   I wouldn't say easy to find.  I said I saw
13  him.  I don't know how many times I saw him, but I
14  became intimately involved with what he looked
15  like in that interview and having direct contact
16  with him.  Prior to that, I was dealing with just
17  a photo, and who knows if I saw him on the street,
18  but I didn't quickly identify that it was
19  Philander Hampton.  I may have passed by him while
20  I was looking for him previously, but now I had
21  intimate knowledge of his actions, how he walked,
22  how he looked, and how he presented himself.  And
23  for some reason when I'd see him after the event,
24  I was able to quickly spot him and identify him.
25  It was like seeing a friend.  You knew how they

---

Tietjen - Direct/Bonjean                                 Page 259

1   walked and how they are.  I would see him and have
2   contact with him.  And he freely talked to me
3   every time I saw him.
4   Q.   So he was -- he didn't seem concerned
5   about being arrested; right?
6   A.   I don't know if he was not concerned.  He
7   didn't know what was happening.  I think he was
8   probably -- like I'm only surmising -- he was
9   surprised he wasn't arrested that day, or charged.
10  Q.   Right.  But you said you weren't
11  concerned that he was a flight risk?
12  A.   Well, I couldn't make -- I wasn't
13  determining when charges were going to be done.
14  Q.   I understand.  But I'm just bringing
15  you back to your prior testimony that -- your
16  words -- you weren't concerned he was a flight
17  risk?
18  A.   No, I didn't believe he had the means to
19  leave Newark; or if he did, we knew who he was as
20  far as at any point whether he'd become a
21  fugitive, and the unit I was in was pretty adept
22  at locating people and returning them where they
23  had to be.
24  Q.   But it's fair to say that he didn't
25  try to evade you?

---

Tietjen - Direct/Bonjean                                 Page 260

1   A.   No.
2   Q.   Right?
3   A.   Correct.
4   Q.   He was pretty accessible to you once
5   he made this --
6   A.   Well, I would only see him -- I don't know
7   where he was living at the time, but I would see
8   him -- I don't know how many times, but I
9   definitely saw him on the street and had like a
10  short conversation with him.
11  Q.   But you wanted to keep tabs on him,
12  though?  No?
13  A.   I was not anybody keeping tabs on him.
14  Q.   You weren't -- I didn't understand
15  your response.  You said you weren't keeping tabs
16  on him?
17  A.   No.
18  Q.   You would agree, though, that the
19  team would have wanted to keep tabs on him; right?
20  A.   I don't know what --
21       MR. LIPSHUTZ: Objection to the form.
22       MR. VOMACKA: Join.
23  A.   At that point, like, we had done our steps
24  and gone through, and you'll notice that others
25  had many more tasks than me following that

---

Evans v.
Newark City

Video Deposition

---

Tietjen - Direct/Bonjean                                    Page 261

1  December when I was transferred.  I don't know if
2  anybody was or not, but it wasn't something that I
3  had to worry about, that he was charged at that
4  point.  He was easy to find the day he got the
5  arrest warrant, too, so, however, you know...
6  Q.  Right.  But you have someone who's
7  confessed to killing five people in a high profile
8  case that has gone unsolved for 30 years, and he's
9  now just walking around the streets.  To me it
10  would be common sense that law enforcement would
11  want to keep an eye on him to make sure he doesn't
12  flee?  Even you're right, he probably doesn't have
13  the means, but you still want to make sure you know
14  where he is; right?
15      MR. VOMACKA: Objection to form, but
16  you can answer.
17  A.  I don't know what steps were taken to
18  verify where he was or what he was doing.
19  Q.  Okay.  Well, you did subsequently try
20  to get information about this fire; right?
21  A.  Correct.
22  Q.  And lo and behold the psychic was
23  right after all?
24      MR. LIPSHUTZ: Objection to the form.
25      MR. VOMACKA: Objection to the form.

---

Tietjen - Direct/Bonjean                                    Page 262

1  A.  I'm not even going to go to that, because I
2  said to you before psychics will throw out a huge
3  amount of what-if's and possibilities, and she
4  talks about a brown uniform and some other stuff.
5  You know, like, we do this all time.  It's in a
6  field.  Well, if I find them in the field, was she
7  right?  It's a fire.  Is she right?  Oh, well, we
8  had a fire.  We have psychics call my unit monthly
9  on cases.  It's all the same story.
10      The Dolce Aviles Amber Alert case, we
11  had so many psychics call from all over the
12  country on that.  Dreams.  Like I saw her in a
13  dream.  She's in a field of flowers.  You know,
14  and they give you all these full-on statements.
15  It's great when you can link something up, but
16  there's plenty of things in such provides.  So,
17  yeah, it's a fire.  Was she correct?  Who knows?
18  Q.  Fair to say, though, that your team
19  wanted to corroborate this, though, because you
20  weren't 100 percent certain; right?  Is that fair
21  to say?
22      MR. LIPSHUTZ: Objection to the form.
23      MR. VOMACKA: Objection to the form.
24  You can answer.
25  A.  I would say we wanted to verify what he

---

Tietjen - Direct/Bonjean                                    Page 263

1  told us because everything was unknown to us.  As
2  far as I know, I knew nothing about a fire on 256
3  Camden Street.  I knew nothing about any potential
4  fire reports, any arson report, that was at 256
5  Camden, let alone that Lee Evans was involved in
6  the fire with Philander Hampton that day until
7  Philander Hampton told us, let alone occurring on
8  the third floor, you know, all those steps, so I
9  had no real -- I know my bosses were curious as to
10  why he wasn't arrested right away, but we have two
11  people here because he implicated Lee Evans, and,
12  again, it's a case, again, of 30 years with
13  minimal stuff around and available to prove or to
14  go through your factual basis.  We had no
15  information about a fire, so I had really no
16  concern that we weren't jumping on him right away.
17  I was thankful that we found that article in the
18  newspaper, and thankful we found some fire items,
19  and thankful that, you know, Mr. Delk's (phonetic)
20  report was identified later on that next year in
21  April.
22  Q.  You had some reservations, though,
23  about the fire theory; right?  You wanted to
24  corroborate that this was all true; correct?
25  A.  Correct.  I wouldn't say reservations about

---

Tietjen - Direct/Bonjean                                    Page 264

1  the theory.  He told us it was a fire, so I had to
2  believe him and then go with finding factual basis
3  to support what he told me.  Whether it occurred
4  on August 20th.  Like, you look at--
5  Q.  I want to make sure I understand.
6  A.  Someone tells you a fire occurred on
7  August 20th, the night thereof, in a case like
8  this, you're going on 30 years, I want to verify
9  as much information as I can.  Whether that fire
10  did occur, whether -- and then that adds to more
11  of it.  There's plenty of things that you couldn't
12  with the lapse of years, but that was definitely
13  one.
14  Q.  Did Philander Hampton's story seem a
15  little implausible to you when you heard it, or did
16  it ring true to you?
17  A.  Well, there were things in there that I
18  think he could have potentially diminished.  You
19  know, they have a gun.  Why not shoot a boy, or
20  why not do harm to a boy?  Whether that's
21  diminishment.  And people do that all the time in
22  confessions.  They diminish their own potential
23  involvement.  So did I believe every step he
24  stated about it?  No.  I think there's
25  diminishment on both sides as to what occurred --

---

Rizman Rapaport (973)992-7650
"When every word counts"

| Tietjen - Direct/Bonjean | Page 265 |
| --- | --- |

1     (Reporter requested clarification.)
2  A.  I don't know where I skipped off.  But they
3  tend to diminish involvement or put down their
4  efforts.
5     Like, a pedophile, and I've
6  interviewed plenty of them, will always indicate
7  it was always accidental, but they still had
8  penetration.  You know, but they didn't intend to
9  do it, like that.  So there's -- he's belittling
10  an event maybe to not make himself look so demonic
11  in the event, and that's normal.
12  Q.  Right.
13  A.  So it's necessarily I believe every spoken
14  word exactly how it occurred.  The fire reported
15  that one neighbor heard a pop.  Could that have
16  been gunshot that was muffled, or could it have
17  been something popping due to the fire?
18  Q.  Right.
19     MS. BONJEAN: I believe we have to go
20  off the record to change media, so -- is that
21  right?
22     THE VIDEOGRAPHER: Yes.  The time is
23  3:57 p.m.  Off the record.
24     (Break taken.)
25     THE VIDEOGRAPHER: The time is 4:06

| Tietjen - Direct/Bonjean | Page 266 |
| --- | --- |

1  p.m.  Beginning of media number five.  Back on the
2  record.
3  Q.  Okay.  Sergeant, let's look back at
4  your report, page 9 of 19, if you don't mind.
5  A.  Yes.
6  Q.  So after this interview, it looks
7  like you did, in fact, try to get information from
8  the Star Film about -- Star Ledger about any fires
9  that occurred over on Camden Street; right?
10  A.  Correct.
11  Q.  Were you able to at this point
12  connect up that reference by Hairston to the 15th
13  and Bergen fire and the Camden, or were you still
14  not sure about that connection?
15  A.  No, I don't believe that matched up at all.
16  That wasn't -- it wasn't something I recalled
17  coming out as an ah-hah moment because I didn't
18  recall it from Hairston's report that was
19  something that was ah-hah to look at.
20  Q.  I mean, you agree now that that's
21  likely the same fire?
22  A.  Oh, yes, certainly.
23  Q.  Okay.  But at the time, it didn't
24  jump out at you; is that right?
25  A.  No.

| Tietjen - Direct/Bonjean | Page 267 |
| --- | --- |

1  Q.  So it was there under your nose the
2  whole time, you didn't know; right?
3     MR. VOMACKA: Objection to the form.
4  You can answer.
5     MR. LIPSHUTZ: Objection.
6  A.  And I don't even know if I had that form,
7  that report.  The report has been provided to me
8  because we were getting -- like, people at all
9  different -- there were no original copies here.
10  So I don't know where the original file went from
11  '78.
12  Q.  And you don't know whether Hairston
13  actually got any other reports in connection with
14  that --
15  A.  No clue what was done.
16  Q.  But you did find out that there had
17  been a fire and that it was reported on by the Star
18  Ledger on August 22, 1978; right?
19  A.  Right.
20  Q.  And you wrote in your report, 254,
21  256, 258, and 260 Camden Street.  Were those all
22  different buildings to the best of your knowledge?
23  A.  To the best of my knowledge, they were
24  buildings one after each other.  I don't know if
25  any of them were doubles.  I believe they had like

| Tietjen - Direct/Bonjean | Page 268 |
| --- | --- |

1  a small gap between them, but I don't know -- we
2  saw some floor plans that seemed similar in the
3  area but a separation between them.
4  Q.  I'm sorry.  What did you say?
5  A.  But a minimal separation.  So like a large
6  fire would continue on to the next residence and
7  the next.
8  Q.  And 256 was kind of smack dab in the
9  middle?
10  A.  Correct.
11  Q.  Did you develop any information that
12  256 was actually a vacant building at that time?
13  A.  From Philander Hampton, and then the
14  article also says that it was vacant.
15  Q.  That the building was vacant?
16  A.  256, correct.
17  Q.  Okay.  So that's a good piece of
18  corroboration that you developed the day after you
19  got this video-recorded statement from Philander
20  Hampton; right?
21  A.  Correct.
22  Q.  And then fair to say that you
23  continued to try to get information about the fire
24  and the building and so forth and so on?
25  A.  Correct.

Video Deposition

---

Tietjen - Direct/Bonjean                                    Page 269

1  Q.  Did you still have some questions
2  about why -- well, strike that.
3      Did you have some questions about why
4  there were no remains found?
5  A.  No.  1978 everybody was talking about -- we
6  have Jack Eutsey there, who was on the force then.
7  He said there were fires all over the city back
8  then, and abandoned buildings and things burning
9  down, and described that sort of experience of
10 Newark in 1978, indicating that many of the homes
11 were owned by the city as well.  So them not
12 finding remains and having a large fire like that,
13 and speaking to the fire department would support
14 that, that they didn't enter the building to look
15 for remains.
16 Q.  But they did enter the building to
17 look for remains in some of the other buildings;
18 right?  In fact, they saved some people?  The
19 police did; right?
20 A.  People got out, and you have a officer,
21 University Hospital, I believe, at the time come
22 by as well and assist in rescuing residents from
23 the homes.  And I don't think that he went in any
24 further to examine to look for remains because no
25 one was missing to their knowledge that would have

---

Tietjen - Direct/Bonjean                                    Page 270

1  been in the home.  So, you know, they indicated
2  they would only dig out the remains if they were
3  reported someone was trapped in a home or entered
4  to fight the fire, but 256 was reportedly well
5  involved upon their arrival as well.
6  Q.  All right.  I want to draw your
7  attention to November 18th, which would have been,
8  I guess, less than a week later.  You actually had
9  Philander Hampton's cell phone; right?
10 A.  I didn't have it.  I had his number.
11 Q.  Yes, right.  His phone number.  And
12 you just called him up and said, "Meet me over the
13 at the Essex County Prosecutor's Office"?
14 A.  Yeah.  Like, my style of how I interview
15 people is, I think I express an honestly to them,
16 and I develop a little bit of a rapport.  So
17 Philander Hampton was one who was able to
18 communicate with me in that respect, and I -- you
19 know, my whole theory is if I show respect to
20 people when I interview them, in some respect,
21 it's, you know, fitting that they're going to
22 answer my call and talk -- he agreed to -- you
23 know, we had a call, and he answered, and he
24 agreed to meet with us.
25 Q.  Did you give Philander Hampton the

---

Tietjen - Direct/Bonjean                                    Page 271

1  idea that he might not be charged with this crime?
2  A.  No.
3  Q.  Is that why he was so cooperative
4  that he was operating under the assumption that he
5  would not be charged?
6  A.  No.
7  Q.  Did you tell him that he was going to
8  be charged?
9  A.  No.
10 Q.  Did anyone tell him he was going to
11 be charged with this crime that you saw?  Law
12 enforcement?
13 A.  I don't know.
14 Q.  I know you don't know.  That's fine
15 if you don't know.  I'm saying did you hear or
16 observe any other law enforcement official
17 communicate to him that he would be charged in
18 connection with this crime?
19 A.  I just said I don't know.
20 Q.  You don't --
21 A.  I don't know if anyone did that.  I said
22 no, I do not know.
23 Q.  I appreciate you saying you don't
24 know whether anybody did that, but that's not
25 really what I'm asking.  I'm saying did you hear

---

Tietjen - Direct/Bonjean                                    Page 272

1  it?  Did you see it?  Did you observe it?
2  A.  I didn't hear it, didn't see it, didn't
3  observe it.
4  Q.  So the answer is no then?
5  A.  No.
6  Q.  You didn't see or observe or hear
7  those things; right?
8      Did you ever see, observe, or hear
9  any other law enforcement official communicate to
10 Philander Hampton that he would not be charged --
11 A.  No.
12 Q.  -- with -- well, do you recall any
13 conversations about whether or not Philander was
14 going to be charged, with Philander, conversations
15 with Philander about whether he would be charged?
16 A.  No.
17 Q.  So it just never came up whether he'd
18 be charged after confessing to five bodies in a
19 building?
20 A.  I don't know if he was as confused as I
21 was.
22      (Reporter requested clarification.)
23 A.  As confused as even I was.  It's -- you
24 know, he expressed to us what he did, and he went
25 off to jail, and he walked out.  And when I called

---

Evans v.
Newark City

| Tietjen - Direct/Bonjean | Page 273 |
|---|---|

1   him, he answered the phone.  He came in.  He knew
2   that day he was not getting charged.  You know, he
3   walked in.  He walked out of there as well.
4   Q.  How did he know he wasn't getting
5   charged when you asked him to come down?
6   A.  I would have believed when I called him
7   that I probably said to him I just want to meet
8   with him tomorrow, and I wanted to talk to him.
9   You know, that's how that conversation was going.
10  I think we probably would have some conversation
11  to that, but not that he was never going to get
12  charged or that he would some day get charged.
13  Q.  Did you ask you, Hey, I'll come down
14  there, but am I going to get arrested or charged?
15  A.  He may have asked if he was getting
16  arrested that day, but I don't recall that.  That
17  would be a normal conversation potentially in a
18  case like this, like the guy would say, "Hey, am I
19  getting locked up today?"  And I would say, "No."
20  But not that you're not ever, or it's not coming
21  in the future.
22  Q.  But you also never told him he was
23  likely to get charged either; correct?
24  A.  No.
25  Q.  When you say no, you mean that's

| Tietjen - Direct/Bonjean | Page 274 |
|---|---|

1   correct; right?
2   A.  Correct.
3   Q.  And then again, the next day -- wait,
4   hold on.  Back up a second.
5      What did you talk about with
6   Philander on November 18, 2008?
7   A.  You broke up.  On the 18th?
8   Q.  Sure.  My apologies.  What was the
9   substance of your conversation with Philander
10  Hampton on November 18, 2008, at the Essex County
11  Prosecutor's Office?
12  A.  No.  That on the 18th was a talk via cell
13  phone to get him to come in on the 19th.
14  Q.  Got it.  Apologies.  So on
15  November 19th, the following day, he comes down;
16  right?
17  A.  Yes.
18  Q.  So you ask him to come down on the
19  19th.  He obliges, and he's there at the Essex
20  County Prosecutor's Office at 8:00 a.m.; is that
21  right?
22  A.  That's correct.  He's actually there at
23  seven-something.  Before eight.
24  Q.  7:30 a.m.?
25  A.  Yes.

| Tietjen - Direct/Bonjean | Page 275 |
|---|---|

1   Q.  7:39 a.m. right on the dot.
2      And you were present along with
3   Detective Hadley, a Detective Recktenwald; is that
4   right?
5   A.  Correct.
6   Q.  And an Agent Eutsey; right?
7   A.  Correct.
8   Q.  And how long did this meeting last
9   with Philander Hampton which was now about a week
10  out from the November 12th meeting?
11  A.  I don't know an end time.  I know at 9:30
12  he was still there because that's when he showed
13  us how he -- how the boys were stacked in the
14  closet is the way he described it, and he
15  physically used Detective Recktenwald to show --
16  the term stacked is something we keyed up on as
17  were they deceased already and placed in there, or
18  were they laid down, but he showed us by grabbing
19  our sides and placing us in.  That's what he said,
20  stacked.  You know, standing up, not stacked like
21  that.
22  Q.  He suggested they were alive; right?
23  A.  Correct.
24  Q.  Did you believe that?
25  A.  That's what he presented.  I had to believe

| Tietjen - Direct/Bonjean | Page 276 |
|---|---|

1   that as well.  But, you know, could they have been
2   injured?  Possibly.
3   Q.  So it was your belief, you credited
4   Philander's statement that five boys were put into
5   a room, not children, really kind of like young
6   adults, or at least grown -- teenagers; right?
7   A.  Well, he indicated in his statement that
8   Lee Evans just wanted to teach them a lesson.  So
9   whether he was successful in communicating that,
10  that, you know, they're going to get locked in
11  this closet or whatever.  I don't think they were
12  aware that a fire was going to get started there,
13  but that depends if he's diminished some facts,
14  but that's what's presented to us, that they were
15  put in the closet together.  The closet was big
16  enough for the five boys to stand in there.
17  Q.  Well, you'd admit, though, that you
18  know enough about fires to know that it would take
19  some time before a building was engulfed; correct?
20      MR. VOMACKA: Objection to the form.
21  A.  I know with an accelerant, five gallons of
22  gasoline, that I can barely outrun a fire pour
23  with that much gas.
24  Q.  Okay.
25  A.  I was a firefighter years ago myself, and

Evans v.
Newark City

Video Deposition

| Tietjen - Direct/Bonjean | Page 277 |
| --- | --- |

1  it's quick as ever.
2  Q.  Okay.  So when he said stacked, it
3  was a weird use of a word of how they were placed
4  into this closet or room; right?
5  A.  Correct.
6  Q.  All right.  And you had him sketch
7  the room, I guess, a little bit; right?
8  A.  Yes, the actual third floor he sketched.
9  Q.  And he continued to be cooperative
10  during this investigation?
11  A.  Yes.
12  Q.  Do you know whether anyone else wrote
13  a report about this subsequent interview you had
14  with Mr. Hampton?
15  A.  I would have to see all the reports, but I
16  don't know.
17  Q.  Um --
18  A.  I know, I think Recktenwald wrote a report
19  when I turned in the sketch to him.
20  Q.  You think Recktenwald wrote a report?
21  A.  When I turned in the sketch to him, but I
22  don't know if anyone else memorialized this.
23  Q.  But it wasn't video recorded or audio
24  recorded, I see; correct?
25  A.  I don't know.

| Tietjen - Direct/Bonjean | Page 278 |
| --- | --- |

1  Q.  Do you know why it wasn't, or did you
2  make a decision about that?
3  A.  I did not.
4  Q.  And you also started to try to track
5  down Lee Evans as well; correct?
6  A.  Correct.
7  Q.  I noticed that Carrega doesn't seem
8  to be involved anymore, at least according to your
9  report.  Do you remember if that's the case?
10  A.  I don't know what reason he's not mentioned
11  here.  He was not involved in these aspects.  The
12  case developed into a larger component of people,
13  and I believe he was much more involved with the
14  actual structure of it as far as like the lead
15  person.
16  Q.  I'm not sure I understand your answer
17  to that question, so let me see if I can get some
18  understanding.
19       At least according to your report,
20  which memorializes investigative work for the rest
21  of November, and I believe into December, and it
22  does not seem to me to reflect that Carrega was
23  involved in this investigative work; am I wrong
24  about that?
25  A.  You're wrong.

| Tietjen - Direct/Bonjean | Page 279 |
| --- | --- |

1  Q.  Okay.  He just wasn't involved in
2  this aspect of the investigation?
3  A.  He wasn't involved in the tasks that I was
4  assigned to do.
5  Q.  But he was still involved in the
6  investigation?
7  A.  Correct.
8  Q.  And, again, I want to say, I want
9  to -- I'm going to skip along, try to go a little
10  more quickly.
11       On November 21st, 2008, you reached
12  out to Philander Hampton via his cell phone again;
13  correct?  Is that right?
14  A.  Correct.
15  Q.  And he said, "Sure, I'll come in for
16  another polygraph examination."  Is that correct?
17  A.  Correct.
18  Q.  Why did you polygraph him a second
19  time?
20  A.  I need to refer to the report as to what
21  questions were asked, but we were concerned that
22  he may not be providing full details by
23  diminishing certain aspects.  Some of the things,
24  the stacking, the closet, these things, you know,
25  you have to inquire as to did it truly, fully

| Tietjen - Direct/Bonjean | Page 280 |
| --- | --- |

1  happen that way.  They have a gun.  I was
2  concerned that they weren't shot before or injured
3  in some fashion, and it was thought that we would,
4  you know, try to confer with him as far as his
5  truthfulness on those items.
6  Q.  And did he pass the second polygraph?
7  A.  I don't know if he -- I don't know if I
8  even mentioned it in my report because it was not
9  my handling.  I was the one who made the call to
10  him and set it up.
11  Q.  By the way, were there any
12  prosecutors involved in the case up until this
13  point?
14  A.  There were people aware and people part of
15  the meetings, so...
16  Q.  So prosecutors were being debriefed
17  on the investigation?
18  A.  Correct.
19  Q.  At any point prior to, let's just
20  say, November 24, 2008, did you raise a concern
21  with either other detectives or officers or
22  prosecutors about why Philander had not been
23  charged and arrested for this?
24  A.  It's not my house.  I'm there to assist.
25  They decide those things, you know.

Evans v.
Newark City

1  Q.  So you didn't raise that concern?
2  A.  I may have expressed my wonderment as to
3   why he wasn't charged.
4  Q.  Yeah, that's what I'm asking?
5  A.  But it wasn't important enough that I would
6   document or push it.  I am truly a guest there as
7   an assistant to them, and I had certainly an
8   interest in this case and its progression.
9  Q.  Right.  I understand that you
10   wouldn't have necessarily pressed it or documented
11   it, but it sounds like you may have at least
12   informally raised it as --
13  A.  I wouldn't know who.  I'm sure it was a
14   conversation as to what they wanted, being the
15   prosecutor's office, before they would go through
16   with the charge, as far as corroboration or any
17   additional stuff to go over.
18  Q.  And your efforts at interviewing Lee
19   Evans were unsuccessful; would you say that's
20   correct?
21  A.  Correct.
22  Q.  Tell me about the interview with
23   Lenzell Kimble.  How did that come to be?
24  A.  Well, that's his son.  We were trying to
25   speak to the father, but the father was deceased.

1  Q.  Why did you want to speak to him?
2  A.  He was named in the investigation report.
3   I don't recall on what page.  But we were trying
4   to identify him, and I never even spoke to his
5   son.  His son communicated with DOC guards at the
6   facility where he's incarcerated that his father
7   was deceased in 2001, I believe.
8  Q.  Do you have any idea why Michael
9   Recktenwald's report was not prepared until
10   January 4th, 2010, when this polygraph took place
11   back in the fall of 2008?
12  A.  Just like my own report with the time, it's
13   -- I have no -- like, for me it was just a
14   culmination of facts.  I even identify -- I will
15   get back to mine.  I didn't identify that this
16   1988 report that's mine is until December when I
17   spoke to Eileen Gilleece who reached out to me
18   when she heard about this case within the state
19   police.  She reached out to me said, Hey, she
20   worked on this.  I know we worked on it.  We never
21   found the case number.  So she identified what
22   year it was, because the thing about the case is
23   it was from 1978, and my unit comes into effect in
24   1984, and she got involved in it in '88.  That's
25   where this -- so there was a delay for me there

1  as well with the sup.  But I don't know why his
2  report would have that delay as well.  To me that
3  would be not, like, something I would think
4  significant at all.
5  Q.  Well, you understand from the
6  perspective of perhaps a defense attorney that a
7  report that's prepared a year and a half after the
8  events happened might not have the same reliability
9  as a contemporaneously-made report?
10     MR. VOMACKA:  Objection to the form,
11  but you can answer.
12     MR. LIPSHUTZ:  Objection to the form.
13  A.  I understand the potential concern, but I
14  can tell you that how I wrote mine was based upon
15  the notes I had and my memories of those notes,
16  and the notes reflect back to what I wrote.
17  Q.  Notes that you destroyed, though, or
18  did not hand over to the --
19  A.  I don't know --
20     MR. LIPSHUTZ:  Objection to the form.
21     MR. VOMACKA:  Objection to the form.
22  Facts not in evidence.  You can answer.
23  A.  I don't know where they are.  Like, whether
24  I turned them over.  I don't have nothing to say
25  to that as far as --

1  Q.  Well, you testified earlier that you
2  were pretty confident that you did not provide your
3  notes to --
4  A.  Yes, I was pretty confident.  If someone
5  shows me they're there, great.
6  Q.  And it wasn't your practice to give
7  your notes to the prosecutors in a investigation;
8  right?
9  A.  Correct.
10  Q.  I assume it wasn't your practice to
11  give your notes to defense counsel for the accused;
12  right?
13  A.  Well, in this case, I definitely did not.
14  Q.  Okay.
15  A.  But I don't know if I provided it to the
16  county before.  I don't recall what happened to my
17  notes, whether I destroyed them.  I don't -- I
18  have no reference of where they are.  I can
19  certainly look, like I said I would do.  I didn't
20  say they're destroyed.  I don't recall if they
21  were submitted, if anybody requested them.  That
22  wasn't something that 10, now 12 years ago, that I
23  would routinely worry about after I had submitted
24  my report.
25  Q.  But you don't have the understanding

Evans v.
Newark City

Video Deposition

---

Tietjen - Direct/Bonjean                          Page 285

1  that even in connection with the civil lawsuit that
2  was filed back, I don't know, years ago now, that
3  you didn't have an obligation to look for your
4  handwritten notes and provide them, if they were
5  available?
6  A.  I may have looked for them then as well and
7  not have found them, but that's one thing I
8  provided it as part of your lawsuit the documents
9  that I had then.  I mean, this is, what, how many
10 years ago was it first filed?  Like 2016?  I
11 don't know --
12 Q.  About.
13 A.  Like, I provided to them what I had.
14 Q.  Do you remember looking for your
15 handwritten notes at the time that you were doing
16 your diligence and searching for documents in your
17 care and custody?
18 A.  I believe I looked for everything that I
19 had, which would have included notes.
20 Q.  December 12 -- I stand corrected.
21 Here's a mention by Lieutenant Carrega.  On
22 December 12, there was a search of a basement at
23 137 Vassar Avenue?
24 A.  Correct.
25 Q.  And that's at page 16 of 19?

---

Tietjen - Direct/Bonjean                          Page 286

1  A.  Yes.
2  Q.  Why was there a search of a basement
3  at 137 Vassar?
4  A.  At some point, that address was in the
5  report as a potential location of bodies -- who
6  knows if it's bodies related to this case or not
7  -- in the basement, and it had not ever been
8  resolved through, so it's another thing like
9  you're asking about all these other facets did we
10 not look, or did we?  Well, that one we looked at,
11 and to the best of our ability that day with a
12 cadaver dog and looking at the floor in the
13 basement did not come with any significant
14 indication that there would be remains below that
15 concrete floor.  I think that would be good police
16 work to follow up on anything that's presented
17 there.
18 Q.  Yeah, but it's not consistent with
19 Philander's story at all; right?
20 A.  We're going through every single aspect
21 here.
22 Q.  So what I'm saying is you weren't
23 persuaded of Philander's story?
24 A.  No, I wouldn't say I'm not persuaded of
25 Philander's story.  I don't want somebody like

---

Tietjen - Direct/Bonjean                          Page 287

1  yourself asking why I didn't go to 137 Vassar
2  Street when somebody reported there were bodies in
3  the basement.
4  Q.  Well, you have this court-reported
5  statement -- or strike that.
6  You have a video-recorded statement.
7  He's not arrested.  He's not charged; right?
8  A.  Yes, yes.
9  Q.  You have confirmed that there was a
10 fire at the exact location that he allegedly says
11 this is where it happened; right?
12 A.  Correct.
13 Q.  But you're continuing to pursue leads
14 that are inconsistent with what -- hold on.  Let me
15 finish my question.
16 You continued to pursue leads that
17 were inconsistent with his account of what
18 happened; correct?
19 A.  I don't --
20 MR. VOMACKA: Objection to the form.
21 You can answer.
22 A.  I don't think you're understanding the
23 direction of the case here.  I am like the low
24 fruit of the detectives at that time.  There are
25 meetings to determine what we do and what leads

---

Tietjen - Direct/Bonjean                          Page 288

1  we'll follow through.  This isn't me saying, Let's
2  go to 137 Vassar.  Whether it's an AP saying, Hey,
3  there's 137 Vassar out there, let's square this
4  away, because they know nobody is going to ask
5  about it later.  I didn't write down who made it
6  an assignment, but it was an assignment.  All of
7  these are assignments.
8  Q.  Okay.  Somebody made the call --
9  maybe it wasn't you, but somebody made the call to
10 check out a lead on December 12, 2008, that was not
11 in any way consistent with Philander Hampton's
12 account of what happened; can we agree on that?
13 MR. VOMACKA: Objection to form.  You
14 can answer the question.
15 A.  Yes.
16 Q.  I think you agreed; right?
17 A.  Yes.
18 Q.  Do you remember interviewing Kevin
19 Royster?
20 A.  What page is that on?  I don't have it in
21 my memory.
22 Q.  Oh, my apologies.  It wasn't an
23 interview.
24 Do you remember reading the
25 interviews of either Gregory Royster or Kevin

---

---

Tietjen - Direct/Bonjean                                    Page 289

1    Royster?
2  A.  I don't recall them.
3  Q.  Okay.  I'm not going to spend time.
4    That's fine.
5      Okay.  And as of June 25, 2009,
6  again, you know, about at least six months, more
7  than six months after the video-recorded statement
8  of Philander Hampton, the case wasn't closed;
9  right?
10 A.  Correct.
11 Q.  And did you believe that there was
12 any other investigative work that could be done at
13 that point?
14 A.  At that point, I don't know everything that
15 was all done, so I can't answer that.
16 Q.  Well, did you see any need for
17 investigative work to be done at that point?
18 A.  Just like I stated, I was just a low-level,
19 and at that point, I was significantly removed
20 from the investigation, so I don't know where
21 their steps were leading them.
22 Q.  Sometime after June 25, 2009, in or
23 around March of 2010, things changed; correct?
24 A.  Correct.
25 Q.  There was an indication that the

---

Tietjen - Direct/Bonjean                                    Page 290

1    Essex County Prosecutor's Office was going to
2  pursue charges against Philander Hampton and Lee
3  Evans; right?
4  A.  Correct.
5  Q.  Do you know why at that point?
6  A.  No.
7  Q.  They just decided to do that?
8  A.  No.
9  Q.  Okay.  I want to ask you before we
10 move on to that, but before we get there, did you
11 ever make any promises to Philander Hampton for
12 leniency or any type of benefits in exchange for
13 his cooperation in the case?
14 A.  Was.
15 Q.  Did you ever hear any of your fellow
16 officers make any promises of leniency and/or offer
17 any type of benefit to Philander Hampton in
18 exchange for his cooperation in the case?
19 A.  No.
20 Q.  Did you ever hear any of your fellow
21 officers make any promise of -- non-prosecution
22 promises to Philander Hampton in exchange for his
23 cooperation in identifying Lee Evans as the culprit
24 in the case, or the offender?
25 A.  No.

---

Tietjen - Direct/Bonjean                                    Page 291

1  Q.  Did you make any promise of
2  non-prosecution, or just, I'll put in a good word
3  type of thing, if he cooperated and provided
4  information about Lee Evans?
5  A.  No.
6  Q.  Did you ever hear any communications
7  made to Philander Hampton by anybody that would
8  lead the average person to believe that Philander
9  Hampton would not be charged with this crime if he
10 just cooperated and inculpated Lee Evans?
11 A.  No.
12 Q.  In your questioning of Mr. Hampton,
13 either on November 12th of 2008, or any subsequent
14 times, did you have the impression that he did not
15 realize he was implicating himself in the crime?
16 A.  No, I fully think he realized what he was
17 saying.
18 Q.  So you mentioned earlier that
19 sometimes people minimize their culpability, which
20 I think you're right about that.  Did you believe
21 or even cultivate the view that maybe he was not
22 legally responsible for the deaths of the boys
23 since he didn't light the match?
24 A.  No, I didn't think that.
25 Q.  So as you sit here today, are you

---

Tietjen - Direct/Bonjean                                    Page 292

1    confident that Philander Hampton understood that he
2  was inculpating himself, or implicating himself, in
3  this crime when he made this statement on
4  November 12, 2008?
5  A.  Yes.
6  Q.  Do you have any idea what prompted
7  the prosecutor's office to pursue the case with the
8  evidence that had been available 18 months earlier?
9      MR. VOMACKA: Objection to form, but
10 he can answer.
11 A.  I have no clue what led to the delay.
12 Q.  You would agree, though, that
13 ultimately the evidence that was used to indict Lee
14 Evans was the same evidence that was available on
15 November 12, 2008; right?
16     MR. VOMACKA: Objection to the form,
17 but you can answer.
18 A.  I don't know if there was any other
19 evidence involved in the indictment, but I know
20 that they should have had a decent amount, and we
21 verified the fire, so within that month and a
22 half, say.  The Delk report coming in April of '19
23 -- or 2009, definitely added to that as well.
24 Q.  Corroborating the fire is just
25 corroborating Philander Hampton's version of

---

Evans v.
Newark City                                          Video Deposition

---

Tietjen - Direct/Bonjean                                    Page 293

1  events; right?
2      MR. VOMACKA: Objection to the form,
3  but you can answer.
4  A.  Delk also provided information about two
5  males running from that third floor out the back
6  of Bergen Street.
7  Q.  Well, Delk didn't see that.
8  A.  No.  Delk spoke with people who
9  corroborated that.
10  Q.  But you didn't talk to anybody who
11  saw that; right?
12  A.  Excuse me?
13  Q.  Did you ever speak to anybody who saw
14  that with their own two eyes?
15  A.  No, I wish I did.  I'm speaking about what
16  was generating during the case between November
17  and that time.
18  Q.  Right.  Okay.  But to be clear, I
19  know what -- I know that there was a statement
20  within the Delk, Harris Delk report, a
21  witness seeing this, but you would agree, I think
22  you know probably, basically that that, of course,
23  is a hearsay statement contained in a report;
24  right?
25  A.  Correct, but --

---

Tietjen - Direct/Bonjean                                    Page 294

1      MR. LIPSHUTZ: Objection.
2  Q.  Is that correct?
3  A.  That's what I said.  Correct.
4  Q.  Yes.  And are you aware of whether
5  anybody was able to get or find any witness who
6  actually could confirm that that is what he or she
7  saw?
8  A.  They were unable to.
9  Q.  So, again, that was not evidence that
10  you were able to present because hearsay is not
11  admissible; right?
12      MR. LIPSHUTZ: Objection to the form.
13      MR. VOMACKA: Objection to the form.
14  You can answer.
15  A.  Correct.
16  Q.  I would like you to look, if you
17  would, please -- I'm going to have you look at --
18  we're going to mark it as an exhibit -- Carrega
19  affidavit.
20      (Tietjen-6, Carrega affidavit in
21  support of arrest warrants, Bates ECPO 257 through
22  259, was received and marked for identification.)
23  Q.  Let me know.  We are going to call
24  this Tietjen-6.  Have you seen this document
25  before, Sergeant?

---

Tietjen - Direct/Bonjean                                    Page 295

1  A.  Yes.
2  Q.  And what is it?
3  A.  It's the affidavit to support for arrest
4  warrants.
5  Q.  This was prepared by whom?  Whose
6  affidavit is it?
7  A.  It's Louis Carrega.
8  Q.  Okay.  And this was the factual basis
9  for providing probable cause to support an arrest
10  warrant of the evidence?
11  A.  Correct.
12  Q.  I want to go through a couple pieces
13  of it.  One just deals with the background of
14  Lieutenant Carrega, paragraph one; right?
15  A.  Correct.
16  Q.  And two identifies that this
17  affidavit relates to the five missing boys that
18  occurred in Newark on August 20, 1978; right?
19  A.  Correct.
20  Q.  And then it says it's being offered
21  in support of the state's application for an arrest
22  warrant for both Philander and Lee Evans; right?
23  A.  Yes.
24  Q.  Now, paragraph four, "On August 20,
25  1978," do you see that?

---

Tietjen - Direct/Bonjean                                    Page 296

1  A.  Yes.
2  Q.  This is information that was
3  available in 1978; correct?
4  A.  Correct.
5      MR. LIPSHUTZ: Objection.
6  Argumentative.
7  Q.  And actually paragraph five was
8  information that was available in 1978 that the
9  five boys had been seen in the company, or last
10  seen and -- "had last been seen in the company of
11  Lee Evans, a local contractor."  Correct?
12  A.  Yes.
13      MR. LIPSHUTZ: Objection to the form.
14  Q.  And would you agree actually that the
15  paragraph six also contains information that was
16  available in the 1978, from the 1978 investigation?
17  A.  Yes.
18  Q.  Same for, I guess, paragraphs seven
19  through nine; right?
20  A.  Yes.
21  Q.  Okay.  And then paragraph ten relates
22  to the fire at 256 Camden Street; correct?
23  A.  Yes.
24  Q.  And that was information that was
25  obtained, according to you, the very first time it

---

Evans v.
Newark City                                                              Video Deposition

| Tietjen - Direct/Bonjean | Page 297 |

1  was obtained was from Philander Hampton; correct?
2  A.  Correct.
3  Q.  And then paragraphs 11 through 12 --
4  I'm sorry -- paragraph 11 summarizes what Philander
5  Hampton revealed during his video recorded
6  statement; right?
7  A.  Yes.
8  Q.  Okay.  And then 12 is culled from
9  historical data that the buildings were
10  subsequently demolished; right?
11  A.  Yes.
12  Q.  So in terms of evidence that pointed
13  the finger at Lee Evans as the perpetrator really
14  turned on the statement of Philander Hampton;
15  correct?
16      MR. VOMACKA: Objection to the form.
17      MR. LIPSHUTZ: Objection to the form.
18  Argumentative.
19      MR. VOMACKA: You can answer.
20  Q.  Is that right?
21  A.  Yes.
22  Q.  In fact, the evidence that came from
23  Philander Hampton, which included information about
24  the fire, first came from him, was the only new
25  evidence that was developed in the course of the

| Tietjen - Direct/Bonjean | Page 298 |

1  investigation, at least that's reflected in this
2  affidavit in support, right?
3      MR. VOMACKA: Same objection.
4      MR. LIPSHUTZ: Same objection.
5  A.  Admission, and then the fire is the only.
6      (Reporter requested clarification.)
7  Q.  The admission, and the -- I'm sorry.
8  I don't want to put words in your mouth.
9  A.  He discussed -- the fire is new to us in
10  here, and then his statements he made to us in
11  his statement.
12  Q.  But the evidence about the fires
13  wouldn't mean anything without Philander Hampton's
14  statement; right?
15      MR. VOMACKA: Objection to the form.
16      MR. LIPSHUTZ: Objection to the form.
17      MR. VOMACKA: Argumentative.  You can
18  answer the question.
19  A.  Correct.
20  Q.  Really -- the information about the
21  fires was -- really corroborated Philander
22  Hampton's account of what happened; correct?
23      MR. VOMACKA: Same objection.  You
24  can answer.
25  Q.  In other words, without Philander

| Tietjen - Direct/Bonjean | Page 299 |

1  Hampton's statement, just evidence about those
2  fires wouldn't tell us anything about whether or
3  not Lee Evans did it or not; right?
4      MR. VOMACKA: Same objection.  You
5  can answer.
6  A.  Yes.
7      MS. BONJEAN: All right.  I believe I
8  may be finished, but what I would like to do is if
9  you can give me two minutes to check my notes, so
10  when I go off, and then make sure that I haven't
11  missed anything, and then anybody else can
12  proceed.  Okay.  We can go off the record.
13      THE VIDEOGRAPHER: The time is 4:47
14  p.m.  Off the record.
15      (Break taken.)
16      THE VIDEOGRAPHER: The time is 4:52
17  p.m.  Back on the record.
18      BY MS. BONJEAN:
19  Q.  Just a couple questions.  Sergeant
20  Tietjen, do you know whose decision it was to
21  ultimately decide to bring charges against Lee
22  Evans and Philander Hampton for this case?
23  A.  No.
24  Q.  Were you present during any
25  conversations when that decision was made?

| Tietjen - Direct/Bonjean | Page 300 |

1  A.  No.
2  Q.  So the decision was already made by
3  the time that you were at a meeting in March of
4  2010?
5  A.  Yeah.  The day of the meeting was the day
6  that the complaints were signed.
7  Q.  Right.  So you weren't present for
8  any prior meetings where it was discussed?
9  A.  No.
10  Q.  And you don't know as you sit here
11  today who ultimately made that decision, if anyone?
12  A.  No.
13  Q.  And you don't know why or the basis
14  for the decision either; correct?
15  A.  No.
16  Q.  Just a couple questions.  Have you
17  ever been disciplined in the course of your
18  employment as a police officer in the state police?
19  A.  No.
20  Q.  And have you been the subject of any
21  civilian complaints?
22  A.  Yes.
23  Q.  Do you know approximately how many?
24  A.  Maybe two.
25  Q.  In 25 years, just two, huh?

| Tietjen - Direct/Bonjean | Page 301 |
|---|---|

1 A. Yes.

2 Q. And do you know what they were about?

3 A. It was a traffic stop related. Well, one

4 is traffic stop related and one was a unit

5 related.

6 Q. A what related?

7 A. I was in a unit where we had a sergeant

8 first class who was undermining lieutenants, and

9 someone left either human feces or dog feces in

10 his mailbox, and he accused the entire unit. I

11 was a principal in that one. And then I had a

12 traffic stop where the individuals had a large bag

13 of currency --

14 (Reporter requested clarification.)

15 A. A large bag with money in it, like full of

16 money. So they weren't arrested, they were

17 released with the money, but they tried to

18 indicate that the stop was racially profiling,

19 which was a motor vehicle violation. They were

20 able to prove where the money came from and what

21 it was going to, which was fine. They were never

22 under arrest ever.

23 Q. Okay. Have you ever been sued for

24 any Civil Rights violations?

25 A. Not that I'm aware of. I had a civil suit

| Tietjen - Direct/Bonjean | Page 302 |
|---|---|

1 years ago because I was named as a detective in

2 the case, but I don't think it was a Civil Rights

3 violation. I never had any depositions in it. So

4 not that I'm aware of.

5 Q. Do you know what --

6 A. Repeat that.

7 Q. Do you know what the allegation

8 generally was?

9 A. No. It was related -- it was so long ago.

10 I was on the Turnpike. It wasn't my case, but I

11 was one of the people that assisted in the case at

12 some point.

13 Q. Was it a case that was filed in state

14 court?

15 A. I believe it was federal court, but I

16 didn't get anywhere with it.

17 Q. And you don't remember what the

18 subject matter of the allegation was?

19 A. No. Our Civil Proceedings Unit should have

20 a copy of that.

21 MS. BONJEAN: Okay. I don't think I

22 have any additional questions for Sergeant

23 Tietjen. Thank you for your time.

24 MR. LIPSHUTZ: Rebecca, do you have

25 questions?

| Tietjen - Cross/Lipshutz | Page 303 |
|---|---|

1 MS. ROSEN: I do have some questions.

2 MR. LIPSHUTZ: Do you want me to go

3 first, or do you want to go?

4 MS. ROSEN: You can go first.

5 MR. LIPSHUTZ: Okay. I'll be quick.

6 CROSS-EXAMINATION BY MR. LIPSHUTZ:

7 Q. Detective Sergeant, I have a couple

8 questions about a report that you haven't talked

9 about, I don't think. It's the report, March 22nd,

10 2010. I think it's part of your April 21st, 2001,

11 supplemental report.

12 Do you have that in front of you, or

13 can you find it?

14 A. Yes.

15 Q. Do you have it in front of you?

16 A. Yes.

17 MR. LIPSHUTZ: Was that marked,

18 Jennifer? Or court reporter?

19 (Tietjen-7, Tietjen supplemental

20 report dated 4/21/10, Bates ECPO 1315 through

21 1317, was received and marked for identification.)

22 MS. BONJEAN: Do you have the Bates

23 stamp as well?

24 MR. LIPSHUTZ: I'm looking at the one

25 you uploaded. It's ECPO 1315 through 1317. Three

| Tietjen - Cross/Lipshutz | Page 304 |
|---|---|

1 pages.

2 Q. Okay. But before we get to that

3 report, Detective Sergeant, you're part of a

4 Missing Persons Unit at the time of this

5 investigation; right?

6 A. Yes.

7 Q. Do you know what unit Sergeant Henry

8 and Detective Hadley were part of?

9 A. I think it was a like a Robbery/Homicide.

10 A Robbery -- I think it was just a Robbery. I

11 don't know if it was Robbery/Homicide back in the

12 day. I don't know the exact name of their unit.

13 Q. Well, maybe could you return to the

14 second page of this report, the number 7, the Bates

15 stamp 1316, the second page?

16 A. Oh, I have Cold Case Unit, but I don't even

17 know if they had a Cold Case Unit, so that may

18 have been a mistype there.

19 Q. Well, if you read that, does that

20 refresh your recollection?

21 A. I don't know if they had a Cold Case Unit.

22 Like, I think that was, like, when I'm reading it

23 there, I don't know if I miswrote that, as I'm

24 reading it right now, or if it was correct.

25 Q. Well, I can't tell you one way or the

Video Deposition

| Tietjen - Cross/Lipshutz | Page 305 |
|---|---|

1 other. I'm sure they would tell you but --
2     MS. BONJEAN: Okay. Now it's
3 editorializing.
4 Q. Right. Okay. So you're not really
5 sure what unit they were assigned to?
6 A. Correct.
7 Q. And Carrega, do you know what unit he
8 was assigned to within the prosecutor's office?
9 A. I believe it's the Homicide Unit, and he
10 was assigned the cold case aspect of their, like,
11 unit.
12 Q. So he was a Homicide Unit detective
13 and handling a cold case?
14 A. Yes.
15 Q. Now, did you ever take directions
16 from Joe Hadley as part of your work on this case?
17 A. No.
18 Q. Did you ever take directions from
19 Sergeant Henry as part of your work on this case?
20 A. No.
21 Q. There's been words thrown about in
22 this deposition about a team and a crew. And what
23 was your understanding about the role of Joe Hadley
24 and Sergeant Henry, if you even have an
25 understanding?

| Tietjen - Cross/Lipshutz | Page 306 |
|---|---|

1 A. They were, as I was, part of this, whatever
2 you want to say, team, or whatever, that was
3 trying to resolve this case. I know Newark is the
4 lead on the missing person's case through, and
5 then the county started the backup, and they were
6 over as part of a co-investigation, co-op.
7 Q. Am I correct that at the outset, it
8 was a cold case, missing persons file, but then at
9 some point it turned into a homicide investigation;
10 am I correct?
11 A. Yes.
12 Q. Because, as I understand it, you and
13 the other officers didn't know there was a homicide
14 until Philander Hampton told you; am I correct
15 about that?
16 A. Correct.
17 Q. Okay. So take a look at this report,
18 this supplemental report here, and the first page
19 says that on Monday, March 22, 2010, that you
20 attended a meeting at the prosecutor's office, and
21 present at that meeting was Prosecutor Laurino; do
22 you remember that?
23 A. Yes.
24 Q. Okay. And the Homicide Unit
25 director, Greg DeMattia?

| Tietjen - Cross/Lipshutz | Page 307 |
|---|---|

1 A. Correct.
2 Q. Chief of Essex County Prosecutor's
3 Office Detective Anthony Ambrose was present?
4 A. Correct.
5 Q. Lieutenant Carrega?
6 A. Yes.
7 Q. Henry Hadley and Murad Muhammed from
8 the Newark Police Department?
9 A. Yes.
10 Q. Okay. Now, what do you recall
11 happened at that meeting? Actually, let me ask you
12 this. What do you recall Sergeant Henry saying at
13 that meeting, if anything?
14 A. I don't recall anything.
15 Q. What do you recall Detective Hadley
16 saying at that meeting, if anything?
17 A. Nothing.
18 Q. Okay. That's ambiguous. Do you not
19 recall?
20 A. I don't recall anything he said or Henry
21 said.
22 Q. Okay. What do you remember about
23 that meeting at all?
24 A. It was discussed that they had
25 authorization for the arrest warrants.

| Tietjen - Cross/Lipshutz | Page 308 |
|---|---|

1 Q. Who is they?
2 A. The county had obtained.
3 Q. Okay. So that's what I'm confused
4 about. I understand at that meeting you guys
5 figured out a plan to go and arrest Hampton and
6 Evans; right?
7 A. Correct.
8 Q. But the authorization for the
9 warrant, did that come from anyone from the Newark
10 Police Department or division?
11     MS. BONJEAN: Objection. Form,
12 foundation.
13 Q. Did you understand my question?
14 A. Yes. And no, it did not. I don't know if
15 they were consulted, but as far as I know, it was
16 the county, someone in the county would have
17 decided to press forward.
18 Q. Have you ever sought an arrest
19 warrant --
20 A. Yes.
21 Q. -- before a judge? You have. Okay.
22     Did you understand that your role in
23 this case at any point would be to seek a warrant
24 for the arrest of Evans or Hampton?
25 A. Yes.

Evans v.
Newark City

Video Deposition

| Tietjen - Cross/Lipshutz | Page 309 |
|---|---|

1 Q.  No, you personally?
2 A.  No, no, no, never me.
3 Q.  Why not?
4 A.  I was an assistant on this.  It wasn't my
5 case.
6 Q.  Did you have any understanding that
7 Detective Hadley or Sergeant Henry would have the
8 obligation to go seek a warrant for the arrest of
9 Evans or Hampton?
10 A.  No.
11 MS. BONJEAN: Objection.  Form,
12 foundation.
13 Q.  You did not have that understanding?
14 A.  No.
15 Q.  It may be a badly formed question.
16 A.  No, I did not.
17 Q.  Okay.  Last question, or last topic.
18 Philander Hampton's statement.  Did you then have
19 any reason to believe that Hampton lied about Lee
20 Evans' involvement in the homicide of these five
21 teenagers?
22 A.  No.
23 Q.  Today, at your deposition, do you
24 have any reason to believe that Hampton lied about
25 Lee Evans' involvement in the homicide of these

| Tietjen - Cross/Lipshutz | Page 310 |
|---|---|

1 five teenagers?
2 A.  None whatsoever.
3 Q.  What do you mean "none whatsoever"?
4 A.  No, like an emphatical [sic] no.
5 Q.  Well, you're aware -- you obviously
6 are aware that a jury acquitted Lee Evans; right?
7 A.  Correct.
8 Q.  Now, does that change your opinion --
9 A.  No.
10 Q.  -- or your belief?
11 A.  No, no.
12 Q.  Why not?
13 A.  Because I know what was presented to us,
14 and I know what was presented in trial, and there
15 were statements made as I sat there that were
16 different than what was provided as well.  You can
17 look at the transcript.  I saw the case change, so
18 I thought when I was there that this was
19 definitely not going to happen.  But I still
20 believe wholeheartedly that Lee Evans and
21 Philander Hampton killed those boys in that
22 building.
23 MR. LIPSHUTZ: Okay.  I don't have
24 any other questions.  Thank you, Detective
25 Sergeant.

| Tietjen - Cross/Rosen | Page 311 |
|---|---|

1 MS. ROSEN: I just have a few
2 questions.
3 CROSS-EXAMINATION MS. ROSEN:
4 Q.  Lieutenant -- Sergeant, were you
5 involved in the arrest of Lee Evans?
6 A.  Yes.
7 Q.  Do you know who ordered Carrega to
8 stay in the office on the date of Evans' arrest?
9 A.  I don't know any of that.
10 Q.  And do you know who arrested Evans?
11 A.  Myself and Sergeant Henry arrested Evans.
12 I believe the other detectives there was Hadley
13 and Murad Muhammed.  And then he was transported
14 from our location, I believe, by Lieutenant
15 Carrega.  I'm pretty positive he's the one that
16 transports him to the county.  So to say he was
17 locked in his room would be not anything I was
18 aware of.
19 Q.  And how do you know that Carrega
20 transported him?
21 A.  I was on the scene of the arrest.
22 Q.  So you saw him transport him?
23 A.  I saw him depart with him.  To the best of
24 my recollection, I believe he was even at
25 Philander Hampton's arrest, too, but I wasn't at

| Tietjen - Cross/Rosen | Page 312 |
|---|---|

1 that location.
2 Q.  So how do you know that he was there?
3 A.  No, that's my belief.
4 Q.  What's the basis for your belief?
5 A.  We had broken up into teams.
6 Q.  I don't understand.  Can you give
7 more information about that?
8 A.  Well, we broke up into arrest teams who
9 would go to what location.
10 Q.  So you knew that he was part of
11 arrest team assigned to that arrest?
12 A.  I didn't write that down.  That's my
13 recollection.  I believe he was the one who went
14 to -- if I was at Lee Evans, but I also wrote that
15 Lieutenant Carrega and other Essex County
16 Detectives --
17 (Reporter requested clarification.)
18 A.  I wrote that Lieutenant Carrega and other
19 Essex County detectives responded to our location
20 to transport Lee Evans to the Essex County
21 Prosecutor's Office.
22 Q.  And did you also write down that
23 Carrega was part of the arrest of Hampton?
24 A.  No, I did not.
25 Q.  So it's just your recollection --

Evans v.
Newark City

Video Deposition

---

| Tietjen - Cross/Rosen | Page 313 |
| --- | --- |

1  A.  Correct.
2  Q.  -- based on conversations with
3  someone?
4  A.  No, just based upon my memories of that
5  day.
6  Q.  Okay.
7  A.  Whether he made it there or not, I don't
8  know.
9  Q.  Do you know who Evans spoke to when
10  he was brought in?
11      MS. BONJEAN: Objection.  Form.
12  Q.  When he was arrested, do you know who
13  he spoke to?
14      MS. BONJEAN: Objection.  Foundation
15  as well.  Sorry for the late objection.
16  A.  I'm trying to figure out like in the
17  interview room that he was brought into, it was
18  myself and Detective Hadley who tried to initiate
19  an interview.  I don't know if anybody had any
20  words at all with him prior to that.
21  Q.  And did he ask for an attorney?
22  A.  Yes.
23  Q.  Did he speak to an attorney at that
24  time?
25  A.  No.

---

| Tietjen - Cross/Rosen | Page 314 |
| --- | --- |

1  Q.  Okay.  I just have a few more
2  questions.  So when you were first assigned to the
3  case in May of 2008, you had said that Carrega had
4  identified Evans as a lead suspect.  How do you
5  know that Carrega had said that he had Evans as a
6  lead suspect at that time?
7  A.  Because that's what he discussed with me.
8  Q.  Do you remember when he discussed
9  that?
10  A.  We spoke that day on May 8th.  We had a
11  short conversation there and then set up our
12  meeting as well and then called me -- or on May
13  2nd.  May 8th he called my about Philander
14  Hampton, and then we had a meeting on the 9th.
15  Q.  And do you have notes to that effect?
16  A.  I have reports to that effect.
17  Q.  Okay.  And how do you remember after
18  that meeting that Carrega asked you to look into
19  information about Philander Hampton?
20  A.  Because I took notes of the conversation,
21  the information about Philander Hampton, and then
22  memorialized it in my report.
23  Q.  You had said earlier that Carrega
24  probably told you about the psychic.  Why do you
25  think it was Carrega that had told you that

---

| Tietjen - Cross/Rosen | Page 315 |
| --- | --- |

1  information?
2  A.  That's just a probably.  Because he was
3  intimately involved with the case.  I don't know
4  who did, but I'm just surmising it was him, so
5  it's not a yes or no.  I don't know who.
6  Q.  Is it possible that you got that
7  information from someone else?
8  A.  It's possible, yes.
9  Q.  So you had said earlier when -- on
10  November 12, 2008, that Carrega would know whether
11  Hampton consented to go to Newark.  Why did you say
12  that?
13  A.  I guess that would be -- he was the one who
14  organized it, so he would be the one to discuss
15  that with.  I don't have --
16      (Reporter asked for clarification.)
17      MS. BONJEAN: He said he didn't have
18  a report written by him or notes; right?
19  A.  Yes.  He was the one who was organizing the
20  whole thing.  So someone there, whether it's
21  Carrega or not, obtained that consent, verbal or
22  whatever, to go on to Newark.
23  Q.  It could have been someone other than
24  Carrega, though?
25  A.  Correct.

---

| Tietjen - Redirect/Bonjean | Page 316 |
| --- | --- |

1  Q.  And how do you know that Hampton went
2  in the vehicle with Carrega to Newark?
3  A.  Because he told me.
4      MS. ROSEN: Those are all my
5  questions.  Thank you.
6      MS. BONJEAN: I just have maybe one
7  other two based on that, unless someone else has.
8  I don't know if there's anyone else.
9      MR. LIPSHUTZ: I have nothing else.
10      MS. BONJEAN: Okay.  And does
11  Sergeant Tietjen's attorneys have anything for
12  him?
13      MR. DIFRANCESCO: No, we have no
14  questions.
15      REDIRECT EXAMINATION BY MS. BONJEAN:
16  Q.  I just want to be clear on something.
17  You were asked to assist in this investigation by
18  Lieutenant Carrega; is that right, Sergeant?
19  A.  Yes.
20  Q.  And there were other officers who
21  were assisting in the investigation; correct?
22  A.  Yes.
23  Q.  And whether we call it a team or
24  whatever word you want to use, there were a number
25  of you working and collaborating together to

---

Rizman Rappaport (973)992-7650
"When every word counts"

Tietjen - Redirect/Bonjean                        Page 317

1    investigate this cold case in order to bring it to
2    a conclusion; correct?
3  A.   Correct.
4  Q.   And it's your understanding that both
5    Detectives Hadley and, I guess, Sergeant Henry were
6    part of this group that was working together to
7    solve the case of the five missing boys; correct?
8  A.   Correct.
9  Q    And, in fact, all of you individuals
10   had different tasks that you were assigned to do
11   with the goal of solving the case of the five
12   missing boys; right?
13 A.   Yes.
14 Q.   And at the time that -- you testified
15   to this.  But at the time you came on the case,
16   they were presumed dead, or at least certainly
17   after you did your initial Experian look at the
18   case, they were presumed dead; is that right?
19 A.   Yes.
20 Q.   And all the individuals I just
21   mentioned were, in fact, present for Philander
22   Hampton's statement, including yourself; correct?
23     MR. VOMACKA: Objection to form, but
24   you can answer.
25 A.   You'd have to -- all of them.  Let's go

Tietjen - Redirect/Bonjean                        Page 318

1    over the names again.  Henry, Hadley, Carrega, and
2    myself; is that what you're saying?
3  Q.   Yes.
4  A.   Yeah, we were all present.  Henry was not
5    in the room.  Whether he was actively monitoring
6    the video on a monitor or outside or not, I don't
7    know.
8  Q.   Okay.  And ultimately, I think what
9    you said in response to Mr. Lipshutz's question was
10   that the prosecutors ultimately made the decision
11   to indict?
12 A.   Yes, someone there.
13 Q.   And the prosecutors relied on your
14   work and your fellow officers' work in securing an
15   indictment against Philander Hampton and Lee Evans;
16   correct?
17     MR. VOMACKA: Objection to the form
18   and foundation.
19     MR. LIPSHUTZ: Objection to form.
20     MR. VOMACKA: You can answer.
21 A.   I don't know what was presented to get the
22   indictment.  I know I provided my case work to
23   them.
24 Q.   Right.  Well, Philander Hampton
25   testified before the Grand Jury.  And if Philander

Tietjen - Redirect/Bonjean                        Page 319

1    Hampton testified before the Grand Jury consistent
2    with what he told you and your fellow officers,
3    would you agree that that evidence was developed
4    first by you and your fellow officers, Mr. Hadley,
5    Mr. Henry, and Lieutenant Carrega?
6  A.   Yes.
7      MS. BONJEAN: I have nothing further.
8    Thank you.  All right.
9      MR. LIPSHUTZ: Sounds like we're all
10   done, Detective Sergeant.  Nice to meet you.
11     Oh, by the way, I do have one
12   question.  Have we spoken before or met or talked
13   before, Detective Sergeant?
14     THE WITNESS: I don't know.  I mean,
15   it's -- I don't recognize you.
16     MR. LIPSHUTZ: Okay.  Thank you.
17   That's all.
18     MR. VOMACKA: Thank you, Audrey.
19     MS. BONJEAN: Thank you, Audrey.
20     THE VIDEOGRAPHER: The time is 5:16.
21   This concludes the deposition.
22     MR. LIPSHUTZ: Oh, I'd like a copy of
23   the transcript.
24     (Concluded at 5:44 p.m.)
25

Page 320

1                 CERTIFICATE OF OFFICER
2
3        I CERTIFY that the foregoing is a true and
4    accurate transcript of the testimony and
5    proceedings as reported stenographically by me at
6    the time, place and on the date as hereinbefore
7    set forth.
8
9        I DO FURTHER CERTIFY that I am neither a
10   relative nor employee nor attorney or counsel of
11   any of the parties to this action, and that I am
12   neither a relative nor employee of such attorney
13   or counsel, and that I am not financially
14   interested in the action.
15
16
17
18            AUDREY ZABAWA, C.C.R.
               Certificate No. XI01410
19
20
21
22
23
24
25

Page 321

1
2     I, WILLIAM TIETJEN, JR., have read the

3 foregoing transcript and hereby certify that it is

4 a true and accurate transcript of my testimony.

5

6

           WILLIAM TIETJEN, JR.

7

8

9

10

11 Sworn and subscribed to before me

12 this    day of        , 2020.

13

14

15

16 A Notary Public of the

17 State of          .

18 My Commission Expires:

19

20

21

22

23

24

25

**[**

**[sic] (4)**
151:3,3;235:12;
310:4

**A**

**abandoned (3)**
191:20;195:18;
269:8
**abide (1)**
224:20
**abided (1)**
225:10
**ability (9)**
7:12;17:8;33:7;
56:19;155:2;199:8;
202:4;216:15;286:11
**able (47)**
17:7;52:16;88:20;
110:16,18,22;115:18,
19,24;116:5,11,18;
121:11,19;127:13;
128:4;132:6,24;
133:2,17;134:5;
139:25;142:13,17;
147:24;154:25;155:6;
160:17;162:5;167:21;
173:16;174:14;
176:13;177:3,24,25,
25;204:13;229:25;
230:2;247:24;258:24;
266:11;270:17;294:5,
10;301:20
**above (3)**
27:12;41:20;226:10
**academy (8)**
14:1,3,5,8,11,13,16,
22
**accelerant (1)**
276:21
**acceptance (1)**
13:25
**accepted (3)**
13:24;61:25;63:2
**access (2)**
51:12;199:8
**accessible (1)**
260:4
**accident (1)**
6:16
**accidental (1)**
265:7
**accidents (1)**
15:10
**accomplish (1)**
96:19
**according (13)**
48:2;84:20;85:23;
107:1;113:7;131:4;
175:25;233:22;234:3;

238:19;278:8,19;
296:25
**account (4)**
111:9;287:17;
288:12;298:22
**accounts (1)**
118:8
**accurate (8)**
25:20;26:13;28:5;
62:4,5,22;83:1;85:8
**accused (1)**
31:4;284:11;301:10
**accusing (1)**
140:10
**acquitted (1)**
310:6
**ACS (2)**
180:6,15
**act (1)**
143:2
**acting (1)**
27:24
**actions (3)**
29:15;228:16;
258:21
**active (9)**
99:11;123:19;
203:14,17,23;204:2,9,
10;250:21
**actively (4)**
45:2;136:25;159:3;
318:5
**activity (1)**
36:20
**actual (6)**
74:12;175:20;
212:10;251:5;277:8;
278:14
**Actually (46)**
11:11;35:14;53:13;
58:23;60:12;64:17;
76:7,19;83:8,10,25;
84:19;102:25;104:12;
106:8;107:3;108:8,
19,20;110:11;116:5;
122:17;125:9;126:16,
22;139:6;151:18;
160:1;165:19;169:5;
193:1;224:7;233:2;
244:15;246:6;247:6;
251:4,10;267:13;
268:12;270:8;274:22;
294:6;296:7,14;
307:11
**add (1)**
155:11
**added (1)**
292:23
**addition (2)**
23:24;220:21
**additional (14)**
24:1;44:15;51:3,11,
13;54:17,24;57:13;

124:3;158:21,22;
217:21;281:17;
302:22
**address (8)**
9:12;49:14;97:18;
194:3;241:14,19;
251:8;286:4
**addresses (1)**
241:13
**addressing (1)**
203:7
**adds (1)**
264:10
**adept (1)**
259:21
**administer (2)**
61:6;248:13
**administered (4)**
60:23;61:22;62:6;
170:25
**administering (2)**
60:3,12
**administration (2)**
12:6,9
**admissible (2)**
172:5;294:11
**admission (3)**
255:10;298:5,7
**admit (2)**
178:17;276:17
**admits (1)**
256:7
**admitted (4)**
155:10;211:10;
228:8;253:14
**admitting (1)**
202:2
**adopted (1)**
146:6
**adults (1)**
276:6
**advance (2)**
4:8;98:20
**advanced (1)**
124:3
**advised (16)**
50:1,16;51:5;67:18;
70:8;130:7;141:9;
178:18;179:2,6;
185:5,7;188:9,11;
208:3;230:23
**advises (1)**
164:21
**advising (2)**
211:1;250:10
**affect (1)**
232:19
**affidavit (6)**
294:19,20;295:3,6,
17;298:2
**afield (1)**
111:5
**afternoon (6)**

28:13;184:15,16,
17,18;248:2
**afterwards (1)**
112:3
**again (55)**
8:15;12:8;17:7;
18:22;20:5,12;29:5;
32:19;39:14;41:2;
47:17;51:3;53:12;
56:20;58:7;61:3;
72:13;74:3;76:23,24;
79:17;84:11;85:17;
86:3;98:11;103:12;
105:23;106:5,7;
119:24;123:22;
126:11;127:20;
151:21,25;177:22;
178:8;187:3;196:8;
214:13;215:19;
221:19;222:25;
227:19;238:20;
242:13;256:24;
263:12,12;274:3;
279:8,12;289:6;
294:9;318:1
**against (6)**
7:9;67:5;157:3;
290:2;299:21;318:15
**age (4)**
53:4,4;89:9;159:15
**agencies (7)**
13:14;19:20;80:1;
90:24;91:2;109:6;
248:24
**agency (13)**
19:7,13,14,17;
43:11;61:14;88:23;
91:7;223:3,3,16;
226:5;248:24
**agency's (1)**
90:20
**Agent (8)**
63:7;68:11,17;
131:24;152:2;186:10;
243:10;275:6
**ago (10)**
6:16;30:11;127:20;
240:7;276:25;284:22;
285:2,10;302:1,9
**agree (40)**
59:23,25;64:3,14;
78:1;80:10;84:20;
90:5;99:10;100:2;
102:15,21;104:8,14;
107:8,9,15;108:21;
129:5,19;145:7,11;
146:1;154:12;156:24;
157:12;196:24;197:8;
200:18;243:4;253:9;
255:21;256:5;260:18;
266:20;288:12;
292:12;293:21;
296:14;319:3

**agreed (6)**
44:1;49:24;169:14;
270:22,24;288:16
**ahead (6)**
34:7;90:7;114:18;
179:1;224:14;245:2
**ah-hah (2)**
266:17,19
**aid (1)**
170:3
**air (1)**
251:23
**Akbar (3)**
138:19;139:13;
169:13
**Alcohol (3)**
23:15,16,19
**Alert (2)**
11:3;262:10
**Alerts (1)**
11:5
**aliens (1)**
195:2
**alive (8)**
48:14;49:16,17;
149:20;155:5;168:11;
169:23;275:22
**allegation (2)**
302:7,18
**allegations (1)**
7:7
**alleged (1)**
138:5
**allegedly (9)**
58:9,16;109:19;
129:15;148:9;161:1;
194:4;240:4;287:10
**Allison (1)**
84:12
**allow (1)**
99:15
**allowed (1)**
89:13
**almost (1)**
31:20
**alone (2)**
263:5,7
**along (4)**
29:17;31:6;275:2;
279:9
**alter (1)**
62:1
**alternate (3)**
163:9,10;235:13
**although (1)**
148:10
**Alvin (16)**
128:13,14,16;
130:9,10,25,25;131:9,
11;132:8;133:6;
135:12;153:13;
154:15;155:1;167:22
**Alvin's (1)**

Case 2:14-cv-00120-KM-MAH   Document 232-6   Filed 08/17/22   Page 125 of 345 PageID: 3163

Evans v.
Newark City
Video Deposition
William H. Tietjen, Jr.

134:6

**always (16)**
10:20;75:19;91:11;
106:1;115:6;120:7;
128:14;159:10,16;
162:10,15;163:9;
194:24;250:25;265:6,
7

**Alzheimer's/dementia (1)**
89:11

**amazingly (1)**
136:10

**Amber (3)**
11:3,4;262:10

**ambiguous (1)**
307:18

**Ambrose (1)**
307:3

**amount (6)**
119:9;154:1;
158:17;255:14;262:3;
292:20

**analysis (1)**
53:2

**and/or (5)**
90:20;96:7;105:20;
221:11;290:16

**annoyed (1)**
158:13

**answered (8)**
108:9;112:23;
184:4;217:9;222:25;
227:9;270:23;273:1

**Anthony (1)**
307:3

**anticipate (1)**
9:4

**anymore (1)**
278:8

**AP (1)**
288:2

**Apart (14)**
6:23;10:24;24:7;
27:6;44:20;57:5;
105:17;111:6;112:19;
116:14;117:7;132:22;
140:10;182:7

**apartment (3)**
149:18;152:8;167:3

**apologies (5)**
84:1;96:4;274:8,14;
288:22

**apologize (1)**
4:8

**apparently (3)**
154:15;200:21;
237:22

**appear (3)**
28:5;71:15;84:14

**appearance (2)**
231:21;254:19

**appearances (3)**
4:15;52:22;53:5

**appeared (7)**
133:5;134:16;
157:25;238:4,5,8;
254:8

**appearing (2)**
5:9,17

**appears (1)**
73:17

**application (3)**
13:16;16:13;295:21

**applied (1)**
13:16

**apply (1)**
13:13

**appreciate (2)**
221:8;271:23

**approach (1)**
97:5

**approval (5)**
89:3;210:6;212:14;
234:17;235:25

**approvals (2)**
156:10;230:6

**approved (1)**
78:14

**approving (1)**
11:4

**Approximately (7)**
15:1;17:24;20:1,8;
107:12;233:24;
300:23

**April (4)**
84:5;263:21;
292:22;303:10

**area (8)**
19:8;21:3;192:23;
236:5;240:18,19;
243:23;268:3

**areas (2)**
19:19;36:13

**Argued (1)**
158:9

**arguing (1)**
223:25

**Argumentative (12)**
107:17;164:16,18;
166:7;182:19;192:3;
202:20;224:12;255:3;
296:6;297:18;298:17

**around (34)**
21:13;32:8;36:15;
37:13;53:14;54:19;
104:24;105:16;107:2,
13;109:24;110:3;
116:17;117:9;118:15,
15,22;140:14;151:4;
161:2;162:19;168:2;
184:23;185:18;
188:10;203:10;210:6;
212:12;213:21;
214:23;234:5;261:9;
263:13;289:23

**arranged (1)**

181:3

**arranges (1)**
182:10

**arrest (41)**
98:4,10;103:6;
121:16,24;163:7,25;
230:17,19,20;231:1,2;
232:18,22,25;253:1,
11;255:5,18,24;
256:3;257:14;261:5;
294:21;295:3,9,21;
301:22;307:25;308:5,
18,24;309:8;311:5,8,
21,25;312:8,11,11,23

**arrested (21)**
103:7;115:3;
172:18;179:17;231:9;
253:17;256:20,21,22,
23;259:5,9;263:10;
273:14,16;280:23;
287:7;301:16;311:10,
11;313:12

**arrests (2)**
122:14;230:23

**arrival (4)**
217:22;233:9,21;
270:5

**arrive (2)**
215:6;217:19

**arrived (22)**
185:14;186:2,11;
187:12,17;204:25;
205:11;214:10,10;
216:21,22;217:4;
227:25;229:18;230:2;
233:8,25;234:5,19;
237:18,19;240:12

**arriving (2)**
234:21;239:11

**arson (1)**
263:4

**article (4)**
40:20;252:6;
263:17;268:14

**articles (1)**
66:5

**articulate (1)**
244:15

**Ashley (2)**
6:2;80:9

**aside (6)**
28:9;60:25;86:3;
104:4;230:15;247:24

**aspect (17)**
45:15;90:25;91:13;
97:16;124:21;125:24;
133:13;140:18;
144:24;149:2;171:21;
217:13,14;220:13;
279:2;286:20;305:10

**aspects (12)**
82:17;91:19;92:14;
99:24;103:18;113:1;

125:17,18,21;162:2;
278:11;279:23

**assault (1)**
222:17

**assigned (25)**
11:6;14:19;15:4;
16:25;18:7,8,9,14;
20:21;21:3;22:18;
41:4;81:8,10;82:25;
88:10;89:6,18;279:4;
305:5,8,10;312:11;
314:2;317:10

**assignment (10)**
14:17,25;15:3,13,
21;16:7,19;110:10;
288:6,6

**assignments (5)**
11:12;23:12;28:4,6;
288:7

**assist (13)**
51:9;64:10;69:18;
90:24;91:2,5,18;
176:14;235:23,25;
269:22;280:24;
316:17

**assistance (8)**
18:13,17;33:19;
42:25;43:7,8,14;63:2

**Assistant (6)**
5:1;10:18;42:14;
89:23;281:7;309:4

**assisted (1)**
302:11

**assisting (1)**
316:21

**associate (2)**
6:2;153:2

**associate's (1)**
12:12

**assume (16)**
7:20;9:17;13:21;
14:16;27:2;37:13;
41:4;88:17;89:4;
90:13;187:4,20;
189:20;228:20;229:9;
284:10

**assumed (2)**
48:15;192:18

**assuming (5)**
141:14;187:9;
199:8;223:12;242:14

**assumption (2)**
53:13;271:4

**assure (1)**
104:10

**at- (1)**
264:4

**Atlantic (3)**
161:6,11,11

**ATS (1)**
180:16

**attempt (4)**
98:3;159:1;179:18,

21

**attempts (2)**
70:8;109:9

**attended (3)**
17:22;306:20

**attention (3)**
84:3;128:20;270:7

**Attorney (9)**
5:8,13;6:3;40:12;
164:21;226:8;283:6;
313:21,23

**attorneys (3)**
8:21;29:22;316:11

**audio (10)**
47:24;103:4,12,17;
219:9,16;220:1;
227:14;247:2;277:23

**audiotape (2)**
219:17;238:7

**Audrey (5)**
24:23;34:12;246:8;
319:18,19

**August (16)**
85:6;106:10;107:2,
3,4;109:19,21;110:10,
11;193:10;228:25;
264:4,7;267:18;
295:18,24

**authored (1)**
35:9

**authority (4)**
21:4;88:15;156:4;
183:10

**authorization (5)**
90:12,14,18;
307:25;308:8

**authorize (1)**
90:10

**Automated (1)**
180:15

**Automatic (1)**
180:16

**available (16)**
66:3;67:19;169:23;
188:15;263:13;285:5;
292:8,14;296:3,8,16

**Avenue (5)**
85:13,13,14;
164:14;285:23

**avenues (3)**
92:14;164:11,13

**average (1)**
291:8

**Aviles (1)**
262:10

**aware (29)**
45:19;89:8;95:24;
103:25;112:2;125:7,
8;174:22;179:22,23;
189:5;192:16,22;
202:23;217:12;
221:10,23;224:19;
229:8,10;250:19;

276:12;280:14;294:4;
301:25;302:4;310:5,
6;311:18
**awareness (1)**
226:12
**away (9)**
39:14,18;120:17,
20;237:11;253:15;
263:10,16;288:4

## B

**Bachelor's (3)**
12:5,11,13
**back (84)**
4:9;11:13;28:16;
37:3,14;38:22;41:22;
45:24;58:13;61:15;
66:4;71:13;72:17;
76:16;84:14;91:14,
15;99:15;102:4;
103:8,9,19;111:6;
113:15,20;114:12;
116:4;120:23;127:20;
128:5;129:14;130:1;
132:13;134:10,10,14;
142:5;144:9;147:4;
151:4;154:7;161:11,
21;162:3;165:16;
173:21;174:17;
183:15;191:18;
192:13;194:8,10;
197:8;198:3,12;
200:5;201:7,9;
209:16;210:6;214:25;
218:20;220:6,12;
223:6;228:24;235:22;
236:19;240:20;242:6;
244:2;250:21;259:15;
266:1,3;269:7;274:4;
282:11,15;283:16;
285:2;293:5;299:17;
304:11
**backed (3)**
166:18,21,24
**background (5)**
4:8;207:24;241:11;
248:25;295:13
**backup (1)**
306:5
**bad (1)**
88:8
**badly (1)**
309:15
**bag (5)**
153:19,22;154:6;
301:12,15
**bail (8)**
253:25;254:1,4,4,7,
11,15,18
**barely (1)**
276:22
**barrel (1)**

196:3
**based (19)**
27:4;30:25;55:14;
78:16;82:5;83:2;
84:19;156:21;162:8;
172:14,15;182:19;
199:9;229:11;253:17;
283:14;313:2,4;316:7
**basement (6)**
145:1;285:22;
286:2,7,13;287:3
**basic (4)**
14:13;16:4,4;17:11
**basically (2)**
37:7;293:22
**basis (13)**
58:1;86:25;115:11;
127:7;160:18;163:8;
175:9;201:22;263:14;
264:2;295:8;300:13;
312:4
**Bates (16)**
24:25;34:15,22;
70:16,19;73:3,7;
83:23;126:8;198:18;
246:13,18;294:21;
303:20,22;304:14
**bathroom (2)**
245:13,17
**bear (1)**
21:24
**bears (1)**
34:22
**beat (2)**
143:17;257:21
**became (14)**
24:1;33:12;41:17;
69:25;91:8;123:12,
13;125:8;135:9;
179:21;189:5;250:19;
257:10;258:14
**become (7)**
27:20;80:17;89:8;
103:25;199:7;211:5;
259:20
**becomes (1)**
90:25
**becoming (1)**
199:17
**began (2)**
222:7;249:10
**begin (1)**
6:10
**beginning (8)**
41:10;67:21;120:8;
244:13,14,19;245:4;
266:1
**begins (3)**
76:16;147:4;198:12
**behalf (2)**
5:9,17
**behold (1)**
261:22

**belief (11)**
41:24;68:5;112:16;
148:4;175:17;190:3;
191:9;276:3;310:10;
312:3,4
**belittling (1)**
265:9
**bell (1)**
116:7
**below (1)**
286:14
**benefit (3)**
163:18,23;290:17
**benefits (1)**
290:12
**Bergen (8)**
85:13;192:8;194:8,
10;242:7;251:9;
266:13;293:6
**best (29)**
4:10;7:12;9:1,7,9;
17:7;24:8;33:7;56:19;
65:21;68:2;77:7;85:9;
91:23;106:3;141:7;
143:1;174:17;179:20;
180:5;211:24;214:12;
216:21;217:7;219:8;
267:22,23;286:11;
311:23
**better (3)**
46:18;133:18;
209:18
**beyond (6)**
46:4;62:2;132:3;
197:19;219:4;226:10
**big (5)**
87:17;115:5;
234:19;236:10;
276:15
**Bill (1)**
125:19
**binder (1)**
37:5
**binders (1)**
38:24
**bit (16)**
29:10;33:4;56:13;
114:25,25;119:13;
138:16;141:14,23;
142:18;143:7;165:19;
177:13;258:6;270:16;
277:7
**black (2)**
102:11;130:8
**blank (1)**
37:8
**block (1)**
94:22
**blood (2)**
143:19;145:3
**bloody (9)**
141:11;144:9;
148:20;149:7;150:3,

9,14,23,25
**board (2)**
16:14,14
**Bob (28)**
116:7,11;139:16,
19,22;140:1,1,9,12,
19,24,25,25;141:4,4,
5;155:16;158:7,20;
159:7;161:20;162:6,
19;164:25;165:1;
167:10,12;168:1
**bodies (13)**
150:4,8;165:23,24;
166:1,5,12;197:24;
251:18;272:18;286:5,
6;287:2
**BONJEAN (46)**
4:4,17;5:19;6:1,7,9;
24:22;28:14,25;29:1;
31:18;34:10;48:1;
64:6;67:14;70:10;
76:6;88:8;146:20,23;
182:17,24;189:17;
198:14;221:17,20;
223:21;246:5,10;
247:13;265:19;299:7,
18;302:21;303:22;
305:2;308:11;309:11;
313:11,14;315:17;
316:6,10,15;319:7,19
**B-O-N-J-E-A-N (1)**
4:18
**Booker (1)**
5:4
**bosses (2)**
235:25;263:9
**both (7)**
52:12;89:18,18;
212:2;264:25;295:22;
317:4
**bottom (9)**
34:23;35:23;70:20,
24;77:21;84:4;
141:16;198:24;
200:10
**bought (3)**
167:8,8,12
**boxes (2)**
35:21;244:25
**boy (2)**
264:19,20
**Boykins (5)**
169:13,18,20;
170:2;175:4
**boys (107)**
33:5,13;40:1,19;
46:23;48:5,14;53:5,9;
57:3,6;58:9;63:5,17;
64:18;69:7;71:18;
72:18;75:5;77:25;
96:6;104:24;105:5,
16;106:4,9;107:7,12,
22;108:8,23;109:11,

19;110:17,18;111:9,
10,15,16,24;112:6,7,
7,10,17;113:7,11,24,
25;114:7,23;115:13;
116:15,17;117:9,21;
118:6,16;120:14;
129:21,22;139:17;
140:14;141:12;
143:17;147:13;
149:17;150:2;159:12;
161:1;167:4,9,22;
168:2;188:21;190:13,
16;191:15;192:16,17;
193:24;194:4,16;
195:12;196:7,23;
197:2,4,16;200:14,23;
212:9;213:8;228:24;
231:10;250:17;
251:17;253:2;275:13;
276:4,16;291:22;
295:17;296:9;310:21;
317:7,12
**boys' (8)**
52:4,21;57:18;
152:20;160:19;
221:11,14;212:3
**boy's (2)**
115:15,25
**break (22)**
4:13;8:4,7;70:11,
12;76:8,11,14;87:15;
146:13,19,22,24;
147:2;198:4,10;
208:11,11,15;218:19;
265:24;299:15
**breakdowns (1)**
106:13
**breaking (2)**
119:15;167:17
**break-ins (2)**
119:11;120:25
**Breathalyzer (1)**
23:20
**bring (11)**
20:9;76:3;101:17;
102:7,13;103:8,19;
111:6;156:5;299:21;
317:1
**bringing (2)**
103:9;259:14
**broke (10)**
88:4;115:22;
116:21,23;117:18;
119:24;123:12;223:5;
274:7;312:8
**broken (3)**
111:16;123:12;
312:5
**Brooklyn (2)**
4:7;237:7
**brother (1)**
138:18
**brought (28)**

Evans v.
Newark City

Video Deposition

William H. Tietjen, Jr.

7:8;30:21;32:14;
33:16;149:6;150:4;
155:21;161:9;178:12;
181:14;182:4,11;
183:11;184:7,9,11,19;
185:10;186:19;
187:10,16;208:2;
243:21,21;253:24;
254:17;313:10,17

**brown (2)**
65:22;262:4

**Brunswick (1)**
13:19

**building (17)**
141:11;143:24;
148:21;149:18;194:3;
236:6,10;242:6;
243:20;248:12,15,24;
269:14,16;272:19;
276:19;310:22

**buildings (5)**
267:22,24;269:8,
17;297:9

**bunch (1)**
253:8

**bureau (1)**
212:15

**burglaries (1)**
18:25

**burglary (2)**
19:6,11

**buried (3)**
191:19,20,21

**burn (1)**
143:23

**burned (4)**
145:14;196:3;
232:20;233:18

**burning (1)**
269:8

**business (2)**
148:19;252:3

**buy (1)**
144:10

**bystander (1)**
229:12

**C**

**cadaver (1)**
286:12

**call (51)**
25:9;73:1,1;75:13;
90:10;97:11;120:22;
138:22;184:20;185:2;
196:7;206:11,15,21,
23;207:5,10,12,14,21;
208:10;209:16;
211:19,25;212:7,10,
18,19,21,25;213:10,
23,23;214:14,17;
215:1,3,6;234:4;
235:17,22;253:12;

262:8,11;270:22,23;
280:9;288:8,9;
294:23;316:23

**called (19)**
4:1;18:19;34:1,4;
98:15,16,17;184:23;
200:12;203:22;
209:21,21;211:13;
234:16;270:12;
272:25;273:6;314:12,
13

**calling (7)**
43:10,11;62:14;
75:24;116:6;140:2,12

**Calls (13)**
137:19;139:23;
140:13;162:7;202:5;
207:9;208:22;209:3,
25;225:4;235:15,19,
21

**calm (1)**
100:5

**Camden (14)**
194:5;241:4,16,21;
251:7,12;252:8,15;
263:3,5;266:9,13;
267:21;296:22

**came (26)**
28:2;53:23;54:1;
59:6;61:6;62:4;
123:22;130:9;131:8;
132:6;133:17;134:11;
154:8,12;161:11;
178:5;232:21;241:14;
252:4;256:6;272:17;
273:1;297:22,24;
301:20;317:15

**camera (2)**
146:10;232:1

**can (167)**
7:4;8:9,13;9:1;
17:16,16,24:6;26:4;
28:8,24;29:21;30:3;
32:5;33:8;34:8,17;
35:6;36:11;39:23;
40:12;44:21;51:3;
63:13;67:17;68:16;
69:10,12;70:12;71:4,
20;75:17;76:7;78:1;
79:12;83:5;85:11;
86:2;87:6,15;88:20;
89:14,18;92:2;97:3;
99:21;102:13,22;
104:10;105:8,18;
107:19;108:11;109:1;
111:1;112:3;114:23,
25;115:7;117:10;
118:10,18;121:23;
123:8;127:5;129:19;
132:10;134:18;136:9,
16;138:9;145:11,22;
149:15;151:15;
152:16;154:8;156:8;

157:10,22;163:3,21;
164:7,12,18;166:7,9,
15;168:16;172:14;
174:9;176:20;178:24;
179:11,19;180:12;
181:8,13;182:20;
183:3,14,14,15;184:4;
185:4;186:23;188:7;
189:1;192:21;195:6;
197:6;198:4;202:20;
211:25;215:11;217:9;
219:12;220:18;
221:18;222:25;
224:12,14;225:4;
226:9;227:9;229:7;
235:22;236:18;237:8;
239:1,13;243:24;
244:20,22;246:6;
251:24;255:17;
261:16;262:15,24;
264:9;267:4;272:25;
278:17;283:11,14,22;
284:18;287:21;
288:12,14;292:10,17;
293:3;294:14;297:19;
298:17,24;299:5,9,11,
12;303:4,13;310:16;
312:6;317:24;318:20

**Canady (2)**
124:7,25

**capable (2)**
215:9;218:12

**capacities (1)**
10:10

**capacity (1)**
27:24

**capture (1)**
103:16

**car (11)**
102:9,9,11;135:4;
214:23;233:3,4,5,6;
238:23;240:2

**care (7)**
99:18;159:2;224:7;
225:20;236:10;
246:25;285:17

**career (2)**
17:1;25:16

**Carrega (149)**
5:18;32:24;33:17,
21;34:1;42:10,21,24;
43:16,24;44:22;46:9;
48:12;49:23;50:1,5,
12,20;51:2,16,24;
53:18;55:16,17;
56:24;58:6,20;59:5;
62:19;63:10,17;
64:16,22;65:9,13;
67:8;69:5;74:24;
86:17,22;87:25;
88:14;91:17;92:6;
94:1,12,24;95:6,16,
19;96:17;99:5;

104:19;124:21,24;
125:23;126:12,20;
131:25;152:2;169:19;
173:23;174:6;175:13;
176:10;177:3;178:11,
18;181:2;182:10;
183:5;184:21;185:6;
186:7,18;187:2,25;
188:4,16,23;189:9,19;
196:11;203:3,24;
206:6,11,17;208:10;
209:6,9,21;210:12,17;
211:10;212:1,1,22;
216:17;228:22;
229:16,21;231:15;
232:13;233:16;
238:20;239:3,9,20,21;
240:10;242:13,14;
243:13;245:7;246:21,
25;247:17;248:3;
249:5,8;258:5;278:7,
22;285:21;294:18,20;
295:7,14;305:7;
307:5;311:7,15,19;
312:15,18,23;314:3,5,
18,23,25;315:10,21,
24;316:2,18;318:1;
319:5

**Carrega's (8)**
124:10;127:1,17;
153:5;176:17;227:21;
228:12;233:3

**case (197)**
6:3,15,22,24;20:21;
21:5;30:10,18,22;
31:7;32:2,18;33:16,
20;35:18;39:2,7,7;
40:18;41:4,24;43:5,7,
14;44:4,6,8;45:13,14,
17,20,24;46:2,6,7,11,
20;51:21;55:18,21;
56:18;57:1,2,9,20;
59:9;60:25;61:9;
62:22;64:13;65:8,14,
20;66:1,2,10,20,22,
24;67:10;68:10,10;
70:4;72:10,15;74:11,
14,18,20,25;76:25;
79:15,19;80:7;85:19,
23;86:16,18,23;
87:17;88:21;89:14,
20;90:6,14,15,19;
91:13;92:21;93:12;
94:13,15,20,25;95:23;
96:1,3,11;97:8,17;
105:9,15,15,24;116:4;
120:2,3,5,5,8;121:3;
134:19;142:21,22;
143:10,11,16;147:8;
158:15;159:2,6;
163:8,14,23;164:3,9;
165:16;169:21;
170:21,23;189:22;

191:23;193:4;196:12;
197:12;199:18;
202:17;208:1,5,11;
219:21;220:23;
221:24;225:22;228:9;
243:8;253:18;255:13;
257:18,19;261:8;
262:10;263:12;264:7;
273:18;278:9,12;
280:12;281:8;282:18,
21,22;284:13;286:6;
287:23;289:8;290:13,
18,24;292:7;293:16;
299:22;302:2,10,11,
13;304:16,17,21;
305:10,13,16,19;
306:3,4,8;308:23;
309:5;310:17;314:3;
315:3;317:1,7,11,15,
18;318:22

**cases (26)**
17:15;19:16;38:25;
46:3;64:11;75:13,24;
88:17;89:6,7,12,18,
19,19;90:23;91:3;
96:5,6,12;106:1;
119:6;162:4;220:8,
25;222:14;262:9

**Cassian (3)**
249:12,13,23

**cat-and-mouse (1)**
176:9

**Cathy (2)**
124:6,25

**cause (7)**
150:2;253:11;
255:9,16,19,23;295:9

**caused (1)**
116:24

**causes (1)**
251:21

**cell (5)**
243:23,23;270:9;
274:12;279:12

**certain (11)**
46:4;82:8;87:11;
92:14;125:18;160:4,
4;161:24,25;262:20;
279:23

**certainly (30)**
61:23;86:19;89:13;
97:7,17;98:1,22;
99:13;119:3;125:1;
133:2,19;134:18;
135:9;137:8,21;
154:5;164:12;202:1;
206:5;210:9;217:12;
229:2;231:20;234:11;
250:25;266:22;281:7;
284:19;317:16

**certainty (1)**
214:19

**cetera (1)**

52:18
**chain (1)**
89:3
**chance (3)**
30:14;73:23;176:16
**change (8)**
16:9;146:21,24;
161:3;220:11;265:20;
310:8,17
**changed (10)**
115:1;158:12;
161:10,15,16;163:12;
220:7;222:8;225:18;
289:23
**characterization (2)**
35:25;163:5
**characterize (2)**
77:3;87:14
**charge (6)**
45:7,10;87:25;91:7;
255:5;281:16
**charged (25)**
230:21;253:15,20;
256:20;259:9;261:3;
271:1,5,8,11,17;
272:10,14,15,18;
273:2,5,12,12,14,23;
280:23;281:3;287:7;
291:9
**charges (6)**
121:25;230:22;
231:9;259:13;290:2;
299:21
**chart (1)**
58:22
**charts (2)**
60:16;61:20
**chat (1)**
98:5
**check (4)**
183:6;203:24;
288:10;299:9
**checked (7)**
48:18;79:11;84:21,
24;85:3,12;244:24
**checks (1)**
203:25
**Chief (6)**
5:2,5;32:16,17,20;
307:2
**children (7)**
119:2;145:14;
237:24;238:12;
254:25;258:10;276:5
**choose (3)**
88:22;125:25;
178:15
**chose (1)**
125:25
**Christian (3)**
234:12,15;236:14
**circle (1)**
151:5

**circumstance (1)**
61:5
**circumstances (1)**
33:15
**cities (1)**
119:12
**City (14)**
5:2,3;79:9;120:21;
161:6,11,12;193:5;
197:19;250:21;252:4;
257:24;269:7,11
**civil (12)**
6:15,22,23;7:8;
13:9,11;32:13;285:1;
301:24,25;302:2,19
**civilian (1)**
300:21
**clarification (27)**
21:25;31:17;42:3;
62:13;64:5;69:14;
74:8;92:5;102:2;
112:8;131:19;134:13;
147:17;170:22;180:8;
191:2;201:11;203:21;
234:14;254:6;257:22;
265:1;272:22;298:6;
301:14;312:17;
315:16
**clarify (2)**
36:12;68:19
**Class (13)**
4:23;9:23;10:14;
16:23;17:21;24:13,
16;25:25;27:11,18,
20;101:22;301:8
**classes (2)**
16:24;26:8
**classroom (3)**
100:19,20;101:12
**clean (3)**
143:20,22;144:10
**clear (13)**
50:24;53:21;
104:21;144:13;
149:15;167:25;
176:21;179:25;
196:11;217:4;226:3;
293:18;316:16
**cleared (3)**
79:16,19;143:11
**client's (1)**
5:20
**close (5)**
55:10;77:25;178:2;
191:5;213:14
**closed (2)**
143:11;289:8
**closely (1)**
11:13
**closer (2)**
106:15;209:17
**closet (8)**
143:18;149:17;

275:14;276:11,15,15;
277:4;279:24
**clothes (9)**
144:10,11,11;
145:17;148:21;149:7;
150:9,10,11
**clothing (13)**
141:11;143:19,20,
23;144:8,23,25;
145:3;150:3,7,14,23,
25
**clue (14)**
136:2;142:24;
143:3;163:6;190:13,
19;198:1;201:7,14;
205:13;218:2;225:18;
267:15;292:11
**coat (1)**
39:12
**Cohen (2)**
6:2;80:9
**co-investigation (1)**
306:6
**Cold (27)**
45:13,17,20,24;
46:2,6,7,20;70:5;
88:17;91:13;94:15,
19,25;95:23;96:1,6,
11,11;197:11;304:16,
17,21;305:10,13;
306:8;317:1
**collaborating (1)**
316:25
**colleagues (4)**
83:18;97:11;
130:20;196:6
**collected (1)**
52:14
**collection (4)**
70:21;71:9,16;
76:19
**collective (1)**
41:24
**college (1)**
12:15
**comfortable (2)**
127:16;171:8
**coming (8)**
14:22;162:6;189:3;
203:6;241:20;266:17;
273:20;292:22
**command (1)**
89:4
**commencement (1)**
247:21
**commences (1)**
245:22
**comments (1)**
253:7
**committed (1)**
119:7
**committing (2)**
136:11;143:2

**common (3)**
18:22;19:1;261:10
**communicate (4)**
212:1;270:18;
271:17;272:9
**communicated (12)**
44:17;64:16;
188:23;189:19;
208:14;210:12;
212:23;213:17;214:1;
239:8;240:23;282:5
**communicating (1)**
276:9
**communications (3)**
29:21;188:3;291:6
**communities (1)**
18:20
**company (2)**
296:9,10
**compared (1)**
52:4
**competence (1)**
60:2
**competitive (1)**
16:16
**complaining (1)**
31:2
**complaint (6)**
7:8;30:9,23;31:1;
180:10,15
**complaints (2)**
300:6,21
**complete (8)**
7:11;8:10;9:7;
72:11;79:10;86:16;
205:22;216:23
**completed (5)**
9:5;18:6;54:20;
125:20;216:20
**completely (3)**
163:4;195:22;
226:11
**completion (1)**
54:7
**complex (2)**
131:24;152:8
**complied (2)**
226:16,21
**component (1)**
278:12
**computerized (2)**
201:9;204:12
**concept (2)**
45:23;164:4
**concern (13)**
92:14;110:6;115:3,
6;164:24;170:20;
250:20;251:19;252:1;
263:16;280:20;281:1;
283:13
**concerned (11)**
110:5,8;176:22;
252:1;257:18;259:4,

6,11,16;279:21;280:2
**concerning (1)**
218:7
**concerns (2)**
55:18;90:23
**Concluded (1)**
319:24
**concludes (1)**
319:21
**conclusion (4)**
60:24;162:8;217:7;
317:2
**conclusive (2)**
172:8,12
**conclusively (1)**
107:14
**concrete (1)**
286:15
**concur (1)**
61:21
**conduct (3)**
17:19;19:5;77:15
**conducted (13)**
51:22;59:10;60:21;
65:7;66:9;104:18;
140:18;168:23;172:2;
214:15;216:17;217:6;
220:2
**conducting (11)**
14:7,12;16:20;
20:16;24:8;79:1;
94:19,25;100:15;
104:7;126:16
**confer (1)**
280:4
**confessed (2)**
250:5;261:7
**confesses (1)**
258:9
**confessing (3)**
242:22;257:1;
272:18
**confession (3)**
255:22,22,23
**confessions (1)**
264:22
**confident (4)**
99:20;284:2,4;
292:1
**configured (1)**
233:15
**confirm (10)**
48:13,14;128:4;
142:17;147:8;186:15;
230:2;244:23;252:7;
294:6
**confirmed (2)**
221:6;287:9
**confused (5)**
272:20,23;308:3
**connect (5)**
115:24;116:5,11;
133:3;266:12

**connected (3)**
60:12;114:15,20
**connection (23)**
6:20;30:18,21;
32:13;35:24;43:5;
66:21;72:9,17;88:1;
92:12;94:25;100:15;
124:25;172:18;
218:24;220:15;231:9;
253:1;266:14;267:13;
271:18;285:1
**connectivity (9)**
4:11;47:23;96:22;
101:8;116:22;120:19;
146:7;169:12;188:8
**consent (4)**
157:17,25;231:12;
315:21
**consented (3)**
183:25;200:20;
315:11
**consider (6)**
62:10;119:23,25;
120:13;195:11,12
**consideration (1)**
94:14
**considered (4)**
13:3;97:9;137:14;
195:14
**consistent (9)**
78:24;142:21;
143:12;145:23;150:1;
151:19;286:18;
288:11;319:1
**construction (1)**
12:16
**consulted (1)**
308:15
**contact (10)**
32:3,10,21;88:14,
20;97:1;215:16;
237:18;258:15;259:2
**contacted (9)**
33:18,21;42:11,12;
43:6;47:17;49:23;
50:16;204:14
**contacting (1)**
46:20
**contained (5)**
39:9;56:21;65:25;
77:12;293:23
**contains (1)**
296:15
**contemporaneous (4)**
54:5;77:15;81:22;
209:1
**contemporaneously-made (1)**
283:9
**continuation (2)**
77:4,6
**continue (4)**
90:10;113:1;
217:12;268:6

**continued (4)**
217:17;268:23;
277:9;287:16
**continuing (5)**
17:2,4;92:8;212:25;
287:13
**continuously (1)**
39:10
**contractor (1)**
296:11
**contradict (1)**
187:6
**contradicts (2)**
148:24;149:3
**convened (2)**
187:25;188:1
**convenient (1)**
201:15
**conversation (42)**
43:20,24;44:23;
45:1;46:25;47:4,6,13;
48:17;50:12,15;75:2,
4,7,10;86:22;96:25;
98:24;99:23;103:14;
161:4;212:11;219:19;
231:19,24;232:5;
236:13,16,25;240:16;
245:8,14,15;247:4;
260:10;273:9,10,17;
274:9;281:14;314:11,
20
**conversations (16)**
29:24,25;30:4;
32:12;42:20;74:24;
191:24;196:6;203:3;
237:20;245:11;249:4;
272:13,14;299:25;
313:2
**conveyed (2)**
141:20;229:21
**co-op (1)**
306:6
**cooperated (2)**
291:3,10
**cooperation (3)**
290:13,18,23
**cooperative (2)**
271:3;277:9
**coordinators (1)**
11:3
**copies (1)**
267:9
**copy (8)**
30:11,12;65:8,14;
72:11;93:9;302:20;
319:22
**corner (6)**
70:20;83:25;
102:10,11;108:16;
251:8
**Corporation (1)**
5:1
**corrected (1)**

285:20
**Corrections (3)**
157:19;181:22;
249:18
**correctly (3)**
192:15;234:13,16
**Correglia (1)**
249:22
**corroborate (8)**
121:19;150:21;
155:1,6;253:21;
257:7;262:19;263:24
**corroborated (3)**
155:4;293:9;298:21
**Corroborating (2)**
292:24,25
**corroboration (2)**
268:18;281:16
**corroborative (1)**
169:5
**Counsel (2)**
5:2;284:11
**count (1)**
78:10
**country (1)**
262:12
**County (85)**
15:6;33:17;38:8;
44:2;45:13,20;49:25;
53:19;68:17,22;
93:16;94:2,8;95:25;
96:7;155:17;156:11;
157:19;179:3;180:21;
181:4,14,16;182:5;
183:11,16,18;184:1,9,
10;185:15,18,24;
186:3;187:11;204:25;
205:10,24;206:19;
215:7,13,21;216:4,7,
18;217:5,19,21;
219:5;221:3;223:12;
224:17,21;226:16;
227:2,13,25;230:13;
232:1;233:11;234:9,
20,24;235:2;237:3;
239:10;244:4;253:24;
254:8,14;256:13;
270:13;274:10,20;
284:16;290:1;306:5;
307:2;308:2,16,16;
311:16;312:15,19,20
**couple (6)**
87:12;108:20;
295:12;299:19;
300:16;303:7
**course (13)**
24:2;25:18;26:5;
53:13;59:19;80:17;
81:21;99:16;137:10;
252:3;293:22;297:25;
300:17
**courses (2)**
25:14;26:6

**court (8)**
8:2;172:5;189:14,
16;246:9;302:14,15;
303:18
**court-generated (1)**
180:7
**court-reported (2)**
257:1;287:4
**courtroom (1)**
181:15
**courts (1)**
180:9
**cousin (10)**
141:10;142:10,15,
15;148:20;153:12;
174:12;190:20,24;
200:7
**cousins (2)**
150:14;191:5
**cousins' (1)**
150:11
**cousin's (1)**
153:17
**cover (11)**
11:5;19:16;75:16;
80:2;81:7,8;124:20;
125:17,18;209:6;
249:1
**covered (5)**
15:5,12;19:19;
196:2;227:21
**covering (3)**
82:19;83:7,10
**covers (2)**
17:12;100:9
**crazy (4)**
136:10;144:1,3;
250:22
**create (2)**
37:15;226:10
**credit (3)**
49:1,3,13
**credited (1)**
276:3
**crew (2)**
243:14;305:22
**Crime (12)**
21:5;31:4;165:25;
229:4,21;242:23;
271:1,11,18;291:9,15;
292:3
**crimes (4)**
24:10;136:11;
222:10;256:22
**Criminal (4)**
12:1;17:11;79:1;
119:19
**critical (1)**
213:16
**critiqued (1)**
100:25
**cross (4)**
194:6,7,9,12

**CROSS-EXAMINATION (2)**
303:6;311:3
**culled (1)**
297:8
**culmination (1)**
282:14
**culpability (1)**
291:19
**culprit (1)**
290:23
**cult (2)**
120:18,21
**cultivate (1)**
291:21
**curb (1)**
137:3
**curious (1)**
263:9
**currency (1)**
301:13
**currently (1)**
9:20
**custody (12)**
156:1;172:21;
178:18;183:5,7;
188:14;208:10;
230:13;231:2;232:18;
246:25;285:17
**cut (3)**
47:24;91:16;116:25
**Cutler (20)**
139:16,19;140:1,9,
12,25;141:4;155:16;
158:7,20;159:7;
161:21;164:25;165:1;
167:10,12;168:1;
181:18,21;182:8
**Cutler's (1)**
162:8

## D

**dab (1)**
268:8
**Daily (2)**
87:8,15
**data (4)**
52:14;53:3;60:14;
297:9
**database (2)**
52:12
**databases (1)**
51:12
**date (29)**
34:3,6;41:20;42:6;
44:9;52:18,22;53:4,5;
54:7;55:12;57:3;63:8;
65:2;67:23;69:17;
71:17;77:22;84:5;
86:4;141:25;152:1;
163:12;177:20,21;
178:12;202:5,7;311:8
**dated (5)**

34:15;36:3;73:19;
78:4;303:20
**dates (6)**
30:6;36:6;52:18;
161:3,10;193:1
**dating (1)**
71:13
**Dave (2)**
88:13;89:23
**day (49)**
42:10;48:18;66:13;
81:14,15;106:11,25;
125:9;126:2;130:9,
25;131:9;133:7;
150:25;155:6;158:10;
164:2;168:5,14,19;
178:16;179:13,14;
186:7;200:14;210:2;
211:4;213:13;227:3;
237:9;241:23;250:22;
254:16;256:8;259:9;
261:4;263:6;268:18;
273:2,12,16;274:3,15;
286:11;300:5,5;
304:12;313:5;314:10
**days (9)**
64:12;108:21;
109:7;134:2,17,17;
136:12,19;254:13
**day-to-day (1)**
18:11
**DC (1)**
120:22
**dead (7)**
48:15;114:7;
141:18;142:11;143:1;
317:16,18
**deal (3)**
98:2;222:12;225:19
**dealer (4)**
123:4,10;166:25,25
**dealing (5)**
92:3;165:12;
236:14;237:10;
258:16
**deals (1)**
295:13
**death (4)**
52:18;57:18;
147:21;193:24
**deaths (3)**
175:21;211:8;
291:22
**debate (1)**
118:4
**debriefed (1)**
280:16
**debris (1)**
251:25
**deceased (6)**
11:2;72:5,6;275:17;
281:25;282:7
**December (8)**

23:7;257:12;261:1;
278:21;282:16;
285:20,22;288:10
**decent (1)**
292:20
**decide (8)**
19:4;80:21;81:2;
89:1;98:8;157:7;
280:25;299:21
**decided (10)**
19:4;80:3;97:2;
124:20;125:18;
144:24;190:22;
253:19;290:7;308:17
**decides (1)**
238:16
**decision (10)**
220:25;256:2,4;
278:2;299:20,25;
300:2,11,14;318:10
**decision-maker (1)**
256:4
**decomp (1)**
251:23
**deemed (1)**
172:4
**default (1)**
95:18
**Defendant (3)**
5:14,17;7:9
**Defendants (4)**
5:25;7:10;31:6,8
**defense (2)**
283:6;284:11
**definitely (16)**
70:12;96:13;
127:13;174:20;
175:14;201:10,12;
215:16;253:10;256:5;
258:4;260:9;264:12;
284:13;292:23;
310:19
**degree (6)**
12:4,9,11;222:10,
10,11
**delay (7)**
109:8,12;234:19;
235:24;282:25;283:2;
292:11
**delivered (1)**
137:3
**Delk (6)**
292:22;293:4,7,8,
20,20
**Delk's (1)**
263:19
**demanding (2)**
162:7,20
**DeMattia (1)**
306:25
**demise (2)**
135:16;142:25
**demolished (1)**

297:10
**demonic (1)**
265:10
**demonstrate (1)**
167:21
**demonstrated (1)**
147:12
**denials (1)**
162:9
**denied (7)**
132:1;139:10;
140:25;153:1;170:24;
171:10,25
**denies (1)**
200:17
**deny (1)**
173:25
**denying (1)**
171:1
**depart (2)**
232:6;311:23
**department (23)**
13:18,19;39:20;
46:5;63:19;66:3;
68:21;69:6,15;84:21;
85:4;92:25;94:7;
128:22;157:19;
181:22;195:19;223:9,
22;226:21;269:13;
307:8;308:10
**departments (3)**
19:3;21:24;79:9
**Department's (1)**
91:22
**depend (2)**
39:8;103:23
**dependent (1)**
157:6
**depending (2)**
237:6,9
**depends (7)**
22:10;79:23;
101:16;103:2;111:25;
153:22;276:13
**deponent (1)**
29:2
**deposition (11)**
5:25;6:11,14,17,19;
29:12,16,23;305:22;
309:23;319:21
**depositions (1)**
302:3
**depth (1)**
65:24
**describe (4)**
33:15;100:4;
126:25;127:2
**described (5)**
15:22;108:2;127:2;
269:9;275:14
**description (1)**
200:14
**designated (1)**

17:17
**destroy (1)**
39:13
**destroyed (3)**
283:17;284:17,20
**destruction (1)**
251:21
**detail (2)**
75:19;210:18
**detailed (2)**
99:3;200:13
**detailing (1)**
211:13
**details (13)**
101:14;124:10;
212:2,6,7,8,23,24;
228:16;229:15,20;
240:15;279:22
**detained (1)**
180:1
**Detective (81)**
4:23,24;5:4;9:23;
10:13;16:1,1,12;
17:10,17;18:7,11,24;
21:20,21,22;24:1;
26:24,24,27:2,9,11,
13,16,16,16,17,17,19,
21,24;28:1;31:15;
32:7,13,20;63:6;
68:13,20,25;69:17,20,
24;71:21,22,24,25;
72:22;73:18;84:15;
98:4,6;104:19;
127:22;144:15,17;
169:9;186:5;193:4;
205:17;206:2;215:10;
233:23;234:15;
249:12,13;275:3,3,15;
302:1;303:7;304:3,8;
305:12;307:3,15;
309:7;310:24;313:18;
319:10,13
**detectives (15)**
17:12;21:6;27:7;
115:19,24;116:3;
128:5;129:14;209:25;
280:21;287:24;
311:12;312:16,19;
317:5
**determination (4)**
255:7,9,16,20
**determine (4)**
139:25;170:25;
171:9;287:25
**determined (3)**
19:13;135:8;192:9
**determining (2)**
170:3;259:13
**develop (8)**
49:6;80:11;84:16;
132:24;134:5;165:19;
268:11;270:16
**developed (12)**

67:2,5;104:22;
116:19;122:22;
165:20,23;167:14;
268:18;278:12;
297:25;319:3
**developments (1)**
208:6
**died (8)**
53:14;191:15;
192:17;196:23;197:2,
4;250:17;251:17
**differ (2)**
61:21;79:5
**differed (1)**
94:6
**differences (2)**
127:11,25
**different (44)**
16:25;17:15;27:1,6;
38:25;60:7,23,24;
61:8;66:5;75:16,18,
25;79:8;90:25;99:24;
100:1,2;109:2,18;
112:4;127:6,21;
145:6;146:17;148:2;
172:10;174:23;
181:12;195:10;
217:18;221:9;222:7;
224:6;226:5;232:7,
24;251:7;255:13;
258:4;267:9,22;
310:16;317:10
**differently (2)**
111:16;216:13
**difficult (1)**
241:4
**difficulty (2)**
176:7,12
**DiFRANCESCO (3)**
5:7,8;316:13
**dig (1)**
270:2
**diligence (1)**
285:16
**diminish (2)**
264:22;265:3
**diminished (2)**
264:18;276:13
**diminishing (1)**
279:23
**diminishment (2)**
264:21,25
**DIRECT (5)**
4:4;39:15;52:2;
254:24;258:15
**directed (1)**
224:15
**directing (1)**
172:6
**direction (1)**
287:23
**directions (2)**
305:15,18

Evans v.
Newark City

Video Deposition

William H. Tietjen, Jr.

**directly (7)**
18:19;33:25;189:4;
213:18;216:5;231:17;
243:25
**Director (2)**
5:3;306:25
**disabled (1)**
238:3
**disagree (1)**
241:7
**disagreed (1)**
148:10
**disagreeing (2)**
255:4;256:2
**disappear (1)**
167:15
**disappearance (22)**
47:7;52:6;57:18;
104:25;105:5,17,20;
113:10;116:17,20;
139:17;147:13,21;
152:20;160:19;
171:24;175:21;
200:18;211:14;212:4;
231:10;253:2
**disappeared (8)**
57:6;106:9;108:23;
117:10;140:14;143:4;
161:1;213:8
**disciplined (1)**
300:17
**dis-clude (1)**
151:3
**disconnected (1)**
146:12
**discuss (13)**
94:11;96:17;97:10,
15,15;99:4;101:17;
102:7;103:10;142:14;
160:7;191:15;315:14
**discussed (10)**
57:10,14;96:23;
98:20;190:10;298:9;
300:8;307:24;314:7,8
**discussion (1)**
99:7
**discussions (1)**
86:17
**dispel (1)**
132:17
**disposal (1)**
34:9
**disputing (1)**
109:17
**disregard (1)**
162:23
**distorted (1)**
84:23
**distracting (1)**
4:9
**distribution (2)**
138:19;148:16
**Division (2)**

22:6;308:10
**DNA (9)**
63:21;64:1,11;
97:14,16;144:9;
155:14;165:23;166:9
**DOC (4)**
155:23,23;157:15;
282:5
**document (20)**
24:15,19;25:6,12;
35:3;37:15;72:25;
73:6,9,11,13;74:12;
76:9;78:6;79:24;
83:22;135:10;170:12;
281:6;294:24
**documentation (1)**
26:6;209:7;228:12;
248:13
**documented (3)**
126:13,15;281:10
**documenting (1)**
126:15
**documents (7)**
29:13,17;72:8;
222:3;248:6;285:8,16
**dog (2)**
286:12;301:9
**Dolce (1)**
262:10
**domestics (1)**
15:10
**done (35)**
9:1;59:9;60:19;
61:15,17;66:13,24;
67:22;78:20;83:3,16;
86:23;155:25;168:8;
176:10;190:12;
192:18;211:18;214:9;
218:11;219:4,23;
221:3;225:12,12,12;
228:24;257:9;259:13;
260:23;267:15;
289:12,15,17;319:10
**door (10)**
96:24;130:10,24;
131:8;132:3,7;
133:18;140:24;141:6;
152:22
**Dorothy (1)**
84:12
**dot (1)**
275:1
**doubles (1)**
267:25
**doubt (6)**
119:14;145:2;
163:18,23;202:11;
239:4
**doubting (1)**
202:12
**doubts (1)**
119:16
**down (47)**

23:9;80:20;82:1;
87:15;98:24;103:13;
109:3;111:16;120:9;
125:24;143:24;
145:16;179:8,23;
188:12;193:21;196:3;
207:18;209:1,4,15,20;
210:1,4,6;211:3;
212:13,20;213:12;
214:22;218:19;
229:23;232:2;233:19;
255:12;258:10;265:3;
269:9;273:5,13;
274:15,18;275:18;
278:5;288:5;312:12,
22
**dragged (1)**
254:14
**drastically (1)**
127:21
**draw (4)**
83:21;84:3;128:19;
270:6
**dream (1)**
262:13
**dreams (2)**
75:25;262:12
**drew (1)**
113:23
**drive (2)**
232:9,12
**drives (2)**
109:23;218:21
**driving (1)**
210:5
**drop (1)**
257:13
**dropped (2)**
136:19;137:10
**drove (4)**
110:3;183:15;
233:15;238:22
**Drug (10)**
23:15,16,19;
122:24;123:3,10;
138:18;148:16;
166:18,22
**drug-dealing (1)**
138:5
**DSFC (1)**
4:23
**due (1)**
265:17
**dug (1)**
195:21
**duly (1)**
4:2
**dumped (1)**
191:21
**during (35)**
17:9;39:16;44:22;
46:24;56:6,22;58:20;
62:18,24;67:9;80:17;

81:20;82:9;85:19;
87:1,18;97:25;104:1;
124:13;125:8;128:3;
159:9;187:20;209:16;
221:1;228:22,24;
229:16;235:6;237:14;
249:9;277:10;293:16;
297:5;299:24
**dusted (1)**
136:1
**duties (5)**
10:17;15:21;16:5;
18:11;93:22
**duty (1)**
15:3
**DVD (4)**
76:16;147:4;
198:12;218:21
**dying (1)**
194:16

# E

**eager (1)**
237:23
**earlier (15)**
4:25;54:2,15,22;
118:8;129:1;139:9;
154:7;234:23;240:25;
284:1;291:18;292:8;
314:23;315:9
**early (11)**
20:10;55:19;57:2;
69:24;74:18;80:11;
105:25;170:6;177:8,
9;184:17
**early-on (1)**
163:14
**earn (1)**
12:4
**easier (2)**
8:25;83:25
**easiest (2)**
23:20;181:25
**east (1)**
189:3
**easy (6)**
176:8;179:10;
182:8;258:11,12;
261:4
**ECPO (13)**
34:15,23;70:17,20;
71:6;83:23;126:8;
198:19;246:13,18;
294:21;303:20,25
**editorializing (1)**
305:3
**Edmunds (1)**
28:12
**education (1)**
11:22
**educational (1)**
11:14

**Edward (2)**
71:24,25
**effect (11)**
109:16;222:2,5;
223:17;225:6,8,17;
226:19;282:23;
314:15,16
**effort (2)**
180:20;220:1
**efforts (12)**
70:3;90:11;98:11;
131:6,7;172:25;
173:3;174:2;187:22;
201:6;265:4;281:18
**eight (1)**
274:23
**Eileen (1)**
282:17
**either (26)**
5:24;11:22;26:7;
37:5;46:23;49:8;67:9;
85:5;89:9;94:1;149:2;
162:14;188:5;206:2,
11;216:14;219:9;
221:11;225:9;249:14;
273:23;280:21;
288:25;291:13;
300:14;301:9
**elaborate (1)**
171:16
**electronic (1)**
65:17
**elevator (1)**
233:19
**elicit (2)**
99:22;101:20
**else (45)**
6:24;34:11;38:4,6;
42:13;44:3,7;45:16;
47:9;55:22;58:5;63:4;
64:21;81:14;82:10,
19;92:8;94:2;98:17;
99:15;108:15;112:3,
24;117:10,17;136:7;
141:21;146:20;150:4;
176:24;177:2;182:4;
227:23;232:14;
234:10;237:13;
238:23;250:2;277:12,
22;299:11;315:7;
316:7,8,9
**else's (3)**
82:13;88:16;194:21
**embarked (1)**
95:25
**embarking (1)**
92:9
**embrace (1)**
162:25
**embraced (1)**
146:6
**emphatical (1)**
310:4

**employed (2)**
9:20,25
**employment (4)**
11:12,23;29:10;
300:18
**en (1)**
189:3
**end (8)**
11:9;21:13;41:16;
52:9;79:9;163:7;
252:19;275:11
**ended (5)**
181:16;217:10,17;
249:1;252:22
**ending (1)**
237:10
**end-of-shift (1)**
79:8
**ends (1)**
182:10
**enforcement (25)**
6:21;10:10;12:17;
13:14;19:7,12,14,17,
20;21:23;36:20;
59:17;61:4,11;93:22;
156:5;158:16,25;
160:8;161:4;221:25;
261:10;271:12,16;
272:9
**enforcement's (1)**
158:14
**engage (2)**
99:22,22
**engaged (2)**
96:25;219:19
**engine (3)**
84:24;85:2,4
**engulfed (1)**
276:19
**enjoyment (1)**
22:23
**enough (21)**
18:3;26:12;60:9;
87:17;89:16,16;
99:20;100:9;123:2;
130:2,6;136:24;
182:7;211:15;212:11;
226:1;233:10;254:10;
276:16,18;281:5
**ensure (3)**
80:15;83:1;102:22
**entails (1)**
218:3
**enter (2)**
269:14,16
**entered (1)**
270:3
**entering (1)**
116:23
**entire (2)**
115:2;301:10
**entities (1)**
17:13

**entity (1)**
15:9
**entries (2)**
48:20;70:6
**entry (3)**
49:3;52:15;65:6
**envelope (2)**
65:23,23
**equipment (13)**
28:13;201:8;215:5;
217:25;218:3,8;
219:3;221:4;227:2,3;
228:2;230:2;235:12
**Ernest (1)**
138:17
**Ernie (1)**
116:24
**especially (4)**
85:6;186:12;
193:16;250:8
**essentially (6)**
90:9;91:6;98:7;
208:4;210:12;238:10
**Essex (77)**
33:17;38:8;44:2;
45:13,20;49:25;
53:19;68:17,22;
93:16;94:2,8;95:25;
96:7;155:17;156:11;
157:19;180:21;181:4,
14,16;182:4;183:11,
16,18;184:1,9,10;
185:14,18,24;186:3;
187:10;204:25;
205:10,24;206:19;
215:7,12,21;216:4,6,
18;217:5,19,21;
219:4;221:2;223:12;
224:17,21;226:16;
227:2,13,24;230:13;
232:1;233:10;234:9,
20,24;235:2;237:3;
239:10;244:4;248:8;
253:24;254:14;
256:13;270:13;
274:10,19;290:1;
307:2;312:15,19,20
**establish (2)**
151:18;154:11
**established (3)**
105:14,15;200:6
**estimate (1)**
30:3
**et (1)**
52:18
**Eutsey (15)**
63:7;68:11,13,20,
25;131:25;152:3;
186:7;10;206:8,17;
243:10,12;269:6;
275:6
**evade (1)**
259:25

**Evans (112)**
4:19;7:9;24:25;
31:2;32:14;40:25;
44:6;46:10,11;47:3,6;
50:3;55:19,20;56:7,
25;57:5,8,11,15,17;
58:2,6,12;62:20;67:6;
96:5;97:22;104:25;
105:4;106:3;107:12,
22;111:7,14,23;112:9,
16,21;113:10;114:16;
115:2;116:12;118:15;
120:25;121:9,12;
122:19,24;123:3;
124:4;133:3;138:13,
18;139:10;142:15;
143:1;144:24;147:20,
25;149:13;150:13;
153:2;154:23;158:9;
162:23,25;165:4,5,13,
14;171:5;174:11;
176:3;177:9;178:3,6;
190:20;201:3;204:19,
20;210:16;228:23;
263:5,11;276:8;
278:5;281:19;290:3,
23;291:4,10;292:14;
295:22;296:11;
297:13;299:3,22;
308:6,24;309:9;
310:6,20;311:5,10,11;
312:14,20;313:9;
314:4,5;318:15
**Evans' (22)**
98:3;108:4;116:1;
129:16;138:5,11;
139:2;141:11;147:19,
23;148:11,21;150:10;
163:11;164:14;200:7;
202:5;212:3;228:20;
309:20,25;311:8
**even (55)**
9:7;50:10;59:8;
74:21;98:10;103:6;
107:3;112:13;115:12;
119:18;125:12;128:6;
129:19;133:16;
142:21;143:23;
144:14;160:25;162:3,
5;163:11;168:14;
172:3;176:15;177:7;
178:13;181:9;190:9;
193:19;197:8;200:10,
11;203:7;210:3,21;
218:11;226:3,12;
227:19;238:10;
251:22;252:14;
255:17;261:12;262:1;
267:6;272:23;280:8;
282:4,14;285:1;
291:21;304:16;
305:24;311:24
**evening (10)**

29:14;112:10,13,
16;118:13;136:19;
155:3;205:20;228:16;
230:24
**event (17)**
101:17;102:6,7;
103:23;104:13;
147:10;148:10;184:7;
192:14;209:17;211:3;
247:10;250:7,12;
258:23;265:10,11
**events (11)**
127:7;159:17;
173:19;190:18;202:7;
211:6;221:2;228:9;
245:17;283:8;293:1
**eventually (3)**
39:13;43:16;247:18
**everybody (5)**
169:22;175:19;
177:2;196:13;203:10;
269:5
**everyone (7)**
4:15;34:11;89:12;
95:21;127:6;165:2;
167:1
**evidence (26)**
67:1,5;112:20;
115:20;117:8;165:20,
25,25;166:3;167:14;
182:20;191:18;255:5;
283:22;292:8,13,14,
19;294:9;295:10;
297:12,22,25;298:12;
299:1;319:3
**evidentiary (3)**
102:18;135:2;166:4
**exact (7)**
34:6;47:5;287:10;
304:12
**exactly (9)**
6:17;10:25;69:16;
72:15;110:23;162:2;
186:4;256:16;265:14
**exam (6)**
13:3,6,7,8,11,12
**EXAMINATION (8)**
4:4;58:13,21;60:7,
21;252:2;279:16;
316:15
**examine (1)**
269:24
**examined (1)**
195:21
**examiner (1)**
171:18
**except (3)**
26:2;30:23;233:15
**exchange (3)**
290:12,18,22
**exclude (1)**
159:18
**excluded (2)**

195:23;250:23
**excluding (1)**
202:6
**Excuse (1)**
293:12
**exhibit (2)**
70:11;294:18
**exist (1)**
153:8
**existed (1)**
223:3
**existence (1)**
22:13
**expect (5)**
145:10,11;162:1;
249:3,7
**expecting (1)**
7:7
**Experian (5)**
48:19,23,23,25;
317:17
**experience (5)**
27:4;78:17;127:18;
253:13;269:9
**experienced (1)**
109:11
**expert (4)**
60:24;61:6;62:11;
238:2
**experts (3)**
58:22;59:2,6
**explain (10)**
41:9;45:6;51:16;
59:5;60:5;63:3;69:5;
181:3;217:24;225:11
**explained (2)**
56:13;69:16
**explanation (1)**
162:21
**express (4)**
56:5;81:13;190:1;
270:15
**expressed (10)**
45:12;55:18;91:2;
211:16,19;212:15;
217:11;241:9;272:24;
281:2
**expressing (1)**
231:19
**extended (2)**
46:4;193:7
**extent (8)**
26:14;33:5;34:18;
47:4;60:1;140:17,19;
155:2
**eye (1)**
261:11
**eyes (6)**
95:23;185:13,22;
203:9;205:10;293:14

**F**

face (3)
50:4,5;99:2

facets (3)
17:12;253:8;286:9

facilitate (1)
51:9

facility (3)
156:11;157:24;
282:6

fact (45)
57:5;58:7;83:17;
98:14;105:18,18,22;
112:19;113:5,8,23;
115:14;116:3,16;
117:8;122:17;134:20,
23;135:1;139:21;
142:20;143:12;145:1;
148:24;151:9;161:14;
162:19;165:22;
195:15;200:20;204:1;
208:2;209:19;210:22;
242:21;247:6;248:13;
251:3,4,18;266:7;
269:18;297:22;317:9,
21

facts (25)
80:16,16;97:8,17;
103:11;116:18;
117:24;128:4;143:16;
148:3,11,12;149:5,12;
159:17,18;160:13;
163:24,25;182:19;
210:24;211:8;276:13;
282:14;283:22

factual (11)
57:7;58:1;81:3;
115:11;127:7;160:18;
208:6;255:8;263:14;
264:2;295:8

failed (2)
58:23;59:3

fair (31)
7:21;16:2;18:3;
22:24;26:12;35:25;
38:14;62:11;76:4;
78:16;86:24;87:17;
91:20;99:5;123:19;
130:2,5,5,5;167:20;
172:23;182:7;187:14;
188:22;219:24;
233:10;239:7;259:24;
262:18,20;268:22

fairly (1)
86:25

fall (1)
282:11

familiar (2)
45:23;172:10

families (2)
109:6;139:23

family (10)
9:18;63:22;106:24;
109:14,25;112:1;

140:13;141:6;155:13;
167:4

far (30)
33:8;62:15;89:15;
92:13;109:21;111:5;
132:1;133:23;143:20;
161:5;162:3;176:22;
178:11;180:9;201:10;
207:18;220:8;222:4;
235:10;237:5,6;
248:23;250:10;
259:20;263:2;278:14;
280:4;281:16;283:25;
308:15

fashion (4)
86:11;219:22;
220:20;280:3

fatalities (12)
85:6,14;192:10;
193:6,11,13,14,17,18;
194:25;195:17,24

father (3)
281:25,25;282:6

fear (1)
257:20

fearful (1)
131:12

feces (2)
301:9,9

federal (1)
302:15

feed (4)
101:19,24;102:22;
104:9

feeding (2)
101:7,14

feel (3)
108:22;131:14;
146:18

feeling (1)
175:7

feet (1)
257:21

fellow (5)
290:15,20;318:14;
319:2,4

felt (3)
55:20;127:15;219:2

few (3)
251:21;311:1;314:1

field (4)
191:21;262:6,6,13

fifth (1)
29:3

fight (2)
149:8;270:4

figure (2)
162:6;313:16

figured (1)
308:5

file (16)
24:20;65:8,14,20,
23;66:1,10,20;72:10,

15;76:25;79:21;
86:16;105:15;267:10;
306:8

filed (3)
285:2,10;302:13

files (2)
48:4;114:24

fill (2)
26:6,10

Film (1)
266:8

final (4)
37:15,15;38:12;
39:5

find (45)
48:13;52:19;59:16;
64:17;114:25;131:7;
132:20;138:3,4,10;
139:3,12;141:23;
142:4;166:1,11;
172:5,7,25;174:3,7;
176:8,9,11;181:24,25;
182:2,9;199:9;
203:20;204:1,12;
209:10;218:7;227:17;
234:11;257:17;258:7,
11,12;261:4;262:6;
267:16;294:5;303:13

finding (5)
173:24;182:9;
241:3;264:2;269:12

fine (11)
30:13;33:6;44:14;
88:5;112:15;115:8;
226:2;245:1;271:14;
289:4;301:21

finer (1)
105:13

finger (1)
297:13

finish (4)
50:24;117:13;
231:5;287:15

finished (1)
299:8

fire (72)
74:16;75:6,12;
84:21;85:3;192:1,4,4,
7,17,25;193:20,23;
194:16,16;195:13,19,
19,25;196:7,8,23;
197:2,4,17,21;219:16;
250:17;251:5,6,18,21;
252:2,3,4,5,6,7,15;
257:17;261:20;262:7,
8,17;263:2,4,6,15,18,
23;264:1,6,9;265:14,
17;266:13,21;267:17;
268:6,23;269:12,13;
270:4;276:12,22;
287:10;292:21,24;
296:22;297:24;298:5,
9

firefighter (1)
276:25

fires (24)
84:22;85:2,5,12;
192:9,22,24;193:5,10,
18;194:25;195:16,23,
24;197:3,18;250:21;
251:11;266:8;269:7;
276:18;298:12,21;
299:2

first (58)
4:2,23;6:10;8:17;
9:23;10:14;12:21;
14:16;27:11,18,19,20;
29:6;30:5;31:9;34:20,
23;35:21,22;41:3;
42:4;46:12,24;54:23;
55:14;74:19;77:21;
78:1,5,9,17;88:4;
97:1;104:7;106:7;
125:19;159:21;
161:15;176:22;
185:12,21;187:16;
222:9;225:15;243:25;
247:2;250:14,19;
253:13;285:10;
296:25;297:24;301:8;
303:3,4;306:18;
314:2;319:4

firsthand (6)
104:12;147:23;
175:10;182:12;183:9;
187:14

fitting (1)
270:21

five (39)
22:11;33:4;52:4;
61:18;96:5;111:14,
24;112:5,10,17;119:2,
8;123:4,15;136:4,16;
154:2;159:12;234:20;
237:8,24;238:11;
242:22;246:9;254:25;
258:10;261:7;266:1;
272:18;276:4,16,21;
295:17;296:7,9;
309:20;310:1;317:7,
11

five-minute (2)
56:11;146:18

five-person (1)
119:8

five-something (2)
185:18;234:6

five-subject (1)
39:9

flee (1)
261:12

flesh (1)
143:8

flight (2)
259:11,16

floor (7)

243:20;263:8;
268:2;277:8;286:12,
15;293:5

Floria (6)
110:1,2;126:4;
128:12;131:10;132:7

flowers (1)
262:13

focus (2)
138:13;205:23

focused (1)
138:12

follow (13)
18:15;90:22;167:6;
193:4;223:18;224:1,
8,8,9,15;225:1;
286:16;288:1

followed (2)
218:23;220:15

following (5)
90:21;92:12;223:4;
260:25;274:15

follows (1)
4:3

force (5)
20:22;21:1,6;
257:24;269:6

forego (1)
254:10

forgive (2)
10:6;175:22

forgotten (1)
225:14

form (137)
26:10;63:12;65:17,
18,19;66:8;67:13,16;
68:15;69:10,12;
70:24;83:4;87:3,5;
88:19;90:16;91:10,
24;92:2;93:13;94:16;
95:2,7;96:20;105:7;
107:18;108:10,24,25;
110:25;114:17;116:9;
118:9,11,17;121:22;
127:4;136:8;138:7,8;
139:4;143:25;145:21;
148:15;150:16,17;
151:14,22;152:15;
156:7;157:9,21;
160:21;163:2,20;
164:6;166:19;174:8;
178:22,23;180:3,4;
181:6,7,19;182:15,21;
183:13;186:22;
188:25;189:25;190:6;
191:16;192:20;
194:23;195:5;196:18;
201:19,24;209:24;
215:14;217:8;219:18;
220:17;221:16,19;
224:10,11;225:3;
227:8;229:6;238:25;
239:6,12;242:24;

243:2,3,16;244:16,19;
245:24;247:11;248:5;
257:5,8;260:21;
261:15,24,25;262:22,
23;267:3,6;276:20;
283:10,12,20,21;
287:20;288:13;292:9,
16;293:2;294:12,13;
296:13;297:16,17;
298:15,16;308:11;
309:11;313:11;
317:23;318:17,19

**formal (8)**
79:19,22;80:21,22;
81:2,4;82:12,21

**formalize (1)**
82:2

**formalized (2)**
14:6;82:2

**formally (1)**
110:9

**formatting (1)**
35:17

**formed (1)**
309:15

**former (3)**
5:3,4,4

**forth (1)**
268:24

**forthcoming (1)**
238:6

**forward (5)**
99:16,21;135:7;
254:11;308:17

**forwarded (1)**
226:25

**found (19)**
52:18;122:7;126:2;
134:1;136:20;137:1,
2;179:6;183:8;219:2;
225:14,16;251:18;
253:14;263:17,18;
269:4;282:21;285:7

**foundation (13)**
94:10;145:20,22;
223:20,21;224:3,12;
225:4;229:7;308:12;
309:12;313:14;
318:18

**four (7)**
136:16;137:12;
198:6,12;224:2;
228:6;295:24

**four-hour (1)**
228:23

**fourth (2)**
135:19;222:11

**frame (1)**
110:9

**freaky (1)**
144:16

**free (3)**
230:11;245:3;256:6

**freely (1)**
259:2

**fresh (1)**
202:8

**friend (2)**
130:15;258:25

**friends (2)**
118:12;167:3

**front (13)**
72:12;130:10,14,
24;132:2;140:24;
141:6;180:20;187:3;
240:18;255:17;
303:12,15

**froze (2)**
146:9,11

**fruit (1)**
287:24

**Fugitive (8)**
23:7,9,14;27:23;
28:1;257:11,14;
259:21

**fugitives (1)**
23:10

**full (11)**
7:11;8:10,13,15;
15:9;29:4;106:11;
144:16;153:20;
279:22;301:15

**full-on (1)**
262:14

**fully (3)**
257:14;279:25;
291:16

**functional (3)**
219:3;221:4,4

**further (6)**
11:22;18:16;86:16;
211:17;269:24;319:7

**furtherance (1)**
21:7

**furthering (1)**
22:23

**future (1)**
273:21

## G

**gallons (1)**
276:21

**game (1)**
176:9

**gap (2)**
234:2;268:1

**Gary (2)**
5:1,19

**gas (1)**
276:23

**gasoline (1)**
276:22

**gave (6)**
59:2;148:3,3;
206:12;231:14;

253:10

**geez (1)**
226:1

**General (11)**
5:13;15:3;39:15;
43:6,8;175:24;
202:13;210:11;
211:11;250:6,7

**generalization (2)**
57:19;176:4

**generally (4)**
25:25;65:25;172:3;
302:8

**General's (2)**
5:8;226:9

**generated (3)**
43:5;66:4;156:10

**generating (1)**
293:16

**generic (1)**
75:15

**genuine (1)**
100:6

**gets (2)**
238:15;258:7

**Gilleece (1)**
282:17

**girlfriend (1)**
161:17

**given (13)**
7:1;14:16;38:4;
176:1;184:20;188:16;
213:15;228:15;
242:21;244:4,9;
251:18;255:23

**gives (1)**
200:13

**giving (5)**
9:11;163:17,22;
210:19;254:23

**gleaned (1)**
159:6

**Glennon (1)**
89:24

**goal (4)**
64:15,19;98:1;
317:11

**goals (1)**
64:15

**gobbledygook (1)**
113:4

**goes (5)**
78:4;108:13;157:7,
8;244:17

**gonna (2)**
83:23;90:7

**Good (25)**
4:5,6,20,25;5:7,15;
6:8;28:24;87:22;
102:17;132:11;
146:13,22;161:9;
193:4;201:7;202:11,
15;223:23;254:10;

257:2;258:6;268:17;
286:15;291:2

**Gotcha (3)**
22:24;26:21;221:20

**govern (1)**
220:13

**grabbed (1)**
21:6

**grabbing (1)**
275:18

**graduate (2)**
12:2,21

**Graduated (1)**
11:15

**graduating (1)**
12:20

**graduation (1)**
11:21

**Grand (2)**
318:25;319:1

**grandmother (1)**
161:16

**Granted (1)**
250:24

**graphs (1)**
172:15

**Great (7)**
28:8;74:2;127:13;
135:24;227:22;
262:15;284:5

**green (1)**
226:13

**Greg (1)**
306:25

**Gregory (2)**
168:17;288:25

**ground (1)**
7:4

**group (7)**
31:7;81:7;87:24;
89:10;99:23;125:16;
317:6

**grown (2)**
53:9;276:6

**guaranteed (1)**
163:6

**guard (2)**
155:23,23

**guards (1)**
282:5

**guess (39)**
9:2;11:5;23:20;
25:19;30:8;31:16;
34:13;37:4;40:8;
46:18;47:21;80:25;
85:9;87:22;90:9;
100:8;109:25;126:7;
132:18;133:13;147:9;
154:25;155:23;
171:15;179:12;
181:15;183:2;198:16;
211:23;214:12;230:6;
246:6;252:18;253:19;

270:8;277:7;296:18;
315:13;317:5

**guest (1)**
281:6

**guidance (2)**
17:15;91:5

**guided (1)**
92:21

**guidelines (1)**
226:8

**guides (1)**
93:21

**gun (7)**
131:3,8,13;133:7;
152:22;264:19;280:1

**gunshot (1)**
265:16

**guy (5)**
31:22;109:14;
179:24;248:22;
273:18

**guys (2)**
138:4;308:4

## H

**habit (2)**
38:22;39:15

**Hadley (32)**
5:5,25;31:23,25;
32:7,13,20;63:6;
69:19;98:5,6;104:19;
125:20;127:22;186:5;
205:17;206:2;243:12;
245:7;249:22;275:3;
304:8;305:16,23;
307:7,15;309:7;
311:12;313:18;317:5;
318:1;319:4

**Hadley's (1)**
69:25

**Hairston (23)**
70:14,16,25;71:1,2,
4,24;72:1,22,25;
73:18;76:20;84:15;
86:7;177:22;192:18,
22;197:2;198:16;
250:20;251:4;266:12;
267:12

**Hairston's (4)**
114:24;192:7;
251:13;266:18

**half (6)**
20:8;35:22;240:7;
257:2;283:7;292:22

**hallway (4)**
134:2,7;135:6;
162:22

**Hampton (163)**
40:25;47:19;50:22;
51:6,8,10,17;97:22;
115:4;120:9,10;
125:9;130:21;133:11,

12,15,24;142:14;
145:15,18,24;146:4;
147:14,18;149:16;
150:20;165:7,9,19;
166:16;172:18;173:1,
4,9,24;174:7,15,16;
176:3,12,18;178:2,5,
9;181:4,12;182:8;
183:11;184:22,24;
185:13,21;186:19;
187:10;188:14,24;
189:6,10,21;190:4,11,
15;199:10,11,12,21,
23,24;200:6;202:2,
24;203:17;204:4,18;
205:1;208:9;210:3,
14;211:1,5;212:2;
214:1;215:21;216:3,
6,17;217:6;218:9,16;
227:12;230:7,11;
231:8;232:11,15;
233:24;236:4;237:23;
238:1,22;239:9,21;
240:4,18,24;241:2,12;
243:17;244:4;245:10;
246:13,24;248:4;
249:5,9;250:5;
251:17;252:9,13;
255:24;258:1,19;
263:6,7;268:13,20;
270:17,25;272:10;
274:10;275:9;277:14;
279:12;289:8;290:2,
11,17,22;291:7,9,12;
292:1;297:1,5,14,23;
299:22;306:14;308:5,
24;309:9,19,24;
310:21;312:23;
314:14,19,21;315:11;
316:1;318:15,24;
319:1

**Hamptons' (1)**
150:10
**Hampton's (16)**
148:25;149:4;
203:5;215:13;246:7,
10;264:14;270:9;
288:11;292:25;
298:13,22;299:1;
309:18;311:25;
317:22
**hand (4)**
28:23;43:20;
116:25;283:18
**handcuffed (1)**
233:2
**handcuffs (2)**
232:16,22
**handed (3)**
25:4;125:19;128:22
**handgun (6)**
130:14;132:8,9,11,
14,17

**handing (1)**
38:7
**hand-in-hand (1)**
95:22
**handle (5)**
18:19;19:14,15;
91:4;256:10
**handled (5)**
19:17;63:10,16;
96:18;249:8
**handling (3)**
92:7;280:9;305:13
**handwritten (10)**
37:11;39:4,21;40:1,
11;81:1,22;198:19;
285:4,15
**handy (2)**
71:4;73:2
**hang (1)**
173:7
**happen (5)**
77:11,14;120:11;
280:1;310:19
**happened (24)**
42:9;145:4,24;
150:22;151:20;155:3;
170:3;181:16;182:12;
183:6;200:23;212:9;
225:20;240:5,24;
241:8;256:12;283:8;
284:16;287:11,18;
288:12;298:22;
307:11
**happening (1)**
259:7
**happens (5)**
50:25;146:16;
162:4;172:17;200:24
**happy (1)**
8:5
**hard (5)**
138:4;181:24;
182:2;200:9;218:21
**harm (1)**
264:20
**Harris (1)**
293:20
**Haven (1)**
11:2
**head (7)**
10:18;15:18;42:14;
210:6;211:3;212:19;
227:24
**headed (1)**
213:17
**heading (1)**
188:12
**headquarters (2)**
22:6,9
**health (1)**
155:12
**hear (13)**
4:9;115:22;146:8;

189:13;192:15;
271:15,25;272:2,6,8;
290:15,20;291:6
**heard (11)**
60:20;61:1,4;88:6;
122:19;138:17;
139:15;141:10;
264:15;265:15;
282:18
**hearing (12)**
73:14;74:19;75:10;
125:8;148:19;176:18;
207:8,17;210:21;
215:1;247:20,21
**hearsay (2)**
293:23;294:10
**height (2)**
52:17;65:24
**held (1)**
15:20
**hello (1)**
4:25
**help (1)**
225:9
**helped (1)**
31:16
**helpful (2)**
170:2;195:8
**helps (1)**
198:20
**Henry (23)**
5:5,25;32:16,17,20;
69:20,21;186:6;
205:21;206:2;243:12;
304:7;305:19,24;
307:7,12,20;309:7;
311:11;317:5;318:1,
4;319:5
**Here's (1)**
285:21
**hesitate (1)**
4:12
**Hey (6)**
97:2;179:24;
273:13,18;282:19;
288:2
**hierarchy (1)**
95:9
**high (5)**
11:15,17,18;22:10;
261:7
**himself (12)**
28:17;29:3;109:15;
161:8;229:4;238:11;
254:12;258:22;
265:10;291:15;292:2,
2
**hindsight (1)**
143:10
**historical (2)**
158:8;297:9
**history (3)**
11:12,15;29:10

**Hmm (1)**
122:23
**hold (9)**
14:24;21:17;39:5;
186:14;189:12;231:5;
243:24;274:4;287:14
**holds (1)**
144:19
**home (12)**
133:6;135:13;
136:5;137:17,22;
145:14;185:2;189:3;
234:17;256:7;270:1,3
**homes (2)**
269:10,23
**homework (1)**
176:10
**Homicide (9)**
46:8;119:8;305:9,
12;306:9,13,24;
309:20,25
**homicides (1)**
119:8
**hone (1)**
33:3
**honed (1)**
112:20
**honest (1)**
61:24
**honestly (1)**
270:15
**Hope (8)**
15:15;19:9;99:20;
151:1;159:3;167:6;
173:16;177:5
**hoped (1)**
142:12
**hopeful (1)**
158:18
**hopefully (1)**
7:5
**horrible (1)**
249:18
**Hospital (1)**
269:21
**hour (8)**
56:16;235:4,4,4,6;
236:1;237:10;252:23
**hour-long (1)**
255:22
**hours (5)**
109:7,15;114:24;
118:8;228:7
**house (7)**
117:19;119:12,16;
121:21;123:2,12;
129:2,6,8,16;137:3;
145:4;167:5,16,22;
191:20;280:24
**housekeeping (1)**
245:18
**housing (1)**
131:24

**huge (1)**
262:2
**huh (1)**
300:25
**human (5)**
52:5;64:17;251:22,
24;301:9
**hunch (2)**
148:6,8
**Hunterdon (3)**
178:7;199:2;241:16
**hurt (4)**
110:19,23,24;111:2
**husband (2)**
131:17,21
**hypothesis (1)**
135:11
**hypothesize (1)**
134:18

# I

**idea (14)**
129:14;143:7;
173:13;177:6;197:23;
239:8,19,20;240:1;
250:6,16;271:1;
282:8;292:6
**identification (8)**
25:1;34:16;70:18;
73:4;165:24;246:15;
294:22;303:21
**identified (26)**
40:15;46:5;50:3;
57:2;66:3;69:19;
96:15;105:6,9;113:6;
117:8;120:1;123:9;
132:4,13;152:1;
163:8;164:10;165:13;
173:23;174:3;176:1;
203:13;263:20;
282:21;314:4
**identifies (1)**
295:16
**identify (27)**
29:3;35:6;57:16,25;
63:25;108:17;111:18;
113:2,5,8;116:18;
130:23;132:6;133:17;
134:15;152:23,24;
174:13;178:1;181:13;
235:8;251:12;258:18,
24;282:4,14,15
**identifying (3)**
132:11;165:12;
290:23
**identity (1)**
24:11
**I-E-T-J-E-N (1)**
8:19
**imagine (7)**
17:21;60:15;
199:14;232:17,20;

251:6,10
**immediate (1)**
180:20
**implausible (1)**
264:15
**implicated (1)**
263:11
**implicating (3)**
238:11;291:15;
292:2
**importance (2)**
101:14;211:16
**important (20)**
44:19;49:5;66:20;
92:10,11;97:21;99:2;
102:21;104:8,14;
134:21,24;136:24;
143:7;145:2,9;
205:14;235:10;
242:21;281:5
**impression (1)**
291:14
**impressions (1)**
86:18
**improperly (1)**
172:14
**inadmissible (1)**
59:20
**incarcerated (1)**
282:6
**inches (1)**
65:24
**incident (3)**
103:1;175:11,11
**incidental (1)**
245:11
**include (9)**
26:7;81:4;82:12,20;
135:6;151:2;197:16;
209:23;220:22
**included (10)**
41:22;49:2;55:6;
86:5;104:1,2;151:9;
204:10;285:19;
297:23
**includes (1)**
248:21
**including (3)**
95:6;127:12;317:22
**inconsistencies (4)**
159:21;161:20;
162:18;163:18
**inconsistent (2)**
287:14,17
**incorrect (3)**
164:19;182:14,17
**inculpated (2)**
229:4;291:10
**inculpating (1)**
292:2
**incumbent (1)**
224:19
**independent (7)**

40:17;44:16;68:1;
202:14;205:9;211:24;
215:25
**in-depth (7)**
65:8;66:10;72:9;
85:19,22;204:17;
235:19
**indicate (12)**
46:22;62:17,24;
73:17;177:9;179:5;
211:10;212:22;
228:17;230:10;265:6;
301:18
**indicated (15)**
62:19;67:24;
114:10;122:2;128:25;
131:12;167:1;179:7;
228:8,9,14,19;230:21;
270:1;276:7
**indicates (2)**
246:21;248:15
**indicating (6)**
77:9;202:9;211:5;
235:22;236:21;
269:10
**indication (6)**
49:16;113:24;
178:20;215:4;286:14;
289:25
**indications (1)**
171:25
**indicative (1)**
49:7
**indict (2)**
292:13;318:11
**indictable (1)**
222:16
**indictment (3)**
292:19;318:15,22
**individual (10)**
38:1;50:17,19;
91:12;131:11,12;
132:6;179:8;202:6,9
**individuals (7)**
32:21;41:17;66:6;
131:15;301:12;317:9,
20
**infants (1)**
11:3
**infer (2)**
143:18,19
**inference (1)**
144:12
**informally (1)**
281:12
**information (166)**
36:18,22,23;38:11;
39:4;40:21;41:3,10,
19,21,21;44:16,21;
48:13;49:6;50:17;
51:3,4,13;52:4,21,24,
25;54:18;55:2;57:4,7;
80:11,13,21;82:13;

84:11;98:2;100:7;
101:7,13,20,20,24;
102:5,12,16,22,23;
103:5,8,15;104:9,23;
105:2;107:7;115:5;
120:6;121:25;122:23;
124:3;132:24;134:6;
135:23;137:25;138:4,
16;139:15;140:22;
141:15,20,24;142:5,8,
12,18;143:8;144:21,
23;145:9;147:11,14;
149:4,5;150:21;
151:2,4;152:7,14;
154:4;158:21;159:5;
164:24;165:3;169:24,
25;170:2,11,21,23;
171:2,10;172:7,9;
173:11,14;174:15;
175:18;176:13,24;
177:1,5,7;184:2,20,
25;188:20,24;189:2,6,
22;190:3,16,17,18,22,
25;191:25;192:12;
193:18;195:16;197:3,
4;200:17;202:9;
206:16;207:25;210:5,
15;211:7;213:7,16,25,
25;218:14,17;229:9,
11;240:9;242:13;
253:6;257:20;261:20;
263:15;264:9;266:7;
268:11,23;291:4;
293:4;296:2,8,15,24;
297:23;298:20;312:7;
314:19,21;315:1,7
**informed (3)**
158:3;183:5;228:2
**initial (11)**
8:18;16:23;29:7;
70:4;99:19;107:21;
109:9;111:3;142:6;
222:4;317:17
**initially (2)**
78:18;108:22
**initials (1)**
180:13
**initiate (2)**
98:5;313:18
**initiated (2)**
18:16;99:19
**injured (3)**
110:18;276:2;280:2
**ink (1)**
201:13
**inoperational (1)**
235:12
**input (1)**
157:3
**inquire (3)**
193:10,14;279:25
**inquiry (1)**
48:10

**in-services (1)**
17:4
**inside (6)**
135:5;149:18;
195:20,21;216:15;
243:17
**insignificant (1)**
178:14
**instance (2)**
17:18;175:4
**instead (1)**
231:21
**instruction (2)**
9:3;14:11
**intend (2)**
143:23;265:8
**intended (1)**
250:18
**interest (12)**
22:21;43:3;89:9;
100:7;106:6;113:2;
117:22,23;142:11;
173:24;175:24;281:8
**interested (7)**
45:3;67:4,11;
149:11,12;189:21;
193:16
**Interesting (1)**
218:22
**interim (1)**
256:23
**interpret (2)**
172:13,14
**interpretation (1)**
113:7
**interpreted (1)**
60:22
**interrogations (2)**
99:12;100:15
**interrupt (2)**
185:3;189:13
**interview (121)**
24:16;51:5,7,17;
57:25;60:17;96:15,
18,19;97:6,12,21,22,
23,25;98:4,6,11;
99:17;103:12;104:7,
18,22;120:10;123:23;
124:13,15,25;126:12,
17,21;127:23;128:3;
130:8;142:24;152:4,
7,11,13;155:19;
156:12;157:20;158:1,
7;168:22,24;169:4,14,
17,19,22,23;170:1;
174:13;176:11;177:4;
178:14;179:18,19;
180:22;181:17;
183:25;188:7,10,11;
189:10;190:21;191:8,
14;199:5;200:1,2,5;
203:10;205:4,15;
211:17;215:14,15,15,

17,20;216:3,6,16,20,
23,25;217:5,14;
218:11,17,19,24;
219:5,8,20,25;221:7;
222:14;224:23,24,25;
227:12;231:22;
241:20;243:22;244:1;
245:14,21;246:13;
250:3;258:15;266:6;
270:14,20;277:13;
281:22;288:23;
313:17,19
**interview/interrogation (1)**
24:10
**interviewed (28)**
96:16;101:15;
104:16;107:20;
118:12;122:1;124:6;
126:4;131:25;137:25;
140:9;142:13;152:2;
153:12;155:9;158:23,
25;169:11;174:17,19;
182:5;184:22;188:15;
190:20;213:3;218:10;
253:16;265:6
**interviewer (1)**
127:13
**interviewers (1)**
100:1
**interviewing (11)**
51:9;67:12;99:18;
126:23;127:1,19;
158:19;168:17;
175:19;281:18;
288:18
**interviewing/interrogation (1)**
17:22
**interviews (29)**
16:15;17:19;57:13,
14,16;63:1;66:7,8,17;
85:24;95:5,10,17,19;
99:9,12;100:16;
156:6;170:6;219:21;
220:2,16,19;221:2,11,
25;222:9,23;288:25
**intimate (1)**
258:21
**intimately (5)**
106:23;163:13;
173:19;258:14;315:3
**into (50)**
15:25;19:6;26:7;
33:16;38:11;39:5;
46:6;47:21;48:4;
80:22;81:1;82:21;
87:15;94:14;116:21;
117:18;123:12;
127:14;134:9;135:22;
140:6,8;149:6,8;
157:3;170:1;179:3,9;
181:14,15;202:5;
224:24;229:22;
232:20;233:6;243:21,

25;250:3;254:14,20;
276:4;277:4;278:12,
21;282:23;306:9;
312:5,8;313:17;
314:18
**intrigued (1)**
74:16
**intro (1)**
96:24
**introduce (1)**
236:20
**introduced (1)**
63:7
**introduction (3)**
17:14;97:16;236:19
**introductory (1)**
30:6
**inves (2)**
17:11;82:9
**investigate (5)**
11:1;70:8;140:11;
220:24;317:1
**investigated (1)**
96:7
**investigates (1)**
106:2
**investigating (5)**
14:14;21:4;68:10;
220:8;225:22
**investigation (82)**
17:20;19:6;21:7;
22:22;30:19;31:11;
33:12;35:8,25;36:14;
40:2;43:1;45:2,4,7,11,
11,17;46:15;50:2;
51:19;55:20;56:14;
57:11;59:23;63:10,
16,18;67:22;69:1;
70:5;74:10;76:4;77:9;
79:1,22;80:6,11,13,
18;81:21,24;82:18,20,
25;87:25;88:2,11;
90:14;91:8,11,21;
92:10,10,12;93:12;
123:19;125:17;
138:13;140:18;141:3;
142:6;155:11;166:17;
170:6;173:11;177:15,
17;197:12;277:10;
279:2,6;280:17;
282:2;284:7;289:20;
296:16;298:1;304:5;
306:9;316:17,21
**investigation/cold (1)**
93:11
**investigations (19)**
14:7,7,12;16:20;
18:16,17,18,21;20:15,
19,24,25;24:8;89:2;
94:20,25;96:1;
123:18;172:6
**investigative (20)**
17:13;18:13;36:20;

47:13;51:22;53:2;
54:5;55:5;77:15;
78:19;83:2;91:5;
131:7;146:5;147:7;
192:18;278:20,23;
289:12,17
**investigator (3)**
68:23;81:5;144:4
**involved (88)**
15:2;17:20;18:25;
20:24;33:12;36:14;
40:19;45:2,3;62:21;
69:25;74:7,10,14;
81:12;89:10,12;91:9,
12;96:10,12;105:10,
20;106:23;112:21;
113:10;121:12,21;
122:2,3,5,24;123:18,
24;124:4;131:16,17,
20;135:16;136:17,25;
147:15,16,20;149:13;
150:22;159:3;160:17;
163:14;164:10;
165:17;168:22;170:5;
173:19;175:11,17,20;
186:6,6;192:13;
208:3;211:1,4,6,11;
216:3,5;217:13;
226:24;243:8;249:17;
250:10;258:9,14;
263:5;270:5;278:8,
11,13,23;279:1,3,5;
280:12;282:24;
292:19;311:5;315:3
**involvement (37)**
33:20;59:9;62:16;
66:21,24;87:21;
94:19;105:4;132:2;
138:11;147:19,23;
148:11;158:24;169:1;
175:15;177:9;178:15;
184:25;202:3;210:15;
211:14;212:3,16;
219:5;228:9,14,17,20;
238:7;255:14;257:10,
12;264:23;265:3;
309:20,25
**involving (2)**
176:10;222:17
**in-your-face (1)**
100:11
**issue (2)**
68:12;103:20
**issues (15)**
4:11;47:23;90:24;
95:21;96:22;101:8;
109:4;116:22;120:19;
146:7;169:12;188:8;
215:7;218:3,4
**items (2)**
263:18;280:5

## J

**Jack (3)**
68:13;186:7;269:6
**jail (19)**
179:3,8,10,19,20;
182:10;183:16;184:1,
9;230:14;232:25;
253:24;254:3,4,8,9,
12;256:13;272:25
**January (5)**
11:9;21:14;23:23;
26:15;282:10
**jeans (1)**
144:2
**Jen (1)**
88:3
**Jennifer (3)**
4:17;6:9;303:18
**Jersey (14)**
5:8,10,12;9:13,14,
24;11:4,18;21:10;
22:7;35:16;52:6,14;
109:5
**job (5)**
16:10;39:12;83:18;
95:22;225:17
**jobs (2)**
89:8;90:2
**Joe (8)**
31:25;63:6;69:19;
89:24;98:4;127:12;
305:16,23
**John (2)**
28:11;73:19
**Johnson (1)**
155:10
**join (3)**
69:11;178:25;
260:22
**joined (4)**
22:15;28:10;68:22;
80:9
**joining (2)**
6:4;168:23
**Jones (8)**
42:16,19,24;43:20;
88:13;89:23;164:25;
165:1
**JR (1)**
4:1
**J-R (1)**
29:8
**judge (7)**
180:20;254:9;
255:8,12,15,17;
308:21
**judgment (1)**
232:19
**jump (1)**
266:24
**jumping (1)**

263:16
**June (19)**
36:6,16,21;37:14;
41:22;54:18,19,20;
55:10;104:15;105:3;
120:2;123:17;124:7;
137:24;152:1,3;
289:5,22
**Junior (5)**
8:17,19;28:20;29:6,
8
**jurisdiction (2)**
13:10;19:18
**jury (4)**
148:10;310:6;
318:25;319:1
**justice (3)**
12:1,6,10
**juvenile (1)**
24:16
**juveniles (3)**
40:16;54:17,24

## K

**Kathy (1)**
153:12
**keep (10)**
4:10;39:11;71:4;
136:13;147:6;159:9;
250:25;260:11,19;
261:11
**keeping (3)**
61:10;260:13,15
**Kelly (2)**
248:9,17
**Kelly's (1)**
248:16
**kept (1)**
38:12
**Kevin (2)**
288:18,25
**keyed (1)**
275:16
**kid (2)**
108:13;110:15
**kids (2)**
106:25;242:22
**kill (5)**
119:13,14;123:4;
159:12,13
**killed (4)**
109:14;135:5;
136:4;310:21
**killer (1)**
143:22
**killing (2)**
119:2;261:7
**Kimble (1)**
281:23
**kind (6)**
17:2;100:9;231:23;
243:1;268:8;276:5

**King (1)**
5:17
**knew (21)**
43:12;70:7;106:3,
10,13;126:1;174:10;
189:8;199:12,14;
219:14;225:24;
241:12;250:11,11;
258:25;259:19;263:2,
3;273:1;312:10
**knock (1)**
97:3
**knowing (4)**
139:10;170:21,23,
24
**knowledge (33)**
40:18;51:21;
102:25;104:12;
147:23;157:17;
169:20;171:23,25;
174:17;175:10,15;
179:20;180:5;182:12;
183:9;187:14;190:12;
191:10,11,12;199:25;
200:22;216:21;217:7;
219:8;226:12;247:5;
250:4;258:21;267:22,
23;269:25
**known (10)**
104:23;173:5,6,7;
175:19;191:3;194:25;
195:17;208:7;231:21
**knows (7)**
110:23;135:7;
137:4,23;258:17;
262:17;286:6

## L

**Lack (1)**
94:10
**Lacks (1)**
145:19
**laid (2)**
136:15;275:18
**lapse (1)**
264:12
**laptop (1)**
179:11
**large (10)**
65:20,22;236:6,6;
243:23;257:18;268:5;
269:12;301:12,15
**larger (3)**
76:19;87:20;278:12
**Last (56)**
8:18;14:3;16:22;
29:7,14;30:7;32:6,17,
25;52:3;56:9;57:3;
58:8;61:17;74:1,4,15;
86:5;105:10,22;
106:4,14,16;107:7,10,
14,21;108:7,12,14,15;

109:13;110:15;111:3,
8,8,14,23,25;112:6;
113:6;116:24;117:15,
20,21;118:7;135:15;
137:22;154:19,22;
248:10;275:8;296:9,
10;309:17,17
**lasted (1)**
30:4
**late (2)**
184:16;313:15
**later (27)**
18:4;34:3;58:21;
60:23;61:6;69:18;
79:12;80:13;81:17;
104:2;108:21;120:16;
122:1;134:17;135:22;
136:25;178:13;
195:22,25;196:3;
202:8;233:16;237:21;
240:3;263:20;270:8;
288:5
**laundering (1)**
24:11
**Laurino (1)**
306:21
**law (31)**
6:20;8:2;10:9;
12:17;13:14;19:7,12,
14,17,19;21:23;
36:19;59:16;61:4,11;
64:4,7,9;93:21;109:3;
156:4;158:13,15,25;
160:8;161:4;221:25;
261:10;271:11,16;
272:9
**lawful (3)**
156:16,19,23
**lawsuit (4)**
30:21;32:14;285:1,
8
**lawsuits (1)**
6:25
**lead (33)**
45:15;55:8;65:12;
71:21;95:16,23;
96:24;98:7;99:4,14,
19;105:3,19;106:5;
117:24;120:5;126:12,
15,16,21,22;148:16;
163:24;164:9;165:3;
197:1,8;278:14;
288:10;291:8;306:4;
314:4,6
**leading (2)**
45:11;289:21
**leads (9)**
56:6;144:22;
196:16,22;197:12;
213:24;287:13,16,25
**learn (6)**
17:18;101:6;127:7;
195:22;240:3,8

**learned (2)**
233:16;237:21
**learning (1)**
81:23
**least (25)**
25:19;58:2;64:16;
71:17;77:21,24,25;
78:13,17;84:15;
85:23;89:2;93:10;
99:2;108:22;109:21;
193:9;237:11;276:6;
278:8,19;281:11;
289:6;298:1;317:16
**leave (7)**
36:10;56:17;
143:16;144:22;
224:25;230:11;
259:19
**leaving (3)**
108:2;137:22;
239:10
**led (14)**
57:17;95:10;
112:20;113:9;116:19;
117:11,13;157:15;
162:11;170:1;192:23;
193:23;241:10;
292:11
**Ledger (2)**
266:8;267:18
**Lee (141)**
4:18;7:9;40:25;
44:6;46:10,11;47:2,6;
50:2;55:19,20;56:7,
25;57:5,8,11,14,17;
58:2,6;62:20;67:6;
96:5;97:22;98:3,11,
24;104:25;105:4,16,
19;106:3;107:12,22;
108:4,4;111:7,13,23;
112:9,16,21;113:9;
114:1,16,21;115:2,14;
116:1,12,16,16,20;
117:14;118:6,15;
120:14,25;121:9,12,
20,24;122:19,23;
123:3,23;124:4;
129:16;133:3;138:12,
18;139:10;141:11;
142:15;143:1;144:24;
147:12,15,18,20,23,
25;148:11,21;149:13;
150:9,13;153:2;
154:23;158:9;160:9,
16,18;162:23,24;
163:8,11;164:14;
165:3,5,13,14;171:5;
174:11;176:3;177:9;
190:12,16,20;200:7;
201:3;202:5;204:19,
20;210:15;212:3;
228:20,23;263:5,11;
276:8;278:5;281:18;

290:2,23;291:4,10;
292:13;295:22;
296:11;297:13;299:3,
21;309:19,25;310:6,
20;311:5;312:14,20;
318:15
**Lee's (1)**
167:16
**left (15)**
29:9;98:15,16,17;
107:13;135:4,17,18;
137:1,2,3;190:14;
210:10;233:10;301:9
**legal (1)**
65:22
**legally (1)**
291:22
**leniency (2)**
290:12,16
**Lenzell (1)**
281:23
**less (2)**
99:2;270:8
**lesson (1)**
276:8
**level (1)**
159:13
**levels (2)**
27:1,7,13;182:14
**lied (2)**
309:19,24
**lieu (1)**
254:4
**Lieutenant (93)**
32:24;33:17,21;
34:1;42:10,21;43:16,
24;44:22;46:9;48:12;
49:23;50:1,5,12,20;
51:2,24;53:18;55:16,
17;56:24;59:5;62:19;
63:17;64:16,22;65:9,
13;67:8;69:5;73:19;
74:24;86:17,22;
88:14;91:17;92:6;
94:1,12,24;95:6,16;
96:17;104:19;124:10,
21,24;125:23;126:20,
25;131:25;152:2;
153:5;169:19;175:13;
176:9,17;177:3;
178:10;184:21;185:6;
186:18;189:9,19;
203:3,24;209:6;
210:17;216:17;
227:21;228:12;
231:15;232:13;233:3;
238:19;239:9;240:10;
245:7;246:21,25;
247:17;249:8,22;
285:21;295:14;307:5;
311:4,14;312:15,18;
316:18;319:5
**Lieutenants (2)**

239:3;301:8
**life (1)**
122:20
**lifted (2)**
238:5,9
**light (4)**
132:25;152:19;
155:2;291:23
**liked (1)**
201:14
**likely (5)**
79:15;123:23;
145:13;266:21;
273:23
**Lillie (7)**
104:16,22;123:21;
130:16;131:10,15;
132:22
**line (2)**
84:23;246:19
**lines (1)**
166:17
**lingo (1)**
21:23
**link (3)**
151:10;175:20;
262:15
**linked (1)**
132:23
**links (1)**
75:18
**LIPSHUTZ (93)**
4:20,24;5:1,23;
63:12;68:15;69:9;
78:22;87:3;88:3,19;
90:16;91:10,24;93:4,
8,13;94:10,16;95:7;
96:20;107:16;108:10,
24;111:11;112:23;
114:17;116:9;118:11,
19;122:10;123:6,8;
137:19;138:7;139:4;
143:25;145:19;146:8;
150:6,17;160:21;
164:15;178:25;180:4,
12;181:19;182:13,18;
189:12;191:16;192:2;
194:23;195:4;221:13,
16,18;223:19,24;
224:10;242:24;243:2,
16;247:11;248:5;
255:2;257:5,8;
260:21;261:24;
262:22;267:5;283:12,
20;294:1,12;296:5,
13;297:17;298:4,16;
302:24;303:2,5,6,17,
24;310:23;316:9;
318:19;319:9,16,22
**Lipshutz's (1)**
318:9
**list (10)**
25:14;40:24;41:12;

49:1,13;174:25;
176:25;192:11;
199:23,24
**listed (3)**
26:11;28:4;70:14
**listen (3)**
103:24;160:2;
229:25
**lit (1)**
195:19
**literally (1)**
256:25
**Litigation (1)**
5:2
**little (18)**
8:23,24;11:13;
29:10;33:4;56:13;
83:24;105:13;111:5;
119:13;177:13;
205:23;233:11;
234:20;264:15;
270:16;277:7;279:9
**Littleton (1)**
85:14
**live (3)**
9:12,17;237:7
**lived (2)**
9:15;241:2
**living (4)**
11:2;195:20;
241:16;260:7
**lo (1)**
261:22
**local (6)**
19:3,7,14,17,19;
296:11
**locate (4)**
51:13;52:7;173:4;
176:6
**located (6)**
22:5;131:23;
136:18;205:1;241:6;
242:1
**locating (4)**
176:7,12,14;259:22
**location (18)**
18:8;75:21;217:18;
218:6;234:11;235:13;
240:4,20;241:10,22;
250:7;255:11;286:5;
287:10;311:14;312:1,
9,19
**locations (2)**
52:19;173:5
**lock (1)**
149:23
**locked (3)**
273:19;276:10;
311:17
**locking (1)**
163:7
**lodge (1)**
8:21

**logic (3)**
144:5,7,18
**logical (2)**
136:3;238:17
**logs (1)**
252:6
**long (28)**
9:15;10:3;11:6;
14:3,24;16:22;19:25;
20:7;21:12;30:3;
46:14,19;56:9;68:1,2;
129:1,7,10;234:25;
235:1,2;237:3;
252:17;256:19;257:6;
258:6;275:8;302:9
**longer (1)**
192:19
**long-term (3)**
20:21;64:11,13
**look (75)**
18:1;24:14,18,19;
30:14;34:2;40:8,10;
47:20;52:16;56:1,2;
59:6;60:6,10,16;65:1;
66:20;71:5;72:24;
73:5,23;76:19;83:8,
22,22;86:4;89:6;
119:12;120:3;140:6,
8;163:11;168:16;
169:3;170:13;176:20;
177:4;178:11;196:15;
197:18;198:16,18;
203:16,19;204:17;
207:17;209:11;210:9,
21;216:15;238:21;
242:3;244:20,22;
245:2,24;246:4;
257:16;264:4;265:10;
266:3,19;269:14,17,
24;284:19;285:3;
286:10;294:16,17;
306:17;310:17;
314:18;317:17
**looked (42)**
17:9;30:15;34:21;
39:1;48:22;66:17;
76:25;120:23;121:5,
8;130:15;134:9,10,10,
14;142:4,8;169:1;
173:5;178:5;179:3,9;
192:22;193:1,13;
194:25;196:1;197:2,
9,20;201:14;202:25;
214:24;225:11;
250:21;251:6,11;
258:14,22;285:6,18;
286:10
**looking (51)**
7:10;29:17;33:18;
40:7,14;42:25;43:1;
44:10;45:14;47:18;
48:4,24;49:19;50:17;
51:5;52:24;53:3,8,9;

55:13;56:7;71:3,20;
86:15;91:12;92:8;
94:13;100:7;109:24;
110:4;115:9,10;
120:2;121:24;139:2,
16;144:17;163:23,24;
165:1;170:12;179:12;
193:2;242:5;249:25;
257:15;258:6,20;
285:14;286:12;
303:24
**looks (11)**
35:23;47:11;48:3;
63:21;78:3;84:20,23;
146:10;170:17;
249:21;266:6
**lookup (1)**
204:11
**lost (1)**
136:21
**lot (11)**
76:3;89:7;118:14;
136:11;159:25;160:6,
7,10,13;171:12;
220:24
**Lou (5)**
63:10;174:12;
186:6;239:20,20
**Louis (2)**
5:18;295:7
**loved (1)**
135:3
**low (4)**
22:11;159:12,12;
287:23
**low-level (1)**
289:18
**luck (1)**
190:21
**lucky (1)**
179:15

**M**

**mailbox (1)**
301:10
**main (8)**
44:5;46:10;47:3;
50:2;57:9;58:2;115:2,
7
**Mainly (1)**
219:22
**maintain (2)**
32:21;52:12
**maintained (2)**
32:9;37:22
**maintaining (1)**
38:22
**Major (2)**
21:5;75:23
**majority (3)**
87:21;127:15;
219:21

**makes (3)**
15:22;46:16;144:19
**Making (5)**
139:23;140:13;
162:7;163:7;253:7
**male (2)**
131:18,22
**males (1)**
293:5
**man (3)**
130:8,15;159:10
**manhandled (1)**
201:10
**man-manipulated (1)**
201:12
**man's (1)**
130:14
**many (32)**
6:13,17;22:8;26:8;
27:13,14;29:25;31:6,
13;70:6;75:16;79:6;
91:2;103:10,18;
112:25;119:6;120:15;
127:18;140:23;
174:24;182:13;251:2;
257:9;258:3,13;
260:8,25;262:11;
269:10;285:9;300:23
**map (2)**
242:3,5
**March (7)**
64:9;73:19;256:21;
289:23;300:3;303:9;
306:19
**marijuana (59)**
113:11,18,20,21,25;
114:12,13,20;115:14,
15,19,20,25;116:15;
117:2,4,19;119:2,9,
15;120:14,25;121:7,
10,20,21,25;122:3,5,
8,14,18;123:2,5,11,
11;128:9,21;129:2,15,
19,24;153:17,20;
154:1,2,8,12;155:1;
161:7,7;167:2,2,3,16,
17,23;168:1,14
**mark (9)**
24:19;25:5;34:7,12;
70:11,13;246:6,7;
294:18
**marked (12)**
25:1;34:16,21;
62:18;70:18;71:7;
73:4;76:20;246:14;
294:22;303:17,21
**marshals (1)**
257:25
**Marvin (2)**
169:13;175:4
**match (3)**
52:17;145:18;
291:23

**matched (1)**
266:15
**matches (1)**
52:7
**materials (5)**
64:25;70:21;71:10,
13;177:24
**math (2)**
10:6;257:2
**matter (4)**
4:19;32:18;247:14;
302:18
**matters (1)**
247:15
**Maurice (6)**
118:22;141:10,18;
142:10;148:20;
150:10
**Maurine (1)**
145:1
**may (104)**
7:1;8:21;15:25;
16:7;18:3;33:6,14;
34:4;36:6;37:4;40:5,
20;41:15,20;42:6,9,
21;43:17,24;44:1,16,
23;46:12;47:17;48:5;
49:24;50:5,8,9,11,12;
51:2,24;52:2;53:17;
55:3,15;56:15;58:3,
20;64:23;65:7,14;
67:2,9,20;69:8;72:10;
75:5;76:9,9;80:12,17;
81:14;85:23;86:3;
93:16;95:1;96:21,23;
99:7;101:25;102:4,8;
104:4;108:16;111:7;
116:15;131:16;
132:14,23;133:6;
136:4;138:19;141:4;
169:7;173:21;175:22,
23;176:6;177:1;
190:11;195:12;196:7,
23;207:1;216:7;
225:6;227:15;248:12;
249:19;258:19;
273:15;279:22;281:2,
11;285:6;299:8;
304:17;309:15;314:3,
10,12,13
**maybe (25)**
8:23;17:3;44:18;
69:21;80:5;82:7;85:2;
99:3;119:7;122:23;
142:14;147:10;
149:15;171:15;
197:16;202:12;
214:24;219:24;
252:18;265:10;288:9;
291:21;300:24;
304:13;316:6
**Mayor (1)**
5:4

**McCarthy (1)**
5:4
**McDowell (8)**
110:1,2;126:5,23;
128:12;130:7;131:10;
133:6
**McDowell's (2)**
128:12;132:7
**mean (39)**
10:16,23;19:3;25:9;
43:8;45:14;54:15;
56:2;57:10;61:25;
66:11,15;74:15;
75:12,23;88:24;
106:20;126:14;142:2;
144:3,4;145:17;
152:18;159:10;
173:25;185:3;195:8;
212:13;228:14;237:7;
238:7,17;247:14;
266:20;273:25;285:9;
298:13;310:3;319:14
**means (2)**
259:18;261:13
**meant (2)**
137:16;244:2
**media (4)**
146:22,24;265:20;
266:1
**meet (8)**
5:6;44:1;49:24;
230:7;270:12,24;
273:7;319:10
**meeting (34)**
34:3;50:4,11;53:18,
22;55:15,23;56:6,9,
12,12,17,22;58:20;
62:19,25;64:22;67:9;
155:15;168:19;275:8,
10;300:3,5;306:20,
21;307:11,13,16,23;
308:4;314:12,14,18
**meetings (3)**
280:15;287:25;
300:8
**Melvin (1)**
130:16
**member (2)**
88:22;94:12;
109:14,25;203:4;
206:17
**members (9)**
63:22;86:25;89:11;
95:5;106:24;112:11;
167:4;189:20;190:2
**memorialize (9)**
36:23;37:10;219:4;
220:20;221:1;247:4,
8;248:1;249:4
**memorialized (4)**
216:8;250:13;
277:22;314:22
**memorializes (1)**

278:20
**memorializing (2)**
80:16;81:15
**memories (3)**
161:25;283:15;
313:4
**memory (10)**
24:9;36:22;53:24;
55:14;177:13;210:11;
211:24;232:20;
233:19;288:21
**men (5)**
40:16;53:9;132:23;
167:15;170:4
**mentally (1)**
238:3
**mention (5)**
46:10,14;48:22;
178:1;285:21
**mentioned (13)**
6:24;8:20;23:24;
47:6;58:11;74:11,16;
199:2;241:18;278:10;
280:8;291:18;317:21
**mentioning (2)**
47:8;192:25
**mesh (2)**
127:14;151:10
**meshing (1)**
127:22
**message (3)**
98:15,16,17
**met (10)**
29:21;55:17;72:3;
142:24;155:13;
176:15;205:20,21;
233:23;319:12
**Michael (2)**
5:11;282:8
**Middle (7)**
8:18;23:1;29:7;
184:18;207:10;
213:10;268:9
**midnight (1)**
112:14
**mid-thought (1)**
146:14
**might (23)**
17:20;25:21;33:19;
40:11;48:13;82:17;
87:11;97:2;99:24;
102:10,12;107:25;
132:25;159:4,4;
175:10;179:14;190:4,
12,24;214:18;271:1;
283:8
**Mike (1)**
128:12
**miles (1)**
237:8
**million (1)**
151:5
**mind (14)**

6:25;40:7;102:21;
114:3,6;119:21;
136:14;140:4;175:2;
181:11;197:23;202:8;
250:25;266:4
**mine (5)**
127:21;194:19;
282:15,16;283:14
**minimal (4)**
91:3;231:24;
263:13;268:5
**minimize (1)**
291:19
**minimum (1)**
4:10
**minute (4)**
224:23,24;240:7;
242:11
**minutes (8)**
30:7;198:6;214:11;
235:7;236:1;237:8,
11;299:9
**Miranda (16)**
98:7,9;103:6;125:8;
126:3;176:17;207:8,
17;209:17;210:21;
214:24;244:3,9,15;
247:20,21
**Mirandized (1)**
248:22
**missed (3)**
134:17;137:7;
299:11
**Missing (72)**
10:18,21,23,24;
11:1;22:3,4,8,12,21;
23:13;24:3;26:22;
33:5,12,13,22;40:1,
15,19;46:7,24;48:5;
49:3;52:22;53:6,14;
54:17,24;63:5,16,25;
64:11;69:7;71:18;
72:18;75:13;78:1;
88:21;90:13;91:8;
93:11;96:11;107:2,4;
108:8,12,13,20;
109:19;110:10;118:6;
130:10,25;131:9;
134:3;137:17;141:12;
155:7;168:2;188:21;
200:15,23;222:15,18;
269:25;295:17;304:4;
306:4,8;317:7,12
**Mister (1)**
25:10
**mistype (1)**
304:18
**misunderstood (1)**
80:5
**miswrote (1)**
304:23
**mix (1)**
229:22

**mixed (2)**
128:15;250:2
**moment (3)**
6:5;205:25;266:17
**Monday (1)**
306:19
**money (14)**
24:11;113:20,20;
114:12;116:6,7;
139:22;162:7,20;
254:12;301:15,16,17,
20
**monitor (1)**
318:6
**monitoring (1)**
318:5
**month (2)**
129:6;292:21
**monthly (1)**
262:8
**months (13)**
15:1;54:11;55:11;
79:7,12;80:6,6;81:17;
208:5;258:7;289:6,7;
292:8
**more (27)**
11:13;17:13;18:3;
30:5;51:1;57:23;
64:24;99:11;123:18,
23,25;132:19;153:4;
175:3,18;176:13,24;
205:24;210:18;237:1;
260:25;264:10;
278:13;279:10;289:6;
312:7;314:1
**morning (8)**
4:5,6,20,25;5:7,15;
6:8;28:13
**most (9)**
18:22;19:1;79:14;
103:23;164:3;219:11;
220:1;222:14;251:24
**mother (2)**
109:23;130:16
**mothers (1)**
175:3
**motive (19)**
113:14,17;114:4;
116:15;117:5,5,7,15;
119:2,17,21,22;
120:24;121:6,7,10;
123:13;143:1;169:6
**motives (5)**
119:23;120:1,13,
15;121:3
**motor (3)**
180:10,17;301:19
**mouth (1)**
298:8
**move (6)**
18:4;29:11;156:5;
202:22;217:2;290:10
**moved (3)**

15:25;157:2,18
**movement (3)**
157:6,11,24
**moving (2)**
147:7;153:11
**Mrs (2)**
84:12;130:7
**much (20)**
21:23;22:14;47:4;
61:14;64:24;67:22;
73:24;75:14,19,23;
76:1;171:17;177:23;
198:5;209:17;237:1,
1;264:9;276:23;
278:13
**muffled (2)**
189:14;265:16
**Muhammed (2)**
307:7;311:13
**multi-month (1)**
81:21
**multiple (4)**
98:11;119:11,16;
179:7
**multiple-alarm (1)**
85:12
**multi-victim (1)**
20:21
**municipalities (2)**
15:11;19:3
**municipality (2)**
19:7,12
**Murad (2)**
307:7;311:13
**murder (8)**
20:18,25;21:2;
114:4;123:14;148:1;
237:24;242:22
**murdered (2)**
46:24;108:23
**murders (6)**
105:5,21;123:24;
238:11;254:25;258:9
**Murphy (1)**
73:19
**must (2)**
178:19;208:14
**myself (9)**
4:16;88:23;236:20;
243:13;245:7;276:25;
311:11;313:18;318:2
**mystery (1)**
133:7

---

**N**

**nail (1)**
149:23
**name (28)**
4:17;5:1,15;6:9;
8:14,15,15,17,18;
28:11,18;29:5,6,7;
49:9,10;51:18;110:1;

128:15;130:17;
131:23;168:18,25;
169:21;174:20;
178:10;248:10;
304:12
**named (7)**
7:9;31:6;116:7;
117:23;139:22;282:2;
302:1
**names (2)**
178:4;318:1
**narcotics (2)**
24:12;121:12
**narrative (10)**
35:23;40:15;41:5,
11;42:5;53:21;54:23;
77:12;84:4;144:19
**National (1)**
61:11
**natural (1)**
9:3
**nature (2)**
50:14;245:17
**necessarily (6)**
82:20;86:21;89:5;
131:13;265:13;
281:10
**necessary (1)**
33:9
**need (18)**
4:13;8:4;21:25,25;
33:5;34:18;79:25;
82:6;114:18;146:13;
164:22;198:5;225:1;
245:13,13;246:5;
279:20;289:16
**needed (1)**
18:16
**needs (1)**
70:11
**negative (2)**
93:5;140:16
**neighbor (1)**
265:15
**neighbors (1)**
257:17
**Nelson (3)**
131:21,23;152:1
**New (28)**
5:8,10,12;9:12,14,
24;11:4,18;21:10;
22:6;35:16;52:6,14;
58:23;59:2,6;109:5;
115:4;144:11;169:24;
173:17;208:6;240:21;
250:22;251:1;253:6;
297:24;298:9
**Newark (73)**
5:3;21:10,18;22:1;
33:13;63:19;66:3;
68:14,21;69:6,13,15,
17;70:24;73:3,7;
84:21;85:3;91:11,22;

92:24;94:7;95:25;
96:7,12;128:22;
130:4;131:24;185:16;
193:5;201:7;205:21;
210:7;211:18;215:8;
219:6;221:5;223:9,
22;226:21;227:1;
230:3;231:8,13,25;
233:20,23;234:7,21;
235:14,23;236:20,21;
237:4,19;238:23;
239:11;240:10;
242:12;243:6,18;
244:10;245:10;
251:14;259:19;
269:10;295:18;306:3;
307:8;308:9;315:11,
22;316:2

**Newark's (2)**
93:5,10

**newer (1)**
133:14

**news (2)**
40:20;250:22

**newspaper (3)**
66:5;252:5;263:18

**next (12)**
27:7,12;34:5;65:6;
106:25;125:20;
200:11;206:24;
263:20;268:6,7;274:3

**Nice (2)**
5:6;319:10

**niece (1)**
128:21

**night (13)**
30:7;74:1,4,15;
106:16;135:4;136:17;
151:20;154:20;155:5;
228:10;230:21;264:7

**nine (1)**
296:19

**NJDOC (1)**
156:10

**NJSP (1)**
24:25

**nobody (2)**
251:1;288:4

**noise (2)**
4:8,10

**None (3)**
106:24;310:2,3

**nonoperational (1)**
218:15

**non-prosecution (2)**
290:21;291:2

**nonthreatening (1)**
100:6

**normal (7)**
79:13;144:12;
242:18,20;252:3;
265:11;273:17

**Northwest (1)**

9:14

**nose (1)**
267:1

**notated (1)**
86:21

**note (2)**
79:25;247:7

**notebook (2)**
37:8,11

**noted (2)**
75:14;251:5

**notepad (4)**
37:5;39:10,17,17

**notes (65)**
36:24,25;37:3,11,
14,19,25;38:12,17,
20,23;39:1,5,6,14,21;
40:1,11;53:23;54:1;
56:2,22;57:21;66:2;
70:6;79:13;80:18,23,
24;81:1,6,13,22;82:2,
9,14,14,15,18,21;
124:12,14;209:1,5,9,
20;211:21;219:4;
220:21;283:15,15,16,
17;284:3,7,11,17;
285:4,15,19;299:9;
314:15,20;315:18

**notice (5)**
36:2;65:6;124:9;
251:25;260:24

**noticed (2)**
47:20;278:7

**notified (2)**
178:20;179:23

**November (34)**
26:1;172:17;173:1,
4;178:12;179:17;
187:12;189:9,18;
194:17;195:13;196:8;
199:13;219:7;220:2;
231:7;247:1;248:2,3;
250:14,16;270:7;
274:6,10,15;275:10;
278:21;279:11;
280:20;291:13;292:4,
15;293:16;315:10

**nowhere (1)**
148:17

**number (23)**
7:10;43:11;48:19;
49:8,9,11,17;76:16;
83:24;84:25;85:4;
95:4;122:4;137:12;
147:4;198:12;207:9;
266:1;270:10,11;
282:21;304:14;
316:24

**numbers (2)**
49:2;199:9

**numerous (1)**
163:13

**Nutley (1)**

213:13

**O**

**oath (2)**
7:24;8:1

**object (3)**
69:9;92:1;221:19

**objecting (1)**
182:21

**objection (159)**
8:24;63:12;67:13,
16;68:15;69:11;
78:22;83:4;87:3,5;
88:19;90:16;91:10,
24;93:13;94:16;95:2,
7;96:20;105:7;
107:16,18;108:10,24,
25;110:25;114:17;
116:9;118:9,11,17,19;
121:22;122:10;123:6,
7;127:4;136:8;
137:19;138:7,8;
139:4;143:25;145:19,
21;148:15;150:6,16,
17;151:14,21;152:15;
156:7;157:9,21;
160:21;163:2,20;
164:6,15,17;166:6,14,
19;174:8;178:22,23;
179:1;180:3,4;181:6,
7,19;182:13,14,16;
183:13,23;184:3;
186:22;188:25;
189:25;190:6;191:1,
16;192:2,20;194:23;
195:4,5;196:18;
201:19,24;202:19;
209:24;217:8;220:17;
221:12,16;222:24;
223:19;224:10,11;
225:3;227:8;229:6;
238:25;239:6,12,17,
23;242:24;243:2,3,
16;247:11;248:5;
255:2;257:5,8;
260:21;261:15,24,25;
262:22,23;267:3,5;
276:20;283:10,12,20,
21;287:20;288:13;
292:9,16;293:2;
294:1,12,13;296:5,13;
297:16,17;298:3,4,15,
16,23;299:4;308:11;
309:11;313:11,14,15;
317:23;318:17,19

**objections (2)**
8:21;182:23

**obligated (2)**
222:22;223:17

**obligation (3)**
156:25;285:3;309:8

**obligatory (1)**

220:16

**oblige (1)**
8:5

**obliges (1)**
274:19

**observe (7)**
216:14;244:12;
271:16;272:1,3,6,8

**observed (3)**
130:13;137:23;
216:19

**observing (1)**
5:24

**obtain (1)**
63:21

**obtained (7)**
41:3;152:6;153:16;
296:25;297:1;308:2;
315:21

**obvious (1)**
10:24

**Obviously (8)**
36:5;146:9;185:10;
199:13;217:17;
220:10;223:6;310:5

**occasions (2)**
161:22;163:13

**occur (1)**
264:10

**occurred (16)**
15:11;19:11;
173:20;190:13,19;
210:2;228:10;240:2;
247:8;251:3;264:3,6,
25;265:14;266:9;
295:18

**occurrence (1)**
87:16

**occurrences (1)**
82:8

**occurring (8)**
84:22;85:6;217:23;
232:3;235:10;237:2,
20;263:7

**o'clock (22)**
106:16;112:14;
154:20;155:5;185:19,
20,20;186:20;187:11,
12,13,13,15,16,17;
228:1;229:17,17,17;
247:1,9;248:2

**October (1)**
26:15

**odd (6)**
135:8,9,21;141:23;
218:18;258:2

**off (27)**
29:9;47:24;54:16;
55:14;56:21;76:13;
90:5;91:16;99:8;
125:19;143:20;147:1;
150:3,8;197:21;
198:9;238:6,9;

244:24;257:13;265:2,
20,23;272:25;299:10,
12,14

**offender (3)**
102:17;104:9;
290:24

**offense (2)**
212:23;222:17

**offensive (1)**
127:17

**offer (2)**
43:13;290:16

**offered (3)**
13:21;63:2;295:20

**offhand (1)**
194:9

**Office (67)**
5:9,13;33:18;38:25;
44:2;45:14,20;49:25;
53:19;68:18,22;69:3;
93:16;94:3,8;155:18;
157:20;180:21;181:5,
17;182:5;183:12,19;
184:10;185:15,25;
186:3;187:11;204:25;
205:11,24;206:20;
215:8,13,22;216:4,7,
18;217:5,15,19,22;
223:13;224:22;226:9;
227:13,25;233:11;
234:9,24;235:3;
236:6;237:4;239:11;
244:5;254:15;270:13;
274:11,20;281:15;
290:1;292:7;305:8;
306:20;307:3;311:8;
312:21

**officer (11)**
6:21;31:10;61:4;
68:14;88:16;218:8;
245:9;255:19,21;
269:20;300:18

**officers (10)**
99:11;237:17;
243:7;280:21;290:16,
21;306:13;316:20;
319:2,4

**officers' (1)**
318:14

**offices (1)**
243:19

**official (2)**
271:16;272:9

**often (1)**
4:7

**old (2)**
114:23;177:25

**Olds (5)**
118:22;141:10,18;
142:11;145:1

**Olds' (1)**
150:10

**once (8)**

38:11;39:4;143:10;
205:11;219:14;243:6;
252:4;260:4
**one (119)**
7:14,19;9:2;38:23;
43:11;51:1;58:8;
59:11;61:23;62:14;
63:20;64:14;66:14;
75:1;76:6;84:24;
87:20;88:13;91:18;
94:22;96:2;98:15,16;
99:25;106:4;107:25;
109:23;110:16,17,22,
22;111:2,7,18,24,25;
113:5,6,23;115:15;
120:1,14,24;121:6;
122:18;124:19,21;
126:13,13,17;128:8;
134:16;135:14,15;
136:16;137:18;
138:16;143:2;149:14;
152:22;154:1,7;
158:10;159:4;164:2,
11;165:2,5;168:5;
171:22;172:11;
174:12,24;180:7;
186:14;192:25;
195:20;196:22;
200:25;201:2;202:24;
207:1;209:14,15;
212:19;214:7;217:3;
219:12,23;223:16;
224:8;238:23;241:12;
248:10,12;253:18;
264:13;265:15;
267:24;269:25;
270:17;280:9;285:7;
286:10;295:13,14;
301:3,4,11;302:11;
303:24;304:25;
311:15;312:13;
315:13,14,19;316:6;
319:11
**ones (3)**
81:8;87:20;108:1
**online (2)**
6:4;25:14
**Only (19)**
12:16;31:10;60:1;
81:5;102:16;104:9;
121:14;165:6;173:6;
175:25;201:5;214:10;
242:20;248:12;259:8;
260:6;270:2;297:24;
298:5
**on-the-job (1)**
101:12
**onto (1)**
39:5
**open (8)**
120:3;136:14;
149:4;159:10;162:10,
15;164:8;251:23

**open-ended (3)**
36:10;120:24;121:9
**open-minded (1)**
159:16
**operated (1)**
87:24
**operating (6)**
22:14;28:12;218:5,
9;232:1;271:4
**operation (5)**
122:8;138:5;
166:18,22;215:11
**operational (4)**
227:1,3,5;230:3
**opinion (6)**
115:10,11;148:3;
160:16;243:5;310:8
**opinions (1)**
160:10
**order (3)**
83:9;178:19;317:1
**ordered (1)**
311:7
**orders (1)**
93:20
**organizations (1)**
25:15
**organized (1)**
315:14
**organizing (1)**
315:19
**original (10)**
36:25;37:18,25;
38:23;39:1;40:10;
112:22;177:15;267:9,
10
**originally (1)**
180:6
**others (15)**
96:3;99:12,14;
118:12;125:21;
127:17;140:22;
143:16;159:2;161:24;
174:14;176:8;177:10;
229:9;260:24
**otherwise (3)**
14:6;166:23;175:11
**out (83)**
6:2;14:22;26:6,10;
28:2;34:17;58:5;
70:15;72:25;75:21,
22;76:9;88:23;89:20;
97:20;103:14;122:7;
123:22;126:2;131:7;
132:20;136:15;138:3,
4,10;142:4,16;143:8,
16;144:22;148:9,12;
151:17;156:10;162:6;
163:10;167:6;172:22;
173:7;174:3,12;
179:6;180:9;183:8;
189:3;195:22;204:1;
209:2;215:10;218:5;

219:2;225:15,16;
227:17,24;233:7;
235:13;237:10,23;
240:21;241:5;250:9;
255:11;256:16,19,25;
262:2;266:17,24;
267:16;269:20;270:2;
272:25;273:3;275:10;
279:12;282:17,19;
288:3,10;293:5;
308:5;313:16
**outrun (1)**
276:22
**outset (1)**
306:7
**outside (11)**
26:3;58:22;136:19;
137:17;152:8;157:25;
175:16;211:6,7;
253:19;318:6
**over (40)**
24:2;25:18;28:16;
38:8;88:9;99:14;
101:18;123:15;
128:22;158:8;160:5,
7;180:21;181:4,10;
182:11,25;183:25;
184:6,8,9,12;185:10,
15;186:19;187:10,16;
189:17;217:16;
218:20;219:15;
262:11;266:9;269:7;
270:12;281:17;
283:18,24;306:6;
318:1
**overnight (1)**
109:11
**overstep (1)**
103:11
**overtime (1)**
212:14
**own (25)**
18:18;48:10,11;
66:22;78:25;89:19;
92:13,17;101:18;
127:2;135:9,9,18;
137:17;157:25;
163:11;183:21;
185:22;205:10;
218:19;226:10;232:9;
264:22;282:12;
293:14
**owned (1)**
269:11

**P**

**pad (2)**
37:6;39:11
**page (36)**
7:4,17;34:6,24;
35:14,21,22;42:4;
47:21;48:3,22;49:23;

77:22;78:5,9,9,11;
84:1;85:11;93:19;
97:24;126:7;170:14;
198:18,21;200:12;
229:3;246:16,17;
266:4;282:3;285:25;
288:20;304:14,15;
306:18
**pages (6)**
35:4;78:5,10,17;
142:8;304:1
**pants (1)**
133:7
**pant's (1)**
130:14
**paper (10)**
37:8;52:12;65:17,
19;93:21;153:19,22;
201:13;247:7,25
**paperwork (5)**
43:4;155:25;156:9;
225:11;248:14
**paragraph (6)**
295:14,24;296:7,
15,21;297:4
**paragraphs (2)**
296:18;297:3
**parent (2)**
97:14;110:14
**parents (4)**
108:22;109:20;
110:7;118:12
**parents' (1)**
118:8
**parked (1)**
102:9
**part (42)**
9:12;14:5,10;20:22,
25;25:15;30:19;
48:10;51:18;52:15;
54:23;60:11;82:21,
25;84:4;87:18;88:4;
101:3;113:16;116:20;
117:4;126:2;157:17;
197:11;198:25;
203:25;211:3;220:1;
233:17;234:8;280:14;
285:8;303:10;304:3,
8;305:16,19;306:1,6;
312:10,23;317:6
**participate (5)**
62:25;152:11;
196:12;215:12,20
**participated (4)**
24:2;95:4,11;
237:24
**participating (2)**
45:17;85:24
**particular (1)**
18:8
**particularly (2)**
119:19;242:20
**parties (1)**

157:7
**parts (1)**
250:11
**party (1)**
105:10
**pass (1)**
280:6
**passed (7)**
58:16;125:22,23,
24;200:21;201:16;
258:19
**past (3)**
61:22;170:10;
251:24
**Patricia's (4)**
64:4,7,9;109:3
**patrolled (2)**
15:4;18:20
**pause (3)**
8:24;251:16,19
**payment (1)**
254:11
**PD's (1)**
91:11
**pedophile (1)**
265:5
**pending (1)**
8:6
**penetration (1)**
265:8
**people (63)**
11:1;22:8;55:25;
58:8;61:25;63:25;
66:2;101:17;103:10;
106:14,23;107:20;
111:8;117:21,22;
118:15;119:10,13,13;
122:1,4;123:4,15;
125:16;127:15,19;
136:4,10;137:4;
140:24;143:15;144:1,
3,16;160:4;175:17,
24;176:1,11,25;
187:24;188:1;199:9,
24;204:12;219:15;
243:24;253:16;
259:22;261:7;263:11;
264:21;267:8;269:18,
20;270:15,20;278:12;
280:14,14;291:19;
293:8;302:11
**people's (1)**
111:9
**per (3)**
97:9;210:4;241:19
**percent (3)**
206:4;214:19;
262:20
**perform (1)**
62:15
**perhaps (4)**
137:10;209:22;
246:1;283:6

**period (13)**
19:23;39:6,16;46:4;
87:1,18;112:12;
118:3;187:20;193:7;
228:23,24;237:14

**perished (5)**
75:6;194:4;195:13;
196:8;197:16

**permission (2)**
211:2;212:12

**permitted (1)**
252:8

**perpetrator (2)**
117:14;297:13

**Perryville (1)**
15:19

**person (45)**
60:2,6,22;82:24;
96:15;98:15;99:17,
19,21;103:20;105:19;
107:14;108:17;111:9,
14,23;113:2;115:3;
116:5;117:23;118:7;
123:11;130:24;131:8;
132:2,3,13,20,25;
133:3,17;135:15,16;
139:22;145:13;
163:10;173:10,15;
174:13;177:1;191:7;
222:18;224:23;
278:15;291:8

**personal (2)**
76:2;89:9

**personality (2)**
99:13;103:20

**personally (2)**
252:1;309:1

**personnel (2)**
25:9;31:14

**Persons (23)**
10:19,21,25;22:3,5,
9,12,21;23:13;24:3;
26:22;33:22;46:7;
49:3;62:21;64:11;
75:13;88:21;91:8;
96:11;222:15;304:4;
306:8

**person's (1)**
306:4

**persons/homicide (1)**
93:11

**perspective (1)**
283:6

**persuade (1)**
123:3

**persuaded (3)**
119:22;286:23,24

**pertained (1)**
93:10

**pertinent (2)**
80:16,17

**Phil (10)**
120:9,9;142:14;

144:25;147:14;
150:10;165:7,9;
178:3,6

**Philan (1)**
199:5

**Philander (175)**
40:25;47:19;50:22;
51:6,7,10,17;97:22;
115:4;125:9;130:21;
133:11,12,14,24;
145:15,18,24;146:4;
147:18;148:25;149:4,
16;150:20;151:19;
165:10,18;166:16;
173:4,9,24;174:7,15,
16;175:14;176:3,12,
18;178:1,2,5,9,21;
181:12;182:8;183:10;
184:21,24;185:13,21;
186:19;187:25;
188:14,24;189:6,10,
21;190:4,11,15;199:1,
10,11,12,21,22,23;
200:6,12;202:2,24;
203:5,17;204:4,18;
205:1;206:19;208:9;
210:3,13,14,25;211:5,
10;212:2,22;214:1;
215:13,21;216:3,6;
217:6;218:16;227:12;
228:6;229:4,16;
230:7,11;231:8;
232:11,15;233:24;
236:4,7,10,15,17;
237:17,22;238:1,22;
239:9,19,21;240:4,18;
243:13;245:9;246:12,
24;250:4;251:16;
252:8,13;255:24;
257:25;258:19;263:6,
7;264:14;268:13,19;
270:9,17,25;272:10,
13,14,15;274:6,9;
275:9;279:12;280:22;
288:11;289:8;290:2,
11,17,22;291:7,8;
292:1,25;295:22;
297:1,4,14,23;298:13,
21,25;299:22;306:14;
309:18;310:21;
311:25;314:13,19,21;
317:21;318:15,24,25

**Philander's (5)**
151:11;276:4;
286:19,23,25

**Phillipsburg (4)**
11:18,19,20,21

**phone (41)**
29:24,25;43:20;
44:23,25;97:1;
139:23;140:13;162:7;
184:20;185:2;188:5;
206:11,14,21;207:5,

21;208:10,22;209:3,
25;210:25;211:19;
212:7,10,17;214:17;
215:1,3,6;219:15;
234:4;235:15,17,19,
21;270:9,11;273:1;
274:13;279:12

**phonetic (1)**
263:19

**photo (5)**
133:12,14,15,18;
258:17

**physical (4)**
18:8;52:4,21;53:5

**physically (2)**
205:2;275:15

**pick (1)**
241:5

**picked (4)**
178:21;238:15;
244:18;258:8

**picture (1)**
130:21

**piece (9)**
82:19;93:21;102:4,
23;114:16;142:12;
247:7,25;268:17

**pieces (2)**
37:8;295:12

**pile (1)**
38:25

**pinpoint (1)**
106:8

**Pittman (1)**
130:16

**place (21)**
4:15;5:20;62:3;
75:4,8;97:5;101:19;
155:16,17,20;193:23;
216:25;222:22;
225:15;227:12;
237:23;245:6,9;
247:3;252:7;282:10

**placed (9)**
230:17,19;231:2;
233:3,4,5;253:1;
275:17;277:3

**places (1)**
163:13

**placing (1)**
275:19

**plaintiff (1)**
4:18

**plan (7)**
97:5,9,10;98:23;
99:3,6;308:5

**plans (1)**
268:2

**plausible (1)**
60:8

**play (2)**
132:12;220:6

**played (1)**

254:24

**please (11)**
7:15;8:13,14;28:24;
29:3;35:6;63:14;
101:9;186:15;198:16;
294:17

**plenty (6)**
75:24;158:8;
253:16;262:16;
264:11;265:6

**plus (1)**
9:16

**pm (21)**
147:1,4;185:8,21;
186:20;187:12,13;
198:9,12;233:24;
234:4;246:2,22;
247:9;248:3;249:10;
265:23;266:1;299:14,
17;319:24

**pocket (7)**
39:11,12;130:14;
132:10,11,15;152:23

**point (102)**
6:2;13:21;20:19;
26:17;39:14;40:21;
41:17;48:16,18;
51:20;56:15;63:6;
65:3;70:13;74:7,9;
75:9;78:18;79:23;
82:1;92:7;98:15;
102:14;103:10;
105:13,18;107:11;
108:6,12;110:17,22;
111:4,6;112:10,11,13,
15;117:10;118:1;
120:9;127:18;133:15;
142:24,25;143:2,3,6;
145:6;150:24;154:7;
161:10;163:5,19;
164:1;168:20;174:10;
179:18;185:1,1,14;
186:5,21;195:15,18;
197:24;198:4;199:20;
205:14,20;213:4,6;
219:2;222:8;228:23;
229:2;230:12;235:11;
236:13;237:23;
241:24;242:10;
244:10,12;247:25;
253:20;255:6;256:15;
259:20;260:23;261:4;
266:11;280:13,19;
286:4;289:13,14,17,
19;290:5;302:12;
306:9;308:23

**pointed (3)**
57:11;240:21;
297:12

**pointing (3)**
75:21;250:9;255:11

**pointing-the-finger (1)**
100:12

**points (4)**
8:21;79:24;81:3;
87:11

**pole (3)**
240:17,20;241:1

**police (74)**
5:5;9:24;10:1,4,7,
11,19,20;12:25;13:4,
9,12,15,19;14:10;
15:5,9;17:13;19:3;
20:23;21:5;25:19;
31:10,13;35:17;43:4;
48:5;62:17;63:19;
66:3;68:14,21;69:6,
15;71:16;79:6;88:11,
16,25;89:1;91:22;
92:18,19,22,24;94:6,
7;99:11;110:5;121:5;
128:22;158:11;
159:22,23;161:15;
203:5;218:8;223:7,9,
22;226:6,21;236:1;
239:10;245:9;255:19,
21;269:19;282:19;
286:15;300:18,18;
307:8;308:10

**policies (40)**
90:20,22;91:1,21,
23;92:13,15,17,18,18,
19,22,25;93:6,10,15,
18,20;94:1,6,7,13;
220:14;222:2;223:7,
10,13,16,22;224:1,3,
15,17,18;225:13,17;
226:5,7,16,21

**policing (1)**
19:8

**policy (29)**
39:19;62:3;92:11;
218:23;219:1;220:5,
6,7,13;221:10,23;
222:19,22;223:1,2;
224:6,8,9,20,22;
225:1,6,10,21,25;
226:9,10,13,23

**polygamist (1)**
31:20

**polygraph (52)**
31:19,22;57:14;
58:11,13,17,22;59:7,
14;60:7,11,13,21,25;
61:5,8,13,19;62:6;
170:19,24;171:13,17,
18,21,22;184:24;
185:8;200:21,21;
201:3,23;202:4,5,10;
207:11,22;208:2;
213:4;214:7,9,15,21;
248:7,14,16,18;249:4;
279:16,18;280:6;
282:10

**polygraphed (2)**
170:16;214:4

**polygraphist (6)**
31:16,22;62:4,14;
200:25;202:11

**polygraphists (1)**
248:11

**polygraphs (8)**
59:25;60:16;61:21;
172:2;201:6,16,17;
202:13

**poor (1)**
133:13

**pop (1)**
265:15

**popping (1)**
265:17

**portion (4)**
192:6;216:16,19;
218:24

**portions (1)**
26:2

**position (8)**
13:3,21,24,25;16:1;
18:24;21:17;22:17

**positive (3)**
38:5;206:14;311:15

**possess (2)**
105:3;129:24

**possession (1)**
85:18

**possibilities (8)**
75:17;120:4,7;
135:14;136:14;
144:18;151:17;262:3

**possibility (13)**
137:11,13,18,21;
140:4,5;162:10,16;
194:24;195:2,9;
196:4;197:1

**possible (17)**
40:4;121:3;137:6,9;
139:12;144:8,15,17;
145:12;150:13;
196:16,22;209:8,13;
255:25;315:6,8

**possibly (6)**
43:1;84:24;135:12;
195:25;206:8;276:2

**post (1)**
103:6

**potential (20)**
47:18;52:17;
105:24;106:1;113:14,
17;114:4;116:14;
120:17;144:24;159:8;
165:13;169:20;211:7;
252:3,5;263:3;
264:22;283:13;286:5

**potentially (17)**
43:13;49:7,14,17;
102:6;120:7;132:14;
137:18;145:3;169:4;
173:10;174:11;
175:17;178:6;213:11;

**pound (2)**
119:11;153:21

**pour (1)**
276:22

**practice (10)**
39:3,16,20;79:14,
18;86:14;100:22,23;
284:6,10

**practices (1)**
90:20

**Pray (5)**
138:20,24;139:7,
13;169:13

**preceded (1)**
42:6

**preceding (1)**
228:6

**predated (1)**
36:21

**predecessors (1)**
132:5

**preempted (1)**
157:11

**preparation (2)**
29:16,22

**prepare (9)**
29:12;54:4;77:13;
78:25;79:15,19;
81:19;82:6;247:18

**prepared (14)**
36:9,11;41:22;
71:16;72:17,21;
77:14;80:7;83:1;94:2;
247:9;282:9;283:7;
295:5

**preparing (4)**
55:9;71:22;81:17,
22

**present (28)**
5:21,24;6:3;55:22,
25;120:4;126:21;
133:19;152:3;159:18;
186:2,4;187:19;
188:1;238:24;243:8;
245:5;249:5;255:8,
12;275:2;294:10;
299:24;300:7;306:21;
307:3;317:21;318:4

**presented (9)**
118:2;149:5;
258:22;275:25;
276:14;286:16;
310:13,14;318:21

**preservation (1)**
39:22

**press (1)**
308:17

**pressed (1)**
281:10

**pressure (1)**
238:9

**presumably (2)**

**97:23;196:15**

**presumed (6)**
57:18;105:5,20;
123:24;317:16,18

**presuming (1)**
114:7

**pretty (19)**
38:5;47:3;59:22;
75:23;153:25;161:25;
162:23;200:9,13;
206:14;213:14;237:1;
244:24;251:22;
259:21;260:4;284:2,
4;311:15

**previous (4)**
30:6;77:10;158:24;
174:21

**previously (14)**
43:5;123:25;128:5;
141:21;142:9;158:13,
15;160:6;169:21;
183:4;236:23;240:6;
250:24;258:20

**previously-given (1)**
61:7

**Price (1)**
5:16

**primarily (1)**
43:3

**primary (2)**
64:15,15

**prime (3)**
57:1;58:7;164:5

**principal (1)**
301:11

**principle (1)**
102:20

**prints (1)**
136:1

**prior (68)**
6:22,23;10:10;
33:20;36:6;40:18;
46:20;56:14;59:8;
63:10,17;65:14;
66:20,24;67:2,10,23;
70:3;77:10;78:18,20;
94:18;95:1;96:1,12;
97:8;98:10;103:5,6;
104:21;125:9;134:17;
141:25;142:1;157:20;
161:22;168:8,23;
173:1,4;176:10;
185:11,15;186:21;
188:23;189:9,18;
191:14;194:17;
195:13;196:8;200:1,
2;203:6;212:21,25;
219:7;220:2;231:7;
233:21;241:3,18;
245:10;258:16;
259:15;280:19;300:8;
313:20

**prisoner (1)**

**157:4**

**privy (3)**
180:24;190:3;
231:18

**Probable (7)**
55:11;253:11;
255:9,16,19,23;295:9

**probably (35)**
11:11;19:1;22:11;
32:8,19;56:16;65:24;
75:1;101:22;107:25;
135:14,19;136:16;
165:16;184:18;
185:17;195:14;
201:10,13;213:19;
234:5;235:4,8,22;
237:7;242:4;249:16;
250:11;259:8;261:12;
273:7,10;293:22;
314:24;315:2

**problem (2)**
146:16;198:7

**problems (2)**
215:4;217:25

**proceed (2)**
28:24;299:12

**proceedings (3)**
28:10;80:9;302:19

**process (6)**
16:16;27:23;90:13;
117:20;156:13;207:3

**processes (1)**
55:19

**product (1)**
37:15

**profile (1)**
261:7

**profiling (1)**
301:18

**profound (1)**
119:19

**program (1)**
26:3

**progress (1)**
188:11

**progressed (1)**
70:1

**progression (1)**
281:8

**promise (2)**
290:21;291:1

**promises (3)**
290:11,16,22

**promoted (1)**
27:25

**promotion (5)**
16:8;26:18,18;28:2;
257:11

**promotions (1)**
26:19

**prompted (1)**
292:6

**prompts (1)**

**79:21**

**proof (1)**
121:15

**proofs (1)**
256:3

**proper (1)**
227:1

**properly (3)**
218:5,9;232:1

**property (1)**
240:22

**prosecution (1)**
146:5

**prosecutor (2)**
38:8;306:21

**prosecutors (6)**
280:12,16,22;
284:7;318:10,13

**Prosecutor's (64)**
33:18;44:2;45:13,
20;49:25;53:19;
68:18,22;69:3;93:16;
94:3,8;96:8;155:18;
157:20;180:21;181:5,
17;182:5;183:12,19;
184:10;185:15,25;
186:3;187:11;204:25;
205:10,24;206:20;
215:8,13,22;216:4,7,
18;217:5,14,19,22;
223:13;224:17,22;
226:16;227:13,25;
233:11;234:9,24;
235:3;237:4;239:11;
244:4;254:15;270:13;
274:11,20;281:15;
290:1;292:7;305:8;
306:20;307:2;312:21

**protocol (1)**
242:17

**protracted (1)**
56:12

**prove (5)**
121:11;166:23,25;
263:13;301:20

**proved (1)**
192:13

**proves (1)**
202:16

**provide (16)**
17:14;64:25;65:3;
102:3;12;151:2;
155:14;158:11;
160:17;170:2;172:7;
173:17;190:22;
248:25;284:2;285:4

**provided (49)**
29:13;37:25;44:22;
57:8;58:1;65:9,13,16;
66:12;70:9;72:14;
76:1,10,24;93:9,25;
101:25;115:4;120:6;
121:25;124:1;135:22;

142:1,5,9;143:21;
144:22;147:11;
148:11;164:24;165:3;
178:10;184:25;212:2,
6,8;213:7;229:12;
241:17;248:15;
253:21;267:7;284:15;
285:8,13;291:3;
293:4;310:16;318:22
**provides (3)**
102:16;147:14;
262:16
**providing (5)**
140:22;202:9;
210:15;279:22;295:9
**psychic (12)**
74:6,10,14,20,25;
75:4,12;84:11;
192:24;193:3;261:22;
314:24
**psychics (6)**
75:12,24;76:3;
262:2,8,11
**public (1)**
254:21
**pull (5)**
34:17;70:15;76:8;
193:8;258:2
**pulled (3)**
56:21;72:25;196:2
**pulling (1)**
193:18
**pun (1)**
250:18
**purely (2)**
220:22,25
**purpose (5)**
29:4;48:24;63:24;
158:3,19
**purposes (4)**
28:15,18;172:4;
187:4
**pursuant (1)**
220:5
**pursue (5)**
121:2;287:13,16;
290:2;292:7
**pursued (1)**
166:17
**push (2)**
112:14;281:6
**put (29)**
16:9;28:8,22;38:11;
39:4;44:19;54:18;
75:14,25;80:25;86:2;
105:12;109:3;134:24;
143:18;144:18;
145:11;149:17,21;
171:12,16;216:9;
242:9;243:22;265:3;
276:4,15;291:2;298:8
**putting (5)**
52:20,23;104:4;

230:15;247:24

## Q

**quarrel (2)**
186:21,25
**quibble (1)**
217:16
**quick (6)**
84:8;132:16,17;
244:22;277:1;303:5
**quickly (4)**
109:4;258:18,24;
279:10
**quite (2)**
99:3;251:20
**quote (1)**
148:8

## R

**racially (1)**
301:18
**raise (3)**
28:23;280:20;281:1
**raised (2)**
7:8;281:12
**ran (1)**
122:8
**rank (4)**
14:22;17:16;26:23;
27:7
**ranking (1)**
25:14
**rapport (1)**
270:16
**rather (5)**
91:3;136:5;141:25;
158:10;238:6
**reach (4)**
60:7;88:23;162:8;
215:10
**reached (5)**
61:8;209:2;279:11;
282:17,19
**reaches (1)**
60:24
**read (22)**
30:9;44:20;66:15;
74:1,4,15;84:7,25;
92:15,24;93:5;98:6,8;
173:18;176:16;179:4;
186:17;192:6;193:9;
200:9;244:25;304:19
**readily (3)**
59:22;162:24;
251:12
**reading (5)**
60:11;112:25;
288:24;304:22,24
**ready (1)**
185:17
**real (4)**

84:8;159:12;
244:22;263:9
**realize (3)**
80:12;195:17;
291:15
**realized (1)**
291:16
**really (24)**
51:20;101:12;
119:4;122:24;127:24;
132:19;138:4;160:17;
189:13;194:17;195:8;
208:5;210:20;233:14;
234:18;247:14,15;
263:15;271:25;276:5;
297:13;298:20,21;
305:4
**rear (1)**
39:11
**reason (16)**
30:22;44:18;49:19;
109:19;141:5;156:22;
176:23;186:20,24;
208:25;217:20;239:4;
258:23;278:10;
309:19,24
**reasons (1)**
8:9
**Rebecca (2)**
5:16;302:24
**rebooted (1)**
146:15
**recall (129)**
20:2;33:11;37:24;
38:3,13;39:23,25;
40:3;42:13;43:22,23;
44:25;45:18;47:5,8;
55:24;56:8;57:19;
59:12;61:2,9;64:21;
68:4;73:9,11,12,14,
15;74:17,19,22,23;
75:2,3,7;87:10;96:10;
99:8;100:23;111:22;
112:3;115:1;117:12;
127:20;129:3;134:16;
140:23;141:22;158:6;
159:24;169:7;170:8;
181:9;183:8,15;
184:5,8;186:4,11;
188:5;196:10;197:6;
199:14,17;203:1,2,7,
15;204:8;205:3,7,13,
16,17;209:18;210:8,
20,24;211:15,18;
212:6,10;215:23,24;
216:2;217:15;220:6,
12;222:2,5,19;223:1;
224:2,5;225:8,13,16,
25;227:15,19,20;
228:5;229:24;231:23;
232:23;233:2,17;
234:13;236:7,12;
237:1,20;241:18,19;

243:22,24;266:18;
272:12;273:16;282:3;
284:16,20;289:2;
307:10,12,14,15,19,
20
**recalled (1)**
266:16
**recalling (4)**
161:24,24;172:11;
234:16
**receive (4)**
14:11;90:14;
101:13;140:16
**received (22)**
24:25;25:18;26:1,
18;34:16;70:17;73:4;
90:18;94:18,24;
110:11;137:24;
138:17;145:9;206:16,
20;207:5;211:25;
212:17;246:14;
294:22;303:21
**recent (3)**
26:8,8;60:15
**recently (1)**
30:15
**Recktenwald (4)**
275:3,15;277:18,20
**Recktenwald's (1)**
282:9
**recognize (6)**
25:5,12;71:9,12;
73:6;319:15
**recollection (27)**
30:25;33:6;40:22;
44:13,16;65:21;68:3,
12;72:16,20;104:5;
141:7;161:5;187:6;
205:9;206:1;212:5;
214:16;216:1;217:23;
226:18;229:23;235:9;
304:20;311:24;
312:13,25
**recommenced (1)**
69:2
**recommend (1)**
8:22
**reconvene (1)**
76:11
**record (30)**
4:16;5:20;8:16;
28:18;41:23;50:24;
73:17;76:13,17;
119:19;147:1,5;
198:9,13;220:1,9,9,
11,16;221:21,25;
222:23;231:6;252:21;
265:20,23;266:2;
299:12,14,17
**recorded (12)**
218:25;219:9,9,22,
25;220:19;226:25;
245:6;249:9;277:23,

24;297:5
**recording (5)**
215:5;218:8;
221:10;222:8;247:3
**Records (2)**
24:21,24
**recovered (7)**
52:5;64:1;115:15,
25;128:8,21;167:21
**REDIRECT (1)**
316:15
**refer (12)**
33:9;34:17;35:20;
48:23;81:12;82:24;
83:6;124:9;160:1;
214:5;228:11;279:20
**reference (7)**
60:17;84:10;86:3;
199:4;249:14;266:12;
284:18
**referenced (2)**
58:1;75:5
**references (1)**
199:1
**referencing (1)**
200:3
**referred (2)**
37:14;210:5
**referring (3)**
83:9;103:3;125:12
**reflect (16)**
25:17,25;81:23;
107:11;111:13;
115:23;204:15;
208:18,22;209:9;
210:2;222:13;236:18;
248:17;278:22;
283:16
**reflected (6)**
36:19;44:17;53:23;
78:19;107:6;298:1
**reflecting (2)**
35:17;111:7
**reflection (1)**
28:6
**reflective (1)**
52:24
**reflects (9)**
26:14;36:5,19;54:7;
70:20;246:1,1;
252:18,21
**refresh (6)**
33:6;44:13;102:1,4;
104:5;304:20
**Regarding (3)**
96:3;176:18;203:4
**regular (3)**
37:8;86:25;87:8
**regularly (1)**
87:7
**regurgitating (2)**
102:24;104:11
**reignited (1)**

250:18

**reinitiate (1)**
103:17

**re-interview (7)**
62:20,21;67:18,19;
196:13;197:13;
199:25

**re-interviewed (1)**
203:11

**re-interviewing (2)**
67:12;175:24

**reintroduce (1)**
28:17

**reinvestigate (1)**
70:4

**re-investigating (1)**
63:4

**reinvestigation (1)**
69:7

**related (18)**
7:7;16:20;24:8;
27:23;48:5;67:6;96:5;
140:15;171:23;
172:22;231:9;248:8;
286:6;301:3,4,5,6;
302:9

**relates (2)**
295:17;296:21

**relation (1)**
149:1

**relative (4)**
110:4;174:11;
177:10;188:20

**release (1)**
254:10

**released (4)**
253:25;254:20;
256:15;301:17

**relevance (1)**
135:2

**relevant (3)**
81:3;189:7;213:25

**reliability (3)**
201:23;202:13;
283:8

**reliable (2)**
172:5;201:17

**relied (1)**
318:13

**re-look (1)**
197:12

**relying (1)**
83:17

**remain (1)**
251:24

**remained (1)**
256:16

**Remains (18)**
46:8;52:5,13,16;
63:25;64:17;164:2;
195:21;196:2;251:22,
23;269:4,12,15,17,24;
270:2;286:14

**remember (46)**
5:22,23;9:2;17:24;
32:6;33:7;38:7;55:15;
65:16;74:4,6,9,12,13;
75:9,11;111:20,21;
127:24;130:18;162:1;
168:17,19,24,25;
170:7;171:2;196:5;
205:2,12;206:5;
229:15,20;232:3;
240:24,25;242:2;
278:9;285:14;288:18,
24;302:17;306:22;
307:22;314:8,17

**remembered (1)**
185:1

**remove (1)**
254:12

**removed (2)**
222:11;289:19

**reopened (1)**
46:16

**repeat (12)**
4:12,13;12:7;21:25;
26:4;47:25;52:9;
63:14;79:17;101:9;
114:18;180:13;194:1;
302:6

**rephrase (5)**
7:16;182:20,24;
247:13,16

**report (173)**
34:8,15;35:3,7,8,10,
14;36:3,9,13,15,19;
38:12;39:5;41:13,16,
22;42:5;44:11,21;
47:20;48:3,22;49:4;
53:23;54:7,8,16,20;
55:9,14;56:3,21;
58:14,19;62:18;65:7;
71:21;73:2,18;74:5;
77:4,6,9,10,21;78:4;
79:7,15,19,22;80:2,3,
7,21,22;81:2,4,6,13,
17,19;82:2,6,13,21;
83:2,6,6,9;84:4,20;
85:24;86:4,5,8;88:1;
105:15;108:14,20;
109:4,8,13;111:3,17;
112:25;113:1;114:25;
124:10,24;125:2,4,7,
12,13,13,19,20,21;
126:1,3,8;134:24;
135:22;151:10;153:6,
8;170:13;174:20;
175:25;176:5;179:5;
192:7;193:9;197:19;
199:1;204:15;207:18;
208:21;209:5,23;
210:2;211:22;214:5,
14;216:8,9,10;
220:22;227:21;
233:22;242:15;247:7,

18;248:7,16;249:4;
263:4,20;266:4,18;
267:7,7,20;277:13,18,
20;278:9,19;279:20;
280:8;282:2,9,12,16;
283:2,7,9;284:24;
286:5;292:22;293:20,
23;303:8,9,11,20;
304:3,14;306:17,18;
314:22;315:18

**reported (16)**
71:17;78:1;85:14;
88:5;106:14;107:4;
109:14,20;110:9;
119:10;128:5;131:19;
265:14;267:17;270:3;
287:2

**reportedly (1)**
270:4

**Reporter (30)**
31:17;42:3;62:13;
64:5;69:14;74:8;92:5;
102:2;112:8;134:13;
147:17;170:22;180:8,
14;189:14,16;191:2;
201:11;203:21;
234:14;246:9;254:6;
257:22;265:1;272:22;
298:6;301:14;303:18;
312:17;315:16

**reporting (9)**
90:24;91:3,4,13,15,
17;109:9;114:11;
153:24

**reports (76)**
33:9,19;43:2;54:4;
59:2,11;61:7;66:4,15;
70:7,9,14,16;71:2,13,
16,23;72:8,16,21;
76:20,23;77:12;78:4,
25;79:6,10,12;81:7;
85:17;89:25;106:15,
18;107:1,6,11,13,21;
110:5;111:7,13,21;
112:1,22;113:8,9,19,
23;114:15;115:8,13,
23;116:11,19;117:11;
120:16;121:5,8;
134:11,14;174:21;
177:8,14,22,25;192:1;
198:17;207:8;208:18;
210:1;248:23;257:17;
263:4;267:13;277:15;
314:16

**represent (3)**
4:18;5:3;34:22

**representing (1)**
5:13

**request (2)**
155:25;235:21

**requested (26)**
31:17;42:3;62:13;
64:5;69:14;74:8;92:5;

102:2;112:8;131:19;
134:13;170:22;180:8;
191:2;201:11;203:21;
212:12;234:14;254:6;
257:22;265:1;272:22;
284:21;298:6;301:14;
312:17

**requests (1)**
147:17

**require (1)**
26:9

**required (6)**
17:16;39:20;64:10;
221:10,25;224:22

**requirement (1)**
79:8

**requires (1)**
255:18

**rescuing (1)**
269:22

**research (2)**
47:21;48:4

**reservations (2)**
263:22,25

**residence (11)**
116:21,24;121:1;
130:9;132:7;134:2;
240:22;241:2,3,5;
268:6

**residences (1)**
241:19

**residents (1)**
269:22

**resolution (2)**
134:15;158:18

**resolve (1)**
306:3

**resolved (2)**
117:25;286:8

**respect (5)**
204:3,6;270:18,19,
20

**respond (1)**
235:22

**responded (1)**
312:19

**response (4)**
62:4;158:14;
260:15;318:9

**responses (3)**
60:18;61:24;99:22

**responsibilities (6)**
10:17;63:20;87:13,
18;89:17;93:22

**responsibility (1)**
82:11

**responsible (8)**
57:17;71:22;
124:22;126:2;148:1;
152:19;160:19;
291:22

**rest (2)**
88:6;278:20

**result (3)**
60:7,12;61:8

**results (7)**
48:24;59:7,19;60:9,
22,25;200:22

**resume (3)**
16:13,15;26:7

**retired (4)**
10:1;31:24;32:25;
68:21

**return (5)**
109:10;136:5;
137:4;172:8;304:13

**returned (5)**
11:9;135:12;
136:17;232:24;
256:12

**returning (1)**
259:22

**reuse (1)**
144:11

**revealed (2)**
133:25;297:5

**revealing (1)**
29:20

**review (15)**
16:15;46:3;59:9,10;
61:20;65:8;66:10;
67:10;72:10;85:19,
22;93:15;114:23;
219:16,18

**reviewed (11)**
18:17;29:13;61:7;
72:9;85:19;90:1;
100:25;112:22;
177:24;219:18;239:2

**reviewing (8)**
48:20;57:13;72:16,
21;73:9,11,12,15

**reviews (1)**
62:2

**ride (1)**
233:19

**right (414)**
5:19;7:19;10:1;
12:25;13:13,22;
14:17,22;17:5;19:20;
20:12;22:15;24:4;
25:10;26:18;31:24;
33:3;35:4,10,11,20;
36:2;37:16;38:9;40:2,
9,25;41:5,25;42:2;
47:14;48:6,21;49:20;
50:6;51:25;53:10,17,
19,24;54:2,19,22,25;
55:6;56:17,20;58:13,
24;59:1,20;64:8,18;
65:9;67:8;68:7,19,25;
74:13;73:20;74:5;
77:22;78:14;80:7;
81:24;82:3,22;84:17,
22;85:25;86:13;
88:21;89:4;90:8;

Evans v.
Newark City

Video Deposition

William H. Tietjen, Jr.

92:22,25;97:21;
98:12,18;99:14;
100:1,16;102:20;
104:16,25;105:12;
106:9,11,19;107:1,4;
108:8;110:23;111:10,
15;112:17;113:22;
114:1,13,16,22;
115:16;116:1,7,8;
117:2,5,5,16;118:3,8,
14,16,24;121:3,7,13,
21;122:5,8,20;123:5,
15;124:2,4;126:5;
127:8;128:6,9,12,17,
23,25;129:2,9,17;
130:5,11,21,25;
132:16;133:3,8,12;
134:3,24;135:15;
136:13,23;137:7,11,
13;138:1,6,12,20,24,
25;139:3,7,17,23;
140:23;142:22;143:6,
12;144:5,20;145:17;
148:6,13,17;149:9,11,
18,21,24;150:5,15,23;
151:12,13,20,25;
152:20;153:2,9,11,17,
19;154:3,4,8,23;
155:7,11;157:4,8;
160:11,19;161:9,12,
17;162:17;163:15,17,
24;164:4,23;165:18;
166:10,12,13,18;
167:18;168:11,14;
169:6,9;171:6;
172:16,19;173:25;
175:5;178:8,21;
179:13;180:2,22,25;
181:11,22,25;182:12;
183:20,21;185:8;
187:7;188:24;189:23;
192:1;193:2,10,14;
195:3;196:13,20;
197:11,13;199:2,5,13,
22;201:1,23;203:1;
204:4;205:8;206:13,
25;207:16;208:11,12,
16,23;212:18;213:11,
18;214:1,23;216:10,
24;217:1;219:10;
220:3;223:7,13;
225:2;226:22;227:6,
23;228:20;229:5,13;
230:1,4;231:10;
232:6,7;233:16,25;
234:5;235:17,20;
237:12,14;240:19;
241:13;242:15,23;
243:6,11;244:5;
245:4,18;246:22,23;
247:4,10,18,22;
248:16,18;249:3,6,10;
250:6,18;251:9,10;

252:23;253:9,11,15,
23;254:1,20,25;
255:1;256:9,17;
257:3,7;259:5,10;
260:2,19;261:6,12,14,
20,23;262:7,7,20;
263:10,16,23;265:12,
18,21;266:9,24;267:2,
18,19;268:20;269:18,
19;270:6,9,11;272:7;
274:1,16,21;275:1,4,
6,22;276:6;277:4,6,7;
279:13;281:9;284:8,
12;286:19;287:7,11;
288:16;289:9;290:3;
291:20;292:15;293:1,
11,18,24;294:11;
295:14,18,22;296:19;
297:6,10,20;298:2,14;
299:3,7;300:7;304:5,
24;305:4;308:6;
310:6;315:18;316:18;
317:12,18;318:24;
319:8

**right-hand (2)**
70:20;83:24
**Rights (2)**
301:24;302:2
**ring (2)**
116:7;264:16
**risk (2)**
259:11,17
**river (1)**
136:6
**road (2)**
15:3;18:14
**Robbery (2)**
304:10,10
**Robbery/Homicide (2)**
304:9,11
**Robert (3)**
181:18,21;182:8
**Roger (3)**
138:18;147:10,25
**Rogers (8)**
137:25;139:16;
140:21;147:8,9,9,15,
19
**role (8)**
69:6,13,15,22;
147:12;254:24;
305:23;308:22
**room (32)**
115:25;128:9,21;
149:18;153:17;
185:17;205:5;215:9;
216:15,16;218:4,12;
221:6;224:24,25;
227:1;231:23;232:4;
236:3,7,9,14;243:22;
244:1;245:5,21;
276:5;277:4,7;
311:17;313:17;318:5

**rooms (2)**
115:15;218:13
**ROSEN (22)**
5:15,16;67:13,16;
95:2;127:4;174:8;
178:22;181:6;186:22;
188:25;189:25;190:6;
196:18;209:24;
238:25;239:6;303:1,
4;311:1,3;316:4
**roughly (2)**
21:13;252:22
**route (1)**
189:3
**routine (1)**
87:14
**routinely (2)**
109:6;284:23
**Royster (6)**
118:24;168:13,17;
288:19,25;289:1
**rule (1)**
109:16
**rules (1)**
7:4
**rumor (1)**
138:22
**rumors (1)**
160:22
**run (3)**
120:17,20;241:11
**running (2)**
21:6;293:5
**rush (4)**
103:22;179:16;
180:19;237:10
**Rutgers (4)**
11:24,25;12:2,21

## S

**Safe (1)**
11:2
**salary (1)**
88:25
**same (41)**
7:4,16;8:1;15:16;
20:5,13,15;21:17;
32:19;35:3;93:19;
97:24;98:1,2;118:19;
128:16;129:15;
136:19;166:14;
167:11;182:22;
198:25;200:24;202:6,
9;221:12;222:24;
229:3;239:17,23;
240:20;251:13;262:9;
266:21;283:8;292:14;
296:18;298:3,4,23;
299:4
**sample (1)**
155:14
**samples (2)**

63:21;64:2
**Sarah (1)**
155:9
**sat (2)**
120:9;310:15
**saved (1)**
269:18
**saving (1)**
74:2
**saw (46)**
22:22;30:11;40:23;
98:14;102:10;106:24,
24;107:21;108:7,17;
110:15,16;111:4;
112:2;121:8;154:5,5,
19,23;155:4;167:4;
183:6;185:21;205:9,
13,19;214:9;232:5;
241:15;244:3;258:3,
4,12,13,17;259:3;
260:9;262:12;268:2;
271:11;293:11,13;
294:7;310:17;311:22,
23
**saying (36)**
19:10;82:6;95:11,
14;122:4;129:23;
143:9;167:10,12;
168:8;179:15;189:8;
195:19;197:4,7;
199:18;201:5;209:4,
5;210:8,9;213:15;
221:9;225:7;226:2;
251:17;271:15,23,25;
286:22;288:1,2;
291:17;307:12,16;
318:2
**scenario (1)**
75:17
**scene (3)**
152:10;198:2;
311:21
**Schenck (1)**
5:16
**school (5)**
11:15,17,18;17:11,
22
**Science (1)**
12:5
**screen (1)**
28:22
**scripted (1)**
97:19
**se (3)**
97:9;210:4;241:19
**search (5)**
48:20,23;204:16;
285:22;286:2
**searching (1)**
285:16
**second (16)**
11:13;48:21;49:23;
60:6;72:15;76:7;

113:16;186:14;222:9;
223:6;243:20;274:4;
279:18;280:6;304:14,
15
**secondhand (1)**
154:3
**section (5)**
40:15;42:5;83:7,10;
200:10
**securing (1)**
318:14
**security (3)**
48:19;49:2;199:9
**seeing (12)**
67:4;74:5,12;
134:16;158:21;
168:24;205:16,17;
206:2;236:12;258:25;
293:21
**seek (6)**
89:19,20;218:5;
235:13;308:23;309:8
**seeking (1)**
127:6
**seem (12)**
96:21;145:12,13;
162:23;226:3;238:1,
3,17;259:4;264:14;
278:7,22
**seemed (4)**
99:2;136:3;158:13;
268:2
**seems (3)**
9:1;86:14;162:17
**selected (3)**
16:14,18;26:20
**selling (1)**
121:21
**senior (1)**
131:24
**sense (6)**
15:22;46:16;67:20;
121:6;144:19;261:10
**sent (1)**
29:17
**sentence (1)**
52:3
**separate (2)**
13:12;236:4
**separately (1)**
231:3
**separation (2)**
268:3,5
**September (6)**
23:23;28:3;77:22;
78:14,19,20
**sergeant (53)**
4:21,22,23,25;5:5,
9;9:23;10:13;25:10;
27:9,11,17,17,19,21,
25;28:1;30:10;34:25;
48:2;69:21;76:18;
89:24;92:17;147:6;

179:1;180:12;182:25;
186:6;195:12;198:15;
205:20;206:2;266:3;
294:25;299:19;301:7;
302:22;303:7;304:3,
7;305:19,24;307:12;
309:7;310:25;311:4,
11;316:11,18;317:5;
319:10,13
**sergeant's (1)**
202:4
**serious (3)**
20:24;158:17;180:2
**served (1)**
254:9
**service (3)**
13:10,11;27:5
**set (9)**
34:3;44:1;60:14;
79:12;110:8;185:13;
218:13;280:10;
314:11
**setting (1)**
30:6
**seven (4)**
78:5,10,17;296:18
**seven-something (1)**
274:23
**several (5)**
79:12;120:7;
158:16;208:5;209:2
**Sex (1)**
24:10
**sexual (1)**
222:17
**shall (1)**
6:5
**shape (1)**
215:14
**share (3)**
134:21;159:4;
175:13
**shared (1)**
141:24
**shed (4)**
132:25;152:19;
155:2;176:13
**shift (1)**
79:10
**shoot (1)**
264:19
**short (2)**
260:10;314:11
**shortly (6)**
57:6;71:5;202:7;
228:1;230:1;233:25
**shot (1)**
280:2
**show (7)**
100:6;107:14;
136:21;159:1;248:6;
270:19;275:15
**showed (5)**

130:20;133:11;
240:13;275:12,18
**showing (1)**
34:24
**shows (6)**
102:25;110:6;
177:21;178:7;180:17;
284:5
**side (1)**
242:6
**sides (2)**
264:25;275:19
**sightings (2)**
105:25;106:17
**sights (1)**
106:23
**sign (2)**
157:12;219:18
**signature (1)**
35:13
**signed (4)**
64:9;222:4;244:16;
300:6
**significance (5)**
80:12;132:17;
175:3;188:14,19
**significant (11)**
123:3,10;154:1;
161:20;162:1;199:18;
213:24;250:11;
251:22;283:4;286:13
**significantly (1)**
289:19
**signing (2)**
64:12;90:5
**similar (5)**
77:8;86:11,11;
127:10;268:2
**simple (1)**
132:19
**simply (4)**
99:15;135:18;
151:17;155:13
**simulations (1)**
100:21
**single (7)**
61:5;111:24;
165:19;179:13;
219:25;247:7;286:20
**sit (12)**
39:24;57:24;80:20;
82:1;98:24;99:15;
103:13;125:6;194:2;
201:21;291:25;
300:10
**sites (1)**
85:12
**sitting (2)**
229:23;256:6
**situation (2)**
60:20;128:20
**six (6)**
15:1;65:24;129:25;

289:6,7;296:15
**size (1)**
153:22
**sketch (3)**
277:6,19,21
**sketched (1)**
277:8
**skip (2)**
204:16;279:9
**skipped (1)**
265:2
**slightly (1)**
216:13
**smack (1)**
268:8
**small (3)**
39:17;119:9;268:1
**smaller (1)**
31:7
**Smith (1)**
5:16
**smoothly (1)**
7:5
**so-called (1)**
122:18
**social (3)**
48:19;49:2;199:9
**sold (1)**
167:7
**solution (1)**
62:5
**solve (2)**
166:24;317:7
**solved (1)**
165:16
**solving (1)**
317:11
**somebody (30)**
38:4;39:21;43:10;
49:8;82:6;99:15,24;
101:24;103:14;
113:19;119:15;
120:22;136:17;
142:13;143:19;149:8;
167:7,11;176:7;
177:2;179:19;196:2;
222:13;250:2;253:14;
255:6;286:25;287:2;
288:8,9
**somehow (1)**
179:21
**someone (41)**
18:19;42:13;81:14;
82:10,13;19;88:11;
89:3;96:15;98:17;
101:14;106:5;108:15;
114:11;119:7,18;
131:3;135:3,22;
136:4,24;140:11;
151:2;162:2;172:12,
13;203:13;225:10;
242:21;261:6;264:6;
270:3;284:4;301:9;

308:16;313:3;315:7,
20,23;316:7;318:12
**someone's (3)**
9:4;104:5;227:5
**sometime (7)**
69:8;185:11,18,23;
207:20;211:13;
289:22
**sometimes (12)**
4:11;75:17;80:10;
87:12;99:17;101:16;
103:4,19,20,25;172:8;
291:19
**somewhat (1)**
84:23
**somewhere (7)**
55:11;109:12;
136:6;150:4;178:7;
187:13;207:10
**son (6)**
128:12,16;132:8;
281:24;282:5,5
**son's (2)**
128:9;134:1
**sorry (28)**
12:7;21:22;25:8;
26:4;41:7;42:19;
67:14;68:16;73:10;
88:3;91:15;93:4;
95:13;111:1;113:16;
159:14;165:8;189:12;
190:7;193:25;210:23;
239:25;244:2;252:11;
268:4;297:4;298:7;
313:15
**sort (9)**
35:23;43:4;78:24;
138:22;210:18;
245:18;248:12;250:6;
269:9
**sought (3)**
26:17,19;308:18
**sound (1)**
153:20
**Sounds (5)**
27:2;40:4;62:9;
281:11;319:9
**South (1)**
13:19
**SP (1)**
26:3
**space (2)**
8:22;236:7
**speak (21)**
33:25;43:16;47:18;
50:18,20;102:5;
111:22;117:24,25;
139:6;156:25;169:15;
172:1;173:8;231:17;
236:2;256:6;281:25;
282:1;293:13;313:23
**speaking (7)**
127:16;141:21;

172:3;189:21;202:2;
269:13;293:15
**specific (15)**
16:19;49:14;57:23,
25;94:19;99:9;100:5;
103:3;115:20,24;
151:8;171:21;175:2;
191:9;206:1
**specifically (6)**
39:25;67:5;101:21;
129:23;171:23;
195:11
**specificity (1)**
176:2
**specifics (2)**
57:22;74:17
**speculating (1)**
191:22
**speculation (2)**
137:20;225:4
**speculative (1)**
182:18
**spell (2)**
8:15;28:17;29:4
**spend (2)**
177:23;289:3
**spent (2)**
158:16;160:7
**SPI (1)**
212:14
**split (2)**
153:25;154:2
**spoke (30)**
30:7;32:7,17;33:1;
34:3,6;42:13,14;
46:12;50:20;51:1;
68:6;86:24;87:7;
115:4;122:17;123:21;
127:15;130:10;
131:15;132:8;133:6;
173:15;219:14;282:4,
17;293:8;313:9,13;
314:10
**spoken (3)**
158:15;265:13;
319:12
**sporadic (1)**
87:12
**spot (3)**
41:12;115:1;258:24
**spouse (1)**
49:14
**spreadsheet (1)**
52:15
**spreadsheets (1)**
52:13
**squabble (1)**
144:14
**squad (1)**
15:4
**square (1)**
288:3
**stacked (5)**

275:13,16,20,20;
277:2
**stacking (1)**
279:24
**stages (2)**
105:25;163:14
**stamp (5)**
34:22;70:19;73:7;
303:23;304:15
**stamped (4)**
83:23;126:8;
198:18;246:18
**stand (2)**
276:16;285:20
**standards (2)**
61:11,11
**standing (2)**
240:22;275:20
**Star (3)**
266:8,8;267:17
**start (12)**
4:16;9:5;10:7;
25:24;31:9;41:5;55:9;
84:1;88:9;99:8;
182:25;189:17
**started (19)**
4:14;6:6;11:8;
22:13;54:6,10,11;
69:8;85:24;123:17;
164:4;165:14;188:12;
220:10;237:16;
257:13;276:12;278:4;
306:5
**starts (2)**
35:23;54:16
**stash (1)**
116:1
**State (46)**
5:10;8:13,14;9:24;
10:1,4,7,11,19,20;
11:4;12:25;13:4,9,12,
15;15:5;17:13;19:5;
20:23;21:5,23;25:19;
31:10,13;35:16;43:4;
48:4;79:6;88:11,16,
21,25;89:1;92:18,19,
21;94:5;109:5;
110:17;223:7;224:16;
226:6;282:18;300:18;
302:13
**stated (16)**
30:24;61:19;74:18;
111:2;136:25;154:5;
210:21;214:21;
220:20;236:23;
239:24;240:1,6;
253:6;264:24;289:18
**statement (59)**
101:10;103:3,17,
18;145:12,23;148:25;
149:17;151:11,18;
168:16;202:23;203:5,
8;205:22;220:24;

226:25;230:8;234:12;
244:13,15;245:2,4,6,
10,22,24;246:7,11,18;
249:10,15;250:13;
252:14,18,19,22,25;
253:10,22;254:24;
257:1,7;268:19;
276:4,7;287:5,6;
289:7;292:3;293:19,
23;297:6,14;298:11,
14;299:1;309:18;
317:22
**statements (23)**
66:6;103:25;
121:14,17,20;122:1;
123:1;158:12,22;
159:21,22;160:5;
162:19;163:12;
166:22;219:16,17;
230:22;249:17;
253:18;262:14;
298:10;310:15
**states (1)**
77:5
**state's (1)**
295:21
**stating (2)**
31:3;210:25
**Station (49)**
14:20;15:15,19;
16:1;18:9,10,12,15;
19:22;20:4;21:2,10,
18,21,22;22:2;
185:16;205:22;
211:18;215:8;218:19;
219:6;222:13;230:3;
231:8,13,25;232:21;
233:7,12,20,23;234:7,
16,21;235:14;236:21,
22;237:4,19;238:23;
239:11;240:11;
242:12;243:7,18;
244:10;245:10;250:8
**status (1)**
16:9
**stay (3)**
19:22;173:6;311:8
**staying (1)**
109:11
**stealing (6)**
119:1,9,15;123:4;
161:7;167:5
**step (7)**
9:9;99:14,16,21;
103:18;117:20;
264:23
**stepping (1)**
231:21
**steps (11)**
57:10;172:10;
197:18;224:24;251:2;
257:9,15;260:23;
261:17;263:8;289:21

**Steve (2)**
164:25;165:1
**sticking (1)**
213:9
**sticks (2)**
58:5;227:23
**still (41)**
7:3;9:25;21:17;
25:8;38:16,24;40:5;
42:4;48:14;55:20;
56:25;57:4,11;87:13;
90:3,4;99:4;113:1;
118:1;120:24;121:9;
122:2;135:18;144:5;
164:2;169:23;195:20;
203:10;219:19;
230:13;232:17,21,22;
237:10;261:13;265:7;
266:13;269:1;275:12;
279:5;310:19
**stock (2)**
171:12,17
**stole (8)**
117:19;120:14;
167:1,9,10,13;168:1,
14
**stolen (9)**
113:11,18,25,25;
115:13;116:15;
123:11;129:15;
167:17
**stop (7)**
113:22;178:19;
258:1;301:3,4,12,18
**stopped (3)**
146:14;237:22;
240:3
**stops (2)**
15:7,10
**story (8)**
103:22;145:18;
213:9;262:9;264:14;
286:19,23,25
**straight (1)**
258:5
**Street (25)**
85:13;103:14,15;
108:16;160:22;194:5,
8,9,10,13,13;199:2;
240:18;241:5;252:8;
258:1,11,17;260:9;
263:3;266:9;267:21;
287:2;293:6;296:22
**Streets (5)**
192:8;194:6,7;
242:2;261:9
**stress (1)**
238:5
**strike (16)**
38:20;42:19;45:9;
53:2;64:20;118:4;
121:17;175:8;187:23;
230:10,18;242:10;

245:20;250:15;269:2;
287:5
**stripped (3)**
145:16;150:3,8
**strong (2)**
160:16;173:23
**structure (2)**
195:18;278:14
**struggle (1)**
137:10
**stuck (1)**
195:20
**studies (1)**
17:3
**study (1)**
11:25
**stuff (11)**
57:20;75:25;90:23;
119:13;125:23;
191:22;207:18;210:4;
262:4;263:13;281:17
**stunning (1)**
243:1
**style (13)**
100:4;101:18,23;
127:1,9,9,10,17,20,
25;128:1;248:20;
270:14
**styles (2)**
100:2;127:14
**stylistically (1)**
127:8
**subject (6)**
32:18;91:22;226:5,
7;300:20;302:18
**submit (2)**
16:13;26:10
**submitted (4)**
58:12;78:18;
284:21,23
**subsequent (5)**
43:19;47:13;
159:22;277:13;
291:13
**subsequently (3)**
253:25;261:19;
297:10
**substance (1)**
274:9
**substantive (2)**
75:10;245:16
**success (1)**
202:15
**successful (1)**
276:9
**sudden (1)**
182:10
**sued (2)**
30:18;301:23
**sufficient (1)**
255:5
**suggested (2)**
234:23;275:22

**suggesting (2)**
86:20;110:7
**suggests (1)**
199:25
**suit (1)**
301:25
**sum (1)**
236:24
**summarize (1)**
17:8
**summarizes (1)**
297:4
**summary (2)**
41:21;210:19
**Summer (1)**
12:19
**summons (3)**
180:10,11,17
**Sup (2)**
34:11;283:1
**supervise (1)**
90:7
**supervises (1)**
89:21
**supervisor (5)**
38:1;69:25;82:7;
89:25;90:4
**supervisors (3)**
61:20;89:14;212:13
**supplemental (4)**
35:8;303:11,19;
306:18
**supplementary (2)**
34:14;77:8
**supplier (3)**
122:11;138:25;
139:2
**suppliers (2)**
122:18;139:13
**support (13)**
57:8;149:12;
160:18;162:22,24;
163:25;264:3;269:13;
294:21;295:3,9,21;
298:2
**suppose (2)**
114:6;153:23
**supposed (1)**
191:3
**supposedly (2)**
118:21;152:22
**sure (44)**
14:10;30:13;35:2;
38:3;44:12;48:1;
76:22;83:10;88:6;
96:9;101:11;106:20;
118:20;128:11;
130:17;133:20;139:5;
144:16;176:21;
180:13;185:16;
191:17,23;198:5,7,25;
206:4;208:17;225:16,
24;231:4;234:11;

**surmise (1)**
132:10
**surmising (2)**
259:8;315:4
**surprised (3)**
136:12;143:17;
259:9
**surviving (1)**
63:22
**suspect (27)**
44:6;46:10;47:3,7,
9;50:2;55:21;57:1,9;
58:2,7;102:16,22;
104:8;115:6,7;158:9;
159:8;164:2,5,9,10;
165:12,13;222:8;
314:4,6
**suspects (14)**
17:19;40:24,25;
41:12,17;46:11;
54:17,24;101:7;
103:4;117:23;164:8;
221:11;222:1
**Sussex (6)**
14:20;15:5;20:4,7,
20;21:8
**sworn (3)**
4:2;7:1;25:9
**system (8)**
23:20;179:3,9,10;
180:15,17;218:15;
234:18
**systems (1)**
218:19

**T**

**table (2)**
192:19;197:21
**tabs (4)**
260:11,13,15,19
**takeaway (1)**
163:1
**talk (16)**
99:25;144:24;
155:15;172:16;
174:25;176:2,25;
212:25;213:1;250:20;
258:1;270:22;273:8;
274:5,12;293:10
**talked (4)**
161:6;259:2;303:8;
319:12
**talking (30)**
18:23;29:9;61:16;
84:15;86:7;92:17;
93:18,20;98:3;
101:22;104:6;129:22;

130:24;132:22;
177:14;192:5;198:25;
201:25;207:2,4,21,25;
208:1,15;209:19;
210:13,19;213:10;
252:23;269:5
**talks (1)**
262:4
**tape (2)**
160:2;244:18
**taped (5)**
103:5;219:22;
220:20,23;227:14
**taping (1)**
224:23
**task (4)**
20:22;21:1,6;
257:24
**tasks (4)**
51:23;260:25;
279:3;317:10
**taught (1)**
101:21
**tax (1)**
211:24
**Taylor (15)**
116:25;138:1,18;
139:16;140:21;141:9,
19;147:8,9,9,16,20,
22,25;148:3
**Taylor's (1)**
138:17
**teach (1)**
276:8
**team (19)**
63:4;86:25;95:5;
96:17;146:5;168:24;
189:20;190:2;191:14;
194:21;203:4;206:18;
223:17;260:19;
262:18;305:22;306:2;
312:11;316:23
**teams (2)**
312:5,8
**team's (1)**
64:15
**technically (1)**
219:20
**teenage (1)**
53:8
**teenagers (5)**
129:18,24;276:6;
309:21;310:1
**teens (1)**
130:1
**telephone (3)**
237:19;240:17;
241:1
**telling (5)**
83:19;147:20;
161:21;171:24;228:5
**tells (1)**
264:6

**Ten (3)**
9:16;22:11;296:21
**tend (6)**
89:10;99:11;
101:19,23;103:18;
265:3
**tendency (1)**
9:4
**tenure (1)**
10:21
**term (5)**
23:21;26:8;91:6;
172:9;275:16
**termed (1)**
64:13
**terms (9)**
6:25;10:16;38:22;
51:21;58:6;87:24;
95:10;248:17;297:12
**terrible (1)**
19:8
**terrorism (1)**
24:12
**test (13)**
13:20;23:15,16;
58:23;59:3;60:13,15,
23;61:6;62:1,7,15;
248:18
**testified (16)**
4:3;54:15;125:10;
149:16;183:4;186:18;
187:2,5;207:7;224:2;
237:13;239:3;284:1;
317:14;318:25;319:1
**testify (1)**
231:15
**testifying (1)**
174:23
**testimony (13)**
7:1;8:11;141:2;
176:17,21;179:4;
181:2;186:21;190:23;
194:15;238:22;
252:14;259:15
**testing (3)**
23:19;177:12;
214:20
**tests (2)**
13:17;59:14
**thankful (3)**
263:17,18,19
**that'd (1)**
227:22
**theft (2)**
24:11;102:9
**thefts (1)**
19:1
**theories (2)**
46:22;191:15
**theory (28)**
124:3;142:20,22,
25;143:10;145:15;
146:4;149:13;150:13;

154:10;160:18;
162:22,24;163:10;
169:5;190:9;192:16,
16;194:17,20;196:7;
197:16,25;202:16;
250:17;263:23;264:1;
270:19
**therefore (1)**
129:13
**thereof (1)**
264:7
**thinking (1)**
205:6
**third (7)**
153:20;157:6;
222:10;246:17;263:8;
277:8;293:5
**thorough (2)**
83:1;204:11
**though (34)**
44:14;77:20;80:5;
82:17;90:2;97:4;
110:9;112:4;115:12,
13;117:2;125:12;
127:24;141:19;143:9,
23;144:14;160:14;
162:5,14;172:3;
189:8;197:7;238:10;
250:4;260:12,18;
262:18,19;263:22;
276:17;283:17;
292:12;315:24
**thought (24)**
46:23;75:19;80:4;
102:11;109:16;121:6;
130:13,15;132:9,18;
134:21,23;135:21;
160:8;178:14;191:19;
195:20;197:20;
207:12;218:18;
236:17;250:23;280:3;
310:18
**thoughts (6)**
55:18;97:7;135:9,
10;159:10;191:17
**threat (1)**
131:13
**threatening (1)**
140:13
**three (12)**
30:2;77:24,25,25;
112:6;127:12;135:14;
136:15;147:4;213:11;
254:13;303:25
**threw (2)**
135:5,17
**throughout (22)**
16:25;25:15;39:10;
41:15;57:10;66:5;
75:18;105:25;109:5;
111:17;113:2;125:22;
158:11;159:1;161:4;
163:8,12;164:3;

173:12;200:13;220:7,
11
**throw (4)**
39:14;136:6,6;
262:2
**throwing (1)**
135:13
**thrown (2)**
39:18;305:21
**ticket (2)**
172:22;254:16
**tidbits (1)**
143:15
**tie (1)**
226:14
**tied (1)**
138:19
**Tietjen (24)**
4:5;5:10,14;6:8;
8:17;9:11;24:21,24;
25:6,10;28:19;29:6;
30:10;34:11,14;48:2;
147:6;183:1;195:12;
198:15;249:23;
299:20;302:23;
303:19
**T-I-E-T-J-E-N (1)**
29:8
**Tietjen-1 (3)**
24:24;25:5;28:5
**Tietjen-2 (7)**
34:13,14,21;40:14;
62:18;198:17;202:25
**Tietjen-3 (4)**
70:13,16;71:8;
76:21
**Tietjen-4 (2)**
73:3,6
**Tietjen-5 (2)**
246:10,12
**Tietjen-6 (2)**
294:20,24
**Tietjen-7 (1)**
303:19
**Tietjen's (2)**
92:18;316:11
**timeline (1)**
111:18
**times (17)**
6:13,17;87:12;
103:10;107:9;119:16;
151:5;158:16;207:19;
209:18;214:17;224:2;
258:3,4,13;260:8;
291:14
**timing (1)**
214:6
**today (21)**
7:5,24;8:11;29:12,
16,23;39:24;57:24;
108:13;109:2;119:12;
125:6;161:23;194:3;
201:21;225:19,25;

273:19;291:25;
300:11;309:23
**together (10)**
95:20;127:23;
144:18,19;191:4,6;
242:9;276:15;316:25;
317:6
**told (54)**
42:24;44:5;45:1,10;
46:9;51:2;58:15;75:1;
102:24;103:7;104:6,
11;109:10;120:11;
151:19;154:15,16;
161:15;162:3;170:9,
9;179:3;181:9;183:8;
188:6;189:4;196:11;
208:22;209:1,9,22;
210:12;215:7;218:4,
14;225:1;227:2;
228:22;229:16,16,24;
235:11;240:10;251:1;
263:1,7;264:1,3;
273:22;306:14;
314:24,25;316:3;
319:2
**toll (1)**
243:20
**Tom (1)**
8:19
**tomorrow (1)**
273:8
**took (26)**
13:8,16,20;56:22;
75:4;87:20;124:14;
126:15,16,22;142:7;
145:17;155:17;
159:17;193:23;201:3;
216:25;227:5,12;
228:16;245:6,9;
251:2;252:18;282:10;
314:20
**tool (1)**
59:17
**toothbrush (1)**
166:10
**top (3)**
77:5;78:9,10
**topic (1)**
309:17
**topics (1)**
191:23
**total (3)**
30:2;236:24;250:12
**totally (1)**
229:24
**touched (2)**
120:16;215:1
**towns (1)**
15:5
**trace (1)**
204:16
**track (2)**
83:25;278:4

**tracking (1)**
23:9
**traffic (16)**
15:7,9;172:19,22;
180:1,6,11,16;237:6;
238:15;254:1,16;
258:8;301:3,4,12
**trafficking (1)**
121:12;122:24
**trained (1)**
27:22
**training (30)**
14:6,11;16:20,22;
17:4,9,10;18:4,6;
23:25;24:2,7,7,20,24;
25:25;26:14;94:18,
24;100:14,18,19,20;
101:3,6,11,12,12;
171:20;172:15
**trainings (1)**
25:17
**transcribes (1)**
249:17
**transcript (8)**
18:2;187:3;239:3;
244:21;245:25;
246:12;310:17;
319:23
**transcripts (2)**
160:1;186:18
**transferred (2)**
257:11;261:1
**transpired (5)**
187:15;206:18;
227:24;239:15;248:1
**transport (3)**
156:11;311:22;
312:20
**transported (5)**
155:24;157:14,14;
311:13,20
**transports (1)**
311:16
**trapped (1)**
270:3
**trash (1)**
191:21
**Trenton (1)**
22:6
**trial (5)**
32:8,10,19;33:2;
310:14
**tricks (1)**
62:1
**tried (5)**
142:4;205:6;221:3;
301:17;313:18
**trip (1)**
161:5
**Troop (1)**
14:20
**Trooper (6)**
14:23,24;15:21;

16:3,4;19:5
**troopers (1)**
18:14
**trouble (4)**
125:11;154:16;
161:19;182:9
**troubling (1)**
125:15
**truck (3)**
108:2,5;137:2
**Trucks (1)**
24:12
**true (11)**
41:8;49:9;57:4;
58:12;145:13;148:9,
12;201:17;257:20;
263:24;264:16
**truly (4)**
228:10;250:1;
279:25;281:6
**trusted (1)**
192:12
**truth (1)**
171:24
**truthful (8)**
8:11;61:24;170:21,
25;171:9;172:1;
203:6,8
**truthfulness (1)**
280:5
**try (24)**
33:7;40:8;48:13;
62:1;64:17;100:5;
101:19,20,23,24;
106:7;120:3;141:15;
143:8;200:10;203:25;
251:2;259:25;261:19;
266:7;268:23;278:4;
279:9;280:4
**trying (34)**
61:25;84:16;87:10;
97:13;98:2,23;
103:24;105:12;
109:25;110:8;113:19;
114:12;116:6;138:3,
10;139:22;144:18;
145:5,6;151:6,17;
169:22;203:9,9;
205:23;211:9;234:11;
236:20;257:16,19;
281:24;282:3;306:3;
313:16
**Tuesday (1)**
226:14
**turn (4)**
34:5;39:21;85:11;
210:6
**turned (10)**
148:9,12;212:12;
213:21;214:23;
277:19,21;283:24;
297:14;306:9
**Turner (5)**

128:13,14;153:12,
13;154:25
**Turner's (1)**
167:22
**Turnpike (4)**
21:11;215:9;
234:21;302:10
**turns (2)**
142:16;174:12
**two (27)**
16:23;17:4,9;23:1;
30:5;41:16;76:16;
85:12;107:25;112:7;
134:2,16;135:16;
136:19;175:25;
185:22;204:22;
205:10;235:17;
263:10;293:4,14;
295:16;299:9;300:24,
25;316:7
**two-minute (2)**
76:8,11
**two-week (2)**
23:25;24:7
**type (36)**
9:22;12:4,18;13:2,
6,10;14:1;15:16;20:5,
13;22:22;24:6;36:15;
62:3;79:7,12,13;
87:16;100:12,18,19;
101:1,4;122:7;153:1;
154:16;160:23;
178:19,20;201:8;
204:16,17;205:5;
290:12,17;291:3
**typed (1)**
36:13
**types (3)**
18:21;20:15;174:2
**typically (9)**
46:5;75:15,16;82:5;
88:23;96:25;97:12;
193:6;222:17
**typing (3)**
54:6,10,11
**typo (2)**
25:21,22

**U**

**ultimately (11)**
139:6;146:6;
151:10;171:9;193:23;
255:15;292:13;
299:21;300:11;318:8,
10
**Um (1)**
277:17
**Um-hum (4)**
54:9;126:10,14;
173:22
**unable (8)**
8:10;52:7;106:8;

108:7;129:1;130:23;
147:11;294:8
**unaware (5)**
91:1;92:7;197:3;
224:17;226:11
**unclear (2)**
101:9;247:12
**uncovered (1)**
195:24
**under (19)**
7:24;33:16;53:13;
183:10;196:3;226:8;
230:16,17,19,20;
231:1,2;232:17,22,25;
253:1;267:1;271:4;
301:22
**undergo (1)**
16:19
**underlying (2)**
115:11;120:24
**undermining (1)**
301:8
**Understood (6)**
7:17,20;12:20;
150:12;229:3;292:1
**undertook (1)**
63:18
**underwent (1)**
23:25
**unidentified (5)**
11:2;46:8;52:5,13;
193:7
**uniform (1)**
262:4
**un-include (1)**
151:3
**uninvolved (1)**
242:23
**unique (2)**
191:10,12
**unit (64)**
10:18,19,21,25;
11:7;21:5;22:3,5,12,
14,21;23:8,9,13,14,
15,16;24:3;26:22;
27:23;28:1;31:22;
33:18,22,23;42:11,12,
14;45:13,21,24;46:2,
7;61:13,20;62:15;
75:20;87:13;88:22;
89:7,22;94:12;
251:20;257:11,14;
259:21;262:8;282:23;
301:4,7,10;302:19;
304:4,7,12,16,17,21;
305:5,7,9,11,12;
306:24
**units (1)**
23:1
**University (2)**
11:24;269:21
**unknowing (1)**
102:6

**unknown (8)**
101:24;109:8;
111:3;133:16;141:10;
240:21;253:6;263:1
**unless (5)**
94:21;145:16;
164:21;238:21;316:7
**unreliable (2)**
172:4;201:16
**unsolved (1)**
261:8
**unsuccessful (1)**
281:19
**unusual (2)**
129:18,23
**up (89)**
4:13;11:13;18:15;
22:8;27:7;30:6;34:3;
44:1;51:24;56:14;
60:14;62:5;63:11;
75:24;78:5;87:20;
88:4;89:3;102:3;
115:18,20,22;119:24;
125:24;127:22;
128:15;134:11;
136:21;144:2;149:15;
151:10;153:25;154:2;
161:9;163:7,7;164:1;
165:18;166:16,18,21,
24;169:21;174:14;
177:21;178:5,5,7,21;
179:3;181:16;182:10;
191:19;193:4;205:20;
213:15;218:13;223:5,
6;237:8;238:15,17;
241:14,20;242:14;
244:18;249:1,23;
251:6,11;252:4;
258:2,8;262:15;
266:12,15;270:12;
272:17;273:19;274:4,
7;275:16,20;280:10,
12;286:16;312:5,8;
314:11
**upbringing (1)**
103:21
**update (3)**
188:16;206:12,24
**uploaded (1)**
303:25
**upon (12)**
11:21;12:20;13:25;
103:23;172:14,15;
224:18,19;253:17;
270:5;283:14;313:4
**upset (3)**
123:13,14;158:10
**upstairs (1)**
243:19
**use (10)**
62:12;90:5;144:5,7;
172:9;215:11;234:18;
245:13;277:3;316:24

**used (12)**
21:23;35:16;39:10;
59:22;61:21;62:9;
74:20,25;75:5;
149:23;275:15;
292:13
**useful (7)**
59:16;60:1,2;
152:14,18;166:9,11
**uses (1)**
251:7
**using (5)**
49:8,8,11;52:21;
53:4
**usually (3)**
20:24,25;255:18

**V**

**vacant (3)**
268:12,14,15
**vague (4)**
75:15,19;91:4;
102:13
**value (8)**
22:23;75:14;76:1,3;
79:24;102:18;135:2;
166:4
**various (4)**
8:21;16:24;174:19;
178:4
**varying (3)**
107:6,9;127:11
**Vassar (5)**
285:23;286:3;
287:1;288:2,3
**vehicle (12)**
108:3,4;112:9;
135:17;152:9;180:10,
17;232:9;239:10,21;
301:19;316:2
**vehicles (2)**
232:7;233:8
**Velazques (4)**
233:23;234:12,15;
236:15
**verbal (1)**
315:21
**verifiable (1)**
148:13
**verified (4)**
147:18,19;148:22;
292:21
**verifies (1)**
147:15
**verify (9)**
62:3;147:11,24;
251:3;253:5,8;
261:18;262:25;264:8
**version (2)**
292:25
**versus (2)**
19:6;161:21

**VHS (1)**
218:20
**via (5)**
97:1;188:4;237:18;
274:12;279:12
**viable (2)**
52:7;106:22
**Vic (1)**
5:12
**victims' (2)**
150:8;175:3
**Victor (1)**
5:8
**video (31)**
28:15,18;103:3,12,
16,17;127:19;205:22;
215:5,7;217:11;
218:8,12,16;219:6,9;
221:6;226:25;229:23,
25;230:2;231:25;
234:12;236:22;
244:20,21;246:1;
247:3;277:23;297:5;
318:6
**Videographer (15)**
28:10,11,21;76:12,
15;146:21,25;147:3;
198:8,11;265:22,25;
299:13,16;319:20
**videographer's (1)**
29:4
**video-recorded (5)**
253:10;254:23;
268:19;287:6;289:7
**videos (3)**
100:24,25;101:1
**videotape (3)**
28:12;235:9;238:8
**videotaped (7)**
185:17;217:3;
221:7;222:16;244:13,
14;250:13
**videotaping (1)**
217:25
**view (10)**
57:8;58:23;59:2;
76:2;115:9;159:7;
175:14;190:24;
224:25;291:21
**viewed (1)**
176:18
**violation (2)**
301:19;302:3
**violations (1)**
301:24
**voluntarily (1)**
248:22
**VOMACKA (87)**
5:11,12;47:24;
69:11;83:4;87:5;92:1;
105:7;107:18;108:9,
25;110:25;118:9,17;
121:22;123:7;136:8;

138:8;145:21;146:10;
148:15;150:16;
151:14,21;152:15;
156:7;157:9,21;
163:2,20;164:6,17;
166:6,14,19;178:23;
180:3;181:7;182:16,
22;183:13,23;184:3;
191:1;192:20;193:25;
195:5;201:19,24;
202:19;217:8;220:17;
221:12;222:24;
224:11;225:3;227:8;
229:6;239:12,17,23;
243:3;260:22;261:15,
25;262:23;267:3;
276:20;283:10,21;
287:20;288:13;292:9,
16;293:2;294:13;
297:16,19;298:3,15,
17,23;299:4;317:23;
318:17,20;319:18

**W**

**wait (4)**
109:7,7,10;274:3
**waited (1)**
109:15
**waiver (1)**
157:13
**walk (1)**
251:24
**walked (5)**
258:21;259:1;
272:25;273:3,3
**walking (2)**
258:10;261:9
**walk-up (1)**
97:2
**wallet (10)**
134:2,6;135:4,13,
25;136:5,21;137:1,2;
162:21
**wants (4)**
127:7;144:2;176:6;
196:15
**warnings (3)**
244:3,9,15
**warrant (23)**
172:19,22;178:21;
180:1,6,6,9;204:16;
230:14,15,17;232:23;
238:16;254:2,16;
258:8;261:5;295:10,
22;308:9,19,23;309:8
**warrants (10)**
174:3;203:14,17,
23;204:2,9,10;
294:21;295:4;307:25
**washed (5)**
141:11;144:25;
150:4,11,15

**washing (1)**
148:20
**Washington (5)**
18:9,10,12;19:22;
120:22
**watch (1)**
127:19
**watched (1)**
100:24
**way (25)**
4:21;11:22;46:18;
73:7;86:2;93:19;94:6;
95:24;116:11;131:14;
151:11;154:11;
159:17;185:2;211:11;
213:13;215:14;
227:14;238:3;275:14;
280:1,11;288:11;
304:25;319:11
**Wayne (2)**
138:19;139:13
**ways (2)**
140:11;179:7
**wear (1)**
226:13
**week (2)**
87:12;109:13;
270:8;275:9
**weekly (2)**
87:9,16
**weeks (6)**
14:4,15;16:24;17:5,
9;77:25
**weight (2)**
52:17;238:13
**weird (1)**
277:3
**welcoming (1)**
163:9
**weren't (27)**
53:9;104:1,2;107:3;
108:1;110:8;115:18;
121:19;133:2;142:17;
166:18;214:13;
225:12;231:18;
234:24;235:19;
253:15;259:10,16;
260:14,15;262:20;
263:16;280:2;286:22;
300:7;301:16
**West (1)**
22:6
**what-if's (1)**
262:3
**what's (19)**
14:21;23:18;27:7;
30:17;31:1;34:21;
76:1;83:13;87:8;
135:7;193:12,22;
194:2;200:11;208:6;
210:11;223:15;
276:14;312:4
**whatsoever (8)**

187:8;190:9;
197:25;198:1;201:22;
245:15;310:2,3
**whenever (2)**
75:3;228:1
**whole (7)**
101:9;103:22;
243:14;253:8;267:2;
270:19;315:20
**wholeheartedly (3)**
202:3,11;310:20
**whoop (1)**
238:16
**who's (3)**
99:19;160:2;261:6
**whose (3)**
220:14;295:5;
299:20
**William (3)**
8:17;28:19;29:6
**W-I-L-L-I-A-M (2)**
8:18;29:7
**Williams (11)**
104:16,22;123:21;
130:16;131:15,22,23;
132:23;152:1;199:5;
200:12
**willing (6)**
120:10;158:22;
162:23,25;207:11,22
**window (1)**
116:23
**wish (3)**
208:17;214:5;
293:15
**withdraw (1)**
202:21
**within (12)**
15:11;18:19;21:2;
39:9;55:11;66:1;
112:11;247:9;282:18;
292:21;293:20;305:8
**without (9)**
9:11;29:20;55:13;
89:2;157:3;193:2;
249:25;298:13,25
**witness (17)**
4:2,22;28:19,23;
31:19;47:18;93:7;
181:13,13;203:12;
204:7;211:7;220:19;
221:15;293:21;294:5;
319:14
**witnesses (17)**
17:19;67:11;85:25;
97:4;99:1;101:7;
141:3;156:5,5,24;
173:12;174:24;
197:13;204:17;
219:10;221:11;
257:16
**woman (2)**
153:15,16

**wondering (2)**
178:8;234:3
**wonderment (1)**
281:2
**woods (1)**
251:23
**word (12)**
17:3;90:5;162:2,2;
192:25;217:17;227:5;
238:21;265:14;277:3;
291:2;316:24
**words (7)**
247:7,25;259:16;
298:8,25;305:21;
313:20
**work (63)**
6:20;9:1,22;10:9;
12:14,19;15:16;19:2;
20:5,13;25:25;33:4;
35:17,24;36:5,20;
37:10;43:21;47:13;
51:22;52:11;54:5;
55:5;59:14;61:3;
67:22;78:20;83:2;
88:16,20;89:2,7,13,
17,21;90:15,19;92:21,
22;94:14;101:4;
106:21;125:16;147:7;
158:11;164:11,13;
171:19;191:3;192:19;
193:4;212:13;221:24;
278:20,23;286:16;
289:12,17;305:16,19;
318:14,14,22
**worked (19)**
10:3;12:25;16:3;
20:18;31:10,14;
62:10;67:24;68:2;
95:20,22;117:19;
133:20;138:4;164:14;
191:6;257:24;282:20,
20
**working (32)**
10:10;18:23;22:21;
26:21;32:1;33:23;
39:12;46:20;53:12;
68:6,9;69:2;80:1;
81:6;87:11;88:24;
95:22;105:11;116:4;
117:16;135:11;
154:10;169:5;194:17,
21;208:5;221:5;
228:3;230:3;234:13;
316:25;317:6
**works (1)**
101:4
**world (2)**
144:16;151:16
**worry (4)**
50:25;192:12;
261:3;284:23
**worthwhile (1)**
212:16

**worthy (3)**
89:15;90:6,11
**write (14)**
80:23;124:24;
126:1;207:18;208:25;
209:4,5;214:22;
231:16;242:14;
255:12;288:5;312:12,
22
**writing (1)**
109:3
**writted (1)**
181:14
**written (15)**
13:7;53:22;56:21;
66:8;93:20,25;99:6;
125:22;126:3;209:15,
20,23;210:1;232:2;
315:18
**written-down (1)**
211:22
**wrong (11)**
17:3;72:6;73:18;
82:16;160:9;163:1,4;
164:12;218:18;
278:23,25
**wrongfully (1)**
31:3
**wrote (14)**
52:3;125:18,20;
173:18;193:21;210:4;
267:20;277:12,18,20;
283:14,16;312:14,18

---

**Y**

**yards (1)**
251:24
**year (18)**
10:7,8;12:21;20:1,
8;22:10;27:5;52:17;
54:2,12;64:10;86:5;
247:10;257:2,12;
263:20;282:22;283:7
**years (31)**
6:16;9:16;10:5;
27:14;30:11;54:12;
61:3,18;127:18,20;
133:14;158:14;
209:19;218:20;220:8,
12,24;238:13;240:25;
242:23;251:21;261:8;
263:12;264:8,12;
276:25;284:22;285:2,
10;300:25;302:1
**Yep (4)**
199:3;208:8,13;
223:11
**yield (1)**
152:13
**young (7)**
40:15;147:13;
153:15;159:10;

167:15;170:3;276:5

---

**Z**

**zero (1)**
239:8
**Zoom (2)**
8:22,22

---

**0**

**000342 (1)**
246:13
**001343 (1)**
34:23
**003548 (3)**
70:17,20;71:6
**003569 (1)**
198:19
**003586 (1)**
70:17

---

**1**

**1 (11)**
26:24;27:16;78:9;
186:19;187:11,15,16;
229:17;247:1,8;248:1
**1:00 (1)**
207:20
**1:14 (1)**
146:25
**1:27 (1)**
147:3
**10 (3)**
28:3;151:5;284:22
**100 (3)**
206:4;214:19;
262:20
**10th (1)**
152:3
**11 (3)**
106:16;297:3,4
**11/13/08 (1)**
246:13
**11:00 (3)**
108:16,18;112:1
**11:39 (1)**
76:12
**11:45 (1)**
76:15
**117 (1)**
85:2
**12 (24)**
23:23;127:20;
187:12;189:9,18;
195:13;199:13;
209:19;220:2;231:7;
247:1;248:2,3;
250:14,16;284:22;
285:20,22;288:10;
292:4,15;297:3,8;
315:10

**12th (6)**
179:17;194:17;
196:8;219:7;275:10;
291:13
**13 (1)**
23:23
**1315 (2)**
303:20,25
**1316 (1)**
304:15
**1317 (2)**
303:21,25
**1343 (1)**
34:15
**1347 (1)**
126:8
**1361 (1)**
34:16
**137 (5)**
285:23;286:3;
287:1;288:2,3
**15 (3)**
30:7;235:4;237:11
**15th (13)**
73:19;77:22;78:14,
19,20;85:13;192:8;
194:13;242:1;251:7,
9,11;266:12
**16 (5)**
65:7,14;72:10;
246:19;285:25
**16th (2)**
85:13;242:2
**18 (3)**
274:6,10;292:8
**18th (3)**
270:7;274:7,12
**19 (5)**
35:4;170:14;266:4;
285:25;292:22
**1970s (1)**
129:19
**1970-whatever (1)**
251:13
**1978 (49)**
33:13;58:13,21;
60:19;62:22;66:4;
71:14;72:17;78:14,
21;84:22;85:7;
104:23;106:10,15;
107:6;109:2,18;
116:4,19;120:16;
121:15;123:1;129:14;
130:4;132:3;133:16;
162:3;165:20;167:14;
173:20;174:18;
177:17;193:10;200:6;
201:8;208:7;228:25;
240:20;267:18;269:5,
10;282:23;295:18,25;
296:3,8,16,16
**1979 (3)**
73:20;84:5;197:8

**1984 (1)**
282:24
**1988 (2)**
31:16;282:16
**1994 (1)**
13:8
**1995 (5)**
10:8;12:23,24;16:3;
22:13
**1999 (6)**
15:25;16:3,7;18:23;
101:23;222:6
**19th (3)**
274:13,15,19

**2**

**2 (8)**
27:16;47:21;48:3;
186:20;187:11,16;
247:1;248:2
**2:28 (1)**
198:8
**2:38 (1)**
198:11
**20 (7)**
106:10;235:5,7;
236:1;237:8;295:18,
24
**2000 (2)**
21:13;27:22
**2000s (1)**
20:10
**2001 (5)**
21:13;23:12;26:22;
282:7;303:10
**2006 (4)**
11:8;21:14;23:3;
26:22
**2007 (1)**
26:15
**2007/2008 (1)**
63:17
**2008 (92)**
11:9;23:4,7;33:14;
36:6;37:4;38:22;
39:16;41:15,20;42:6,
9,21;43:17,25;44:23;
45:24;46:12;49:24;
51:2,24;52:2;55:3,16;
56:15;58:3,20;64:10,
23;65:7,14;67:2,21;
69:8;70:1;72:10;
85:23;95:1;104:15;
105:3;114:7;120:2;
123:17;124:7;141:25;
142:7;161:21;172:17;
173:1,4,21;175:23,23;
187:12;189:9,18;
194:18;195:13;196:9;
199:13;219:7;220:3,
7,12;221:24;222:3,6,
19,22;223:17;225:8,

18,19,20,24;226:19;
231:7;248:2,3;
250:14,16;274:6,10;
279:11;280:20;
282:11;288:10;
291:13;292:4,15;
314:3;315:10
**2009 (12)**
36:6,16,21;37:14;
41:23;54:19,21;
55:10;225:18;289:5,
22;292:23
**2010 (8)**
28:3;214:25;
256:21;282:10;
289:23;300:4;303:10;
306:19
**2011 (1)**
32:4
**2012 (1)**
26:15
**2013 (1)**
11:10
**2016 (1)**
285:10
**2017 (1)**
26:1
**2018 (1)**
247:1
**20th (5)**
107:2,10;109:20;
264:4,7
**21st (2)**
279:11;303:10
**22 (3)**
198:19;267:18;
306:19
**22nd (4)**
107:3;109:21;
110:10;303:9
**23rd (2)**
107:4;110:11
**24 (4)**
10:5;109:7,15;
280:20
**24-hour (2)**
109:16;112:11
**25 (5)**
54:19;61:3;289:5,
22;300:25
**254 (1)**
267:20
**256 (14)**
194:5;241:3,16,21;
252:8,15;263:2,4;
267:21;268:8,12,16;
270:4;296:22
**257 (1)**
294:21
**258 (1)**
267:21
**259 (1)**
294:22

**3**

**25th (8)**
10:8;28:3;36:16,21;
37:14;54:18,20;55:10
**26 (2)**
14:4,15
**260 (1)**
267:21
**271 (3)**
178:7;199:2;241:15
**2nd (13)**
34:4;41:20;42:6,9,
21;43:17,25;44:23;
46:12;104:15;105:3;
175:22;314:13

**3 (3)**
**3:00 (2)**
109:24;110:4
**3:57 (1)**
265:23
**30 (9)**
64:12;133:14;
238:13;240:25;
242:23;243:24;261:8;
263:12;264:8
**30-year-old (1)**
257:19
**33 (1)**
84:1
**334 (1)**
246:18
**34 (1)**
83:24
**3580 (1)**
83:25
**3581 (1)**
83:23
**3rd (1)**
84:5

**4**

**4 (1)**
229:17
**4/21/10 (1)**
303:20
**4:06 (1)**
265:25
**4:15 (24)**
184:23;185:5,7,8;
188:10,15;189:5;
206:10,21,25;207:12,
13,14,21;211:13;
212:18,19;213:20,23;
214:6,14;215:1,3;
234:4
**4:47 (1)**
299:13
**4:52 (1)**
299:16
**426 (1)**
246:14

**45 (1)**
214:11
**4th (1)**
282:10

**5**

**5 (7)**
126:7;185:19,20;
187:13,16;228:1;
229:17
**5:00 (2)**
234:5,8
**5:16 (1)**
319:20
**5:44 (1)**
319:24
**503 (1)**
24:25
**506 (1)**
24:25

**6**

**6/25/09 (1)**
34:15
**6/25/2009 (2)**
34:12;36:3
**60 (3)**
70:24;73:3,8
**62 (2)**
73:4,8
**6th (1)**
124:7

**7**

**7 (9)**
78:11;172:17;
173:1,4;185:19,20;
187:13,17;304:14
**7:30 (5)**
233:24;234:8,8,22;
274:24
**7:39 (1)**
275:1
**70s (2)**
128:5;129:24
**78 (10)**
77:22;78:19;105:9;
117:11;177:18;189:3;
191:25;196:4;203:5;
267:11
**79 (1)**
84:14
**7th (1)**
179:17

**8**

**8 (7)**
51:24;52:2;112:14;
154:20;155:5;170:14;

175:23
**8:00 (1)**
274:20
**8:18 (5)**
246:2,22;247:9;
248:3;249:10
**88 (1)**
282:24
**89 (1)**
25:20
**8th (9)**
47:17;50:5,12;51:2;
173:21;176:6,14;
314:10,13

**9**

**9 (2)**
58:3;266:4
**9/15 (1)**
78:4
**9:00 (2)**
108:14,15
**9:23 (1)**
252:22
**9:30 (1)**
275:11
**90s (1)**
128:6
**95 (2)**
25:24;26:1
**9th (12)**
44:1;49:24;50:8,9,
11;53:17;55:15;
58:20;64:23;67:9;
137:24;314:14

# EXHIBIT B

Case 2:14-cv-00120-KM-MAH   Document 232-6   Filed 08/17/22   Page 156 of 345 PageID: 3194

# The State of New Jersey

**POLICE CASE NO.**

W820637

**vs.**

| | |
|---|---|
| COURT | SUPERIOR |
| COUNTY OF | ESSEX N.J. |
| COURT CODE NUMBER | |
| COURT DOCKET NUMBER(S) | |
| C— | |

Defendant / Alias ___ LEE ANTHONY EVANS

Address ___ 10 MELVILLE PLACE    773-703-965?

City, State ___ IRVINGTON, NJ    SS No.

Date of birth ___ 6/14/1953 ___ Date of arrest ___

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

Number of co-defendants ___ 1 ___ Dr. Lic.# ___ SBI No. 602567?

**COMPLAINT**

Complainant: ___ LT. LOUIS CARREGA ___ of ___ ESSEX COUNTY PROSECUTOR'S OFFICE

(NAME OF COMPLAINANT)    (IDENTIFY DEPARTMENT OR AGENCY REPRESENTED)

Residing at ___ E.C. VETERANS COURTHOUSE, NEWARK, NJ ___ Upon oath says that, to the best of (his) (her) knowledge,

(ADDRESS OF PRIVATE CITIZEN COMPLAINANT)    information and belief, the named defendant on or about the

___ day of ___ AUG. , 20 XX 1978 in the CITY NEWARK    MUNICIPAL CODE NO. 0714  County of ESSEX N.J.

did; WILFULLY, FELONIOUSLY AND OF HIS MALICE AFORETHOUGHT KILL AND MURDER
ALVIN TURNER, A CRIME OF THE FIRST DEGREE, 1CT and 2A:113-2, A CRIME OF THEFTFIRST
DEGREE, CT.9.

DID WILFULLY, FELONIOUSLY AND OF HIS MALICE AFORETHOUGHT KILL AND MURDER
MICHAEL MCDOWELL, CONTRARY TO N.J.S., 2A:113-1 and 2A:113-2, A CRIME OF THE
FIRST DEGREE, CT.10

PROBABLE CAUSE: SEE AFFIDAVIT OF DET LOUIS CARREGA

| Charge Number 1 N.J.S. 2A:113-1 and 2A:113-2 | Charge Number 2 N.J.S. 2A:113-1 and 2A:113-2 | Charge Number 3 N.J.S. 2A:113-1 and 2A:113-2 |
|---|---|---|
| Charge Number 1 As Amended N.J.S. | Charge Number 2 As Amended N.J.S. | Charge Number 3 As Amended N.J.S. |

Subscribed and sworn to before me this ___ day of ___ March , 20 ___ .

Signed ___    Signed ___

(NAME AND TITLE OF PERSON ADMINISTERING OATH)    (COMPLAINANT)

To any peace officer or other authorized person: Pursuant to this warrant, you are hereby commanded to arrest the named defendant and bring (him)(her)
forthwith before this court to answer the foregoing complaint.

Bail has been fixed by ___ In the amount of $ ___ 500,000 ___ or ___

(Specify condition of release, e.g. R.O.R.)

Date Warrant Issued ___ 3/12/10 ___

Court Appearance Date ___ 72 hours ___ Time ___ (AM) (PM) ___    SIGNATURE OF JUDGE OR CLERK

**(IF YOU INTEND TO PLEAD NOT GUILTY, YOU MUST NOTIFY
THE COURT AT LEAST THREE DAYS IN ADVANCE OF YOUR
SCHEDULED COURT APPEARANCE DATE.)**

EVANS000001

# The State of New Jersey

| POLICE CASE NO. | | | **vs.** | W.820632 |
| --- | --- | --- | --- | --- |

| COURT | | Defendant / Alias | LEE ANTHONY EVANS | |
| --- | --- | --- | --- | --- |
| SUPERIOR | | | | |

COUNTY OF **ESSEX** N.J.

Address _____ 10 MELVILLE PLACE

City, State _____ IRVINGTON, NN

COURT CODE NUMBER

SS No.

COURT DOCKET NUMBER(S)

C—

Date of birth _6/14/1953_ Date of arrest _____

Number of co-defendants _____ Dr. Lic.# _____ SBI No. _602567A_

## COMPLAINT

Complainant: _LT. LOUIS CARREGA_ of _ESSEX COUNTY PROSECUTOR'S OFFICE_
(NAME OF COMPLAINANT) (IDENTIFY DEPARTMENT OR AGENCY REPRESENTED)

Residing at _E.C. VETERANS COURTHOUSE - NEWARK, N.J._ Upon oath says that, to the best of (his) (her) knowledge
(ADDRESS OF PRIVATE CITIZEN COMPLAINANT) information and belief, the named defendant on or about the

_____ day of _AUG._, 20 _1978_ in the _CITY_ of _NEWARK_ MUNICIPAL CODE NO. _0714_ County of _ESSEX_ N.J.

did; WHILE IN THE COURSE OF COMMITTING OR ATTEMPTING TO COMMIT ARSON OF WHICH THE PROBABLE CONSEQUENCES WAS BLOODSHED DID KILL OR CAUSE THE DEATH OF RANDY JACKSON, CONTRARY TO N.J.S. 2A:113-1 and 2A:113-2, A CRIME OF THE FIRST DEGREE, CT.1

DID WHILE IN THE COURSE OF COMMITTING OR ATTEMPTING TO COMMIT ARSON OF WHICH THE PROBABLE CONSEQUENCES WAS BLOODSHED DID KILL OR CAUSE THE DEATH OF ERNEST TAYLOR CONTRARY TO N.J.S. 2A:113-1 and 2A:113-2, A CRIME OF THE FIRST DEGREE, CT.2

DID WHILE IN THE COURSE OF COMMITTING OR ATTEMPTING TO COMMIT ARSON OF WHICH THE PROBABLE CONSEQUENCES WAS BLOODSHED DID KILL OR CAUSE THE DEATH OF MELVIN PITTMAN CONTRARY TO N.J.S. 2A:113-1 and 2A:113-2, A CRIME OF THE FIRST DEGREE, CT.3

PC: SEE AFFIDAVIT OF LT. LOUIS CARREGA

| Charge Number 1 | Charge Number 2 | Charge Number 3 |
| --- | --- | --- |
| N.J.S. 2A:113-1 and 2A:113-2 | N.J.S. 2A:113-1 and 2A:113-2 | N.J.S. 2A:113-1 & 2A:113-2 |
| Charge Number 1 As Amended | Charge Number 2 As Amended | Charge Number 3 As Amended |
| N.J.S. | N.J.S. | N.J.S. |

Subscribed and sworn to before me this _22ND_ day of _MARCH_ 20 _10_.

Signed _____ Signed _____
(NAME AND TITLE OF PERSON ADMINISTERING OATH) (COMPLAINANT)

To any peace officer or other authorized person: Pursuant to this warrant, you are hereby commanded to arrest the named defendant and bring (him)(her) forthwith before this court to answer the foregoing complaint.

Bail has been fixed by _SEE WA 10637_ in the amount of $ _____ or _____
(Specify condition of release, e.g. R.O.R.)

Date Warrant Issued _____

Court Appearance Date _____ Time _____ (AM) (PM)

SIGNATURE OF JUDGE OR CLERK

**(IF YOU INTEND TO PLEAD NOT GUILTY, YOU MUST NOTIFY THE COURT AT LEAST THREE DAYS IN ADVANCE OF YOUR SCHEDULED COURT APPEARANCE DATE.)**

EVANS000002

# The State of New Jersey

**vs.**

W820633

| POLICE CASE NO. | |
|---|---|

**COURT** SUPERIOR

**Defendant / Alias** LEE ANTHONY EVANS

**COUNTY OF** ESSEX N.J.

**Address** 10 MELVILLE PLACE

**COURT CODE NUMBER**

**City, State** IRVINGTON, NJ

**SS No.**

**COURT DOCKET NUMBER(S)**
C—

**Date of birth** 6/14/1953   **Date of arrest**

Number of co-defendants **22**   Dr. Lic.#    **SBI No.** 602567A

## COMPLAINT

Complainant: **LT. LOUIS CARREGA** of **ESSEX COUNTY PROSECUTOR'S OFFICE**
(NAME OF COMPLAINANT)   (IDENTIFY DEPARTMENT OR AGENCY REPRESENTED)

Residing at **E.C. VETERANS COURTHOUSE, NEWARK, NJ**   Upon oath says that, to the best of (his) (her) knowledge,
(ADDRESS OF PRIVATE CITIZEN COMPLAINANT)   information and belief, the named defendant on or about the

**6TH** day of **AUG.** 20 **X1978** in the **CITY** of **NEWARK**   **MUNICIPAL CODE NO.** **0714** County of **ESSEX** N.J.

did; WHILE IN THE COURSE OF COMMITTING OR ATTEMPTING TO COMMIT ARSON OR WHICH THE
PROBABLE CONSEQUENCES WAS BLOODSHED DID KILL OR CAUSE THE DEATH OF ALVIN TURNER,
CONTRARY TO N.J.S. 2A:113-1 and 2A:113-2, A CRIME OF THE FIRST DEGREE, CT.4

DID WHILE IN THE COURSE OF COMMITTING OR ATTEMPTING TO COMMIT ARSON OF WHICH THE
PROBALBE CONSEQUENCES WAS BLOODSHED DID KILL OR CAUSE THE DEATH OF MICHAEL MCDOW
CONTRARY TO N.J.S. 2A:113-1 and 2A:113-2, A CRIME OF THE FIRST DEGREE, CT.5

PC: SEE AFFIDAVIT OF LT. LOUIS CARREGA

| Charge Number 1<br>N.J.S. 2A:113-1 and 2A:113-2 | Charge Number 2<br>N.J.S. 2A:113-1 and 2A:113-2 | Charge Number 3<br>N.J.S. |
|---|---|---|
| Charge Number 1 As Amended<br>N.J.S. | Charge Number 2 As Amended<br>N.J.S. | Charge Number 3 As Amended<br>N.J.S. |

Subscribed and sworn to before me this _____ day of _____ , 20___

Signed _____   Signed _____
(NAME AND TITLE OF PERSON ADMINISTERING OATH)   (COMPLAINANT)

To any peace officer or other authorized person: Pursuant to this warrant, you are hereby commanded to arrest the named defendant and bring (him)(her)
forthwith before this court to answer the foregoing complaint.

Bail has been fixed by _____   In the amount of $ _____   or _____
(Specify condition of release, e.g. R.O.R.)

Date Warrant Issued _____

Court Appearance Date _____   Time _____   (AM) (PM)

SIGNATURE OF JUDGE OR CLERK

**(IF YOU INTEND TO PLEAD NOT GUILTY, YOU MUST NOTIFY
THE COURT AT LEAST THREE DAYS IN ADVANCE OF YOUR
SCHEDULED COURT APPEARANCE DATE.)**

EVANS000003

# The State of New Jersey

POLICE CASE NO.

COURT
**SUPERIOR**

COUNTY OF
**ESSEX**
N.J.

COURT CODE NUMBER

COURT DOCKET NUMBER(S)
**C—**

Number of co-defendants _____ 1 _____ Dr. Lic.# _____

**vs.**

**W820636**

Defendant / Alias _____ LEE ANTHONY EVANS

Address _____ 10 MELVILLE PLACE

City, State _____ IRVINGTON, NJ

SS No.

Date of birth _6/14/1953_ Date of arrest _____

SBI No. _602567A

## COMPLAINT

Complainant: __LT. LOUIS CARREGA__ of __ESSEX COUNTY PROSECUTOR'S OFFICE__
(NAME OF COMPLAINANT)                                  (IDENTIFY DEPARTMENT OR AGENCY REPRESENTED)

Residing at __E.C. VETERANS COURTHOUSE, NEWARK, NJ__     Upon oath says that, to the best of (his) (her) knowledge,
information and belief, the named defendant on or about the

_____ day of _AUG. 1978_ , 20___ , in the ___ of _CITY   NEWARK_   MUNICIPAL CODE NO. **0714**   County of _ESSEX_ N.J.

did; WILFULLY, FELONIOUSLY AND OF HIS MALICE AFORETHOUGHT KILL AND MURDER
RANDY JOHNSON, CONTRARY TO N.J.S 2A:113-2 and N.J.S. 2A:113-2, A CRIME OF THE
FIRST DEGREE, CT.6

DID WILFULLY, FELONIOUSLY AND OF HIS MALICE AFORETHOUGHT KILL AND MURDER
ERNEST TAYLOR, CONTRARY TO N.J.S. 2A:113-1 and 2A:113-2, A CRIME OF THE
FIRST DEGREE, CT.7.

did WILFULLY, FELONIOUSLY AND OF HIS MALICE AFORETHOUGHT KILL AND MURDER
MELVIN PITTMAN, CONTRARY TO N.J.S. 2A:113-1 and 2A:113-2, A CRIME OF THE
FIRST DEGREE, CT.8

AFFIDAVIT OF LT. LOUIS CARREGA

| Charge Number 1 | Charge Number 2 | Charge Number 3 |
|---|---|---|
| N.J.S. 2A:113-1 and 2A:113-2 | N.J.S. 2A:113-1 and 2A:113-2 | N.J.S. 2A:113-1 and 2A:113-2 |
| Charge Number 1 As Amended<br>N.J.S. | Charge Number 2 As Amended<br>N.J.S. | Charge Number 3 As Amended<br>N.J.S. |

Subscribed and sworn to before me this _____ day of _____ , 20 _____ .

Signed _____
(NAME AND TITLE OF PERSON ADMINISTERING OATH)

Signed _____
(COMPLAINANT)

To any peace officer or other authorized person: Pursuant to this warrant, you are hereby commanded to arrest the named defendant and bring (him)(her)
forthwith before this court to answer the foregoing complaint.

Bail has been fixed by _____ In the amount of $ _____ or _____
(Specify condition of release, e.g. R.O.R.)

Date Warrant Issued _____

Court Appearance Date _____ Time _____ (AM) (PM)

SIGNATURE OF JUDGE OR CLERK _____

**(IF YOU INTEND TO PLEAD NOT GUILTY, YOU MUST NOTIFY
THE COURT AT LEAST THREE DAYS IN ADVANCE OF YOUR
SCHEDULED COURT APPEARANCE DATE.)**

EVANS000004

**ROBERT LAURINO**
**ACTING ESSEX COUNTY PROSECUTOR**
**ESSEX COUNTY COURT HOUSE**
**NEWARK, NEW JERSEY 07102**
**(973) 621-4700**

|  |  |
|---|---|
| INVESTIGATION   INTO | SUPERIOR COURT OF NEW JERSEY |
|  | ESSEX COUNTY |
| THE DEATHS   OF |  |
|  | AFFIDAVIT IN SUPPORT OF |
| Randy Johnson | ARREST WARRANTS |
| Michael McDowel |  |
| Melvin  (Ricky) Pittman |  |
| Ernest Taylor |  |
| Alvin Turner |  |

**Detective Lieutenant Louis Carrega, of** full age, being duly sworn according to law, upon his oath, deposes and says:

1.  I am Lieutenant of Detectives in the Essex County Prosecutor's Office Homicide Squad. I have been a member of law enforcement since   September 1985. Prior to my present assignment, I had various other assignments including Executive Officer of the Essex/Union Auto Theft Task Force and also as Lieutenant in charge of Major Crimes. I was a Detective in the Homicide Squad for approximately 5 years. I was responsible for the coordination of information regarding individuals involved in felony crimes that are gang related.  As a homicide detective, my duties included the investigation of all homicides, suspicious deaths, police related shootings and other special investigations. During my tenure with the Homicide Squad as a detective I investigated over 100 cases.  My training includes completion of the Union  County Police Academy,  Attorney Generals Office Basic Course for Investigators, Trenton, NJ, Union County Police Academy Methods of Instruction Course.  I have also completed several other Training Courses involving Police Supervision given by the Federal Bureau of Investigation.  I am familiar with the facts  contained herein.

2.  I have been assigned to investigate the disappearance and deaths of  Randy Johnson, Michael McDowel,  Melvin (Ricky) Pittman, Ernest Taylor and Alvin Turner, which occurred on or about August 20, 1978 at  or near 256 Camden Street  in  Newark , New Jersey

3.  This Affidavit is being offered in support of the State's application for  the issuance of a Warrant for the arrest of  Philander Hampton and Lee Evans.

1

ECPO 000257

4.   On or about August 20, 1978 Newark Police were notified by members of the families of  Randy Johnson, Michael McDowel,  Melvin (Ricky) Pittman, Ernest Taylor and Alvin Turner, that these five boys,  all between the ages of  16 and 17 years old,  had  not returned home and were missing

5.   Investigation revealed that each of the five boys had  last been seen  in the company of Lee Evans, a local contractor.

6.   On August 22, 1978 and on August 25, 1978 Lee Evans  stated to police that he commonly  picked up the FIVE boys  sometimes to help him with construction work.  Lee Evans stated to police that on the day they disappeared he had picked up Melvin Pittman, Michael McDowel  and  Randy  Johnson  and  later  dropped  them  off  along  Clinton  Avenue  at approximately 8:00 PM.     He further stated that at approximately 10:30 PM he picked up Michael McDowel, Alvin Turner and Ernest Taylor to help him move boxes but again dropped them  off in the vicinity of Clinton Avenue and Fabyan Place in Newark.

7.   On August 23, 1978 Ruby Taylor, sister of Ernest Taylor, stated that Melvin Pittman came to her house and asked her brother, Ernest Taylor,  to go with him to pick up some boxes on Camden Street.  She stated that she  saw her brother get on a  pick up truck belonging to Lee Evans with Melvin Pittman and several other young boys.

8.   Janet Lawson, the mother of Michael McDowell stated  on August  23, 1978 that the last time she saw her son he was with Lee Evans in his pick-up truck.

9.   Marvin Hall  stated on  October 31,  1978 that he was on Fabyan Place at approximately 9:30 PM with Alvin Turner.  He stated that Lee Evans came by in his pick up with Michael McDowell.  Evans gave him money to buy a milkshake and Alvin stated he was going home.  Alvin was never seen again.

10.  On or about August 21, 1978  the residential structure located at 256 Camden Street, Newark,  N.J. was involved in a three Alarm fire.  Fire Investigators  Delk and Harris  reported that it was their opinion that  an incendiary  was used to start the fire and that two black males had been observed by neighbors to have fled  the building immediately before the fire began.

11.  On  November 13, 2008 Philander Hampton was interviewed by Lt. Louis Carrega, ECPO, Det. Joseph Hadly, NPD and Det. Trooper  William Tietjen, NJSP.  Hampton stated to officers that   he resided on the third floor of 256 Camden Street aforesaid  and that he moved out on  Saturday, August 19, 1978.  Hampton stated that he participated in the murder of the five missing boys and that he was assisting his cousin Lee Evans, who he knew wanted to kill the boys.  Philander Hampton stated that he held two of the boys at gun point at 256 Camden Street

ECPO 000258

while Lee Evans rounded up the other three boys.  Hampton stated that the five boys were then put in a closet, the closet was nailed shut and the room was doused with gasoline. Lee Evans lit the house on fire.  Hampton further stated that he and Lee Evans  ran out from the back of the house.

12.   The multi family dwelling at 256 Camden Street, Newark, New Jersey was subsequently demolished. The bodies of the five missing  boys were never recovered.

13.   A search of all pertinent data  bases revealed  that none of the missing boys ever applied for or received drivers licenses, their social security numbers have not been used, they have not applied for passports,  they have never  contacted family members and they have never applied for social services.

For the foregoing reasons  it is respectfully  requested that    warrants  for  the arrest  of  Philander Hampton  and  Lee Evans  be issued  for   the murders of   Randy Johnson, Michael McDowell  Melvin (Ricky) Pittman, Ernest Taylor and Alvin Turner.

DETECTIVE LOUIS CARREGA
ESSEX COUNTY PROSECUTOR'S OFFICE
HOMICIDE SQUAD

SWORN TO AND SUBSCRIBED BEFORE
ME THIS 22nd DAY OF MARCH, 2010

HONORABLE  PETER J. VAZQUEZ, P.J.CR
SUPERIOR COURT OF NEW JERSEY
ESSEX COUNTY

3

ECPO 000259

# EXHIBIT C

**Page 1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

Civil Action No.  14-cv-120(KM-MAH)

LEE EVANS,

Plaintiff,

-vs-                              DEPOSITION OF:

LEE EVANS

NEWARK CITY, FORMER MAYOR
CORY A. BOOKER, NEWARK POLICE
DEPARTMENT, FORMER NEWARK POLICE
DIRECTOR GARRY MCCARTHY, OFFICER
JOE HADLEY, DETECTIVE RASHID SABUR,
DETECTIVE KEITH SHEPPARD, SGT.
DARNELL HENRY, DETECTIVE JOSEPH
HADLEY, OFFICER ANGEL RAMOS,
NEWARK POLICE OFFICER JOHN DOE (1-10)
ESSEX COUNTY NEW JERSEY, ESSEX COUNTY
PROSECUTOR'S OFFICE, FORMER ACTING
ESSEX COUNTY PROSECUTOR ROBERT D.
LAURINO, FORMER ESSEX COUNTY
PROSECUTOR DOW, ASSISTANT PROSECUTOR
PETER GUARINO, ASSISTANT PROSECUTOR
CHERYL CUCINELLO, DETECTIVE LOUIS
CORRETEGA, DETECTIVE CHRISTOPHER
SMITH, LT. LOU CORREGA, AGENT JACK
EUTSEY, DETECTIVE MICHAEL M. RECKENWALD,
INVESTIGATOR EDWARD JONES, INVESTIGATOR
PATRICK DEFRANCISCI, ESSEX COUNTY SHERIFF'S
OFFICE, SHERIFF OFFICERS JOHN DOE (1-10),
JUDGE PETER VASQUEZ, NEW JERSEY STATE POLICE
DEPARTMENT, DETECTIVE WILLIAM TIETJEN,
AND NEW JERSEY STATE TROOPER (1-10),

Defendants.

Thursday, March 18, 2021

**Page 2**

TRANSCRIPT of testimony taken by and

before JACQUELINE ZAMMATARO, a Notary Public and

Certified Court Reporter of the State of New

Jersey, License No. 30XI0144200, remotely via

Zoom, on Thursday, March 18, 2021, commencing at

10:00 a.m.

**ROSELAND REPORTING SERVICE**
**Certified Shorthand Reporters**
**PO Box 97**
**Roseland, New Jersey 07068**
**www.RoselandReportingService.com**

**Page 3**

A P P E A R A N C E S :

BONJEAN LAW GROUP, PLLC

BY: JENNIFER BONJEAN, ESQ.

ASHLEY COHEN, ESQ.

HALEY COOLBAUGH, PARALEGAL

467 Saint Johns Place

Brooklyn, New Jersey 11238

Attorneys for Plaintiff

SCHENCK, PRICE, SMITH & KING, LLP

BY: JAMES KASSIS, ESQ.

220 Park Avenue

Florham Park, New Jersey 07932

Attorneys for Defendant,

Louis Carrega

**Page 4**

A P P E A R A N C E S :

MICHAEL VOMACKA, ESQ.

VICTOR DiFRANCESCO, JR., ESQ.

NEW JERSEY OFFICE OF THE ATTORNEY GENERAL

DIVISION OF LAW

STATE POLICE, EMPLOYMENT & CORRECTION CENTER

RICHARD J. HUGHES JUSTICE COMPLEX

25 Market Street

P.O. Box 112

Trenton, New Jersey 08625-0112

Attorneys for State of New Jersey & William Tietjen

KENYATTA STEWART, CORPORATION COUNSEL

BY: GARY S. LIPSHUTZ, ESQ.

FIRST ASSISTANT CORPORATION COUNSEL

City of Newark - Department of Law

920 Broad Street, Room 316

Newark, New Jersey 07102

Attorneys for Defendants City Of Newark

(improperly pled as "Newark City" and

"Newark Police Department"), Cory A. Booker,

Garry McCarthy, Darnell Henry & Joseph Hadley, Jr.

**Page 5**

1  ALSO PRESENT
2       JOSEPH HADLEY
3    DARNELL HENRY
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 6**

1       QUESTIONS & OBJECTIONS MARKED
2  QUESTION:      Is it approximately ten years?  More
3  than ten years?
   ANSWER: It could be more.  I was just saying
4  that's why, you know --
   MS. BONJEAN:  Okay.  I am going to object to the
5  argumentative grounds.  He did approximate.  He
   said or so.  That's what an approximation is.
6  MR. LIPSHUTZ:  Your objection is to form.
   MS. BONJEAN:  My objection is what my -- what
7  comes out of my mouth.  Objection to the
   question.  Form.  Foundation.  He answered your
8  question.  Please, next question.
   MR. LIPSHUTZ:  Yes.  I will ask my next question.
9  Your objections are going to be to form.  They're
   not going to be speaking objections.  You're not
10 going to interrupt me.
   MS. BONJEAN:  I am not dealing with you today.
11 Okay?  Ask your questions.  Objection.  Form.
   Move on.
12 MR. LIPSHUTZ:  Madam reporter, please
   mark that.
13                                    Page 31
14 QUESTION:  And how did he say they formulated and
15 manufactured this whole case?
   MS. BONJEAN:  Objection.  Asked and answered.
16 Argumentative.  He just told you he cannot tell
   you word for word.
17 MR. LIPSHUTZ:  Your objections are to form.
   Madam Reporter, please mark that objection.
18                                    Page 43
19 QUESTION:  So when the detectives
   wrote that you picked them up at
20 10:30 p.m., the detectives were
   lying?
21 ANSWER:  No.  I didn't say the
   detectives was lying.  I am saying
22 these statements here it's falsified
   and documented.  I don't know who
23 put it together.
   QUESTION:  This report is falsified?
24 ANSWER:  Yes.        Page 150
25

**Page 7**

1                I N D E X
2
3  WITNESS          DIRECT      CROSS
4  By Mr. Lipshutz    9
5  By Mr. Kassis         186
6
7             E X H I B I T S
8
9  No.     Description
10 P-1              Answers to Interrogatories
11 P-2    First Set of Interrogatories to
12 Lee Evans
13 P-3    Plaintiff's Amended Answers
14 To Interrogatories
15 P-4    Missing Person Report
16 P-5    Missing Person Report
17 P-6    Missing Person Report
18 P-7    Supplemental Report
19 P-8    Preliminary Investigative Report
20 P-9    Photograph
21 P-10   Copy of Greeting Card
22 P-11   Investigation Report
23         (All Exhibits Marked Prior to Deposition)
24
25

**Page 8**

1       THE REPORTER:  The attorneys
2  participating in this deposition acknowledge that
3  I am not physically present in the deposition
4  room and that I will be reporting this deposition
5  remotely.  They further acknowledge that, in lieu
6  of an oath administered in person, I will
7  administer the oath remotely.  The parties and
8  their counsel consent to this arrangement and
9  waive any objections to this manner of reporting.
10        Please indicate your agreement by
11 stating your name and your agreement on the
12 record.
13        MR. KASSIS:  Jim Kassis on behalf of
14 Louis Carrega.  I agree.
15        MS. BONJEAN:  Jennifer Bonjean on
16 behalf of the plaintiff.  I agree.
17        MR. LIPSHUTZ:  My name is Gary
18 Lipshutz.  I agree.  I represent the City of
19 Newark, Darnell Henry, Joe Hadley, Corey Booker,
20 and Garry McCarthy.  Good morning.
21        MR. DiFRANCESCO:  Good morning,
22 Jackie.  Victor DiFrancesco, along with Michael
23 Vomacka, deputies attorney generals.  We are
24 appearing on behalf of the State of New Jersey,
25 William Tietjen.

9

1      MS. BONJEAN: I would like to put on

2  the record Defendant Hadley and Defendant Henry

3  are also present for this deposition as are my

4  colleagues, Ashley Cohen and Haley Coolbaugh.

5  LEE EVANS, affirms to tell the truth, the whole

6  truth and nothing but the truth, testifies as

7  follows:

8  EXAMINATION

9  BY MR. LIPSHUTZ:

10      Q      Good morning, Mr. Evans.

11      A      Yes, it is.

12      Q      Okay. Can you hear me okay, sir?

13      A      Yes.

14      Q      Okay. Good morning. We are here

15  today to ask you some questions in a deposition

16  concerning a lawsuit that you filed. I think we

17  have met before once in court, but if you don't

18  remember, my name is Gary Lipshutz. I am an

19  attorney for the City of Newark and for Detective

20  Hadley and Sergeant Henry and Mayor Booker and

21  police director Garry McCarthy.

22      Also on this deposition are a number

23  of other attorneys who represent various

24  defendants in the case. We are here to ask you

25  some questions about your lawsuit. I am going to

10

1  probably go through some background questions

2  about you first.

3      Then I am going to go and ask you

4  about your recollection of the events of 1978. I

5  may ask you some questions about the criminal

6  trial. And at the conclusion of my testimony –

7  I am sure we will get into some other topics, but

8  at the conclusion of my questioning, the other

9  attorneys have the right to ask you some

10  questions.

11      Do you understand that so far?

12      A      Yes.

13      Q      Okay. Have you ever had the

14  opportunity to give deposition testimony before?

15      A      No.

16      Q      Okay. This is the first time?

17      A      Yes.

18      Q      Okay. Well, I am going to give you

19  a few instructions. Okay?

20      First of all, you just affirmed to

21  tell the truth. Do you understand that you're

22  here today to give truthful and honest testimony?

23      A      Yes.

24      Q      Okay. And your answers to my

25  questions today will be truthful and honest; is

11

1  that correct?

2      A      Correct.

3      Q      Okay. Now, we are all in different

4  locations. It's a little unusual. Normally we

5  would all be in the same conference room, but

6  because of the circumstances of the pandemic, all

7  of us are separated by miles. I take it today,

8  sir, that you're in the -- where are you, sir?

9      A      I am in an attorney's office.

10      Q      Okay. What -- where are they

11  located?

12      A      In Brooklyn.

13      Q      Okay. So you're in Brooklyn. Okay.

14  So we are not in -- together. But this is a

15  sworn deposition under oath. The significance of

16  that is that this is testimony that can be used

17  later at a trial, if necessary. And let me

18  explain.

19      If at a trial in this matter you

20  were to give testimony that differs from

21  testimony that you give today, you can be

22  confronted by your testimony today. Do you

23  understand that?

24      MS. BONJEAN: Sir, I am going to

25  object to these instructions. A, they're not

12

1  necessarily accurate reflections of the law.

2  It's all very hypothetical. So I would

3  appreciate it if you have instructions as to --

4  would help him get through this deposition, go

5  right ahead. But your misstatements of the law

6  and hypothetical scenarios that may or may not

7  play out in trial I think are inappropriate.

8      MR. LIPSHUTZ: Your objection is to

9  form, and I would ask you to limit your objection

10  to form.

11      MS. BONJEAN: I will object as I see

12  fit. Go ahead. Keep going. Let's keep going.

13  BY MR. LIPSHUTZ:

14      Q      Okay. Also, it's important that

15  only one of us speak at a time. This is a

16  especially true because of the fact that we are

17  not in a conference room. This will help the

18  court reporter take down everything that is said

19  accurately. So please let me finish my question,

20  and I will give you every opportunity to finish

21  and complete your answer.

22      It may be a little awkward at times.

23  I may anticipate that you might be done, but I am

24  not trying to speak over you. Can we agree on

25  that?

13

| | | |
|---|---|---|
| 1 | A | **You talking to me, Evans?** |
| 2 | Q | I am speaking to you, Mr. Evans. |
| 3 | A | **Yes.** |
| 4 | Q | Okay. There is a court reporter |

present here today. Her name is on the screen,
and her name is Jacqueline Zammataro. Okay. She
is taking down everything that is being said word
for word, and at the conclusion of this
deposition, a transcript will be prepared. Okay?

If at any point during this
deposition you do not understand any of my
questions, I would appreciate it if you let me
know. That way I will be happy to rephrase the
question. If you go ahead and answer the
question, when we read the transcript later,
everyone will presume that you understood the
question. So can we agree, sir, if you don't
understand my question, you will let me know.
Okay?

| | | |
|---|---|---|
| 20 | A | **Yes.** |
| 21 | Q | Okay. I also need you to respond |

verbally to my questions. The court reporter
cannot take down shrugs of the shoulders or words
like uh-huh or um-hum. We won't know later what
those words mean. So speak your answers verbally

14

out loud. Do you understand that?

| | | |
|---|---|---|
| 2 | A | **Yes.** |
| 3 | Q | Okay. If you need to take a break |

at any time, please let me know. I will be happy
to do so. But typically, there is no breaks
while there is a question pending. So you will
please just answer the question first and then
ask me to take a break. Okay?

| | | |
|---|---|---|
| 9 | A | **Yes.** |
| 10 | Q | Okay. There may come a time when |

your attorney or perhaps the other attorneys may
object to one or more of my questions. Again,
this is awkward since we are not all in the same
room. Please let your attorney pose her
objection. And this is not a courtroom. There
is no judge here to rule on your objection. So
unless your attorney instructs you not to answer
a question, you're still going to have to answer
the question. Do you understand that?

| | | |
|---|---|---|
| 20 | A | **Yes.** |
| 21 | Q | Okay. Are you under -- are you |

taking any medication, sir?

| | | |
|---|---|---|
| 23 | A | **Yes.** |
| 24 | Q | What kind of medication? |
| 25 | A | **Pressure. High blood pressure.** |

15

| | | |
|---|---|---|
| 1 | Q | High blood pressure. Okay. What is |

the name of the medication, sir?

| | | |
|---|---|---|
| 3 | A | **There is several. One of them** |

**metformin and the other one is -- I don't know at**
**the moment.**

| | | |
|---|---|---|
| 6 | Q | Metformin, is that typically for |

diabetes?

| | | |
|---|---|---|
| 8 | A | **Yes. Diabetes and also you got the** |

**pressure, high pressure.**

| | | |
|---|---|---|
| 10 | Q | Okay. Does that mean, sir, that you |

also suffer from diabetes?

| | | |
|---|---|---|
| 12 | A | **I don't suffer from it. It's** |

**borderline.**

| | | |
|---|---|---|
| 14 | Q | Okay. Type 1 or type 2, sir? |
| 15 | A | **No. I don't take no injections or** |

**nothing like that.**

| | | |
|---|---|---|
| 17 | Q | But is it type 1 diabetes or type 2? |
| 18 | A | **Type 1 is what, the -- type 2 is the** |

**second phase.**

| | | |
|---|---|---|
| 20 | Q | Well -- |
| 21 | A | **I'm not -- I don't know.** |
| 22 | Q | **I will tell you what. If you don't** |

**know the answer to my question, just let me know.**
**Okay?**

| | | |
|---|---|---|
| 25 | A | **Yes.** |

16

| | | |
|---|---|---|
| 1 | Q | **Okay. That's one of the other** |

**instructions I should give you. We don't want**
**you to guess. We just want you to tell us your**
**recollection. If you don't remember, it's okay**
**to say "I don't remember." If you don't recall,**
**let us know you don't recall. All right. Is**
**that fair?**

| | | |
|---|---|---|
| 8 | A | **Yes.** |
| 9 | Q | Okay. Other than the medication for |

high blood pressure, are you taking any other
medication?

| | | |
|---|---|---|
| 12 | A | **Yes. I was taking depression,** |

**anxiety. They gave me something. It was**
**affecting me too far. It was bringing me too far**
**down. It was turning me into a zombie almost,**
**you know.**

| | | |
|---|---|---|
| 17 | Q | Okay. I am a little confused. Are |

you taking that medication now or have you taken
it in the past?

| | | |
|---|---|---|
| 20 | A | **I took it in the past, yes.** |
| 21 | Q | What I meant for today's purposes, |

are you taking any other medication?

| | | |
|---|---|---|
| 23 | A | I still have that medication, yes. |
| 24 | | MS. BONJEAN: Are you taking it |

today?

**R O S E L A N D   R E P O R T I N G   S E R V I C E**

17

1     THE WITNESS:  No.  I didn't take it
2  today.
3  BY MR. LIPSHUTZ:
4     Q     When was the last time you took it,
5  sir?
6     A     About a week.
7     Q     Okay.  And other than that, have you
8  taken any other medication?
9     A     Herbal.
10     Q     Herbal?
11     A     Yes.
12     MS. BONJEAN:  Do you mean today?
13     THE WITNESS:  You're talking about
14  today?
15  BY MR. LIPSHUTZ:
16     Q     Yeah.  I want to know what
17  medications you are taking today or in the last
18  12 hours.
19     A     That was it.
20     Q     Okay.  Is there any reason why you
21  cannot give truthful answers today?  Any reason?
22     A     Is there any reason?
23     Q     Yeah.
24     A     What you mean by that?
25     Q     Okay.  Thank you.  Let me rephrase

18

1  the question and I should have rephrased it.
2     Is the fact that you're taking any
3  of those medications -- would that affect your
4  ability to give truthful and honest answer today?
5     A     No.
6     Q     Okay.  Have you had any alcohol
7  beverages in the last 12 hours?
8     A     No.
9     Q     Okay.  One second, sir.  Have you
10  looked at any documents prior or in preparation
11  for today's deposition?
12     A     Documents is in my head.
13     Q     It's a simple question.  Have you
14  looked at any documents in preparation for
15  today's deposition?
16     A     Did I look at anything?  No.  I was
17  instructed to look, but I didn't need to look.
18     Q     Well, one of the things I would tell
19  you is --
20     MS. BONJEAN:  Just answer --
21  BY MR. LIPSHUTZ:
22     Q     -- I don't really want to get into
23  what you were instructed to do.  I don't want to
24  get into what your attorney spoke to you about.
25  I am not asking you about that.  I don't want to

19

1  get into the conversations that you had with your
2  attorneys.  That's not something I am interested
3  in.  All I was asking was have you reviewed any
4  documents in preparation of today's deposition?
5     A     No.
6     Q     Okay.  Other than your attorneys or
7  anybody at their law firm, have you spoken to
8  anybody in preparation of today's deposition?
9     A     I might have told somebody I was
10  coming here.  That's what you mean?
11     Q     That's a fair response.  Other than
12  saying I am driving to Brooklyn for a deposition
13  or I can't be at a meeting because I am going to
14  a deposition, have you discussed -- I am getting
15  feedback here.
16     Have you discussed this upcoming
17  deposition with anyone other than your attorneys
18  or anyone in their office?
19     A     No.
20     MS. BONJEAN:  I am just going to
21  object to form.  Foundation.  Go ahead.
22  BY MR. LIPSHUTZ:
23     Q     I am sorry.  I didn't hear your
24  answer, sir.
25     A     You said --

20

1     MS. BONJEAN:  No.  Just answer the
2  question.  You already answered it.
3     THE WITNESS:  I said no.
4  BY MR. LIPSHUTZ:
5     Q     Let me just ask you some background
6  questions.  Okay?
7     What is your full name, please?
8     A     Lee Anthony Evans, Sr.
9     Q     Senior.  Have you ever gone by any
10  other names?
11     A     Other names?  What, change my name?
12  Nickname?  What you mean?  You got to explain
13  that.
14     Q     Have you ever gone by any other
15  names?
16     MS. BONJEAN:  Objection.  Form.
17  Foundation.
18     You can answer if you understand.
19     THE WITNESS:  You got to explain to
20  me.  Are you talking about my -- changing my name
21  or a nickname?
22  BY MR. LIPSHUTZ:
23     Q     I'll happily -- well, I want to just
24  sort of just ask a broad question.  But have you
25  ever had a formal different name?

**21**

1     A     **Not formal, no.**
2     Q     Okay. Have you had nicknames?
3     A     **Yes. I had nicknames.**
4     Q     What nicknames have you gone by or
5 have people called you?
6     A     **When I was born, they called me Book**
7 **because I was crawling. I was -- in one area**
8 **they was calling me Potato and -- because my head**
9 **was round like a potato, and they called me Big**
10 **Man. They have called me Genius. You know,**
11 **that's basically.**
12     Q     Okay. Any other nicknames that you
13 can recall?
14     A     **Not really.**
15     Q     Okay. What is the date you were
16 born, sir?
17     A     **June 14, 1953.**
18     Q     Where were you born?
19     A     **Louisiana.**
20     Q     And did there come a time you -- you
21 or your family moved to New Jersey?
22     A     **Yes.**
23     Q     When was that?
24     A     **That was in roughly around '62,**
25 **somewhere in there.**

**22**

1     Q     So for the first nine, ten years --
2 eight or nine years of your life where did you
3 live?
4     A     **I was in Louisiana, I was in**
5 **Alabama, and from Alabama came to Jersey.**
6     Q     Since 1962 have you lived in New
7 Jersey exclusively?
8     A     **Yes.**
9     Q     Okay. Now, there are a lot of names
10 I want to ask you about, and sometimes I read
11 that they're cousins. So I am going to ask a
12 little bit about your family tree, sir. So what
13 -- are your parents still alive?
14     A     **In spirit, yes. They passed on.**
15     Q     Your parents have passed on. What
16 was your father's name? What is your father's
17 name
18     A     **Laverne Evans, Senior [phonetic].**
19     Q     And your mother?
20     A     **Mildred B. Williams Evans.**
21     Q     Mildred B.?
22     A     **Yeah.**
23     Q     Williams?
24     A     **Evans.**
25     Q     Evans. Okay. Now, did your father

**23**

1 have siblings?
2     A     **Yes.**
3     Q     Can you tell me who -- the siblings'
4 names?
5     A     **Well, Andrew Junior, Belle, Annie B.**
6 **There's Levi, his twin, Levi Evans. And that's**
7 **about it.**
8     Q     He had three brothers?
9     A     **Three, four, yeah.**
10     Q     I missed your answer on that.
11     A     **Three or four. Three brothers,**
12 **yeah. I think it was three brothers. Twin -- my**
13 **father; right? You're talking about my father?**
14     Q     Yes, sir.
15     A     **Yeah. That's what I am saying.**
16 **Okay.**
17     Q     No sisters?
18     A     Yeah. He had sisters. There is two
19 sisters.
20     Q     What were their names, sir?
21     A     **One Annie B and one was Belle.**
22     Q     I guess I am having trouble hearing.
23 I thought you said Andy, A-N-D-Y. It's Annie?
24     MS. BONJEAN: Speak up. Okay?
25     THE WITNESS: Annie B. Ann. Annie

**24**

1 B.
2 BY MR. LIPSHUTZ:
3     Q     Thank you, sir. And so any other
4 siblings?
5     A     **Not as far as I know.**
6     Q     Annie B, what was -- was she
7 married?
8     A     **At one point, I guess. I don't**
9 **know.**
10     Q     Do you know what her last name was?
11     A     **When it passed Evans, no.**
12     Q     And Belle?
13     A     **Same.**
14     Q     You don't know what her last name
15 was?
16     A     **No.**
17     Q     Okay. Now, your mother, Mildred,
18 her maiden name was Williams?
19     A     **Her maiden was Hampton.**
20     Q     Hampton. Mildred B. Williams Evans.
21 I'm sorry. I didn't hear you?
22     A     **Evans was her -- her married name.**
23 **She was married twice with a Williams also.**
24     Q     Thank you, sir. So Williams was a
25 prior husband?

**25**

1    A    Yes.

2    Q    A prior marriage. And then her

3  maiden name was Hampton?

4    A    Right.

5    Q    Now, did Mildred have siblings?

6    A    Yes.

7    Q    Do you know how many?

8    A    About five or six.

9    Q    Do you recall their names?

10    A    Yes. Julia. Julia May.

11    Q    Julia?

12    A    Yeah. Woody.

13    Q    Okay.

14    A    John Hampton, Randolph Hampton, and

15  sister Vera and a sister Claire.

16    Q    Okay. Thank you. You're doing

17  great. Julia's last name?

18    A    Woody.

19    Q    Julia Woody?

20    A    Yes.

21    Q    Vera's last name?

22    A    I'm not for sure.

23    Q    Claire?

24    A    I think it's Taylor. Taylor.

25    Q    Okay. Now, those aunts and uncles

**26**

1    -- various aunts and uncles, did many of them

2  live in New Jersey?

3    A    Just two.

4    Q    Which two, sir?

5    A    Did I mention John Hampton?

6    Q    Yes, you did.

7    A    Okay. John Hampton and Julia Woody.

8    Q    What about on your father's side?

9  Did any of those siblings live in New Jersey?

10    A    Not that I know of.

11    Q    Okay. So John Hampton and Julia

12  Woody lived in New Jersey, your mother's

13  siblings?

14    A    Yes.

15    Q    That would be your uncle and your

16  aunt?

17    A    Yes.

18    Q    Okay. Now, I want to ask you about

19  a couple names here. And can you explain their

20  relationship to me? Philander Hampton, was that

21  John's son?

22    A    No.

23    Q    Okay. That's why I asked.

24    A    He is a second cousin.

25    Q    Second cousin?

**27**

1    A    Right.

2    Q    Okay. Can you explain the -- the

3  relationship to you other than second cousin?

4  Like who is his parents, et cetera?

5    A    His mother and my mother was first

6  cousins.

7    Q    Okay. Mildred Evans, your mother,

8  had a cousin, and her cousin's name was?

9    A    That was -- mental lapse -- Merrell,

10  Jessie Merrell (phonetic).

11    Q    Jessie Merrell?

12    A    Yes.

13    Q    And that was Philander's mother?

14    A    Right.

15    Q    That makes Philander your second

16  cousin. Fantastic. Thank you.

17        Darryl Woody, is he related to you?

18    A    Yes.

19    Q    What was his relationship to you?

20    A    First cousin.

21    Q    Is that Julia's son, then?

22    A    Correct.

23    Q    Were you also related to Maurice

24  Olds?

25    A    Yes.

**28**

1    Q    What is the relationship there?

2    A    First cousin.

3    Q    Whose -- which one of your aunts or

4  uncles was --

5    A    That's Darryl's brother.

6    Q    Thank you. So Darryl and Maurice

7  are siblings?

8    A    Correct. Yes.

9    Q    And their mother was Julia Woody?

10    A    Yes.

11    Q    Okay. Maurice has passed away;

12  correct?

13    A    Yes.

14    Q    Is Darryl still alive?

15    A    He passed.

16    Q    He has also passed. Okay.

17        Are you presently married?

18    A    Yes.

19    Q    What is your wife's name?

20    A    Frances.

21    Q    Is that F-R-A-N-C-E-S or I-S?

22    A    E-S.

23    Q    How long have you been married, sir?

24    A    Say 40 – 45 years, something like

25  that.

29

1   Q   Do you remember the date you got
2   married, your anniversary?
3   A   Yeah. That's December the 5th.
4   Q   What year, sir?
5   A   Oh, I didn't get that. I got to get
6   the year also. That was in – yeah. I could
7   tell you the year. It had to be '75. '75.
8   Q   Would it be fair to say that you
9   were married prior to the disappearance of the
10  five boys in 1978?
11  A   Yes.
12  Q   Okay. And you were married to
13  Frances?
14  A   Yes.
15  Q   Okay. Are you – do you still live
16  with her?
17  A   We communicate. No. Not at this
18  moment.
19  Q   Would you say you're separated?
20  A   Yes. At the moment, yes.
21  Q   Okay. How long have you been
22  separated, sir?
23  A   Well, I guess ten years or so, you
24  know.
25  Q   So let's – I really don't like you

30

1   to guess. Okay? You can approximate.
2       MS. BONJEAN:  He said ten years or
3   so.
4       MR. LIPSHUTZ:  I heard him say ten
5   years or so.
6   BY MR. LIPSHUTZ:
7   Q   Is it approximately ten years? More
8   than ten years?
9   A   It could be more. I was just saying
10  that's why, you know –
11      MS. BONJEAN:  Okay. I am going to
12  object to the argumentative grounds. He did
13  approximate. He said or so. That's what an
14  approximation is.
15      MR. LIPSHUTZ:  Your objection is to
16  form.
17      MS. BONJEAN:  My objection is what
18  my -- what comes out of my mouth. Objection to
19  the question. Form. Foundation. He answered
20  your question. Please, next question.
21      MR. LIPSHUTZ:  Yes. I will ask my
22  next question. Your objections are going to be
23  to form. They're not going to be speaking
24  objections. You're not going to interrupt me.
25      MS. BONJEAN:  I am not dealing with

31

1   you today. Okay? Ask your questions.
2   Objection. Form. Move on.
3       MR. LIPSHUTZ:  Madam reporter,
4   please mark that.
5   BY MR. LIPSHUTZ:
6   Q   Presently it's 2021. What year do
7   you approximate that you became separated from
8   your wife?
9   A   Oh, had to be 10 to – I guess 10,
10  11 – 10 years, 11 years, somewhere in there. I
11  mean it was – you know, where we – it had to be
12  10 or 11 years or somewhere in there.
13  Q   Okay.
14  A   You know.
15  Q   Where does she live? Do you know?
16  A   Yes. She live in Newark.
17  Q   Okay. Have you – has anybody filed
18  divorce papers?
19  A   No.
20  Q   Do you know if she is aware of this
21  lawsuit?
22      MS. BONJEAN:  Objection. Form.
23  Foundation.
24  BY MR. LIPSHUTZ:
25  Q   You can answer that.

32

1   A   Yes. She's aware.
2   Q   Have you discussed this lawsuit with
3   her?
4   A   I haven't discussed it with no one
5   really.
6   Q   So then I guess the answer is you
7   have not discussed it with her?
8   A   No.
9   Q   Okay.
10  A   You mean lately; right? That's what
11  you mean? What period?
12  Q   Well, that's a good – that's a fair
13  question. Have you ever discussed this lawsuit
14  with her?
15  A   Yes.
16  Q   Okay. And when was the last time
17  you discussed this lawsuit with her?
18  A   I couldn't tell you.
19  Q   More than two years?
20  A   Probably not. I don't know. I
21  wouldn't be able to give you no answer on that.
22  Q   Okay. Do you have children?
23  A   Yes.
24  Q   How many children do you have?
25  A   I have five.

33

```
1    Q    Okay.  Just give me a range of their
2  ages.
3    A    From 50 all the way down to 25.
4    Q    Okay.  Do you live with any of them?
5    A    No.
6    Q    Do any of them live with Frances?
7    A    Yes.
8    Q    Okay.  Now, at the beginning of the
9  deposition you gave a post office box for an
10 address.  Do you have a physical address?
11   A    Well, that's where all my –
12 everything goes to me.  I don't have a permanent
13 physical address, no.  Everything goes to the PO
14 box or it goes to 10 Melville Place.
15   Q    What is 10 Melville Place?
16   A    That's a location.
17   Q    Yeah.  Is that where you sleep at
18 night?
19   A    No.  I don't really sleep there.
20   Q    Okay.  Where do you --
21   A    I was there sometimes, but, you
22 know, mostly –
23   Q    Mostly what?
24   A    No.  I house there sometimes.
25 Mostly I just be there every day, though, you
```

34

```
1  know.  We goes in and out of there.  Where I
2  sleep at is – it's a location in Budd Lake, New
3  Jersey.
4    Q    What is address of Budd Lake
5  location?
6    A    That's 38 4B.
7    Q    38 4B?
8    A    Yes.
9    Q    What?  38 4B what?
10   A    That's the – that's the building
11 number.
12   Q    Can you just tell me -- what is the
13 location?  What is the address?
14   A    Eagle Rock Village.  Eagle Rock
15 Village.
16   Q    Is that an apartment?
17   A    Yes.
18   Q    Condominium?
19   A    Yes.  That's apartment.
20   Q    Okay.  So you rent an apartment?
21   A    Yeah.  I rent apartment.
22   Q    And 10 Melville, is that a house or
23 apartment?
24   A    No.  That's not a house.  That's a
25 – like warehouse garage thing.
```

35

```
1    Q    A warehouse garage.  Do you own any
2  real estate?
3    A    Yeah.
4    Q    Tell me what real estate you own.
5    A    Prior to this here situation I was
6  in, I lost properties.  That was on Chancellor.
7  Property at 10 Melville Place and 16 Melville
8  Place.
9    Q    So I am a little confused you.  Are
10 you saying that you lost property on Chancellor
11 and 16 Melville Place?
12   A    No.  I lost – no.  16 – I lost
13 property on – that was 18 Melville Place, in my
14 son's name.
15   Q    Let me just ask it a different way.
16 Do you presently own real estate at all?
17   A    Yes.  Jammed up, yes.  Yes.
18   Q    You mean mortgaged by jammed up?  Is
19 that what you mean?
20   A    No.  Lot of financial difficulties.
21   Q    I know.  But it's a pretty simple
22 straightforward question.  Do you own property?
23 I am just curious.
24   A    I said yes already.
25   Q    Okay.  Well, what is the property
```

36

```
1  you own?
2    A    10 Melville Place and you got 16
3  Melville Place.
4    Q    Okay.  Anywhere else?
5    A    No.
6    Q    Okay.  When was the last time you
7  spoke to Philander Hampton?
8    A    I don't associate with him like
9  that, but he called me.  This had to be two,
10 three months ago, somewhere in there like that.
11   Q    He called you?
12   A    Yes.
13   Q    And what did he say?
14   A    When he had called me?
15   Q    Yes.
16   A    He doesn't say too much because I
17 cut the conversation.
18   Q    Why?
19   A    Because I don't affiliate with him.
20   Q    You broke up.  I'm sorry.  What did
21 you say?
22   A    Because I don't affiliate with him.
23   Q    I understand.  You don't affiliate
24 with him.
25        So when he spoke to you two, three
```

37

1    months ago, did you speak about anything or just

2    broke up the question -- you just broke up the

3    conversation, I mean?

4        A       Yes.

5        Q       Okay.

6                And before you spoke to him two or

7    three months ago, when was the last time you

8    spoke to him before that?

9        A       I don't know. It wasn't on the same

10   basis. Like I cut the conversation off. But I

11   don't know the time. I couldn't give you the

12   time. It's been awhile.

13       Q       You know, a while can mean one thing

14   to one person and one thing to another. So can

15   you give me a better estimate?

16               MS. BONJEAN: Objection. Asked and

17   answered.

18               THE WITNESS: I couldn't, not right

19   off, you know.

20   BY MR. LIPSHUTZ:

21       Q       Well, let me ask you this. Since

22   the -- since the acquittal; right? Since the

23   acquittal --

24       A       Yes.

25       Q       -- have you discussed with

38

1    Mr. Hampton anything about his testimony, his

2    accusations, anything at all?

3                MS. BONJEAN: Objection to form.

4                You can answer.

5                THE WITNESS: Repeat that.

6    BY MR. LIPSHUTZ:

7        Q       Since the acquittal, have you had

8    discussions with Mr. Hampton about his testimony

9    or his accusations against you?

10       A       Yes.

11       Q       When was that conversation and what

12   was discussed?

13               MS. BONJEAN: Objection to form.

14   Compound.

15   BY MR. LIPSHUTZ:

16       Q       When was that conversation?

17       A       Oh, man, that could have been -- it

18   was years. It wasn't no months.

19               MS. BONJEAN: If you don't know, you

20   don't know.

21               THE WITNESS: No. Not right off.

22   I'm not -- but it wasn't months.

23   BY MR. LIPSHUTZ:

24       Q       Was it in 2011?

25       A       No.

39

1        Q       Was it in 2012?

2        A       No.

3        Q       Was it in 2013?

4        A       No. It was in -- if you're

5    narrowing it down, you know, it was past '13,

6    '14. It had to be '17, '18. Could have been

7    '19. I am not for sure. Maybe it was '17,

8    somewhere in there.

9        Q       Somewhere --

10       A       I know -- I know for a fact it

11   wasn't '14 and it wasn't '15.

12       Q       Why do you know for a fact it wasn't

13   those years?

14       A       Because that's when I went into the

15   -- I filed my complaints, and I know it wasn't

16   there. It had to be '18. It could have been

17   '18. I don't know if it was '19.

18       Q       Somewhere between 2017 and 2019?

19       A       Somewhere in there, yeah.

20       Q       And you spoke to Philander. What

21   was that discussion? Was it in person or over

22   the phone?

23               MS. BONJEAN: Objection. Form.

24               You can answer. When I object, you

25   can still answer.

40

1                THE WITNESS: Yes. Yes. It was --

2    it was in person.

3    BY MR. LIPSHUTZ:

4        Q       Where did that conversation take

5    place?

6        A       In Newark.

7        Q       Where?

8                MS. BONJEAN: Objection. Form.

9                THE WITNESS: I don't really

10   remember the street. I know the street. It was

11   off South Orange Avenue. The street runs off

12   South Orange Avenue.

13   BY MR. LIPSHUTZ:

14       Q       What time of year was this?

15       A       I don't even remember. I don't

16   remember.

17       Q       What time of day was it?

18       A       Oh, it was probably after 12:00.

19   3:00, 4:00, somewhere in there.

20               MS. BONJEAN: Don't guess.

21   BY MR. LIPSHUTZ:

22       Q       Are you guessing or you're not sure?

23       A       I am not sure.

24               MS. BONJEAN: Here is -- the

25   instruction he gave you is if you don't know the

41

1 answer --

2 THE WITNESS: Right.

3 MS. BONJEAN: -- tell him you don't

4 know the answer, or if you're approximating, tell

5 him you're approximating.

6 BY MR. LIPSHUTZ:

7 Q Do you know when you had your

8 conversation with Mr. Hampton?

9 A It wasn't night and it wasn't

10 morning.

11 Q Was anybody else present?

12 A No.

13 Q What was discussed?

14 A What was discussed about this -- how

15 he said they tricked him into doing what he did.

16 Q Explain exactly what he said to you.

17 MS. BONJEAN: Objection to the form.

18 THE WITNESS: They tricked him in

19 putting this here case together.

20 BY MR. LIPSHUTZ:

21 Q Did he say anything else?

22 A I don't recall.

23 Q Did he say who tricked him?

24 A Yeah. He said the police, the

25 prosecutor.

42

1 Q Did he say who, as in what persons,

2 or did he just say the police, the prosecutor?

3 A Yeah. That's what he said.

4 Q Okay. I will rephrase my question.

5 Did he give names or he just said the police, the

6 prosecutor?

7 A No. No.

8 Q No names?

9 A No names. I knew something came up,

10 but I don't know how.

11 MS. BONJEAN: Just answer the

12 question. Don't --

13 THE WITNESS: To me, no. He didn't

14 give no names to me.

15 BY MR. LIPSHUTZ:

16 Q Just the police or prosecutor;

17 correct?

18 A The police and the prosecutor.

19 Q Thank you. That's what you said. I

20 appreciate that.

21 Did he explain to you what he meant

22 by they tricked him?

23 A In detail some stuff he said, you

24 know. I'm trying to recollect what he said, how

25 he said it. Word for word, no. I don't recall.

43

1 Q Philander told you the police and

2 prosecutor tricked him, but you're telling me you

3 don't recall exactly what he said?

4 A I didn't say that. I said word for

5 word. In essence -- in essence, I am telling you

6 word -- I couldn't repeat word for word. But he

7 was telling -- he was saying -- in essence, what

8 he said was how they formulated and manufactured

9 this whole case.

10 Q And how did he say they formulated

11 and manufactured this whole case?

12 MS. BONJEAN: Objection. Asked and

13 answered. Argumentative. He just told you he

14 cannot tell you word for word.

15 MR. LIPSHUTZ: Your objections are

16 to form.

17 Madam Reporter, please mark that

18 objection.

19 MS. BONJEAN: Mr. Lipshutz, you are

20 the king of speaking objections. I am objecting

21 to form. Okay? Please stop. Mark -- mark --

22 mark away. This is really ridiculous. Stop

23 harassing my client and being argumentative.

24 Please ask your next question, sir.

25 MR. LIPSHUTZ: Madam reporter,

44

1 please mark that.

2 BY MR. LIPSHUTZ:

3 Q Sir, all I want to know is what he

4 told you.

5 MS. BONJEAN: Objection. Asked and

6 answered.

7 BY MR. LIPSHUTZ:

8 Q What did he tell you how they

9 tricked him into manufacturing this case?

10 A I can't put it in words the way he

11 said it. That's what I am saying at this point.

12 Q Can you give me anything else as to

13 what he said?

14 A No.

15 Q Were there more than one

16 conversations with him about this?

17 A What you mean?

18 Q Well, other than this one

19 conversation that took place on some street near

20 South Orange Avenue between 2017 and

21 2019, did you have any other conversations with

22 him about his testimony?

23 MS. BONJEAN: Objection to the form

24 and foundation of that question.

25 Go ahead. You can answer.

45

1    THE WITNESS: No. It was the same
2    basic, you know, when I got with him on this
3    here.
4    BY MR. LIPSHUTZ:
5        Q    So I don't really understand that.
6    Did you have -- my question was, did you have
7    other conversations about this?
8        A    You mean a different date --
9        Q    Yes, sir.
10       A    Yeah. It was a different date.
11       Q    Okay. Where did that conversation
12   take place?
13       A    I don't know. Before this
14   conversation. And that conversation led to the
15   meeting of this conversation.
16       Q    Okay. Thank you for clarifying.
17            So prior to -- prior to the
18   conversation you told me about, you had another
19   conversation or an earlier conversation with Mr.
20   Hampton. Is that right?
21       A    The earlier conversation went on
22   this conversation.
23       Q    Okay. What happened in the earlier
24   conversation?
25       A    That's what it was about, meeting

46

1    for this -- it's all the same. Ain't no
2    difference.
3        Q    Well, I wasn't there, so I am just
4    trying to understand. And you will forgive for
5    me for just trying to inquire. Okay?
6            MS. BONJEAN: Objection to form and
7    editorializing.
8    BY MR. LIPSHUTZ:
9        Q    Mr. Evans --
10       A    The first -- go ahead.
11       Q    Yeah. Just tell me about the first
12   conversation.
13       A    The first conversation was when we
14   came together -- he called me for me to meet, and
15   then I met up. And that's when the second
16   conversation came in place.
17       Q    Okay. During this first
18   conversation, was anything -- was anything
19   discussed about his testimony or about his
20   accusation?
21       A    No. It was the same. Basically,
22   he's telling me how they put him -- and another
23   thing he added, that he said he claimed -- I
24   don't know if it's true or not. He claimed that
25   they didn't give him money like they said -- they

47

1    promised. I don't know whether it's true or
2    false.
3        Q    I understand that. When -- when did
4    he bring that up? During the first conversation
5    or the second one?
6        A    It could have been the second one.
7        Q    That was the face-to-face
8    conversation?
9        A    Yeah.
10       Q    And I guess I didn't ask you about
11   the conversation. Was that also face-to-face or
12   on the telephone or --
13       A    That was the phone.
14       Q    Okay. So you have told me about two
15   conversations with Mr. Hampton, one over the
16   phone and one face-to-face. Were there other
17   conversations with Mr. Hampton -- excuse me. Let
18   me rephrase the question. I am sorry. You have
19   told me about three.
20           MS. BONJEAN: Objection to form.
21   BY MR. LIPSHUTZ:
22       Q    One over the telephone, one
23   face-to-face, and then a later one where you said
24   you don't really associate with him. Were there
25   any other conversations?

48

1        A    You talking about after the -- after
2    '10 or before the '10? What year you talking
3    about?
4        A    After the acquittal, sir.
5        A    After. It could have been. I am
6    not for sure.
7        Q    What is your recollection?
8            MS. BONJEAN: Objection. Asked and
9    answered.
10           THE WITNESS: I don't -- I don't
11   have that. That's what I am saying.
12   BY MR. LIPSHUTZ:
13       Q    So I want to make sure I understand
14   what you have told me. You have told me that Mr.
15   Hampton told you he was tricked by the police and
16   prosecutors, that he wasn't paid. Is there
17   anything else he told you?
18           MS. BONJEAN: Objection. Asked and
19   answered and mischaracterizes the testimony.
20           Go ahead. You can answer.
21           THE WITNESS: Yes. Yes. He was
22   telling me how they put his statement together.
23   BY MR. LIPSHUTZ:
24       Q    When did he tell you that?
25       A    The same time. That's what I am

**49**

1  saying. It came to me on that -- when he was --
2  same conversation where they tricked him and lied
3  to him and everything else he claimed. I don't
4  know.
5  Q    He's also said that they lied to
6  him?
7  A    Yeah. Because they didn't pay him.
8  Q    How did they --
9  A    I don't know nothing about how they
10  did it. This is what he said, and that's it. I
11  don't know nothing behind the scenes.
12  Q    I got that. I understand that.
13  What did he say to you about how they put this
14  statement together?
15  A    I already said. I just told you
16  what was happening. That was it. Right now I
17  couldn't come word for word the way he said it.
18  Q    Well, give me your best
19  recollection.
20  A    I did already.
21  MS. BONJEAN: Objection. Objection.
22  Asked and answered. You're now harassing the
23  witness. He did his best to recollect.
24  Objection. Form.
25  BY MR. LIPSHUTZ:

**50**

1  Q    So the only thing you remember is
2  that they -- that he said something to the effect
3  that they put this statement together?
4  MS. BONJEAN: Objection.
5  Mischaracterizes his testimony.
6  BY MR. LIPSHUTZ:
7  Q    Mr. Evans, just tell me what you
8  remember.
9  MS. BONJEAN: Objection. Asked and
10  answered. This is argumentative and harassing.
11  He did his best. You've asked him many times.
12  MR. LIPSHUTZ: Okay. Keep going,
13  Ms. Bonjean.
14  Madam Reporter, can you mark that
15  objection too?
16  MS. BONJEAN: You know what? You
17  know what? You can -- you can -- hold on a
18  second.
19  Mr. Lipshutz, you are not going to
20  harass the client just because you don't -- you
21  don't feel that he is giving you as much detail
22  as he likes from a conversation from many years
23  ago. He has done his best to answer the
24  question. You are not harassing him. You can --
25  yes. And, Madam Reporter, please do mark that

**51**

1  question.
2  BY MR. LIPSHUTZ:
3  Q    Mr. Evans --
4  A    Yes.
5  Q    -- I just want to understand what
6  Mr. Hampton told you. What did he say to you
7  about how they manufactured his statement, if
8  they said anything?
9  A    The best way to do that is get Mr.
10  Hampton. That's the only way you'll find out. I
11  told you everything I can tell you at this point.
12  You want to know anything about
13  Mr. Hampton, what he said, you have to get Mr.
14  Hampton.
15  Q    I know. But I am asking him what he
16  told -- I'm asking you --
17  A    I just told you. I already told you
18  as far as I can go with it, you know, as far as I
19  can recollect. Now, if you told me to go home
20  and go to sleep and think about it and think
21  about it, other things might come up. But other
22  than that, you know, it's not there.
23  Q    Is there anything else about the
24  conversation that you had with Mr. Hampton that
25  you haven't told me?

**52**

1  MS. BONJEAN: Objection to the form
2  of that question.
3  THE WITNESS: It's been -- repeat
4  it; right? You want me to repeat the same thing
5  and I'll be like a parrot. I will say no.
6  That's what we are going to do. Because you done
7  ask me this here ten times already. And I am not
8  talking about the lawyer now. I am talking about
9  me. I am here, sitting down, taking the
10  deposition. Not to be harassed, not to go over
11  this crazy stuff. And you ask me the same thing
12  ten times, and I said it ten times. So don't ask
13  me 11 times.
14  BY MR. LIPSHUTZ:
15  Q    Is there anything else about the
16  conversation with Mr. Hampton that you haven't
17  told me that you recall?
18  MS. BONJEAN: If there is not,
19  answer the question.
20  THE WITNESS: No.
21  BY MR. LIPSHUTZ:
22  Q    Okay. What do you do for a living,
23  sir?
24  MS. BONJEAN: Objection. Form.
25  THE WITNESS: What do I do? Right

53

1  now odd jobs, but I'm plumbing and heating, you
2  know, construction.
3  BY MR. LIPSHUTZ:
4      Q      Do you have a business?
5      A      Crippled business. I had a
6  business, good business, yes.
7      Q      I guess I didn't hear your answer.
8  Did you say crippled?
9      A      Yeah.
10     Q      What is the name of your business?
11          MS. BONJEAN: I am going to object
12  to the form of that question. Also
13  mischaracterizes. Maybe you didn't hear it, but
14  objection. Form.
15          THE WITNESS: Evans General GC.
16  BY MR. LIPSHUTZ:
17     Q      Evans General GC?
18     A      Yeah. General construction.
19     Q      Okay. How long have you had that
20  business?
21     A      I had the business for years.
22     Q      How long?
23          MS. BONJEAN: Objection. He
24  testified that he had a business. Had. So I
25  don't know if you – I am just trying to –

54

1          THE WITNESS: You can say 40-plus
2  years.
3  BY MR. LIPSHUTZ:
4      Q      Is the business out of business?
5      A      It's not out of business, but it's
6  not – you know, it's in business like it should
7  be.
8      Q      What do you mean by that?
9      A      I am not operating in the form that
10  I should be operating in. I am making less than
11  when – you know, when I know was to support my
12  means.
13     Q      Why are you making less?
14     A      Because this whole situation put me
15  in a – in a crippling situation.
16     Q      And what whole situation are you
17  referring to, sir?
18     A      With this case here.
19     Q      This case is keeping you from your
20  business?
21     A      No. The case is not keeping me from
22  the business. The case screw up my business.
23     Q      I didn't hear your answer, sir.
24     A      This case destroyed the business.
25     Q      Oh, okay. The criminal case, is

55

1  that what you're saying?
2      A      Yes.
3      Q      Okay. I am just trying to
4  understand. Remember, we are far away, so it's
5  hard for me to understand sometimes. And that's
6  – I'm not – I am just trying to make sure I am
7  clear. Okay?
8          Was it ever called – did you ever
9  have another business called Evans and Son
10  Construction?
11     A      Yes. It was lead off the same line.
12  In '78 – no. It was – I mean, 2008, 2007, it
13  was Kumar, attorney – I mean tax accountant in
14  Freehold. They set up the business, and they
15  restructure everything in my business.
16          And he took the name out and put
17  Evans General GC in there and put everything –
18  he was taking out X amount of dollars a month,
19  150 – possibly 150. And come to find out that
20  he – all this stuff was the same conspiracy.
21  All the stuff came together.
22          I went to the Internal Revenue
23  Service. They said this guy ain't filed nothing
24  on you. So they gave me papers to file, I guess,
25  out – I guess somewhere in – in California

56

1  somewhere. And that's what happened. One thing
2  led to another. Seemed like it was just going
3  backwards instead forward, you know.
4      Q      I take it from your answer that you
5  were the victim of fraud by your tax accountant.
6  Is that what you're saying?
7          MS. BONJEAN: Objection. Misstates
8  his testimony and it –
9          MR. LIPSHUTZ: What ever –
10  BY MR. LIPSHUTZ:
11     Q      What happened with your tax
12  accountant, sir?
13     A      I said he didn't file my papers,
14  nothing. He didn't file my papers like he
15  supposed to have been for my thing and status and
16  all that, so that nature.
17     Q      What was the name of the accountant,
18  sir? It was hard to hear you.
19     A      Kumar. It was a – an Indian firm.
20     Q      Is there any chance you could spell
21  that for the court reporter?
22     A      K-U-K-A, something like that.
23     Q      K-U-K-A?
24          MS. BONJEAN: Kumar, you said?
25          THE WITNESS: Kumar.

57

1    MS. BONJEAN: He is saying Kumar
2  which I assume is K-U-M-A-R, but I don't know.
3  BY MR. LIPSHUTZ:
4    Q    Does that sound right to you, sir,
5  K-U-M-A-R?
6    A    Yes. Yes.
7    Q    And are you saying to me that you
8  were the victim of fraud by this Kumar?
9    MS. BONJEAN: Objection to the form.
10    You can answer.
11    THE WITNESS: Yeah. I guess you
12  would say that.
13  BY MR. LIPSHUTZ:
14    Q    This was because -- let me rephrase
15  that.
16    So sometime in 2008 you said you
17  were re-forming your business through this
18  accountant?
19    A    No. Everything was still
20  re-forming, getting on my tax and all and
21  everything, my tax status and all.
22    Q    But -- and I am just trying to
23  understand your answer, sir. I thought you said
24  they changed the name of the business?
25    A    Yeah. The name changed.

58

1    Q    Okay. And that was a suggestion of
2  your tax accountant?
3    A    Yes.
4    Q    Okay. Did you also say it was part
5  of a conspiracy?
6    A    I believe so. All this stuff came
7  together. I mean, for some reason all --
8  everything happened at the same time.
9    Q    So can you explain what you mean?
10  Is it your belief that there was a conspiracy
11  with your tax accountant and some other entity or
12  person?
13    A    I am not for sure. I am not going
14  to say yes.
15    Q    Well, what is your belief?
16    A    Doesn't matter.
17    MS. BONJEAN: Objection to the form.
18  BY MR. LIPSHUTZ:
19    Q    I'm sorry. I didn't hear your
20  answer.
21    A    I said doesn't matter what the
22  belief is, you know.
23    Q    Well, why do you think there was a
24  conspiracy? Just because of the same time frame?
25    A    Possibility.

59

1    Q    Any other reason?
2    A    Well, maybe because the conspiracy
3  with the local and state authority what happened
4  to me in 2010. That was all conspiracy. They
5  all conspired together.
6    Q    And do you believe that the
7  authorities conspired with Kumar, your tax
8  accountant?
9    A    Already said. I am not for sure.
10    Q    One second, sir. Okay. When you --
11  let's get back to this conversation with Mr.
12  Hampton sometime between 2017 and 2019. Did Mr.
13  Hampton explain to you why he was suddenly coming
14  forward to tell you he had been -- let me
15  rephrase it.
16    Back to that conversation. Did he
17  tell you why he was coming forward to say that
18  the police and the prosecutor pressured him or
19  coerced him?
20    MS. BONJEAN: Objection to form.
21    THE WITNESS: Not that I recollect.
22  BY MR. LIPSHUTZ:
23    Q    You don't recall if he said -- I'm
24  sorry. I didn't hear you.
25    MS. BONJEAN: He said he could not

60

1  recollect.
2  BY MR. LIPSHUTZ:
3    Q    So you're not sure if he told you
4  why he was --
5    MS. BONJEAN: Objection. Asked and
6  answered.
7    You can answer again.
8    THE WITNESS: I couldn't recollect
9  at the moment.
10  BY MR. LIPSHUTZ:
11    Q    Did you promise him anything?
12    A    No.
13    Q    Did you offer him anything?
14    A    No.
15    Q    Did he know you were suing the
16  police and the prosecutors?
17    A    I am not for sure.
18    Q    Did you tell him that you were suing
19  the police and prosecutors?
20    A    I'm not sure. Could have been an
21  investigator might have told him. I'm not for
22  sure. I'm not -- it was an investigator might
23  have told him.
24    MS. BONJEAN: Just answer his
25  question.

61

1      THE WITNESS: I am not for sure.

2   BY MR. LIPSHUTZ:

3      Q      So my question was, did you tell him

4   and you're not for sure?

5      A      I am not for sure.

6      Q      So it's possible you did?

7      MS. BONJEAN: Objection. Asked and

8   answered. He already answered the question. He

9   said he wasn't sure.

10     You can answer it again.

11     THE WITNESS: I am not for sure.

12  BY MR. LIPSHUTZ:

13     Q      Did you offer him any money in

14  exchange for his –

15     MS. BONJEAN: Objection. Asked and

16  answered.

17  BY MR. LIPSHUTZ:

18     Q      Did you offer him any money in

19  exchange for his changed testimony?

20     A      You already asked me that. I said

21  no.

22     Q      Did he ask for money from you?

23     A      No.

24     Q      He was out of prison at that point;

25  right?

62

1      A      I really don't know. I don't even

2   know if he was in prison, really.

3      Q      Well, when you met on the street, he

4   wasn't in prison, I take it. Right?

5      A      Yeah. But I don't know what was

6   going on.

7      MS. BONJEAN: Just answer the

8   question.

9   BY MR. LIPSHUTZ:

10     Q      Who initiated the very first

11  conversation between the two of you?

12     MS. BONJEAN: Objection. Asked and

13  answered. He – we have been through this. I am

14  going to object to the form of this question.

15  Eventually I'm going to tell him not to – to

16  stop answering your questions being repeated

17  multiple times.

18     But go ahead. It won't – tell him

19  again.

20     THE WITNESS: He did.

21  BY MR. LIPSHUTZ:

22     Q      I am sorry. If you had mentioned

23  that before –

24     A      I did.

25     MS. BONJEAN: He did.

63

1      THE WITNESS: Three times.

2   BY MR. LIPSHUTZ:

3      Q      Excuse me. I am sorry that I

4   misunderstood. Okay? So he called you;

5   correct?         That's all I want to know. Yes?

6      A      You want me to say it again?

7      Q      You have to forgive me. The

8   distance is difficult, sir. And I am not trying

9   to repeat myself. I just – I missed – I had

10  forgotten that he had called you. That's how the

11  conversation went?

12     A      Yes.

13     Q      Okay. That's all. Had you ever

14  tried to reach out to him?

15     MS. BONJEAN: Objection.

16  Foundation. Form.

17     THE WITNESS: That was in the same

18  correspondence when we – when he had called me

19  and I came – when I set up for thata meeting,

20  yes.

21  BY MR. LIPSHUTZ:

22     Q      So at one point you reached out for

23  him is what you're saying?

24     A      I reached back to him, yes.

25     Q      To set up a meeting or for something

64

1   else?

2      A      That's what I just said already.

3   One meeting triggered the other.

4      Q      Did you reach out to him at any

5   other time?

6      A      No.

7      Q      So it would be the one time only?

8      A      I don't remember. I don't remember

9   that. It was the second time or whatever, you

10  know. I don't remember.

11     MS. BONJEAN: Gary, will you let me

12  know when you can take a couple-minute break? I

13  have to jump on a phone call for two minutes, but

14  I can put it off.

15     MR. LIPSHUTZ: Ms. Bonjean, that's

16  fine. You may take – this is a fine time to

17  take it.

18     MS. BONJEAN: Okay. Thank you.

19     (An off-the-record discussion takes

20  place.)

21     MR. LIPSHUTZ: Mr. Evans, we are

22  going take a five-minute break.

23     THE WITNESS: All right.

24     (Whereupon, a recess is taken.)

25  BY MR. LIPSHUTZ:

65

```
1     Q      Okay.
2            Mr. Evans, when we were talking
3     before, you mentioned an investigator who spoke
4     to Mr. Hampton.  Do you recall whether your
5     conversation in person with Mr. Hampton was
6     before or after he spoke to the investigator?
7            MS. BONJEAN:  Objection to form.
8     Foundation.
9            Go ahead.  You can answer.
10           THE WITNESS:  When you say did I
11    speak to him, before or after?
12    BY MR. LIPSHUTZ:
13    Q      Do you recall whether your in-person
14    conversation with Mr. Hampton was before or after
15    he spoke with the investigator?
16    A      I think I spoke to him after.
17           MS. BONJEAN:  You need to answer the
18    question --
19           THE WITNESS:  I'm trying to say.
20    What he said, before.  It had to be after.  I
21    talked to him after.  That's what it -- it was
22    both.
23           MS. BONJEAN:  Okay.  Lee, listen to
24    the question.
25           THE WITNESS:  Yeah.
```

66

```
1            MS. BONJEAN:  Answer the question.
2            THE WITNESS:  Yeah.
3            MS. BONJEAN:  If you don't know, you
4     don't know.  If you approximate, guess,  Just
5     please tell him, but don't just --
6            THE WITNESS:  It was before, before
7     the investigation.  Yeah.  It had to be before,
8     yeah.
9     BY MR. LIPSHUTZ:
10    Q      Okay.  Why do you say it had to be
11    before, sir?
12    A      Because he had reached out to me
13    before, and then we -- we put this thing
14    together.  I came with the meeting.
15    Q      He reached out to you and then you
16    put the meeting together.  Is that what you mean
17    by "this thing"?
18    A      The first time he reached out, then
19    we schedule a time to meet.  And then that's when
20    we met, on that other second turn.
21    Q      And that was that second meeting and
22    that was the in-person meeting?
23    A      Yes.
24    Q      Right?
25    A      Yes.
```

67

```
1     Q      And that was that in-person meeting
2     you're saying before he spoke to the
3     investigator?
4     A      Yes.
5     Q      All right.  If I say to you and I
6     represent to you that Mr. Hampton spoke to the
7     investigator on June 6, 2017, would that refresh
8     your recollection that you met with
9     Mr. Hampton in person prior to June 6, 2017?
10    A      No.  Not really.
11    Q      That does not refresh your
12    recollection?
13    A      No.
14    Q      Okay.  Did you discuss with Mr.
15    Hampton the possibility of speaking to an
16    investigator?
17           MS. BONJEAN:  Hold on.  Objection to
18    the foundation of that question.
19           Go ahead.
20           THE WITNESS:  No.  No.  I -- when I
21    --
22           MS. BONJEAN:  Don't -- do you want
23    to finish your answer?  I thought you answered
24    it, but --
25           THE WITNESS:  Yeah.
```

68

```
1            MS. BONJEAN:  -- is there something
2     you want to say?
3            THE WITNESS:  No.  No.  I was saying
4     when the investigation came in, that's when --
5     the question was -- repeat that question again.
6     BY MR. LIPSHUTZ:
7     Q      I am happy to do so, sir.
8     A      Okay.
9     Q      I am happy to do so.
10           MS. BONJEAN:  Will you just listen
11    to the question and answer it?  Okay?
12           THE WITNESS:  Uh-huh.
13           MR. LIPSHUTZ:  Why don't we do it
14    this way.
15           Ms. Reporter, can you read back my
16    question?
17           (The reporter reads as requested.)
18           MS. BONJEAN:  I have an objection to
19    the foundation of that question.
20           But you can answer it.
21           THE WITNESS:  That was after the
22    investigation.
23           MS. BONJEAN:  That's not an answer
24    -- how is that an answer to his question?
25           THE WITNESS:  No.
```

69

1    MS. BONJEAN: Okay. That's an
2  answer to the question.
3  BY MR. LIPSHUTZ:
4    Q    So you have answered no, but I am
5  confused. Okay? I thought you told me -- and
6  correct me if I am wrong --
7    A    Uh-huh.
8    Q    -- that you met in person with Mr.
9  Hampton before he spoke to the investigator.
10   A    Yes.
11   Q    And when you were meeting with him
12 in person, you did not discuss the possibility of
13 him speaking to an investigator?
14   MS. BONJEAN: Objection. Asked and
15 answered.
16   You can answer again.
17   THE WITNESS: I correct that. Yeah.
18 It was before and after. That's what I said
19 before.
20 BY MR. LIPSHUTZ:
21   Q    All right. Before and after is very
22 confusing to me. I'm going to -- and so I have
23 to clear this up, sir.
24   A    With the investigator, no. Only the
25 first -- the second time, not the first time.

70

1  When I first spoke with him, no.
2    Q    The first time you spoke to him was
3  on the telephone; right?
4    A    Right.
5    Q    And that was to set up an in-person
6  face-to-face?
7    A    Right.
8    Q    Okay. Then you met with him
9  face-to-face?
10   A    Right.
11   Q    Okay. That meeting was before he
12 spoke to the investigator?
13   A    Right.
14   Q    Okay. At that meeting face-to-face,
15 did you discuss the possibility with Mr. Hampton
16 of going to see an investigator?
17   A    No.
18   Q    Did that topic come up later?
19   A    Later when?
20   Q    In any other conversations with Mr.
21 Hampton, did he tell you he saw an investigator?
22 Let me ask you that question.
23   Did you speak to Mr. Hampton? Did
24 he tell you that he spoke to an investigator?
25   A    I am pretty sure he did. I don't

71

1  recollect. I can't recollect when.
2    MS. BONJEAN: Okay. That's the
3  answer.
4  BY MR. LIPSHUTZ:
5    Q    He did, but you don't remember when?
6    A    Right.
7    Q    Did he tell you about his
8  conversation or his meeting with the
9  investigator?
10   A    No.
11   Q    So other than I met with an
12 investigator --
13   A    Yeah.
14   Q    -- he didn't say anything else about
15 that?
16   A    Right. The information I had got
17 from the investigator.
18   Q    Did you meet with the investigator
19 prior to the investigator meeting with Hampton?
20   MS. BONJEAN: I am going to object.
21 Possibly on grounds that that could be
22 attorney-client protected. I don't know if this
23 was an investigator for the -- if you would allow
24 me to consult with my client for a minute to ask
25 that question, I will allow him to answer it if

72

1  wasn't part of an attorney-client communication.
2    MR. LIPSHUTZ: I didn't ask him
3  about communications. I just said did he meet.
4  So that's not privileged.
5    MS. BONJEAN: That's -- fair enough.
6    Go ahead. You can answer that.
7    THE WITNESS: Repeat it.
8  BY MR. LIPSHUTZ:
9    Q    That was my question, sir. Did you
10 meet with the investigator prior to --
11   A    Yes.
12   Q    -- the investigator -- I'm sorry.
13 This is for the benefit of the court reporter,
14 and, again, we are so far away. So I am going to
15 try to ask the question fully. Please let me ask
16 fully, and then I will give you every opportunity
17 to respond. That's all. My question -- that way
18 you know what I am asking you. Okay? Fair
19 enough; right?
20   A    Yes.
21   Q    Did you meet with the investigator
22 before the investigator met with Mr. Hampton?
23   A    Yes.
24   Q    Was there anybody else present at
25 that meeting with the investigator?

73

1   A   Yes.

2   Q   Who else was present?

3   A   One of his assistants.

4   Q   One of whose assistants, sir?

5   A   The investigator.

6   Q   Was there anybody else?

7   A   No.

8   Q   Who was the investigator?

9   A   Max.

10  Q   Who was involved in retaining this

11  investigator? Was that you or somebody else?

12  A   That was me.

13  Q   Did you have an attorney at the time

14  you retained this investigator?

15  A   No.

16  Q   What was the conversation that you

17  had with the investigator?

18      MS. BONJEAN: Objection to form.

19  Foundation.

20      THE WITNESS: No. The question was,

21  he said basically I should have retained him in

22  the criminal matter. It would have helped a

23  whole lot if he would have got into the criminal

24  matter. He would have did the investigation on

25  that criminal matter. All this would have been

74

1   resolved.

2   BY MR. LIPSHUTZ:

3   Q   Okay.

4   A   That's basically what he was saying.

5   He was talking about the criminal – he brought

6   the criminal up a lot.

7   Q   What did you give the investigator

8   to prepare for his conversation with Mr. Hampton?

9   A   I don't remember. I don't recall.

10  I had it to, discovery whatever he wanted, but I

11  don't recall.

12  Q   Well, let me ask you a different

13  way. Did you give him anything?

14  A   I had to give him something. I

15  don't recall.

16  Q   Are you saying that you did give him

17  something, but you don't recall what you gave

18  him?

19  A   If I don't give him nothing, how is

20  he going to have a case? No. I don't recall

21  what I gave him. I know I gave him something.

22  Q   That's what I mean.

23  A   I don't recall. I don't recall.

24  Q   That's what I asked. Okay. Let me

25  see if I can refresh your recollection. Did you

75

1   give him the statement from November of 2008 that

2   Mr. Hampton – where Mr. Hampton confessed?

3   A   Yes. I believe so.

4   Q   So you remember giving him that

5   statement?

6   A   I believe so.

7   Q   Okay. Did you give him any

8   documents related to the plea agreement or the

9   agreement that Mr. Hampton had with the State to

10  testify?

11  A   I don't remember, but I gave him the

12  documents that he asked for. I had everything

13  available to give him.

14  Q   When – did you give him a list of

15  questions to ask Mr. Hampton?

16  A   It's possible. I don't remember. I

17  don't remember. I don't remember exactly.

18  Q   Did you discuss the questions that

19  the investigator was going to ask Mr. Hampton?

20  A   I am quite sure we did. Certain

21  things he wanted to – to – I knew it was

22  something he said about – I remember him saying

23  the prosecutor was picking – picking Philander's

24  girl or wife up from Jersey City and taking her

25  here and there, something to that effect. I am

76

1   not for sure.

2   Q   Just clear it up for me. Who said

3   that?

4   A   That would be the investigator.

5   Q   Did the investigator show you any

6   questions that he was going to ask Mr. Hampton?

7   A   Yes.

8   Q   So the investigator had questions

9   prepared that he was going to ask Philander?

10  A   Yes.

11  Q   Okay. Did you edit those questions?

12  A   No.

13  Q   Did you suggest changes?

14  A   No. I think we went over all that

15  already, what he – the areas he was going to go

16  into.

17  Q   Did you tell the investigator where

18  to find Mr. Hampton?

19  A   No.

20  Q   Did you set up the meeting between

21  Mr. Hampton and the investigator?

22  A   No. I just – I was thinking about

23  something when you said that.

24  Q   Is there something you want to

25  clarify an answer to?

77

1    A    No. I wasn't for sure whether the

2  investigator found Mr. Hampton -- no. No.

3        MS. BONJEAN: If you don't know,

4  that's a perfectly --

5        THE WITNESS: No. I don't know.

6        MS. BONJEAN: -- okay answer. I

7  mean, definitely give it some thought and see if

8  you can answer it because --

9        THE WITNESS: No. I don't know.

10       MR. LIPSHUTZ: I think my question

11  was -- Madam Reporter, can you read back the last

12  substantive question I had?

13       (The reporter reads as requested.)

14  BY MR. LIPSHUTZ:

15    Q    So just so I am clear, I want to ask

16  that question again.

17       Did you set up the meeting with Mr.

18  Hampton and the investigator?

19    A    No.

20    Q    And did you tell the investigator

21  where to meet Mr. Hampton -- or where Mr. Hampton

22  was?

23    A    No.

24    Q    Okay. After Mr. Hampton gave his

25  statement, did you have any other conversations,

78

1  other than the one that you told me about where

2  you said we don't associate?

3    A    No.

4    Q    Did you ever tell Mr. Hampton how to

5  answer any of these questions?

6    A    No.

7    Q    Did you ever suggest to Mr. Hampton

8  how to answer any of these questions?

9    A    No.

10    Q    Did you ever tell him it would be

11  helpful to you in your lawsuit if he answered

12  questions a certain way?

13    A    No.

14    Q    You read his statement; correct?

15  You've read his statement?

16    A    Correct.

17    Q    Were any of those answers that you

18  suggested to Mr. Hampton?

19    A    His statement?

20    Q    Yes.

21    A    Which statement you talking about?

22    Q    Thank you. Fair clarification. I

23  appreciate that.

24       You read his statement to the

25  investigator; right?

79

1    A    Yes.

2    Q    Okay. That's the one I was talking

3  about.

4       Were any of the answers answers that

5  Mr. Hampton gave, did you suggest any of those

6  answers to Mr. Hampton?

7    A    No.

8    Q    Okay. Let's talk about 1978. Okay?

9  We are going to switch gears a little bit, Mr.

10  Evans.

11    A    Yes.

12    Q    Well, this case obviously is about

13  the five missing boys that you were accused of

14  murdering -- right -- in August -- on August 20,

15  1978. Where were you living on that day?

16    A    I was living in 979 Clinton Avenue.

17    Q    Is that a house or apartment, sir?

18    A    That's an apartment.

19    Q    Okay. How long had you lived there?

20    A    Two or three years.

21    Q    You lived there with your -- who did

22  you live there with?

23    A    My wife.

24    Q    Children?

25    A    No children at the time, no.

80

1    Q    And tell me, sir, to the best of

2  your recollection and in your own words what

3  happened on Sunday, August 20, 1978.

4        MS. BONJEAN: Objection to form and

5  foundation of that question.

6        If you understand, you can answer

7  it.

8        THE WITNESS: Yes. I can answer it.

9  BY MR. LIPSHUTZ:

10    Q    You understood my question, sir?

11    A    Yes.

12    Q    Okay. Can you give me an answer?

13    A    Okay. I was scheduled -- I was

14  buying a property. That was my first property,

15  93 Paine Avenue in Irvington. And I was closing

16  out on it. I had got to see it all and

17  everything.

18        And what happened with 93 -- 93

19  Paine Avenue was the new address, and 979 Clinton

20  Avenue, that was my apartment. And what I did

21  was I had boxed up everything, and I wanted to

22  get out of there before the first, way before the

23  first of the month.

24        So it was a Sunday. It was around

25  12:00. Had to be 12:00 or earlier because I came

81

1   through – I was looking for my cousin Maurice to
2   help me move these boxes to – from 979 Clinton
3   Avenue to 93 Paine Avenue. And I came through
4   the neighborhood and they wasn't around. So –
5   and from that point I just drove around the
6   corner. There was a place called the Hideaway
7   where I shoot a lot of pool. I think I shot some
8   games.
9           And then from there I came back
10  through. I shot about two games and left and
11  came back through. When I was coming back from
12  Fabyan Place, I wasn't intending to stop and pick
13  anybody up. I was going back to Clinton Avenue
14  before I go back over to my mother-in-law's
15  house. That's where I stayed that night.
16          So I came back through. As I was
17  coming back through Fabyan Place, Michael
18  McDowell – that's one of the missing boys I can
19  recollect – he ran out. And when he ran out and
20  – from the porch, he asked me what was going –
21  what was up or something. I said I was moving.
22  I was looking for Maurice now. He wasn't around.
23          So long story short, from that point
24  it was about seven boys that I had picked up
25  right there. It was seven in truck. Went from

82

1   Fabyan Place and then from Fabyan Place when you
2   get to Clinton Avenue, you make a left and you're
3   going back up. You'd be going back into Irvington.
4   979 Clinton Avenue is two doors in from Grove
5   Street, but you be in Irvington at the time.
6           And they did a little train thing.
7   I was on the third floor of the building. I am
8   inside the building, passing boxes out the door,
9   and then went to the next guy, to the next guy,
10  each one on different floor until they loaded the
11  truck up. And they loaded it up and we took it
12  over to 979 – I mean 93 Paine Avenue.
13          Went across Grove Street, straight
14  across Grove on the other side of Chancellor be
15  – run into Paine Avenue. And we unloaded the
16  truck. We did about two loads like that. And
17  then I came back.
18          When I came back down Clinton Avenue
19  back into Newark, it was on the corner of – one
20  side is 18th Street. The other side is Fabyan
21  Place. That's the same connecting street to
22  Clinton Avenue. And on the 18th Street side, it
23  was an ice cream parlor, and that's when I gave
24  the boys some money. And the bills – they went
25  into the ice cream parlor and to break it up, I

83

1   guess. Then I made my right turn to Fabyan
2   Place, and I went back over to the Hobson Street.
3   Q        What street?
4   A        Hobson.
5   Q        Thank you.
6   A        And from Hobson Street my main
7   concern at that point – this was August the
8   20th. My wife was on me because I didn't go to
9   the bank and get that certified check. So my
10  main concern was I had to get money – make sure
11  I get to the bank and get a certified check for
12  the closing. I closed on that property August
13  the 21st, that Monday – that – that Monday.
14          So that was – and that night there
15  I wasn't out. I was staying at 342 Hobson
16  Street. That was my in-laws' house. I stayed
17  there until the next morning. And that's what
18  happened to me on that Sunday.
19  Q        I take it that that day is kind of
20  burned into your mind because of the events of
21  the trial and accusations. Is that fair to say?
22  A        Yes.
23  Q        How do you – how do you feel about
24  your memory of that day?
25          MS. BONJEAN: Objection to the form

84

1   of the question.
2   BY MR. LIPSHUTZ:
3   Q        Do you feel you're confident in your
4   memory of that day?
5           MS. BONJEAN: Objection to the form
6   of the question.
7           THE WITNESS: Is my memory what?
8   Repeat that.
9   BY MR. LIPSHUTZ:
10  Q        Sure. Do you feel confident in your
11  memory of events of that day?
12  A        1000 percent.
13          MS. BONJEAN: Objection to form.
14  Still a form objection.
15  BY MR. LIPSHUTZ:
16  Q        1,000 percent –
17  A        1,000 percent sure.
18  Q        Okay. What time did you leave –
19  A        Correct that now. I don't mean
20  every little second. I mean certain things of
21  that day.
22  Q        Oh, let's – we're going to talk
23  about that. That's okay.
24  A        Okay. All right.
25  Q        It was 43 years ago; right? Right?

85

1 43 years ago?

2     A    **Something like that.**

3     MS. BONJEAN: 42.

4 BY MR. LIPSHUTZ:

5     Q    42-plus years.  When was the last

6 time that you saw Michael McDowell that day?

7     A    **When he got out of the truck at the**

8 **ice cream parlor.**

9     Q    What time?

10     A    **That had to be before 3:00 p.m.**

11     Q    Did you see Michael McDowell after

12 3:00 p.m. August the 20th, 1978?

13     A    **After?**

14     Q    **Yes.  After 3:00 p.m.**

15     A    **No.  After I dropped him off, that**

16 **was it.**

17     Q    You have never seen him since?

18     A    **Never seen him since.**

19     Q    **Okay.  How confident are you in the**

20 **3:00 p.m.?**

21     MS. BONJEAN:  Objection to form of

22 the question.

23     THE WITNESS:  No.  I am not -- I'm

24 **not -- I'm -- it's in that area.  It could have**

25 **been 2:30.  It could have been 3:30.  It was**

---

86

1 **right there, though.**

2 BY MR. LIPSHUTZ:

3     Q    Could it have been 6:00 p.m.?

4     A    **No.  No.  No.  No.  It was not 6:00**

5 **p.m.**

6     Q    Could it have been 9:00 p.m.?

7     A    **No.  No.  It had to be between 2:30**

8 and 3:30, in that range right there.

9     Q    So it could not possibly have been,

10 say, 11:00 p.m.?

11     A    **No.**

12     Q    Okay.  And you are absolutely

13 certain?

14     A    **1,000 percent.**

15     Q    Okay.  Do you know the names of any

16 of the other -- let me make sure I am clear.  You

17 said there were about seven boys in the truck?

18     A    **Right.**

19     Q    Does that mean Michael McDowell plus

20 six others or Michael McDowell plus --

21     A    **No.  Michael -- Michael plus six**

22 **others.**

23     Q    Okay.  Do you know the names of the

24 other six -- of any of the other six?

25     A    **Only one.**

---

87

1     Q    What is the other name?

2     A    **Pittman.  They call him Ricky.  I**

3 **think his nickname is Ricky.**

4     Q    Was his first name Melvin?

5     A    **Melvin.**

6     Q    Melvin is one of the boys that

7 disappeared?

8     A    **Yes.**

9     Q    When was the last time you saw

10 Melvin Pittman?

11     A    **Same thing.  Same place.  Ice cream**

12 **parlor.**

13     Q    And you're 1,000 percent certain

14 that it was sometime between 2:30 and, say, 4:00,

15 something like that?

16     A    **It wasn't 4:00.  It wasn't that**

17 **late.**

18     Q    I'm -- 2:30 to, say, 3:30.  You tell

19 me.

20     A    **It had to be between 2:30 and 3:00.**

21 **If it was 4:00, then possible.  That's the max,**

22 **you know.**

23     Q    Okay.

24     A    **I doubt it.**

25     Q    But you're absolutely certain it was

---

88

1 not 6:00 p.m.?

2     A    **I'm positive.**

3     MS. BONJEAN:  Object -- I am going

4 to object.  You have asked the question.  He told

5 you the range of time it was.  Asked and

6 answered.

7     MR. LIPSHUTZ:  Well, I asked him

8 about Michael McDowell.

9 BY MR. LIPSHUTZ:

10     Q    I asked you about Michael McDowell.

11 I just want to make sure it's the same for -- for

12 Melvin Pittman.  You didn't see Melvin Pittman at

13 any time after 6:00 p.m. -- after 3:30,

14 approximately, on August 20th?

15     A    **After I dropped him off at the ice**

16 **cream parlor.**

17     Q    Okay.  When you -- what time did you

18 get back to Hobson Street -- 342 Hobson Street?

19     A    **That had to be like maybe before**

20 **4:00, I guess.  I dropped them off.  It takes me**

21 **about maybe I guess 15 -- 10, 15 minutes.**

22     Q    I am sorry.  Did you ever leave 342

23 Hobson Street after --

24     A    No.  No.

25     Q    Once again, it's best you let me ask

---

89

1 the question completely.

2          MS. BONJEAN: Let him finish the

3 question, and then you answer. Otherwise, you're

4 talking over each other --

5          THE WITNESS: Right.

6          MS. BONJEAN: -- and then nobody can

7 hear anything. So go ahead. Answer it.

8 BY MR. LIPSHUTZ:

9      Q     **Plus you don't know exactly what I**

10 **am going to ask you. Okay?**

11          **After you got to 342 Hobson Street,**

12 **which is your in-laws' place; right? Correct?**

13 **Your in-laws' place?**

14     A     **Yes.**

15     Q     Did you leave that place at all?

16     A     **No.**

17     Q     Are you also 1,000 percent certain

18 about that?

19     A     **Yes.**

20     Q     You mentioned that somewhere around

21 noon you were looking for your cousins Darryl and

22 Maurice?

23     A     **Yes.**

24     Q     Did you ever see them?

25     A     **No. No.**

90

1     Q     Did you ever spend any time with

2 them?

3     A     **That day?**

4     Q     Yes. Yes.

5     A     **No. No.**

6     Q     Where did Maurice -- they're

7 siblings; right? You told me earlier; right?

8 Siblings?

9     A     **Yes. Yes.**

10     Q     Where did they live? What house at

11 that time?

12     A     **56 Fabyan Place.**

13     Q     Okay. And you -- you passed their

14 house. Am I right?

15     A     **Yes.**

16     Q     And is that where you ran into --

17 where Michael McDowell ran out, and that --

18 that's when you ran into Michael McDowell?

19     A     **That was earlier.**

20     Q     Okay. I am sorry. When did you

21 meet up with Michael McDowell?

22     A     **That was 12:00 or 12:30, somewhere**

23 **in there. About 12:30, something like that.**

24     Q     Somewhere like that. I thought you

25 said it was near Fabyan?

91

1     A     **Fabyan.**

2     Q     Okay. Was that near Darryl and

3 Maurice's house?

4     A     **Two doors down.**

5     Q     What was the address that you met

6 the McDowells?

7     A     **I don't have the address. I didn't**

8 **meet him at the address. He ran out to the**

9 **truck.**

10     Q     Okay. What kind of truck were you

11 driving?

12     A     **A pickup, gray pickup.**

13     Q     Did it have anything on the side of

14 the truck?

15     A     **Yes.**

16     Q     What did it have?

17     A     **Evans & Sons.**

18     Q     Name of your construction business?

19     A     **Yes.**

20     Q     And what about Philander Hampton?

21 Did you see him that day?

22     A     **That day? No.**

23     Q     How confident are you that you

24 didn't see Philander Hampton that day?

25     A     1,000 percent.

92

1          MS. BONJEAN: I am going to object,

2 by the way, to the form of that question. I am

3 sorry for the late objection.

4          MR. LIPSHUTZ: That's fine.

5 BY MR. LIPSHUTZ:

6     Q     Let me ask it this way. Are you

7 absolutely certain that you did not see Philander

8 Hampton that day?

9     A     **1,000 percent.**

10     Q     Okay. Did you see Ernest Taylor on

11 August 20th, 1978?

12     A     **If he was the one that got on the**

13 **truck, if he was one of the boys. It wasn't just**

14 **five boys in that area. It was like maybe 15 or**

15 **20 of them. So I don't know what the -- the only**

16 **one I can confirm is Michael and Melvin. That's**

17 **the two I definitely can confirm the names.**

18     Q     Well, let me ask you about the other

19 people. It's kind of important. Okay? Did you

20 see Randy Johnson that day?

21     A     **I am not for sure.**

22     Q     Okay. Did you see Ernest Taylor

23 that day?

24     A     **I am not for sure.**

25     Q     Okay. Did you see -- of the seven

93

1  boys, did you see any of those seven boys after

2  you left to go to 342 Hobson Street?

3      A      I am not for sure. The only ones I

4  can confirm is Melvin -- Melvin and Michael.

5             MS. BONJEAN: Listen to his

6  question, though.

7  BY MR. LIPSHUTZ:

8      Q      Maybe you didn't understand my

9  question, so I'm going to ask it again.

10            MS. BONJEAN: Listen.

11 BY MR. LIPSHUTZ:

12     Q      After you dropped the boys off --

13     A      Uh-huh.

14     Q      -- at the ice cream parlor --

15     A      Right.

16     Q      -- and went to 342 Hobson --

17     A      Right.

18     Q      -- did you see any of those seven

19 boys --

20     A      No.

21     Q      Let me finish. Let me finish.

22            MS. BONJEAN: Let him finish. Hold

23 on. Let me just resolve this. Please let him --

24            THE WITNESS: All right.

25            MS. BONJEAN: -- finish the

94

1  question. Thank you, Lee. It will go much more

2  smoothly. Okay. Go ahead.

3  BY MR. LIPSHUTZ:

4      Q      I am not going to repeat the whole

5  question. Did you see any of those seven boys

6  after you went to 342 Hobson Street at all?

7      A      No.

8      Q      Are you absolutely certain that you

9  didn't see any of those --

10     A      10,000 percent positive, no.

11     Q      Okay. Mr. Evans, you're aware that

12 there were a number of accusations that one or

13 more of the five missing boys had stolen

14 marijuana from you; correct? You're aware of

15 those allegations?

16     A      Yes.

17     Q      Back in 1978 did you sell marijuana?

18     A      I didn't sell marijuana. What

19 happened was I was -- at that time I working with

20 -- I was working with this construction for -- we

21 was building Meadowlands at the time.

22     Q      The what, sir?

23     A      We was doing the Meadowlands.

24     Q      Oh, okay. The Meadowlands?

25     A      Meadowlands, yeah. And what

95

1  happened was at that time I was interconnected

2  with some -- a lot of guys out there. It was an

3  Italian guy named Charlie. He always told me, he

4  said, Lee, I know you in Newark area, you know.

5  Go back and get all this marijuana -- anything

6  you want, just like that. But I wasn't

7  interested in none of that stuff at that time.

8             And my uncle and them, they was

9  shooting pool with another guy, a friend of his.

10 They was working at the airport. They was

11 pipefitters. And they were shooting pool and

12 they was talking. Got in the conversation, I

13 said, yeah, this guy on the job -- and that's

14 where it connected with this guy, Eddie Gibson.

15            And I started out -- I had --

16 definitely I was transporting like a couple

17 pounds to him, to this guy. And it was foolish,

18 but, you know, wasn't no reason, but I was doing

19 it.

20            And what happened was back in August

21 the 20th when this thing --

22            MS. BONJEAN: Okay.

23            THE WITNESS: Okay.

24            MS. BONJEAN: You can keep going if

25 you want. I don't know if that answers your

96

1  question. If you wanted to ask another question

2  or --

3             MR. LIPSHUTZ: No. I mean, we are

4  going to get to it.

5             MS. BONJEAN: Yeah.

6  BY MR. LIPSHUTZ:

7      Q      What -- what happened -- you say you

8  weren't selling marijuana. But you said you were

9  transporting it?

10     A      No. I wasn't in the street selling

11 no marijuana, not like that.

12     Q      Okay.

13     A      And -- but I had some marijuana and

14 I was trying -- what happened also -- and August

15 the 20th -- it was after the 20th. Lillie

16 Williams, that's Melvin's mother. Lillie

17 Williams came to me when the boys was missing.

18 She said that the boys had some marijuana in the

19 house. They found marijuana in the boy's house.

20 And when she said that, Lillie Williams, I told

21 her -- I am the one telling Lillie Williams like

22 I never -- that somebody stole something from my

23 place at that time.

24            And then that's when it went from

25 there. That's how the police -- it didn't dawn

97

1 on me that the police came -- where they came
2 from until 2010. I am sitting there and the
3 police ask me back then. That was Scott-Bey and
4 Hairston. They asked me, hey, I am not
5 interested in the marijuana. We are just looking
6 for the boys. That's what he said.
7 But the situation came. The only
8 one I told was Lillie Williams. She the only
9 one. Because she told the police. And that was
10 Michael's mother. So why would I tell her
11 something to that nature like that?
12 MS. BONJEAN: Just answer his
13 questions.
14 THE WITNESS: That was it.
15 BY MR. LIPSHUTZ:
16 Q This was a conversation after the
17 boys disappeared; right?
18 A Right. After they disappeared.
19 Q Okay.
20 A Lillie Williams.
21 Q When was the marijuana stolen?
22 A I am not for sure. It was just
23 missing. It wasn't no -- it wasn't a break-in.
24 I only thought it was the super or somebody in
25 that building there. But it wasn't no break and

98

1 entries or nothing like that. I am not 100
2 percent when because it was in the closet.
3 Q How much was taken?
4 A About maybe two pounds or something.
5 Normally I wouldn't have it in there.
6 Q Was it taken before the boys -- the
7 boys disappeared?
8 MS. BONJEAN: Objection. Asked and
9 answered.
10 THE WITNESS: I don't know. I am
11 not for sure.
12 BY MR. LIPSHUTZ:
13 Q Well, your conversation with Ms.
14 Williams was --
15 A I told her -- I told her something
16 was missing. Somebody broke in, but I don't know
17 when it was -- when it took place.
18 Q But your conversation with Ms.
19 Williams was the day after the boys disappeared?
20 MS. BONJEAN: Okay. Object -- okay.
21 Hold on. Objection. Let him finish before you
22 start answering. Okay? Okay. Let him finish
23 before you start answering.
24 And he just -- I am going to object
25 to the form. Mischaracterizes his testimony.

99

1 Go ahead. If you -- if you remember
2 it.
3 BY MR. LIPSHUTZ:
4 Q You want me to rephrase the
5 question, sir?
6 A Yes.
7 Q Okay. I'm happy to do so. You
8 spoke with Ms. Williams. When did you speak to
9 her?
10 A That was after the boys came
11 missing.
12 Q Okay. Wasn't it the day after they
13 were missing?
14 A I don't think it was the day after.
15 I don't think it was the day after. It had to be
16 two or three days, maybe as -- I am not for sure
17 when, but it wasn't no day after. I know that.
18 Q You're certain it wasn't the day
19 after?
20 A I am positive.
21 Q And sitting here today, can you tell
22 me whether the marijuana was stolen before or
23 after the boys disappeared?
24 A I couldn't tell you that. The
25 marijuana -- I don't know what time of day it was

100

1 stolen.
2 Q Okay. All right. It's the time
3 line -- I am going to show you some documents,
4 sir. Okay?
5 A Okay.
6 Q So bear with me a second.
7 A Uh-huh.
8 Q Okay. Mr. Evans, can you see this
9 document on your screen? It says O'Connor &
10 O'Connor, Lee Evans versus City of Newark. Can
11 you see that?
12 A Yes.
13 Q Okay. I am going to scroll down a
14 bit. And do you see where I have marked it
15 Evans-1 here?
16 A Yes.
17 Q That's the sticker that I put on
18 there. Okay? You see that?
19 A Yes.
20 Q Okay. And the first paragraph says
21 "Plaintiff Lee Evans, by way of certified Answers
22 to Interrogatories served upon him by the
23 Defendants City of Newark, former mayor Cory
24 Booker" --
25 MS. BONJEAN: Hold on. I am going

101

1   to -- I'm going to object for a second here. Did
2   -- were these among the documents that you were
3   ordered to reproduce to us? I think they were.
4   And did you, in fact, do that, Mr. Lipshutz?
5               MR. LIPSHUTZ: I don't need to
6   answer the question. These are --
7               MS. BONJEAN: Sir, no. We're going
8   to -- we're going to -- this is -- this is an
9   issue. There was -- this was a big issue that
10  was raised earlier on. I wrote follow-up
11  letters, saying I don't have anything from
12  Mr. O'Connor. The judge ordered that all
13  discovery and written discovery requests be
14  reproduced. I followed up with letters. The
15  only people that were responsive were the AGs.
16               And now you're pulling out something
17  that I am not sure I have ever seen. Because
18  despite having the order to reproduce it, I am
19  not sure you did. So if you could -- I would
20  like, you know, to make sure that we have an
21  opportunity to -- I mean, this is new to me and
22  you know that.
23               MR. LIPSHUTZ: No, I don't.
24               MS. BONJEAN: Yeah. You do know
25  that because it's been a matter of record. The

102

1   record --
2               MR. LIPSHUTZ: I don't know that.
3               MS. BONJEAN: Did you reproduce
4   this, sir?
5               MR. LIPSHUTZ: I thought I did. In
6   any event, I'm going to question --
7               MS. BONJEAN: No. It's a -- it's a
8   violation of the court order if you did not
9   reproduce this to me. Because you knew very well
10  that I was never provided Mr. O'Connor's file,
11  and I made that absolutely clear of record. And
12  you were ordered to reproduce all written
13  discovery, both that was propounded and answered.
14               **MR. LIPSHUTZ: I thought I did.**
15               **MS. BONJEAN: Okay. Well, we are**
16  **going to take a break right now because I am not**
17  **sure -- I'm not -- he is not answering questions**
18  **about this until I get a copy of it per the court**
19  **order. Okay?**
20               MR. LIPSHUTZ: No.
21               MS. BONJEAN: You -- you -- we can
22  get the -- we can get the court on the phone
23  unless you can show me that you actually
24  propounded this to me.
25               Let's take a break and let me look

103

1   and see. I don't believe you did.
2               MR. LIPSHUTZ: No.
3               MS. BONJEAN: No what?
4               MR. LIPSHUTZ: No. I am not taking
5   a break. This is --
6               MS. BONJEAN: Okay. Well, he is not
7   answering your questions about it. You can get
8   the court on the phone because you were ordered
9   to produce this.
10               MR. LIPSHUTZ: Excuse me. I can
11  show him anything I want during a deposition.
12               **MS. BONJEAN: No, you cannot. No,**
13  **you cannot. Okay. He is not answering questions**
14  **because I have been ambushed with this.**
15               MR. LIPSHUTZ: This is his answers
16  to interrogatories.
17               MS. BONJEAN: I don't care. I
18  am his counsel and I was not provided with this
19  per the court order. So why don't we get Judge
20  Hammer on the phone, and then we can -- we can
21  discuss what the -- what the -- what the sanction
22  is for your failure to produce this despite --
23  you obviously had it. You're here ready to pull
24  it up. You've never produced it to me pursuant
25  to the court's order and that -- and I don't know

104

1   what the -- what the result of that is.
2               But I am certainly going to take the
3   time to take a look at it. You want to take a
4   five-minute break and send it to me?
5               MR. LIPSHUTZ: No. Anybody else
6   want to join in on this?
7               MR. VOMACKA: Just -- just briefly,
8   this is Michael Vomacka from the State's office.
9   Ms. Bonjean, I don't have all the documents
10  offhand because we're working remotely. There is
11  a letter that we had sent you on January 6. I
12  would share a screen. It's just I can't on the
13  iPad. So please just take my representation of
14  what it says for a moment.
15               I am reading from the middle of it.
16  It mentions "we advised that written discovery
17  requests have been propounded and answered by
18  plaintiff. The same CD/DVD sent to you includes
19  State's defendant" --
20               THE REPORTER: Wait. Wait. Wait.
21  Wait. Wait. I can't understand you. Wait a
22  minute. We are going to have to start --
23               MR. VOMACKA: I'll slow down.
24               THE REPORTER: Yes, please.
25               MR. VOMACKA: It mentions that there

105

1  were responses to interrogatories dated March 26,
2  2018. I am not sure if that is the same document
3  that Gary sent me. I don't know at this moment
4  if the document that Mr. Lipshutz is showing is
5  on that CD or DVD. I will do my best to endeavor
6  to check.
7             But I was just wondering if -- Gary,
8  if yours matches the date March 26, 2018. Then
9  that would probably answer it. And if not, I
10 will try and look into it myself and see.
11            MR. LIPSHUTZ: Does that answer your
12 question, Mr. Vomacka?
13            MR. VOMACKA: It does. So I -- I
14 can't -- I can't look at the CD that I sent you
15 at this very moment, Ms. Bonjean. I'm just -- at
16 least just from what Gary is showing the dates
17 matches. I don't know if that's the same one,
18 but it's --
19            MS. BONJEAN: I -- I don't --
20            MR. VOMACKA: I just jumped in to
21 clarify there. I can only tell you as much as I
22 know.
23            MS. BONJEAN: Okay. Thank you. I
24 appreciate that. But, again, I will -- you know,
25 perhaps it was on the disk you sent. I don't

106

1  believe it was. But I would like to take a
2  second to double-check that.
3             I know Mr. Lipshutz was required to
4  produce it, and I even followed up with a letter
5  saying I don't have anything from the City. And
6  as a result, I got no response from that, so --
7             MR. LIPSHUTZ: Mr. Vomacka, I have
8  another question for you.
9             MR. VOMACKA: I will answer if I
10 can. Go ahead.
11            MR. LIPSHUTZ: Did you serve
12 separate interrogatories to Mr. Evans?
13            MR. VOMACKA: I am not sure because
14 that would have been prior to me getting on the
15 case. I am also not sure if the answers would
16 have been joint or collective. I don't know if
17 the first page of the document would indicate
18 that.
19            MR. LIPSHUTZ: Okay.
20            MR. VOMACKA: I am trying to look
21 into it as well now. It's just a little
22 difficult with -- with our remote office
23 connection. So I guess I would say that sort of
24 piece of information I have is the date, which
25 seems to match what you're putting on the screen.

107

1  But if that's the same or not, that's -- that's
2  the best I can do.
3             MS. BONJEAN: Okay. Well, we'll --
4  I am going to have my paralegals look into it.
5  But you know, it doesn't matter. Go ahead
6  Mr. Lipshutz. If this is how you need to
7  litigate, by all means ask -- ask away. We'll go
8  right ahead.
9             But there will -- I -- I do intend
10 -- I mean, you -- you -- you have now produced a
11 document that you did not produce pursuant to a
12 court order previously. I don't care if
13 Mr. Vomacka produced it or not. You did not and
14 -- but go ahead. We -- I don't -- I am not going
15 to delay this deposition. So go right ahead.
16 BY MR. LIPSHUTZ:
17     Q      Mr. Evans --
18     A      Yes.
19     Q      -- you hear me? Do you see the
20 declaration and the signature?
21     A      Yes.
22     Q      Is that your signature?
23     A      Yes.
24     Q      I'm sorry. I skipped to the bottom.
25 There is -- these are the answers to

108

1  interrogatories. I'm going back to the top. And
2  I am not going to ask about every question, but
3  these are the answers to interrogatories. I am
4  going fast. I realize that.
5             I just -- first of all, I just
6  wanted to make sure this is your signature, which
7  you told me it is. Okay? Now --
8             MS. BONJEAN: Is there a question
9  pending?
10            MR. LIPSHUTZ: I just --
11            MS. BONJEAN: Okay.
12            MR. LIPSHUTZ: -- wanted to show him
13 the document, ma'am.
14            MS. BONJEAN: Okay. Go ahead.
15 BY MR. LIPSHUTZ:
16     Q      Okay. Do you remember signing these
17 answers to interrogatories?
18     A      No. I don't remember signing them,
19 but that's my signature.
20     Q      Okay. Well, I am going to show you
21 -- let me go back. The answers to
22 interrogatories I have only have the answer --
23 the answer number. It doesn't have the question.
24 So I have also marked the questions themselves
25 because I am going to ask you the question first,

**109**

1  and then I'm going to show you the answer. Okay?

2       So this document is the

3  interrogatories. They're called the first set of

4  interrogatories. Okay? This is Evans-2.

5       MS. BONJEAN: Okay. Objection to

6  the editorializing and your own testifying. Go

7  ahead.

8  BY MR. LIPSHUTZ:

9       Q    I'm just trying -- since we are not

10  together, I am just trying to explain. Mr.

11  Evans, I am going to show you question number 11.

12  Okay?

13      A    Yes.

14      Q    Can you see that on your screen,

15  sir?

16      A    No.

17      Q    Thank you. Make it a little bigger.

18  Can you see it now?

19      A    No.

20      Q    Can anybody see it?

21      MR. VOMACKA: It's coming up now,

22  Gary.

23  BY MR. LIPSHUTZ:

24      Q    Can you see it now?

25      A    Yes.

**110**

1       Q    Okay. Question number 11, Evans-2,

2  let me go back. Maybe I wasn't sharing the

3  screen. These are interrogatories to Plaintiff

4  Lee Evans, Evans number 2.

5       MS. BONJEAN: Okay. I am also going

6  to put on the record an objection that despite a

7  court order, this was not produced by

8  Mr. Lipshutz.

9       I know court orders only apply to

10  me. I know they don't apply to the defense. It

11  seems to be a pattern in this case. But yes.

12  You were ordered to reproduce this. It was not

13  reproduced.

14      Whether or not it was on

15  Mr. Vomacka's disk -- we are going to get to the

16  bottom of, I don't know. But this -- this

17  ambushing at a deposition with documents you knew

18  that I did not have as his counsel is not only a

19  violation of the court order, but it's also

20  problematic in a number of other ways, but go

21  ahead.

22  BY MR. LIPSHUTZ:

23      Q    I am now going to show you question

24  number 11. Okay, Mr. Evans? And I'll just read

25  it to you.

**111**

1       "In chronological order, as

2  completely as you can recall, state specifically

3  and in detail what you did on August 20-21, 1978,

4  including all interactions you had with any or

5  all of the presently five missing individuals,

6  (Michael McDowell, Randy Johnson, Alvin Turner,

7  Melvin Pittman, and Ernest Taylor." That's the

8  question. What was your interaction on August

9  20-21, 1978. Now I'm going to go to your answer.

10      MS. BONJEAN: Okay.

11  BY MR. LIPSHUTZ:

12      Q    Now I am showing you, Mr. Evans,

13  answer number 11. I'll try to make it a little

14  bigger. Okay? Are you able to read it?

15      A    Uh-huh.

16      Q    Yes? I didn't hear you.

17      A    Yes.

18      Q    Okay. I just want to go through it

19  a little bit with you. Okay? These are your

20  sworn answers to interrogatories -- well, let me

21  strike that. Okay?

22      The first sentence says that you

23  were living on 979 Clinton Avenue; correct?

24      MS. BONJEAN: Objection. You laid

25  no foundation. You want him to read it?

**112**

1       THE WITNESS: No. No. What I'm

2  going to say that date is not right up there.

3  They got August 19. Where did that come from?

4  BY MR. LIPSHUTZ:

5       Q    It says Saturday, sir.

6       A    Yeah. But the 19th. It wasn't no

7  19th. We wasn't involved in no 19th.

8       Q    Am I correct that the children

9  disappeared on the Sunday, the 20th of August?

10      MS. BONJEAN: Objection to form.

11  Foundation.

12      THE WITNESS: Yes.

13  BY MR. LIPSHUTZ:

14      Q    I am correct; right?

15      A    I went -- no. Where did the 19th

16  come from?

17      Q    Sir.

18      A    I wouldn't participate with that. I

19  see that right away, the 19th.

20      Q    This is just your answer to

21  interrogatories. And I will just go through it

22  with you, and you can disagree or not. Okay?

23      MS. BONJEAN: You know what? We are

24  going to take a break right now. I have to -- I

25  have to take care of something. I got to look at

113

1  something myself. We are going to take a break.
2                    MR. LIPSHUTZ: No. I just --
3                    MS. BONJEAN: We are taking a break.
4  You have -- I am going to take a look at
5  Mr. Vomacka's CD. That is happening. If you --
6  if you want to -- you can do whatever you want in
7  response, because --
8                    MR. LIPSHUTZ: I have a pending
9  question.
10                   MS. BONJEAN: What was the question
11 that was pending? You didn't have a question
12 pending.
13                   MR. LIPSHUTZ: Yes, I did.
14                   **MS. BONJEAN: Okay. What -- Madam**
15 **Court Reporter, please read back the last**
16 **question.**
17                   (The reporter reads as requested.)
18                   **MS. BONJEAN: So we are going to**
19 **take a break. Unless you can tell me what the**
20 **question was, he'll answer it.**
21                   MR. LIPSHUTZ: Take a break.
22                   MS. BONJEAN: Yes, we are.
23                   (Whereupon, a recess is taken.)
24 BY MR. LIPSHUTZ:
25     Q      Mr. Evans, can you hear me?

114

1      A      Yes.
2      Q      Okay. You don't remember signing
3  Interrogatories with Mr. O'Connor?
4      **A      I didn't say that. It's my**
5  **signature, but I want to look at that document**
6  **again.**
7      Q      Okay. I just have a few questions
8  about your response.
9      **A      Yeah. But I need to see that**
10 **document you had up there.**
11     Q      I will put it up.
12     **A      Yeah. I need to see that.**
13     Q      Sure. Why don't you take a minute
14 and read it. First of all, do you see it?
15     **A      Yeah.**
16     Q      This is Evans -- I am going to make
17 sure I -- I put on the record what it is I am
18 showing. This is Evans-1, and this is the answer
19 to number 11. Take a minute and read it. Okay?
20     **A      Yeah. That's not -- that's not me.**
21 **I didn't agree to that. That's my signature down**
22 **there, but that's not -- I didn't agree to --**
23 **first of all, you got the City of Newark. What**
24 **is the City of Newark doing in there? That's**
25 **Irvington. That property is in Irvington.**

115

1      Q      Mr. Evans, tell me when you've read
2  it. I didn't ask any questions. When you want
3  me to scroll down, I will scroll down.
4      **A      Yeah. But I am saying this document**
5  **is not correct.**
6                    MS. BONJEAN: Okay. Here.
7                    THE WITNESS: Okay.
8                    MS. BONJEAN: Just let him answer --
9  ask the questions. You answer the questions. He
10 asks the questions.
11                   Go ahead, Mr. Lipshutz.
12                   THE WITNESS: All right.
13 **BY MR. LIPSHUTZ:**
14     Q      I am going to scroll down and let
15 you read the rest of it. okay? Tell me when
16 you're finished. I will scroll down for the rest
17 of it. Okay?
18     A      Uh-huh.
19                   MS. BONJEAN: Read it and then he
20 will ask.
21 BY MR. LIPSHUTZ:
22     Q      I just want to know when you have
23 read this document.
24                   MS. BONJEAN: Are you done reading
25 it?

116

1                    THE WITNESS: I am reading it, but I
2  still feel --
3                    MS. BONJEAN: Have you read -- have
4  you read what is on the screen?
5                    **THE WITNESS: Not yet. Yeah.**
6                    **MS. BONJEAN: Okay. He's read**
7  **what's on the screen. Go ahead. Is there a**
8  **question you want to ask? He read it.**
9                    MR. LIPSHUTZ: Forgive me. I didn't
10 think he was finished.
11 BY MR. LIPSHUTZ:
12     Q      Have you read this whole thing, Mr.
13 Evans?
14     **A      I read it, yeah. I see inconsistent**
15 **there.**
16                   MS. BONJEAN: He didn't ask you
17 about that.
18                   THE WITNESS: Yes. Yes.
19 BY MR. LIPSHUTZ:
20     Q      Okay. So I am going to go through
21 it, and if there is something you don't agree
22 with, let me know. Okay?
23     **A      Okay. Yes.**
24     Q      Back at the top -- now remember, the
25 question was, tell me about -- would you like to

117

1  see the question again?

2      A      Yes.

3          MS. BONJEAN: Objection to the form

4  and foundation of these questions.

5  BY MR. LIPSHUTZ:

6      Q      Now I put back up here question

7  number 11. Can we go to the answer now?

8      A      Yes.

9      Q      Mr. Evans, it is true that on August

10  19th you were living in an apartment with your

11  wife at 979 Clinton Avenue?

12      A      In August? No. That's not true.

13      Q      On August 19th you were not living

14  in that apartment?

15      A      I was in the apartment. I kept the

16  apartment. At the time my wife -- my new son --

17  newborn baby, that was my son. No. It's not

18  true.

19      Q      Where were you living on August 19,

20  1978?

21      A      I was living at 979 Clinton Avenue.

22  Also I was at 342 Hobson Street.

23      Q      Was your wife living at 979 Clinton

24  Avenue on August 19, 1978?

25      A      No.

118

1      Q      She was living where?

2      A      342 Hobson Street.

3      Q      Okay. This paragraph -- the first

4  paragraph mentions a contract for purchase of

5  property at 93 Paine, P-A-I-N-E, Avenue,

6  Irvington; correct?

7      A      Correct.

8      Q      You told me about that earlier in

9  the deposition; correct?

10      A      Yes.

11      Q      Okay. Let's skip to the second

12  paragraph. Okay? Unless there is some other

13  inconsistency or something that you want to tell

14  me about the first paragraph.

15      A      Yeah.

16      Q      I would like to move on to the

17  second paragraph. Okay?

18      A      Number 11 is not -- is all

19  inconsistent.

20          MS. BONJEAN: Okay. It's his

21  deposition.

22          THE WITNESS: All right.

23          MS. BONJEAN: Let him ask the

24  questions, and then you will answer the

25  questions.

119

1  BY MR. LIPSHUTZ:

2      Q      On Sunday, the 20th of August, you

3  had everything packed in boxes at your -- the

4  apartment. You've already told me about that;

5  correct?

6      A      Yes.

7      Q      And you did tell me that you

8  went to Fabyan Place looking for your cousins

9  Darryl and Maurice Woody?

10      A      Yes.

11      Q      Correct?

12      A      Yes.

13      Q      Maurice, does he go by a different

14  last name?

15      A      Olds.

16      Q      O-L-D-S?

17      A      Yes.

18      Q      Okay. And you told me that it was

19  to move boxes from 979 Clinton to 93 Paine;

20  correct?

21      A      Yes.

22      Q      Okay. And you told me you were not

23  able to locate your cousins; right?

24      A      Yes.

25      Q      And you told me that you went to The

120

1  Hideaway on Nye Avenue where you used to shoot

2  pool?

3      A      Yes.

4      Q      That's in here; correct? That's in

5  here; right?

6      A      Yeah.

7      Q      Okay. And it says here no one was

8  there. So I -- does that mean no one was at The

9  Hideaway when you went there to shoot pool?

10      A      No one to shoot with.

11      Q      Okay. Thank you for clarifying.

12  And when you were driving to your cousin's house,

13  Michael McDowell ran out on the street from his

14  porch at a home two doors down from 56 Fabyan

15  Place that was owned by his aunt and where his

16  cousins lived?

17      A      Yes.

18      Q      Okay. And because you could not

19  find your cousins, you had a conversation with

20  Michael?

21      A      Yes.

22      Q      Correct?

23      A      Yes.

24      Q      And you told Michael that you needed

25  help moving boxes?

121

1    A    Yes.

2    Q    Okay.  And this happened before 2:00

3  and most probably between 12:30 and 1:00 p.m?

4    A    Right.

5    Q    Is that accurate?

6    A    Somewhere in there, yes.

7    Q    Okay.  You had a green pickup truck?

8    A    Yes.

9    Q    Name and number on the side; right?

10   A    Yes.

11   Q    Okay.  And Michael and Melvin

12 Pittman and about five other boys went with you

13 to 979 Clinton Avenue.  That's what you told me

14 earlier; right?

15   A    Yeah.

16   Q    Okay.

17   A    Except on the -- go ahead.

18   Q    I thought that's what you told me

19 earlier.

20   A    No.  That's what I told you, but I

21 see in here it's different.  They say My wife

22 live on the third floor.

23   Q    Okay.  Your wife didn't live on the

24 third floor?

25   A    She wasn't there.  I didn't put my

122

1  wife in there.

2    Q    Okay.  Thank you for clarifying.

3  And you say here the boys moved the boxes by

4  passing it down the stairs from one to another?

5    A    Right.

6    Q    You told me about the train; right?

7    A    Right.

8    Q    Okay.

9        Then you drove to 93 Paine Avenue,

10 where you unloaded the boxes and put the boxes on

11 the first floor; correct?

12   A    The first floor, basement, somewhere

13 between there, yeah.

14   Q    Okay.  And here in your

15 interrogatory answers you said approximately

16 three trips.  I know earlier in the deposition

17 you said maybe two trips.

18   A    Yes.  Something like that.

19   Q    Two or three trips; right?  Correct?

20   A    I think it was two, though, yeah.

21   Q    Okay.  You did say approximately

22 three in your interrogatory answer.

23   A    Oh, okay.

24   Q    Okay.  And it says here they were

25 done moving no later than 4:00 p.m. and probably

123

1  earlier; correct?  That's what it says.

2    A    Yeah.  But it was earlier, yeah.

3    Q    Okay.  And then you took the boys

4  back to Newark and Clinton -- excuse me.  You

5  took the boys back to Newark to the intersection

6  of 18th and Fabyan Place with an ice cream parlor

7  on the 18th Street side of Clinton Avenue.  You

8  told me about that earlier in the deposition;

9  correct?

10   A    Correct.

11   Q    Okay.  You gave one of the boys a

12 bill to buy ice cream; correct?

13   A    No.  Not to buy ice cream.  To make

14 change to give the others, yeah.

15   Q    My mistake.  And this occurred, and

16 in your answers to interrogatories, no later than

17 4:30 p.m. and probably earlier; correct?

18   A    It was earlier.

19   Q    Okay.  And the last time plaintiff

20 saw the boys was at the ice cream parlor.  You

21 told me that earlier; correct?

22   A    Correct.

23   Q    Okay.  It says here plaintiff may

24 have gone to The Hideaway to shoot a game of pool

25 but is unsure if you did and that on that Sunday

124

1  plaintiff and his wife were staying at the

2  plaintiff's house at 342 Hobson Street.

3    A    It wasn't my house.

4    Q    Parents' house?  Her parents' house.

5        MS. BONJEAN:  At her parents' house.

6        THE WITNESS:  Her parents' house,

7  yeah.

8  BY MR. LIPSHUTZ:

9    Q    Okay.  So we sort of went through

10 this.  The inconsistency that you said is your

11 wife was not living at 939 Clinton Avenue with

12 you?

13   A    At the time she hadn't been living

14 there for at least maybe four months.

15   Q    Is there anything else that you

16 disagree with in the answers to interrogatories?

17       MS. BONJEAN:  Objection to the form

18 and foundation of that question.  Anything else

19 that seems what you -- I don't know what you mean

20 by disagree -- do you know what he means by

21 disagree with?

22       THE WITNESS:  What?

23       MS. BONJEAN:  I don't know.  Do you

24 -- do --

25       THE WITNESS:  What you mean?

125

1   BY MR. LIPSHUTZ:
2        Q        I will ask it again.  We read
3   through your answer to number 11.  Is there
4   anything else in there that you read today that
5   you disagree with?
6        A        I'll have to go over that whole
7   thing.  I have to get it.
8        MS. BONJEAN:  What he read -- what
9   you read right now, was there anything else that
10  stuck out that you disagree with?
11       THE WITNESS:  Yes.  I see where they
12  got the Newark in there, City of Newark.  And I
13  see August the 20th.  I don't know where that
14  came from, and the wife was living at 979 Clinton
15  Avenue.  That wasn't correct.
16  BY MR. LIPSHUTZ:
17       Q        You mentioned that.
18       A        Yeah.
19       Q        You say that it might have been
20  Irvington where it says Newark?  Is that what you
21  mean?
22       A        Yeah.  That was -- that's incorrect
23  too.
24       Q        Okay.
25       A        Just a lot -- there's probably other

126

1   things also just overlooking.
2        Q        Okay.  Let me show you the last --
3   let's go through the last paragraph of this
4   answer.  "Plaintiff arose early the next morning
5   and went to see his aunt."
6        A        Right.
7        Q        At 56 Fabyan Street.
8        A        Yeah.
9        Q        So he could play a number.
10       A        Right.
11       Q        And this was your aunt you told me
12  earlier.  What was her name?  That's --
13       A        Julia, Julia May, Julia Woody.
14       Q        And that's Darryl and Maurice's
15  mother.  Right?
16       A        Right.
17       Q        Okay.  And as you were getting in
18  your car, Alvin Turner's mother and father
19  stopped and told plaintiff that Alvin had not
20  come home the night before.  You see that?
21       A        Yes.
22       Q        Did that happen?
23       A        Yes.  Yes.  It did happen.
24       Q        And you told them that you were on
25  your way to a closing?

127

1        A        I was going to a closing.
2        Q        What was Alvin Turner's mother's
3   name?
4        A        Florence.  Florence, I think.
5        Q        Did you tell her anything else?
6        A        No.  I told her after I come from
7   the closing, you know, I'd get back with her.
8   And she was -- I don't know what was happening.
9   I didn't know -- I didn't even know her son.  I
10  know her -- her sister was living across the
11  street, and I know her nephew, you know.  Her
12  nephew -- she had more than one.  I knew two of
13  her nephews, but I didn't really know her son.
14       Q        What was her sister's name?
15       A        Ms. Hall.
16       Q        Did you ever speak to her after you
17  got back from your closing?
18       A        No.  I don't think so, no.
19       Q        But you did speak to the mother and
20  the father that morning -- the next -- the next
21  morning; that is, the morning of Monday, the
22  21st?
23       A        Right.  The next morning.
24       Q        Okay.
25       A        Also --

128

1        Q        Did you talk to anybody else that
2   day about the disappearances?
3        A        No.
4        Q        You're 100 percent or 1,000 percent
5   certain you didn't talk to anybody else?
6        A        Might have told my aunt.  I am not
7   going to say I didn't talk to no one else.  I
8   can't say that.  But if they disappeared and
9   didn't show up, you know.
10       Q        When you say you may have talked to
11  your aunt, what was your aunt's name?
12       A        Julia.
13       Q        Okay.  That aunt.  Okay.  Did you
14  talk to any of the other family members other --
15       A        I don't remember.  I don't remember.
16       Q        Okay.  What is the first time that
17  you remember, sir, talking to the police?
18       A        That had to be -- that had to be
19  maybe the 23rd or something.  23rd -- the 23rd.
20  The police didn't come at all, I don't think, you
21  know, until the 23rd.
22       Q        Tell me about that the first time
23  you -- did you speak to the police officers?
24       A        Yeah.
25       Q        Tell me about it.

129

1    MS. BONJEAN:  Objection to form of
2    that question.
3    BY MR. LIPSHUTZ:
4        Q       What happened?
5        A       Well, that's when I -- the police
6    Scott-Bey and Hairston, those are the two that
7    was on the case.  And they came to me.  It went
8    over my head, though, what they said.  I didn't
9    catch it until by 2010.  He said we know about
10   the marijuana, but we don't care about the
11   marijuana.  We just want the boys back, you know.
12   And that's what he was -- he came to me on that.
13   And it was amazing to me how I am getting
14   involved and right away they missing Sunday night
15   and Monday morning they come to me.  And then
16   also when --
17       MS. BONJEAN:  Okay.  He -- we're
18   going to answer questions.  We are not -- we're
19   not getting into your theories of the case right
20   now.  We're going to answer questions.  Okay?
21   BY MR. LIPSHUTZ:
22       Q       So did they come to you the next
23   day?
24       A       Next what day?
25       Q       I thought you just said the police

130

1    came to you the next day.
2        A       I didn't --
3        Q       What did you say?
4        A       I said the 23rd.
5        Q       Okay.  And that's when you spoke to
6    Scott-Bey?
7        A       23rd or it could have been the 24th.
8    I'm not 100 percent.
9        Q       Okay.  That's when you spoke to
10   Hairston and Scott-Bey?
11       A       Yes.
12       Q       Okay.  What did they ask you?  Do
13   you remember?
14       A       Yeah.  They said I know about the
15   marijuana.  I don't care about the marijuana.  I
16   just want the boys.  We just want to make sure we
17   get the boys back or something to that nature.
18       Q       Is that when you had -- when they
19   found out that you had a traffic warrant?
20       A       No.  That was -- that was the time
21   when -- the traffic warrant when I went downtown,
22   they ask me come down.
23       Q       Okay.
24       A       And then when I came down.
25       Q       Did you ever -- do you remember

131

1    speaking with Detectives Rodriguez and Clark?
2        A       Not really.
3        Q       Not really?
4        A       There was more than one detective,
5    so, you know, I mean, more than two detectives.
6    It was other detectives involved.
7        Q       Do you remember ever talking to
8    other police officers, other than Scott-Bey and
9    Hairston?
10       A       Yeah.  When I came down to the
11   police department.
12       Q       What about any other detectives who
13   -- who may have met you out not in a police
14   department?  Do you remember speaking to any
15   other detectives outside of the police
16   department?
17       MS. BONJEAN:  Objection to form.
18   Foundation of that question.
19       THE WITNESS:  Are you talking about
20   back in '78 or are you talking up-to-date?
21   BY MR. LIPSHUTZ:
22       Q       I am sorry, sir.  I am talking about
23   '78, sir.
24       A       No.  No other police officers.
25       Q       Okay.

132

1        A       Outside.
2        Q       So Scott-Bey and Hairston said
3    they're not interested in the marijuana.  They
4    want the boys back.  And what else?  Did they ask
5    you any other questions?  Do you remember?
6        A       They asked me a lot of questions,
7    but I just answered whatever -- you know,
8    whatever they asked.
9        Q       Did they ask you when you last saw
10   the boys?
11       A       Yeah.  Quite sure they asked me
12   that.
13       Q       What did you -- did you tell them
14   that you last saw them at 4:00?
15       A       No.  I told them the same thing.
16   The ice cream parlor right there.
17       Q       You told them that the last time you
18   saw them was at the ice cream parlor in the
19   afternoon?
20       A       Yes.
21       Q       I am getting the names confused, and
22   I am sorry about that.  Randy Johnson, did you
23   ever speak to his mother?
24       A       No.
25       Q       Do you know what her name is?

133

1    A    Ms. Johnson, I guess. Yeah.

2    Q    Sarah Johnson?

3    A    No. That's -- the only mother I

4  spoke to -- the only two mothers, really, the one

5  time with Florence outside, but the one I was

6  communicating with was Lillie Williams. That's

7  Pittman's mother.

8    Q    Mr. Evans, I am going to show you a

9  document that I've marked already. It's marked

10 Evans-5, Mr. Evans. Evans-5, it's got a stamp at

11 the bottom Newark 63. Mr. Evans, this is the

12 initial missing persons report.

13      MS. BONJEAN: We can't see it. We

14 can't see it. If you want to --

15      MR. LIPSHUTZ: I'll make it as big

16 as you want.

17      MS. BONJEAN: It's not up at all.

18 We don't see it. It's not -- it's not presented.

19      MR. LIPSHUTZ: That's a different

20 issue and I apologize because I didn't get to

21 share screen. Thank you.

22 BY MR. LIPSHUTZ:

23      Q    Okay. This is Evans-5. Do you see

24 the stamp on it says Evans-5?

25      A    Yes.

134

1    Q    It's got a stamp at the bottom that

2  says Newark 63. Do you see that? Newark 63,

3  right here?

4        MS. BONJEAN: You see it right

5  there? It says Newark 63 right there. You see

6  that?

7        THE WITNESS: Okay.

8        MS. BONJEAN: You need glasses on?

9  BY MR. LIPSHUTZ:

10      Q    It's an old document, Mr. Evans, but

11 I am going to try to make it as big as possible.

12 But I am going to represent to you that this is a

13 missing persons report filed by Sarah Johnson,

14 the mother of Randy Johnson. And the date of the

15 report is August 21st, 1978, the day after they

16 went disappearing. And it's signed by the police

17 officer and the lieutenant on August 22nd, 1978.

18 Okay?

19      But I'm going to read to you the --

20 the remarks, okay, here. "Victim mother states

21 that victim went to work with several other guys

22 for a Lee Anthony Evans of 979 Clinton Avenue who

23 stated to victim mother that he dropped victim

24 off near his house at approximately 2300 hours on

25 August 20th, 1978.

135

1    Mr. Evans, did you tell Ms. Johnson,

2  Randy Johnson's mother, that you dropped the kids

3  off at 11:00 p.m.?

4    A    No.

5    Q    Can you think of any reason why the

6  victim's mother would lie about that to the

7  police, that --

8    A    I don't --

9        MS. BONJEAN: Stop. Stop.

10 Objection to the form of that question. He never

11 said -- mischaracterizes his testimony. I am

12 going to object to the form of it.

13      It's -- go ahead. Go ahead. You

14 can answer to the best of your knowledge.

15      THE WITNESS: Yes.

16 BY MR. LIPSHUTZ:

17      Q    Let me -- let me ask the question,

18 sir, because I didn't get the full question out.

19      A    Okay.

20      Q    Can you think of any reason why the

21 victim's mother would lie?

22      MS. BONJEAN: Objection. He never

23 said --

24      MR. LIPSHUTZ: Can I please ask the

25 question?

136

1        MS. BONJEAN: Okay. I need you to

2  quit yelling, sir.

3        MR. LIPSHUTZ: May I please ask the

4  question?

5        MS. BONJEAN: Yes. Go ahead.

6  Answer the -- ask the question.

7  BY MR. LIPSHUTZ:

8    Q    Mr. Evans, can you think of any

9  reason why the mother of a missing boy would lie

10 to the police about the time you dropped off her

11 son?

12      MS. BONJEAN: I am going to object.

13 You can answer. I am first going to object to

14 the form.

15      Now go ahead and answer, Lee.

16      THE WITNESS: Well, first of all, I

17 -- I -- I doubt very seriously that the mother

18 would lie. But I can tell you this here. All

19 these documents was -- was altered and falsified

20 and everything else.

21 BY MR. LIPSHUTZ:

22      Q    Oh, so the officer who wrote this

23 down --

24      A    No. Not the officer. It's not the

25 officer. And I can go through those documents

137

1  and I can prove that they was altered and
2  falsified.
3          Q       Oh, I see what you're saying.  So
4  this document has been altered, is that what –
5  you're saying this document was altered?
6          A       If – if – if she is not a liar, of
7  course it is.  I am not.
8                  MS. BONJEAN:  Just answer the
9  question.
10 BY MR. LIPSHUTZ:
11         Q       So this document was altered.
12         A       If you ask me –
13                 MS. BONJEAN:  Go ahead.  Listen.
14 BY MR. LIPSHUTZ:
15         Q       This document was altered.  That's
16 what you're saying?
17                 MS. BONJEAN:  He answered that
18 question.  I will object.
19                 Mr. LIPSHUTZ:  It's hard for me to
20 hear him.  That's all.
21 BY MR. LIPSHUTZ:
22         Q       How was this document altered and
23 who altered it?
24         A       Who altered it?  The police
25 department – I mean, the '78 police report is

138

1  altered.  The fire report is altered.  All of is
2  altered.  It contradict itself.  I can show you
3  all the inconsistencies in it, because they be
4  saying things.  You say who.  I can't tell you
5  who.  I wasn't there – who wrote it.  All I am
6  telling you, all this here conspiracy came
7  together when they altered all these here
8  documents, and I can prove it.
9          Q       I am asking you to tell me who –
10 you can't tell me who altered it; right?
11         A       I am just telling you what is in
12 front of me.  These documents is not correct.
13         Q       What – how was – how was this
14 document altered?
15         A       Now you calling Ms. Johnson a liar,
16 that's what you're saying?
17         Q       I didn't hear what you said, sir.  I
18 just didn't hear what your answer was.  Can you
19 repeat that answer back?
20         A       You said how did this document could
21 be altered.
22         Q       How was it altered?  What was
23 altered about this document?
24         A       I will just repeat.  I will repeat
25 it again.  The document is – not just this

139

1  document.  The police report, the file report,
2  everything is altered in there.  I can show you
3  everything inconsistencies.  Even Ms. Johnson,
4  you can take these – the daughter report and put
5  it with that report.  It's totally opposite.
6          Q       Okay.  Mr. Evans, did you tell the
7  victim's mother that you dropped off her son at
8  11:00 p.m.?
9          A       No.  No.
10         Q       Okay.
11         A       1,000 percent no.
12         Q       Thank you.  Let's look at another
13 document.
14                 Mr. Evans, I am showing a document
15 that's been marked Evans-4.  It's a number of
16 pages.  It's marked at the bottom Newark 73 to
17 Newark 79.  Okay?  And it is the – I'm going to
18 represent to you it's the first report from
19 Hairston.  Okay?
20                 And on the first page it is Newark
21 73.  It's signed September 15, 1978.  I presume
22 that you have seen Detective Hairston's police
23 reports before?
24         A       Yes.
25         Q       I want to talk to you about a

140

1  paragraph on the very first page, assignment
2  received August 23, 1978, and it lists the five
3  missing boys.  Okay?
4                  The very next paragraph says – I'm
5  going to read it.  "Ms. McDowell further stated
6  to the officers that the youths were picked up by
7  Lee Evans in the truck somewhere on Clinton
8  Avenue, and that was the last time they have been
9  seen.  Ms. McDowell further stated to officers
10 that an unidentified youth named Bob had received
11 a telephone call from an unidentified person,
12 advising him if the marijuana was not returned to
13 them, the youths would be killed.
14                 Detectives further reported that a
15 Mrs. Johnson, sister of the missing youth Randy
16 Johnson, was at the McDowell residence, and she
17 them she would try to get Bob's name and address
18 and she would contact the YAB," which I will
19 represent to you stood for Youth Aid Bureau.
20                 My first question is did I read it
21 – did I read the report accurately?
22         A       The report is – what you reading is
23 accurate, but it's not accurate.
24                 MS. BONJEAN:  Okay.  I want you –
25 okay.  I want you to answer his question.  I want

141

1  you to answer his question and only his question.
2  Is that so hard? I know – I know you're upset.
3  The way this goes is to answer his question.
4  Okay?
5  BY MR. LIPSHUTZ:
6      Q      So I'm just – the first question
7  was I read that to you accurately; correct?
8      A      Yes.
9      Q      You do not believe it is accurate;
10 is that correct? Is that what you believe? It's
11 not accurate?
12     A      1,000 percent not.
13     Q      What is inaccurate about this report
14 – about this paragraph?
15     A      Well, first of all, that's – that's
16 Florence. You talking about Florence McDowell
17 right now; right? All right. Her statement here
18 – her statement, not the police report. Her
19 statement was total opposite. Said Roger Taylor
20 came to her house first thing in the morning and
21 told her they weren't – they snuck back. That's
22 – that's the statement she gave, not this here.
23 Every – every statement on – everybody made a
24 statement and is contradicting itself on this
25 here, on the reverse, on the changes of this

142

1  report. And I am not saying that Scott-Bey and
2  Hairston made this report. I am saying somebody
3  went on top of them.
4      Q      Who went on top of them?
5      A      It was inconsistent.
6      Q      Who went on top of this report?
7      A      I couldn't tell you the names.
8      Q      Okay. Let's look at the next
9  paragraph which I'm going to read. First thing
10 I'm going to do is read the paragraph. All
11 right. Be let me go back.
12             This is August 22nd, 1978.
13 "Detective Rodriguez and Clark reported that they
14 responded to 707 Clinton Avenue, Apartment 307,
15 address given of Lee Evans where they interviewed
16 Evans. Detectives reported that Evans stated he
17 picked up the missing youths who sometimes help
18 him with his construction work and took them with
19 him on several jobs and returned with them at
20 approximately 2300 hours. Also he only – had
21 only three of the youths with him. Evans further
22 stated to detectives that he heard about the
23 telephone call made to Bob and the caller wanting
24 $150 for each youth or the smoke.
25             First question, did I read that

143

1  accurately?
2      A      You read it accurate, yeah.
3      Q      Did you tell Detectives Rodriguez
4  and Clark that you dropped the boys off at 11:00
5  p.m.?
6      A      No.
7      Q      Did you --
8      A      I told --
9      Q      What -- what time did you tell
10 Detective Rodriguez and Clark you dropped the
11 boys off?
12             MS. BONJEAN: Objection to form.
13 Foundation.
14             Go ahead.
15             THE WITNESS: I don't remember
16 talking to Detective Rodriguez. I don't remember
17 that. But I know for a fact that is not the
18 accurate statement there.
19 BY MR. LIPSHUTZ:
20     Q      What is not accurate about it?
21     A      What is not?
22     Q      What is inaccurate about it?
23             MS. BONJEAN: Objection. Asked and
24 answered.
25             You can answer again. Go ahead.

144

1             THE WITNESS: It contradicts itself
2  with the – with the statement of the witnesses,
3  with the --
4  BY MR. LIPSHUTZ:
5      Q      This is your statement. What is
6  inaccurate about it?
7      A      It wasn't correct. It's not
8  correct.
9      Q      Yes. I -- I heard you say that.
10 What is not correct about this statement?
11     A      The correct -- what is not correct
12 because they're saying Lee Evans was at 342
13 Hobson Street at that time. And all the time Lee
14 Evans dropped the boys off was at 18th Street and
15 Fabyan.
16     Q      So when the detectives wrote that
17 you dropped -- that you said you dropped the boys
18 off at 11:00 p.m., the detectives were lying?
19             MS. BONJEAN: Objection to the form.
20 That's an improper question. Form. Foundation.
21             You can answer.
22             THE WITNESS: If that's what them
23 detectives said, yes.
24 BY MR. LIPSHUTZ:
25     Q      That they're lying?

145

1      A      If that's in their statement and
2  they said this, yes.
3      Q      Yes what?  That they're lying?
4      A      Yeah, they're lying.
5      Q      Okay.  The day after – the day
6  after the boys are disappearing, they're lying
7  about the time you dropped off the boys?
8              MS. BONJEAN:  Objection.  You are
9  now just harassing and this is argumentative.  He
10  said it's inaccurate, and if that's what they
11  said, they're lying.  He answered your question.
12  Okay?
13              MR. LIPSHUTZ:  Okay.  I am just
14  clearing it up.
15              MS. BONJEAN:  There is nothing to be
16  cleared.  He answered it.
17  BY MR. LIPSHUTZ:
18      Q      Did you tell the detectives that you
19  knew about the call to Bob and that the caller
20  wanted $150 for each youth or the smoke?
21      A      No.  The $150 came from Lillie
22  Williams at the time, another mother.  She came
23  to me.  That's how I found about this.  She came
24  to me and asked – told me about they want $150.
25  She looked at – I said I tell you what.  I will

146

1  put up the $750.  Bring it to the one who said
2  it.  That's what I told Lillie Williams.
3      Q      Did you tell the officers –
4      A      No.  I didn't tell the officers.
5  That came from Lillie Williams.
6      Q      Let me ask -- let me finish my
7  question.
8              On August 22nd, 1978, did you tell
9  Rodriguez and Clark that you heard about the
10  telephone call made to Bob, and the caller wanted
11  $150 for each youth or the smoke?
12      A      No.  No.
13      Q      So the detectives lied about that in
14  1978?
15      A      Yes.
16              MS. BONJEAN:  Hold on.  I am going
17  to object.  I'm going to object to the form and
18  foundation of that question.  That's an improper
19  question.
20  BY MR. LIPSHUTZ:
21      Q      Okay.
22      A      You saying – you're asking me if
23  the detectives lied.  I didn't say the detective
24  lied.  Somebody could have changed their
25  statement.  That's what I am saying.  All I know

147

1  this is not correct.
2      Q      This is your statement, sir.
3              MS. BONJEAN:  Objection.  Objection.
4  That mischaracterizes the document.  This is a
5  police report that was written by somebody other
6  than Mr. Evans.
7              MR. LIPSHUTZ:  That's why I am
8  asking him what is inconsistent.  Did he say – I
9  want to know did they make this up.
10              MS. BONJEAN:  Hold on.  Objection.
11  That is speculative.  He cannot get into the mind
12  of somebody else.  He is saying it's incorrect,
13  and he is not going to speculate about how it got
14  to be incorrect.
15              MR. LIPSHUTZ:  Okay.
16              MS. BONJEAN:  Just go on.  He's
17  having an issue.  What is wrong with your foot?
18              THE WITNESS:  It's fine.
19              MS. BONJEAN:  You're sure?
20              THE WITNESS:  Yeah.
21              MS. BONJEAN:  Okay.
22  BY MR. LIPSHUTZ:
23      Q      I am skipping a little bit forward.
24  Newark 77, Mr. Evans.  Same report.  It's now
25  August the 25th.  Okay?  Page 5 of the report.

148

1              Detective Scott-Bey and Hairston,
2  the undersigned – let me read it to you.  The
3  undersigned responded to 342 Hobson Street.  Upon
4  my arrival, we went to 342 Hobson Street.  There
5  we found Lee Evans and we transported him to the
6  YAB, end quote.  Did I read that accurately?
7      A      Yeah.  You read it accurately, yeah.
8      Q      Okay.  Let me continue.  Quote,
9  Evans was slated for the traffic warrant.
10  Sergeant Gibson notified and responded to the
11  YAB, end quote.  Did I read that accurately?
12      A      Yeah.  You're reading it accurately.
13      Q      Evans – quote, Evans was questioned
14  after reading him his rights about the missing
15  youths by the undersigned Detective Scott-Bey and
16  Sergeant Gibson, end quote.  Did I read that
17  correctly?
18      A      Yes.
19      Q      Evans stated on August 20, 1978, he
20  picked up Melvin Ricky Pittman, Michael McDowell,
21  and Randy Johnson early in the day and dropped
22  them off at Clinton Avenue and Fabyan Place at
23  approximately 2000 hours, which is – first of
24  all, did I read that accurately?
25      A      You're reading it accurate.

149

```
1    Q       And you would agree with me that
2  2000 hours is 6:00 p. m.; right?  No, it's not.
3  It's 8:00 p.m.  2000 hours -- 2000 hours is 8:00
4  p.m.  Just the number itself.
5    A       It's not correct.
6    Q       Okay.  Let me continue reading.
7  Evans further stated that at 2230 hours he again
8  picked up M. McDowell and drove him to East
9  Orange and then returned to Newark with him and
10  then picked up Ernest Taylor and Alvin Turner to
11  help him move some boxes to Irvington, New
12  Jersey.  They drove around and in his pickup
13  truck and then he thought it was too late to move
14  boxes, and then they dropped the youths off in
15  the area of Clinton Avenue and Fabyan Place, end
16  quote.  Did I read that correctly?
17    A       You are reading it correctly.
18    Q       Okay.
19    A       Reading a falsified statement
20  correctly.
21    Q       Did you -- this is my question to
22  you, Mr. Evans.  Did you tell Detective
23  Scott-Bey, Detective Hairston, and Detective
24  Gibson that you picked up M. McDowell and picked
25  up Ernest Taylor and Alvin Taylor at 2230 hours,
```

150

```
1  which is 10:30 p.m.?  Did you tell the detectives
2  that?
3    A       No.
4    Q       So when the detectives wrote that
5  you picked them up at 10:30 p.m., the detectives
6  were lying?
7    A       No.  I didn't say the detectives was
8  lying.  I am saying these statements here it's
9  falsified and documented.  I don't know who put
10  it together.
11    Q       This report is falsified?
12    A       Yes.
13        MS. BONJEAN:  I am going to object
14  to the form of that question.  He didn't write
15  the report.  He is saying it's not accurate, and
16  he is saying he doesn't know how it got
17  inaccurate.
18        MR. LIPSHUTZ:  You know, I don't
19  care what you say, Ms. Bonjean.
20        MS. BONJEAN:  Well, I care -- okay.
21  BY MR. LIPSHUTZ:
22    Q       Mr. Evans --
23        MS. BONJEAN:  Madam Court Reporter,
24  please mark -- please mark this whole line of
25  questioning which is entirely improper asking
```

151

```
1  Mr. -- I'm going to put it on the record --
2  Mr. --
3        MR. LIPSHUTZ:  Stop.  Stop. --
4        MS. BONJEAN:  Just speculating.
5        MR. LIPSHUTZ:  Stop.
6        MS. BONJEAN:  Okay.
7        MR. LIPSHUTZ:  Stop.  Send Mr. Evans
8  out.  If you are going to do this, send him out.
9  Send him out.
10        MS. BONJEAN:  Okay.  Go ahead.
11  Mr. Evans, go ahead.
12        MR. LIPSHUTZ:  Let him out?
13        MS. BONJEAN:  Leave my office for a
14  second, would you.  Go out there.
15        THE WITNESS:  I'll step out here.
16        MS. BONJEAN:  Okay.  Yeah.  Step
17  outside.
18        Okay.  Thank you.  I am just going
19  to make a record that it is an inappropriate line
20  of questioning to ask Mr. Evans to speculate
21  about whether somebody lied or didn't lie.  All
22  he can do is answer whether it's accurate or not
23  accurate.  You can ask him why he believes that
24  it was put in here.  And if he gives you an
25  answer -- but to say are you saying he lied is an
```

152

```
1  inappropriate question.  It would never -- it
2  would never be appropriate in a court of law.
3  It's not really appropriate here.  That's my
4  objection.
5        MR. LIPSHUTZ:  Okay.  You can bring
6  him back in now.
7        MS. BONJEAN:  Okay.
8  BY MR. LIPSHUTZ:
9    Q       You did not tell the detectives that
10  you picked him up again at 2230, 10:30 p.m.?
11    A       Absolutely not.
12    Q       And you believe that this police
13  report has been altered?
14    A       It's not what I believe.  It's what
15  I am looking at and what happened.
16    Q       What time -- I am sorry to
17  interrupt.  What time did you tell the detectives
18  that you dropped them off?
19    A       What time?  I used the same time if
20  I told anybody the same time.  I told them the
21  time I dropped them off at the ice cream parlor.
22  And I wasn't out at night at all.
23        And plus another thing was -- make
24  this very inaccurate.  They giving names.  I
25  don't even know the names.  They say Randy
```

153

1  Johnson. They say, you know -- and the only two
2  names. If they would have said Michael and
3  Melvin, if they would have said Pittman, it would
4  have threw me off. So they throwing names out
5  there. That's killed that right there. You
6  know, I know it's inaccurate because I didn't
7  know those names.
8      Q      Okay.
9              MR. LIPSHUTZ: I am done with this
10 report. Why don't we take a five-minute break.
11             (Whereupon, a recess is taken.)
12 BY MR. LIPSHUTZ:
13     Q      Mr. Evans, can you hear me okay?
14     A      Yes.
15     Q      Okay. Great. I want to circle back
16 a little bit. I want to talk about Philander a
17 little bit more. Okay?
18             You have told us he is your second
19 cousin. I think you told me his mother's name.
20 I thought it was Jessie. Was that right?
21     A      Yes.
22     Q      What was -- Jessie Earl? I can't
23 read my own handwriting. What was it?
24     A      Jessie, the first name. Middle name
25 you mean?

154

1      Q      What was his mother's -- what was
2  his mother's name?
3      A      Jesse Merrell or something like --
4  yeah.
5      Q      Merrell. Okay. And her last name?
6      A      I don't recall right off.
7      Q      Did you know her?
8      A      It could be Williams. Could be
9  Williams.
10     Q      Did you know her?
11     A      Huh?
12     Q      Did you know her?
13     A      Yeah. I knew her.
14     Q      Do you know Philander's father?
15     A      Not his father. His stepfather I
16 knew. I know his name.
17     Q      His stepfather was Anthony?
18     A      No. Henry Lee. Henry.
19     Q      Henry Lee?
20     A      Henry Williams. I believe his last
21 name was Williams, yeah.
22     Q      Henry Williams and Jesse Merrell.
23 Back in 1978 was Philander living with his mother
24 and/or stepfather?
25     A      Not his stepfather. With his

155

1  mother.
2      Q      Do you remember where they were
3  living?
4      A      Yeah. They was living on Hunterdon.
5      Q      What town was that? Is that Newark?
6      A      Yeah.
7      Q      How long -- let's talk about when
8  the boys were missing in August of 1978. Were
9  they living on Hunterdon?
10     A      Yeah. Yeah. Hunterdon.
11     Q      Do you know where they lived before
12 that?
13     A      Out on Ashley Street somewhere.
14 Ashley? I don't --
15     Q      Is that your answer?
16     A      Yes. Yeah.
17     Q      I am sorry. I was just waiting.
18 Did you visit them?
19     A      No. Not really.
20     Q      Do you remember a time when they
21 were living on Camden Street?
22     A      No.
23     Q      Philander said he was living on
24 Camden Street, 256 Camden Street. You're aware
25 of that; right?

156

1      A      Yes.
2      Q      Were you aware that he lived on --
3  at 256 Camden Street?
4              MS. BONJEAN: Objection. Asked and
5  answered.
6              You can answer again.
7              THE WITNESS: No.
8  BY MR. LIPSHUTZ:
9      Q      You didn't know that?
10             MS. BONJEAN: Objection.
11             MR. LIPSHUTZ: It's hard for me --
12             MS. BONJEAN: It's argumentative.
13 Okay? He answered it. Move -- I don't know --
14 it's asked and answered.
15             THE WITNESS: Okay. No.
16 BY MR. LIPSHUTZ:
17     Q      Thank you. Had you ever been to
18 anybody -- any relative of yours that lived at
19 256 Camden Street?
20     A      No.
21     Q      Back in 1978 did you work with
22 Philander?
23     A      Yes.
24     Q      What was -- what kind of work were
25 you doing with him?

157

```
1      A      Construction.
2      Q      About how long had you guys been
3  working together?
4      A      Maybe a year or so, maybe.
5      Q      Okay.  Just -- so was he like an
6  assistant to you or how would you describe him?
7      A      Helper.
8      Q      He was a helper for you.  Okay.        I
9  want to ask you about another document, sir.  I
10 will pull it up.
11            This is a document that's marked
12 Evans-7.  Do you see that on your screen?
13     A      Yes.
14     Q      It's Newark 95 through Newark 99.
15 Okay?
16     A      Uh-huh.
17     Q      I want to go back up to the
18 beginning, though.  This is a supplemental
19 report, I am going represent to you, adding
20 information five missing juveniles.  And it
21 begins on October 14, 1978.  Okay.  So about two
22 months after the boys went missing.  Okay?
23            I want to ask you about an entry
24 from October 19, 1978.  I don't know if I said
25 August or October.  October 14, 1978, is the
```

158

```
1  first entry.  And now I want to ask you about an
2  October 19, 1978, entry.  First, I am going to
3  read it.  Okay?
4             On October 19, 1978, the undersigned
5  and Detective Scott-Bey and Detective Conte
6  interviewed Philand Williams, black male, 21.
7  Date of birth 12/4/56.  Social Security number,
8  that's on the document.  I don't want to read it
9  out loud.  Of 271 Hunterdon Street.  Phone
10 number, 824-0439 at YAB, end quote.
11            Except for the fact that I took out
12 his Social Security number, did I read that
13 accurately?
14     A      You say you took out the Social
15 Security.
16     Q      Yeah.  I didn't want to read the
17 Social Security number into the record.  Did I --
18 did I read that sentence correctly?
19     A      You talking about Scott-Bey?
20     Q      Yeah.  I -- did I read what I -- did
21 I read it?  That's all.
22     A      Yeah.  You read that.
23     Q      Okay.  Did I read it accurately?
24     A      Yes.  That's what it says.
25     Q      Next sentence says Williams stated
```

159

```
1  he was with Lee Evans, who is his cousin, on
2  August 20, 1978, during the day.  Williams stated
3  that he worked with Evans off and on for a year,
4  end quote.  Did I read that accurately?
5      A      Yes.
6      Q      Williams stated he was at Maurice
7  Olds' house on August 20, 1978, at approximately
8  1700 hours with all five of the missing boys and
9  Maurice, Darryl, Greg, and Evans.  Did I read
10 that correctly?
11     A      Yeah.  You read it correctly.
12     Q      Okay.  Now, let's go back.
13 Williams, Philander Hampton said he was with his
14 cousin Lee Evans on August 20, 1978, during the
15 day.
16     A      Who is Williams?
17     Q      Philander Williams.
18     A      It's not Philander Williams.  His
19 name ain't Williams.  So I don't know if that's
20 in there.  Not Williams.  Really they crossing
21 up.  Tell them if they've going to change it,
22 change it right.
23     Q      Mr. Evans, do you know Philander
24 Hampton's date of birth?
25     A      No.  I don't know.  But I know his
```

160

```
1  name is not Williams.  That's his mother's name.
2  That's not his name.  Just Jessie Merrell
3  Williams, not Philander Williams.
4      Q      That is his birthday, I will
5  represent to you, December 4, 1956.
6      A      I don't know the birthday.  I am
7  just -- you know, you're asking me a question and
8  I am answering.
9      Q      I am going represent to you, Mr.
10 Evans, that Philander Williams is Philander
11 Hampton.  Okay?
12     A      I don't know.  I am just saying
13 that's what you said.
14     Q      Do you know Philander Williams?
15     A      No.  I don't know Philander
16 Williams.
17     Q      Okay.  Do you know Philander
18 Hampton?
19     A      I know Philander Hampton.
20     Q      And Philander Hampton's mother was?
21     A      Williams.
22     Q      Right.  Well, Philand Williams says
23 he worked with you on and off for a year.  So you
24 don't know a person named Philand Williams who
25 worked on and off with you for a year?
```

**161**

1    A    Philander Hampton. If that's
2 Philander Hampton, that's where we at. But it's
3 not Philander Williams. That's out.
4    Q    I am going to represent to you that
5 this person, Philand Williams, is your second
6 cousin, Philander Hampton. Okay?
7    A    He was never a Williams. He always
8 was a Hampton.
9    Q    Philand Williams stated that he was
10 at Maurice Olds's house at 5:00 p.m. with all
11 five of the missing boys and Maurice, Darryl,
12 Greg, and you.
13    A    That's incorrect.
14    Q    I asked you earlier in this
15 deposition if you had been with Philander Hampton
16 at all that day, and you had said you were not
17 with him at all that day; correct?
18    A    Correct. That's why I say right now
19 this statement is incorrect.
20    Q    Okay. What is incorrect about this
21 statement?
22    A    What is incorrect?
23    Q    Yes.
24    A    You said that I was there.
25    Q    I am not saying it.

**162**

1    A    The statement. You said – we
2 talking about the statement.
3    Q    I want to be very clear.
4    MS. BONJEAN: The report –
5 BY MR. LIPSHUTZ:
6    Q    The report says Mr. Philand Williams
7 said he was at Maurice Olds's house on August 20,
8 1978, at 1700 hours with all five of the missing
9 boys and Maurice, your cousin, Darryl, your
10 cousin, Greg, and you. Were you with your two
11 cousins, Philander Hampton, and all five of the
12 missing boys at 1500 – 1700 hours at Maurice
13 Olds's house on August the 20th, 1978?
14    A    That's not correct.
15    Q    This statement – okay.
16    A    Also –
17    Q    Okay.
18    A    – cross-reference. If you need a
19 cross-reference on that, we got that too.
20    Q    I am sorry. What does that mean, if
21 I need –
22    A    Cross-reference in your – in your
23 discovery. If you go to Roger Taylor, he claimed
24 they all was in the park playing. You go to each
25 one of them. They was together.

**163**

1    Q    Okay. I am just asking you about
2 this statement here.
3    A    I said that's incorrect.
4    Q    Okay. And it's incorrect because
5 you were not with your two cousins, your second
6 cousin, and all five of the missing boys at 1700
7 hours at Maurice Olds's house?
8    A    Correct.
9    Q    Okay.
10    Now, continuing. Mr. Philand
11 Williams stated – let me read it first. Quote,
12 Williams stated they talked about going to the
13 park to play basketball. Williams stated he left
14 the porch and went to Clinton Avenue to get some
15 sodas, and when he returned to the Olds' porch
16 he, Maurice, Ricky, Michael, and Randy got on
17 Evans' truck and he drove to Vailsburg Park, end
18 quote.
19    First question, did I read that
20 accurately?
21    A    Yeah. You read it accurately.
22    Q    Okay. Did you take Maurice, Ricky,
23 Michael, Randy on your truck to Vailsburg Park?
24    A    What day that was? That was the
25 20th, the same day; right?

**164**

1    Q    That's correct.
2    A    We did go there early in the
3 morning. That was in the morning. I remember
4 that.
5    Q    Maurice, Ricky, Michael, and Randy?
6    A    I don't know. No. Not names. I
7 know it was Maurice and Ricky and Michael. I
8 don't know who else was there. They – who was
9 there. Definitely early in the morning, because
10 I had did a job across the street. I finished it
11 but we came back early.
12    Q    What job did you do early in the
13 morning?
14    A    No. Finished job. It was across
15 the street at 57 Fabyan Place.
16    Q    And when you say early in the
17 morning, what time is that?
18    A    About 7:00.
19    Q    7:00 a.m.?
20    A    Yes. 7:00 p.m. I finished the job.
21    Q    So when did you go to Vailsburg
22 Park?
23    A    We went there around about – it had
24 to be 8:00, 8:30, something like that. It was in
25 the morning.

165

1    Q    Oh, so you had seen Maurice, Ricky,

2    Michael at 7:00 or 8:00 that morning?

3    A    **That morning.**

4    Q    You didn't tell me about that

5    earlier.

6    A    **When? You never asked that.**

7    Q    Okay.

8    A    **You said after.**

9    Q    So you saw some of the missing boys

10   at 8:00 that morning?

11   A    **Yeah. You asked me after -- after**

12   **3:00 did I see these people. That's what you**

13   **asked me.**

14   Q    The transcript will show.

15   A    **All right.**

16   Q    Quote, Williams stated when they got

17   to the park, other guys were on the basketball

18   court, and they did not get a chance to play.

19   Williams stated some guys in the park wanted to

20   start a fight, and they got back on the truck and

21   left the park. And Evans then dropped him off at

22   the house at about 1900 hours, end quote. Did I

23   read it accurately?

24   A    **Yeah. You read it accurate, but**

25   **that's not correct.**

166

1    Q    My first question did I read it

2    accurately?

3    A    **Yes. You read it accurately.**

4    Q    1900 hours is 7:00 p.m. What is

5    inaccurate about that statement?

6    A    **First of all, you said Williams.**

7    **You're talking about Philander Hampton. He**

8    **wasn't there. He wasn't there. And the time**

9    **wasn't -- is not correct. It was in the morning.**

10   **Like I said, it was morning.**

11   Q    It was morning when you and

12   Philander went to the basketball court at

13   Vailsburg Park?

14   A    **Philander wasn't there with us.**

15   **When you say -- you calling Williams Philander,**

16   **but that's not -- he wasn't there. He didn't**

17   **even go to the park.**

18        MS. BONJEAN: Is there something

19   funny, Mr. Lipshutz?

20        MR. LIPSHUTZ: Well, yes. It's

21   funny. It is funny to me.

22        **MS. BONJEAN: What's funny? What is**

23   **so funny?**

24        **MR. LIPSHUTZ: Okay.**

25        MS. BONJEAN: I am going to ask that

167

1    you control yourself. This is a little

2    ridiculous. Okay?

3    BY MR. LIPSHUTZ:

4    Q    Williams stated when they got --

5    quote, Williams stated when they got to the park,

6    other guys were on the basketball court, and they

7    did not get a chance to play. Williams stated

8    some guys in the park wanted to start a fight,

9    and they got back on --

10        MS. BONJEAN: Objection to the --

11   you've already read this. Please just ask a

12   question.

13   BY MR. LIPSHUTZ:

14   Q    Was Philander Hampton with you?

15        MS. BONJEAN: Objection. Asked and

16   answered. He answered.

17        THE WITNESS: The statement is not

18   correct. The statement is not correct. This

19   statement is not correct.

20   BY MR. LIPSHUTZ:

21   Q    So Philander Williams said you, Mr.

22   Evans, went to the --

23        MS. BONJEAN: Objection. You are

24   continuing to read what we already read.

25        MS. BONJEAN: I am asking him a

168

1    question.

2        MS. BONJEAN: You are reading --

3    reading. You have already read it. You've asked

4    and answered it. I know you don't know like the

5    answer --

6        MR. LIPSHUTZ: It's a different

7    question.

8        MS. BONJEAN: -- but he answered it.

9        MR. LIPSHUTZ: The answer is fine.

10   BY MR. LIPSHUTZ:

11   Q    Mr. Evans, Philander Williams says

12   you went to Vailsburg Park. You have agreed that

13   you went to Vailsburg Park; right?

14   A    **Philander wasn't there. Philander**

15   **wasn't there.**

16   Q    Okay.

17   A    **The information that I gave to the**

18   **parents, and they -- you put Philander in there,**

19   **Williams in there, whoever he is. I don't know.**

20   Q    **Okay. All I am saying is Philander**

21   **Williams says you went to Vailsburg Park, and you**

22   **have agreed that you went to Vailsburg Park;**

23   **correct?**

24        MS. BONJEAN: Okay. I am going to

25   object.

169

1     First of all, assumes facts not in
2     evidence. You're asking him to agree that
3     Philander said something that he has no way of
4     knowing whether Philander said this.
5             MR. LIPSHUTZ: Okay.
6             MS. BONJEAN: It's a police report.
7             MR. LIPSHUTZ: Objection to form is
8     what you can object to. You're not going to –
9             MS. BONJEAN: You're not going to do
10    anything actually. You can continue to threaten
11    me all you want, but you're not –
12            MR. LIPSHUTZ: I am not threatening
13    you. You can coach him all you want.
14            MS. BONJEAN: I'm not coaching.
15    BY MR. LIPSHUTZ:
16    Q      Mr. Evans –
17            MS. BONJEAN: I don't – geez.
18    Coaching? As if I could coach him. Go ahead,
19    ask your question.
20    BY MR. LIPSHUTZ:
21    Q      Mr. Evans, you went to Vailsburg
22    Park; correct?
23    A      **That's the statement I made.**
24    Q      Right. And you returned and dropped
25    people off at 1900 hours.

170

1     A      **No. That's not correct.**
2     Q      That's not correct?
3     A      **No.**
4     Q      7:00 p.m.?
5             MS. BONJEAN: Objection. What are
6     you doing? You just – we have already
7     determined 7:00 p.m. Is there a question?
8             MR. LIPSHUTZ: Yes.
9             **MS. BONJEAN: Stop harassing him and**
10    **ask questions. This isn't – this isn't your**
11    **moment in the sun on a cross-examination. Just**
12    **ask your question. Okay?**
13            MR. LIPSHUTZ: Okay. Thank you.
14            **MS. BONJEAN: You know he's**
15    **acquitted of this offence. I know you feel like**
16    **you got a smoking gun here. But just ask the**
17    **questions and keep going.**
18            MR. LIPSHUTZ: O.J. Simpson was
19    acquitted too.
20    BY MR. LIPSHUTZ:
21    Q      Mr. Evans –
22            MS. BONJEAN: I'm going to – you're
23    saying O.J. Simpson was acquitted too?
24            **THE WITNESS: He is saying I am**
25    **guilty?**

171

1             **MS. BONJEAN: Yeah. Yeah. Okay.**
2     **Mr. Lipshutz –**
3             **MR. LIPSHUTZ: You said it, not her.**
4             **MS. BONJEAN: – are you – we are**
5     **not going to do this. We are not going to that.**
6     **Okay?**
7     BY MR. LIPSHUTZ:
8     Q      My next question is – my next
9     question is, did you drop Philander Williams off
10    at 1900 hours?
11            MS. BONJEAN: It was asked and
12    answered.
13            You can answer again.
14            **THE WITNESS: No.**
15    BY MR. LIPSHUTZ:
16    Q      **Were you with Maurice – your cousin**
17    **Maurice and Darryl at the Olds' house on August**
18    **20, 1978? Were you with your cousins?**
19    A      **No.**
20    Q      Okay. Were you with all five of the
21    missing boys at the house?
22    A      **No.**
23    Q      **All of this is incorrect as to you?**
24            MS. BONJEAN: Objection to the form
25    of that question. All of it? What is all of it?

172

1             MR. LIPSHUTZ: I will rephrase my
2     question.
3             MS. BONJEAN: Form. Foundation.
4     BY MR. LIPSHUTZ:
5     Q      Mr. Evans, did you murder these five
6     boys?
7     A      **I think you would be guilty before I**
8     **would be.**
9     Q      Mr. Evans, did you murder these five
10    boys?
11    A      **No.**
12    Q      **Did you take them to 256 Clinton**
13    **Avenue? Is that right? Clinton – did I say**
14    **that right? Camden Street, excuse me. Did you**
15    **take them to 256 Camden Street?**
16    A      **No.**
17    Q      Did you put them in a closet and
18    lock the door?
19    A      **No.**
20    Q      Or nail the door shut?
21    A      **No. And it's cross-reference with**
22    **that also.**
23            MS. BONJEAN: Just answer the
24    questions.
25    BY MR. LIPSHUTZ:

173

1    Q    Did you -- did you -- did you light
2  the house on fire?
3    A    No.
4    Q    Did you -- you didn't murder these
5  five boys?
6         MS. BONJEAN:  Okay.  You are now --
7  okay.  Mr. Lipshutz -- okay.  Mr. Lipshutz, you
8  are not -- he answered it.  Okay.  And now you're
9  harassing him.  Okay?  And -- and he will answer
10  it again, but it will be the last time.
11         Okay.  You can answer that question.
12  I think he asked you if you murdered them.
13         THE WITNESS:  No.  No.  You know the
14  truth.  All them papers you gave me, it ain't
15  good enough.  The same thing you talked about
16  Philander.  The same thing he gave you --
17         MS. BONJEAN:  Okay.  Stop.  Stop.
18  Just stop.  Okay.  You have been acquitted.
19         THE WITNESS:  Yes.
20         MS. BONJEAN:  Okay.  It doesn't
21  matter what this guy thinks.
22         THE WITNESS:  No.  He don't -- he
23  know the truth.  He think that.
24         MS. BONJEAN:  Okay.
25         THE WITNESS:  His -- his job is just

174

1  to make the truth out of a lie.  That's his job.
2         MS. BONJEAN:  Okay.  Okay.  So he
3  answered your question.  Do you have anything
4  else?
5         MR. LIPSHUTZ:  Yeah, I do.
6         MS. BONJEAN:  Okay.  Then go ahead
7  and ask.
8         MR. LIPSHUTZ:  I just want to -- I
9  just -- I see Mr. Evans is upset.  I want to know
10  -- I mean is he crying?  I can't help him here.
11         MS. BONJEAN:  You stop.  Okay.
12  Yeah.  People -- you're right.  Thank you.  That
13  usually causes emotional trauma when people are
14  falsely accused of crimes.  That's how it works.
15         MR. LIPSHUTZ:  I just asked if he
16  was crying?
17         MS. BONJEAN:  Okay.  Okay.  What are
18  you doing?  What are you doing?  Ask your next
19  question.  He is okay.  Okay?
20         MR. LIPSHUTZ:  Okay.
21         MS. BONJEAN:  He is a grown man.  He
22  will pull it together.  Now start asking
23  questions.  Let's go.
24  BY MR. LIPSHUTZ:
25    Q    When you picked up the boys and took

175

1  them to Vailsburg Park, where did you get them
2  from?
3         MS. BONJEAN:  Objection.  That's
4  like asking --
5         MR. LIPSHUTZ:  Can you just object
6  to the form?
7         MS. BONJEAN:  No.
8         MR. LIPSHUTZ:  It a question.
9         MS. BONJEAN:  Stop trying to trick
10  him.  Stop with your unethical behavior.  He
11  never -- stop mischaracterizing his testimony.
12  Go ahead.
13  BY MR. LIPSHUTZ:
14    Q    When you picked up the boys and took
15  them to Vailsburg Park, where did you get them
16  from?
17    A    Fabyan Place.
18    Q    The same place you picked them up at
19  noon?
20    A    No.  It was across the street there,
21  the opposite side of the street.
22    Q    Mr. Evans, can you tell me what the
23  nonprofit Museum of Life or Death is?
24    A    It was a skill center was put
25  together.

176

1    Q    I didn't hear your answer.
2    A    It was --
3    Q    A little louder.  I'm sorry.  Or
4  come a little closer.
5    A    It was a counseling and a skill
6  center that we were putting together.
7    Q    Counseling?
8    A    And a skill center.
9    Q    Was it religious?
10         MS. BONJEAN:  Counseling and skill.
11  I don't know if you heard that, and skill center.
12         THE WITNESS:  It's not religion.
13  It's transformation of consciousness.
14  BY MR. LIPSHUTZ:
15    Q    What does that mean?  I am sorry.  I
16  am ignorant about that.  What does that mean,
17  transformation of consciousness?
18    A    What it means happened to your
19  subconscious mind.
20    Q    Why did you put that together?
21    A    Why?
22    Q    Yeah.
23    A    That was a revelation.
24    Q    Was it something that you put
25  together, I should say?

177

1    A    Yeah. Through the revelation.

2    Q    Was this before you were accused of

3    homicides or after?

4    A    **When you say accused, what do you**

5    **mean? 2010 or '78.**

6    Q    I'll tell you what, let me -- let me

7    rephrase the question. When did you put together

8    the Museum of Life or Death?

9    A    **'89.**

10   Q    '89?

11   A    **Yeah. '89.**

12   Q    I want to show you a picture, sir.

13   This is marked Evans-9. Can you see it?

14   A    **Yes.**

15   Q    Is that your van?

16   A    **Yes.**

17   Q    **Okay. And you say you put this**

18   **together in -- oh, I'm sorry. Hold on a second.**

19   **You said you put this together in 1989?**

20   MS. BONJEAN: I am going to object.

21   What is the "this"? The van or the -- or the

22   skill center?

23   MR. LIPSHUTZ: Sure.

24   BY MR. LIPSHUTZ:

25   Q    You say you put the skill center

178

1    together in 1989?

2    A    **Correct.**

3    Q    Was it abandoned at some point and

4    reinstated?

5    A    **Yes.**

6    Q    When was it abandoned?

7    A    **It just was dormant, you know, and**

8    **then I reinstated it.**

9    Q    When did you reinstate it?

10   A    **Had to be in -- I'm not for sure.**

11   Q    Would it be accurate to say that you

12   reinstated the Museum of Life or Death because

13   you were charged with the murder of the five

14   boys?

15   A    **How is that? That was -- yeah.**

16   **That was put together way before that. How could**

17   **you say something like?**

18   Q    I am asking you. Would it be

19   accurate to say that you reinstated the Museum of

20   Life or Death because you were accused with the

21   murder of five boys?

22   A    **That was 2010 when I was accused.**

23   MS. BONJEAN: Just answer his

24   questions.

25   **THE WITNESS: No. It's not correct.**

179

1    MS. BONJEAN: Why are you arguing

2    with him?

3    THE WITNESS: Yeah. You're right.

4    BY MR. LIPSHUTZ:

5    Q    I am going to show you, sir, a

6    document Evans-2, which I have shown you before,

7    which is the interrogatories to you. I am going

8    to show you question number five. This question

9    asks you -- first of all, can you see it on the

10   screen, sir?

11   A    **Yes.**

12   Q    **This question asks you about your**

13   **personal injuries and all the complaints of any**

14   **nature whatsoever. Okay? This is about injuries**

15   **and complaints. Okay?**

16   **Now, I want to show you, sir,**

17   **Evans-1. Can you see this? This is your Answers**

18   **to Interrogatories, Evans-1? Do you see that?**

19   A    **Yes. I see Evans-1.**

20   Q    I am going to show you the answer to

21   question five. Question five was, again, tell us

22   about your injuries. And I want to show you the

23   first paragraph and I'm going to read it to you,

24   portions.

25   Because he was falsely charged with

180

1    the murder of five boys, his reputation in the

2    community was injured. Plaintiff reinstated a

3    nonprofit museum -- a nonprofit called Museum of

4    Life or Death. In 2009 the nonprofit was funded

5    by the plaintiff. Did I read those portions

6    accurately?

7    A    **You read it accurately, yes.**

8    Q    Okay. These are your answers to

9    interrogatories. Is this incorrect?

10   A    **That's incorrect, yeah.**

11   Q    Okay. What is incorrect about it?

12   A    **The truck is 2006.**

13   Q    I didn't ask about the truck.

14   What is incorrect --

15   A    **Everything.**

16   Q    What is inaccurate about the

17   interrogatory answers, I'm asking.

18   A    **Everything. The year. It was way**

19   **before this here. Didn't have nothing to do with**

20   **the arrest.**

21   Q    I am just confused. It says here

22   because he was falsely charged with the murder of

23   five boys, his reputation in the community was

24   injured. Plaintiff reinstated a nonprofit museum

25   called Museum of Life or Death.

181

1    Are you saying that the
2    reinstatement of the nonprofit had nothing to do
3    with the charges against you?
4         MS. BONJEAN: Okay. I am going to
5    object. There is nothing about this –
6    objection. You're – I don't – I don't even
7    know what you're trying to get at, but you're
8    mischaracterizing, I guess, in some way. You're
9    making an assumption that's just not there. But
10   go ahead ask your question.
11   BY MR. LIPSHUTZ:
12        Q    Did the reinstatement of the Museum
13   of Life or Death have anything to do with you
14   being arrested or charged with the murder of five
15   boys?
16        MS. BONJEAN: He already answered
17   that. Asked and answered.
18   BY MR. LIPSHUTZ:
19        Q    I didn't hear your answer, sir.
20        A    No.
21        Q    One more second. Hold on. I want
22   to show you a document I marked as Evans-10. Do
23   you see this on the screen, sir?
24        A    **Yes.**
25        Q    Do you see the stamp that says

182

1    Evans-10?
2         A    **Yes.**
3         Q    Okay. I am going to represent to
4    you that this was a card that was in the
5    prosecutor's file at the Essex County
6    Prosecutor's Office. It's two pages long. I am
7    going to show you.
8         Have you ever seen this – let me
9    show you the whole thing. Have you ever seen
10   this card before?
11        A    **The first time I seen it was**
12   **Tuesday.**
13        Q    Tuesday of this week?
14        A    **This week.**
15        Q    Okay. Did you send this card to the
16   prosecutors?
17        A    **No.**
18        Q    **Okay.**
19        **MR. LIPSHUTZ: I am just going to**
20   **give you – I am going to ask for about two**
21   **minutes because I may be done. Okay? So just**
22   **give me two minutes, please.**
23        **(Whereupon, a recess is taken.)**
24        MR. LIPSHUTZ: I really only have a
25   few more questions, I promise.

183

1    BY MR. LIPSHUTZ:
2         Q    I am a little confused about
3    Vailsburg Park. You picked up the boys at around
4    Fabyan Place. I think you said around 8:30.
5    What – what time did you pick them up? I am
6    sorry.
7         A    **Early.**
8         Q    Early?
9         A    **I was there – I was at Fabyan Place**
10   **at 6:30. I was over at 57 Fabyan Place. I know**
11   **that.**
12        Q    I am sorry. When did you take them
13   to the Vailsburg Park?
14        A    **That was – that's the same morning.**
15        Q    I know. What time, sir?
16        A    **It had to be around maybe 8:00. You**
17   **know, before – you know, it wasn't late. It was**
18   **early because all I had to do – from where I was**
19   **working I know – and then we came. They brought**
20   **up basketball, then they started talking. I**
21   **say, okay, we will go.**
22        Q    And I guess I was confused. Who was
23   with you that you took to Vailsburg Park?
24        A    **Repeat that.**
25        Q    Who was with you when you took them

184

1    to Vailsburg Park?
2         A    **Mike – I know Mike and Melvin, they**
3    **was there. And it was – I'll say Rodney.**
4    **Rodney, he is not part of the five, but he was**
5    **living across the street. And I don't know if it**
6    **was maybe – it was a group of them because it**
7    **was – two of them in front and the rest of them**
8    **got in back of the truck.**
9         Q    What about – I am not sure if I
10   asked.
11        What about your cousins Maurice and
12   Darryl? Did you take them to the Vailsburg Park?
13        A    **I don't think Darryl. I don't think**
14   **so. I don't – I think Maurice. I don't think**
15   **Darryl.**
16        Q    So can you just clear up – clarify
17   your answer to me. You – you're not sure if you
18   took Darryl. Do you recall –
19        A    **I don't recall Darryl.**
20        Q    Do you recall taking Maurice?
21        A    **Yes.**
22        Q    Okay. Now, the last question is
23   when did you drop them off? Not the last
24   question, the last topic. When did you drop them
25   off?

185

1    A    About maybe – roughly it would have
2  been – it was before – about 9:30, something
3  like that.  9:30, something like.
4    Q    About 9:30, 10:00 did you say?
5    A    About 9:30.
6    Q    And I think you told me you dropped
7  them off at Fabyan Place as well?
8    A    Yeah.
9    Q    And I guess I am confused as to
10 where you went between 9:30-ish and when you came
11 back at noon.
12   A    When I came back?
13   Q    Well, where did you go between?
14   A    I went home.
15   Q    What is home?
16   A    I went to Clinton Avenue.
17   Q    Okay.  In Irvington?
18   A    Right.
19   Q    Okay.
20       MR. LIPSHUTZ:  All right.  Mr.
21 Evans, I don't have any questions further at this
22 point.
23       At this point now the other
24 attorneys get to ask you questions.  I may have
25 some follow-up on what they ask you later.  Thank

186

1  you very much.
2        MR. DiFRANCESCO:  I have no
3  questions for you, Mr. Evans.  Thank you very
4  much.
5  CROSS-EXAMINATION
6  BY MR. KASSIS:
7    Q    I am just going to ask him
8  questions.  Mr. Evans, I represent Lieutenant
9  Carrega.
10       You testified about the ice cream
11 parlor that you dropped the boys off the last
12 time you saw them.  Do you remember the name of
13 that ice cream shop?
14   A    No.
15   Q    Do you know the specific address
16 where it was located?
17   A    There is a lot now, right on the
18 corner of 18th and Clinton Avenue.  The other
19 side of Clinton Avenue is 18th Street.
20   Q    Okay.  So you believe that ice cream
21 shop – I assume it's not there today.  Correct?
22   A    It's a lot, a parking lot.  It's
23 just a lot, not a parking lot.
24   Q    Okay.
25   A    Vacant lot.

187

1    Q    Okay.  So is it a corner lot?
2    A    Yes.
3    Q    What are the two streets that make
4  up the intersection where that lot is located?
5    A    The opposite side is Fabyan Place
6  and then you got Clinton Avenue.
7    Q    So the intersection would be
8  Fabyan Avenue and Clinton?
9    A    You said the intersection where the
10 lot – the corner lot?
11   Q    Yeah.  So an intersection is when
12 two lines come together; right?  I am just trying
13 to understand the names of the two roads that
14 make the intersection that is the corner where
15 the ice cream shop was located.
16   A    Oh, 18th – 19th and 18th, but it's
17 on the corner of 18th.
18   Q    Okay.  And 18th and Fabyan?
19   A    No.  18th and Fabyan is the same
20 street.  It's a – Fabyan is a continuation of
21 18th Street once you pass Clinton Avenue.
22   Q    Okay.  So what is the other street
23 that makes up the intersection?
24       MS. BONJEAN:  The intersection?
25       THE WITNESS:  Clinton Avenue and

188

1  18th Street.
2        MS. BONJEAN:  Clinton.  So he said
3  Clinton and 18th.  I don't know how many more
4  times.  Right?
5        THE WITNESS:  Yeah.
6        MS. BONJEAN:  Is that what you're
7  asking?
8        MR. KASSIS:  Yeah.  Thank you.
9        MS. BONJEAN:  Okay.
10       MR. KASSIS:  I appreciate that.
11 BY MR. KASSIS:
12   Q    A little confusion.  I wasn't sure
13 why you were using – thank you.  You cleared it
14 up.  Okay.  Great.  Are you right-handed or
15 left-handed?
16   A    Right.
17   Q    Now, I want to just focus your
18 attention a little bit on the – on this
19 marijuana.  I think you told me that there was
20 two pounds of marijuana that went missing from
21 your apartment; correct?
22   A    Yeah.
23   Q    And that apartment – I'm sorry?
24   A    Estimated, yeah.
25   Q    Estimate.  Okay.  Fair enough.  And

189

1  that apartment was the 979 Clinton Avenue;
2  correct?
3        A       Correct.
4        Q       Do you know what the street value of
5  the marijuana was at that time? I know we threw
6  around $750 because we multiplied 150 by 5. But
7  do you know what the street value of that -- of
8  that drug was at that time?
9                MS. BONJEAN: I am going to object
10 to the editorializing about the 150. I don't
11 know what that had to do with street value.
12               But go ahead. You can answer. Do
13 you know what the street value was of it?
14               THE WITNESS: Of the marijuana?
15               MS. BONJEAN: Yeah.
16               THE WITNESS: No. Not really. I
17 don't know the street value.
18 BY MR. KASSIS:
19       Q       Okay. And I respect. Can you --
20 are you able to approximate what the street value
21 was of the marijuana?
22       A       I can tell you what it was going
23 through me, you know. No. It was like a couple
24 hundred dollars, 250.
25       Q       So 250 for the -- for the

190

1  approximately two pounds of marijuana was the
2  street value?
3        A       No. Each.
4        Q       Each pound?
5        A       Yeah.
6        Q       So $500?
7        A       Yeah.
8        Q       Okay. Now, when you -- when you --
9  when you obtained the marijuana, I think you
10 referenced something about an Italian individual
11 that you knew when you worked jobs at
12 Meadowlands. Is that right?
13       A       Right.
14       Q       Is that the individual who you --
15 who you obtained the marijuana from?
16       A       Through him, yeah.
17       Q       What was your intent -- what were
18 you going to do with that marijuana?
19       A       I was Passing it off to another
20 party.
21       Q       Okay.
22               Okay. Did you -- did you pay this
23 Italian individual for the marijuana or did he
24 give it to you on credit?
25       A       Yeah. Just give it to me, you know.

191

1        Q       He gave it to you on credit?
2        A       Yeah. We was doing jobs together
3  also.
4        Q       So was the idea to pass it along to
5  the next person and then when you got the cash
6  pay him, the Italian individual the cash?
7        A       Yes. Give him his part back, his
8  money back.
9        Q       Okay. So you basically owed the
10 Italian man money for the marijuana that was
11 stolen; correct?
12       A       Yeah. But I didn't have no problem
13 with him like that.
14       Q       Okay. I am not suggesting you did.
15 How much did he want to be paid for the two
16 pounds of marijuana that you obtained from him?
17       A       What you mean?
18       Q       How much were you -- how much were
19 you going to give him for the marijuana once it
20 was sold or whatever you were going to do with
21 it?
22       A       How much I was going to give him?
23       Q       Yes. The Italian individual.
24       A       Oh, I would give him $400.
25       Q       Okay. So were you intending to make

192

1  a profit of $100?
2        A       I guess in between.
3        Q       And who were you going to pass off
4  the drugs to?
5        A       The marijuana to?
6        Q       Yes.
7        A       It was a close friend of the family.
8  He's -- his name is Eddie Gibson. He was working
9  at the airport. He was a pipefitter.
10       Q       Sorry. Do you know what Eddie's
11 intentions were with the drugs? Was he going to
12 distribute them? Was he going to use them
13 himself?
14       A       I don't know.
15               MS. BONJEAN: Objection. I said
16 hold on. Objection to the form, foundation of
17 that question.
18 BY MR. KASSIS:
19       Q       Okay. Do you know what he was going
20 to do with them?
21       A       I don't know.
22       Q       Okay. Were you intending on using
23 any of those five boys that went missing to
24 distribute the marijuana?
25       A       No.

**193**

1  Q   The five boys that went missing, had
2  they ever been – other than on August 20, 2000
3  – I'm sorry – 1978, had the boys ever been in
4  your apartment located at 979 Clinton Avenue?
5       MS. BONJEAN: Objection. That,
6  again, assumes facts not in evidence.
7  BY MR. KASSIS:
8  Q   Fair enough. Fair enough. Let me
9  do this. On the day that the boys went missing,
10 I know they helped you move boxes from one
11 location to the other. Did they actually go into
12 your house located at 979 Clinton Avenue?
13 A   No.
14 Q   Okay. Had the boys ever been inside
15 the apartment that you occupied located at 979
16 Clinton Avenue?
17 A   No.
18 Q   Where was – where did you store
19 that two pounds of marijuana in your apartment
20 when – before it went missing?
21 A   I had it in a closet temporary, you
22 know.
23 Q   In a closet?
24 A   Yeah.
25 Q   Was the closet locked?

**194**

1  A   No. It wasn't locked, no.
2  Q   You told me that – actually, you
3  told Mr. Lipshutz you lived with your wife in
4  that apartment; correct?
5       MS. BONJEAN: Objection. Misstates
6  the testimony.
7       You can answer.
8       THE WITNESS: At the time, no.
9  BY MR. KASSIS:
10 Q   Okay. She was living at her
11 parents' house?
12 A   At that time, yes.
13 Q   Understood. So the only person in
14 that apartment was you; correct?
15 A   Correct.
16 Q   Did you know who took the marijuana?
17 A   No. Not really, but I had theories
18 that the super had a – you know, he had the –
19 he had access to the apartment. Could go in and
20 out.
21 Q   Did you ever tell the super you had
22 marijuana or you kept two pounds of marijuana in
23 your apartment?
24 A   No.
25 Q   Okay. Did the super ever know you

**195**

1  to have drugs or sell drugs or store drugs in
2  your apartment?
3       MS. BONJEAN: Objection to form.
4  Foundation.
5       You can answer.
6       THE WITNESS: No.
7  BY MR. KASSIS:
8  Q   Did you ever mention to any of the
9  five boys that – that you had marijuana?
10 A   No.
11 Q   When you left your apartment, was it
12 your habit to lock the door behind you?
13 A   Yes.
14 Q   And I think you said earlier to some
15 of Mr. Lipshutz's questioning that there was no
16 evidence of a break-in. Correct?
17 A   Correct.
18 Q   And that – that leads you to – to
19 theorize that whoever entered the apartment had
20 the key; correct?
21 A   Correct.
22 Q   Other than the super, did anybody
23 else have a key to that apartment?
24 A   No.
25 Q   How long were the -- how long were

**196**

1  the drugs in that closet before -- how long were
2  the drugs stored in that closet before they went
3  missing, if you know?
4  A   I don't know. I don't know.
5  Q   Because you don't know when they
6  went; missing correct?
7  A   Correct.
8  Q   How long -- let me ask you this.
9  Can you estimate for me how long the drugs were
10 in that apartment prior to August 20, 1978?
11 A   Repeat that.
12 Q   Do you know how long the drugs were
13 in the apartment prior to August 20, 1978?
14      MS. BONJEAN: Objection. Asked and
15 answered.
16      You can answer again.
17      THE WITNESS: I don't know.
18 BY MR. KASSIS:
19 Q   Okay. You don't know when you -- so
20 let me see if I can create a foundation here.
21      Do you know when you purchased -- or
22 obtained, rather, the drugs from the Italian
23 person in the Meadowlands?
24 A   Yeah.
25 Q   Okay. How long before August 20,

197

1  1978, did you obtain the drugs from the Italian

2  individual?

3       A      It might have been a week.  Could

4  have been a week or something.

5       Q      A week to what?

6       A      I am not for sure accurate, but it

7  could have been a week -- between a week or

8  better, you know.

9       Q      Did you ever confront the

10  superintendent about the drugs?

11      A      No.

12      Q      What is the superintendent's name?

13      A      I don't know.

14      Q      Why didn't you confront him about

15  it?

16      A      Because I wasn't 1,000 percent sure.

17  If you don't -- if you're not for sure, you know,

18  you don't confront somebody.  You can believe

19  something.  Then you have to just go with it, you

20  know, but you don't accuse somebody if you're not

21  100 percent.

22      Q      Just last line of questioning.

23             I know we talked about the general

24  contractor back in 1978.  Did you have any

25  equipment that required gasoline to operate?

198

1             MS. BONJEAN:  Objection.

2  BY MR. KASSIS:

3       Q      Other than a vehicle, other a truck?

4       A      No.

5             MR. KASSIS:  Okay.  I don't have

6  anything further.

7             MR. LIPSHUTZ:  Is it back to me now?

8  I don't have anything else.  I didn't know if you

9  had anything, Ms. Bonjean.

10             MS. BONJEAN:  I don't.

11             MR. LIPSHUTZ:  Okay.  Thank you.

12             (The deposition is adjourned at

13  2:24.)

14

15

16

17

18

19

20

21

22

23

24

25

199

1                C E R T I F I C A T E

2        I, JACQUELINE ZAMMATARO, a Notary Public and

3  Certified Court Reporter of the State of New

4  Jersey, License No. XI01142, do hereby certify

5  that prior to the commencement of the

6  examination, the witness was duly sworn by me to

7  testify to the truth, the whole truth and nothing

8  but the truth.

9        I DO FURTHER CERTIFY that the foregoing is a

10  true and accurate transcript of the testimony as

11  taken stenographically by and before me on the

12  date and at the place aforementioned.

13        I DO FURTHER CERTIFY that I am neither a

14  relative to nor employee of, nor attorney or

15  counsel for any of the parties to this action;

16  and that I am neither a relative to nor employee

17  of such attorney or counsel; and that I am not

18  financially interested in the action.

19        *Jacqueline Zammataro*

20              Jacqueline Zammataro, C.C.R.

21              Notary Public of the State of

22              New Jersey, Notary No. 50126074

23

24  Dated:    4/1/21

25

**- 0 -**

**07068**  [1]
2:24
**07102**  [1]
4:19
**07932**  [1]
3:16
**08625-0112**
[1]  4:11

**- 1 -**

**1,000**  [11]
84:16,  17;
86:14;
87:13;
89:17;
91:25;
92:9;
128:4;
139:11;
141:12;
197:16
**1-10**  [3]
1:10, 17, 18
**10,000**  [1]
94:10
**1000**  [1]
84:12
**11238**  [1]
3:8
**14-cv-120**
[1]  1:2
**1500**  [1]
162:12
**1700**  [4]
159:8;
162:8,  12;
163:6
**18th**  [15]
82:20,  22;
123:6,  7;
144:14;
186:18,  19;
187:16,  17,
18, 19, 21;
188:1, 3
**1900**  [4]
165:22;

**166:4;**
169:25;
171:10
**1953**  [1]
21:17
**1956**  [1]
160:5
**1962**  [1]
22:6
**1978**  [40]
10:4;
29:10;
79:8,  15;
80:3;
85:12;
92:11;
94:17;
111:3,  9;
117:20, 24;
134:15, 17,
25; 139:21;
140:2;
142:12;
146:8,  14;
148:19;
154:23;
155:8;
156:21;
157:21, 24,
25;  158:2,
4;  159:2,
7,  14;
162:8, 13;
171:18;
193:3;
196:10, 13;
197:1, 24
**1989**  [2]
177:19;
178:1
**19th**  [8]
112:6,   7,
15,   19;
117:10, 13;
187:16

**- 2 -**

**20-21**  [2]
111:3, 9

**2000**  [5]
148:23;
149:2,  3;
193:2
**2006**  [1]
180:12
**2007**  [1]
55:12
**2008**  [3]
55:12;
57:16;  75:1
**2009**  [1]
180:4
**2010**  [5]
59:4;  97:2;
129:9;
177:5;
178:22
**2011**  [1]
38:24
**2012**  [1]
39:1
**2013**  [1]
39:3
**2017**  [5]
39:18;
44:20;
59:12;
67:7, 9
**2018**  [2]
105:2, 8
**2019**  [3]
39:18;
44:21;
59:12
**2021**  [3]
1:22,   2:5;
31:6
**20th**  [13]
83:8;
85:12;
88:14;
92:11;
95:21;
96:15;
112:9;
119:2;
125:13;
134:25;

**162:13;**
163:25
**21st**  [3]
83:13;
127:22;
134:15
**2230**  [3]
149:7, 25;
152:10
**22nd**  [3]
134:17;
142:12;
146:8
**2300**  [2]
134:24;
142:20
**23rd**  [6]
128:19, 21;
130:4, 7
**24th**  [1]
130:7
**25th**  [1]
147:25

**- 3 -**

**30-ish**  [1]
185:10
**30XI014420**
**0** [1]  2:4

**- 4 -**

**40-plus**  [1]
54:1
**42-plus**  [1]
85:5

**- 5 -**

**50126074**
[1]  199:22

**- 8 -**

**824-0439**
[1]  158:10

**- A -**

**A-N-D-Y**  [1]
23:23
**a.m.**  [2]
2:6;  164:19
**abandoned**
[2]   178:3,
6
**ability**  [1]
18:4
**able**  [4]
32:21;
111:14;
119:23;
189:20
**About**  [9]
17:6;  25:8;
90:23;
98:4;
157:2;
164:18;
185:1, 4, 5
**about**  [144]
9:25;  10:2,
4,   5;
17:13;
18:24,  25;
20:20;
22:10,  12;
23:7,  13;
26:8,  18;
37:1;  38:1,
8;   41:14;
44:16,  22;
45:7,   18,
25;  46:11,
19;  47:10,
14,   19;
48:1,   3;
49:9,  13;
51:7,   12,
20, 21, 23;
52:8,   15;
71:7,   14;
72:3;  74:5;
75:22;
76:22;
78:1,   21;
79:3, 8, 12;

81:10, 24;
82:16;
83:23;
84:23;
86:17;
88:8, 10,
21; 89:18;
91:20;
92:18;
102:18;
103:7;
108:2;
114:8;
116:17, 25;
118:8, 14;
119:4;
121:12;
122:6;
123:8;
128:2, 22,
25; 129:9,
10; 130:14,
15; 131:12,
19, 22;
132:22;
135:6;
136:10;
138:23;
139:25;
141:13, 14,
16; 142:22;
143:20, 22;
144:6, 10;
145:7, 19,
23, 24;
146:9, 13;
147:13;
148:14;
151:21;
153:16;
155:7;
157:9, 21,
23; 158:1,
19; 161:20;
162:2;
163:1, 12;
164:23;
165:4, 22;
166:5, 7;
173:15;

176:16;
179:12, 14,
22; 180:11,
13, 16;
181:5;
182:20;
183:2;
184:9, 11;
185:2;
186:10;
189:10;
190:10;
197:10, 14,
23
Absolutely
[1] 152:11
absolutely
[5] 86:12;
87:25;
92:7; 94:8;
102:11
access [1]
194:19
accountant
[8] 55:13;
56:5, 12,
17; 57:18;
58:2, 11;
59:8
accurate
[18] 12:1;
121:5;
140:23;
141:9, 11;
143:2, 18,
20; 148:25;
150:15;
151:22, 23;
165:24;
178:11, 19;
197:6;
199:10
accurately
[19] 12:19;
140:21;
141:7;
143:11;
148:6, 7,
11, 12, 24;
158:13, 23;

159:4;
163:20, 21;
165:23;
166:2, 3;
180:6, 7
accusation
[1] 46:20
accusation
s [4] 38:2,
9; 83:21;
94:12
accuse [1]
197:20
accused [6]
79:13;
174:14;
177:2, 4;
178:20, 22
acknowledg
e [2] 8:2, 5
acquittal
[4] 37:22,
23; 38:7;
48:4
acquitted
[4] 170:15,
19, 23;
173:18
across [7]
82:13, 14;
127:10;
164:10, 14;
175:20;
184:5
ACTING [1]
1:11
Action [1]
1:2
action [2]
199:15, 18
actually [4]
102:23;
169:10;
193:11;
194:2
added [1]
46:23
adding [1]
157:19

address
[12] 33:10,
13; 34:4,
13; 80:19;
91:5, 7, 8;
140:17;
142:15;
186:15
adjourned
[1] 198:12
administer
[1] 8:7
administere
d [1] 8:6
advised [1]
104:16
advising
[1] 140:12
affect [1]
18:3
affecting
[1] 16:14
affiliate [3]
36:19, 22,
23
affirmed [1]
10:20
affirms [1]
9:5
aforementi
oned [1]
199:12
After [10]
48:4, 5;
77:24;
85:13, 14,
15; 88:15;
89:11;
93:12;
97:18
after [39]
40:18;
48:1; 65:6,
11, 14, 16,
20, 21;
68:21;
69:18, 21;
85:11;
88:13, 23;
93:1; 94:6;

96:15;
97:16;
98:19;
99:10, 12,
14, 15, 17,
19, 23;
127:6, 16;
134:15;
145:5, 6;
148:14;
157:22;
165:8, 11;
177:3
afternoon
[1] 132:19
Again [1]
14:12
again [24]
60:7;
61:10;
62:19;
63:6; 68:5;
69:16;
72:14;
77:16;
88:25;
93:9;
105:24;
114:6;
117:1;
125:2;
138:25;
143:25;
149:7;
152:10;
156:6;
171:13;
173:10;
179:21;
193:6;
196:16
against [2]
38:9; 181:3
AGENT [1]
1:15
ages [1]
33:2
agree [10]
8:14, 16,
18; 12:24;

13:17;
114:21, 22;
116:21;
149:1;
169:2
**agreed** [2]
168:12, 22
**agreement**
[4]      8:10,
11;  75:8, 9
**ahead** [39]
12:5,   12;
13:14;
19:21;
44:25;
46:10;
48:20;
62:18;
65:9;
67:19;
72:6;  89:7;
94:2;  99:1;
106:10;
107:5,    8,
14,   15;
108:14;
109:7;
110:21;
115:11;
116:7;
121:17;
135:13;
136:5,  15;
137:13;
143:14, 25;
151:10, 11;
169:18;
174:6;
175:12;
181:10;
189:12
**Ain't**   [1]
46:1
**ain't**   [3]
55:23;
159:19;
173:14
**airport** [2]
95:10;
192:9

**Alabama** [2]
22:5
**alcohol**  [1]
18:6
**alive**   [2]
22:13;
28:14
**allegations**
[1]  94:15
**allow**   [2]
71:23, 25
**almost**  [1]
16:15
**along**   [2]
8:22;  191:4
**Already**  [1]
59:9
**already** [17]
20:2;
35:24;
49:15,  20;
51:17;
52:7;  61:8,
20;    64:2;
76:15;
119:4;
133:9;
167:11, 24;
168:3;
170:6;
181:16
**Also**    [7]
9:22;
12:14;
53:12;
117:22;
127:25;
142:20;
162:16
**also**   [21]
9:3;  13:21;
15:8,   11;
24:23;
27:23;
28:16;
29:6;
47:11;
49:5;  58:4;
89:17;
96:14;

106:15;
108:24;
110:5,  19;
126:1;
129:16;
172:22;
191:3
**altered** [20]
136:19;
137:1, 4, 5,
11,  15,  22,
23,    24;
138:1,     7,
10,  14,  21,
22,    23;
139:2;
152:13
**Alvin**   [6]
111:6;
126:18, 19;
127:2;
149:10, 25
**always**  [2]
95:3;  161:7
**amazing** [1]
129:13
**ambushed**
[1]  103:14
**ambushing**
[1]  110:17
**Amended**
[1]  7:13
**among**  [1]
101:2
**amount**  [1]
55:18
**Andrew**  [1]
23:5
**Andy**    [1]
23:23
**ANGEL**   [1]
1:10
**Annie**   [6]
23:5,    21,
23,    25;
24:6
**anniversary**
[1]  29:2
**another**
[14]  37:14;

45:18;
46:22;
55:9;  56:2;
95:9;  96:1;
106:8;
122:4;
139:12;
145:22;
152:23;
157:9;
190:19
**ANSWER** [3]
6:3, 20, 23
**Answer**  [3]
66:1;  89:7;
136:6
**answer**
[108]
12:21;
13:14;
14:7,    17,
18;   15:23;
18:4,   20;
19:24;
20:1,   18;
23:10;
31:25;
32:6,   21;
38:4;
39:24,  25;
41:1,     4;
42:11;
44:25;
48:20;
50:23;
52:19;
53:7;
54:23;
56:4;
57:10,  23;
58:20;
60:7,   24;
61:10;
62:7;  65:9,
17;   67:23;
68:11,   20,
23,    24;
69:2,   16;
71:3,   25;
72:6;

76:25;
77:6,    8;
78:5,    8;
80:6, 8, 12;
89:3;
97:12;
101:6;
105:9,  11;
106:9;
108:22, 23;
109:1;
111:9,  13;
112:20;
113:20;
114:18;
115:8,    9;
117:7;
118:24;
122:22;
125:3;
126:4;
129:18, 20;
135:14;
136:13, 15;
137:8;
138:18, 19;
140:25;
141:1,    3;
143:25;
144:21;
151:22, 25;
155:15;
156:6;
168:5,    9;
171:13;
172:23;
173:9,  11;
176:1;
178:23;
179:20;
181:19;
184:17;
189:12;
194:7;
195:5;
196:16
**answered**
[42]      6:7,
15;   20:2;
30:19;

37:17;
43:13;
44:6;   48:9,
19;   49:22;
50:10;
60:6;   61:8,
16;   62:13;
67:23;
69:4,   15;
78:11;
88:6;   98:9;
102:13;
104:17;
132:7;
137:17;
143:24;
145:11,   16;
156:5,   13,
14;   167:16;
168:4,   8;
171:12;
173:8;
174:3;
181:16,   17;
196:15
**answering**
[7]   62:16;
98:22,   23;
102:17;
103:7,   13;
160:8
**Answers** [4]
7:10,   13;
100:21;
179:17
**answers**
[20]   10:24;
13:25;
17:21;
78:17;
79:4,   6;
95:25;
103:15;
106:15;
107:25;
108:3,   17,
21;   111:20;
122:15;
123:16;

124:16;
180:8, 17
**Anthony** [3]
20:8;
134:22;
154:17
**anticipate**
[1]   12:23
**anxiety** [1]
16:13
**Anybody** [1]
104:5
**anybody**
[13]   19:7,
8;   31:17;
41:11;
72:24;
73:6;
81:13;
109:20;
128:1;
152:20;
156:18;
195:22
**anyone**   [2]
19:17, 18
**Anything**
[1] 124:18
**anything**
[33]   18:16;
37:1;   38:1,
2;   41:21;
44:12;
46:18;
48:17;
51:8,   12,
23;   52:15;
60:11,   13;
71:14;
74:13;
89:7;
91:13;
95:5;
101:11;
103:11;
106:5;
124:15;
125:4,   9;
127:5;
169:10;

174:3;
181:13;
198:6, 8, 9
**Anywhere**
[1] 36:4
**Apartment**
[1] 142:14
**apartment**
[29] 34:16,
19, 20, 21,
23;   79:17,
18;   80:20;
117:10, 14,
15,   16;
119:4;
188:21, 23;
189:1;
193:4,   15,
19;   194:4,
14, 19, 23;
195:2,   11,
19,   23;
196:10, 13
**apologize**
[1] 133:20
**appearing**
[1] 8:24
**apply**   [2]
110:9, 10
**appreciate**
[6]   12:3;
13:12;
42:20;
78:23;
105:24;
188:10
**appropriate**
[2]   152:2,
3
**approximat**
**e** [6]   6:5;
30:1,   13;
31:7;   66:4;
189:20
**approximat**
**ely**   [10]
6:2;   30:7;
88:14;
122:15, 21;
134:24;

142:20;
148:23;
159:7;
190:1
**approximati**
**ng**   [2]
41:4, 5
**approximati**
**on** [2]   6:5;
30:14
**area**   [5]
21:7;
85:24;
92:14;
95:4;
149:15
**areas**   [1]
76:15
**arguing** [1]
179:1
**Argumentat**
**ive**   [2]
6:15; 43:13
**argumentat**
**ive** [6]   6:5;
30:12;
43:23;
50:10;
145:9;
156:12
**arose**   [1]
126:4
**around**   [12]
21:24;
80:24;
81:4, 5, 22;
89:20;
149:12;
164:23;
183:3,   4,
16;   189:6
**arrangemen**
**t** [1] 8:8
**arrest**   [1]
180:20
**arrested** [1]
181:14
**arrival**   [1]
148:4

**ASHLEY** [1]
3:5
**Ashley**   [3]
9:4;
155:13, 14
**Asked**   [20]
6:15;
37:16;
43:12;
44:5;   48:8,
18;   49:22;
50:9;   60:5;
61:7,   15;
62:12;
69:14;
88:5;   98:8;
143:23;
156:4;
167:15;
181:17;
196:14
**asked**   [24]
26:23;
50:11;
61:20;
74:24;
75:12;
81:20;
88:4, 7, 10;
97:4;
132:6,   8,
11;   145:24;
156:14;
161:14;
165:6,   11,
13;   168:3;
171:11;
173:12;
174:15;
184:10
**asking**   [18]
18:25;
19:3;
51:15,   16;
72:18;
138:9;
146:22;
147:8;
150:25;
160:7;

163:1;
167:25;
169:2;
174:22;
175:4;
178:18;
180:17;
188:7
**asks** [3]
115:10;
179:9, 12
**assignment**
[1] 140:1
**ASSISTANT**
[3] 1:13;
4:16
**assistant**
[1] 157:6
**assistants**
[2] 73:3, 4
**associate**
[3] 36:8;
47:24; 78:2
**assume** [2]
57:2;
186:21
**assumes**
[2] 169:1;
193:6
**assumption**
[1] 181:9
**attention**
[1] 188:18
**ATTORNEY**
[1] 4:5
**attorney**
[10] 8:23;
9:19;
14:11, 14,
17; 18:24;
55:13;
73:13;
199:14, 17
**attorney's**
[1] 11:9
**attorney-cli**
**ent** [2]
71:22; 72:1

**Attorneys**
[4] 3:9, 17;
4:12, 20
**attorneys**
[8] 8:1;
9:23; 10:9;
14:11;
19:2, 6, 17;
185:24
**August** [41]
79:14;
80:3; 83:7,
12; 85:12;
88:14;
92:11;
95:20;
96:14;
111:3, 8;
112:3, 9;
117:9, 12,
13, 19, 24;
119:2;
125:13;
134:15, 17,
25; 140:2;
142:12;
146:8;
147:25;
148:19;
155:8;
157:25;
159:2, 7,
14; 162:7,
13; 171:17;
193:2;
196:10, 13,
25
**aunt** [7]
26:16;
120:15;
126:5, 11;
128:6, 11,
13
**aunt's** [1]
128:11
**aunts** [3]
25:25;
26:1; 28:3
**authorities**
[1] 59:7

**authority**
[1] 59:3
**available**
[1] 75:13
**Avenue** [46]
3:15;
40:11, 12;
44:20;
79:16;
80:15, 19,
20; 81:3,
13; 82:2,
4, 12, 15,
18, 22;
111:23;
117:11, 21,
24; 118:5;
120:1;
121:13;
122:9;
123:7;
124:11;
125:15;
134:22;
140:8;
142:14;
148:22;
149:15;
163:14;
172:13;
185:16;
186:18, 19;
187:6, 8,
21, 25;
189:1;
193:4, 12,
16
**aware** [6]
31:20;
32:1;
94:11, 14;
155:24;
156:2
**away** [7]
28:11;
43:22;
55:4;
72:14;
107:7;

112:19;
129:14
**awhile** [1]
37:12
**awkward** [2]
12:22;
14:13

— B —

**baby** [1]
117:17
**Back** [5]
59:16;
94:17;
116:24;
154:23;
156:21
**back** [50]
59:11;
63:24;
68:15;
77:11;
81:9, 11,
13, 14, 16,
17; 82:3,
17, 18, 19;
83:2;
88:18;
95:5, 20;
97:3;
108:1, 21;
110:2;
113:15;
117:6;
123:4, 5;
127:7, 17;
129:11;
130:17;
131:20;
132:4;
138:19;
141:21;
142:11;
152:6;
153:15;
157:17;
159:12;
164:11;
165:20;

167:9;
184:8;
185:11, 12;
191:7, 8;
197:24;
198:7
**background**
[2] 10:1;
20:5
**backwards**
[1] 56:3
**bank** [2]
83:9, 11
**basement**
[1] 122:12
**basic** [1]
45:2
**Basically**
[1] 46:21
**basically**
[4] 21:11;
73:21;
74:4; 191:9
**basis** [1]
37:10
**basketball**
[5] 163:13;
165:17;
166:12;
167:6;
183:20
**bear** [1]
100:6
**became** [1]
31:7
**Because**
[13] 36:19,
22; 39:14;
49:7; 52:6;
54:14;
66:12;
97:9;
101:17;
102:9;
179:25;
196:5;
197:16
**because**
[38] 11:6;
12:16;

19:13;
21:7, 8;
36:16;
50:20;
57:14;
58:24;
59:2; 77:8;
80:25;
83:8, 20;
98:2;
101:25;
102:16;
103:8, 14;
104:10;
106:13;
108:25;
113:7;
120:18;
133:20;
135:18;
138:3;
144:12;
153:6;
163:4;
164:9;
178:12, 20;
180:22;
182:21;
183:18;
184:6;
189:6
**been** [42]
28:23;
29:21;
37:12;
38:17;
39:6, 16;
47:6; 48:5;
52:3;
56:15;
59:14;
60:20;
62:13;
73:25;
85:25;
86:3, 6, 9;
101:25;
103:14;
104:17;
106:14, 16;

124:13;
125:19;
130:7;
137:4;
139:15;
140:8;
152:13;
156:17;
157:2;
161:15;
173:18;
185:2;
193:2, 3,
14; 197:3,
4, 7
**Before** [2]
45:13;
69:21
**before** [49]
2:2; 9:17;
10:14;
37:6, 8;
48:2;
62:23;
65:3, 6, 11,
14, 20;
66:6, 7, 11,
13; 67:2;
69:9, 18,
19; 70:11;
72:22;
80:22;
81:14;
85:10;
88:19;
98:6, 21,
23; 99:22;
121:2;
126:20;
139:23;
155:11;
172:7;
177:2;
178:16;
179:6;
180:19;
182:10;
183:17;
185:2;
193:20;

196:1, 2,
25; 199:11
**beginning**
[2] 33:8;
157:18
**begins** [1]
157:21
**behalf** [3]
8:13, 16, 24
**behavior**
[1] 175:10
**behind** [2]
49:11;
195:12
**being** [4]
13:7;
43:23;
62:16;
181:14
**belief** [3]
58:10, 15,
22
**believe** [13]
58:6; 59:6;
75:3;
103:1;
106:1;
141:9, 10;
152:12, 14;
154:20;
186:20;
197:18
**believes** [1]
151:23
**Belle** [3]
23:5, 21;
24:12
**benefit** [1]
72:13
**best** [10]
49:18, 23;
50:11, 23;
51:9; 80:1;
88:25;
105:5;
107:2;
135:14
**better** [2]
37:15;
197:8

**between**
[14] 39:18;
44:20;
59:12;
62:11;
76:20;
86:7;
87:14, 20;
121:3;
122:13;
185:10, 13;
192:2;
197:7
**beverages**
[1] 18:7
**bigger** [2]
109:17;
111:14
**bill** [1]
123:12
**bills** [1]
82:24
**birth** [2]
158:7;
159:24
**birthday** [2]
160:4, 6
**black** [1]
158:6
**blood** [3]
14:25;
15:1; 16:10
**Bob's** [1]
140:17
**BONJEAN**
[243] 3:3,
4; 6:4, 6,
10, 15;
8:15; 9:1;
11:24;
12:11;
16:24;
17:12;
18:20;
19:20;
20:1, 16;
23:24;
30:2, 17,
25; 31:22;
37:16;

38:3, 13,
19; 39:23;
40:8, 20,
24; 41:3,
17; 42:11;
43:12, 19;
44:5, 23;
46:6;
47:20;
48:8, 18;
49:21;
50:4, 9, 16;
52:1, 18,
24; 53:11,
23; 56:7,
24; 57:1;
58:17;
59:20, 25;
60:5, 24;
61:7, 15;
62:7, 12,
25; 63:15;
64:11, 18;
65:7, 17,
23; 66:1,
3; 67:17,
22; 68:1,
10, 18, 23;
69:1, 14;
71:2, 20;
72:5;
73:18;
77:3, 6;
80:4;
83:25;
84:5, 13;
85:3, 21;
88:3; 89:2,
6; 92:1;
93:5, 10,
22, 25;
95:22, 24;
96:5;
97:12;
98:8, 20;
100:25;
101:7, 24;
102:3, 15,
21; 103:3,
6, 12, 17;

105:19, 23;
107:3;
108:8, 11,
14; 109:5;
110:5;
111:10, 24;
112:10, 23;
113:3, 10,
14, 18, 22;
115:6, 8,
19, 24;
116:3, 6,
16; 117:3;
118:20, 23;
124:5, 17,
23; 125:8;
129:1, 17;
131:17;
133:13, 17;
134:4, 8;
135:9, 22;
136:1, 5,
12; 137:8,
13, 17;
140:24;
143:12, 23;
144:19;
145:8, 15;
146:16;
147:3, 10,
16, 19, 21;
150:13, 20,
23; 151:4,
6, 10, 13,
16; 152:7;
156:4, 10,
12; 162:4;
166:18, 22,
25; 167:10,
15, 23, 25;
168:2, 8,
24; 169:6,
9, 14, 17;
170:5, 9,
14, 22;
171:1, 4,
11, 24;
172:3, 23;
173:6, 17,
20, 24;

174:2, 6,
11, 17, 21;
175:3, 7, 9;
176:10;
177:20;
178:23;
179:1;
181:4, 16;
187:24;
188:2, 6, 9;
189:9, 15;
192:15;
193:5;
194:5;
195:3;
196:14;
198:1, 10
**Bonjean** [7]
8:15;
50:13;
64:15;
104:9;
105:15;
150:19;
198:9
**Book** [1]
21:6
**BOOKER** [1]
1:7
**Booker** [4]
4:22; 8:19;
9:20;
100:24
**borderline**
[1] 15:13
**born** [3]
21:6, 16, 18
**both** [2]
65:22;
102:13
**bottom** [5]
107:24;
110:16;
133:11;
134:1;
139:16
**boxed** [1]
80:21
**boxes** [11]
81:2; 82:8;

119:3, 19;
120:25;
122:3, 10;
149:11, 14;
193:10
**boy's** [1]
96:19
**boys** [69]
29:10;
79:13;
81:18, 24;
82:24;
86:17;
87:6;
92:13, 14;
93:1, 12,
19; 94:5,
13; 96:17,
18; 97:6,
17; 98:6,
7, 19;
99:10, 23;
121:12;
122:3;
123:3, 5,
11, 20;
129:11;
130:16, 17;
132:4, 10;
140:3;
143:4, 11;
144:14, 17;
145:6, 7;
155:8;
157:22;
159:8;
161:11;
162:9, 12;
163:6;
165:9;
171:21;
172:6, 10;
173:5;
174:25;
175:14;
178:14, 21;
180:1, 23;
181:15;
183:3;
186:11;

192:23;
193:1, 3, 9,
14; 195:9
**break** [16]
14:3, 8;
64:12, 22;
82:25;
97:25;
102:16, 25;
103:5;
104:4;
112:24;
113:1, 3,
19, 21;
153:10
**break-in** [2]
97:23;
195:16
**breaks** [1]
14:5
**briefly** [1]
104:7
**Bring** [1]
146:1
**bring** [2]
47:4; 152:5
**bringing** [1]
16:14
**Broad** [1]
4:18
**broad** [1]
20:24
**broke** [4]
36:20;
37:2; 98:16
**Brooklyn**
[4] 3:8;
11:12, 13;
19:12
**brother** [1]
28:5
**brothers**
[3] 23:8,
11, 12
**brought** [2]
74:5;
183:19
**Budd** [2]
34:2, 4

**building** [5]
34:10;
82:7, 8;
94:21;
97:25
**Bureau** [1]
140:19
**burned** [1]
83:20
**business**
[22] 53:4,
5, 6, 10,
20, 21, 24;
54:4, 6, 20,
22, 24;
55:9, 14,
15; 57:17,
24; 91:18
**buying** [1]
80:14

- C -

**C.C.R.** [1]
199:20
**California**
[1] 55:25
**call** [6]
64:13;
87:2;
140:11;
142:23;
145:19;
146:10
**called** [17]
21:5, 6, 9,
10; 36:9,
11, 14;
46:14;
55:8, 9;
63:4, 10,
18; 81:6;
109:3;
180:3, 25
**caller** [3]
142:23;
145:19;
146:10
**calling** [3]
21:8;

**138**:15;
166:15
**Camden** [7]
155:21, 24;
156:3, 19;
172:14, 15
**came** [38]
22:5; 42:9;
46:14, 16;
49:1;
55:21;
58:6;
63:19;
66:14;
68:4;
80:25;
81:3, 9, 11,
16; 82:17,
18; 96:17;
97:1, 7;
99:10;
125:14;
129:7, 12;
130:1, 24;
131:10;
138:6;
141:20;
145:21, 22,
23; 146:5;
164:11;
183:19;
185:10, 12
**can't** [14]
19:13;
44:10;
71:1;
104:12, 21;
105:14;
128:8;
133:13, 14;
138:4, 10;
153:22;
174:10
**cannot** [7]
6:15;
13:23;
17:21;
43:14;
103:12, 13;
147:11

**Card** [1]
7:21
**card** [3]
182:4, 10,
15
**care** [7]
103:17;
107:12;
112:25;
129:10;
130:15;
150:19, 20
**Carrega** [3]
3:18; 8:14;
186:9
**case** [18]
6:14; 9:24;
41:19;
43:9, 11;
44:9;
54:18, 19,
21, 22, 24,
25; 74:20;
79:12;
106:15;
110:11;
129:7, 19
**cash** [2]
191:5, 6
**catch** [1]
129:9
**causes** [1]
174:13
**CENTER** [1]
4:7
**center** [6]
175:24;
176:6, 8,
11; 177:22,
25
**Certain** [1]
75:20
**certain** [10]
78:12;
84:20;
86:13;
87:13, 25;
89:17;
92:7; 94:8;

99:18;
128:5
**certainly**
[1] 104:2
**Certified**
[3] 2:3, 23;
199:3
**certified**
[3] 83:9,
11; 100:21
**CERTIFY** [2]
199:9, 13
**certify** [1]
199:4
**cetera** [1]
27:4
**chance** [3]
56:20;
165:18;
167:7
**Chancellor**
[3] 35:6,
10; 82:14
**change** [4]
20:11;
123:14;
159:21, 22
**changed** [4]
57:24, 25;
61:19;
146:24
**changes** [2]
76:13;
141:25
**changing**
[1] 20:20
**charged** [4]
178:13;
179:25;
180:22;
181:14
**charges** [1]
181:3
**Charlie** [1]
95:3
**check** [3]
83:9, 11;
105:6
**CHERYL** [1]
1:14

**Children**
[1] 79:24
**children** [4]
32:22, 24;
79:25;
112:8
**CHRISTOPH
ER** [1] 1:14
**chronologi
cal** [1]
111:1
**circle** [1]
153:15
**circumstan
ces** [1]
11:6
**CITY** [1]
1:6
**City** [12]
4:17, 20,
21; 8:18;
9:19;
75:24;
100:10, 23;
106:5;
114:23, 24;
125:12
**Civil** [1]
1:2
**claimed** [4]
46:23, 24;
49:3;
162:23
**Claire** [2]
25:15, 23
**clarificatio
n** [1] 78:22
**clarify** [3]
76:25;
105:21;
184:16
**clarifying**
[3] 45:16;
120:11;
122:2
**Clark** [5]
131:1;
142:13;
143:4, 10;
146:9

**clear** [8]
55:7;
69:23;
76:2;
77:15;
86:16;
102:11;
162:3;
184:16
**cleared** [2]
145:16;
188:13
**clearing** [1]
145:14
**client** [3]
43:23;
50:20;
71:24
**Clinton** [39]
79:16;
80:19;
81:2, 13;
82:2, 4, 18,
22; 111:23;
117:11, 21,
23; 119:19;
121:13;
123:4, 7;
124:11;
125:14;
134:22;
140:7;
142:14;
148:22;
149:15;
163:14;
172:12, 13;
185:16;
186:18, 19;
187:6, 8,
21, 25;
188:2, 3;
189:1;
193:4, 12,
16
**close** [1]
192:7
**closed** [1]
83:12

closer [1] 176:4
closet [7] 98:2; 172:17; 193:21, 23, 25; 196:1, 2
closing [6] 80:15; 83:12; 126:25; 127:1, 7, 17
coach [2] 169:13, 18
Coaching [1] 169:18
coaching [1] 169:14
coerced [1] 59:19
COHEN [1] 3:5
Cohen [1] 9:4
colleagues [1] 9:4
collective [1] 106:16
come [16] 14:10; 21:20; 49:17; 51:21; 55:19; 70:18; 112:3, 16; 126:20; 127:6; 128:20; 129:15, 22; 130:22; 176:4; 187:12
comes [2] 6:7; 30:18
coming [6] 19:10; 59:13, 17;

81:11, 17; 109:21
commencement [1] 199:5
commencing [1] 2:5
communicate [1] 29:17
communicating [1] 133:6
communication [1] 72:1
communications [1] 72:3
community [2] 180:2, 23
complaints [3] 39:15; 179:13, 15
complete [1] 12:21
completely [2] 89:1; 111:2
COMPLEX [1] 4:8
Compound [1] 38:14
concern [2] 83:7, 10
concerning [1] 9:16
conclusion [3] 10:6, 8; 13:8
Condominium [1] 34:18
conference [2] 11:5; 12:17
confessed [1] 75:2
confident [4] 84:3,

10; 85:19; 91:23
confirm [3] 92:16, 17; 93:4
confront [3] 197:9, 14, 18
confronted [1] 11:22
confused [8] 16:17; 35:9; 69:5; 132:21; 180:21; 183:2, 22; 185:9
confusing [1] 69:22
confusion [1] 188:12
connected [1] 95:14
connecting [1] 82:21
connection [1] 106:23
consciousness [2] 176:13, 17
consent [1] 8:8
conspiracy [7] 55:20; 58:5, 10, 24; 59:2, 4; 138:6
conspired [2] 59:5, 7
Construction [2] 55:10; 157:1
construction [5] 53:2, 18; 91:18; 94:20; 142:18
consult [1] 71:24

contact [1] 140:18
Conte [1] 158:5
continuation [1] 187:20
continue [3] 148:8; 149:6; 169:10
continuing [2] 163:10; 167:24
contract [1] 118:4
contractor [1] 197:24
contradict [1] 138:2
contradicting [1] 141:24
contradicts [1] 144:1
control [1] 167:1
conversation [43] 36:17; 37:3, 10; 38:11, 16; 40:4; 41:8; 44:19; 45:11, 14, 15, 18, 19, 21, 22, 24; 46:12, 13, 16, 18; 47:4, 8, 11; 49:2; 50:22; 51:24; 52:16; 59:11, 16; 62:11; 63:11; 65:5, 14; 71:8; 73:16;

74:8; 95:12; 97:16; 98:13, 18; 120:19
conversations [9] 19:1; 44:16, 21; 45:7; 47:15, 17, 25; 70:20; 77:25
COOLBAUGH [1] 3:6
Coolbaugh [1] 9:4
Copy [1] 7:21
copy [1] 102:18
Corey [1] 8:19
corner [7] 81:6; 82:19; 186:18; 187:1, 10, 14, 17
CORPORATION [2] 4:14, 16
Correct [22] 11:2; 27:22; 28:8; 78:16; 84:19; 89:12; 118:7; 119:11; 120:22; 122:19; 123:10, 22; 161:18; 163:8; 178:2; 186:21; 189:3; 194:15;

195:16, 17, 21; 196:7
**correct** [54] 11:1; 28:12; 42:17; 63:5; 69:6, 17; 78:14; 94:14; 111:23; 112:8, 14; 115:5; 118:6, 9; 119:5, 20; 120:4; 122:11; 123:1, 9, 12, 17, 21; 125:15; 138:12; 141:7, 10; 144:7, 8, 10, 11; 147:1; 149:5; 161:17; 162:14; 164:1; 165:25; 166:9; 167:18, 19; 168:23; 169:22; 170:1; 178:25; 188:21; 189:2; 191:11; 194:4, 14; 195:20; 196:6
**CORRECTION** [1] 4:7
**correctly** [7] 148:17; 149:16, 17, 20; 158:18; 159:10, 11
**CORREGA** [1] 1:15

**correspondence** [1] 63:18
**CORRETEGA** [1] 1:14
**CORY** [1] 1:7
**Cory** [2] 4:22; 100:23
**Could** [7] 39:6; 60:20; 86:3, 6; 154:8; 194:19; 197:3
**could** [23] 6:3; 29:6; 30:9; 38:17; 39:16; 47:6; 48:5; 56:20; 59:25; 71:21; 85:24, 25; 86:9; 101:19; 120:18; 126:9; 130:7; 138:20; 146:24; 154:8; 169:18; 178:16; 197:7
**couldn't** [8] 32:18; 37:11, 18; 43:6; 49:17; 60:8; 99:24; 142:7
**COUNSEL** [2] 4:14, 16

**counsel** [5] 8:8; 103:18; 110:18; 199:15, 17
**Counseling** [2] 176:7
**counseling** [1] 176:5
**COUNTY** [5] 1:11, 12, 16
**County** [1] 182:5
**couple** [3] 26:19; 95:16; 189:23
**couple-minute** [1] 64:12
**course** [1] 137:7
**COURT** [1] 1:1
**Court** [4] 2:3; 113:15; 150:23; 199:3
**court** [19] 9:17; 12:18; 13:4, 22; 56:21; 72:13; 102:8, 18, 22; 103:8, 19; 107:12; 110:7, 9, 19; 152:2; 165:18; 166:12; 167:6
**court's** [1] 103:25
**courtroom** [1] 14:15
**cousin** [16] 26:24, 25; 27:3, 8, 16,

20; 28:2; 81:1; 153:19; 159:1, 14; 161:6; 162:9, 10; 163:6; 171:16
**cousin's** [2] 27:8; 120:12
**cousins** [11] 22:11; 27:6; 89:21; 119:8, 23; 120:16, 19; 162:11; 163:5; 171:18; 184:11
**crawling** [1] 21:7
**crazy** [1] 52:11
**cream** [17] 82:23, 25; 85:8; 87:11; 88:16; 93:14; 123:6, 12, 13, 20; 132:16, 18; 152:21; 186:10, 13, 20; 187:15
**create** [1] 196:20
**credit** [2] 190:24; 191:1
**crimes** [1] 174:14
**criminal** [7] 10:5; 54:25; 73:22, 23, 25; 74:5, 6

**Crippled** [1] 53:5
**crippled** [1] 53:8
**crippling** [1] 54:15
**CROSS** [1] 7:3
**CROSS-EXAMINATION** [1] 186:5
**cross-examination** [1] 170:11
**Cross-reference** [1] 162:22
**cross-reference** [3] 162:18, 19; 172:21
**crossing** [1] 159:20
**crying** [2] 174:10, 16
**CUCINELLO** [1] 1:14
**curious** [1] 35:23

- D -

**DARNELL** [2] 1:9; 5:3
**Darnell** [2] 4:23; 8:19
**Darryl** [16] 27:17; 28:6, 14; 89:21; 91:2; 119:9; 126:14; 159:9; 161:11; 162:9; 171:17; 184:12, 13, 15, 18, 19

**Darryl's** [1] 28:5
**Date** [1] 158:7
**date** [10] 21:15; 29:1; 45:8, 10; 105:8; 106:24; 112:2; 134:14; 159:24; 199:12
**Dated** [1] 199:24
**dated** [1] 105:1
**dates** [1] 105:16
**daughter** [1] 139:4
**dawn** [1] 96:25
**days** [1] 99:16
**dealing** [2] 6:10; 30:25
**Death** [7] 175:23; 177:8; 178:12, 20; 180:4, 25; 181:13
**December** [2] 29:3; 160:5
**declaration** [1] 107:20
**Defendant** [3] 3:17; 9:2
**defendant** [1] 104:19
**Defendants** [3] 1:19; 4:20; 100:23
**defendants** [1] 9:24

**defense** [1] 110:10
**Definitely** [1] 164:9
**definitely** [3] 77:7; 92:17; 95:16
**DEFRANCIS CI** [1] 1:16
**delay** [1] 107:15
**DEPARTME NT** [2] 1:7, 18
**Department** [2] 4:17, 22
**department** [4] 131:11, 14, 16; 137:25
**DEPOSITIO N** [1] 1:5
**Deposition** [1] 7:23
**deposition** [29] 8:2, 3, 4; 9:3, 15, 22; 10:14; 11:15; 12:4; 13:9, 11; 18:11, 15; 19:4, 8, 12, 14, 17; 33:9; 52:10; 103:11; 107:15; 110:17; 118:9, 21; 122:16; 123:8; 161:15; 198:12
**depression** [1] 16:12
**deputies** [1] 8:23

**describe** [1] 157:6
**Description** [1] 7:9
**despite** [3] 101:18; 103:22; 110:6
**destroyed** [1] 54:24
**detail** [3] 42:23; 50:21; 111:3
**DETECTIVE** [7] 1:8, 9, 14, 15, 18
**Detective** [12] 9:19; 139:22; 142:13; 143:10, 16; 148:1, 15; 149:22, 23; 158:5
**detective** [2] 131:4; 146:23
**Detectives** [4] 131:1; 140:14; 142:16; 143:3
**detectives** [20] 6:18, 19, 21; 131:5, 6, 12, 15; 142:22; 144:16, 18, 23; 145:18; 146:13, 23; 150:1, 4, 5, 7; 152:9, 17
**determined** [1] 170:7
**Diabetes** [1] 15:8

**diabetes** [3] 15:7, 11, 17
**Didn't** [1] 180:19
**didn't** [68] 6:20; 17:1; 18:17; 19:23; 24:21; 29:5; 42:13; 43:4; 46:25; 47:10; 49:7; 53:7, 13; 54:23; 56:13, 14; 58:19; 59:24; 71:14; 72:2; 83:8; 88:12; 91:7, 24; 93:8; 94:9, 18; 96:25; 111:16; 113:11; 114:4, 21, 22; 115:2; 116:9, 16; 121:23, 25; 127:9, 13; 128:5, 7, 9, 20; 129:8; 130:2; 133:20; 135:18; 138:17, 18; 146:4, 23; 150:7, 14; 151:21; 153:6; 156:9; 158:16; 165:4; 166:16; 173:4; 176:1; 180:13;

181:19; 191:12; 197:14; 198:8
**difference** [1] 46:2
**different** [11] 11:3; 20:25; 35:15; 45:8, 10; 74:12; 82:10; 119:13; 121:21; 133:19; 168:6
**differs** [1] 11:20
**difficult** [2] 63:8; 106:22
**difficulties** [1] 35:20
**DiFRANCES CO** [3] 4:4; 8:21; 186:2
**DiFrancesc o** [1] 8:22
**DIRECT** [1] 7:3
**DIRECTOR** [1] 1:8
**director** [1] 9:21
**disagree** [6] 112:22; 124:16, 20, 21; 125:5, 10
**disappeara nce** [1] 29:9
**disappeara nces** [1] 128:2
**disappeare d** [8] 87:7; 97:17, 18; 98:7, 19;

99:23; 112:9; 128:8
**disappearing** [2] 134:16; 145:6
**discovery** [6] 74:10; 101:13; 102:13; 104:16; 162:23
**discuss** [5] 67:14; 69:12; 70:15; 75:18; 103:21
**discussed** [12] 19:14, 16; 32:2, 4, 7, 13, 17; 37:25; 38:12; 41:13, 14; 46:19
**discussion** [2] 39:21; 64:19
**discussions** [1] 38:8
**disk** [2] 105:25; 110:15
**distance** [1] 63:8
**distribute** [2] 192:12, 24
**DISTRICT** [2] 1:1
**DIVISION** [1] 4:6
**divorce** [1] 31:18
**document** [31] 100:9; 105:2, 4; 106:17;

107:11; 108:13; 109:2; 114:5, 10; 115:4, 23; 133:9; 134:10; 137:4, 5, 11, 15, 22; 138:14, 20, 23, 25; 139:1, 13, 14; 147:4; 157:9, 11; 158:8; 179:6; 181:22
**documented** [2] 6:22; 150:9
**Documents** [1] 18:12
**documents** [13] 18:10, 14; 19:4; 75:8, 12; 100:3; 101:2; 104:9; 110:17; 136:19, 25; 138:8, 12
**Does** [4] 15:10; 57:4; 86:19; 105:11
**does** [8] 31:15; 67:11; 105:13; 119:13; 120:8; 162:20; 176:15, 16
**Doesn't** [1] 58:16
**doesn't** [6] 36:16; 58:21;

107:5; 108:23; 150:16; 173:20
**doing** [10] 25:16; 41:15; 94:23; 95:18; 114:24; 156:25; 170:6; 174:18; 191:2
**dollars** [2] 55:18; 189:24
**done** [7] 12:23; 50:23; 52:6; 115:24; 122:25; 153:9; 182:21
**door** [4] 82:8; 172:18, 20; 195:12
**doors** [3] 82:4; 91:4; 120:14
**dormant** [1] 178:7
**double-check** [1] 106:2
**doubt** [2] 87:24; 136:17
**down** [22] 12:18; 13:7, 23; 16:15; 33:3, 39:5; 52:9; 82:18; 91:4; 100:13; 104:23;

114:21; 115:3, 14, 16; 120:14; 122:4; 130:22, 24; 131:10; 136:23
**downtown** [1] 130:21
**driving** [3] 19:12; 91:11; 120:12
**drop** [3] 171:9; 184:23, 24
**dropped** [22] 85:15; 88:15, 20; 93:12; 134:23; 135:2; 136:10; 139:7; 143:4, 10; 144:14, 17; 145:7; 148:21; 149:14; 152:18, 21; 165:21; 169:24; 185:6; 186:11
**drove** [5] 81:5; 122:9; 149:8, 12; 163:17
**drug** [1] 189:8
**drugs** [12] 192:4, 11; 195:1; 196:1, 2, 9, 12, 22; 197:1, 10
**duly** [1] 199:6

114:21; 115:3, 14, 16; 120:14; 122:4; 130:22, 24; 131:10; 136:23
**During** [2] 46:17; 47:4
**during** [4] 13:10; 103:11; 159:2, 14

- E -

**Each** [2] 190:3, 4
**each** [6] 82:10; 89:4; 142:24; 145:20; 146:11; 162:24
**Eagle** [2] 34:14
**Earl** [1] 153:22
**earlier** [21] 45:19, 21, 23; 80:25; 90:7, 19; 101:10; 118:8; 121:14, 19; 122:16; 123:1, 2, 8, 17, 18, 21; 126:12; 161:14; 165:5; 195:14
**Early** [2] 183:7, 8
**early** [8] 126:4; 148:21; 164:2, 9, 11, 12, 16; 183:18
**East** [1] 149:8
**Eddie** [2] 95:14; 192:8

**Eddie's** [1]
192:10
**edit** [1]
76:11
**editorializi
ng** [3]
46:7;
109:6;
189:10
**EDWARD** [1]
1:16
**effect** [2]
50:2; 75:25
**eight** [1]
22:2
**else** [30]
36:4;
41:11, 21;
44:12;
48:17;
49:3;
51:23;
52:15;
64:1;
71:14;
72:24;
73:2, 6, 11;
104:5;
124:15, 18;
125:4, 9;
127:5;
128:1, 5, 7;
132:4;
136:20;
147:12;
164:8;
174:4;
195:23;
198:8
**emotional**
[1] 174:13
**employee**
[2] 199:14,
16
**EMPLOYME
NT** [1] 4:7
**endeavor**
[1] 105:5
**enough** [6]
72:5, 19;

173:15;
188:25;
193:8
**entered** [1]
195:19
**entirely** [1]
150:25
**entity** [1]
58:11
**entries** [1]
98:1
**entry** [3]
157:23;
158:1, 2
**equipment**
[1] 197:25
**Ernest** [5]
92:10, 22;
111:7;
149:10, 25
**especially**
[1] 12:16
**essence** [3]
43:5, 7
**ESSEX** [5]
1:11, 12, 16
**Essex** [1]
182:5
**estate** [3]
35:2, 4, 16
**Estimate**
[1] 188:25
**estimate**
[2] 37:15;
196:9
**Estimated**
[1] 188:24
**EUTSEY** [1]
1:15
**EVANS** [3]
1:3, 6; 9:5
**Evans** [91]
7:12; 9:10;
13:1, 2;
20:8;
22:18, 20,
24, 25;
23:6;
24:11, 20,
22; 27:7;

46:9; 50:7;
51:3;
53:15, 17;
55:9, 17;
64:21;
65:2;
79:10;
91:17;
94:11;
100:8, 10,
21; 106:12;
107:17;
109:11;
110:4, 24;
111:12;
113:25;
114:16;
115:1;
116:13;
117:9;
133:8, 10,
11; 134:10,
22; 135:1;
136:8;
139:6, 14;
140:7;
142:15, 16,
21; 144:12,
14; 147:6,
24; 148:5,
9, 13, 19;
149:7, 22;
150:22;
151:7, 11,
20; 153:13;
159:1, 3, 9,
14, 23;
160:10;
163:17;
165:21;
167:22;
168:11;
169:16, 21;
170:21;
172:5, 9;
174:9;
175:22;
185:21;
186:3, 8

**Evans-1** [5]
100:15;
114:18;
179:17, 18,
19
**Evans-10**
[2] 181:22;
182:1
**Evans-2** [3]
109:4;
110:1;
179:6
**Evans-4** [1]
139:15
**Evans-5** [4]
133:10, 23,
24
**Evans-7** [1]
157:12
**Evans-9** [1]
177:13
**Even** [1]
139:3
**even** [7]
40:15;
62:1;
106:4;
127:9;
152:25;
166:17;
181:6
**event** [1]
102:6
**events** [3]
10:4;
83:20;
84:11
**Eventually**
[1] 62:15
**ever** [30]
10:13;
20:9, 14,
25; 32:13;
55:8; 56:9;
63:13;
78:4, 7, 10;
88:22;
89:24;
90:1;
101:17;

127:16;
130:25;
131:7;
132:23;
156:17;
182:8, 9;
193:2, 3,
14; 194:21,
25; 195:8;
197:9
**Every** [1]
141:23
**every** [6]
12:20;
33:25;
72:16;
84:20;
108:2;
141:23
**everybody**
[1] 141:23
**everyone**
[1] 13:16
**Everything**
[4] 33:13;
57:19;
180:15, 18
**everything**
[16] 12:18;
13:7;
33:12;
49:3;
51:11;
55:15, 17;
57:21;
58:8;
75:12;
80:17, 21;
119:3;
136:20;
139:2, 3
**evidence**
[3] 169:2;
193:6;
195:16
**exactly** [4]
41:16;
43:3;
75:17; 89:9

**EXAMINATION** [1] 9:8

**examination** [1] 199:6

**Except** [2] 121:17; 158:11

**exchange** [2] 61:14, 19

**exclusively** [1] 22:7

**Excuse** [2] 63:3; 103:10

**excuse** [3] 47:17; 123:4; 172:14

**Exhibits** [1] 7:23

**Explain** [1] 41:16

**explain** [9] 11:18; 20:12, 19; 26:19; 27:2; 42:21; 58:9; 59:13; 109:10

- F -

**F-R-A-N-C-E-S** [1] 28:21

**Fabyan** [27] 81:12, 17; 82:1, 20; 83:1; 90:12, 25; 91:1; 119:8; 120:14; 123:6; 126:7; 144:15; 148:22;

149:15; 164:15; 175:17; 183:4, 9, 10; 185:7; 187:5, 8, 18, 19, 20

**face-to-face** [7] 47:7, 11, 16, 23; 70:6, 9, 14

**fact** [7] 12:16; 18:2; 39:10, 12; 101:4; 143:17; 158:11

**facts** [2] 169:1; 193:6

**failure** [1] 103:22

**Fair** [5] 72:18; 78:22; 188:25; 193:8

**fair** [6] 16:7; 19:11; 29:8; 32:12; 72:5; 83:21

**false** [1] 47:2

**falsely** [3] 174:14; 179:25; 180:22

**falsified** [7] 6:21, 23; 136:19; 137:2; 149:19; 150:9, 11

**family** [4] 21:21; 22:12;

128:14; 192:7

**Fantastic** [1] 27:16

**fast** [1] 108:4

**father** [7] 22:25; 23:13; 126:18; 127:20; 154:14, 15

**father's** [3] 22:16; 26:8

**feedback** [1] 19:15

**feel** [6] 50:21; 83:23; 84:3, 10; 116:2; 170:15

**fight** [2] 165:20; 167:8

**file** [6] 55:24; 56:13, 14; 102:10; 139:1; 182:5

**filed** [5] 9:16; 31:17; 39:15; 55:23; 134:13

**financial** [1] 35:20

**financially** [1] 199:18

**find** [4] 51:10; 55:19; 76:18; 120:19

**fine** [5] 64:16; 92:4;

147:18; 168:9

**finish** [11] 12:19, 20; 67:23; 89:2; 93:21, 22, 25; 98:21, 22; 146:6

**Finished** [1] 164:14

**finished** [4] 115:16; 116:10; 164:10, 20

**fire** [2] 138:1; 173:2

**firm** [2] 19:7; 56:19

**FIRST** [1] 4:16

**First** [11] 7:11; 10:20; 27:20; 28:2; 114:14; 142:9, 25; 158:2; 163:19; 166:6; 169:1

**first** [50] 10:2, 16; 14:7; 22:1; 27:5; 46:10, 11, 13, 17; 47:4; 62:10; 66:18; 69:25; 70:1, 2; 80:14, 22, 23; 87:4; 100:20; 106:17; 108:5, 25; 109:3;

111:22; 114:23; 118:3, 14; 122:11, 12; 128:16, 22; 136:13, 16; 139:18, 20; 140:1, 20; 141:6, 15, 20; 148:23; 153:24; 158:1; 163:11; 166:1; 179:9, 23; 182:11

**five** [31] 25:8; 29:10; 32:25; 79:13; 92:14; 94:13; 111:5; 121:12; 140:2; 157:20; 159:8; 161:11; 162:8, 11; 163:6; 171:20; 172:5, 9; 173:5; 178:13, 21; 179:8, 21; 180:1, 23; 181:14; 184:4; 192:23; 193:1; 195:9

**five-minute** [3] 64:22; 104:4; 153:10

**floor** [6] 82:7, 10; 121:22, 24; 122:11, 12

**Florence**
[5]   127:4;
133:5;
141:16
**Florham** [1]
3:16
**focus**   [1]
188:17
**follow-up**
[2]  101:10;
185:25
**followed**
[2]  101:14;
106:4
**follows** [1]
9:7
**foolish** [1]
95:17
**foot**   [1]
147:17
**foregoing**
[1]  199:9
**Forgive** [1]
116:9
**forgive** [2]
46:4;  63:7
**forgotten**
[1]  63:10
**Form**  [14]
6:7,   11;
20:16;
30:19;
31:2,   22;
39:23;
40:8;
49:24;
52:24;
53:14;
63:16;
144:20;
172:3
**form**  [50]
6:6,  9,  16;
12:9,   10;
19:21;
30:16,   23;
38:3,   13;
41:17;
43:16,   21;
44:23;

46:6;
47:20;
52:1;
53:12;
54:9;   57:9;
58:17;
59:20;
62:14;
65:7;
73:18;
80:4;
83:25;
84:5,    13,
14;  85:21;
92:2;
98:25;
112:10;
117:3;
124:17;
129:1;
131:17;
135:10,  12;
136:14;
143:12;
144:19;
146:17;
150:14;
169:7;
171:24;
175:6;
192:16;
195:3
**formal**   [2]
20:25;  21:1
**FORMER** [4]
1:6,  7,  11,
12
**former**  [1]
100:23
**formulated**
[3]    6:14;
43:8, 10
**forward**  [4]
56:3;
59:14,   17;
147:23
**found**   [5]
77:2;
96:19;
130:19;

145:23;
148:5
**Foundation**
[14]    6:7;
19:21;
20:17;
30:19;
31:23;
63:16;
65:8;
73:19;
112:11;
131:18;
143:13;
144:20;
172:3;
195:4
**foundation**
[10]  44:24;
67:18;
68:19;
80:5;
111:25;
117:4;
124:18;
146:18;
192:16;
196:20
**four**   [3]
23:9,   11;
124:14
**frame**   [1]
58:24
**Frances** [3]
28:20;
29:13;  33:6
**fraud**   [2]
56:5;  57:8
**Freehold**
[1]  55:14
**friend**  [2]
95:9;  192:7
**From**   [1]
33:3
**from**   [57]
11:20;
15:11,   12;
22:5;   31:7;
50:22;
54:19,   21;

56:4;
61:22;
71:17;
75:1,   24;
81:2,  5,  9,
11,  20,  23,
25;    82:1,
4;    83:6;
94:14;
96:22,   24;
97:2;
101:11;
104:8,   15;
105:16;
106:5,   6;
112:3,   16;
119:19;
120:13,  14;
122:4;
125:14;
127:6,   17;
139:18;
140:11;
145:21;
146:5;
157:24;
175:2,   16;
183:18;
188:20;
190:15;
191:16;
193:10;
196:22;
197:1
**front**   [2]
138:12;
184:7
**full**   [2]
20:7;
135:18
**fully**   [2]
72:15, 16
**funded** [1]
180:4
**funny**   [5]
166:19,  21,
22, 23
**FURTHER**
[2]    199:9,
13

**further**  [8]
8:5;  140:5,
9,    14;
142:21;
149:7;
185:21;
198:6

- G -

**game**   [1]
123:24
**games**  [2]
81:8, 10
**garage**  [2]
34:25;  35:1
**GARRY**  [1]
1:8
**Garry**   [3]
4:23;   8:20;
9:21
**GARY**   [1]
4:15
**Gary**   [7]
8:17;   9:18;
64:11;
105:3,    7,
16;  109:22
**gasoline**
[1]  197:25
**gave**   [17]
16:13;
33:9;
40:25;
55:24;
74:17,   21;
75:11;
77:24;
79:5;
82:23;
123:11;
141:22;
168:17;
173:14,  16;
191:1
**gears**   [1]
79:9
**geez**   [1]
169:17

**GENERAL**
[1] 4:5
**General** [4]
53:15, 17,
18; 55:17
**general** [1]
197:23
**generals**
[1] 8:23
**Genius** [1]
21:10
**getting** [7]
19:14;
57:20;
106:14;
126:17;
129:13, 19;
132:21
**Gibson** [5]
95:14;
148:10, 16;
149:24;
192:8
**girl** [1]
75:24
**Give** [1]
191:7
**give** [38]
10:14, 18,
22; 11:20,
21; 12:20;
16:2;
17:21;
18:4;
32:21;
33:1;
37:11, 15;
42:5, 14;
44:12;
46:25;
49:18;
72:16;
74:7, 13,
14, 16, 19;
75:1, 7, 13,
14; 77:7;
80:12;
123:14;
182:20, 22;
190:24, 25;

191:19, 22,
24
**given** [1]
142:15
**gives** [1]
151:24
**giving** [3]
50:21;
75:4;
152:24
**glasses** [1]
134:8
**goes** [5]
33:12, 13,
14; 34:1;
141:3
**going** [139]
6:4, 9, 10;
9:25; 10:3,
18; 11:24;
12:12;
14:18;
19:13, 20;
22:11;
30:11, 22,
23, 24;
50:12, 19;
52:6;
53:11;
56:2;
58:13;
62:6, 14,
15; 64:22;
69:22;
70:16;
71:20;
72:14;
74:20;
75:19;
76:6, 9, 15;
79:9;
81:13, 20;
82:3;
84:22;
88:3;
89:10;
92:1; 93:9;
94:4;
95:24;
96:4;

98:24;
100:3, 13,
25; 101:1,
7, 8;
102:6, 16;
104:2, 22;
107:4, 14;
108:1, 2, 4,
20, 25;
109:1, 11;
110:5, 15,
23; 111:9;
112:2, 24;
113:1, 18;
114:16;
115:14;
116:20;
127:1;
128:7;
129:18, 20;
133:8;
134:11, 12,
19; 135:12;
136:12, 13;
139:17;
140:5;
142:9, 10;
146:16, 17;
147:13;
150:13;
151:1, 8,
18; 157:19;
158:2;
159:21;
160:9;
161:4;
163:12;
166:25;
168:24;
169:8, 9;
170:17, 22;
171:5;
177:20;
179:5, 7,
20, 23;
181:4;
182:3, 7,
19, 20;
186:7;
189:9, 22;

190:18;
191:19, 20,
22; 192:3,
11, 12, 19
**gone** [4]
20:9, 14;
21:4;
123:24
**Good** [4]
8:20, 21;
9:10, 14
**good** [3]
32:12;
53:6;
173:15
**gray** [1]
91:12
**Great** [2]
153:15;
188:14
**great** [1]
25:17
**green** [1]
121:7
**Greeting**
[1] 7:21
**Greg** [3]
159:9;
161:12;
162:10
**grounds** [3]
6:5; 30:12;
71:21
**GROUP** [1]
3:3
**group** [1]
184:6
**Grove** [3]
82:4, 13, 14
**grown** [1]
174:21
**GUARINO**
[1] 1:13
**guess** [23]
16:3;
23:22;
24:8;
29:23;
30:1; 31:9;
32:6;

40:20;
47:10;
53:7;
55:24, 25;
57:11;
66:4; 83:1;
88:20, 21;
106:23;
133:1;
181:8;
183:22;
185:9;
192:2
**guessing**
[1] 40:22
**guilty** [2]
170:25;
172:7
**guys** [7]
95:2;
134:21;
157:2;
165:17, 19;
167:6, 8

- H -

**habit** [1]
195:12
**HADLEY** [3]
1:8, 10;
5:2
**Hadley** [4]
4:23; 8:19;
9:2, 20
**hadn't** [1]
124:13
**Hairston**
[9] 97:4;
129:6;
130:10;
131:9;
132:2;
139:19;
142:2;
148:1;
149:23
**Hairston's**
[1] 139:22

**HALEY** [1]
3:6

**Haley** [1]
9:4

**Hall** [1]
127:15

**Hammer** [1]
103:20

**Hampton**
[71] 24:19,
20; 25:3,
14; 26:5,
7, 11, 20;
36:7; 38:1,
8; 41:8;
45:20;
47:15, 17;
48:15;
51:6, 10,
13, 14, 24;
52:16;
59:12, 13;
65:4, 5, 14;
67:6, 9, 15;
69:9;
70:15, 21,
23; 71:19;
72:22;
74:8; 75:2,
9, 15, 19;
76:6, 18,
21; 77:2,
18, 21, 24;
78:4, 7, 18;
79:5, 6;
91:20, 24;
92:8;
159:13;
160:11, 18,
19; 161:1,
2, 6, 8, 15;
162:11;
166:7;
167:14

**Hampton's**
[2] 159:24;
160:20

**handwritin
g** [1]
153:23

**happen** [2]
126:22, 23

**happened**
[17] 45:23;
56:1, 11;
58:8; 59:3;
80:3, 18;
83:18;
94:19;
95:1, 20;
96:7, 14;
121:2;
129:4;
152:15;
176:18

**happening**
[3] 49:16;
113:5;
127:8

**happily** [1]
20:23

**happy** [5]
13:13;
14:4; 68:7,
9; 99:7

**harass** [1]
50:20

**harassed**
[1] 52:10

**harassing**
[7] 43:23;
49:22;
50:10, 24;
145:9;
170:9;
173:9

**hard** [5]
55:5;
56:18;
137:19;
141:2;
156:11

**haven't** [3]
32:4;
51:25;
52:16

**having** [3]
23:22;
101:18;
147:17

**he'll** [1]
113:20

**He's** [4]
49:5;
116:6;
147:16;
192:8

**he's** [2]
46:22;
170:14

**head** [3]
18:12;
21:8; 129:8

**hear** [19]
9:12;
19:23;
24:21;
53:7, 13;
54:23;
56:18;
58:19;
59:24;
89:7;
107:19;
111:16;
113:25;
137:20;
138:17, 18;
153:13;
176:1;
181:19

**heard** [5]
30:4;
142:22;
144:9;
146:9;
176:11

**hearing** [1]
23:22

**heating** [1]
53:1

**help** [7]
12:4, 17;
81:2;
120:25;
142:17;
149:11;
174:10

**helped** [2]
73:22;
193:10

**Helper** [1]
157:7

**helper** [1]
157:8

**helpful** [1]
78:11

**HENRY** [2]
1:9; 5:3

**Henry** [9]
4:23; 8:19;
9:2, 20;
154:18, 19,
20, 22

**Herbal** [2]
17:9, 10

**Here** [2]
40:24;
115:6

**here** [47]
6:21; 9:14,
24; 10:22;
13:5;
14:16;
19:10, 15;
26:19;
35:5;
41:19;
45:3; 52:7,
9; 54:18;
75:25;
99:21;
100:15;
101:1;
103:23;
117:6;
120:4, 5, 7;
121:21;
122:3, 14,
24; 123:23;
134:3, 20;
136:18;
138:6, 7;
141:17, 22,
25; 150:8;
151:15, 24;
152:3;
163:2;

170:16;
174:10;
180:19, 21;
196:20

**hereby** [1]
199:4

**Hideaway**
[4] 81:6;
120:1, 9;
123:24

**High** [2]
14:25; 15:1

**high** [2]
15:9; 16:10

**himself** [1]
192:13

**Hobson** [17]
83:2, 4, 6,
15; 88:18,
23; 89:11;
93:2, 16;
94:6;
117:22;
118:2;
124:2;
144:13;
148:3, 4

**Hold** [8]
67:17;
93:22;
98:21;
100:25;
146:16;
147:10;
177:18;
181:21

**hold** [2]
50:17;
192:16

**home** [5]
51:19;
120:14;
126:20;
185:14, 15

**homicides**
[1] 177:3

**honest** [3]
10:22, 25;
18:4

hours [18]
17:18;
18:7;
134:24;
142:20;
148:23;
149:2, 3, 7,
25;   159:8;
162:8,   12;
163:7;
165:22;
166:4;
169:25;
171:10
house [31]
33:24;
34:22,   24;
79:17;
81:15;
83:16;
90:10,   14;
91:3;
96:19;
120:12;
124:2, 3, 4,
5,     6;
134:24;
141:20;
159:7;
161:10;
162:7,   13;
163:7;
165:22;
171:17, 21;
173:2;
193:12;
194:11
HUGHES [1]
4:8
hundred [1]
189:24
Hunterdon
[4]    155:4,
9,    10;
158:9
husband [1]
24:25
hypothetica
l [2]    12:2,
6

- I -

I'll   [10]
20:23;
52:5;
104:23;
110:24;
111:13;
125:6;
133:15;
151:15;
177:6;
184:3
I've   [1]
133:9
idea   [1]
191:4
ignorant [1]
176:16
important
[2]   12:14;
92:19
improper
[3]   144:20;
146:18;
150:25
improperly
[1] 4:21
in-laws [3]
83:16;
89:12, 13
in-person
[4]    65:13;
66:22;
67:1; 70:5
inaccurate
[9]   141:13;
143:22;
144:6;
145:10;
150:17;
152:24;
153:6;
166:5;
180:16
inappropria
te [3]  12:7;
151:19;
152:1

includes
[1] 104:18
including
[1] 111:4
inconsisten
cies   [2]
138:3;
139:3
inconsisten
cy    [2]
118:13;
124:10
inconsisten
t    [4]
116:14;
118:19;
142:5;
147:8
incorrect
[14]
125:22;
147:12, 14;
161:13, 19,
20,   22;
163:3;
171:23;
180:9,   10,
11, 14
Indian   [1]
56:19
indicate [2]
8:10;
106:17
individual
[6]   190:10,
14,    23;
191:6, 23;
197:2
individuals
[1] 111:5
information
[4]    71:16;
106:24;
157:20;
168:17
initial   [1]
133:12
initiated
[1] 62:10

injections
[1] 15:15
injured [2]
180:2, 24
injuries [3]
179:13, 14,
22
inquire [1]
46:5
inside   [2]
82:8;
193:14
instead [1]
56:3
instructed
[2]   18:17,
23
instruction
[1] 40:25
instruction
s    [4]
10:19;
11:25;
12:3; 16:2
instructs
[1] 14:17
intend   [1]
107:9
intending
[3]   81:12;
191:25;
192:22
intent   [1]
190:17
intentions
[1] 192:11
interaction
[1] 111:8
interaction
s [1] 111:4
interconnec
ted    [1]
95:1
interested
[5]    19:2;
95:7;  97:5;
132:3;
199:18
Internal [1]
55:22

Interrogato
ries    [6]
7:10,    11,
14; 100:22;
114:3;
179:18
interrogato
ries   [16]
103:16;
105:1;
106:12;
108:1,    3,
17,   22;
109:3,   4;
110:3;
111:20;
112:21;
123:16;
124:16;
179:7;
180:9
interrogato
ry    [3]
122:15, 22;
180:17
interrupt
[3]    6:10;
30:24;
152:17
intersectio
n    [8]
123:5;
187:4, 7, 9,
11, 14, 23,
24
interviewed
[2] 142:15;
158:6
into   [24]
10:7;
16:15;
18:22,   24;
19:1;
39:14;
41:15;
44:9;
73:23;
76:16;
82:3,    15,
19,    25;

83:20; 90:16, 18; 105:10; 106:21; 107:4; 129:19; 147:11; 158:17; 193:11

**Investigati on** [1] 7:22

**investigati on** [4] 66:7; 68:4, 22; 73:24

**Investigati ve** [1] 7:19

**INVESTIGA TOR** [2] 1:16

**investigato r** [42] 60:21, 22; 65:3, 6, 15; 67:3, 7, 16; 69:9, 13, 24; 70:12, 16, 21, 24; 71:9, 12, 17, 18, 19, 23; 72:10, 12, 21, 22, 25; 73:5, 8, 11, 14, 17; 74:7; 75:19; 76:4, 5, 8, 17, 21; 77:2, 18, 20; 78:25

**involved** [4] 73:10; 112:7; 129:14; 131:6

**iPad** [1] 104:13

**Irvington** [9] 80:15; 82:3, 5;

114:25; 118:6; 125:20; 149:11; 185:17

**isn't** [2] 170:10

**issue** [4] 101:9; 133:20; 147:17

**It's** [53] 11:4; 12:2; 15:12; 18:13; 23:23; 37:12; 52:3; 54:5; 75:16; 92:19; 100:2; 102:7; 104:12; 106:21; 109:21; 114:4; 117:17; 118:20; 133:9, 17, 18; 134:1, 10; 135:13; 136:24; 137:19; 139:5, 15, 16, 21; 141:10; 144:7; 147:18, 24; 149:3, 5; 152:3, 14; 156:11, 12; 157:14; 159:18; 166:20; 168:6; 169:6; 176:12, 13; 178:25; 182:6;

186:22; 187:20

**it's** [41] 6:21; 12:14; 16:4; 25:24; 31:6; 34:2; 35:21; 46:1, 24; 47:1; 51:22; 54:5, 6; 55:4; 61:6; 85:24; 88:11, 25; 101:25; 102:7; 105:18; 110:19; 121:21; 133:10, 18; 134:16; 139:18; 140:23; 145:10; 147:12; 149:2; 150:8, 15; 151:22; 153:6; 156:14; 161:2; 163:4; 172:21; 186:21; 187:16

**Italian** [8] 95:3; 190:10, 23; 191:6, 10, 23; 196:22; 197:1

**itself** [4] 138:2; 141:24; 144:1; 149:4

- J -

**JACK** [1] 1:15

**Jackie** [1] 8:22

**JACQUELIN E** [2] 2:2; 199:2

**Jacqueline** [2] 13:6; 199:20

**JAMES** [1] 3:14

**Jammed** [1] 35:17

**jammed** [1] 35:18

**January** [1] 104:11

**JENNIFER** [1] 3:4

**Jennifer** [1] 8:15

**JERSEY** [5] 1:1, 11, 17, 18; 4:5

**Jersey** [19] 2:4, 24; 3:8, 16; 4:11, 12, 19; 8:24; 21:21; 22:5, 7; 26:2, 9, 12; 34:3; 75:24; 149:12; 199:4, 22

**Jesse** [2] 154:3, 22

**Jessie** [6] 27:10, 11; 153:20, 22, 24; 160:2

**jobs** [4] 53:1; 142:19; 190:11; 191:2

**JOHN** [2] 1:10, 17

**John** [4] 25:14; 26:5, 7, 11

**John's** [1] 26:21

**Johns** [1] 3:7

**Johnson** [14] 92:20; 111:6; 132:22; 133:1, 2; 134:13, 14; 135:1; 138:15; 139:3; 140:15, 16; 148:21; 153:1

**Johnson's** [1] 135:2

**join** [1] 104:6

**joint** [1] 106:16

**JONES** [1] 1:16

**JOSEPH** [2] 1:9; 5:2

**Joseph** [1] 4:23

**JUDGE** [1] 1:17

**Judge** [1] 103:19

**judge** [2] 14:16; 101:12

**Julia** [11] 25:10, 11, 19; 26:7, 11; 28:9; 126:13; 128:12

**Julia's** [2] 25:17; 27:21

**jump** [1]
64:13
**jumped** [1]
105:20
**June** [3]
21:17;
67:7, 9
**Junior** [1]
23:5
**JUSTICE** [1]
4:8
**juveniles**
[1] 157:20

- K -

**K-U-K-A** [2]
56:22, 23
**K-U-M-A-R**
[2] 57:2, 5
**KASSIS** [14]
3:14;  8:13;
186:6;
188:8,  10,
11;  189:18;
192:18;
193:7;
194:9;
195:7;
196:18;
198:2, 5
**Kassis** [2]
7:5;  8:13
**Keep** [2]
12:12;
50:12
**keep** [3]
12:12;
95:24;
170:17
**keeping** [2]
54:19, 21
**KEITH** [1]
1:9
**KENYATTA**
[1]  4:14
**kept** [2]
117:15;
194:22

**kids** [1]
135:2
**killed** [2]
140:13;
153:5
**kind** [5]
14:24;
83:19;
91:10;
92:19;
156:24
**KING** [1]
3:13
**king** [1]
43:20
**KM-MAH** [1]
1:2
**knew** [9]
42:9;
75:21;
102:9;
110:17;
127:12;
145:19;
154:13, 16;
190:11
**know** [224]
6:4,  22;
13:13,  18,
24;  14:4;
15:4,  21,
23;  16:6,
16;  17:16;
21:10;
24:5, 9, 10,
14;  25:7;
26:10;
29:24;
30:10;
31:11,  14,
15,  20;
32:20;
33:22;
34:1;
35:21;
37:9,  11,
13,  19;
38:19, 20;
39:5,  10,
12, 15, 17;

40:10,  25;
41:4,  7;
42:10,  24;
44:3;  45:2,
13;  46:24;
47:1;  49:4,
9,  11;
50:16,  17;
51:12,  15,
18,  22;
53:2,  25;
54:6,  11;
56:3;  57:2;
58:22;
60:15;
62:1, 2,  5;
63:5;
64:10,  12;
66:3,  4;
71:22;
72:18;
74:21;
77:3, 5, 9;
86:15,  23;
87:22;
89:9;
92:15;
95:4,  18,
25;  98:10,
16;  99:17,
25;  101:20,
22,  24;
102:2;
103:25;
105:3,  17,
22,  24;
106:3,  16;
107:5;
110:9,  10,
16;  112:23;
115:22;
116:22;
122:16;
124:19,  20,
23;  125:13;
127:7, 8, 9,
10, 11, 13;
128:9,  21;
129:9,  11;
130:14;

131:5;
132:7,  25;
141:2;
143:17;
146:25;
147:9;
150:9,  16,
18;  152:25;
153:1, 6, 7;
154:7,  10,
14,  16;
155:11;
156:9,  13;
157:24;
159:19,  23,
25;  160:6,
7,  12,  14,
15, 17, 19,
24;  164:6,
7,  8;
168:4,  19;
170:14, 15;
173:13, 23;
174:9;
176:11;
178:7;
181:7;
183:10, 15,
17,  19;
184:2,  5;
186:15;
188:3;
189:4, 5, 7,
11, 13, 17,
23;  190:25;
192:10, 14,
19,  21;
193:10, 22;
194:16,  18,
25;  196:3,
4,  5,  12,
17, 19, 21;
197:8,  13,
17, 20, 23;
198:8
**knowing** [1]
169:4
**knowledge**
[1]  135:14

**Kumar** [7]
55:13;
56:19,  24,
25;  57:1,
8;  59:7

- L -

**laid** [1]
111:24
**Lake** [2]
34:2
**lapse** [1]
27:9
**last** [30]
17:4,  17;
18:7;
24:10,  14;
25:17,  21;
32:16;
36:6;  37:7;
77:11;
85:5;  87:9;
113:15;
119:14;
123:19;
126:2,  3;
132:9,  14,
17;  140:8;
154:5,  20;
173:10;
184:22,  23,
24;  186:11;
197:22
**late** [4]
87:17;
92:3;
149:13;
183:17
**lately** [1]
32:10
**Later** [1]
70:19
**later** [8]
11:17;
13:15,  24;
47:23;
70:18;
122:25;

123:16; 185:25

**LAURINO** [1] 1:12

**Laverne** [1] 22:18

**lawsuit** [7] 9:16, 25; 31:21; 32:2, 13, 17; 78:11

**lawyer** [1] 52:8

**lead** [1] 55:11

**leads** [1] 195:18

**least** [2] 105:16; 124:14

**Leave** [1] 151:13

**leave** [3] 84:18; 88:22; 89:15

**left** [6] 81:10; 82:2; 93:2; 163:13; 165:21; 195:11

**left-handed** [1] 188:15

**less** [2] 54:10, 13

**Let's** [7] 12:12; 79:8; 102:25; 118:11; 139:12; 142:8; 174:23

**let's** [6] 29:25; 59:11; 84:22; 126:3;

155:7; 159:12

**letter** [2] 104:11; 106:4

**letters** [2] 101:11, 14

**Levi** [2] 23:6

**liar** [2] 137:6; 138:15

**License** [2] 2:4; 199:4

**lied** [7] 49:2, 5; 146:13, 23, 24; 151:21, 25

**lieu** [1] 8:5

**Lieutenant** [1] 186:8

**lieutenant** [1] 134:17

**Life** [7] 175:23; 177:8; 178:12, 20; 180:4, 25; 181:13

**life** [1] 22:2

**light** [1] 173:1

**Like** [3] 27:4; 37:10; 166:10

**like** [44] 9:1; 13:24; 15:16; 21:9; 28:24; 29:25; 34:25; 36:8, 10; 46:25; 52:5; 54:6; 56:2, 14, 22; 82:16;

85:2; 87:15; 88:19; 90:23, 24; 92:14; 95:6, 16; 96:11, 21; 97:11; 98:1; 101:20; 106:1; 116:25; 118:16; 122:18; 154:3; 157:5; 164:24; 168:4; 170:15; 175:4; 178:17; 185:3; 189:23; 191:13

**likes** [1] 50:22

**Lillie** [10] 96:15, 16, 20, 21; 97:8, 20; 133:6; 145:21; 146:2, 5

**limit** [1] 12:9

**line** [5] 55:11; 100:3; 150:24; 151:19; 197:22

**lines** [1] 187:12

**LIPSHUTZ** [223] 4:15; 6:6, 8, 12, 16; 8:17; 9:9; 12:8, 13; 17:3, 15; 18:21;

19:22; 20:4, 22; 24:2; 30:4, 6, 15, 21; 31:3, 5, 24; 37:20; 38:6, 15, 23; 40:3, 13, 21; 41:6, 20; 42:15; 43:15, 25; 44:2, 7; 45:4; 46:8; 47:21; 48:12, 23; 49:25; 50:6, 12; 51:2; 52:14, 21; 53:3, 16; 54:3; 56:9, 10; 57:3, 13; 58:18; 59:22; 60:2, 10; 61:2, 12, 17; 62:9, 21; 63:2, 21; 64:15, 21, 25; 65:12; 66:9; 68:6, 13; 69:3, 20; 71:4; 72:2, 8; 74:2; 77:10, 14; 80:9; 84:2, 9, 15; 85:4; 86:2; 88:7, 9; 89:8; 92:4, 5; 93:7, 11; 94:3; 96:3, 6; 97:15; 98:12; 99:3; 101:5, 23;

102:2, 5, 14, 20; 103:2, 4, 10, 15; 104:5; 105:11; 106:7, 19; 107:16; 108:10, 12, 15; 109:8, 23; 110:22; 111:11; 112:4, 13; 113:2, 8, 13, 21, 24; 115:13, 21; 116:9, 11, 19; 117:5; 119:1; 124:8; 125:1, 16; 129:3, 21; 131:21; 133:15, 19, 22; 134:9; 135:16, 24; 136:3, 7, 21; 137:10, 14, 19, 21; 141:5; 143:19; 144:4, 24; 145:13, 17; 146:20; 147:7, 15, 22; 150:18, 21; 151:3, 5, 7, 12; 152:5, 8; 153:9, 12; 156:8, 11, 16; 162:5; 166:20, 24; 167:3, 13, 20; 168:6, 9, 10; 169:5, 7, 12, 15, 20; 170:8, 13, 18, 20;

171:3,   7,
15;   172:1,
4,   25;
174:5,   8,
15, 20, 24;
175:5,   8,
13;  176:14;
177:23, 24;
179:4;
181:11, 18;
182:19, 24;
183:1;
185:20;
198:7, 11
**Lipshutz**
**[16]**   7:4;
8:18;  9:18;
43:19;
50:19;
101:4;
105:4;
106:3;
107:6;
110:8;
115:11;
166:19;
171:2;
173:7;
194:3
**Lipshutz's**
**[1]**  195:15
**list**   **[1]**
75:14
**Listen**  **[3]**
93:5,  10;
137:13
**listen**  **[2]**
65:23;
68:10
**lists**  **[1]**
140:2
**litigate** **[1]**
107:7
**little**  **[21]**
11:4;
12:22;
16:17;
22:12;
35:9;  79:9;
82:6;

84:20;
106:21;
109:17;
111:13, 19;
147:23;
153:16, 17;
167:1;
176:3,  4;
183:2;
188:12, 18
**live**   **[12]**
22:3;  26:2,
9;  29:15;
31:15,  16;
33:4,  6;
79:22;
90:10;
121:22, 23
**lived**  **[9]**
22:6;
26:12;
79:19,  21;
120:16;
155:11;
156:2, 18;
194:3
**living**  **[22]**
52:22;
79:15,  16;
111:23;
117:10, 13,
19, 21, 23;
118:1;
124:11, 13;
125:14;
127:10;
154:23;
155:3, 4, 9,
21,   23;
184:5;
194:10
**loaded**  **[2]**
82:10, 11
**loads**  **[1]**
82:16
**local**  **[1]**
59:3
**locate**  **[1]**
119:23

**located**  **[7]**
11:11;
186:16;
187:4,  15;
193:4,   12,
15
**location**  **[5]**
33:16;
34:2, 5, 13;
193:11
**locations**
**[1]**  11:4
**lock**  **[2]**
172:18;
195:12
**locked**  **[2]**
193:25;
194:1
**long**   **[16]**
28:23;
29:21;
53:19,  22;
79:19;
81:23;
155:7;
157:2;
182:6;
195:25;
196:1, 8, 9,
12, 25
**look**  **[14]**
18:16,  17;
102:25;
104:3;
105:10, 14;
106:20;
107:4;
112:25;
113:4;
114:5;
139:12;
142:8
**looked**  **[3]**
18:10,  14;
145:25
**looking**  **[6]**
81:1,   22;
89:21;
97:5;

119:8;
152:15
**lost**   **[4]**
35:6, 10, 12
**loud**   **[2]**
14:1;  158:9
**louder**  **[1]**
176:3
**LOUIS**  **[1]**
1:14
**Louis**  **[2]**
3:18;  8:14
**Louisiana**
**[2]**   21:19;
22:4
**lying**  **[10]**
6:20,  21;
144:18, 25;
145:3, 4, 6,
11;   150:6,
8

———————

- M -

**ma'am**  **[1]**
108:13
**Madam**  **[10]**
6:12,   17;
31:3;
43:17,  25;
50:14,  25;
77:11;
113:14;
150:23
**made**  **[7]**
83:1;
102:11;
141:23;
142:2,  23;
146:10;
169:23
**maiden**  **[3]**
24:18,  19;
25:3
**main**  **[2]**
83:6, 10
**Make**  **[1]**
109:17
**make**  **[21]**
48:13;

55:6;  82:2;
83:10;
86:16;
88:11;
101:20;
108:6;
111:13;
114:16;
123:13;
130:16;
133:15;
134:11;
147:9;
151:19;
152:23;
174:1;
187:3,  14;
191:25
**makes**  **[2]**
27:15;
187:23
**making**  **[3]**
54:10,  13;
181:9
**male**  **[1]**
158:6
**manner**  **[1]**
8:9
**manufactur**
**ed**  **[4]**
6:14;  43:8,
11;  51:7
**manufactur**
**ing**  **[1]**
44:9
**many**  **[6]**
25:7;  26:1;
32:24;
50:11,  22;
188:3
**March**  **[4]**
1:22;   2:5;
105:1, 8
**marijuana**
**[39]**  94:14,
17,   18;
95:5;  96:8,
11, 13, 18,
19;   97:5,
21;   99:22,

25; 129:10, 11; 130:15; 132:3; 140:12; 188:19, 20; 189:5, 14, 21; 190:1, 9, 15, 18, 23; 191:10, 16, 19; 192:5, 24; 193:19; 194:16, 22; 195:9

**Mark** [1] 43:21

**mark** [11] 6:12, 17; 31:4; 43:17, 21, 22; 44:1; 50:14, 25; 150:24

**MARKED** [1] 6:1

**Marked** [1] 7:23

**marked** [9] 100:14; 108:24; 133:9; 139:15, 16; 157:11; 177:13; 181:22

**Market** [1] 4:9

**marriage** [1] 25:2

**married** [8] 24:7, 22, 23; 28:17, 23; 29:2, 9, 12

**match** [1] 106:25

**matches** [2] 105:8, 17

**matter** [9] 11:19;

58:16, 21; 73:22, 24, 25; 101:25; 107:5; 173:21

**Maurice** [27] 27:23; 28:6, 11; 81:1, 22; 89:22; 90:6; 119:9, 13; 159:6, 9; 161:10, 11; 162:7, 9, 12; 163:7, 16, 22; 164:5, 7; 165:1; 171:16, 17; 184:11, 14, 20

**Maurice's** [2] 91:3; 126:14

**Maybe** [5] 39:7; 53:13; 93:8; 110:2; 157:4

**maybe** [13] 59:2; 88:19, 21; 92:14; 98:4; 99:16; 122:17; 124:14; 128:19; 157:4; 183:16; 184:6; 185:1

**MAYOR** [1] 1:6

**Mayor** [1] 9:20

**mayor** [1] 100:23

**MCCARTHY** [1] 1:8

**McCarthy** [3] 4:23; 8:20; 9:21

**McDowell** [19] 81:18; 85:6, 11; 86:19, 20; 88:8, 10; 90:17, 18, 21; 111:6; 120:13; 140:5, 9, 16; 141:16; 148:20; 149:8, 24

**McDowells** [1] 91:6

**Meadowlands** [6] 94:21, 23, 24, 25; 190:12; 196:23

**mean** [43] 13:25; 15:10; 17:12, 24; 19:10; 20:12; 31:11; 32:10, 11; 35:18, 19; 37:3, 13; 44:17; 45:8; 54:8; 55:12, 13; 58:7, 9; 66:16; 74:22; 77:7; 82:12; 84:19, 20; 86:19; 96:3; 101:21; 107:10; 120:8; 124:19, 25;

125:21; 131:5; 137:25; 153:25; 162:20; 174:10; 176:15, 16; 177:5; 191:17

**means** [4] 54:12; 107:7; 124:20; 176:18

**meant** [2] 16:21; 42:21

**medication** [9] 14:22, 24; 15:2; 16:9, 11, 18, 22, 23; 17:8

**medications** [2] 17:17; 18:3

**meet** [9] 46:14; 66:19; 71:18; 72:3, 10, 21; 77:21; 90:21; 91:8

**meeting** [19] 19:13; 45:15, 25; 63:19, 25; 64:3; 66:14, 16, 21, 22; 67:1; 69:11; 70:11, 14; 71:8, 19; 72:25; 76:20; 77:17

**Melville** [9] 33:14, 15; 34:22;

35:7, 11, 13; 36:2, 3

**Melvin** [14] 87:4, 5, 6, 10; 88:12; 92:16; 93:4; 111:7; 121:11; 148:20; 153:3; 184:2

**Melvin's** [1] 96:16

**members** [1] 128:14

**memory** [4] 83:24; 84:4, 7, 11

**mental** [1] 27:9

**mention** [2] 26:5; 195:8

**mentioned** [4] 62:22; 65:3; 89:20; 125:17

**mentions** [3] 104:16, 25; 118:4

**Merrell** [7] 27:9, 10, 11; 154:3, 5, 22; 160:2

**Metformin** [1] 15:6

**metformin** [1] 15:4

**MICHAEL** [2] 1:15; 4:3

**Michael** [28] 8:22; 81:17; 85:6, 11; 86:19, 20, 21; 88:8, 10; 90:17,

18, 21;
92:16;
93:4;
104:8;
111:6;
120:13, 20,
24; 121:11;
148:20;
153:2;
163:16, 23;
164:5, 7;
165:2
**Michael's**
[1] 97:10
**Middle** [1]
153:24
**middle** [1]
104:15
**Might** [1]
128:6
**might** [7]
12:23;
19:9;
51:21;
60:21, 22;
125:19;
197:3
**Mike** [2]
184:2
**Mildred** [6]
22:20, 21;
24:17, 20;
25:5; 27:7
**miles** [1]
11:7
**mind** [3]
83:20;
147:11;
176:19
**minute** [4]
71:24;
104:22;
114:13, 19
**minutes** [4]
64:13;
88:21;
182:21, 22
**Mischaract
erizes** [2]
50:5; 98:25

**mischaract
erizes** [4]
48:19;
53:13;
135:11;
147:4
**mischaract
erizing** [2]
175:11;
181:8
**missed** [2]
23:10; 63:9
**Missing** [3]
7:15, 16, 17
**missing**
[34] 79:13;
81:18;
94:13;
96:17;
97:23;
98:16;
99:11, 13;
111:5;
129:14;
133:12;
134:13;
136:9;
140:3, 15;
142:17;
148:14;
155:8;
157:20, 22;
159:8;
161:11;
162:8, 12;
163:6;
165:9;
171:21;
188:20;
192:23;
193:1, 9,
20; 196:3,
6
**misstateme
nts** [1]
12:5
**Misstates**
[2] 56:7;
194:5

**mistake** [1]
123:15
**misunderst
ood** [1]
63:4
**moment** [8]
15:5;
29:18, 20;
60:9;
104:14;
105:3, 15;
170:11
**Monday** [4]
83:13;
127:21;
129:15
**money** [8]
46:25;
61:13, 18,
22; 82:24;
83:10;
191:8, 10
**month** [2]
55:18;
80:23
**months** [7]
36:10;
37:1, 7;
38:18, 22;
124:14;
157:22
**More** [3]
6:2; 30:7;
32:19
**more** [13]
6:3; 14:12;
30:9;
44:15;
94:1, 13;
127:12;
131:4, 5;
153:17;
181:21;
182:25;
188:3
**morning**
[26] 8:20,
21; 9:10,
14; 41:10;
83:17;

126:4;
127:20, 21,
23; 129:15;
141:20;
164:3, 9,
13, 17, 25;
165:2, 3,
10; 166:9,
10, 11;
183:14
**mortgaged**
[1] 35:18
**most** [1]
121:3
**Mostly** [2]
33:23, 25
**mostly** [1]
33:22
**mother** [28]
22:19;
24:17;
27:5, 7, 13;
28:9;
96:16;
97:10;
126:15, 18;
127:19;
132:23;
133:3, 7;
134:14, 20,
23; 135:2,
6, 21;
136:9, 17;
139:7;
145:22;
154:23;
155:1;
160:20
**mother's**
[6] 26:12;
127:2;
153:19;
154:1, 2;
160:1
**mother-in-l
aw's** [1]
81:14
**mothers** [1]
133:4

**mouth** [2]
6:7; 30:18
**Move** [3]
6:11; 31:2;
156:13
**move** [6]
81:2;
118:16;
119:19;
149:11, 13;
193:10
**moved** [2]
21:21;
122:3
**moving** [3]
81:21;
120:25;
122:25
**much** [11]
36:16;
50:21;
94:1; 98:3;
105:21;
186:1, 4;
191:15, 18,
22
**multiple** [1]
62:17
**multiplied**
[1] 189:6
**murder** [8]
172:5, 9;
173:4;
178:13, 21;
180:1, 22;
181:14
**murdered**
[1] 173:12
**murdering**
[1] 79:14
**Museum** [7]
175:23;
177:8;
178:12, 19;
180:3, 25;
181:12
**museum** [2]
180:3, 24
**myself** [3]
63:9;

105:10;
113:1

- N -

nail [1]
172:20
Name [2]
91:18;
121:9
name [50]
8:11, 17;
9:18; 13:5,
6; 15:2;
20:7, 11,
20, 25;
22:16, 17;
24:10, 14,
18, 22;
25:3, 17,
21; 27:8;
28:19;
35:14;
53:10;
55:16;
56:17;
57:24, 25;
87:1, 4;
119:14;
126:12;
127:3, 14;
128:11;
132:25;
140:17;
153:19, 24;
154:2, 5,
16, 21;
159:19;
160:1, 2;
186:12;
192:8;
197:12
named [3]
95:3;
140:10;
160:24
names [24]
20:10, 11,
15; 22:9;
23:4, 20;

25:9;
26:19;
42:5, 8, 9,
14; 86:15,
23; 92:17;
132:21;
142:7;
152:24, 25;
153:2, 4, 7;
164:6;
187:13
narrowing
[1] 39:5
nature [4]
56:16;
97:11;
130:17;
179:14
near [4]
44:19;
90:25;
91:2;
134:24
necessarily
[1] 12:1
necessary
[1] 11:17
need [12]
13:21;
14:3;
18:17;
65:17;
101:5;
107:6;
114:9, 12;
134:8;
136:1;
162:18, 21
needed [1]
120:24
neighborho
od [1] 81:4
neither [2]
199:13, 16
nephew [2]
127:11, 12
nephews
[1] 127:13
Never [1]
85:18

never [11]
85:17;
96:22;
102:10;
103:24;
135:10, 22;
152:1, 2;
161:7;
165:6;
175:11
NEWARK [4]
1:6, 10
Newark [32]
4:17, 19,
20, 21, 22;
8:19; 9:19;
31:16;
40:6;
82:19;
95:4;
100:10, 23;
114:23, 24;
123:4, 5;
125:12, 20;
133:11;
134:2, 5;
139:16, 17,
20; 147:24;
149:9;
155:5;
157:14
newborn [1]
117:17
Next [2]
129:24;
158:25
next [20]
6:8; 30:20,
22; 43:24;
82:9;
83:17;
126:4;
127:20, 23;
129:22;
130:1;
140:4;
142:8;
171:8;
174:18;
191:5

Nickname
[1] 20:12
nickname
[2] 20:21;
87:3
nicknames
[4] 21:2, 3,
4, 12
night [7]
33:18;
41:9;
81:15;
83:14;
126:20;
129:14;
152:22
nine [2]
22:1, 2
nobody [1]
89:6
none [1]
95:7
nonprofit
[6] 175:23;
180:3, 4,
24; 181:2
noon [3]
89:21;
175:19;
185:11
Normally
[2] 11:4;
98:5
Notary [4]
2:2; 199:2,
21, 22
nothing
[13] 9:6;
15:16;
49:9, 11;
55:23;
56:14;
74:19;
98:1;
145:15;
180:19;
181:2, 5;
199:7
notified [1]
148:10

November
[1] 75:1
Number [1]
118:18
number [22]
9:22;
34:11;
94:12;
108:23;
109:11;
110:1, 4,
20, 24;
111:13;
114:19;
117:7;
121:9;
125:3;
126:9;
139:15;
149:4;
158:7, 10,
12, 17;
179:8

- O -

O'Connor
[4] 100:9,
10; 101:12;
114:3
O'Connor's
[1] 102:10
O-L-D-S [1]
119:16
O.J. [2]
170:18, 23
oath [3]
8:6, 7;
11:15
Object [2]
88:3; 98:20
object [27]
6:4; 11:25;
12:11;
14:12;
19:21;
30:12;
39:24;
53:11;
62:14;

71:20;
88:4; 92:1;
98:24;
101:1;
135:12;
136:12, 13;
137:18;
146:17;
150:13;
168:25;
169:8;
175:5;
177:20;
181:5;
189:9
**objecting**
[1] 43:20
**Objection**
[80]   6:7,
11,   15;
20:16;
30:18;
31:2,  22;
37:16;
38:3,   13;
39:23;
40:8;
41:17;
43:12;
44:5,   23;
46:6;
47:20;
48:8,  18;
49:21,  24;
50:4,   9;
52:1,   24;
53:23;
56:7;  57:9;
58:17;
59:20;
60:5;  61:7,
15;  62:12;
63:15;
65:7;
67:17;
69:14;
73:18;
80:4;
83:25;
84:5,  13;

85:21;
98:8,  21;
109:5;
111:24;
112:10;
117:3;
124:17;
129:1;
131:17;
135:10, 22;
143:12, 23;
144:19;
145:8;
147:3,  10;
156:4,  10;
167:10, 15,
23;  169:7;
170:5;
171:24;
175:3;
192:15, 16;
193:5;
194:5;
195:3;
196:14;
198:1
**objection**
[18]    6:6,
17;   12:8,
9;   14:15,
16;   30:15,
17;  43:18;
50:15;
53:14;
68:18;
84:14;
92:3;
110:6;
152:4;
181:6
**OBJECTION
S** [1] 6:1
**objections**
[8] 6:9, 16;
8:9; 30:22,
24;  43:15,
20
**obtain**  [1]
197:1

**obtained**
[4]   190:9,
15;  191:16;
196:22
**obviously**
[2]   79:12;
103:23
**occupied**
[1] 193:15
**occurred**
[1] 123:15
**October** [6]
157:21, 24,
25;   158:2,
4
**off-the-rec
ord**   [1]
64:19
**offence** [1]
170:15
**offer**   [3]
60:13;
61:13, 18
**offhand** [1]
104:10
**OFFICE** [3]
1:11,  17;
4:5
**Office**  [1]
182:6
**office**  [6]
11:9;
19:18;
33:9;
104:8;
106:22;
151:13
**OFFICER**
[3] 1:8, 10
**officer**  [4]
134:17;
136:22, 24,
25
**OFFICERS**
[1] 1:17
**officers** [7]
128:23;
131:8,  24;
140:6,   9;
146:3, 4

**Okay**  [348]
6:4,   11;
9:12,   14;
10:13,  16,
18,  19,  24;
11:3,    10,
13;  12:14;
13:4,  6,  9,
19,    21;
14:3, 8, 10,
21;    15:1,
10,  14,  24;
16:1, 9, 17;
17:7,    20,
25;   18:6,
9;    19:6;
20:6;  21:2,
12,    15;
22:9,   25;
23:16,  24;
24:17;
25:13,  16,
25;   26:7,
11, 18, 23;
27:2,   7;
28:11,  16;
29:12,  15,
21;    30:1,
11;   31:1,
13,   17;
32:9,   16,
22;    33:1,
4,  8,  20;
34:20;
35:25;
36:4,   6;
37:5;  42:4;
43:21;
45:11,  16,
23;   46:5,
17;  47:14;
50:12;
52:22;
53:19;
55:3,   7;
58:1,   4;
59:10;
63:4,  13;
64:18;
65:1,  23;

66:10;
67:14;
68:8,  11;
69:1,   5;
70:8,   11,
14;  71:2;
72:18;
74:3,  24;
75:7;
76:11;
77:24;
79:2, 8, 19;
80:12,  13;
84:18,  24;
85:19;
86:12,  15,
23;  87:23;
88:17;
89:10;
90:13,  20;
91:2,  10;
92:10,  19,
22,   25;
94:2,  11;
95:22,  23;
96:12;
97:19;
98:20,  22;
99:7,  12;
100:2, 4, 5,
8,  13,  18,
20;  102:15,
19;  103:6,
13;  105:23;
106:19;
107:3;
108:7,  11,
14, 16, 20;
109:1, 4, 5,
12;  110:1,
5,   24;
111:10, 14,
18, 19, 21;
112:22;
113:14;
114:2,   7,
19;  115:6,
7,   17;
116:6,  20,
22,   23;

118:3, 11,
12, 17, 20;
119:7, 18,
22; 120:7,
11, 18;
121:2, 7,
11, 16, 23;
122:2, 14,
21, 24;
123:3, 11,
19, 23;
124:9;
125:24;
126:2, 17;
127:24;
128:13, 16;
129:17, 20;
130:5, 9,
12, 23;
131:25;
133:23;
134:7, 18;
135:19;
136:1;
139:6, 10,
17, 19;
140:3, 24;
141:4;
142:8;
145:5, 12,
13; 146:21;
147:15, 21,
25; 148:8;
149:6, 18;
151:6, 10,
16, 18;
152:5, 7;
153:8, 15,
17; 154:5;
156:13, 15;
157:5, 8,
15, 21, 22;
158:3, 23;
159:12;
160:11, 17;
161:6, 20;
162:17;
163:1, 4, 9,
22; 165:7;
166:24;

167:2;
168:16, 20,
24; 169:5;
170:12,
13; 171:1,
6, 20;
173:6, 8, 9,
11, 17, 18,
20, 24;
174:2, 6,
11, 17, 19,
20; 177:17;
179:14, 15;
180:8, 11;
181:4;
182:3, 15,
18, 21;
184:22;
185:17, 19;
186:20, 24;
187:1, 7,
18, 22;
188:9, 14,
25; 189:19;
190:8, 21,
22; 191:9,
14, 25;
192:19, 22;
193:14;
194:10, 25;
196:19, 25;
198:5, 11

**okay** [18]
9:12; 16:4;
54:25;
77:6;
84:23;
94:24;
98:20;
115:15;
122:23;
134:20;
140:25;
150:20;
153:13;
162:15;
173:7;
174:19;
183:21

**Olds** [5]
27:24;
119:15;
159:7;
163:15;
171:17

**Olds's** [4]
161:10;
162:7, 13;
163:7

**Once** [1]
88:25

**once** [3]
9:17;
187:21;
191:19

**ones** [1]
93:3

**Only** [2]
69:24;
86:25

**only** [22]
12:15;
50:1;
51:10;
64:7;
92:15;
93:3; 97:7,
8, 24;
101:15;
105:21;
108:22;
110:9, 18;
133:3, 4;
141:1;
142:20, 21;
153:1;
182:24;
194:13

**operate** [1]
197:25

**operating**
[2] 54:9,
10

**opportunity**
[4] 10:14;
12:20;
72:16;
101:21

**opposite**
[4] 139:5;
141:19;
175:21;
187:5

**Orange** [4]
40:11, 12;
44:20;
149:9

**order** [9]
101:18;
102:8, 19;
103:19, 25;
107:12;
110:7, 19;
111:1

**ordered** [5]
101:3, 12;
102:12;
103:8;
110:12

**orders** [1]
110:9

**Other** [6]
16:9; 19:6,
11; 20:11;
195:22;
198:3

**other** [63]
9:23; 10:7,
8; 14:11;
15:4; 16:1,
10, 22;
17:7, 8;
19:17;
20:10, 14;
21:12;
24:3; 27:3;
44:18, 21;
45:7;
47:16, 25;
51:21;
58:11;
59:1; 64:3,
5; 66:20;
70:20;
71:11;
77:25;
78:1;
82:14, 20;

86:16, 24;
87:1; 89:4;
92:18;
110:20;
118:12;
121:12;
125:25;
128:14;
131:6, 8,
12, 15, 24;
132:5;
134:21;
147:5;
165:17;
167:6;
185:23;
186:18;
187:22;
193:2, 11;
198:3

**others** [3]
86:20, 22;
123:14

**Otherwise**
[1] 89:3

**Outside** [1]
132:1

**outside** [3]
131:15;
133:5;
151:17

**over** [13]
12:24;
39:21;
47:15, 22;
52:10;
76:14;
81:14;
82:12;
83:2; 89:4;
125:6;
129:8;
183:10

**overlooking**
[1] 126:1

**owed** [1]
191:9

**owned** [1]
120:15

- P -

**P-10** [1]
7:21
**P-11** [1]
7:22
**P-A-I-N-E**
[1] 118:5
**p.m.** [27]
6:19;
85:10, 12,
14, 20;
86:3, 5, 6,
10; 88:1,
13; 122:25;
123:17;
135:3;
139:8;
143:5;
144:18;
149:3, 4;
150:1, 5;
152:10;
161:10;
164:20;
166:4;
170:4, 7
**P.O.** [1]
4:10
**packed** [1]
119:3
**Page** [4]
6:13, 17,
24; 147:25
**page** [3]
106:17;
139:20;
140:1
**pages** [2]
139:16;
182:6
**paid** [2]
48:16;
191:15
**Paine** [8]
80:15, 19;
81:3;
82:12, 15;
118:5;

119:19;
122:9
**pandemic**
[1] 11:6
**papers** [5]
31:18;
55:24;
56:13, 14;
173:14
**paragraph**
[13]
100:20;
118:3, 4,
12, 14, 17;
126:3;
140:1, 4;
141:14;
142:9, 10;
179:23
**PARALEGAL**
[1] 3:6
**paralegals**
[1] 107:4
**Parents** [1]
124:4
**parents** [8]
22:13, 15;
27:4;
124:4, 5, 6;
168:18;
194:11
**Park** [18]
3:15, 16;
163:17, 23;
164:22;
166:13;
168:12, 13,
21, 22;
169:22;
175:1, 15;
183:3, 13,
23; 184:1,
12
**park** [8]
162:24;
163:13;
165:17, 19,
21; 166:17;
167:5, 8

**parking** [2]
186:22, 23
**parlor** [12]
82:23, 25;
85:8;
87:12;
88:16;
93:14;
123:6, 20;
132:16, 18;
152:21;
186:11
**parrot** [1]
52:5
**part** [4]
58:4; 72:1;
184:4;
191:7
**participate**
[1] 112:18
**participatin
g** [1] 8:2
**parties** [2]
8:7; 199:15
**party** [1]
190:20
**pass** [3]
187:21;
191:4;
192:3
**passed** [7]
22:14, 15;
24:11;
28:11, 15,
16; 90:13
**Passing** [1]
190:19
**passing** [2]
82:8; 122:4
**past** [3]
16:19, 20;
39:5
**PATRICK**
[1] 1:16
**pattern** [1]
110:11
**pending** [5]
14:6;
108:9;

113:8, 11,
12
**People** [1]
174:12
**people** [6]
21:5;
92:19;
101:15;
165:12;
169:25;
174:13
**percent**
[17] 84:12,
16, 17;
86:14;
87:13;
89:17;
91:25;
92:9;
94:10;
98:2;
128:4;
130:8;
139:11;
141:12;
197:16, 21
**perfectly**
[1] 77:4
**perhaps** [2]
14:11;
105:25
**period** [1]
32:11
**permanent**
[1] 33:12
**Person** [3]
7:15, 16, 17
**person** [15]
8:6; 37:14;
39:21;
40:2;
58:12;
65:5; 67:9;
69:8, 12;
140:11;
160:24;
161:5;
191:5;
194:13;
196:23

**personal**
[1] 179:13
**persons** [3]
42:1;
133:12;
134:13
**PETER** [2]
1:13, 17
**phase** [1]
15:19
**Philand** [7]
158:6;
160:22, 24;
161:5, 9;
162:6;
163:10
**Philander**
[46] 26:20;
27:15;
36:7;
39:20;
43:1; 76:9;
91:20, 24;
92:7;
153:16;
154:23;
155:23;
156:22;
159:13, 17,
18, 23;
160:3, 10,
14, 15, 17,
19, 20;
161:1, 2, 3,
6, 15;
162:11;
166:7, 12,
14, 15;
167:14, 21;
168:11, 14,
18, 20;
169:3, 4;
171:9;
173:16
**Philander's**
[3] 27:13;
75:23;
154:14
**Phone** [1]
158:9

**phone** [7]
39:22;
47:13, 16;
64:13;
102:22;
103:8, 20
**phonetic**
[2] 22:18;
27:10
**Photograph**
[1] 7:20
**physical** [2]
33:10, 13
**physically**
[1] 8:3
**pick** [2]
81:12;
183:5
**picked** [15]
6:19;
81:24;
140:6;
142:17;
148:20;
149:8, 10,
24; 150:5;
152:10;
174:25;
175:14, 18;
183:3
**picking** [2]
75:23
**pickup** [4]
91:12;
121:7;
149:12
**picture** [1]
177:12
**piece** [1]
106:24
**pipefitter**
[1] 192:9
**pipefitters**
[1] 95:11
**Pittman** [8]
87:2, 10;
88:12;
111:7;
121:12;

148:20;
153:3
**Pittman's**
[1] 133:7
**Place** [28]
3:7; 33:14,
15; 35:7,
8, 11, 13;
36:2, 3;
81:12, 17;
82:1, 21;
83:2;
90:12;
119:8;
120:15;
123:6;
148:22;
149:15;
164:15;
175:17;
183:4, 9,
10; 185:7;
187:5
**place** [14]
40:5;
44:19;
45:12;
46:16;
64:20;
81:6;
87:11;
89:12, 13,
15; 96:23;
98:17;
175:18;
199:12
**Plaintif** [7]
1:4; 3:9;
100:21;
110:3;
126:4;
180:2, 24
**plaintiff** [7]
8:16;
104:18;
123:19, 23;
124:1;
126:19;
180:5

**Plaintiff's**
[1] 7:13
**plaintiff's**
[1] 124:2
**play** [5]
12:7;
126:9;
163:13;
165:18;
167:7
**playing** [1]
162:24
**plea** [1]
75:8
**Please** [9]
6:8; 8:10;
14:14;
30:20;
43:21, 24;
72:15;
93:23;
167:11
**please** [19]
6:12, 17;
12:19;
14:4, 7;
20:7; 31:4;
43:17;
44:1;
50:25;
66:5;
104:13, 24;
113:15;
135:24;
136:3;
150:24;
182:22
**pled** [1]
4:21
**PLLC** [1]
3:3
**plumbing**
[1] 53:1
**Plus** [1]
89:9
**plus** [4]
86:19, 20,
21; 152:23
**point** [12]
13:10;

24:8;
44:11;
51:11;
61:24;
63:22;
81:5, 23;
83:7;
178:3;
185:22, 23
**POLICE** [5]
1:7, 10, 17;
4:7
**Police** [1]
4:22
**police** [36]
9:21;
41:24;
42:2, 5, 16,
18; 43:1;
48:15;
59:18;
60:16, 19;
96:25;
97:1, 3, 9;
128:17, 20,
23; 129:5,
25; 131:8,
11, 13, 15,
24; 134:16;
135:7;
136:10;
137:24, 25;
139:1, 22;
141:18;
147:5;
152:12;
169:6
**pool** [6]
81:7; 95:9,
11; 120:2,
9; 123:24
**porch** [4]
81:20;
120:14;
163:14, 15
**portions** [2]
179:24;
180:5
**pose** [1]
14:14

**positive** [3]
88:2;
94:10;
99:20
**Possibility**
[1] 58:25
**possibility**
[3] 67:15;
69:12;
70:15
**possible**
[4] 61:6;
75:16;
87:21;
134:11
**Possibly**
[1] 71:21
**possibly** [2]
55:19; 86:9
**post** [1]
33:9
**Potato** [1]
21:8
**potato** [1]
21:9
**pound** [1]
190:4
**pounds** [7]
95:17;
98:4;
188:20;
190:1;
191:16;
193:19;
194:22
**Preliminary**
[1] 7:19
**preparation**
[4] 18:10,
14; 19:4
**prepare** [1]
74:8
**prepared**
[2] 13:9;
76:9
**present** [6]
8:3; 9:3;
13:5;
41:11;
72:24; 73:2

presented
[1] 133:18
Presently
[1] 31:6
presently
[3] 28:17;
35:16;
111:5
Pressure
[1] 14:25
pressure
[5] 14:25;
15:1, 9;
16:10
pressured
[1] 59:18
presume [2]
13:16;
139:21
pretty [2]
35:21;
70:25
previously
[1] 107:12
PRICE [1]
3:13
Prior [2]
7:23; 35:5
prior [13]
18:10;
24:25;
25:2; 29:9;
45:17;
67:9;
71:19;
72:10;
106:14;
196:10, 13;
199:5
prison [3]
61:24;
62:2, 4
privileged
[1] 72:4
Probably
[1] 32:20
probably
[7] 10:1;
40:18;
105:9;

121:3;
122:25;
123:17;
125:25
problem [1]
191:12
problematic
[1] 110:20
produce [4]
103:9, 22;
106:4;
107:11
produced
[4] 103:24;
107:10, 13;
110:7
profit [1]
192:1
promise [2]
60:11;
182:25
promised
[1] 47:1
properties
[1] 35:6
Property
[1] 35:7
property [9]
35:10, 13,
22, 25;
80:14;
83:12;
114:25;
118:5
propounded
[3] 102:13,
24; 104:17
PROSECUT
OR [4]
1:12, 13
prosecutor
[8] 41:25;
42:2, 6, 16,
18; 43:2;
59:18;
75:23
PROSECUT
OR'S [1]
1:11

Prosecutor'
s [1] 182:6
prosecutor'
s [1] 182:5
prosecutor
s [4]
48:16;
60:16, 19;
182:16
protected
[1] 71:22
prove [2]
137:1;
138:8
provided
[2] 102:10;
103:18
Public [3]
2:2; 199:2,
21
pull [3]
103:23;
157:10;
174:22
pulling [1]
101:16
purchase
[1] 118:4
purchased
[1] 196:21
purposes
[1] 16:21
pursuant
[2] 103:24;
107:11
putting [3]
41:19;
106:25;
176:6

- Q -

QUESTION
[4] 6:2, 14,
18, 23
Question
[2] 110:1;
179:21
question
[149] 6:7,

8; 12:19;
13:14, 15,
17, 18;
14:6, 7, 18,
19; 15:23;
18:1, 13;
20:2, 24;
30:19, 20,
22; 32:13;
35:22;
37:2; 42:4,
12; 43:24;
44:24;
45:6;
47:18;
50:24;
51:1; 52:2,
19; 53:12;
60:25;
61:3, 8;
62:8, 14;
65:18, 24;
66:1;
67:18;
68:5, 11,
16, 19, 24;
69:2;
70:22;
71:25;
72:9, 17;
73:20;
77:10, 12,
16; 80:5,
10; 84:1,
6; 85:22;
88:4; 89:1,
3; 92:2;
93:6, 9;
94:1; 96:1;
99:5;
101:6;
102:6;
105:12;
106:8;
108:2, 8,
23, 25;
109:11;
110:23;
111:8;
113:9, 10,

11, 16, 20;
116:8, 25;
117:1, 6;
124:18;
129:2;
131:18;
135:10, 17,
18, 25;
136:4, 6;
137:9, 18;
140:20, 25;
141:1, 3, 6;
142:25;
144:20;
145:11;
146:7, 18,
19; 149:21;
150:14;
152:1;
160:7;
163:19;
166:1;
167:12;
168:1, 7;
169:19;
170:7, 12;
171:8, 9,
25; 172:2;
173:11;
174:3, 19;
175:8;
177:7;
179:8, 12,
21; 181:10;
184:22, 24;
192:17
questioned
[1] 148:13
questioning
[5] 10:8;
150:25;
151:20;
195:15;
197:22
QUESTIONS
[1] 6:1
questions
[48] 6:11;
9:15, 25;
10:1, 5, 10,

25; 13:12,
22; 14:12;
20:6; 31:1;
62:16;
75:15, 18;
76:6, 8, 11;
78:5, 8, 12;
97:13;
102:17;
103:7, 13;
108:24;
114:7;
115:2, 9,
10; 117:4;
118:24, 25;
129:18, 20;
132:5, 6;
170:10, 17;
172:24;
174:23;
178:24;
182:25;
185:21, 24;
186:3, 8
quit [1]
136:2
Quite [1]
132:11
quite [1]
75:20
Quote [3]
148:8;
163:11;
165:16
quote [10]
148:6, 11,
13, 16;
149:16;
158:10;
159:4;
163:18;
165:22;
167:5

- R -

raised [1]
101:10
RAMOS [1]
1:10

Randolph
[1] 25:14
Randy [11]
92:20;
111:6;
132:22;
134:14;
135:2;
140:15;
148:21;
152:25;
163:16, 23;
164:5
range [3]
33:1; 86:8;
88:5
RASHID [1]
1:8
rather [1]
196:22
re-forming
[2] 57:17,
20
reach [2]
63:14; 64:4
reached [5]
63:22, 24;
66:12, 15,
18
Read [1]
115:19
read [69]
13:15;
22:10;
68:15;
77:11;
78:14, 15,
24; 110:24;
111:14, 25;
113:15;
114:14, 19;
115:1, 15,
23; 116:3,
4, 6, 8, 12,
14; 125:2,
4, 8, 9;
134:19;
140:5, 20,
21; 141:7;
142:9, 10,

25; 143:2;
148:2, 6, 7,
11, 16, 24;
149:16;
153:23;
158:3, 12,
16, 18, 20,
21, 22, 23;
159:4, 9,
11; 163:11,
19, 21;
165:23, 24;
166:1, 3;
167:11, 24;
168:3;
179:23;
180:5, 7
Reading [1]
149:19
reading
[11]
104:15;
115:24;
116:1;
140:22;
148:12, 14,
25; 149:6,
17; 168:2,
3
reads [3]
68:17;
77:13;
113:17
ready [1]
103:23
real [3]
35:2, 4, 16
realize [1]
108:4
Really [1]
159:20
really [21]
18:22;
21:14;
29:25;
32:5;
33:19;
40:9;
43:22;
45:5;

47:24;
62:1, 2;
67:10;
127:13;
131:2, 3;
133:4;
152:3;
155:19;
182:24;
189:16;
194:17
reason [9]
17:20, 21,
22; 58:7;
59:1;
95:18;
135:5, 20;
136:9
recall [23]
16:5, 6;
21:13;
25:9;
41:22;
42:25;
43:3;
52:17;
59:23;
65:4, 13;
74:9, 11,
15, 17, 20,
23; 111:2;
154:6;
184:18, 19,
20
received
[2] 140:2,
10
recess [4]
64:24;
113:23;
153:11;
182:23
RECKENWA
LD [1] 1:15
recollect
[9] 42:24;
49:23;
51:19;
59:21;

60:1, 8;
71:1; 81:19
recollectio
n [8] 10:4;
16:4; 48:7;
49:19;
67:8, 12;
74:25; 80:2
record [10]
8:12; 9:2;
101:25;
102:1, 11;
110:6;
114:17;
151:1, 19;
158:17
referenced
[1] 190:10
referring
[1] 54:17
reflections
[1] 12:1
refresh [3]
67:7, 11;
74:25
reinstate
[1] 178:9
reinstated
[6] 178:4,
8, 12, 19;
180:2, 24
reinstateme
nt [2]
181:2, 12
related [3]
27:17, 23;
75:8
relationshi
p [4]
26:20;
27:3, 19;
28:1
relative [3]
156:18;
199:14, 16
religion [1]
176:12
religious
[1] 176:9

**remarks** [1]
134:20
**Remember**
[1] 55:4
**remember**
[39]   9:18;
16:4,    5;
29:1;
40:10,   15,
16;      50:1,
8;       64:8,
10;     71:5;
74:9;   75:4,
11,  16,  17,
22;     99:1;
108:16,  18;
114:2;
116:24;
128:15,  17;
130:13,  25;
131:7,   14;
132:5;
143:15,  16;
155:2,   20;
164:3;
186:12
**remote**  [1]
106:22
**remotely**
[4]      2:4;
8:5,     7;
104:10
**rent**   [2]
34:20, 21
**Repeat** [5]
38:5;  72:7;
84:8;
183:24;
196:11
**repeat**  [9]
43:6;   52:3,
4;      63:9;
68:5;   94:4;
138:19, 24
**repeated**
[1] 62:16
**rephrase**
[9]    13:13;
17:25;
42:4;

47:18;
57:14;
59:15;
99:4;
172:1;
177:7
**rephrased**
[1] 18:1
**Report** [6]
7:15,    16,
17, 18, 19,
22
**report** [29]
6:23;
133:12;
134:13, 15;
137:25;
138:1;
139:1, 4, 5,
18;  140:21,
22;  141:13,
18;   142:1,
2,       6;
147:5,   24,
25;  150:11,
15;  152:13;
153:10;
157:19;
162:4,   6;
169:6
**reported**
[3] 140:14;
142:13, 16
**REPORTER**
[3]      8:1;
104:20, 24
**Reporter**
[10]    2:3;
6:17;
43:17;
50:14,   25;
68:15;
77:11;
113:15;
150:23;
199:3
**reporter**
[11]    6:12;
12:18;
13:4,   22;

31:3;
43:25;
56:21;
68:17;
72:13;
77:13;
113:17
**Reporters**
[1]  2:23
**REPORTING**
[1]  2:22
**reporting**
[2]  8:4, 9
**reports**  [1]
139:23
**represent**
[12]    8:18;
9:23;   67:6;
134:12;
139:18;
140:19;
157:19;
160:5,    9;
161:4;
182:3;
186:8
**representat
ion**    [1]
104:13
**reproduce**
[6]    101:3,
18;   102:3,
9,      12;
110:12
**reproduced**
[2]  101:14;
110:13
**reputation**
[2]    180:1,
23
**requested**
[3]    68:17;
77:13;
113:17
**requests**
[2]  101:13;
104:17
**required** [2]
106:3;
197:25

**residence**
[1] 140:16
**resolve** [1]
93:23
**resolved**
[1] 74:1
**respect** [1]
189:19
**respond** [2]
13:21;
72:17
**responded**
[3]  142:14;
148:3, 10
**response**
[4]    19:11;
106:6;
113:7;
114:8
**responses**
[1] 105:1
**responsive**
[1] 101:15
**rest**    [3]
115:15, 16;
184:7
**restructure**
[1] 55:15
**result**  [2]
104:1;
106:6
**retained** [2]
73:14, 21
**retaining**
[1] 73:10
**returned**
[5]  140:12;
142:19;
149:9;
163:15;
169:24
**revelation**
[2]  176:23;
177:1
**Revenue** [1]
55:22
**reverse** [1]
141:25
**reviewed**
[1]  19:3

**RICHARD**
[1]  4:8
**Ricky**  [8]
87:2,    3;
148:20;
163:16,  22;
164:5,   7;
165:1
**ridiculous**
[2]    43:22;
167:2
**Right**  [34]
25:4;   27:1,
14;    41:2;
49:16;
52:25;
62:4;
66:24;
70:4, 7, 10,
13;    71:6,
16;    84:25;
86:18;
89:5;
93:15,   17;
97:18;
121:4;
122:5,    7;
126:6,   10,
15,     16;
127:23;
160:22;
169:24;
185:18;
188:4,   16;
190:13
**right**  [76]
10:9;   12:5;
16:6;
23:13;
32:10;
37:18,   22;
38:21;
52:4;   57:4;
61:25;
64:23;
67:5;
69:21;
70:3;
72:19;
78:25;

79:14;
81:25;
83:1;
84:24, 25;
86:1, 8;
89:12;
90:7, 14;
93:24;
97:17;
100:2;
102:16;
107:8, 15;
112:2, 14,
19, 24;
115:12;
118:22;
119:23;
120:5;
121:9, 14;
122:6, 19;
125:9;
129:14, 19;
132:16;
134:3, 4, 5;
138:10;
141:17;
142:11;
149:2;
153:5, 20;
154:6;
155:25;
159:22;
161:18;
163:25;
165:15;
168:13;
172:13, 14;
174:12;
179:3;
185:20;
186:17;
187:12;
190:12
**right-hande
d** [1]
188:14
**rights** [1]
148:14
**roads** [1]
187:13

**ROBERT** [1]
1:12
**Rock** [2]
34:14
**Rodney** [2]
184:3, 4
**Rodriguez**
[6]   131:1;
142:13;
143:3, 10,
16; 146:9
**Roger** [2]
141:19;
162:23
**Room** [1]
4:18
**room** [4]
8:4; 11:5;
12:17;
14:14
**ROSELAND**
[1] 2:22
**Roseland**
[1] 2:24
**roughly** [2]
21:24;
185:1
**round** [1]
21:9
**rule** [1]
14:16
**runs** [1]
40:11

- S -

**SABUR** [1]
1:8
**Said** [1]
141:19
**said** [107]
6:5; 12:18;
13:7;
19:25;
20:3;
23:23;
30:2, 13;
35:24;
41:15, 16,
24; 42:3,

5, 19, 23,
24, 25;
43:3, 4, 8;
44:11, 13;
46:23, 25;
47:23;
49:5, 10,
15, 17;
50:2; 51:8,
13; 52:12;
55:23;
56:13, 24;
57:16, 23;
58:21;
59:9, 23,
25; 61:9,
20; 64:2;
65:20;
69:18;
72:3;
73:21;
75:22;
76:2, 23;
78:2;
81:21;
86:17;
90:25;
95:4, 13;
96:8, 18,
20; 97:6;
122:15, 17;
124:10;
129:8, 9,
25; 130:4,
14; 132:2;
135:11, 23;
138:17, 20;
144:17, 23;
145:2, 10,
11, 25;
146:1;
153:2, 3;
155:23;
157:24;
159:13;
160:13;
161:16, 24;
162:1, 7;
163:3;
165:8;

166:6, 10;
167:21;
169:3, 4;
171:3;
177:19;
183:4;
187:9;
188:2;
192:15;
195:14
**Saint** [1]
3:7
**Same** [4]
24:13;
87:11;
147:24
**same** [30]
11:5;
14:13;
37:9; 45:1;
46:1, 21;
48:25;
49:2; 52:4,
11; 55:11,
20; 58:8,
24; 63:17;
82:21;
88:11;
104:18;
105:2, 17;
107:1;
132:15;
152:19, 20;
163:25;
173:15, 16;
175:18;
183:14;
187:19
**sanction**
[1] 103:21
**Sarah** [2]
133:2;
134:13
**Saturday**
[1] 112:5
**saying** [44]
6:3, 21;
19:12;
23:15;
30:9;

35:10;
43:7;
44:11;
48:11;
49:1; 55:1;
56:6; 57:1,
7; 63:23;
67:2; 68:3;
74:4, 16;
75:22;
101:11;
106:5;
115:4;
137:3, 5,
16; 138:4,
16; 142:1,
2; 144:12;
146:22, 25;
147:12;
150:8, 15,
16; 151:25;
160:12;
161:25;
168:20;
170:23, 24;
181:1
**says** [22]
100:9, 20;
104:14;
111:22;
112:5;
120:7;
122:24;
123:1, 23;
125:20;
133:24;
134:2, 5;
140:4;
158:24, 25;
160:22;
162:6;
168:11, 21;
180:21;
181:25
**scenarios**
[1] 12:6
**scenes** [1]
49:11
**schedule**
[1] 66:19

**scheduled**
[1] 80:13
**SCHENCK**
[1] 3:13
**Scott-Bey**
[12] 97:3;
129:6;
130:6, 10;
131:8;
132:2;
142:1;
148:1, 15;
149:23;
158:5, 19
**screen** [12]
13:5;
100:9;
104:12;
106:25;
109:14;
110:3;
116:4, 7;
133:21;
157:12;
179:10;
181:23
**screw** [1]
54:22
**scroll** [5]
100:13;
115:3, 14,
16
**Second** [1]
26:25
**second** [26]
15:19;
18:9;
26:24;
27:3, 15;
46:15;
47:5, 6;
50:18;
59:10;
64:9;
66:20, 21;
69:25;
84:20;
100:6;
101:1;
106:2;

118:11, 17;
151:14;
153:18;
161:5;
163:5;
177:18;
181:21
**Security** [4]
158:7, 12,
15, 17
**Seemed** [1]
56:2
**seems** [3]
106:25;
110:11;
124:19
**seen** [9]
85:17, 18;
101:17;
139:22;
140:9;
165:11;
182:8, 9, 11
**sell** [3]
94:17, 18;
195:1
**selling** [2]
96:8, 10
**Send** [2]
151:7, 9
**send** [3]
104:4;
151:8;
182:15
**Senior** [2]
20:9; 22:18
**sent** [5]
104:11, 18;
105:3, 14,
25
**sentence**
[3] 111:22;
158:18, 25
**separate**
[1] 106:12
**separated**
[4] 11:7;
29:19, 22;
31:7

**September**
[1] 139:21
**Sergeant**
[3] 9:20;
148:10, 16
**seriously**
[1] 136:17
**serve** [1]
106:11
**served** [1]
100:22
**SERVICE**
[1] 2:22
**Service** [1]
55:23
**seven** [7]
81:24, 25;
86:17;
92:25;
93:1, 18;
94:5
**several** [3]
15:3;
134:21;
142:19
**share** [2]
104:12;
133:21
**sharing** [1]
110:2
**She's** [1]
32:1
**SHEPPARD**
[1] 1:9
**SHERIFF** [1]
1:17
**SHERIFF'S**
[1] 1:16
**shoot** [5]
81:7;
120:1, 9,
10; 123:24
**shooting**
[2] 95:9,
11
**shop** [3]
186:13, 21;
187:15
**short** [1]
81:23

**Shorthand**
[1] 2:23
**shot** [2]
81:7, 10
**should** [6]
16:2; 18:1;
54:6, 10;
73:21;
176:25
**shoulders**
[1] 13:23
**show** [24]
76:5;
100:3;
102:23;
103:11;
108:12, 20;
109:1, 11;
110:23;
126:2;
128:9;
133:8;
138:2;
139:2;
165:14;
177:12;
179:5, 8,
16, 20, 22;
181:22;
182:7, 9
**showing** [5]
105:4, 16;
111:12;
114:18;
139:14
**shown** [1]
179:6
**shrugs** [1]
13:23
**shut** [1]
172:20
**Siblings** [1]
90:8
**siblings** [8]
23:1, 3;
24:4; 25:5;
26:9, 13;
28:7; 90:7
**side** [11]
26:8;

82:14, 20,
22; 91:13;
121:9;
123:7;
175:21;
186:19;
187:5
**signature**
[6] 107:20,
22; 108:6,
19; 114:5,
21
**signed** [2]
134:16;
139:21
**significanc
e** [1] 11:15
**signing** [3]
108:16, 18;
114:2
**simple** [2]
18:13;
35:21
**Simpson** [2]
170:18, 23
**Since** [4]
22:6;
37:21, 22;
38:7
**since** [5]
14:13;
37:22;
85:17, 18;
109:9
**sister** [4]
25:15;
127:10;
140:15
**sister's** [1]
127:14
**sisters** [3]
23:17, 18,
19
**sitting** [3]
52:9; 97:2;
99:21
**situation**
[5] 35:5;
54:14, 15,
16; 97:7

**skill** [7] 175:24; 176:5, 8, 10, 11; 177:22, 25
**skip** [1] 118:11
**skipped** [1] 107:24
**skipping** [1] 147:23
**slated** [1] 148:9
**sleep** [4] 33:17, 19; 34:2; 51:20
**slow** [1] 104:23
**SMITH** [2] 1:15; 3:13
**smoke** [3] 142:24; 145:20; 146:11
**smoking** [1] 170:16
**smoothly** [1] 94:2
**snuck** [1] 141:21
**Social** [4] 158:7, 12, 14, 17
**sodas** [1] 163:15
**sold** [1] 191:20
**some** [28] 9:15, 25; 10:1, 5, 7, 9; 20:5; 42:23; 44:19; 58:7, 11; 77:7; 81:7; 82:24; 95:2; 96:13, 18; 100:3; 118:12;

149:11; 163:14; 165:9, 19; 167:8; 178:3; 181:8; 185:25; 195:14
**Somebody** [2] 98:16; 146:24
**somebody** [10] 19:9; 73:11; 96:22; 97:24; 142:2; 147:5, 12; 151:21; 197:18, 20
**Something** [2] 85:2; 122:18
**something** [40] 16:13; 19:2; 28:24; 42:9; 50:2; 56:22; 63:25; 68:1; 74:14, 17, 21; 75:22, 25; 76:23, 24; 81:21; 87:15; 90:23; 96:22; 97:11; 98:4, 15; 101:16; 112:25; 113:1; 116:21; 118:13; 128:19; 130:17; 154:3; 164:24; 166:18;

169:3; 176:24; 178:17; 185:2, 3; 190:10; 197:4, 19
**sometime** [4] 44:20; 57:16; 59:12; 87:14
**sometimes** [5] 22:10; 33:21, 24; 55:5; 142:17
**Somewhere** [5] 39:9, 18, 19; 90:24; 121:6
**somewhere** [13] 21:25; 31:10, 12; 36:10; 39:8; 40:19; 55:25; 56:1; 89:20; 90:22; 122:12; 140:7; 155:13
**son's** [1] 35:14
**Sons** [1] 91:17
**Sorry** [1] 192:10
**sorry** [25] 19:23; 24:21; 36:20; 47:18; 58:19; 59:24; 62:22; 63:3; 72:12;

88:22; 90:20; 92:3; 107:24; 131:22; 132:22; 152:16; 155:17; 162:20; 176:3, 15; 177:18; 183:6, 12; 188:23; 193:3
**sort** [3] 20:24; 106:23; 124:9
**sound** [1] 57:4
**South** [3] 40:11, 12; 44:20
**Speak** [1] 23:24
**speak** [11] 12:15, 24; 13:25; 37:1; 65:11; 70:23; 99:8; 127:16, 19; 128:23; 132:23
**speaking** [8] 6:9; 13:2; 30:23; 43:20; 67:15; 69:13; 131:1, 14
**specific** [1] 186:15
**specifically** [1] 111:2
**speculate** [2] 147:13; 151:20

**speculating** [1] 151:4
**speculative** [1] 147:11
**spell** [1] 56:20
**spend** [1] 90:1
**spirit** [1] 22:14
**spoke** [21] 18:24; 36:7, 25; 37:6, 8; 39:20; 65:3, 6, 15, 16; 67:2, 6; 69:9; 70:1, 2, 12, 24; 99:8; 130:5, 9; 133:4
**spoken** [1] 19:7
**stairs** [1] 122:4
**stamp** [4] 133:10, 24; 134:1; 181:25
**start** [6] 98:22, 23; 104:22; 165:20; 167:8; 174:22
**started** [2] 95:15; 183:20
**STATE** [3] 1:17, 18; 4:7
**State** [6] 2:3; 4:12; 8:24; 75:9; 199:3, 21
**state** [2] 59:3; 111:2
**State's** [2] 104:8, 19

**stated** [19] 134:23; 140:5, 9; 142:16, 22; 148:19; 149:7; 158:25; 159:2; 161:9; 163:11, 12, 13; 165:16, 19; 167:4, 5, 7

**statement** [37] 48:22; 49:14; 50:3; 51:7; 75:1, 5; 77:25; 78:14, 15, 19, 21, 24; 141:17, 18, 19, 22, 23, 24; 143:18; 144:2, 5, 10; 145:1; 146:25; 147:2; 149:19; 161:19, 21; 162:1, 2, 15; 163:2; 166:5; 167:17, 18, 19; 169:23

**statements** [2] 6:21; 150:8

**STATES** [1] 1:1

**states** [1] 134:20

**stating** [1] 8:11

**status** [2] 56:15; 57:21

**stayed** [2] 81:15; 83:16

**staying** [2] 83:15; 124:1

**stenograph ically** [1] 199:11

**Step** [1] 151:16

**step** [1] 151:15

**stepfather** [4] 154:15, 17, 24, 25

**STEWART** [1] 4:14

**sticker** [1] 100:17

**Still** [1] 84:14

**still** [8] 14:18; 16:23; 22:13; 28:14; 29:15; 39:25; 57:19; 116:2

**stole** [1] 96:22

**stolen** [5] 94:13; 97:21; 99:22; 100:1; 191:11

**stood** [1] 140:19

**Stop** [12] 43:22; 135:9; 151:3, 5, 7; 170:9; 173:17; 175:9, 10

**stop** [6] 43:21; 62:16; 81:12; 173:18;

174:11; 175:11

**stopped** [1] 126:19

**store** [2] 193:18; 195:1

**stored** [1] 196:2

**story** [1] 81:23

**straight** [1] 82:13

**straightfor ward** [1] 35:22

**Street** [36] 4:9, 18; 82:5, 13, 20, 22; 83:2, 6, 16; 88:18, 23; 89:11; 93:2; 94:6; 117:22; 118:2; 123:7; 124:2; 126:7; 144:13, 14; 148:3, 4; 155:13, 21, 24; 156:3, 19; 158:9; 172:14, 15; 186:19; 187:21; 188:1

**street** [24] 40:10, 11; 44:19; 62:3; 82:21; 83:3; 96:10; 120:13; 127:11; 164:10, 15; 175:20, 21; 184:5;

187:20, 22; 189:4, 7, 11, 13, 17, 20; 190:2

**streets** [1] 187:3

**strike** [1] 111:21

**stuck** [1] 125:10

**stuff** [6] 42:23; 52:11; 55:20, 21; 58:6; 95:7

**subconscio us** [1] 176:19

**substantive** [1] 77:12

**such** [1] 199:17

**suddenly** [1] 59:13

**suffer** [2] 15:11, 12

**suggest** [3] 76:13; 78:7; 79:5

**suggested** [1] 78:18

**suggesting** [1] 191:14

**suggestion** [1] 58:1

**suing** [2] 60:15, 18

**Sunday** [7] 80:3, 24; 83:18; 112:9; 119:2; 123:25; 129:14

**super** [5] 97:24; 194:18, 21, 25; 195:22

**superinten dent** [1] 197:10

**superinten dent's** [1] 197:12

**Supplement al** [1] 7:18

**supplement al** [1] 157:18

**support** [1] 54:11

**supposed** [1] 56:15

**Sure** [3] 84:10; 114:13; 177:23

**sure** [52] 10:7; 25:22; 39:7; 40:22, 23; 48:6, 13; 55:6; 58:13; 59:9; 60:3, 17, 20, 22; 61:1, 4, 5, 9, 11; 70:25; 75:20; 76:1; 77:1; 83:10; 84:17; 86:16; 88:11; 92:21, 24; 93:3; 97:22; 98:11; 99:16; 101:17, 19, 20; 102:17; 105:2; 106:13, 15; 108:6; 114:17; 130:16;

132:11;
147:19;
178:10;
184:9, 17;
188:12;
197:6, 16,
17
**switch** [1]
79:9
**sworn** [3]
11:15;
111:20;
199:6

—————

- T -

**Take** [2]
113:21;
114:19
**take** [36]
11:7;
12:18;
13:23;
14:3, 8;
15:15;
17:1; 40:4;
45:12;
56:4; 62:4;
64:12, 16,
17, 22;
83:19;
102:16, 25;
104:2, 3,
13; 106:1;
112:24, 25;
113:1, 4,
19; 114:13;
139:4;
153:10;
163:22;
172:12, 15;
183:12;
184:12
**taken** [10]
2:1; 16:18;
17:8;
64:24;
98:3, 6;
113:23;
153:11;

182:23;
199:11
**takes** [2]
64:19;
88:20
**taking** [15]
13:7;
14:22;
16:10, 12,
18, 22, 24;
17:17;
18:2; 52:9;
55:18;
75:24;
103:4;
113:3;
184:20
**talk** [9]
79:8;
84:22;
128:1, 5, 7,
14; 139:25;
153:16;
155:7
**talked** [5]
65:21;
128:10;
163:12;
173:15;
197:23
**talking** [25]
13:1;
17:13;
20:20;
23:13;
48:1, 2;
52:8; 65:2;
74:5;
78:21;
79:2; 89:4;
95:12;
128:17;
131:7, 19,
20, 22;
141:16;
143:16;
158:19;
162:2;
166:7;
183:20

**Taylor** [10]
25:24;
92:10, 22;
111:7;
141:19;
149:10, 25;
162:23
**telephone**
[6] 47:12,
22; 70:3;
140:11;
142:23;
146:10
**Tell** [5]
35:4;
115:15;
128:22, 25;
159:21
**tell** [69]
6:15; 9:5;
10:21;
15:22;
16:3;
18:18;
23:3; 29:7;
32:18;
34:12;
41:3, 4;
43:14;
44:8;
46:11;
48:24;
50:7;
51:11;
59:14, 17;
60:18;
61:3;
62:15, 18;
66:5;
70:21, 24;
71:7;
76:17;
77:20;
78:4, 10;
80:1;
87:18;
97:10;
99:21, 24;
105:21;
113:19;

115:1;
116:25;
118:13;
119:7;
127:5;
132:13;
135:1;
136:18;
138:4, 10;
139:6;
142:7;
143:3, 9;
145:18, 25;
146:3, 4, 8;
149:22;
150:1;
152:9, 17;
165:4;
175:22;
177:6;
179:21;
189:22;
194:21
**telling** [8]
43:2, 5, 7;
46:22;
48:22;
96:21;
138:6, 11
**temporary**
[1] 193:21
**testified**
[2] 53:24;
186:10
**testifies**
[1] 9:6
**testify** [2]
75:10;
199:7
**testifying**
[1] 109:6
**testimony**
[21] 2:1;
10:6, 14,
22; 11:16,
20, 21, 22;
38:1, 8;
44:22;
46:19;
48:19;

50:5; 56:8;
61:19;
98:25;
135:11;
175:11;
194:6;
199:10
**than** [25]
6:3; 16:9;
17:7; 19:6,
11, 17;
27:3; 30:8;
32:19;
44:15, 18;
51:22;
54:10;
71:11;
78:1;
122:25;
123:16;
127:12;
131:4, 5, 8;
147:6;
193:2;
195:22;
198:3
**Thank** [26]
17:25;
24:3, 24;
25:16;
27:16;
28:6;
42:19;
45:16;
64:18;
78:22;
83:5; 94:1;
105:23;
109:17;
120:11;
122:2;
133:21;
139:12;
151:18;
156:17;
170:13;
174:12;
185:25;
186:3;

188:8;
198:11
**thank** [1]
188:13
**That's** [93]
6:5; 16:1;
19:2, 10,
11; 23:15;
26:23;
28:5; 29:3;
30:13;
32:10;
33:16;
34:6, 10,
19, 24;
42:3, 19;
44:11;
45:25;
48:11, 25;
51:10;
52:6; 63:5,
10, 13;
64:2;
65:21;
68:23;
69:1, 18;
71:2; 72:5,
17; 74:4,
22, 24;
79:2, 18;
81:15;
82:21;
84:23;
87:21;
92:4, 16;
96:25;
97:6;
100:17;
111:7;
114:20, 21,
24; 117:12;
120:4;
121:13, 20;
123:1;
126:12;
130:9;
133:3, 6,
19; 137:15,
20; 141:21;
144:20;

145:23;
146:2, 18,
25; 147:7;
152:3;
153:5;
158:21, 24;
160:1, 2;
161:3, 13,
18; 162:14;
164:1;
165:12;
169:23;
170:1, 2;
174:1, 14;
175:3;
180:10
**that's** [57]
6:4; 21:11;
23:6;
30:10;
32:12;
33:11;
34:10;
39:14;
46:15;
49:10;
55:5; 56:1;
64:15;
66:19;
68:4; 72:4;
77:4;
81:18;
82:23;
83:17;
90:18;
95:13;
96:16, 24;
105:17;
107:1;
108:19;
114:20, 22;
121:18;
125:22;
126:14;
129:5, 12;
130:5;
138:16;
139:15;
141:15, 22;
144:22;

145:1, 10;
157:11;
158:8;
159:19;
160:13;
161:1, 2;
163:3;
165:25;
166:16;
181:9;
183:14
**thata** [1]
63:19
**their** [11]
8:8; 19:7,
18; 23:20;
25:9;
26:19;
28:9; 33:1;
90:13;
145:1;
146:24
**them** [56]
6:19; 15:3;
26:1; 33:4,
6; 88:20;
89:24;
90:2;
92:15;
95:8;
108:18;
126:24;
132:13, 14,
15, 17, 18;
140:13, 17;
142:3, 4,
18, 19;
144:22;
148:22;
150:5;
152:18, 20,
21; 155:18;
159:21;
162:25;
172:12, 15,
17; 173:12,
14; 175:1,
15, 18;
183:5, 12,
25; 184:6,

7, 12, 23,
24; 185:7;
186:12;
192:12, 20
**themselves**
[1] 108:24
**Then** [7]
10:3; 70:8;
83:1;
105:8;
122:9;
174:6;
197:19
**then** [37]
14:7; 25:2;
27:21;
32:6;
46:15;
47:23;
66:13, 15,
18, 19;
72:16;
81:9; 82:1,
9, 17;
87:21;
89:3, 6;
96:24;
97:3;
103:20;
109:1;
115:19;
118:24;
123:3;
129:15;
130:24;
149:9, 10,
13, 14;
165:21;
178:8;
183:19, 20;
187:6;
191:5
**theories** [2]
129:19;
194:17
**theorize** [1]
195:19
**There** [14]
13:4;
14:10, 15;

15:3;
23:18;
81:6;
101:9;
104:10;
107:25;
131:4;
145:15;
148:4;
181:5;
186:17
**there** [113]
14:5, 6;
17:20, 22;
21:20, 25;
22:9; 28:1;
31:10, 12;
33:19, 21,
24, 25;
34:1;
36:10;
39:8, 16,
19; 40:19;
44:15;
46:3;
47:16, 24;
48:16;
51:22, 23;
52:15, 18;
55:17;
56:20;
58:10, 23;
68:1;
72:24;
73:6;
75:25;
76:24;
79:19, 21,
22; 80:22;
81:9, 25;
83:14, 17;
86:1, 8, 17;
90:23;
94:12;
95:2;
96:25;
97:2, 25;
98:5;
100:18;
104:25;

105:21;
107:9;
108:8;
112:2;
114:10, 22,
24; 116:7,
15, 21;
118:12;
120:8, 9;
121:6, 25;
122:1, 13;
124:14, 15;
125:3, 4, 9,
12; 132:16;
134:5;
138:5;
139:2;
143:18;
151:14;
153:5;
159:20;
161:24;
164:2, 8, 9,
23; 166:8,
14, 16, 18;
168:14, 15,
18, 19;
170:7;
175:20;
181:9;
183:9;
184:3;
186:21;
188:19;
195:15
There's [1]
23:6
there's [1]
125:25
These [5]
101:6;
110:3;
111:19;
138:12;
180:8
these [18]
6:21;
11:25;
78:5, 8;
81:2;

101:2;
107:25;
108:3, 16;
117:4;
136:19;
138:7;
139:4;
150:8;
165:12;
172:5, 9;
173:4
They [26]
8:5; 16:13;
21:10;
22:14;
41:18;
55:14, 23;
59:4; 87:2;
95:10;
96:19;
97:4;
112:3;
121:21;
130:14;
132:3, 6;
149:12;
152:24, 25;
153:1;
155:4;
162:25;
164:8;
183:19
they [97]
6:14;
11:10;
21:6, 8, 9;
41:15;
42:22;
43:8, 10;
44:8;
46:22, 25;
48:22;
49:2, 5, 7,
8, 9, 13;
50:2, 3;
51:7, 8;
55:14, 24;
57:24;
81:4; 82:6,
10, 11, 24;

90:10;
95:8, 11,
12; 97:1,
18; 99:12;
101:3;
110:10;
122:24;
125:11;
128:8;
129:7, 8,
14, 15, 22;
130:12, 18,
22; 132:4,
8, 9, 11;
134:15;
137:1;
138:3, 7;
140:8;
141:21;
142:13, 15;
145:2, 10,
24; 147:9;
149:14;
153:2, 3, 4;
155:2, 9,
11, 20;
159:20;
162:24;
163:12;
165:16, 18,
20; 167:4,
5, 6, 9;
168:18;
183:20;
184:2;
185:25;
193:2, 10,
11; 196:2,
5
They're [3]
6:9; 30:23;
109:3
they're [10]
11:25;
22:11;
90:6;
132:3;
144:12, 25;
145:3, 4, 6,
11

they've [1]
159:21
thing [23]
34:25;
37:13, 14;
46:23;
50:1; 52:4,
11; 56:1,
15; 66:13,
17; 82:6;
87:11;
95:21;
116:12;
125:7;
132:15;
141:20;
142:9;
152:23;
173:15, 16;
182:9
things [6]
18:18;
51:21;
75:21;
84:20;
126:1;
138:4
think [36]
9:16; 12:7;
23:12;
25:24;
51:20;
58:23;
65:16;
76:14;
77:10;
81:7; 87:3;
99:14, 15;
101:3;
116:10;
122:20;
127:4, 18;
128:20;
135:5, 20;
136:8;
153:19;
172:7;
173:12, 23;
183:4;
184:13, 14;

185:6;
188:19;
190:9;
195:14
thinking [1]
76:22
thinks [1]
173:21
third [3]
82:7;
121:22, 24
This [39]
6:23;
10:16;
12:15, 17;
36:9;
43:22;
49:10;
50:10;
54:19, 24;
57:14;
72:13;
97:16;
103:5, 15;
109:4;
112:20;
114:16, 18;
118:3;
133:23;
137:15;
142:12;
144:5;
147:2, 4;
150:11;
157:11, 18;
162:15;
167:1, 18;
170:10;
177:13;
179:8, 12,
14, 17;
182:14
this [174]
6:14; 8:2,
4, 8, 9;
9:3, 22;
11:14, 16,
19; 12:4;
13:8, 10;
14:13, 15;

19:16;
29:17;
31:20;
32:2, 13,
17; 35:5;
37:21;
40:14;
41:14, 19;
43:9, 11;
44:9, 11,
16, 18;
45:2, 7, 13,
15, 22;
46:1, 17;
49:13;
50:3;
51:11;
52:7, 11;
54:14, 18;
55:20, 23;
57:8, 17;
58:6;
59:11;
62:13, 14;
64:16;
66:13, 17;
68:14;
69:23;
71:22;
73:10, 14,
25; 79:12;
83:7; 92:6;
93:23;
94:20;
95:5, 13,
14, 17, 21;
100:8;
101:8, 9,
21; 102:4,
9, 18, 24;
103:9, 14,
18, 22;
104:6, 8;
105:3, 15;
107:6, 15;
108:6;
109:2;
110:7, 11,
12, 16;
114:18;

115:4, 23;
116:12;
121:2;
123:15;
124:10;
126:3, 11;
133:11;
134:12;
136:18, 22;
137:4, 5,
11, 22;
138:6, 13,
20, 23, 25;
141:3, 13,
14, 22, 24,
25; 142:2,
6; 144:10;
145:2, 9,
23; 147:1,
9; 149:21;
150:24;
151:8;
152:12, 24;
153:9;
161:5, 14,
19, 20;
163:2;
167:11;
169:4;
170:10, 15;
171:5, 23;
173:21;
177:2, 17,
19, 21;
179:17;
180:9, 19;
181:5, 23;
182:4, 8,
10, 13, 15;
185:21, 23;
188:18;
190:22;
193:9;
196:8;
199:15
**those** [18]
13:25;
18:3;
25:25;
26:9;

39:13;
76:11;
78:17;
79:5; 93:1,
18; 94:5,
9, 15;
129:6;
136:25;
153:7;
180:5;
192:23
**though** [6]
33:25;
86:1; 93:6;
122:20;
129:8;
157:18
**thought**
[13] 23:23;
57:23;
67:23;
69:5; 77:7;
90:24;
97:24;
102:5, 14;
121:18;
129:25;
149:13;
153:20
**threaten** [1]
169:10
**threatening**
[1] 169:12
**Three** [4]
23:9, 11;
63:1
**three** [12]
23:8, 12;
36:10, 25;
37:7;
47:19;
79:20;
99:16;
122:16, 19,
22; 142:21
**threw** [2]
153:4;
189:5

**Through** [2]
177:1;
190:16
**through**
[19] 10:1;
12:4;
57:17;
62:13;
81:1, 3, 10,
11, 16, 17;
111:18;
112:21;
116:20;
124:9;
125:3;
126:3;
136:25;
157:14;
189:23
**throwing**
[1] 153:4
**Thursday**
[2] 1:22;
2:5
**TIETJEN** [1]
1:18
**Tietjen** [2]
4:12; 8:25
**time** [78]
10:16;
12:15;
14:4, 10;
17:4;
21:20;
32:16;
36:6; 37:7,
11, 12;
40:14, 17;
48:25;
58:8, 24;
64:5, 7, 9,
16; 66:18,
19; 69:25;
70:2;
73:13;
79:25;
82:5;
84:18;
85:6, 9;
87:9; 88:5,

13, 17;
90:1, 11;
94:19, 21;
95:1, 7;
96:23;
99:25;
100:2;
104:3;
117:16;
123:19;
124:13;
128:16, 22;
130:20;
132:17;
133:5;
136:10;
140:8;
143:9;
144:13;
145:7, 22;
152:16, 17,
19, 20, 21;
155:20;
164:17;
166:8;
173:10;
182:11;
183:5, 15;
186:12;
189:5, 8;
194:8, 12
**times** [9]
12:22;
50:11;
52:7, 12,
13; 62:17;
63:1; 188:4
**today** [19]
6:10; 9:15;
10:22, 25;
11:7, 21,
22; 13:5;
16:25;
17:2, 12,
14, 17, 21;
18:4; 31:1;
99:21;
125:4;
186:21

**today's** [5]
16:21;
18:11, 15;
19:4, 8
**together**
[29]   6:22;
11:14;
41:19;
46:14;
48:22;
49:14;
50:3;
55:21;
58:7;   59:5;
66:14,  16;
109:10;
138:7;
150:10;
157:3;
162:25;
174:22;
175:25;
176:6,   20,
25;   177:7,
18,   19;
178:1,  16;
187:12;
191:2
**told**   [66]
6:15;  19:9;
43:1,   13;
44:4;
45:18;
47:14,  19;
48:14,  15,
17;   49:15;
51:6,   11,
16,  17,  19,
25;   52:17;
60:3,   21,
23;    69:5;
78:1;   88:4;
90:7;   95:3;
96:20;
97:8,    9;
98:15;
108:7;
118:8;
119:4,   18,
22,   25;

120:24;
121:13,  18,
20;   122:6;
123:8,   21;
126:11,  19,
24;   127:6;
128:6;
132:15,  17;
141:21;
143:8;
145:24;
146:2;
152:20;
153:18,  19;
185:6;
188:19;
194:2, 3
**took**   [17]
16:20;
17:4;
44:19;
55:16;
82:11;
98:17;
123:3,   5;
142:18;
158:11,  14;
174:25;
175:14;
183:23,  25;
184:18;
194:16
**topic**   [2]
70:18;
184:24
**topics**  [1]
10:7
**total**   [1]
141:19
**totally**  [1]
139:5
**town**   [1]
155:5
**traffic**   [3]
130:19,  21;
148:9
**train**   [2]
82:6;  122:6
**TRANSCRIP
T** [1]  2:1

**transcript**
[4]     13:9,
15;  165:14;
199:10
**transformat
ion**   [2]
176:13, 17
**transported**
[1]  148:5
**transportin
g**    [2]
95:16;  96:9
**trauma**  [1]
174:13
**tree**    [1]
22:12
**Trenton** [1]
4:11
**trial**    [5]
10:6;
11:17,  19;
12:7;  83:21
**trick**   [1]
175:9
**tricked**  [8]
41:15,  18,
23;   42:22;
43:2;   44:9;
48:15;  49:2
**tried**   [1]
63:14
**triggered**
[1]  64:3
**trips**   [3]
122:16,  17,
19
**TROOPER**
[1]  1:18
**trouble**  [1]
23:22
**truck**   [19]
81:25;
82:11,  16;
85:7;
86:17;
91:9,    10,
14;   92:13;
121:7;
140:7;
149:13;

163:17,  23;
165:20;
180:12,  13;
184:8;
198:3
**true**    [8]
12:16;
45:20;
46:24;
47:1;
117:9,   12,
18;  199:10
**truth**   [10]
9:5;   10:21;
173:14,  23;
174:1;
199:7, 8
**truthful** [4]
10:22,   25;
17:21;  18:4
**trying**   [17]
12:24;
42:24;
46:4,    5;
53:25;
55:3,    6;
57:22;
63:8;
65:19;
96:14;
106:20;
109:9,   10;
175:9;
181:7;
187:12
**Tuesday** [2]
182:12, 13
**turn**    [2]
66:20;  83:1
**Turner**  [2]
111:6;
149:10
**Turner's** [2]
126:18;
127:2
**turning**  [1]
16:15
**twice**    [1]
24:23

**Twin**    [1]
23:12
**twin**    [1]
23:6
**Type**    [2]
15:14, 18
**type**    [4]
15:14,   17,
18
**typically**
[2]    14:5;
15:6

- U -

**Uh-huh**  [7]
68:12;
69:7;
93:13;
100:7;
111:15;
115:18;
157:16
**uh-huh**  [1]
13:24
**um-hum**  [1]
13:24
**uncle**   [2]
26:15;  95:8
**uncles**  [3]
25:25;
26:1;  28:4
**under**   [2]
11:15;
14:21
**undersigne
d**   [4]
148:2,    3,
15;  158:4
**understand**
[22]   10:11,
21;   11:23;
13:11,   18;
14:1,   19;
20:18;
36:23;
45:5;   46:4;
47:3;
48:13;
49:12;

51:5;  55:4,
5;   57:23;
80:6;  93:8;
104:21;
187:13
**Understood**
[1]  194:13
**understood**
[2]  13:16;
80:10
**unethical**
[1]  175:10
**unidentifie
d**    [2]
140:10, 11
**UNITED** [1]
1:1
**Unless** [2]
113:19;
118:12
**unless** [2]
14:17;
102:23
**unloaded**
[2]  82:15;
122:10
**unsure** [1]
123:25
**until** [6]
82:10;
83:17;
97:2;
102:18;
128:21;
129:9
**unusual** [1]
11:4
**up-to-date**
[1]  131:20
**upcoming**
[1]  19:16
**Upon** [1]
148:3
**upon** [1]
100:22
**upset** [2]
141:2;
174:9
**used** [3]
11:16;

120:1;
152:19
**using** [2]
188:13;
192:22
**usually** [1]
174:13

_____

- V -

**Vacant** [1]
186:25
**Vailsburg**
[16]
163:17, 23;
164:21;
166:13;
168:12, 13,
21,   22;
169:21;
175:1, 15;
183:3, 13,
23;  184:1,
12
**value** [7]
189:4,   7,
11, 13, 17,
20; 190:2
**various** [2]
9:23; 26:1
**VASQUEZ**
[1]  1:17
**vehicle** [1]
198:3
**Vera** [1]
25:15
**Vera's** [1]
25:21
**verbally** [2]
13:22, 25
**versus** [1]
100:10
**very** [12]
12:2;
62:10;
69:21;
102:9;
105:15;
136:17;
140:1,  4;

152:24;
162:3;
186:1, 3
**Victim** [1]
134:20
**victim** [5]
56:5;  57:8;
134:21, 23
**victim's** [3]
135:6, 21;
139:7
**VICTOR** [1]
4:4
**Victor** [1]
8:22
**Village** [2]
34:14, 15
**violation**
[2]  102:8;
110:19
**visit** [1]
155:18
**VOMACKA**
[10]   4:3;
104:7,  23,
25; 105:13,
20;  106:9,
13,   20;
109:21
**Vomacka**
[5]  8:23;
104:8;
105:12;
106:7;
107:13
**Vomacka's**
[2] 110:15;
113:5

_____

- W -

**Wait** [6]
104:20, 21
**waiting** [1]
155:17
**waive** [1]
8:9
**want** [67]
16:2,   3;
17:16;

18:22,   23,
25;  20:23;
22:10;
26:18;
44:3;
48:13;
51:5,  12;
52:4;  63:5,
6;   67:22;
68:2;
76:24;
77:15;
88:11;
95:6,   25;
99:4;
103:11;
104:3,   6;
111:18, 25;
113:6;
114:5;
115:2,  22;
116:8;
118:13;
129:11;
130:16;
132:4;
133:14, 16;
139:25;
140:24, 25;
145:24;
147:9;
153:15, 16;
157:9,   17,
23;   158:1,
8,   16;
162:3;
169:11, 13;
174:8,   9;
177:12;
179:16, 22;
181:21;
188:17;
191:15
**wanted** [10]
74:10;
75:21;
80:21;
96:1;
108:6,  12;
145:20;

146:10;
165:19;
167:8
**wanting** [1]
142:23
**warehouse**
[2]  34:25;
35:1
**warrant** [3]
130:19, 21;
148:9
**Wasn't** [1]
99:12
**wasn't** [50]
37:9;
38:18,  22;
39:11,   12,
15;   41:9;
46:3;
48:16;
61:9;  62:4;
72:1;  77:1;
81:4,   12,
22;  83:15;
87:16;
92:13;
95:6,   18;
96:10;
97:23,  25;
99:17,  18;
110:2;
112:6,   7;
121:25;
124:3;
125:15;
138:5;
144:7;
152:22;
166:8,   9,
14,   16;
168:14, 15;
183:17;
188:12;
194:1;
197:16
**ways** [1]
110:20
**We'll** [1]
107:7

we'll [1]
107:3
We're [2]
101:7;
129:20
we're [5]
84:22;
101:8;
104:10;
129:17, 18
week [8]
17:6;
182:13, 14;
197:3, 4, 5,
7
Well [32]
10:18;
15:20;
18:18;
23:5;
29:23;
32:12;
33:11;
35:25;
37:21;
44:18;
46:3;
49:18;
58:15, 23;
59:2;  62:3;
74:12;
79:12;
88:7;
92:18;
98:13;
102:15;
103:6;
107:3;
108:20;
129:5;
136:16;
141:15;
150:20;
160:22;
166:20;
185:13
well [5]
20:23;
102:9;
106:21;

111:20;
185:7
Went [2]
81:25;
82:13
went [46]
39:14;
45:21;
55:22;
63:11;
76:14;
82:9,  24;
83:2;
93:16;
94:6;
96:24;
112:15;
119:8, 25;
120:9;
121:12;
124:9;
126:5;
129:7;
130:21;
134:16, 21;
142:3, 4, 6;
148:4;
157:22;
163:14;
164:23;
166:12;
167:22;
168:12, 13,
21,  22;
169:21;
185:10, 14,
16;  188:20;
192:23;
193:1,  9,
20;  196:2,
6
Were [13]
27:23;
44:15;
47:16,  24;
78:17;
79:4;
155:8;
156:2;
162:10;

171:16, 18,
20; 192:22
were [71]
6:19;
11:20;
18:23;
21:15, 18;
23:20;
29:9,  12;
56:5;  57:8,
17;  60:15,
18;  65:2;
69:11;
79:13, 15;
86:17;
89:21;
91:10;
94:12;
95:11;
96:8;
99:13;
101:2,  3,
15; 102:12;
103:8;
105:1;
110:12;
111:23;
117:10, 13,
19; 119:22;
120:12;
122:24;
124:1;
126:17, 24;
140:6;
144:18;
150:6;
155:2,  8,
21; 156:24;
161:16;
163:5;
165:17;
167:6;
176:6;
177:2;
178:13, 20;
188:13;
190:17;
191:18, 20,
25;  192:3,

11; 195:25;
196:1, 9, 12
weren't [2]
96:8;
141:21
What's [1]
166:22
what's [1]
116:7
whatever
[6]  64:9;
74:10;
113:6;
132:7,  8;
191:20
whatsoever
[1] 179:14
Where [14]
21:18;
31:15;
33:20;
34:1;  40:4,
7;  45:11;
79:15;
90:6,  10;
112:3,  15;
117:19;
193:18
where [41]
11:8,  10;
22:2;
31:11;
33:11,  17;
47:23;
49:2;  75:2;
76:17;
77:21;
78:1;  81:7,
15;  90:16,
17;  95:14;
97:1;
100:14;
118:1;
120:1,  15;
122:10;
125:11, 13,
20; 142:15;
155:2, 11;
161:2;
175:1, 15;

183:18;
185:10, 13;
186:16;
187:4,  9,
14; 193:18
Whereupon
[4]  64:24;
113:23;
153:11;
182:23
Whether [1]
110:14
whether [8]
47:1;  65:4,
13;  77:1;
99:22;
151:21, 22;
169:4
Which [2]
26:4; 78:21
which [12]
28:3;  57:2;
89:12;
106:24;
108:6;
140:18;
142:9;
148:23;
150:1,  25;
179:6, 7
whoever [2]
168:19;
195:19
whole [13]
6:14,   9:5;
43:9,  11;
54:14,  16;
73:23;
94:4;
116:12;
125:6;
150:24;
182:9;
199:7
Whose [1]
28:3
whose [1]
73:4
wife [14]
31:8;

75:24;
79:23;
83:8;
117:11, 16,
23; 121:21,
23; 122:1;
124:1, 11;
125:14;
194:3
**wife's** [1]
28:19
**Will** [1]
68:10
**will** [48]
6:8; 8:4, 6;
10:7, 25;
12:11, 17,
20; 13:9,
13, 16, 18;
14:4, 6;
15:22;
30:21;
42:4; 46:4;
52:5;
64:11;
71:25;
72:16;
94:1;
105:5, 10,
24; 106:9;
107:9;
112:21;
114:11;
115:3, 16,
20; 118:24;
125:2;
137:18;
138:24;
140:18;
145:25;
157:10;
160:4;
165:14;
172:1;
173:9, 10;
174:22;
183:21
**WILLIAM** [1]
1:18

**William** [2]
4:12; 8:25
**WIlliams**
[1] 154:9
**Williams**
[62] 22:20,
23; 24:18,
20, 23, 24;
96:16, 17,
20, 21;
97:8, 20;
98:14, 19;
99:8;
133:6;
145:22;
146:2, 5;
154:8, 20,
21, 22;
158:6, 25;
159:2, 6,
13, 16, 17,
18, 19, 20;
160:1, 3,
10, 14, 16,
21, 22, 24;
161:3, 5, 7,
9; 162:6;
163:11, 12,
13; 165:16,
19; 166:6,
15; 167:4,
5, 7, 21;
168:11, 19,
21; 171:9
**WITNESS**
[97] 7:3;
17:1, 13;
20:3, 19;
23:25;
37:18;
38:5, 21;
40:1, 9;
41:2, 18;
42:13;
45:1;
48:10, 21;
52:3, 20,
25; 53:15;
54:1;
56:25;

57:11;
59:21;
60:8; 61:1,
11; 62:20;
63:1, 17;
64:23;
65:10, 19,
25; 66:2,
6; 67:20,
25; 68:3,
21, 25;
69:17;
72:7;
73:20;
77:5, 9;
80:8; 84:7;
85:23;
89:5;
93:24;
95:23;
97:14;
98:10;
112:1, 12;
115:7, 12;
116:1, 5,
18; 118:22;
124:6, 22,
25; 125:11;
131:19;
134:7;
135:15;
136:16;
143:15;
144:1, 22;
147:18, 20;
151:15;
156:7, 15;
167:17;
170:24;
171:14;
173:13, 19,
22, 25;
176:12;
178:25;
179:3;
187:25;
188:5;
189:14, 16;
194:8;

195:6;
196:17
**witness** [2]
49:23;
199:6
**witnesses**
[1] 144:2
**won't** [2]
13:24;
62:18
**wondering**
[1] 105:7
**Woody** [9]
25:12, 18,
19; 26:7,
12; 27:17;
28:9;
119:9;
126:13
**Word** [1]
42:25
**word** [14]
6:16; 13:7,
8; 42:25;
43:4, 5, 6,
14; 49:17
**words** [4]
13:23, 25;
44:10; 80:2
**work** [4]
134:21;
142:18;
156:21, 24
**worked** [4]
159:3;
160:23, 25;
190:11
**working** [7]
94:19, 20;
95:10;
104:10;
157:3;
183:19;
192:8
**works** [1]
174:14
**Would** [4]
29:8, 19;
178:11, 18

**would** [50]
9:1; 11:5;
12:2, 4, 9;
13:12;
18:3, 18;
26:15;
57:12;
64:7; 67:7;
71:23;
73:22, 23,
24, 25;
76:4;
78:10;
97:10;
101:19;
104:12;
105:9;
106:1, 14,
15, 17, 23;
116:25;
118:16;
135:6, 21;
136:9, 18;
140:13, 17,
18; 149:1;
151:14;
152:1, 2;
153:2, 3;
157:6;
172:7;
185:1;
187:7;
191:24
**wouldn't**
[3] 32:21;
98:5;
112:18
**write** [1]
150:14
**written** [4]
101:13;
102:12;
104:16;
147:5
**wrong** [2]
69:6;
147:17
**wrote** [6]
6:19;
101:10;

136:22;
138:5;
144:16;
150:4
www.Rosel
andReporti
ngService.c
om [1] 2:24

**- X -**

XI01142 [1]
199:4

**- Y -**

year [11]
29:4, 6, 7;
31:6;
40:14;
48:2;
157:4;
159:3;
160:23, 25;
180:18
years [23]
6:2,    3;
22:1,    2;
28:24;
29:23;
30:2, 5, 7,
8;    31:10,
12;   32:19;
38:18;
39:13;
50:22;
53:21;
54:2;
79:20;
84:25;
85:1, 5
yelling [1]
136:2
You'd [1]
82:3
you'll [1]
51:10
You're [21]
6:9; 17:13;
23:13;

25:16;
30:24;
49:22;
94:14;
99:18;
103:23;
128:4;
147:19;
148:12, 25;
155:24;
166:7;
169:2, 8, 9;
179:3;
181:6, 8
you're [43]
10:21;
11:8, 13;
14:18;
18:2;
29:19;
39:4;
40:22;
41:4,    5;
43:2;   55:1;
56:6;   60:3;
61:4;
63:23;
67:2;   82:2;
84:3;
87:13, 25;
89:3;
94:11;
101:16;
106:25;
115:16;
137:3,   5,
16;  138:16;
141:2;
146:22;
160:7;
169:11;
170:22;
173:8;
174:12;
181:7;
184:17;
188:6;
197:17, 20
You've [5]
50:11;

78:15;
103:24;
119:4;
168:3
you've [2]
115:1;
167:11
Your [10]
6:6, 9, 16;
12:8;
22:15;
30:15, 22;
43:15;
89:13;
121:23
your [167]
6:7,    11;
8:10, 11;
9:25; 10:4,
24;  11:22;
12:5, 9, 21;
13:25;
14:11, 14,
16,   17;
16:3;   18:3,
24;    19:1,
6,  17, 23;
20:7;
21:21;
22:2,    12,
13, 16, 19,
25;   23:10;
24:17;
26:8,    12,
15;    27:7,
15;    28:3,
19;   29:2;
30:20;
31:1,    8;
41:7;
43:24;
48:7;
49:18;
53:7,   10;
54:19, 23;
56:4, 5, 11;
57:17, 23;
58:2,    10,
11, 15, 19;
59:7;

62:16;
65:4,   13;
67:8,    11,
23;  74:25;
78:11;
79:21;
80:2;
83:20, 24;
84:3,   10;
89:12, 21;
91:18;
95:25;
98:13, 18;
100:9;
103:7, 22;
105:11;
107:22;
108:6;
109:6;
111:8,    9,
19; 112:20;
114:8;
117:10, 23;
119:3, 23;
120:12, 19;
122:14, 22;
123:16;
124:10;
125:3;
126:11, 18,
25; 127:17;
128:11;
129:19;
135:14;
138:18;
144:5;
145:11;
147:2, 17;
153:18;
155:15;
157:12;
161:5;
162:9,   10,
22;   163:5,
23; 169:19;
170:10, 12;
171:16, 18;
174:3, 18;
175:10;
176:1, 18;

177:15;
179:12, 17,
22;  180:8;
181:10, 19;
184:11, 17;
188:17, 21;
190:17;
193:4, 12,
19;  194:3,
23;   195:2,
11, 12
yours [2]
105:8;
156:18
yourself [1]
167:1
Youth [1]
140:19
youth [5]
140:10, 15;
142:24;
145:20;
146:11
youths [6]
140:6, 13;
142:17, 21;
148:15;
149:14

**- Z -**

ZAMMATAR
O [2]   2:2;
199:2
Zammataro
[2]   13:6;
199:20
zombie [1]
16:15
Zoom [1]
2:5

# EXHIBIT D

SUPERIOR COURT OF NEW JERSEY
ESSEX COUNTY, HOMICIDE SQUAD
INDICTMENT NO.
PROSECUTOR NO.
CASE NO. S-23-01
CC #

√ = correction needed

IN THE   )
      )
MATTER OF  )  TRANSCRIPT
      )   of
INVESTIGATION OF THE )  INTERVIEW OF
      ) PHILANDER HAMPTON
DISAPPEARANCE OF )
      )
R.J., ET AL.  )

Place: State Police Barracks
    Newark, NJ

Date: November 13, 2008

TRANSCRIPT ORDERED BY:

 GREGORY DE MATTIA, ESQ., (Essex County
 Prosecutor's Office, 50 West Market Street,
 Newark, New Jersey 07102)

APPEARANCES:

 LIEUTENANT LOU CORREGLIA
 Essex County Prosecutor's Office

 DETECTIVE JOE CASSIAN
 New Jersey State Trooper, Missing Persons Unit

 OFFICER JOE HADLEY
 Newark Police Department, Homicide Unit

     Transcriber SHERRY M. BACHMANN
     **ELITE TRANSCRIPTS, INC.**
     14 Boonton Avenue
     Butler, NJ  07405
     (973) 283-0196
     Audio Recorded
     Operator, _____



EXHIBIT ID
HAMPTON-6
2·15·22  MAA

ECPO 000342

2

1              LT. CORREGLIA:  Phil, sit right there.  What

2   do you want, three sugars?

3              MR. HAMPTON:  Yeah.

4              LT. CORREGLIA:  And a little milk or a lot of

5   milk?

6              MR. HAMPTON:  A little milk.

7              LT. CORREGLIA:  A little milk?

8              MR. HAMPTON:  Not a lot.

9              LT. CORREGLIA:  You don't need to go to the

10  bathroom at all?

11             MR. HAMPTON:  No.  I'll be fine.  I ain't got

12  no clothes.

13             LT. CORREGLIA:  You want a jacket or a

14  blanket

15  or --

16             MR. HAMPTON:  You got a blanket?

17             LT. CORREGLIA: Yes.

18             MR. HAMPTON:  Yes.

19             DETECTIVE HADLEY:  Coffee?  Water?

20             MR. HAMPTON:  He's getting me some coffee.

21             LT. CORREGLIA:  Leave those alone.  I'll show

22  you.  You can look at it later.  I don't know if he's

23  your cousin, this guy right here.  That's Maurice,

24  right?

25             MR. HAMPTON:  Yeah.

3

1              LT. CORREGLIA:  We'll talk about it.  Do you

2       want more cream?

3              MR. HAMPTON:  No.  That's good.

4              LT. CORREGLIA:  That's good?

5              MR. HAMPTON:  Yeah.

6              LT. CORREGLIA:  I put enough sugar in it.

7       All right.  You know where you are?  You're at the

8       State Police Barracks in Newark.  Okay?  That's where

9       you are.

10             MR. HAMPTON:  All right.

11             LT. CORREGLIA:  You were brought here by us.

12       We brought you here, and we're going to talk to you

13       about what we started to talk about before, before we

14       drove over to Campbell Street.  Okay?

15             MR. HAMPTON:  Uh-huh.

16             LT. CORREGLIA:  The time -- the time now is

17       8:18 p.m.  The date is November 12th, 2008.  Okay.  I'm

18       going to put your name here.  Philander, right?

19       P-h-i-l-a-n-d-e-r?

20             MR. HAMPTON:  Uh-huh.

21             LT. CORREGLIA:  Hampton, H-a-m-p-t-o-n?

22             MR. HAMPTON:  Uh-huh.

23             LT. CORREGLIA:  I'm Lieutenant Correglia

24       (phonetic), Lou Correglia, okay, of the Essex County

25       Prosecutor's Office.  I'll read this to you.  Then you

ECPO 000344

4

1   can read it back.  The Essex County Prosecutor's

2   Office, Newark, New Jersey.  I'm going to ask you

3   certain questions regarding five missing kids and the

4   year was 1978, okay?  So I'm writing that down.

5          However, before beginning, I advise you of

6   your rights.  You've heard your rights many times

7   before?

8          MR. HAMPTON:  Yes.

9          LT. CORREGLIA:  You've seen it on TV.  You've

10  been read before, right?

11         MR. HAMPTON:  Yeah.

12         LT. CORREGLIA:  You have the right to remain

13  silent.  Anything you say can be used against you in a

14  court of law.  You have the right to talk to a lawyer,

15  have him present with you while -- to hire a lawyer, if

16  you wish one.  You have the right to stop answering

17  questions or giving a statement -- If you cannot afford

18  a lawyer, one will be -- These are your rights for

19  MIRANDA.  The bottom part of this form that's in front

20  of you is the waiver.  And, like I said, you can read

21  it and I'm going to have you initial each one.

22         I've been advised of my rights, and I have

23  read the statement of my rights shown above.  I

24  understand what my write -- I do not want a lawyer at

25  this time and understand that I may have one at anytime

1    I so desire.  I also understand -- or threat of any

2    kind has been used against me.  Okay.  You understand

3    the way I read it, right?

4            MR. HAMPTON:  Yes.

5            LT. CORREGLIA:  Now, you can read and write,

6    Philander?

7            MR. HAMPTON:  Uh-huh.

8            LT. CORREGLIA:  Okay.  Again, this is what I

9    filled out, right?  What's this, November 12, 2008,

10   right?  Philander Hampton, right?  I'm Lieutenant Lou

11   Correglia, Essex County Prosecutor's Office.  I'm going

12   to ask you questions regarding the this case.  Okay.

13   You have to read these outright, okay, and then initial

14   each one, okay, one through five.  Read them out loud,

15   though.

16           MR. HAMPTON:  Okay.  You have the right to

17   remain silent.

18           LT. CORREGLIA:  Okay.

19           MR. HAMPTON:  Anything you say can be used

20   against you in a court of law.  You have the right to

21   -- you have the right to talk to a lawyer and to have

22   him present with you while you are being questioned.

23   If you have -- if you cannot afford to hire a lawyer,

24   one will be appointed to you.

25           LT. CORREGLIA:  Okay.

ECPO 000346

6

1          MR. HAMPTON:  You're represented -- what's
2     that --
3          LT. CORREGLIA:  Before any questioning --
4          MR. HAMPTON:  Yeah.  Okay.  I --
5          LT. CORREGLIA:  You need glasses.  You're
6     getting old.  You have the right to stop answering
7     questions or giving a statement or the answering of
8     questions of -- initial one through five.
9          MR. HAMPTON:  Where do I initial, my first?
10         LT. CORREGLIA:  Initial each one, first name
11    and last name.  Right.  P. and an H.  P.H.  The bottom
12    is the waiver that I read to you.  You read it and then
13    you sign the bottom.
14         MR. HAMPTON:  I have read the statement of my
15    rights shown above.  I understand what my rights are.
16    I am willing to answer -- I do not want a lawyer at
17    this time.  Okay.  All right.
18         LT. CORREGLIA:  All right.  You do not want a
19    lawyer at this time, but you know that you may have
20    one, if so desired, and also understand no promises,
21    threats have been made to you?
22         MR. HAMPTON:  No.
23         LT. CORREGLIA:  All right.  Sign it.  Over
24    here on this side.  Today's date is Wednesday, November
25    12th.  The time now is 8:24 p.m.

ECPO 000347

```
 1              MR. HAMPTON:  8:24?

 2              LT. CORREGLIA:  Correct.

 3              MR. HAMPTON:  Okay.  That's time -- I put

 4    time is 8:24.

 5              LT. CORREGLIA:  Yes.  That's fine.  That's

 6    fine right there.  Don't worry about it.  All right.

 7    Joe Hadley (phonetic), Newark Police Homicide.  Okay?

 8    Joe Cassian, State Trooper, Detective from Missing

 9    Persons Unit.  Okay?

10              MR. HAMPTON:  Yeah.

11              LT. CORREGLIA:  And you know who I am.  I

12    already told you.

13              MR. HAMPTON:  Yeah.

14              LT. CORREGLIA:  All right.  And we've done

15    that before.  Okay?  Just so they're going to witness

16    this form, okay, and then we can start.  I just want a

17    little background on you.  Were are you living now?

18              MR. HAMPTON:  I live at 36 Underwood.

19              LT. CORREGLIA:  You live there?

20              MR. HAMPTON:  That's my address.

21              LT. CORREGLIA:  That's your address.

22              MR. HAMPTON:  Yeah.

23              LT. CORREGLIA:  Where are you living now?

24              MR. HAMPTON:  Okay.  I live at 136

25    Monticello.
```

ECPO 000348

8

```
1            LT. CORREGLIA:  Monticello Avenue?
2            MR. HAMPTON:  Yeah.
3            LT. CORREGLIA:  Where is that?
4            MR. HAMPTON:  In Jersey City.
5            LT. CORREGLIA:  Who do you live there with?
6            MR. HAMPTON:  My girlfriend.
7            LT. CORREGLIA:  What's your girlfriend's
8    name?
9            MR. HAMPTON:  Joanne Waymer (phonetic).
10           LT. CORREGLIA:  Joanne Lemore?
11           MR. HAMPTON;  Waymer.
12           LT. CORREGLIA:  Waymer.
13           MR. HAMPTON:  W-a--
14           LT. CORREGLIA:  Okay.  How long have you
15   lived there in Jersey City?
16           MR. HAMPTON:  About six years.
17           LT. CORREGLIA:  Six years?
18           MR. HAMPTON:  Yeah.
19           LT. CORREGLIA:  Okay.  How far did you go in
20   school?  What grade did you go to in school?
21           MR. HAMPTON:  Tenth.
22           LT. CORREGLIA:  Tenth grade?  What school?
23           MR. HAMPTON:  West Side.
24           LT. CORREGLIA:  West Side?  West Side High?
25   All right.  I know you can read.  You can also write?
```

ECPO 000349

9

1           MR. HAMPTON:  Uh-huh.

2           LT. CORREGLIA:  Where do you currently live,

3    right now, I mean, today?

4           MR. HAMPTON:  I'm in jail now.

5           LT. CORREGLIA:  You're in jail.  Okay.

6    Listen, one thing, the whole time we're here, I don't

7    want to know about what you're in jail for.  I don't

8    want to talk about it.  All right?  None of us are

9    going to talk about that.

10          MR. HAMPTON:  Okay.

11          LT. CORREGLIA:  You understand why you're

12   here, right?

13          MR. HAMPTON:  I understand.

14          LT. CORREGLIA:  We're here to talk about five

15   missing children --

16          MR. HAMPTON:  All right.

17          LT. CORREGLIA:  -- from 1978, nothing else.

18   You know what I mean?  Okay.  So we're not going to ask

19   you other questions.  It's just concerning this and

20   nothing else, okay?

21          MR. HAMPTON:  Okay.

22          LT. CORREGLIA:  Is there anything you've done

23   in the past, any other stuff, I really don't want to

24   know about it.

25          MR. HAMPTON:  Yeah.

ECPO 000350

1           LT. CORREGLIA:  This is why we're here.

2    Okay?

3           MR. HAMPTON:  Uh-huh.

4           LT. CORREGLIA:  The date was August 20th,

5    1978.  It was a Sunday.  Do you recall that day?

6           MR. HAMPTON:  I recall that day.

7           LT. CORREGLIA:  You recall?

8           MR. HAMPTON:  Yeah.

9           LT. CORREGLIA:  Okay.  Where were you living

10   back in 1978?

11          MR. HAMPTON:  I was living on Camden Street -

12   - Hunterdon (phonetic) Street.

13          LT. CORREGLIA:  Okay.

14          MR. HAMPTON:  271 Hunterdon Street.

15          LT. CORREGLIA:  Okay.  All right.

16          MR. HAMPTON:  Around the exact time.

17          LT. CORREGLIA:  Exact time?

18          MR. HAMPTON:  Yeah.

19          LT. CORREGLIA:  Okay.  Before we came here to

20   the State Police Barracks, did I take you to Camden

21   Street?

22          MR. HAMPTON:  Yes.

23          LT. CORREGLIA:  In Newark, correct?

24          MR. HAMPTON:  Yeah.  In Newark.

25          LT. CORREGLIA:  Who gave me directions to get

11

1    there?

2              MR. HAMPTON:  I did.

3              LT. CORREGLIA:  Okay.  Why did we go there?

4              MR. HAMPTON:  Because that's where the five

5    boys was missing at, right there.  A fire is set in the

6    house that we moved out of on Camden Street and Evans,

7    you know, wanted to kill the boys, you know, but I

8    didn't really feel that he wanted -- you know, I didn't

9    really feel that way inside of me.

10             LT. CORREGLIA:  Okay.  I understand.

11             MR. HAMPTON:  Yeah.

12             LT. CORREGLIA:  But hold on.  But we went

13   there.  You took me there.  You gave me directions

14   there, right?

15             MR. HAMPTON:  Yeah.

16             LT. CORREGLIA:  Okay.  And what's there now?

17    New houses, right?  New housing?

18             MR. HAMPTON:  Right.

19             LT. CORREGLIA:  It wasn't like that back then

20   on August 20th, 1978, was it?

21             MR. HAMPTON:  No.

22             LT. CORREGLIA:  What was there on August

23   20th, 1978?

24             MR. HAMPTON:  A three-family house.

25             LT. CORREGLIA:  Three-family house?

12

```
 1            MR. HAMPTON:  Yeah.
 2            LT. CORREGLIA:  And you lived in that house?
 3            MR. HAMPTON:  I lived in the house on the
 4  third floor.
 5            LT. CORREGLIA:  The third floor of that
 6  house?  Do you remember the number?
 7            MR. HAMPTON:  I don't know the number.
 8            LT. CORREGLIA:  You don't remember the
 9  number, but you know it was on that spot that you
10  showed me, right, about the --
11            MR. HAMPTON:  -- between there where I see
12  where the lot was at.
13            LT. CORREGLIA:  Right.
14            MR. HAMPTON:  Right.  Because I remember,
15  there used to be a telephone pole right there.  That's
16  what I remember seeing.
17            LT. CORREGLIA:  All right.  And I saw the
18  telephone pole there.
19            MR. HAMPTON:  Yeah.
20            LT. CORREGLIA:  So it's pretty much the
21  middle of the block?
22            MR. HAMPTON:  Yeah.  Yeah.
23            LT. CORREGLIA:  If you're going south, --
24            MR. HAMPTON:  Yeah.
25            LT. CORREGLIA:  -- middle of a block on your
```

13

```
 1   left-hand side, --

 2             MR. HAMPTON:  Right.

 3             LT. CORREGLIA:  -- if you were going south?

 4             MR. HAMPTON:  Right.

 5             LT. CORREGLIA:  Right where you showed me.

 6   Okay.

 7             DETECTIVE CASSIAN:  Do you remember who owned

 8   the house?

 9             MR. HAMPTON:  Who owned that house?

10             LT. CORREGLIA:  Let me ask you, August 20th,

11   1978, or before, you told me you just moved to 271

12   Hunterdon Street.

13             MR. HAMPTON:  Yeah.

14             LT. CORREGLIA:  Who lived there with you on

15   Camden Street?

16             MR. HAMPTON:  My mother.

17             LT. CORREGLIA:  Just you and your mom?

18             MR. HAMPTON:  My mother and my brother.

19             LT. CORREGLIA:  And your brother that passed?

20    That's in the 80's, right?

21             MR. HAMPTON:  Yeah.

22             LT. CORREGLIA:  Okay.  He died in New York

23   City, right?

24             MR. HAMPTON:  Yeah.

25             DETECTIVE CASSIAN:  Did anybody else live in
```

14

1   that residence?  You said, it was a three-family.

2           MR. HAMPTON:  Somebody lived on the first

3   floor, but I didn't know them that well.

4           LT. CORREGLIA:  Let me ask -- we're going to

5   start asking you more questions, and I'm not going to

6   be the only one asking you these questions, but do you

7   know the exact date when you moved to 271 Hunterdon?

8           MR. HAMPTON:  Not the exact date.  No.

9           LT. CORREGLIA:  No?

10          MR. HAMPTON:  I don't know exactly, in '78.

11          LT. CORREGLIA:  All right.  On August 20th,

12  what was the condition of the house on Camden Street?

13  Were there people living in it?

14          MR. HAMPTON:  Yeah.  People were living

15  there, but --

16          LT. CORREGLIA:  On August 20th?

17          MR. HAMPTON:  Yeah.  But it was -- yeah.  I

18  never knew the landlord that owned that house.

19          OFFICER HADLEY:  I -- on the date.

20          LT. CORREGLIA:  On August 20th, --

21          MR. HAMPTON:  Yeah.

22          LT. CORREGLIA:  On August 20th, okay, were

23  there people living in it?  What was the condition of

24  the house, after you moved here?

25          DETECTIVE CASSIAN:  After you moved out.

ECPO 000355

 1            LT. CORREGLIA:  After you moved here, what

 2    was the condition of that house?

 3            DETECTIVE CASSIAN:  Was anyone living in the

 4    house when you went there?

 5            MR. HAMPTON:  No.  There wasn't no one living

 6    in there.

 7            DETECTIVE CASSIAN:  In none of the

 8    apartments?

 9            MR. HAMPTON:  Everybody moved out.

10            LT. CORREGLIA:  Everybody moved?

11            MR. HAMPTON:  Yes.

12            LT. CORREGLIA:  Was it boarded up?

13            MR. HAMPTON:  No.  It wasn't boarded up.

14            LT. CORREGLIA:  It wasn't boarded up?

15            MR. HAMPTON:  Everybody just moved out.

16            LT. CORREGLIA:  Everybody moved out?

17            MR. HAMPTON:  Yeah.  Everybody just moved

18    out.

19            LT. CORREGLIA:  How did you get in and out of

20    that house?

21            MR. HAMPTON:  I had a key to get in the

22    bottom door.

23            LT. CORREGLIA:  The bottom door, you had a

24    key?

25            MR. HAMPTON:  I had a key to get in.

ECPO 000356

1          LT. CORREGLIA:  Okay.

2          MR. HAMPTON:  Since we moved out, we had left

3    the door upstairs open.

4          LT. CORREGLIA:  Okay.  Listen, I'm going to

5    show you this -- this -- truthfully, I don't know who

6    made it up.  I believe it's -- long time ago, and it's

7    really a missing persons poster, and it has five -- a

8    picture of five boys.  One is Ernest Taylor, one is

9    Melvin Rickey Pitman, another one is Randy Johnson,

10   another one is Alvin Turner, and another one is Michael

11   McDowell.

12         MR. HAMPTON:  Yeah.

13         LT. CORREGLIA:  Do you recognize these boys?

14         MR. HAMPTON:  I recognize Michael.

15         LT. CORREGLIA:  Do you know Michael?

16         MR. HAMPTON:  I recognize him.

17         LT. CORREGLIA:  Personally?

18         MR. HAMPTON:  No.  I don't know him

19   personally.

20         LT. CORREGLIA:  How do you know him?  What is

21   his relationship with Lee?

22         MR. HAMPTON:  He just worked for Lee.

23         LT. CORREGLIA:  He works for Lee?

24         MR. HAMPTON:  Like cleaning up.  You know, --

25         LT. CORREGLIA:  All right.  Do you recall the

17

1    date and these boys?  Did you ever see these photos

2    before?

3              MR. HAMPTON:  No.

4              LT. CORREGLIA:  No?  Okay.

5              MR. HAMPTON:  No.  I never seen them photos

6    before.

7              LT. CORREGLIA:  These are the boys we're

8    talking about, though, all right?

9              MR. HAMPTON:  Yeah.  Yeah.

10             LT. CORREGLIA:  This is the first time you

11   see this -- right?

12             MR. HAMPTON:  Yeah.  The last time I seen

13   them, you know, --

14             LT. CORREGLIA:  Okay.  But you know Michael,

15   right?

16             MR. HAMPTON:  I knew Michael.  I knew another

17   kid, too.

18             LT. CORREGLIA:  You do?

19             MR. HAMPTON:  The other kid.  Where he at,

20   brown-skinned, big kid.

21             LT. CORREGLIA:  Ernie?

22             MR. HAMPTON:  Ernie?

23             LT. CORREGLIA:  I think this is actually

24   Ernie.  Let me see if we can find him.  Ernest --

25   right.  Ernie.  Right.  They're backwards.  Ernie is

18

1    actually this one here.  See, they got them backwards
2    on the poster?  These two are -- all right.  Here.
3    Sentence.  This is the photo, so just put your initials
4    there next to Michael's photo.
5             MR. HAMPTON:  And who is Rickey --
6             LT. CORREGLIA:  Rickey is this kid.  That's
7    Rickey.
8             MR. HAMPTON:  Yeah.  Yeah.  I -- I --
9             LT. CORREGLIA:  You know Rickey?
10            MR. HAMPTON:  Yeah.
11            DETECTIVE CORREGLIA:  All right.  Put your
12   initials next to him.  Okay.  Write down Rickey because
13   you know why, they messed up.  They inverted the names.
14   R-i-c-k-e-y.
15            MR. HAMPTON:  I can't see that writing on
16   that.
17            LT. CORREGLIA:  Okay.  That's Rickey.  Okay?
18   Yes.  That's Rickey.  They inverted them.  All right?
19   Now, Lee Anthony Ethers (phonetic), do you know him?
20            MR. HAMPTON:  Yes.  I know him.
21            LT. CORREGLIA:  Who is Lee Anthony Ethers?
22            MR. HAMPTON:  My cousin.
23            LT. CORREGLIA:  He's your cousin?
24            MR. HAMPTON:  Yeah.
25            LT. CORREGLIA:  And how long have you known

19

1    your cousin?

2             MR. HAMPTON:  Ever since I was about four,

3    five.

4             LT. CORREGLIA:  Four or five years old?  How

5    old are you now?

6             MR. HAMPTON:  Fifty-two.

7             LT. CORREGLIA:  Fifty-two.  You've known him

8    a long time.

9             MR. HAMPTON:  Because they moved up here --

10            LT. CORREGLIA:  Maybe 47 years, 48 years,

11   you've known them.

12            MR. HAMPTON:  But they moved up here.

13            LT. CORREGLIA:  Okay.

14            MR. HAMPTON:  They left us -- I was still

15   down south.

16            LT. CORREGLIA:  Oh, you were down -- okay.

17            MR. HAMPTON:  Yeah.  They moved from down

18   south to here.

19            LT. CORREGLIA:  And when did you move up

20   here?

21            MR. HAMPTON:  We moved up here --

22            LT. CORREGLIA:  A long time ago?

23            MR. HAMPTON:  Yeah.

24            LT. CORREGLIA:  Okay.  So you've known him

25   all your life, right?

ECPO 000360

1          MR. HAMPTON:  Yeah.

2          LT. CORREGLIA:  Okay.

3          DETECTIVE CASSIAN:  Where did you move from?

4          MR. HAMPTON:  Mobile.

5          DETECTIVE CASSIAN:  Alabama?

6          MR. HAMPTON:  Yeah.

7          LT. CORREGLIA:  Who is that?

8          MR. HAMPTON:  Ben Evans (phonetic).

9          LT. CORREGLIA:  Okay.  Okay.  Sign this down

10   there.  Sign your name and put today's date.  Did Lee

11   have a brother?

12          MR. HAMPTON:  Yeah.  He's dead.

13          LT. CORREGLIA:  He's dead?

14          MR. HAMPTON:  Yeah.

15          LT. CORREGLIA:  Put today's date.  11/12/08.

16    How long did you know Lavert (phonetic)?

17          MR. HAMPTON:  About the same time.

18          LT. CORREGLIA:  About the same time?  All

19   your life, right?  Who is that?  It's an old photo,

20   man.  Who is that?  That photo is very old, from 1977.

21          MR. HAMPTON:  I don't know who that is?

22          LT. CORREGLIA:  That's not Lavert?

23          MR. HAMPTON:  No.

24          LT. CORREGLIA:  Are you sure?

25          DETECTIVE CASSIAN:  Or do you not know the

ECPO 000361

1   name Lavert?

2                 MR. HAMPTON:  Yeah.  That's not Lavert.

3                 LT. CORREGLIA:  That's not Lavert?

4                 MR. HAMPTON:  No.

5                 LT. CORREGLIA:  Okay.  Well, again, these are

6   old records and I had this attached to this that says,

7   it's Lavert Evans, mother -- brother Lee Evans from 611

8   High Street, born in Mobile, Alabama.

9                 MR. HAMPTON:  It's not the --

10                LT. CORREGLIA:  Okay.  I believe you.  It may

11  not be --

12                MR. HAMPTON:  No.  It's not.

13                LT. CORREGLIA:  It may be the wrong photo was

14  attached to -- somebody put the wrong photo here.  That

15  could be.

16                MR. HAMPTON:  That's not him.

17                LT. CORREGLIA:  Okay.  It could be.  Like I

18  said, this is going back to 1977, so it could very well

19  be.  So we'll --

20                DETECTIVE CASSIAN:  But you knew that he died

21  and had previously passed away and was Lee Evans'

22  brother, correct?

23                MR. HAMPTON:  Yeah.

24                DETECTIVE CASSIAN:  Okay.

25                LT. CORREGLIA:  Where did William live at the

22

1    time in 1978?  Again, everything I'm going to ask you

2    is regarding, you know, 1978.

3              MR. HAMPTON:  Yes.  1978.  Okay.

4              LT. CORREGLIA:  Where did he live a that

5    time?

6              MR. HAMPTON:  On Glen Avenue.

7              LT. CORREGLIA:  Glen Avenue?

8              MR. HAMPTON:  Yeah.

9              LT. CORREGLIA:  In a house or a building?

10             MR. HAMPTON:  Building.

11             LT. CORREGLIA:  Building?

12             MR. HAMPTON:  Yeah.

13             LT. CORREGLIA:  In one of the apartments?

14             MR. HAMPTON:  Yeah.

15             LT. CORREGLIA:  Do you know what floor?

16             MR. HAMPTON:  No.  I think it was the top

17   floor.

18             LT. CORREGLIA:  Top floor?  Okay.  Do you

19   know this individual?

20             MR. HAMPTON:  Yeah.  That's Reese -- Maurice.

21             LT. CORREGLIA:  Maurice, right?

22             MR. HAMPTON:  Yeah.

23             LT. CORREGLIA:  He's also your cousin?

24             MR. HAMPTON:  Yeah.  He's my cousin.

25             LT. CORREGLIA:  And he's deceased now, also,

ECPO 000363

23

1    right?

2                MR. HAMPTON:  Yes.

3                LT. CORREGLIA:  Maurice Olds, was his name?

4                MR. HAMPTON:  Yeah.

5                LT. CORREGLIA:  Right.  Okay.  You want to

6    sign that picture?  11/12/08.  Did these boys do

7    anything to Lee?

8                MR. HAMPTON:  They broke in his house.

9                LT. CORREGLIA:  They broke in his house?

10               MR. HAMPTON:  Yeah.

11               LT. CORREGLIA:  Why did they break in his

12   house?

13               MR. HAMPTON:  I can't tell you that.  I have

14   no idea.  I have no idea.

15               LT. CORREGLIA:  Did they bring something into

16   the house?

17               MR. HAMPTON:  He said, he broke in his house.

18    He told me that.  I didn't know.

19               LT. CORREGLIA:  Did they take anything from

20   his house?

21               MR. HAMPTON:  He say they did.  He said they

22   took a bunch of weed.

23               LT. CORREGLIA:  A bunch of weed?

24               MR. HAMPTON:  Yeah.

25               DETECTIVE CASSIAN:  What is weed?

24

1          MR. HAMPTON:  Huh?

2          DETECTIVE CASSIAN:  What is weed?

3          MR. HAMPTON:  Reefer.

4          LT. CORREGLIA:  Reefer.

5          DETECTIVE CASSIAN:  Marijuana?

6          MR. HAMPTON:  Yeah.

7          LT. CORREGLIA:  So they took a bunch of weed?

8          MR. HAMPTON:  Yeah.

9          LT. CORREGLIA:  Around what time was this?

10          MR. HAMPTON:  It was like two or -- almost a

11  week before -- you know, before this happened.

12          LT. CORREGLIA:  A week before what happened?

13          MR. HAMPTON:  Before they got missing.

14          LT. CORREGLIA:  They got missing?

15          MR. HAMPTON:  Yeah.

16          LT. CORREGLIA:  A week before they got

17  missing, they broke in his house and took weed?

18          MR. HAMPTON:  Yeah.

19          LT. CORREGLIA:  Okay.  And Lee told you this?

20          MR. HAMPTON:  Yeah.  Lee told me.

21          LT. CORREGLIA:  What was Lee driving at the

22  time?  We know he was living on Clinton and Grove.

23  What was he driving?

24          MR. HAMPTON:  Chevy pickup.

25          LT. CORREGLIA:  Chevy pickup?  What color

25

1   pickup?

2          MR. HAMPTON:  Green.

3          LT. CORREGLIA:  Green?

4          MR. HAMPTON:  Light green.  Like a light

5   green.

6          LT. CORREGLIA:  Any writing on his truck?  --

7   You drove it?

8          MR. HAMPTON:  I have drove it.  Yeah.

9          LT. CORREGLIA:  Yes?  You rode in it and you

10  drove it.  August 20, 1978, okay, --

11         DETECTIVE CASSIAN:  I want to back up just a

12  -- for just a minute.

13         LT. CORREGLIA:  Yes.  Go ahead.  Go.

14         DETECTIVE CASSIAN:  You talked about the weed

15  that you said was stolen from his residence.

16         MR. HAMPTON:  Yeah.

17         DETECTIVE CASSIAN:  You think it's a week

18  prior to this event of August 20th?

19         MR. HAMPTON:  Yeah.

20         DETECTIVE·CASSIAN:  Just tell me about how

21  that came up to you.  What did he say to you?  What --

22  how did he sound?

23         MR. HAMPTON:  No.  He was upset about it.  He

24  -- you know, actually, he told the police or whatever

25  -- investigate it, see what was -- you know, but he

ECPO 000366

26

1    knew all the time who broke in the house and what he

2    tells me, he would take care of it.

3              LT. CORREGLIA:  He would take care of it?

4              MR. HAMPTON:  Yeah.

5              DETECTIVE CASSIAN:  Now, was he all pissed

6    off about this?

7              MR. HAMPTON:  He was pissed off, but he

8    didn't show it.

9              LT. CORREGLIA:  Okay.

10             MR. HAMPTON:  He didn't show it.

11             LT. CORREGLIA:  How did you know he was

12   pissed off?

13             MR. HAMPTON:  Because he didn't say a lot

14   about it.  He just said, he would take care of it, but

15   I didn't know exactly who broke into his house until

16   later on.

17             LT. CORREGLIA:  Now, when he told you it was

18   weed, did he say how much weed?

19             MR. HAMPTON:  He didn't say exactly how much

20   weed.

21             LT. CORREGLIA:  Did you ever see any weed in

22   his residency?

23             MR. HAMPTON:  Yeah.

24             LT. CORREGLIA:  Okay.  How much would he

25   have, typically?

27

1              MR. HAMPTON:  I would say, half an ounce,
2    something like that.
3              LT. CORREGLIA:  What do you mean you got it?
4     He gave it to you?
5              MR. HAMPTON:  He gave it to me.
6              DETECTIVE CASSIAN:  Would you see other
7    mounds of weed in --
8              MR. HAMPTON:  No.  I didn't see --
9              DETECTIVE CASSIAN:  Do you remember where he
10   stored that?
11             MR. HAMPTON:  No.
12             LT. CORREGLIA:  If he had a bunch of week,
13   what was he doing?  Was he selling it?  Was he using
14   it?
15             MR. HAMPTON:  He was most likely selling it.
16    He didn't get high.
17             LT. CORREGLIA:  He didn't get high?
18             MR. HAMPTON:  Never.  He never get --
19             LT. CORREGLIA:  Do you know for a fact?
20             MR. HAMPTON:  Yeah.  I know for a fact he was
21   selling.  Who have that much weed and don't sell it?
22             DETECTIVE CASSIAN:  Well, no.  We're asking
23   if you knew for a fact.
24             MR. HAMPTON:  I didn't know for a fact
25   whether he's selling it or not.  No.

ECPO 000368

1              LT. CORREGLIA:  When he gave you the half,

2     did you pay him?

3              MR. HAMPTON:  No.  Sometimes, I did.

4     Sometimes, I didn't.

5              LT. CORREGLIA:  Okay.  So he was selling to

6     you?

7              MR. HAMPTON:  Yeah.  Sometimes, but I

8     wouldn't give him a lot money for a half ounce.

9              OFFICER HADLEY:  How much would you give him

10    for a half ounce?

11             MR. HAMPTON:  About $30 here.  You know, a

12    half ounce at that time cost, what, about $60.

13             DETECTIVE CASSIAN:  Okay.  So he told you

14    about this weed that's missing from his house and he

15    said, he's going to take care of it?

16             MR. HAMPTON:  He said, he's missing a lot.

17             DETECTIVE CASSIAN:  Okay.  A lot?

18             MR. HAMPTON:  Yeah.

19             DETECTIVE CASSIAN:  Did he tell you how much

20    was a lot to him?

21             MR. HAMPTON:  No.

22             DETECTIVE CASSIAN:  Now, a half ounce, that

23    wouldn't be considered a lot, right?

24             MR. HAMPTON:  No.  No.  No.

25             LT. CORREGLIA:  So you knew the boys took the

29

1    weed?

2            MR. HAMPTON:  He said, he knew he took it.

3    He didn't exactly say who did it.  You know,

4    eventually, he came around to that because I knew the

5    boys took the weed.

6            DETECTIVE CASSIAN:  Did you ever have any --

7    prior to the 20th, did you ever go out with Lee Evans

8    to look for these boys who took his weed?

9            MR. HAMPTON:  No.  I didn't go looking for

10   him.  No.  I never went with him.

11           LT. CORREGLIA:  Who went to look for these

12   boys?

13           MR. HAMPTON:  Reese went with him to look for

14   the boys.

15           DETECTIVE CASSIAN:  Reese?

16           MR. HAMPTON:  Reese?

17           DETECTIVE CASSIAN:  Maurice?

18           MR. HAMPTON:  Yeah.  Maurice.

19           DETECTIVE CASSIAN:  And this is August 20th?

20           MR. HAMPTON:  Yeah.

21           LT. CORREGLIA:  Sunday?

22           MR. HAMPTON:  That's Sunday the 28th.

23           OFFICER HADLEY:  Before, when you say Reese

24   and you say Maurice, are we talking about the same

25   Maurice Olds that you signed pictures of?

1          MR. HAMPTON:  Yeah.

2          DETECTIVE CASSIAN:  His other cousin, Maurice

3    Olds, right?

4          MR. HAMPTON:  Yeah.

5          LT. CORREGLIA:  Now, Maurice rode around with

6    him that Sunday looking for these boys?

7          MR. HAMPTON:  Yeah.  And they found -- I

8    guess, he must have told Reese that they was going --

9    you know, wanted to help him do some work this summer

10   and, eventually, you know, Reese wanted to help him

11   look for the guys.  You know, eventually, he found them

12   all but, you know, he had two and I was sitting there

13   at the house when he first -- I was at my mother's

14   house.  He came and he got me when he got the first

15   two.  And then we went around the corner and he gave me

16   a gun --

17         DETECTIVE CASSIAN:  Hold on.  You were at

18   your mother's house on Hunterdon, right?

19         MR. HAMPTON:  Yeah.  My mother's house on

20   Hunterdon.  Then he went upstairs -- we went upstairs

21   and then he passed me a gun.  He said, keep an eye on

22   them until I get back.  I'll be right back, and he left

23   them, when he got the other three, him and Reese, and

24   brung them back, but he had to drop Reese off

25   somewhere.  I don't know.  I guess, he took Reese home

31

```
1    and he came back with the other three, and he came back
2    with a five gallon can of gas, too, and when he got
3    back with the other three, he took the gun from me and
4    made them get in the car, and he -- he came through the
5    back off of Bergen Street, another car, the Chevy and
6    poured gas all around the car and the door and poured
7    gas all around the room and poured gas out in the
8    kitchen and left the gas can sitting right by the
9    kitchen door and struck a match.  He had his -- match.
10    I told him, I didn't have a match.  He said you got
11   matches because you smoke.  So I gave him a match and
12   he strike the match and -- but I was going down the
13   stairs before he really --
14           LT. CORREGLIA:  Did you see the flames?
15           MR. HAMPTON:  Yeah.  I seen the flames.  It
16   was blazing.
17           LT. CORREGLIA:  Blazing?
18           MR. HAMPTON:  Yes.
19           LT. CORREGLIA:  The house?
20           MR. HAMPTON:  Yes.
21           LT. CORREGLIA:  What floor was this?
22           MR. HAMPTON:  Third floor.
23           DETECTIVE CASSIAN:  The kitchen was on the
24   third floor, so it was a third floor unit?
25           MR. HAMPTON:  Yeah.  Yeah.  Third floor.
```

ECPO 000372

32

1           LT. CORREGLIA:  And let me ask you, when you
2   said, he came in through Bergen Ave., the house?
3           MR. HAMPTON:  Yeah.
4           DETECTIVE CASSIAN:  With the last three boys?
5           MR. HAMPTON:  Yeah.  With the last.
6           LT. CORREGLIA:  Do you remember who the two
7   boys were that you were sitting up there with, with the
8   gym?
9           DETECTIVE CASSIAN:  Do you remember the
10  names?
11          MR. HAMPTON:  I don't exactly know.
12          LT. CORREGLIA:  Michael was one of them?
13          MR. HAMPTON:  I know Michael was one of the
14  names.
15          LT. CORREGLIA:  One of the first two?
16          MR. HAMPTON:  Yeah.  One of the first two.
17  But I'm trying to think who was the -- I don't know
18  exactly.
19          LT. CORREGLIA:  We're talking about these
20  five boys, right, the ones that you saw?
21          MR. HAMPTON:  Yeah.  Same five boys.
22          LT. CORREGLIA:  Same five boys.
23          MR. HAMPTON:  Yeah.
24          DETECTIVE CASSIAN:  How long did you have to
25  sit there before the other three came?

33

1           MR. HAMPTON:  Came?

2           LT. CORREGLIA:  How long did you keep the gun

3    on the two?

4           MR. HAMPTON:  About 45 minutes.

5           LT. CORREGLIA:  Forty-five minutes, you held

6    them at gunpoint?

7           MR. HAMPTON:  Not exactly at gunpoint, but I

8    -- they knew they was at bay.  I didn't -- you know,

9    nobody got shot in that.  He didn't shoot anyone.  It's

10   just that he just --

11          LT. CORREGLIA:  Now, when you were holding

12   the two boys at bay, were they in the room?  Were they

13   in the closet already or what?

14          MR. HAMPTON:  Yeah.  They were in the room.

15   They -- in the room.

16          DETECTIVE CASSIAN:  In the kitchen or --

17          MR. HAMPTON:  No.  In the bedroom where the

18   closet is at.

19          LT. CORREGLIA:  Okay.  So it was in the

20   bedroom?  Where was the bedroom located on the third

21   floor?

22          MR. HAMPTON:  In the back of the house.

23          LT. CORREGLIA:  The back of the house is --

24   would the bad of the house be Bergen?

25          MR. HAMPTON:  Yeah.  The back of the house

1    would be Bergen.

2              LT. CORREGLIA:  Because Camden and then

3    Camden is the first block past Bergen, --

4              MR. HAMPTON:  Yeah.

5              LT. CORREGLIA:  -- west of Bergen, right?

6              MR. HAMPTON:  Yeah.  Uh-huh.

7              LT. CORREGLIA:  So it would be -- the back of

8    the house would be Bergen, right?

9              MR. HAMPTON:  Yeah.  Uh-huh.

10             LT. CORREGLIA:  So it was a back bedroom

11   towards Bergen?

12             MR. HAMPTON:  Yeah.  Uh-huh.

13             LT. CORREGLIA:  And there was one closet in

14   that bedroom?

15             MR. HAMPTON:  Yeah.  One closet.

16             LT. CORREGLIA:  Was there furniture in the

17   bedroom?

18             MR. HAMPTON:  No.

19             LT. CORREGLIA:  Was there --

20             MR. HAMPTON:  It was empty.

21             LT. CORREGLIA:  It was empty?  The whole

22   thing was empty?

23             MR. HAMPTON:  It was a nice size.  It was a

24   nice size closet.

25             DETECTIVE CASSIAN:  Like as big as the table

35

1   here?  As --

2           MR. HAMPTON:  You could say, it wasn't as

3   long as this table, but it was just as deep as this

4   table.  It wasn't as long as this table.

5           LT. CORREGLIA:  And five boys fit in there?

6           MR. HAMPTON:  Yeah.  He placed them in there,

7   situated them in there.  But I never thought he was

8   going to burn the house down because I didn't have no

9   thoughts to him going to really kill them because I

10  didn't feel that way, you know.  They took something

11  from me, and I'm going to kill them.

12          LT. CORREGLIA:  What kind of gun did he give

13  you?

14          MR. HAMPTON:  I think --

15          LT. CORREGLIA:  What color was the gun?

16          MR. HAMPTON:  Nickel plated.

17          LT. CORREGLIA:  A revolver or a hand--

18          MR. HAMPTON:  Revolver.

19          LT. CORREGLIA:  Revolver?

20          MR. HAMPTON:  Yeah.

21          LT. CORREGLIA:  When you say "nickel plated,"

22  it's silver, chrome?

23          MR. HAMPTON:  Silver.  Yeah.  Chrome.

24          DETECTIVE CASSIAN:  I'm going to bring you

25  back to -- When he picked you up at your house, what

ECPO 000376

1    did he say he was doing that night?

2              MR. HAMPTON:  He said -- he didn't say

3    exactly.  He didn't say what he was doing.  He was just

4    taking a ride, but he had already mentioned that before

5    he got to that point.  You know, he had mentioned what

6    he was going to do.

7              DETECTIVE CASSIAN:  What did he say?

8              MR. HAMPTON:  He said, he's going to get rid

9    of them, going to kill them.

10             LT. CORREGLIA:  He was going to get rid of

11   them?

12             MR. HAMPTON:  Yeah.

13             LT. CORREGLIA:  He was going to kill them?

14             MR. HAMPTON:  Yeah.

15             DETECTIVE CASSIAN:  He said that to you?

16             MR. HAMPTON:  Yeah.  He said that to me, but

17   I didn't really think he was serious about it.

18             LT. CORREGLIA:  Okay.

19             OFFICER HADLEY:  How long before that day or

20   that time did he say that?

21             MR. HAMPTON:  It happened all in the same --

22   you know, I don't know, he told me that before -- you

23   know, about -- maybe that same day, in the daytime.

24             OFFICER:  Okay.  I understand this was 30

25   years ago, so take your time when you think about it.

1          MR. HAMPTON:  Yeah.  Yeah.  Yeah.  It may

2     have been that same day.  I don't know.

3          LT. CORREGLIA:  Real quick, describe the

4     house, if you can.  If you think back to the house you

5     used to live in on Camden Street, what color was it?

6     You don't know?

7          MR. HAMPTON:  I ain't going to tell that now.

8          LT. CORREGLIA:  Did he have a porch?

9          MR. HAMPTON:  It had a little porch you come

10    out to, a little porch you can walk out onto.

11         LT. CORREGLIA:  Onto Camden?

12         MR. HAMPTON:  Yeah.  Where you come off --

13         LT. CORREGLIA:  Steps coming down to the

14    street and then steps going up, right?

15         MR. HAMPTON:  Yeah.

16         LT. CORREGLIA:  I guess, three family, right,

17    a three--

18         MR. HAMPTON:  Two flights of steps.

19         LT. CORREGLIA:  Two flights, but it was a

20    three-family house?

21         MR. HAMPTON:  Yeah.

22         LT. CORREGLIA:  Okay.  And it had steps or a

23    door coming in through the back?

24         MR. HAMPTON:  It had a back door.  Yeah.

25         LT. CORREGLIA:  Did you take the same steps

1   to go up through the front that you did through the --

2   if you came in through the back?

3           MR. HAMPTON:  No.  You --

4           LT. CORREGLIA:  What I'm saying, was there a

5   set of steps in the back hall or --

6           MR. HAMPTON:  Two sets of stairs.

7           LT. CORREGLIA:  So there were two sets of

8   steps to get up there?

9           MR. HAMPTON:  Yeah.

10          LT. CORREGLIA:  Okay.  So --

11          DETECTIVE CASSIAN:  I want to bring you back

12  to this, when he picks you up.  When he picks you up,

13  he's got the truck.  He's driving his green truck,

14  correct?

15          MR. HAMPTON:  Right.

16          DETECTIVE CASSIAN:  All right.  He's got two

17  with him, right?

18          MR. HAMPTON:  Yeah.

19          DETECTIVE CASSIAN:  He picks you up at your

20  house.  What does he say to you that night when he

21  picks you up there?

22          MR. HAMPTON:  He didn't really say nothing.

23  I don't exactly remember what he said.  I just know he

24  had already, you know, rehearsed it.

25          DETECTIVE CASSIAN:  Planned it.

39

```
 1            LT. CORREGLIA:  Let me ask you something
 2    because I'm a little confused.  Does he pick you up
 3    with the two boys in the truck already --
 4            MR. HAMPTON:  Yeah.  He --
 5            LT. CORREGLIA:  -- or he dropped you off
 6    already at the house?  You know what I mean?  Were you
 7    already at the house when he brings the boys there?
 8            MR. HAMPTON:  No.  No.  No.
 9            LT. CORREGLIA:  No?
10            MR. HAMPTON:  No.  He picked me up at my
11    mother house.
12            LT. CORREGLIA:  He picked you up?
13            DETECTIVE CASSIAN:  He had two boys with you
14    in the truck?
15            MR. HAMPTON:  There was two boys in the truck
16    with him.
17            LT. CORREGLIA:  With him?
18            MR. HAMPTON:  Yeah.
19            LT. CORREGLIA:  Where were the boys, inside
20    the cab or in the back or where?
21            MR. HAMPTON:  I think, they was in the back.
22            LT. CORREGLIA:  It was a pickup truck, right?
23            MR. HAMPTON:  Yeah.  They was in the back.
24            LT. CORREGLIA:  They were in the back of the
25    pickup truck?
```

ECPO 000380

1          MR. HAMPTON:  Yeah.

2          LT. CORREGLIA:  So you got in next to him?

3          MR. HAMPTON:  Yeah.  I got in next to him.

4    Right.

5          LT. CORREGLIA:  Were you two guys talking or

6    you already knew what was going to happen?

7          MR. HAMPTON:  I already knew because he had

8    already re-- you know, rehearsed what he was going to

9    do.

10          LT. CORREGLIA:  What did he rehearse?  Tell

11    me.

12          MR. HAMPTON:  He said, he was going to get

13    rid of them, going to kill them and, you know, I didn't

14    really think he was, you know, going to do that.

15          LT. CORREGLIA:  But did he tell you, hey, I'm

16    going to take them to the house?  How did he come up

17    with that house?

18          MR. HAMPTON:  Because he knew we had just

19    moved out of the house.

20          LT. CORREGLIA:  Did he come up with the house

21    or did you come up with the house?

22          MR. HAMPTON:  He came up with the house.

23          LT. CORREGLIA:  He came up with the house?

24          MR. HAMPTON:  Yeah.  I didn't.

25          LT. CORREGLIA:  What did he say?

ECPO 000381

1          MR. HAMPTON:  He just -- he just said, I'm

2    going to take a ride to where your mother move from.

3    It's been so long, I'm trying to remember exactly how

4    he put that because he orchestrated the whole thing.

5    You know that.  I ain't -- I ain't going to kill

6    nobody.

7          OFFICER HADLEY:  In short, when you got into

8    the car with the three guys or two other guys and Lee,

9    did you know Lee was coming for you at the time or had

10   Lee just knocked on the door and said, let's go?  Or

11   did he tell you to wait here or anything to let you

12   know that Lee was coming to pick you up?

13         MR. HAMPTON:  I think he did call me and tell

14   me he was coming by the house.  He come by my mother

15   house to pick me up.

16         OFFICER HADLEY:  When he picked you up, --

17         MR. HAMPTON:  Yeah.

18         OFFICER HADLEY:  -- or even before that,

19   during that phone call, did he tell you he had the boys

20   with him or did he --

21         MR. HAMPTON:  No.  He didn't.  No.  No.

22         OFFICER HADLEY:  Hold on a second.  After he

23   picked you up and you saw the two boys in the car, in

24   the truck, --

25         MR. HAMPTON:  Yeah.  Yeah.  And then I knew

ECPO 000382

42

1    exactly what he was doing.

2            OFFICER HADLEY:  Okay.  At that point is

3    where you realized what was about to happen?

4            MR. HAMPTON:  Yeah.  Uh-huh.

5            OFFICER HADLEY:  And you --

6            DETECTIVE CASSIAN:  I'm sorry.  You went

7    directly from your house on Hunterdon then to Camden,

8    correct?

9            MR. HAMPTON:  Straight out of Hunterdon

10   Street and came around and came through the back on

11   Bergen Street.

12           OFFICER HADLEY:  Okay.  So, at that point,

13   you walked the guys upstairs from the back?

14           MR. HAMPTON:  Yeah.  From the back.

15           OFFICER HADLEY:  If you recall who led and

16   who followed, how would that have gone?

17           MR. HAMPTON:  Oh, god.  I couldn't tell you.

18           OFFICER HADLEY:  Do you recall --

19           MR. HAMPTON:  He was behind them.

20           LT. CORREGLIA:  Well, let me ask you.  I know

21   where Joe is going.  Was the gun out already?

22           MR. HAMPTON:  No.  There wasn't no gun.

23           OFFICER HADLEY:  What was your position, if

24   you remember?

25           MR. HAMPTON:  I might have been in the front.

ECPO 000383

1           OFFICER HADLEY:  Just take your time.

2           DETECTIVE CASSIAN:  No.  We don't want you to

3   -- if you remember, you remember.

4           MR. HAMPTON:  I don't remember it that well.

5           DETECTIVE CASSIAN:  Do you recall him being

6   in the back saying anything to the boys, like they were

7   going in the house to move something, going to do

8   something?

9           MR. HAMPTON:  He might have been saying some

10  of that.

11          DETECTIVE CASSIAN:  I mean, do you recall

12  that?

13          MR. HAMPTON:  I don't know.  I can't recall

14  it because it's been so long ago.

15          DETECTIVE CASSIAN:  But you're certain at

16  this point coming up to the house, there's no gun out,

17  nobody is being --

18          MR. HAMPTON:  No.  No gun out.  No.

19          OFFICER HADLEY:  So, at this point, it's

20  pretty much free will, walking?

21          MR. HAMPTON:  Right.  Free will, walking.

22          OFFICER HADLEY:  And do you know if they

23  believed that they were going there because he wanted

24  to question them about the marijuana that was stolen or

25  if they believed they were going to do some work?

ECPO 000384

44

1           MR. HAMPTON:  Do some work.  He was going to
2   do some work.  That's the one.
3           OFFICER HADLEY:  Throughout their ride
4   because I'm understanding now that they were in the
5   back cab, which is opened up, throughout their ride,
6   did anybody ever talk to these two boys that were in
7   the back?
8           MR. HAMPTON:  He talked to them before he
9   picked me up.
10          OFFICER HADLEY:  Okay.  But after he picked
11  you up, --
12          MR. HAMPTON:  He didn't say anything else to
13  them.
14          OFFICER HADLEY:  Okay.  Now, on the way
15  upstairs, did anybody make any reference to why we're
16  coming to an abandoned house?
17          MR. HAMPTON:  I guess, they already knew
18  where they was coming to.
19          DETECTIVE CASSIAN:  Yeah.  I mean, you're
20  coming to an abandoned house, but you lived on the
21  third floor, correct?
22          MR. HAMPTON:  Yeah.
23          DETECTIVE CASSIAN:  You're going up to your
24  apartment.
25          MR. HAMPTON:  My old apartment.  Yeah.

ECPO 000385

1              LT. CORREGLIA:  To do some work.  What type

2    of work?  What was the --

3              MR. HAMPTON:  I don't really --

4              LT. CORREGLIA:  If it was set up --

5              DETECTIVE CASSIAN:  With no furniture on the

6    first or second.

7              LT. CORREGLIA:  -- if Lee said to them, we're

8    going to do some work, do you know what type of work

9    the boys thought they were there to do?

10             MR. HAMPTON:  It might have been something to

11   clean up.  Who knows?

12             OFFICER HADLEY:  Clean up?

13             MR. HAMPTON:  Yeah.

14             OFFICER HADLEY:  Had they ever cleaned up for

15   Lee Evans any other --

16             MR. HAMPTON:  Yeah.

17             OFFICER HADLEY:  And is it my understanding

18   that they worked for Lee Evans in the capacity as

19   clean-up kids or kids that actually did construction

20   work?

21             MR. HAMPTON:  Clean up.  Clean up.

22             OFFICER HADLEY:  Just clean up?

23             MR. HAMPTON:  Just clean up.

24             DETECTIVE CASSIAN:  Clean up?  Move junk?

25   Move --

46

1        MR. HAMPTON:  Yeah.  Like he want to move

2   some of his stuff or trash or some stuff of that

3   nature.

4        LT. CORREGLIA:  Now, to your knowledge, had

5   those boys ever been to that house before?  It would

6   have been your house at the time that they were --

7        MR. HAMPTON:  No.  I don't think they ever

8   been there.  They might have been there riding there

9   with him for me or whatever.  I don't know.

10       OFFICER HADLEY:  Now, at the time that these

11  boys was working with Lee, were you also working with

12  Lee in the same capacity?

13       MR. HAMPTON:  Yeah.

14       OFFICER HADLEY:  So you were doing cleanup,

15  too, or were you doing construction?

16       MR. HAMPTON:  No.  I was a mason and -- stuff

17  of that nature.

18       OFFICER HADLEY:  And how many times have you

19  worked with Lee and those boys have worked at the same

20  time?

21       MR. HAMPTON:  I can't tell you.  It wasn't a

22  lot of times.  It wasn't a lot of times.  They would

23  never be around all the time.  He would even go get

24  them on his own, and I wouldn't even be around.  But

25  they have worked with me and Lee together.

1          LT. CORREGLIA:  Okay.  All of them or just a

2     couple of them?

3          MR. HAMPTON:  Just a couple of them.  He

4     never brought like --

5          OFFICER HADLEY:  It sounds like it might be

6     one or two and then, other times, it might have been

7     two other ones or any variation of --

8          MR. HAMPTON:  Yeah.  It never been five all

9     together, unless he did that while I wasn't around.  I

10    don't know.

11         DETECTIVE CASSIAN:  Now, -- to the house,

12    you're coming to this house under the pretext to do

13    work, at least in your mind, there's been no threats

14    that you've stated or observed outside or in the

15    vehicle.  Now, we're getting to the third floor.

16    You're walking up through two floors that are empty.

17         MR. HAMPTON:  Right.

18         DETECTIVE CASSIAN:  There's nobody living

19    there, correct?

20         MR. HAMPTON:  Right.

21         DETECTIVE CASSIAN:  You get to the third

22    floor.  I presume it's empty because you said, you

23    moved out.

24         MR. HAMPTON:  Uh-hun.

25         DETECTIVE CASSIAN:  What transpires

1    immediately upon entering into your old apartment?

2              MR. HAMPTON:  We just go into the apartment.

3     The back door was open, too, so we went straight in

4    the apartment.  We went through the kitchen.  We go

5    through the kitchen first and enter the room to the

6    left to the room.

7              DETECTIVE CASSIAN:  And that's the bedroom?

8              MR. HAMPTON:  That's the bedroom.  That was

9    my bedroom.

10             DETECTIVE CASSIAN:  Okay.  So the boys are

11   going to --

12             LT. CORREGLIA:  What happened?  What's going

13   on?  Where's the furniture?  Where's -- it's like all

14   of us walking in here.  Is that --

15             MR. HAMPTON:  No.  I didn't -- it was just

16   like smooth.

17             DETECTIVE CASSIAN:  It went smooth?

18             MR. HAMPTON:  Really smooth.  There wasn't no

19   getting excited like --

20             DETECTIVE CASSIAN:  Like the boys didn't

21   question what was going on at all?

22             MR. HAMPTON:  They -- they might.  I can't --

23   but they didn't get excited about it.

24             LT. CORREGLIA:  Who pulled the rachet on

25   them?

49

1          MR. HAMPTON:  Evans passed me the rachet.
2   That's what it was.
3          LT. CORREGLIA:  "Rachet" being a handgun?
4          MR. HAMPTON:  Yeah.  A gun.
5          DETECTIVE CASSIAN:  Now, did he pull it out
6   first and point it at them or did he pull it out and
7   then hand it to you and tell you?  What did he --
8          MR. HAMPTON:  He pointed it at them and told
9   them to sit down on the floor.  That's what it was.
10  And then he gave me the gun.  He said, watch them until
11  I get back and he went and got the other three guys
12         DETECTIVE CASSIAN:  Okay.  And that's --
13         MR. HAMPTON:  Yeah.
14         DETECTIVE CASSIAN:  So they sat on the floor?
15         MR. HAMPTON:  They sat on -- yeah.  But he
16  had -- once he went and got the other three guys, he
17  must have -- once he found the three guys, he must have
18  dropped Reese off at home.
19         DETECTIVE CASSIAN:  Okay.  Reese was with you
20  with this first two?
21         MR. HAMPTON:  The first two, he was.
22         DETECTIVE CASSIAN:  Okay.  What was Reese
23  doing?  Do you know?
24         MR. HAMPTON:  Reese stayed in the truck, from
25  what I gather.

50

```
 1              DETECTIVE CASSIAN:  Okay.  You don't remember
 2   him coming upstairs in the house at all?
 3              MR. HAMPTON:  I don't remember him coming
 4   upstairs.
 5              DETECTIVE CASSIAN:  Okay.  So it's just you,
 6   Lee Evans, and the two boys upstairs at first?
 7              MR. HAMPTON:  Yeah.  Uh-huh.
 8              DETECTIVE CASSIAN:  Now, Lee Evans gives you
 9   the gun, tells you to watch them?
10              MR. HAMPTON:  Watch them until he get back.
11   He's coming right back.
12              LT. CORREGLIA:  And Maurice was in the truck?
13              MR. HAMPTON:  Yeah.  Maurice was --
14              LT. CORREGLIA:  Let me ask you something.
15   Did Maurice know that this was going on, too, that he
16   was --
17              MR. HAMPTON:  No.  He didn't know it.  I
18   don't even think he really knew.  He just knew that --
19   you know, Lee didn't give nobody -- didn't stress it
20   like, this is what he going to do to these -- you
21   know, --
22              OFFICER HADLEY:  But you're going there.
23   You --
24              MR. HAMPTON:  I knew that he had that on his
25   mind.  You understand what I'm saying?  But I didn't
```

ECPO 000391

51

1    think he was going to --
2              DETECTIVE CASSIAN:  He was going to carry it
3    out.
4              MR. HAMPTON:  -- carry it out.
5              DETECTIVE CASSIAN:  Now, Maurice was much
6    younger than you and Lee Evans at the time, correct?
7              MR. HAMPTON:  No.  He not much younger.
8              DETECTIVE CASSIAN:  He was still a teen then,
9    correct?  Maurice was like 16 then, right?
10             MR. HAMPTON:  Well, he's about 48, something
11   like that, right?
12             DETECTIVE CASSIAN:  And you're only in your
13   20's at the time, 22, right?
14             MR. HAMPTON:  Twenty-one.
15             DETECTIVE CASSIAN:  Twenty-one.
16             MR. HAMPTON:  Lee is about 48, right?
17             LT. CORREGLIA:  Reese was born in, yes, 61,
18   so he'd be about --
19             DETECTIVE CASSIAN:  16.  16 or 17, depending
20   on -- right?
21             MR. HAMPTON:  17.
22             DETECTIVE CASSIAN:  Yes.  17.  So he's a
23   little bit younger than you.  Now, when Lee leaves,
24   what's that 45 minutes like going by?  Are these kids
25   asking what's going on?

ECPO 000392

52

1           MR. HAMPTON:  Yeah.  But it's -- I was trying
2   to convince them that Lee wasn't going to do anything
3   to them.
4           DETECTIVE CASSIAN:  Okay.
5           MR. HAMPTON:  That's what I was doing.  I
6   said, Lee isn't going to do nothing to you.  He's just
7   scaring you.  That's what I told them.  That's -- you
8   know, I was trying to explain it to them.  He's not
9   going to hurt you all.
10          LT. CORREGLIA:  So these boys are sitting on
11  the floor.  You got the gun out.
12          MR. HAMPTON:  Yeah.  He just scaring you all.
13          LT. CORREGLIA:  And then you're telling them
14  that Lee is just going to scare them?
15          MR. HAMPTON:  Yeah.  Yeah.  But when Lee got
16  back, I said, Lee, are you really going to go all the
17  way through with this?  --
18          DETECTIVE CASSIAN:  Now, what were the other
19  -- he walks into the -- how, three boys with himself,
20  right?
21          MR. HAMPTON:  Yeah.  Uh-huh.  But he gets
22  them in the room first before, you know, he let them
23  know what was going on.
24          DETECTIVE CASSIAN:  Okay.  So they come up
25  all non-- like --

ECPO 000393

53

1              MR. HAMPTON:  All three were nice -- not even

2    thinking like that.

3              DETECTIVE CASSIAN:  Thinking anything.  Just

4    thinking they're going to go to work now.  Do you know

5    what time of day this was?

6              MR. HAMPTON:  This was at night.

7              OFFICER HADLEY:  Okay.  About what time at

8    night?

9              MR. HAMPTON:  About 8, 8:30, 9.

10             LT. CORREGLIA:  But it was dark out?

11             MR. HAMPTON:  It was dark.  That's right.

12             LT. CORREGLIA:  Let me ask you something.

13   Was it dark in the house?

14             MR. HAMPTON:  No.  I had lights in the house.

15             LT. CORREGLIA:  The house still had lights?

16             MR. HAMPTON:  Yeah.

17             LT. CORREGLIA:  Okay.  There was nobody

18   living there, but it still had lights?

19             MR. HAMPTON:  Yeah.  Lights.

20             LT. CORREGLIA:  Okay.

21             OFFICER HADLEY:  Did the boys ever, during

22   the time you were talking to the two that you had

23   there, acknowledge that they had taken anything from

24   Lee?

25             MR. HAMPTON:  Yeah.  The way I gave it to

ECPO 000394

1    them, like he's just going to scare them.  He wasn't

2    going to hurt them or nothing.  I didn't even have -- I

3    didn't even -- he going to kill them boys, you know,

4    and it wasn't even on my mind.  I said -- because when

5    he came in and Lee said -- he did what he did, I said,

6    Lee, you're really going to carry this out, you know?

7    And he puts them in the close and nails the closets up

8    and start pouring the gas around and he has me striking

9    the match.  I said, I ain't striking no match.  He

10   said, well, he had started pouring the gas all around

11   the door.  I said, I ain't striking no match and he

12   poured the gas in the kitchen.  Because he didn't have

13   a match because he don't smoke, you know, and I was on

14   my way down the steps, the first five steps and, when

15   he did strike the match, you know, how you get a back

16   draft on a fire, it blew back and I jumped down a whole

17   flight of steps.  The house was on fire instantly.

18   That gas set the house on fire instantly.

19        DETECTIVE CASSIAN:  Now, back to the room, if

20   I could.  When he comes back with the three boys and,

21   now, they become aware of what's going on, they walk in

22   a room and you're there with a gun, --

23        MR. HAMPTON:  Yeah.

24        DETECTIVE CASSIAN:  -- what are they saying?

25        MR. HAMPTON:  They ain't saying -- you know,

1    they might have said something, but it's -- I don't

2    know.

3              LT. CORREGLIA:  Are you sure there's only one

4    gun?

5              MR. HAMPTON:  There's only one gun.  I had

6    until Evans took it away from me.

7              DETECTIVE CASSIAN:  So he came back and how

8    did that work out?

9              MR. HAMPTON:  When he came back, he just --

10   you know, he was -- he might have said something to

11   them before he attempted to put them in the closet.  He

12   might have said something to them.  I said, Evans,

13   you're really going to carry this out?  He said, yeah.

14    You know?  And it been a week later.  I don't know the

15   exact date they broke in his house, but I know it was

16   later, days later.

17             LT. CORREGLIA:  Right.  Right.

18             MR. HAMPTON:  You know, and --

19             DETECTIVE CASSIAN:  Truck -- were they going

20   in his closet?

21             MR. HAMPTON:  He didn't struggle with them at

22   first.  He -- a little bit, you know, getting them in

23   there, getting them into the close.

24             LT. CORREGLIA:  How did he nail the closet?

25             MR. HAMPTON:  He nailed it into the --

ECPO 000396

1            LT. CORREGLIA:  The jam?

2            MR. HAMPTON:  The jam.

3            LT. CORREGLIA:  How did he nail it?

4            DETECTIVE CASSIAN:  Did he bring tools or

5    hammers?

6            MR. HAMPTON:  He had a hammer and a nail.  He

7    had a hammer with --

8            DETECTIVE CASSIAN:  One --

9            MR. HAMPTON:  One nail.

10            LT. CORREGLIA:  One nail?

11            MR. HAMPTON:  One big nail.  One long ass

12    nail.

13            LT. CORREGLIA:  And he nailed one nail

14    through the door?

15            MR. HAMPTON:  Yeah.  Through the side.

16            DETECTIVE CASSIAN:  Now, you just showed me a

17    nail like --

18            MR. HAMPTON:  I don't know exactly how long

19    it was, but I know it was a big nail.

20            LT. CORREGLIA:  Okay.  Okay.

21            MR. HAMPTON:  And he nailed it all the way

22    in.

23            LT. CORREGLIA:  Did he have any tools in the

24    car, in the truck, in the pickup truck?

25            MR. HAMPTON:  Yeah.  He always had tools in

57

1   the truck.

2           LT. CORREGLIA:  He always had them?

3           MR. HAMPTON:  Yeah.

4           DETECTIVE CASSIAN:  When did he come in with

5   the hammer and the nail?

6           MR. HAMPTON:  The last time he came with the

7   kids.

8           DETECTIVE CASSIAN:  With the three?

9           MR. HAMPTON:  Yeah.

10          DETECTIVE CASSIAN:  When did he come in with

11  the gasoline?

12          MR. HAMPTON:  He came with the gas now at the

13  same time.

14          DETECTIVE CASSIAN:  So he's walking in the

15  house --

16          MR. HAMPTON:  Yeah.

17          DETECTIVE CASSIAN:  -- with three boys, a

18  hammer and a jug of gas?

19          MR. HAMPTON:  Yeah.  Yeah.

20          DETECTIVE CASSIAN:  Now, is it -- describe

21  the can of gas.

22          MR. HAMPTON:  It's a red can.

23          DETECTIVE CASSIAN:  Red can?

24          MR. HAMPTON:  Yeah.  A red can.

25          DETECTIVE CASSIAN:  I'm going to assume it's

58

1   a metal red can, right?

2            MR. HAMPTON:  It's a metal red can.

3            LT. CORREGLIA:  How big of a can?

4            MR. HAMPTON:  I'd say about a five gallon

5   can.

6            OFFICER HADLEY:  If you was to show that in

7   size, how would you do?

8            MR. HAMPTON:  I'd say about that tall and --

9            LT. CORREGLIA:  Let me ask you, that can

10  wasn't there before?  You guys didn't bring that can

11  there before?

12           MR. HAMPTON:  No.  No.

13           LT. CORREGLIA:  No?

14           MR. HAMPTON:  No.

15           LT. CORREGLIA:  Maurice didn't bring that can

16  up?

17           MR. HAMPTON:  No.

18           LT. CORREGLIA:  No?

19           MR. HAMPTON:  No.

20           LT. CORREGLIA:  There was Evans that brought

21  that can up?

22           MR. HAMPTON:  Evans brought the can up.

23           DETECTIVE CASSIAN:  Do you recall seeing the

24  can in the truck when you were on your --

25           MR. HAMPTON:  It was on the back of the

1    truck.

2              DETECTIVE CASSIAN:  In the bed?

3              MR. HAMPTON:  Yeah.  In the bed.

4              LT. CORREGLIA:  Is it -- how many times you

5    been in that truck?  The question is, was that can

6    always in the truck?  Is that a part of the truck, part

7    of tools?

8              MR. HAMPTON:  No.

9              LT. CORREGLIA:  No?

10             DETECTIVE CASSIAN:  Were you with him when he

11   bought the gasoline?

12             MR. HAMPTON:  No.  I wasn't with him.  I

13   think he bought the gasoline when he went out to get

14   the three boys the last time he went out.  He didn't

15   buy the gas when I was with him.

16             DETECTIVE CASSIAN:  Which way did the door

17   open on the close?  I'm assuming one way, but I want

18   you to --

19             MR. HAMPTON:  Out.

20             DETECTIVE CASSIAN:  Out?

21             MR. HAMPTON:  Uh-huh.

22             LT. CORREGLIA:  Okay.  And all five went into

23   that closet?

24             MR. HAMPTON:  All five.

25             LT. CORREGLIA:  And, now, you say -- when did

60

1    he strike the match?  Let me ask you this.  You say,

2    from the floor, from what I gather, from what you are

3    saying, he poured gasoline around the door to the

4    closet?

5            MR. HAMPTON:  Yeah.  He put a lot of gas

6    around the door to the closet.

7            LT. CORREGLIA:  The door to the closet?

8            MR. HAMPTON:  Yeah.

9            LT. CORREGLIA:  Did gasoline go into the

10   closet?

11           MR. HAMPTON:  -- poured a stream of gas all

12   the way out and into the kitchen, but he sat the gas

13   can down right by the kitchen, the door going out to

14   the front steps.

15           LT. CORREGLIA:  Okay.

16           MR. HAMPTON:  And he asked me for the match.

17    I was on my way out.

18           LT. CORREGLIA:  Where were you when -- you're

19   in the --

20           MR. HAMPTON:  I was standing -- I was

21   standing outside the door by the kitchen when he asked

22   me for the match.  I say, I ain't have a match and he

23   said, I know you got matches.  You smoke.  I said, I

24   ain't striking no match.

25           LT. CORREGLIA:  Okay.

ECPO 000401

61

1            MR. HAMPTON:  All right?  And I gave him the

2    matches and he striked the match.

3            LT. CORREGLIA:  Did he strike it?

4            MR. HAMPTON:  Yeah.

5            LT. CORREGLIA:  And what happened?

6            MR. HAMPTON:  I took off.

7            LT. CORREGLIA:  But you saw the flames?

8            MR. HAMPTON:  I saw the flame.  I took off,

9    and he took off.

10           LT. CORREGLIA:  Did you sit around and watch

11   the house burn?

12           MR. HAMPTON:  No.

13           DETECTIVE CASSIAN:  How did you exit the

14   house?

15           MR. HAMPTON:  I exited the house through the

16   back.  I went all the way down to the first floor and

17   went out the back.

18           DETECTIVE CASSIAN:  And how did he exit the

19   house?

20           MR. HAMPTON:  The same way.

21           DETECTIVE CASSIAN:  The same way?  What did

22   you guys do?

23           MR. HAMPTON:  Huh?

24           DETECTIVE CASSIAN:  What did you do?  You ran

25   out the back of the house?

62

```
 1              MR. HAMPTON:  Ran out the back of the house
 2   and get in the truck and leave because it was blazing.
 3              LT. CORREGLIA:  It was blazing, the house?
 4              MR. HAMPTON:  Yeah.  It was blazing when we
 5   got out of there.
 6              LT. CORREGLIA:  Did you hear any screams, any
 7   yells?
 8              MR. HAMPTON:  No.  If I did, I didn't pay it
 9   no mind.
10              DETECTIVE CASSIAN:  Okay.  Did you guys go
11   anywhere to watch the fire at all?
12              MR. HAMPTON:  No.
13              DETECTIVE CASSIAN:  Where did you go after
14   you got in the truck?
15              MR. HAMPTON:  He took me home.
16              DETECTIVE CASSIAN:  What, two blocks away?
17              MR. HAMPTON:  Yeah.
18              DETECTIVE CASSIAN:  Did you watch the fire
19   from your house or go back down and see the fire trucks
20   by car?
21              MR. HAMPTON:  I know, I heard a lot of --
22   around there.
23              DETECTIVE CASSIAN:  Do you remember what time
24   you got home in your house?
25              MR. HAMPTON:  No.  I don't know exactly.  I
```

63

1    wasn't even thinking about the time.  I took a bath,

2    washed up, cleaned up.

3              DETECTIVE CASSIAN:  Did you have gasoline all

4    over yourself?

5              MR. HAMPTON:  No.  I didn't have no gasoline,

6    unless it splashed on my feet.  There was no gas on me.

7              LT. CORREGLIA:  Was Maurice with you?

8              MR. HAMPTON:  No.

9              LT. CORREGLIA:  He wasn't at the house

10   waiting or anything like that?

11             (Mr. Hampton shaking his head no.)

12             LT. CORREGLIA:  After this day, did you guys

13   talk about it again?

14             DETECTIVE CASSIAN:  This is over 30 years.

15             MR. HAMPTON:  Yeah.

16             LT. CORREGLIA:  In these 30 years, how many

17   times have you seen him in 30 years?

18             DETECTIVE CASSIAN:  You guys never worked

19   together again after this?

20             MR. HAMPTON:  After that, no, because he had

21   took my sister to court because she wasn't fixing

22   things in the house she stayed in on 19th Street, so

23   she put up money -- rent.  And the deed was in my

24   uncle's name, but my uncle must have been at work that

25   day and he -- evicted out of the house and, when we

ECPO 000404

64

1    went in front of the Judge and the Judge said, is this

2    your uncle's signature?  She looked at it and she said,

3    no.  That's my brother's signature.  And the Judge

4    said, well, you know, I can give you time for forging

5    the deed on the house and, you know, naturally, I said,

6    well, I signed it and that day, we left --

7              LT. CORREGLIA:  Let me ask you this.  You're

8    speaking about your sister?  What's her name?

9              MR. HAMPTON:  Veronica Williams.

10             LT. CORREGLIA:  Veronica Williams?

11             MR. HAMPTON:  Yeah.

12             LT. CORREGLIA:  Have you ever mentioned this

13   to Veronica, about the fire and the boys?

14             MR. HAMPTON:  No.

15             LT. CORREGLIA:  You never said anything to

16   her?

17             MR. HAMPTON:  No.

18             OFFICER HADLEY:  Why you never talked about

19   it?

20             MR. HAMPTON:  I didn't say --

21             LT. CORREGLIA:  Never?  You didn't tell your

22   sister?  Are you sure?

23             MR. HAMPTON:  Positive.

24             DETECTIVE CASSIAN:  Did you ever meet up with

25   Lee after the fire, go for any rides in any cars or

65

1  shortly after the fire?

2            MR. HAMPTON:  No.

3            LT. CORREGLIA:  Let me ask you something.

4  For your participation, your assistance, what you did,

5  did he pay you?

6            MR. HAMPTON:  No.

7            LT. CORREGLIA:  He didn't pay you?  You just

8  --

9            DETECTIVE CASSIAN:  Did he give you any weed?

10           MR. HAMPTON:  No.

11           OFFICER HADLEY:  Okay.  Just on that little

12 note, you ended your statement when you said, you came

13 out of court, he told you to let your sister look after

14 you from now on.

15           MR. HAMPTON:  I asked him for some money that

16 day.  That's what it was.  I asked him for some --

17           OFFICER HADLEY:  How much did you ask for?

18           MR. HAMPTON:  I didn't ask for a lot, you

19 know, --

20           OFFICER HADLEY:  How much?

21           MR. HAMPTON:  -- a couple -- or whatever.  He

22 said, get it from your sister.  That's what it was.

23           LT. CORREGLIA:  So your sister got evicted by

24 him?

25           MR. HAMPTON:  She didn't get evicted.

66

1          LT. CORREGLIA:  Oh, she didn't get evicted?

2          MR. HAMPTON:  No.  The Judge gave her time to

3    move out.

4          LT. CORREGLIA:  He gave her -- the Judge told

5    her to move out?

6          MR. HAMPTON:  Yeah.

7          LT. CORREGLIA:  Okay.

8          DETECTIVE CASSIAN:  You had a relationship

9    over the years where you would normally borrow money

10   from Lee?

11         MR. HAMPTON:  I didn't exactly borrow it from

12   him.  I worked for him.

13         LT. CORREGLIA:  You worked for the money he

14   gave you?

15         MR. HAMPTON:  Uh-huh.

16         LT. CORREGLIA:  Let me ask you something.  If

17   I go speak to your sister, Veronica, she'll remember

18   what you're saying?

19         MR. HAMPTON:  Yeah.  She would.  She should.

20    She got --

21         LT. CORREGLIA:  She's sick, your sister?

22         MR. HAMPTON:  She got -- she have seizures a

23   lot.  She had it all her life.  Most likely, she can

24   remember.

25         LT. CORREGLIA:  Okay.  Other than you and

1   Evans and Maurice is dead, other than yourself and

2   Evans, who else knows about this?

3           MR. HAMPTON:  His brother.

4           LT. CORREGLIA:  Lavert?

5           MR. HAMPTON:  Yeah.

6           LT. CORREGLIA:  But he's also dead?

7           MR. HAMPTON:  Yeah.

8           LT. CORREGLIA:  Why would Lavert know about

9   it?

10          MR. HAMPTON:  Because his brother, they --

11  you know, I know they talk, see each other.

12          DETECTIVE CASSIAN:  How do you know that

13  Lavert knew?

14          MR. HAMPTON:  I don't know exactly, but I

15  know he talks to his brother about confidential stuff.

16   I know he talks to his brother.  -- in the car right

17  by -- I rode past him.  He just sitting in the car.  --

18          LT. CORREGLIA:  How long ago?

19          MR. HAMPTON:  In the Home Depot on Bergen

20  Street when it first opened up.

21          LT. CORREGLIA:  So a couple of years, right?

22   Like two, three years?

23          OFFICER HADLEY:  Yeah.  It hasn't been open

24  that long, two years.  The new one on Bergen, right?

25          MR. HAMPTON:  Yeah.

68

1          OFFICER HADLEY:  It's the only one in Newark,

2    so, yes.

3          LT. CORREGLIA:  And what did he say when he

4    spoke to you then?

5          MR. HAMPTON:  He just spoke to me and asked

6    me how -- going to get my own money.  He didn't give me

7    nothing.

8          LT. CORREGLIA:  Do you think you were owed

9    anything for what you did that day?

10          MR. HAMPTON:  I wouldn't say that.  See,

11    there's a truck -- I have a van that belongs to him

12    that was in my name.  He left it parked on the street

13    and it went to --

14          LT. CORREGLIA:  That green van?

15          MR. HAMPTON:  Yeah.

16          LT. CORREGLIA:  And that was in your name?

17          MR. HAMPTON:  It was in my name, but --

18          LT. CORREGLIA:  But it was his?

19          MR. HAMPTON:  It was him, and it went up to

20    about 800 and some dollars in parking --

21          LT. CORREGLIA:  Why would he put it in your

22    name?

23          MR. HAMPTON:  I guess because he had so much

24    other stuff, you know, other papers in his name, but he

25    put it in my name because I was supposed to be getting

69

1    the van, but it didn't never happen.

2              LT. CORREGLIA:  Did you -- where was your mom

3    living at the time?  -- car to your mom, did she drive?

4     No?

5              MR. HAMPTON:  When she's down south, she

6    does.  She didn't drive when she was here.

7              LT. CORREGLIA:  Not up here?  What about

8    Lee's mom?

9              MR. HAMPTON:  She drove.

10             DETECTIVE CASSIAN:  Do you remember her car?

11             MR. HAMPTON:  She had a red and white 98.

12             LT. CORREGLIA:  Okay.  Do you ever remember

13   riding around in that with Lee at all?

14             MR. HAMPTON:  No.  I used to drive that for

15    her.

16             LT. CORREGLIA:  Okay.  For her?

17             MR. HAMPTON:  Yeah.  She used to gamble a

18    lot.

19             LT. CORREGLIA:  Did you ever borrow that car?

20             MR. HAMPTON:  Not that I can recall.  I -- in

21   there together.  Never with Lee.

22             DETECTIVE CASSIAN:  Did you and Lee ever talk

23   about this investigation once it started?  If you

24   remember back 30 years ago, it was pretty public,

25   right?

ECPO 000410

70

1           MR. HAMPTON:  Well, we --

2           LT. CORREGLIA:  And before we get past --

3           MR. HAMPTON:  I think he did say something

4    about -- us.  You got to be ready for them.  He tried

5    to explain to me how to do the polygraph.  That's what

6    he was doing.

7           LT. CORREGLIA:  He was telling you how to

8    deal with a polygraph?

9           MR. HAMPTON:  Yeah.

10          LT. CORREGLIA:  And what did he say, if you

11   remember?

12          MR. HAMPTON:  He said, just think about

13   somebody, you know, that's dead that you --

14          LT. CORREGLIA:  You would beat the polygraph?

15          MR. HAMPTON:  That polygraph.

16          LT. CORREGLIA:  Okay.  Now, you took a

17   polygraph how long after this happened?

18          MR. HAMPTON:  I'd say about a couple of weeks

19   -- not --

20          LT. CORREGLIA:  You were questioned by the

21   police back then?

22          MR. HAMPTON:  Yeah.

23          LT. CORREGLIA:  Okay.  And you didn't tell

24   the police anything at the time?  Let me ask you one

25   thing before we go past this.  After the fire, you only

ECPO 000411

1    lived a couple of blocks away, correct?

2              MR. HAMPTON:  Right.

3              LT. CORREGLIA:  From 271 Hunterdon.

4              MR. HAMPTON:  Right.

5              LT. CORREGLIA:  It's pretty much the same

6    block as the 300 block of Camden.  So you're talking

7    Hunterdon, Bergen, Camden.

8              MR. HAMPTON:  Right.

9              LT. CORREGLIA:  Right?

10             MR. HAMPTON:  Like around on the other side.

11             LT. CORREGLIA:  Around on the other side,

12   though.

13             MR. HAMPTON:  Yeah.

14             LT. CORREGLIA:  The next day, the next two

15   days, the next week, did you go past that house and

16   look at the condition of the house?

17             MR. HAMPTON:  I did.  Yes.

18             LT. CORREGLIA:  What was the condition of the

19   house after the fire?

20             MR. HAMPTON:  It was burnt all the way down.

21             LT. CORREGLIA:  What do you mean by, "all the

22   way down?"

23             MR. HAMPTON:  To the ground.  It burned down

24   to like the bottom floor.

25             LT. CORREGLIA:  All the way to the bottom

72

1    floor?

2              MR. HAMPTON:  Yeah.

3              DETECTIVE CASSIAN:  Like to the basement

4    bottom floor of the --

5              MR. HAMPTON:  To the first floor.

6              LT. CORREGLIA:  The first floor was still

7    partially standing or --

8              MR. HAMPTON:  It was partially standing.

9              DETECTIVE CASSIAN:  So it was burned on the

10   back of the house then?

11             OFFICER HADLEY:  All the way to the basement?

12             MR. HAMPTON:  Yes.  All the way to the

13   basement.

14             OFFICER HADLEY:  Now, just for my

15   clarification, when you say, the house was burned down

16   to the ground, does that mean, if you were standing

17   outside, you could see from the top floor to the bottom

18   floor burned or are you saying that the building was

19   collapsed?

20             MR. HAMPTON:  The whole thing came down.  The

21   whole thing collapsed because -- fire department.

22             DETECTIVE CASSIAN:  Just the front first

23   floor was there?

24             MR. HAMPTON:  That's all I can probably

25   remember.  Yeah.  But there any no parts to the back

ECPO 000413

73

1    was there.

2            LT. CORREGLIA:  Okay.  So the back would be

3    charred rubble into the basement?

4            MR. HAMPTON:  -- charcoal.

5            LT. CORREGLIA:  Right.  Oh, charcoal?  Now,

6    let me go one step further.  How long did that house

7    stay like that for?  Do you recall?

8            MR. HAMPTON:  I don't know.

9          `  LT. CORREGLIA:  You don't know?  Do you

10   remember the house itself being completely gone?  They

11   went at it with bulldozers, they took down the --

12   whatever was left.

13           MR. HAMPTON:  I don't --

14           OFFICER HADLEY:  You were 21 at the time.  It

15   was still there when you were 22 or 23?

16           DETECTIVE CASSIAN:  If you don't recall, --

17           MR. HAMPTON:  Yeah.  I think so.  It might

18   have been.  I don't know.

19           DETECTIVE CASSIAN:  Okay.  But you can't

20   recollect the house sitting there abandoned, burned

21   out, I mean, a shell of the house?

22           MR. HAMPTON:  For a long period of time.

23           DETECTIVE CASSIAN:  I think they would have

24   cleaned that up quick.

25           MR. HAMPTON:  Yeah.

ECPO 000414

74

1          LT. CORREGLIA:  It would have been several

2     days, if not weeks, before the cleanup.  Philander,

3     everything you've told us here, is it the truth?

4          MR. HAMPTON:  Yes.  It's the truth.

5          LT. CORREGLIA:  You swear?

6          MR. HAMPTON:  I swear.

7          LT. CORREGLIA:  You affirm?

8          MR. HAMPTON:  Yes.

9          LT. CORREGLIA:  I don't know if you believe

10    in god?  Do you believe in god?

11         MR. HAMPTON:  Yeah.

12         LT. CORREGLIA:  Do you swear everything you

13    told us is the truth?

14         MR. HAMPTON:  Yeah.

15         LT. CORREGLIA:  No bull shit?

16         MR. HAMPTON:  No.

17         LT. CORREGLIA:  Right?

18         MR. HAMPTON:  No.

19         LT. CORREGLIA:  Okay.

20         OFFICER HADLEY:  Before -- I just want to ask

21    him a couple of questions.  This incident happened 30

22    years ago, and you've been questioned by the police how

23    many times about?

24         MR. HAMPTON:  About the third or fourth time.

25         OFFICER HADLEY:  Now, during those times, you

ECPO 000415

```
 1    never alluded to the police that you may have been

 2    there at the time that this happened?

 3              MR. HAMPTON:  No.

 4              OFFICER HADLEY:  Today, why do you feel it's

 5    more different than any other time?

 6              MR. HAMPTON:  I don't know.

 7              OFFICER HADLEY:  You mentioned --

 8              MR. HAMPTON:  Thirty years.  Not that in 30

 9    years.  You know, as you get older, --

10              OFFICER HADLEY:  It's been 30 years.  Let me

11    ask you -- let me just ask you him.  How often would

12    you think about this --

13              MR. HAMPTON:  Because, you know, it's still

14    coming around and, you know, they had mentioned the

15    other people.

16              LT. CORREGLIA:  You knew we were looking for

17    you, right?

18              MR. HAMPTON:  Yeah.

19              OFFICER HADLEY:  When was the last time you

20    thought about this case before today?

21              MR. HAMPTON:  Last time?

22              DETECTIVE CASSIAN:  Yesterday?

23              MR. HAMPTON:  No.

24              OFFICER HADLEY:  How many times would you say

25    you thought about it this year?
```

ECPO 000416

76

1           MR. HAMPTON:  Oh, I don't know when it
2   crossed my mind.
3           LT. CORREGLIA:  The mother of some of these
4   dead kids what would you tell them?  If they were
5   there, what do you think you would come up with?
6           MR. HAMPTON:  Well, I didn't.
7           LT. CORREGLIA:  Okay.  Well, that's your
8   answer, that's our answer.  Anything else you want to
9   add?  Anything you left out?  Anything you left out
10  that maybe you want to add?
11          MR. HAMPTON:  No.
12          LT. CORREGLIA:  Are you sure that gun was
13  never fired at these kids?
14          MR. HAMPTON:  No.
15          LT. CORREGLIA:  Never fired, never shot one
16  of the kids, nothing?  Just put them in the closet --
17          MR. HAMPTON:  Yes.
18          LT. CORREGLIA:  -- at gunpoint and never
19  shot?
20          OFFICER HADLEY:  Why wouldn't you have fired?
21          MR. HAMPTON:  I didn't have no reason.
22          LT. CORREGLIA:  Let me ask you, did Lee hold
23  onto that gun?  He still has it?
24          MR. HAMPTON:  I don't know if he still has
25  it.  No.

1          DETECTIVE CASSIAN:  Do you think you would be

2    able to identify it, if he did still own that weapon?

3    Anything in particular about it, a different grip, you

4    know, oyster handle color, you know?

5          MR. HAMPTON:  No --

6          LT. CORREGLIA:  What color grip was it?  Do

7    you remember?

8          MR. HAMPTON:  It might have been a --

9          DETECTIVE CASSIAN:  Okay.  All right.  Now,

10   I'm just asking you this.  Now, the fact that I wanted

11   to ask you one thing before -- with that home being

12   there and charred, did you ever walk up to the house to

13   look in and see if you could find any bones or anything

14   like that?

15         MR. HAMPTON:  No.

16         DETECTIVE CASSIAN:  Nothing?  Do you remember

17   Lee ever going back there at all or talking about it?

18         MR. HAMPTON:  No.  I don't.  No.  I never

19   went there looking for nothing back there.  That was

20   it, everything because I didn't know -- you know, I had

21   no clue that he was going to do that.  I tried to talk

22   him out of it, but he was, you know, sincere about what

23   he was planning to do.

24         LT. CORREGLIA:  Let me ask you one quick

25   question.  I got you out around midday.  Were you given

78

1   a sandwich -- apple juice?

2           MR. HAMPTON:  Yes.

3           LT. CORREGLIA:  Okay.

4           DETECTIVE CASSIAN:  And several drinks,

5   correct?  You've been here.

6           MR. HAMPTON:  Yes.

7           DETECTIVE CASSIAN:  How do you feel now after

8   talking about this?

9           LT. CORREGLIA:  Do you feel better that you

10  told us?

11          MR. HAMPTON:  I still feel the same.

12          LT. CORREGLIA:  You still feel the same?

13          MR. HAMPTON:  Yeah.

14          OFFICER HADLEY:  Let me ask you.  At any

15  point, did you feel remorseful for any of this?

16          MR. HAMPTON:  I ain't --

17          LT. CORREGLIA:  Do you know what remorse is?

18   Feel sorry.

19          MR. HAMPTON:  Oh, yeah.  I felt sorry for the

20  families in some way.  Yeah.

21          LT. CORREGLIA:  When you say, "some way?"

22          MR. HAMPTON:  Yeah.  But I didn't really,

23  really know them, so -- I don't even know what his

24  mothers look like.  You couldn't even tell me that's

25  the mother or whatever.

1            LT. CORREGLIA:  Okay.

2            MR. HAMPTON:  I didn't know.  Lee might have

3    known, but I didn't.

4            LT. CORREGLIA:  Okay.  Anything else?

5            OFFICER HADLEY:  If we talked to Lee Evans

6    and he decided to tell us the accounts of what happened

7    that day, would they be --

8            MR. HAMPTON:  I couldn't exactly tell you.

9            OFFICER HADLEY:  If he was telling the truth.

10           MR. HAMPTON:  If he was telling the truth, it

11   should be exactly right.

12           LT. CORREGLIA:  He would try to put this off

13   on you and change up anything saying it was the truth?

14           MR. HAMPTON:  I want to say he wouldn't.

15           LT. CORREGLIA:  I mean, what you're telling

16   us is that --

17           MR. HAMPTON:  Yes.  It's true.

18           LT. CORREGLIA:  Did we threaten you here

19   today?

20           MR. HAMPTON:  No.

21           LT. CORREGLIA:  Did we promise you stuff here

22   today?

23           MR. HAMPTON:  No.

24           LT. CORREGLIA:  Okay.  Thanks.

25           DETECTIVE CASSIAN:  Is there anything you

1   want to add to this or know of -- Do you want to say

2   anything about it?

3              OFFICER HADLEY:  Take your time and think

4   about it.

5              DETECTIVE CASSIAN:  I mean, think about it.

6   Did we forget to ask you anything today?

7              OFFICER HADLEY:  The reason why I say it is

8   it's 30 years passed and you've repressed a lot of

9   stuff and -- it's all --

10             MR. HAMPTON:  No.

11             OFFICER CASSIAN:  Any type of events in the

12  room.  I'm interested about the room because I'm just

13  trying -- you know, when you've got five boys in the

14  room, the stress level has go to be high.  What were

15  they saying?  Were they trying to give back his stuff?

16   Or are they trying -- or -- was he asking about his

17  stuff?

18             MR. HAMPTON:  It might have been.

19             MR. CASSIAN:  I'm just asking if you remember

20  that.

21             MR. HAMPTON:  I don't remember.  I don't

22  recall it too well because it's been so long.  I don't

23  mean --

24             MR. CASSIAN:  No.  It's a stress fun event

25  for you as well, so I --

81

1              MR. HAMPTON:   Yeah.   And there might have --

2              MR. CASSIAN:   Did you have a -- behind this

3      vents.

4              OFFICER HADLEY:   I know you're a grown man

5      and everything.

6              MR. HAMPTON:   I'm just telling you the truth

7      now.

8              DETECTIVE CASSIAN:   But you acknowledge that

9      you've thought about this case at least 30 times this

10     year and plenty of times over 30 years?

11             MR. HAMPTON:   Yeah.

12             OFFICER HADLEY:   Did you ever think there

13     would come a time when you would tell the police what

14     happened?

15             MR. HAMPTON:   I don't know.

16             OFFICER HADLEY:   Do you feel that you would

17     repress it for so long.   In other words, is this

18     something that you would have been willing to take to

19     your grave?

20             MR. HAMPTON:   Yeah.

21             OFFICER HADLEY:   I just want to, you know,

22     get the full feel because at some point, I think, you

23     know, would you have wanted the parents to know

24     whatever happened to them?

25             DETECTIVE CASSIAN:   We all met with the

1   surviving families and just this year and spoke with

2   them all.  And there was a big concern to try to locate

3   their remains.  So that's why I asked you if you ever

4   returned to the residence to remove anything or if

5   anybody ever did, you know, any recollection of any of

6   those remains being removed from that house?

7            MR. HAMPTON:  No.

8            LT. CORREGLIA:  Okay.  I've got one closing

9   question I just thought about.  If Lee told you that he

10  was going to kill them, why did you think he wasn't

11  going to carry it out?

12           MR. HAMPTON:  I just did.

13           LT. CORREGLIA:  Okay.  That's it, you just

14  did?

15           MR. HAMPTON:  Because he ain't killed nobody

16  in his family.

17           LT. CORREGLIA:  He didn't tell anybody in his

18  own family?  Because he hasn't killed anybody in his

19  family?

20           MR. HAMPTON:  I didn't see no reason to.

21           DETECTIVE CASSIAN:  All they did was take

22  some weed, right?

23           MR. HAMPTON:  Yeah.  I didn't see no reason

24  to kill the kids.  I really --

25           LT. CORREGLIA:  Okay.

83

1          MR. HAMPTON:  Deep down inside me, I didn't

2    see no reason.

3          LT. CORREGLIA:  I know you didn't see no

4    reason, but I was just asking, why you didn't believe

5    him, if he told you he was going to kill them?

6          MR. HAMPTON:  I just didn't believe him.  I

7    just didn't believe him.

8          LT. CORREGLIA:  Okay.

9          MR. HAMPTON:  He never gave me that

10   impression to believe.

11          DETECTIVE CASSIAN:  Do you have any knowledge

12   of him killing anybody else before this?

13          MR. HAMPTON:  No.  No.

14          DETECTIVE CASSIAN:  What about since this?

15          MR. HAMPTON:  What?

16          DETECTIVE CASSIAN:  What about since this

17   event?

18          MR. HAMPTON:  No.

19          DETECTIVE CASSIAN:  Has he ever threatened

20   you?

21          MR. HAMPTON:  No.

22          LT. CORREGLIA:  Okay.  All right.  Anything

23   else?

24          MR. CASSIAN:  You want to wait for Joe?

25          LT. CORREGLIA:  No.  We can close it.  Thank

84

1   you.  You know, -- what's the matter, you're cold?  You
2   want another coffee or something?
3              MR. HAMPTON:  Yeah.  Get me another cup.
4              LT. CORREGLIA:  I'll get you another coffee.
5    Okay.  We're going to --
6              DETECTIVE CASSIAN:  The time is now 9:23 p.m.
7              LT. CORREGLIA:  9:23?  Okay.  I'll write that
8   down.  All right.  I'm going to take you back to the --
9   you know, to the County or one of us will take you back
10  to the County.
11             MR. HAMPTON:  I'm in Delaney Hall.
12             LT. CORREGLIA:  You're in Delaney?
13             MR. HAMPTON:  I'm in Delaney Hall.  I have my
14  clothes over there.
15             LT. CORREGLIA:  Where did you come when they
16  --
17             MR. HAMPTON:  They came and got me out of the
18  County, but when you all come get me from the County
19  because I was getting ready to go to --
20             LT. CORREGLIA:  All right.  I've got to take
21  you back to the County.  Maybe they'll walk you over to
22  Delaney?
23             MR. HAMPTON:  Not this time of night.  I need
24  to go over there because my clothes is over there.
25             LT. CORREGLIA:  Delaney Hall or the County?

85

1          MR. HAMPTON:  Delaney Hall.

2          LT. CORREGLIA:  We'll make a phone call.

3     We'll take care of you.  Don't worry about it.

4          MR. HAMPTON:  They got my long johns,

5     everything.  I'm cold.

6          LT. CORREGLIA:  I'm not going to leave you

7     stranded, man.  Don't worry about it.  We'll take you

8     back to the jail.  Are you hungry at all now?

9          MR. HAMPTON:  No.  I just want to take a

10    leak.

11         LT. CORREGLIA:  You want to what, take a

12    leak?  All right.  You can get the bathroom right there

13    in the cell.  We'll have to get him another coffee

14    before he's done anyway.

15               (Interview concluded)