Jennifer Bonjean
Bonjean Law Group, PLLC
750 Lexington Ave., 9th Fl.
New York, NY 10022
Tel: (718)875-1850

Attorney for Plaintiff

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY, NEWARK VICINAGE**

| | | |
|---|---|---|
| **LEE EVANS,** | : | |
| **Plaintiff,** | : | 14 CV 120 (KM) (MAH) |
| **-vs** | : | |
| **CITY OF NEWARK, ET AL.** | : | |

# PLAINTIFF'S STATEMENT OF DISPUTED MATERIAL FACTS

## A. Five Newark Teenagers Go Missing in August 1978

1. On August 20, 1978, Plaintiff was preparing to close on a property in Irvington, New Jersey the following day. He had packed up boxes at his apartment in Newark and wanted to move the boxes to a different location prior to the closing date. [Ex. A - Evans Deposition at 80]

2. Around noon or earlier, Plaintiff looked for his younger cousin Maurice to help him move the boxes but could not find him. A group of teenagers from the neighborhood, including Michael McDowell and Melvin Pittman (a.k.a Ricky) jumped in his truck to help. [*Id*. at 86:23:-87:5] Plaintiff estimated that about seven boys were in the truck [*Id*. at 80:24-81]

3. Plaintiff frequently gave work to the teenagers in the neighborhood and had been on Plaintiff's truck previously. [Ex. C - Hairston Trial Testimony at ECPO2215] [Ex. D - Rogers Taylor Statement (2/16/1999) at ECPO681] [Ex. F - Carrega's Deposition at 224:14-22]

4. The teenagers helped Plaintiff move the boxes and Plaintiff dropped them off by the ice cream shop at approximately 2:30 or 3:30 p.m. [Ex. A at 85] Plaintiff never saw Michael McDowell or Pittman again. [*Id.* at 85:11-18; 87:6-19]

5. Five teenagers, including McDowell and Pittman, were reported missing two days later. [Ex. B - Tietjen Deposition at 107:1-20]

6. Newark City detectives promptly identified Plaintiff as a person of interest in the boys' disappearance since he had been with the boys shortly before they disappeared. [Ex. C - Hairston Trial Testimony at ECPO2215]

7. Although one of the teenagers' friends claimed that the missing boys told him that they had stolen marijuana from Plaintiff, detectives were never able to confirm that the missing boys had stolen marijuana from Plaintiff. [Ex. B at 115:23-116:2]

8. Plaintiff was promptly questioned by detectives Hairston and Scott-Bey; Plaintiff denied having knowledge about the whereabouts of the missing boys. [Ex. C at ECPO2217] Plaintiff was questioned a second time and was cooperative with investigative efforts. [*Id.* at 2239]

9. Plaintiff's two cousins, Philander Hampton and Maurice Olds, were interviewed by detectives in 1978 and denied having knowledge about the missing boys. Both Hampton and Olds agreed to take polygraph tests and passed those polygraph tests. [Ex. A to Carrega's MSJ at ECPO3569-3571]

10. After a pyschic suggested that a fire was involved in the boys' disappearances, on April 3, 1979, detective Hairston checked with Newark Police Department "for all fires" occurring in August 1978, including a site at 15th Avenue and Bergen St. [Ex. A to Carrega's MSJ at ECPO3580-3581] No fatalities were reported at that site. [*Id.*] That location corresponds to the address of 256 Camden. [Ex. B at 241:21-242:8; 251:4-15]

11. On August 22, 1978, the Star Ledger reported a fire at 256 Camden. [Ex. B at 267: 16-19] The investigative detectives checked a lot of abandoned and burnt-out buildings. [Ex. C at ECPO2286]

12. After 10 years of investigation, the case remained a missing persons case. [Ex. C at ECPO2222; ECPO2286]

**B. The Cold Case Unit Reopens The Investigation**

13. During Detective Rashid Sabur's first interviews with various family members of the missing teens, the family members communicated that they believed that Plaintiff was responsible for the disappearances of their loved ones. [Ex. E - Rashid Sabur's Trial Testimony at ECPO2127-2128]

