# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

Civil Action No. 14-cv-120(KM-MAH)

LEE EVANS,

Plaintiff,

-vs-

DEPOSITION OF:

LEE EVANS

NEWARK CITY, FORMER MAYOR CORY A. BOOKER, NEWARK POLICE DEPARTMENT, FORMER NEWARK POLICE DIRECTOR GARRY MCCARTHY, OFFICER JOE HADLEY, DETECTIVE RASHID SABUR, DETECTIVE KEITH SHEPPARD, SGT. DARNELL HENRY, DETECTIVE JOSEPH HADLEY, OFFICER ANGEL RAMOS, NEWARK POLICE OFFICER JOHN DOE (1-10), ESSEX COUNTY NEW JERSEY, ESSEX COUNTY PROSECUTOR'S OFFICE, FORMER ACTING ESSEX COUNTY PROSECUTOR ROBERT D. LAURINO, FORMER ESSEX COUNTY PROSECUTOR DOW, ASSISTANT PROSECUTOR PETER GUARINO, ASSISTANT PROSECUTOR CHERYL CUCINELLO, DETECTIVE LOUIS CORRETEGA, DETECTIVE CHRISTOPHER SMITH, LT. LOU CORREGA, AGENT JACK EUTSEY, DETECTIVE MICHAEL M. RECKENWALD, INVESTIGATOR EDWARD JONES, INVESTIGATOR PATRICK DEFRANCISCI, ESSEX COUNTY SHERIFF'S OFFICE, SHERIFF OFFICERS JOHN DOE (1-10), JUDGE PETER VASQUEZ, NEW JERSEY STATE POLICE DEPARTMENT, DETECTIVE WILLIAM TIETJEN, AND NEW JERSEY STATE TROOPER (1-10),

Defendants.

Thursday, March 18, 2021



TRANSCRIPT of testimony taken by and before JACQUELINE ZAMMATARO, a Notary Public and Certified Court Reporter of the State of New Jersey, License No. 30XI0144200, remotely via Zoom, on Thursday, March 18, 2021, commencing at 10:00 a.m.

**ROSELAND REPORTING SERVICE**
**Certified Shorthand Reporters**
**PO Box 97**
**Roseland, New Jersey 07068**
**www.RoselandReportingService.com**



A P P E A R A N C E S:

BONJEAN LAW GROUP, PLLC
BY: JENNIFER BONJEAN, ESQ.
ASHLEY COHEN, ESQ.
HALEY COOLBAUGH, PARALEGAL
467 Saint Johns Place
Brooklyn, New Jersey 11238
Attorneys for Plaintiff

SCHENCK, PRICE, SMITH & KING, LLP
BY: JAMES KASSIS, ESQ.
220 Park Avenue
Florham Park, New Jersey 07932
Attorneys for Defendant,
Louis Carrega



A P P E A R A N C E S:

MICHAEL VOMACKA, ESQ.
VICTOR DiFRANCESCO, JR., ESQ.
NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
DIVISION OF LAW
STATE POLICE, EMPLOYMENT & CORRECTION CENTER
RICHARD J. HUGHES JUSTICE COMPLEX
25 Market Street
P.O. Box 112
Trenton, New Jersey 08625-0112
Attorneys for State of New Jersey & William Tietjen

KENYATTA STEWART, CORPORATION COUNSEL
BY: GARY S. LIPSHUTZ, ESQ.
FIRST ASSISTANT CORPORATION COUNSEL
City of Newark - Department of Law
920 Broad Street, Room 316
Newark, New Jersey 07102
Attorneys for Defendants City Of Newark
(improperly pled as "Newark City" and
"Newark Police Department"), Cory A. Booker,
Garry McCarthy, Darnell Henry & Joseph Hadley, Jr.

ALSO PRESENT

JOSEPH HADLEY

DARNELL HENRY



QUESTIONS & OBJECTIONS MARKED

QUESTION: Is it approximately ten years? More than ten years?
ANSWER: It could be more. I was just saying that's why, you know --
MS. BONJEAN: Okay. I am going to object to the argumentative grounds. He did approximate. He said or so. That's what an approximation is.
MR. LIPSHUTZ: Your objection is to form.
MS. BONJEAN: My objection is what my -- what comes out of my mouth. Objection to the question. Form. Foundation. He answered your question. Please, next question.
MR. LIPSHUTZ: Yes. I will ask my next question. Your objections are going to be to form. They're not going to be speaking objections. You're not going to interrupt me.
MS. BONJEAN: I am not dealing with you today. Okay? Ask your questions. Objection. Form. Move on.
MR. LIPSHUTZ: Madam reporter, please mark that.
Page 31

QUESTION: And how did he say they formulated and manufactured this whole case?
MS. BONJEAN: Objection. Asked and answered. Argumentative. He just told you he cannot tell you word for word.
MR. LIPSHUTZ: Your objections are to form. Madam Reporter, please mark that objection.
Page 43

QUESTION: So when the detectives wrote that you picked them up at 10:30 p.m., the detectives were lying?
ANSWER: No. I didn't say the detectives was lying. I am saying these statements here it's falsified and documented. I don't know who put it together.
QUESTION: This report is falsified?
ANSWER: Yes.
Page 150



INDEX



| WITNESS | DIRECT | CROSS |
|---|---|---|
| By Mr. Lipshutz | 9 | |
| By Mr. Kassis | 186 | |

EXHIBITS

| No. | Description |
|---|---|
| P-1 | Answers to Interrogatories |
| P-2 | First Set of Interrogatories to Lee Evans |
| P-3 | Plaintiff's Amended Answers To Interrogatories |
| P-4 | Missing Person Report |
| P-5 | Missing Person Report |
| P-6 | Missing Person Report |
| P-7 | Supplemental Report |
| P-8 | Preliminary Investigative Report |
| P-9 | Photograph |
| P-10 | Copy of Greeting Card |
| P-11 | Investigation Report |

(All Exhibits Marked Prior to Deposition)




THE REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely. They further acknowledge that, in lieu of an oath administered in person, I will administer the oath remotely. The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.
Please indicate your agreement by stating your name and your agreement on the record.
MR. KASSIS: Jim Kassis on behalf of Louis Carrega. I agree.
MS. BONJEAN: Jennifer Bonjean on behalf of the plaintiff. I agree.
MR. LIPSHUTZ: My name is Gary Lipshutz. I agree. I represent the City of Newark, Darnell Henry, Joe Hadley, Corey Booker, and Garry McCarthy. Good morning.
MR. DiFRANCESCO: Good morning, Jackie. Victor DiFrancesco, along with Michael Vomacka, deputies attorney generals. We are appearing on behalf of the State of New Jersey, William Tietjen.

MS. BONJEAN: I would like to put on the record Defendant Hadley and Defendant Henry are also present for this deposition as are my colleagues, Ashley Cohen and Haley Coolbaugh.
LEE EVANS, affirms to tell the truth, the whole truth and nothing but the truth, testifies as follows:
EXAMINATION
BY MR. LIPSHUTZ:
Q Good morning, Mr. Evans.
**A Yes, it is.**
**Q Okay. Can you hear me okay, sir?**
**A Yes.**
**Q Okay. Good morning. We are here today to ask you some questions in a deposition concerning a lawsuit that you filed. I think we have met before once in court, but if you don't remember, my name is Gary Lipshutz. I am an attorney for the City of Newark and for Detective Hadley and Sergeant Henry and Mayor Booker and police director Garry McCarthy.**
**Also on this deposition are a number of other attorneys who represent various defendants in the case. We are here to ask you some questions about your lawsuit. I am going to**



**probably go through some background questions about you first.**
**Then I am going to go and ask you about your recollection of the events of 1978. I may ask you some questions about the criminal trial. And at the conclusion of my testimony -- I am sure we will get into some other topics, but at the conclusion of my questioning, the other attorneys have the right to ask you some questions.**
Do you understand that so far?
**A Yes.**
Q Okay. Have you ever had the opportunity to give deposition testimony before?
**A No.**
Q Okay. This is the first time?
**A Yes.**
Q Okay. Well, I am going to give you a few instructions. Okay?
First of all, you just affirmed to tell the truth. Do you understand that you're here today to give truthful and honest testimony?
**A Yes.**
Q Okay. And your answers to my questions today will be truthful and honest; is



that correct?
**A Correct.**
Q Okay. Now, we are all in different locations. It's a little unusual. Normally we would all be in the same conference room, but because of the circumstances of the pandemic, all of us are separated by miles. I take it today, sir, that you're in the -- where are you, sir?
**A I am in an attorney's office.**
Q Okay. What -- where are they located?
**A In Brooklyn.**
Q Okay. So you're in Brooklyn. Okay. So we are not in -- together. But this is a sworn deposition under oath. The significance of that is that this is testimony that can be used later at a trial, if necessary. And let me explain.
**If at a trial in this matter you were to give testimony that differs from testimony that you give today, you can be confronted by your testimony today. Do you understand that?**
MS. BONJEAN: Sir, I am going to object to these instructions. A, they're not



necessarily accurate reflections of the law. It's all very hypothetical. So I would appreciate it if you have instructions as to -- would help him get through this deposition, go right ahead. But your misstatements of the law and hypothetical scenarios that may or may not play out in trial I think are inappropriate.
MR. LIPSHUTZ: Your objection is to form, and I would ask you to limit your objection to form.
MS. BONJEAN: I will object as I see fit. Go ahead. Keep going. Let's keep going.
BY MR. LIPSHUTZ:
Q Okay. Also, it's important that only one of us speak at a time. This is a especially true because of the fact that we are not in a conference room. This will help the court reporter take down everything that is said accurately. So please let me finish my question, and I will give you every opportunity to finish and complete your answer.
**It may be a little awkward at times. I may anticipate that you might be done, but I am not trying to speak over you. Can we agree on that?**

A You talking to me, Evans?
Q I am speaking to you, Mr. Evans.
A Yes.
Q Okay. There is a court reporter present here today. Her name is on the screen, and her name is Jacqueline Zammataro. Okay. She is taking down everything that is being said word for word, and at the conclusion of this deposition, a transcript will be prepared. Okay?
If at any point during this deposition you do not understand any of my questions, I would appreciate it if you let me know. That way I will be happy to rephrase the question. If you go ahead and answer the question, when we read the transcript later, everyone will presume that you understood the question. So can we agree, sir, if you don't understand my question, you will let me know. Okay?
A Yes.
Q Okay. I also need you to respond verbally to my questions. The court reporter cannot take down shrugs of the shoulders or words like uh-huh or um-hum. We won't know later what those words mean. So speak your answers verbally



out loud. Do you understand that?
A Yes.
Q Okay. If you need to take a break at any time, please let me know. I will be happy to do so. But typically, there is no breaks while there is a question pending. So you will please just answer the question first and then ask me to take a break. Okay?
A Yes.
Q Okay. There may come a time when your attorney or perhaps the other attorneys may object to one or more of my questions. Again, this is awkward since we are not all in the same room. Please let your attorney pose her objection. And this is not a courtroom. There is no judge here to rule on your objection. So unless your attorney instructs you not to answer a question, you're still going to have to answer the question. Do you understand that?
A Yes.
Q Okay. Are you under -- are you taking any medication, sir?
A Yes.
Q What kind of medication?
A Pressure. High blood pressure.



Q High blood pressure. Okay. What is the name of the medication, sir?
A There is several. One of them metformin and the other one is -- I don't know at the moment.
Q Metformin, is that typically for diabetes?
A Yes. Diabetes and also you got the pressure, high pressure.
Q Okay. Does that mean, sir, that you also suffer from diabetes?
A I don't suffer from it. It's borderline.
Q Okay. Type 1 or type 2, sir?
A No. I don't take no injections or nothing like that.
Q But is it type 1 diabetes or type 2?
A Type 1 is what, the -- type 2 is the second phase.
Q Well --
A I'm not -- I don't know.
Q I will tell you what. If you don't know the answer to my question, just let me know. Okay?
A Yes.



Q Okay. That's one of the other instructions I should give you. We don't want you to guess. We just want you to tell us your recollection. If you don't remember, it's okay to say "I don't remember." If you don't recall, let us know you don't recall. All right. Is that fair?
A Yes.
Q Okay. Other than the medication for high blood pressure, are you taking any other medication?
A Yes. I was taking depression, anxiety. They gave me something. It was affecting me too far. It was bringing me too far down. It was turning me into a zombie almost, you know.
Q Okay. I am a little confused. Are you taking that medication now or have you taken it in the past?
A I took it in the past, yes.
Q What I meant for today's purposes, are you taking any other medication?
A I still have that medication, yes.
MS. BONJEAN: Are you taking it today?

**THE WITNESS: No. I didn't take it today.**

BY MR. LIPSHUTZ:

Q When was the last time you took it, sir?

**A About a week.**

Q Okay. And other than that, have you taken any other medication?

**A Herbal.**

Q Herbal?

**A Yes.**

MS. BONJEAN: Do you mean today?

**THE WITNESS: You're talking about today?**

BY MR. LIPSHUTZ:

Q Yeah. I want to know what medications you are taking today or in the last 12 hours.

**A That was it.**

**Q Okay. Is there any reason why you cannot give truthful answers today? Any reason?**

**A Is there any reason?**

Q Yeah.

**A What you mean by that?**

Q Okay. Thank you. Let me rephrase



the question and I should have rephrased it.

Is the fact that you're taking any of those medications -- would that affect your ability to give truthful and honest answer today?

**A No.**

Q Okay. Have you had any alcohol beverages in the last 12 hours?

**A No.**

Q Okay. One second, sir. Have you looked at any documents prior or in preparation for today's deposition?

**A Documents is in my head.**

Q It's a simple question. Have you looked at any documents in preparation for today's deposition?

**A Did I look at anything? No. I was instructed to look, but I didn't need to look.**

Q Well, one of the things I would tell you is --

MS. BONJEAN: Just answer --

BY MR. LIPSHUTZ:

Q -- I don't really want to get into what you were instructed to do. I don't want to get into what your attorney spoke to you about. I am not asking you about that. I don't want to



get into the conversations that you had with your attorneys. That's not something I am interested in. All I was asking was have you reviewed any documents in preparation of today's deposition?

**A No.**

Q Okay. Other than your attorneys or anybody at their law firm, have you spoken to anybody in preparation of today's deposition?

**A I might have told somebody I was coming here. That's what you mean?**

Q That's a fair response. Other than saying I am driving to Brooklyn for a deposition or I can't be at a meeting because I am going to a deposition, have you discussed -- I am getting feedback here.

Have you discussed this upcoming deposition with anyone other than your attorneys or anyone in their office?

**A No.**

**MS. BONJEAN: I am just going to object to form. Foundation. Go ahead.**

BY MR. LIPSHUTZ:

Q I am sorry. I didn't hear your answer, sir.

**A You said --**



MS. BONJEAN: No. Just answer the question. You already answered it.

**THE WITNESS: I said no.**

**BY MR. LIPSHUTZ:**

**Q Let me just ask you some background questions. Okay?**

**What is your full name, please?**

**A Lee Anthony Evans, Sr.**

Q Senior. Have you ever gone by any other names?

**A Other names? What, change my name? Nickname? What you mean? You got to explain that.**

Q Have you ever gone by any other names?

MS. BONJEAN: Objection. Form. Foundation.

You can answer if you understand.

**THE WITNESS: You got to explain to me. Are you talking about my -- changing my name or a nickname?**

BY MR. LIPSHUTZ:

Q I'll happily -- well, I want to just sort of just ask a broad question. But have you ever had a formal different name?

A Not formal, no.
Q Okay. Have you had nicknames?
A Yes. I had nicknames.
Q What nicknames have you gone by or have people called you?
A When I was born, they called me Book because I was crawling. I was -- in one area they was calling me Potato and -- because my head was round like a potato, and they called me Big Man. They have called me Genius. You know, that's basically.
Q Okay. Any other nicknames that you can recall?
A Not really.
Q Okay. What is the date you were born, sir?
A June 14, 1953.
Q Where were you born?
A Louisiana.
Q And did there come a time you -- you or your family moved to New Jersey?
A Yes.
Q When was that?
A That was in roughly around '62, somewhere in there.



Q So for the first nine, ten years -- eight or nine years of your life where did you live?
A I was in Louisiana, I was in Alabama, and from Alabama came to Jersey.
Q Since 1962 have you lived in New Jersey exclusively?
A Yes.
Q Okay. Now, there are a lot of names I want to ask you about, and sometimes I read that they're cousins. So I am going to ask a little bit about your family tree, sir. So what -- are your parents still alive?
A In spirit, yes. They passed on.
Q Your parents have passed on. What was your father's name? What is your father's name
A Laverne Evans, Senior [phonetic].
Q And your mother?
A Mildred B. Williams Evans.
Q Mildred B.?
A Yeah.
Q Williams?
A Evans.
Q Evans. Okay. Now, did your father



have siblings?
A Yes.
Q Can you tell me who -- the siblings' names?
A Well, Andrew Junior, Belle, Annie B. There's Levi, his twin, Levi Evans. And that's about it.
Q He had three brothers?
A Three, four, yeah.
Q I missed your answer on that.
A Three or four. Three brothers, yeah. I think it was three brothers. Twin -- my father; right? You're talking about my father?
Q Yes, sir.
A Yeah. That's what I am saying. Okay.
Q No sisters?
A Yeah. He had sisters. There is two sisters.
Q What were their names, sir?
A One Annie B and one was Belle.
Q I guess I am having trouble hearing. I thought you said Andy, A-N-D-Y. It's Annie?
MS. BONJEAN: Speak up. Okay?
THE WITNESS: Annie B. Ann. Annie



B.
BY MR. LIPSHUTZ:
Q Thank you, sir. And so any other siblings?
A Not as far as I know.
Q Annie B, what was -- was she married?
A At one point, I guess. I don't know.
Q Do you know what her last name was?
A When it passed Evans, no.
Q And Belle?
A Same.
Q You don't know what her last name was?
A No.
Q Okay. Now, your mother, Mildred, her maiden name was Williams?
A Her maiden was Hampton.
Q Hampton. Mildred B. Williams Evans. I'm sorry. I didn't hear you?
A Evans was her -- her married name. She was married twice with a Williams also.
Q Thank you, sir. So Williams was a prior husband?

A **Yes.**
Q A prior marriage. And then her maiden name was Hampton?
A **Right.**
Q Now, did Mildred have siblings?
A **Yes.**
Q Do you know how many?
A **About five or six.**
Q Do you recall their names?
A **Yes. Julia. Julia May.**
Q Julia?
A **Yeah. Woody.**
Q Okay.
A **John Hampton, Randolph Hampton, and sister Vera and a sister Claire.**
Q Okay. Thank you. You're doing great. Julia's last name?
A **Woody.**
Q Julia Woody?
A **Yes.**
Q Vera's last name?
A **I'm not for sure.**
Q Claire?
A **I think it's Taylor. Taylor.**
Q Okay. Now, those aunts and uncles



-- various aunts and uncles, did many of them live in New Jersey?
A **Just two.**
Q Which two, sir?
A **Did I mention John Hampton?**
Q Yes, you did.
A **Okay. John Hampton and Julia Woody.**
Q What about on your father's side? Did any of those siblings live in New Jersey?
A **Not that I know of.**
Q Okay. So John Hampton and Julia Woody lived in New Jersey, your mother's siblings?
A **Yes.**
Q That would be your uncle and your aunt?
A **Yes.**
Q Okay. Now, I want to ask you about a couple names here. And can you explain their relationship to me? Philander Hampton, was that John's son?
A **No.**
Q Okay. That's why I asked.
A **He is a second cousin.**
Q Second cousin?



A **Right.**
**Q** **Okay. Can you explain the -- the relationship to you other than second cousin? Like who is his parents, et cetera?**
A **His mother and my mother was first cousins.**
Q Okay. Mildred Evans, your mother, had a cousin, and her cousin's name was?
A **That was -- mental lapse -- Merrell, Jessie Merrell (phonetic).**
Q Jessie Merrell?
A **Yes.**
Q And that was Philander's mother?
A **Right.**
Q That makes Philander your second cousin. Fantastic. Thank you.
Darryl Woody, is he related to you?
A **Yes.**
Q What was his relationship to you?
A **First cousin.**
Q Is that Julia's son, then?
A **Correct.**
Q Were you also related to Maurice Olds?
A **Yes.**



Q What is the relationship there?
A **First cousin.**
Q Whose -- which one of your aunts or uncles was --
A **That's Darryl's brother.**
Q Thank you. So Darryl and Maurice are siblings?
A **Correct. Yes.**
Q And their mother was Julia Woody?
A **Yes.**
Q Okay. Maurice has passed away; correct?
A **Yes.**
Q Is Darryl still alive?
A **He passed.**
Q He has also passed. Okay.
Are you presently married?
A **Yes.**
Q What is your wife's name?
A **Frances.**
**Q** **Is that F-R-A-N-C-E-S or I-S?**
A **E-S.**
Q How long have you been married, sir?
A **Say 40 -- 45 years, something like that.**

Q Do you remember the date you got married, your anniversary?
**A Yeah. That's December the 5th.**
Q What year, sir?
**A Oh, I didn't get that. I got to get the year also. That was in – yeah. I could tell you the year. It had to be '75. '75.**
**Q Would it be fair to say that you were married prior to the disappearance of the five boys in 1978?**
**A Yes.**
Q Okay. And you were married to Frances?
**A Yes.**
Q Okay. Are you -- do you still live with her?
**A We communicate. No. Not at this moment.**
Q Would you say you're separated?
**A Yes. At the moment, yes.**
Q Okay. How long have you been separated, sir?
**A Well, I guess ten years or so, you know.**
**Q So let's – I really don't like you to guess. Okay? You can approximate.**



MS. BONJEAN: He said ten years or so.
MR. LIPSHUTZ: I heard him say ten years or so.
BY MR. LIPSHUTZ:
Q Is it approximately ten years? More than ten years?
**A It could be more. I was just saying that's why, you know --**
MS. BONJEAN: Okay. I am going to object to the argumentative grounds. He did approximate. He said or so. That's what an approximation is.
MR. LIPSHUTZ: Your objection is to form.
MS. BONJEAN: My objection is what my -- what comes out of my mouth. Objection to the question. Form. Foundation. He answered your question. Please, next question.
MR. LIPSHUTZ: Yes. I will ask my next question. Your objections are going to be to form. They're not going to be speaking objections. You're not going to interrupt me.
MS. BONJEAN: I am not dealing with you today. Okay? Ask your questions. Objection. Form. Move on.



MR. LIPSHUTZ: Madam reporter, please mark that.
BY MR. LIPSHUTZ:
Q Presently it's 2021. What year do you approximate that you became separated from your wife?
**A Oh, had to be 10 to – I guess 10, 11 – 10 years, 11 years, somewhere in there. I mean it was -- you know, where we – it had to be 10 or 11 years or somewhere in there.**
Q Okay.
**A You know.**
Q Where does she live? Do you know?
**A Yes. She live in Newark.**
Q Okay. Have you -- has anybody filed divorce papers?
**A No.**
Q Do you know if she is aware of this lawsuit?
MS. BONJEAN: Objection. Form. Foundation.
**BY MR. LIPSHUTZ:**
Q You can answer that.



**A Yes. She's aware.**
Q Have you discussed this lawsuit with her?
**A I haven't discussed it with no one really.**
Q So then I guess the answer is you have not discussed it with her?
**A No.**
Q Okay.
A You mean lately; right? That's what you mean? What period?
Q Well, that's a good -- that's a fair question. Have you ever discussed this lawsuit with her?
**A Yes.**
Q Okay. And when was the last time you discussed this lawsuit with her?
**A I couldn't tell you.**
Q More than two years?
**A Probably not. I don't know. I wouldn't be able to give you no answer on that.**
Q Okay. Do you have children?
**A Yes.**
Q How many children do you have?
**A I have five.**

Q Okay. Just give me a range of their ages.
**A From 50 all the way down to 25.**
Q Okay. Do you live with any of them?
**A No.**
Q Do any of them live with Frances?
**A Yes.**
Q Okay. Now, at the beginning of the deposition you gave a post office box for an address. Do you have a physical address?
**A Well, that's where all my -- everything goes to me. I don't have a permanent physical address, no. Everything goes to the PO box or it goes to 10 Melville Place.**
Q What is 10 Melville Place?
**A That's a location.**
Q Yeah. Is that where you sleep at night?
**A No. I don't really sleep there.**
Q Okay. Where do you --
**A I was there sometimes, but, you know, mostly --**
Q Mostly what?
**A No. I house there sometimes. Mostly I just be there every day, though, you know. We goes in and out of there. Where I sleep at is -- it's a location in Budd Lake, New Jersey.**



Q What is address of Budd Lake location?
**A That's 38 4B.**
Q 38 4B?
**A Yes.**
**Q What? 38 4B what?**
**A That's the -- that's the building number.**
Q Can you just tell me -- what is the location? What is the address?
**A Eagle Rock Village. Eagle Rock Village.**
Q Is that an apartment?
**A Yes.**
Q Condominium?
**A Yes. That's apartment.**
Q Okay. So you rent an apartment?
**A Yeah. I rent apartment.**
Q And 10 Melville, is that a house or apartment?
**A No. That's not a house. That's a -- like warehouse garage thing.**



Q A warehouse garage. Do you own any real estate?
**A Yeah.**
Q Tell me what real estate you own.
**A Prior to this here situation I was in, I lost properties. That was on Chancellor. Property at 10 Melville Place and 16 Melville Place.**
Q So I am a little confused you. Are you saying that you lost property on Chancellor and 16 Melville Place?
**A No. I lost -- no. 16 -- I lost property on -- that was 18 Melville Place, in my son's name.**
Q Let me just ask it a different way. Do you presently own real estate at all?
**A Yes. Jammed up, yes. Yes.**
Q You mean mortgaged by jammed up? Is that what you mean?
**A No. Lot of financial difficulties.**
Q I know. But it's a pretty simple straightforward question. Do you own property? I am just curious.
**A I said yes already.**
Q Okay. Well, what is the property you own?



**A 10 Melville Place and you got 16 Melville Place.**
Q Okay. Anywhere else?
**A No.**
Q Okay. When was the last time you spoke to Philander Hampton?
**A I don't associate with him like that, but he called me. This had to be two, three months ago, somewhere in there like that.**
Q He called you?
**A Yes.**
Q And what did he say?
**A When he had called me?**
Q Yes.
**A He doesn't say too much because I cut the conversation.**
Q Why?
**A Because I don't affiliate with him.**
Q You broke up. I'm sorry. What did you say?
**A Because I don't affiliate with him.**
Q I understand. You don't affiliate with him.
So when he spoke to you two, three

months ago, did you speak about anything or just broke up the question -- you just broke up the conversation, I mean?
A Yes.
Q Okay.
And before you spoke to him two or three months ago, when was the last time you spoke to him before that?
**A I don't know. It wasn't on the same basis. Like I cut the conversation off. But I don't know the time. I couldn't give you the time. It's been awhile.**
**Q You know, a while can mean one thing to one person and one thing to another. So can you give me a better estimate?**
MS. BONJEAN: Objection. Asked and answered.
**THE WITNESS: I couldn't, not right off, you know.**
BY MR. LIPSHUTZ:
Q Well, let me ask you this. Since the -- since the acquittal; right? Since the acquittal --
**A Yes.**
**Q -- have you discussed with**



**Mr. Hampton anything about his testimony, his accusations, anything at all?**
MS. BONJEAN: Objection to form.
You can answer.
**THE WITNESS: Repeat that.**
BY MR. LIPSHUTZ:
Q Since the acquittal, have you had discussions with Mr. Hampton about his testimony or his accusations against you?
**A Yes.**
**Q When was that conversation and what was discussed?**
MS. BONJEAN: Objection to form. Compound.
BY MR. LIPSHUTZ:
Q When was that conversation?
**A Oh, man, that could have been -- it was years. It wasn't no months.**
MS. BONJEAN: If you don't know, you don't know.
**THE WITNESS: No. Not right off. I'm not -- but it wasn't months.**
BY MR. LIPSHUTZ:
Q Was it in 2011?
**A No.**



Q Was it in 2012?
**A No.**
Q Was it in 2013?
**A No. It was in -- if you're narrowing it down, you know, it was past '13, '14. It had to be '17, '18. Could have been '19. I am not for sure. Maybe it was '17, somewhere in there.**
Q Somewhere --
**A I know -- I know for a fact it wasn't '14 and it wasn't '15.**
Q Why do you know for a fact it wasn't those years?
**A Because that's when I went into the -- I filed my complaints, and I know it wasn't there. It had to be '18. It could have been '18. I don't know if it was '19.**
Q Somewhere between 2017 and 2019?
**A Somewhere in there, yeah.**
Q And you spoke to Philander. What was that discussion? Was it in person or over the phone?
MS. BONJEAN: Objection. Form.
You can answer. When I object, you can still answer.



**THE WITNESS: Yes. Yes. It was -- it was in person.**
BY MR. LIPSHUTZ:
Q Where did that conversation take place?
**A In Newark.**
**Q Where?**
MS. BONJEAN: Objection. Form.
**THE WITNESS: I don't really remember the street. I know the street. It was off South Orange Avenue. The street runs off South Orange Avenue.**
BY MR. LIPSHUTZ:
Q What time of year was this?
**A I don't even remember. I don't remember.**
Q What time of day was it?
**A Oh, it was probably after 12:00. 3:00, 4:00, somewhere in there.**
MS. BONJEAN: Don't guess.
BY MR. LIPSHUTZ:
Q Are you guessing or you're not sure?
**A I am not sure.**
MS. BONJEAN: Here is -- the instruction he gave you is if you don't know the

answer --
THE WITNESS: Right.
MS. BONJEAN: -- tell him you don't know the answer, or if you're approximating, tell him you're approximating.
BY MR. LIPSHUTZ:
Q Do you know when you had your conversation with Mr. Hampton?
**A It wasn't night and it wasn't morning.**
Q Was anybody else present?
**A No.**
Q What was discussed?
**A What was discussed about this -- how he said they tricked him into doing what he did.**
**Q Explain exactly what he said to you.**
MS. BONJEAN: Objection to the form.
**THE WITNESS: They tricked him in putting this here case together.**
BY MR. LIPSHUTZ:
Q Did he say anything else?
**A I don't recall.**
Q Did he say who tricked him?
**A Yeah. He said the police, the prosecutor.**



Q Did he say who, as in what persons, or did he just say the police, the prosecutor?
**A Yeah. That's what he said.**
Q Okay. I will rephrase my question. Did he give names or he just said the police, the prosecutor?
**A No. No.**
Q No names?
**A No names. I knew something came up, but I don't know how.**
**MS. BONJEAN: Just answer the question. Don't --**
**THE WITNESS: To me, no. He didn't give no names to me.**
BY MR. LIPSHUTZ:
Q Just the police or prosecutor; correct?
**A The police and the prosecutor.**
Q Thank you. That's what you said. I appreciate that.
Did he explain to you what he meant by they tricked him?
**A In detail some stuff he said, you know. I'm trying to recollect what he said, how he said it. Word for word, no. I don't recall.**



Q Philander told you the police and prosecutor tricked him, but you're telling me you don't recall exactly what he said?
**A I didn't say that. I said word for word. In essence -- in essence, I am telling you word -- I couldn't repeat word for word. But he was telling -- he was saying -- in essence, what he said was how they formulated and manufactured this whole case.**
Q And how did he say they formulated and manufactured this whole case?
MS. BONJEAN: Objection. Asked and answered. Argumentative. He just told you he cannot tell you word for word.
MR. LIPSHUTZ: Your objections are to form.
Madam Reporter, please mark that objection.
**MS. BONJEAN: Mr. Lipshutz, you are the king of speaking objections. I am objecting to form. Okay? Please stop. Mark -- mark -- mark away. This is really ridiculous. Stop harassing my client and being argumentative. Please ask your next question, sir.**
**MR. LIPSHUTZ: Madam reporter,**



**please mark that.**
BY MR. LIPSHUTZ:
Q Sir, all I want to know is what he told you.
MS. BONJEAN: Objection. Asked and answered.
BY MR. LIPSHUTZ:
Q What did he tell you how they tricked him into manufacturing this case?
**A I can't put it in words the way he said it. That's what I am saying at this point.**
Q Can you give me anything else as to what he said?
**A No.**
Q Were there more than one conversations with him about this?
**A What you mean?**
**Q Well, other than this one conversation that took place on some street near South Orange Avenue sometime between 2017 and 2019, did you have any other conversations with him about his testimony?**
MS. BONJEAN: Objection to the form and foundation of that question.
Go ahead. You can answer.

THE WITNESS: No. It was the same basic, you know, when I got with him on this here.

BY MR. LIPSHUTZ:

Q So I don't really understand that. Did you have -- my question was, did you have other conversations about this?

A You mean a different date --

Q Yes, sir.

A Yeah. It was a different date.

Q Okay. Where did that conversation take place?

A I don't know. Before this conversation. And that conversation led to the meeting of this conversation.

Q Okay. Thank you for clarifying.

So prior to -- prior to the conversation you told me about, you had another conversation or an earlier conversation with Mr. Hampton. Is that true?

A The earlier conversation went on this conversation.

Q Okay. What happened in the earlier conversation?

A That's what it was about, meeting



for this -- it's all the same. Ain't no difference.

Q Well, I wasn't there, so I am just trying to understand. And you will forgive for me for just trying to inquire. Okay?

MS. BONJEAN: Objection to form and editorializing.

BY MR. LIPSHUTZ:

Q Mr. Evans --

A The first -- go ahead.

Q Yeah. Just tell me about the first conversation.

A The first conversation was when we came together -- he called me for me to meet, and then I met up. And that's when the second conversation came in place.

Q Okay. During this first conversation, was anything -- was anything discussed about his testimony or about his accusation?

A No. It was the same. Basically, he's telling me how they put him -- and another thing he added, that he said he claimed -- I don't know if it's true or not. He claimed that they didn't give him money like they said -- they



promised. I don't know whether it's true or false.

Q I understand that. When -- when did he bring that up? During the first conversation or the second one?

A It could have been the second one.

Q That was the face-to-face conversation?

A Yeah.

Q And I guess I didn't ask you about the conversation. Was that also face-to-face or on the telephone or --

A That was the phone.

Q Okay. So you have told me about two conversations with Mr. Hampton, one over the phone and one face-to-face. Were there other conversations with Mr. Hampton -- excuse me. Let me rephrase the question. I am sorry. You have told me about three.

MS. BONJEAN: Objection to form.

BY MR. LIPSHUTZ:

Q One over the telephone, one face-to-face, and then a later one where you said you don't really associate with him. Were there any other conversations?



A You talking about after the -- after '10 or before the '10? What year you talking about?

Q After the acquittal, sir.

A After. It could have been. I am not for sure.

Q What is your recollection?

MS. BONJEAN: Objection. Asked and answered.

THE WITNESS: I don't -- I don't have that. That's what I am saying.

BY MR. LIPSHUTZ:

Q So I want to make sure I understand what you have told me. You have told me that Mr. Hampton told you he was tricked by the police and prosecutors, that he wasn't paid. Is there anything else he told you?

MS. BONJEAN: Objection. Asked and answered and mischaracterizes the testimony.

Go ahead. You can answer.

THE WITNESS: Yes. Yes. He was telling me how they put his statement together.

BY MR. LIPSHUTZ:

Q When did he tell you that?

A The same time. That's what I am

**saying. It came to me on that -- when he was -- same conversation where they tricked him and lied to him and everything else he claimed. I don't know.**

Q He's also said that they lied to him?

**A Yeah. Because they didn't pay him.**

Q How did they --

**A I don't know nothing about how they did it. This is what he said, and that's it. I don't know nothing behind the scenes.**

Q I got that. I understand that. What did he say to you about how they put this statement together?

**A I already said. I just told you what was happening. That was it. Right now I couldn't come word for word the way he said it.**

Q Well, give me your best recollection.

**A I did already.**

MS. BONJEAN: Objection. Objection. Asked and answered. You're now harassing the witness. He did his best to recollect. Objection. Form.

BY MR. LIPSHUTZ:



Q So the only thing you remember is that they -- that he said something to the effect that they put this statement together?

MS. BONJEAN: Objection. Mischaracterizes his testimony.

BY MR. LIPSHUTZ:

**Q Mr. Evans, just tell me what you remember.**

MS. BONJEAN: Objection. Asked and answered. This is argumentative and harassing. He did his best. You've asked him many times.

MR. LIPSHUTZ: Okay. Keep going, Ms. Bonjean.

Madam Reporter, can you mark that objection too?

MS. BONJEAN: You know what? You know what? You can -- you can -- hold on a second.

Mr. Lipshutz, you are not going to harass the client just because you don't -- you don't feel that he is giving you as much detail as he likes from a conversation from many years ago. He has done his best to answer the question. You are not harassing him. You can -- yes. And, Madam Reporter, please do mark that question.



BY MR. LIPSHUTZ:

Q Mr. Evans --

**A Yes.**

Q -- I just want to understand what Mr. Hampton told you. What did he say to you about how they manufactured his statement, if they said anything?

**A The best way to do that is get Mr. Hampton. That's the only way you'll find out. I told you everything I can tell you at this point. You want to know anything about Mr. Hampton, what he said, you have to get Mr. Hampton.**

Q I know. But I am asking him what he told -- I'm asking you --

**A I just told you. I already told you as far as I can go with it, you know, as far as I can recollect. Now, if you told me to go home and go to sleep and think about it and think about it, other things might come up. But other than that, you know, it's not there.**

**Q Is there anything else about the conversation that you had with Mr. Hampton that you haven't told me?**



MS. BONJEAN: Objection to the form of that question.

**THE WITNESS: It's been -- repeat it; right? You want me to repeat the same thing and I'll be like a parrot. I will say no. That's what we are going to do. Because you done ask me this here ten times already. And I am not talking about the lawyer now. I am talking about me. I am here, sitting down, taking the deposition. Not to be harassed, not to go over this crazy stuff. And you ask me the same thing ten times, and I said it ten times. So don't ask me 11 times.**

BY MR. LIPSHUTZ:

**Q Is there anything else about the conversation with Mr. Hampton that you haven't told me that you recall?**

MS. BONJEAN: If there is not, answer the question.

THE WITNESS: No.

BY MR. LIPSHUTZ:

**Q Okay. What do you do for a living, sir?**

MS. BONJEAN: Objection. Form.

**THE WITNESS: What do I do? Right**

**now odd jobs, but I'm plumbing and heating, you know, construction.**

BY MR. LIPSHUTZ:

Q Do you have a business?

**A Crippled business. I had a business, good business, yes.**

Q I guess I didn't hear your answer. Did you say crippled?

**A Yeah.**

**Q What is the name of your business?**

MS. BONJEAN: I am going to object to the form of that question. Also mischaracterizes. Maybe you didn't hear it, but objection. Form.

**THE WITNESS: Evans General GC.**

BY MR. LIPSHUTZ:

Q Evans General GC?

**A Yeah. General construction.**

Q Okay. How long have you had that business?

**A I had the business for years.**

Q How long?

MS. BONJEAN: Objection. He testified that he had a business. Had. So I don't know if you -- I am just trying to --



**THE WITNESS: You can say 40-plus years.**

BY MR. LIPSHUTZ:

Q Is the business out of business?

**A It's not out of business, but it's not -- you know, it's in business like it should be.**

Q What do you mean by that?

**A I am not operating in the form that I should be operating in. I am making less than when -- you know, when I know was to support my means.**

Q Why are you making less?

**A Because this whole situation put me in a -- in a crippling situation.**

Q And what whole situation are you referring to, sir?

**A With this case here.**

Q This case is keeping you from your business?

**A No. The case is not keeping me from the business. The case screw up my business.**

Q I didn't hear your answer, sir.

**A This case destroyed the business.**

Q Oh, okay. The criminal case, is



that what you're saying?

**A Yes.**

Q Okay. I am just trying to understand. Remember, we are far away, so it's hard for me to understand sometimes. And that's -- I'm not -- I am just trying to make sure I am clear. Okay?

Was it ever called -- did you ever have another business called Evans and Son Construction?

**A Yes. It was lead off the same line. In '78 -- no. It was -- I mean, 2008, 2007, it was Kumar, attorney -- I mean tax accountant in Freehold. They set up the business, and they restructure everything in my business.**

**And he took the name out and put Evans General GC in there and put everything -- he was taking out X amount of dollars a month, 150 -- possibly 150. And come to find out that he -- all this stuff was the same conspiracy. All the stuff came together.**

**I went to the Internal Revenue Service. They said this guy ain't filed nothing on you. So they gave me papers to file, I guess, out -- I guess somewhere in -- in California**



**somewhere. And that's what happened. One thing led to another. Seemed like it was just going backwards instead forward, you know.**

Q I take it from your answer that you were the victim of fraud by your tax accountant. Is that what you're saying?

MS. BONJEAN: Objection. Misstates his testimony and it --

MR. LIPSHUTZ: What ever --

BY MR. LIPSHUTZ:

Q What happened with your tax accountant, sir?

**A I said he didn't file my papers, nothing. He didn't file my papers like he supposed to have been for my thing and status and all that, so that nature.**

Q What was the name of the accountant, sir? It was hard to hear you.

**A Kumar. It was a -- an Indian firm.**

Q Is there any chance you could spell that for the court reporter?

**A K-U-K-A, something like that.**

**Q K-U-K-A?**

MS. BONJEAN: Kumar, you said?

**THE WITNESS: Kumar.**

MS. BONJEAN: He is saying Kumar which I assume is K-U-M-A-R, but I don't know.
BY MR. LIPSHUTZ:
Q Does that sound right to you, sir, K-U-M-A-R?
**A Yes. Yes.**
**Q And are you saying to me that you were the victim of fraud by this Kumar?**
MS. BONJEAN: Objection to the form.
You can answer.
**THE WITNESS: Yeah. I guess you would say that.**
BY MR. LIPSHUTZ:
Q This was because -- let me rephrase that.
So sometime in 2008 you said you were re-forming your business through this accountant?
**A No. Everything was still re-forming, getting on my tax and all and everything, my tax status and all.**
Q But -- and I am just trying to understand your answer, sir. I thought you said they changed the name of the business?
**A Yeah. The name changed.**



Q Okay. And that was a suggestion of your tax accountant?
**A Yes.**
Q Okay. Did you also say it was part of a conspiracy?
**A I believe so. All this stuff came together. I mean, for some reason all -- everything happened at the same time.**
Q So can you explain what you mean? Is it your belief that there was a conspiracy with your tax accountant and some other entity or person?
**A I am not for sure. I am not going to say yes.**
Q Well, what is your belief?
**A Doesn't matter.**
MS. BONJEAN: Objection to the form.
BY MR. LIPSHUTZ:
Q I'm sorry. I didn't hear your answer.
**A I said doesn't matter what the belief is, you know.**
Q Well, why do you think there was a conspiracy? Just because of the same time frame?
**A Possibility.**



Q Any other reason?
**A Well, maybe because the conspiracy with the local and state authority what happened to me in 2010. That was all conspiracy. They all conspired together.**
Q And do you believe that the authorities conspired with Kumar, your tax accountant?
**A Already said. I am not for sure.**
Q One second, sir. Okay. When you -- let's get back to this conversation with Mr. Hampton sometime between 2017 and 2019. Did Mr. Hampton explain to you why he was suddenly coming forward to tell you he had been -- let me rephrase it.
Back to that conversation. Did he tell you why he was coming forward to say that the police and the prosecutor pressured him or coerced him?
MS. BONJEAN: Objection to form.
**THE WITNESS: Not that I recollect.**
BY MR. LIPSHUTZ:
Q You don't recall if he said -- I'm sorry. I didn't hear you.
MS. BONJEAN: He said he could not recollect.



BY MR. LIPSHUTZ:
Q So you're not sure if he told you why he was --
MS. BONJEAN: Objection. Asked and answered.
You can answer again.
**THE WITNESS: I couldn't recollect at the moment.**
BY MR. LIPSHUTZ:
Q Did you promise him anything?
**A No.**
Q Did you offer him anything?
**A No.**
Q Did he know you were suing the police and the prosecutors?
**A I am not for sure.**
Q Did you tell him that you were suing the police and prosecutors?
**A I'm not sure. Could have been an investigator might have told him. I'm not for sure. I'm not -- it was an investigator might have told him.**
MS. BONJEAN: Just answer his question.

THE WITNESS: I am not for sure.
BY MR. LIPSHUTZ:
Q So my question was, did you tell him and you're not for sure?
**A I am not for sure.**
**Q So it's possible you did?**
**MS. BONJEAN: Objection. Asked and answered. He already answered the question. He said he wasn't sure.**
You can answer it again.
**THE WITNESS: I am not for sure.**
BY MR. LIPSHUTZ:
Q Did you offer him any money in exchange for his --
MS. BONJEAN: Objection. Asked and answered.
BY MR. LIPSHUTZ:
Q Did you offer him any money in exchange for his changed testimony?
**A You already asked me that. I said no.**
Q Did he ask for money from you?
**A No.**
Q He was out of prison at that point; right?



**A I really don't know. I don't even know if he was in prison, really.**
Q Well, when you met on the street, he wasn't in prison, I take it. Right?
**A Yeah. But I don't know what was going on.**
MS. BONJEAN: Just answer the question.
BY MR. LIPSHUTZ:
Q Who initiated the very first conversation between the two of you?
MS. BONJEAN: Objection. Asked and answered. He -- we have been through this. I am going to object to the form of this question. Eventually I'm going to tell him not to -- to stop answering your questions being repeated multiple times.
But go ahead. It won't -- tell him again.
**THE WITNESS: He did.**
BY MR. LIPSHUTZ:
Q I am sorry. If you had mentioned that before --
**A I did.**
MS. BONJEAN: He did.



**THE WITNESS: Three times.**
BY MR. LIPSHUTZ:
**Q Excuse me. I am sorry that I misunderstood. Okay? So he called you; correct? That's all I want to know. Yes?**
**A You want me to say it again?**
Q You have to forgive me. The distance is difficult, sir. And I am not trying to repeat myself. I just -- I missed -- I had forgotten that he had called you. That's how the conversation went?
**A Yes.**
Q Okay. That's all. Had you ever tried to reach out to him?
MS. BONJEAN: Objection. Foundation. Form.
**THE WITNESS: That was in the same correspondence when we -- when he had called me and I came -- when I set up for thata meeting, yes.**
BY MR. LIPSHUTZ:
Q So at one point you reached out for him is what you're saying?
**A I reached back to him, yes.**
Q To set up a meeting or for something



else?
**A That's what I just said already. One meeting triggered the other.**
Q Did you reach out to him at any other time?
**A No.**
Q So it would be the one time only?
**A I don't remember. I don't remember that. It was the second time or whatever, you know. I don't remember.**
MS. BONJEAN: Gary, will you let me know when you can take a couple-minute break? I have to jump on a phone call for two minutes, but I can put it off.
**MR. LIPSHUTZ: Ms. Bonjean, that's fine. You may take -- this is a fine time to take it.**
MS. BONJEAN: Okay. Thank you.
(An off-the-record discussion takes place.)
MR. LIPSHUTZ: Mr. Evans, we are going take a five-minute break.
THE WITNESS: All right.
(Whereupon, a recess is taken.)
**BY MR. LIPSHUTZ:**

Q Okay.

Mr. Evans, when we were talking before, you mentioned an investigator who spoke to Mr. Hampton. Do you recall whether your conversation in person with Mr. Hampton was before or after he spoke to the investigator?

MS. BONJEAN: Objection to form. Foundation.

Go ahead. You can answer.

THE WITNESS: When you say did I speak to him, before or after?

BY MR. LIPSHUTZ:

Q Do you recall whether your in-person conversation with Mr. Hampton was before or after he spoke with the investigator?

A I think I spoke to him after.

MS. BONJEAN: You need to answer the question --

THE WITNESS: I'm trying to say. What he said, before. It had to be after. I talked to him after. That's what it -- it was both.

MS. BONJEAN: Okay. Lee, listen to the question.

THE WITNESS: Yeah.



MS. BONJEAN: Answer the question.

THE WITNESS: Yeah.

MS. BONJEAN: If you don't know, you don't know. If you approximate, guess, Just please tell him, but don't just --

THE WITNESS: It was before, before the investigation. Yeah. It had to be before, yeah.

BY MR. LIPSHUTZ:

Q Okay. Why do you say it had to be before, sir?

A Because he had reached out to me before, and then we -- we put this thing together. I came with the meeting.

Q He reached out to you and then you put the meeting together. Is that what you mean by "this thing"?

A The first time he reached out, then we schedule a time to meet. And then that's when we met, on that other second turn.

Q And that was that second meeting and that was the in-person meeting?

A Yes.

Q Right?

A Yes.



Q And was that in-person meeting you're saying before he spoke to the investigator?

A Yes.

Q All right. If I say to you and I represent to you that Mr. Hampton spoke to the investigator on June 6, 2017, would that refresh your recollection that you met with Mr. Hampton in person prior to June 6, 2017?

A No. Not really.

Q That does not refresh your recollection?

A No.

Q Okay. Did you discuss with Mr. Hampton the possibility of speaking to an investigator?

MS. BONJEAN: Hold on. Objection to the foundation of that question.

Go ahead.

THE WITNESS: No. No. I -- when I --

MS. BONJEAN: Don't -- do you want to finish your answer? I thought you answered it, but --

THE WITNESS: Yeah.



MS. BONJEAN: -- is there something you want to say?

THE WITNESS: No. No. I was saying when the investigation came in, that's when -- the question was -- repeat that question again.

BY MR. LIPSHUTZ:

Q I am happy to do so, sir.

A Okay.

Q I am happy to do so.

MS. BONJEAN: Will you just listen to the question and answer it? Okay?

THE WITNESS: Uh-huh.

MR. LIPSHUTZ: Why don't we do it this way.

Ms. Reporter, can you read back my question?

(The reporter reads as requested.)

MS. BONJEAN: I have an objection to the foundation of that question.

But you can answer it.

THE WITNESS: That was after the investigation.

MS. BONJEAN: That's not an answer -- how is that an answer to his question?

THE WITNESS: No.

MS. BONJEAN: Okay. That's an
answer to the question.

BY MR. LIPSHUTZ:

Q So you have answered no, but I am confused. Okay? I thought you told me -- and correct me if I am wrong --

A Uh-huh.

Q -- that you met in person with Mr. Hampton before he spoke to the investigator.

A Yes.

Q And when you were meeting with him in person, you did not discuss the possibility of him speaking to an investigator?

MS. BONJEAN: Objection. Asked and answered.

You can answer again.

THE WITNESS: I correct that. Yeah. It was before and after. That's what I said before.

BY MR. LIPSHUTZ:

Q All right. Before and after is very confusing to me. I'm going to -- and so I have to clear this up, sir.

A With the investigator, no. Only the first -- the second time, not the first time.



When I first spoke with him, no.

Q The first time you spoke to him was on the telephone; right?

A Right.

Q And that was to set up an in-person face-to-face?

A Right.

Q Okay. Then you met with him face-to-face?

A Right.

Q Okay. That meeting was before he spoke to the investigator?

A Right.

Q Okay. At that meeting face-to-face, did you discuss the possibility with Mr. Hampton of going to see an investigator?

A No.

Q Did that topic come up later?

A Later when?

Q In any other conversations with Mr. Hampton, did he tell you he saw an investigator? Let me ask you that question.

Did you speak to Mr. Hampton? Did he tell you that he spoke to an investigator?

A I am pretty sure he did. I don't



recollect. I can't recollect when.

MS. BONJEAN: Okay. That's the answer.

BY MR. LIPSHUTZ:

Q He did, but you don't remember when?

A Right.

Q Did he tell you about his conversation or his meeting with the investigator?

A No.

Q So other than I met with an investigator --

A Yeah.

Q -- he didn't say anything else about that?

A Right. The information I had got from the investigator.

Q Did you meet with the investigator prior to the investigator meeting with Hampton?

MS. BONJEAN: I am going to object. Possibly on grounds that that could be attorney-client protected. I don't know if this was an investigator for the -- if you would allow me to consult with my client for a minute to ask that question, I will allow him to answer if it



wasn't part of an attorney-client communication.

MR. LIPSHUTZ: I didn't ask him about communications. I just said did he meet. So that's not privileged.

MS. BONJEAN: That's -- fair enough.

Go ahead. You can answer that.

THE WITNESS: Repeat it.

BY MR. LIPSHUTZ:

Q That was my question, sir. Did you meet with the investigator prior to --

A Yes.

Q -- the investigator -- I'm sorry. This is for the benefit of the court reporter, and, again, we are so far away. So I am going to try to ask the question fully. Please let me ask fully, and then I will give you every opportunity to respond. That's all. My question -- that way you know what I am asking you. Okay? Fair enough; right?

A Yes.

Q Did you meet with the investigator before the investigator met with Mr. Hampton?

A Yes.

Q Was there anybody else present at that meeting with the investigator?

A Yes.
Q Who else was present?
A One of his assistants.
Q One of whose assistants, sir?
A The investigator.
Q Was there anybody else?
A No.
Q Who was the investigator?
A Max.
Q Who was involved in retaining this investigator? Was that you or somebody else?
A That was me.
Q Did you have an attorney at the time you retained this investigator?
A No.
Q What was the conversation that you had with the investigator?
MS. BONJEAN: Objection to form. Foundation.
THE WITNESS: No. The question was, he said basically I should have retained him in the criminal matter. It would have helped a whole lot if he would have got into the criminal matter. He would have did the investigation on that criminal matter. All this would have been



resolved.
BY MR. LIPSHUTZ:
Q Okay.
A That's basically what he was saying. He was talking about the criminal -- he brought the criminal up a lot.
Q What did you give the investigator to prepare for his conversation with Mr. Hampton?
A I don't remember. I don't recall. I had it to, discovery whatever he wanted, but I don't recall.
Q Well, let me ask you a different way. Did you give him anything?
A I had to give him something. I don't recall.
Q Are you saying that you did give him something, but you don't recall what you gave him?
A If I don't give him nothing, how is he going to have a case? No. I don't recall what I gave him. I know I gave him something.
Q That's what I mean.
A I don't recall. I don't recall.
Q That's what I asked. Okay. Let me see if I can refresh your recollection. Did you



give him the statement from November of 2008 that Mr. Hampton -- where Mr. Hampton confessed?
A Yes. I believe so.
Q So you remember giving him that statement?
A I believe so.
Q Okay. Did you give him any documents related to the plea agreement or the agreement that Mr. Hampton had with the State to testify?
A I don't remember, but I gave him the documents that he asked for. I had everything available to give him.
Q When -- did you give him a list of questions to ask Mr. Hampton?
A It's possible. I don't remember. I don't remember. I don't remember exactly.
Q Did you discuss the questions that the investigator was going to ask Mr. Hampton?
A I am quite sure we did. Certain things he wanted to -- to -- I knew it was something he said about -- I remember him saying the prosecutor was picking -- picking Philander's girl or wife up from Jersey City and taking her here and there, something to that effect. I am



not for sure.
Q Just clear it up for me. Who said that?
A That would be the investigator.
Q Did the investigator show you any questions that he was going to ask Mr. Hampton?
A Yes.
Q So the investigator had questions prepared that he was going to ask Philander?
A Yes.
Q Okay. Did you edit those questions?
A No.
Q Did you suggest changes?
A No. I think we went over all that already, what he -- the areas he was going to go into.
Q Did you tell the investigator where to find Mr. Hampton?
A No.
Q Did you set up the meeting between Mr. Hampton and the investigator?
A No. I just -- I was thinking about something when you said that.
Q Is there something you want to clarify an answer to?

**A No. I wasn't for sure whether the investigator found Mr. Hampton -- no. No.**

MS. BONJEAN: If you don't know, that's a perfectly --

THE WITNESS: No. I don't know.

MS. BONJEAN: -- okay answer. I mean, definitely give it some thought and see if you can answer it because --

**THE WITNESS: No. I don't know.**

MR. LIPSHUTZ: I think my question was -- Madam Reporter, can you read back the last substantive question I had?

(The reporter reads as requested.)

BY MR. LIPSHUTZ:

Q So just so I am clear, I want to ask that question again.

Did you set up the meeting with Mr. Hampton and the investigator?

**A No.**

Q And did you tell the investigator where to meet Mr. Hampton -- or where Mr. Hampton was?

**A No.**

Q Okay. After Mr. Hampton gave his statement, did you have any other conversations,



other than the one that you told me about where you said we don't associate?

**A No.**

Q Did you ever tell Mr. Hampton how to answer any of these questions?

A No.

Q Did you ever suggest to Mr. Hampton how to answer any of these questions?

**A No.**

Q Did you ever tell him it would be helpful to you in your lawsuit if he answered questions a certain way?

**A No.**

Q You read his statement; correct? You've read his statement?

**A Correct.**

Q Were any of those answers that you suggested to Mr. Hampton?

**A His statement?**

Q Yes.

**A Which statement you talking about?**

Q Thank you. Fair clarification. I appreciate that.

You read his statement to the investigator; right?



**A Yes.**

Q Okay. That's the one I was talking about.

Were any of the answers answers that Mr. Hampton gave, did you suggest any of those answers to Mr. Hampton?

**A No.**

Q Okay. Let's talk about 1978. Okay? We are going to switch gears a little bit, Mr. Evans.

**A Yes.**

Q Well, this case obviously is about the five missing boys that you were accused of murdering -- right -- in August -- on August 20, 1978. Where were you living on that day?

**A I was living in 979 Clinton Avenue.**

Q Is that a house or apartment, sir?

**A That's an apartment.**

Q Okay. How long had you lived there?

**A Two or three years.**

Q You lived there with your -- who did you live there with?

**A My wife.**

Q Children?

A No children at the time, no.



Q And tell me, sir, to the best of your recollection and in your own words what happened on Sunday, August 20, 1978.

MS. BONJEAN: Objection to form and foundation of that question.

If you understand, you can answer it.

**THE WITNESS: Yes. I can answer it.**

BY MR. LIPSHUTZ:

Q You understood my question, sir?

**A Yes.**

Q Okay. Can you give me an answer?

**A Okay. I was scheduled -- I was buying a property. That was my first property, 93 Paine Avenue in Irvington. And I was closing out on it. I had got to see it all and everything.**

**And what happened with 93 -- 93 Paine Avenue was the new address, and 979 Clinton Avenue, that was my apartment. And what I did was I had boxed up everything, and I wanted to get out of there before the first, way before the first of the month.**

**So it was a Sunday. It was around 12:00. Had to be 12:00 or earlier because I came**

through -- I was looking for my cousin Maurice to
help me move these boxes to -- from 979 Clinton
Avenue to 93 Paine Avenue. And I came through
the neighborhood and they wasn't around. So --
and from that point I just drove around the
corner. There was a place called the Hideaway
where I shoot a lot of pool. I think I shot some
games.
And then from there I came back
through. I shot about two games and left and
came back through. When I was coming back from
Fabyan Place, I wasn't intending to stop and pick
anybody up. I was going back to Clinton Avenue
before I go back over to my mother-in-law's
house. That's where I stayed that night.
So I came back through. As I was
coming back through Fabyan Place, Michael
McDowell -- that's one of the missing boys I can
recollect -- he ran out. And when he ran out and
-- from the porch, he asked me what was going --
what was up or something. I said I was moving.
I was looking for Maurice now. He wasn't around.
So long story short, from that point
it was about seven boys that I had picked up
right there. It was seven in truck. Went from



Fabyan Place and then from Fabyan Place when you
get to Clinton Avenue, you make a left and you're
going back up. You'd be going into Irvington.
979 Clinton Avenue is two doors in from Grove
Street, but you be in Irvington at the time.
And they did a little train thing.
I was on the third floor of the building. I am
inside the building, passing boxes out the door,
and then went to the next guy, to the next guy,
each one on different floor until they loaded the
truck up. And they loaded it up and we took it
over to 979 -- I mean 93 Paine Avenue.
Went across Grove Street, straight
across Grove on the other side of Chancellor be
-- run into Paine Avenue. And we unloaded the
truck. We did about two loads like that. And
then I came back.
When I came back down Clinton Avenue
back into Newark, it was on the corner of -- one
side is 18th Street. The other side is Fabyan
Place. That's the same connecting street to
Clinton Avenue. And on the 18th Street side, it
was an ice cream parlor, and that's when I gave
the boys some money. And the bills -- they went
into the ice cream parlor and to break it up, I



guess. Then I made my right turn to Fabyan
Place, and I went back over to the Hobson Street.
Q What street?
A Hobson.
Q Thank you.
A And from Hobson Street my main
concern at that point -- this was August the
20th. My wife was on me because I didn't go to
the bank and get that certified check. So my
main concern was I had to get money -- make sure
I get to the bank and get a certified check for
the closing. I closed on that property August
the 21st, that Monday -- that -- that Monday.
So that was -- and that night there
I wasn't out. I was staying at 342 Hobson
Street. That was my in-laws' house. I stayed
there until the next morning. And that's what
happened to me on that Sunday.
Q I take it that that day is kind of
burned into your mind because of the events of
the trial and accusations. Is that fair to say?
A Yes.
Q How do you -- how do you feel about
your memory of that day?
MS. BONJEAN: Objection to the form



of the question.
BY MR. LIPSHUTZ:
Q Do you feel you're confident in your
memory of that day?
MS. BONJEAN: Objection to the form
of the question.
THE WITNESS: Is my memory what?
Repeat that.
BY MR. LIPSHUTZ:
Q Sure. Do you feel confident in your
memory of events of that day?
A 1000 percent.
MS. BONJEAN: Objection to form.
Still a form objection.
BY MR. LIPSHUTZ:
Q 1,000 percent --
A 1,000 percent sure.
Q Okay. What time did you leave --
A Correct that now. I don't mean
every little second. I mean certain things of
that day.
Q Oh, let's -- we're going to talk
about that. That's okay.
A Okay. All right.
Q It was 43 years ago; right? Right?

43 years ago?
A Something like that.
MS. BONJEAN: 42.
BY MR. LIPSHUTZ:
Q 42-plus years. When was the last time that you saw Michael McDowell that day?
A When he got out of the truck at the ice cream parlor.
Q What time?
A That had to be before 3:00 p.m.
Q Did you see Michael McDowell after 3:00 p.m. August the 20th, 1978?
A After?
Q Yes. After 3:00 p.m.
A No. After I dropped him off, that was it.
Q You have never seen him since?
A Never seen him since.
Q Okay. How confident are you in the 3:00 p.m.?
MS. BONJEAN: Objection to form of the question.
THE WITNESS: No. I am not -- I'm not -- I'm -- it's in that area. It could have been 2:30. It could have been 3:30. It was



right there, though.
BY MR. LIPSHUTZ:
Q Could it have been 6:00 p.m.?
A No. No. No. No. It was not 6:00 p.m.
Q Could it have been 9:00 p.m.?
A No. No. It had to be between 2:30 and 3:30, in that range right there.
Q So it could not possibly have been, say, 11:00 p.m.?
A No.
Q Okay. And you are absolutely certain?
A 1,000 percent.
Q Okay. Do you know the names of any of the other -- let me make sure I am clear. You said there were about seven boys in the truck?
A Right.
Q Does that mean Michael McDowell plus six others or Michael McDowell plus --
A No. Michael -- Michael plus six others.
Q Okay. Do you know the names of the other six -- of any of the other six?
A Only one.



Q What is the other name?
A Pittman. They call him Ricky. I think his nickname is Ricky.
Q Was his first name Melvin?
A Melvin.
Q Melvin is one of the boys that disappeared?
A Yes.
Q When was the last time you saw Melvin Pittman?
A Same thing. Same place. Ice cream parlor.
Q And you're 1,000 percent certain that it was sometime between 2:30 and, say, 4:00, something like that?
A It wasn't 4:00. It wasn't that late.
Q I'm -- 2:30 to, say, 3:30. You tell me.
A It had to be between 2:30 and 3:00. If it was 4:00, then possible. That's the max, you know.
Q Okay.
A I doubt it.
Q But you're absolutely certain it was



not 6:00 p.m.?
A I'm positive.
MS. BONJEAN: Object -- I am going to object. You have asked the question. He told you the range of time it was. Asked and answered.
MR. LIPSHUTZ: Well, I asked him about Michael McDowell.
BY MR. LIPSHUTZ:
Q I asked you about Michael McDowell. I just want to make sure it's the same for -- for Melvin Pittman. You didn't see Melvin Pittman at any time after 6:00 p.m. -- after 3:30, approximately, on August 20th?
A After I dropped him off at the ice cream parlor.
Q Okay. When you -- what time did you get back to Hobson Street -- 342 Hobson Street?
A That had to be like maybe before 4:00, I guess. I dropped them off. It takes me about maybe I guess 15 -- 10, 15 minutes.
Q I am sorry. Did you ever leave 342 Hobson Street after --
A No. No.
Q Once again, it's best you let me ask

the question completely.

MS. BONJEAN: Let him finish the question, and then you answer. Otherwise, you're talking over each other --

THE WITNESS: Right.

MS. BONJEAN: -- and then nobody can hear anything. So go ahead. Answer it.

**BY MR. LIPSHUTZ:**

**Q Plus you don't know exactly what I am going to ask you. Okay?**

**After you got to 342 Hobson Street, which is your in-laws' place; right? Correct? Your in-laws' place?**

**A Yes.**

Q Did you leave that place at all?

**A No.**

Q Are you also 1,000 percent certain about that?

**A Yes.**

Q You mentioned that somewhere around noon you were looking for your cousins Darryl and Maurice?

**A Yes.**

Q Did you ever see them?

**A No. No.**



Q Did you ever spend any time with them?

**A That day?**

Q Yes. Yes.

**A No. No.**

Q Where did Maurice -- they're siblings; right? You told me earlier; right? Siblings?

**A Yes. Yes.**

Q Where did they live? What house at that time?

**A 56 Fabyan Place.**

Q Okay. And you -- you passed their house. Am I right?

**A Yes.**

Q And is that where you ran into -- where Michael McDowell ran out, and that -- that's when you ran into Michael McDowell?

**A That was earlier.**

Q Okay. I am sorry. When did you meet up with Michael McDowell?

**A That was 12:00 or 12:30, somewhere in there. About 12:30, something like that.**

Q Somewhere like that. I thought you said it was near Fabyan?



**A Fabyan.**

Q Okay. Was that near Darryl and Maurice's house?

**A Two doors down.**

Q What was the address that you met the McDowells?

**A I don't have the address. I didn't meet him at the address. He ran out to the truck.**

Q Okay. What kind of truck were you driving?

**A A pickup, gray pickup.**

Q Did it have anything on the side of the truck?

**A Yes.**

Q What did it have?

**A Evans & Sons.**

Q Name of your construction business?

**A Yes.**

Q And what about Philander Hampton? Did you see him that day?

**A That day? No.**

Q How confident are you that you didn't see Philander Hampton that day?

A 1,000 percent.



MS. BONJEAN: I am going to object, by the way, to the form of that question. I am sorry for the late objection.

MR. LIPSHUTZ: That's fine.

BY MR. LIPSHUTZ:

Q Let me ask it this way. Are you absolutely certain that you did not see Philander Hampton that day?

**A 1,000 percent.**

Q Okay. Did you see Ernest Taylor on August 20th, 1978?

**A If he was the one that got on the truck, if he was one of the boys. It wasn't just five boys in that area. It was like maybe 15 or 20 of them. So I don't know what the -- the only one I can confirm is Michael and Melvin. That's the two I definitely can confirm the names.**

Q Well, let me ask you about the other people. It's kind of important. Okay? Did you see Randy Johnson that day?

**A I am not for sure.**

Q Okay. Did you see Ernest Taylor that day?

**A I am not for sure.**

Q Okay. Did you see -- of the seven

boys, did you see any of those seven boys after
you left to go to 342 Hobson Street?

**A I am not for sure. The only ones I can confirm is Melvin -- Melvin and Michael.**

MS. BONJEAN: Listen to his question, though.

BY MR. LIPSHUTZ:

Q Maybe you didn't understand my question, so I'm going to ask it again.

MS. BONJEAN: Listen.

BY MR. LIPSHUTZ:

Q After you dropped the boys off --

**A Uh-huh.**

Q -- at the ice cream parlor --

**A Right.**

Q -- and went to 342 Hobson --

**A Right.**

Q -- did you see any of those seven boys --

**A No.**

Q Let me finish. Let me finish.

MS. BONJEAN: Let him finish. Hold on. Let me just resolve this. Please let him --

THE WITNESS: All right.

MS. BONJEAN: -- finish the



question. Thank you, Lee. It will go much more smoothly. Okay. Go ahead.

BY MR. LIPSHUTZ:

Q I am not going to repeat the whole question. Did you see any of those seven boys after you went to 342 Hobson Street at all?

**A No.**

Q Are you absolutely certain that you didn't see any of those --

A 10,000 percent positive, no.

Q Okay. Mr. Evans, you're aware that there were a number of accusations that one or more of the five missing boys had stolen marijuana from you; correct? You're aware of those allegations?

**A Yes.**

Q Back in 1978 did you sell marijuana?

**A I didn't sell marijuana. What happened was I was -- at that time I working with -- I was working with this construction for -- we was building Meadowlands at the time.**

Q The what, sir?

**A We was doing the Meadowlands.**

Q Oh, okay. The Meadowlands?

**A Meadowlands, yeah. And what**



**happened was at that time I was interconnected with some -- a lot of guys out there. It was an Italian guy named Charlie. He always told me, he said, Lee, I know you in Newark area, you know. Go back and get all this marijuana -- anything you want, just like that. But I wasn't interested in none of that stuff at that time.**

**And my uncle and them, they was shooting pool with another guy, a friend of his. They was working at the airport. They was pipefitters. And they were shooting pool and they was talking. Got in the conversation, I said, yeah, this guy on the job -- and that's where it connected with this guy, Eddie Gibson.**

**And I started out -- I had -- definitely I was transporting like a couple pounds to him, to this guy. And it was foolish, but, you know, wasn't no reason, but I was doing it.**

**And what happened was back in August the 20th when this thing --**

**MS. BONJEAN: Okay.**

**THE WITNESS: Okay.**

**MS. BONJEAN: You can keep going if you want. I don't know if that answers your**



**question. If you wanted to ask another question or --**

MR. LIPSHUTZ: No. I mean, we are going to get to it.

MS. BONJEAN: Yeah.

BY MR. LIPSHUTZ:

Q What -- what happened -- you say you weren't selling marijuana. But you said you were transporting it?

**A No. I wasn't in the street selling no marijuana, not like that.**

Q Okay.

**A And -- but I had some marijuana and I was trying -- what happened also -- and August the 20th -- it was after the 20th. Lillie Williams, that's Melvin's mother. Lillie Williams came to me when the boys was missing. She said that the boys had some marijuana in the house. They found marijuana in the boy's house. And when she said that, Lillie Williams, I told her -- I am the one telling Lillie Williams like I never -- that somebody stole something from my place at that time.**

And then that's when it went from there. That's how the police -- it didn't dawn

on me that the police came -- where they came from until 2010. I am sitting there and the police ask me back then. That was Scott-Bey and Hairston. They asked me, hey, I am not interested in the marijuana. We are just looking for the boys. That's what he said.

But the situation came. The only one I told was Lillie Williams. She the only one. Because she told the police. And that was Michael's mother. So why would I tell her something to that nature like that?

MS. BONJEAN: Just answer his questions.

**THE WITNESS: That was it.**

BY MR. LIPSHUTZ:

Q This was a conversation after the boys disappeared; right?

**A Right. After they disappeared.**

Q Okay.

**A Lillie Williams.**

Q When was the marijuana stolen?

**A I am not for sure. It was just missing. It wasn't no -- it wasn't a break-in. I only thought it was the super or somebody in that building there. But it wasn't no break and**



**entries or nothing like that. I am not 100 percent when because it was in the closet.**

Q How much was taken?

**A About maybe two pounds or something. Normally I wouldn't have it in there.**

Q Was it taken before the boys -- the boys disappeared?

MS. BONJEAN: Objection. Asked and answered.

**THE WITNESS: I don't know. I am not for sure.**

BY MR. LIPSHUTZ:

Q Well, your conversation with Ms. Williams was --

**A I told her -- I told her something was missing. Somebody broke in, but I don't know when it was -- when it took place.**

Q But your conversation with Ms. Williams was the day after the boys disappeared?

**MS. BONJEAN: Okay. Object -- okay. Hold on. Objection. Let him finish before you start answering. Okay? Okay. Let him finish before you start answering.**

**And he just -- I am going to object to the form. Mischaracterizes his testimony.**



**Go ahead. If you -- if you remember it.**

BY MR. LIPSHUTZ:

Q You want me to rephrase the question, sir?

**A Yes.**

Q Okay. I'm happy to do so. You spoke with Ms. Williams. When did you speak to her?

A That was after the boys came missing.

Q Okay. Wasn't it the day after they were missing?

**A I don't think it was the day after. I don't think it was the day after. It had to be two or three days, maybe as -- I am not for sure when, but it wasn't no day after. I know that.**

Q You're certain it wasn't the day after?

**A I am positive.**

Q And sitting here today, can you tell me whether the marijuana was stolen before or after the boys disappeared?

**A I couldn't tell you that. The marijuana -- I don't know what time of day it was**



**stolen.**

Q Okay. All right. It's the time line -- I am going to show you some documents, sir. Okay?

**A Okay.**

Q So bear with me a second.

A Uh-huh.

Q Okay. Mr. Evans, can you see this document on your screen? It says O'Connor & O'Connor, Lee Evans versus City of Newark. Can you see that?

**A Yes.**

Q Okay. I am going to scroll down a bit. And do you see where I have marked it Evans-1 here?

**A Yes.**

**Q That's the sticker that I put on there. Okay? You see that?**

**A Yes.**

Q Okay. And the first paragraph says "Plaintiff Lee Evans, by way of certified Answers to Interrogatories served upon him by the Defendants City of Newark, former mayor Cory Booker" --

MS. BONJEAN: Hold on. I am going

to -- I'm going to object for a second here. Did
-- were these among the documents that you were
ordered to reproduce to us? I think they were.
And did you, in fact, do that, Mr. Lipshutz?
MR. LIPSHUTZ: I don't need to
answer the question. These are --
MS. BONJEAN: Sir, no. We're going
to -- we're going to -- this is -- this is an
issue. There was -- this was a big issue that
was raised earlier on. I wrote follow-up
letters, saying I don't have anything from
Mr. O'Connor. The judge ordered that all
discovery and written discovery requests be
reproduced. I followed up with letters. The
only people that were responsive were the AGs.
And now you're pulling out something
that I am not sure I have ever seen. Because
despite having the order to reproduce it, I am
not sure you did. So if you could -- I would
like, you know, to make sure that we have an
opportunity to -- I mean, this is new to me and
you know that.
MR. LIPSHUTZ: No, I don't.
MS. BONJEAN: Yeah. You do know
that because it's been a matter of record. The



record --
MR. LIPSHUTZ: I don't know that.
MS. BONJEAN: Did you reproduce
this, sir?
MR. LIPSHUTZ: I thought I did. In
any event, I'm going to question --
MS. BONJEAN: No. It's a -- it's a
violation of the court order if you did not
reproduce this to me. Because you knew very well
that I was never provided Mr. O'Connor's file,
and I made that absolutely clear of record. And
you were ordered to reproduce all written
discovery, both that was propounded and answered.
**MR. LIPSHUTZ: I thought I did.**
**MS. BONJEAN: Okay. Well, we are**
**going to take a break right now because I am not**
**sure -- I'm not -- he is not answering questions**
**about this until I get a copy of it per the court**
**order. Okay?**
MR. LIPSHUTZ: No.
MS. BONJEAN: You -- you -- we can
get the -- we can get the court on the phone
unless you can show me that you actually
propounded this to me.
Let's take a break and let me look



and see. I don't believe you did.
MR. LIPSHUTZ: No.
MS. BONJEAN: No what?
MR. LIPSHUTZ: No. I am not taking
a break. This is --
MS. BONJEAN: Okay. Well, he is not
answering your questions about it. You can get
the court on the phone because you were ordered
to produce this.
MR. LIPSHUTZ: Excuse me. I can
show him anything I want during a deposition.
**MS. BONJEAN: No, you cannot. No,**
**you cannot. Okay. He is not answering questions**
**because I have been ambushed with this.**
MR. LIPSHUTZ: This is his answers
to interrogatories.
MS. BONJEAN: I don't care. I
am his counsel and I was not provided with this
per the court order. So why don't we get Judge
Hammer on the phone, and then we can -- we can
discuss what the -- what the -- what the sanction
is for your failure to produce this despite --
you obviously had it. You're here ready to pull
it up. You've never produced it to me pursuant
to the court's order and that -- and I don't know



what the -- what the result of that is.
But I am certainly going to take the
time to take a look at it. You want to take a
five-minute break and send it to me?
MR. LIPSHUTZ: No. Anybody else
want to join in on this?
MR. VOMACKA: Just -- just briefly,
this is Michael Vomacka from the State's office.
Ms. Bonjean, I don't have all the documents
offhand because we're working remotely. There is
a letter that we had sent you on January 6. I
would share a screen. It's just I can't on the
iPad. So please just take my representation of
what it says for a moment.
I am reading from the middle of it.
It mentions "we advised that written discovery
requests have been propounded and answered by
plaintiff. The same CD/DVD sent to you includes
State's defendant" --
THE REPORTER: Wait. Wait. Wait.
Wait. Wait. I can't understand you. Wait a
minute. We are going to have to start --
MR. VOMACKA: I'll slow down.
THE REPORTER: Yes, please.
MR. VOMACKA: It mentions that there

were responses to interrogatories dated March 26, 2018. I am not sure if that is the same document that Gary sent me. I don't know at this moment if the document that Mr. Lipshutz is showing is on that CD or DVD. I will do my best to endeavor to check.

But I was just wondering if -- Gary, if yours matches the date March 26, 2018. Then that would probably answer it. And if not, I will try and look into it myself and see.

MR. LIPSHUTZ: Does that answer your question, Mr. Vomacka?

MR. VOMACKA: It does. So I -- I can't -- I can't look at the CD that I sent you at this very moment, Ms. Bonjean. I'm just -- at least just from what Gary is showing the dates matches. I don't know if that's the same one, but it's --

MS. BONJEAN: I -- I don't --

MR. VOMACKA: I just jumped in to clarify there. I can only tell you as much as I know.

MS. BONJEAN: Okay. Thank you. I appreciate that. But, again, I will -- you know, perhaps it was on the disk you sent. I don't



believe it was. But I would like to take a second to double-check that.

I know Mr. Lipshutz was required to produce it, and I even followed up with a letter saying I don't have anything from the City. And as a result, I got no response from that, so --

MR. LIPSHUTZ: Mr. Vomacka, I have another question for you.

MR. VOMACKA: I will answer if I can. Go ahead.

MR. LIPSHUTZ: Did you serve separate interrogatories to Mr. Evans?

**MR. VOMACKA: I am not sure because that would have been prior to me getting on the case. I am also not sure if the answers would have been joint or collective. I don't know if the first page of the document would indicate that.**

**MR. LIPSHUTZ: Okay.**

**MR. VOMACKA: I am trying to look into it as well now. It's just a little difficult with -- with our remote office connection. So I guess I would say that sort of piece of information I have is the date, which seems to match what you're putting on the screen.**



**But if that's the same or not, that's -- that's the best I can do.**

MS. BONJEAN: Okay. Well, we'll -- I am going to have my paralegals look into it. But you know, it doesn't matter. Go ahead Mr. Lipshutz. If this is how you need to litigate, by all means ask -- ask away. We'll go right ahead.

But there will -- I -- I do intend -- I mean, you -- you -- you have now produced a document that you did not produce pursuant to a court order previously. I don't care if Mr. Vomacka produced it or not. You did not and -- but go ahead. We -- I don't -- I am not going to delay this deposition. So go right ahead.

BY MR. LIPSHUTZ:

Q Mr. Evans --

**A Yes.**

Q -- you hear me? Do you see the declaration and the signature?

**A Yes.**

Q Is that your signature?

**A Yes.**

**Q I'm sorry. I skipped to the bottom. There is -- these are the answers to**



**interrogatories. I'm going back to the top. And I am not going to ask about every question, but these are the answers to interrogatories. I am going fast. I realize that.**

**I just -- first of all, I just wanted to make sure this is your signature, which you told me it is. Okay? Now --**

MS. BONJEAN: Is there a question pending?

**MR. LIPSHUTZ: I just --**

**MS. BONJEAN: Okay.**

**MR. LIPSHUTZ: -- wanted to show him the document, ma'am.**

**MS. BONJEAN: Okay. Go ahead.**

BY MR. LIPSHUTZ:

Q Okay. Do you remember signing these answers to interrogatories?

**A No. I don't remember signing them, but that's my signature.**

**Q Okay. Well, I am going to show you -- let me go back. The answers to interrogatories I have only have the answer -- the answer number. It doesn't have the question. So I have also marked the questions themselves because I am going to ask you the question first,**

**and then I'm going to show you the answer. Okay?**

**So this document is the interrogatories. They're called the first set of interrogatories. Okay? This is Evans-2.**

**MS. BONJEAN: Okay. Objection to the editorializing and your own testifying. Go ahead.**

**BY MR. LIPSHUTZ:**

**Q I'm just trying -- since we are not together, I am just trying to explain. Mr. Evans, I am going to show you question number 11. Okay?**

**A Yes.**

Q Can you see that on your screen, sir?

**A No.**

Q Thank you. Make it a little bigger. Can you see it now?

**A No.**

Q Can anybody see it?

MR. VOMACKA: It's coming up now, Gary.

BY MR. LIPSHUTZ:

Q Can you see it now?

**A Yes.**



Q Okay. Question number 11, Evans-2, let me go back. Maybe I wasn't sharing the screen. These are interrogatories to Plaintiff Lee Evans, Evans number 2.

MS. BONJEAN: Okay. I am also going to put on the record an objection that despite a court order, this was not produced by Mr. Lipshutz.

I know court orders only apply to me. I know they don't apply to the defense. It seems to be a pattern in this case. But yes. You were ordered to reproduce this. It was not reproduced.

Whether or not it was on Mr. Vomacka's disk -- we are going to get to the bottom of, I don't know. But this -- this ambushing at a deposition with documents you knew that I did not have as his counsel is not only a violation of the court order, but it's also problematic in a number of other ways, but go ahead.

BY MR. LIPSHUTZ:

Q I am now going to show you question number 11. Okay, Mr. Evans? And I'll just read it to you.



"In chronological order, as completely as you can recall, state specifically and in detail what you did on August 20-21, 1978, including all interactions you had with any or all of the presently five missing individuals, (Michael McDowell, Randy Johnson, Alvin Turner, Melvin Pittman, and Ernest Taylor." That's the question. What was your interaction on August 20-21, 1978. Now I'm going to go to your answer.

MS. BONJEAN: Okay.

BY MR. LIPSHUTZ:

Q Now I am showing you, Mr. Evans, answer number 11. I'll try to make it a little bigger. Okay? Are you able to read it?

**A Uh-huh.**

Q Yes? I didn't hear you.

**A Yes.**

Q Okay. I just want to go through it a little bit with you. Okay? These are your sworn answers to interrogatories -- well, let me strike that. Okay?

**The first sentence says that you were living on 979 Clinton Avenue; correct?**

MS. BONJEAN: Objection. You laid no foundation. You want him to read it?



**THE WITNESS: No. No. What I'm going to say that date is not right up there. They got August 19. Where did that come from?**

BY MR. LIPSHUTZ:

Q It says Saturday, sir.

**A Yeah. But the 19th. It wasn't no 19th. We wasn't involved in no 19th.**

Q Am I correct that the children disappeared on the Sunday, the 20th of August?

MS. BONJEAN: Objection to form. Foundation.

**THE WITNESS: Yes.**

BY MR. LIPSHUTZ:

Q I am correct; right?

**A I went -- no. Where did the 19th come from?**

Q Sir.

**A I wouldn't participate with that. I see that right away, the 19th.**

Q This is just your answer to interrogatories. And I will just go through it with you, and you can disagree or not. Okay?

MS. BONJEAN: You know what? We are going to take a break right now. I have to -- I have to take care of something. I got to look at

something myself. We are going to take a break.
MR. LIPSHUTZ: No. I just --
MS. BONJEAN: We are taking a break.
You have -- I am going to take a look at Mr. Vomacka's CD. That is happening. If you -- if you want to -- you can do whatever you want in response, because --
MR. LIPSHUTZ: I have a pending question.
MS. BONJEAN: What was the question that was pending? You didn't have a question pending.
MR. LIPSHUTZ: Yes, I did.
**MS. BONJEAN: Okay. What -- Madam Court Reporter, please read back the last question.**
(The reporter reads as requested.)
**MS. BONJEAN: So we are going to take a break. Unless you can tell me what the question was, he'll answer it.**
MR. LIPSHUTZ: Take a break.
MS. BONJEAN: Yes, we are.
(Whereupon, a recess is taken.)
BY MR. LIPSHUTZ:
Q Mr. Evans, can you hear me?



**A Yes.**
Q Okay. You don't remember signing Interrogatories with Mr. O'Connor?
**A I didn't say that. It's my signature, but I want to look at that document again.**
Q Okay. I just have a few questions about your response.
**A Yeah. But I need to see that document you had up there.**
Q I will put it up.
**A Yeah. I need to see that.**
Q Sure. Why don't you take a minute and read it. First of all, do you see it?
**A Yeah.**
Q This is Evans -- I am going to make sure I -- I put on the record what it is I am showing. This is Evans-1, and this is the answer to number 11. Take a minute and read it. Okay?
**A Yeah. That's not -- that's not me. I didn't agree to that. That's my signature down there, but that's not -- I didn't agree to -- first of all, you got the City of Newark. What is the City of Newark doing in there? That's Irvington. That property is in Irvington.**



Q Mr. Evans, tell me when you've read it. I didn't ask any questions. When you want me to scroll down, I will scroll down.
**A Yeah. But I am saying this document is not correct.**
MS. BONJEAN: Okay. Here.
THE WITNESS: Okay.
MS. BONJEAN: Just let him answer -- ask the questions. You answer the questions. He asks the questions.
Go ahead, Mr. Lipshutz.
THE WITNESS: All right.
**BY MR. LIPSHUTZ:**
Q I am going to scroll down and let you read the rest of it. okay? Tell me when you're finished. I will scroll down for the rest of it. Okay?
A Uh-huh.
MS. BONJEAN: Read it and then he will ask.
BY MR. LIPSHUTZ:
Q I just want to know when you have read this document.
MS. BONJEAN: Are you done reading it?



THE WITNESS: I am reading it, but I still feel --
MS. BONJEAN: Have you read -- have you read what is on the screen?
**THE WITNESS: Not yet. Yeah.**
**MS. BONJEAN: Okay. He's read what's on the screen. Go ahead. Is there a question you want to ask? He read it.**
MR. LIPSHUTZ: Forgive me. I didn't think he was finished.
BY MR. LIPSHUTZ:
Q Have you read this whole thing, Mr. Evans?
**A I read it, yeah. I see inconsistent there.**
MS. BONJEAN: He didn't ask you about that.
THE WITNESS: Yes. Yes.
BY MR. LIPSHUTZ:
Q Okay. So I am going to go through it, and if there is something you don't agree with, let me know. Okay?
**A Okay. Yes.**
Q Back at the top -- now remember, the question was, tell me about -- would you like to

see the question again?
A Yes.
MS. BONJEAN: Objection to the form and foundation of these questions.
BY MR. LIPSHUTZ:
Q Now I put back up here question number 11. Can we go to the answer now?
**A Yes.**
Q Mr. Evans, it is true that on August 19th you were living in an apartment with your wife at 979 Clinton Avenue?
**A In August? No. That's not true.**
Q On August 19th you were not living in that apartment?
**A I was in the apartment. I kept the apartment. At the time my wife -- my new son -- newborn baby, that was my son. No. It's not true.**
Q Where were you living on August 19, 1978?
**A I was living at 979 Clinton Avenue. Also I was at 342 Hobson Street.**
Q Was your wife living at 979 Clinton Avenue on August 19, 1978?
**A No.**



Q She was living where?
**A 342 Hobson Street.**
**Q Okay. This paragraph -- the first paragraph mentions a contract for purchase of property at 93 Paine, P-A-I-N-E, Avenue, Irvington; correct?**
**A Correct.**
Q You told me about that earlier in the deposition; correct?
**A Yes.**
Q Okay. Let's skip to the second paragraph. Okay? Unless there is some other inconsistency or something that you want to tell me about the first paragraph.
**A Yeah.**
Q I would like to move on to the second paragraph. Okay?
**A Number 11 is not -- is all inconsistent.**
MS. BONJEAN: Okay. It's his deposition.
THE WITNESS: All right.
MS. BONJEAN: Let him ask the questions, and then you will answer the questions.



BY MR. LIPSHUTZ:
Q On Sunday, the 20th of August, you had everything packed in boxes at your -- the apartment. You've already told me about that; correct?
**A Yes.**
Q Okay. And you did tell me that you went to Fabyan Place looking for your cousins Darryl and Maurice Woody?
**A Yes.**
Q Correct?
**A Yes.**
Q Maurice, does he go by a different last name?
**A Olds.**
Q O-L-D-S?
**A Yes.**
Q Okay. And you told me that it was to move boxes from 979 Clinton to 93 Paine; correct?
**A Yes.**
Q Okay. And you told me you were not able to locate your cousins; right?
**A Yes.**
Q And you told me that you went to The



Hideaway on Nye Avenue where you used to shoot pool?
**A Yes.**
**Q That's in here; correct? That's in here; right?**
**A Yeah.**
Q Okay. And it says here no one was there. So I -- does that mean no one was at The Hideaway when you went there to shoot pool?
**A No one to shoot with.**
Q Okay. Thank you for clarifying. And when you were driving to your cousin's house, Michael McDowell ran out on the street from his porch at a home two doors down from 56 Fabyan Place that was owned by his aunt and where his cousins lived?
**A Yes.**
Q Okay. And because you could not find your cousins, you had a conversation with Michael?
**A Yes.**
Q Correct?
**A Yes.**
Q And you told Michael that you needed help moving boxes?

A Yes.
Q Okay. And this happened before 2:00 and most probably between 12:30 and 1:00 p.m?
A Right.
Q Is that accurate?
A Somewhere in there, yes.
Q Okay. You had a green pickup truck?
A Yes.
Q Name and number on the side; right?
A Yes.
Q Okay. And Michael and Melvin Pittman and about five other boys went with you to 979 Clinton Avenue. That's what you told me earlier; right?
A Yeah.
Q Okay.
A Except on the -- go ahead.
Q I thought that's what you told me earlier.
A No. That's what I told you, but I see in here it's different. They say My wife live on the third floor.
Q Okay. Your wife didn't live on the third floor?
A She wasn't there. I didn't put my



wife in there.
Q Okay. Thank you for clarifying. And you say here the boys moved the boxes by passing it down the stairs from one to another?
A Right.
Q You told me about the train; right?
A Right.
Q Okay. Then you drove to 93 Paine Avenue, where you unloaded the boxes and put the boxes on the first floor; correct?
A The first floor, basement, somewhere between there, yeah.
Q Okay. And here in your interrogatory answers you said approximately three trips. I know earlier in the deposition you said maybe two trips.
A Yes. Something like that.
Q Two or three trips; right? Correct?
A I think it was two, though, yeah.
Q Okay. You did say approximately three in your interrogatory answer.
A Oh, okay.
Q Okay. And it says here they were done moving no later than 4:00 p.m. and probably



earlier; correct? That's what it says.
A Yeah. But it was earlier, yeah.
Q Okay. And then you took the boys back to Newark and Clinton -- excuse me. You took the boys back to Newark to the intersection of 18th and Fabyan Place with an ice cream parlor on the 18th Street side of Clinton Avenue. You told me about that earlier in the deposition; correct?
A Correct.
Q Okay. You gave one of the boys a bill to buy ice cream; correct?
A No. Not to buy ice cream. To make change to give the others, yeah.
Q My mistake. And this occurred, and in your answers to interrogatories, no later than 4:30 p.m. and probably earlier; correct?
A It was earlier.
Q Okay. And the last time plaintiff saw the boys was at the ice cream parlor. You told me that earlier; correct?
A Correct.
Q Okay. It says here plaintiff may have gone to The Hideaway to shoot a game of pool but is unsure if you did and that on that Sunday



plaintiff and his wife were staying at the plaintiff's house at 342 Hobson Street.
A It wasn't my house.
Q Parents' house? Her parents' house.
MS. BONJEAN: At her parents' house.
THE WITNESS: Her parents' house, yeah.
BY MR. LIPSHUTZ:
Q Okay. So we sort of went through this. The inconsistency that you said is your wife was not living at 939 Clinton Avenue with you?
A At the time she hadn't been living there for at least maybe four months.
Q Is there anything else that you disagree with in the answers to interrogatories?
MS. BONJEAN: Objection to the form and foundation of that question. Anything else that seems what you -- I don't know what you mean by disagree -- do you know what he means by disagree with?
THE WITNESS: What?
MS. BONJEAN: I don't know. Do you -- do --
THE WITNESS: What you mean?

BY MR. LIPSHUTZ:
Q I will ask it again. We read through your answer to number 11. Is there anything else in there that you read today that you disagree with?
A I'll have to go over that whole thing. I have to get it.
MS. BONJEAN: What he read -- what you read right now, was there anything else that stuck out that you disagree with?
THE WITNESS: Yes. I see where they got the Newark in there, City of Newark. And I see August the 20th. I don't know where that came from, and the wife was living at 979 Clinton Avenue. That wasn't correct.
BY MR. LIPSHUTZ:
Q You mentioned that.
A Yeah.
Q You say that it might have been Irvington where it says Newark? Is that what you mean?
A Yeah. That was -- that's incorrect too.
Q Okay.
A Just a lot -- there's probably other things also just overlooking.



Q Okay. Let me show you the last -- let's go through the last paragraph of this answer. "Plaintiff arose early the next morning and went to see his aunt."
A Right.
Q At 56 Fabyan Street.
A Yeah.
Q So he could play a number.
A Right.
Q And this was your aunt you told me earlier. What was her name? That's --
A Julia, Julia May, Julia Woody.
Q And that's Darryl and Maurice's mother. Right?
A Right.
Q Okay. And as you were getting in your car, Alvin Turner's mother and father stopped and told plaintiff that Alvin had not come home the night before. You see that?
A Yes.
Q Did that happen?
A Yes. Yes. It did happen.
Q And you told them that you were on your way to a closing?



A I was going to a closing.
Q What was Alvin Turner's mother's name?
A Florence. Florence, I think.
Q Did you tell her anything else?
A No. I told her after I come from the closing, you know, I'd get back with her. And she was -- I don't know what was happening. I didn't know -- I didn't even know her son. I know her -- her sister was living across the street, and I know her nephew, you know. Her nephew -- she had more than one. I knew two of her nephews, but I didn't really know her son.
Q What was her sister's name?
A Ms. Hall.
Q Did you ever speak to her after you got back from your closing?
A No. I don't think so, no.
Q But you did speak to the mother and the father that morning -- the next -- the next morning; that is, the morning of Monday, the 21st?
A Right. The next morning.
Q Okay.
A Also --



Q Did you talk to anybody else that day about the disappearances?
A No.
Q You're 100 percent or 1,000 percent certain you didn't talk to anybody else?
A Might have told my aunt. I am not going to say I didn't talk to no one else. I can't say that. But if they disappeared and didn't show up, you know.
Q When you say you may have talked to your aunt, what was your aunt's name?
A Julia.
Q Okay. That aunt. Okay. Did you talk to any of the other family members other --
A I don't remember. I don't remember.
Q Okay. What is the first time that you remember, sir, talking to the police?
A That had to be -- that had to be maybe the 23rd or something. 23rd -- the 23rd. The police didn't come at all, I don't think, you know, until the 23rd.
Q Tell me about that the first time you -- did you speak to the police officers?
A Yeah.
Q Tell me about it.

MS. BONJEAN: Objection to form of that question.
BY MR. LIPSHUTZ:
Q What happened?
**A Well, that's when I -- the police Scott-Bey and Hairston, those are the two that was on the case. And they came to me. It went over my head, though, what they said. I didn't catch it until by 2010. He said we know about the marijuana, but we don't care about the marijuana. We just want the boys back, you know. And that's what he was -- he came to me on that. And it was amazing to me how I am getting involved and right away they missing Sunday night and Monday morning they come to me. And then also when --**
**MS. BONJEAN: Okay. He -- we're going to answer questions. We are not -- we're not getting into your theories of the case right now. We're going to answer questions. Okay?**
BY MR. LIPSHUTZ:
Q So did they come to you the next day?
**A Next what day?**
Q I thought you just said the police came to you the next day.



**A I didn't --**
Q What did you say?
**A I said the 23rd.**
Q Okay. And that's when you spoke to Scott-Bey?
**A 23rd or it could have been the 24th. I'm not 100 percent.**
Q Okay. That's when you spoke to Hairston and Scott-Bey?
**A Yes.**
Q Okay. What did they ask you? Do you remember?
**A Yeah. They said I know about the marijuana. I don't care about the marijuana. I just want the boys. We just want to make sure we get the boys back or something to that nature.**
Q Is that when you had -- when they found out that you had a traffic warrant?
**A No. That was -- that was the time when -- the traffic warrant when I went downtown, they ask me come down.**
Q Okay.
**A And then when I came down.**
Q Did you ever -- do you remember speaking with Detectives Rodriguez and Clark?



**A Not really.**
Q Not really?
**A There was more than one detective, so, you know, I mean, more than two detectives. It was other detectives involved.**
Q Do you remember ever talking to other police officers, other than Scott-Bey and Hairston?
**A Yeah. When I came down to the police department.**
Q What about any other detectives who -- who may have met you out not in a police department? Do you remember speaking to any other detectives outside of the police department?
MS. BONJEAN: Objection to form. Foundation of that question.
**THE WITNESS: Are you talking about back in '78 or are you talking up-to-date?**
BY MR. LIPSHUTZ:
Q I am sorry, sir. I am talking about '78, sir.
**A No. No other police officers.**
Q Okay.



**A Outside.**
Q So Scott-Bey and Hairston said they're not interested in the marijuana. They want the boys back. And what else? Did they ask you any other questions? Do you remember?
**A They asked me a lot of questions, but I just answered whatever -- you know, whatever they asked.**
Q Did they ask you when you last saw the boys?
**A Yeah. Quite sure they asked me that.**
Q What did you -- did you tell them that you last saw them at 4:00?
**A No. I told them the same thing. The ice cream parlor right there.**
Q You told them that the last time you saw them was at the ice cream parlor in the afternoon?
**A Yes.**
Q I am getting the names confused, and I am sorry about that. Randy Johnson, did you ever speak to his mother?
**A No.**
Q Do you know what her name is?

A Ms. Johnson, I guess. Yeah.
Q Sarah Johnson?
A No. That's -- the only mother I spoke to -- the only two mothers, really, the one time with Florence outside, but the one I was communicating with was Lillie Williams. That's Pittman's mother.
Q Mr. Evans, I am going to show you a document that I've marked already. It's marked Evans-5, Mr. Evans. Evans-5, it's got a stamp at the bottom Newark 63. Mr. Evans, this is the initial missing persons report.
MS. BONJEAN: We can't see it. We can't see it. If you want to --
MR. LIPSHUTZ: I'll make it as big as you want.
MS. BONJEAN: It's not up at all. We don't see it. It's not -- it's not presented.
MR. LIPSHUTZ: That's a different issue and I apologize because I didn't get to share screen. Thank you.
BY MR. LIPSHUTZ:
Q Okay. This is Evans-5. Do you see the stamp on it says Evans-5?
A Yes.



Q It's got a stamp at the bottom that says Newark 63. Do you see that? Newark 63, right here?
MS. BONJEAN: You see it right there? It says Newark 63 right there. You see that?
THE WITNESS: Okay.
MS. BONJEAN: You need glasses on?
BY MR. LIPSHUTZ:
Q It's an old document, Mr. Evans, but I am going to try to make it as big as possible. But I am going to represent to you that this is a missing persons report filed by Sarah Johnson, the mother of Randy Johnson. And the date of the report is August 21st, 1978, the day after they went disappearing. And it's signed by the police officer and the lieutenant on August 22nd, 1978. Okay?
But I'm going to read to you the -- the remarks, okay, here. "Victim mother states that victim went to work with several other guys for a Lee Anthony Evans of 979 Clinton Avenue who stated to victim mother that he dropped victim off near his house at approximately 2300 hours on August 20th, 1978.



Mr. Evans, did you tell Ms. Johnson, Randy Johnson's mother, that you dropped the kids off at 11:00 p.m.?
A No.
Q Can you think of any reason why the victim's mother would lie about that to the police, that --
A I don't --
MS. BONJEAN: Stop. Stop. Objection to the form of that question. He never said -- mischaracterizes his testimony. I am going to object to the form of it.
It's -- go ahead. Go ahead. You can answer to the best of your knowledge.
THE WITNESS: Yes.
BY MR. LIPSHUTZ:
Q Let me -- let me ask the question, sir, because I didn't get the full question out.
A Okay.
Q Can you think of any reason why the victim's mother would lie?
MS. BONJEAN: Objection. He never said --
MR. LIPSHUTZ: Can I please ask the question?



MS. BONJEAN: Okay. I need you to quit yelling, sir.
MR. LIPSHUTZ: May I please ask the question?
MS. BONJEAN: Yes. Go ahead. Answer the -- ask the question.
BY MR. LIPSHUTZ:
Q Mr. Evans, can you think of any reason why the mother of a missing boy would lie to the police about the time you dropped off her son?
MS. BONJEAN: I am going to object. You can answer. I am first going to object to the form.
Now go ahead and answer, Lee.
THE WITNESS: Well, first of all, I -- I -- I doubt very seriously that the mother would lie. But I can tell you this here. All these documents was -- was altered and falsified and everything else.
BY MR. LIPSHUTZ:
Q Oh, so the officer who wrote this down --
A No. Not the officer. It's not the officer. And I can go through those documents

and I can prove that they was altered and
falsified.
Q Oh, I see what you're saying. So this document has been altered, is that what -- you're saying this document was altered?
A If -- if -- if she is not a liar, of course it is. I am not.
MS. BONJEAN: Just answer the question.
BY MR. LIPSHUTZ:
Q So this document was altered.
A If you ask me --
MS. BONJEAN: Go ahead. Listen.
BY MR. LIPSHUTZ:
Q This document was altered. That's what you're saying?
MS. BONJEAN: He answered that question. I will object.
Mr. LIPSHUTZ: It's hard for me to hear him. That's all.
BY MR. LIPSHUTZ:
Q How was this document altered and who altered it?
A Who altered it? The police department -- I mean, the '78 police report is



altered. The fire report is altered. All of is altered. It contradict itself. I can show you all the inconsistencies in it, because they be saying things. You say who. I can't tell you who. I wasn't there -- who wrote it. All I am telling you, all this here conspiracy came together when they altered all these here documents, and I can prove it.
Q I am asking you to tell me who -- you can't tell me who altered it; right?
A I am just telling you what is in front of me. These documents is not correct.
Q What -- how was -- how was this document altered?
A Now you calling Ms. Johnson a liar, that's what you're saying?
Q I didn't hear what you said, sir. I just didn't hear what your answer was. Can you repeat that answer back?
A You said how did this document could be altered.
Q How was it altered? What was altered about this document?
A I will just repeat. I will repeat it again. The document is -- not just this



document. The police report, the file report, everything is altered in there. I can show you everything inconsistencies. Even Ms. Johnson, you can take these -- the daughter report and put it with that report. It's totally opposite.
Q Okay. Mr. Evans, did you tell the victim's mother that you dropped off her son at 11:00 p.m.?
A No. No.
Q Okay.
A 1,000 percent no.
Q Thank you. Let's look at another document.
Mr. Evans, I am showing a document that's been marked Evans-4. It's a number of pages. It's marked at the bottom Newark 73 to Newark 79. Okay? And it is the -- I'm going to represent to you it's the first report from Hairston. Okay?
And on the first page it is Newark 73. It's signed September 15, 1978. I presume that you have seen Detective Hairston's police reports before?
A Yes.
Q I want to talk to you about a



paragraph on the very first page, assignment received August 23, 1978, and it lists the five missing boys. Okay?
The very next paragraph says -- I'm going to read it. "Ms. McDowell further stated to the officers that the youths were picked up by Lee Evans in the truck somewhere on Clinton Avenue, and that was the last time they have been seen. Ms. McDowell further stated to officers that an unidentified youth named Bob had received a telephone call from an unidentified person, advising him if the marijuana was not returned to them, the youths would be killed.
Detectives further reported that a Mrs. Johnson, sister of the missing youth Randy Johnson, was at the McDowell residence, and she them she would try to get Bob's name and address and she would contact the YAB," which I will represent to you stood for Youth Aid Bureau.
My first question is did I read it -- did I read the report accurately?
A The report is -- what you reading is accurate, but it's not accurate.
MS. BONJEAN: Okay. I want you -- okay. I want you to answer his question. I want

**you to answer his question and only his question. Is that so hard? I know -- I know you're upset. The way this goes is to answer his question. Okay?**

BY MR. LIPSHUTZ:

Q So I'm just -- the first question was I read that to you accurately; correct?

**A Yes.**

**Q You do not believe it is accurate; is that correct? Is that what you believe? It's not accurate?**

**A 1,000 percent not.**

**Q What is inaccurate about this report -- about this paragraph?**

**A Well, first of all, that's -- that's Florence. You talking about Florence McDowell right now; right? All right. Her statement here -- her statement, not the police report. Her statement was total opposite. Said Roger Taylor came to her house first thing in the morning and told her they weren't -- they snuck back. That's -- that's the statement she gave, not this here. Every -- every statement on -- everybody made a statement and is contradicting itself on this here, on the reverse, on the changes of this**



**report. And I am not saying that Scott-Bey and Hairston made this report. I am saying somebody went on top of them.**

Q Who went on top of them?

**A It was inconsistent.**

Q Who went on top of this report?

**A I couldn't tell you the names.**

Q Okay. Let's look at the next paragraph which I'm going to read. First thing I'm going to do is read the paragraph. All right. Be let me go back.

This is August 22nd, 1978.

"Detective Rodriguez and Clark reported that they responded to 707 Clinton Avenue, Apartment 307, address given of Lee Evans where they interviewed Evans. Detectives reported that Evans stated he picked up the missing youths who sometimes help him with his construction work and took them with him on several jobs and returned with them at approximately 2300 hours. Also he only -- had only three of the youths with him. Evans further stated to detectives that he heard about the telephone call made to Bob and the caller wanting $150 for each youth or the smoke.

First question, did I read that



accurately?

**A You read it accurate, yeah.**

Q Did you tell Detectives Rodriguez and Clark that you dropped the boys off at 11:00 p.m.?

**A No.**

Q Did you --

**A I told --**

Q What -- what time did you tell Detective Rodriguez and Clark you dropped the boys off?

MS. BONJEAN: Objection to form. Foundation.

Go ahead.

**THE WITNESS: I don't remember talking to Detective Rodriguez. I don't remember that. But I know for a fact that is not the accurate statement there.**

BY MR. LIPSHUTZ:

Q What is not accurate about it?

**A What is not?**

**Q What is inaccurate about it?**

MS. BONJEAN: Objection. Asked and answered.

You can answer again. Go ahead.



**THE WITNESS: It contradicts itself with the -- with the statement of the witnesses, with the --**

BY MR. LIPSHUTZ:

Q This is your statement. What is inaccurate about it?

**A It wasn't correct. It's not correct.**

Q Yes. I -- I heard you say that. What is not correct about this statement?

**A The correct -- what is not correct because they're saying Lee Evans was at 342 Hobson Street at that time. And all the time Lee Evans dropped the boys off was at 18th Street and Fabyan.**

Q So when the detectives wrote that you dropped -- that you said you dropped the boys off at 11:00 p.m., the detectives were lying?

MS. BONJEAN: Objection to the form. That's an improper question. Form. Foundation.

You can answer.

**THE WITNESS: If that's what them detectives said, yes.**

BY MR. LIPSHUTZ:

Q That they're lying?

A If that's in their statement and they said this, yes.
Q Yes what? That they're lying?
A Yeah, they're lying.
Q Okay. The day after -- the day after the boys are disappearing, they're lying about the time you dropped off the boys?
MS. BONJEAN: Objection. You are now just harassing and this is argumentative. He said it's inaccurate, and if that's what they said, they're lying. He answered your question. Okay?
MR. LIPSHUTZ: Okay. I am just clearing it up.
MS. BONJEAN: There is nothing to be cleared. He answered it.
BY MR. LIPSHUTZ:
Q Did you tell the detectives that you knew about the call to Bob and that the caller wanted $150 for each youth or the smoke?
A No. The $150 came from Lillie Williams at the time, another mother. She came to me. That's how I found about this. She came to me and asked -- told me about they want $150. She looked at -- I said I tell you what. I will



put up the $750. Bring it to the one who said it. That's what I told Lillie Williams.
Q Did you tell the officers --
A No. I didn't tell the officers. That came from Lillie Williams.
Q Let me ask -- let me finish my question.
On August 22nd, 1978, did you tell Rodriguez and Clark that you heard about the telephone call made to Bob, and the caller wanted $150 for each youth or the smoke?
A No. No.
Q So the detectives lied about that in 1978?
A Yes.
MS. BONJEAN: Hold on. I am going to object. I'm going to object to the form and foundation of that question. That's an improper question.
BY MR. LIPSHUTZ:
Q Okay.
A You saying -- you're asking me if the detectives lied. I didn't say the detective lied. Somebody could have changed their statement. That's what I am saying. All I know



this is not correct.
Q This is your statement, sir.
MS. BONJEAN: Objection. Objection. That mischaracterizes the document. This is a police report that was written by somebody other than Mr. Evans.
MR. LIPSHUTZ: That's why I am asking him what is inconsistent. Did he say -- I want to know did they make this up.
MS. BONJEAN: Hold on. Objection. That is speculative. He cannot get into the mind of somebody else. He is saying it's incorrect, and he is not going to speculate about how it got to be incorrect.
MR. LIPSHUTZ: Okay.
MS. BONJEAN: Just go on. He's having an issue. What is wrong with your foot?
THE WITNESS: It's fine.
MS. BONJEAN: You're sure?
THE WITNESS: Yeah.
MS. BONJEAN: Okay.
BY MR. LIPSHUTZ:
Q I am skipping a little bit forward. Newark 77, Mr. Evans. Same report. It's now August the 25th. Okay? Page 5 of the report.



Detective Scott-Bey and Hairston, the undersigned -- let me read it to you. The undersigned responded to 342 Hobson Street. Upon my arrival, we went to 342 Hobson Street. There we found Lee Evans and we transported him to the YAB, end quote. Did I read that accurately?
A Yeah. You read it accurately, yeah.
Q Okay. Let me continue. Quote, Evans was slated for the traffic warrant. Sergeant Gibson notified and responded to the YAB, end quote. Did I read that accurately?
A Yeah. You're reading it accurately.
Q Evans -- quote, Evans was questioned after reading him his rights about the missing youths by the undersigned Detective Scott-Bey and Sergeant Gibson, end quote. Did I read that correctly?
A Yes.
Q Evans stated on August 20, 1978, he picked up Melvin Ricky Pittman, Michael McDowell, and Randy Johnson early in the day and dropped them off at Clinton Avenue and Fabyan Place at approximately 2000 hours, which is -- first of all, did I read that accurately?
A You're reading it accurate.

Q And you would agree with me that 2000 hours is 6:00 p. m.; right? No, it's not. It's 8:00 p.m. 2000 hours -- 2000 hours is 8:00 p.m. Just the number itself.

**A It's not correct.**

Q Okay. Let me continue reading. Evans further stated that at 2230 hours he again picked up M. McDowell and drove him to East Orange and then returned to Newark with him and then picked up Ernest Taylor and Alvin Turner to help him move some boxes to Irvington, New Jersey. They drove around and in his pickup truck and then he thought it was too late to move boxes, and then they dropped the youths off in the area of Clinton Avenue and Fabyan Place, end quote. Did I read that correctly?

**A You are reading it correctly.**

Q Okay.

**A Reading a falsified statement correctly.**

**Q Did you -- this is my question to you, Mr. Evans. Did you tell Detective Scott-Bey, Detective Hairston, and Detective Gibson that you picked up M. McDowell and picked up Ernest Taylor and Alvin Taylor at 2230 hours,**



**which is 10:30 p.m.? Did you tell the detectives that?**

**A No.**

Q So when the detectives wrote that you picked them up at 10:30 p.m., the detectives were lying?

**A No. I didn't say the detectives was lying. I am saying these statements here it's falsified and documented. I don't know who put it together.**

Q This report is falsified?

**A Yes.**

MS. BONJEAN: I am going to object to the form of that question. He didn't write the report. He is saying it's not accurate, and he is saying he doesn't know how it got inaccurate.

MR. LIPSHUTZ: You know, I don't care what you say, Ms. Bonjean.

**MS. BONJEAN: Well, I care -- okay.**

**BY MR. LIPSHUTZ:**

Q Mr. Evans --

MS. BONJEAN: Madam Court Reporter, please mark -- please mark this whole line of questioning which is entirely improper asking



Mr. -- I'm going to put it on the record -- **Mr. --**

**MR. LIPSHUTZ: Stop. Stop. --**

**MS. BONJEAN: Just speculating.**

**MR. LIPSHUTZ: Stop.**

**MS. BONJEAN: Okay.**

**MR. LIPSHUTZ: Stop. Send Mr. Evans out. If you are going to do this, send him out. Send him out.**

**MS. BONJEAN: Okay. Go ahead. Mr. Evans, go ahead.**

MR. LIPSHUTZ: Let him out?

MS. BONJEAN: Leave my office for a second, would you. Go out there.

THE WITNESS: I'll step out here.

**MS. BONJEAN: Okay. Yeah. Step outside.**

**Okay. Thank you. I am just going to make a record that it is an inappropriate line of questioning to ask Mr. Evans to speculate about whether somebody lied or didn't lie. All he can do is answer whether it's accurate or not accurate. You can ask him why he believes that it was put in here. And if he gives you an answer -- but to say are you saying he lied is an**



**inappropriate question. It would never -- it would never be appropriate in a court of law. It's not really appropriate here. That's my objection.**

**MR. LIPSHUTZ: Okay. You can bring him back in now.**

MS. BONJEAN: Okay.

BY MR. LIPSHUTZ:

Q You did not tell the detectives that you picked him up again at 2230, 10:30 p.m.?

**A Absolutely not.**

Q And you believe that this police report has been altered?

**A It's not what I believe. It's what I am looking at and what happened.**

Q What time -- I am sorry to interrupt. What time did you tell the detectives that you dropped them off?

**A What time? I used the same time if I told anybody the same time. I told them the time I dropped them off at the ice cream parlor. And I wasn't out at night at all.**

**And plus another thing was -- make this very inaccurate. They giving names. I don't even know the names. They say Randy**

Johnson. They say, you know -- and the only two names. If they would have said Michael and Melvin, if they would have said Pittman, it would have threw me off. So they throwing names out there. That's killed that right there. You know, I know it's inaccurate because I didn't know those names.

Q Okay.

MR. LIPSHUTZ: I am done with this report. Why don't we take a five-minute break.

(Whereupon, a recess is taken.)

BY MR. LIPSHUTZ:

Q Mr. Evans, can you hear me okay?

A Yes.

Q Okay. Great. I want to circle back a little bit. I want to talk about Philander a little bit more. Okay?

You have told us he is your second cousin. I think you told me his mother's name. I thought it was Jessie. Was that right?

A Yes.

Q What was -- Jessie Earl? I can't read my own handwriting. What was it?

A Jessie, the first name. Middle name you mean?



Q What was his mother's -- what was his mother's name?

A Jesse Merrell or something like -- yeah.

Q Merrell. Okay. And her last name?

A I don't recall right off.

Q Did you know her?

A It could be Williams. Could be WIlliams.

Q Did you know her?

A Huh?

Q Did you her?

A Yeah. I knew her.

Q Do you know Philander's father?

A Not his father. His stepfather I knew. I know his name.

Q His stepfather was Anthony?

A No. Henry Lee. Henry.

Q Henry Lee?

A Henry Williams. I believe his last name was Williams, yeah.

Q Henry Williams and Jesse Merrell. Back in 1978 was Philander living with his mother and/or stepfather?

A Not his stepfather. With his



mother.

Q Do you remember where they were living?

A Yeah. They was living on Hunterdon.

Q What town was that? Is that Newark?

A Yeah.

Q How long -- let's talk about when the boys were missing in August of 1978. Were they living on Hunterdon?

A Yeah. Yeah. Hunterdon.

Q Do you know where they lived before that?

A Out on Ashley Street somewhere. Ashley? I don't --

Q Is that your answer?

A Yes. Yeah.

Q I am sorry. I was just waiting. Did you visit them?

A No. Not really.

Q Do you remember a time when they were living on Camden Street?

A No.

Q Philander said he was living on Camden Street, 256 Camden Street. You're aware of that; right?



A Yes.

Q Were you aware that he lived on -- at 256 Camden Street?

MS. BONJEAN: Objection. Asked and answered.

You can answer again.

THE WITNESS: No.

BY MR. LIPSHUTZ:

Q You didn't know that?

MS. BONJEAN: Objection.

MR. LIPSHUTZ: It's hard for me --

MS. BONJEAN: It's argumentative. Okay? He answered it. Move -- I don't know -- it's asked and answered.

THE WITNESS: Okay. No.

BY MR. LIPSHUTZ:

Q Thank you. Had you ever been to anybody -- any relative of yours that lived at 256 Camden Street?

A No.

Q Back in 1978 did you work with Philander?

A Yes.

Q What was -- what kind of work were you doing with him?

157

A Construction.

Q About how long had you guys been working together?

A Maybe a year or so, maybe.

Q Okay. Just -- so was he like an assistant to you or how would you describe him?

A Helper.

Q He was a helper for you. Okay. I want to ask you about another document, sir. I will pull it up.

This is a document that's marked Evans-7. Do you see that on your screen?

A Yes.

Q It's Newark 95 through Newark 99. Okay?

A Uh-huh.

Q I want to go back up to the beginning, though. This is a supplemental report, I am going represent to you, adding information five missing juveniles. And it begins on October 14, 1978. Okay. So about two months after the boys went missing. Okay?

I want to ask you about an entry from October 19, 1978. I don't know if I said August or October. October 14, 1978, is the

158

first entry. And now I want to ask you about an October 19, 1978, entry. First, I am going to read it. Okay?

On October 19, 1978, the undersigned and Detective Scott-Bey and Detective Conte interviewed Philand Williams, black male, 21. Date of birth 12/4/56. Social Security number, that's on the document. I don't want to read it out loud. Of 271 Hunterdon Street. Phone number, 824-0439 at YAB, end quote.

Except for the fact that I took out his Social Security number, did I read that accurately?

A You say you took out the Social Security.

Q Yeah. I didn't want to read the Social Security number into the record. Did I -- did I read that sentence correctly?

A You talking about Scott-Bey?

Q Yeah. I -- did I read what I -- did I read it? That's all.

A Yeah. You read that.

Q Okay. Did I read it accurately?

A Yes. That's what it says.

Q Next sentence says Williams stated

159

he was with Lee Evans, who is his cousin, on August 20, 1978, during the day. Williams stated that he worked with Evans off and on for a year, end quote. Did I read that accurately?

A Yes.

Q Williams stated he was at Maurice Olds' house on August 20, 1978, at approximately 1700 hours with all five of the missing boys and Maurice, Darryl, Greg, and Evans. Did I read that correctly?

A Yeah. You read it correctly.

Q Okay. Now, let's go back. Williams, Philander Hampton said he was with his cousin Lee Evans on August 20, 1978, during the day.

A Who is Williams?

Q Philander Williams.

A It's not Philander Williams. His name ain't Williams. So I don't know if that's in there. Not Williams. Really they crossing up. Tell them if they've going to change it, change it right.

Q Mr. Evans, do you know Philander Hampton's date of birth?

A No. I don't know. But I know his

160

name is not Williams. That's his mother's name. That's not his name. Just Jessie Merrell Williams, not Philander Williams.

Q That is his birthday, I will represent to you, December 4, 1956.

A I don't know the birthday. I am just -- you know, you're asking me a question and I am answering.

Q I am going represent to you, Mr. Evans, that Philander Williams is Philander Hampton. Okay?

A I don't know. I am just saying that's what you said.

Q Do you know Philander Williams?

A No. I don't know Philander Williams.

Q Okay. Do you know Philander Hampton?

A I know Philander Hampton.

Q And Philander Hampton's mother was?

A Williams.

Q Right. Well, Philand Williams says he worked with you on and off for a year. So you don't know a person named Philand Williams who worked on and off with you for a year?

**A Philander Hampton. If that's Philander Hampton, that's where we at. But it's not Philander Williams. That's out.**

**Q I am going to represent to you that this person, Philand Williams, is your second cousin, Philander Hampton. Okay?**

A He was never a Williams. He always was a Hampton.

Q Philand Williams stated that he was at Maurice Olds's house at 5:00 p.m. with all five of the missing boys and Maurice, Darryl, Greg, and you.

**A That's incorrect.**

Q I asked you earlier in this deposition if you had been with Philander Hampton at all that day, and you had said you were not with him at all that day; correct?

**A Correct. That's why I say right now this statement is incorrect.**

Q Okay. What is incorrect about this statement?

**A What is incorrect?**

Q Yes.

**A You said that I was there.**

Q I am not saying it.



**A The statement. You said -- we talking about the statement.**

Q I want to be very clear.

MS. BONJEAN: The report --

BY MR. LIPSHUTZ:

Q The report says Mr. Philand Williams said he was at Maurice Olds's house on August 20, 1978, at 1700 hours with all five of the missing boys and Maurice, your cousin, Darryl, your cousin, Greg, and you. Were you with your two cousins, Philander Hampton, and all five of the missing boys at 1500 -- 1700 hours at Maurice Olds's house on August the 20th, 1978?

**A That's not correct.**

Q This statement -- okay.

**A Also --**

Q Okay.

**A -- cross-reference. If you need a cross-reference on that, we got that too.**

Q I am sorry. What does that mean, if I need --

**A Cross-reference in your -- in your discovery. If you go to Roger Taylor, he claimed they all was in the park playing. You go to each one of them. They was together.**



Q Okay. I am just asking you about this statement here.

**A I said that's incorrect.**

Q Okay. And it's incorrect because you were not with your two cousins, your second cousin, and all five of the missing boys at 1700 hours at Maurice Olds's house?

**A Correct.**

Q Okay.

Now, continuing. Mr. Philand Williams stated -- let me read it first. Quote, Williams stated they talked about going to the park to play basketball. Williams stated he left the porch and went to Clinton Avenue to get some sodas, and when he returned to the Olds' porch he, Maurice, Ricky, Michael, and Randy got on Evans' truck and he drove to Vailsburg Park, end quote.

First question, did I read that accurately?

**A Yeah. You read it accurately.**

Q Okay. Did you take Maurice, Ricky, Michael, Randy on your truck to Vailsburg Park?

**A What day that was? That was the 20th, the same day; right?**



Q That's correct.

**A We did go there early in the morning. That was in the morning. I remember that.**

Q Maurice, Ricky, Michael, and Randy?

**A I don't know. No. Not names. I know it was Maurice and Ricky and Michael. I don't know who else was there. They -- who was there. Definitely early in the morning, because I had did a job across the street. I finished it but we came back early.**

Q What job did you do early in the morning?

**A No. Finished job. It was across the street at 57 Fabyan Place.**

Q And when you say early in the morning, what time is that?

**A About 7:00.**

Q 7:00 a.m.?

**A Yes. 7:00 p.m. I finished the job.**

Q So when did you go to Vailsburg Park?

**A We went there around about -- it had to be 8:00, 8:30, something like that. It was in the morning.**

Q Oh, so you had seen Maurice, Ricky, Michael at 7:00 or 8:00 that morning?

**A That morning.**

Q You didn't tell me about that earlier.

**A When? You never asked that.**

Q Okay.

**A You said after.**

Q So you saw some of the missing boys at 8:00 that morning?

**A Yeah. You asked me after -- after 3:00 did I see these people. That's what you asked me.**

Q The transcript will show.

**A All right.**

Q Quote, Williams stated when they got to the park, other guys were on the basketball court, and they did not get a chance to play. Williams stated some guys in the park wanted to start a fight, and they got back on the truck and left the park. And Evans then dropped him off at the house at about 1900 hours, end quote. Did I read it accurately?

**A Yeah. You read it accurate, but that's not correct.**



Q My first question did I read it accurately?

**A Yes. You read it accurately.**

Q 1900 hours is 7:00 p.m. What is inaccurate about that statement?

**A First of all, you said Williams. You're talking about Philander Hampton. He wasn't there. He wasn't there. And the time wasn't -- is not correct. It was in the morning. Like I said, it was morning.**

Q It was morning when you and Philander went to the basketball court at Vailsburg Park?

**A Philander wasn't there with us. When you say -- you calling Williams Philander, but that's not -- he wasn't there. He didn't even go to the park.**

MS. BONJEAN: Is there something funny, Mr. Lipshutz?

MR. LIPSHUTZ: Well, yes. It's funny. It is funny to me.

**MS. BONJEAN: What's funny? What is so funny?**

**MR. LIPSHUTZ: Okay.**

MS. BONJEAN: I am going to ask that



you control yourself. This is a little ridiculous. Okay?

BY MR. LIPSHUTZ:

Q Williams stated when they got -- quote, Williams stated when they got to the park, other guys were on the basketball court, and they did not get a chance to play. Williams stated some guys in the park wanted to start a fight, and they got back on --

MS. BONJEAN: Objection to the -- you've already read this. Please just ask a question.

BY MR. LIPSHUTZ:

Q Was Philander Hampton with you?

MS. BONJEAN: Objection. Asked and answered. He answered.

THE WITNESS: The statement is not correct. The statement is not correct. This statement is not correct.

BY MR. LIPSHUTZ:

Q So Philander Williams said you, Mr. Evans, went to the --

MS. BONJEAN: Objection. You are continuing to read what we already read.

MS. BONJEAN: I am asking him a



question.

MS. BONJEAN: You are reading -- reading. You have already read it. You've asked and answered it. I know you don't know like the answer --

MR. LIPSHUTZ: It's a different question.

MS. BONJEAN: -- but he answered it.

MR. LIPSHUTZ: The answer is fine.

BY MR. LIPSHUTZ:

Q Mr. Evans, Philander Williams says you went to Vailsburg Park. You have agreed that you went to Vailsburg Park; right?

**A Philander wasn't there. Philander wasn't there.**

Q Okay.

**A The information that I gave to the parents, and they -- you put Philander in there, Williams in there, whoever he is. I don't know.**

**Q Okay. All I am saying is Philander Williams says you went to Vailsburg Park, and you have agreed that you went to Vailsburg Park; correct?**

MS. BONJEAN: Okay. I am going to object.

First of all, assumes facts not in evidence. You're asking him to agree that Philander said something that he has no way of knowing whether Philander said this.
MR. LIPSHUTZ: Okay.
MS. BONJEAN: It's a police report.
MR. LIPSHUTZ: Objection to form is what you can object to. You're not going to --
MS. BONJEAN: You're not going to do anything actually. You can continue to threaten me all you want, but you're not --
MR. LIPSHUTZ: I am not threatening you. You can coach him all you want.
MS. BONJEAN: I'm not coaching.
BY MR. LIPSHUTZ:
Q Mr. Evans --
MS. BONJEAN: I don't -- geez. Coaching? As if I could coach him. Go ahead, ask your question.
BY MR. LIPSHUTZ:
Q Mr. Evans, you went to Vailsburg Park; correct?
**A That's the statement I made.**
Q Right. And you returned and dropped people off at 1900 hours.



**A No. That's not correct.**
Q That's not correct?
**A No.**
Q 7:00 p.m.?
MS. BONJEAN: Objection. What are you doing? You just -- we have already determined 7:00 p.m. Is there a question?
MR. LIPSHUTZ: Yes.
**MS. BONJEAN: Stop harassing him and ask questions. This isn't -- this isn't your moment in the sun on a cross-examination. Just ask your question. Okay?**
**MR. LIPSHUTZ: Okay. Thank you.**
**MS. BONJEAN: You know he's acquitted of this offence. I know you feel like you got a smoking gun here. But just ask the questions and keep going.**
**MR. LIPSHUTZ: O.J. Simpson was acquitted too.**
**BY MR. LIPSHUTZ:**
Q Mr. Evans --
MS. BONJEAN: I'm going to -- you're saying O.J. Simpson was acquitted too?
**THE WITNESS: He is saying I am guilty?**



**MS. BONJEAN: Yeah. Yeah. Okay. Mr. Lipshutz --**
**MR. LIPSHUTZ: You said it, not her.**
**MS. BONJEAN: -- are you -- we are not going to do this. We are not going to that. Okay?**
BY MR. LIPSHUTZ:
Q My next question is -- my next question is, did you drop Philander Williams off at 1900 hours?
MS. BONJEAN: It was asked and answered.
You can answer again.
**THE WITNESS: No.**
BY MR. LIPSHUTZ:
**Q Were you with Maurice -- your cousin Maurice and Darryl at the Olds' house on August 20, 1978? Were you with your cousins?**
**A No.**
Q Okay. Were you with all five of the missing boys at the house?
**A No.**
**Q All of this is incorrect as to you?**
MS. BONJEAN: Objection to the form of that question. All of it? What is all of it?



MR. LIPSHUTZ: I will rephrase my question.
MS. BONJEAN: Form. Foundation.
BY MR. LIPSHUTZ:
Q Mr. Evans, did you murder these five boys?
**A I think you would be guilty before I would be.**
Q Mr. Evans, did you murder these five boys?
**A No.**
**Q Did you take them to 256 Clinton Avenue? Is that right? Clinton -- did I say that right? Camden Street, excuse me. Did you take them to 256 Camden Street?**
**A No.**
Q Did you put them in a closet and lock the door?
**A No.**
Q Or nail the door shut?
**A No. And it's cross-reference with that also.**
MS. BONJEAN: Just answer the questions.
BY MR. LIPSHUTZ:

Q Did you -- did you -- did you light the house on fire?
**A No.**
Q Did you -- you didn't murder these five boys?
**MS. BONJEAN: Okay. You are now -- okay. Mr. Lipshutz -- okay. Mr. Lipshutz, you are not -- he answered it. Okay. And now you're harassing him. Okay? And -- and he will answer it again, but it will be the last time.**
**Okay. You can answer that question. I think he asked you if you murdered them.**
**THE WITNESS: No. No. You know the truth. All them papers you gave me, it ain't good enough. The same thing you talked about Philander. The same thing he gave you --**
**MS. BONJEAN: Okay. Stop. Stop. Just stop. Okay. You have been acquitted.**
**THE WITNESS: Yes.**
**MS. BONJEAN: Okay. It doesn't matter what this guy thinks.**
**THE WITNESS: No. He don't -- he know the truth. He think that.**
**MS. BONJEAN: Okay.**
**THE WITNESS: His -- his job is just**



**to make the truth out of a lie. That's his job.**
MS. BONJEAN: Okay. Okay. So he answered your question. Do you have anything else?
MR. LIPSHUTZ: Yeah, I do.
MS. BONJEAN: Okay. Then go ahead and ask.
**MR. LIPSHUTZ: I just want to -- I just -- I see Mr. Evans is upset. I want to know -- I mean is he crying? I can't help him here.**
**MS. BONJEAN: You stop. Okay. Yeah. People -- you're right. Thank you. That usually causes emotional trauma when people are falsely accused of crimes. That's how it works.**
MR. LIPSHUTZ: I just asked if he was crying?
**MS. BONJEAN: Okay. Okay. What are you doing? What are you doing? Ask your next question. He is okay. Okay?**
**MR. LIPSHUTZ: Okay.**
**MS. BONJEAN: He is a grown man. He will pull it together. Now start asking questions. Let's go.**
BY MR. LIPSHUTZ:
Q When you picked up the boys and took



them to Vailsburg Park, where did you get them from?
MS. BONJEAN: Objection. That's like asking --
MR. LIPSHUTZ: Can you just object to the form?
MS. BONJEAN: No.
MR. LIPSHUTZ: It a question.
MS. BONJEAN: Stop trying to trick him. Stop with your unethical behavior. He never -- stop mischaracterizing his testimony. Go ahead.
BY MR. LIPSHUTZ:
Q When you picked up the boys and took them to Vailsburg Park, where did you get them from?
**A Fabyan Place.**
Q The same place you picked them up at noon?
**A No. It was across the street there, the opposite side of the street.**
Q Mr. Evans, can you tell me what the nonprofit Museum of Life or Death is?
**A It was a skill center was put together.**



Q I didn't hear your answer.
**A It was --**
Q A little louder. I'm sorry. Or come a little closer.
A It was a counseling and a skill center that we were putting together.
Q Counseling?
**A And a skill center.**
Q Was it religious?
MS. BONJEAN: Counseling and skill. I don't know if you heard that, and skill center.
**THE WITNESS: It's not religion. It's transformation of consciousness.**
BY MR. LIPSHUTZ:
Q What does that mean? I am sorry. I am ignorant about that. What does that mean, transformation of consciousness?
**A What it means happened to your subconscious mind.**
Q Why did you put that together?
**A Why?**
Q Yeah.
A That was a revelation.
Q Was it something that you put together, I should say?

A **Yeah. Through the revelation.**
Q Was this before you were accused of homicides or after?
A **When you say accused, what do you mean? 2010 or '78.**
Q I'll tell you what, let me -- let me rephrase the question. When did you put together the Museum of Life or Death?
A **'89.**
Q '89?
A **Yeah. '89.**
Q I want to show you a picture, sir. This is marked Evans-9. Can you see it?
A **Yes.**
Q Is that your van?
A **Yes.**
**Q Okay. And you say you put this together in -- oh, I'm sorry. Hold on a second. You said you put this together in 1989?**
MS. BONJEAN: I am going to object. What is the "this"? The van or the -- or the skill center?
MR. LIPSHUTZ: Sure.
BY MR. LIPSHUTZ:
Q You say you put the skill center together in 1989?



A **Correct.**
Q Was it abandoned at some point and reinstated?
A **Yes.**
Q When was it abandoned?
A **It just was dormant, you know, and then I reinstated it.**
Q When did you reinstate it?
A **Had to be in -- I'm not for sure.**
Q Would it be accurate to say that you reinstated the Museum of Life or Death because you were charged with the murder of the five boys?
A **How is that? That was -- yeah. That was put together way before that. How could you say something like?**
Q I am asking you. Would it be accurate to say that you reinstated the Museum of Life or Death because you were accused with the murder of five boys?
A **That was 2010 when I was accused.**
MS. BONJEAN: Just answer his questions.
**THE WITNESS: No. It's not correct.**



MS. BONJEAN: Why are you arguing with him?
THE WITNESS: Yeah. You're right.
BY MR. LIPSHUTZ:
Q I am going to show you, sir, a document Evans-2, which I have shown you before, which is the interrogatories to you. I am going to show you question number five. This question asks you -- first of all, can you see it on the screen, sir?
A **Yes.**
**Q This question asks you about your personal injuries and all the complaints of any nature whatsoever. Okay? This is about injuries and complaints. Okay?**
**Now, I want to show you, sir, Evans-1. Can you see this? This is your Answers to Interrogatories, Evans-1? Do you see that?**
A **Yes. I see Evans-1.**
Q I am going to show you the answer to question five. Question five was, again, tell us about your injuries. And I want to show you the first paragraph and I'm going to read it to you, portions.
Because he was falsely charged with the murder of five boys, his reputation in the community was injured. Plaintiff reinstated a nonprofit museum -- a nonprofit called Museum of Life or Death. In 2009 the nonprofit was funded by the plaintiff. Did I read those portions accurately?



A **You read it accurately, yes.**
Q Okay. These are your answers to interrogatories. Is this incorrect?
A **That's incorrect, yeah.**
Q Okay. What is incorrect about it?
A **The truck is 2006.**
Q I didn't ask you about the truck. What is incorrect --
A **Everything.**
Q What is inaccurate about the interrogatory answers, I'm asking.
A **Everything. The year. It was way before this here. Didn't have nothing to do with the arrest.**
Q I am just confused. It says here because he was falsely charged with the murder of five boys, his reputation in the community was injured. Plaintiff reinstated a nonprofit museum called Museum of Life or Death.

Are you saying that the reinstatement of the nonprofit had nothing to do with the charges against you?

MS. BONJEAN: Okay. I am going to object. There is nothing about this -- objection. You're -- I don't -- I don't even know what you're trying to get at, but you're mischaracterizing, I guess, in some way. You're making an assumption that's just not there. But go ahead ask your question.

BY MR. LIPSHUTZ:

Q Did the reinstatement of the Museum of Life or Death have anything to do with you being arrested or charged with the murder of five boys?

MS. BONJEAN: He already answered that. Asked and answered.

BY MR. LIPSHUTZ:

Q I didn't hear your answer, sir.

A No.

Q One more second. Hold on. I want to show you a document I marked as Evans-10. Do you see this on the screen, sir?

**A Yes.**

Q Do you see the stamp that says



Evans-10?

**A Yes.**

Q Okay. I am going to represent to you that this was a card that was in the prosecutor's file at the Essex County Prosecutor's Office. It's two pages long. I am going to show you.

Have you ever seen this -- let me show you the whole thing. Have you ever seen this card before?

**A The first time I seen it was Tuesday.**

Q Tuesday of this week?

**A This week.**

Q Okay. Did you send this card to the prosecutors?

**A No.**

**Q Okay.**

**MR. LIPSHUTZ: I am just going to give you -- I am going to ask for about two minutes because I may be done. Okay? So just give me two minutes, please.**

**(Whereupon, a recess is taken.)**

MR. LIPSHUTZ: I really only have a few more questions, I promise.



BY MR. LIPSHUTZ:

Q I am a little confused about Vailsburg Park. You picked up the boys at around Fabyan Place. I think you said around 8:30. What -- what time did you pick them up? I am sorry.

**A Early.**

Q Early?

**A I was there -- I was at Fabyan Place at 6:30. I was over at 57 Fabyan Place. I know that.**

Q I am sorry. When did you take them to the Vailsburg Park?

**A That was -- that's the same morning.**

Q I know. What time, sir?

**A It had to be around maybe 8:00. You know, before -- you know, it wasn't late. It was early because all I had to do -- from where I was working I know -- and then we came. They brought up basketball and then they started talking. I say, okay, we will go.**

Q And I guess I was confused. Who was with you that you took to Vailsburg Park?

**A Repeat that.**

Q Who was with you when you took them



to Vailsburg Park?

**A Mike -- I know Mike and Melvin, they was there. And it was -- I'll say Rodney. Rodney, he is not part of the five, but he was living across the street. And I don't know if it was maybe -- it was a group of them because it was -- two of them in front and the rest of them got in back of the truck.**

Q What about -- I am not sure if I asked.

What about your cousins Maurice and Darryl? Did you take them to the Vailsburg Park?

**A I don't think Darryl. I don't think so. I don't -- I think Maurice. I don't think Darryl.**

Q So can you just clear up -- clarify your answer to me. You -- you're not sure if you took Darryl. Do you recall --

**A I don't recall Darryl.**

Q Do you recall taking Maurice?

**A Yes.**

**Q Okay. Now, the last question is when did you drop them off? Not the last question, the last topic. When did you drop them off?**

**A About maybe -- roughly it would have been -- it was before -- about 9:30, something like that. 9:30, something like.**

Q About 9:30, 10:00 did you say?

**A About 9:30.**

Q And I think you told me you dropped them off at Fabyan Place as well?

**A Yeah.**

Q And I guess I am confused as to where you went between 9:30-ish and when you came back at noon.

**A When I came back?**

Q Well, where did you go between?

**A I went home.**

Q What is home?

**A I went to Clinton Avenue.**

Q Okay. In Irvington?

**A Right.**

Q Okay.

MR. LIPSHUTZ: All right. Mr. Evans, I don't have any questions further at this point.

At this point now the other attorneys get to ask you questions. I may have some follow-up on what they ask you later. Thank you very much.



MR. DiFRANCESCO: I have no questions for you, Mr. Evans. Thank you very much.

CROSS-EXAMINATION

BY MR. KASSIS:

Q I am just going to ask him questions. Mr. Evans, I represent Lieutenant Carrega.

You testified about the ice cream parlor that you dropped the boys off the last time you saw them. Do you remember the name of that ice cream shop?

**A No.**

Q Do you know the specific address where it was located?

**A There is a lot now, right on the corner of 18th and Clinton Avenue. The other side of Clinton Avenue is 18th Street.**

Q Okay. So you believe that ice cream shop -- I assume it's not there today. Correct?

**A It's a lot, a parking lot. It's just a lot, not a parking lot.**

Q Okay.

**A Vacant lot.**



Q Okay. So is it a corner lot?

**A Yes.**

Q What are the two streets that make up the intersection where that lot is located?

**A The opposite side is Fabyan Place and then you got Clinton Avenue.**

Q Okay. So the intersection would be Fabyan Avenue and Clinton?

**A You said the intersection where the lot -- the corner lot?**

Q Yeah. So an intersection is when two lines come together; right? I am just trying to understand the names of the two roads that make the intersection that is the corner where the ice cream shop was located.

**A Oh, 18th -- 19th and 18th, but it's on the corner of 18th.**

Q Okay. And 18th and Fabyan?

**A No. 18th and Fabyan is the same street. It's a -- Fabyan is a continuation of 18th Street once you pass Clinton Avenue.**

**Q Okay. So what is the other street that makes up the intersection?**

MS. BONJEAN: The intersection?

**THE WITNESS: Clinton Avenue and 18th Street.**



MS. BONJEAN: Clinton. So he said Clinton and 18th. I don't know how many more times. Right?

THE WITNESS: Yeah.

MS. BONJEAN: Is that what you're asking?

MR. KASSIS: Yeah. Thank you.

MS. BONJEAN: Okay.

MR. KASSIS: I appreciate that.

BY MR. KASSIS:

Q A little confusion. I wasn't sure why you were using -- thank you. You cleared it up. Okay. Great. Are you right-handed or left-handed?

**A Right.**

Q Now, I want to just focus your attention a little bit on the -- on this marijuana. I think you told me that there was two pounds of marijuana that went missing from your apartment; correct?

**A Yeah.**

Q And that apartment -- I'm sorry?

**A Estimated, yeah.**

**Q Estimate. Okay. Fair enough. And**

**that apartment was the 979 Clinton Avenue; correct?**
A **Correct.**
Q Do you know what the street value of the marijuana was at that time? I know we threw around $750 because we multiplied 150 by 5. But do you know what the street value of that -- of that drug was at that time?
MS. BONJEAN: I am going to object to the editorializing about the 150. I don't know what that had to do with street value.
But go ahead. You can answer. Do you know what the street value was of it?
**THE WITNESS: Of the marijuana?**
MS. BONJEAN: Yeah.
THE WITNESS: No. Not really. I don't know the street value.
BY MR. KASSIS:
Q Okay. And I respect. Can you -- are you able to approximate what the street value was of the marijuana?
A **I can tell you what it was going through me, you know. No. It was like a couple hundred dollars, 250.**
Q So 250 for the -- for the



approximately two pounds of marijuana was the street value?
A **No. Each.**
Q Each pound?
A **Yeah.**
Q So $500?
A **Yeah.**
Q Okay. Now, when you -- when you -- when you obtained the marijuana, I think you referenced something about an Italian individual that you knew when you worked jobs at Meadowlands. Is that right?
A **Right.**
Q Is that the individual who you -- who you obtained the marijuana from?
A **Through him, yeah.**
Q What was your intent -- what were you going to do with that marijuana?
A **I was Passing it off to another party.**
Q Okay.
Okay. Did you -- did you pay this Italian individual for the marijuana or did he give it to you on credit?
A **Yeah. Just give it to me, you know.**



Q He gave it to you on credit?
A **Yeah. We was doing jobs together also.**
Q So was the idea to pass it along to the next person and then when you got the cash pay him, the Italian individual the cash?
A **Yes. Give him his part back, his money back.**
Q Okay. So you basically owed the Italian man money for the marijuana that was stolen; correct?
A **Yeah. But I didn't have no problem with him like that.**
Q Okay. I am not suggesting you did. How much did he want to be paid for the two pounds of marijuana that you obtained from him?
A **What you mean?**
Q How much were you -- how much were you going to give him for the marijuana once it was sold or whatever you were going to do with it?
A **How much I was going to give him?**
Q Yes. The Italian individual.
A **Oh, I would give him $400.**
Q Okay. So were you intending to make



a profit of $100?
A **I guess in between.**
Q And who were you going to pass off the drugs to?
A **The marijuana to?**
Q Yes.
A **It was a close friend of the family. He's -- his name is Eddie Gibson. He was working at the airport. He was a pipefitter.**
Q Sorry. Do you know what Eddie's intentions were with the drugs? Was he going to distribute them? Was he going to use them himself?
A **I don't know.**
MS. BONJEAN: Objection. I said hold on. Objection to the form, foundation of that question.
BY MR. KASSIS:
Q Okay. Do you know what he was going to do with them?
A **I don't know.**
Q Okay. Were you intending on using any of those five boys that went missing to distribute the marijuana?
A **No.**

**Q The five boys that went missing, had they ever been -- other than on August 20, 2000 -- I'm sorry -- 1978, had the boys ever been in your apartment located at 979 Clinton Avenue?**

MS. BONJEAN: Objection. That, again, assumes facts not in evidence.

BY MR. KASSIS:

Q Fair enough. Fair enough. Let me do this. On the day that the boys went missing, I know they helped you move boxes from one location to the other. Did they actually go into your house located a 979 Clinton Avenue?

**A No.**

Q Okay. Had the boys ever been inside the apartment that you occupied located at 979 Clinton Avenue?

**A No.**

Q Where was -- where did you store that two pounds of marijuana in your apartment when -- before it went missing?

**A I had it in a closet temporary, you know.**

Q In a closet?

**A Yeah.**

Q Was the closet locked?



**A No. It wasn't locked, no.**

**Q You told me that -- actually, you told Mr. Lipshutz you lived with your wife in that apartment; correct?**

MS. BONJEAN: Objection. Misstates the testimony.

You can answer.

THE WITNESS: At the time, no.

BY MR. KASSIS:

Q Okay. She was living at her parents' house?

**A At that time, yes.**

Q Understood. So the only person in that apartment was you; correct?

**A Correct.**

Q Did you know who took the marijuana?

**A No. Not really, but I had theories that the super had a -- you know, he had the -- he had access to the apartment. Could go in and out.**

Q Did you ever tell the super you had marijuana or you kept two pounds of marijuana in your apartment?

**A No.**

Q Okay. Did the super ever know you



to have drugs or sell drugs or store drugs in your apartment?

MS. BONJEAN: Objection to form. Foundation.

You can answer.

**THE WITNESS: No.**

BY MR. KASSIS:

Q Did you ever mention to any of the five boys that -- that you had marijuana?

**A No.**

Q When you left your apartment, was it your habit to lock the door behind you?

**A Yes.**

Q And I think you said earlier to some of Mr. Lipshutz's questioning that there was no evidence of a break-in. Correct?

**A Correct.**

Q And that -- that leads you to -- to theorize that whoever entered the apartment had the key; correct?

**A Correct.**

Q Other than the super, did anybody else have a key to that apartment?

**A No.**

Q How long were the -- how long were



the drugs in that closet before -- how long were the drugs stored in that closet before they went missing, if you know?

**A I don't know. I don't know.**

Q Because you don't know when they went; missing correct?

**A Correct.**

Q How long -- let me ask you this. Can you estimate for me how long the drugs were in that apartment prior to August 20, 1978?

**A Repeat that.**

**Q Do you know how long the drugs were in the apartment prior to August 20, 1978?**

MS. BONJEAN: Objection. Asked and answered.

You can answer again.

**THE WITNESS: I don't know.**

BY MR. KASSIS:

Q Okay. You don't know when you -- so let me see if I can create a foundation here.

Do you know when you purchased -- or obtained, rather, the drugs from the Italian person in the Meadowlands?

**A Yeah.**

Q Okay. How long before August 20,

1978, did you obtain the drugs from the Italian individual?

**A It might have been a week. Could have been a week or something.**

Q A week to what?

**A I am not for sure accurate, but it could have been a week -- between a week or better, you know.**

Q Did you ever confront the superintendent about the drugs?

**A No.**

Q What is the superintendent's name?

**A I don't know.**

Q Why didn't you confront him about it?

**A Because I wasn't 1,000 percent sure. If you don't -- if you're not for sure, you know, you don't confront somebody. You can believe something. Then you have to just go with it, you know, but you don't accuse somebody if you're not 100 percent.**

**Q Just last line of questioning.**

**I know we talked about the general contractor back in 1978. Did you have any equipment that required gasoline to operate?**



MS. BONJEAN: Objection.

BY MR. KASSIS:

Q Other than a vehicle, other a truck?

**A No.**

MR. KASSIS: Okay. I don't have anything further.

**MR. LIPSHUTZ: Is it back to me now? I don't have anything else. I didn't know if you had anything, Ms. Bonjean.**

**MS. BONJEAN: I don't.**

**MR. LIPSHUTZ: Okay. Thank you.**

**(The deposition is adjourned at 2:24.)**



CERTIFICATE

I, JACQUELINE ZAMMATARO, a Notary Public and Certified Court Reporter of the State of New Jersey, License No. XI01142, do hereby certify that prior to the commencement of the examination, the witness was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me on the date and at the place aforementioned.

I DO FURTHER CERTIFY that I am neither a relative to nor employee of, nor attorney or counsel for any of the parties to this action; and that I am neither a relative to nor employee of such attorney or counsel; and that I am not financially interested in the action.

Jacqueline Zammataro

Jacqueline Zammataro, C.C.R.
Notary Public of the State of
New Jersey, Notary No. 50126074

Dated: 4/1/21

- 0 -

**07068** [1] 2:24
**07102** [1] 4:19
**07932** [1] 3:16
**08625-0112** [1] 4:11

- 1 -

**1,000** [11] 84:16, 17; 86:14; 87:13; 89:17; 91:25; 92:9; 128:4; 139:11; 141:12; 197:16
**1-10** [3] 1:10, 17, 18
**10,000** [1] 94:10
**1000** [1] 84:12
**11238** [1] 3:8
**14-cv-120** [1] 1:2
**1500** [1] 162:12
**1700** [4] 159:8; 162:8, 12; 163:6
**18th** [15] 82:20, 22; 123:6, 7; 144:14; 186:18, 19; 187:16, 17, 18, 19, 21; 188:1, 3
**1900** [4] 165:22; 166:4; 169:25; 171:10
**1953** [1] 21:17
**1956** [1] 160:5
**1962** [1] 22:6
**1978** [40] 10:4; 29:10; 79:8, 15; 80:3; 85:12; 92:11; 94:17; 111:3, 9; 117:20, 24; 134:15, 17, 25; 139:21; 140:2; 142:12; 146:8, 14; 148:19; 154:23; 155:8; 156:21; 157:21, 24, 25; 158:2, 4; 159:2, 7, 14; 162:8, 13; 171:18; 193:3; 196:10, 13; 197:1, 24
**1989** [2] 177:19; 178:1
**19th** [8] 112:6, 7, 15, 19; 117:10, 13; 187:16

- 2 -

**20-21** [2] 111:3, 9
**2000** [5] 148:23; 149:2, 3; 193:2
**2006** [1] 180:12
**2007** [1] 55:12
**2008** [3] 55:12; 57:16; 75:1
**2009** [1] 180:4
**2010** [5] 59:4; 97:2; 129:9; 177:5; 178:22
**2011** [1] 38:24
**2012** [1] 39:1
**2013** [1] 39:3
**2017** [5] 39:18; 44:20; 59:12; 67:7, 9
**2018** [2] 105:2, 8
**2019** [3] 39:18; 44:21; 59:12
**2021** [3] 1:22; 2:5; 31:6
**20th** [13] 83:8; 85:12; 88:14; 92:11; 95:21; 96:15; 112:9; 119:2; 125:13; 134:25; 162:13; 163:25
**21st** [3] 83:13; 127:22; 134:15
**2230** [3] 149:7, 25; 152:10
**22nd** [3] 134:17; 142:12; 146:8
**2300** [2] 134:24; 142:20
**23rd** [6] 128:19, 21; 130:4, 7
**24th** [1] 130:7
**25th** [1] 147:25

- 3 -

**30-ish** [1] 185:10
**30XI014420 0** [1] 2:4

- 4 -

**40-plus** [1] 54:1
**42-plus** [1] 85:5

- 5 -

**50126074** [1] 199:22

- 8 -

**824-0439** [1] 158:10

- A -

**A-N-D-Y** [1] 23:23
**a.m.** [2] 2:6; 164:19
**abandoned** [2] 178:3, 6
**ability** [1] 18:4
**able** [4] 32:21; 111:14; 119:23; 189:20
**About** [9] 17:6; 25:8; 90:23; 98:4; 157:2; 164:18; 185:1, 4, 5
**about** [144] 9:25; 10:2, 4, 5; 17:13; 18:24, 25; 20:20; 22:10, 12; 23:7, 13; 26:8, 18; 37:1; 38:1, 8; 41:14; 44:16, 22; 45:7, 18, 25; 46:11, 19; 47:10, 14, 19; 48:1, 3; 49:9, 13; 51:7, 12, 20, 21, 23; 52:8, 15; 71:7, 14; 72:3; 74:5; 75:22; 76:22; 78:1, 21; 79:3, 8, 12;

81:10, 24; 82:16; 83:23; 84:23; 86:17; 88:8, 10, 21; 89:18; 91:20; 92:18; 102:18; 103:7; 108:2; 114:8; 116:17, 25; 118:8, 14; 119:4; 121:12; 122:6; 123:8; 128:2, 22, 25; 129:9, 10; 130:14, 15; 131:12, 19, 22; 132:22; 135:6; 136:10; 138:23; 139:25; 141:13, 14, 16; 142:22; 143:20, 22; 144:6, 10; 145:7, 19, 23, 24; 146:9, 13; 147:13; 148:14; 151:21; 153:16; 155:7; 157:9, 21, 23; 158:1, 19; 161:20; 162:2; 163:1, 12; 164:23; 165:4, 22; 166:5, 7; 173:15; 176:16; 179:12, 14, 22; 180:11, 13, 16; 181:5; 182:20; 183:2; 184:9, 11; 185:2; 186:10; 189:10; 190:10; 197:10, 14, 23

**Absolutely** [1] 152:11

**absolutely** [5] 86:12; 87:25; 92:7; 94:8; 102:11

**access** [1] 194:19

**accountant** [8] 55:13; 56:5, 12, 17; 57:18; 58:2, 11; 59:8

**accurate** [18] 12:1; 121:5; 140:23; 141:9, 11; 143:2, 18, 20; 148:25; 150:15; 151:22, 23; 165:24; 178:11, 19; 197:6; 199:10

**accurately** [19] 12:19; 140:21; 141:7; 143:1; 148:6, 7, 11, 12, 24; 158:13, 23; 159:4; 163:20, 21; 165:23; 166:2, 3; 180:6, 7

**accusation** [1] 46:20

**accusations** [4] 38:2, 9; 83:21; 94:12

**accuse** [1] 197:20

**accused** [6] 79:13; 174:14; 177:2, 4; 178:20, 22

**acknowledge** [2] 8:2, 5

**acquittal** [4] 37:22, 23; 38:7; 48:4

**acquitted** [4] 170:15, 19, 23; 173:18

**across** [7] 82:13, 14; 127:10; 164:10, 14; 175:20; 184:5

**ACTING** [1] 1:11

**Action** [1] 1:2

**action** [2] 199:15, 18

**actually** [4] 102:23; 169:10; 193:11; 194:2

**added** [1] 46:23

**adding** [1] 157:19

**address** [12] 33:10, 13; 34:4, 13; 80:19; 91:5, 7, 8; 140:17; 142:15; 186:15

**adjourned** [1] 198:12

**administer** [1] 8:7

**administered** [1] 8:6

**advised** [1] 104:16

**advising** [1] 140:12

**affect** [1] 18:3

**affecting** [1] 16:14

**affiliate** [3] 36:19, 22, 23

**affirmed** [1] 10:20

**affirms** [1] 9:5

**aforementioned** [1] 199:12

**After** [10] 48:4, 5; 77:24; 85:13, 14, 15; 88:15; 89:11; 93:12; 97:18

**after** [39] 40:18; 48:1; 65:6, 11, 14, 16, 20, 21; 68:21; 69:18, 21; 85:11; 88:13, 23; 93:1; 94:6; 96:15; 97:16; 98:19; 99:10, 12, 14, 15, 17, 19, 23; 127:6, 16; 134:15; 145:5, 6; 148:14; 157:22; 165:8, 11; 177:3

**afternoon** [1] 132:19

**Again** [1] 14:12

**again** [24] 60:7; 61:10; 62:19; 63:6; 68:5; 69:16; 72:14; 77:16; 88:25; 93:9; 105:24; 114:6; 117:1; 125:2; 138:25; 143:25; 149:7; 152:10; 156:6; 171:13; 173:10; 179:21; 193:6; 196:16

**against** [2] 38:9; 181:3

**AGENT** [1] 1:15

**ages** [1] 33:2

**agree** [10] 8:14, 16, 18; 12:24;

13:17; 114:21, 22; 116:21; 149:1; 169:2
**agreed** [2] 168:12, 22
**agreement** [4] 8:10, 11; 75:8, 9
**ahead** [39] 12:5, 12; 13:14; 19:21; 44:25; 46:10; 48:20; 62:18; 65:9; 67:19; 72:6; 89:7; 94:2; 99:1; 106:10; 107:5, 8, 14, 15; 108:14; 109:7; 110:21; 115:11; 116:7; 121:17; 135:13; 136:5, 15; 137:13; 143:14, 25; 151:10, 11; 169:18; 174:6; 175:12; 181:10; 189:12
**Ain't** [1] 46:1
**ain't** [3] 55:23; 159:19; 173:14
**airport** [2] 95:10; 192:9
**Alabama** [2] 22:5
**alcohol** [1] 18:6
**alive** [2] 22:13; 28:14
**allegations** [1] 94:15
**allow** [2] 71:23, 25
**almost** [1] 16:15
**along** [2] 8:22; 191:4
**Already** [1] 59:9
**already** [17] 20:2; 35:24; 49:15, 20; 51:17; 52:7; 61:8, 20; 64:2; 76:15; 119:4; 133:9; 167:11, 24; 168:3; 170:6; 181:16
**Also** [7] 9:22; 12:14; 53:12; 117:22; 127:25; 142:20; 162:16
**also** [21] 9:3; 13:21; 15:8, 11; 24:23; 27:23; 28:16; 29:6; 47:11; 49:5; 58:4; 89:17; 96:14; 106:15; 108:24; 110:5, 19; 126:1; 129:16; 172:22; 191:3
**altered** [20] 136:19; 137:1, 4, 5, 11, 15, 22, 23, 24; 138:1, 7, 10, 14, 21, 22, 23; 139:2; 152:13
**Alvin** [6] 111:6; 126:18, 19; 127:2; 149:10, 25
**always** [2] 95:3; 161:7
**amazing** [1] 129:13
**ambushed** [1] 103:14
**ambushing** [1] 110:17
**Amended** [1] 7:13
**among** [1] 101:2
**amount** [1] 55:18
**Andrew** [1] 23:5
**Andy** [1] 23:23
**ANGEL** [1] 1:10
**Annie** [6] 23:5, 21, 23, 25; 24:6
**anniversary** [1] 29:2
**another** [14] 37:14; 45:18; 46:22; 55:9; 56:2; 95:9; 96:1; 106:8; 122:4; 139:12; 145:22; 152:23; 157:9; 190:19
**ANSWER** [3] 6:3, 20, 23
**Answer** [3] 66:1; 89:7; 136:6
**answer** [108] 12:21; 13:14; 14:7, 17, 18; 15:23; 18:4, 20; 19:24; 20:1, 18; 23:10; 31:25; 32:6, 21; 38:4; 39:24, 25; 41:1, 4; 42:11; 44:25; 48:20; 50:23; 52:19; 53:7; 54:23; 56:4; 57:10, 23; 58:20; 60:7, 24; 61:10; 62:7; 65:9, 17; 67:23; 68:11, 20, 23, 24; 69:2, 16; 71:3, 25; 72:6; 76:25; 77:6, 8; 78:5, 8; 80:6, 8, 12; 89:3; 97:12; 101:6; 105:9, 11; 106:9; 108:22, 23; 109:1; 111:9, 13; 112:20; 113:20; 114:18; 115:8, 9; 117:7; 118:24; 122:22; 125:3; 126:4; 129:18, 20; 135:14; 136:13, 15; 137:8; 138:18, 19; 140:25; 141:1, 3; 143:25; 144:21; 151:22, 25; 155:15; 156:6; 168:5, 9; 171:13; 172:23; 173:9, 11; 176:1; 178:23; 179:20; 181:19; 184:17; 189:12; 194:7; 195:5; 196:16
**answered** [42] 6:7, 15; 20:2; 30:19;

37:17;
43:13;
44:6; 48:9,
19; 49:22;
50:10;
60:6; 61:8,
16; 62:13;
67:23;
69:4, 15;
78:11;
88:6; 98:9;
102:13;
104:17;
132:7;
137:17;
143:24;
145:11, 16;
156:5, 13,
14; 167:16;
168:4, 8;
171:12;
173:8;
174:3;
181:16, 17;
196:15
**answering** [7] 62:16;
98:22, 23;
102:17;
103:7, 13;
160:8
**Answers** [4] 7:10, 13;
100:21;
179:17
**answers** [20] 10:24;
13:25;
17:21;
78:17;
79:4, 6;
95:25;
103:15;
106:15;
107:25;
108:3, 17,
21; 111:20;
122:15;
123:16;
124:16;
180:8, 17
**Anthony** [3] 20:8;
134:22;
154:17
**anticipate** [1] 12:23
**anxiety** [1] 16:13
**Anybody** [1] 104:5
**anybody** [13] 19:7,
8; 31:17;
41:11;
72:24;
73:6;
81:13;
109:20;
128:1;
152:20;
156:18;
195:22
**anyone** [2] 19:17, 18
**Anything** [1] 124:18
**anything** [33] 18:16;
37:1; 38:1,
2; 41:21;
44:12;
46:18;
48:17;
51:8, 12,
23; 52:15;
60:11, 13;
71:14;
74:13;
89:7;
91:13;
95:5;
101:11;
103:11;
106:5;
124:15;
125:4, 9;
127:5;
169:10;
174:3;
181:13;
198:6, 8, 9
**Anywhere** [1] 36:4
**Apartment** [1] 142:14
**apartment** [29] 34:16,
19, 20, 21,
23; 79:17,
18; 80:20;
117:10, 14,
15, 16;
119:4;
188:21, 23;
189:1;
193:4, 15,
19; 194:4,
14, 19, 23;
195:2, 11,
19, 23;
196:10, 13
**apologize** [1] 133:20
**appearing** [1] 8:24
**apply** [2] 110:9, 10
**appreciate** [6] 12:3;
13:12;
42:20;
78:23;
105:24;
188:10
**appropriate** [2] 152:2,
3
**approximate** [6] 6:5;
30:1, 13;
31:7; 66:4;
189:20
**approximately** [10] 6:2; 30:7;
88:14;
122:15, 21;
134:24;
142:20;
148:23;
159:7;
190:1
**approximating** [2] 41:4, 5
**approximation** [2] 6:5;
30:14
**area** [5] 21:7;
85:24;
92:14;
95:4;
149:15
**areas** [1] 76:15
**arguing** [1] 179:1
**Argumentative** [2] 6:15; 43:13
**argumentative** [6] 6:5;
30:12;
43:23;
50:10;
145:9;
156:12
**arose** [1] 126:4
**around** [12] 21:24;
80:24;
81:4, 5, 22;
89:20;
149:12;
164:23;
183:3, 4,
16; 189:6
**arrangement** [1] 8:8
**arrest** [1] 180:20
**arrested** [1] 181:14
**arrival** [1] 148:4
**ASHLEY** [1] 3:5
**Ashley** [3] 9:4;
155:13, 14
**Asked** [20] 6:15;
37:16;
43:12;
44:5; 48:8,
18; 49:22;
50:9; 60:5;
61:7, 15;
62:12;
69:14;
88:5; 98:8;
143:23;
156:4;
167:15;
181:17;
196:14
**asked** [24] 26:23;
50:11;
61:20;
74:24;
75:12;
81:20;
88:4, 7, 10;
97:4;
132:6, 8,
11; 145:24;
156:14;
161:14;
165:6, 11,
13; 168:3;
171:11;
173:12;
174:15;
184:10
**asking** [18] 18:25;
19:3;
51:15, 16;
72:18;
138:9;
146:22;
147:8;
150:25;
160:7;

163:1; 167:25; 169:2; 174:22; 175:4; 178:18; 180:17; 188:7
**asks** [3] 115:10; 179:9, 12
**assignment** [1] 140:1
**ASSISTANT** [3] 1:13; 4:16
**assistant** [1] 157:6
**assistants** [2] 73:3, 4
**associate** [3] 36:8; 47:24; 78:2
**assume** [2] 57:2; 186:21
**assumes** [2] 169:1; 193:6
**assumption** [1] 181:9
**attention** [1] 188:18
**ATTORNEY** [1] 4:5
**attorney** [10] 8:23; 9:19; 14:11, 14, 17; 18:24; 55:13; 73:13; 199:14, 17
**attorney's** [1] 11:9
**attorney-client** [2] 71:22; 72:1
**Attorneys** [4] 3:9, 17; 4:12, 20
**attorneys** [8] 8:1; 9:23; 10:9; 14:11; 19:2, 6, 17; 185:24
**August** [41] 79:14; 80:3; 83:7, 12; 85:12; 88:14; 92:11; 95:20; 96:14; 111:3, 8; 112:3, 9; 117:9, 12, 13, 19, 24; 119:2; 125:13; 134:15, 17, 25; 140:2; 142:12; 146:8; 147:25; 148:19; 155:8; 157:25; 159:2, 7, 14; 162:7, 13; 171:17; 193:2; 196:10, 13, 25
**aunt** [7] 26:16; 120:15; 126:5, 11; 128:6, 11, 13
**aunt's** [1] 128:11
**aunts** [3] 25:25; 26:1; 28:3
**authorities** [1] 59:7
**authority** [1] 59:3
**available** [1] 75:13
**Avenue** [46] 3:15; 40:11, 12; 44:20; 79:16; 80:15, 19, 20; 81:3, 13; 82:2, 4, 12, 15, 18, 22; 111:23; 117:11, 21, 24; 118:5; 120:1; 121:13; 122:9; 123:7; 124:11; 125:15; 134:22; 140:8; 142:14; 148:22; 149:15; 163:14; 172:13; 185:16; 186:18, 19; 187:6, 8, 21, 25; 189:1; 193:4, 12, 16
**aware** [6] 31:20; 32:1; 94:11, 14; 155:24; 156:2
**away** [7] 28:11; 43:22; 55:4; 72:14; 107:7; 112:19; 129:14
**awhile** [1] 37:12
**awkward** [2] 12:22; 14:13

**- B -**

**baby** [1] 117:17
**Back** [5] 59:16; 94:17; 116:24; 154:23; 156:21
**back** [50] 59:11; 63:24; 68:15; 77:11; 81:9, 11, 13, 14, 16, 17; 82:3, 17, 18, 19; 83:2; 88:18; 95:5, 20; 97:3; 108:1, 21; 110:2; 113:15; 117:6; 123:4, 5; 127:7, 17; 129:11; 130:17; 131:20; 132:4; 138:19; 141:21; 142:11; 152:6; 153:15; 157:17; 159:12; 164:11; 165:20; 167:9; 184:8; 185:11, 12; 191:7, 8; 197:24; 198:7
**background** [2] 10:1; 20:5
**backwards** [1] 56:3
**bank** [2] 83:9, 11
**basement** [1] 122:12
**basic** [1] 45:2
**Basically** [1] 46:21
**basically** [4] 21:11; 73:21; 74:4; 191:9
**basis** [1] 37:10
**basketball** [5] 163:13; 165:17; 166:12; 167:6; 183:20
**bear** [1] 100:6
**became** [1] 31:7
**Because** [13] 36:19, 22; 39:14; 49:7; 52:6; 54:14; 66:12; 97:9; 101:17; 102:9; 179:25; 196:5; 197:16
**because** [38] 11:6; 12:16;

19:13; 21:7, 8; 36:16; 50:20; 57:14; 58:24; 59:2; 77:8; 80:25; 83:8, 20; 98:2; 101:25; 102:16; 103:8, 14; 104:10; 106:13; 108:25; 113:7; 120:18; 133:20; 135:18; 138:3; 144:12; 153:6; 163:4; 164:9; 178:12, 20; 180:22; 182:21; 183:18; 184:6; 189:6
**been** [42] 28:23; 29:21; 37:12; 38:17; 39:6, 16; 47:6; 48:5; 52:3; 56:15; 59:14; 60:20; 62:13; 73:25; 85:25; 86:3, 6, 9; 101:25; 103:14; 104:17; 106:14, 16; 124:13; 125:19; 130:7; 137:4; 139:15; 140:8; 152:13; 156:17; 157:2; 161:15; 173:18; 185:2; 193:2, 3, 14; 197:3, 4, 7
**Before** [2] 45:13; 69:21
**before** [49] 2:2; 9:17; 10:14; 37:6, 8; 48:2; 62:23; 65:3, 6, 11, 14, 20; 66:6, 7, 11, 13; 67:2; 69:9, 18, 19; 70:11; 72:22; 80:22; 81:14; 85:10; 88:19; 98:6, 21, 23; 99:22; 121:2; 126:20; 139:23; 155:11; 172:7; 177:2; 178:16; 179:6; 180:19; 182:10; 183:17; 185:2; 193:20; 196:1, 2, 25; 199:11
**beginning** [2] 33:8; 157:18
**begins** [1] 157:21
**behalf** [3] 8:13, 16, 24
**behavior** [1] 175:10
**behind** [2] 49:11; 195:12
**being** [4] 13:7; 43:23; 62:16; 181:14
**belief** [3] 58:10, 15, 22
**believe** [13] 58:6; 59:6; 75:3; 103:1; 106:1; 141:9, 10; 152:12, 14; 154:20; 186:20; 197:18
**believes** [1] 151:23
**Belle** [3] 23:5, 21; 24:12
**benefit** [1] 72:13
**best** [10] 49:18, 23; 50:11, 23; 51:9; 80:1; 88:25; 105:5; 107:2; 135:14
**better** [2] 37:15; 197:8
**between** [14] 39:18; 44:20; 59:12; 62:11; 76:20; 86:7; 87:14, 20; 121:3; 122:13; 185:10, 13; 192:2; 197:7
**beverages** [1] 18:7
**bigger** [2] 109:17; 111:14
**bill** [1] 123:12
**bills** [1] 82:24
**birth** [2] 158:7; 159:24
**birthday** [2] 160:4, 6
**black** [1] 158:6
**blood** [3] 14:25; 15:1; 16:10
**Bob's** [1] 140:17
**BONJEAN** [243] 3:3, 4; 6:4, 6, 10, 15; 8:15; 9:1; 11:24; 12:11; 16:24; 17:12; 18:20; 19:20; 20:1, 16; 23:24; 30:2, 17, 25; 31:22; 37:16; 38:3, 13, 19; 39:23; 40:8, 20, 24; 41:3, 17; 42:11; 43:12, 19; 44:5, 23; 46:6; 47:20; 48:8, 18; 49:21; 50:4, 9, 16; 52:1, 18, 24; 53:11, 23; 56:7, 24; 57:1; 58:17; 59:20, 25; 60:5, 24; 61:7, 15; 62:7, 12, 25; 63:15; 64:11, 18; 65:7, 17, 23; 66:1, 3; 67:17, 22; 68:1, 10, 18, 23; 69:1, 14; 71:2, 20; 72:5; 73:18; 77:3, 6; 80:4; 83:25; 84:5, 13; 85:3, 21; 88:3; 89:2, 6; 92:1; 93:5, 10, 22, 25; 95:22, 24; 96:5; 97:12; 98:8, 20; 100:25; 101:7, 24; 102:3, 15, 21; 103:3, 6, 12, 17;

105:19, 23; 107:3; 108:8, 11, 14; 109:5; 110:5; 111:10, 24; 112:10, 23; 113:3, 10, 14, 18, 22; 115:6, 8, 19, 24; 116:3, 6, 16; 117:3; 118:20, 23; 124:5, 17, 23; 125:8; 129:1, 17; 131:17; 133:13, 17; 134:4, 8; 135:9, 22; 136:1, 5, 12; 137:8, 13, 17; 140:24; 143:12, 23; 144:19; 145:8, 15; 146:16; 147:3, 10, 16, 19, 21; 150:13, 20, 23; 151:4, 6, 10, 13, 16; 152:7; 156:4, 10, 12; 162:4; 166:18, 22, 25; 167:10, 15, 23, 25; 168:2, 8, 24; 169:6, 9, 14, 17; 170:5, 9, 14, 22; 171:1, 4, 11, 24; 172:3, 23; 173:6, 17, 20, 24; 174:2, 6, 11, 17, 21; 175:3, 7, 9; 176:10; 177:20; 178:23; 179:1; 181:4, 16; 187:24; 188:2, 6, 9; 189:9, 15; 192:15; 193:5; 194:5; 195:3; 196:14; 198:1, 10

**Bonjean** [7] 8:15; 50:13; 64:15; 104:9; 105:15; 150:19; 198:9

**Book** [1] 21:6

**BOOKER** [1] 1:7

**Booker** [4] 4:22; 8:19; 9:20; 100:24

**borderline** [1] 15:13

**born** [3] 21:6, 16, 18

**both** [2] 65:22; 102:13

**bottom** [5] 107:24; 110:16; 133:11; 134:1; 139:16

**boxed** [1] 80:21

**boxes** [11] 81:2; 82:8; 119:3, 19; 120:25; 122:3, 10; 149:11, 14; 193:10

**boy's** [1] 96:19

**boys** [69] 29:10; 79:13; 81:18, 24; 82:24; 86:17; 87:6; 92:13, 14; 93:1, 12, 19; 94:5, 13; 96:17, 18; 97:6, 17; 98:6, 7, 19; 99:10, 23; 121:12; 122:3; 123:3, 5, 11, 20; 129:11; 130:16, 17; 132:4, 10; 140:3; 143:4, 11; 144:14, 17; 145:6, 7; 155:8; 157:22; 159:8; 161:11; 162:9, 12; 163:6; 165:9; 171:21; 172:6, 10; 173:5; 174:25; 175:14; 178:14, 21; 180:1, 23; 181:15; 183:3; 186:11; 192:23; 193:1, 3, 9, 14; 195:9

**break** [16] 14:3, 8; 64:12, 22; 82:25; 97:25; 102:16, 25; 103:5; 104:4; 112:24; 113:1, 3, 19, 21; 153:10

**break-in** [2] 97:23; 195:16

**breaks** [1] 14:5

**briefly** [1] 104:7

**Bring** [1] 146:1

**bring** [2] 47:4; 152:5

**bringing** [1] 16:14

**Broad** [1] 4:18

**broad** [1] 20:24

**broke** [4] 36:20; 37:2; 98:16

**Brooklyn** [4] 3:8; 11:12, 13; 19:12

**brother** [1] 28:5

**brothers** [3] 23:8, 11, 12

**brought** [2] 74:5; 183:19

**Budd** [2] 34:2, 4

**building** [5] 34:10; 82:7, 8; 94:21; 97:25

**Bureau** [1] 140:19

**burned** [1] 83:20

**business** [22] 53:4, 5, 6, 10, 20, 21, 24; 54:4, 6, 20, 22, 24; 55:9, 14, 15; 57:17, 24; 91:18

**buying** [1] 80:14

**- C -**

**C.C.R.** [1] 199:20

**California** [1] 55:25

**call** [6] 64:13; 87:2; 140:11; 142:23; 145:19; 146:10

**called** [17] 21:5, 6, 9, 10; 36:9, 11, 14; 46:14; 55:8, 9; 63:4, 10, 18; 81:6; 109:3; 180:3, 25

**caller** [3] 142:23; 145:19; 146:10

**calling** [3] 21:8;

138:15; 166:15
**Camden** [7] 155:21, 24; 156:3, 19; 172:14, 15
**came** [38] 22:5; 42:9; 46:14, 16; 49:1; 55:21; 58:6; 63:19; 66:14; 68:4; 80:25; 81:3, 9, 11, 16; 82:17, 18; 96:17; 97:1, 7; 99:10; 125:14; 129:7, 12; 130:1, 24; 131:10; 138:6; 141:20; 145:21, 22, 23; 146:5; 164:11; 183:19; 185:10, 12
**can't** [14] 19:13; 44:10; 71:1; 104:12, 21; 105:14; 128:8; 133:13, 14; 138:4, 10; 153:22; 174:10
**cannot** [7] 6:15; 13:23; 17:21; 43:14; 103:12, 13; 147:11
**Card** [1] 7:21
**card** [3] 182:4, 10, 15
**care** [7] 103:17; 107:12; 112:25; 129:10; 130:15; 150:19, 20
**Carrega** [3] 3:18; 8:14; 186:9
**case** [18] 6:14; 9:24; 41:19; 43:9, 11; 44:9; 54:18, 19, 21, 22, 24, 25; 74:20; 79:12; 106:15; 110:11; 129:7, 19
**cash** [2] 191:5, 6
**catch** [1] 129:9
**causes** [1] 174:13
**CENTER** [1] 4:7
**center** [6] 175:24; 176:6, 8, 11; 177:22, 25
**Certain** [1] 75:20
**certain** [10] 78:12; 84:20; 86:13; 87:13, 25; 89:17; 92:7; 94:8; 99:18; 128:5
**certainly** [1] 104:2
**Certified** [3] 2:3, 23; 199:3
**certified** [3] 83:9, 11; 100:21
**CERTIFY** [2] 199:9, 13
**certify** [1] 199:4
**cetera** [1] 27:4
**chance** [3] 56:20; 165:18; 167:7
**Chancellor** [3] 35:6, 10; 82:14
**change** [4] 20:11; 123:14; 159:21, 22
**changed** [4] 57:24, 25; 61:19; 146:24
**changes** [2] 76:13; 141:25
**changing** [1] 20:20
**charged** [4] 178:13; 179:25; 180:22; 181:14
**charges** [1] 181:3
**Charlie** [1] 95:3
**check** [3] 83:9, 11; 105:6
**CHERYL** [1] 1:14
**Children** [1] 79:24
**children** [4] 32:22, 24; 79:25; 112:8
**CHRISTOPHER** [1] 1:14
**chronological** [1] 111:1
**circle** [1] 153:15
**circumstances** [1] 11:6
**CITY** [1] 1:6
**City** [12] 4:17, 20, 21; 8:18; 9:19; 75:24; 100:10, 23; 106:5; 114:23, 24; 125:12
**Civil** [1] 1:2
**claimed** [4] 46:23, 24; 49:3; 162:23
**Claire** [2] 25:15, 23
**clarification** [1] 78:22
**clarify** [3] 76:25; 105:21; 184:16
**clarifying** [3] 45:16; 120:11; 122:2
**Clark** [5] 131:1; 142:13; 143:4, 10; 146:9
**clear** [8] 55:7; 69:23; 76:2; 77:15; 86:16; 102:11; 162:3; 184:16
**cleared** [2] 145:16; 188:13
**clearing** [1] 145:14
**client** [3] 43:23; 50:20; 71:24
**Clinton** [39] 79:16; 80:19; 81:2, 13; 82:2, 4, 18, 22; 111:23; 117:11, 21, 23; 119:19; 121:13; 123:4, 7; 124:11; 125:14; 134:22; 140:7; 142:14; 148:22; 149:15; 163:14; 172:12, 13; 185:16; 186:18, 19; 187:6, 8, 21, 25; 188:2, 3; 189:1; 193:4, 12, 16
**close** [1] 192:7
**closed** [1] 83:12

**closer** [1] 176:4
**closet** [7] 98:2; 172:17; 193:21, 23, 25; 196:1, 2
**closing** [6] 80:15; 83:12; 126:25; 127:1, 7, 17
**coach** [2] 169:13, 18
**Coaching** [1] 169:18
**coaching** [1] 169:14
**coerced** [1] 59:19
**COHEN** [1] 3:5
**Cohen** [1] 9:4
**colleagues** [1] 9:4
**collective** [1] 106:16
**come** [16] 14:10; 21:20; 49:17; 51:21; 55:19; 70:18; 112:3, 16; 126:20; 127:6; 128:20; 129:15, 22; 130:22; 176:4; 187:12
**comes** [2] 6:7; 30:18
**coming** [6] 19:10; 59:13, 17; 81:11, 17; 109:21
**commencement** [1] 199:5
**commencing** [1] 2:5
**communicate** [1] 29:17
**communicating** [1] 133:6
**communication** [1] 72:1
**communications** [1] 72:3
**community** [2] 180:2, 23
**complaints** [3] 39:15; 179:13, 15
**complete** [1] 12:21
**completely** [2] 89:1; 111:2
**COMPLEX** [1] 4:8
**Compound** [1] 38:14
**concern** [2] 83:7, 10
**concerning** [1] 9:16
**conclusion** [3] 10:6, 8; 13:8
**Condominium** [1] 34:18
**conference** [2] 11:5; 12:17
**confessed** [1] 75:2
**confident** [4] 84:3, 10; 85:19; 91:23
**confirm** [3] 92:16, 17; 93:4
**confront** [3] 197:9, 14, 18
**confronted** [1] 11:22
**confused** [8] 16:17; 35:9; 69:5; 132:21; 180:21; 183:2, 22; 185:9
**confusing** [1] 69:22
**confusion** [1] 188:12
**connected** [1] 95:14
**connecting** [1] 82:21
**connection** [1] 106:23
**consciousness** [2] 176:13, 17
**consent** [1] 8:8
**conspiracy** [7] 55:20; 58:5, 10, 24; 59:2, 4; 138:6
**conspired** [2] 59:5, 7
**Construction** [2] 55:10; 157:1
**construction** [5] 53:2, 18; 91:18; 94:20; 142:18
**consult** [1] 71:24
**contact** [1] 140:18
**Conte** [1] 158:5
**continuation** [1] 187:20
**continue** [3] 148:8; 149:6; 169:10
**continuing** [2] 163:10; 167:24
**contract** [1] 118:4
**contractor** [1] 197:24
**contradict** [1] 138:2
**contradicting** [1] 141:24
**contradicts** [1] 144:1
**control** [1] 167:1
**conversation** [43] 36:17; 37:3, 10; 38:11, 16; 40:4; 41:8; 44:19; 45:11, 14, 15, 18, 19, 21, 22, 24; 46:12, 13, 16, 18; 47:4, 8, 11; 49:2; 50:22; 51:24; 52:16; 59:11, 16; 62:11; 63:11; 65:5, 14; 71:8; 73:16; 74:8; 95:12; 97:16; 98:13, 18; 120:19
**conversations** [9] 19:1; 44:16, 21; 45:7; 47:15, 17, 25; 70:20; 77:25
**COOLBAUGH** [1] 3:6
**Coolbaugh** [1] 9:4
**Copy** [1] 7:21
**copy** [1] 102:18
**Corey** [1] 8:19
**corner** [7] 81:6; 82:19; 186:18; 187:1, 10, 14, 17
**CORPORATION** [2] 4:14, 16
**Correct** [22] 11:2; 27:22; 28:8; 78:16; 84:19; 89:12; 118:7; 119:11; 120:22; 122:19; 123:10, 22; 161:18; 163:8; 178:2; 186:21; 189:3; 194:15;

195:16, 17, 21; 196:7
**correct** [54] 11:1; 28:12; 42:17; 63:5; 69:6, 17; 78:14; 94:14; 111:23; 112:8, 14; 115:5; 118:6, 9; 119:5, 20; 120:4; 122:11; 123:1, 9, 12, 17, 21; 125:15; 138:12; 141:7, 10; 144:7, 8, 10, 11; 147:1; 149:5; 161:17; 162:14; 164:1; 165:25; 166:9; 167:18, 19; 168:23; 169:22; 170:1; 178:25; 188:21; 189:2; 191:11; 194:4, 14; 195:20; 196:6
**CORRECTION** [1] 4:7
**correctly** [7] 148:17; 149:16, 17, 20; 158:18; 159:10, 11
**CORREGA** [1] 1:15
**correspondence** [1] 63:18
**CORRETEGA** [1] 1:14
**CORY** [1] 1:7
**Cory** [2] 4:22; 100:23
**Could** [7] 39:6; 60:20; 86:3, 6; 154:8; 194:19; 197:3
**could** [23] 6:3; 29:6; 30:9; 38:17; 39:16; 47:6; 48:5; 56:20; 59:25; 71:21; 85:24, 25; 86:9; 101:19; 120:18; 126:9; 130:7; 138:20; 146:24; 154:8; 169:18; 178:16; 197:7
**couldn't** [8] 32:18; 37:11, 18; 43:6; 49:17; 60:8; 99:24; 142:7
**COUNSEL** [2] 4:14, 16
**counsel** [5] 8:8; 103:18; 110:18; 199:15, 17
**Counseling** [2] 176:7
**counseling** [1] 176:5
**COUNTY** [5] 1:11, 12, 16
**County** [1] 182:5
**couple** [3] 26:19; 95:16; 189:23
**couple-minute** [1] 64:12
**course** [1] 137:7
**COURT** [1] 1:1
**Court** [4] 2:3; 113:15; 150:23; 199:3
**court** [19] 9:17; 12:18; 13:4, 22; 56:21; 72:13; 102:8, 18, 22; 103:8, 19; 107:12; 110:7, 9, 19; 152:2; 165:18; 166:12; 167:6
**court's** [1] 103:25
**courtroom** [1] 14:15
**cousin** [16] 26:24, 25; 27:3, 8, 16, 20; 28:2; 81:1; 153:19; 159:1, 14; 161:6; 162:9, 10; 163:6; 171:16
**cousin's** [2] 27:8; 120:12
**cousins** [11] 22:11; 27:6; 89:21; 119:8, 23; 120:16, 19; 162:11; 163:5; 171:18; 184:11
**crawling** [1] 21:7
**crazy** [1] 52:11
**cream** [17] 82:23, 25; 85:8; 87:11; 88:16; 93:14; 123:6, 12, 13, 20; 132:16, 18; 152:21; 186:10, 13, 20; 187:15
**create** [1] 196:20
**credit** [2] 190:24; 191:1
**crimes** [1] 174:14
**criminal** [7] 10:5; 54:25; 73:22, 23, 25; 74:5, 6
**Crippled** [1] 53:5
**crippled** [1] 53:8
**crippling** [1] 54:15
**CROSS** [1] 7:3
**CROSS-EXAMINATION** [1] 186:5
**cross-examination** [1] 170:11
**Cross-reference** [1] 162:22
**cross-reference** [3] 162:18, 19; 172:21
**crossing** [1] 159:20
**crying** [2] 174:10, 16
**CUCINELLO** [1] 1:14
**curious** [1] 35:23

- D -

**DARNELL** [2] 1:9; 5:3
**Darnell** [2] 4:23; 8:19
**Darryl** [16] 27:17; 28:6, 14; 89:21; 91:2; 119:9; 126:14; 159:9; 161:11; 162:9; 171:17; 184:12, 13, 15, 18, 19

**Darryl's** [1] 28:5
**Date** [1] 158:7
**date** [10] 21:15; 29:1; 45:8, 10; 105:8; 106:24; 112:2; 134:14; 159:24; 199:12
**Dated** [1] 199:24
**dated** [1] 105:1
**dates** [1] 105:16
**daughter** [1] 139:4
**dawn** [1] 96:25
**days** [1] 99:16
**dealing** [2] 6:10; 30:25
**Death** [7] 175:23; 177:8; 178:12, 20; 180:4, 25; 181:13
**December** [2] 29:3; 160:5
**declaration** [1] 107:20
**Defendant** [3] 3:17; 9:2
**defendant** [1] 104:19
**Defendants** [3] 1:19; 4:20; 100:23
**defendants** [1] 9:24
**defense** [1] 110:10
**Definitely** [1] 164:9
**definitely** [3] 77:7; 92:17; 95:16
**DEFRANCISCI** [1] 1:16
**delay** [1] 107:15
**DEPARTMENT** [2] 1:7, 18
**Department** [2] 4:17, 22
**department** [4] 131:11, 14, 16; 137:25
**DEPOSITION** [1] 1:5
**Deposition** [1] 7:23
**deposition** [29] 8:2, 3, 4; 9:3, 15, 22; 10:14; 11:15; 12:4; 13:9, 11; 18:11, 15; 19:4, 8, 12, 14, 17; 33:9; 52:10; 103:11; 107:15; 110:17; 118:9, 21; 122:16; 123:8; 161:15; 198:12
**depression** [1] 16:12
**deputies** [1] 8:23
**describe** [1] 157:6
**Description** [1] 7:9
**despite** [3] 101:18; 103:22; 110:6
**destroyed** [1] 54:24
**detail** [3] 42:23; 50:21; 111:3
**DETECTIVE** [7] 1:8, 9, 14, 15, 18
**Detective** [12] 9:19; 139:22; 142:13; 143:10, 16; 148:1, 15; 149:22, 23; 158:5
**detective** [2] 131:4; 146:23
**Detectives** [4] 131:1; 140:14; 142:16; 143:3
**detectives** [20] 6:18, 19, 21; 131:5, 6, 12, 15; 142:22; 144:16, 18, 23; 145:18; 146:13, 23; 150:1, 4, 5, 7; 152:9, 17
**determined** [1] 170:7
**Diabetes** [1] 15:8
**diabetes** [3] 15:7, 11, 17
**Didn't** [1] 180:19
**didn't** [68] 6:20; 17:1; 18:17; 19:23; 24:21; 29:5; 42:13; 43:4; 46:25; 47:10; 49:7; 53:7, 13; 54:23; 56:13, 14; 58:19; 59:24; 71:14; 72:2; 83:8; 88:12; 91:7, 24; 93:8; 94:9, 18; 96:25; 111:16; 113:11; 114:4, 21, 22; 115:2; 116:9, 16; 121:23, 25; 127:9, 13; 128:5, 7, 9, 20; 129:8; 130:2; 133:20; 135:18; 138:17, 18; 146:4, 23; 150:7, 14; 151:21; 153:6; 156:9; 158:16; 165:4; 166:16; 173:4; 176:1; 180:13; 181:19; 191:12; 197:14; 198:8
**difference** [1] 46:2
**different** [11] 11:3; 20:25; 35:15; 45:8, 10; 74:12; 82:10; 119:13; 121:21; 133:19; 168:6
**differs** [1] 11:20
**difficult** [2] 63:8; 106:22
**difficulties** [1] 35:20
**DiFRANCESCO** [3] 4:4; 8:21; 186:2
**DiFrancesco** [1] 8:22
**DIRECT** [1] 7:3
**DIRECTOR** [1] 1:8
**director** [1] 9:21
**disagree** [6] 112:22; 124:16, 20, 21; 125:5, 10
**disappearance** [1] 29:9
**disappearances** [1] 128:2
**disappeared** [8] 87:7; 97:17, 18; 98:7, 19;

99:23; 112:9; 128:8
**disappearing** [2] 134:16; 145:6
**discovery** [6] 74:10; 101:13; 102:13; 104:16; 162:23
**discuss** [5] 67:14; 69:12; 70:15; 75:18; 103:21
**discussed** [12] 19:14, 16; 32:2, 4, 7, 13, 17; 37:25; 38:12; 41:13, 14; 46:19
**discussion** [2] 39:21; 64:19
**discussions** [1] 38:8
**disk** [2] 105:25; 110:15
**distance** [1] 63:8
**distribute** [2] 192:12, 24
**DISTRICT** [2] 1:1
**DIVISION** [1] 4:6
**divorce** [1] 31:18
**document** [31] 100:9; 105:2, 4; 106:17; 107:11; 108:13; 109:2; 114:5, 10; 115:4, 23; 133:9; 134:10; 137:4, 5, 11, 15, 22; 138:14, 20, 23, 25; 139:1, 13, 14; 147:4; 157:9, 11; 158:8; 179:6; 181:22
**documented** [2] 6:22; 150:9
**Documents** [1] 18:12
**documents** [13] 18:10, 14; 19:4; 75:8, 12; 100:3; 101:2; 104:9; 110:17; 136:19, 25; 138:8, 12
**Does** [4] 15:10; 57:4; 86:19; 105:11
**does** [8] 31:15; 67:11; 105:13; 119:13; 120:8; 162:20; 176:15, 16
**Doesn't** [1] 58:16
**doesn't** [6] 36:16; 58:21; 107:5; 108:23; 150:16; 173:20
**doing** [10] 25:16; 41:15; 94:23; 95:18; 114:24; 156:25; 170:6; 174:18; 191:2
**dollars** [2] 55:18; 189:24
**done** [7] 12:23; 50:23; 52:6; 115:24; 122:25; 153:9; 182:21
**door** [4] 82:8; 172:18, 20; 195:12
**doors** [3] 82:4; 91:4; 120:14
**dormant** [1] 178:7
**double-check** [1] 106:2
**doubt** [2] 87:24; 136:17
**down** [22] 12:18; 13:7, 23; 16:15; 33:3; 39:5; 52:9; 82:18; 91:4; 100:13; 104:23; 114:21; 115:3, 14, 16; 120:14; 122:4; 130:22, 24; 131:10; 136:23
**downtown** [1] 130:21
**driving** [3] 19:12; 91:11; 120:12
**drop** [3] 171:9; 184:23, 24
**dropped** [22] 85:15; 88:15, 20; 93:12; 134:23; 135:2; 136:10; 139:7; 143:4, 10; 144:14, 17; 145:7; 148:21; 149:14; 152:18, 21; 165:21; 169:24; 185:6; 186:11
**drove** [5] 81:5; 122:9; 149:8, 12; 163:17
**drug** [1] 189:8
**drugs** [12] 192:4, 11; 195:1; 196:1, 2, 9, 12, 22; 197:1, 10
**duly** [1] 199:6
**During** [2] 46:17; 47:4
**during** [4] 13:10; 103:11; 159:2, 14


- E -


**Each** [2] 190:3, 4
**each** [6] 82:10; 89:4; 142:24; 145:20; 146:11; 162:24
**Eagle** [2] 34:14
**Earl** [1] 153:22
**earlier** [21] 45:19, 21, 23; 80:25; 90:7, 19; 101:10; 118:8; 121:14, 19; 122:16; 123:1, 2, 8, 17, 18, 21; 126:12; 161:14; 165:5; 195:14
**Early** [2] 183:7, 8
**early** [8] 126:4; 148:21; 164:2, 9, 11, 12, 16; 183:18
**East** [1] 149:8
**Eddie** [2] 95:14; 192:8

**Eddie's** [1] 192:10
**edit** [1] 76:11
**editorializing** [3] 46:7; 109:6; 189:10
**EDWARD** [1] 1:16
**effect** [2] 50:2; 75:25
**eight** [1] 22:2
**else** [30] 36:4; 41:11, 21; 44:12; 48:17; 49:3; 51:23; 52:15; 64:1; 71:14; 72:24; 73:2, 6, 11; 104:5; 124:15, 18; 125:4, 9; 127:5; 128:1, 5, 7; 132:4; 136:20; 147:12; 164:8; 174:4; 195:23; 198:8
**emotional** [1] 174:13
**employee** [2] 199:14, 16
**EMPLOYMENT** [1] 4:7
**endeavor** [1] 105:5
**enough** [6] 72:5, 19; 173:15; 188:25; 193:8
**entered** [1] 195:19
**entirely** [1] 150:25
**entity** [1] 58:11
**entries** [1] 98:1
**entry** [3] 157:23; 158:1, 2
**equipment** [1] 197:25
**Ernest** [5] 92:10, 22; 111:7; 149:10, 25
**especially** [1] 12:16
**essence** [3] 43:5, 7
**ESSEX** [5] 1:11, 12, 16
**Essex** [1] 182:5
**estate** [3] 35:2, 4, 16
**Estimate** [1] 188:25
**estimate** [2] 37:15; 196:9
**Estimated** [1] 188:24
**EUTSEY** [1] 1:15
**EVANS** [3] 1:3, 6; 9:5
**Evans** [91] 7:12; 9:10; 13:1, 2; 20:8; 22:18, 20, 24, 25; 23:6; 24:11, 20, 22; 27:7; 46:9; 50:7; 51:3; 53:15, 17; 55:9, 17; 64:21; 65:2; 79:10; 91:17; 94:11; 100:8, 10, 21; 106:12; 107:17; 109:11; 110:4, 24; 111:12; 113:25; 114:16; 115:1; 116:13; 117:9; 133:8, 10, 11; 134:10, 22; 135:1; 136:8; 139:6, 14; 140:7; 142:15, 16, 21; 144:12, 14; 147:6, 24; 148:5, 9, 13, 19; 149:7, 22; 150:22; 151:7, 11, 20; 153:13; 159:1, 3, 9, 14, 23; 160:10; 163:17; 165:21; 167:22; 168:11; 169:16, 21; 170:21; 172:5, 9; 174:9; 175:22; 185:21; 186:3, 8
**Evans-1** [5] 100:15; 114:18; 179:17, 18, 19
**Evans-10** [2] 181:22; 182:1
**Evans-2** [3] 109:4; 110:1; 179:6
**Evans-4** [1] 139:15
**Evans-5** [4] 133:10, 23, 24
**Evans-7** [1] 157:12
**Evans-9** [1] 177:13
**Even** [1] 139:3
**even** [7] 40:15; 62:1; 106:4; 127:9; 152:25; 166:17; 181:6
**event** [1] 102:6
**events** [3] 10:4; 83:20; 84:11
**Eventually** [1] 62:15
**ever** [30] 10:13; 20:9, 14, 25; 32:13; 55:8; 56:9; 63:13; 78:4, 7, 10; 88:22; 89:24; 90:1; 101:17; 127:16; 130:25; 131:7; 132:23; 156:17; 182:8, 9; 193:2, 3, 14; 194:21, 25; 195:8; 197:9
**Every** [1] 141:23
**every** [6] 12:20; 33:25; 72:16; 84:20; 108:2; 141:23
**everybody** [1] 141:23
**everyone** [1] 13:16
**Everything** [4] 33:13; 57:19; 180:15, 18
**everything** [16] 12:18; 13:7; 33:12; 49:3; 51:11; 55:15, 17; 57:21; 58:8; 75:12; 80:17, 21; 119:3; 136:20; 139:2, 3
**evidence** [3] 169:2; 193:6; 195:16
**exactly** [4] 41:16; 43:3; 75:17; 89:9

**EXAMINATION** [1] 9:8
**examination** [1] 199:6
**Except** [2] 121:17; 158:11
**exchange** [2] 61:14, 19
**exclusively** [1] 22:7
**Excuse** [2] 63:3; 103:10
**excuse** [3] 47:17; 123:4; 172:14
**Exhibits** [1] 7:23
**Explain** [1] 41:16
**explain** [9] 11:18; 20:12, 19; 26:19; 27:2; 42:21; 58:9; 59:13; 109:10

**- F -**

**F-R-A-N-C-E-S** [1] 28:21
**Fabyan** [27] 81:12, 17; 82:1, 20; 83:1; 90:12, 25; 91:1; 119:8; 120:14; 123:6; 126:7; 144:15; 148:22; 149:15; 164:15; 175:17; 183:4, 9, 10; 185:7; 187:5, 8, 18, 19, 20
**face-to-face** [7] 47:7, 11, 16, 23; 70:6, 9, 14
**fact** [7] 12:16; 18:2; 39:10, 12; 101:4; 143:17; 158:11
**facts** [2] 169:1; 193:6
**failure** [1] 103:22
**Fair** [5] 72:18; 78:22; 188:25; 193:8
**fair** [6] 16:7; 19:11; 29:8; 32:12; 72:5; 83:21
**false** [1] 47:2
**falsely** [3] 174:14; 179:25; 180:22
**falsified** [7] 6:21, 23; 136:19; 137:2; 149:19; 150:9, 11
**family** [4] 21:21; 22:12; 128:14; 192:7
**Fantastic** [1] 27:16
**fast** [1] 108:4
**father** [7] 22:25; 23:13; 126:18; 127:20; 154:14, 15
**father's** [3] 22:16; 26:8
**feedback** [1] 19:15
**feel** [6] 50:21; 83:23; 84:3, 10; 116:2; 170:15
**fight** [2] 165:20; 167:8
**file** [6] 55:24; 56:13, 14; 102:10; 139:1; 182:5
**filed** [5] 9:16; 31:17; 39:15; 55:23; 134:13
**financial** [1] 35:20
**financially** [1] 199:18
**find** [4] 51:10; 55:19; 76:18; 120:19
**fine** [5] 64:16; 92:4; 147:18; 168:9
**finish** [11] 12:19, 20; 67:23; 89:2; 93:21, 22, 25; 98:21, 22; 146:6
**Finished** [1] 164:14
**finished** [4] 115:16; 116:10; 164:10, 20
**fire** [2] 138:1; 173:2
**firm** [2] 19:7; 56:19
**FIRST** [1] 4:16
**First** [11] 7:11; 10:20; 27:20; 28:2; 114:14; 142:9, 25; 158:2; 163:19; 166:6; 169:1
**first** [50] 10:2, 16; 14:7; 22:1; 27:5; 46:10, 11, 13, 17; 47:4; 62:10; 66:18; 69:25; 70:1, 2; 80:14, 22, 23; 87:4; 100:20; 106:17; 108:5, 25; 109:3; 111:22; 114:23; 118:3, 14; 122:11, 12; 128:16, 22; 136:13, 16; 139:18, 20; 140:1, 20; 141:6, 15, 20; 148:23; 153:24; 158:1; 163:11; 166:1; 179:9, 23; 182:11
**five** [31] 25:8; 29:10; 32:25; 79:13; 92:14; 94:13; 111:5; 121:12; 140:2; 157:20; 159:8; 161:11; 162:8, 11; 163:6; 171:20; 172:5, 9; 173:5; 178:13, 21; 179:8, 21; 180:1, 23; 181:14; 184:4; 192:23; 193:1; 195:9
**five-minute** [3] 64:22; 104:4; 153:10
**floor** [6] 82:7, 10; 121:22, 24; 122:11, 12

**Florence** [5] 127:4; 133:5; 141:16
**Florham** [1] 3:16
**focus** [1] 188:17
**follow-up** [2] 101:10; 185:25
**followed** [2] 101:14; 106:4
**follows** [1] 9:7
**foolish** [1] 95:17
**foot** [1] 147:17
**foregoing** [1] 199:9
**Forgive** [1] 116:9
**forgive** [2] 46:4; 63:7
**forgotten** [1] 63:10
**Form** [14] 6:7, 11; 20:16; 30:19; 31:2, 22; 39:23; 40:8; 49:24; 52:24; 53:14; 63:16; 144:20; 172:3
**form** [50] 6:6, 9, 16; 12:9, 10; 19:21; 30:16, 23; 38:3, 13; 41:17; 43:16, 21; 44:23; 46:6; 47:20; 52:1; 53:12; 54:9; 57:9; 58:17; 59:20; 62:14; 65:7; 73:18; 80:4; 83:25; 84:5, 13, 14; 85:21; 92:2; 98:25; 112:10; 117:3; 124:17; 129:1; 131:17; 135:10, 12; 136:14; 143:12; 144:19; 146:17; 150:14; 169:7; 171:24; 175:6; 192:16; 195:3
**formal** [2] 20:25; 21:1
**FORMER** [4] 1:6, 7, 11, 12
**former** [1] 100:23
**formulated** [3] 6:14; 43:8, 10
**forward** [4] 56:3; 59:14, 17; 147:23
**found** [5] 77:2; 96:19; 130:19; 145:23; 148:5
**Foundation** [14] 6:7; 19:21; 20:17; 30:19; 31:23; 63:16; 65:8; 73:19; 112:11; 131:18; 143:13; 144:20; 172:3; 195:4
**foundation** [10] 44:24; 67:18; 68:19; 80:5; 111:25; 117:4; 124:18; 146:18; 192:16; 196:20
**four** [3] 23:9, 11; 124:14
**frame** [1] 58:24
**Frances** [3] 28:20; 29:13; 33:6
**fraud** [2] 56:5; 57:8
**Freehold** [1] 55:14
**friend** [2] 95:9; 192:7
**From** [1] 33:3
**from** [57] 11:20; 15:11, 12; 22:5; 31:7; 50:22; 54:19, 21; 56:4; 61:22; 71:17; 75:1, 24; 81:2, 5, 9, 11, 20, 23, 25; 82:1, 4; 83:6; 94:14; 96:22, 24; 97:2; 101:11; 104:8, 15; 105:16; 106:5, 6; 112:3, 16; 119:19; 120:13, 14; 122:4; 125:14; 127:6, 17; 139:18; 140:11; 145:21; 146:5; 157:24; 175:2, 16; 183:18; 188:20; 190:15; 191:16; 193:10; 196:22; 197:1
**front** [2] 138:12; 184:7
**full** [2] 20:7; 135:18
**fully** [2] 72:15, 16
**funded** [1] 180:4
**funny** [5] 166:19, 21, 22, 23
**FURTHER** [2] 199:9, 13
**further** [8] 8:5; 140:5, 9, 14; 142:21; 149:7; 185:21; 198:6

**- G -**

**game** [1] 123:24
**games** [2] 81:8, 10
**garage** [2] 34:25; 35:1
**GARRY** [1] 1:8
**Garry** [3] 4:23; 8:20; 9:21
**GARY** [1] 4:15
**Gary** [7] 8:17; 9:18; 64:11; 105:3, 7, 16; 109:22
**gasoline** [1] 197:25
**gave** [17] 16:13; 33:9; 40:25; 55:24; 74:17, 21; 75:11; 77:24; 79:5; 82:23; 123:11; 141:22; 168:17; 173:14, 16; 191:1
**gears** [1] 79:9
**geez** [1] 169:17

**GENERAL** [1] 4:5
**General** [4] 53:15, 17, 18; 55:17
**general** [1] 197:23
**generals** [1] 8:23
**Genius** [1] 21:10
**getting** [7] 19:14; 57:20; 106:14; 126:17; 129:13, 19; 132:21
**Gibson** [5] 95:14; 148:10, 16; 149:24; 192:8
**girl** [1] 75:24
**Give** [1] 191:7
**give** [38] 10:14, 18, 22; 11:20, 21; 12:20; 16:2; 17:21; 18:4; 32:21; 33:1; 37:11, 15; 42:5, 14; 44:12; 46:25; 49:18; 72:16; 74:7, 13, 14, 16, 19; 75:1, 7, 13, 14; 77:7; 80:12; 123:14; 182:20, 22; 190:24, 25; 191:19, 22, 24
**given** [1] 142:15
**gives** [1] 151:24
**giving** [3] 50:21; 75:4; 152:24
**glasses** [1] 134:8
**goes** [5] 33:12, 13, 14; 34:1; 141:3
**going** [139] 6:4, 9, 10; 9:25; 10:3, 18; 11:24; 12:12; 14:18; 19:13, 20; 22:11; 30:11, 22, 23, 24; 50:12, 19; 52:6; 53:11; 56:2; 58:13; 62:6, 14, 15; 64:22; 69:22; 70:16; 71:20; 72:14; 74:20; 75:19; 76:6, 9, 15; 79:9; 81:13, 20; 82:3; 84:22; 88:3; 89:10; 92:1; 93:9; 94:4; 95:24; 96:4; 98:24; 100:3, 13, 25; 101:1, 7, 8; 102:6, 16; 104:2, 22; 107:4, 14; 108:1, 2, 4, 20, 25; 109:1, 11; 110:5, 15, 23; 111:9; 112:2, 24; 113:1, 18; 114:16; 115:14; 116:20; 127:1; 128:7; 129:18, 20; 133:8; 134:11, 12, 19; 135:12; 136:12, 13; 139:17; 140:5; 142:9, 10; 146:16, 17; 147:13; 150:13; 151:1, 8, 18; 157:19; 158:2; 159:21; 160:9; 161:4; 163:12; 166:25; 168:24; 169:8, 9; 170:17, 22; 171:5; 177:20; 179:5, 7, 20, 23; 181:4; 182:3, 7, 19, 20; 186:7; 189:9, 22; 190:18; 191:19, 20, 22; 192:3, 11, 12, 19
**gone** [4] 20:9, 14; 21:4; 123:24
**Good** [4] 8:20, 21; 9:10, 14
**good** [3] 32:12; 53:6; 173:15
**gray** [1] 91:12
**Great** [2] 153:15; 188:14
**great** [1] 25:17
**green** [1] 121:7
**Greeting** [1] 7:21
**Greg** [3] 159:9; 161:12; 162:10
**grounds** [3] 6:5; 30:12; 71:21
**GROUP** [1] 3:3
**group** [1] 184:6
**Grove** [3] 82:4, 13, 14
**grown** [1] 174:21
**GUARINO** [1] 1:13
**guess** [23] 16:3; 23:22; 24:8; 29:23; 30:1; 31:9; 32:6; 40:20; 47:10; 53:7; 55:24, 25; 57:11; 66:4; 83:1; 88:20, 21; 106:23; 133:1; 181:8; 183:22; 185:9; 192:2
**guessing** [1] 40:22
**guilty** [2] 170:25; 172:7
**guys** [7] 95:2; 134:21; 157:2; 165:17, 19; 167:6, 8

**- H -**

**habit** [1] 195:12
**HADLEY** [3] 1:8, 10; 5:2
**Hadley** [4] 4:23; 8:19; 9:2, 20
**hadn't** [1] 124:13
**Hairston** [9] 97:4; 129:6; 130:10; 131:9; 132:2; 139:19; 142:2; 148:1; 149:23
**Hairston's** [1] 139:22

**HALEY** [1] 3:6
**Haley** [1] 9:4
**Hall** [1] 127:15
**Hammer** [1] 103:20
**Hampton** [71] 24:19, 20; 25:3, 14; 26:5, 7, 11, 20; 36:7; 38:1, 8; 41:8; 45:20; 47:15, 17; 48:15; 51:6, 10, 13, 14, 24; 52:16; 59:12, 13; 65:4, 5, 14; 67:6, 9, 15; 69:9; 70:15, 21, 23; 71:19; 72:22; 74:8; 75:2, 9, 15, 19; 76:6, 18, 21; 77:2, 18, 21, 24; 78:4, 7, 18; 79:5, 6; 91:20, 24; 92:8; 159:13; 160:11, 18, 19; 161:1, 2, 6, 8, 15; 162:11; 166:7; 167:14
**Hampton's** [2] 159:24; 160:20
**handwriting** [1] 153:23
**happen** [2] 126:22, 23
**happened** [17] 45:23; 56:1, 11; 58:8; 59:3; 80:3, 18; 83:18; 94:19; 95:1, 20; 96:7, 14; 121:2; 129:4; 152:15; 176:18
**happening** [3] 49:16; 113:5; 127:8
**happily** [1] 20:23
**happy** [5] 13:13; 14:4; 68:7, 9; 99:7
**harass** [1] 50:20
**harassed** [1] 52:10
**harassing** [7] 43:23; 49:22; 50:10, 24; 145:9; 170:9; 173:9
**hard** [5] 55:5; 56:18; 137:19; 141:2; 156:11
**haven't** [3] 32:4; 51:25; 52:16
**having** [3] 23:22; 101:18; 147:17
**he'll** [1] 113:20
**He's** [4] 49:5; 116:6; 147:16; 192:8
**he's** [2] 46:22; 170:14
**head** [3] 18:12; 21:8; 129:8
**hear** [19] 9:12; 19:23; 24:21; 53:7, 13; 54:23; 56:18; 58:19; 59:24; 89:7; 107:19; 111:16; 113:25; 137:20; 138:17, 18; 153:13; 176:1; 181:19
**heard** [5] 30:4; 142:22; 144:9; 146:9; 176:11
**hearing** [1] 23:22
**heating** [1] 53:1
**help** [7] 12:4, 17; 81:2; 120:25; 142:17; 149:11; 174:10
**helped** [2] 73:22; 193:10
**Helper** [1] 157:7
**helper** [1] 157:8
**helpful** [1] 78:11
**HENRY** [2] 1:9; 5:3
**Henry** [9] 4:23; 8:19; 9:2, 20; 154:18, 19, 20, 22
**Herbal** [2] 17:9, 10
**Here** [2] 40:24; 115:6
**here** [47] 6:21; 9:14, 24; 10:22; 13:5; 14:16; 19:10, 15; 26:19; 35:5; 41:19; 45:3; 52:7, 9; 54:18; 75:25; 99:21; 100:15; 101:1; 103:23; 117:6; 120:4, 5, 7; 121:21; 122:3, 14, 24; 123:23; 134:3, 20; 136:18; 138:6, 7; 141:17, 22, 25; 150:8; 151:15, 24; 152:3; 163:2; 170:16; 174:10; 180:19, 21; 196:20
**hereby** [1] 199:4
**Hideaway** [4] 81:6; 120:1, 9; 123:24
**High** [2] 14:25; 15:1
**high** [2] 15:9; 16:10
**himself** [1] 192:13
**Hobson** [17] 83:2, 4, 6, 15; 88:18, 23; 89:11; 93:2, 16; 94:6; 117:22; 118:2; 124:2; 144:13; 148:3, 4
**Hold** [8] 67:17; 93:22; 98:21; 100:25; 146:16; 147:10; 177:18; 181:21
**hold** [2] 50:17; 192:16
**home** [5] 51:19; 120:14; 126:20; 185:14, 15
**homicides** [1] 177:3
**honest** [3] 10:22, 25; 18:4

**hours** [18] 17:18; 18:7; 134:24; 142:20; 148:23; 149:2, 3, 7, 25; 159:8; 162:8, 12; 163:7; 165:22; 166:4; 169:25; 171:10
**house** [31] 33:24; 34:22, 24; 79:17; 81:15; 83:16; 90:10, 14; 91:3; 96:19; 120:12; 124:2, 3, 4, 5, 6; 134:24; 141:20; 159:7; 161:10; 162:7, 13; 163:7; 165:22; 171:17, 21; 173:2; 193:12; 194:11
**HUGHES** [1] 4:8
**hundred** [1] 189:24
**Hunterdon** [4] 155:4, 9, 10; 158:9
**husband** [1] 24:25
**hypothetical** [2] 12:2, 6

- I -

**I'll** [10] 20:23; 52:5; 104:23; 110:24; 111:13; 125:6; 133:15; 151:15; 177:6; 184:3
**I've** [1] 133:9
**idea** [1] 191:4
**ignorant** [1] 176:16
**important** [2] 12:14; 92:19
**improper** [3] 144:20; 146:18; 150:25
**improperly** [1] 4:21
**in-laws** [3] 83:16; 89:12, 13
**in-person** [4] 65:13; 66:22; 67:1; 70:5
**inaccurate** [9] 141:13; 143:22; 144:6; 145:10; 150:17; 152:24; 153:6; 166:5; 180:16
**inappropriate** [3] 12:7; 151:19; 152:1
**includes** [1] 104:18
**including** [1] 111:4
**inconsistencies** [2] 138:3; 139:3
**inconsistency** [2] 118:13; 124:10
**inconsistent** [4] 116:14; 118:19; 142:5; 147:8
**incorrect** [14] 125:22; 147:12, 14; 161:13, 19, 20, 22; 163:3; 171:23; 180:9, 10, 11, 14
**Indian** [1] 56:19
**indicate** [2] 8:10; 106:17
**individual** [6] 190:10, 14, 23; 191:6, 23; 197:2
**individuals** [1] 111:5
**information** [4] 71:16; 106:24; 157:20; 168:17
**initial** [1] 133:12
**initiated** [1] 62:10
**injections** [1] 15:15
**injured** [2] 180:2, 24
**injuries** [3] 179:13, 14, 22
**inquire** [1] 46:5
**inside** [2] 82:8; 193:14
**instead** [1] 56:3
**instructed** [2] 18:17, 23
**instruction** [1] 40:25
**instructions** [4] 10:19; 11:25; 12:3; 16:2
**instructs** [1] 14:17
**intend** [1] 107:9
**intending** [3] 81:12; 191:25; 192:22
**intent** [1] 190:17
**intentions** [1] 192:11
**interaction** [1] 111:8
**interactions** [1] 111:4
**interconnected** [1] 95:1
**interested** [5] 19:2; 95:7; 97:5; 132:3; 199:18
**Internal** [1] 55:22
**Interrogatories** [6] 7:10, 11, 14; 100:22; 114:3; 179:18
**interrogatories** [16] 103:16; 105:1; 106:12; 108:1, 3, 17, 22; 109:3, 4; 110:3; 111:20; 112:21; 123:16; 124:16; 179:7; 180:9
**interrogatory** [3] 122:15, 22; 180:17
**interrupt** [3] 6:10; 30:24; 152:17
**intersection** [8] 123:5; 187:4, 7, 9, 11, 14, 23, 24
**interviewed** [2] 142:15; 158:6
**into** [24] 10:7; 16:15; 18:22, 24; 19:1; 39:14; 41:15; 44:9; 73:23; 76:16; 82:3, 15, 19, 25;

83:20; 90:16, 18; 105:10; 106:21; 107:4; 129:19; 147:11; 158:17; 193:11
**Investigation** [1] 7:22
**investigation** [4] 66:7; 68:4, 22; 73:24
**Investigative** [1] 7:19
**INVESTIGATOR** [2] 1:16
**investigator** [42] 60:21, 22; 65:3, 6, 15; 67:3, 7, 16; 69:9, 13, 24; 70:12, 16, 21, 24; 71:9, 12, 17, 18, 19, 23; 72:10, 12, 21, 22, 25; 73:5, 8, 11, 14, 17; 74:7; 75:19; 76:4, 5, 8, 17, 21; 77:2, 18, 20; 78:25
**involved** [4] 73:10; 112:7; 129:14; 131:6
**iPad** [1] 104:13
**Irvington** [9] 80:15; 82:3, 5; 114:25; 118:6; 125:20; 149:11; 185:17
**isn't** [2] 170:10
**issue** [4] 101:9; 133:20; 147:17
**It's** [53] 11:4; 12:2; 15:12; 18:13; 23:23; 37:12; 52:3; 54:5; 75:16; 92:19; 100:2; 102:7; 104:12; 106:21; 109:21; 114:4; 117:17; 118:20; 133:9, 17, 18; 134:1, 10; 135:13; 136:24; 137:19; 139:5, 15, 16, 21; 141:10; 144:7; 147:18, 24; 149:3, 5; 152:3, 14; 156:11, 12; 157:14; 159:18; 166:20; 168:6; 169:6; 176:12, 13; 178:25; 182:6; 186:22; 187:20
**it's** [41] 6:21; 12:14; 16:4; 25:24; 31:6; 34:2; 35:21; 46:1, 24; 47:1; 51:22; 54:5, 6; 55:4; 61:6; 85:24; 88:11, 25; 101:25; 102:7; 105:18; 110:19; 121:21; 133:10, 18; 134:16; 139:18; 140:23; 145:10; 147:12; 149:2; 150:8, 15; 151:22; 153:6; 156:14; 161:2; 163:4; 172:21; 186:21; 187:16
**Italian** [8] 95:3; 190:10, 23; 191:6, 10, 23; 196:22; 197:1
**itself** [4] 138:2; 141:24; 144:1; 149:4

**- J -**

**JACK** [1] 1:15
**Jackie** [1] 8:22
**JACQUELINE** [2] 2:2; 199:2
**Jacqueline** [2] 13:6; 199:20
**JAMES** [1] 3:14
**Jammed** [1] 35:17
**jammed** [1] 35:18
**January** [1] 104:11
**JENNIFER** [1] 3:4
**Jennifer** [1] 8:15
**JERSEY** [5] 1:1, 11, 17, 18; 4:5
**Jersey** [19] 2:4, 24; 3:8, 16; 4:11, 12, 19; 8:24; 21:21; 22:5, 7; 26:2, 9, 12; 34:3; 75:24; 149:12; 199:4, 22
**Jesse** [2] 154:3, 22
**Jessie** [6] 27:10, 11; 153:20, 22, 24; 160:2
**jobs** [4] 53:1; 142:19; 190:11; 191:2
**JOHN** [2] 1:10, 17
**John** [4] 25:14; 26:5, 7, 11
**John's** [1] 26:21
**Johns** [1] 3:7
**Johnson** [14] 92:20; 111:6; 132:22; 133:1, 2; 134:13, 14; 135:1; 138:15; 139:3; 140:15, 16; 148:21; 153:1
**Johnson's** [1] 135:2
**join** [1] 104:6
**joint** [1] 106:16
**JONES** [1] 1:16
**JOSEPH** [2] 1:9; 5:2
**Joseph** [1] 4:23
**JUDGE** [1] 1:17
**Judge** [1] 103:19
**judge** [2] 14:16; 101:12
**Julia** [11] 25:10, 11, 19; 26:7, 11; 28:9; 126:13; 128:12
**Julia's** [2] 25:17; 27:21

**jump** [1] 64:13
**jumped** [1] 105:20
**June** [3] 21:17; 67:7, 9
**Junior** [1] 23:5
**JUSTICE** [1] 4:8
**juveniles** [1] 157:20

- K -

**K-U-K-A** [2] 56:22, 23
**K-U-M-A-R** [2] 57:2, 5
**KASSIS** [14] 3:14; 8:13; 186:6; 188:8, 10, 11; 189:18; 192:18; 193:7; 194:9; 195:7; 196:18; 198:2, 5
**Kassis** [2] 7:5; 8:13
**Keep** [2] 12:12; 50:12
**keep** [3] 12:12; 95:24; 170:17
**keeping** [2] 54:19, 21
**KEITH** [1] 1:9
**KENYATTA** [1] 4:14
**kept** [2] 117:15; 194:22
**kids** [1] 135:2
**killed** [2] 140:13; 153:5
**kind** [5] 14:24; 83:19; 91:10; 92:19; 156:24
**KING** [1] 3:13
**king** [1] 43:20
**KM-MAH** [1] 1:2
**knew** [9] 42:9; 75:21; 102:9; 110:17; 127:12; 145:19; 154:13, 16; 190:11
**know** [224] 6:4, 22; 13:13, 18, 24; 14:4; 15:4, 21, 23; 16:6, 16; 17:16; 21:10; 24:5, 9, 10, 14; 25:7; 26:10; 29:24; 30:10; 31:11, 14, 15, 20; 32:20; 33:22; 34:1; 35:21; 37:9, 11, 13, 19; 38:19, 20; 39:5, 10, 12, 15, 17; 40:10, 25; 41:4, 7; 42:10, 24; 44:3; 45:2, 13; 46:24; 47:1; 49:4, 9, 11; 50:16, 17; 51:12, 15, 18, 22; 53:2, 25; 54:6, 11; 56:3; 57:2; 58:22; 60:15; 62:1, 2, 5; 63:5; 64:10, 12; 66:3, 4; 71:22; 72:18; 74:21; 77:3, 5, 9; 86:15, 23; 87:22; 89:9; 92:15; 95:4, 18, 25; 98:10, 16; 99:17, 25; 101:20, 22, 24; 102:2; 103:25; 105:3, 17, 22, 24; 106:3, 16; 107:5; 110:9, 10, 16; 112:23; 115:22; 116:22; 122:16; 124:19, 20, 23; 125:13; 127:7, 8, 9, 10, 11, 13; 128:9, 21; 129:9, 11; 130:14; 131:5; 132:7, 25; 141:2; 143:17; 146:25; 147:9; 150:9, 16, 18; 152:25; 153:1, 6, 7; 154:7, 10, 14, 16; 155:11; 156:9, 13; 157:24; 159:19, 23, 25; 160:6, 7, 12, 14, 15, 17, 19, 24; 164:6, 7, 8; 168:4, 19; 170:14, 15; 173:13, 23; 174:9; 176:11; 178:7; 181:7; 183:10, 15, 17, 19; 184:2, 5; 186:15; 188:3; 189:4, 5, 7, 11, 13, 17, 23; 190:25; 192:10, 14, 19, 21; 193:10, 22; 194:16, 18, 25; 196:3, 4, 5, 12, 17, 19, 21; 197:8, 13, 17, 20, 23; 198:8
**knowing** [1] 169:4
**knowledge** [1] 135:14
**Kumar** [7] 55:13; 56:19, 24, 25; 57:1, 8; 59:7

- L -

**laid** [1] 111:24
**Lake** [2] 34:2
**lapse** [1] 27:9
**last** [30] 17:4, 17; 18:7; 24:10, 14; 25:17, 21; 32:16; 36:6; 37:7; 77:11; 85:5; 87:9; 113:15; 119:14; 123:19; 126:2, 3; 132:9, 14, 17; 140:8; 154:5, 20; 173:10; 184:22, 23, 24; 186:11; 197:22
**late** [4] 87:17; 92:3; 149:13; 183:17
**lately** [1] 32:10
**Later** [1] 70:19
**later** [8] 11:17; 13:15, 24; 47:23; 70:18; 122:25;

123:16; 185:25
**LAURINO** [1] 1:12
**Laverne** [1] 22:18
**lawsuit** [7] 9:16, 25; 31:21; 32:2, 13, 17; 78:11
**lawyer** [1] 52:8
**lead** [1] 55:11
**leads** [1] 195:18
**least** [2] 105:16; 124:14
**Leave** [1] 151:13
**leave** [3] 84:18; 88:22; 89:15
**left** [6] 81:10; 82:2; 93:2; 163:13; 165:21; 195:11
**left-handed** [1] 188:15
**less** [2] 54:10, 13
**Let's** [7] 12:12; 79:8; 102:25; 118:11; 139:12; 142:8; 174:23
**let's** [6] 29:25; 59:11; 84:22; 126:3; 155:7; 159:12
**letter** [2] 104:11; 106:4
**letters** [2] 101:11, 14
**Levi** [2] 23:6
**liar** [2] 137:6; 138:15
**License** [2] 2:4; 199:4
**lied** [7] 49:2, 5; 146:13, 23, 24; 151:21, 25
**lieu** [1] 8:5
**Lieutenant** [1] 186:8
**lieutenant** [1] 134:17
**Life** [7] 175:23; 177:8; 178:12, 20; 180:4, 25; 181:13
**life** [1] 22:2
**light** [1] 173:1
**Like** [3] 27:4; 37:10; 166:10
**like** [44] 9:1; 13:24; 15:16; 21:9; 28:24; 29:25; 34:25; 36:8, 10; 46:25; 52:5; 54:6; 56:2, 14, 22; 82:16; 85:2; 87:15; 88:19; 90:23, 24; 92:14; 95:6, 16; 96:11, 21; 97:11; 98:1; 101:20; 106:1; 116:25; 118:16; 122:18; 154:3; 157:5; 164:24; 168:4; 170:15; 175:4; 178:17; 185:3; 189:23; 191:13
**likes** [1] 50:22
**Lillie** [10] 96:15, 16, 20, 21; 97:8, 20; 133:6; 145:21; 146:2, 5
**limit** [1] 12:9
**line** [5] 55:11; 100:3; 150:24; 151:19; 197:22
**lines** [1] 187:12
**LIPSHUTZ** [223] 4:15; 6:6, 8, 12, 16; 8:17; 9:9; 12:8, 13; 17:3, 15; 18:21; 19:22; 20:4, 22; 24:2; 30:4, 6, 15, 21; 31:3, 5, 24; 37:20; 38:6, 15, 23; 40:3, 13, 21; 41:6, 20; 42:15; 43:15, 25; 44:2, 7; 45:4; 46:8; 47:21; 48:12, 23; 49:25; 50:6, 12; 51:2; 52:14, 21; 53:3, 16; 54:3; 56:9, 10; 57:3, 13; 58:18; 59:22; 60:2, 10; 61:2, 12, 17; 62:9, 21; 63:2, 21; 64:15, 21, 25; 65:12; 66:9; 68:6, 13; 69:3, 20; 71:4; 72:2, 8; 74:2; 77:10, 14; 80:9; 84:2, 9, 15; 85:4; 86:2; 88:7, 9; 89:8; 92:4, 5; 93:7, 11; 94:3; 96:3, 6; 97:15; 98:12; 99:3; 101:5, 23; 102:2, 5, 14, 20; 103:2, 4, 10, 15; 104:5; 105:11; 106:7, 19; 107:16; 108:10, 12, 15; 109:8, 23; 110:22; 111:11; 112:4, 13; 113:2, 8, 13, 21, 24; 115:13, 21; 116:9, 11, 19; 117:5; 119:1; 124:8; 125:1, 16; 129:3, 21; 131:21; 133:15, 19, 22; 134:9; 135:16, 24; 136:3, 7, 21; 137:10, 14, 19, 21; 141:5; 143:19; 144:4, 24; 145:13, 17; 146:20; 147:7, 15, 22; 150:18, 21; 151:3, 5, 7, 12; 152:5, 8; 153:9, 12; 156:8, 11, 16; 162:5; 166:20, 24; 167:3, 13, 20; 168:6, 9, 10; 169:5, 7, 12, 15, 20; 170:8, 13, 18, 20;

171:3, 7, 15; 172:1, 4, 25; 174:5, 8, 15, 20, 24; 175:5, 8, 13; 176:14; 177:23, 24; 179:4; 181:11, 18; 182:19, 24; 183:1; 185:20; 198:7, 11
**Lipshutz** [16] 7:4; 8:18; 9:18; 43:19; 50:19; 101:4; 105:4; 106:3; 107:6; 110:8; 115:11; 166:19; 171:2; 173:7; 194:3
**Lipshutz's** [1] 195:15
**list** [1] 75:14
**Listen** [3] 93:5, 10; 137:13
**listen** [2] 65:23; 68:10
**lists** [1] 140:2
**litigate** [1] 107:7
**little** [21] 11:4; 12:22; 16:17; 22:12; 35:9; 79:9; 82:6; 84:20; 106:21; 109:17; 111:13, 19; 147:23; 153:16, 17; 167:1; 176:3, 4; 183:2; 188:12, 18
**live** [12] 22:3; 26:2, 9; 29:15; 31:15, 16; 33:4, 6; 79:22; 90:10; 121:22, 23
**lived** [9] 22:6; 26:12; 79:19, 21; 120:16; 155:11; 156:2, 18; 194:3
**living** [22] 52:22; 79:15, 16; 111:23; 117:10, 13, 19, 21, 23; 118:1; 124:11, 13; 125:14; 127:10; 154:23; 155:3, 4, 9, 21, 23; 184:5; 194:10
**loaded** [2] 82:10, 11
**loads** [1] 82:16
**local** [1] 59:3
**locate** [1] 119:23
**located** [7] 11:11; 186:16; 187:4, 15; 193:4, 12, 15
**location** [5] 33:16; 34:2, 5, 13; 193:11
**locations** [1] 11:4
**lock** [2] 172:18; 195:12
**locked** [2] 193:25; 194:1
**long** [16] 28:23; 29:21; 53:19, 22; 79:19; 81:23; 155:7; 157:2; 182:6; 195:25; 196:1, 8, 9, 12, 25
**look** [14] 18:16, 17; 102:25; 104:3; 105:10, 14; 106:20; 107:4; 112:25; 113:4; 114:5; 139:12; 142:8
**looked** [3] 18:10, 14; 145:25
**looking** [6] 81:1, 22; 89:21; 97:5; 119:8; 152:15
**lost** [4] 35:6, 10, 12
**loud** [2] 14:1; 158:9
**louder** [1] 176:3
**LOUIS** [1] 1:14
**Louis** [2] 3:18; 8:14
**Louisiana** [2] 21:19; 22:4
**lying** [10] 6:20, 21; 144:18, 25; 145:3, 4, 6, 11; 150:6, 8

**- M -**

**ma'am** [1] 108:13
**Madam** [10] 6:12, 17; 31:3; 43:17, 25; 50:14, 25; 77:11; 113:14; 150:23
**made** [7] 83:1; 102:11; 141:23; 142:2, 23; 146:10; 169:23
**maiden** [3] 24:18, 19; 25:3
**main** [2] 83:6, 10
**Make** [1] 109:17
**make** [21] 48:13; 55:6; 82:2; 83:10; 86:16; 88:11; 101:20; 108:6; 111:13; 114:16; 123:13; 130:16; 133:15; 134:11; 147:9; 151:19; 152:23; 174:1; 187:3, 14; 191:25
**makes** [2] 27:15; 187:23
**making** [3] 54:10, 13; 181:9
**male** [1] 158:6
**manner** [1] 8:9
**manufactured** [4] 6:14; 43:8, 11; 51:7
**manufacturing** [1] 44:9
**many** [6] 25:7; 26:1; 32:24; 50:11, 22; 188:3
**March** [4] 1:22; 2:5; 105:1, 8
**marijuana** [39] 94:14, 17, 18; 95:5; 96:8, 11, 13, 18, 19; 97:5, 21; 99:22,

25; 129:10, 11; 130:15; 132:3; 140:12; 188:19, 20; 189:5, 14, 21; 190:1, 9, 15, 18, 23; 191:10, 16, 19; 192:5, 24; 193:19; 194:16, 22; 195:9
**Mark** [1] 43:21
**mark** [11] 6:12, 17; 31:4; 43:17, 21, 22; 44:1; 50:14, 25; 150:24
**MARKED** [1] 6:1
**Marked** [1] 7:23
**marked** [9] 100:14; 108:24; 133:9; 139:15, 16; 157:11; 177:13; 181:22
**Market** [1] 4:9
**marriage** [1] 25:2
**married** [8] 24:7, 22, 23; 28:17, 23; 29:2, 9, 12
**match** [1] 106:25
**matches** [2] 105:8, 17
**matter** [9] 11:19; 58:16, 21; 73:22, 24, 25; 101:25; 107:5; 173:21
**Maurice** [27] 27:23; 28:6, 11; 81:1, 22; 89:22; 90:6; 119:9, 13; 159:6, 9; 161:10, 11; 162:7, 9, 12; 163:7, 16, 22; 164:5, 7; 165:1; 171:16, 17; 184:11, 14, 20
**Maurice's** [2] 91:3; 126:14
**Maybe** [5] 39:7; 53:13; 93:8; 110:2; 157:4
**maybe** [13] 59:2; 88:19, 21; 92:14; 98:4; 99:16; 122:17; 124:14; 128:19; 157:4; 183:16; 184:6; 185:1
**MAYOR** [1] 1:6
**Mayor** [1] 9:20
**mayor** [1] 100:23
**MCCARTHY** [1] 1:8
**McCarthy** [3] 4:23; 8:20; 9:21
**McDowell** [19] 81:18; 85:6, 11; 86:19, 20; 88:8, 10; 90:17, 18, 21; 111:6; 120:13; 140:5, 9, 16; 141:16; 148:20; 149:8, 24
**McDowells** [1] 91:6
**Meadowlands** [6] 94:21, 23, 24, 25; 190:12; 196:23
**mean** [43] 13:25; 15:10; 17:12, 24; 19:10; 20:12; 31:11; 32:10, 11; 35:18, 19; 37:3, 13; 44:17; 45:8; 54:8; 55:12, 13; 58:7, 9; 66:16; 74:22; 77:7; 82:12; 84:19, 20; 86:19; 96:3; 101:21; 107:10; 120:8; 124:19, 25; 125:21; 131:5; 137:25; 153:25; 162:20; 174:10; 176:15, 16; 177:5; 191:17
**means** [4] 54:12; 107:7; 124:20; 176:18
**meant** [2] 16:21; 42:21
**medication** [9] 14:22, 24; 15:2; 16:9, 11, 18, 22, 23; 17:8
**medications** [2] 17:17; 18:3
**meet** [9] 46:14; 66:19; 71:18; 72:3, 10, 21; 77:21; 90:21; 91:8
**meeting** [19] 19:13; 45:15, 25; 63:19, 25; 64:3; 66:14, 16, 21, 22; 67:1; 69:11; 70:11, 14; 71:8, 19; 72:25; 76:20; 77:17
**Melville** [9] 33:14, 15; 34:22; 35:7, 11, 13; 36:2, 3
**Melvin** [14] 87:4, 5, 6, 10; 88:12; 92:16; 93:4; 111:7; 121:11; 148:20; 153:3; 184:2
**Melvin's** [1] 96:16
**members** [1] 128:14
**memory** [4] 83:24; 84:4, 7, 11
**mental** [1] 27:9
**mention** [2] 26:5; 195:8
**mentioned** [4] 62:22; 65:3; 89:20; 125:17
**mentions** [3] 104:16, 25; 118:4
**Merrell** [7] 27:9, 10, 11; 154:3, 5, 22; 160:2
**Metformin** [1] 15:6
**metformin** [1] 15:4
**MICHAEL** [2] 1:15; 4:3
**Michael** [28] 8:22; 81:17; 85:6, 11; 86:19, 20, 21; 88:8, 10; 90:17,

18, 21; 92:16; 93:4; 104:8; 111:6; 120:13, 20, 24; 121:11; 148:20; 153:2; 163:16, 23; 164:5, 7; 165:2
**Michael's** [1] 97:10
**Middle** [1] 153:24
**middle** [1] 104:15
**Might** [1] 128:6
**might** [7] 12:23; 19:9; 51:21; 60:21, 22; 125:19; 197:3
**Mike** [2] 184:2
**Mildred** [6] 22:20, 21; 24:17, 20; 25:5; 27:7
**miles** [1] 11:7
**mind** [3] 83:20; 147:11; 176:19
**minute** [4] 71:24; 104:22; 114:13, 19
**minutes** [4] 64:13; 88:21; 182:21, 22
**Mischaracterizes** [2] 50:5; 98:25
**mischaracterizes** [4] 48:19; 53:13; 135:11; 147:4
**mischaracterizing** [2] 175:11; 181:8
**missed** [2] 23:10; 63:9
**Missing** [3] 7:15, 16, 17
**missing** [34] 79:13; 81:18; 94:13; 96:17; 97:23; 98:16; 99:11, 13; 111:5; 129:14; 133:12; 134:13; 136:9; 140:3, 15; 142:17; 148:14; 155:8; 157:20, 22; 159:8; 161:11; 162:8, 12; 163:6; 165:9; 171:21; 188:20; 192:23; 193:1, 9, 20; 196:3, 6
**misstatements** [1] 12:5
**Misstates** [2] 56:7; 194:5
**mistake** [1] 123:15
**misunderstood** [1] 63:4
**moment** [8] 15:5; 29:18, 20; 60:9; 104:14; 105:3, 15; 170:11
**Monday** [4] 83:13; 127:21; 129:15
**money** [8] 46:25; 61:13, 18, 22; 82:24; 83:10; 191:8, 10
**month** [2] 55:18; 80:23
**months** [7] 36:10; 37:1, 7; 38:18, 22; 124:14; 157:22
**More** [3] 6:2; 30:7; 32:19
**more** [13] 6:3; 14:12; 30:9; 44:15; 94:1, 13; 127:12; 131:4, 5; 153:17; 181:21; 182:25; 188:3
**morning** [26] 8:20, 21; 9:10, 14; 41:10; 83:17; 126:4; 127:20, 21, 23; 129:15; 141:20; 164:3, 9, 13, 17, 25; 165:2, 3, 10; 166:9, 10, 11; 183:14
**mortgaged** [1] 35:18
**most** [1] 121:3
**Mostly** [2] 33:23, 25
**mostly** [1] 33:22
**mother** [28] 22:19; 24:17; 27:5, 7, 13; 28:9; 96:16; 97:10; 126:15, 18; 127:19; 132:23; 133:3, 7; 134:14, 20, 23; 135:2, 6, 21; 136:9, 17; 139:7; 145:22; 154:23; 155:1; 160:20
**mother's** [6] 26:12; 127:2; 153:19; 154:1, 2; 160:1
**mother-in-law's** [1] 81:14
**mothers** [1] 133:4
**mouth** [2] 6:7; 30:18
**Move** [3] 6:11; 31:2; 156:13
**move** [6] 81:2; 118:16; 119:19; 149:11, 13; 193:10
**moved** [2] 21:21; 122:3
**moving** [3] 81:21; 120:25; 122:25
**much** [11] 36:16; 50:21; 94:1; 98:3; 105:21; 186:1, 4; 191:15, 18, 22
**multiple** [1] 62:17
**multiplied** [1] 189:6
**murder** [8] 172:5, 9; 173:4; 178:13, 21; 180:1, 22; 181:14
**murdered** [1] 173:12
**murdering** [1] 79:14
**Museum** [7] 175:23; 177:8; 178:12, 19; 180:3, 25; 181:12
**museum** [2] 180:3, 24
**myself** [3] 63:9;

105:10; 113:1

- N -

**nail** [1] 172:20
**Name** [2] 91:18; 121:9
**name** [50] 8:11, 17; 9:18; 13:5, 6; 15:2; 20:7, 11, 20, 25; 22:16, 17; 24:10, 14, 18, 22; 25:3, 17, 21; 27:8; 28:19; 35:14; 53:10; 55:16; 56:17; 57:24, 25; 87:1, 4; 119:14; 126:12; 127:3, 14; 128:11; 132:25; 140:17; 153:19, 24; 154:2, 5, 16, 21; 159:19; 160:1, 2; 186:12; 192:8; 197:12
**named** [3] 95:3; 140:10; 160:24
**names** [24] 20:10, 11, 15; 22:9; 23:4, 20; 25:9; 26:19; 42:5, 8, 9, 14; 86:15, 23; 92:17; 132:21; 142:7; 152:24, 25; 153:2, 4, 7; 164:6; 187:13
**narrowing** [1] 39:5
**nature** [4] 56:16; 97:11; 130:17; 179:14
**near** [4] 44:19; 90:25; 91:2; 134:24
**necessarily** [1] 12:1
**necessary** [1] 11:17
**need** [12] 13:21; 14:3; 18:17; 65:17; 101:5; 107:6; 114:9, 12; 134:8; 136:1; 162:18, 21
**needed** [1] 120:24
**neighborhood** [1] 81:4
**neither** [2] 199:13, 16
**nephew** [2] 127:11, 12
**nephews** [1] 127:13
**Never** [1] 85:18
**never** [11] 85:17; 96:22; 102:10; 103:24; 135:10, 22; 152:1, 2; 161:7; 165:6; 175:11
**NEWARK** [4] 1:6, 10
**Newark** [32] 4:17, 19, 20, 21, 22; 8:19; 9:19; 31:16; 40:6; 82:19; 95:4; 100:10, 23; 114:23, 24; 123:4, 5; 125:12, 20; 133:11; 134:2, 5; 139:16, 17, 20; 147:24; 149:9; 155:5; 157:14
**newborn** [1] 117:17
**Next** [2] 129:24; 158:25
**next** [20] 6:8; 30:20, 22; 43:24; 82:9; 83:17; 126:4; 127:20, 23; 129:22; 130:1; 140:4; 142:8; 171:8; 174:18; 191:5
**Nickname** [1] 20:12
**nickname** [2] 20:21; 87:3
**nicknames** [4] 21:2, 3, 4, 12
**night** [7] 33:18; 41:9; 81:15; 83:14; 126:20; 129:14; 152:22
**nine** [2] 22:1, 2
**nobody** [1] 89:6
**none** [1] 95:7
**nonprofit** [6] 175:23; 180:3, 4, 24; 181:2
**noon** [3] 89:21; 175:19; 185:11
**Normally** [2] 11:4; 98:5
**Notary** [4] 2:2; 199:2, 21, 22
**nothing** [13] 9:6; 15:16; 49:9, 11; 55:23; 56:14; 74:19; 98:1; 145:15; 180:19; 181:2, 5; 199:7
**notified** [1] 148:10
**November** [1] 75:1
**Number** [1] 118:18
**number** [22] 9:22; 34:11; 94:12; 108:23; 109:11; 110:1, 4, 20, 24; 111:13; 114:19; 117:7; 121:9; 125:3; 126:9; 139:15; 149:4; 158:7, 10, 12, 17; 179:8

- O -

**O'Connor** [4] 100:9, 10; 101:12; 114:3
**O'Connor's** [1] 102:10
**O-L-D-S** [1] 119:16
**O.J.** [2] 170:18, 23
**oath** [3] 8:6, 7; 11:15
**Object** [2] 88:3; 98:20
**object** [27] 6:4; 11:25; 12:11; 14:12; 19:21; 30:12; 39:24; 53:11; 62:14;

71:20;
88:4; 92:1;
98:24;
101:1;
135:12;
136:12, 13;
137:18;
146:17;
150:13;
168:25;
169:8;
175:5;
177:20;
181:5;
189:9
**objecting**
[1] 43:20
**Objection**
[80] 6:7,
11, 15;
20:16;
30:18;
31:2, 22;
37:16;
38:3, 13;
39:23;
40:8;
41:17;
43:12;
44:5, 23;
46:6;
47:20;
48:8, 18;
49:21, 24;
50:4, 9;
52:1, 24;
53:23;
56:7; 57:9;
58:17;
59:20;
60:5; 61:7,
15; 62:12;
63:15;
65:7;
67:17;
69:14;
73:18;
80:4;
83:25;
84:5, 13;
85:21;
98:8, 21;
109:5;
111:24;
112:10;
117:3;
124:17;
129:1;
131:17;
135:10, 22;
143:12, 23;
144:19;
145:8;
147:3, 10;
156:4, 10;
167:10, 15,
23; 169:7;
170:5;
171:24;
175:3;
192:15, 16;
193:5;
194:5;
195:3;
196:14;
198:1
**objection**
[18] 6:6,
17; 12:8,
9; 14:15,
16; 30:15,
17; 43:18;
50:15;
53:14;
68:18;
84:14;
92:3;
110:6;
152:4;
181:6
**OBJECTION**
**S** [1] 6:1
**objections**
[8] 6:9, 16;
8:9; 30:22,
24; 43:15,
20
**obtain** [1]
197:1
**obtained**
[4] 190:9,
15; 191:16;
196:22
**obviously**
[2] 79:12;
103:23
**occupied**
[1] 193:15
**occurred**
[1] 123:15
**October** [6]
157:21, 24,
25; 158:2,
4
**off-the-rec**
**ord** [1]
64:19
**offence** [1]
170:15
**offer** [3]
60:13;
61:13, 18
**offhand** [1]
104:10
**OFFICE** [3]
1:11, 17;
4:5
**Office** [1]
182:6
**office** [6]
11:9;
19:18;
33:9;
104:8;
106:22;
151:13
**OFFICER**
[3] 1:8, 10
**officer** [4]
134:17;
136:22, 24,
25
**OFFICERS**
[1] 1:17
**officers** [7]
128:23;
131:8, 24;
140:6, 9;
146:3, 4
**Okay** [348]
6:4, 11;
9:12, 14;
10:13, 16,
18, 19, 24;
11:3, 10,
13; 12:14;
13:4, 6, 9,
19, 21;
14:3, 8, 10,
21; 15:1,
10, 14, 24;
16:1, 9, 17;
17:7, 20,
25; 18:6,
9; 19:6;
20:6; 21:2,
12, 15;
22:9, 25;
23:16, 24;
24:17;
25:13, 16,
25; 26:7,
11, 18, 23;
27:2, 7;
28:11, 16;
29:12, 15,
21; 30:1,
11; 31:1,
13, 17;
32:9, 16,
22; 33:1,
4, 8, 20;
34:20;
35:25;
36:4, 6;
37:5; 42:4;
43:21;
45:11, 16,
23; 46:5,
17; 47:14;
50:12;
52:22;
53:19;
55:3, 7;
58:1, 4;
59:10;
63:4, 13;
64:18;
65:1, 23;
66:10;
67:14;
68:8, 11;
69:1, 5;
70:8, 11,
14; 71:2;
72:18;
74:3, 24;
75:7;
76:11;
77:24;
79:2, 8, 19;
80:12, 13;
84:18, 24;
85:19;
86:12, 15,
23; 87:23;
88:17;
89:10;
90:13, 20;
91:2, 10;
92:10, 19,
22, 25;
94:2, 11;
95:22, 23;
96:12;
97:19;
98:20, 22;
99:7, 12;
100:2, 4, 5,
8, 13, 18,
20; 102:15,
19; 103:6,
13; 105:23;
106:19;
107:3;
108:7, 11,
14, 16, 20;
109:1, 4, 5,
12; 110:1,
5, 24;
111:10, 14,
18, 19, 21;
112:22;
113:14;
114:2, 7,
19; 115:6,
7, 17;
116:6, 20,
22, 23;

118:3, 11, 12, 17, 20; 119:7, 18, 22; 120:7, 11, 18; 121:2, 7, 11, 16, 23; 122:2, 14, 21, 24; 123:3, 11, 19, 23; 124:9; 125:24; 126:2, 17; 127:24; 128:13, 16; 129:17, 20; 130:5, 9, 12, 23; 131:25; 133:23; 134:7, 18; 135:19; 136:1; 139:6, 10, 17, 19; 140:3, 24; 141:4; 142:8; 145:5, 12, 13; 146:21; 147:15, 21, 25; 148:8; 149:6, 18; 151:6, 10, 16, 18; 152:5, 7; 153:8, 15, 17; 154:5; 156:13, 15; 157:5, 8, 15, 21, 22; 158:3, 23; 159:12; 160:11, 17; 161:6, 20; 162:17; 163:1, 4, 9, 22; 165:7; 166:24; 167:2; 168:16, 20, 24; 169:5; 170:12, 13; 171:1, 6, 20; 173:6, 8, 9, 11, 17, 18, 20, 24; 174:2, 6, 11, 17, 19, 20; 177:17; 179:14, 15; 180:8, 11; 181:4; 182:3, 15, 18, 21; 184:22; 185:17, 19; 186:20, 24; 187:1, 7, 18, 22; 188:9, 14, 25; 189:19; 190:8, 21, 22; 191:9, 14, 25; 192:19, 22; 193:14; 194:10, 25; 196:19, 25; 198:5, 11

**okay** [18] 9:12; 16:4; 54:25; 77:6; 84:23; 94:24; 98:20; 115:15; 122:23; 134:20; 140:25; 150:20; 153:13; 162:15; 173:7; 174:19; 183:21

**Olds** [5] 27:24; 119:15; 159:7; 163:15; 171:17

**Olds's** [4] 161:10; 162:7, 13; 163:7

**Once** [1] 88:25

**once** [3] 9:17; 187:21; 191:19

**ones** [1] 93:3

**Only** [2] 69:24; 86:25

**only** [22] 12:15; 50:1; 51:10; 64:7; 92:15; 93:3; 97:7, 8, 24; 101:15; 105:21; 108:22; 110:9, 18; 133:3, 4; 141:1; 142:20, 21; 153:1; 182:24; 194:13

**operate** [1] 197:25

**operating** [2] 54:9, 10

**opportunity** [4] 10:14; 12:20; 72:16; 101:21

**opposite** [4] 139:5; 141:19; 175:21; 187:5

**Orange** [4] 40:11, 12; 44:20; 149:9

**order** [9] 101:18; 102:8, 19; 103:19, 25; 107:12; 110:7, 19; 111:1

**ordered** [5] 101:3, 12; 102:12; 103:8; 110:12

**orders** [1] 110:9

**Other** [6] 16:9; 19:6, 11; 20:11; 195:22; 198:3

**other** [63] 9:23; 10:7, 8; 14:11; 15:4; 16:1, 10, 22; 17:7, 8; 19:17; 20:10, 14; 21:12; 24:3; 27:3; 44:18, 21; 45:7; 47:16, 25; 51:21; 58:11; 59:1; 64:3, 5; 66:20; 70:20; 71:11; 77:25; 78:1; 82:14, 20; 86:16, 24; 87:1; 89:4; 92:18; 110:20; 118:12; 121:12; 125:25; 128:14; 131:6, 8, 12, 15, 24; 132:5; 134:21; 147:5; 165:17; 167:6; 185:23; 186:18; 187:22; 193:2, 11; 198:3

**others** [3] 86:20, 22; 123:14

**Otherwise** [1] 89:3

**Outside** [1] 132:1

**outside** [3] 131:15; 133:5; 151:17

**over** [13] 12:24; 39:21; 47:15, 22; 52:10; 76:14; 81:14; 82:12; 83:2; 89:4; 125:6; 129:8; 183:10

**overlooking** [1] 126:1

**owed** [1] 191:9

**owned** [1] 120:15

- P -

**P-10** [1] 7:21
**P-11** [1] 7:22
**P-A-I-N-E** [1] 118:5
**p.m.** [27] 6:19; 85:10, 12, 14, 20; 86:3, 5, 6, 10; 88:1, 13; 122:25; 123:17; 135:3; 139:8; 143:5; 144:18; 149:3, 4; 150:1, 5; 152:10; 161:10; 164:20; 166:4; 170:4, 7
**P.O.** [1] 4:10
**packed** [1] 119:3
**Page** [4] 6:13, 17, 24; 147:25
**page** [3] 106:17; 139:20; 140:1
**pages** [2] 139:16; 182:6
**paid** [2] 48:16; 191:15
**Paine** [8] 80:15, 19; 81:3; 82:12, 15; 118:5; 119:19; 122:9
**pandemic** [1] 11:6
**papers** [5] 31:18; 55:24; 56:13, 14; 173:14
**paragraph** [13] 100:20; 118:3, 4, 12, 14, 17; 126:3; 140:1, 4; 141:14; 142:9, 10; 179:23
**PARALEGAL** [1] 3:6
**paralegals** [1] 107:4
**Parents** [1] 124:4
**parents** [8] 22:13, 15; 27:4; 124:4, 5, 6; 168:18; 194:11
**Park** [18] 3:15, 16; 163:17, 23; 164:22; 166:13; 168:12, 13, 21, 22; 169:22; 175:1, 15; 183:3, 13, 23; 184:1, 12
**park** [8] 162:24; 163:13; 165:17, 19, 21; 166:17; 167:5, 8
**parking** [2] 186:22, 23
**parlor** [12] 82:23, 25; 85:8; 87:12; 88:16; 93:14; 123:6, 20; 132:16, 18; 152:21; 186:11
**parrot** [1] 52:5
**part** [4] 58:4; 72:1; 184:4; 191:7
**participate** [1] 112:18
**participating** [1] 8:2
**parties** [2] 8:7; 199:15
**party** [1] 190:20
**pass** [3] 187:21; 191:4; 192:3
**passed** [7] 22:14, 15; 24:11; 28:11, 15, 16; 90:13
**Passing** [1] 190:19
**passing** [2] 82:8; 122:4
**past** [3] 16:19, 20; 39:5
**PATRICK** [1] 1:16
**pattern** [1] 110:11
**pending** [5] 14:6; 108:9; 113:8, 11, 12
**People** [1] 174:12
**people** [6] 21:5; 92:19; 101:15; 165:12; 169:25; 174:13
**percent** [17] 84:12, 16, 17; 86:14; 87:13; 89:17; 91:25; 92:9; 94:10; 98:2; 128:4; 130:8; 139:11; 141:12; 197:16, 21
**perfectly** [1] 77:4
**perhaps** [2] 14:11; 105:25
**period** [1] 32:11
**permanent** [1] 33:12
**Person** [3] 7:15, 16, 17
**person** [15] 8:6; 37:14; 39:21; 40:2; 58:12; 65:5; 67:9; 69:8, 12; 140:11; 160:24; 161:5; 191:5; 194:13; 196:23
**personal** [1] 179:13
**persons** [3] 42:1; 133:12; 134:13
**PETER** [2] 1:13, 17
**phase** [1] 15:19
**Philand** [7] 158:6; 160:22, 24; 161:5, 9; 162:6; 163:10
**Philander** [46] 26:20; 27:15; 36:7; 39:20; 43:1; 76:9; 91:20, 24; 92:7; 153:16; 154:23; 155:23; 156:22; 159:13, 17, 18, 23; 160:3, 10, 14, 15, 17, 19, 20; 161:1, 2, 3, 6, 15; 162:11; 166:7, 12, 14, 15; 167:14, 21; 168:11, 14, 18, 20; 169:3, 4; 171:9; 173:16
**Philander's** [3] 27:13; 75:23; 154:14
**Phone** [1] 158:9

**phone** [7] 39:22; 47:13, 16; 64:13; 102:22; 103:8, 20
**phonetic** [2] 22:18; 27:10
**Photograph** [1] 7:20
**physical** [2] 33:10, 13
**physically** [1] 8:3
**pick** [2] 81:12; 183:5
**picked** [15] 6:19; 81:24; 140:6; 142:17; 148:20; 149:8, 10, 24; 150:5; 152:10; 174:25; 175:14, 18; 183:3
**picking** [2] 75:23
**pickup** [4] 91:12; 121:7; 149:12
**picture** [1] 177:12
**piece** [1] 106:24
**pipefitter** [1] 192:9
**pipefitters** [1] 95:11
**Pittman** [8] 87:2, 10; 88:12; 111:7; 121:12; 148:20; 153:3
**Pittman's** [1] 133:7
**Place** [28] 3:7; 33:14, 15; 35:7, 8, 11, 13; 36:2, 3; 81:12, 17; 82:1, 21; 83:2; 90:12; 119:8; 120:15; 123:6; 148:22; 149:15; 164:15; 175:17; 183:4, 9, 10; 185:7; 187:5
**place** [14] 40:5; 44:19; 45:12; 46:16; 64:20; 81:6; 87:11; 89:12, 13, 15; 96:23; 98:17; 175:18; 199:12
**Plaintiff** [7] 1:4; 3:9; 100:21; 110:3; 126:4; 180:2, 24
**plaintiff** [7] 8:16; 104:18; 123:19, 23; 124:1; 126:19; 180:5
**Plaintiff's** [1] 7:13
**plaintiff's** [1] 124:2
**play** [5] 12:7; 126:9; 163:13; 165:18; 167:7
**playing** [1] 162:24
**plea** [1] 75:8
**Please** [9] 6:8; 8:10; 14:14; 30:20; 43:21, 24; 72:15; 93:23; 167:11
**please** [19] 6:12, 17; 12:19; 14:4, 7; 20:7; 31:4; 43:17; 44:1; 50:25; 66:5; 104:13, 24; 113:15; 135:24; 136:3; 150:24; 182:22
**pled** [1] 4:21
**PLLC** [1] 3:3
**plumbing** [1] 53:1
**Plus** [1] 89:9
**plus** [4] 86:19, 20, 21; 152:23
**point** [12] 13:10; 24:8; 44:11; 51:11; 61:24; 63:22; 81:5, 23; 83:7; 178:3; 185:22, 23
**POLICE** [5] 1:7, 10, 17; 4:7
**Police** [1] 4:22
**police** [36] 9:21; 41:24; 42:2, 5, 16, 18; 43:1; 48:15; 59:18; 60:16, 19; 96:25; 97:1, 3, 9; 128:17, 20, 23; 129:5, 25; 131:8, 11, 13, 15, 24; 134:16; 135:7; 136:10; 137:24, 25; 139:1, 22; 141:18; 147:5; 152:12; 169:6
**pool** [6] 81:7; 95:9, 11; 120:2, 9; 123:24
**porch** [4] 81:20; 120:14; 163:14, 15
**portions** [2] 179:24; 180:5
**pose** [1] 14:14
**positive** [3] 88:2; 94:10; 99:20
**Possibility** [1] 58:25
**possibility** [3] 67:15; 69:12; 70:15
**possible** [4] 61:6; 75:16; 87:21; 134:11
**Possibly** [1] 71:21
**possibly** [2] 55:19; 86:9
**post** [1] 33:9
**Potato** [1] 21:8
**potato** [1] 21:9
**pound** [1] 190:4
**pounds** [7] 95:17; 98:4; 188:20; 190:1; 191:16; 193:19; 194:22
**Preliminary** [1] 7:19
**preparation** [4] 18:10, 14; 19:4
**prepare** [1] 74:8
**prepared** [2] 13:9; 76:9
**present** [6] 8:3; 9:3; 13:5; 41:11; 72:24; 73:2

**presented** [1] 133:18
**Presently** [1] 31:6
**presently** [3] 28:17; 35:16; 111:5
**Pressure** [1] 14:25
**pressure** [5] 14:25; 15:1, 9; 16:10
**pressured** [1] 59:18
**presume** [2] 13:16; 139:21
**pretty** [2] 35:21; 70:25
**previously** [1] 107:12
**PRICE** [1] 3:13
**Prior** [2] 7:23; 35:5
**prior** [13] 18:10; 24:25; 25:2; 29:9; 45:17; 67:9; 71:19; 72:10; 106:14; 196:10, 13; 199:5
**prison** [3] 61:24; 62:2, 4
**privileged** [1] 72:4
**Probably** [1] 32:20
**probably** [7] 10:1; 40:18; 105:9; 121:3; 122:25; 123:17; 125:25
**problem** [1] 191:12
**problematic** [1] 110:20
**produce** [4] 103:9, 22; 106:4; 107:11
**produced** [4] 103:24; 107:10, 13; 110:7
**profit** [1] 192:1
**promise** [2] 60:11; 182:25
**promised** [1] 47:1
**properties** [1] 35:6
**Property** [1] 35:7
**property** [9] 35:10, 13, 22, 25; 80:14; 83:12; 114:25; 118:5
**propounded** [3] 102:13, 24; 104:17
**PROSECUTOR** [4] 1:12, 13
**prosecutor** [8] 41:25; 42:2, 6, 16, 18; 43:2; 59:18; 75:23
**PROSECUTOR'S** [1] 1:11
**Prosecutor's** [1] 182:6
**prosecutor's** [1] 182:5
**prosecutors** [4] 48:16; 60:16, 19; 182:16
**protected** [1] 71:22
**prove** [2] 137:1; 138:8
**provided** [2] 102:10; 103:18
**Public** [3] 2:2; 199:2, 21
**pull** [3] 103:23; 157:10; 174:22
**pulling** [1] 101:16
**purchase** [1] 118:4
**purchased** [1] 196:21
**purposes** [1] 16:21
**pursuant** [2] 103:24; 107:11
**putting** [3] 41:19; 106:25; 176:6

**- Q -**

**QUESTION** [4] 6:2, 14, 18, 23
**Question** [2] 110:1; 179:21
**question** [149] 6:7, 8; 12:19; 13:14, 15, 17, 18; 14:6, 7, 18, 19; 15:23; 18:1, 13; 20:2, 24; 30:19, 20, 22; 32:13; 35:22; 37:2; 42:4, 12; 43:24; 44:24; 45:6; 47:18; 50:24; 51:1; 52:2, 19; 53:12; 60:25; 61:3, 8; 62:8, 14; 65:18, 24; 66:1; 67:18; 68:5, 11, 16, 19, 24; 69:2; 70:22; 71:25; 72:9, 17; 73:20; 77:10, 12, 16; 80:5, 10; 84:1, 6; 85:22; 88:4; 89:1, 3; 92:2; 93:6, 9; 94:1; 96:1; 99:5; 101:6; 102:6; 105:12; 106:8; 108:2, 8, 23, 25; 109:11; 110:23; 111:8; 113:9, 10, 11, 16, 20; 116:8, 25; 117:1, 6; 124:18; 129:2; 131:18; 135:10, 17, 18, 25; 136:4, 6; 137:9, 18; 140:20, 25; 141:1, 3, 6; 142:25; 144:20; 145:11; 146:7, 18, 19; 149:21; 150:14; 152:1; 160:7; 163:19; 166:1; 167:12; 168:1, 7; 169:19; 170:7, 12; 171:8, 9, 25; 172:2; 173:11; 174:3, 19; 175:8; 177:7; 179:8, 12, 21; 181:10; 184:22, 24; 192:17
**questioned** [1] 148:13
**questioning** [5] 10:8; 150:25; 151:20; 195:15; 197:22
**QUESTIONS** [1] 6:1
**questions** [48] 6:11; 9:15, 25; 10:1, 5, 10,

25; 13:12, 22; 14:12; 20:6; 31:1; 62:16; 75:15, 18; 76:6, 8, 11; 78:5, 8, 12; 97:13; 102:17; 103:7, 13; 108:24; 114:7; 115:2, 9, 10; 117:4; 118:24, 25; 129:18, 20; 132:5, 6; 170:10, 17; 172:24; 174:23; 178:24; 182:25; 185:21, 24; 186:3, 8
**quit** [1] 136:2
**Quite** [1] 132:11
**quite** [1] 75:20
**Quote** [3] 148:8; 163:11; 165:16
**quote** [10] 148:6, 11, 13, 16; 149:16; 158:10; 159:4; 163:18; 165:22; 167:5

**- R -**

**raised** [1] 101:10
**RAMOS** [1] 1:10
**Randolph** [1] 25:14
**Randy** [11] 92:20; 111:6; 132:22; 134:14; 135:2; 140:15; 148:21; 152:25; 163:16, 23; 164:5
**range** [3] 33:1; 86:8; 88:5
**RASHID** [1] 1:8
**rather** [1] 196:22
**re-forming** [2] 57:17, 20
**reach** [2] 63:14; 64:4
**reached** [5] 63:22, 24; 66:12, 15, 18
**Read** [1] 115:19
**read** [69] 13:15; 22:10; 68:15; 77:11; 78:14, 15, 24; 110:24; 111:14, 25; 113:15; 114:14, 19; 115:1, 15, 23; 116:3, 4, 6, 8, 12, 14; 125:2, 4, 8, 9; 134:19; 140:5, 20, 21; 141:7; 142:9, 10, 25; 143:2; 148:2, 6, 7, 11, 16, 24; 149:16; 153:23; 158:3, 12, 16, 18, 20, 21, 22, 23; 159:4, 9, 11; 163:11, 19, 21; 165:23, 24; 166:1, 3; 167:11, 24; 168:3; 179:23; 180:5, 7
**Reading** [1] 149:19
**reading** [11] 104:15; 115:24; 116:1; 140:22; 148:12, 14, 25; 149:6, 17; 168:2, 3
**reads** [3] 68:17; 77:13; 113:17
**ready** [1] 103:23
**real** [3] 35:2, 4, 16
**realize** [1] 108:4
**Really** [1] 159:20
**really** [21] 18:22; 21:14; 29:25; 32:5; 33:19; 40:9; 43:22; 45:5; 47:24; 62:1, 2; 67:10; 127:13; 131:2, 3; 133:4; 152:3; 155:19; 182:24; 189:16; 194:17
**reason** [9] 17:20, 21, 22; 58:7; 59:1; 95:18; 135:5, 20; 136:9
**recall** [23] 16:5, 6; 21:13; 25:9; 41:22; 42:25; 43:3; 52:17; 59:23; 65:4, 13; 74:9, 11, 15, 17, 20, 23; 111:2; 154:6; 184:18, 19, 20
**received** [2] 140:2, 10
**recess** [4] 64:24; 113:23; 153:11; 182:23
**RECKENWALD** [1] 1:15
**recollect** [9] 42:24; 49:23; 51:19; 59:21; 60:1, 8; 71:1; 81:19
**recollection** [8] 10:4; 16:4; 48:7; 49:19; 67:8, 12; 74:25; 80:2
**record** [10] 8:12; 9:2; 101:25; 102:1, 11; 110:6; 114:17; 151:1, 19; 158:17
**referenced** [1] 190:10
**referring** [1] 54:17
**reflections** [1] 12:1
**refresh** [3] 67:7, 11; 74:25
**reinstate** [1] 178:9
**reinstated** [6] 178:4, 8, 12, 19; 180:2, 24
**reinstatement** [2] 181:2, 12
**related** [3] 27:17, 23; 75:8
**relationship** [4] 26:20; 27:3, 19; 28:1
**relative** [3] 156:18; 199:14, 16
**religion** [1] 176:12
**religious** [1] 176:9

**remarks** [1] 134:20
**Remember** [1] 55:4
**remember** [39] 9:18; 16:4, 5; 29:1; 40:10, 15, 16; 50:1, 8; 64:8, 10; 71:5; 74:9; 75:4, 11, 16, 17, 22; 99:1; 108:16, 18; 114:2; 116:24; 128:15, 17; 130:13, 25; 131:7, 14; 132:5; 143:15, 16; 155:2, 20; 164:3; 186:12
**remote** [1] 106:22
**remotely** [4] 2:4; 8:5, 7; 104:10
**rent** [2] 34:20, 21
**Repeat** [5] 38:5; 72:7; 84:8; 183:24; 196:11
**repeat** [9] 43:6; 52:3, 4; 63:9; 68:5; 94:4; 138:19, 24
**repeated** [1] 62:16
**rephrase** [9] 13:13; 17:25; 42:4; 47:18; 57:14; 59:15; 99:4; 172:1; 177:7
**rephrased** [1] 18:1
**Report** [6] 7:15, 16, 17, 18, 19, 22
**report** [29] 6:23; 133:12; 134:13, 15; 137:25; 138:1; 139:1, 4, 5, 18; 140:21, 22; 141:13, 18; 142:1, 2, 6; 147:5, 24, 25; 150:11, 15; 152:13; 153:10; 157:19; 162:4, 6; 169:6
**reported** [3] 140:14; 142:13, 16
**REPORTER** [3] 8:1; 104:20, 24
**Reporter** [10] 2:3; 6:17; 43:17; 50:14, 25; 68:15; 77:11; 113:15; 150:23; 199:3
**reporter** [11] 6:12; 12:18; 13:4, 22; 31:3; 43:25; 56:21; 68:17; 72:13; 77:13; 113:17
**Reporters** [1] 2:23
**REPORTING** [1] 2:22
**reporting** [2] 8:4, 9
**reports** [1] 139:23
**represent** [12] 8:18; 9:23; 67:6; 134:12; 139:18; 140:19; 157:19; 160:5, 9; 161:4; 182:3; 186:8
**representation** [1] 104:13
**reproduce** [6] 101:3, 18; 102:3, 9, 12; 110:12
**reproduced** [2] 101:14; 110:13
**reputation** [2] 180:1, 23
**requested** [3] 68:17; 77:13; 113:17
**requests** [2] 101:13; 104:17
**required** [2] 106:3; 197:25
**residence** [1] 140:16
**resolve** [1] 93:23
**resolved** [1] 74:1
**respect** [1] 189:19
**respond** [2] 13:21; 72:17
**responded** [3] 142:14; 148:3, 10
**response** [4] 19:11; 106:6; 113:7; 114:8
**responses** [1] 105:1
**responsive** [1] 101:15
**rest** [3] 115:15, 16; 184:7
**restructure** [1] 55:15
**result** [2] 104:1; 106:6
**retained** [2] 73:14, 21
**retaining** [1] 73:10
**returned** [5] 140:12; 142:19; 149:9; 163:15; 169:24
**revelation** [2] 176:23; 177:1
**Revenue** [1] 55:22
**reverse** [1] 141:25
**reviewed** [1] 19:3
**RICHARD** [1] 4:8
**Ricky** [8] 87:2, 3; 148:20; 163:16, 22; 164:5, 7; 165:1
**ridiculous** [2] 43:22; 167:2
**Right** [34] 25:4; 27:1, 14; 41:2; 49:16; 52:25; 62:4; 66:24; 70:4, 7, 10, 13; 71:6, 16; 84:25; 86:18; 89:5; 93:15, 17; 97:18; 121:4; 122:5, 7; 126:6, 10, 15, 16; 127:23; 160:22; 169:24; 185:18; 188:4, 16; 190:13
**right** [76] 10:9; 12:5; 16:6; 23:13; 32:10; 37:18, 22; 38:21; 52:4; 57:4; 61:25; 64:23; 67:5; 69:21; 70:3; 72:19; 78:25;

79:14;
81:25;
83:1;
84:24, 25;
86:1, 8;
89:12;
90:7, 14;
93:24;
97:17;
100:2;
102:16;
107:8, 15;
112:2, 14,
19, 24;
115:12;
118:22;
119:23;
120:5;
121:9, 14;
122:6, 19;
125:9;
129:14, 19;
132:16;
134:3, 4, 5;
138:10;
141:17;
142:11;
149:2;
153:5, 20;
154:6;
155:25;
159:22;
161:18;
163:25;
165:15;
168:13;
172:13, 14;
174:12;
179:3;
185:20;
186:17;
187:12;
190:12
**right-hande
d** [1]
188:14
**rights** [1]
148:14
**roads** [1]
187:13
**ROBERT** [1]
1:12
**Rock** [2]
34:14
**Rodney** [2]
184:3, 4
**Rodriguez**
[6] 131:1;
142:13;
143:3, 10,
16; 146:9
**Roger** [2]
141:19;
162:23
**Room** [1]
4:18
**room** [4]
8:4; 11:5;
12:17;
14:14
**ROSELAND**
[1] 2:22
**Roseland**
[1] 2:24
**roughly** [2]
21:24;
185:1
**round** [1]
21:9
**rule** [1]
14:16
**runs** [1]
40:11

**- S -**

**SABUR** [1]
1:8
**Said** [1]
141:19
**said** [107]
6:5; 12:18;
13:7;
19:25;
20:3;
23:23;
30:2, 13;
35:24;
41:15, 16,
24; 42:3,
5, 19, 23,
24, 25;
43:3, 4, 8;
44:11, 13;
46:23, 25;
47:23;
49:5, 10,
15, 17;
50:2; 51:8,
13; 52:12;
55:23;
56:13, 24;
57:16, 23;
58:21;
59:9, 23,
25; 61:9,
20; 64:2;
65:20;
69:18;
72:3;
73:21;
75:22;
76:2, 23;
78:2;
81:21;
86:17;
90:25;
95:4, 13;
96:8, 18,
20; 97:6;
122:15, 17;
124:10;
129:8, 9,
25; 130:4,
14; 132:2;
135:11, 23;
138:17, 20;
144:17, 23;
145:2, 10,
11, 25;
146:1;
153:2, 3;
155:23;
157:24;
159:13;
160:13;
161:16, 24;
162:1, 7;
163:3;
165:8;
166:6, 10;
167:21;
169:3, 4;
171:3;
177:19;
183:4;
187:9;
188:2;
192:15;
195:14
**Saint** [1]
3:7
**Same** [4]
24:13;
87:11;
147:24
**same** [30]
11:5;
14:13;
37:9; 45:1;
46:1, 21;
48:25;
49:2; 52:4,
11; 55:11,
20; 58:8,
24; 63:17;
82:21;
88:11;
104:18;
105:2, 17;
107:1;
132:15;
152:19, 20;
163:25;
173:15, 16;
175:18;
183:14;
187:19
**sanction**
[1] 103:21
**Sarah** [2]
133:2;
134:13
**Saturday**
[1] 112:5
**saying** [44]
6:3, 21;
19:12;
23:15;
30:9;
35:10;
43:7;
44:11;
48:11;
49:1; 55:1;
56:6; 57:1,
7; 63:23;
67:2; 68:3;
74:4, 16;
75:22;
101:11;
106:5;
115:4;
137:3, 5,
16; 138:4,
16; 142:1,
2; 144:12;
146:22, 25;
147:12;
150:8, 15,
16; 151:25;
160:12;
161:25;
168:20;
170:23, 24;
181:1
**says** [22]
100:9, 20;
104:14;
111:22;
112:5;
120:7;
122:24;
123:1, 23;
125:20;
133:24;
134:2, 5;
140:4;
158:24, 25;
160:22;
162:6;
168:11, 21;
180:21;
181:25
**scenarios**
[1] 12:6
**scenes** [1]
49:11
**schedule**
[1] 66:19

**scheduled** [1] 80:13
**SCHENCK** [1] 3:13
**Scott-Bey** [12] 97:3; 129:6; 130:6, 10; 131:8; 132:2; 142:1; 148:1, 15; 149:23; 158:5, 19
**screen** [12] 13:5; 100:9; 104:12; 106:25; 109:14; 110:3; 116:4, 7; 133:21; 157:12; 179:10; 181:23
**screw** [1] 54:22
**scroll** [5] 100:13; 115:3, 14, 16
**Second** [1] 26:25
**second** [26] 15:19; 18:9; 26:24; 27:3, 15; 46:15; 47:5, 6; 50:18; 59:10; 64:9; 66:20, 21; 69:25; 84:20; 100:6; 101:1; 106:2; 118:11, 17; 151:14; 153:18; 161:5; 163:5; 177:18; 181:21
**Security** [4] 158:7, 12, 15, 17
**Seemed** [1] 56:2
**seems** [3] 106:25; 110:11; 124:19
**seen** [9] 85:17, 18; 101:17; 139:22; 140:9; 165:1; 182:8, 9, 11
**sell** [3] 94:17, 18; 195:1
**selling** [2] 96:8, 10
**Send** [2] 151:7, 9
**send** [3] 104:4; 151:8; 182:15
**Senior** [2] 20:9; 22:18
**sent** [5] 104:11, 18; 105:3, 14, 25
**sentence** [3] 111:22; 158:18, 25
**separate** [1] 106:12
**separated** [4] 11:7; 29:19, 22; 31:7
**September** [1] 139:21
**Sergeant** [3] 9:20; 148:10, 16
**seriously** [1] 136:17
**serve** [1] 106:11
**served** [1] 100:22
**SERVICE** [1] 2:22
**Service** [1] 55:23
**seven** [7] 81:24, 25; 86:17; 92:25; 93:1, 18; 94:5
**several** [3] 15:3; 134:21; 142:19
**share** [2] 104:12; 133:21
**sharing** [1] 110:2
**She's** [1] 32:1
**SHEPPARD** [1] 1:9
**SHERIFF** [1] 1:17
**SHERIFF'S** [1] 1:16
**shoot** [5] 81:7; 120:1, 9, 10; 123:24
**shooting** [2] 95:9, 11
**shop** [3] 186:13, 21; 187:15
**short** [1] 81:23
**Shorthand** [1] 2:23
**shot** [2] 81:7, 10
**should** [6] 16:2; 18:1; 54:6, 10; 73:21; 176:25
**shoulders** [1] 13:23
**show** [24] 76:5; 100:3; 102:23; 103:11; 108:12, 20; 109:1, 11; 110:23; 126:2; 128:9; 133:8; 138:2; 139:2; 165:14; 177:12; 179:5, 8, 16, 20, 22; 181:22; 182:7, 9
**showing** [5] 105:4, 16; 111:12; 114:18; 139:14
**shown** [1] 179:6
**shrugs** [1] 13:23
**shut** [1] 172:20
**Siblings** [1] 90:8
**siblings** [8] 23:1, 3; 24:4; 25:5; 26:9, 13; 28:7; 90:7
**side** [11] 26:8; 82:14, 20, 22; 91:13; 121:9; 123:7; 175:21; 186:19; 187:5
**signature** [6] 107:20, 22; 108:6, 19; 114:5, 21
**signed** [2] 134:16; 139:21
**significance** [1] 11:15
**signing** [3] 108:16, 18; 114:2
**simple** [2] 18:13; 35:21
**Simpson** [2] 170:18, 23
**Since** [4] 22:6; 37:21, 22; 38:7
**since** [5] 14:13; 37:22; 85:17, 18; 109:9
**sister** [4] 25:15; 127:10; 140:15
**sister's** [1] 127:14
**sisters** [3] 23:17, 18, 19
**sitting** [3] 52:9; 97:2; 99:21
**situation** [5] 35:5; 54:14, 15, 16; 97:7

**skill** [7] 175:24; 176:5, 8, 10, 11; 177:22, 25
**skip** [1] 118:11
**skipped** [1] 107:24
**skipping** [1] 147:23
**slated** [1] 148:9
**sleep** [4] 33:17, 19; 34:2; 51:20
**slow** [1] 104:23
**SMITH** [2] 1:15; 3:13
**smoke** [3] 142:24; 145:20; 146:11
**smoking** [1] 170:16
**smoothly** [1] 94:2
**snuck** [1] 141:21
**Social** [4] 158:7, 12, 14, 17
**sodas** [1] 163:15
**sold** [1] 191:20
**some** [28] 9:15, 25; 10:1, 5, 7, 9; 20:5; 42:23; 44:19; 58:7, 11; 77:7; 81:7; 82:24; 95:2; 96:13, 18; 100:3; 118:12; 149:11; 163:14; 165:9, 19; 167:8; 178:3; 181:8; 185:25; 195:14
**Somebody** [2] 98:16; 146:24
**somebody** [10] 19:9; 73:11; 96:22; 97:24; 142:2; 147:5, 12; 151:21; 197:18, 20
**Something** [2] 85:2; 122:18
**something** [40] 16:13; 19:2; 28:24; 42:9; 50:2; 56:22; 63:25; 68:1; 74:14, 17, 21; 75:22, 25; 76:23, 24; 81:21; 87:15; 90:23; 96:22; 97:11; 98:4, 15; 101:16; 112:25; 113:1; 116:21; 118:13; 128:19; 130:17; 154:3; 164:24; 166:18; 169:3; 176:24; 178:17; 185:2, 3; 190:10; 197:4, 19
**sometime** [4] 44:20; 57:16; 59:12; 87:14
**sometimes** [5] 22:10; 33:21, 24; 55:5; 142:17
**Somewhere** [5] 39:9, 18, 19; 90:24; 121:6
**somewhere** [13] 21:25; 31:10, 12; 36:10; 39:8; 40:19; 55:25; 56:1; 89:20; 90:22; 122:12; 140:7; 155:13
**son's** [1] 35:14
**Sons** [1] 91:17
**Sorry** [1] 192:10
**sorry** [25] 19:23; 24:21; 36:20; 47:18; 58:19; 59:24; 62:22; 63:3; 72:12; 88:22; 90:20; 92:3; 107:24; 131:22; 132:22; 152:16; 155:17; 162:20; 176:3, 15; 177:18; 183:6, 12; 188:23; 193:3
**sort** [3] 20:24; 106:23; 124:9
**sound** [1] 57:4
**South** [3] 40:11, 12; 44:20
**Speak** [1] 23:24
**speak** [11] 12:15, 24; 13:25; 37:1; 65:11; 70:23; 99:8; 127:16, 19; 128:23; 132:23
**speaking** [8] 6:9; 13:2; 30:23; 43:20; 67:15; 69:13; 131:1, 14
**specific** [1] 186:15
**specifically** [1] 111:2
**speculate** [2] 147:13; 151:20
**speculating** [1] 151:4
**speculative** [1] 147:11
**spell** [1] 56:20
**spend** [1] 90:1
**spirit** [1] 22:14
**spoke** [21] 18:24; 36:7, 25; 37:6, 8; 39:20; 65:3, 6, 15, 16; 67:2, 6; 69:9; 70:1, 2, 12, 24; 99:8; 130:5, 9; 133:4
**spoken** [1] 19:7
**stairs** [1] 122:4
**stamp** [4] 133:10, 24; 134:1; 181:25
**start** [6] 98:22, 23; 104:22; 165:20; 167:8; 174:22
**started** [2] 95:15; 183:20
**STATE** [3] 1:17, 18; 4:7
**State** [6] 2:3; 4:12; 8:24; 75:9; 199:3, 21
**state** [2] 59:3; 111:2
**State's** [2] 104:8, 19

**stated** [19] 134:23; 140:5, 9; 142:16, 22; 148:19; 149:7; 158:25; 159:2; 161:9; 163:11, 12, 13; 165:16, 19; 167:4, 5, 7
**statement** [37] 48:22; 49:14; 50:3; 51:7; 75:1, 5; 77:25; 78:14, 15, 19, 21, 24; 141:17, 18, 19, 22, 23, 24; 143:18; 144:2, 5, 10; 145:1; 146:25; 147:2; 149:19; 161:19, 21; 162:1, 2, 15; 163:2; 166:5; 167:17, 18, 19; 169:23
**statements** [2] 6:21; 150:8
**STATES** [1] 1:1
**states** [1] 134:20
**stating** [1] 8:11
**status** [2] 56:15; 57:21
**stayed** [2] 81:15; 83:16
**staying** [2] 83:15; 124:1
**stenographically** [1] 199:11
**Step** [1] 151:16
**step** [1] 151:15
**stepfather** [4] 154:15, 17, 24, 25
**STEWART** [1] 4:14
**sticker** [1] 100:17
**Still** [1] 84:14
**still** [8] 14:18; 16:23; 22:13; 28:14; 29:15; 39:25; 57:19; 116:2
**stole** [1] 96:22
**stolen** [5] 94:13; 97:21; 99:22; 100:1; 191:11
**stood** [1] 140:19
**Stop** [12] 43:22; 135:9; 151:3, 5, 7; 170:9; 173:17; 175:9, 10
**stop** [6] 43:21; 62:16; 81:12; 173:18; 174:11; 175:11
**stopped** [1] 126:19
**store** [2] 193:18; 195:1
**stored** [1] 196:2
**story** [1] 81:23
**straight** [1] 82:13
**straightforward** [1] 35:22
**Street** [36] 4:9, 18; 82:5, 13, 20, 22; 83:2, 6, 16; 88:18, 23; 89:11; 93:2; 94:6; 117:22; 118:2; 123:7; 124:2; 126:7; 144:13, 14; 148:3, 4; 155:13, 21, 24; 156:3, 19; 158:9; 172:14, 15; 186:19; 187:21; 188:1
**street** [24] 40:10, 11; 44:19; 62:3; 82:21; 83:3; 96:10; 120:13; 127:11; 164:10, 15; 175:20, 21; 184:5; 187:20, 22; 189:4, 7, 11, 13, 17, 20; 190:2
**streets** [1] 187:3
**strike** [1] 111:21
**stuck** [1] 125:10
**stuff** [6] 42:23; 52:11; 55:20, 21; 58:6; 95:7
**subconscious** [1] 176:19
**substantive** [1] 77:12
**such** [1] 199:17
**suddenly** [1] 59:13
**suffer** [2] 15:11, 12
**suggest** [3] 76:13; 78:7; 79:5
**suggested** [1] 78:18
**suggesting** [1] 191:14
**suggestion** [1] 58:1
**suing** [2] 60:15, 18
**Sunday** [7] 80:3, 24; 83:18; 112:9; 119:2; 123:25; 129:14
**super** [5] 97:24; 194:18, 21, 25; 195:22
**superintendent** [1] 197:10
**superintendent's** [1] 197:12
**Supplemental** [1] 7:18
**supplemental** [1] 157:18
**support** [1] 54:11
**supposed** [1] 56:15
**Sure** [3] 84:10; 114:13; 177:23
**sure** [52] 10:7; 25:22; 39:7; 40:22, 23; 48:6, 13; 55:6; 58:13; 59:9; 60:3, 17, 20, 22; 61:1, 4, 5, 9, 11; 70:25; 75:20; 76:1; 77:1; 83:10; 84:17; 86:16; 88:11; 92:21, 24; 93:3; 97:22; 98:11; 99:16; 101:17, 19, 20; 102:17; 105:2; 106:13, 15; 108:6; 114:17; 130:16;

132:11; 147:19; 178:10; 184:9, 17; 188:12; 197:6, 16, 17
**switch** [1] 79:9
**sworn** [3] 11:15; 111:20; 199:6

- T -

**Take** [2] 113:21; 114:19
**take** [36] 11:7; 12:18; 13:23; 14:3, 8; 15:15; 17:1; 40:4; 45:12; 56:4; 62:4; 64:12, 16, 17, 22; 83:19; 102:16, 25; 104:2, 3, 13; 106:1; 112:24, 25; 113:1, 4, 19; 114:13; 139:4; 153:10; 163:22; 172:12, 15; 183:12; 184:12
**taken** [10] 2:1; 16:18; 17:8; 64:24; 98:3, 6; 113:23; 153:11; 182:23; 199:11
**takes** [2] 64:19; 88:20
**taking** [15] 13:7; 14:22; 16:10, 12, 18, 22, 24; 17:17; 18:2; 52:9; 55:18; 75:24; 103:4; 113:3; 184:20
**talk** [9] 79:8; 84:22; 128:1, 5, 7, 14; 139:25; 153:16; 155:7
**talked** [5] 65:21; 128:10; 163:12; 173:15; 197:23
**talking** [25] 13:1; 17:13; 20:20; 23:13; 48:1, 2; 52:8; 65:2; 74:5; 78:21; 79:2; 89:4; 95:12; 128:17; 131:7, 19, 20, 22; 141:16; 143:16; 158:19; 162:2; 166:7; 183:20
**Taylor** [10] 25:24; 92:10, 22; 111:7; 141:19; 149:10, 25; 162:23
**telephone** [6] 47:12, 22; 70:3; 140:11; 142:23; 146:10
**Tell** [5] 35:4; 115:15; 128:22, 25; 159:21
**tell** [69] 6:15; 9:5; 10:21; 15:22; 16:3; 18:18; 23:3; 29:7; 32:18; 34:12; 41:3, 4; 43:14; 44:8; 46:11; 48:24; 50:7; 51:11; 59:14, 17; 60:18; 61:3; 62:15, 18; 66:5; 70:21, 24; 71:7; 76:17; 77:20; 78:4, 10; 80:1; 87:18; 97:10; 99:21, 24; 105:21; 113:19; 115:1; 116:25; 118:13; 119:7; 127:5; 132:13; 135:1; 136:18; 138:4, 10; 139:6; 142:7; 143:3, 9; 145:18, 25; 146:3, 4, 8; 149:22; 150:1; 152:9, 17; 165:4; 175:22; 177:6; 179:21; 189:22; 194:21
**telling** [8] 43:2, 5, 7; 46:22; 48:22; 96:21; 138:6, 11
**temporary** [1] 193:21
**testified** [2] 53:24; 186:10
**testifies** [1] 9:6
**testify** [2] 75:10; 199:7
**testifying** [1] 109:6
**testimony** [21] 2:1; 10:6, 14, 22; 11:16, 20, 21, 22; 38:1, 8; 44:22; 46:19; 48:19; 50:5; 56:8; 61:19; 98:25; 135:11; 175:11; 194:6; 199:10
**than** [25] 6:3; 16:9; 17:7; 19:6, 11, 17; 27:3; 30:8; 32:19; 44:15, 18; 51:22; 54:10; 71:11; 78:1; 122:25; 123:16; 127:12; 131:4, 5, 8; 147:6; 193:2; 195:22; 198:3
**Thank** [26] 17:25; 24:3, 24; 25:16; 27:16; 28:6; 42:19; 45:16; 64:18; 78:22; 83:5; 94:1; 105:23; 109:17; 120:11; 122:2; 133:21; 139:12; 151:18; 156:17; 170:13; 174:12; 185:25; 186:3;

188:8; 198:11
**thank** [1] 188:13
**That's** [93] 6:5; 16:1; 19:2, 10, 11; 23:15; 26:23; 28:5; 29:3; 30:13; 32:10; 33:16; 34:6, 10, 19, 24; 42:3, 19; 44:11; 45:25; 48:11, 25; 51:10; 52:6; 63:5, 10, 13; 64:2; 65:21; 68:23; 69:1, 18; 71:2; 72:5, 17; 74:4, 22, 24; 79:2, 18; 81:15; 82:21; 84:23; 87:21; 92:4, 16; 96:25; 97:6; 100:17; 111:7; 114:20, 21, 24; 117:12; 120:4; 121:13, 20; 123:1; 126:12; 130:9; 133:3, 6, 19; 137:15, 20; 141:21; 144:20; 145:23; 146:2, 18, 25; 147:7; 152:3; 153:5; 158:21, 24; 160:1, 2; 161:3, 13, 18; 162:14; 164:1; 165:12; 169:23; 170:1, 2; 174:1, 14; 175:3; 180:10
**that's** [57] 6:4; 21:11; 23:6; 30:10; 32:12; 33:11; 34:10; 39:14; 46:15; 49:10; 55:5; 56:1; 64:15; 66:19; 68:4; 72:4; 77:4; 81:18; 82:23; 83:17; 90:18; 95:13; 96:16, 24; 105:17; 107:1; 108:19; 114:20, 22; 121:18; 125:22; 126:14; 129:5, 12; 130:5; 138:16; 139:15; 141:15, 22; 144:22; 145:1, 10; 157:11; 158:8; 159:19; 160:13; 161:1, 2; 163:3; 165:25; 166:16; 181:9; 183:14
**thata** [1] 63:19
**their** [11] 8:8; 19:7, 18; 23:20; 25:9; 26:19; 28:9; 33:1; 90:13; 145:1; 146:24
**them** [56] 6:19; 15:3; 26:1; 33:4, 6; 88:20; 89:24; 90:2; 92:15; 95:8; 108:18; 126:24; 132:13, 14, 15, 17, 18; 140:13, 17; 142:3, 4, 18, 19; 144:22; 148:22; 150:5; 152:18, 20, 21; 155:18; 159:21; 162:25; 172:12, 15, 17; 173:12, 14; 175:1, 15, 18; 183:5, 12, 25; 184:6, 7, 12, 23, 24; 185:7; 186:12; 192:12, 20
**themselves** [1] 108:24
**Then** [7] 10:3; 70:8; 83:1; 105:8; 122:9; 174:6; 197:19
**then** [37] 14:7; 25:2; 27:21; 32:6; 46:15; 47:23; 66:13, 15, 18, 19; 72:16; 81:9; 82:1, 9, 17; 87:21; 89:3, 6; 96:24; 97:3; 103:20; 109:1; 115:19; 118:24; 123:3; 129:15; 130:24; 149:9, 10, 13, 14; 165:21; 178:8; 183:19, 20; 187:6; 191:5
**theories** [2] 129:19; 194:17
**theorize** [1] 195:19
**There** [14] 13:4; 14:10, 15; 15:3; 23:18; 81:6; 101:9; 104:10; 107:25; 131:4; 145:15; 148:4; 181:5; 186:17
**there** [113] 14:5, 6; 17:20, 22; 21:20, 25; 22:9; 28:1; 31:10, 12; 33:19, 21, 24, 25; 34:1; 36:10; 39:8, 16, 19; 40:19; 44:15; 46:3; 47:16, 24; 48:16; 51:22, 23; 52:15, 18; 55:17; 56:20; 58:10, 23; 68:1; 72:24; 73:6; 75:25; 76:24; 79:19, 21, 22; 80:22; 81:9, 25; 83:14, 17; 86:1, 8, 17; 90:23; 94:12; 95:2; 96:25; 97:2, 25; 98:5; 100:18; 104:25;

105:21; 107:9; 108:8; 112:2; 114:10, 22, 24; 116:7, 15, 21; 118:12; 120:8, 9; 121:6, 25; 122:1, 13; 124:14, 15; 125:3, 4, 9, 12; 132:16; 134:5; 138:5; 139:2; 143:18; 151:14; 153:5; 159:20; 161:24; 164:2, 8, 9, 23; 166:8, 14, 16, 18; 168:14, 15, 18, 19; 170:7; 175:20; 181:9; 183:9; 184:3; 186:21; 188:19; 195:15

**There's** [1] 23:6

**there's** [1] 125:25

**These** [5] 101:6; 110:3; 111:19; 138:12; 180:8

**these** [18] 6:21; 11:25; 78:5, 8; 81:2; 101:2; 107:25; 108:3, 16; 117:4; 136:19; 138:7; 139:4; 150:8; 165:12; 172:5, 9; 173:4

**They** [26] 8:5; 16:13; 21:10; 22:14; 41:18; 55:14, 23; 59:4; 87:2; 95:10; 96:19; 97:4; 112:3; 121:21; 130:14; 132:3, 6; 149:12; 152:24, 25; 153:1; 155:4; 162:25; 164:8; 183:19

**they** [97] 6:14; 11:10; 21:6, 8, 9; 41:15; 42:22; 43:8, 10; 44:8; 46:22, 25; 48:22; 49:2, 5, 7, 8, 9, 13; 50:2, 3; 51:7, 8; 55:14, 24; 57:24; 81:4; 82:6, 10, 11, 24; 90:10; 95:8, 11, 12; 97:1, 18; 99:12; 101:3; 110:10; 122:24; 125:11; 128:8; 129:7, 8, 14, 15, 22; 130:12, 18, 22; 132:4, 8, 9, 11; 134:15; 137:1; 138:3, 7; 140:8; 141:21; 142:13, 15; 145:2, 10, 24; 147:9; 149:14; 153:2, 3, 4; 155:2, 9, 11, 20; 159:20; 162:24; 163:12; 165:16, 18, 20; 167:4, 5, 6, 9; 168:18; 183:20; 184:2; 185:25; 193:2, 10, 11; 196:2, 5

**They're** [3] 6:9; 30:23; 109:3

**they're** [10] 11:25; 22:11; 90:6; 132:3; 144:12, 25; 145:3, 4, 6, 11

**they've** [1] 159:21

**thing** [23] 34:25; 37:13, 14; 46:23; 50:1; 52:4, 11; 56:1, 15; 66:13, 17; 82:6; 87:11; 95:21; 116:12; 125:7; 132:15; 141:20; 142:9; 152:23; 173:15, 16; 182:9

**things** [6] 18:18; 51:21; 75:21; 84:20; 126:1; 138:4

**think** [36] 9:16; 12:7; 23:12; 25:24; 51:20; 58:23; 65:16; 76:14; 77:10; 81:7; 87:3; 99:14, 15; 101:3; 116:10; 122:20; 127:4, 18; 128:20; 135:5, 20; 136:8; 153:19; 172:7; 173:12, 23; 183:4; 184:13, 14; 185:6; 188:19; 190:9; 195:14

**thinking** [1] 76:22

**thinks** [1] 173:21

**third** [3] 82:7; 121:22, 24

**This** [39] 6:23; 10:16; 12:15, 17; 36:9; 43:22; 49:10; 50:10; 54:19, 24; 57:14; 72:13; 97:16; 103:5, 15; 109:4; 112:20; 114:16, 18; 118:3; 133:23; 137:15; 142:12; 144:5; 147:2, 4; 150:11; 157:11, 18; 162:15; 167:1, 18; 170:10; 177:13; 179:8, 12, 14, 17; 182:14

**this** [174] 6:14; 8:2, 4, 8, 9; 9:3, 22; 11:14, 16, 19; 12:4; 13:8, 10; 14:13, 15;

19:16; 29:17; 31:20; 32:2, 13, 17; 35:5; 37:21; 40:14; 41:14, 19; 43:9, 11; 44:9, 11, 16, 18; 45:2, 7, 13, 15, 22; 46:1, 17; 49:13; 50:3; 51:11; 52:7, 11; 54:14, 18; 55:20, 23; 57:8, 17; 58:6; 59:11; 62:13, 14; 64:16; 66:13, 17; 68:14; 69:23; 71:22; 73:10, 14, 25; 79:12; 83:7; 92:6; 93:23; 94:20; 95:5, 13, 14, 17, 21; 100:8; 101:8, 9, 21; 102:4, 9, 18, 24; 103:9, 14, 18, 22; 104:6, 8; 105:3, 15; 107:6, 15; 108:6; 109:2; 110:7, 11, 12, 16; 114:18; 115:4, 23; 116:12; 121:2; 123:15; 124:10; 126:3, 11; 133:11; 134:12; 136:18, 22; 137:4, 5, 11, 22; 138:6, 13, 20, 23, 25; 141:3, 13, 14, 22, 24, 25; 142:2, 6; 144:10; 145:2, 9, 23; 147:1, 9; 149:21; 150:24; 151:8; 152:12, 24; 153:9; 161:5, 14, 19, 20; 163:2; 167:11; 169:4; 170:10, 15; 171:5, 23; 173:21; 177:2, 17, 19, 21; 179:17; 180:9, 19; 181:5, 23; 182:4, 8, 10, 13, 15; 185:21, 23; 188:18; 190:22; 193:9; 196:8; 199:15

**those** [18] 13:25; 18:3; 25:25; 26:9; 39:13; 76:11; 78:17; 79:5; 93:1, 18; 94:5, 9, 15; 129:6; 136:25; 153:7; 180:5; 192:23

**though** [6] 33:25; 86:1; 93:6; 122:20; 129:8; 157:18

**thought** [13] 23:23; 57:23; 67:23; 69:5; 77:7; 90:24; 97:24; 102:5, 14; 121:18; 129:25; 149:13; 153:20

**threaten** [1] 169:10

**threatening** [1] 169:12

**Three** [4] 23:9, 11; 63:1

**three** [12] 23:8, 12; 36:10, 25; 37:7; 47:19; 79:20; 99:16; 122:16, 19, 22; 142:21

**threw** [2] 153:4; 189:5

**Through** [2] 177:1; 190:16

**through** [19] 10:1; 12:4; 57:17; 62:13; 81:1, 3, 10, 11, 16, 17; 111:18; 112:21; 116:20; 124:9; 125:3; 126:3; 136:25; 157:14; 189:23

**throwing** [1] 153:4

**Thursday** [2] 1:22; 2:5

**TIETJEN** [1] 1:18

**Tietjen** [2] 4:12; 8:25

**time** [78] 10:16; 12:15; 14:4, 10; 17:4; 21:20; 32:16; 36:6; 37:7, 11, 12; 40:14, 17; 48:25; 58:8, 24; 64:5, 7, 9, 16; 66:18, 19; 69:25; 70:2; 73:13; 79:25; 82:5; 84:18; 85:6, 9; 87:9; 88:5, 13, 17; 90:1, 11; 94:19, 21; 95:1, 7; 96:23; 99:25; 100:2; 104:3; 117:16; 123:19; 124:13; 128:16, 22; 130:20; 132:17; 133:5; 136:10; 140:8; 143:9; 144:13; 145:7, 22; 152:16, 17, 19, 20, 21; 155:20; 164:17; 166:8; 173:10; 182:11; 183:5, 15; 186:12; 189:5, 8; 194:8, 12

**times** [9] 12:22; 50:11; 52:7, 12, 13; 62:17; 63:1; 188:4

**today** [19] 6:10; 9:15; 10:22, 25; 11:7, 21, 22; 13:5; 16:25; 17:2, 12, 14, 17, 21; 18:4; 31:1; 99:21; 125:4; 186:21

**today's** [5] 16:21; 18:11, 15; 19:4, 8
**together** [29] 6:22; 11:14; 41:19; 46:14; 48:22; 49:14; 50:3; 55:21; 58:7; 59:5; 66:14, 16; 109:10; 138:7; 150:10; 157:3; 162:25; 174:22; 175:25; 176:6, 20, 25; 177:7, 18, 19; 178:1, 16; 187:12; 191:2
**told** [66] 6:15; 19:9; 43:1, 13; 44:4; 45:18; 47:14, 19; 48:14, 15, 17; 49:15; 51:6, 11, 16, 17, 19, 25; 52:17; 60:3, 21, 23; 69:5; 78:1; 88:4; 90:7; 95:3; 96:20; 97:8, 9; 98:15; 108:7; 118:8; 119:4, 18, 22, 25; 120:24; 121:13, 18, 20; 122:6; 123:8, 21; 126:11, 19, 24; 127:6; 128:6; 132:15, 17; 141:21; 143:8; 145:24; 146:2; 152:20; 153:18, 19; 185:6; 188:19; 194:2, 3
**took** [17] 16:20; 17:4; 44:19; 55:16; 82:11; 98:17; 123:3, 5; 142:18; 158:11, 14; 174:25; 175:14; 183:23, 25; 184:18; 194:16
**topic** [2] 70:18; 184:24
**topics** [1] 10:7
**total** [1] 141:19
**totally** [1] 139:5
**town** [1] 155:5
**traffic** [3] 130:19, 21; 148:9
**train** [2] 82:6; 122:6
**TRANSCRIPT** [1] 2:1
**transcript** [4] 13:9, 15; 165:14; 199:10
**transformation** [2] 176:13, 17
**transported** [1] 148:5
**transporting** [2] 95:16; 96:9
**trauma** [1] 174:13
**tree** [1] 22:12
**Trenton** [1] 4:11
**trial** [5] 10:6; 11:17, 19; 12:7; 83:21
**trick** [1] 175:9
**tricked** [8] 41:15, 18, 23; 42:22; 43:2; 44:9; 48:15; 49:2
**tried** [1] 63:14
**triggered** [1] 64:3
**trips** [3] 122:16, 17, 19
**TROOPER** [1] 1:18
**trouble** [1] 23:22
**truck** [19] 81:25; 82:11, 16; 85:7; 86:17; 91:9, 10, 14; 92:13; 121:7; 140:7; 149:13; 163:17, 23; 165:20; 180:12, 13; 184:8; 198:3
**true** [8] 12:16; 45:20; 46:24; 47:1; 117:9, 12, 18; 199:10
**truth** [10] 9:5; 10:21; 173:14, 23; 174:1; 199:7, 8
**truthful** [4] 10:22, 25; 17:21; 18:4
**trying** [17] 12:24; 42:24; 46:4, 5; 53:25; 55:3, 6; 57:22; 63:8; 65:19; 96:14; 106:20; 109:9, 10; 175:9; 181:7; 187:12
**Tuesday** [2] 182:12, 13
**turn** [2] 66:20; 83:1
**Turner** [2] 111:6; 149:10
**Turner's** [2] 126:18; 127:2
**turning** [1] 16:15
**twice** [1] 24:23
**Twin** [1] 23:12
**twin** [1] 23:6
**Type** [2] 15:14, 18
**type** [4] 15:14, 17, 18
**typically** [2] 14:5; 15:6

**- U -**

**Uh-huh** [7] 68:12; 69:7; 93:13; 100:7; 111:15; 115:18; 157:16
**uh-huh** [1] 13:24
**um-hum** [1] 13:24
**uncle** [2] 26:15; 95:8
**uncles** [3] 25:25; 26:1; 28:4
**under** [2] 11:15; 14:21
**undersigned** [4] 148:2, 3, 15; 158:4
**understand** [22] 10:11, 21; 11:23; 13:11, 18; 14:1, 19; 20:18; 36:23; 45:5; 46:4; 47:3; 48:13; 49:12;

51:5; 55:4, 5; 57:23; 80:6; 93:8; 104:21; 187:13
**Understood** [1] 194:13
**understood** [2] 13:16; 80:10
**unethical** [1] 175:10
**unidentified** [2] 140:10, 11
**UNITED** [1] 1:1
**Unless** [2] 113:19; 118:12
**unless** [2] 14:17; 102:23
**unloaded** [2] 82:15; 122:10
**unsure** [1] 123:25
**until** [6] 82:10; 83:17; 97:2; 102:18; 128:21; 129:9
**unusual** [1] 11:4
**up-to-date** [1] 131:20
**upcoming** [1] 19:16
**Upon** [1] 148:3
**upon** [1] 100:22
**upset** [2] 141:2; 174:9
**used** [3] 11:16; 120:1; 152:19
**using** [2] 188:13; 192:22
**usually** [1] 174:13

- V -

**Vacant** [1] 186:25
**Vailsburg** [16] 163:17, 23; 164:21; 166:13; 168:12, 13, 21, 22; 169:21; 175:1, 15; 183:3, 13, 23; 184:1, 12
**value** [7] 189:4, 7, 11, 13, 17, 20; 190:2
**various** [2] 9:23; 26:1
**VASQUEZ** [1] 1:17
**vehicle** [1] 198:3
**Vera** [1] 25:15
**Vera's** [1] 25:21
**verbally** [2] 13:22, 25
**versus** [1] 100:10
**very** [12] 12:2; 62:10; 69:21; 102:9; 105:15; 136:17; 140:1, 4; 152:24; 162:3; 186:1, 3
**Victim** [1] 134:20
**victim** [5] 56:5; 57:8; 134:21, 23
**victim's** [3] 135:6, 21; 139:7
**VICTOR** [1] 4:4
**Victor** [1] 8:22
**Village** [2] 34:14, 15
**violation** [2] 102:8; 110:19
**visit** [1] 155:18
**VOMACKA** [10] 4:3; 104:7, 23, 25; 105:13, 20; 106:9, 13, 20; 109:21
**Vomacka** [5] 8:23; 104:8; 105:12; 106:7; 107:13
**Vomacka's** [2] 110:15; 113:5

- W -

**Wait** [6] 104:20, 21
**waiting** [1] 155:17
**waive** [1] 8:9
**want** [67] 16:2, 3; 17:16; 18:22, 23, 25; 20:23; 22:10; 26:18; 44:3; 48:13; 51:5, 12; 52:4; 63:5, 6; 67:22; 68:2; 76:24; 77:15; 88:11; 95:6, 25; 99:4; 103:11; 104:3, 6; 111:18, 25; 113:6; 114:5; 115:2, 22; 116:8; 118:13; 129:11; 130:16; 132:4; 133:14, 16; 139:25; 140:24, 25; 145:24; 147:9; 153:15, 16; 157:9, 17, 23; 158:1, 8, 16; 162:3; 169:11, 13; 174:8, 9; 177:12; 179:16, 22; 181:21; 188:17; 191:15
**wanted** [10] 74:10; 75:21; 80:21; 96:1; 108:6, 12; 145:20; 146:10; 165:19; 167:8
**wanting** [1] 142:23
**warehouse** [2] 34:25; 35:1
**warrant** [3] 130:19, 21; 148:9
**Wasn't** [1] 99:12
**wasn't** [50] 37:9; 38:18, 22; 39:11, 12, 15; 41:9; 46:3; 48:16; 61:9; 62:4; 72:1; 77:1; 81:4, 12, 22; 83:15; 87:16; 92:13; 95:6, 18; 96:10; 97:23, 25; 99:17, 18; 110:2; 112:6, 7; 121:25; 124:3; 125:15; 138:5; 144:7; 152:22; 166:8, 9, 14, 16; 168:14, 15; 183:17; 188:12; 194:1; 197:16
**ways** [1] 110:20
**We'll** [1] 107:7

**we'll** [1] 107:3
**We're** [2] 101:7; 129:20
**we're** [5] 84:22; 101:8; 104:10; 129:17, 18
**week** [8] 17:6; 182:13, 14; 197:3, 4, 5, 7
**Well** [32] 10:18; 15:20; 18:18; 23:5; 29:23; 32:12; 33:11; 35:25; 37:21; 44:18; 46:3; 49:18; 58:15, 23; 59:2; 62:3; 74:12; 79:12; 88:7; 92:18; 98:13; 102:15; 103:6; 107:3; 108:20; 129:5; 136:16; 141:15; 150:20; 160:22; 166:20; 185:13
**well** [5] 20:23; 102:9; 106:21; 111:20; 185:7
**Went** [2] 81:25; 82:13
**went** [46] 39:14; 45:21; 55:22; 63:11; 76:14; 82:9, 24; 83:2; 93:16; 94:6; 96:24; 112:15; 119:8, 25; 120:9; 121:12; 124:9; 126:5; 129:7; 130:21; 134:16, 21; 142:3, 4, 6; 148:4; 157:22; 163:14; 164:23; 166:12; 167:22; 168:12, 13, 21, 22; 169:21; 185:10, 14, 16; 188:20; 192:23; 193:1, 9, 20; 196:2, 6
**Were** [13] 27:23; 44:15; 47:16, 24; 78:17; 79:4; 155:8; 156:2; 162:10; 171:16, 18, 20; 192:22
**were** [71] 6:19; 11:20; 18:23; 21:15, 18; 23:20; 29:9, 12; 56:5; 57:8, 17; 60:15, 18; 65:2; 69:11; 79:13, 15; 86:17; 89:21; 91:10; 94:12; 95:11; 96:8; 99:13; 101:2, 3, 15; 102:12; 103:8; 105:1; 110:12; 111:23; 117:10, 13, 19; 119:22; 120:12; 122:24; 124:1; 126:17, 24; 140:6; 144:18; 150:6; 155:2, 8, 21; 156:24; 161:16; 163:5; 165:17; 167:6; 176:6; 177:2; 178:13, 20; 188:13; 190:17; 191:18, 20, 25; 192:3, 11; 195:25; 196:1, 9, 12
**weren't** [2] 96:8; 141:21
**What's** [1] 166:22
**what's** [1] 116:7
**whatever** [6] 64:9; 74:10; 113:6; 132:7, 8; 191:20
**whatsoever** [1] 179:14
**Where** [14] 21:18; 31:15; 33:20; 34:1; 40:4, 7; 45:11; 79:15; 90:6, 10; 112:3, 15; 117:19; 193:18
**where** [41] 11:8, 10; 22:2; 31:11; 33:11, 17; 47:23; 49:2; 75:2; 76:17; 77:21; 78:1; 81:7, 15; 90:16, 17; 95:14; 97:1; 100:14; 118:1; 120:1, 15; 122:10; 125:11, 13, 20; 142:15; 155:2, 11; 161:2; 175:1, 15; 183:18; 185:10, 13; 186:16; 187:4, 9, 14; 193:18
**Whereupon** [4] 64:24; 113:23; 153:11; 182:23
**Whether** [1] 110:14
**whether** [8] 47:1; 65:4, 13; 77:1; 99:22; 151:21, 22; 169:4
**Which** [2] 26:4; 78:21
**which** [12] 28:3; 57:2; 89:12; 106:24; 108:6; 140:18; 142:9; 148:23; 150:1, 25; 179:6, 7
**whoever** [2] 168:19; 195:19
**whole** [13] 6:14; 9:5; 43:9, 11; 54:14, 16; 73:23; 94:4; 116:12; 125:6; 150:24; 182:9; 199:7
**Whose** [1] 28:3
**whose** [1] 73:4
**wife** [14] 31:8;

75:24; 79:23; 83:8; 117:11, 16, 23; 121:21, 23; 122:1; 124:1, 11; 125:14; 194:3
**wife's** [1] 28:19
**Will** [1] 68:10
**will** [48] 6:8; 8:4, 6; 10:7, 25; 12:11, 17, 20; 13:9, 13, 16, 18; 14:4, 6; 15:22; 30:21; 42:4; 46:4; 52:5; 64:11; 71:25; 72:16; 94:1; 105:5, 10, 24; 106:9; 107:9; 112:21; 114:11; 115:3, 16, 20; 118:24; 125:2; 137:18; 138:24; 140:18; 145:25; 157:10; 160:4; 165:14; 172:1; 173:9, 10; 174:22; 183:21
**WILLIAM** [1] 1:18
**William** [2] 4:12; 8:25
**WIlliams** [1] 154:9
**Williams** [62] 22:20, 23; 24:18, 20, 23, 24; 96:16, 17, 20, 21; 97:8, 20; 98:14, 19; 99:8; 133:6; 145:22; 146:2, 5; 154:8, 20, 21, 22; 158:6, 25; 159:2, 6, 13, 16, 17, 18, 19, 20; 160:1, 3, 10, 14, 16, 21, 22, 24; 161:3, 5, 7, 9; 162:6; 163:11, 12, 13; 165:16, 19; 166:6, 15; 167:4, 5, 7, 21; 168:11, 19, 21; 171:9
**WITNESS** [97] 7:3; 17:1, 13; 20:3, 19; 23:25; 37:18; 38:5, 21; 40:1, 9; 41:2, 18; 42:13; 45:1; 48:10, 21; 52:3, 20, 25; 53:15; 54:1; 56:25; 57:11; 59:21; 60:8; 61:1, 11; 62:20; 63:1, 17; 64:23; 65:10, 19, 25; 66:2, 6; 67:20, 25; 68:3, 21, 25; 69:17; 72:7; 73:20; 77:5, 9; 80:8; 84:7; 85:23; 89:5; 93:24; 95:23; 97:14; 98:10; 112:1, 12; 115:7, 12; 116:1, 5, 18; 118:22; 124:6, 22, 25; 125:11; 131:19; 134:7; 135:15; 136:16; 143:15; 144:1, 22; 147:18, 20; 151:15; 156:7, 15; 167:17; 170:24; 171:14; 173:13, 19, 22, 25; 176:12; 178:25; 179:3; 187:25; 188:5; 189:14, 16; 194:8; 195:6; 196:17
**witness** [2] 49:23; 199:6
**witnesses** [1] 144:2
**won't** [2] 13:24; 62:18
**wondering** [1] 105:7
**Woody** [9] 25:12, 18, 19; 26:7, 12; 27:17; 28:9; 119:9; 126:13
**Word** [1] 42:25
**word** [14] 6:16; 13:7, 8; 42:25; 43:4, 5, 6, 14; 49:17
**words** [4] 13:23, 25; 44:10; 80:2
**work** [4] 134:21; 142:18; 156:21, 24
**worked** [4] 159:3; 160:23, 25; 190:11
**working** [7] 94:19, 20; 95:10; 104:10; 157:3; 183:19; 192:8
**works** [1] 174:14
**Would** [4] 29:8, 19; 178:11, 18
**would** [50] 9:1; 11:5; 12:2, 4, 9; 13:12; 18:3, 18; 26:15; 57:12; 64:7; 67:7; 71:23; 73:22, 23, 24, 25; 76:4; 78:10; 97:10; 101:19; 104:12; 105:9; 106:1, 14, 15, 17, 23; 116:25; 118:16; 135:6, 21; 136:9, 18; 140:13, 17, 18; 149:1; 151:14; 152:1, 2; 153:2, 3; 157:6; 172:7; 185:1; 187:7; 191:24
**wouldn't** [3] 32:21; 98:5; 112:18
**write** [1] 150:14
**written** [4] 101:13; 102:12; 104:16; 147:5
**wrong** [2] 69:6; 147:17
**wrote** [6] 6:19; 101:10;

136:22; 138:5; 144:16; 150:4
**www.RoselandReportingService.com** [1] 2:24

- X -

**XI01142** [1] 199:4

- Y -

**year** [11] 29:4, 6, 7; 31:6; 40:14; 48:2; 157:4; 159:3; 160:23, 25; 180:18
**years** [23] 6:2, 3; 22:1, 2; 28:24; 29:23; 30:2, 5, 7, 8; 31:10, 12; 32:19; 38:18; 39:13; 50:22; 53:21; 54:2; 79:20; 84:25; 85:1, 5
**yelling** [1] 136:2
**You'd** [1] 82:3
**you'll** [1] 51:10
**You're** [21] 6:9; 17:13; 23:13; 25:16; 30:24; 49:22; 94:14; 99:18; 103:23; 128:4; 147:19; 148:12, 25; 155:24; 166:7; 169:2, 8, 9; 179:3; 181:6, 8
**you're** [43] 10:21; 11:8, 13; 14:18; 18:2; 29:19; 39:4; 40:22; 41:4, 5; 43:2; 55:1; 56:6; 60:3; 61:4; 63:23; 67:2; 82:2; 84:3; 87:13, 25; 89:3; 94:11; 101:16; 106:25; 115:16; 137:3, 5, 16; 138:16; 141:2; 146:22; 160:7; 169:11; 170:22; 173:8; 174:12; 181:7; 184:17; 188:6; 197:17, 20
**You've** [5] 50:11; 78:15; 103:24; 119:4; 168:3
**you've** [2] 115:1; 167:11
**Your** [10] 6:6, 9, 16; 12:8; 22:15; 30:15, 22; 43:15; 89:13; 121:23
**your** [167] 6:7, 11; 8:10, 11; 9:25; 10:4, 24; 11:22; 12:5, 9, 21; 13:25; 14:11, 14, 16, 17; 16:3; 18:3, 24; 19:1, 6, 17, 23; 20:7; 21:21; 22:2, 12, 13, 16, 19, 25; 23:10; 24:17; 26:8, 12, 15; 27:7, 15; 28:3, 19; 29:2; 30:20; 31:1, 8; 41:7; 43:24; 48:7; 49:18; 53:7, 10; 54:19, 23; 56:4, 5, 11; 57:17, 23; 58:2, 10, 11, 15, 19; 59:7; 62:16; 65:4, 13; 67:8, 11, 23; 74:25; 78:11; 79:21; 80:2; 83:20, 24; 84:3, 10; 89:12, 21; 91:18; 95:25; 98:13, 18; 100:9; 103:7, 22; 105:11; 107:22; 108:6; 109:6; 111:8, 9, 19; 112:20; 114:8; 117:10, 23; 119:3, 23; 120:12, 19; 122:14, 22; 123:16; 124:10; 125:3; 126:11, 18, 25; 127:17; 128:11; 129:19; 135:14; 138:18; 144:5; 145:11; 147:2, 17; 153:18; 155:15; 157:12; 161:5; 162:9, 10, 22; 163:5, 23; 169:19; 170:10, 12; 171:16, 18; 174:3, 18; 175:10; 176:1, 18; 177:15; 179:12, 17, 22; 180:8; 181:10, 19; 184:11, 17; 188:17, 21; 190:17; 193:4, 12, 19; 194:3, 23; 195:2, 11, 12
**yours** [2] 105:8; 156:18
**yourself** [1] 167:1
**Youth** [1] 140:19
**youth** [5] 140:10, 15; 142:24; 145:20; 146:11
**youths** [6] 140:6, 13; 142:17, 21; 148:15; 149:14

- Z -

**ZAMMATARO** [2] 2:2; 199:2
**Zammataro** [2] 13:6; 199:20
**zombie** [1] 16:15
**Zoom** [1] 2:5