14. Sabur interviewed Philander Hampton in February 1999. [*Id.* at ECPO 2152-2154] Hampton denied having any knowledge of the disappearance of the boys. [*Id.* at 2154] Because Hampton purportedly gave conflicting responses to Sabur's questions, Hampton became a suspect and was advised of his constitutional rights. [*Id.* at 2154]

15. Sabur also interviewed Plaintiff's cousin, Maurice Olds, in February 1999. Sabur testified before the grand jury that Olds disclosed that he heard that teen burned in a fire on Hawthorne and Camden streets in Newark. [Ex. G - Sabur's Grand Jury Testimony (July 9, 2010) at 30] Sabur investigated that fire and it did not involve any fatalities of the five teens. [*Id*. at 36]

According to Sabur's grand jury testimony, "no stone was unturned. In 1978, nor in 1999, nor at present date. Every stone was turned." [*Id.* at 36]

16. Prosecutor Guarino testified that before he was assigned to the case, he was aware of the theory that there was a connection between the boys' disappearance and a fire. Guarino testified that everybody knew about the fire at Philander Hampton's home and that the parents knew about the fire the night the boys disappeared. The information was publicly available long before 2002. [Ex. L - Deposition of Prosecutor Guarino (8/4/2020) at 65-66]

17. In early 2007, Lieutenant Lou Carrega, an investigator with the Essex County Prosecutor's Office ("ECPO") started investigating the disappearance of the teens from Newark. [Ex. F - Carrega's Deposition at 56:17-57:1] Defendant Carrega became involved in the case after his colleague Agent Eutsey of the Essex County Prosecutor's office, and a former Newark police detective, expressed criticism of the investigation. [*Id*. at pg. 60]

18. Eutsey told Carrega that the initial suspect, Plaintiff, was the likely perpetrator as he was the only person with the motive and opportunity. [*Id.* at 60:4-13; 61:6-8 ] Carrega agreed that Evans was the primary suspect. [*Id.* at 75:21-76:2]

19. State Trooper William Tietjen, a detective with the New Jersey State Police, became involved in the investigation in May 2008 after Carrega contacted his unit looking for assistance. [Ex. B at 33:11-20] Carrega immediately told Tietjen that Evans was the "main suspect" during their first conversation on May 2, 2008 [*Id.* at 44:1-6; 46:22-47:4; 56:24-57:4; 138:12-15]

20. A few days later, on May 8, 2008, Carrega told Tietjen that they were looking for Philander Hampton. [*Id.* at 47:16-19; 51:1-6]

21. On May 16, 2008, Carrega provided Tietjen with a paper copy of the case file that included case notes on each of the people identified, Newark Police Department reports dating back to 1978, newspaper articles, statements of individuals and interviews in written form. [Ex. B at 65:6-66:8]

22. Tietjen identified a collection of police reports prepared by detective Hairston and bate-stamped ECPO3548-3586 as among the reports that were provided to him by Carrega. [Ex. B at 71:20-72:72:23; Exhibit 3 to Teitjen Dep.]

**C. Interrogation and Confession of Philander Hampton**

23. The Defendant officers had a strong interest in locating Philander Hampton and made multiple efforts to locate him. [Ex. B at 172:25-174:1; 189:18-24]

24. Carrega had been looking for Hampton for a long time. [Ex. G - Carrega's Grand Jury Testimony (July 9, 2010) at 39]. A few days before November 12, 2008, Carrega learned that Hampton was in custody on a traffic warrant in the Essex County Jail. [Ex. H - Carrega's *Miranda* Hearing Testimony (3/1/2011) at ECPO437]

25. Carrega arranged for him to be transported to the Essex County Prosecutor's office, homicide squad, between 1:00 p.m. and 2:00 p.m. [*Id.* at ECPO437-438]

26. When Hampton was brought to the homicide unit of the Essex County Prosecutor's Office, he was met by Carrega and Agent Eutsey. [Ex. H at 438] [Ex. I - Affidavit of Philander Hampton (10/27/2020) EVANS6196-6199 at ¶8]

27. Carrega told Hampton they wanted to question him about the missing boys. Hampton repeatedly denied have knowledge about the missing boys and Carrega called him a liar. [Ex. H at ECPO438-439] Carrega falsely told Hampton that he already knew that Hampton was involved because he got the information from Maurice Olds and that Hampton should stop

lying. [*Id.* at 439] Hampton agreed to take a polygraph test that he allegedly failed [*Id*. at 440-442]

28. Carrega testified to the grand jury that he gave Hampton the impression that Maurice Old told him "what happened" because Maurice Olds confessed Hampton's involvement before he died. [Ex. G - Carrega Grand Jury Testimony at 134] Carrega explained that Olds had provided a statement but he gave Hampton the false impression that Maruice had told Carrega and that Carrega knew what happened. [*Id.* at 136]

29. Carrega had a tape recording device but did not record his interrogation of Hampton at the Essex County Prosecutor's office. [Ex. G at 41] Carrega did not prepare any reports memorializing his interrogation of Hampton at the Essex County Prosecutor's office. During the 18 months in which he investigated the case, he did not put anything writing with respect to his work on the case. [Ex. H at ECPO451]

30. Hampton was in the custody of care of Carrega since 1:00 or 2:00 p.m. on November 12, 2008, but the first time the interview was recorded started at 8:18 p.m. [Ex. B at 245:20-247:5]

31. Hampton was not told why he was being brought to the prosecutor's office on November 12, 2008, nor was he told that he could decline. Had he known that he was being brought to the prosecutor's office to be interviewed about the missing boys, he would not have consented because he had already told detectives everything I knew. [Ex. I - Philander Hampton's Affidavit (10/27/20) at ¶7]

32. When Hampton arrived at the prosecutor's office, he was met by two Essex County investigators, Lt. Louis Carrega and Jack Eutsey. They did not tell him he was under no obligation to answer their questions. [*Id.* at ¶8]

33. Lt. Carrega told Hampton they already knew what happened to the boys because his cousin Maurice Olds had told them what happened. They told Hampton they knew that Lee had killed the boys and they knew Hampton was also present. They told Hampton they knew Lee had killed the boys because the boys had stole marijuana from him. They also told Hampton that they knew Hampton had helped Lee by bringing the boys to his apartment on Camden St. and that the boys died in a fire. [*Id.* at ¶9]

34. Hampton told Carrega that he had no idea why Maurice would have told them that because it was not true. Hampton repeated that he knew nothing about the boys' disappearance and had no knowledge that the boys died in a fire on Camden street. [*Id.* at ¶10]

35. At some point, Newark police detectives came into the interview room. One of the detectives was Joseph Hadley who is a Black detective. There was another White police officer present too who was a state trooper named Tietjen. Lt. Carrega did most of the questioning but occasionally one of the other detectives would question Hampton too. [*Id.* at ¶11]

36. The questioning went on for a period of time and Hampton told the detectives that he did not have knowledge about the boys' disappearance and could not assist their investigation. They continued to say they already knew what happened and that Lee and Hampton had brought the boys to the Camden apartment and that the boys died in a fire there, but they wanted Hampton to tell them from his own mouth what happened. Hampton told them again that he did not know what happened. Hampton was asked whether he would take a lie detector test. Hampton agreed because he wanted to prove that he was telling the truth so he could leave. But after the polygraph, Hampton was told he failed it. [*Id*. at ¶12]

37. Carrega started getting more aggressive with Hampton after he told Hampton he had failed the polygraph. Hampton was very nervous and scared when Carrega told him he failed the test. Carrega told Hampton they were getting tired of Hampton's denials and that he already had enough evidence to convict him and send him to prison for life. Carrega said that he knew that Lee was the mastermind behind the boys' murders but if Hampton did not "cooperate" with them, Hampton would be charged. Carrega told Hampton that if he told them Lee did it, he would not be charged. [*Id.* at ¶13]

38. Hampton told Carrega and the other detectives including Hadley and Tietjen that he didn't know what happened to the boys and had no knowledge that Lee was involved. Carrega and the other detectives kept telling Hampton that he had to help himself and that Hampton if didn't implicate Lee then he would be charged since they already had Maurice's testimony. [*Id.* at 14]

39. The questioning went on for many hours. Hampton was scared and exhausted and it was clear that they were not going to let him go until Hampton told them something about Lee. Eventually Hampton agreed to repeat the story they wanted Hampton to say about Lee even though it wasn't true, because Hampton did not want to get charged with the boys' murders and he wanted to get out of police custody. Carrega had told Hampton numerous times his idea about how the boys died and Hampton knew he wanted the detectives wanted him to repeat the story. Hampton did not tell Carrega the story about the boys dying in a fire; Carrega told Hampton the story. Carrega told Hampton what to say, but it was a lie. [*Id*. at ¶15]

40. After Hampton agreed to repeat the false story, Hampton was transported to another police station in a car driven by Carrega. On the way to the other police station, Carrega

went through the story that he wanted Hampton to say on video. Carrega told Hampton what he was going to ask him and then coached Hampton about how he should respond. [*Id.* at ¶16]

41. Carrega made it clear that he wanted Hampton to repeat the following statements in his own words: (1) Lee wanted to kill the boys because they stole his marijuana; (2) Lee and Maurice Olds got a couple of the boys and brought them to Hampton's apartment on Camden St. and that they picked Hampton up on the way; (3) Lee gave Hampton a gun to watch the boys and then Hampton left and came back with the other boys and placed them all in a closet that he nailed shut; (4) Lee had a can of gasoline that he poured around the apartment; and (5) Hampton gave Lee a match that he ignited the gasoline with and that the building burned. [*Id.* at ¶17]

42. On the way to the police station, Carrega told Hampton he wanted to stop at the Camden street address where Hampton used to live. He drove to that location and Hampton and Carrega got out of the car. Detective Hadley and another Newark detective, and state trooper Tietjen arrived at the Camden address. They asked Hampton questions about what the building looked like, what floor my apartment was on, the location of the front and back doors, and how someone would enter and leave the building. As they asked Hampton those questions, they were telling him the story they wanted him to repeat about Lee bringing the boys to the apartment and starting the fire. [*Id*. at ¶18]

43. Carrega drove Hampton to the State police barracks. It was late and dark outside. Carrega continued to coach Hampton until they arrived. Once they arrived at the police station, Hampton was put on video and repeated the false story Carrega and the other detectives fed to him. Hampton was then returned to Essex County Jail and released from custody. He was not charged. [*Id.* at ¶19]

44. Hampton later entered into an agreement with the prosecution that if he testified against Plaintiff consistent with his video-recorded statement, he would receive only 10 years and be eligible for parole after 2 years. The prosecution promised to support parole and financially support Hampton upon his release. [*Id.* at ¶21]

45. Hampton did not want to testify consistent with his video-recorded statement because the statement was false but Hampton did testify for the prosecution at Lee's trial and again repeated the false statements that were fed to him by Carrega, Hadley, and Tietjen. Those statements were false. Hampton knew that if he did not go along with the story, he would lose his deal and possibly spend the rest of my life in prison. [*Id.* at ¶22]

46. Hampton testified at his deposition that he did not recall making his 2008 video-recorded statement but that he had no reason to believe he didn't make the statements in the transcript. [Ex. J - Hampton Deposition (2/15/22) at pg. 144:1-7; 146:24-147:3]

47. Hampton testified that the statement was coerced with the police and that the police already had a picture in their minds about what happened. [*Id.* at 150:11-14; 199:17-23]

48. Hampton testified when he stated in his 2008 video-recorded statement that Lee Evans started the fire and that he was present when Evans started the file, that statement was a lie. [*Id.* at 155:11-19]

49. Hampton testified that he pled guilty to get out of jail and that he was willing to say whatever he had to say to get out of jail. [*Id.* at 172-174]

50. At his deposition, Hampton reviewed his October 27, 2020 affidavit and recalled signing it and initialing every paragraph to the affidavit. Hampton confirmed that he reviewed the affidavit for accuracy when he signed it. [*Id.* at 186-187]

51. Hampton was expressly asked about the truth of the statements made in his 2020 affidavit at paragraphs 7, 9, 11, 12, 13, 14, 15, 16, 17, 18, 21. Hampton confirmed the truth of those statements. [*Id.* at 187-197]

**D. Plaintiff and Hampton Charged**

52. After Hampton confessed his involvement in the murder of the five teens on November 12, 2008, he was not charged with any crimes connected to the boys' murders. [Ex. B at 252:25-253:255:1] [Ex. G at pg. 135]

53. Hampton was not arrested for the murders of Newark teens until March of 2010. [*Id*. at 256:19-24] After confessing to murdering five teenagers, Hampton was not charged for approximately a year and a half. [*Id.* at 256:25-257:4]

54. Apart from Philander's Hampton's 2008 confession, no additional evidence was developed that didn't already exist in 1978. [Ex. B at 165:18-21]

55. Robert Laurino, the acting Essex County Prosecutor, who ultimately approved charges against Plaintiff, testified that when he received the case in 2010, he had a "charging conference" with members of the Essex County Prosecutor's Office, the Newark Police Department and the State Police. [Ex. R to the City's MSJ at 22:22-23:12] The investigators went through the evidence with him and he "got everybody's opinion and as to the case and then ultimately decided to go forward with the - the prosecution as there is sufficient probable cause to go forward." [*Id.*] The meeting occurred on March 22, 2010. Carrega, Hadley, and Tietjen were present. [*Id.* at 23:21-24:21] [Ex. B at 306:17-307:14]

56. Laurino has no recollection of any detectives informing him that: (1) Hampton repeatedly denied all involvement in the crime; (2) the investigators fed a narrative about the boys dying in a fire to Hampton that they wanted him to repeat; (4) Carrega threatened Hampton

with conviction of murders and life sentence if he did not implicate Plaintiff as the mastermind in the boys' killings; (4) investigators induced or manipulated Hampton into implicating Plaintiff; (5) investigators lied to Hampton and told him that already had sworn testimony from Maurice Olds that implicated him in the boys' disappearances and subsequent murders; (6) Hampton agreed to regurgitate the narrative that was fed to him by the detectives; (7) Hampton agreed to make a false statement; (8) Carrega initiated a stop at the Camden location prior to proceeding to the police barracks to show Hampton the location of the fire. [*Id.* at 76-81] and identified the location where Hampton should say th When Prosecutor Laurino approved charges against Plaintiff and Hampton, [*Id.* at 57:4-21]

57. Laurino was unaware of any coercion directed at Hampton during his November 12, 2008 interrogation; he relied on the investigators to provide truthful, complete and comprehensive information about their investigation.[Ex. R to the City's MSJ at 63:14-19; 57:4-21; 67:8-69:9]

58. Probable cause to charge Plaintiff turned on Philander Hampton's statement. [Ex. B at 297:12-21] Prosecutor Laurino agreed that without Philander Hampton's statement there would not have been probable to arrest Plaintiff. [Ex. R to the City's MSJ at 62:15-24]

59. Carrega told the Grand Jury that they would not be charging Plaintiff or seeking an indictment if it wasn't for Hampton coming and identifying the location of the house. [Ex. G at 131]

60. Prosecutor Cucinello testified at her deposition that without Hampton's confession, no probable cause to charge Plaintiff existed. She testified, "[Y]ou needed this evidence to at least have probable cause, because without Philander Hampton, you didn't have probable cause. You had - you know - you had circumstantial evidence of a bunch of kids being

last seen with Defendant Evans, but that's not really enough to charge somebody with murder." [Ex. K - Cucinello Deposition (8/5/20) at 151:21-152:1-12]

**E. Hampton's Plea Agreement With the Prosecutor's Office**

61. Hampton entered into a plea agreement with the prosecutor's office that involved pleading guilty to felony-murder and sentence of ten years, and a recommendation of parole after two years in exchange for his testimony against Plaintiff. Under the criminal code in effect in 1978, Hampton would be eligible for parole after serving two years in custody. [Ex. R to City's MSJ at 86:2-25] [Ex. I at ¶21]

Respectfully Submitted,

/s/JENNIFER BONJEAN