# EXHIBIT B

# In The Matter Of:

*Evans v.*
*Newark City*

---

*William H. Tietjen, Jr.*
*July 22, 2020*
*Video Deposition*

---


RIZMANRAPPAPORT
CERTIFIED COURT REPORTERS

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com


*Min-U-Script® with Word Index*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
NEWARK VICINAGE
14-cv-00120 (KM)(MAH)

LEE EVANS,
Plaintiff,
v.
NEWARK CITY; FORMER MAYOR, CORY A. BOOKER; FORMER POLICE DIRECTOR, GARRY McCARTHY; LIEUTENANT LOU CARREGA; DETECTIVE JOSEPH HADLEY; DETECTIVE SGT. WILLIAM TIETJEN; SGT. DARNELL HENRY; OFFICER JOE HADLEY,
Defendants.

VIDEOTAPED
DEPOSITION UPON
ORAL EXAMINATION
OF
WILLIAM H. TIETJEN, JR.
VIA VIDEOCONFERENCE

T R A N S C R I P T of the stenographic notes of AUDREY ZABAWA, a Certified Court Reporter of the State of New Jersey, Certificate No. XI01410, taken via videoconference, on Wednesday, July 22, 2020, commencing at 10:10 a.m.



A P P E A R A N C E S:

BONJEAN LAW GROUP, PLLC
467 Saint Johns Place
Brooklyn, New York 11238
718.875.1850
jennifer@bonjeanlaw.com
ashley@bonjeanlaw.com
BY: JENNIFER BONJEAN, ESQ.
ASHLEY COHEN, ESQ.
Counsel for Plaintiff

KENYATTA STEWART, CORPORATION COUNSEL
CITY OF NEWARK – DEPARTMENT OF LAW
920 Broad Street, Room 316
Newark, New Jersey 07102
973.733.5945
lipshutzg@ci.newark.nj.us
BY: GARY S. LIPSHUTZ, ESQ.
Assistant Corporation Counsel
Attorney for Defendants City of Newark (improperly pled as "Newark City" and "Newark Police Department"), Cory A. Booker, Garry McCarthy, Darnell Henry, and Joe Hadley

STATE OF NEW JERSEY
OFFICE OF THE ATTORNEY GENERAL - DIVISION OF LAW
STATE POLICE, EMPLOYMENT, AND CORRECTIONS SECTION
Richard J. Hughes Justice Complex
25 Market Street, PO Box 112
Trenton, NJ 08625-0112
609.376.2948
Michael.Vomacka@lps.state.nj.us
Victor.DiFrancesco@njoag.gov
BY: VICTOR DiFRANCESCO, JR., DEPUTY ATTORNEY GENERAL
MICHAEL VOMACKA, DEPUTY ATTORNEY GENERAL
Counsel for Defendant William H. Tietjen Jr.

SCHENCK, PRICE, SMITH & KING
220 Park Avenue
Florham Park, New Jersey 07932 973.539.1000
rjr@spskcom
BY: REBECCA J. ROSEN, ESQ.
Counsel for Defendant Lou Carrega

Also Present:

Joseph Hadley
Darnell Henry



I N D E X


| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| WILLIAM H. TIETJEN JR. | | | | |
| Ms. Bonjean | 4 | | 316 | |
| Mr. Lipshutz | | 303 | | |
| Ms. Rosen | | 311 | | |


NOTE: Reporter retained exhibits.
(Attached herewith.)

E X H I B I T S


| NUMBER | DESCRIPTION | FOR IDENT. |
|---|---|---|
| Tietjen-1, | Tietjen Training Records, Bates NJSP EVANS 503 through 506 | 24 |
| Tietjen-2, | Tietjen supplementary report dated 6/25/09, Bates ECPO 1343 through 1361 | 34 |
| Tietjen-3, | Hairston reports, Bates ECPO 003548 through 003586 | 70 |
| Tietjen-4, | Bates Newark 60 through 62 | 73 |
| Tietjen-5, | transcript of Philander Hampton interview 11/13/08, Bates ECPO 000342 through 426 | 246 |
| Tietjen-6, | Carrega affidavit in support of arrest warrants, Bates ECPO 257 through 259 | 294 |
| Tietjen-7, | Tietjen supplemental report dated 4/21/10, Bates ECPO 1315 through 1317 | 303 |




W I L L I A M T I E T J E N, JR., called as a witness, having been first duly sworn, testified as follows:

DIRECT EXAMINATION BY MS. BONJEAN:

Q. Good morning, Mr. Tietjen.
A. Good morning.
Q. I am in Brooklyn, so there's often background noise. I will apologize in advance if you hear anything in the back that's distracting. I'll do my best to keep the noise to a minimum. And sometimes there are connectivity issues, so don't hesitate to ask me to repeat something if I break up or you need me to repeat.
Okay. But before we get started, I'm going to ask that everyone place their appearances on the record. So I'll start with myself.
My name is Jennifer Bonjean. B-O-N-J-E-A-N. And I represent the plaintiff, Lee Evans, in this matter.
MR. LIPSHUTZ: Good morning. Is it sergeant, by the way?
THE WITNESS: It's sergeant. Detective Sergeant First Class. DSFC.
MR. LIPSHUTZ: Okay. Detective Sergeant, good morning. I said hello earlier. My

name is Gary Lipshutz. I am Assistant Corporation Counsel and Chief of Litigation for the City of Newark. I represent the City, former Director McCarthy, former Mayor Booker, former Detective Hadley, and Sergeant Henry, now chief of police. Nice to meet you, sir.
MR. DiFRANCESCO: Good morning. Victor DiFrancesco, New Jersey Attorney General's Office. We are appearing on behalf of Sergeant Tietjen, as well as the State of New Jersey.
MR. VOMACKA: This is Michael Vomacka. I am also with Vic in the New Jersey Office of the Attorney General, representing Defendant Tietjen.
MS. ROSEN: Good morning. My name Rebecca Rosen. I'm at Schenck, Price, Smith & King, and I'm appearing on behalf of Defendant Louis Carrega.
MS. BONJEAN: All right. And, Gary, did you place on the record that your client's were also present? Do you want to -- I don't know if you did. I can't remember.
MR. LIPSHUTZ: I don't remember if I did either, but present and observing the deposition are the Defendants Henry and Hadley.



MS. BONJEAN: And also, I should point out my associate, Ashley Cohen, who is also an attorney in this case, is present. She's going to be joining us online, but she's doing some other things at the moment. So we shall get started. I'm going to -- there we go. Okay.
BY MS. BONJEAN:
Q. Good morning, Mr. Tietjen. As I said, my name is Jennifer Bonjean. I'd like to first begin by asking you whether you have ever had your deposition taken before?
A. Yes, I have.
Q. How many times, sir, have you had your deposition taken?
A. Don't know. I know I had a civil case, I believe it was an accident, years ago. I don't know exactly how many times I had a deposition taken.
Q. Have you ever had your deposition taken in connection with your work as a law enforcement officer?
A. Yes, it was that prior civil case.
Q. Okay. Apart from the prior civil case that you just mentioned, does anything else come to mind in terms of any lawsuits in which you



may have given sworn testimony?
A. No.
Q. Well, I'm still going to go through some ground rules so we can be on the same page today, and hopefully things will go smoothly. Okay. I'm going to be asking you questions and expecting answers related to allegations that have been raised in a civil complaint that was brought by Lee Evans against yourself as a named defendant and a number of other defendants. I'm looking for full and complete answers to my questions to the best of your ability. Do you understand that?
A. Yes.
Q. Okay. If you do not understand one of my questions, please let me know, and I will rephrase the question so that we are on the same page. Okay? Understood?
A. Yes.
Q. All right. If you answer one of my questions, I am going to assume that you understood the question; is that fair?
A. Yes.
Q. You understand, sir, that you are under oath today; correct?
A. Yes.



Q. And that's the same oath you would take as if you were in a court of law?
A. Yes.
Q. If you need a break, let us know. I'm happy to oblige you. Just, if there is a question pending, I'd ask that you answer the question before we break. Okay?
A. Yes.
Q. Okay. Can you think of any reasons why you are unable to give full, complete, and truthful testimony here today?
A. No.
Q. Okay. Can you please state your full name? I know you did it, but will you please state your full name and spell your name again for the record?
A. William H. Tietjen, Junior. First name is W-I-L-L-I-A-M. Middle initial H. Last name is T, as in Tom, I-E-T-J-E-N. And I'm a junior.
Q. Also, I should have mentioned, the attorneys may at various points lodge objections, so I would recommend in the Zoom, the Zoom space that we are in here, that maybe take a little, a little pause to see if anyone has an objection before answering. I know that's easier said than

done, but that seems to work best, if you can remember to do that. One other, I guess, instruction I would give is that it's a natural tendency to anticipate someone's questions and start answering them before they've completed their question, so I am going to ask that you do your very best to let me complete my question even if you know where I'm going with it, and I will do my very best not to step on your answers. Okay?
A. Yes.
Q. Okay. Mr. Tietjen, without giving me your address, where do you live? What part of New Jersey?
A. Northwest New Jersey.
Q. And how long have you lived there?
A. Ten years plus.
Q. I assume you live there with your family?
A. Yes.
Q. Are you currently employed?
A. Yes.
Q. What type of work do you do?
A. I am a Detective Sergeant First Class with the New Jersey State Police.
Q. So you are still employed by the



state police; is that right? Not retired?
A. Yes.
Q. And how long have you worked for the state police?
A. 24 years.
Q. And forgive my math, when did you -- what year did you start with the state police?
A. 1995. I am in my 25th year.
Q. Okay. Did you work in any law enforcement capacities prior to working for the state police?
A. No, I did not.
Q. So as a Detective Sergeant, you said, First Class, was that --
A. Yes.
Q. What does that mean in terms of your duties and responsibilities?
A. I am the assistant unit head of the Missing Persons Unit for the state police.
Q. Has the state police always had a Missing Persons Unit since your tenure there?
A. Yes.
Q. And what does the missing -- I mean, apart from the obvious, but what does the Missing Persons Unit do exactly?



A. We investigate missing people; unidentified, living, and deceased, Safe Haven infants. We are also the Amber Alert coordinators for the State of a New Jersey approving any Amber Alerts. I guess that would cover it.
Q. How long have you been assigned to that unit?
A. I started here in 2006, and I was here through the end of 2008, and I returned in January of 2013, and I've been here since then.
Q. Okay. Actually, I will probably go through your employment history and assignments a little more closely. I want to back up a second.
Tell me about your educational history. Graduated high school?
A. Yes.
Q. What high school did you go to?
A. Phillipsburg High School in New Jersey.
Q. Phillipsburg, you said?
A. Yes. Phillipsburg.
Q. Phillipsburg. And upon graduation, what did you do by way of either further education or employment?
A. I went on to Rutgers University.
Q. What did you study at Rutgers?



A. Criminal justice.
Q. And did you graduate Rutgers?
A. Yes.
Q. What type of degree did you earn?
A. It was a Bachelor's of Science in administration of justice.
Q. I'm sorry. Could you repeat that again?
A. It was a -- my degree was administration of justice.
Q. Was it a bachelor's degree or associate's?
A. Bachelor's.
Q. Did you work while you were in college?
A. Only construction. Yes, I did.
Q. Okay. Not law enforcement, but some other type?
A. No, no. Summer work.
Q. Understood. And upon graduating from Rutgers -- what year did you graduate, first of all?
A. 1995.
Q. Okay. So, in 1995, then you went and worked for the state police; is that right?

A. Correct.
Q. Okay. Did you have to take any type of exam to be considered for a position with the state police?
A. Yes.
Q. What type of exam was that?
A. It was a written exam. And that was in 1994 I took that exam.
Q. And is the state police like a civil service jurisdiction type of --
A. It's not a civil service exam. It's a separate state police exam.
Q. Okay. All right. And did you apply to any other law enforcement agencies other than the state police?
A. I applied. An application. I never took any other tests.
Q. Okay. And what department was that?
A. That was South Brunswick Police Department.
Q. Now, after you took the test, I assume you were offered a position at some point; is that right?
A. Yes.
Q. And you accepted that position? Tell me about, upon acceptance of that position, did you



go through some type of academy?
A. Yes.
Q. And how long did that academy last?
A. I believe it was 26 weeks.
Q. And as part of the academy, did you get any training, formalized or otherwise, in investigations, conducting investigations?
A. After the academy you're asking? I don't understand what you're asking.
Q. Yeah, sure. As part of your police academy training, did you receive any instruction in conducting investigations?
A. In the academy, I believe it was very basic investigating.
Q. And after your 26 weeks at the academy, I assume you were given your first assignment; is that right?
A. Yes.
Q. And where were you assigned?
A. Sussex Station in Troop B.
Q. Okay. And what was -- what's your rank coming right out of the academy?
A. Trooper.
Q. Trooper. How long did you hold that assignment?



A. Approximately six months.
Q. And what was involved in that?
A. It was a general road duty assignment where you were assigned to a squad and you patrolled towns covered by the state police in Sussex County.
Q. And did you do like traffic stops and things like that?
A. Yeah, it was a full police entity. Traffic stops, accidents, domestics, anything that occurred within those municipalities that we covered.
Q. Okay. And after that assignment, where did you go?
A. I went on to Hope Station.
Q. Same type of work?
A. Yes.
Q. And from there, where did you head?
A. I went to Perryville Station.
Q. Did there come a time when you held an assignment that was not your trooper duties that you've described, if that makes sense?
A. Yes.
Q. When was that?
A. In May of 1999, I was moved into a



detective position as a station detective.
Q. Okay. So would it be fair to say that between 1995 and 1999, you worked as a trooper doing, I don't want to say basic, but basic trooper duties?
A. Yes.
Q. And was the May 1999 assignment a promotion?
A. No. It's just a status change. You put in for the job.
Q. Okay. And did you ask for that -- ask to be a detective, or how did you do that?
A. You submit a resume, application. You go before a board, and you're selected after board interviews and a review of your resume.
Q. Is it a competitive process?
A. Yes.
Q. Now, after you were selected for that assignment, did you have to undergo any specific training related to conducting investigations?
A. Yes.
Q. How long did that training last?
A. I think the initial class was about two weeks, and then there were various classes that you would be assigned throughout your different

time in the career.
Q. I see. So kind of like continuing studies? Maybe that's the wrong word. But you had in-services or continuing training after that two weeks; is that right?
A. Yes.
Q. Are you able to, again, to the best of your ability, summarize for me what your training looked like during those two weeks that you were training to be a detective?
A. It's a basic criminal inves school that all detectives have to go to, and it covers all facets of state police investigative entities. More of like an introduction to, and they provide you with guidance on different cases in going through, and it's required before you can be -- your rank can be designated as detective.
Q. Did you learn, for instance, how to conduct interviews of witnesses or suspects that might be involved in an investigation?
A. I imagine it was in the class, but I also attended, like, interviewing/interrogation school as well.
Q. I see. Do you remember approximately when you did that?



A. No. I would have to look at the transcript.
Q. Fair enough. I may ask you some more questions about your training later, but we'll move on.
After you completed the training, you now are assigned as a detective. Do you have a particular physical location where you're assigned?
A. Yes. I was assigned at Washington Station.
Q. Washington Station. And what were your day-to-day duties as a detective at the Washington Station?
A. It was investigative assistance for the troopers who were on the road assigned to the station, and then we would follow up on investigations that they initiated, needed further assistance. We reviewed their investigations. And then we would take our own investigations, if someone called directly to us to handle within the communities we patrolled.
Q. I see. What types of investigations would you say were most common? Again, we're talking in 1999 when you were working in this detective position.
A. We would get involved in burglaries and



thefts probably would be our most common.
Q. I see. And how did that work with local municipalities, police departments? I mean, how did you decide -- or how was it decided whether or not a state trooper would conduct an investigation into say a burglary versus whatever local municipality was, law enforcement agency, was policing the area where -- that's a terrible question -- but I hope you understand what I'm saying.
If a burglary occurred in a municipality where there was a law enforcement agency, how was it determined whether you would handle that or the local law enforcement agency would handle it?
A. We would not cover any cases that were handled by a local law enforcement agency.
Q. I see. So your jurisdiction were areas that were not covered by local law enforcement agencies; is that right?
A. Yes.
Q. Did you stay at Washington Station for a period of time?
A. Yes.
Q. How long?



A. Approximately a year.
Q. Do you recall where you went after that?
A. Sussex Station.
Q. Again, doing the same type of work?
A. Yes.
Q. And how long were you at Sussex?
A. Approximately a year and a half.
Q. Okay. So does that bring us to like early 2000s?
A. Yes.
Q. All right. Again, were you doing the same type of work there?
A. Yes, yes.
Q. Same types of investigations that you were conducting?
A. Yes.
Q. Had you worked on any murder investigations at that point?
A. No. Oh, when I was at Sussex, I was assigned to like a long-term multi-victim case as part of the task force.
Q. Okay. Is that how state police usually get involved in serious investigations, like murder investigations, usually as part of a

task force?
A. No. If we had a murder within our station area while I was assigned there, we would be the investigating authority for that. But this was a state police case that our Major Crime Unit was running that grabbed detectives for a task force in furtherance of that investigation.
Q. I see. After Sussex, where did you go?
A. I went to Newark Station on the New Jersey Turnpike.
Q. Okay. And how long were you there?
A. From roughly around 2000 -- end of 2001 through January of 2006.
Q. Okay. So for a while?
A. Yes.
Q. Did you still hold the same position while you were at Newark Station?
A. Yes.
Q. And that was as a detective?
A. Yes. Station detective, yes.
Q. Station detective. I'm sorry. I'm not used to the state law enforcement lingo as much as I am other departments, so bear with me if I need clarification or need you to repeat something.



Where did you go after Newark Station?
A. I went to the Missing Persons Unit.
Q. Okay. And where is the Missing Persons Unit located?
A. Division headquarters in West Trenton, New Jersey.
Q. How many people make up the Missing Persons headquarters?
A. Every year -- it depends. We've had a high of ten and probably a low of five.
Q. And you said the Missing Persons Unit was in existence since you started in 1995, so it was already very much an operating unit at the time that you joined it; right?
A. Yes.
Q. Did you ask for that position, or were you assigned there?
A. I asked.
Q. Did you have -- what was your interest in working in the Missing Persons Unit?
A. It was a type of investigation that I saw value or enjoyment in furthering.
Q. Okay. Gotcha. Is it fair to say you've been there ever since?



A. I was in two other units in the middle of that time as well.
Q. Yeah. I think you said in 2006 and 2008?
A. Yes.
Q. Where did you go?
A. December 2008, I went on to the Fugitive Unit as a --
Q. Fugitive Unit. Is that tracking down fugitives?
A. Yes.
Q. Any other assignments since 2001 other than the Missing Persons Unit and the Fugitive Unit?
A. The Alcohol Drug Test Unit.
Q. The Alcohol Drug Test Unit?
A. Yes.
Q. What's that?
A. That's -- they do the alcohol drug testing system. The Breathalyzer is, I guess, the easiest term.
Q. When were you there?
A. September of '12 through January of '13.
Q. You mentioned that in addition to the two-week training that you underwent when you



became a detective that there was additional training that you participated in over the course of your time in the Missing Persons Unit; is that right?
A. Yes.
Q. Can you tell me about what type of training you did apart from that two-week training related to conducting investigations, to the best of your memory?
A. Sex crimes, interview/interrogation, identity theft. We have a money laundering on there, too. Trucks and terrorism. Some narcotics class.
Q. I'm going to have you look at a document.
A. A juvenile interview class I went through as well.
Q. I am going to have you look at a document that we're going to mark. If you look at the file that you have, I believe it says "Training Records Tietjen."
MS. BONJEAN: And I think you have that also, Audrey.
(Tietjen-1, Tietjen Training Records, Bates NJSP EVANS 503 through 506, was received and

marked for identification.)
Q. Do you see that?
A. Yes.
Q. I have handed you what we are going to mark as Tietjen-1. Do you recognize that document, Mr. Tietjen?
A. Yes.
Q. I'm sorry. And I know you are still sworn personnel, so I don't mean to call you Mister. Sergeant Tietjen. Is that right?
A. Yes.
Q. What do you recognize that document to be?
A. It's our online list of courses, ranking, and organizations you were part of throughout your career.
Q. Does that reflect the trainings you received over the course of your time with the state police, I guess at least between -- it says '89. I think -- I don't know if that's accurate. That might be a typo.
A. That's a typo.
Q. Yeah, because I know you said you didn't start there until '95, so... But does this generally reflect the class work and training you



received between '95 and November of 2017?
A. It does, except for portions that were outside of an SP program.
Q. I'm sorry. Can you repeat that?
A. You could take a course, like I've taken courses, and you have to fill out documentation, either include it into in your resume or not. So in my recent term, many of my recent classes are not on here at all because it would require me to fill out a form and submit it, and there's -- no, they are not listed.
Q. Okay. Fair enough. What about, let's say, would you say it's accurate to the extent that it reflects your training between, we'll say, January of 2007 through October of 2012?
A. Yes.
Q. Okay. Now, at some point you sought a promotion and received a promotion; am I right?
A. All of my promotions were not sought. They were -- you're selected.
Q. Gotcha. And when you were working in the Missing Persons Unit between 2001 and 2006, what was your rank?
A. I was Detective -- I was Detective 1 at the time.



Q. And are there different levels of being a detective, I assume? Sounds so.
A. Yes.
Q. Is that based on experience?
A. It's a year of service.
Q. Okay. And apart from the different levels of detectives, what's the next rank up from there?
A. It would be Detective Sergeant.
Q. And is that what you are?
A. No. I'm a Detective Sergeant First Class. I'm the next above.
Q. Okay. And how many detective levels are there, or is it as many as your years are?
A. No, there's -- well, there's -- you could be a Detective, a Detective 2, a Detective 1, a Detective Sergeant, and then a Detective Sergeant First Class.
Q. So you are a Detective Sergeant First Class. And tell me when did you become first a Detective Sergeant?
A. In 2000 -- well, I was trained through the Fugitive Unit. Our process is related to you're in an acting capacity. So I was a Detective Sergeant there, and I was promoted while I was in



the Fugitive Unit to Detective Sergeant. And that was in, I think -- my promotion came out September 25th of '10. 2010.
Q. And these assignments that are listed in Tietjen-1, does that appear to be an accurate reflection of your assignments?
A. Yes.
Q. Okay. Great. You can put that aside.
(Videographer joined proceedings.)
THE VIDEOGRAPHER: My name is John Edmunds. I'll be operating the videotape equipment this morning and this afternoon.
MS. BONJEAN: I think for the purposes of the video, I'm just going to ask -- I'm not going to go back over anything. I'm just going to ask him to reintroduce himself, spell his name for the record for purposes of the video.
THE WITNESS: William Tietjen, Junior.
THE VIDEOGRAPHER: Before you do that, sir, let me just put you on the screen. Who is the witness? Could you raise your hand, please? Very good. You can proceed.
MS. BONJEAN: Thank you.

BY MS. BONJEAN:
Q. I am going to ask the deponent to please, for about the fifth time, identify himself for the videographer's purpose, and spell your full name again, sir.
A. William H. Tietjen, Junior. First name W-I-L-L-I-A-M. Middle initial is H. Last name is T-I-E-T-J-E-N. Junior, J-R.
Q. Thank you. We just left off talking a little bit about your employment history. I wanted to move on to ask you what, sir, did you do to prepare for your deposition here today?
A. I reviewed the documents that were provided to me last evening.
Q. And did you take any other actions in preparation for your deposition here today other than looking at the documents that were sent along to you?
A. No, I did not.
Q. And without revealing any communications, can you tell me whether you met with your attorneys in preparation for your deposition here today?
A. I had phone conversations.
Q. How many phone conversations did you



have?
A. A total of three.
Q. Can you estimate how long each of those conversations lasted?
A. I believe the first two were more introductory in setting up previous dates. And then last night we spoke for about 15 minutes, I guess.
Q. Have you read the complaint in this case, Sergeant Tietjen?
A. I saw a copy of it years ago. I do not have a copy of it now.
Q. That's fine. I just wasn't sure if you ever had a chance to look at it. But it's not something you looked at recently; correct?
A. No.
Q. And what's your understanding of why you have been sued in connection with this case?
A. Because I was part of the investigation.
Q. What is your understanding of why there is a lawsuit being brought in connection with this case for any reason, if you know?
A. I don't know, except for what the complaint stated.
Q. And based on your recollection of the



complaint, what's your understanding of what Mr. Evans is complaining about?
A. I believe he's stating he was wrongfully accused of this crime.
Q. Okay. Now, you know that there were many defendants that were named along with yourself in this case, and now there is a smaller group of defendants. I want to ask you about some of them.
Well, first let me start, were you the only state police officer who worked on this investigation?
A. No.
Q. Okay. How many state police personnel worked on this, if you know?
A. I don't know. I know we had a detective in 1988, I guess, and a polygraphist helped as well.
(Reporter requested clarification.)
MS. BONJEAN: I think he said a --
THE WITNESS: He did a polygraph.
Q. I almost said polygamist, but I know that's not what --
A. Polygraphist. A guy in our Polygraph Unit.
Q. Do you know Mr. Hadley? Or I don't know if he's retired right now. But do you know Joe Hadley?



A. I know him from working with him on this case, yes.
Q. And have you had any contact with him since 2011?
A. Not that I can -- no.
Q. Okay. Do you remember the last time you spoke to Detective Hadley?
A. Probably around the time of the trial.
Q. But you haven't maintained any contact with him since the trial?
A. No.
Q. And have you had any conversations with Detective Hadley in connection with the civil lawsuit that was brought by Mr. Evans?
A. No.
Q. What about Chief Henry, when is the last time you spoke to Chief Henry about the subject matter of this case?
A. Probably, again, the same time of trial.
Q. So Chief Henry and Detective Hadley are not individuals who you maintain contact with; correct?
A. Correct.
Q. What about Lieutenant Carrega, now retired, I believe, when was the last time you

spoke to him?
A. The trial as well.
Q. All right. I want to now hone in a little bit about -- in on your work on the five missing boys. And to the extent that you need to refresh your recollection, that's fine. I may ask you to try to remember to the best of your ability, and then we'll see how far we get, and then we can refer to your reports, if necessary. Okay?
A. Yes.
Q. Do you recall when it was that you became involved in the investigation of the missing boys from Newark that went missing in 1978?
A. May of 2008.
Q. And describe for me the circumstances under which you were brought into the case?
A. Lieutenant Carrega from the Essex County Prosecutor's Office contacted my unit looking for any assistance or any reports that we might have had from the prior involvement in this case.
Q. And when Lieutenant Carrega contacted your unit, would that have been the Missing Persons Unit that you were working in?
A. Yes.
Q. And did you speak directly with



Lieutenant Carrega when he called?
A. That -- I have to look and see. I think I spoke to him later that date and set up a meeting with him. It was May 2nd when he called here, and then I think -- I would have to turn to the next page to see the exact date when I spoke to him.
Q. Why don't we go ahead and mark your report now so that we can have that at your disposal.
MS. BONJEAN: It is going to be, for everyone else, I believe it's, "Tietjen Sup 6/25/2009." And if you could mark that, Audrey, as Tietjen-2, I guess.
(Tietjen-2, Tietjen supplementary report dated 6/25/09, Bates ECPO 1343 through 1361, was received and marked for identification.)
Q. If you can pull that out and refer to it to the extent you need it. Okay?
A. Yes.
Q. Okay. I'm first going to have you looked at what's now been marked as Tietjen-2, and I'm going to represent it bears a Bates stamp at the bottom that says, ECPO 001343 on the first page. Is that what you're showing as well, Sergeant?



A. Yes, yes.
Q. Okay. I just want to make sure that we have the same document. And it is a report that is 19 pages; is that right?
A. Yes.
Q. Okay. Can you please identify this report?
A. It's a supplemental investigation report that I authored.
Q. All right. And this is your report; right?
A. Yes.
Q. And it has your signature on every page actually of this report; correct?
A. Yes.
Q. And you used the New Jersey State Police formatting for reflecting your work in this case; am I correct about that?
A. Yes.
Q. All right. So I am going to refer you to the first page, and there is some boxes that are on the first half of the page, but at the bottom it looks like it starts sort of a narrative of the work you did in connection with this investigation. Is that a fair characterization?



A. Yes.
Q. All right. And I notice that the report is dated 6/25/2009. Do you see that?
A. Yes.
Q. Obviously, it reflects work that you did in May of 2008 and dates prior to June of 2009. Do you see that?
A. Yes.
Q. How did this report get prepared? I'll just leave the question as open-ended as that. How did it get prepared? If you understand. I can clarify if you don't.
A. I typed the report for areas of the investigation that I was involved in.
Q. Did you type the report on or around June 25th of 2009?
A. Yes.
Q. Okay. And all of the information that is reflected in this report that reflects law enforcement activity or investigative work that predated June 25th, 2009, did you get that information from your memory, or how did you memorialize information?
A. I had notes.
Q. So there were original notes that you

had?
A. Yes.
Q. How did you take notes back in, I guess, May of 2008?
A. Either on a notepad or in a, like a binder pad.
Q. So it was just like basically a regular notebook with blank pieces of paper?
A. Yes.
Q. And you would memorialize your work in that notebook, handwritten notes; is that --
A. Yes, yes.
Q. And then I assume in and around June 25th, 2009, you referred back to your notes to create this final document or final product; is that right?
A. Yes.
Q. What did you do with your original notes?
A. Don't know.
Q. Okay. Do you know whether or not you maintained them?
A. Don't know.
Q. Do you recall whether or not you provided those notes to, the original notes, to any



supervisor or any other individual?
A. No.
Q. You don't recall, or you're sure that you wouldn't have given them to somebody else?
A. I'm pretty positive I didn't give them to anybody else.
Q. Okay. You don't remember handing them over to the Essex County prosecutor; is that right?
A. No.
Q. So once you put your information into your final report, you kept your notes, but you don't recall what, if anything, you did with them; is that fair?
A. Correct.
Q. Do you know if you still have your notes?
A. Don't know. I don't know.
Q. Well, do you have any of your notes -- well, strike that.
Let me ask you this. What was your habit back in 2008 in terms of maintaining your original notes, if you had one?
A. I would have some binders that were still from different cases, just in a pile in my office,



but I haven't looked for original notes on this case.
Q. Okay. And was it your practice to, once you put information from your handwritten notes into a final report, that you would hold onto your notes for a period of time, and not just in this case, but in any case?
A. No. It would depend on what they were contained within, whether be a five-subject notepad that I continuously used throughout, or like a pad you keep in your rear pocket or in your coat pocket when you're working a job.
Q. Okay. Did you eventually destroy or throw away your notes at some point? Again, I'm just going to direct you to your general habit or practice during this time period of 2008?
A. Notepad, the small notepad, they would have been thrown away.
Q. Okay. And was there any policy or practice of the department that required you to turn in your handwritten notes to somebody for preservation?
A. Not that I can recall.
Q. As you sit here today, you don't recall specifically what you did with your



handwritten notes for the missing boys investigation; right?
A. No, I don't recall.
Q. But it sounds like it's possible that you may still have them; is that correct?
A. I don't know.
Q. Okay. Would you mind looking?
A. I guess I could try to look, yeah.
Q. Right. Thank you. I would ask that you, if you could, look for any original handwritten notes that you might have and then let your attorney know so they can let me know. Okay?
A. Okay.
Q. Looking at Tietjen-2, in the narrative section, you identified the missing young men who were juveniles at the time.
Did you have any independent knowledge about this case prior to getting involved? The missing boys.
A. I think I may have seen a news article on it at some point, or information, but not from my recollection.
Q. And you also saw that there were suspects -- or you also list that there were suspects, Lee Evans and Philander Hampton; right?

A. Correct.
Q. And, again, this would have been information that you obtained when you were first assigned to the case, I assume, since it's the start of your narrative; is that right?
A. No.
Q. I'm sorry?
A. No, that's not true.
Q. Okay. So what -- explain to me how the information got here at the beginning of your narrative?
A. The spot where we would list suspects on our report?
Q. Yeah.
A. So throughout that time from May of 2008 through the end of this report, those two individuals became suspects at some point in there.
Q. I see. So this information that I will say is above the date, May 2nd, 2008, is information for summary information that you included when you prepared the report back in June of 2009, and for the record, that is your collective belief or understanding of the case; right?



A. Yes.
Q. All right.
(Reporter requested clarification.)
Q. I'm still on the first page of your report. There is a narrative section that is preceded by the date May 2nd, 2008. Do you see that?
A. Yes.
Q. Now, what happened on May 2nd, 2008?
A. That is the day that Lieutenant Carrega contacted my unit.
Q. And when you say contacted your unit, do you recall if he spoke to you or someone else?
A. No. He spoke to my assistant unit head at the time.
Q. And was that Jones?
A. Yes.
Q. And do you know whether or not Mr. Jones -- well, strike that. I'm sorry.
Did you have any conversations with Lieutenant Carrega on May 2nd of 2008?
A. Yes.
Q. Okay. So what was your understanding of what Carrega told Jones?
A. That he was looking for assistance with



this investigation and possibly looking to see if he had reports on it.
Q. So was his interest primarily to see what sort of paperwork the state police had generated in connection with the case previously?
A. I don't know. He contacted for general assistance with the case.
Q. What does general assistance mean to you?
A. It would be somebody just calling, an agency calling to see if we, number one, had anything, if we knew of anything, and then potentially if we could offer them anything, or any assistance on the case.
Q. Okay. And you said that you did eventually speak with Lieutenant Carrega yourself on May 2nd, 2008?
A. Yes.
Q. And was that in a subsequent conversation, or did Jones hand you the phone, or how did that work?
A. I do not recall that.
Q. Okay. Tell me what you recall about your conversation with Lieutenant Carrega on May 2nd of 2008?



A. We set up -- agreed to meet on May 9th at the Essex County Prosecutor's Office.
Q. What else did he tell you about the case?
A. That -- he told me that he had a main suspect in the case of Lee Evans.
Q. Did he tell you anything else about the case?
A. Not on that date, no.
Q. Now, I know you are looking at your report --
A. Sure.
Q. -- to refresh your recollection, and that's fine. I would just ask, though, that you also think about whether you have any additional, independent recollection of information that may have been communicated that is not reflected here because, for whatever reason, maybe you didn't think it was important to put in here.
So, apart from what you have read on this report, can you think of any other information that Lieutenant Carrega provided to you during your phone conversation on May 2nd of 2008?
A. No.
Q. Do you recall whether in that phone

conversation he told you that he wanted you actively involved in the investigation or asked whether you would be interested in being involved in the investigation?
A. No.
Q. Did he explain to you who was in charge of the investigation?
A. He was.
Q. How did you -- well, strike that.
He told he was in charge of the investigation or leading the investigation?
A. He was -- he expressed to me he was on the Cold Case Unit for the Essex County Prosecutor's Office looking at this case, so that would mean he was the lead of that aspect.
Q. Did he tell you who else was participating in this cold case investigation?
A. Not that I recall.
Q. Were you aware whether or not the Essex County Prosecutor's Office had a Cold Case Unit?
A. No.
Q. Were you familiar with the concept of a Cold Case Unit back in 2008?
A. Yes.



Q. Okay. What was your understanding of what a Cold Case Unit does?
A. That you would review cases that have extended beyond a certain period of time, typically identified by the department, at the time of it. It would then go into a Cold Case Unit. Whether it be Cold Case Missing Persons, Homicide, or Unidentified Remains.
Q. And Lieutenant Carrega told you that they had a main suspect Lee Evans. Did he mention any other suspects in the case other than Lee Evans when he first spoke to you on May 2nd, 2008?
A. No, he did not.
Q. Did he mention how long the investigation had been going on since it had been reopened, if that makes sense?
A. No.
Q. I guess the better way to ask the question is did he tell you how long he had been working on this cold case prior to contacting you?
A. No.
Q. Did he indicate to you any theories about how he thought that the boys had either been murdered or had gone missing during this first conversation?



A. No.
Q. He just said he believed that Lee Evans was the main suspect, and that was pretty much the extent of his -- the conversation?
A. Well, I can't recall the exact conversation, but he had mentioned that Lee Evans was a suspect in their disappearance.
Q. But you don't recall him mentioning anybody else as a suspect?
A. No.
Q. Now, it looks like that you -- he asked you to do something because you did some investigative work subsequent to that conversation; right?
A. Yes.
Q. What did you do?
A. On May 8th, he contacted me again, and he was looking to speak to a potential witness, Philander Hampton.
Q. I noticed in your report, if you look at page 2, you did do some, I guess, research into the --
(Connectivity issues.)
MR. VOMACKA: The audio cut off. Would you repeat that?



MS. BONJEAN: Sure, yes.
Q. Sergeant Tietjen, according to your report on page 2, it looks to me as if you did some research looking into the files that the state police may have had related to these missing boys; is that right?
A. Yes.
Q. Okay. And did you do that because you were asked to do that, or did you do that just on your own as part of your inquiry?
A. That would be on my own.
Q. Did Lieutenant Carrega ask you to confirm, or try to find information that might confirm, whether or not the boys were still alive, or was it assumed that they were dead at that point?
A. I believe we had a conversation at some point. I don't know which day. I know I checked Experian, which was a social security number search, as well as reviewing the entries.
Q. Right. And I see that on the second page of your report, you mention that you looked at Experian. You said, Refer to Experian search results. What was the purpose in looking at Experian?

A. It would list if they had credit, the social security numbers that were included in the missing persons entry, or had like a credit report.
Q. And why would that be important information to develop?
A. That would be potentially indicative of either somebody using their number or them using the number, whether their true name or on another name.
Q. And if they were using their number, what would that tell you?
A. It would just list that they had credit to a specific address. Potentially a spouse as well.
Q. Would it also give you some indication as to whether they were alive?
A. That their number potentially is alive, yes.
Q. That's the reason you were looking; right?
A. Yes.
Q. Now, it says here that you, on the second page, that you contacted Lieutenant Carrega, and you agreed to meet on May 9th, 2008, at the Essex County Prosecutor's Office.



It says, "Lieutenant Carrega advised that the main suspect in this investigation is Lee Evans," who you've identified here.
You did then have a meeting face to face with Lieutenant Carrega on May 8th; is that right?
A. No.
Q. May 9th?
A. May 9th.
Q. Okay. Am I correct that even before that meeting on May 9th, you had another conversation with Lieutenant Carrega on May 8th?
A. Yes.
Q. What was the nature of that conversation?
A. He contacted me and he advised he was looking for information on an individual that he wanted to speak to.
Q. And who was that individual that Lieutenant Carrega wanted to speak to when he spoke to --
A. Philander Hampton.
Q. Okay. I'm going to ask you to let me finish my question just so the record is clear. Don't worry. It happens all the time.



One more time. When you spoke to Lieutenant Carrega on May 8th, 2008, he told you some additional information. Can you tell me again what that information was?
A. He advised that he was looking to interview a Philander Hampton.
Q. He wanted to interview a Philander Hampton. And what did he want you to do to facilitate or assist him in interviewing a Philander Hampton?
A. It was just if I had any additional databases that I had access to, to see if he could locate additional information on him.
Q. And did you do that?
A. Yes.
Q. Did Carrega explain to you why he wanted to interview Philander Hampton?
A. No. Just that his name was part of the investigation.
Q. So at this point, you didn't really have any knowledge about the case in terms of the investigative work that had been conducted; you were just doing some tasks that you were asked to by Lieutenant Carrega up until May 8, 2008; is that right?



A. Yes.
Q. On May 8, 2008, I'm going to direct you to this last sentence here, where you wrote, "I also compared the five boys' physical information to that of unidentified human remains recovered in New Jersey, since their disappearance, but was unable to locate any viable matches."
How did you do that?
A. Repeat the end of that question?
Q. How did you do that? What was that work that you did?
A. We maintain a database, both paper and spreadsheets of all our unidentified remains in New Jersey. And there's data that's collected on the entry that is part of that spreadsheet, so you're able to look through for remains that would be of a potential match to height, weight, year, dates found, date of death, et cetera, and locations of the find as well.
Q. And when you were putting in the information, were you using the boys' physical appearances as of the date they went missing?
A. Yes. And I'm not putting it in. I'm looking at that information with that reflective information.

Q. Okay. So when you were doing that analysis or that investigative -- strike that
When you were looking at this data, you were using the age and date, or the age and physical appearances of the boys from the date that they went missing; correct?
A. Yes.
Q. You were looking for like teenage boys, you weren't looking for grown men; am I right?
A. Yes.
Q. And, again, that would be working under the assumption, of course, that they actually died in and around the time that they went missing; correct?
A. Yes.
Q. All right. Now, on May 9th, you did have that meeting with Lieutenant Carrega of the Essex County Prosecutor's Office; is that right?
A. Yes.
Q. And just to be clear, the narrative that you have written about that meeting as reflected in your report came from your notes, not from your memory; is that right?
A. Yes.



Q. And they came from your notes that had been taken a year earlier; right?
A. Yes.
Q. Did you prepare any reports contemporaneous with your investigative work?
A. I don't know when I started typing this report. The date reflects the completion of the report.
Q. Um-hum.
A. I don't know when I started typing. I could have started typing it months before.
Q. But not years before, not a year before?
A. I don't know.
Q. Well, I mean you testified earlier that that the report, which starts off with this "Additional Missing Juveniles" and "Suspects" was information that you put in after June 25th, or around June 25, 2009; right?
A. Well, the report was completed June 25th, 2009, yes.
Q. Right. And I asked you earlier about the first part of the narrative where it says "Suspects" and "Additional Missing Juveniles." Right?



A. Yes.
Q. And I asked you was that information that you had as of May of 2008, and you said no, that would have been, you know, after all of the investigative work you did, that's where you included that; is that right?
A. Yes.
Q. So would that lead you to believe that you did not start preparing this report until close in time to June 25th of 2009?
A. Probable somewhere within months of that date.
Q. Okay. Now, without looking at your report first, let's just go based off memory, tell me what you remember about your meeting on May 9th, 2008, with Lieutenant Carrega?
A. I met with Lieutenant Carrega. He expressed his thoughts on the case, his concerns about Lee Evans, and the early processes of the investigation, that he still felt Lee Evans was a suspect in the case.
Q. Who else was present for that meeting?
A. I don't recall.
Q. Were there other people present?



A. I don't believe so. I'd have to look at the notes -- I mean, I would have to look at my report to see if there was, but I don't believe there was.
Q. Okay. And did he express to you during that meeting any other leads that he was looking at other than Lee Evans?
A. Not that I recall.
Q. Okay. How long did the meeting last?
A. I don't know.
Q. Well, was it like a five-minute meeting, or was it a protracted meeting where he explained to you, you know, a little bit about the prior investigation and what they were doing up until that point in May of 2008?
A. It probably would have been about an hour.
Q. All right. Did you leave the meeting with an understanding of what the case was about?
A. To the best of my ability, yes.
Q. All right. And, again, what you have contained in your written report, you pulled off your notes that you took during the meeting?
A. Yes.
Q. What did Lieutenant Carrega say to you about why he still believed that Lee Evans was

the prime suspect in the case?
A. The case had identified him early on from the date of who the boys were last with and that he still believed that information to be true.
Q. Apart from the fact that Lee Evans was with the boys shortly before they disappeared, was there any other factual information that he provided to support his view that Lee Evans was the main suspect in the case?
A. I mean we discussed other steps throughout the investigation that still pointed to Lee Evans.
Q. Like what?
A. Additional interviews, reviewing of interviews. He discussed the polygraph that Lee Evans had taken.
Q. Well, what interviews did he identify led him to believe that Lee Evans was responsible for the boys' disappearance and presumed death?
A. I don't recall. It was a generalization of the case stuff that he had.
Q. Did you take any notes about those specifics?
A. No, not more specific than that.
Q. So as you sit here today, you can't identify for me any specific interview that he



referenced that provided a factual basis to believe that Lee Evans was the main suspect, at least as of May 9, 2008?
A. No.
Q. Anything else that sticks out in terms of why Carrega believed that Lee Evans was the prime suspect, again, other than the fact that he was one of the last people to have been seen with the boys allegedly?
A. No.
Q. And you mentioned the polygraph. It's true that Mr. Evans had submitted to a polygraph examination back in 1978; right?
A. I had not seen the report, but that's what I was told, yes.
Q. And, allegedly, he passed that polygraph; correct?
A. Yes.
Q. Now, it says in your report that during your meeting with Carrega on May 9th, 2008, that there was a later examination of this 1978 polygraph chart by outside experts and that there was a new view that he actually failed the test; is that right?
A. Yes.



Q. All right. Okay. Did you see any reports from any experts that gave this new view that he had failed the test?
A. No.
Q. Did Lieutenant Carrega explain to you how he came to have new experts look at the polygraph results?
A. No. I believe it was prior to his even involvement in the case that this review was done.
Q. Do you know who conducted the review?
A. I believe it's in one of the reports, but I don't recall.
Q. And do you have an understanding of how polygraph tests work?
A. Yes.
Q. Do you find them to be a useful law enforcement tool?
A. Yes.
Q. You know, of course, that the results are inadmissible; right?
A. Yes.
Q. They were used pretty readily in this investigation; would you agree with that?
A. Yes.
Q. And would you agree that polygraphs,



to the extent that they are useful, are only as useful as the competence of the person administering them?
A. Yes.
Q. And how is it that -- or explain to me how is it that a second person could look at a polygraph examination and reach a different result? Is that plausible?
A. I don't know enough about what the results they would look at to say.
Q. But isn't part of reading a polygraph result connected to actually administering the polygraph test?
A. They have some data that's set up from the test, I would imagine. I've seen now recent polygraphs, and you look at charts of the interview with reference to the questions they asked and by your responses, but I don't know what was done in 1978.
Q. Have you ever heard of a situation where a polygraph examination is conducted and the results are interpreted by the person who administered the test, but then later a different expert reaches a different conclusion about those polygraph results? Aside from this case, have you

ever heard of that?
A. I don't recall.
Q. And, again, in your work as 25 years as a law enforcement officer, have you ever heard of a single other circumstance where a polygraph expert who did not administer a test later came and reviewed the reports of a previously-given polygraph and reached a different result?
A. I can't recall a case, no.
Q. Do you know if that's in keeping with law enforcement standards? National standards, we'll say?
A. I don't know what any of the Polygraph Unit in our agency, and I don't know much about what was done back then.
Q. I'm talking about now. Is that something that you have seen done in say the last five years?
A. Like I stated, I'm not in our Polygraph Unit, so if the supervisors review their charts to concur or differ -- I've used polygraphs in the past, but I have not administered them, and certainly not every one of the, you know, responses from being truthful and honest or accepted, so that's... I mean, people are trying



to do tricks to try to alter the test as well. But beyond that, I don't know who reviews or what type of policy there is in place to verify that that polygraphist got a accurate response or came up with an accurate solution to that.
Q. Have you administered a polygraph test yourself?
A. No.
Q. So it sounds like you've used them, you've worked with them, but you wouldn't consider yourself an expert; is that fair?
A. My use has --
(Reporter requested clarification.)
A. Just calling one of the polygraphist in our unit to perform the test. That would be as far as my involvement.
Q. Okay. You indicate in your police report marked as Tietjen-2 that during this meeting, Lieutenant Carrega indicated that he wanted to re-interview Lee Evans and also re-interview all persons who were involved in the case since 1978; is that accurate?
A. Yes.
Q. And did he indicate during the meeting that he wanted you to participate in those



interviews?
A. I offered my assistance, and he accepted.
Q. Okay. And did he explain to you who else was on this team for re-investigating the missing boys?
A. At some point, Detective Joe Hadley and Agent Eutsey were introduced to me, but I don't know what date.
Q. What was your understanding of who had handled the investigation prior to Lou Carrega taking it up?
MR. LIPSHUTZ: Objection to the form of the question. You can answer it, sir.
A. Repeat the question, please.
Q. Yes. What was your understanding of who had handled the investigation of the missing boys prior to 2007/2008 when Lieutenant Carrega undertook that investigation?
A. The Newark Police Department.
Q. One of your responsibilities, it looks like, was to obtain DNA samples from surviving family members; is that correct?
A. Yes.
Q. What was the purpose in doing that?
A. It's to identify remains of missing people



that were already recovered that we have DNA samples from.
Q. Would you agree that --
A. Patricia's Law --
(Reporter requested clarification.)
MS. BONJEAN: I think he said it was Patricia's Law.
Q. Is that right?
A. Patricia's Law was signed in March of that year 2008, which required us to assist or to get DNA for long-term missing persons cases. And at the time of the signing, it was 30 days is what they termed a long-term case.
Q. Okay. Would you agree that one of your primary goals, or the team's primary goal, at least as communicated to you by Lieutenant Carrega, was to try to actually find the human remains of these boys, if you could; right?
A. That would be a goal, yes.
Q. Now, after -- strike that.
What else, if anything, do you recall about the meeting with Lieutenant Carrega on May 9th, 2008?
A. Not much more than that.
Q. Did he provide you with any materials

to look at?
A. Not on that date, I don't believe.
Q. At some point did he provide you with some?
A. Yes.
Q. Now, I notice your next entry on your report says on May 16, 2008, you conducted an in-depth review of a copy of a case file that was provided to you by Lieutenant Carrega; right? Is that a yes?
A. Yes.
Q. Okay. So does that lead you to believe that Lieutenant Carrega provided you with a copy of the case file prior to May 16, 2008?
A. Yes.
Q. And do you remember how he provided that to you? Was it in paper form, electronic form?
A. I believe it was paper form.
Q. And how large was the case file to best of your recollection?
A. It was whatever, a brown large, like, legal envelope. You know, like, a file envelope. It was probably six inches in depth and height.
Q. And what generally was contained



within the case file?
A. Case notes on each of the people identified, any available Newark Police Department reports that were generated from back in 1978 and throughout, some newspaper articles, different statements of individuals as well.
Q. Interviews?
A. Yeah, interviews in written form.
Q. Got it. And you said you conducted an in-depth review of the case file. What do you mean by that? What did you do?
A. I went through it, what was provided to me, to get an understanding of what was done from day one through.
Q. Does that mean you read the reports?
A. Yes.
Q. Looked at the interviews?
A. Yes.
Q. And why did you believe it was important to look at the prior case file in connection with your involvement?
A. Well, my own understanding of the case.
Q. Did you want to know what had been done prior to your involvement in the case?
A. Yes.



Q. Did you want to see what evidence had been developed prior to May of 2008?
A. Yes.
Q. Were you interested in seeing what evidence specifically had been developed against or related to Lee Evans?
A. Yes.
Q. All right. Did Lieutenant Carrega tell you during your meeting either on May 9th, or any time prior to your review of the case, any of the other witnesses that he was interested in interviewing or re-interviewing?
MS. ROSEN: Objection to form.
MS. BONJEAN: I'm sorry. What did you say?
MS. ROSEN: Objection to form. You can answer it.
A. He advised that he wanted to re-interview all those that were available to re-interview.
Q. Okay. Did you get the sense in May of 2008 that this was the beginning of his investigation, that he had not done too much work prior to this date?
A. No. No, he indicated that he had worked on this.



Q. How long did he independent -- for how long had he worked on it, to the best of your recollection?
A. I do not recall.
Q. But it was your belief that he had been working on it before he spoke with you; is that right?
A. Yes.
Q. Do you know who he was working on the case, investigating the case with?
A. I believe Agent Eutsey, but that's a recollection issue if he was or not.
Q. And that's Detective Jack Eutsey, a Newark police officer; is that correct?
MR. LIPSHUTZ: Objection to form. Sorry. You can answer it, sir.
A. He was an agent of the Essex County Prosecutor's Office at the time.
Q. Right. So -- and let me clarify. Was it your understanding that Detective Eutsey had retired from the Newark Police Department but had joined the Essex County Prosecutor's Office as an investigator?
A. Yes.
Q. All right. And so Detective Eutsey

at the time that this investigation had, we'll say, recommenced was already working for the prosecutor's office; correct?
A. Yes.
Q. Did Lieutenant Carrega explain to you what role, if any, Newark Police Department would have in this reinvestigation of the missing boys that started sometime before May of 2008?
MR. LIPSHUTZ: I'm going to object to the form of the question. You can answer it, sir.
MR. VOMACKA: I'll join the objection as to form. You can answer.
A. The role of Newark was --
(Reporter requested clarification.)
A. The role of Newark Police Department was explained to me -- I don't know if exactly that date -- that they had a detective from Newark who was going to assist as well, and that was later identified as Joe Hadley.
Q. What about Detective Henry, or Sergeant Henry, I believe, maybe at the time, what was your understanding of what his role would be, if any?
A. Early on, I believe he was Detective Hadley's supervisor, and then he became involved



as 2008 progressed.
Q. Okay. Did you have an understanding of whether or not there had been prior efforts to reinvestigate this case after the initial investigation went cold?
A. There was many entries in the notes, and I knew we didn't have all the reports. I was advised there were other attempts to investigate, but the reports were not provided.
MS. BONJEAN: Okay. I am going to mark as an exhibit, and if anyone needs a break, let me know. We can definitely break at any point. I am going to mark as Tietjen-3 what I believe is listed as the "Hairston reports," and if you could pull that out.
(Tietjen-3, Hairston reports, Bates ECPO 003548 through 003586, was received and marked for identification.)
Q. It should have a Bates stamp at the bottom right-hand corner that reflects ECPO 003548. Do you see that collection of materials?
A. No.
Q. Okay.
A. I have a Newark 60 the bottom of the form I have for Hairston.



Q. There is a "Hairston to from" and a "Hairston reports."
Yeah, you were looking at the Hairston. You can keep that handy. We're going to look at that shortly but...
A. I have ECPO 003548.
Q. Yes. And that's been marked as Tietjen-3.
Sir, do you recognize this collection of materials?
A. Yes.
Q. And what do you recognize this to be?
A. Just materials of the reports dating back to 1978.
Q. Does this appear to you to be a collection of police reports that were prepared from the date on which it was at least reported that the boys had gone missing?
A. Yes.
Q. And can you tell from looking at this report who the lead detective -- or who the detective was that was responsible for preparing these reports?
A. Detective Edward Hairston.
Q. Did you know Detective Edward



Hairston?
A. No.
Q. Have you ever met him?
A. No.
Q. I believe he's deceased. I could be wrong. Do you know if he's deceased?
A. No.
Q. Now, would these reports be documents that you reviewed in connection with your in-depth review of the case file on May 16, 2008?
A. If they were all complete, the copy in front of me, yes.
Q. And, again, I know you can't say whether or not what you've been provided right this second is exactly what you had in your case file, but do you have a recollection of reviewing reports that were prepared back in 1978 in connection with the missing boys?
A. Yes.
Q. And do you have a recollection of reviewing reports that had been prepared by Detective Hairston?
A. Yes.
Q. Okay. Now, I'll have you look at the other document you pulled out, which is a Hairston,

I'm going to call it a -- I call it a "to from" report. Do you have that handy?
(Tietjen-4, Bates Newark 60 through 62, was received and marked for identification.)
Q. I'm going to have you look at Tietjen-4. Tell me if you recognize this document? And by the way, the Bates stamp on this is Newark 60 through 62.
A. I don't recall reviewing this document.
Q. I'm sorry?
A. I don't recall reviewing this document.
Q. You don't recall ever reviewing this document?
A. No. I recall hearing about it. I don't recall reviewing it.
Q. Well, I'm just going to, for the record, indicate that it appears to be, correct me if I'm wrong, a report from Detective Hairston to Lieutenant John Murphy, and it's dated March 15th, 1979; right?
A. Yes.
Q. Okay. I'm going to give you a chance, if you could, if you could just take a look at it and let me know, take as much time as you want --



A. I read through it last night.
Q. Okay. Great. You're saving yourself and all of us time. And so, again, I'll ask you, having read it last night, you don't remember ever seeing this report; is that right?
A. Not the -- well, I remember a psychic was involved at some point.
(Reporter requested clarification.)
A. I remember at some point in the investigation a psychic had been involved in the case, and it mentioned things, but I don't remember seeing this actual document.
Q. And what do you remember about the psychic being involved in the case?
A. I mean, I read through this last night. I was intrigued on this. She mentioned about a fire in here, but I don't recall specifics of what was stated to me early on the case.
Q. When do you first recall hearing about a psychic being used in the case, if you --
A. I don't, I don't know. No, I can't even recall.
Q. Do you recall having any conversations with Lieutenant Carrega about the psychic being used in the case?



A. He was probably the one who told me about it, but I don't recall the conversation.
Q. And do you recall, whenever that conversation took place, that a psychic had been used and had referenced that the boys may have perished in a fire?
A. I don't recall when that conversation would have taken place.
Q. But do you remember at some point hearing that substantive conversation?
A. I don't believe I remember anything about a fire. Just that a psychic -- I mean, psychics call at the time of missing persons cases, and I don't put much value in what they say. It's noted typically, but it's so vague and generic. Typically, they cover so many different possibilities that the scenario sometimes can have different links throughout. You know, they give you so much vague detail. My thought has always been just in this unit, If you know where they are, why aren't you out to that location pointing that out to us?
I mean, pretty much any of our major cases, we have plenty of psychics calling up with all different dreams and stuff, so I don't put too



much value on what's provided by them.
Q. Okay. So your personal view is that psychics don't bring a lot of value to an investigation; is that fair?
A. Yes.
MS. BONJEAN: Okay. Give me one second, if you could. Actually, can we take a two-minute break? I think I want to pull a document out that I may or may not have already provided, but if we could -- let's take a two-minute break and reconvene, if that's okay.
THE VIDEOGRAPHER: The time is 11:39 a.m. Off the record.
(Break taken.)
THE VIDEOGRAPHER: The time is 11:45 a.m. This begins DVD number two. Back on the record.
Q. Thank you, Sergeant. I'm going to have you actually look at that larger collection of Hairston reports, which I believe is marked as Tietjen-3. Let me know when you're there.
A. Sure.
Q. Again, these are the reports that, again, if you had been provided with them, with the case file, this is what you would have looked at;

correct?
A. Yes.
Q. And would you characterize this as a continuation report?
A. It states that on the top.
Q. What is a continuation report to the best of your understanding?
A. It would be similar to my supplementary investigation report indicating that there was a prior report previous to that.
Q. Do you happen to know whether or not the narrative that is contained in these reports, and I know that you did not prepare them, but do you happen to know whether they were prepared contemporaneous with the investigative conduct that was being taken at the time?
A. No.
Q. You don't know?
A. No.
Q. Okay. You will see, though, at the bottom of the report is, at least on the first page, is a date of September 15th, '78; right?
A. Yes.
Q. And that's at least three, it's at least three, close -- three weeks after the boys



first are reported missing? Can we agree on that?
A. Yes.
Q. Okay. So, and it looks as if the report -- that the reports that are dated 9/15 goes up to page -- the first seven pages of this document. Do you see that?
A. Yes.
Q. And I'm just going to ask, you see at the very top of first page, it says page 1, and then if you count seven pages in, at the very top, it says page 7?
A. Yes.
Q. And they are all, at least they're approved as of September 15th, 1978; right?
A. Yes.
Q. So would it be fair to say based on your experience that at least the first seven pages were submitted initially at some point prior to September 15th, '78, and reflected investigative work that had been done prior to September 15th, 1978?
MR. LIPSHUTZ: Objection.
A. Yes.
Q. And is that sort of consistent with how you would prepare your own reports as well, if



you were conducting a criminal investigation?
A. No.
Q. No?
A. No.
Q. Okay. How would that differ?
A. Many of our reports in the state police go on months before you would type a report. We don't have an end-of-shift requirement. Different city departments will have at the end of your shift, you complete all your reports, and they are checked. We don't have that. We never have. I can type reports several months later and a set of my notes and type them. That's just the normal.
Q. So it's your practice that you most likely do not prepare a report until the case is cleared?
A. You got to repeat that again.
Q. Is it your practice that you wouldn't prepare a formal report until the case is cleared?
A. No, I wouldn't say that's correct.
Q. Okay. Then what prompts you to file a formal report in an investigation?
A. It depends at what point you are in it when you want to document it, what value points you have that you need to note. You know, if you're



working with other agencies, do they then want that report, and what are you going to cover in your report, and that's decided as well.
Q. Well, I thought you just said -- maybe I misunderstood, though -- that an investigation could go on months and months before you prepared a report in a case; is that right?
A. Yes.
(Ashley Cohen joined proceedings.)
Q. And would you agree that sometimes information you develop early in an investigation, you may not realize the significance of that information until later in the investigation?
A. Yes.
Q. Okay. And how do you ensure that you are memorializing all pertinent facts, or facts that may become pertinent, during the course of your investigation? Is that through your notes?
A. Yes.
Q. And then when you sit down to do your formal report, do you decide what information should go into the formal report?
A. You go through your notes, and you write from your notes as to what you did.
Q. I guess my question is do you put

everything that is in your handwritten notes into the formal report, or do you decide what you believe to be the relevant factual points that you want to include in the formal report?
A. If I am the only investigator, all of my notes would go in my report. If I'm working in a group, the reports that I would cover would be the ones that were assigned to me to cover, and some other things --
Q. And when you say assigned?
A. Well, you'll see some other things in here that I was involved with, and I say "refer to a report," where I don't express all the notes that I may have had of that day that someone else is memorializing that day.
Q. But how do you know that if you're not preparing the report until months later?
A. Do I know what? That they're going to prepare a report?
Q. So what I'm asking is during the course of a multi-month investigation, you are preparing contemporaneous handwritten notes that reflect what you're learning and what you're doing through the investigation; is that right?
A. Yes.



Q. And then at some point, you sit down to formalize your notes in a formalized report; right?
A. Yes.
Q. And is that typically based on somebody saying, We need you to prepare a report? Maybe a supervisor or something like that.
A. Yes. And they'll be certain occurrences during the inves that I don't have notes on as well that someone else was taking, or taking that responsibility for.
Q. And would you include in your formal report information that comes from someone else's notes, or just your notes?
A. Just my notes.
Q. And correct me if I'm wrong, I think you said, though, that there might be aspects of an investigation that you do have notes on, but because someone else is covering that piece of the investigation, you would not necessarily include those part of your notes into the formal report; is that right?
A. Yes.
Q. Would you refer to the person who was assigned to that part of the investigation to



ensure that they prepared a thorough and accurate report based on whatever investigative work had been done?
MR. VOMACKA: Objection to form, but you can answer.
A. My report would refer to their report for covering that section.
Q. And do you actually go look at that report that you're referring to in order to make sure that it actually is covering the section that you're --
A. No.
Q. What's that?
A. No.
Q. Why not?
A. I believe it's going to be done, you know.
Q. So you're relying on the fact that your colleagues are going to do their job? Is that what you're telling me?
A. Yes.
Q. I would like to draw -- I'm going to have you look at that document. If you could look at -- it's gonna be Bates stamped ECPO 3581, but it also has a little number 34 in the right-hand corner, if that's easier to track. Actually, 3580.



Let's start there. My apologies. So page 33.
A. Okay.
Q. I want to draw your attention to the bottom part of the report narrative where it has a date of April 3rd, 1979. Do you see that?
A. Yes.
Q. And if you just could read that to yourself real quick, and then I'll have some questions for you.
Okay. You see reference to this information from the psychic again, this Mrs. Dorothy Allison?
A. Yes.
Q. And it would appear that back in '79, Detective Hairston was at least talking to her, or they were trying to see what they could develop through her, if anything; right?
A. Yes.
Q. And based on that, they actually, it looks -- according to this report, you would agree that they checked the Newark Fire Department for fires occurring in 1978; right?
A. That line is somewhat distorted. It looks like they checked one engine possibly. I can't read the number.

Q. I think it says --
A. Engine 117 maybe, for fires.
Q. It says, "Checked with Newark Fire Department Engine" -- whatever number that is -- "for all fires" -- I think it says, either, "especially fatalities occurring in August of 1978."
I don't know if that's accurate, but that's my best guess. But do you see that?
A. Yes.
Q. And you can turn the page. And it says, "Checked sites of two multiple-alarm fires. 15th Avenue and Bergen Street and 16th Avenue and Littleton Avenue. No reported fatalities."
Do you see that?
A. Yes.
Q. And, again, these are reports that, if you had in your possession, you would have reviewed during your in-depth review of the case; correct?
A. Yes.
Q. Now, after your in-depth review of the case in May of 2008, at least according to your report, you started participating in interviews with witnesses; right?



A. Yes.
Q. And by the way, you can put that aside for now, we may reference it again.
A. If you look at the date on that report, it's a year after last included in that report as well.
Q. You're talking about the Hairston report?
A. Yes.
Q. Uh-huh.
A. So similar, that's in similar fashion as well.
Q. Yeah. No, no, you're right. That seems to be the practice.
Okay. Now, after looking at the complete case file, did you have further discussions with Lieutenant Carrega about your impressions about the case?
A. I believe we certainly did.
Q. I'm not suggesting that you would have necessarily notated every time you had a conversation with Lieutenant Carrega about the case, or that you should have done that, but would it be fair to say that you spoke with him and other members of this team on a fairly regular basis during this period of time?



A. Yes.
MR. LIPSHUTZ: Objection to the form of that question.
MR. VOMACKA: Objection to form. You can answer.
A. I spoke with them regularly.
Q. And what's regular to you? Daily, weekly?
A. I'm trying to recall if we were -- at certain points, we might have been working on this a couple times a week. Sometimes it was sporadic. I still had other unit responsibilities as well. I would characterize it as routine, but I don't know how I can break that down into a daily or a weekly type of occurrence.
Q. Fair enough. Was this case a big part of your responsibilities during this period of time?
A. It was one of my larger ones. It took up a majority of my involvement, yes.
Q. And I guess this would be a good time to ask, what was your understanding of how the group operated in terms of -- I know you said Carrega was in charge of the investigation, but who did you report to in connection with this investigation?



MR. LIPSHUTZ: I'm sorry, Jen, your first part of your question broke up, so if you're just asking him who he reported to, that's fine. I heard that. But I wasn't sure what the rest of it was.
MS. BONJEAN: It was a bad question. I'll start over.
Q. Did you have to get assigned to this investigation by someone from the state police also?
A. Dave Jones is the one who asked me to contact Lieutenant Carrega.
Q. And you don't have the authority as a state police officer to go work on anyone else's cold cases just because you want to, I assume; correct?
MR. LIPSHUTZ: Objection to the form.
A. We are able to contact them, and I can work on any missing persons case right now in the state that I choose to, or any member of my unit does, typically to reach out to the agency by myself.
Q. I mean, if you are working for the state police, you're getting a salary from the

state police, you don't get to decide which investigations you want to work on without at least getting approval from someone up your chain of command, I assume; right?
A. I don't know if that's necessarily so. You're assigned cases, and then you also look for cases. Like our work in this unit is a lot of what you become aware of in jobs that you have a personal interest in. Either, you know, an age group that you tend to like to get involved in. If it's Alzheimer's/dementia, we have members who like to get involved in those cases. And everyone is allowed to work something. Certainly, supervisors can be, like, if it's not a case that's worthy of time, as far as, like, if there just isn't enough there, or enough there for you to work, or you have other responsibilities, or other cases come in, you can be both assigned both cases and seek your own cases.
Q. Well, when you seek out a case that you want to work on, who supervises you?
A. That's in our unit. We all have -- at the time, Dave Jones was my assistant, and then I had Joe Glennon at the time was my sergeant. So he would be the supervisor that my reports would be



reviewed by, but he wouldn't be with me on my jobs, though.
Q. Okay. But you would still have -- your supervisor would still have to -- I don't know what word to use -- signing off or agree that this is a case that, you know, is worthy of our time, and go ahead, and I'm gonna supervise you on it; right?
A. Yeah. They would essentially, I guess you would call it, authorize you to continue, you know, and say that's worthy of our efforts.
Q. Got it. So there is an authorization process. And I assume that with this missing investigation case, you did receive authorization to work on this case; correct?
MR. LIPSHUTZ: Objection to the form.
A. Yes.
Q. Now, having received authorization to work on the case, what was your understanding of which agency's policies and/or practices you would be following?
A. That's not -- like, I follow my policies with concerns for my stuff. Cases, when you assist other agencies, there are reporting issues, and that aspect becomes very different, and I'm



unaware of their policies, so it's whatever is expressed to you. We assist many agencies on cases where our reporting is rather minimal and vague because they handle all the reporting. We assist them with investigative guidance essentially is how I would term it.
Q. Which agency was in charge of the missing persons investigation when you became involved?
MR. LIPSHUTZ: Objection to the form.
A. It's always been Newark PD's investigation. The individual I was involved with was looking at it from a cold case aspect, so I was reporting back to him.
Q. I'm sorry. You were reporting back to who? You cut off for that.
A. I was reporting to Lieutenant Carrega. He would be the one who would ask me to assist or -- those aspects.
Q. Okay. So would it be fair to say then the policies that the investigation would be subject to would then be Newark Police Department's policies, to the best of your understanding?
MR. LIPSHUTZ: Objection to the form of the question.



MR. VOMACKA: I also object to the form of the question. You can answer.
A. I don't know. I was dealing with whatever --
(Reporter requested clarification.)
A. Whatever Lieutenant Carrega was doing, how he was handling it. I was unaware at that point if anyone else was continuing it or looking at it.
Q. Okay. But you're embarking on an investigation, an important investigation. Was it important to you to know what policy you should be following in connection with this investigation?
A. I'd go with my own policies as far as the aspects that would concern certain avenues, yes, but I don't read their policies.
Q. Okay. So when you say you go with your own policies, are you talking about Sergeant Tietjen's policies or the state police policies?
A. State police policies.
Q. Okay. So when you were doing your work on this case, you were guided by the state police policies in your work; right?
A. Yes.
Q. You didn't read Newark Police Department policies; right?

A. No.
Q. Is that a no?
A. No.
MR. LIPSHUTZ: I'm sorry. It was a negative question. Did you read Newark's policies?
THE WITNESS: No.
MR. LIPSHUTZ: Okay.
Q. And were you provided a copy with Newark's policies, at least as they pertained to this missing persons/homicide investigation/cold case investigation?
MR. LIPSHUTZ: Objection to the form.
A. No.
Q. Did you review any policies that the Essex County Prosecutor's Office may have had?
A. No.
Q. And when I'm talking about policies, by the way, just so we're on the same page, I'm talking about written policies or orders or anything on a piece of paper that guides law enforcement in their duties and responsibilities. Okay?
A. Yes.
Q. Were you provided with any written



policies either by Lieutenant Carrega or anyone else that were prepared by the Essex County Prosecutor's Office?
A. No.
Q. And do you know whether the state police policies differed in any way from the policies of the Newark Police Department or the Essex County Prosecutor's Office?
A. No.
MR. LIPSHUTZ: Lack of foundation.
Q. Okay. Did you ever discuss with Lieutenant Carrega or any other member of this unit that was looking at this case policies that you should take into consideration in your work on this cold case?
MR. LIPSHUTZ: Objection to the form.
A. No.
Q. Had you received any training prior to your involvement specific to conducting cold case investigations?
A. I don't believe so, unless there was a block in one.
Q. And do you know whether or not Lieutenant Carrega had received any training in connection with conducting cold case investigations



prior to May of 2008, if you know?
MS. ROSEN: Objection to the form.
A. I do not.
Q. Now, you participated in a number of interviews with other members of the team, including Lieutenant Carrega; correct?
MR. LIPSHUTZ: Objection to the form.
A. Yes.
Q. Tell me what the hierarchy was in terms of who led the interviews when you participated, if you understand what I'm saying?
A. Yes, I do.
Q. I'm sorry?
A. Yes, I understand what you're saying.
Q. Okay. And who was that?
A. Lieutenant Carrega was the lead on interviews that he was there.
Q. And was there a default for interviews when Carrega was not there?
A. No, I think we all worked well together, and I didn't see any issues. Everyone who was working on the job worked hand-in-hand, but he was our, in my eyes, the lead of the cold case.
Q. By the way, were you aware of whether or not Essex County or Newark had any embarked on



any other cold case investigations prior to this one?
A. Regarding what? This case or others?
Q. Yeah, no. My apologies. Any other cases not related to this Lee Evans or the five boys, any other cold cases that had been investigated by Newark and/or Essex County Prosecutor's?
A. I'm sure they do and did, but, you know, like, I can't recall any that I was involved in a cold case as a missing persons that were cold cases prior to this from Newark that were involved as well. So, yeah, definitely.
Q. Okay. Now, before you would go interview someone that was identified as a person, you know, who should be interviewed, did you discuss with your team or Lieutenant Carrega how the interview would be handled and what you wanted to accomplish in the interview?
MR. LIPSHUTZ: Objection to the form.
A. That may seem so like --
(Connectivity issues.)
A. You may have discussed who is going to do the intro and take the lead at the door, and typically that's who engaged in the conversation

via phone or, if anything, at first contact, it might have just been decided on the walk-up, Hey, you can knock, and then you go from there, but...
Q. Were there some witnesses, though, you had a plan in place for how you would approach the interview?
A. You certainly would have thoughts of what you want to ask them about from case facts prior, so that would be considered a plan per se.
Q. And did you discuss the plan, if you want to call it that, with your colleagues before the interview typically?
A. Which? Like, I'm trying to think about, like, if I was going to a parent for a DNA, I would discuss that it would be my thing to discuss the DNA aspect. There would be an introduction. You certainly have other case facts you want to address, so that would be like -- but who says what and who does what, it wasn't like scripted out, no.
Q. Right. But in an important interview like a Philander Hampton interview or a Lee Evans interview, presumably, you all wanted to be on the same page about how you -- what you wanted to do during that interview; correct?



A. We all had the same goal, certainly, and the same information we were trying to deal with. If we're talking about Lee Evans' attempt at the interview after his arrest, it was Detective Joe Hadley and I had a chat with him to initiate the interview, and Detective Hadley read him the Miranda, so that would essentially be the lead. We decide before we go who is going to read the Miranda.
Q. But even prior to his arrest, you all had made multiple efforts to interview Lee again; right?
A. Yes.
Q. And, in fact, I think I saw at some point one person called and then left a message, and another one of you called and left a message, and then someone else called and left a message; right?
A. Yes.
Q. That was all discussed in advance; correct?
A. Oh, certainly.
Q. And you had a plan for trying to get Lee to sit down for a conversation; correct?
A. Yes.



Q. And I would say, you know, witnesses that at least on their face seemed less important, maybe you didn't have quite a detailed plan, but you would still discuss who would take the lead if Carrega wasn't there; is that fair?
A. I don't know -- there's no written plan. There may have been discussion like, Oh, I'll start off here, but I don't recall each of those specific interviews.
Q. Well, would you agree that some police officers tend to be more active in interrogations or interviews than others?
A. Certainly. It's a personality. Some would lead right through and step over others, or some will just simply sit back and allow somebody else to step forward and let the course of the interview go, and sometimes you have a person you're interviewing who does not care for the person who's initiated the initial lead, and then you hope that you're confident enough in your other person with you that they can step forward and engage and elicit responses and engage them in conversation. And, you know, this group had all very different aspects that somebody might want to talk to each one of us.



Q. Right. And different interviewers have different styles; would you agree?
A. Correct, yes.
Q. How would you describe your style?
A. I would say I try to be calm, specific, nonthreatening, you know, and show genuine interest in the information I'm looking for. I guess that would be -- you know, I don't know if it covers enough, but that's kind of how I would go at it.
Q. You're not an in-your-face pointing-the-finger type?
A. No.
Q. You said you had training in connection with conducting interrogations or interviews; right?
A. Yes.
Q. What type of training was that? Was that a classroom type of training or --
A. It was a classroom training.
Q. Did you do simulations, like practice?
A. I don't recall practice in there, no. We watched some videos as well.
Q. So you reviewed videos, critiqued

videos type of thing?
A. Yes.
Q. And was part of the training, you know, this works, this doesn't work type of thing?
A. Yes.
Q. What did you learn in that training about feeding witnesses or suspects information --
(Connectivity issues.)
A. You're unclear. Please repeat that whole statement.
Q. Sure. In your training, in your classroom training, or really on-the-job training, did you receive any information about the importance of not feeding details to someone who is being interviewed that they wouldn't already know?
A. Depends. Like sometimes you have to, like, bring people to the event that you want to discuss because their own style is very all over the place. I tend not to try to feed them information. I try to elicit information. I don't know if that was specifically taught in the class. It probably was, but we're talking like 1999. But that's my style. I tend not try to feed unknown information to somebody. I try to see -- if they've provided it before, I may



refresh them. And after that --
(Reporter requested clarification.)
A. If it doesn't come up, and they provide it before, I may refresh them back to that piece of information I want to speak about. If they're unknowing of the event, I would potentially have to bring them to that event to discuss. If they say, I don't know, so you may know nothing about this car theft, or whether the car was parked on the corner, and they might say, Oh, I saw the black car on the corner, but I thought nothing of it. So the information they provide you might have been very vague until you can bring them to that point.
Q. Well, would you agree that if a suspect provides you with information that only the offender would know, this would have good evidentiary value?
A. Yes.
Q. All right. So with that principle in mind, would you agree that it's important not to feed information to a suspect so you can ensure that if you're getting a piece of information, he's not just regurgitating what you told him but that it actually shows that he has knowledge about the



incident?
A. It depends what you're -- if we're referring to a specific statement like on a video or audio, sometimes you have suspects who will tell you information prior to that taped -- after Miranda, post arrest, or even prior to them being arrested, and they already told you, so you have to bring them back to that information. Just like I said before, you're bringing them back to the point you want to discuss, and many times people will overstep facts when they're going through the interview again, whether it be on video or audio, or when you did sit down. You know, if I have a street conversation with somebody out on the street, and they tell me information, and, you know, I want to capture this on the video statement. When I reinitiate that video or audio statement, they tend to step through many aspects of it, and you have to sometimes bring them back. And sometimes the personality issue on the person or like the upbringing, you ask them to tell the whole story, they rush through it. So it would all depend upon the event. I think that most of it we're trying to listen to what they have to say. And sometimes we become aware of statements



they've made to us during it that weren't included now or weren't included later, so I don't know what we're...
Q. Well, putting aside that you may want to refresh someone's recollection with something they already told you, I'm talking about when you are conducting an interview for the first time with a suspect, would you agree that it's important not to feed them information that only the offender would know so that you can assure yourself that they're not just regurgitating what you told them but that they actually have firsthand knowledge about the event?
A. I would agree that would be important.
Q. Now, on June 2nd of 2008, you interviewed a Lillie Williams; right?
A. Yes.
Q. And this interview was conducted with Lieutenant Carrega and Detective Hadley; correct?
A. Yes.
Q. And just to be clear, prior to your interview with Lillie Williams, you had developed information that had been known since 1978 that the boys had been seen in and around the time of their disappearance with Lee Evans; right?

A. Yes.
Q. What other information as of June 2nd, 2008, did you possess that would lead you to believe that Lee Evans had any involvement in the disappearance and presumed murders of the boys other than what we just identified?
MR. VOMACKA: Objection to form, but you can answer.
A. The identified case from '78 through have him as an involved party and last being seen with them. So that's what we were working on.
Q. Right. And I'm trying to put a little finer point on it.
I know we've established that the case report, case file, no question, established that the boys had been seen with Lee in and around the time of their disappearance. But apart from that fact, what other fact can you point me to that would lead a person to believe that Lee was involved in their disappearance and/or presumed murders?
A. The fact they were last with him, and they were never seen after being with him again. You know, I think, in this case we had other potential sightings throughout the early stages, but they're



always potential. We get that now on cases as well. And some have investigates those as well as they -- but as best we knew, Lee Evans was the last one seen with the boys. They were never seen again, and that would lead us that he's someone of interest.
Q. Okay. Let's try again. First of all, you actually were unable to pinpoint when the boys disappeared; right?
A. Well, we knew on or about August 20, 1978.
Q. Right. That's like a full day, which --
A. No, we knew -- we had at time breakdowns where people last see them, and they're reported in the 1978 reports, so some were closer to that 11 o'clock at night, some had seen, the last sightings.
Q. And there were reports that they were seen after that; right?
A. Sure. I mean, like I said, you're going to get that. You have to work on that as well and see if that's viable, but that was -- I believe those are sights of not people intimately involved saw him. None of the family members saw their kids the next day.



Q. Right. According to the reports, they went missing in and around August 20th to August 22nd, and they actually weren't even reported missing until August 23rd; right?
A. Correct.
Q. The 1978 reports reflected varying information about when the boys were last seen; would you agree with that?
A. I agree that there are varying times on the 20th that they were last seen, yes.
Q. So my point is the reports reflect that Lee Evans was with the boys approximately around the time they left, but the reports didn't conclusively show that he was the last person to see them; would you agree?
MR. LIPSHUTZ: Objection. Argumentative.
MR. VOMACKA: Objection to form. You can answer.
A. Of the people that were interviewed in those initial reports, the last time they saw the boys was with Lee Evans.
Q. Okay.
A. You know, I don't know if -- there are probably one or two that might say that when they



say them, they weren't. But the ones who described them leaving with him in the truck, it was his vehicle. I think what she said was it was Lee Evans' vehicle. They didn't see Lee, but it was his truck.
Q. Okay. And the point is, is that was the last time they saw them, but they were unable to say when the boys actually went missing; right?
MR. VOMACKA: Asked and answered.
MR. LIPSHUTZ: Objection to form. You can answer.
A. Missing to them is the point they last seen them. So if your kid goes missing today at -- you last see them at 9:00 a.m., the report is going to say last seen to you at 9:00 a.m. Someone else may have seen them at 11:00 on the street corner, but we have yet to identify that person who saw them at 11:00, so I don't, you know...
Q. Well, they didn't actually -- they did not actually report them missing until a couple days later, so they -- would you agree that the parents didn't initially at least feel that the boys had been disappeared or murdered or --
MR. LIPSHUTZ: Objection to form.
MR. VOMACKA: Objection to form. You

can answer.
A. 1978 is very different than today. Patricia's Law had you put down in writing how quickly you take the report. Because the issues have been throughout the State of New Jersey routinely where agencies tell families they had to wait 24 hours, they had to wait days, to make a report. Unknown to me why there was a delay in the reporting. Whether they made initial attempts and were told to wait for them to return, whether they had experienced the boys staying overnight somewhere, but there is a delay.
We, as of last week, had a report where a family member reported a guy who killed himself, and she waited 24 hours because she thought the 24-hour rule was in effect.
Q. Okay. And I am not disputing that 1978 was a very different time, but for whatever reason, the boys allegedly went missing on August 20th, and it wasn't reported by the parents, at least as far as we know, until August 22nd; correct?
A. Correct. We have one mother who drives around looking for them at 3:00 a.m. with her, I guess another family member, I'm trying to think



of the name. I think was Floria McDowell or something like that. Floria McDowell. Yeah, I think it was her. She drove around with a relative looking for them at 3:00 a.m., but no reports to police, so they're concerned, and it shows a concern.
Q. I am not suggesting their parents weren't concerned. I'm just trying to set a time frame here, though, they were not formally reported missing until August 22nd, and then the assignment wasn't actually received until August 23rd; correct?
A. Yes.
Q. Okay. And the parent could say when the last time they saw their kid was and who they saw them with, if anyone, but no one was able to state at which point the boys were -- well, no one was able to say whether the boys had been injured or hurt; correct?
A. I don't know what you're getting to with that.
Q. No one was able -- my point is no one knows exactly when they were hurt; right? If they were hurt.
MR. VOMACKA: Objection to form. I'm



sorry. You can answer.
A. No one stated that they were hurt on that initial report. It was unknown from the last point they saw them.
Q. So we're getting a little far afield. I'll bring us back. But my point is apart from the reports reflecting that Lee Evans may have been one of the last people to see him, or was the last person by some people's account, to see the boys, and not all the boys; right?
MR. LIPSHUTZ: Which question are you asking?
Q. The reports did not reflect that Lee Evans was the last person to be seen with all five of the boys; right?
A. Each of the boys is broken down differently throughout the report, so we would have to, like, timeline through that to identify each one in there, but --
Q. I'm just asking if you remember that. If you don't, you don't remember. The reports will speak for themselves. But do you recall whether or not Lee Evans was the last person to be seen with every single one of those five boys?
A. It depends on who -- he's the last one seen



at 11:00 on the reports that the family members are aware of them. I don't know if they saw anybody else afterwards that I can recall.
Q. My question was different, though. It had to do with whether or not it was all five boys that he was last seen with, or three of the boys, or two of the boys?
(Reporter requested clarification.)
A. Lee Evans or his vehicle was seen with all five boys at some point that evening.
Q. At some point within the 24-hour period?
A. No. At some point that evening, let's even push it from 8 o'clock on until midnight.
Q. Okay. Fine. At some point that evening, Lee Evans was seen with, your belief is with all five of the boys; am I right? Correct?
A. Yes.
Q. Okay. And apart from that fact that we've just honed in on, what other evidence led you to believe that Lee Evans was involved from those original reports that you reviewed?
MR. LIPSHUTZ: Asked and answered.
Q. Anything else?
A. Reading through the report, you have many

aspects of the report that still continue to identify him as a person of interest throughout it.
Q. That's just gobbledygook. I'm asking you to identify a fact other than the one you've identified that he was the last one seen with the boys, according to your interpretation of the reports, what other fact did you identify from those reports that led you to believe that Lee Evans was involved in their disappearance?
A. That the boys had stolen marijuana from him.
Q. Okay.
A. That he had a potential motive for getting back at them as well.
Q. I'm sorry. What was the second part?
A. That there was a potential motive because they had stolen marijuana from him. There were reports in there that somebody was trying to get marijuana back and money as well, or money for the marijuana.
Q. I'm going to stop you right there. So one other fact that you drew from these reports is that there was some indication that the boys had stolen, or some of the boys, had stolen marijuana



from Lee; right?
A. Yes.
Q. And in your mind, that was a potential motive for murder; correct?
A. Correct.
Q. Or, I suppose, in your mind as of 2008, you're presuming these boys are dead; correct?
A. Yes.
Q. And I know that you indicated just now that there was some reporting that someone was trying to get the marijuana back or get money for the marijuana; right?
A. Yes.
Q. But the reports never connected that piece to Lee Evans; right?
MR. LIPSHUTZ: Objection to the form.
Q. Go ahead. Do you need me to repeat the question?
A. No. I said the marijuana was connected to Lee.
Q. Right.
A. The boys -- I can review all these old files for hours, if you want, about Hairston's report, and we can go bit by bit and find that



spot. I don't recall what changed in there, but the entire time through, Lee Evans was a main person of concern. He was not arrested. Until we spoke to Philander Hampton and he provided new information to us, yeah, that's where the big concern takes in our -- he was always a suspect.
Q. You can say he was main suspect from those reports, and that's fine. I understand that's your view, but that's not -- I'm not looking for your opinion about that. I'm looking for the underlying factual basis for that opinion.
So my question, though, was even though there was reports that the boys had stolen marijuana from Lee, and, in fact, there was some marijuana recovered from one of the boy's rooms; right?
A. Yes.
Q. But you weren't able to come up with the marijuana, or the detectives were not able come up with that specific marijuana from the evidence; correct?
A. She broke up. I didn't hear her.
Q. The reports did not reflect that the detectives were ever able to connect the specific marijuana that was recovered from the boy's room to



Lee Evans' stash; right?
A. No.
Q. Okay. And, in fact, the detectives who were working on the case back in 1978 were never able to actually connect the person who was trying to get money, and that was calling for the money, named Bob; right? Does that ring a bell?
A. Right, correct.
MR. LIPSHUTZ: Objection to the form.
Q. Did you ever see anything in those reports that was able to connect Bob in any way to Lee Evans?
A. No.
Q. Okay. Apart from the potential motive that the boys may have stolen some marijuana from Lee and the fact that Lee had been with the boys around the time of their disappearance, are you able to identify for me any other facts you developed from the 1978 reports that led you to believe that Lee was part of their disappearance?
A. They broke into his residence, and --
(Connectivity issues.)
A. -- and broke a window entering the residence this last time, which caused Ernie Taylor to have a cut on his hand.

Q. Okay. And that was to get the marijuana, though; right?
A. Correct.
Q. So that's part of the marijuana motive? That's the motive; right? Right?
A. Yes.
Q. Okay. Apart from that motive evidence you've identified and the fact that he was seen in and around the time with the boys when they disappeared, what else, anything you can point me to from those '78 reports that led --
A. Not that I recall.
Q. Let me finish -- that led you to believe that Lee was the perpetrator?
A. He was last seen, and he has a motive. Not -- that's what we're working on, right.
Q. I'm asking what -- anything else?
A. No, that's -- he's -- they broke into his house. They stole his marijuana. He worked with them. It's a step process. He was last seen. So the people last seen with the boys would be the people that would be of interest, whether they are named suspects, they are your person of interest to go speak to. So those facts there lead you to want to speak to them. Whether they get resolved



at some point or they don't, those are still what we have presented.
Q. Right. But the period of time -- well, strike that. I'm not going to debate with you about whether or not -- you don't know when the boys were missing. So whether or not Lee was the last person seen with him, that's just from the parents' accounts from hours earlier; right?
MR. VOMACKA: Objection to form, but you can answer.
MR. LIPSHUTZ: Objection to the form.
A. Parents and friends and others interviewed that were with them that evening.
Q. Right. And there were a lot of people that were around Lee Evans in and around that time other than those boys, too; right?
MR. VOMACKA: Objection to the form, but you can answer the question.
MR. LIPSHUTZ: Same objection.
A. I'm sure.
Q. Okay. So there was -- supposedly Maurice Olds was around there; correct?
A. Correct.
Q. Royster; right?
A. Yes.



Q. Okay. Do you think that stealing marijuana is a motive for killing five children?
A. Certainly.
Q. Really?
A. Yes.
Q. How many other cases have you seen where someone has committed, I don't know, maybe five homicides, a five-person homicide, for the stealing of a small amount of marijuana?
A. Well, some people reported it to be a pound. But you have multiple break-ins at his house. And then look at today in the cities, people kill people for a little bit of stuff. So I don't have any doubt that you could kill somebody for stealing their marijuana and breaking in their house multiple times. I have no doubts about that at all as being a motive.
Q. Even someone who doesn't have a particularly profound criminal record?
A. Yes.
Q. So in your mind, that was the motive? You were persuaded of that motive. Did you consider any other motives?
A. You broke up there again.
Q. I said did you consider any other



motives other than the one that you identified when you were looking at this case in June of 2008?
A. Every case I look at, I try to be open to other possibilities as well that present to the case, and then you go where the case will lead you with the information provided to you. I think there's potentially always several possibilities in every case from the beginning through. At no point when I sat down with Phil Hampton when Phil Hampton was willing to take the interview did I think what he told us was ever going to happen.
Q. Okay. But my question is what other motives did you consider, if any, other than the one of the boys stole some marijuana from Lee?
A. Well, there were many motives that were touched on in the 1978 and later reports that could be a potential. Did they run away and go to a cult? There was --
(Connectivity issues.)
A. It was, like, did they run away? Did they go to a cult? Did they go to the city? I think somebody -- we got a Washington, D.C. call. And all of those things were looked at back then. The underlying open-ended one was still the motive for Lee Evans with the marijuana and the break-ins to

his residence.
Q. So you didn't pursue those other possible motives when you got on the case; right?
A. No, no.
Q. You looked at the police reports, and the one motive that you thought made sense was the marijuana motive; right?
A. I looked at the reports and saw what was still open-ended, and that was the Lee Evans marijuana motive.
Q. And you never were able to prove that Lee Evans was involved in narcotics trafficking; right?
A. Only with statements made to us. That's it. No -- it's 1978. I had no proof of his arrest for that.
Q. Who made statements -- well, strike that.
You weren't able to corroborate any of those statements that Lee had marijuana in his house and was involved in selling marijuana; right?
MR. VOMACKA: Objection to the form, but you can answer.
A. It was -- I wasn't looking to arrest Lee on the marijuana charges. The information provided



in the statements, and people interviewed later on when we got involved still indicated that he was involved with marijuana.
Q. You had a number of people saying he was involved with marijuana; right?
A. Correct.
Q. You never found out what type of marijuana operation he ran; is that right?
A. Yes.
MR. LIPSHUTZ: Objection.
Q. You don't know who his supplier was; correct?
A. No.
Q. He had no arrests for marijuana; correct?
A. No.
Q. And, in fact, you actually spoke to one of the so-called suppliers of marijuana, and he's like, "I've never heard of Lee Evans in my life." Right?
A. Yes.
Q. Okay. So when you developed that information, did it make you think, "Hmm, maybe Lee Evans isn't involved really in drug trafficking"?
A. No.



Q. So the statements from 1978 about him having marijuana in his house was enough to persuade you that Lee Evans was a significant drug dealer who would kill five people for stealing his marijuana; right?
MR. LIPSHUTZ: Objection.
MR. VOMACKA: Objection.
MR. LIPSHUTZ: You can answer.
A. I wouldn't say identified him as a significant drug dealer. I would say he was a person with marijuana who had his marijuana stolen and his broke house broken into and that he became upset to that, and that became his motive.
Q. And so upset that he would murder five people over it; right?
A. Yes.
Q. So in June of 2008, you started getting involved in investigations and being more active in this investigation; fair?
A. Yes.
Q. You spoke to Lillie Williams. But, again, was there anything that came out of that interview that made it more likely that Lee was involved in these presumed murders?
A. Nothing more than previously had been



provided.
Q. Right. She didn't give you any additional information that advanced your theory that Lee Evans was involved; right?
A. No.
Q. And you also interviewed a Cathy Canady on June 6th, 2008?
A. Yes.
Q. And I notice that you said refer to Lieutenant Carrega's report for details about that?
A. Yes.
Q. Is that because you didn't take notes during that interview?
A. I don't know if I took notes or not on that interview.
Q. Could you have?
A. I could have. I don't know.
Q. Okay.
A. But that would have been one that it was decided when we who -- was going to cover each aspect, and that was one that Lieutenant Carrega was to be responsible for.
Q. It was your understanding that Lieutenant Carrega would write a report in connection with the interview of Cathy Canady?

A. Certainly.
Q. Did you ever see that report?
A. No.
Q. Have you ever seen that report?
A. No.
Q. As you sit here today, are you now aware that no such report was ever made?
A. I became aware during the Miranda hearing for Philander Hampton. Actually, the day prior, he testified.
Q. Did it trouble you that there had been no report made, even though you referring were to a report in your report?
A. Oh, yes.
Q. And why was it troubling to you?
A. Because you work with a group of people; you cover aspects of an investigation. It's decided who will cover certain aspects. I wrote first, I handed off my report. I believe Bill Hadley wrote his report next, or completed all aspects of his report, whether he had others that written throughout, and then it was passed on to Lieutenant Carrega. So I don't get stuff passed down on that aspect from him. It's passed up through him. And if he choose, chose, not to



write a report, that's on him. I knew what my responsible part was, and I found out the day of Miranda that no such report was written, so...
Q. Okay. You also interviewed Floria McDowell; right?
A. Yes.
Q. And I'm on page, I guess it's 5 of your report, Bates stamped ECPO 1347. Do you see that?
A. Um-hum.
Q. And, again, would this have been Carrega taking the lead in this interview?
A. No, this one is one that I documented.
Q. Um-hum. Does that mean that you documented it, you took the lead in documenting it, or you took the lead in actually conducting the interview, or one had nothing to do with the other?
A. I would say they had nothing to do with the another.
Q. But because Lieutenant Carrega was present for this interview, would that lead you to believe that he actually took the lead in interviewing Ms. McDowell?
A. Yes.
Q. How would you describe Lieutenant



Carrega's style of interviewing? I know you described your own. But how would you describe his?
MS. ROSEN: Objection to the form. You can answer.
A. Everyone is different. He's seeking factual basis to events he wants to learn.
Q. Right. But stylistically, what was his style? Was he like your style? Would you say you have a similar style?
A. I think we have varying differences. I think the three of us, including Joe, who was definitely a great interviewer as well, were able to mesh our styles into something that the majority of people we spoke to, if not all, felt very comfortable speaking with us. So I wouldn't say Carrega's style wasn't offensive to others. He has many years of experience at this point interviewing people. I'd have to watch a video again of his style to recall back 12 years ago if it was drastically different than mine or Detective Hadley. I know we were all meshing up together to do an interview.
Q. You don't really remember, though, what the differences were between your style and



his style; correct?
A. No.
Q. Now, and during this interview, you were able to confirm some of the facts that he had previously reported to detectives back in the '70s and then even in the '90s, I believe; right?
A. Yes.
Q. And one was that she had recovered marijuana from her son's room; right?
A. Yes.
Q. Just, I want to make sure I got this right. Floria McDowell's son was Mike McDowell?
A. No, Alvin Turner.
Q. Alvin Turner. Yeah, I always get that mixed up, because you'd think the name is the same. But anyway, it was Alvin that was her son; right?
A. Yes.
Q. Okay. I'm going to draw your attention to -- and this is the situation where the niece had recovered the marijuana from his room and handed it over to the Newark Police Department at the time; right?
A. Yes.
Q. All right. And as we indicated

earlier, she was unable to say how long that marijuana had been in the house; right?
A. I don't recall. I don't believe she had a time.
Q. Well, you would agree that if it had been in the house for a month --
A. Well, she didn't know how long it was in the house.
Q. Right. That's what I said. If she didn't know, then she wouldn't know how long it was there; correct?
A. Yes.
Q. So, you, therefore, and the detectives back in 1978, had no idea whether that was the same marijuana that was allegedly stolen from Lee Evans' house; correct?
A. Right.
Q. And it wasn't unusual for teenagers to have marijuana even in the 1970s; can we agree on that?
A. I don't know these boys, so I don't know.
Q. I'm not talking about these boys specifically. I'm saying it wasn't unusual in the '70s for teenagers to possess marijuana; correct?
A. I don't know how -- I'm six at the time,



you know. I'm don't know teens back then so --
Q. Fair enough.
A. Like, I'm going to go with that. Like, I don't know Newark in 1978.
Q. All right. Fair. Fair. Fair enough.
Now, Mrs. McDowell also advised in your interview that there was a black man that "came to her residence on the day Alvin went missing and spoke with Alvin at the front door." Right?
A. Correct.
Q. And she "observed what she thought was a handgun in the man's front pant's pocket. She thought that the man looked like a friend of Lillie Williams, mother of Melvin Pittman, but she was not sure and she did not know his name." Do you remember that?
A. Yes.
Q. And you and your colleagues showed her a picture of Philander Hampton; right?
A. Correct.
Q. And she was unable to identify him as the person who was at the front door talking to Alvin on the day Alvin went missing; right? Is



that correct?
A. Yes.
Q. And this is someone who had a gun, according to her?
A. Yes.
Q. What efforts did you -- what investigative efforts did you take to find out who that person was that came to the door with a gun on the day that Alvin went missing?
A. We asked Lillie -- or Floria McDowell about how Alvin was with the individual, and she indicated he wasn't fearful of the individual with the gun. So was it necessarily a threat to him? No, she didn't feel that way. We then went and spoke to Lillie Williams as well about individuals she may have been involved with, whether it be her husband at the time, or if she was involved with another male, and then --
(Reported requested clarification.)
A. Yeah, who she was involved with at the time. Whether it was her husband, it's Nelson Williams, or another male. And then it was, I believe the name was Nelson Williams, was located at a senior housing complex in Newark, and Agent Eutsey and Lieutenant Carrega interviewed him



there, and he denied, as far as I know, any involvement with being that person at the front door. Beyond that, just as in 1978, that person was never identified.
Q. So you and your predecessors were never able to identify the individual who came to the door of Floria McDowell's residence with a handgun and spoke to her son Alvin; correct?
A. With what she thought was a handgun in his pocket, which you can surmise from there that how good is she at identifying a handgun in a pocket or not, so it's -- you know, we're going to play back to that. So that person was never identified who may have potentially had a handgun in his pocket.
Q. Right. You're quick to -- you're quick to dispel any significance of this handgun, because you said she thought it was, but I guess my questions are really just more simple. Did you ever find out who that person was?
A. No.
Q. And apart from talking to Lillie Williams and any men she may have been linked to, were you able to develop any other information that might shed some light on who that person was?

A. No.
Q. And you certainly weren't able to connect that person to Lee Evans; right?
A. No.
Q. This question about who appeared at the McDowell home and spoke to Alvin who may have had a gun in his pants is a mystery to this day; is that right?
A. Yes.
Q. And she said she didn't believe it was Philander Hampton because you showed her a photo of Philander Hampton; right?
A. I guess the poor aspect there was that we had a photo that was 30 years newer of Philander Hampton at that point. I did not have a photo of him from 1978. Unknown if she would have even been able to identify that of a person who came to her door, but that would have been a better photo to present, certainly.
Q. Sure. But you worked with what you had --
A. Yes.
Q. -- and as far as you know, this was not Philander Hampton?
A. That's what it revealed, yes.



Q. She also said she found her son's wallet in the hallway to her residence two days after he went missing; right?
A. Yes.
Q. Were you able to develop any information about why Alvin's wallet would have been in the hallway?
A. No.
Q. Is that something you looked into?
A. Something we looked back -- I looked back in the reports to see if anything came up on that. I don't know if there was a --
(Reporter requested clarification.)
A. I looked back in the reports to see if I could identify any resolution to that. I don't recall seeing one as to why it appeared there two days later, or if she missed it in days prior, but I can certainly hypothesize some things, but that's what we had, in any case.
Q. Well, that was a fact that she thought was important to share with you; correct?
A. Yes.
Q. And it was a fact that you thought was important to put in your report; right?
A. Yes.



Q. And why did you think that was a fact that was of evidentiary value or relevance?
A. Because I would have loved someone to tell me that he left his wallet in their car the night they killed him, and they threw it inside his hallway. I'm going to include those things because who knows what's going to come forward. That was something that she determined was odd in her own thoughts. Certainly became odd in my own thoughts on this that I would document.
Q. So your working hypothesis was that possibly whoever had taken Alvin had returned his wallet by throwing it at his home?
A. That's probably one of three possibilities. One, the person who was last with him; right? Two, the person who was involved in his demise, it got left in their vehicle, and they threw it; or he simply left it there on his own. So we still don't know. And there was probably a fourth as well. But that would be something that her thought on that, that was odd, so that made it into my report. And if someone later provided me information about that, that would have been great.
Q. Do you know if that wallet was ever



dusted for prints?
A. No clue.
Q. Okay. And to you it seemed logical that someone who may have killed five people would return the wallet to his home rather than, I don't know, throw it in the river, throw it somewhere else?
MR. VOMACKA: Objection to form, but you can answer.
A. People do amazingly crazy things while committing crimes. I've seen a lot of that, so I am not surprised at anything these days.
Q. Right. Which is why you have to keep your mind open to all possibilities?
A. Yes. That's why I laid out three, and we can probably go on four and five. But one is that somebody involved with him that night returned it when they located it, or it could have been dropped outside that same evening, or two days before, and was found. You know, she didn't know when he lost his wallet for it to show up there, but --
Q. Right.
A. But it was important enough if someone stated to me later on who was actively involved

with him that, Oh, yeah, we found his wallet left in the truck, or we found his wallet left on the curb and delivered it to his house and left it there. You know, who knows why people return things or take things or --
Q. But it's also possible that she missed it; right?
A. Certainly.
Q. And it's also possible that it was dropped in the course of perhaps a struggle from there; right? That's a possibility, too; correct?
A. That would be number four.
Q. Right. Is that a possibility you considered?
A. Yes.
Q. Which would have meant that he would have gone missing from outside of his own home potentially; that's one possibility?
MR. LIPSHUTZ: Objection. Calls for speculation.
A. It's certainly a possibility because he was last seen at his home leaving. You know, who knows when she observed it, when it was there.
Q. Okay. On June 9th, you received information from -- you interviewed a Rogers



Taylor; right?
A. Yes.
Q. And you were trying to find out -- you guys worked really hard to find out information about Mr. Evans' alleged drug-dealing operation; right?
MR. LIPSHUTZ: Objection to the form.
MR. VOMACKA: Objection to the form.
You can answer.
A. We were trying to find out about all of Mr. Evans' involvement.
Q. Right. You were focused on Lee Evans, that was the focus of the investigation; correct?
A. Yes.
Q. And one bit of information you received is that you heard from Ernest Taylor's brother, Roger Taylor, that Lee Evans drug distribution may have been tied to Wayne "Akbar" Pray; right?
A. Yes.
Q. Would you call that sort of a rumor?
A. Yes.
Q. All right. And that Pray had been his supplier; right?



A. Yes.
Q. You were looking for Evans' supplier, if you could find him; right?
MR. LIPSHUTZ: Objection to form.
A. Sure.
Q. And you ultimately actually did speak to Mr. Pray; right?
A. Yes.
Q. I think we went through this earlier, but he denied knowing Lee Evans; correct?
A. Yes.
Q. Did you find any other possible suppliers other than Wayne Akbar Pray?
A. No.
Q. You also heard some information from Rogers Taylor that Bob Cutler was looking for the boys at the time of their disappearance; right?
A. That who was?
Q. Bob Cutler?
A. Yes.
Q. And, in fact, that there was also a person named Bob trying to get money from these -- some of these families; right? Making phone calls?
A. Yes.
Q. Were you ever able to determine



whether or not Bob Cutler was the Bob that was calling?
A. No.
Q. Was that a possibility in your mind?
A. A possibility.
Q. Did you look into it?
A. Yes.
Q. And how did you look into it?
A. Bob Cutler was interviewed as well.
Q. Okay. So apart from accusing someone, what other ways did you investigate whether or not it was Bob Cutler who was calling and making threatening phone calls to the family around the time that the boys disappeared?
A. You ask questions related to that, and you receive negative answers.
Q. So that is the extent to which you conducted that aspect of the investigation? You asked Bob, and he said no, and that was the extent of it?
A. I think there's a -- Rogers Taylor is asked that. He's providing information as well. Others are asked it. I don't recall right now how many people were asked about the Bob at the front door, but I know Bob Cutler denied being the Bob that

was there.
Q. So is it your testimony that you did ask other witnesses in your investigation whether or not Bob Cutler may have been the Bob, or whether there was any reason to believe he was the Bob that had come to the front door of the family?
A. To the best of my recollection, I believe we did.
Q. Now, Mr. Taylor also advised that he had heard that Maurice Olds and an unknown cousin had washed bloody clothing in Lee Evans' building after the boys went missing?
A. Yes.
Q. Okay. I'm assuming that was a bit of information that you wanted to try to get to the bottom of? Yeah?
A. Yes.
Q. But Maurice Olds was dead.
Mr. Taylor, though, did he -- did he say whether or not he had conveyed that information to anybody else previously to speaking to you?
A. I do not recall.
Q. Did you find it odd that this bit of information was being shared, you know, I don't know, 2008, rather than at any prior date?



A. I don't know if it was provided prior. I mean, I don't know.
Q. You don't know now, or do you know whether you looked or tried to find out whether that was information that was provided back at the time of the initial investigation?
A. I don't know if in 2008 I took that information and looked through all the pages to see if it was provided previously. I know that he didn't know who the other cousin was, and Maurice Olds was dead. It's of interest to me, and it's another piece of information that I hoped if we interviewed somebody that they would be able to discuss that. Like maybe Phil Hampton was the cousin, because he's Lee Evans cousin as well, it turns out, so, you know...
Q. But you weren't ever able to confirm that bit of information; were you?
A. No.
Q. And, in fact, your theory of the case, it wouldn't even be consistent with your theory of the case; right?
A. How would that be said? Like, I have no clue at this point of the interview how they met their demise. My theory at this point is they're



dead, and Lee Evans has the motive as best we know at this point to be the one committing that act. I have no clue at this point how they would have disappeared, whether -- it could have been anything.
Q. Right. I know at this point you had no idea, and this would have been an important bit of information to try to flesh out.
What I'm saying, though, is that now in hindsight, your theory of the case once you cleared and closed this case wouldn't have been consistent with this fact; right?
A. I don't know if I would say that.
Q. Okay. So --
A. Because I -- people tell you tidbits of case facts and leave out others. Like, I wouldn't be surprised if the boys were beat before they were put in that closet, which would then infer blood on clothing, which would then infer somebody had to clean clothing, so that was not far off from anything that was provided to us.
Q. So you think the killer would clean the clothing even though they intend to burn the building down?
MR. LIPSHUTZ: Objection to form.



A. People do crazy things. Like, you know, who wants to give up their jeans?
Q. I mean, yeah, people do crazy things, but I mean, you know, as an investigator, you got -- you still have to use logic, right, to say, you know --
A. I have to use logic and say everything is possible. If the clothing was there, and they got it bloody, we didn't have DNA back then, so they're going to clean the clothes and not go buy new clothes. They're going to reuse the clothes, and that's a normal inference.
Q. So you -- I just want to be clear on something. Even though -- I'm not here to squabble with you, Detective, Oh, anything is possible. Sure, the world is full of freaky people. Anything is possible. But as a detective, you're looking at logic and possibilities and trying to put together a narrative that holds together, that makes sense; right?
A. We're going with where the information provided us leads us. I'm not going to leave out information about this clothing because that's a potential aspect. If Lee Evans decided to talk and said that Phil washed our clothing in the

basement with Maurine Olds after the fact, that would be very important. And I don't doubt there would be blood potentially on their clothing with whatever happened in the house.
Q. I understand that. I'm trying to make a different point that I'm trying to see if you agree with.
I understand at the time that you received this information, it was very important, and you would -- I would expect, anybody would expect you, to put it in here. But can you agree that this statement doesn't seem -- it's possible, but it doesn't seem likely to be true if the person who did this burned the children in a home, which is what Philander Hampton says, which is the theory you all went with, unless they stripped them down and took their clothes; right? I mean, it doesn't match the Philander Hampton story; does it?
MR. LIPSHUTZ: Objection. Lacks foundation.
MR. VOMACKA: Objection to the form and foundation, but you can answer.
Q. Is this statement consistent with what Philander Hampton said happened?
A. No.



Q. Okay. That's all. You would agree with that; correct?
A. Correct.
Q. And Philander Hampton is the theory that the investigative team and the prosecution ultimately adopted and embraced; correct?
(Connectivity issues.)
MR. LIPSHUTZ: Well, I can't hear you, but he obviously froze.
MR. VOMACKA: Looks like the camera froze.
A. I got disconnected there.
Q. Do you need a break, or are we good?
A. It just stopped mid-thought from you, and it like rebooted.
Q. No, no problem. It happens to all of us. I'm asking now a different question. If you feel like you would like to take a five-minute break?
MS. BONJEAN: Anybody else?
THE VIDEOGRAPHER: Let me change the media, so it would be a good time to take a break.
MS. BONJEAN: Okay. We're going to change the media. We'll take a break.
THE VIDEOGRAPHER: The time is 1:14



p.m. Off the record.
(Break taken.)
THE VIDEOGRAPHER: The time is 1:27 p.m. This begins DVD number three. Back on the record.
Q. Sergeant Tietjen, so I want to keep moving through your investigative work on this case, but I do want to confirm that Rogers Taylor, or Taylor Rogers -- I guess it's Rogers Taylor, or maybe it's just Roger, but in any event, you were unable to verify any information that he provided to you that demonstrated that Lee had any role in the disappearance of the young boys; correct?
A. Well, Phil Hampton provides information that Lee was involved that verifies that Rogers Taylor said he was involved.
(Reporter requests clarification.)
A. I said Philander Hampton verified Lee Evans' involvement with him, which verified Rogers Taylor telling us that Lee Evans is involved in their death and disappearance.
Q. Okay. But Mr. Taylor had no firsthand knowledge of Lee Evans' involvement?
A. No. You asked me if I was able to verify that Roger Taylor said that Lee Evans was



responsible for their murder; correct?
Q. My question was different. Mr. Taylor gave you no facts, he gave you an opinion, his belief --
A. Yes.
Q. -- his hunch; right?
A. Yes.
Q. And a hunch that you quote, allegedly, believe turned out to be true -- although a jury disagreed -- but in any event, he provided you no facts as to Lee Evans' involvement, any facts that turned out to be true and verifiable; right?
A. Yes.
MR. VOMACKA: Objection to the form.
Q. His drug distribution lead went nowhere; right?
A. Yes.
Q. And this business about hearing that Maurice and another cousin was washing bloody clothes in Lee Evans' building, that was never verified; correct?
A. Correct.
Q. And, in fact, it contradicts Philander Hampton's statement; correct?

A. We don't know what that was in relation to either, so that could be another aspect of it as well. I'm not going to say it contradicts Philander Hampton's -- his information is open for other facts that we presented on that information that could have brought that into it as well, or was that -- or he had bloody clothes from another fight that somebody got into.
Q. Right. It could be --
A. It could be anything.
Q. Right. But I'm not interested in anything. I'm interested in facts that support this theory that Lee Evans was involved. And I don't understand one thing about what you just said. Maybe you can clear it up.
Philander Hampton testified in his statement that he put the boys in a closet or a room inside that apartment building; right?
A. Correct.
Q. And that they were alive when they put them in there; right?
A. Yes.
Q. And that they used a nail to lock them in there; right?
A. Yes.



Q. That is not consistent with doing anything to the boys that would cause their clothing to be bloody and then stripped off their bodies and brought to be washed somewhere else; right?
MR. LIPSHUTZ: Objection.
A. It doesn't say here anywhere that clothing was stripped off the victims' bodies. It just says that bloody clothes, whether they're Lee Evans' and Phil Hamptons' clothes, Maurice Olds' and the cousins' clothes, that they were washed.
Q. Got it. Understood. So now there's a theory that you think is possible that Lee Evans and his cousins had bloody clothing that they washed; is that right?
MR. VOMACKA: Objection to the form.
MR. LIPSHUTZ: Objection to the form.
Q. Correct?
A. Yes.
Q. But Philander Hampton didn't give you any information that would corroborate that there was anything that happened that involved their clothing getting bloody; right?
A. You're not understanding the point of the bloody clothing. We don't know what day that is.



We don't know where it is. The hope is that someone would provide information to us to include or dis-clude [sic] or un-include [sic] that information in there. So we're back going around this circle 10 million times.
Q. Yeah. You're trying to tell me your take on it, and I'm not asking for your take. I'm asking a very specific question.
This fact that you've included in your report ultimately does not mesh or link up in any way to Philander's statement? That's it; right?
A. Right.
MR. VOMACKA: Objection to the form. You can answer.
Q. I know there is a world of possibilities out there, but I was simply trying to establish that this statement actually is not consistent with anything that Philander told you about what happened that night; right?
MR. VOMACKA: Again, objection to the form.
Q. That's correct; correct?
A. Yes.
Q. All right. And, again, there was --



on this June date, Nelson Williams was identified and interviewed by Lieutenant Carrega and Agent Eutsey on June 10th. Were you present for that interview?
A. No, I was not.
Q. And how is it that you obtained information about that interview?
A. I was outside of that apartment complex in the vehicle.
Q. Okay. So you were on scene, but you didn't participate in the interview?
A. Yes.
Q. And this interview didn't yield any useful information; correct?
MR. VOMACKA: Objection to the form. You can answer.
A. Yes.
Q. And when I say useful, I mean it didn't shed any light on who was responsible for the boys' disappearance; right?
A. Well, the question there was, was he the one at the door with supposedly the gun in his pocket. It didn't identify that.
Q. It didn't identify anything; correct?
A. Correct.

Q. And he denied being any type of associate with Lee Evans; right?
A. I believe so, yes.
Q. So, if we wanted to know more, we would just have to go to Lieutenant Carrega's report; correct?
A. Oh, yeah.
Q. But that report does not exist; right?
A. Correct.
Q. All right. Moving on, you interviewed Kathy Turner, and she was a cousin of Alvin Turner; correct?
A. Yes.
Q. And this was the woman, or the young woman, I think, at the time who obtained the marijuana from her cousin's room; is that right?
A. Yes.
Q. All right. And it was a paper bag a third full of marijuana. That doesn't sound like a pound to you; does it?
A. It depends on the size of the paper bag.
Q. I suppose.
A. Which we didn't ask. But there's reporting here that they split it up. So that's a pretty



significant amount of marijuana, if you're one of five who split up marijuana.
Q. Right. But this is all secondhand information; right?
A. Certainly. She saw it. She stated she saw the bag.
Q. But back to the point earlier, no one can say where this marijuana came from; right?
A. Correct.
Q. Okay. I know what the working theory is, but there was no way to establish where the marijuana came from; you would agree with that? Is that a yes?
A. Yes.
Q. And apparently, she told -- or Alvin told her that he was in some type of trouble; correct?
A. I believe so, correct, yes.
Q. And the last time she saw him was at 8 o'clock that night?
A. Yes.
Q. And she didn't say the last time she saw him was with Lee Evans; right?
A. Correct.
Q. So Ms. Turner was able to, I guess,



corroborate that Alvin had marijuana, but that was the extent of her ability to shed light on what happened that evening?
A. Well, she also corroborated that she saw him alive at 8 o'clock at night.
Q. Able to corroborate the day after he went missing; right?
A. Yes.
Q. I think you also interviewed Sarah Johnson, and you yourself admitted that she had nothing to add to this investigation; right?
A. Yes. She was not in well health, and we met with her family, and she was simply just to provide a DNA sample.
Q. Talk to me about your meeting with Bob Cutler. Where did that take place?
A. That took place at the Essex County Prosecutor's Office.
Q. And how did that interview take place?
A. How he was brought there or --
Q. Yeah.
A. A DOC guard, I guess the DOC guard transported him there. I don't know what paperwork was done to request that.



Q. Well, he was in custody; is that correct?
A. Correct.
Q. And what authority did law enforcement have to bring witnesses, move witnesses for interviews?
MR. VOMACKA: Objection to the form, but you can answer.
A. I don't know what paperwork had to be generated or approvals to get him out of a NJDOC facility and transport him to Essex County for the interview.
Q. You don't know what the process was?
A. No.
Q. Is it your understanding that that's a lawful thing to do?
A. It's a what?
Q. Is it your understanding that that is a lawful thing to do?
A. Yes.
Q. Based on what?
A. I had no reason to not believe it wasn't lawful.
Q. Well, would you agree that witnesses don't have an obligation to speak to you?

A. Correct.
Q. Okay. And if he's being moved against -- you know, without input into whether he's -- he's a prisoner; right?
A. Correct.
Q. His movement is dependent on third parties? He doesn't get to decide where he goes or when he goes; right?
MR. VOMACKA: Objection to the form, but you can answer.
A. I don't know what preempted his movement, whether he had to agree, whether he had to sign a waiver. Like I said before, I don't know how he was transported there. I know he was transported by DOC, but I don't know what led to that.
Q. Do you know whether or not there was consent on his part with knowledge and understanding of why he was being moved from the Department of Corrections to the Essex County Prosecutor's Office prior to this interview?
MR. VOMACKA: Objection to the form. You can answer.
A. Like I said before, I don't know anything about his movement to the facility. He never appeared to be there outside of his own consent in



the interview.
Q. Well, did you ask him whether he was there because he had been informed of the purpose of the --
A. No. No, I did not ask him.
Q. And what did you recall about this interview with Bob Cutler, if anything?
A. He went over plenty of things historical. Argued that they had Lee Evans as their suspect, you know, from like day one on. Was rather upset with police work throughout it. Did not provide anything that changed statements he made previously. He seemed very annoyed at law enforcement's response through the years to this case. He had previously spoken with law enforcement several times. You know, we spent some serious amount of time with him. He was hopeful for a resolution.
Q. What was the purpose in interviewing Bob Cutler?
A. Seeing if he had additional information or was willing to make additional statements that he had not made before. I know they had interviewed him previous to my ever involvement in this, and he had been interviewed by the law enforcement



throughout, and I think it was an attempt to show that there's others who care about this case actively involved with the hope that, you know, he might like one of us, and he might want to share some other information that had not yet been gleaned in this case.
Q. Did you view Bob Cutler as a potential suspect?
A. Not during this, but I think I keep my thoughts always open. I mean he was a young man at the time, and I don't think he was going to kill five boys. He would be like a real low, low level, if he was going to kill them.
Q. You think that he was -- I'm sorry -- because of his age, he --
A. No. I said I would always be open-minded. If events or facts took us that way, I wouldn't exclude that, but the facts did not present to that.
Q. Well, did you ask him about inconsistencies in his first statements to the police and then his subsequent statements to the police?
A. I believe that was -- I can't recall any -- we went through a lot of things. We'd have to



refer to transcripts. You'd have to actually listen to the tape to see who's asking the questions. I know some of the questions in there are certain people because I know we had certain things. But I think we went over some statements he made previously and a lot of him to just discuss and go over. A lot of it was spent on what he thought was, like, law enforcement doing wrong, or that we had Lee --
Q. Well, he had a lot of opinions; right?
A. Yes.
Q. He didn't have a lot of facts, though; did he?
A. Correct.
Q. He had a strong opinion that Lee was involved, but he wasn't really able to provide you with any factual basis to support a theory that Lee was responsible for the boys' disappearance; right?
A. Yes.
MR. LIPSHUTZ: Objection to the form.
Q. He had some street rumors and that type of thing; correct?
A. Yes.
Q. He couldn't even tell you when the

boys disappeared because he was allegedly not around?
A. Well, his dates would change as well throughout his conversation with law enforcement, as far as his recollection with his trip to Atlantic City. Like, he also talked about the marijuana and stealing the marijuana and doing it himself as well.
Q. Right. But you brought up a good point. His dates changed about when he went to Atlantic City and when he came back from Atlantic City; right?
A. Yes.
Q. And, in fact, who he was with changed, too? He first told the police he was with his grandmother and then it changed to his girlfriend; right?
A. I believe that's correct.
Q. And did it trouble you that there were some significant inconsistencies with what Bob Cutler was telling you back in 2008 versus what he had said on prior occasions?
A. Not at all. Because just like today, I'm recalling certain things and not recalling others. Certain memories will be there pretty well. But I



don't expect him to remember very significant aspects exactly word for word what someone has told before even as far back as 1978. That happens all the time in cases. All the time.
Q. And even though you were not able to figure out who the Bob was that was coming to -- making the phone calls and demanding the money, did you reach the conclusion that based on Mr. Cutler's denials that it wasn't him?
A. I'll always be open to a possibility, but we have nothing that led us that that's going to be him.
Q. You had nothing that said it wasn't him either, though?
A. Correct. As I said, I'm always open to that possibility.
Q. Right. But it seems like whether it's, you know, the inconsistencies in his statements, or the fact that a Bob was going around demanding money, or whether or not, you know, there's some other explanation for the wallet being in the hallway, if it didn't support your theory of Lee Evans, you seem willing to disregard it pretty readily. And if it did support your theory of Lee Evans, you were willing to embrace it. That's my



takeaway. Am I wrong?
MR. VOMACKA: Objection to the form. You can answer.
A. I would say you're completely wrong. It's a characterization. Here, at this point, we have no clue who are guaranteed or who we are going to end up locking up or making an arrest. We have basis throughout the case that identified Lee, but I'll be always welcoming of some other alternate person or some other alternate theory that is out there. If you look at even Lee Evans' own statements throughout changed date, time, and places on numerous occasions, and he's intimately involved from the early-on stages of this case.
Q. Right. And you think he did it?
A. Oh, yeah.
Q. Right. So you're not giving him the benefit of the doubt on the inconsistencies? That's my point.
MR. VOMACKA: Objection to the form, but you can answer.
A. I don't think there's any not giving him the benefit the doubt. We're looking at the case and looking where the facts lead us, right, and then when we have facts to support an arrest, we



do that as well. But up until that point, he still remains the suspect from day one that he was throughout most of this case.
Q. Right. You started with the concept of him being the prime suspect?
MR. VOMACKA: Objection to the form. You can answer.
A. Open to other suspects as well, but he is our lead suspect. As with any case that you get involved in, if a suspect is identified, you have that one, and you work other avenues because you can certainly be wrong.
Q. You didn't work any other avenues; you worked the Lee Evans' avenue?
MR. LIPSHUTZ: Objection. Argumentative.
MR. VOMACKA: Objection. Argumentative. You can answer.
Q. Am I incorrect?
A. Am I answering that question for you?
Q. Yes. Unless your attorney advises you not to answer, you need to answer the question.
A. All right. I'm asking the questions, and my concern is for all information provided. If Bob Cutler says that Steve Jones did it, well, now

I'm looking at Steve Jones. But Bob Cutler didn't say that. No one said that. Everyone has provided information that would lead you to Lee Evans.
Q. No one said Lee Evans did it. The only --
A. Phil Hampton said it.
Q. I'm sorry?
A. Phil Hampton said it.
Q. We're not at Philander yet. We'll get there.
A. We're dealing with identifying a suspect. So Lee Evans is identified as a potential suspect.
Q. You started with Lee Evans.
A. No on said he did it, or they would have solved the case probably back then. They said they believed he is involved.
Q. Right. But up until Philander Hampton, you actually didn't develop a single bit of evidence that wasn't already developed in 1978?
A. Correct.
Q. And, in fact --
A. Well, we developed DNA of the bodies -- you know, for the bodies, for an identification. That would be evidence. But not evidence of the crime.



Q. Did you find the bodies?
A. No. Like you said, we didn't have any evidence.
Q. Well, that has no evidentiary value if you don't have the bodies; does it?
MR. VOMACKA: Objection. Argumentative, but you can answer the question.
A. Correct.
Q. It's as useful as my DNA. I can get go my toothbrush right now for you. That wouldn't be very useful for anything if you don't find the bodies; right?
A. Right.
MR. VOMACKA: Same objection. You can answer.
Q. So up until Philander Hampton, you also had pursued lines of investigation that weren't backed up, like the drug operation; right?
MR. VOMACKA: Objection to the form of the question.
A. I wouldn't say they're not backed up. There's statements in there about drug operation that you would see if you could prove otherwise, so they are not backed up because we didn't solve who his dealer was or prove that he was a dealer,



but everyone indicated that they stole from him the marijuana, that he had marijuana in his apartment, that the marijuana that his friends and family members saw on the boys was from the stealing of his house as well. So, like, we're going to follow those things out with the hope that somebody is going to tell us, Yeah, I sold to him, or I bought from him, and how they bought from him. These boys said they stole from him. And then you have Bob Cutler saying he stole from him as well, so that would be the same as somebody saying, I bought from him, too. But Bob Cutler stole from him.
Q. They developed evidence in 1978 through some of the young men who did not disappear that they had seen marijuana in Lee's house and that they had stolen marijuana by breaking in; right?
A. Yes.
Q. But it's not fair to say that you were able to demonstrate that what was recovered from the boys -- Alvin Turner's house was that marijuana?
A. No, I didn't say that.
Q. I just want to make clear on that.



And Bob Cutler didn't say that he stole marijuana in and around the time that the boys went missing; did he?
A. Yes, he did.
Q. On that day? That he was one of them?
A. No.
Q. Okay. He's saying prior he had done it?
A. Yeah, yes.
Q. And he's a alive; right?
A. Yes.
Q. So, and I think Mr. Royster said he stole marijuana, even on that day; right?
A. I don't know.
Q. Well, we can look at his statement. Do you remember interviewing Gregory Royster, I think is his name?
A. What day is that? I remember meeting with him at some point.
Q. Yeah. You know what, I don't think you were involved, but I think it was an interview that was conducted just prior to you joining the team. Do you remember seeing that interview?
A. No, I just remember the name. I just

looked at -- I didn't have any involvement with him.
Q. But you would have wanted to look at that interview potentially to see whether it actually was corroborative of your working theory about the motive; right?
A. I may have. I don't recall it.
Q. Okay. But that's something a detective would do; right?
A. Correct.
Q. You, I believe, interviewed --
(Connectivity issues.)
Q. -- Akbar Pray. And Marvin Boykins was another interview, I believe, and he agreed to speak with you all; correct?
A. Yes.
Q. Why did you want to interview Mr. Boykins?
A. Lieutenant Carrega wanted to interview Mr. Boykins about also his potential knowledge of the case, and his name had come up previously, and we were trying to interview everybody who was still alive and available to interview to see if they had any new information.
Q. And what information did you have



going into this interview that led you to believe that Boykins could provide some helpful information to aid in determining what happened to the young men?
A. Because he was involved in the investigation early on with interviews as well.
Q. And what did he say; do you remember?
A. No, I don't recall.
Q. But he told you, and as he told -- as he said in the past, that he didn't have any information; correct?
A. I am not looking at a document on that.
Q. Do you want to look at your report? I have it at page 8 of 19.
A. Correct.
Q. Okay. And he was polygraphed, it looks like; correct?
A. Correct.
Q. Why did you polygraph him?
A. There was concern that whether he was truthful about knowing information in the case.
(Reporter requested clarification.)
A. About knowing information in the case. He denied knowing it, and the polygraph was administered to determine if he was being truthful



about denying.
Q. Do you remember what information was asked of him?
A. No.
Q. But it did have to do with Lee Evans; right?
A. Correct.
Q. Were you comfortable with or did you ultimately determine that he was being truthful when he denied having information?
A. Yes.
Q. And you put a lot of stock in the polygraph?
A. Yes.
Q. I guess maybe I'm just -- would like you to elaborate, if you would, why you would put so much stock in a polygraph?
A. Well, I know the polygraph examiner there, and I seen his work before, and I know the training that they've gone through. So on that aspect of that specific polygraph, I believe that one of the questions asked for in the polygraph were specifically related to his knowledge of the disappearance, if he was telling the truth, and he denied the knowledge, and the indications were



that he was being truthful. I can't speak to any other polygraphs being conducted.
Q. But generally speaking, even though they're deemed unreliable for the purposes of being admissible in court, you find them reliable in directing your investigations?
A. I find it to provide information. Sometimes it does not return any conclusive information. They use a term, you know, for each of the different steps. I'm not familiar -- I'm not recalling what they are. I think one being conclusive. Whether someone is going to -- how they're going to interpret that or not. Someone can improperly interpret that based upon the graphs as well based upon their training.
Q. All right. So now let's now talk about what happens on November 7, 2008. This is when Mr. Hampton is arrested in connection with a traffic warrant; right?
A. Correct.
Q. So he is in custody because he has a warrant out related to a traffic ticket; is that fair?
A. Correct.
Q. And had there been efforts to find

Mr. Hampton prior to November 7, 2008?
A. Yes.
Q. Okay. And what efforts were made to locate Philander Hampton prior to November 7, 2008?
A. We looked for him in known locations where he was known not only to stay but where he was known to hang out.
Q. Why did you want to speak with Philander Hampton?
A. Because he was a person that potentially had information on this investigation just like any of the other witnesses throughout.
Q. But where did you get the idea that he had information about this?
A. No, we didn't -- every person we spoke to here, it was the hope that they would be able to provide us something new. There's nothing here that I wrote or read that says he's going to tell me that he was intimately involved in the events that occurred in 1978.
Q. Well, back in May 8th of 2008 --
A. Um-hum.
Q. -- Carrega identified his strong interest in finding Philander Hampton; correct? I mean, you don't deny that; right?



A. No.
Q. And you made all types of efforts to find him? You identified warrants that were out for him; correct?
A. Correct.
Q. And why was it that Carrega wanted to find Philander Hampton?
MS. ROSEN: Objection to the form. You can answer.
A. I believe at that point, we knew that he was potentially a relative of Lee Evans as well. It turns out he's a cousin. But Lou, that was one person he wanted to identify and interview, just like the others. We hadn't been able to come up with information about Philander Hampton.
Q. Well, had Philander Hampton to the best of your knowledge been interviewed back in 1978?
A. He was interviewed at various -- I don't know which report, but I definitely seen his name in previous reports, yes.
Q. So you were aware of him, and what you're testifying is he was no different than any other witnesses, he was just one of many on the list that you wanted to talk to?



A. Correct.
Q. In your mind, he had no specific significance any more than the victims' mothers, for instance, or Marvin Boykins, or anything like that; is that right?
A. Yes.
Q. You didn't have any feeling that he was -- strike that.
You didn't have any basis to believe that he might have firsthand knowledge about the incident or was otherwise involved in the incident?
A. No, I did not.
Q. And Lieutenant Carrega didn't share his view that Philander definitely had some involvement in this or had some knowledge about it?
A. I don't think anyone here was outside of the belief that people involved potentially had more information, and that's why we were interviewing everybody. There was no known to me link to say that he was involved with their actual disappearance and deaths, or whatever.
Q. Yeah, forgive me, but as of May 2nd, 2008, or May 8, 2008, I understand that there was a general interest in re-interviewing people, but according to your report, there were only two



people that were given a -- or identified with specificity as to who you wanted to talk to, and that was Lee Evans and Philander Hampton?
A. Where are you getting that generalization?
Q. From your report. Would you like --
A. He says on May 8th, he wants to locate him. Somebody he was having difficulty locating. The others were easy to find. There was no cat-and-mouse game to find them. So Lieutenant Carrega had done his homework prior to involving me to find people to interview, and he had difficulty locating Philander Hampton and asked me if I would be able to shed any more information to assist in locating him. That's on the 8th. That's before I even met with him.
Q. Have you had a chance to read Lieutenant Carrega's testimony from the Miranda hearing regarding how he viewed Philander Hampton?
A. No, I did not.
Q. And we can look at it, but I just want to make sure that I have your testimony clear first, that as far as you were concerned, he was not -- you had no reason to believe that he had any more information than anybody else, he was just on a list of people to talk to?

A. He was a person that may have information, just like everybody else. I think he was somebody that Lieutenant Carrega had not been able to interview. That's why he asked me to look for him. The hope was that he had information.
Q. And where did you get the idea that he even had any information?
A. I believe there's early reports that indicate his involvement early on with Lee Evans as well and being his relative. Those were others as well.
Q. I'm going -- I know I'm testing your memory a little bit.
Are you talking about reports from the original investigation?
A. Yes.
Q. The 1978 investigation?
A. Yes, '78 through whatever.
Q. Through where?
A. Through whatever date. I don't have the date it shows up in there.
Q. In those Hairston reports, again, I don't want you to spend too much time, but were you able -- when you reviewed those materials, were you able to, those old reports, were you able to



identify where there was a mention of Philander Hampton, or Philander, or anything close to that?
A. There was a Phil Evans in there. Like, he went by various names. And I don't know where the Philander Hampton came up. We looked up for a Phil Evans, too, potentially, but I know there was 271 Hunterdon shows up in there somewhere.
Q. Right. So, again, I'm just wondering how you got to Philander Hampton?
A. I was provided that name by Lieutenant Carrega to look for him. That's as far as I know. And then on November, the date he was brought in, I wasn't even there until later on in the interview. I thought that insignificant of his involvement that I didn't choose to be there that day as well.
Q. Well, you would admit that for Mr. Carrega to be advised that he was in custody, there must have been some type of stop order or some type of indication that he was to be notified if Philander was picked up on a warrant; right?
MS. ROSEN: Objection to form.
MR. VOMACKA: Objection to the form, but you can answer.
MR. LIPSHUTZ: I'm going to join the



objection. Go ahead, Sergeant.
A. I don't how he was advised. Whether he looked up into the county jail system that told him he was there. I didn't read his testimony. I didn't see a report from him on it to indicate how he was advised. So he could have found out multiple ways. He could have indicated to the jail that if this individual comes down here, tell me, or if he looked into the system to see if he was in the jail system, which is very easy to do. I can do it from this laptop.
Q. Well, if you're looking, I guess, every single day; right?
A. Well, it might have been a day he got lucky. You know what I'm saying? Like, if you think about the rush that you're getting at, so on November 7th, he's arrested. On the 12th is the point of the interview. There was no attempt to go to the jail -- we can interview somebody at the jail -- to the best of my knowledge. You know, there was no attempt there. But somehow he became aware that he was there. I don't know how he was made aware. Whether he notified anybody down there, Hey, if the guy comes in. I don't know.
Q. And just to be clear, he was on a



traffic warrant, he wasn't being detained on anything serious; right?
MR. VOMACKA: Objection to the form.
MR. LIPSHUTZ: Objection to the form.
A. To the best of my knowledge, it was for a traffic warrant. He originally had a ACS warrant, which is court-generated one as well --
(Reporter requested clarification.)
A. It's a warrant out of the courts as far as like a summons complaint. Not a motor vehicle or traffic summons.
MR. LIPSHUTZ: Sergeant, can you repeat the initials because I'm not sure that the reporter got it?
A. ACS, so like Automated Complaint System, and then ATS is like Automatic, like, Traffic System, which shows a motor vehicle summons.
Q. Okay. And I know you said that there wasn't a rush to go see him, but there was an immediate effort to get in front of a judge to get him over to the Essex County Prosecutor's Office for an interview; right?
A. I don't know anything about that.
Q. That's not something you were privy to; is that right?

A. No.
Q. And is it your testimony that Carrega didn't explain to you how it was that he arranged for Mr. Hampton to get over to the Essex County Prosecutor's Office?
MS. ROSEN: Objection to form.
MR. VOMACKA: Objection to form. You can answer.
A. I don't recall if he told me or even if I asked how he was getting him over.
Q. All right. And I know in your mind, Philander Hampton was no different than other witness, but can you identify any other witness where they were brought into Essex County, writted into, I guess, to the courtroom -- I don't know how it all happened -- but ended up in the Essex County Prosecutor's Office for an interview?
A. Yeah. Robert Cutler.
MR. LIPSHUTZ: Objection to the form of that question.
Q. But Robert Cutler was in the Department of Corrections; right?
A. Correct.
Q. He wasn't hard to find? He was the easiest to find; right?



A. Correct.
Q. Okay. He wasn't too hard to find. But --
A. But anybody else was brought to the Essex County Prosecutor's Office. So we interviewed him --
Q. Okay. Fair enough. Apart from Robert Cutler, Philander Hampton, who was not easy to find, who you had trouble finding, all of a sudden ends up in jail, and Carrega arranges to have him brought over, but you don't have any firsthand knowledge of how that happened; right?
MR. LIPSHUTZ: Objection. So many levels of that question is incorrect. Objection to the form.
MR. VOMACKA: Objection.
MS. BONJEAN: Incorrect how?
MR. LIPSHUTZ: It's speculative. It's argumentative. It's based on facts that are not in evidence. So you can rephrase it, but I'm objecting to the form.
MR. VOMACKA: Yeah, the same objections.
MS. BONJEAN: I'll rephrase.
Q. So we'll start over, Sergeant



Tietjen.
You don't know, or do you -- I guess you can tell me if you do, but I think you previously testified that you do not know whether or not Carrega was informed that he was in custody or whether he just happened to check and saw that he was in custody?
A. I don't recall being told how he found out.
Q. And you have no firsthand knowledge about how it was and under what authority Philander Hampton was brought to the Essex County Prosecutor's Office; correct?
MR. VOMACKA: Objection to the form. If you can answer it, you can answer.
A. Not that I can recall. We drove him back to the Essex County jail.
Q. Okay.
A. I don't know how he got to the Essex County Prosecutor's Office.
Q. Right. He didn't get there on his own; right?
A. Yes.
MR. VOMACKA: Objection.
Q. And you don't know whether he consented to come over for an interview from the



Essex County jail; correct?
A. I have no information.
MR. VOMACKA: Objection. It was asked and answered. You can answer the question.
A. Like I said, I don't recall how he got over, so I don't know.
Q. But in any event, then he is brought over. And do you recall what time it was that he was brought over from the Essex County jail to the Essex County Prosecutor's Office?
A. I do not have a time that he was brought over.
Q. Do you have an understanding about what time it was?
A. It was in the afternoon.
Q. Do you know if it was late afternoon or early afternoon?
A. It was probably middle afternoon. I don't know what time he was brought in, but I know I was given information, whether a phone call from Lieutenant Carrega, or a text, that Philander Hampton was there and going to be interviewed, and then around 4:15, he called me to say that Philander Hampton had taken a polygraph and then provided information of his involvement. And at

that point, you know, I remembered at that point, I was on my way home, I got a phone call --
Q. I don't mean to interrupt you, but can you tell me what time it was you said --
A. It was 4:15 when I was advised by Lieutenant Carrega.
Q. 4:15. So you were advised at about 4:15 p.m. that he had taken a polygraph; right?
A. Correct.
Q. So obviously, he was brought over --
A. Sometime prior.
Q. -- before? And when was the first time you set eyes on Philander Hampton?
A. At some point after I arrived at Essex County Prosecutor's Office prior to going over to the Newark Station to make sure we get the videotaped room ready to go in there. So probably at Essex County around five-something, so sometime between 5 and say 7 o'clock.
Q. So between 5 o'clock and 7 o'clock p.m. is when you first saw Philander Hampton with your own two eyes?
A. Sometime between there, yes.
Q. And that was at the Essex County Prosecutor's Office?



A. Yes.
Q. And who was present when you arrived at the Essex County Prosecutor's Office?
A. I don't recall exactly who was present, but I know at some point Detective Hadley was involved. Sergeant Henry was involved. Lou Carrega. I think Jack Eutsey was there that day, too.
Q. Who?
A. Agent Eutsey. I believe he was there. But I don't recall who was all there when I arrived, and, you know, especially like who was where and...
Q. Hold on one second, if you would, please. I wanted to just confirm something before I asked...
I know you haven't read the transcripts, but if Lieutenant Carrega testified that Philander Hampton was brought over between 1 or 2 o'clock p.m., do you have any reason to quarrel with his prior testimony on that point?
MS. ROSEN: Objection to form. You can answer.
A. Any reason to what on that?
Q. Quarrel with that?



A. No, no.
Q. And what Carrega testified to, I know, again, you don't have the transcript in front of you, but let's just assume for the purposes of this question that that's what he testified to. You don't have a recollection to contradict that; right?
A. No, not whatsoever.
Q. Okay. So assuming that is correct and that Mr. Hampton was brought over to the Essex County Prosecutor's Office between 1 o'clock and 2 o'clock p.m. on November 12, 2008, and you arrived somewhere between 5 o'clock and 7 o'clock p.m., is it fair to say that you have no firsthand knowledge about what transpired from 1 o'clock when he was first brought over -- or 1 and 2 -- and 5 o'clock to 7 o'clock when you arrived?
A. Correct.
Q. So you don't know who was present during that period of time, I assume; correct?
A. No.
Q. And you do not know what efforts or what -- strike that.
You don't know where people were convened, where Philander and Carrega and any other



people that were present, had convened; correct?
A. Yes.
Q. Did you get communications from Carrega via text, you said?
A. Either text or phone -- I don't recall -- where he told me they had him there to do an interview, and we can --
(Connectivity issues.)
A. He advised me that he was there, and they were going to interview him, and at around 4:15, he advised me of the progress of the interview, and that's when I started heading down there.
Q. And did you understand the significance of Philander Hampton being in custody and available to be interviewed as of 4:15 when you were given that update by Carrega?
A. Yes.
Q. What did you understand the significance of it to be?
A. That he had information relative to the missing boys.
Q. And it would be fair to say that Carrega had communicated with you prior to that that Philander Hampton had information; right?
MS. ROSEN: Objection to form. You

can answer it.
A. No, I did not have information. I was en route home on 78 coming from out east. If he had told me that, I would have gone directly there. At 4:15 is when I became aware that Philander Hampton had information that was relevant.
Q. What I'm saying, though, is you knew prior to November 12, 2008, that Lieutenant Carrega wanted to interview Philander Hampton because he had --
MR. LIPSHUTZ: Hold on. I'm sorry to interrupt. I didn't really hear your question. You got muffled. Did the court reporter get the question?
COURT REPORTER: No.
MS. BONJEAN: Okay. I'll start over.
Q. Prior to November 12, 2008, Lieutenant Carrega had communicated to you and other members of the team, I assume, that he was interested in speaking to Philander Hampton because he believed that he had information about the case; is that right?
A. Correct.
MS. ROSEN: Objection to form.



Q. And did he express to you, or to any other members of the team to which you would have be privy, what his belief was about information Philander Hampton might have?
A. No.
MS. ROSEN: Objection to form.
Q. I'm sorry?
A. No.
Q. Not even any theory whatsoever was discussed?
A. No, just that Philander Hampton may have knowledge of what Lee might have done with the boys. We had no clue what occurred to them after they left them.
Q. Why would Philander Hampton have any information about what Lee did with the boys? Where did you get that information from?
A. It's just information of the events. We had no clue of what occurred. So could he have? He's a cousin of Lee Evans, so we interviewed him. I would say in the interview, like, luck was there that he decided to provide information.
Q. Your testimony is that just because he was a cousin, it was the view that he might have information? That's it? That's all you had?



MR. VOMACKA: Objection.
(Reporter requested clarification.)
A. They were supposed to be known to work together as well.
Q. Okay. So they were close cousins; they worked together?
A. Yes. Just like -- just another person to interview.
Q. But no specific belief that he had any unique knowledge?
A. Any what knowledge?
Q. Any unique knowledge?
A. No.
Q. Prior to the interview, did the team discuss any theories about how the boys had died?
MR. LIPSHUTZ: Objection to the form.
A. I'm sure we had thoughts about -- it was all -- there was no evidence to back anything up. So we had thought that they were buried. We they buried in an abandoned house? Were they buried in a field, dumped in the trash. You know, that's all stuff that you're speculating as you go through a case, and I'm sure we had topics of conversations on that but...
Q. And you had information from the '78



reports that there had been a fire; right?
MR. LIPSHUTZ: Objection. Argumentative.
A. A fire when? And where? What fire are you talking about?
Q. Well, we read a portion of, I think, Hairston's report where there had been a fire at 15th and Bergen Streets? Yes?
A. Yeah, he determined those fires not to have any fatalities. I don't have any -- like, that wasn't something that was on my list of things to worry about. I trusted that he had information back then that proved that it was not involved with our event.
Q. So if I hear you correctly, you were aware of the theory that the boys had -- a theory that the boys could have died in a fire, but you assumed that Hairston had done his investigative work and that that was not on the table any longer?
MR. VOMACKA: Objection to the form, but you can answer.
A. I was aware that Hairston looked at fires in the area. I don't know what led him to the fires, whether if it was just the psychic mentioning the word fire to him. I think this one

actually looked like -- I don't know the dates right now without looking at it, whether it was before the psychic or after, but that would be just good case detective work to follow up on fires in the City of Newark to see if there were any with fatalities, because they typically would be unidentified for an extended period of time.
Q. And he did do that? He did pull, at least what you read from his report, that he did inquire about fires in August of 1978; right?
A. With fatalities, correct.
Q. What's that?
A. With fatalities he looked. So he didn't inquire about -- right. He said with fatalities, yeah, so...
Q. It said he was especially interested in fatalities, but he didn't say he was just pulling information about fires with fatalities?
A. I don't know what he got, or if he even got this fire or anything. I don't know. I know what he wrote down there.
Q. What's your understanding about where the fire that took place that ultimately led to the death of the boys?
MR. VOMACKA: I'm sorry. Would you



repeat the question?
Q. What's your understanding as you sit here today about the address of the building where the boys allegedly perished in?
A. 256 Camden Street.
Q. And what are the cross streets? What were the cross streets?
A. Well, the back street is Bergen. I don't know a cross street offhand.
Q. So Bergen is the back street?
A. Correct.
Q. And do you know whether the cross street was 15th Street?
A. I don't know that.
Q. Okay. So it's your testimony that the fire wasn't -- the boys dying in a fire was not really a working theory prior to November 12th of 2008?
A. Not of mine, no.
Q. Do you know whether it was a theory of anyone else's working on the team?
A. I don't know.
MR. LIPSHUTZ: Objection to the form.
A. It's always a possibility. But they had looked at those fires and had no known fatalities



in there.
Q. Well, aliens are a possibility, too; right?
MR. LIPSHUTZ: Objection.
MR. VOMACKA: Objection to the form.
You can answer.
A. That's --
Q. I mean, that's not really helpful. I know anything is a possibility. I'm asking a different question.
Did you consider, you specifically, Sergeant Tietjen, consider that the boys may have perished in a fire prior to November 12, 2008?
A. I would have to say I probably considered it at some point, but I went with the fact of information that the fires that they had at that time had no known fatalities. I did not realize at that point that a abandoned structure that was lit on fire with the fire department saying there no one thought to be living inside or still stuck inside would not be examined for remains or dug out completely, which we would later learn as well. So I excluded those fires because no fatalities were uncovered in those fires. Could they have been in a fire later on? Possibly. But



that wasn't looked at as well. You know, where somebody pulled them and then covered the remains later on, or burned them in a barrel down under 78. You know, it's all a possibility.
Q. And do you remember having any conversations with your colleagues about the, I'll call it a fire theory, that the boys may have perished in a fire, again, prior to November 12th, 2008?
A. I don't recall anything like that.
Q. And just so I'm clear, Carrega told you when he asked you to participate in this case that he wanted to re-interview everybody; right?
A. Correct.
Q. And presumably, he wants to look at all possible leads; correct?
A. Correct.
MS. ROSEN: Objection to form.
Q. And that's what you all were doing; right?
A. Correct.
Q. And one of those possible leads was that the boys may have died in a fire; would you agree?
A. I don't know if -- you said is that a

possibility before? Now you're having a lead that the boys died in the fire. Hairston looked at information about fires. I am unaware of information saying the boys died in a fire.
Q. Okay. Well --
A. That I can recall.
Q. What I'm saying, though, is that you would agree that even back in 1979, that was a lead that was looked at; correct?
A. Correct.
Q. All right. And part of this cold case investigation was to re-look at leads and re-interview witnesses; right?
A. Correct.
Q. And what I'm asking is does that include the theory that the boys had maybe perished in a fire?
A. I didn't take any steps to look at fires in the city beyond what that report says.
Q. So you looked at that and thought fire was off the table?
A. Yeah.
Q. And you had no idea in your mind where the boys' bodies were at that point? No theory whatsoever?



A. No clue whatsoever.
Q. Okay. Now, the scene, I think I want to go back to -- so whatever time --
A. Can we take a break here at this point?
Q. Sure. How much time do you need?
A. Just about four minutes.
Q. Sure. No problem.
THE VIDEOGRAPHER: The time is 2:28 p.m. Off the record.
(Break taken.)
THE VIDEOGRAPHER: The time is 2:38 p.m. This begins DVD number four. Back on the record.
BY MS. BONJEAN:
Q. Sergeant Tietjen, I'd ask you, if you would, please look at, I guess it's the Hairston reports, but I think it's Tietjen-2. And if you could look at the page that's Bates stamped ECPO 003569, and it has a 22 also handwritten there, if that helps.
A. I'm on that page.
Q. Are you there?
A. Yes.
Q. And at the bottom, I just want to make sure that we're talking about the same part of



the report that references Philander, because I think you mentioned 271 Hunterdon Street; right?
A. Yep.
Q. And there's a reference to an interview with a Philan Williams; right?
A. Correct.
Q. Did it become your understanding, and I'm assuming with your access to the ability to find people based on social security numbers, that this was Philander Hampton?
A. Yes, I believe it's Philander Hampton.
Q. And you knew it was Philander Hampton before November 12, 2008, obviously; right?
A. I imagine so. I don't recall when I knew that.
Q. Well --
A. I don't recall like that becoming significant to the case; you know what I'm saying?
Q. Well --
A. At some point, I would have seen that that was Philander Hampton.
Q. Right. But if you had Philander Hampton on your list -- if you had Philander Hampton on your list of people who you wanted to re-interview, that suggests that you had knowledge



that there was a prior interview with him, and I'm asking if this is the prior interview that you're referencing?
A. I believe so, yes.
Q. Okay. And this interview back in 1978 with Philander Hampton established that he was Lee Evans' cousin; correct?
A. Correct.
Q. It's pretty hard to read in the bottom section, so I'm not even going to try. I don't even know what's all there. But on the next page, Philander, who is being called Williams throughout this, gives a pretty detailed description about the day that the boys went missing; correct?
A. Correct.
Q. And he denies having any information about their disappearance; would you agree?
A. Correct.
Q. And, in fact, he consented to a polygraph and apparently passed that polygraph? It says, "Results: No knowledge of where or what happened to missing boys." Do you see that?
A. Yes. It happens to be the same polygraphist in question for the other one, too;

right?
Q. Which other one?
A. The polygraph that Lee Evans took as well.
Q. Oh, so --
A. You know, what I'm saying is I only know about my polygraphs and their efforts. I have no clue of how good the Newark was -- this was back in 1978. Or what type of equipment it was. Because it wasn't computerized back then. It definitely was probably manhandled as far as --
(Reporter requested clarification.)
A. It was definitely man-manipulated. You know, there was probably some ink and some paper. I have no clue what these looked liked then so...
Q. That's very convenient that the polygraphs that they passed are unreliable, but the polygraphs that you want to be true are reliable; correct?
MR. VOMACKA: Objection to form. Answer the question.
Q. Anyway, but as you sit here today, you don't have any basis whatsoever to question the reliability of this polygraph; right?
MR. VOMACKA: Objection to form. Are you talking about --



A. I certainly have question now after speaking to Philander Hampton and him admitting his involvement. I question wholeheartedly about the sergeant's ability to do the polygraph on that date, which calls into Lee Evans' polygraph with that same individual, if he's excluding them shortly after the events of the date, and they're fresh in their mind, and then later on we have the same individual providing information indicating, and we also have a polygraph then. Yeah, no, I wholeheartedly doubt he was a good polygraphist.
Q. How about just maybe doubting the reliability of polygraphs in general?
A. No, I don't -- it's independent. I've had good success with them.
Q. Okay. When it proves your theory of the case?
A. No.
MR. VOMACKA: Objection. Argumentative. You can answer.
Q. You don't have to. I'll withdraw the question. Let's move on.
Were you aware of any other statement Philander Hampton had made other than the one that we just looked at in Tietjen-2?



A. I don't recall right now.
Q. Now, do you recall having conversations with Lieutenant Carrega or any other member of the team regarding whether or not Philander Hampton's statement to the police in '78 was truthful prior to him coming in?
A. I don't recall us even addressing the statement like that, whether it was truthful or not. We were trying -- in my eyes, we were trying to interview everybody that was still around to be re-interviewed.
Q. Was there any other witness that you know of that was identified as someone who had active warrants?
A. Not that I recall.
Q. Well, you were asked to look and see whether Philander Hampton had active warrants; correct?
A. No, I was asked to look to see like where I could find --
(Reporter requested clarification.)
A. I don't know if I was called to see if there were active warrants because that would be something that Lieutenant Carrega could check as well. That was just part of my checks to try to



find out where he was. Does he, in fact, have active warrants?
Q. And you did do that with respect to Philander Hampton; right?
A. Correct.
Q. And you did not do that with respect to any other witness; correct?
A. I don't recall if I did or did not. If I did, and they had active warrants, I would have included their active warrants in there, but I didn't have to do a thorough like lookup computerized to find other people in here. They were where they said, and they were able to be contacted.
Q. But your report does not reflect that you did any type of skip trace or warrant search or any type of in-depth look for any other witnesses but Philander Hampton; correct?
A. Correct. And Lee Evans.
Q. And Lee Evans?
A. Yeah.
Q. The two of them?
A. Correct.
Q. That's it. Okay. Now, when you arrived at the Essex County Prosecutor's Office,

Philander Hampton was there, and he was located physically where, if you remember?
A. I don't recall.
Q. Do you know if he was in an interview room or some type of --
A. I tried thinking about where it was. I don't recall where he was.
Q. All right. Do you have any independent recollection of what you saw with your own two eyes at the Essex County Prosecutor's Office once you arrived?
A. I just remember he was there. I have no clue -- like, I don't recall where I saw him there. It wasn't important to me at that point. I wasn't doing an interview there.
Q. Do you recall seeing -- I think you said you recall seeing Detective Hadley there as well?
A. I said I believe I saw him there. I know we met up at some point that evening, and Sergeant Henry as well, and they all met us at Newark Station to complete the video statement as well.
Q. Yeah, I'm trying to focus in a little more on the Essex County Prosecutor's Office at the moment.



Do you have a specific recollection of seeing either Detective Hadley or Sergeant Henry there?
A. Not that I could say for sure 100 percent.
Q. Okay. Certainly, you remember Carrega being there; correct?
A. Correct.
Q. And Eutsey possibly?
A. I believe he was there, yes.
Q. And you said about 4:15 you got either a text or a phone call from Carrega that said -- that gave you an update on what was going on; right?
A. Yes. I'm pretty positive it was a phone call.
Q. And had you received any information from Carrega or Eutsey, or any other member of the team, about what had transpired from the time that Philander was taken to the Essex County Prosecutor's Office to the time that you received that phone call at 4:15?
A. Just that he was there.
Q. Okay. So you got the call that he was there, and then the next update you got was at 4:15; right?



A. I think there may have been one in between as well. Just that he was talking or whatever and just going through the process. I don't...
Q. Well, that's what I'm talking about. You received another phone call, you think, in between?
A. Yeah, I think I testified to that in my Miranda hearing. I don't have it in my reports just because the number of calls. I think somewhere in the middle I got a call that he was willing to take a polygraph.
Q. I thought that was the 4:15 call. That's not the 4:15 --
A. No. The 4:15 call was that he -- I think it's he was -- had already taken it.
Q. All right.
A. I would have to look at my Miranda hearing stuff. I didn't write down in my report as far as those times.
Q. Okay. So sometime between 1:00 and 4:15, you got a phone call that he was talking and willing to take a polygraph?
A. Correct.
Q. And did you get any other background information about what he was talking about?



A. Just the case, that he was talking. Now, the polygraph would have brought in the fact that he advised that he was involved.
Q. Okay. You essentially had been working this case for several months with really no new factual developments other than what's already known since 1978?
A. Yep.
Q. And now you have Philander Hampton in custody, and you get a phone call from Carrega, and there's a break; right? It's a break in the case; right?
A. Correct, yep.
Q. So he must have communicated to you, We got a break, he's talking, or something like that; right?
A. Yeah, I'm sure he did, and I wish we had his reports to reflect that what he --
Q. Well, don't we all?
A. Yeah.
Q. But I know your report doesn't reflect what he told you in those phone calls; right?
A. No.
Q. Is there a reason you don't write

down any contemporaneous notes about what he told you when he reached out to you in those several phone calls?
A. I'm not saying I didn't write down any notes. I'm saying I didn't write any in my report because Lieutenant Carrega was going to cover the documentation there.
Q. So it's possible that you do have notes that would reflect what Carrega told you?
A. If I find them. I don't believe I do, but I said before I would look to see if I have them anywhere.
Q. It's possible that you had them at one time?
A. At one time, I would have written down the time of my call. That's why I believe back during the Miranda, which was much closer in this event, that I recall the times better. I'm now -- we're talking about 12 years after the fact.
Q. If you had written down in your notes that Carrega called you and the time he called you, and perhaps what he told you, why did you not include that in your written report?
MS. ROSEN: Objection to form.
A. Yeah. Phone calls between detectives



aren't written down in the reports. Like, his report will reflect what occurred that day with Philander Hampton. And I don't even know if per se if I wrote stuff down, because I was driving. He referred information to me, and then I got approval to turn around and head back down to Newark. So whether I have or have not, I'm saying I don't recall them. I don't know where they are. I'm not saying -- I'll look certainly, but I don't think anything was left.
Q. What's your general memory of what Carrega told you when he essentially communicated that Philander was talking?
A. I believe it was that Philander Hampton was providing information of his involvement with Lee Evans.
Q. And did Lieutenant Carrega give you any more detail than that, or was it just sort of a summary, he's talking, and he's giving --
A. I really don't recall that. I would have to look at that Miranda hearing if I even stated anything to that fact.
Q. I'm sorry. I didn't understand?
A. I don't recall facts about it that he was stating to me on the phone. Just that Philander



Hampton is advising that he was involved and that I was then going to get permission to see if I could head on down. I was not part of the event that day. I didn't get involved until after Philander Hampton was indicating he had now become involved in the events, outside of just being a potential like witness with information, outside of the facts of the deaths.
Q. So I'm just trying to understand, did Carrega indicate just that Philander had admitted in a general way that he was involved, or was it your understanding that he, at that time when he called at sometime before 4:15, was detailing his involvement in the boys' disappearance?
A. I don't recall that. It was enough of an importance expressed to me that I wanted to be there and be there for the further interview that was done at Newark Station, but I don't recall what was expressed in that phone call.
Q. Well --
A. I didn't have -- I don't have notes or a written-down report of that.
Q. No, I understand. But I guess I'm asking you to tax your independent memory the best you can that when you received that call from



Carrega, did Carrega communicate to you that Philander Hampton had provided details about both his and Lee Evans' involvement in the boys' disappearance?
A. Because that's my recollection. I believe he provided details. I just don't recall what those details in that phone call were.
Q. So he had provided details about what happened to the boys?
A. No, I can't recall that actual phone call conversation. It was just enough I know that I turned around and also requested permission from my supervisors to go down. I mean, to work overtime in the SPI, I got to get approval from my bureau. So it was something that I had expressed to them was worthwhile of my involvement.
Q. And you then received another phone call at 4:15; is that right?
A. No. The 4:15 call is the one where I head down.
Q. Okay. Well, in the call prior to that, did Carrega indicate that Philander had communicated any details about the offense?
A. I don't think there were any details in the call prior, just that he was continuing to talk.

Q. And what did you understand "talk" to me?
A. Be interviewed by them, and I believe at some point they were going to do a polygraph with him.
Q. So you don't know at that point whether he had provided any information about how the boys disappeared or whether or not he was sticking to his story?
A. You're talking the middle call of potentially the three right there, and if I didn't -- I would have gone there. I was down that way. I think I was in like Nutley that day, so I was pretty close.
Q. So you're saying if he had given up any critical information at that time, and that was communicated to you, you would have headed there directly; is that right?
A. Yeah, probably, yes.
Q. But it wasn't until 4:15 that you turned around and went there; correct?
A. Correct.
Q. And that call at 4:15 is the call that leads you to believe that there's significant information, relevant information, that's being



communicated by Philander Hampton; right?
A. Correct.
Q. And that he's going to be polygraphed; is that correct?
A. I wish we could refer to another report on that as the timing, but I think that's the 4:15 one is after the polygraph.
Q. Okay.
A. So I never saw a polygraph being done when I arrived, and I arrived there only like 45 minutes or so after.
Q. I see. So your best guess because, again, you weren't there, and you haven't seen any report, is that when you get the call at 4:15, the polygraph has already been conducted?
A. Like I said, the recollection of those times and what was said on that phone call, I believe that might have been it, but it's not -- I can't say with 100 percent certainty what was said, or if they were going to be testing what was stated to him already with the polygraph. I don't -- I didn't write that down. I was in the car and just turned around right after -- I'd have -- if I looked at my Miranda, maybe I'd say something back in 2010 to that, because I believe



I touched on the 4:15 phone call in that hearing as well.
Q. Now, in this 4:15 phone call, is this when there's some indication about problems with video or recording equipment?
A. Not in that phone call. When I arrive, I'm told there's video issues at the Essex County Prosecutor's Office, and Newark Station on the Turnpike has a room capable of it, and then I take time to reach out to the detective there to see if it's in operation, and can we use it.
Q. Did you participate at the Essex County Prosecutor's Office in Philander Hampton's interview in any way, shape, or form?
A. Which interview? Not in the interview. I definitely had contact with him there, but I didn't interview him.
Q. Okay. So let me ask the question again.
Did you participate in the interview of Philander Hampton at the Essex County Prosecutor's Office?
A. Not that I recall.
Q. And when you say not that you recall, is that because you don't have an independent



recollection of it?
A. I don't -- like, I don't recall being involved in any interview with Philander Hampton at the Essex County Prosecutor's Office.
Q. And if you had been involved directly in the interview of Philander Hampton at the Essex County Prosecutor's Office, do you think you may have memorialized that in your report?
A. Yes, I would have put that in my report.
Q. And it's not in your report; right?
A. That's correct. Correct.
Q. Did you -- I'll ask the question slightly differently.
Did you observe, either because you were in the room, or had the ability to look inside the room, any portion of the interview that Lieutenant Carrega conducted with Mr. Hampton at the Essex County Prosecutor's Office?
A. I don't believe I observed any portion of that interview. It was completed by the time I arrived, to the best of my knowledge.
Q. So when you arrived, your understanding was the interview was complete; is that right?
A. The interview that took place there.

Q. Right.
A. They were going to move on to do a videotaped one.
Q. Just to be clear, when you arrived at the Essex County Prosecutor's Office, the interview that had been conducted with Philander Hampton had come to a conclusion to the best of your knowledge?
MR. VOMACKA: Objection to form. And asked and answered. You can answer the question.
A. I don't know how they ended it, if they expressed to him they wanted to get on it video and continue it. You know, he was certainly aware of that aspect as well so, but I was not involved in an aspect of the interview at the prosecutor's office that I recall at all.
Q. Well, I don't want to quibble over the word ended. Obviously, it was continued at a different location. But my question is when you arrive at the Essex County Prosecutor's Office, do you have any reason to believe there was any additional questioning of him at the Essex County Prosecutor's Office after your arrival?
A. I have no recollection of any occurring.
Q. Explain to me what your understanding of the problems with the videotaping equipment



were?
A. I don't -- I have no clue of what their equipment entails or what the issues were or what the issues were with the room. So I just was told it wasn't operating properly and to seek out another location.
Q. Did you find that concerning as a police officer that the video recording equipment had not been operating properly while Mr. Hampton was being interviewed?
A. I don't know if his interview of even done in the room that was capable of the video, but I don't know how the rooms are set up. So I don't know. I have no information. I was told that their system was nonoperational and that they wanted to get Philander Hampton on a video interview. So I have no information of what was wrong, or if I thought it was odd. We have our own station interview systems break down as well over the years, some back when they were VHS, and then they went to DVD, and then to hard drives.
Q. Interesting. What was your understanding about what policy was being followed in connection with what portion of the interview should be recorded?



A. I don't know what they -- what policy they were doing or what point they felt or found out that the equipment was not functional or what was done to memorialize beyond any notes at Essex County. My involvement with the interview was on the video at Newark Station.
Q. Prior to November 12th of 2008, to the best of your knowledge, every interview had been either audio recorded or video recorded of witnesses; right?
A. No every, but most.
Q. Okay. Can you think of one that wasn't?
A. No, not once -- I knew we were -- we spoke to people, like, over the phone. Some are a review of their audio statements. Like fire statements they made that we didn't audiotape. We had them review and sign a form that they reviewed it, but we still engaged them in conversation, so that's technically an interview as well about the case, but the majority of the interviews were recorded in some fashion. Mainly taped. I'm not going to say that every one was done.
Q. Okay. Well, that's fair. Maybe not every single interview was recorded, but there was



an effort on your part to audio record most of the interviews that you conducted prior to November 12, 2008; right?
A. Correct.
Q. And was that pursuant to a policy?
A. I don't recall what policy was in play back in 2008, but the policy has changed throughout the years as far as what cases you are investigating and when you have to record and not record. Obviously, when I started, I didn't have to record anything, and that would change throughout the years. So I don't recall back in 2008 what the policy was that would govern that aspect.
Q. Well, whose policies were being followed in connection with whether or not it was obligatory to record these interviews?
MR. VOMACKA: Objection to the form, but you can answer.
A. Well, the witness interviews were recorded to memorialize what they stated in taped fashion in addition to, like, the notes we take and include them in your report. That's purely a -- like, not every case -- I haven't taken a taped statement in years, and I investigate a lot of cases. So that's purely a decision to do to

memorialize, you know, what is said during those events. Now, with these interviews with Essex County, what was done, or what was tried, or what equipment was functional or not functional. I know that we went to Newark. We had a working video room that I confirmed before, and then that interview was videotaped.
Q. I appreciate that. I'm asking a different question. Are you saying that you're not aware of any policy that required recording the interviews with either witnesses and/or suspects?
MR. VOMACKA: Same objection.
MR. LIPSHUTZ: I think he did answer that question already.
THE WITNESS: I did.
MR. LIPSHUTZ: Objection to form.
MS. BONJEAN: Okay. Well --
MR. LIPSHUTZ: You can answer it again. I object to the form.
MS. BONJEAN: Yeah, I gotcha. You made your record.
Q. My question is, is there a -- was there a policy that you were aware of at the time that you were doing your work on this case in 2008 that required law enforcement to record interviews



with suspects?
A. I don't recall what policies were in effect in 2008. If I see some documents, or something that I signed, as far as initial or anything like that, but I don't recall what was in effect in 2008. That's what I said before. Like, in 1999 when I began, it was very different. At some point, it changed where we were recording suspect interviews. And then it was like first and second degree crimes, and then it was third degree and fourth degree. And I've been removed from having to deal with that for a while, so I'd have to reflect with somebody at a station if I had to do an interview now. But most of my cases are missing persons. If we do, it would have to be videotaped because it would be of an indictable offense; typically a sexual assault involving a missing person. I know that I have to do that now. But in 2008, I can't recall what the policy --
Q. So you don't know whether there was a policy in place in 2008 that obligated you to record the interviews?
MR. VOMACKA: Same objection. And asked and answered. You can answer again.



A. I don't recall what the policy was then.
Q. And if there was a policy that existed, what agency would be the agency that you would be following? Do you understand my question?
A. You broke up there.
Q. Let me back up a second. Obviously the state police had policies; right?
A. Yes.
Q. And Newark Police Department had policies; correct?
A. Yep.
Q. And I'm assuming the Essex County Prosecutor's Office had policies; right?
A. Correct.
Q. Okay. What's your understanding of which one of those agency policies would be in effect in 2008 that the team was obligated to follow?
MR. LIPSHUTZ: Objection. There's no foundation for that question.
MS. BONJEAN: No foundation that Newark Police Department had policies? That's good to know.
MR. LIPSHUTZ: That was not the question, and you're arguing. The question was



what policies would they follow, when he has testified four times that he doesn't recall the policies, so there's no foundation for your question.
Q. I am not asking for you to recall the policy. That's a different question.
If you were to actually care to follow a policy, which one would you follow?
A. I would follow my policy.
MR. LIPSHUTZ: Objection to form.
MR. VOMACKA: Objection to form. No foundation, and also argumentative. You can answer the question.
Q. Go ahead. You can answer.
A. I would follow the policies directed through me by the state, because I would be unaware of the Essex County Prosecutor's policies. If they had other policies, it would upon them and incumbent upon them, to make me aware of that and then abide by their policy.
Q. Okay. So if the Essex County Prosecutor's Office had a policy that required the taping of an interview from the minute the person steps into the interview room to the minute they leave the interview room, your view is you would

need to have been told about that policy to follow it; right?
MR. VOMACKA: Objection to form. Foundation, calls for speculation. You can answer the question.
A. That policy may also have been in effect for us at the time. I'm saying I don't know what was in effect in 2008 and can't recall. So I can't help you with that either. If that was the policy they had, someone should have abided by it. I have not looked at the paperwork to explain why what was done was done or why things weren't done.
Q. Do you not recall the policies because you have forgotten them, or you never found out what they were in the first place?
A. No, I'm sure I found out. But to recall what policies were in effect for me on my job in 2008, I have no clue what changed there from 2009 to 2008. I know what I have to deal with today. Why would I care about what happened in 2008 for a policy like --
Q. Because you're investigating a case, and --
A. No. In 2008, I'm sure I knew what the policy was. Today I can't recall it. Like,



enough, geez.
Q. Okay. Fine. But what I'm saying is I can't seem to even get a clear answer about whether or not you believed you would have been subject to the policies of a different agency other than the state police?
A. No. Their policies are subject to them, and they go under the guidelines of the attorney general's office and make their policy. They can go above and beyond policy and create their own, which I would be completely unaware of, so I would have no awareness of -- no even knowledge of their policy. Whether they said you had to wear a green tie on Tuesday, I would not know that.
Q. So you don't know whether you complied with Essex County Prosecutor's policies? You can't say whether you did or not?
A. I have no recollection of what was in effect in 2008.
Q. And you can't say whether or not you complied with Newark Police Department policies; right?
A. No, I don't have their policy. I know that we went and did when we were involved, that we got forwarded for a video recorded statement in the



room in Newark that had the proper operational equipment, and I was told that the Essex County equipment was not operational on that day.
Q. And you don't know why it wasn't operational? You just took someone's word for it; right?
A. Correct.
MR. VOMACKA: Objection to form. Asked and answered. You can answer.
A. Correct.
Q. And did you ever ask whether or not the interview of Philander Hampton that took place at the Essex County Prosecutor's Office had been audio taped in some way?
A. I don't recall that I asked that. I may have.
Q. And did you find out an answer to that question?
A. I don't recall. Again, I said I don't even recall asking that question. That was, like, if I had Lieutenant Carrega's report that covered that, that'd be great.
Q. Right. So anything else that sticks out in your head about what transpired at the Essex County Prosecutor's Office after you arrived there,



you know, shortly after 5 o'clock, or whenever it was, other than being informed that the equipment wasn't working?
A. No.
Q. Do you recall anyone telling you about what Philander had said in the preceding four hours?
A. No. He admitted and indicated his involvement with the case. Indicated events that occurred that night. I don't know what was truly said or not. That's where I would refer to Lieutenant Carrega's documentation of that.
Q. So when you say your understanding that he indicated his involvement, does that mean it was your understanding that he had given some details about what actions he took that evening that would indicate his involvement?
A. Correct.
Q. Okay. And that he also indicated, I assume, Lee Evans' involvement; is that right?
A. Correct.
Q. And that he told Carrega during this four-hour period at some point what Lee Evans had done with the boys during this time period back in August of 1978?

A. Correct.
Q. And at this point certainly, you all were on all on the same page and understood that Philander has now inculpated himself in the crime; right?
MR. VOMACKA: Objection as to form and foundation. You can answer.
A. I would understand that I was aware. I would assume that others who had that information as well were aware.
Q. Well, based on what information he provided, he wasn't just a, you know, bystander; right?
A. Correct.
Q. Any other details that you remember being told about what Philander told Carrega during 1 o'clock and 4 o'clock, or 5 o'clock, when you arrived?
A. No.
Q. Do you remember any details about the crime itself that was conveyed to Carrega?
A. They would mix into what I have from my video recollection of sitting down with him, so I can't recall what was totally all told to me then or what we were able to listen to in the video.



Q. All right. But shortly after you arrived, you were able to confirm video equipment at the Newark Station is working and operational; right?
A. Correct.
Q. And you get approvals to, I guess, go there to meet Philander Hampton to take his statement?
A. Correct.
Q. Did anyone indicate -- strike that.
Was Philander Hampton free to leave at that point?
A. He was still in custody at the Essex County jail on his warrant; so, no, he was not.
Q. Putting aside his warrant, would you say that if he wasn't under -- if there was no warrant, would he have been placed under arrest, or was -- strike that.
Was he placed under arrest?
A. He was already under arrest. He was never charged that night for anything he indicated in any of those statements. So there were no charges and no arrests for anything he advised us that evening.
Q. Okay. That's my question. He was



not -- I know he was already under arrest and in custody, but he was not placed under arrest separately for any --
A. Sure.
Q. Hold on. Let me finish, for the record, okay.
On November 12, 2008, prior to going to Newark Station, Philander Hampton was not arrested in connection with any charges related to the disappearance of the boys; right?
A. Correct.
Q. So did he give his consent to go to Newark Station?
A. I don't know what he gave. That would be something that Lieutenant Carrega would testify or write to.
Q. You didn't speak to him directly about that, and you weren't privy --
A. I had some conversation expressing we were going there, because I certainly wanted to make my appearance known to him, instead of just stepping in, because I was going to be in the interview room there. I, you know, kind of recall having a minimal conversation with him about that we would be going to Newark Station because the video



camera at Essex County was not operating properly, but I don't have that, you know, written down. I just remember that occurring. I don't know what time that was or who was with me or what room I saw him in when I had that conversation with him.
Q. All right. And then you all depart in different vehicles; is that right?
A. Yes.
Q. Did you drive your own vehicle?
A. I did, yes.
Q. And with whom did Philander Hampton drive?
A. I know he was with Lieutenant Carrega. I don't know if anyone else was with him.
Q. Do you know whether Philander Hampton was in handcuffs?
A. I imagine he was since he was still under arrest and in custody, but I don't have -- like, that didn't affect my judgment. It wasn't something burned into my memory, but I imagine when he came in the station, he was still in handcuffs because he was still under arrest for his warrant, but I can't recall whether he was or wasn't to say anything different. We returned him to the jail under arrest as well.

Q. Okay. Well, my question is do you recall whether or not he was actually handcuffed when he was placed in Lieutenant Carrega's car?
A. I didn't see him placed in the car, so no.
Q. He wasn't placed in the car?
A. I didn't see him go into the car, no. I went to the station before they got out to their vehicles and was there, and then they arrived after my arrival, so...
Q. Fair enough. So you left Essex County Prosecutor's Office a little before them and got to the station --
A. Yes.
Q. So you don't really know how it was all configured, who drove with who, except you later learned he was with Carrega; right?
A. I don't recall being any part of it. Whether I was or not, I don't -- it's not burned in my memory a ride down the elevator with all of us in there. I just know I got to Newark Station prior to their arrival.
Q. Okay. According to your report, you met with Detective Velazques at Newark Station at approximately 7:30 p.m., and Philander Hampton arrived shortly after; right?



A. Correct.
Q. So there's a gap of time. I'm wondering where you were. Because according to you, you got that phone call at 4:15 p.m., and you probably arrived around 5:00, you said; right?
A. Yeah, five-something.
Q. And you're at Newark Station at about 7:30. What did you do between 5:00 and 7:30? Part of it was at the Essex County Prosecutor's Office. But what else?
A. Sure. Certainly trying to find a location to do the video statement. Christian Velazques, if I recall correctly, he wasn't working.
(Reporter requested clarification.)
A. Christian Velazques was the detective at the station. If I'm recalling correctly, I called him, and he was home and had to get approval to come in and use the system as well. So I really don't think that's a big delay, because I arrived at Essex County a little after five, that I am now arriving at Newark Station on the Turnpike at 7:30.
Q. Well, you suggested earlier that you weren't at Essex County Prosecutor's Office for very long?



A. No, that to me isn't very long.
Q. How long were you at the Essex County Prosecutor's Office?
A. Probably about an hour, hour and 15, hour and 20.
Q. What were you doing during that hour and 20 minutes?
A. Probably to identify where we were going to videotape. I don't know. I have no recollection of anything important occurring as far as what I did there. I was told at some point there that their equipment was inoperational [sic] and to seek out an alternate location. That's what I did. Then I went to Newark Station.
Q. You made some phone calls?
A. What?
Q. You made a phone call or two; right?
A. Oh, yeah. Yeah, yeah.
Q. These weren't in-depth phone calls? They were -- right?
A. No, they were request phone calls and probably a call back indicating if he can respond in to Newark to assist with it as well. So there's a delay. Because he would have to get approval from his bosses as well to assist. So



there's -- like, an hour and 20 minutes in police speak is nothing.
Q. And you -- were you in the room where Hampton Philander was, or were in some separate area?
A. No. It's a large building and large office space. I don't recall which room Philander was in.
Q. The question is were you in the room with Philander? I don't care how big that building is.
A. I said before I recall seeing him at some point, having some conversation with him. I was not in the room when I was dealing with Christian Velazques with Philander.
Q. What conversation did you have with Philander? I thought you didn't have.
A. No. I said to you before -- we can reflect back -- I had an introduction with him. Like I said, I was trying to introduce myself at Newark Station, indicating that we'd be going to Newark Station to do the video because we couldn't do it there, and that's what I previously stated to you.
Q. That's the sum total of the conversation?

A. Pretty much. I don't recall much more occurring.
Q. How long is it the Essex County Prosecutor's Office to Newark Station? It's not too far?
A. Not too far, but depending traffic. I mean, you live in Brooklyn. It's probably about five miles, which can take up to 20 minutes. So, I don't know, depending, that time of day, you're dealing with rush hour still ending out, you're at least 15 minutes away.
Q. Right. But other than what you testified to, you can't tell me anything else you were doing during that time period; right?
A. Correct.
Q. You said you went -- you started there before the other officers and Philander arrived. Were you in contact with them via telephone before they arrived at Newark Station?
A. I don't recall any conversations occurring.
Q. Okay. You later learned, did you not, that they apparently stopped because Philander Hampton was eager to point out the place where he had participated in the murder of five children?
A. Correct.



Q. Did Philander Hampton seem to you to be -- I know you're not an expert on this, but did he seem to you to be mentally disabled in any way?
A. No. He appeared to be very with it, and I would say he appeared to have like a stress lifted off of him, and he was rather forthcoming in my involvement in the audiotape -- I mean the videotape. He appeared to be very, like it was just a pressure lifted off of him.
Q. Even though he was essentially implicating himself in the murders of five children?
A. Correct. He's had this weight for 30 years on him, you know, and...
Q. And he gets picked up on a traffic warrant and, whoop, that's when he decides to give it all up? I mean, does that seem logical to you?
A. Very.
Q. Okay. So according to the Lieutenant Carrega, I believe, and, again, you'll have to take my word for it, unless you want to look at the testimony, but that he drove Philander Hampton to the Newark Station in his car with no one else present?
MS. ROSEN: Objection to form. You



can answer.
Q. I know you haven't reviewed the transcript, but if Lieutenants Carrega testified to that, do you have any reason to doubt that?
A. No.
MS. ROSEN: Objection to form.
Q. And would it be fair to say that you have zero idea what was communicated between Philander Hampton and Lieutenant Carrega in his police vehicle between leaving Essex County Prosecutor's Office to arriving in Newark Station?
MR. VOMACKA: Objection to form. But you can answer.
A. No.
Q. You don't know what transpired; correct?
MR. VOMACKA: Same objection.
A. No.
Q. You have no idea what Philander said to Lou Carrega, and you have no idea what Lou Carrega said to Philander Hampton in the vehicle; correct?
MR. VOMACKA: Same objection.
A. I stated that.
Q. I'm sorry?



A. I stated that. No, I have no idea what occurred in the car.
Q. Did you later learn that they stopped at a location where allegedly Philander Hampton said, "This is where it happened"?
A. Yes. And I stated that just previously about a minute and a half ago.
Q. Okay. And how did you learn that information?
A. Lieutenant Carrega told me at Newark Station.
Q. When he arrived, he said, "Oh, he showed us where it was at"? Something like that?
A. Correct.
Q. And did he give you any other details in that conversation?
A. There was a telephone pole, I think, in the front area of the street that Philander Hampton said it was right in this area. Whether that's the same location of the pole back in 1978 or not is unknown to me, but he pointed out the new residence that was standing on that property.
Q. So he communicated to you that Hampton had said, "I remember where this happened because, whatever, 30 years earlier, I remember

this telephone pole here"?
A. Well, Hampton had lived at the residence prior. So him finding the residence at 256 Camden, I don't think would be that difficult for him to pick out on the street where that residence was located.
Q. I don't disagree. I'm just asking if that's how it happened?
A. Yes, that's what was expressed to me, that he led them there to that location.
Q. And having run the background of Hampton, you knew that that was, had been one of his addresses; right?
A. I don't know if that came up as an address for him in anything that I saw. I had 271 Hunterdon and 256 Camden. I believe him living there was something he provided to us, but I don't recall if it was mentioned as any prior residences. I don't recall that address per se coming up in an interview.
Q. Okay. And 256 Camden, did you go to that location?
A. Not that day.
Q. At some point you did?
A. Yes.



Q. And that is located between 15th and 16th Streets? Do you remember that?
A. I didn't look at a map. I don't -- that is -- I believe that's probably correct, if you're looking at a map there.
Q. And the back side of the building is on Bergen?
A. Correct.
Q. So did you put together at that point -- well, strike that. I'll ask that in a minute.
So you get to Newark Station, and you get this information from Carrega. Again, you're assuming Carrega is going to write this all up in his report; right?
A. Correct.
Q. That would be protocol; correct?
A. That would be, like, the normal thing to do.
Q. Not only normal, but a particularly important thing to do, given the fact that someone is confessing to the murder of a five kids in a crime that has gone uninvolved for 30 years; right?
MR. LIPSHUTZ: Objection to the form.
A. Correct.



Q. It's kind of stunning; isn't it?
MR. LIPSHUTZ: Objection to the form.
MR. VOMACKA: Objection to the form.
Q. Do you agree with that?
A. In my opinion, yes.
Q. All right. So once at Newark Station, did you see the other officers who were involved in the case present as well?
A. Correct.
Q. And that would have been Agent Eutsey was there; right?
A. I believe it was Eutsey, Henry, Hadley, Carrega, and myself. Philander.
Q. The whole crew; correct?
A. Correct.
MR. LIPSHUTZ: Objection to the form.
Q. And where was Hampton taken inside Newark Station, if you know?
A. The upstairs is where the offices are on the second floor of the toll building. He was brought in there, and then he was brought into the interview room. I don't recall if he was ever put in the cell area there. It's a large like cell. It can hold like 30 people. I don't recall if he went there first or went directly into the



interview room.
Q. I'm sorry to go back. I meant to ask this question. You never saw Miranda warnings given to Hampton at the Essex County Prosecutor's Office; right?
A. I wasn't there for that, no.
Q. So that's a no; correct?
A. Correct.
Q. Did you see Miranda warnings given to him at any point at Newark Station?
A. Yes.
Q. At which point did you observe that?
A. The beginning of the videotaped statement.
Q. Does the beginning of the videotaped statement actually articulate the Miranda warnings?
A. I believe we have a signed form that he goes through and all that. I haven't seen the tape, if that was picked up on, but I believe at the beginning, we have a form we went through, and I believe it was on video. We can look at the transcript of the video.
Q. Yeah, we can look real quick. I just want to confirm that.
A. I'm pretty sure he checked off all the boxes, read through it.

Q. Okay. That's fine. I see it in the statement, if you want to go ahead and look, you're free to.
A. Right in the beginning of the statement.
Q. Who was present in the room when this recorded statement took place?
A. Lieutenant Carrega, Hadley, and myself.
Q. And was there any conversation that took place between any police officer and Philander Hampton at Newark Station prior to this statement?
A. Well, there's incidental conversations, so yes, like we'll ask him where he's going, do you need anything, do you need to use the bathroom? So, yes, there's conversation, but no interview conversation whatsoever.
Q. So no questions about the substantive nature of the events, but just, you know, bathroom, sort of housekeeping things; right?
A. Correct.
Q. And you're now in -- strike that.
You're now in the interview room. And the statement commences at what time; do you know?
A. Look at the statement form there.
Q. I don't know if the transcript



reflects it, or perhaps the video reflects it. It says 8:18 p.m.
A. Okay.
Q. If you look at --
MS. BONJEAN: I don't think we need to -- actually, I guess we can mark it. Let's mark it. Hampton's statement -- where are we at, Audrey?
COURT REPORTER: Five.
MS. BONJEAN: Tietjen-5 is Hampton's statement.
(Tietjen-5, transcript of Philander Hampton interview 11/13/08, Bates ECPO 000342 through 426, was received and marked for identification.)
A. What page do you see?
Q. Yeah. On the third page of the statement, which is Bates stamped ECPO 334, and it's at line 16.
A. Okay.
Q. Lieutenant Carrega indicates that it's 8:18 p.m.; right?
A. Right.
Q. So Philander Hampton has been in the custody and care of Lieutenant Carrega since



between 1 or 2 o'clock on November 12, 2018, but this is the first time that there is an audio or video recording taking place that is going to memorialize their conversation; right?
A. To the knowledge that I have, yes.
Q. And, in fact, there's actually not a single note or report or piece of paper with words on it that memorialize what occurred between 1 o'clock and 8:18 p.m. that was prepared within a year of the event; right?
MR. LIPSHUTZ: Objection to the form. It's very unclear what you're asking.
MS. BONJEAN: Well, I'll rephrase. I mean it doesn't really matter whether you understand it. It really matters whether he does, but I'll rephrase.
Q. We know that Lieutenant Carrega did eventually prepare a report; right?
A. Correct.
Q. That was after the Miranda hearing; correct? The commencement of the Miranda hearing; right?
A. Correct.
Q. Putting that aside, are you able to point me to any piece of paper with words on it



that would memorialize what transpired between 1 or 2 o'clock in the afternoon on November 12, 2008, and 8:18 p.m. on November 12, 2008, between Carrega and Hampton?
MR. LIPSHUTZ: Objection to the form.
A. I have no documents that show that, but he did take a polygraph. There should be a report related to that in Essex as well. And I don't know who did it, but I think it was Kelly is his last name. I think he was one of their polygraphists there. I don't know if he was the only one. So that may have some sort of documentation if he did, in fact, administer the polygraph. But there's nothing in the paperwork provided to me that indicates anything.
Q. Right. Kelly's polygraph report would reflect what Kelly did in terms of his polygraph test; right?
A. Yeah, I don't know if he does -- I haven't seen it, and I don't know what his style is. I don't know if he includes, I went there, and the guy was here voluntarily, and he was Mirandized. In some of our reports, we'll just say, as far as our agency has to do with other agencies or whatever, they'll provide some background of what

they're there for just to cover how they ended up there.
Q. Right. But you wouldn't expect his polygraph report to memorialize conversations that Hampton had with Carrega that he wasn't present for; right?
A. I don't know what to expect to from that.
Q. And Lieutenant Carrega handled the questioning of Mr. Hampton during the recorded statement that began at 8:18 p.m.; right?
A. Correct.
Q. Was Detective Cassian there as well?
A. I don't know who Detective Cassian is.
Q. I don't either. I see a reference to that in the statement on --
A. Oh, that's probably me. Whoever transcribes these statements that we were involved in is horrible, and there's no corrections made. Like, I may be -- I don't know who I'm in there as.
Q. It looks like --
A. Correglia is Lieutenant. There's Hadley. And then Tietjen, they come up with from Cassian.
Q. So that's you. Okay.
A. And I don't know, without looking at it, if



all of these are truly who they say they are or I'm mixed in with somebody else as well.
Q. When you went into this interview, though, you had no knowledge about what Philander Hampton had already confessed to other than just sort of a general idea; right?
A. I had a general event to it. The location. You know, especially after getting to the station and pointing out where it was, and what he was advising. I don't know what -- how far involved I knew. I probably knew some significant parts of it, but the total event that we wanted to get memorialized on the videotaped statement.
Q. Was November 12, 2008, the first time that -- strike that.
As of November 12, 2008, the idea, theory that the boys had died in a fire was reignited -- no pun intended -- right?
A. That was the first that I became aware that it was a concern for us. We talk about Hairston looked at fires that were active in the city back on that day. This was like crazy new news to me because I had thought that had been excluded previously. Granted, they could have been certainly, you always keep that in mind, but



nobody had told us that, so this is new to me, and I don't think -- so we took many steps to try to verify that it, in fact, occurred.
Q. And, in fact, Hairston had actually noted the actual fire?
A. I would imagine that fire that he looked up on Camden and 15th, but he uses a different address, the corner of.
Q. He said 15th and Bergen, right.
A. Right. So I would imagine that's actually, but the fires we looked up, we had 15th and Camden, but I did not readily identify from Hairston's 1970-whatever that this was the same, but I'm not -- you know, I'm not from Newark. I don't...
Q. Did it give you pause that Philander Hampton was saying that these boys had died in a fire given the fact no bodies had been found? Did that give you pause or concern?
A. No. I've been in this unit now for quite a few years, and the destruction that fire causes to human remains is pretty significant. Even the decomp of remains just that in open air and woods or yards, you can walk past most of a human remain with debris on them and never notice it, so I was



not concerned. My concern personally was did they do any examination of this fire and what was the potential normal course of business of the fire in the city once we, you know, came up with a fire potential that was there a fire. Newspaper article, and go get the fire logs.
Q. Did you confirm a fire did place at 256 Camden Street before you permitted Philander Hampton to --
A. No.
Q. I'm sorry?
A. No.
Q. So when Philander Hampton made this statement, your testimony is you didn't even know whether there had been a fire at 256 Camden?
A. Correct.
Q. Okay. Do you know how long the statement took? I guess maybe it reflects --
A. There is an end time on the statement as well so...
Q. The record reflects that the statement ended at 9:23 roughly, so he was in there talking for about an hour; right?
A. Correct.
Q. And after he made this statement, was

he placed under arrest in connection with the disappearance of the boys?
A. No.
Q. Why not?
A. I believe they wanted to verify things that he stated. This is new information to us, unknown to me at all. So him making those comments, I want to verify a whole bunch facets to it.
Q. Right. But you would agree that a video-recorded statement like this definitely gave you probable cause to arrest him; right?
A. Correct. It wasn't my call. Like, this was -- I would say in my experience my first time I found somebody who had admitted to something like this and they weren't charged right away, and I had never -- I've interviewed plenty of people before and arrested them based upon their statements, but this one, it's not my case, and it was decided, I guess, outside of me that he wouldn't be charged at this point, to then corroborate the things that he provided in his statement.
Q. He was let go; right?
A. He was brought to Essex County jail and then subsequently released there on bail.



Q. Right. On bail? For a traffic warrant?
A. Well, that's why you're in jail. You're in jail in lieu of the bail. This is before the Bail --
(Reporter requested clarification.)
A. He had bail on him. That's why he was at the county jail. Whether he appeared before a judge who then said, Your time served in the jail is good enough, let's release you and forego any payment the bail, or he did come forward with the money to remove himself from the jail.
Q. So the three days he was in there before he was dragged into the Essex County Prosecutor's Office, he couldn't make the bail on the traffic warrant ticket, but he did the day after you brought him?
A. I don't know if he made bail or had an appearance or what.
Q. All right. But he was released into the public --
A. Correct.
Q. -- after giving a video-recorded statement in which he played a direct role in the murders of five children; right?



A. Right.
MR. LIPSHUTZ: Objection. Argumentative.
Q. But you're not disagreeing that there was sufficient evidence to arrest and charge him at that point if somebody wanted to?
A. No, I don't make that determination. I would present those factual things to a judge who would make the determination of probable cause, so I would think that an admission to that with pointing out a location would be something I would write down and present to a judge, but that's me, and that's my -- this is a very different case with the amount of time and involvement.
Q. Yeah, it's ultimately a judge that would make a probable cause determination, but before you can even get in front of a judge, an arrest usually has to be made, and that requires a police officer to make the probable cause determination.
As a police officer, you would agree that a confession, this confession, hour-long confession, would have given you probable cause to arrest Philander Hampton; correct?
A. I would think possible, yes.



Q. But I understand it wasn't your decision to make, but you're not disagreeing that the proofs were there for an arrest to be made if that was the decision of the decision-maker?
A. I would agree with that. Definitely if he was free there sitting there and came in to speak with me, and he admits to it, he's not going home that day.
Q. Right.
A. That's my -- that's how I would handle it.
Q. I understand. I understand. That's not what happened, and you returned him to the Essex County jail?
A. Correct.
Q. And at some point, he was released. We don't know exactly how. And he remained out for some time; right?
A. Correct.
Q. Do you know how long he was out before he was arrested and charged?
A. We arrested him in March of 2010. I don't know if he was arrested for other crimes in the interim there, but that's when we arrested him again.
Q. So he was literally out after

confessing in his court-reported statement for -- my math isn't good -- but for a year and a half about; right?
A. Correct.
MR. LIPSHUTZ: Objection to the form.
Q. And it didn't take you that long to corroborate what he said in that statement; right?
MR. LIPSHUTZ: Objection to the form.
A. There were many steps being done. If you see that my involvement became -- I was transferred to the Fugitive Unit for a promotion in December of that year, so my involvement started to drop off. And then at the time of the arrest, I was fully in the Fugitive Unit as well. So I don't know what steps. They were looking for other witnesses, if they trying to look at neighbors, find reports of the fire. I think they were concerned about -- I'd say it's a large case, a 30-year-old case, so you're trying to get all the information. There was no true fear that he was going to beat feet.
(Reporter requested clarification.)
A. You know, like, I would see him in the city. I worked for the Task Force at the time, for the marshals, and I would see Philander



Hampton on the street and stop and talk to him. It was very odd to me, but I would pull up on him and see him. I can't say how many times I saw him, but I definitely saw him at different times.
Q. So let me get this straight. Carrega is looking for him for a good long bit of time, for months. Can't find him anywhere, until he gets picked up in this traffic warrant. And then after he confesses for being involved in the murders of five children, you just see him walking down the street, he's very easy to find; is that --
A. I wouldn't say easy to find. I said I saw him. I don't know how many times I saw him, but I became intimately involved with what he looked like in that interview and having direct contact with him. Prior to that, I was dealing with just a photo, and who knows if I saw him on the street, but I didn't quickly identify that it was Philander Hampton. I may have passed by him while I was looking for him previously, but now I had intimate knowledge of his actions, how he walked, how he looked, and how he presented himself. And for some reason when I'd see him after the event, I was able to quickly spot him and identify him. It was like seeing a friend. You knew how they



walked and how they are. I would see him and have contact with him. And he freely talked to me every time I saw him.
Q. So he was -- he didn't seem concerned about being arrested; right?
A. I don't know if he was not concerned. He didn't know what was happening. I think he was probably -- like I'm only surmising -- he was surprised he wasn't arrested that day, or charged.
Q. Right. But you said you weren't concerned that he was a flight risk?
A. Well, I couldn't make -- I wasn't determining when charges were going to be done.
Q. I understand. But I'm just bringing you back to your prior testimony that -- your words -- you weren't concerned he was a flight risk?
A. No, I didn't believe he had the means to leave Newark; or if he did, we knew who he was as far as at any point whether he'd become a fugitive, and the unit I was in was pretty adept at locating people and returning them where they had to be.
Q. But it's fair to say that he didn't try to evade you?



A. No.
Q. Right?
A. Correct.
Q. He was pretty accessible to you once he made this --
A. Well, I would only see him -- I don't know where he was living at the time, but I would see him -- I don't know how many times, but I definitely saw him on the street and had like a short conversation with him.
Q. But you wanted to keep tabs on him, though? No?
A. I was not anybody keeping tabs on him.
Q. You weren't -- I didn't understand your response. You said you weren't keeping tabs on him?
A. No.
Q. You would agree, though, that the team would have wanted to keep tabs on him; right?
A. I don't know what --
MR. LIPSHUTZ: Objection to the form.
MR. VOMACKA: Join.
A. At that point, like, we had done our steps and gone through, and you'll notice that others had many more tasks than me following that

December when I was transferred. I don't know if anybody was or not, but it wasn't something that I had to worry about, that he was charged at that point. He was easy to find the day he got the arrest warrant, too, so, however, you know...
Q. Right. But you have someone who's confessed to killing five people in a high profile case that has gone unsolved for 30 years, and he's now just walking around the streets. To me it would be common sense that law enforcement would want to keep an eye on him to make sure he doesn't flee? Even you're right, he probably doesn't have the means, but you still want to make sure you know where he is; right?
MR. VOMACKA: Objection to form, but you can answer.
A. I don't know what steps were taken to verify where he was or what he was doing.
Q. Okay. Well, you did subsequently try to get information about this fire; right?
A. Correct.
Q. And lo and behold the psychic was right after all?
MR. LIPSHUTZ: Objection to the form.
MR. VOMACKA: Objection to the form.



A. I'm not even going to go to that, because I said to you before psychics will throw out a huge amount of what-if's and possibilities, and she talks about a brown uniform and some other stuff. You know, like, we do this all time. It's in a field. Well, if I find them in the field, was she right? It's a fire. Is she right? Oh, well, we had a fire. We have psychics call my unit monthly on cases. It's all the same story.
The Dolce Aviles Amber Alert case, we had so many psychics call from all over the country on that. Dreams. Like I saw her in a dream. She's in a field of flowers. You know, and they give you all these full-on statements. It's great when you can link something up, but there's plenty of things in such provides. So, yeah, it's a fire. Was she correct? Who knows?
Q. Fair to say, though, that your team wanted to corroborate this, though, because you weren't 100 percent certain; right? Is that fair to say?
MR. LIPSHUTZ: Objection to the form.
MR. VOMACKA: Objection to the form. You can answer.
A. I would say we wanted to verify what he



told us because everything was unknown to us. As far as I know, I knew nothing about a fire on 256 Camden Street. I knew nothing about any potential fire reports, any arson report, that was at 256 Camden, let alone that Lee Evans was involved in the fire with Philander Hampton that day until Philander Hampton told us, let alone occurring on the third floor, you know, all those steps, so I had no real -- I know my bosses were curious as to why he wasn't arrested right away, but we have two people here because he implicated Lee Evans, and, again, it's a case, again, of 30 years with minimal stuff around and available to prove or to go through your factual basis. We had no information about a fire, so I had really no concern that we weren't jumping on him right away. I was thankful that we found that article in the newspaper, and thankful we found some fire items, and thankful that, you know, Mr. Delk's (phonetic) report was identified later on that next year in April.
Q. You had some reservations, though, about the fire theory; right? You wanted to corroborate that this was all true; correct?
A. Correct. I wouldn't say reservations about



the theory. He told us it was a fire, so I had to believe him and then go with finding factual basis to support what he told me. Whether it occurred on August 20th. Like, you look at--
Q. I want to make sure I understand.
A. Someone tells you a fire occurred on August 20th, the night thereof, in a case like this, you're going on 30 years, I want to verify as much information as I can. Whether that fire did occur, whether -- and then that adds to more of it. There's plenty of things that you couldn't with the lapse of years, but that was definitely one.
Q. Did Philander Hampton's story seem a little implausible to you when you heard it, or did it ring true to you?
A. Well, there were things in there that I think he could have potentially diminished. You know, they have a gun. Why not shoot a boy, or why not do harm to a boy? Whether that's diminishment. And people do that all the time in confessions. They diminish their own potential involvement. So did I believe every step he stated about it? No. I think there's diminishment on both sides as to what occurred --

(Reporter requested clarification.)
A. I don't know where I skipped off. But they tend to diminish involvement or put down their efforts.
Like, a pedophile, and I've interviewed plenty of them, will always indicate it was always accidental, but they still had penetration. You know, but they didn't intend to do it, like that. So there's -- he's belittling an event maybe not to make himself look so demonic in the event, and that's normal.
Q. Right.
A. So it's necessarily I believe every spoken word exactly how it occurred. The fire reported that one neighbor heard a pop. Could that have been gunshot that was muffled, or could it have been something popping due to the fire?
Q. Right.
MS. BONJEAN: I believe we have to go off the record to change media, so -- is that right?
THE VIDEOGRAPHER: Yes. The time is 3:57 p.m. Off the record.
(Break taken.)
THE VIDEOGRAPHER: The time is 4:06



p.m. Beginning of media number five. Back on the record.
Q. Okay. Sergeant, let's look back at your report, page 9 of 19, if you don't mind.
A. Yes.
Q. So after this interview, it looks like you did, in fact, try to get information from the Star Film about -- Star Ledger about any fires that occurred over on Camden Street; right?
A. Correct.
Q. Were you able to at this point connect up that reference by Hairston to the 15th and Bergen fire and the Camden, or were you still not sure about that connection?
A. No, I don't believe that matched up at all. That wasn't -- it wasn't something I recalled coming out as an ah-hah moment because I didn't recall it from Hairston's report that was something that was ah-hah to look at.
Q. I mean, you agree now that that's likely the same fire?
A. Oh, yes, certainly.
Q. Okay. But at the time, it didn't jump out at you; is that right?
A. No.



Q. So it was there under your nose the whole time, you didn't know; right?
MR. VOMACKA: Objection to the form. You can answer.
MR. LIPSHUTZ: Objection.
A. And I don't even know if I had that form, that report. The report has been provided to me because we were getting -- like, people at all different -- there were no original copies here. So I don't know where the original file went from '78.
Q. And you don't know whether Hairston actually got any other reports in connection with that --
A. No clue what was done.
Q. But you did find out that there had been a fire and that it was reported on by the Star Ledger on August 22, 1978; right?
A. Right.
Q. And you wrote in your report, 254, 256, 258, and 260 Camden Street. Were those all different buildings to the best of your knowledge?
A. To the best of my knowledge, they were buildings one after each other. I don't know if any of them were doubles. I believe they had like



a small gap between them, but I don't know -- we saw some floor plans that seemed similar in the area but a separation between them.
Q. I'm sorry. What did you say?
A. But a minimal separation. So like a large fire would continue on to the next residence and the next.
Q. And 256 was kind of smack dab in the middle?
A. Correct.
Q. Did you develop any information that 256 was actually a vacant building at that time?
A. From Philander Hampton, and then the article also says that it was vacant.
Q. That the building was vacant?
A. 256, correct.
Q. Okay. So that's a good piece of corroboration that you developed the day after you got this video-recorded statement from Philander Hampton; right?
A. Correct.
Q. And then fair to say that you continued to try to get information about the fire and the building and so forth and so on?
A. Correct.

Q. Did you still have some questions about why -- well, strike that.
Did you have some questions about why there were no remains found?
A. No. 1978 everybody was talking about -- we have Jack Eutsey there, who was on the force then. He said there were fires all over the city back then, and abandoned buildings and things burning down, and described that sort of experience of Newark in 1978, indicating that many of the homes were owned by the city as well. So them not finding remains and having a large fire like that, and speaking to the fire department would support that, that they didn't enter the building to look for remains.
Q. But they did enter the building to look for remains in some of the other buildings; right? In fact, they saved some people? The police did; right?
A. People got out, and you have a officer, University Hospital, I believe, at the time come by as well and assist in rescuing residents from the homes. And I don't think that he went in any further to examine to look for remains because no one was missing to their knowledge that would have



been in the home. So, you know, they indicated they would only dig out the remains if they were reported someone was trapped in a home or entered to fight the fire, but 256 was reportedly well involved upon their arrival as well.
Q. All right. I want to draw your attention to November 18th, which would have been, I guess, less than a week later. You actually had Philander Hampton's cell phone; right?
A. I didn't have it. I had his number.
Q. Yes, right. His phone number. And you just called him up and said, "Meet me over the at the Essex County Prosecutor's Office"?
A. Yeah. Like, my style of how I interview people is, I think I express an honestly to them, and I develop a little bit of a rapport. So Philander Hampton was one who was able to communicate with me in that respect, and I -- you know, my whole theory is if I show respect to people when I interview them, in some respect, it's, you know, fitting that they're going to answer my call and talk -- he agreed to -- you know, we had a call, and he answered, and he agreed to meet with us.
Q. Did you give Philander Hampton the



idea that he might not be charged with this crime?
A. No.
Q. Is that why he was so cooperative that he was operating under the assumption that he would not be charged?
A. No.
Q. Did you tell him that he was going to be charged?
A. No.
Q. Did anyone tell him he was going to be charged with this crime that you saw? Law enforcement?
A. I don't know.
Q. I know you don't know. That's fine if you don't know. I'm saying did you hear or observe any other law enforcement official communicate to him that he would be charged in connection with this crime?
A. I just said I don't know.
Q. You don't --
A. I don't know if anyone did that. I said no, I do not know.
Q. I appreciate you saying you don't know whether anybody did that, but that's not really what I'm asking. I'm saying did you hear



it? Did you see it? Did you observe it?
A. I didn't hear it, didn't see it, didn't observe it.
Q. So the answer is no then?
A. No.
Q. You didn't see or observe or hear those things; right?
Did you ever see, observe, or hear any other law enforcement official communicate to Philander Hampton that he would not be charged --
A. No.
Q. -- with -- well, do you recall any conversations about whether or not Philander was going to be charged, with Philander, conversations with Philander about whether he would be charged?
A. No.
Q. So it just never came up whether he'd be charged after confessing to five bodies in a building?
A. I don't know if he was as confused as I was.
(Reporter requested clarification.)
A. As confused as even I was. It's -- you know, he expressed to us what he did, and he went off to jail, and he walked out. And when I called

him, he answered the phone. He came in. He knew that day he was not getting charged. You know, he walked in. He walked out of there as well.
Q. How did he know he wasn't getting charged when you asked him to come down?
A. I would have believed when I called him that I probably said to him I just want to meet with him tomorrow, and I wanted to talk to him. You know, that's how that conversation was going. I think we probably would have some conversation to that, but not that he was never going to get charged or that he would some day get charged.
Q. Did you ask you, Hey, I'll come down there, but am I going to get arrested or charged?
A. He may have asked if he was getting arrested that day, but I don't recall that. That would be a normal conversation potentially in a case like this, like the guy would say, "Hey, am I getting locked up today?" And I would say, "No." But not that you're not ever, or it's not coming in the future.
Q. But you also never told him he was likely to get charged either; correct?
A. No.
Q. When you say no, you mean that's



correct; right?
A. Correct.
Q. And then again, the next day -- wait, hold on. Back up a second.
What did you talk about with Philander on November 18, 2008?
A. You broke up. On the 18th?
Q. Sure. My apologies. What was the substance of your conversation with Philander Hampton on November 18, 2008, at the Essex County Prosecutor's Office?
A. No. That on the 18th was a talk via cell phone to get him to come in on the 19th.
Q. Got it. Apologies. So on November 19th, the following day, he comes down; right?
A. Yes.
Q. So you ask him to come down on the 19th. He obliges, and he's there at the Essex County Prosecutor's Office at 8:00 a.m.; is that right?
A. That's correct. He's actually there at seven-something. Before eight.
Q. 7:30 a.m.?
A. Yes.



Q. 7:39 a.m. right on the dot.
And you were present along with Detective Hadley, a Detective Recktenwald; is that right?
A. Correct.
Q. And an Agent Eutsey; right?
A. Correct.
Q. And how long did this meeting last with Philander Hampton which was now about a week out from the November 12th meeting?
A. I don't know an end time. I know at 9:30 he was still there because that's when he showed us how he -- how the boys were stacked in the closet is the way he described it, and he physically used Detective Recktenwald to show -- the term stacked is something we keyed up on as were they deceased already and placed in there, or were they laid down, but he showed us by grabbing our sides and placing us in. That's what he said, stacked. You know, standing up, not stacked like that.
Q. He suggested they were alive; right?
A. Correct.
Q. Did you believe that?
A. That's what he presented. I had to believe



that as well. But, you know, could they have been injured? Possibly.
Q. So it was your belief, you credited Philander's statement that five boys were put into a room, not children, really kind of like young adults, or at least grown -- teenagers; right?
A. Well, he indicated in his statement that Lee Evans just wanted to teach them a lesson. So whether he was successful in communicating that, that, you know, they're going to get locked in this closet or whatever. I don't think they were aware that a fire was going to get started there, but that depends if he's diminished some facts, but that's what's presented to us, that they were put in the closet together. The closet was big enough for the five boys to stand in there.
Q. Well, you'd admit, though, that you know enough about fires to know that it would take some time before a building was engulfed; correct?
MR. VOMACKA: Objection to the form.
A. I know with an accelerant, five gallons of gasoline, that I can barely outrun a fire pour with that much gas.
Q. Okay.
A. I was a firefighter years ago myself, and

it's quick as ever.
Q. Okay. So when he said stacked, it was a weird use of a word of how they were placed into this closet or room; right?
A. Correct.
Q. All right. And you had him sketch the room, I guess, a little bit; right?
A. Yes, the actual third floor he sketched.
Q. And he continued to be cooperative during this investigation?
A. Yes.
Q. Do you know whether anyone else wrote a report about this subsequent interview you had with Mr. Hampton?
A. I would have to see all the reports, but I don't know.
Q. Um --
A. I know, I think Recktenwald wrote a report when I turned in the sketch to him.
Q. You think Recktenwald wrote a report?
A. When I turned in the sketch to him, but I don't know if anyone else memorialized this.
Q. But it wasn't video recorded or audio recorded, I see; correct?
A. I don't know.



Q. Do you know why it wasn't, or did you make a decision about that?
A. I did not.
Q. And you also started to try to track down Lee Evans as well; correct?
A. Correct.
Q. I noticed that Carrega doesn't seem to be involved anymore, at least according to your report. Do you remember if that's the case?
A. I don't know what reason he's not mentioned here. He was not involved in these aspects. The case developed into a larger component of people, and I believe he was much more involved with the actual structure of it as far as like the lead person.
Q. I'm not sure I understand your answer to that question, so let me see if I can get some understanding.
At least according to your report, which memorializes investigative work for the rest of November, and I believe into December, and it does not seem to me to reflect that Carrega was involved in this investigative work; am I wrong about that?
A. You're wrong.



Q. Okay. He just wasn't involved in this aspect of the investigation?
A. He wasn't involved in the tasks that I was assigned to do.
Q. But he was still involved in the investigation?
A. Correct.
Q. And, again, I want to say, I want to -- I'm going to skip along, try to go a little more quickly.
On November 21st, 2008, you reached out to Philander Hampton via his cell phone again; correct? Is that right?
A. Correct.
Q. And he said, "Sure, I'll come in for another polygraph examination." Is that correct?
A. Correct.
Q. Why did you polygraph him a second time?
A. I need to refer to the report as to what questions were asked, but we were concerned that he may not be providing full details by diminishing certain aspects. Some of the things, the stacking, the closet, these things, you know, you have to inquire as to did it truly, fully



happen that way. They have a gun. I was concerned that they weren't shot before or injured in some fashion, and it was thought that we would, you know, try to confer with him as far as his truthfulness on those items.
Q. And did he pass the second polygraph?
A. I don't know if he -- I don't know if I even mentioned it in my report because it was not my handling. I was the one who made the call to him and set it up.
Q. By the way, were there any prosecutors involved in the case up until this point?
A. There were people aware and people part of the meetings, so...
Q. So prosecutors were being debriefed on the investigation?
A. Correct.
Q. At any point prior to, let's just say, November 24, 2008, did you raise a concern with either other detectives or officers or prosecutors about why Philander had not been charged and arrested for this?
A. It's not my house. I'm there to assist. They decide those things, you know.

Q. So you didn't raise that concern?
A. I may have expressed my wonderment as to why he wasn't charged.
Q. Yeah, that's what I'm asking?
A. But it wasn't important enough that I would document or push it. I am truly a guest there as an assistant to them, and I had certainly an interest in this case and its progression.
Q. Right. I understand that you wouldn't have necessarily pressed it or documented it, but it sounds like you may have at least informally raised it as --
A. I wouldn't know who. I'm sure it was a conversation as to what they wanted, being the prosecutor's office, before they would go through with the charge, as far as corroboration or any additional stuff to go over.
Q. And your efforts at interviewing Lee Evans were unsuccessful; would you say that's correct?
A. Correct.
Q. Tell me about the interview with Lenzell Kimble. How did that come to be?
A. Well, that's his son. We were trying to speak to the father, but the father was deceased.



Q. Why did you want to speak to him?
A. He was named in the investigation report. I don't recall on what page. But we were trying to identify him, and I never even spoke to his son. His son communicated with DOC guards at the facility where he's incarcerated that his father was deceased in 2001, I believe.
Q. Do you have any idea why Michael Recktenwald's report was not prepared until January 4th, 2010, when this polygraph took place back in the fall of 2008?
A. Just like my own report with the time, it's -- I have no -- like, for me it was just a culmination of facts. I even identify -- I will get back to mine. I didn't identify that this 1988 report that's mine is until December when I spoke to Eileen Gilleece who reached out to me when she heard about this case within the state police. She reached out to me said, Hey, she worked on this. I know we worked on it. We never found the case number. So she identified what year it was, because the thing about the case is it was from 1978, and my unit comes into effect in 1984, and she got involved in it in '88. That's where this -- so there was a delay for me there



as well with the sup. But I don't know why his report would have that delay as well. To me that would be not, like, something I would think significant at all.
Q. Well, you understand from the perspective of perhaps a defense attorney that a report that's prepared a year and a half after the events happened might not have the same reliability as a contemporaneously-made report?
MR. VOMACKA: Objection to the form, but you can answer.
MR. LIPSHUTZ: Objection to the form.
A. I understand the potential concern, but I can tell you that how I wrote mine was based upon the notes I had and my memories of those notes, and the notes reflect back to what I wrote.
Q. Notes that you destroyed, though, or did not hand over to the --
A. I don't know --
MR. LIPSHUTZ: Objection to the form.
MR. VOMACKA: Objection to the form. Facts not in evidence. You can answer.
A. I don't know where they are. Like, whether I turned them over. I don't have nothing to say to that as far as --



Q. Well, you testified earlier that you were pretty confident that you did not provide your notes to --
A. Yes, I was pretty confident. If someone shows me they're there, great.
Q. And it wasn't your practice to give your notes to the prosecutors in a investigation; right?
A. Correct.
Q. I assume it wasn't your practice to give your notes to defense counsel for the accused; right?
A. Well, in this case, I definitely did not.
Q. Okay.
A. But I don't know if I provided it to the county before. I don't recall what happened to my notes, whether I destroyed them. I don't -- I have no reference of where they are. I can certainly look, like I said I would do. I didn't say they're destroyed. I don't recall if they were submitted, if anybody requested them. That wasn't something that 10, now 12 years ago, that I would routinely worry about after I had submitted my report.
Q. But you don't have the understanding

that even in connection with the civil lawsuit that was filed back, I don't know, years ago now, that you didn't have an obligation to look for your handwritten notes and provide them, if they were available?
A. I may have looked for them then as well and not have found them, but that's one thing I provided it as part of your lawsuit the documents that I had then. I mean, this is, what, how many years ago was it first filed? Like 2016? I don't know --
Q. About.
A. Like, I provided to them what I had.
Q. Do you remember looking for your handwritten notes at the time that you were doing your diligence and searching for documents in your care and custody?
A. I believe I looked for everything that I had, which would have included notes.
Q. December 12 -- I stand corrected. Here's a mention by Lieutenant Carrega. On December 12, there was a search of a basement at 137 Vassar Avenue?
A. Correct.
Q. And that's at page 16 of 19?



A. Yes.
Q. Why was there a search of a basement at 137 Vassar?
A. At some point, that address was in the report as a potential location of bodies -- who knows if it's bodies related to this case or not -- in the basement, and it had not ever been resolved through, so it's another thing like you're asking about all these other facets did we not look, or did we? Well, that one we looked at, and to the best of our ability that day with a cadaver dog and looking at the floor in the basement did not come with any significant indication that there would be remains below that concrete floor. I think that would be good police work to follow up on anything that's presented there.
Q. Yeah, but it's not consistent with Philander's story at all; right?
A. We're going through every single aspect here.
Q. So what I'm saying is you weren't persuaded of Philander's story?
A. No, I wouldn't say I'm not persuaded of Philander's story. I don't want somebody like



yourself asking why I didn't go to 137 Vassar Street when somebody reported there were bodies in the basement.
Q. Well, you have this court-reported statement -- or strike that.
You have a video-recorded statement. He's not arrested. He's not charged; right?
A. Yes, yes.
Q. You have confirmed that there was a fire at the exact location that he allegedly says this is where it happened; right?
A. Correct.
Q. But you're continuing to pursue leads that are inconsistent with what -- hold on. Let me finish my question.
You continued to pursue leads that were inconsistent with his account of what happened; correct?
A. I don't --
MR. VOMACKA: Objection to the form. You can answer.
A. I don't think you're understanding the direction of the case here. I am like the low fruit of the detectives at that time. There are meetings to determine what we do and what leads



we'll follow through. This isn't me saying, Let's go to 137 Vassar. Whether it's an AP saying, Hey, there's 137 Vassar out there, let's square this away, because they know nobody is going to ask about it later. I didn't write down who made it an assignment, but it was an assignment. All of these are assignments.
Q. Okay. Somebody made the call -- maybe it wasn't you, but somebody made the call to check out a lead on December 12, 2008, that was not in any way consistent with Philander Hampton's account of what happened; can we agree on that?
MR. VOMACKA: Objection to form. You can answer the question.
A. Yes.
Q. I think you agreed; right?
A. Yes.
Q. Do you remember interviewing Kevin Royster?
A. What page is that on? I don't have it in my memory.
Q. Oh, my apologies. It wasn't an interview.
Do you remember reading the interviews of either Gregory Royster or Kevin

Royster?
A. I don't recall them.
Q. Okay. I'm not going to spend time. That's fine.
Okay. And as of June 25, 2009, again, you know, about at least six months, more than six months after the video-recorded statement of Philander Hampton, the case wasn't closed; right?
A. Correct.
Q. And did you believe that there was any other investigative work that could be done at that point?
A. At that point, I don't know everything that was all done, so I can't answer that.
Q. Well, did you see any need for investigative work to be done at that point?
A. Just like I stated, I was just a low-level, and at that point, I was significantly removed from the investigation, so I don't know where their steps were leading them.
Q. Sometime after June 25, 2009, in or around March of 2010, things changed; correct?
A. Correct.
Q. There was an indication that the



Essex County Prosecutor's Office was going to pursue charges against Philander Hampton and Lee Evans; right?
A. Correct.
Q. Do you know why at that point?
A. No.
Q. They just decided to do that?
A. No.
Q. Okay. I want to ask you before we move on to that, but before we get there, did you ever make any promises to Philander Hampton for leniency or any type of benefits in exchange for his cooperation in the case?
A. No.
Q. Did you ever hear any of your fellow officers make any promises of leniency and/or offer any type of benefit to Philander Hampton in exchange for his cooperation in the case?
A. No.
Q. Did you ever hear any of your fellow officers make any promise of -- non-prosecution promises to Philander Hampton in exchange for his cooperation in identifying Lee Evans as the culprit in the case, or the offender?
A. No.



Q. Did you make any promise of non-prosecution, or just, I'll put in a good word type of thing, if he cooperated and provided information about Lee Evans?
A. No.
Q. Did you ever hear any communications made to Philander Hampton by anybody that would lead the average person to believe that Philander Hampton would not be charged with this crime if he just cooperated and inculpated Lee Evans?
A. No.
Q. In your questioning of Mr. Hampton, either on November 12th of 2008, or any subsequent times, did you have the impression that he did not realize he was implicating himself in the crime?
A. No, I fully think he realized what he was saying.
Q. So you mentioned earlier that sometimes people minimize their culpability, which I think you're right about that. Did you believe or even cultivate the view that maybe he was not legally responsible for the deaths of the boys since he didn't light the match?
A. No, I didn't think that.
Q. So as you sit here today, are you



confident that Philander Hampton understood that he was inculpating himself, or implicating himself, in this crime when he made this statement on November 12, 2008?
A. Yes.
Q. Do you have any idea what prompted the prosecutor's office to pursue the case with the evidence that had been available 18 months earlier?
MR. VOMACKA: Objection to form, but he can answer.
A. I have no clue what led to the delay.
Q. You would agree, though, that ultimately the evidence that was used to indict Lee Evans was the same evidence that was available on November 12, 2008; right?
MR. VOMACKA: Objection to the form, but you can answer.
A. I don't know if there was any other evidence involved in the indictment, but I know that they should have had a decent amount, and we verified the fire, so within that month and a half, say. The Delk report coming in April of '19 -- or 2009, definitely added to that as well.
Q. Corroborating the fire is just corroborating Philander Hampton's version of

events; right?
MR. VOMACKA: Objection to the form, but you can answer.
A. Delk also provided information about two males running from that third floor out the back of Bergen Street.
Q. Well, Delk didn't see that.
A. No. Delk spoke with people who corroborated that.
Q. But you didn't talk to anybody who saw that; right?
A. Excuse me?
Q. Did you ever speak to anybody who saw that with their own two eyes?
A. No, I wish I did. I'm speaking about what was generating during the case between November and that time.
Q. Right. Okay. But to be clear, I know what -- I know that there was a statement within the Delk, Harris Delk report, about a witness seeing this, but you would agree, I think you know probably, basically that that, of course, is a hearsay statement contained in a report; right?
A. Correct, but --



MR. LIPSHUTZ: Objection.
Q. Is that correct?
A. That's what I said. Correct.
Q. Yes. And are you aware of whether anybody was able to get or find any witness who actually could confirm that that is what he or she saw?
A. They were unable to.
Q. So, again, that was not evidence that you were able to present because hearsay is not admissible; right?
MR. LIPSHUTZ: Objection to the form.
MR. VOMACKA: Objection to the form. You can answer.
A. Correct.
Q. I would like you to look, if you would, please -- I'm going to have you look at -- we're going to mark it as an exhibit -- Carrega affidavit.
(Tietjen-6, Carrega affidavit in support of arrest warrants, Bates ECPO 257 through 259, was received and marked for identification.)
Q. Let me know. We are going to call this Tietjen-6. Have you seen this document before, Sergeant?



A. Yes.
Q. And what is it?
A. It's the affidavit to support for arrest warrants.
Q. This was prepared by whom? Whose affidavit is it?
A. It's Louis Carrega.
Q. Okay. And this was the factual basis for providing probable cause to support an arrest warrant of the evidence?
A. Correct.
Q. I want to go through a couple pieces of it. One just deals with the background of Lieutenant Carrega, paragraph one; right?
A. Correct.
Q. And two identifies that this affidavit relates to the five missing boys that occurred in Newark on August 20, 1978; right?
A. Correct.
Q. And then it says it's being offered in support of the state's application for an arrest warrant for both Philander and Lee Evans; right?
A. Yes.
Q. Now, paragraph four, "On August 20, 1978," do you see that?



A. Yes.
Q. This is information that was available in 1978; correct?
A. Correct.
MR. LIPSHUTZ: Objection. Argumentative.
Q. And actually paragraph five was information that was available in 1978 that the five boys had been seen in the company, or last seen and -- "had last been seen in the company of Lee Evans, a local contractor." Correct?
A. Yes.
MR. LIPSHUTZ: Objection to the form.
Q. And would you agree actually that the paragraph six also contains information that was available in the 1978, from the 1978 investigation?
A. Yes.
Q. Same for, I guess, paragraphs seven through nine; right?
A. Yes.
Q. Okay. And then paragraph ten relates to the fire at 256 Camden Street; correct?
A. Yes.
Q. And that was information that was obtained, according to you, the very first time it

was obtained was from Philander Hampton; correct?
A. Correct.
Q. And then paragraphs 11 through 12 -- I'm sorry -- paragraph 11 summarizes what Philander Hampton revealed during his video recorded statement; right?
A. Yes.
Q. Okay. And then 12 is culled from historical data that the buildings were subsequently demolished; right?
A. Yes.
Q. So in terms of evidence that pointed the finger at Lee Evans as the perpetrator really turned on the statement of Philander Hampton; correct?
MR. VOMACKA: Objection to the form.
MR. LIPSHUTZ: Objection to the form. Argumentative.
MR. VOMACKA: You can answer.
Q. Is that right?
A. Yes.
Q. In fact, the evidence that came from Philander Hampton, which included information about the fire, first came from him, was the only new evidence that was developed in the course of the



investigation, at least that's reflected in this affidavit in support, right?
MR. VOMACKA: Same objection.
MR. LIPSHUTZ: Same objection.
A. Admission, and then the fire is the only.
(Reporter requested clarification.)
Q. The admission, and the -- I'm sorry. I don't want to put words in your mouth.
A. He discussed -- the fire is new to us in here, and then his statements he made to us in his statement.
Q. But the evidence about the fires wouldn't mean anything without Philander Hampton's statement; right?
MR. VOMACKA: Objection to the form.
MR. LIPSHUTZ: Objection to the form.
MR. VOMACKA: Argumentative. You can answer the question.
A. Correct.
Q. Really -- the information about the fires was -- really corroborated Philander Hampton's account of what happened; correct?
MR. VOMACKA: Same objection. You can answer.
Q. In other words, without Philander



Hampton's statement, just evidence about those fires wouldn't tell us anything about whether or not Lee Evans did it or not; right?
MR. VOMACKA: Same objection. You can answer.
A. Yes.
MS. BONJEAN: All right. I believe I may be finished, but what I would like to do is if you can give me two minutes to check my notes, so when I go off, and then make sure that I haven't missed anything, and then anybody else can proceed. Okay. We can go off the record.
THE VIDEOGRAPHER: The time is 4:47 p.m. Off the record.
(Break taken.)
THE VIDEOGRAPHER: The time is 4:52 p.m. Back on the record.
BY MS. BONJEAN:
Q. Just a couple questions. Sergeant Tietjen, do you know whose decision it was to ultimately decide to bring charges against Lee Evans and Philander Hampton for this case?
A. No.
Q. Were you present during any conversations when that decision was made?



A. No.
Q. So the decision was already made by the time that you were at a meeting in March of 2010?
A. Yeah. The day of the meeting was the day that the complaints were signed.
Q. Right. So you weren't present for any prior meetings where it was discussed?
A. No.
Q. And you don't know as you sit here today who ultimately made that decision, if anyone?
A. No.
Q. And you don't know why or the basis for the decision either; correct?
A. No.
Q. Just a couple questions. Have you ever been disciplined in the course of your employment as a police officer in the state police?
A. No.
Q. And have you been the subject of any civilian complaints?
A. Yes.
Q. Do you know approximately how many?
A. Maybe two.
Q. In 25 years, just two, huh?

A. Yes.
Q. And do you know what they were about?
A. It was a traffic stop related. Well, one is traffic stop related and one was a unit related.
Q. A what related?
A. I was in a unit where we had a sergeant first class who was undermining lieutenants, and someone left either human feces or dog feces in his mailbox, and he accused the entire unit. I was a principal in that one. And then I had a traffic stop where the individuals had a large bag of currency --
(Reporter requested clarification.)
A. A large bag with money in it, like full of money. So they weren't arrested, they were released with the money, but they tried to indicate that the stop was racially profiling, which was a motor vehicle violation. They were able to prove where the money came from and what it was going to, which was fine. They were never under arrest ever.
Q. Okay. Have you ever been sued for any Civil Rights violations?
A. Not that I'm aware of. I had a civil suit



years ago because I was named as a detective in the case, but I don't think it was a Civil Rights violation. I never had any depositions in it. So not that I'm aware of.
Q. Do you know what --
A. Repeat that.
Q. Do you know what the allegation generally was?
A. No. It was related -- it was so long ago. I was on the Turnpike. It wasn't my case, but I was one of the people that assisted in the case at some point.
Q. Was it a case that was filed in state court?
A. I believe it was federal court, but I didn't get anywhere with it.
Q. And you don't remember what the subject matter of the allegation was?
A. No. Our Civil Proceedings Unit should have a copy of that.
MS. BONJEAN: Okay. I don't think I have any additional questions for Sergeant Tietjen. Thank you for your time.
MR. LIPSHUTZ: Rebecca, do you have questions?



MS. ROSEN: I do have some questions.
MR. LIPSHUTZ: Do you want me to go first, or do you want to go?
MS. ROSEN: You can go first.
MR. LIPSHUTZ: Okay. I'll be quick.
CROSS-EXAMINATION BY MR. LIPSHUTZ:
Q. Detective Sergeant, I have a couple questions about a report that you haven't talked about, I don't think. It's the report, March 22nd, 2010. I think it's part of your April 21st, 2001, supplemental report.
Do you have that in front of you, or can you find it?
A. Yes.
Q. Do you have it in front of you?
A. Yes.
MR. LIPSHUTZ: Was that marked, Jennifer? Or court reporter?
(Tietjen-7, Tietjen supplemental report dated 4/21/10, Bates ECPO 1315 through 1317, was received and marked for identification.)
MS. BONJEAN: Do you have the Bates stamp as well?
MR. LIPSHUTZ: I'm looking at the one you uploaded. It's ECPO 1315 through 1317. Three



pages.
Q. Okay. But before we get to that report, Detective Sergeant, you're part of a Missing Persons Unit at the time of this investigation; right?
A. Yes.
Q. Do you know what unit Sergeant Henry and Detective Hadley were part of?
A. I think it was a like a Robbery/Homicide. A Robbery -- I think it was just a Robbery. I don't know if it was Robbery/Homicide back in the day. I don't know the exact name of their unit.
Q. Well, maybe could you return to the second page of this report, the number 7, the Bates stamp 1316, the second page?
A. Oh, I have Cold Case Unit, but I don't even know if they had a Cold Case Unit, so that may have been a mistype there.
Q. Well, if you read that, does that refresh your recollection?
A. I don't know if they had a Cold Case Unit. Like, I think that was, like, when I'm reading it there, I don't know if I miswrote that, as I'm reading it right now, or if it was correct.
Q. Well, I can't tell you one way or the

other. I'm sure they would tell you but --
MS. BONJEAN: Okay. Now it's editorializing.
Q. Right. Okay. So you're not really sure what unit they were assigned to?
A. Correct.
Q. And Carrega, do you know what unit he was assigned to within the prosecutor's office?
A. I believe it's the Homicide Unit, and he was assigned the cold case aspect of their, like, unit.
Q. So he was a Homicide Unit detective and handling a cold case?
A. Yes.
Q. Now, did you ever take directions from Joe Hadley as part of your work on this case?
A. No.
Q. Did you ever take directions from Sergeant Henry as part of your work on this case?
A. No.
Q. There's been words thrown about in this deposition about a team and a crew. And what was your understanding about the role of Joe Hadley and Sergeant Henry, if you even have an understanding?



A. They were, as I was, part of this, whatever you want to say, team, or whatever, that was trying to resolve this case. I know Newark is the lead on the missing person's case through, and then the county started the backup, and they were over as part of a co-investigation, co-op.
Q. Am I correct that at the outset, it was a cold case, missing persons file, but then at some point it turned into a homicide investigation; am I correct?
A. Yes.
Q. Because, as I understand it, you and the other officers didn't know there was a homicide until Philander Hampton told you; am I correct about that?
A. Correct.
Q. Okay. So take a look at this report, this supplemental report here, and the first page says that on Monday, March 22, 2010, that you attended a meeting at the prosecutor's office, and present at that meeting was Prosecutor Laurino; do you remember that?
A. Yes.
Q. Okay. And the Homicide Unit director, Greg DeMattia?



A. Correct.
Q. Chief of Essex County Prosecutor's Office Detective Anthony Ambrose was present?
A. Correct.
Q. Lieutenant Carrega?
A. Yes.
Q. Henry Hadley and Murad Muhammed from the Newark Police Department?
A. Yes.
Q. Okay. Now, what do you recall happened at that meeting? Actually, let me ask you this. What do you recall Sergeant Henry saying at that meeting, if anything?
A. I don't recall anything.
Q. What do you recall Detective Hadley saying at that meeting, if anything?
A. Nothing.
Q. Okay. That's ambiguous. Do you not recall?
A. I don't recall anything he said or Henry said.
Q. Okay. What do you remember about that meeting at all?
A. It was discussed that they had authorization for the arrest warrants.



Q. Who is they?
A. The county had obtained.
Q. Okay. So that's what I'm confused about. I understand at that meeting you guys figured out a plan to go and arrest Hampton and Evans; right?
A. Correct.
Q. But the authorization for the warrant, did that come from anyone from the Newark Police Department or division?
MS. BONJEAN: Objection. Form, foundation.
Q. Did you understand my question?
A. Yes. And no, it did not. I don't know if they were consulted, but as far as I know, it was the county, someone in the county would have decided to press forward.
Q. Have you ever sought an arrest warrant --
A. Yes.
Q. -- before a judge? You have. Okay.
Did you understand that your role in this case at any point would be to seek a warrant for the arrest of Evans or Hampton?
A. Yes.

Q. No, you personally?
A. No, no, no, never me.
Q. Why not?
A. I was an assistant on this. It wasn't my case.
Q. Did you have any understanding that Detective Hadley or Sergeant Henry would have the obligation to go seek a warrant for the arrest of Evans or Hampton?
A. No.
MS. BONJEAN: Objection. Form, foundation.
Q. You did not have that understanding?
A. No.
Q. It may be a badly formed question.
A. No, I did not.
Q. Okay. Last question, or last topic. Philander Hampton's statement. Did you then have any reason to believe that Hampton lied about Lee Evans' involvement in the homicide of these five teenagers?
A. No.
Q. Today, at your deposition, do you have any reason to believe that Hampton lied about Lee Evans' involvement in the homicide of these



five teenagers?
A. None whatsoever.
Q. What do you mean "none whatsoever"?
A. No, like an emphatical [sic] no.
Q. Well, you're aware -- you obviously are aware that a jury acquitted Lee Evans; right?
A. Correct.
Q. Now, does that change your opinion --
A. No.
Q. -- or your belief?
A. No, no.
Q. Why not?
A. Because I know what was presented to us, and I know what was presented in trial, and there were statements made as I sat there that were different than what was provided as well. You can look at the transcript. I saw the case change, so I thought when I was there that this was definitely not going to happen. But I still believe wholeheartedly that Lee Evans and Philander Hampton killed those boys in that building.
MR. LIPSHUTZ: Okay. I don't have any other questions. Thank you, Detective Sergeant.



MS. ROSEN: I just have a few questions.
CROSS-EXAMINATION MS. ROSEN:
Q. Lieutenant -- Sergeant, were you involved in the arrest of Lee Evans?
A. Yes.
Q. Do you know who ordered Carrega to stay in the office on the date of Evans' arrest?
A. I don't know any of that.
Q. And do you know who arrested Evans?
A. Myself and Sergeant Henry arrested Evans. I believe the other detectives there was Hadley and Murad Muhammed. And then he was transported from our location, I believe, by Lieutenant Carrega. I'm pretty positive he's the one that transports him to the county. So to say he was locked in his room would be not anything I was aware of.
Q. And how do you know that Carrega transported him?
A. I was on the scene of the arrest.
Q. So you saw him transport him?
A. I saw him depart with him. To the best of my recollection, I believe he was even at Philander Hampton's arrest, too, but I wasn't at



that location.
Q. So how do you know that he was there?
A. No, that's my belief.
Q. What's the basis for your belief?
A. We had broken up into teams.
Q. I don't understand. Can you give more information about that?
A. Well, we broke up into arrest teams who would go to what location.
Q. So you knew that he was part of arrest team assigned to that arrest?
A. I didn't write that down. That's my recollection. I believe he was the one who went to -- if I was at Lee Evans, but I also wrote that Lieutenant Carrega and other Essex County Detectives --
(Reporter requested clarification.)
A. I wrote that Lieutenant Carrega and other Essex County detectives responded to our location to transport Lee Evans to the Essex County Prosecutor's Office.
Q. And did you also write down that Carrega was part of the arrest of Hampton?
A. No, I did not.
Q. So it's just your recollection --

A. Correct.
Q. -- based on conversations with someone?
A. No, just based upon my memories of that day.
Q. Okay.
A. Whether he made it there or not, I don't know.
Q. Do you know who Evans spoke to when he was brought in?
MS. BONJEAN: Objection. Form.
Q. When he was arrested, do you know who he spoke to?
MS. BONJEAN: Objection. Foundation as well. Sorry for the late objection.
A. I'm trying to figure out like in the interview room that he was brought into, it was myself and Detective Hadley who tried to initiate an interview. I don't know if anybody had any words at all with him prior to that.
Q. And did he ask for an attorney?
A. Yes.
Q. Did he speak to an attorney at that time?
A. No.



Q. Okay. I just have a few more questions. So when you were first assigned to the case in May of 2008, you had said that Carrega had identified Evans as a lead suspect. How do you know that Carrega had said that he had Evans as a lead suspect at that time?
A. Because that's what he discussed with me.
Q. Do you remember when he discussed that?
A. We spoke that day on May 8th. We had a short conversation there and then set up our meeting as well and then called me -- or on May 2nd. May 8th he called my about Philander Hampton, and then we had a meeting on the 9th.
Q. And do you have notes to that effect?
A. I have reports to that effect.
Q. Okay. And how do you remember after that meeting that Carrega asked you to look into information about Philander Hampton?
A. Because I took notes of the conversation, the information about Philander Hampton, and then memorialized it in my report.
Q. You had said earlier that Carrega probably told you about the psychic. Why do you think it was Carrega that had told you that



information?
A. That's just a probably. Because he was intimately involved with the case. I don't know who did, but I'm just surmising it was him, so it's not a yes or no. I don't know who.
Q. Is it possible that you got that information from someone else?
A. It's possible, yes.
Q. So you had said earlier when -- on November 12, 2008, that Carrega would know whether Hampton consented to go to Newark. Why did you say that?
A. I guess that would be -- he was the one who organized it, so he would be the one to discuss that with. I don't have --
(Reporter asked for clarification.)
MS. BONJEAN: He said he didn't have a report written by him or notes; right?
A. Yes. He was the one who was organizing the whole thing. So someone there, whether it's Carrega or not, obtained that consent, verbal or whatever, to go on to Newark.
Q. It could have been someone other than Carrega, though?
A. Correct.



Q. And how do you know that Hampton went in the vehicle with Carrega to Newark?
A. Because he told me.
MS. ROSEN: Those are all my questions. Thank you.
MS. BONJEAN: I just have maybe one other two based on that, unless someone else has. I don't know if there's anyone else?
MR. LIPSHUTZ: I have nothing else.
MS. BONJEAN: Okay. And does Sergeant Tietjen's attorneys have anything for him?
MR. DIFRANCESCO: No, we have no questions.
REDIRECT EXAMINATION BY MS. BONJEAN:
Q. I just want to be clear on something. You were asked to assist in this investigation by Lieutenant Carrega; is that right, Sergeant?
A. Yes.
Q. And there were other officers who were assisting in the investigation; correct?
A. Yes.
Q. And whether we call it a team or whatever word you want to use, there were a number of you working and collaborating together to

investigate this cold case in order to bring it to a conclusion; correct?
A. Correct.
Q. And it's your understanding that both Detectives Hadley and, I guess, Sergeant Henry were part of this group that was working together to solve the case of the five missing boys; correct?
A. Correct.
Q. And, in fact, all of you individuals had different tasks that you were assigned to do with the goal of solving the case of the five missing boys; right?
A. Yes.
Q. And at the time that -- you testified to this. But at the time you came on the case, they were presumed dead, or at least certainly after you did your initial Experian look at the case, they were presumed dead; is that right?
A. Yes.
Q. And all the individuals I just mentioned were, in fact, present for Philander Hampton's statement, including yourself; correct?
MR. VOMACKA: Objection to form, but you can answer.
A. You'd have to -- all of them. Let's go



over the names again. Henry, Hadley, Carrega, and myself; is that what you're saying?
Q. Yes.
A. Yeah, we were all present. Henry was not in the room. Whether he was actively monitoring the video on a monitor or outside or not, I don't know.
Q. Okay. And ultimately, I think what you said in response to Mr. Lipshutz's question was that the prosecutors ultimately made the decision to indict?
A. Yes, someone there.
Q. And the prosecutors relied on your work and your fellow officers' work in securing an indictment against Philander Hampton and Lee Evans; correct?
MR. VOMACKA: Objection to the form and foundation.
MR. LIPSHUTZ: Objection to form.
MR. VOMACKA: You can answer.
A. I don't know what was presented to get the indictment. I know I provided my case work to them.
Q. Right. Well, Philander Hampton testified before the Grand Jury. And if Philander



Hampton testified before the Grand Jury consistent with what he told you and your fellow officers, would you agree that that evidence was developed first by you and your fellow officers, Mr. Hadley, Mr. Henry, and Lieutenant Carrega?
A. Yes.
MS. BONJEAN: I have nothing further. Thank you. All right.
MR. LIPSHUTZ: Sounds like we're all done, Detective Sergeant. Nice to meet you.
Oh, by the way, I do have one question. Have we spoken before or met or talked before, Detective Sergeant?
THE WITNESS: I don't know. I mean, it's -- I don't recognize you.
MR. LIPSHUTZ: Okay. Thank you. That's all.
MR. VOMACKA: Thank you, Audrey.
MS. BONJEAN: Thank you, Audrey.
THE VIDEOGRAPHER: The time is 5:16. This concludes the deposition.
MR. LIPSHUTZ: Oh, I'd like a copy of the transcript.
(Concluded at 5:44 p.m.)



CERTIFICATE OF OFFICER

I CERTIFY that the foregoing is a true and accurate transcript of the testimony and proceedings as reported stenographically by me at the time, place and on the date as hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney or counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

AUDREY ZABAWA, C.C.R.
Certificate No. XI01410

I, WILLIAM TIETJEN, JR., have read the foregoing transcript and hereby certify that it is a true and accurate transcript of my testimony.

WILLIAM TIETJEN, JR.

Sworn and subscribed to before me
this day of , 2020.

A Notary Public of the
State of .
My Commission Expires:

## [

**[sic] (4)**
151:3,3;235:12;310:4

## A

**abandoned (3)**
191:20;195:18;269:8
**abide (1)**
224:20
**abided (1)**
225:10
**ability (9)**
7:12;17:8;33:7;56:19;155:2;199:8;202:4;216:15;286:11
**able (47)**
17:7;52:16;88:20;110:16,18,22;115:18,19,24;116:5,11,18;121:11,19;127:13;128:4;132:6,24;133:2,17;134:5;139:25;142:13,17;147:24;154:25;155:6;160:17;162:5;167:21;173:16;174:14;176:13;177:3,24,25,25;204:13;229:25;230:2;247:24;258:24;266:11;270:17;294:5,10;301:20
**above (3)**
27:12;41:20;226:10
**academy (8)**
14:1,3,5,8,11,13,16,22
**accelerant (1)**
276:21
**acceptance (1)**
13:25
**accepted (3)**
13:24;61:25;63:2
**access (2)**
51:12;199:8
**accessible (1)**
260:4
**accident (1)**
6:16
**accidental (1)**
265:7
**accidents (1)**
15:10
**accomplish (1)**
96:19
**according (13)**
48:2;84:20;85:23;107:1;113:7;131:4;175:25;233:22;234:3;238:19;278:8,19;296:25
**account (4)**
111:9;287:17;288:12;298:22
**accounts (1)**
118:8
**accurate (8)**
25:20;26:13;28:5;62:4,5,22;83:1;85:8
**accused (3)**
31:4;284:11;301:10
**accusing (1)**
140:10
**acquitted (1)**
310:6
**ACS (2)**
180:6,15
**act (1)**
143:2
**acting (1)**
27:24
**actions (3)**
29:15;228:16;258:21
**active (9)**
99:11;123:19;203:14,17,23;204:2,9,10;250:21
**actively (4)**
45:2;136:25;159:3;318:5
**activity (1)**
36:20
**actual (6)**
74:12;175:20;212:10;251:5;277:8;278:14
**Actually (46)**
11:11;35:14;53:13;58:23;60:12;64:17;76:7,19;83:8,10,25;84:19;102:25;104:12;106:8;107:3;108:8,19,20;110:11;116:5;122:17;125:9;126:16,22;139:6;151:18;160:1;165:19;169:5;193:1;224:7;233:2;244:15;246:6;247:6;251:4,10;267:13;268:12;270:8;274:22;294:6;296:7,14;307:11
**add (1)**
155:11
**added (1)**
292:23
**addition (2)**
23:24;220:21
**additional (14)**
24:1;44:15;51:3,11,13;54:17,24;57:13;124:3;158:21,22;217:21;281:17;302:22
**address (8)**
9:12;49:14;97:18;194:3;241:14,19;251:8;286:4
**addresses (1)**
241:13
**addressing (1)**
203:7
**adds (1)**
264:10
**adept (1)**
259:21
**administer (2)**
61:6;248:13
**administered (4)**
60:23;61:22;62:6;170:25
**administering (2)**
60:3,12
**administration (2)**
12:6,9
**admissible (2)**
172:5;294:11
**admission (3)**
255:10;298:5,7
**admit (2)**
178:17;276:17
**admits (1)**
256:7
**admitted (4)**
155:10;211:10;228:8;253:14
**admitting (1)**
202:2
**adopted (1)**
146:6
**adults (1)**
276:6
**advance (2)**
4:8;98:20
**advanced (1)**
124:3
**advised (16)**
50:1,16;51:5;67:18;70:8;130:7;141:9;178:18;179:2,6;185:5,7;188:9,11;208:3;230:23
**advises (1)**
164:21
**advising (2)**
211:1;250:10
**affect (1)**
232:19
**affidavit (6)**
294:19,20;295:3,6,17;298:2
**afield (1)**
111:5
**afternoon (6)**
28:13;184:15,16,17,18;248:2
**afterwards (1)**
112:3
**again (55)**
8:15;12:8;17:7;18:22;20:5,12;29:5;32:19;39:14;41:2;47:17;51:3;53:12;56:20;58:7;61:3;72:13;74:3;76:23,24;79:17;84:11;85:17;86:3;98:11;103:12;105:23;106:5,7;119:24;123:22;126:11;127:20;151:21,25;177:22;178:8;187:3;196:8;214:13;215:19;221:19;222:25;227:19;238:20;242:13;256:24;263:12,12;274:3;279:8,12;289:6;294:9;318:1
**against (6)**
7:9;67:5;157:3;290:2;299:21;318:15
**age (4)**
53:4,4;89:9;159:15
**agencies (7)**
13:14;19:20;80:1;90:24;91:2;109:6;248:24
**agency (13)**
19:7,13,14,17;43:11;61:14;88:23;91:7;223:3,3,16;226:5;248:24
**agency's (1)**
90:20
**Agent (8)**
63:7;68:11,17;131:24;152:2;186:10;243:10;275:6
**ago (10)**
6:16;30:11;127:20;240:7;276:25;284:22;285:2,10;302:1,9
**agree (40)**
59:23,25;64:3,14;78:1;80:10;84:20;90:5;99:10;100:2;102:15,21;104:8,14;107:8,9,15;108:21;129:5,19;145:7,11;146:1;154:12;156:24;157:12;196:24;197:8;200:18;243:4;253:9;255:21;256:5;260:18;266:20;288:12;292:12;293:21;296:14;319:3
**agreed (6)**
44:1;49:24;169:14;270:22,24;288:16
**ahead (6)**
34:7;90:7;114:18;179:1;224:14;245:2
**ah-hah (2)**
266:17,19
**aid (1)**
170:3
**air (1)**
251:23
**Akbar (3)**
138:19;139:13;169:13
**Alcohol (3)**
23:15,16,19
**Alert (2)**
11:3;262:10
**Alerts (1)**
11:5
**aliens (1)**
195:2
**alive (8)**
48:14;49:16,17;149:20;155:5;168:11;169:23;275:22
**allegation (2)**
302:7,18
**allegations (1)**
7:7
**alleged (1)**
138:5
**allegedly (9)**
58:9,16;109:19;129:15;148:9;161:1;194:4;240:4;287:10
**Allison (1)**
84:12
**allow (1)**
99:15
**allowed (1)**
89:13
**almost (1)**
31:20
**alone (2)**
263:5,7
**along (4)**
29:17;31:6;275:2;279:9
**alter (1)**
62:1
**alternate (3)**
163:9,10;235:13
**although (1)**
148:10
**Alvin (16)**
128:13,14,16;130:9,10,25,25;131:9,11;132:8;133:6;135:12;153:13;154:15;155:1;167:22
**Alvin's (1)**

134:6
**always (16)**
10:20;75:19;91:11;106:1;115:6;120:7;128:14;159:10,16;162:10,15;163:9;194:24;250:25;265:6,7
**Alzheimer's/dementia (1)**
89:11
**amazingly (1)**
136:10
**Amber (3)**
11:3,4;262:10
**ambiguous (1)**
307:18
**Ambrose (1)**
307:3
**amount (6)**
119:9;154:1;158:17;255:14;262:3;292:20
**analysis (1)**
53:2
**and/or (5)**
90:20;96:7;105:20;221:11;290:16
**annoyed (1)**
158:13
**answered (8)**
108:9;112:23;184:4;217:9;222:25;227:9;270:23;273:1
**Anthony (1)**
307:3
**anticipate (1)**
9:4
**anymore (1)**
278:8
**AP (1)**
288:2
**Apart (14)**
6:23;10:24;24:7;27:6;44:20;57:5;105:17;111:6;112:19;116:14;117:7;132:22;140:10;182:7
**apartment (3)**
149:18;152:8;167:3
**apologies (5)**
84:1;96:4;274:8,14;288:22
**apologize (1)**
4:8
**apparently (3)**
154:15;200:21;237:22
**appear (3)**
28:5;71:15;84:14
**appearance (2)**
231:21;254:19
**appearances (3)**
4:15;52:22;53:5
**appeared (7)**
133:5;134:16;157:25;238:4,5,8;254:8
**appearing (2)**
5:9,17
**appears (1)**
73:17
**application (3)**
13:16;16:13;295:21
**applied (1)**
13:16
**apply (1)**
13:13
**appreciate (2)**
221:8;271:23
**approach (1)**
97:5
**approval (5)**
89:3;210:6;212:14;234:17;235:25
**approvals (2)**
156:10;230:6
**approved (1)**
78:14
**approving (1)**
11:4
**Approximately (7)**
15:1;17:24;20:1,8;107:12;233:24;300:23
**April (4)**
84:5;263:21;292:22;303:10
**area (8)**
19:8;21:3;192:23;236:5;240:18,19;243:23;268:3
**areas (2)**
19:19;36:13
**Argued (1)**
158:9
**arguing (1)**
223:25
**Argumentative (12)**
107:17;164:16,18;166:7;182:19;192:3;202:20;224:12;255:3;296:6;297:18;298:17
**around (34)**
21:13;32:8;36:15;37:13;53:14;54:19;104:24;105:16;107:2,13;109:24;110:3;116:17;117:9;118:15,15,22;140:14;151:4;161:2;162:19;168:2;184:23;185:18;188:10;203:10;210:6;212:12;213:21;214:23;234:5;261:9;263:13;289:23
**arranged (1)**
181:3
**arranges (1)**
182:10
**arrest (41)**
98:4,10;103:6;121:16,24;163:7,25;230:17,19,20;231:1,2;232:18,22,25;253:1,11;255:5,18,24;256:3;257:14;261:5;294:21;295:3,9,21;301:22;307:25;308:5,18,24;309:8;311:5,8,21,25;312:8,11,11,23
**arrested (21)**
103:7;115:3;172:18;179:17;231:9;253:17;256:20,21,22,23;259:5,9;263:10;273:14,16;280:23;287:7;301:16;311:10,11;313:12
**arrests (2)**
122:14;230:23
**arrival (4)**
217:22;233:9,21;270:5
**arrive (2)**
215:6;217:19
**arrived (22)**
185:14;186:2,11;187:12,17;204:25;205:11;214:10,10;216:21,22;217:4;227:25;229:18;230:2;233:8,25;234:5,19;237:18,19;240:12
**arriving (2)**
234:21;239:11
**arson (1)**
263:4
**article (4)**
40:20;252:6;263:17;268:14
**articles (1)**
66:5
**articulate (1)**
244:15
**Ashley (2)**
6:2;80:9
**aside (6)**
28:9;60:25;86:3;104:4;230:15;247:24
**aspect (17)**
45:15;90:25;91:13;97:16;124:21;125:24;133:13;140:18;144:24;149:2;171:21;217:13,14;220:13;279:2;286:20;305:10
**aspects (12)**
82:17;91:19;92:14;99:24;103:18;113:1;125:17,18,21;162:2;278:11;279:23
**assault (1)**
222:17
**assigned (25)**
11:6;14:19;15:4;16:25;18:7,8,9,14;20:21;21:3;22:18;41:4;81:8,10;82:25;88:10;89:6,18;279:4;305:5,8,10;312:11;314:2;317:10
**assignment (10)**
14:17,25;15:3,13,21;16:7,19;110:10;288:6,6
**assignments (5)**
11:12;23:12;28:4,6;288:7
**assist (13)**
51:9;64:10;69:18;90:24;91:2,5,18;176:14;235:23,25;269:22;280:24;316:17
**assistance (8)**
18:13,17;33:19;42:25;43:7,8,14;63:2
**Assistant (6)**
5:1;10:18;42:14;89:23;281:7;309:4
**assisted (1)**
302:11
**assisting (1)**
316:21
**associate (2)**
6:2;153:2
**associate's (1)**
12:12
**assume (16)**
7:20;9:17;13:21;14:16;27:2;37:13;41:4;88:17;89:4;90:13;187:4,20;189:20;228:20;229:9;284:10
**assumed (2)**
48:15;192:18
**assuming (5)**
141:14;187:9;199:8;223:12;242:14
**assumption (2)**
53:13;271:4
**assure (1)**
104:10
**at- (1)**
264:4
**Atlantic (3)**
161:6,11,11
**ATS (1)**
180:16
**attempt (4)**
98:3;159:1;179:18,21
**attempts (2)**
70:8;109:9
**attended (2)**
17:22;306:20
**attention (3)**
84:3;128:20;270:7
**Attorney (9)**
5:8,13;6:3;40:12;164:21;226:8;283:6;313:21,23
**attorneys (3)**
8:21;29:22;316:11
**audio (10)**
47:24;103:4,12,17;219:9,16;220:1;227:14;247:2;277:23
**audiotape (2)**
219:17;238:7
**Audrey (5)**
24:23;34:12;246:8;319:18,19
**August (16)**
85:6;106:10;107:2,3,4;109:19,21;110:10,11;193:10;228:25;264:4,7;267:18;295:18,24
**authored (1)**
35:9
**authority (4)**
21:4;88:15;156:4;183:10
**authorization (5)**
90:12,14,18;307:25;308:8
**authorize (1)**
90:10
**Automated (1)**
180:15
**Automatic (1)**
180:16
**available (11)**
66:3;67:19;169:23;188:15;263:13;285:5;292:8,14;296:3,8,16
**Avenue (5)**
85:13,13,14;164:14;285:23
**avenues (3)**
92:14;164:11,13
**average (1)**
291:8
**Aviles (1)**
262:10
**aware (29)**
45:19;89:8;95:24;103:25;112:2;125:7,8;174:22;179:22,23;189:5;192:16,22;202:23;217:12;221:10,23;224:19;229:8,10;250:19;

276:12;280:14;294:4;301:25;302:4;310:5,6;311:18
**awareness (1)** 226:12
**away (9)** 39:14,18;120:17,20;237:11;253:15;263:10,16;288:4

## B

**Bachelor's (3)** 12:5,11,13
**back (84)** 4:9;11:13;28:16;37:3,14;38:22;41:22;45:24;58:13;61:15;66:4;71:13;72:17;76:16;84:14;91:14,15;99:15;102:4;103:8,9,19;111:6;113:15,20;114:12;116:4;120:23;127:20;128:5;129:14;130:1;132:13;134:10,10,14;142:5;144:9;147:4;151:4;154:7;161:11,21;162:3;165:16;173:21;174:17;183:15;191:18;192:13;194:8,10;197:8;198:3,12;200:5;201:7,9;209:16;210:6;214:25;218:20;220:6,12;223:6;228:24;235:22;236:19;240:20;242:6;244:2;250:21;259:15;266:1,3;269:7;274:4;282:11,15;283:16;285:2;293:5;299:17;304:11
**backed (3)** 166:18,21,24
**background (5)** 4:8;207:24;241:11;248:25;295:13
**backup (1)** 306:5
**bad (1)** 88:8
**badly (1)** 309:15
**bag (5)** 153:19,22;154:6;301:12,15
**bail (8)** 253:25;254:1,4,4,7,11,15,18
**barely (1)** 276:22
**barrel (1)** 196:3
**based (19)** 27:4;30:25;55:14;78:16;82:5;83:2;84:19;156:21;162:8;172:14,15;182:19;199:9;229:11;253:17;283:14;313:2,4;316:7
**basement (6)** 145:1;285:22;286:2,7,13;287:3
**basic (4)** 14:13;16:4,4;17:11
**basically (2)** 37:7;293:22
**basis (13)** 58:1;86:25;115:11;127:7;160:18;163:8;175:9;201:22;263:14;264:2;295:8;300:13;312:4
**Bates (16)** 24:25;34:15,22;70:16,19;73:3,7;83:23;126:8;198:18;246:13,18;294:21;303:20,22;304:14
**bathroom (2)** 245:13,17
**bear (1)** 21:24
**bears (1)** 34:22
**beat (2)** 143:17;257:21
**became (14)** 24:1;33:12;41:17;69:25;91:8;123:12,13;125:8;135:9;179:21;189:5;250:19;257:10;258:14
**become (7)** 27:20;80:17;89:8;103:25;199:7;211:5;259:20
**becomes (1)** 90:25
**becoming (1)** 199:17
**began (2)** 222:7;249:10
**begin (1)** 6:10
**beginning (8)** 41:10;67:21;120:8;244:13,14,19;245:4;266:1
**begins (3)** 76:16;147:4;198:12
**behalf (2)** 5:9,17
**behold (1)** 261:22
**belief (11)** 41:24;68:5;112:16;148:4;175:17;190:3;191:9;276:3;310:10;312:3,4
**belittling (1)** 265:9
**bell (1)** 116:7
**below (1)** 286:14
**benefit (3)** 163:18,23;290:17
**benefits (1)** 290:12
**Bergen (8)** 85:13;192:8;194:8,10;242:7;251:9;266:13;293:6
**best (29)** 4:10;7:12;9:1,7,9;17:7;24:8;33:7;56:19;65:21;68:2;77:7;85:9;91:23;106:3;141:7;143:1;174:17;179:20;180:5;211:24;214:12;216:21;217:7;219:8;267:22,23;286:11;311:23
**better (3)** 46:18;133:18;209:18
**beyond (6)** 46:4;62:2;132:3;197:19;219:4;226:10
**big (5)** 87:17;115:5;234:19;236:10;276:15
**Bill (1)** 125:19
**binder (1)** 37:5
**binders (1)** 38:24
**bit (16)** 29:10;33:4;56:13;114:25,25;119:13;138:16;141:14,23;142:18;143:7;165:19;177:13;258:6;270:16;277:7
**black (2)** 102:11;130:8
**blank (1)** 37:8
**block (1)** 94:22
**blood (2)** 143:19;145:3
**bloody (9)** 141:11;144:9;148:20;149:7;150:3,9,14,23,25
**board (2)** 16:14,14
**Bob (28)** 116:7,11;139:16,19,22;140:1,1,9,12,19,24,25,25;141:4,4,5;155:16;158:7,20;159:7;161:20;162:6,19;164:25;165:1;167:10,12;168:1
**bodies (13)** 150:4,8;165:23,24;166:1,5,12;197:24;251:18;272:18;286:5,6;287:2
**BONJEAN (46)** 4:4,17;5:19;6:1,7,9;24:22;28:14,25;29:1;31:18;34:10;48:1;64:6;67:14;70:10;76:6;88:8;146:20,23;182:17,24;189:17;198:14;221:17,20;223:21;246:5,10;247:13;265:19;299:7,18;302:21;303:22;305:2;308:11;309:11;313:11,14;315:17;316:6,10,15;319:7,19
**B-O-N-J-E-A-N (1)** 4:18
**Booker (1)** 5:4
**bosses (2)** 235:25;263:9
**both (7)** 52:12;89:18,18;212:2;264:25;295:22;317:4
**bottom (9)** 34:23;35:23;70:20,24;77:21;84:4;141:16;198:24;200:10
**bought (3)** 167:8,8,12
**boxes (2)** 35:21;244:25
**boy (2)** 264:19,20
**Boykins (5)** 169:13,18,20;170:2;175:4
**boys (107)** 33:5,13;40:1,19;46:23;48:5,14;53:5,9;57:3,6;58:9;63:5,17;64:18;69:7;71:18;72:18;75:5;77:25;96:6;104:24;105:5,16;106:4,9;107:7,12,22;108:8,23;109:11,19;110:17,18;111:9,10,15,16,24;112:6,7,7,10,17;113:7,11,24,25;114:7,23;115:13;116:15,17;117:9,21;118:6,16;120:14;129:21,22;139:17;140:14;141:12;143:17;147:13;149:17;150:2;159:12;161:1;167:4,9,22;168:2;188:21;190:13,16;191:15;192:16,17;193:24;194:4,16;195:12;196:7,23;197:2,4,16;200:14,23;212:9;213:8;228:24;231:10;250:17;251:17;253:2;275:13;276:4,16;291:22;295:17;296:9;310:21;317:7,12
**boys' (8)** 52:4,21;57:18;152:20;160:19;197:24;211:14;212:3
**boy's (2)** 115:15,25
**break (22)** 4:13;8:4,7;70:11,12;76:8,11,14;87:15;146:13,19,22,24;147:2;198:4,10;208:11,11,15;218:19;265:24;299:15
**breakdowns (1)** 106:13
**breaking (2)** 119:15;167:17
**break-ins (2)** 119:11;120:25
**Breathalyzer (1)** 23:20
**bring (11)** 20:9;76:3;101:17;102:7,13;103:8,19;111:6;156:5;299:21;317:1
**bringing (2)** 103:9;259:14
**broke (10)** 88:4;115:22;116:21,23;117:18;119:24;123:12;223:5;274:7;312:8
**broken (3)** 111:16;123:12;312:5
**Brooklyn (2)** 4:7;237:7
**brother (1)** 138:18
**brought (28)**

7:8;30:21;32:14;33:16;149:6;150:4;155:21;161:9;178:12;181:14;182:4,11;183:11;184:7,9,11,19;185:10;186:19;187:10,16;208:2;243:21,21;253:24;254:17;313:10,17
**brown (2)**
65:22;262:4
**Brunswick (1)**
13:19
**building (17)**
141:11;143:24;148:21;149:18;194:3;236:6,10;242:6;243:20;268:12,15,24;269:14,16;272:19;276:19;310:22
**buildings (5)**
267:22,24;269:8,17;297:9
**bunch (1)**
253:8
**bureau (1)**
212:15
**burglaries (1)**
18:25
**burglary (2)**
19:6,11
**buried (3)**
191:19,20,21
**burn (1)**
143:23
**burned (4)**
145:14;196:3;232:20;233:18
**burning (1)**
269:8
**business (2)**
148:19;252:3
**buy (1)**
144:10
**bystander (1)**
229:12

## C

**cadaver (1)**
286:12
**call (51)**
25:9;73:1,1;75:13;90:10;97:11;120:22;138:22;184:20;185:2;196:7;206:11,15,21,23;207:5,10,12,14,21;208:10;209:16;211:19,25;212:7,10,18,19,21,25;213:10,23,23;214:14,17;215:1,3,6;234:4;235:17,22;253:12;262:8,11;270:22,23;280:9;288:8,9;294:23;316:23
**called (19)**
4:1;18:19;34:1,4;98:15,16,17;184:23;200:12;203:22;209:21,21;211:13;234:16;270:12;272:25;273:6;314:12,13
**calling (7)**
43:10,11;62:14;75:24;116:6;140:2,12
**Calls (13)**
137:19;139:23;140:13;162:7;202:5;207:9;208:22;209:3,25;225:4;235:15,19,21
**calm (1)**
100:5
**Camden (14)**
194:5;241:4,16,21;251:7,12;252:8,15;263:3,5;266:9,13;267:21;296:22
**came (26)**
28:2;53:23;54:1;59:6;61:6;62:4;123:22;130:9;131:8;132:6;133:17;134:11;154:8,12;161:11;178:5;232:21;241:14;252:4;256:6;272:17;273:1;297:22,24;301:20;317:15
**camera (2)**
146:10;232:1
**can (167)**
7:4;8:9,13;9:1;17:16,16;24:6;26:4;28:8,24;29:21;30:3;32:5;33:8;34:8,17;35:6;36:11;39:23;40:12;44:21;51:3;63:13;67:17;68:16;69:10,12;70:12;71:4,20;75:17;76:7;78:1;79:12;83:5;85:11;86:2;87:6,15;88:20;89:14,18;92:2;97:3;99:21;102:13,22;104:10;105:8,18;107:19;108:11;109:1;111:1;112:3;114:23,25;115:7;117:10;118:10,18;121:23;123:8;127:5;129:19;132:10;134:18;136:9,16;138:9;145:11,22;149:15;151:15;152:16;154:8;156:8;157:10,22;163:3,21;164:7,12,18;166:7,9,15;168:16;172:14;174:9;176:20;178:24;179:11,19;180:12;181:8,13;182:20;183:3,14,14,15;184:4;185:4;186:23;188:7;189:1;192:21;195:6;197:6;198:4;202:20;211:25;215:11;217:9;219:12;220:18;221:18;222:25;224:12,14;225:4;226:9;227:9;229:7;235:22;236:18;237:8;239:1,13;243:24;244:20,22;246:6;251:24;255:17;261:16;262:15,24;264:9;267:4;276:22;278:17;283:11,14,22;284:18;287:21;288:12,14;292:10,17;293:3;294:14;297:19;298:17,24;299:5,9,11,12;303:4,13;310:16;312:6;317:24;318:20
**Canady (2)**
124:7,25
**capable (2)**
215:9;218:12
**capacities (1)**
10:10
**capacity (1)**
27:24
**capture (1)**
103:16
**car (11)**
102:9,9,11;135:4;214:23;233:3,4,5,6;238:23;240:2
**care (7)**
99:18;159:2;224:7;225:20;236:10;246:25;285:17
**career (2)**
17:1;25:16
**Carrega (149)**
5:18;32:24;33:17,21;34:1;42:10,21,24;43:16,24;44:22;46:9;48:12;49:23;50:1,5,12,20;51:2,16,24;53:18;55:16,17;56:24;58:6,20;59:5;62:19;63:10,17;64:16,22;65:9,13;67:8;69:5;74:24;86:17,22;87:25;88:14;91:17;92:6;94:1,12,24;95:6,16,19;96:17;99:5;104:19;124:21,24;125:23;126:12,20;131:25;152:2;169:19;173:23;174:6;175:13;176:10;177:3;178:11,18;181:2;182:10;183:5;184:21;185:6;186:7,18;187:2,25;188:4,16,23;189:9,19;196:11;203:3,24;206:6,11,17;208:10;209:6,9,21;210:12,17;211:10;212:1,1,22;216:17;228:22;229:16,21;231:15;232:13;233:16;238:20;239:3,9,20,21;240:10;242:13,14;243:13;245:7;246:21,25;247:17;248:3;249:5,8;258:5;278:7,22;285:21;294:18,20;295:7,14;305:7;307:5;311:7,15,19;312:15,18,23;314:3,5,18,23,25;315:10,21,24;316:2,18;318:1;319:5
**Carrega's (8)**
124:10;127:1,17;153:5;176:17;227:21;228:12;233:3
**case (197)**
6:3,15,22,24;20:21;21:5;30:10,18,22;31:7;32:2,18;33:16,20;35:18;39:2,7,7;40:18;41:4,24;43:5,7,14;44:4,6,8;45:13,14,17,20,24;46:2,6,7,11,20;51:21;55:18,21;56:18;57:1,2,9,20;59:9;60:25;61:9;62:22;64:13;65:8,14,20;66:1,2,10,20,22,24;67:10;68:10,10;70:4;72:10,15;74:11,14,18,20,25;76:25;79:15,19;80:7;85:19,23;86:16,18,23;87:17;88:21;89:14,20;90:6,14,15,19;91:13;92:21;93:12;94:13,15,20,25;95:23;96:1,3,11;97:8,17;105:9,15,15,24;116:4;120:2,3,5,5,8;121:3;134:19;142:21,22;143:10,11,16;147:8;158:15;159:2,6;163:8,14,23;164:3,9;165:16;169:21;170:21,23;189:22;191:23;193:4;196:12;197:12;199:18;202:17;208:1,5,11;219:21;220:23;221:24;225:22;228:9;243:8;253:18;255:13;257:18,19;261:8;262:10;263:12;264:7;273:18;278:9,12;280:12;281:8;282:18,21,22;284:13;286:6;287:23;289:8;290:13,18,24;292:7;293:16;299:22;302:2,10,11,13;304:16,17,21;305:10,13,16,19;306:3,4,8;308:23;309:5;310:17;314:3;315:3;317:1,7,11,15,18;318:22
**cases (26)**
17:15;19:16;38:25;46:3;64:11;75:13,24;88:17;89:6,7,12,18,19,19;90:23;91:3;96:5,6,12;106:1;119:6;162:4;220:8,25;222:14;262:9
**Cassian (3)**
249:12,13,23
**cat-and-mouse (1)**
176:9
**Cathy (2)**
124:6,25
**cause (7)**
150:2;253:11;255:9,16,19,23;295:9
**caused (1)**
116:24
**causes (1)**
251:21
**cell (5)**
243:23,23;270:9;274:12;279:12
**certain (11)**
46:4;82:8;87:11;92:14;125:18;160:4,4;161:24,25;262:20;279:23
**certainly (30)**
61:23;86:19;89:13;97:7,17;98:1,22;99:13;119:3;125:1;133:2,19;134:18;135:9;137:8,21;154:5;164:12;202:1;206:5;210:9;217:12;229:2;231:20;234:11;250:25;266:22;281:7;284:19;317:16
**certainty (1)**
214:19
**cetera (1)**

52:18
**chain (1)**
89:3
**chance (3)**
30:14;73:23;176:16
**change (8)**
16:9;146:21,24;161:3;220:11;265:20;310:8,17
**changed (10)**
115:1;158:12;161:10,15,16;163:12;220:7;222:8;225:18;289:23
**characterization (2)**
35:25;163:5
**characterize (2)**
77:3;87:14
**charge (6)**
45:7,10;87:25;91:7;255:5;281:16
**charged (25)**
230:21;253:15,20;256:20;259:9;261:3;271:1,5,8,11,17;272:10,14,15,18;273:2,5,12,12,14,23;280:23;281:3;287:7;291:9
**charges (6)**
121:25;230:22;231:9;259:13;290:2;299:21
**chart (1)**
58:22
**charts (2)**
60:16;61:20
**chat (1)**
98:5
**check (4)**
183:6;203:24;288:10;299:9
**checked (7)**
48:18;79:11;84:21,24;85:3,12;244:24
**checks (1)**
203:25
**Chief (6)**
5:2,5;32:16,17,20;307:2
**children (7)**
119:2;145:14;237:24;238:12;254:25;258:10;276:5
**choose (3)**
88:22;125:25;178:15
**chose (1)**
125:25
**Christian (3)**
234:12,15;236:14
**circle (1)**
151:5
**circumstance (1)**
61:5
**circumstances (1)**
33:15
**cities (1)**
119:12
**City (14)**
5:2,3;79:9;120:21;161:6,11,12;193:5;197:19;250:21;252:4;257:24;269:7,11
**civil (12)**
6:15,22,23;7:8;13:9,11;32:13;285:1;301:24,25;302:2,19
**civilian (1)**
300:21
**clarification (27)**
21:25;31:17;42:3;62:13;64:5;69:14;74:8;92:5;102:2;112:8;131:19;134:13;147:17;170:22;180:8;191:2;201:11;203:21;234:14;254:6;257:22;265:1;272:22;298:6;301:14;312:17;315:16
**clarify (2)**
36:12;68:19
**Class (13)**
4:23;9:23;10:14;16:23;17:21;24:13,16;25:25;27:11,18,20;101:22;301:8
**classes (2)**
16:24;26:8
**classroom (3)**
100:19,20;101:12
**clean (3)**
143:20,22;144:10
**clear (13)**
50:24;53:21;104:21;144:13;149:15;167:25;176:21;179:25;196:11;217:4;226:3;293:18;316:16
**cleared (3)**
79:16,19;143:11
**client's (1)**
5:20
**close (5)**
55:10;77:25;178:2;191:5;213:14
**closed (2)**
143:11;289:8
**closely (1)**
11:13
**closer (2)**
106:15;209:17
**closet (8)**
143:18;149:17;275:14;276:11,15,15;277:4;279:24
**clothes (9)**
144:10,11,11;145:17;148:21;149:7;150:9,10,11
**clothing (13)**
141:11;143:19,20,23;144:8,23,25;145:3;150:3,7,14,23,25
**clue (14)**
136:2;142:24;143:3;163:6;190:13,19;198:1;201:7,14;205:13;218:2;225:18;267:15;292:11
**coat (1)**
39:12
**Cohen (2)**
6:2;80:9
**co-investigation (1)**
306:6
**Cold (27)**
45:13,17,20,24;46:2,6,7,20;70:5;88:17;91:13;94:15,19,25;95:23;96:1,6,11,11;197:11;304:16,17,21;305:10,13;306:8;317:1
**collaborating (1)**
316:25
**colleagues (4)**
83:18;97:11;130:20;196:6
**collected (1)**
52:14
**collection (4)**
70:21;71:9,16;76:19
**collective (1)**
41:24
**college (1)**
12:15
**comfortable (2)**
127:16;171:8
**coming (8)**
14:22;162:6;189:3;203:6;241:20;266:17;273:20;292:22
**command (1)**
89:4
**commencement (1)**
247:21
**commences (1)**
245:22
**comments (1)**
253:7
**committed (1)**
119:7
**committing (2)**
136:11;143:2
**common (3)**
18:22;19:1;261:10
**communicate (4)**
212:1;270:18;271:17;272:9
**communicated (12)**
44:17;64:16;188:23;189:19;208:14;210:12;212:23;213:17;214:1;239:8;240:23;282:5
**communicating (1)**
276:9
**communications (3)**
29:21;188:3;291:6
**communities (1)**
18:20
**company (2)**
296:9,10
**compared (1)**
52:4
**competence (1)**
60:2
**competitive (1)**
16:16
**complaining (1)**
31:2
**complaint (6)**
7:8;30:9,23;31:1;180:10,15
**complaints (2)**
300:6,21
**complete (8)**
7:11;8:10;9:7;72:11;79:10;86:16;205:22;216:23
**completed (5)**
9:5;18:6;54:20;125:20;216:20
**completely (3)**
163:4;195:22;226:11
**completion (1)**
54:7
**complex (2)**
131:24;152:8
**complied (2)**
226:16,21
**component (1)**
278:12
**computerized (2)**
201:9;204:12
**concept (2)**
45:23;164:4
**concern (13)**
92:14;110:6;115:3,6;164:24;170:20;250:20;251:19;252:1;263:16;280:20;281:1;283:13
**concerned (11)**
110:5,8;176:22;252:1;257:18;259:4,6,11,16;279:21;280:2
**concerning (1)**
218:7
**concerns (2)**
55:18;90:23
**Concluded (1)**
319:24
**concludes (1)**
319:21
**conclusion (4)**
60:24;162:8;217:7;317:2
**conclusive (2)**
172:8,12
**conclusively (1)**
107:14
**concrete (1)**
286:15
**concur (1)**
61:21
**conduct (3)**
17:19;19:5;77:15
**conducted (13)**
51:22;59:10;60:21;65:7;66:9;104:18;140:18;168:23;172:2;214:15;216:17;217:6;220:2
**conducting (11)**
14:7,12;16:20;20:16;24:8;79:1;94:19,25;100:15;104:7;126:16
**confer (1)**
280:4
**confessed (2)**
250:5;261:7
**confesses (1)**
258:9
**confessing (3)**
242:22;257:1;272:18
**confession (3)**
255:22,22,23
**confessions (1)**
264:22
**confident (4)**
99:20;284:2,4;292:1
**configured (1)**
233:15
**confirm (10)**
48:13,14;128:4;142:17;147:8;186:15;230:2;244:23;252:7;294:6
**confirmed (2)**
221:6;287:9
**confused (3)**
272:20,23;308:3
**connect (5)**
115:24;116:5,11;133:3;266:12

**connected (3)** 60:12;114:15,20
**connection (23)** 6:20;30:18,21; 32:13;35:24;43:5; 66:21;72:9,17;88:1; 92:12;94:25;100:15; 124:25;172:18; 218:24;220:15;231:9; 253:1;266:14;267:13; 271:18;285:1
**connectivity (9)** 4:11;47:23;96:22; 101:8;116:22;120:19; 146:7;169:12;188:8
**consent (4)** 157:17,25;231:12; 315:21
**consented (3)** 183:25;200:20; 315:11
**consider (6)** 62:10;119:23,25; 120:13;195:11,12
**consideration (1)** 94:14
**considered (4)** 13:3;97:9;137:14; 195:14
**consistent (9)** 78:24;142:21; 143:12;145:23;150:1; 151:19;286:18; 288:11;319:1
**construction (1)** 12:16
**consulted (1)** 308:15
**contact (10)** 32:3,10,21;88:14, 20;97:1;215:16; 237:18;258:15;259:2
**contacted (9)** 33:18,21;42:11,12; 43:6;47:17;49:23; 50:16;204:14
**contacting (1)** 46:20
**contained (5)** 39:9;56:21;65:25; 77:12;293:23
**contains (1)** 296:15
**contemporaneous (4)** 54:5;77:15;81:22; 209:1
**contemporaneously-made (1)** 283:9
**continuation (2)** 77:4,6
**continue (4)** 90:10;113:1; 217:12;268:6
**continued (4)** 217:17;268:23; 277:9;287:16
**continuing (5)** 17:2,4;92:8;212:25; 287:13
**continuously (1)** 39:10
**contractor (1)** 296:11
**contradict (1)** 187:6
**contradicts (2)** 148:24;149:3
**convened (2)** 187:25;188:1
**convenient (1)** 201:15
**conversation (42)** 43:20,24;44:23; 45:1;46:25;47:4,6,13; 48:17;50:12,15;75:2, 4,7,10;86:22;96:25; 98:24;99:23;103:14; 161:4;212:11;219:19; 231:19,24;232:5; 236:13,16,25;240:16; 245:8,14,15;247:4; 260:10;273:9,10,17; 274:9;281:14;314:11, 20
**conversations (16)** 29:24,25;30:4; 32:12;42:20;74:24; 191:24;196:6;203:3; 237:20;245:11;249:4; 272:13,14;299:25; 313:2
**conveyed (2)** 141:20;229:21
**co-op (1)** 306:6
**cooperated (2)** 291:3,10
**cooperation (3)** 290:13,18,23
**cooperative (2)** 271:3;277:9
**coordinators (1)** 11:3
**copies (1)** 267:9
**copy (8)** 30:11,12;65:8,14; 72:11;93:9;302:20; 319:22
**corner (6)** 70:20;83:25; 102:10,11;108:16; 251:8
**Corporation (1)** 5:1
**corrected (1)** 285:20
**Corrections (3)** 157:19;181:22; 249:18
**correctly (3)** 192:15;234:13,16
**Correglia (1)** 249:22
**corroborate (8)** 121:19;150:21; 155:1,6;253:21; 257:7;262:19;263:24
**corroborated (3)** 155:4;293:9;298:21
**Corroborating (2)** 292:24,25
**corroboration (2)** 268:18;281:16
**corroborative (1)** 169:5
**Counsel (2)** 5:2;284:11
**count (1)** 78:10
**country (1)** 262:12
**County (85)** 15:6;33:17;38:8; 44:2;45:13,20;49:25; 53:19;68:17,22; 93:16;94:2,8;95:25; 96:7;155:17;156:11; 157:19;179:3;180:21; 181:4,14,16;182:5; 183:11,16,18;184:1,9, 10;185:15,18,24; 186:3;187:11;204:25; 205:10,24;206:19; 215:7,13,21;216:4,7, 18;217:5,19,21; 219:5;221:3;223:12; 224:17,21;226:16; 227:2,13,25;230:13; 232:1;233:11;234:9, 20,24;235:2;237:3; 239:10;244:4;253:24; 254:8,14;256:13; 270:13;274:10,20; 284:16;290:1;306:5; 307:2;308:2,16,16; 311:16;312:15,19,20
**couple (6)** 87:12;108:20; 295:12;299:19; 300:16;303:7
**course (13)** 24:2;25:18;26:5; 53:13;59:19;80:17; 81:21;99:16;137:10; 252:3;293:22;297:25; 300:17
**courses (2)** 25:14;26:6
**court (8)** 8:2;172:5;189:14, 16;246:9;302:14,15; 303:18
**court-generated (1)** 180:7
**court-reported (2)** 257:1;287:4
**courtroom (1)** 181:15
**courts (1)** 180:9
**cousin (10)** 141:10;142:10,15, 15;148:20;153:12; 174:12;190:20,24; 200:7
**cousins (2)** 150:14;191:5
**cousins' (1)** 150:11
**cousin's (1)** 153:17
**cover (11)** 11:5;19:16;75:16; 80:2;81:7,8;124:20; 125:17,18;209:6; 249:1
**covered (5)** 15:5,12;19:19; 196:2;227:21
**covering (3)** 82:19;83:7,10
**covers (2)** 17:12;100:9
**crazy (4)** 136:10;144:1,3; 250:22
**create (2)** 37:15;226:10
**credit (3)** 49:1,3,13
**credited (1)** 276:3
**crew (2)** 243:14;305:22
**Crime (12)** 21:5;31:4;165:25; 229:4,21;242:23; 271:1,11,18;291:9,15; 292:3
**crimes (4)** 24:10;136:11; 222:10;256:22
**Criminal (4)** 12:1;17:11;79:1; 119:19
**critical (1)** 213:16
**critiqued (1)** 100:25
**cross (4)** 194:6,7,9,12
**CROSS-EXAMINATION (2)** 303:6;311:3
**culled (1)** 297:8
**culmination (1)** 282:14
**culpability (1)** 291:19
**culprit (1)** 290:23
**cult (2)** 120:18,21
**cultivate (1)** 291:21
**curb (1)** 137:3
**curious (1)** 263:9
**currency (1)** 301:13
**currently (1)** 9:20
**custody (12)** 156:1;172:21; 178:18;183:5,7; 188:14;208:10; 230:13;231:2;232:18; 246:25;285:17
**cut (3)** 47:24;91:16;116:25
**Cutler (20)** 139:16,19;140:1,9, 12,25;141:4;155:16; 158:7,20;159:7; 161:21;164:25;165:1; 167:10,12;168:1; 181:18,21;182:8
**Cutler's (1)** 162:8

## D

**dab (1)** 268:8
**Daily (2)** 87:8,15
**data (4)** 52:14;53:3;60:14; 297:9
**database (1)** 52:12
**databases (1)** 51:12
**date (29)** 34:3,6;41:20;42:6; 44:9;52:18,22;53:4,5; 54:7;55:12;57:3;63:8; 65:2;67:23;69:17; 71:17;77:22;84:5; 86:4;141:25;152:1; 163:12;177:20,21; 178:12;202:5,7;311:8
**dated (5)**

34:15;36:3;73:19;78:4;303:20
**dates (6)** 30:6;36:6;52:18;161:3,10;193:1
**dating (1)** 71:13
**Dave (2)** 88:13;89:23
**day (49)** 42:10;48:18;66:13;81:14,15;106:11,25;125:9;126:2;130:9,25;131:9;133:7;150:25;155:6;158:10;164:2;168:5,14,19;178:16;179:13,14;186:7;200:14;210:2;211:4;213:13;227:3;237:9;241:23;250:22;254:16;256:8;259:9;261:4;263:6;268:18;273:2,12,16;274:3,15;286:11;300:5,5;304:12;313:5;314:10
**days (9)** 64:12;108:21;109:7;134:2,17,17;136:12,19;254:13
**day-to-day (1)** 18:11
**DC (1)** 120:22
**dead (7)** 48:15;114:7;141:18;142:11;143:1;317:16,18
**deal (3)** 98:2;222:12;225:19
**dealer (4)** 123:4,10;166:25,25
**dealing (5)** 92:3;165:12;236:14;237:10;258:16
**deals (1)** 295:13
**death (4)** 52:18;57:18;147:21;193:24
**deaths (3)** 175:21;211:8;291:22
**debate (1)** 118:4
**debriefed (1)** 280:16
**debris (1)** 251:25
**deceased (6)** 11:2;72:5,6;275:17;281:25;282:7
**December (8)** 23:7;257:12;261:1;278:21;282:16;285:20,22;288:10
**decent (1)** 292:20
**decide (8)** 19:4;80:21;81:2;89:1;98:8;157:7;280:25;299:21
**decided (10)** 19:4;80:3;97:2;124:20;125:18;144:24;190:22;253:19;290:7;308:17
**decides (1)** 238:16
**decision (10)** 220:25;256:2,4;278:2;299:20,25;300:2,11,14;318:10
**decision-maker (1)** 256:4
**decomp (1)** 251:23
**deemed (1)** 172:4
**default (1)** 95:18
**Defendant (3)** 5:14,17;7:9
**Defendants (4)** 5:25;7:10;31:6,8
**defense (2)** 283:6;284:11
**definitely (16)** 70:12;96:13;127:13;174:20;175:14;201:10,12;215:16;253:10;256:5;258:4;260:9;264:12;284:13;292:23;310:19
**degree (6)** 12:4,9,11;222:10,10,11
**delay (7)** 109:8,12;234:19;235:24;282:25;283:2;292:11
**delivered (1)** 137:3
**Delk (6)** 292:22;293:4,7,8,20,20
**Delk's (1)** 263:19
**demanding (2)** 162:7,20
**DeMattia (1)** 306:25
**demise (2)** 135:16;142:25
**demolished (1)** 297:10
**demonic (1)** 265:10
**demonstrate (1)** 167:21
**demonstrated (1)** 147:12
**denials (1)** 162:9
**denied (7)** 132:1;139:10;140:25;153:1;170:24;171:10,25
**denies (1)** 200:17
**deny (1)** 173:25
**denying (1)** 171:1
**depart (2)** 232:6;311:23
**department (23)** 13:18,19;39:20;46:5;63:19;66:3;68:21;69:6,15;84:21;85:4;92:25;94:7;128:22;157:19;181:22;195:19;223:9,22;226:21;269:13;307:8;308:10
**departments (3)** 19:3;21:24;79:9
**Department's (1)** 91:22
**depend (2)** 39:8;103:23
**dependent (1)** 157:6
**depending (2)** 237:6,9
**depends (7)** 22:10;79:23;101:16;103:2;111:25;153:22;276:13
**deponent (1)** 29:2
**deposition (11)** 5:25;6:11,14,17,19;29:12,16,23;305:22;309:23;319:21
**depositions (1)** 302:3
**depth (1)** 65:24
**describe (4)** 33:15;100:4;126:25;127:2
**described (5)** 15:22;108:2;127:2;269:9;275:14
**description (1)** 200:14
**designated (1)** 17:17
**destroy (1)** 39:13
**destroyed (3)** 283:17;284:17,20
**destruction (1)** 251:21
**detail (2)** 75:19;210:18
**detailed (2)** 99:3;200:13
**detailing (1)** 211:13
**details (13)** 101:14;124:10;212:2,6,7,8,23,24;228:16;229:15,20;240:15;279:22
**detained (1)** 180:1
**Detective (81)** 4:23,24;5:4;9:23;10:13;16:1,1,12;17:10,17;18:7,11,24;21:20,21,22;24:1;26:24,24;27:2,9,11,13,16,16,16,17,17,19,21,24;28:1;31:15;32:7,13,20;63:6;68:13,20,25;69:17,20,24;71:21,22,24,25;72:22;73:18;84:15;98:4,6;104:19;127:22;144:15,17;169:9;186:5;193:4;205:17;206:2;215:10;233:23;234:15;249:12,13;275:3,3,15;302:1;303:7;304:3,8;305:12;307:3,15;309:7;310:24;313:18;319:10,13
**detectives (15)** 17:12;21:6;27:7;115:19,24;116:3;128:5;129:14;209:25;280:21;287:24;311:12;312:16,19;317:5
**determination (4)** 255:7,9,16,20
**determine (4)** 139:25;170:25;171:9;287:25
**determined (3)** 19:13;135:8;192:9
**determining (2)** 170:3;259:13
**develop (8)** 49:6;80:11;84:16;132:24;134:5;165:19;268:11;270:16
**developed (12)** 67:2,5;104:22;116:19;122:22;165:20,23;167:14;268:18;278:12;297:25;319:3
**developments (1)** 208:6
**died (8)** 53:14;191:15;192:17;196:23;197:2,4;250:17;251:17
**differ (2)** 61:21;79:5
**differed (1)** 94:6
**differences (2)** 127:11,25
**different (44)** 16:25;17:15;27:1,6;38:25;60:7,23,24;61:8;66:5;75:16,18,25;79:8;90:25;99:24;100:1,2;109:2,18;112:4;127:6,21;145:6;146:17;148:2;172:10;174:23;181:12;195:10;217:18;221:9;222:7;224:6;226:5;232:7,24;251:7;255:13;258:4;267:9,22;310:16;317:10
**differently (2)** 111:16;216:13
**difficult (1)** 241:4
**difficulty (2)** 176:7,12
**DiFRANCESCO (3)** 5:7,8;316:13
**dig (1)** 270:2
**diligence (1)** 285:16
**diminish (2)** 264:22;265:3
**diminished (2)** 264:18;276:13
**diminishing (1)** 279:23
**diminishment (2)** 264:21,25
**DIRECT (5)** 4:4;39:15;52:2;254:24;258:15
**directed (1)** 224:15
**directing (1)** 172:6
**direction (1)** 287:23
**directions (2)** 305:15,18

**directly (7)**
18:19;33:25;189:4;213:18;216:5;231:17;243:25
**Director (2)**
5:3;306:25
**disabled (1)**
238:3
**disagree (1)**
241:7
**disagreed (1)**
148:10
**disagreeing (2)**
255:4;256:2
**disappear (1)**
167:15
**disappearance (22)**
47:7;52:6;57:18;104:25;105:5,17,20;113:10;116:17,20;139:17;147:13,21;152:20;160:19;171:24;175:21;200:18;211:14;212:4;231:10;253:2
**disappeared (8)**
57:6;106:9;108:23;117:10;140:14;143:4;161:1;213:8
**disciplined (1)**
300:17
**dis-clude (1)**
151:3
**disconnected (1)**
146:12
**discuss (13)**
94:11;96:17;97:10,15,15;99:4;101:17;102:7;103:10;142:14;160:7;191:15;315:14
**discussed (10)**
57:10,14;96:23;98:20;190:10;298:9;300:8;307:24;314:7,8
**discussion (1)**
99:7
**discussions (1)**
86:17
**dispel (1)**
132:17
**disposal (1)**
34:9
**disputing (1)**
109:17
**disregard (1)**
162:23
**distorted (1)**
84:23
**distracting (1)**
4:9
**distribution (2)**
138:19;148:16
**Division (2)**
22:6;308:10
**DNA (9)**
63:21;64:1,11;97:14,16;144:9;155:14;165:23;166:9
**DOC (4)**
155:23,23;157:15;282:5
**document (20)**
24:15,19;25:6,12;35:3;37:15;72:25;73:6,9,11,13;74:12;76:9;78:6;79:24;83:22;135:10;170:12;281:6;294:24
**documentation (4)**
26:6;209:7;228:12;248:13
**documented (3)**
126:13,15;281:10
**documenting (1)**
126:15
**documents (7)**
29:13,17;72:8;222:3;248:6;285:8,16
**dog (2)**
286:12;301:9
**Dolce (1)**
262:10
**domestics (1)**
15:10
**done (35)**
9:1;59:9;60:19;61:15,17;66:13,24;67:22;78:20;83:3,16;86:23;155:25;168:8;176:10;190:12;192:18;211:18;214:9;218:11;219:4,23;221:3;225:12,12,12;228:24;257:9;259:13;260:23;267:15;289:12,15,17;319:10
**door (10)**
96:24;130:10,24;131:8;132:3,7;133:18;140:24;141:6;152:22
**Dorothy (1)**
84:12
**dot (1)**
275:1
**doubles (1)**
267:25
**doubt (6)**
119:14;145:2;163:18,23;202:11;239:4
**doubting (1)**
202:12
**doubts (1)**
119:16
**down (47)**
23:9;80:20;82:1;87:15;98:24;103:13;109:3;111:16;120:9;125:24;143:24;145:16;179:8,23;188:12;193:21;196:3;207:18;209:1,4,15,20;210:1,4,6;211:3;212:13,20;213:12;214:22;218:19;229:23;232:2;233:19;255:12;258:10;265:3;269:9;273:5,13;274:15,18;275:18;278:5;288:5;312:12,22
**dragged (1)**
254:14
**drastically (1)**
127:21
**draw (4)**
83:21;84:3;128:19;270:6
**dream (1)**
262:13
**dreams (2)**
75:25;262:12
**drew (1)**
113:23
**drive (2)**
232:9,12
**drives (2)**
109:23;218:21
**driving (1)**
210:5
**drop (1)**
257:13
**dropped (2)**
136:19;137:10
**drove (4)**
110:3;183:15;233:15;238:22
**Drug (10)**
23:15,16,19;122:24;123:3,10;138:18;148:16;166:18,22
**drug-dealing (1)**
138:5
**DSFC (1)**
4:23
**due (1)**
265:17
**dug (1)**
195:21
**duly (1)**
4:2
**dumped (1)**
191:21
**during (35)**
17:9;39:16;44:22;46:24;56:6,22;58:20;62:18,24;67:9;80:17;81:20;82:9;85:19;87:1,18;97:25;104:1;124:13;125:8;128:3;159:9;187:20;209:16;221:1;228:22,24;229:16;235:6;237:14;249:9;277:10;293:16;297:5;299:24
**dusted (1)**
136:1
**duties (5)**
10:17;15:21;16:5;18:11;93:22
**duty (1)**
15:3
**DVD (4)**
76:16;147:4;198:12;218:21
**dying (1)**
194:16

## E

**eager (1)**
237:23
**earlier (15)**
4:25;54:2,15,22;118:8;129:1;139:9;154:7;234:23;240:25;284:1;291:18;292:8;314:23;315:9
**early (11)**
20:10;55:19;57:2;69:24;74:18;80:11;105:25;170:6;177:8,9;184:17
**early-on (1)**
163:14
**earn (1)**
12:4
**easier (2)**
8:25;83:25
**easiest (2)**
23:20;181:25
**east (1)**
189:3
**easy (6)**
176:8;179:10;182:8;258:11,12;261:4
**ECPO (13)**
34:15,23;70:17,20;71:6;83:23;126:8;198:19;246:13,18;294:21;303:20,25
**editorializing (1)**
305:3
**Edmunds (1)**
28:12
**education (1)**
11:22
**educational (1)**
11:14
**Edward (2)**
71:24,25
**effect (11)**
109:16;222:2,5;223:17;225:6,8,17;226:19;282:23;314:15,16
**effort (2)**
180:20;220:1
**efforts (12)**
70:3;90:11;98:11;131:6,7;172:25;173:3;174:2;187:22;201:6;265:4;281:18
**eight (1)**
274:23
**Eileen (1)**
282:17
**either (26)**
5:24;11:22;26:7;37:5;46:23;49:8;67:9;85:5;89:9;94:1;149:2;162:14;188:5;206:2,11;216:14;219:9;221:11;225:9;249:14;273:23;280:21;288:25;291:13;300:14;301:9
**elaborate (1)**
171:16
**electronic (1)**
65:17
**elevator (1)**
233:19
**elicit (2)**
99:22;101:20
**else (45)**
6:24;34:11;38:4,6;42:13;44:3,7;45:16;47:9;55:22;58:5;63:4;64:21;81:14;82:10,19;92:8;94:2;98:17;99:15;108:15;112:3,24;117:10,17;136:7;141:21;146:20;150:4;176:24;177:2;182:4;227:23;232:14;234:10;237:13;238:23;250:2;277:12,22;299:11;315:7;316:7,8,9
**else's (3)**
82:13;88:16;194:21
**embarked (1)**
95:25
**embarking (1)**
92:9
**embrace (1)**
162:25
**embraced (1)**
146:6
**emphatical (1)**
310:4

**employed (2)** 9:20,25
**employment (4)** 11:12,23;29:10; 300:18
**en (1)** 189:3
**end (8)** 11:9;21:13;41:16; 52:9;79:9;163:7; 252:19;275:11
**ended (5)** 181:16;217:10,17; 249:1;252:22
**ending (1)** 237:10
**end-of-shift (1)** 79:8
**ends (1)** 182:10
**enforcement (25)** 6:21;10:10;12:17; 13:14;19:7,12,14,17, 20;21:23;36:20; 59:17;61:4,11;93:22; 156:5;158:16,25; 160:8;161:4;221:25; 261:10;271:12,16; 272:9
**enforcement's (1)** 158:14
**engage (2)** 99:22,22
**engaged (2)** 96:25;219:19
**engine (3)** 84:24;85:2,4
**engulfed (1)** 276:19
**enjoyment (1)** 22:23
**enough (21)** 18:3;26:12;60:9; 87:17;89:16,16; 99:20;100:9;123:2; 130:2,6;136:24; 182:7;211:15;212:11; 226:1;233:10;254:10; 276:16,18;281:5
**ensure (3)** 80:15;83:1;102:22
**entails (1)** 218:3
**enter (2)** 269:14,16
**entered (1)** 270:3
**entering (1)** 116:23
**entire (2)** 115:2;301:10
**entities (1)** 17:13
**entity (1)** 15:9
**entries (2)** 48:20;70:6
**entry (3)** 49:3;52:15;65:6
**envelope (2)** 65:23,23
**equipment (13)** 28:13;201:8;215:5; 217:25;218:3,8; 219:3;221:4;227:2,3; 228:2;230:2;235:12
**Ernest (1)** 138:17
**Ernie (1)** 116:24
**especially (4)** 85:6;186:12; 193:16;250:8
**essentially (6)** 90:9;91:6;98:7; 208:4;210:12;238:10
**Essex (77)** 33:17;38:8;44:2; 45:13,20;49:25; 53:19;68:17,22; 93:16;94:2,8;95:25; 96:7;155:17;156:11; 157:19;180:21;181:4, 14,16;182:4;183:11, 16,18;184:1,9,10; 185:14,18,24;186:3; 187:10;204:25; 205:10,24;206:19; 215:7,12,21;216:4,6, 18;217:5,19,21; 219:4;221:2;223:12; 224:17,21;226:16; 227:2,13,24;230:13; 232:1;233:10;234:9, 20,24;235:2;237:3; 239:10;244:4;248:8; 253:24;254:14; 256:13;270:13; 274:10,19;290:1; 307:2;312:15,19,20
**establish (2)** 151:18;154:11
**established (3)** 105:14,15;200:6
**estimate (1)** 30:3
**et (1)** 52:18
**Eutsey (15)** 63:7;68:11,13,20, 25;131:25;152:3; 186:7,10;206:8,17; 243:10,12;269:6; 275:6
**evade (1)** 259:25
**Evans (112)** 4:19;7:9;24:25; 31:2;32:14;40:25; 44:6;46:10,11;47:3,6; 50:3;55:19,20;56:7, 25;57:5,8,11,15,17; 58:2,6,12;62:20;67:6; 96:5;97:22;104:25; 105:4;106:3;107:12, 22;111:7,14,23;112:9, 16,21;113:10;114:16; 115:2;116:12;118:15; 120:25;121:9,12; 122:19,24;123:3; 124:4;133:3;138:13, 18;139:10;142:15; 143:1;144:24;147:20, 25;149:13;150:13; 153:2;154:23;158:9; 162:23,25;165:4,5,13, 14;171:5;174:11; 176:3;177:9;178:3,6; 190:20;201:3;204:19, 20;210:16;228:23; 263:5,11;276:8; 278:5;281:19;290:3, 23;291:4,10;292:14; 295:22;296:11; 297:13;299:3,22; 308:6,24;309:9; 310:6,20;311:5,10,11; 312:14,20;313:9; 314:4,5;318:15
**Evans' (22)** 98:3;108:4;116:1; 129:16;138:5,11; 139:2;141:11;147:19, 23;148:11,21;150:10; 163:11;164:14;200:7; 202:5;212:3;228:20; 309:20,25;311:8
**even (55)** 9:7;50:10;59:8; 74:21;98:10;103:6; 107:3;112:13;115:12; 119:18;125:12;128:6; 129:19;133:16; 142:21;143:23; 144:14;160:25;162:3, 5;163:11;168:14; 172:3;176:15;177:7; 178:13;181:9;190:9; 193:19;197:8;200:10, 11;203:7;210:3,21; 218:11;226:3,12; 227:19;238:10; 251:22;252:14; 255:17;261:12;262:1; 267:6;272:23;280:8; 282:4,14;285:1; 291:21;304:16; 305:24;311:24
**evening (10)** 29:14;112:10,13, 16;118:13;136:19; 155:3;205:20;228:16; 230:24
**event (17)** 101:17;102:6,7; 103:23;104:13; 147:10;148:10;184:7; 192:14;209:17;211:3; 247:10;250:7,12; 258:23;265:10,11
**events (11)** 127:7;159:17; 173:19;190:18;202:7; 211:6;221:2;228:9; 245:17;283:8;293:1
**eventually (3)** 39:13;43:16;247:18
**everybody (6)** 169:22;175:19; 177:2;196:13;203:10; 269:5
**everyone (7)** 4:15;34:11;89:12; 95:21;127:6;165:2; 167:1
**evidence (26)** 67:1,5;112:20; 115:20;117:8;165:20, 25,25;166:3;167:14; 182:20;191:18;255:5; 283:22;292:8,13,14, 19;294:9;295:10; 297:12,22,25;298:12; 299:1;319:3
**evidentiary (3)** 102:18;135:2;166:4
**exact (4)** 34:6;47:5;287:10; 304:12
**exactly (9)** 6:17;10:25;69:16; 72:15;110:23;162:2; 186:4;256:16;265:14
**exam (6)** 13:3,6,7,8,11,12
**EXAMINATION (8)** 4:4;58:13,21;60:7, 21;252:2;279:16; 316:15
**examine (1)** 269:24
**examined (1)** 195:21
**examiner (1)** 171:18
**except (3)** 26:2;30:23;233:15
**exchange (3)** 290:12,18,22
**exclude (1)** 159:18
**excluded (2)** 195:23;250:23
**excluding (1)** 202:6
**Excuse (1)** 293:12
**exhibit (2)** 70:11;294:18
**exist (1)** 153:8
**existed (1)** 223:3
**existence (1)** 22:13
**expect (5)** 145:10,11;162:1; 249:3,7
**expecting (1)** 7:7
**Experian (5)** 48:19,23,23,25; 317:17
**experience (5)** 27:4;78:17;127:18; 253:13;269:9
**experienced (1)** 109:11
**expert (4)** 60:24;61:6;62:11; 238:2
**experts (3)** 58:22;59:2,6
**explain (10)** 41:9;45:6;51:16; 59:5;60:5;63:3;69:5; 181:3;217:24;225:11
**explained (2)** 56:13;69:16
**explanation (1)** 162:21
**express (4)** 56:5;81:13;190:1; 270:15
**expressed (10)** 45:12;55:18;91:2; 211:16,19;212:15; 217:11;241:9;272:24; 281:2
**expressing (1)** 231:19
**extended (2)** 46:4;193:7
**extent (8)** 26:14;33:5;34:18; 47:4;60:1;140:17,19; 155:2
**eye (1)** 261:11
**eyes (6)** 95:23;185:13,22; 203:9;205:10;293:14

## F

**face (3)**
50:4,5;99:2
**facets (3)**
17:12;253:8;286:9
**facilitate (1)**
51:9
**facility (3)**
156:11;157:24;282:6
**fact (45)**
57:5;58:7;83:17;98:14;105:18,18,22;112:19;113:5,8,23;115:14;116:3,16;117:8;122:17;134:20,23;135:1;139:21;142:20;143:12;145:1;148:24;151:9;161:14;162:19;165:22;195:15;200:20;204:1;208:2;209:19;210:22;242:21;247:6;248:13;251:3,4,18;266:7;269:18;297:22;317:9,21
**facts (25)**
80:16,16;97:8,17;103:11;116:18;117:24;128:4;143:16;148:3,11,12;149:5,12;159:17,18;160:13;163:24,25;182:19;210:24;211:8;276:13;282:14;283:22
**factual (11)**
57:7;58:1;81:3;115:11;127:7;160:18;208:6;255:8;263:14;264:2;295:8
**failed (2)**
58:23;59:3
**fair (31)**
7:21;16:2;18:3;22:24;26:12;35:25;38:14;62:11;76:4;78:16;86:24;87:17;91:20;99:5;123:19;130:2,5,5,5;167:20;172:23;182:7;187:14;188:22;219:24;233:10;239:7;259:24;262:18,20;268:22
**fairly (1)**
86:25
**fall (1)**
282:11
**familiar (2)**
45:23;172:10
**families (2)**
109:6;139:23
**family (10)**
9:18;63:22;106:24;109:14,25;112:1;140:13;141:6;155:13;167:4
**far (30)**
33:8;62:15;89:15;92:13;109:21;111:5;132:1;133:23;143:20;161:5;162:3;176:22;178:11;180:9;201:10;207:18;220:8;222:4;235:10;237:5,6;248:23;250:10;259:20;263:2;278:14;280:4;281:16;283:25;308:15
**fashion (4)**
86:11;219:22;220:20;280:3
**fatalities (12)**
85:6,14;192:10;193:6,11,13,14,17,18;194:25;195:17,24
**father (3)**
281:25,25;282:6
**fear (1)**
257:20
**fearful (1)**
131:12
**feces (2)**
301:9,9
**federal (1)**
302:15
**feed (4)**
101:19,24;102:22;104:9
**feeding (2)**
101:7,14
**feel (3)**
108:22;131:14;146:18
**feeling (1)**
175:7
**feet (1)**
257:21
**fellow (5)**
290:15,20;318:14;319:2,4
**felt (3)**
55:20;127:15;219:2
**few (3)**
251:21;311:1;314:1
**field (4)**
191:21;262:6,6,13
**fifth (1)**
29:3
**fight (2)**
149:8;270:4
**figure (2)**
162:6;313:16
**figured (1)**
308:5
**file (16)**
24:20;65:8,14,20,23;66:1,10,20;72:10,15;76:25;79:21;86:16;105:15;267:10;306:8
**filed (3)**
285:2,10;302:13
**files (2)**
48:4;114:24
**fill (2)**
26:6,10
**Film (1)**
266:8
**final (4)**
37:15,15;38:12;39:5
**find (45)**
48:13;52:19;59:16;64:17;114:25;131:7;132:20;138:3,4,10;139:3,12;141:23;142:4;166:1,11;172:5,7,25;174:3,7;176:8,9,11;181:24,25;182:2,9;199:9;203:20;204:1,12;209:10;218:7;227:17;234:11;257:17;258:7,11,12;261:4;262:6;267:16;294:5;303:13
**finding (5)**
173:24;182:9;241:3;264:2;269:12
**fine (11)**
30:13;33:6;44:14;88:5;112:15;115:8;226:2;245:1;271:14;289:4;301:21
**finer (1)**
105:13
**finger (1)**
297:13
**finish (4)**
50:24;117:13;231:5;287:15
**finished (1)**
299:8
**fire (72)**
74:16;75:6,12;84:21;85:3;192:1,4,4,7,17,25;193:20,23;194:16,16;195:13,19,19,25;196:7,8,23;197:2,4,17,21;219:16;250:17;251:5,6,18,21;252:2,3,4,5,6,7,15;257:17;261:20;262:7,8,17;263:2,4,6,15,18,23;264:1,6,9;265:14,17;266:13,21;267:17;268:6,23;269:12,13;270:4;276:12,22;287:10;292:21,24;296:22;297:24;298:5,9
**firefighter (1)**
276:25
**fires (24)**
84:22;85:2,5,12;192:9,22,24;193:5,10,18;194:25;195:16,23,24;197:3,18;250:21;251:11;266:8;269:7;276:18;298:12,21;299:2
**first (58)**
4:2,23;6:10;8:17;9:23;10:14;12:21;14:16;27:11,18,19,20;29:6;30:5;31:9;34:20,23;35:21,22;41:3;42:4;46:12,24;54:23;55:14;74:19;77:21;78:1,5,9,17;88:4;97:1;104:7;106:7;125:19;159:21;161:15;176:22;185:12,21;187:16;222:9;225:15;243:25;247:2;250:14,19;253:13;285:10;296:25;297:24;301:8;303:3,4;306:18;314:2;319:4
**firsthand (6)**
104:12;147:23;175:10;182:12;183:9;187:14
**fitting (1)**
270:21
**five (39)**
22:11;33:4;52:4;61:18;96:5;111:14,24;112:5,10,17;119:2,8;123:4,15;136:4,16;154:2;159:12;234:20;237:8,24;238:11;242:22;246:9;254:25;258:10;261:7;266:1;272:18;276:4,16,21;295:17;296:7,9;309:20;310:1;317:7,11
**five-minute (2)**
56:11;146:18
**five-person (1)**
119:8
**five-something (2)**
185:18;234:6
**five-subject (1)**
39:9
**flee (1)**
261:12
**flesh (1)**
143:8
**flight (2)**
259:11,16
**floor (7)**
243:20;263:8;268:2;277:8;286:12,15;293:5
**Floria (6)**
110:1,2;126:4;128:12;131:10;132:7
**flowers (1)**
262:13
**focus (2)**
138:13;205:23
**focused (1)**
138:12
**follow (13)**
18:15;90:22;167:6;193:4;223:18;224:1,8,8,9,15;225:1;286:16;288:1
**followed (2)**
218:23;220:15
**following (5)**
90:21;92:12;223:4;260:25;274:15
**follows (1)**
4:3
**force (5)**
20:22;21:1,6;257:24;269:6
**forego (1)**
254:10
**forgive (2)**
10:6;175:22
**forgotten (1)**
225:14
**form (137)**
26:10;63:12;65:17,18,19;66:8;67:13,16;68:15;69:10,12;70:24;83:4;87:3,5;88:19;90:16;91:10,24;92:2;93:13;94:16;95:2,7;96:20;105:7;107:18;108:10,24,25;110:25;114:17;116:9;118:9,11,17;121:22;127:4;136:8;138:7,8;139:4;143:25;145:21;148:15;150:16,17;151:14,22;152:15;156:7;157:9,21;160:21;163:2,20;164:6;166:19;174:8;178:22,23;180:3,4;181:6,7,19;182:15,21;183:13;186:22;188:25;189:25;190:6;191:16;192:20;194:23;195:5;196:18;201:19,24;209:24;215:14;217:8;219:18;220:17;221:16,19;224:10,11;225:3;227:8;229:6;238:25;239:6,12;242:24;

243:2,3,16;244:16,19;245:24;247:11;248:5;257:5,8;260:21;261:15,24,25;262:22,23;267:3,6;276:20;283:10,12,20,21;287:20;288:13;292:9,16;293:2;294:12,13;296:13;297:16,17;298:15,16;308:11;309:11;313:11;317:23;318:17,19
**formal (8)** 79:19,22;80:21,22;81:2,4;82:12,21
**formalize (1)** 82:2
**formalized (2)** 14:6;82:2
**formally (1)** 110:9
**formatting (1)** 35:17
**formed (1)** 309:15
**former (3)** 5:3,4,4
**forth (1)** 268:24
**forthcoming (1)** 238:6
**forward (5)** 99:16,21;135:7;254:11;308:17
**forwarded (1)** 226:25
**found (19)** 52:18;122:7;126:2;134:1;136:20;137:1,2;179:6;183:8;219:2;225:14,16;251:18;253:14;263:17,18;269:4;282:21;285:7
**foundation (13)** 94:10;145:20,22;223:20,21;224:3,12;225:4;229:7;308:12;309:12;313:14;318:18
**four (7)** 136:16;137:12;198:6,12;224:2;228:6;295:24
**four-hour (1)** 228:23
**fourth (2)** 135:19;222:11
**frame (1)** 110:9
**freaky (1)** 144:16
**free (3)** 230:11;245:3;256:6
**freely (1)** 259:2
**fresh (1)** 202:8
**friend (2)** 130:15;258:25
**friends (2)** 118:12;167:3
**front (13)** 72:12;130:10,14,24;132:2;140:24;141:6;180:20;187:3;240:18;255:17;303:12,15
**froze (2)** 146:9,11
**fruit (1)** 287:24
**Fugitive (8)** 23:7,9,14;27:23;28:1;257:11,14;259:21
**fugitives (1)** 23:10
**full (11)** 7:11;8:10,13,15;15:9;29:4;106:11;144:16;153:20;279:22;301:15
**full-on (1)** 262:14
**fully (3)** 257:14;279:25;291:16
**functional (3)** 219:3;221:4,4
**further (6)** 11:22;18:16;86:16;211:17;269:24;319:7
**furtherance (1)** 21:7
**furthering (1)** 22:23
**future (1)** 273:21

## G

**gallons (1)** 276:21
**game (1)** 176:9
**gap (2)** 234:2;268:1
**Gary (2)** 5:1,19
**gas (1)** 276:23
**gasoline (1)** 276:22
**gave (6)** 59:2;148:3,3;206:12;231:14;253:10
**geez (1)** 226:1
**General (11)** 5:13;15:3;39:15;43:6,8;175:24;202:13;210:11;211:11;250:6,7
**generalization (2)** 57:19;176:4
**generally (4)** 25:25;65:25;172:3;302:8
**General's (2)** 5:8;226:9
**generated (3)** 43:5;66:4;156:10
**generating (1)** 293:16
**generic (1)** 75:15
**genuine (1)** 100:6
**gets (2)** 238:15;258:7
**Gilleece (1)** 282:17
**girlfriend (1)** 161:17
**given (13)** 7:1;14:16;38:4;176:1;184:20;188:16;213:15;228:15;242:21;244:4,9;251:18;255:23
**gives (1)** 200:13
**giving (5)** 9:11;163:17,22;210:19;254:23
**gleaned (1)** 159:6
**Glennon (1)** 89:24
**goal (4)** 64:15,19;98:1;317:11
**goals (1)** 64:15
**gobbledygook (1)** 113:4
**goes (5)** 78:4;108:13;157:7,8;244:17
**gonna (2)** 83:23;90:7
**Good (25)** 4:5,6,20,25;5:7,15;6:8;28:24;87:22;102:17;132:11;146:13,22;161:9;193:4;201:7;202:11,15;223:23;254:10;257:2;258:6;268:17;286:15;291:2
**Gotcha (3)** 22:24;26:21;221:20
**govern (1)** 220:13
**grabbed (1)** 21:6
**grabbing (1)** 275:18
**graduate (2)** 12:2,21
**Graduated (1)** 11:15
**graduating (1)** 12:20
**graduation (1)** 11:21
**Grand (2)** 318:25;319:1
**grandmother (1)** 161:16
**Granted (1)** 250:24
**graphs (1)** 172:15
**Great (7)** 28:8;74:2;127:13;135:24;227:22;262:15;284:5
**green (1)** 226:13
**Greg (1)** 306:25
**Gregory (2)** 168:17;288:25
**ground (1)** 7:4
**group (7)** 31:7;81:7;87:24;89:10;99:23;125:16;317:6
**grown (2)** 53:9;276:6
**guaranteed (1)** 163:6
**guard (2)** 155:23,23
**guards (1)** 282:5
**guess (39)** 9:2;11:5;23:20;25:19;30:8;31:16;34:13;37:4;40:8;46:18;47:21;80:25;85:9;87:22;90:9;100:8;109:25;126:7;132:18;133:13;147:9;154:25;155:23;171:15;179:12;181:15;183:2;198:16;211:23;214:12;230:6;246:6;252:18;253:19;270:8;277:7;296:18;315:13;317:5
**guest (1)** 281:6
**guidance (2)** 17:15;91:5
**guided (1)** 92:21
**guidelines (1)** 226:8
**guides (1)** 93:21
**gun (7)** 131:3,8,13;133:7;152:22;264:19;280:1
**gunshot (1)** 265:16
**guy (5)** 31:22;109:14;179:24;248:22;273:18
**guys (2)** 138:4;308:4

## H

**habit (2)** 38:22;39:15
**Hadley (32)** 5:5,25;31:23,25;32:7,13,20;63:6;69:19;98:5,6;104:19;125:20;127:22;186:5;205:17;206:2;243:12;245:7;249:22;275:3;304:8;305:16,23;307:7,15;309:7;311:12;313:18;317:5;318:1;319:4
**Hadley's (1)** 69:25
**Hairston (23)** 70:14,16,25;71:1,2,4,24;72:1,22,25;73:18;76:20;84:15;86:7;177:22;192:18,22;197:2;198:16;250:20;251:4;266:12;267:12
**Hairston's (4)** 114:24;192:7;251:13;266:18
**half (6)** 20:8;35:22;240:7;257:2;283:7;292:22
**hallway (4)** 134:2,7;135:6;162:22
**Hampton (163)** 40:25;47:19;50:22;51:6,8,10,17;97:22;115:4;120:9,10;125:9;130:21;133:11,

12,15,24;142:14;145:15,18,24;146:4;147:14,18;149:16;150:20;165:7,9,19;166:16;172:18;173:1,4,9,24;174:7,15,16;176:3,12,18;178:2,5,9;181:4,12;182:8;183:11;184:22,24;185:13,21;186:19;187:10;188:14,24;189:6,10,21;190:4,11,15;199:10,11,12,21,23,24;200:6;202:2,24;203:17;204:4,18;205:1;208:9;210:3,14;211:1,5;212:2;214:1;215:21;216:3,6,17;217:6;218:9,16;227:12;230:7,11;231:8;232:11,15;233:24;236:4;237:23;238:1,22;239:9,21;240:4,18,24;241:2,12;243:17;244:4;245:10;246:13,24;248:4;249:5,9;250:5;251:17;252:9,13;255:24;258:1,19;263:6,7;268:13,20;270:17,25;272:10;274:10;275:9;277:14;279:12;289:8;290:2,11,17,22;291:7,9,12;292:1;297:1,5,14,23;299:22;306:14;308:5,24;309:9,19,24;310:21;312:23;314:14,19,21;315:11;316:1;318:15,24;319:1

**Hamptons' (1)** 150:10
**Hampton's (16)** 148:25;149:4;203:5;215:13;246:7,10;264:14;270:9;288:11;292:25;298:13,22;299:1;309:18;311:25;317:22
**hand (4)** 28:23;43:20;116:25;283:18
**handcuffed (1)** 233:2
**handcuffs (2)** 232:16,22
**handed (3)** 25:4;125:19;128:22
**handgun (6)** 130:14;132:8,9,11,14,17
**handing (1)** 38:7
**hand-in-hand (1)** 95:22
**handle (5)** 18:19;19:14,15;91:4;256:10
**handled (5)** 19:17;63:10,16;96:18;249:8
**handling (3)** 92:7;280:9;305:13
**handwritten (10)** 37:11;39:4,21;40:1,11;81:1,22;198:19;285:4,15
**handy (2)** 71:4;73:2
**hang (1)** 173:7
**happen (5)** 77:11,14;120:11;280:1;310:19
**happened (24)** 42:9;145:4,24;150:22;151:20;155:3;170:3;181:16;182:12;183:6;200:23;212:9;225:20;240:5,24;241:8;256:12;283:8;284:16;287:11,18;288:12;298:22;307:11
**happening (1)** 259:7
**happens (5)** 50:25;146:16;162:4;172:17;200:24
**happy (1)** 8:5
**hard (5)** 138:4;181:24;182:2;200:9;218:21
**harm (1)** 264:20
**Harris (1)** 293:20
**Haven (1)** 11:2
**head (7)** 10:18;15:18;42:14;210:6;211:3;212:19;227:24
**headed (1)** 213:17
**heading (1)** 188:12
**headquarters (2)** 22:6,9
**health (1)** 155:12
**hear (13)** 4:9;115:22;146:8;189:13;192:15;271:15,25;272:2,6,8;290:15,20;291:6
**heard (11)** 60:20;61:1,4;88:6;122:19;138:17;139:15;141:10;264:15;265:15;282:18
**hearing (12)** 73:14;74:19;75:10;125:8;148:19;176:18;207:8,17;210:21;215:1;247:20,21
**hearsay (2)** 293:23;294:10
**height (2)** 52:17;65:24
**held (1)** 15:20
**hello (1)** 4:25
**help (1)** 225:9
**helped (1)** 31:16
**helpful (2)** 170:2;195:8
**helps (1)** 198:20
**Henry (23)** 5:5,25;32:16,17,20;69:20,21;186:6;205:21;206:2;243:12;304:7;305:19,24;307:7,12,20;309:7;311:11;317:5;318:1,4;319:5
**Here's (1)** 285:21
**hesitate (1)** 4:12
**Hey (6)** 97:2;179:24;273:13,18;282:19;288:2
**hierarchy (1)** 95:9
**high (5)** 11:15,17,18;22:10;261:7
**himself (12)** 28:17;29:3;109:15;161:8;229:4;238:11;254:12;258:22;265:10;291:15;292:2,2
**hindsight (1)** 143:10
**historical (2)** 158:8;297:9
**history (3)** 11:12,15;29:10
**Hmm (1)** 122:23
**hold (9)** 14:24;21:17;39:5;186:14;189:12;231:5;243:24;274:4;287:14
**holds (1)** 144:19
**home (12)** 133:6;135:13;136:5;137:17,22;145:14;185:2;189:3;234:17;256:7;270:1,3
**homes (2)** 269:10,23
**homework (1)** 176:10
**Homicide (9)** 46:8;119:8;305:9,12;306:9,13,24;309:20,25
**homicides (1)** 119:8
**hone (1)** 33:3
**honed (1)** 112:20
**honest (1)** 61:24
**honestly (1)** 270:15
**Hope (8)** 15:15;19:9;99:20;151:1;159:3;167:6;173:16;177:5
**hoped (1)** 142:12
**hopeful (1)** 158:18
**hopefully (1)** 7:5
**horrible (1)** 249:18
**Hospital (1)** 269:21
**hour (8)** 56:16;235:4,4,4,6;236:1;237:10;252:23
**hour-long (1)** 255:22
**hours (5)** 109:7,15;114:24;118:8;228:7
**house (17)** 117:19;119:12,16;121:21;123:2,12;129:2,6,8,16;137:3;145:4;167:5,16,22;191:20;280:24
**housekeeping (1)** 245:18
**housing (1)** 131:24
**huge (1)** 262:2
**huh (1)** 300:25
**human (5)** 52:5;64:17;251:22,24;301:9
**hunch (2)** 148:6,8
**Hunterdon (3)** 178:7;199:2;241:16
**hurt (4)** 110:19,23,24;111:2
**husband (2)** 131:17,21
**hypothesis (1)** 135:11
**hypothesize (1)** 134:18

## I

**idea (14)** 129:14;143:7;173:13;177:6;197:23;239:8,19,20;240:1;250:6,16;271:1;282:8;292:6
**identification (8)** 25:1;34:16;70:18;73:4;165:24;246:15;294:22;303:21
**identified (26)** 40:15;46:5;50:3;57:2;66:3;69:19;96:15;105:6,9;113:6;117:8;120:1;123:9;132:4,13;152:1;163:8;164:10;165:13;173:23;174:3;176:1;203:13;263:20;282:21;314:4
**identifies (1)** 295:16
**identify (27)** 29:3;35:6;57:16,25;63:25;108:17;111:18;113:2,5,8;116:18;130:23;132:6;133:17;134:15;152:23,24;174:13;178:1;181:13;235:8;251:12;258:18,24;282:4,14,15
**identifying (3)** 132:11;165:12;290:23
**identity (1)** 24:11
**I-E-T-J-E-N (1)** 8:19
**imagine (7)** 17:21;60:15;199:14;232:17,20;

251:6,10
**immediate (1)** 180:20
**implausible (1)** 264:15
**implicated (1)** 263:11
**implicating (3)** 238:11;291:15;292:2
**importance (2)** 101:14;211:16
**important (20)** 44:19;49:5;66:20;92:10,11;97:21;99:2;102:21;104:8,14;134:21,24;136:24;143:7;145:2,9;205:14;235:10;242:21;281:5
**impression (1)** 291:14
**impressions (1)** 86:18
**improperly (1)** 172:14
**inadmissible (1)** 59:20
**incarcerated (1)** 282:6
**inches (1)** 65:24
**incident (3)** 103:1;175:11,11
**incidental (1)** 245:11
**include (9)** 26:7;81:4;82:12,20;135:6;151:2;197:16;209:23;220:22
**included (10)** 41:22;49:2;55:6;86:5;104:1,2;151:9;204:10;285:19;297:23
**includes (1)** 248:21
**including (3)** 95:6;127:12;317:22
**inconsistencies (4)** 159:21;161:20;162:18;163:18
**inconsistent (2)** 287:14,17
**incorrect (3)** 164:19;182:14,17
**inculpated (2)** 229:4;291:10
**inculpating (1)** 292:2
**incumbent (1)** 224:19
**independent (7)** 40:17;44:16;68:1;202:14;205:9;211:24;215:25
**in-depth (7)** 65:8;66:10;72:9;85:19,22;204:17;235:19
**indicate (12)** 46:22;62:17,24;73:17;177:9;179:5;211:10;212:22;228:17;230:10;265:6;301:18
**indicated (15)** 62:19;67:24;114:10;122:2;128:25;131:12;167:1;179:7;228:8,9,14,19;230:21;270:1;276:7
**indicates (2)** 246:21;248:15
**indicating (6)** 77:9;202:9;211:5;235:22;236:21;269:10
**indication (6)** 49:16;113:24;178:20;215:4;286:14;289:25
**indications (1)** 171:25
**indicative (1)** 49:7
**indict (2)** 292:13;318:11
**indictable (1)** 222:16
**indictment (3)** 292:19;318:15,22
**individual (10)** 38:1;50:17,19;91:12;131:11,12;132:6;179:8;202:6,9
**individuals (7)** 32:21;41:17;66:6;131:15;301:12;317:9,20
**infants (1)** 11:3
**infer (2)** 143:18,19
**inference (1)** 144:12
**informally (1)** 281:12
**information (166)** 36:18,22,23;38:11;39:4;40:21;41:3,10,19,21,21;44:16,21;48:13;49:6;50:17;51:3,4,13;52:4,21,24,25;54:18;55:2;57:4,7;80:11,13,21;82:13;84:11;98:2;100:7;101:7,13,20,20,24;102:5,12,16,22,23;103:5,8,15;104:9,23;105:2;107:7;115:5;120:6;121:25;122:23;124:3;132:24;134:6;135:23;137:25;138:4,16;139:15;140:22;141:15,20,24;142:5,8,12,18;143:8;144:21,23;145:9;147:11,14;149:4,5;150:21;151:2,4;152:7,14;154:4;158:21;159:5;164:24;165:3;169:24,25;170:2,11,21,23;171:2,10;172:7,9;173:11,14;174:15;175:18;176:13,24;177:1,5,7;184:2,20,25;188:20,24;189:2,6,22;190:3,16,17,18,22,25;191:25;192:12;193:18;195:16;197:3,4;200:17;202:9;206:16;207:25;210:5,15;211:7;213:7,16,25,25;218:14,17;229:9,11;240:9;242:13;253:6;257:20;261:20;263:15;264:9;266:7;268:11,23;291:4;293:4;296:2,8,15,24;297:23;298:20;312:7;314:19,21;315:1,7
**informed (3)** 158:3;183:5;228:2
**initial (11)** 8:18;16:23;29:7;70:4;99:19;107:21;109:9;111:3;142:6;222:4;317:17
**initially (2)** 78:18;108:22
**initials (1)** 180:13
**initiate (2)** 98:5;313:18
**initiated (2)** 18:16;99:19
**injured (3)** 110:18;276:2;280:2
**ink (1)** 201:13
**inoperational (1)** 235:12
**input (1)** 157:3
**inquire (3)** 193:10,14;279:25
**inquiry (1)** 48:10
**in-services (1)** 17:4
**inside (6)** 135:5;149:18;195:20,21;216:15;243:17
**insignificant (1)** 178:14
**instance (2)** 17:18;175:4
**instead (1)** 231:21
**instruction (2)** 9:3;14:11
**intend (2)** 143:23;265:8
**intended (1)** 250:18
**interest (12)** 22:21;43:3;89:9;100:7;106:6;113:2;117:22,23;142:11;173:24;175:24;281:8
**interested (7)** 45:3;67:4,11;149:11,12;189:21;193:16
**Interesting (1)** 218:22
**interim (1)** 256:23
**interpret (2)** 172:13,14
**interpretation (1)** 113:7
**interpreted (1)** 60:22
**interrogations (2)** 99:12;100:15
**interrupt (2)** 185:3;189:13
**interview (121)** 24:16;51:5,7,17;57:25;60:17;96:15,18,19;97:6,12,21,22,23,25;98:4,6,11;99:17;103:12;104:7,18,22;120:10;123:23;124:13,15,25;126:12,17,21;127:23;128:3;130:8;142:24;152:4,7,11,13;155:19;156:12;157:20;158:1,7;168:22,24;169:4,14,17,19,22,23;170:1;174:13;176:11;177:4;178:14;179:18,19;180:22;181:17;183:25;188:7,10,11;189:10;190:21;191:8,14;199:5;200:1,2,5;203:10;205:4,15;211:17;215:14,15,15,17,20;216:3,6,16,20,23,25;217:5,14;218:11,17,19,24;219:5,8,20,25;221:7;222:14;224:23,24,25;227:12;231:22;241:20;243:22;244:1;245:14,21;246:13;250:3;258:15;266:6;270:14,20;277:13;281:22;288:23;313:17,19
**interview/interrogation (1)** 24:10
**interviewed (28)** 96:16;101:15;104:16;107:20;118:12;122:1;124:6;126:4;131:25;137:25;140:9;142:13;152:2;153:12;155:9;158:23,25;169:11;174:17,19;182:5;184:22;188:15;190:20;213:3;218:10;253:16;265:6
**interviewer (1)** 127:13
**interviewers (1)** 100:1
**interviewing (11)** 51:9;67:12;99:18;126:23;127:1,19;158:19;168:17;175:19;281:18;288:18
**interviewing/interrogation (1)** 17:22
**interviews (29)** 16:15;17:19;57:13,14,16;63:1;66:7,8,17;85:24;95:5,10,17,19;99:9,12;100:16;156:6;170:6;219:21;220:2,16,19;221:2,11,25;222:9,23;288:25
**intimate (1)** 258:21
**intimately (5)** 106:23;163:13;173:19;258:14;315:3
**into (50)** 15:25;19:6;26:7;33:16;38:11;39:5;46:6;47:21;48:4;80:22;81:1;82:21;87:15;94:14;116:21;117:18;123:12;127:14;134:9;135:22;140:6,8;149:6,8;157:3;170:1;179:3,9;181:14,15;202:5;224:24;229:22;232:20;233:6;243:21,

25;250:3;254:14,20; 276:4;277:4;278:12, 21;282:23;306:9; 312:5,8;313:17; 314:18
**intrigued (1)** 74:16
**intro (1)** 96:24
**introduce (1)** 236:20
**introduced (1)** 63:7
**introduction (3)** 17:14;97:16;236:19
**introductory (1)** 30:6
**inves (2)** 17:11;82:9
**investigate (5)** 11:1;70:8;140:11; 220:24;317:1
**investigated (1)** 96:7
**investigates (1)** 106:2
**investigating (5)** 14:14;21:4;68:10; 220:8;225:22
**investigation (82)** 17:20;19:6;21:7; 22:22;30:19;31:11; 33:12;35:8,25;36:14; 40:2;43:1;45:2,4,7,11, 11,17;46:15;50:2; 51:19;55:20;56:14; 57:11;59:23;63:10, 16,18;67:22;69:1; 70:5;74:10;76:4;77:9; 79:1,22;80:6,11,13, 18;81:21,24;82:18,20, 25;87:25;88:2,11; 90:14;91:8,11,21; 92:10,10,12;93:12; 123:19;125:17; 138:13;140:18;141:3; 142:6;155:11;166:17; 170:6;173:11;177:15, 17;197:12;277:10; 279:2,6;280:17; 282:2;284:7;289:20; 296:16;298:1;304:5; 306:9;316:17,21
**investigation/cold (1)** 93:11
**investigations (19)** 14:7,7,12;16:20; 18:16,17,18,21;20:15, 19,24,25;24:8;89:2; 94:20,25;96:1; 123:18;172:6
**investigative (20)** 17:13;18:13;36:20; 47:13;51:22;53:2; 54:5;55:5;77:15; 78:19;83:2;91:5; 131:7;146:5;147:7; 192:18;278:20,23; 289:12,17
**investigator (3)** 68:23;81:5;144:4
**involved (88)** 15:2;17:20;18:25; 20:24;33:12;36:14; 40:19;45:2,3;62:21; 69:25;74:7,10,14; 81:12;89:10,12;91:9, 12;96:10,12;105:10, 20;106:23;112:21; 113:10;121:12,21; 122:2,3,5,24;123:18, 24;124:4;131:16,17, 20;135:16;136:17,25; 147:15,16,20;149:13; 150:22;159:3;160:17; 163:14;164:10; 165:17;168:22;170:5; 173:19;175:11,17,20; 186:6,6;192:13; 208:3;211:1,4,6,11; 216:3,5;217:13; 226:24;243:8;249:17; 250:10;258:9,14; 263:5;270:5;278:8, 11,13,23;279:1,3,5; 280:12;282:24; 292:19;311:5;315:3
**involvement (37)** 33:20;59:9;62:16; 66:21,24;87:21; 94:19;105:4;132:2; 138:11;147:19,23; 148:11;158:24;169:1; 175:15;177:9;178:15; 184:25;202:3;210:15; 211:14;212:3,16; 219:5;228:9,14,17,20; 238:7;255:14;257:10, 12;264:23;265:3; 309:20,25
**involving (2)** 176:10;222:17
**in-your-face (1)** 100:11
**issue (2)** 68:12;103:20
**issues (15)** 4:11;47:23;90:24; 95:21;96:22;101:8; 109:4;116:22;120:19; 146:7;169:12;188:8; 215:7;218:3,4
**items (2)** 263:18;280:5

## J

**Jack (3)** 68:13;186:7;269:6
**jail (19)** 179:3,8,10,19,20; 182:10;183:16;184:1, 9;230:14;232:25; 253:24;254:3,4,8,9, 12;256:13;272:25
**January (5)** 11:9;21:14;23:23; 26:15;282:10
**jeans (1)** 144:2
**Jen (1)** 88:3
**Jennifer (3)** 4:17;6:9;303:18
**Jersey (14)** 5:8,10,12;9:13,14, 24;11:4,18;21:10; 22:7;35:16;52:6,14; 109:5
**job (5)** 16:10;39:12;83:18; 95:22;225:17
**jobs (2)** 89:8;90:2
**Joe (8)** 31:25;63:6;69:19; 89:24;98:4;127:12; 305:16,23
**John (2)** 28:11;73:19
**Johnson (1)** 155:10
**join (3)** 69:11;178:25; 260:22
**joined (4)** 22:15;28:10;68:22; 80:9
**joining (2)** 6:4;168:23
**Jones (8)** 42:16,19,24;43:20; 88:13;89:23;164:25; 165:1
**JR (1)** 4:1
**J-R (1)** 29:8
**judge (7)** 180:20;254:9; 255:8,12,15,17; 308:21
**judgment (1)** 232:19
**jump (1)** 266:24
**jumping (1)** 263:16
**June (19)** 36:6,16,21;37:14; 41:22;54:18,19,20; 55:10;104:15;105:3; 120:2;123:17;124:7; 137:24;152:1,3; 289:5,22
**Junior (5)** 8:17,19;28:20;29:6, 8
**jurisdiction (2)** 13:10;19:18
**jury (4)** 148:10;310:6; 318:25;319:1
**justice (3)** 12:1,6,10
**juvenile (1)** 24:16
**juveniles (3)** 40:16;54:17,24

## K

**Kathy (1)** 153:12
**keep (10)** 4:10;39:11;71:4; 136:13;147:6;159:9; 250:25;260:11,19; 261:11
**keeping (3)** 61:10;260:13,15
**Kelly (2)** 248:9,17
**Kelly's (1)** 248:16
**kept (1)** 38:12
**Kevin (2)** 288:18,25
**keyed (1)** 275:16
**kid (2)** 108:13;110:15
**kids (2)** 106:25;242:22
**kill (5)** 119:13,14;123:4; 159:12,13
**killed (4)** 109:14;135:5; 136:4;310:21
**killer (1)** 143:22
**killing (2)** 119:2;261:7
**Kimble (1)** 281:23
**kind (6)** 17:2;100:9;231:23; 243:1;268:8;276:5
**King (1)** 5:17
**knew (21)** 43:12;70:7;106:3, 10,13;126:1;174:10; 189:8;199:12,14; 219:14;225:24; 241:12;250:11,11; 258:25;259:19;263:2, 3;273:1;312:10
**knock (1)** 97:3
**knowing (4)** 139:10;170:21,23, 24
**knowledge (33)** 40:18;51:21; 102:25;104:12; 147:23;157:17; 169:20;171:23,25; 174:17;175:10,15; 179:20;180:5;182:12; 183:9;187:14;190:12; 191:10,11,12;199:25; 200:22;216:21;217:7; 219:8;226:12;247:5; 250:4;258:21;267:22, 23;269:25
**known (10)** 104:23;173:5,6,7; 175:19;191:3;194:25; 195:17;208:7;231:21
**knows (7)** 110:23;135:7; 137:4,23;258:17; 262:17;286:6

## L

**Lack (1)** 94:10
**Lacks (1)** 145:19
**laid (2)** 136:15;275:18
**lapse (1)** 264:12
**laptop (1)** 179:11
**large (10)** 65:20,22;236:6,6; 243:23;257:18;268:5; 269:12;301:12,15
**larger (3)** 76:19;87:20;278:12
**Last (56)** 8:18;14:3;16:22; 29:7,14;30:7;32:6,17, 25;52:3;56:9;57:3; 58:8;61:17;74:1,4,15; 86:5;105:10,22; 106:4,14,16;107:7,10, 14,21;108:7,12,14,15;

109:13;110:15;111:3,8,8,14,23,25;112:6;113:6;116:24;117:15,20,21;118:7;135:15;137:22;154:19,22;248:10;275:8;296:9,10;309:17,17
**lasted (1)** 30:4
**late (2)** 184:16;313:15
**later (27)** 18:4;34:3;58:21;60:23;61:6;69:18;79:12;80:13;81:17;104:2;108:21;120:16;122:1;134:17;135:22;136:25;178:13;195:22,25;196:3;202:8;233:16;237:21;240:3;263:20;270:8;288:5
**laundering (1)** 24:11
**Laurino (1)** 306:21
**law (31)** 6:20;8:2;10:9;12:17;13:14;19:7,12,14,17,19;21:23;36:19;59:16;61:4,11;64:4,7,9;93:21;109:3;156:4;158:13,15,25;160:8;161:4;221:25;261:10;271:11,16;272:9
**lawful (3)** 156:16,19,23
**lawsuit (4)** 30:21;32:14;285:1,8
**lawsuits (1)** 6:25
**lead (33)** 45:15;55:8;65:12;71:21;95:16,23;96:24;98:7;99:4,14,19;105:3,19;106:5;117:24;120:5;126:12,15,16,21,22;148:16;163:24;164:9;165:3;197:1,8;278:14;288:10;291:8;306:4;314:4,6
**leading (2)** 45:11;289:21
**leads (9)** 56:6;144:22;196:16,22;197:12;213:24;287:13,16,25
**learn (6)** 17:18;101:6;127:7;195:22;240:3,8
**learned (2)** 233:16;237:21
**learning (1)** 81:23
**least (25)** 25:19;58:2;64:16;71:17;77:21,24,25;78:13,17;84:15;85:23;89:2;93:10;99:2;108:22;109:21;193:9;237:11;276:6;278:8,19;281:11;289:6;298:1;317:16
**leave (7)** 36:10;56:17;143:16;144:22;224:25;230:11;259:19
**leaving (3)** 108:2;137:22;239:10
**led (14)** 57:17;95:10;112:20;113:9;116:19;117:11,13;157:15;162:11;170:1;192:23;193:23;241:10;292:11
**Ledger (2)** 266:8;267:18
**Lee (141)** 4:18;7:9;40:25;44:6;46:10,11;47:2,6;50:2;55:19,20;56:7,25;57:5,8,11,14,17;58:2,6;62:20;67:6;96:5;97:22;98:3,11,24;104:25;105:4,16,19;106:3;107:12,22;108:4,4;111:7,13,23;112:9,16,21;113:9;114:1,16,21;115:2,14;116:1,12,16,16,20;117:14;118:6,15;120:14,25;121:9,12,20,24;122:19,23;123:3,23;124:4;129:16;133:3;138:12,18;139:10;141:11;142:15;143:1;144:24;147:12,15,18,20,23,25;148:11,21;149:13;150:9,13;153:2;154:23;158:9;160:9,16,18;162:23,24;163:8,11;164:14;165:3,5,13,14;171:5;174:11;176:3;177:9;190:12,16,20;200:7;201:3;202:5;204:19,20;210:15;212:3;228:20,23;263:5,11;276:8;278:5;281:18;290:2,23;291:4,10;292:13;295:22;296:11;297:13;299:3,21;309:19,25;310:6,20;311:5;312:14,20;318:15
**Lee's (1)** 167:16
**left (15)** 29:9;98:15,16,17;107:13;135:4,17,18;137:1,2,3;190:14;210:10;233:10;301:9
**legal (1)** 65:22
**legally (1)** 291:22
**leniency (2)** 290:12,16
**Lenzell (1)** 281:23
**less (2)** 99:2;270:8
**lesson (1)** 276:8
**level (1)** 159:13
**levels (4)** 27:1,7,13;182:14
**lied (2)** 309:19,24
**lieu (1)** 254:4
**Lieutenant (93)** 32:24;33:17,21;34:1;42:10,21;43:16,24;44:22;46:9;48:12;49:23;50:1,5,12,20;51:2,24;53:18;55:16,17;56:24;59:5;62:19;63:17;64:16,22;65:9,13;67:8;69:5;73:19;74:24;86:17,22;88:14;91:17;92:6;94:1,12,24;95:6,16;96:17;104:19;124:10,21,24;125:23;126:20,25;131:25;152:2;153:5;169:19;175:13;176:9,17;177:3;178:10;184:21;185:6;186:18;189:9,19;203:3,24;209:6;210:17;216:17;227:21;228:12;231:15;232:13;233:3;238:19;239:9;240:10;245:7;246:21,25;247:17;249:8,22;285:21;295:14;307:5;311:4,14;312:15,18;316:18;319:5
**Lieutenants (2)** 239:3;301:8
**life (1)** 122:20
**lifted (2)** 238:5,9
**light (4)** 132:25;152:19;155:2;291:23
**liked (1)** 201:14
**likely (5)** 79:15;123:23;145:13;266:21;273:23
**Lillie (7)** 104:16,22;123:21;130:16;131:10,15;132:22
**line (2)** 84:23;246:19
**lines (1)** 166:17
**lingo (1)** 21:23
**link (3)** 151:10;175:20;262:15
**linked (1)** 132:23
**links (1)** 75:18
**LIPSHUTZ (93)** 4:20,24;5:1,23;63:12;68:15;69:9;78:22;87:3;88:3,19;90:16;91:10,24;93:4,8,13;94:10,16;95:7;96:20;107:16;108:10,24;111:11;112:23;114:17;116:9;118:11,19;122:10;123:6,8;137:19;138:7;139:4;143:25;145:19;146:8;150:6,17;160:21;164:15;178:25;180:4,12;181:19;182:13,18;189:12;191:16;192:2;194:23;195:4;221:13,16,18;223:19,24;224:10;242:24;243:2,16;247:11;248:5;255:2;257:5,8;260:21;261:24;262:22;267:5;283:12,20;294:1,12;296:5,13;297:17;298:4,16;302:24;303:2,5,6,17,24;310:23;316:9;318:19;319:9,16,22
**Lipshutz's (1)** 318:9
**list (10)** 25:14;40:24;41:12;49:1,13;174:25;176:25;192:11;199:23,24
**listed (3)** 26:11;28:4;70:14
**listen (3)** 103:24;160:2;229:25
**lit (1)** 195:19
**literally (1)** 256:25
**Litigation (1)** 5:2
**little (18)** 8:23,24;11:13;29:10;33:4;56:13;83:24;105:13;111:5;119:13;177:13;205:23;233:11;234:20;264:15;270:16;277:7;279:9
**Littleton (1)** 85:14
**live (3)** 9:12,17;237:7
**lived (2)** 9:15;241:2
**living (4)** 11:2;195:20;241:16;260:7
**lo (1)** 261:22
**local (6)** 19:3,7,14,17,19;296:11
**locate (4)** 51:13;52:7;173:4;176:6
**located (6)** 22:5;131:23;136:18;205:1;241:6;242:1
**locating (4)** 176:7,12,14;259:22
**location (18)** 18:8;75:21;217:18;218:6;234:11;235:13;240:4,20;241:10,22;250:7;255:11;286:5;287:10;311:14;312:1,9,19
**locations (2)** 52:19;173:5
**lock (1)** 149:23
**locked (3)** 273:19;276:10;311:17
**locking (1)** 163:7
**lodge (1)** 8:21

**logic (3)**
144:5,7,18
**logical (2)**
136:3;238:17
**logs (1)**
252:6
**long (28)**
9:15;10:3;11:6;14:3,24;16:22;19:25;20:7;21:12;30:3;46:14,19;56:9;68:1,2;129:1,7,10;234:25;235:1,2;237:3;252:17;256:19;257:6;258:6;275:8;302:9
**longer (1)**
192:19
**long-term (3)**
20:21;64:11,13
**look (75)**
18:1;24:14,18,19;30:14;34:2;40:8,10;47:20;52:16;56:1,2;59:6;60:6,10,16;65:1;66:20;71:5;72:24;73:5,23;76:19;83:8,22,22;86:4;89:6;119:12;120:3;140:6,8;163:11;168:16;169:3;170:13;176:20;177:4;178:11;196:15;197:18;198:16,18;203:16,19;204:17;207:17;209:11;210:9,21;216:15;238:21;242:3;244:20,22;245:2,24;246:4;257:16;264:4;265:10;266:3,19;269:14,17,24;284:19;285:3;286:10;294:16,17;306:17;310:17;314:18;317:17
**looked (42)**
17:9;30:15;34:21;39:1;48:22;66:17;76:25;120:23;121:5,8;130:15;134:9,10,10,14;142:4,8;169:1;173:5;178:5;179:3,9;192:22;193:1,13;194:25;196:1;197:2,9,20;201:14;202:25;214:24;225:11;250:21;251:6,11;258:14,22;285:6,18;286:10
**looking (51)**
7:10;29:17;33:18;40:7,14;42:25;43:1;44:10;45:14;47:18;48:4,24;49:19;50:17;51:5;52:24;53:3,8,9;55:13;56:7;71:3,20;86:15;91:12;92:8;94:13;100:7;109:24;110:4;115:9,10;120:2;121:24;139:2,16;144:17;163:23,24;165:1;170:12;179:12;193:2;242:5;249:25;257:15;258:6,20;285:14;286:12;303:24
**looks (11)**
35:23;47:11;48:3;63:21;78:3;84:20,23;146:10;170:17;249:21;266:6
**lookup (1)**
204:11
**lost (1)**
136:21
**lot (11)**
76:3;89:7;118:14;136:11;159:25;160:6,7,10,13;171:12;220:24
**Lou (5)**
63:10;174:12;186:6;239:20,20
**Louis (2)**
5:18;295:7
**loved (1)**
135:3
**low (4)**
22:11;159:12,12;287:23
**low-level (1)**
289:18
**luck (1)**
190:21
**lucky (1)**
179:15

## M

**mailbox (1)**
301:10
**main (8)**
44:5;46:10;47:3;50:2;57:9;58:2;115:2,7
**Mainly (1)**
219:22
**maintain (2)**
32:21;52:12
**maintained (2)**
32:9;37:22
**maintaining (1)**
38:22
**Major (2)**
21:5;75:23
**majority (3)**
87:21;127:15;219:21
**makes (3)**
15:22;46:16;144:19
**Making (5)**
139:23;140:13;162:7;163:7;253:7
**male (2)**
131:18,22
**males (1)**
293:5
**man (3)**
130:8,15;159:10
**manhandled (1)**
201:10
**man-manipulated (1)**
201:12
**man's (1)**
130:14
**many (32)**
6:13,17;22:8;26:8;27:13,14;29:25;31:6,13;70:6;75:16;79:6;91:2;103:10,18;112:25;119:6;120:15;127:18;140:23;174:24;182:13;251:2;257:9;258:3,13;260:8,25;262:11;269:10;285:9;300:23
**map (2)**
242:3,5
**March (7)**
64:9;73:19;256:21;289:23;300:3;303:9;306:19
**marijuana (59)**
113:11,18,20,21,25;114:12,13,20;115:14,15,19,20,25;116:15;117:2,4,19;119:2,9,15;120:14,25;121:7,10,20,21,25;122:3,5,8,14,18;123:2,5,11,11;128:9,21;129:2,15,19,24;153:17,20;154:1,2,8,12;155:1;161:7,7;167:2,2,3,16,17,23;168:1,14
**mark (9)**
24:19;25:5;34:7,12;70:11,13;246:6,7;294:18
**marked (12)**
25:1;34:16,21;62:18;70:18;71:7;73:4;76:20;246:14;294:22;303:17,21
**marshals (1)**
257:25
**Marvin (2)**
169:13;175:4
**match (3)**
52:17;145:18;291:23
**matched (1)**
266:15
**matches (1)**
52:7
**materials (5)**
64:25;70:21;71:10,13;177:24
**math (2)**
10:6;257:2
**matter (4)**
4:19;32:18;247:14;302:18
**matters (1)**
247:15
**Maurice (6)**
118:22;141:10,18;142:10;148:20;150:10
**Maurine (1)**
145:1
**may (104)**
7:1;8:21;15:25;16:7;18:3;33:6,14;34:4;36:6;37:4;40:5,20;41:15,20;42:6,9,21;43:17,24;44:1,16,23;46:12;47:17;48:5;49:24;50:5,8,9,11,12;51:2,24;52:2;53:17;55:3,15;56:15;58:3,20;64:23;65:7,14;67:2,9,20;69:8;72:10;75:5;76:9,9;80:12,17;81:14;85:23;86:3;93:16;95:1;96:21,23;99:7;101:25;102:4,8;104:4;108:16;111:7;116:15;131:16;132:14,23;133:6;136:4;138:19;141:4;169:7;173:21;175:22,23;176:6;177:1;190:11;195:12;196:7,23;207:1;216:7;225:6;227:15;248:12;249:19;258:19;273:15;279:22;281:2,11;285:6;299:8;304:17;309:15;314:3,10,12,13
**maybe (25)**
8:23;17:3;44:18;69:21;80:5;82:7;85:2;99:3;119:7;122:23;142:14;147:10;149:15;171:15;197:16;202:12;214:24;219:24;252:18;265:10;288:9;291:21;300:24;304:13;316:6
**Mayor (1)**
5:4
**McCarthy (1)**
5:4
**McDowell (8)**
110:1,2;126:5,23;128:12;130:7;131:10;133:6
**McDowell's (2)**
128:12;132:7
**mean (39)**
10:16,23;19:3;25:9;43:8;45:14;54:15;56:2;57:10;61:25;66:11,15;74:15;75:12,23;88:24;106:20;126:14;142:2;144:3,4;145:17;152:18;159:10;173:25;185:3;195:8;212:13;228:14;237:7;238:7,17;247:14;266:20;273:25;285:9;298:13;310:3;319:14
**means (2)**
259:18;261:13
**meant (2)**
137:16;244:2
**media (4)**
146:22,24;265:20;266:1
**meet (8)**
5:6;44:1;49:24;230:7;270:12,24;273:7;319:10
**meeting (34)**
34:3;50:4,11;53:18,22;55:15,23;56:6,9,12,12,17,22;58:20;62:19,25;64:22;67:9;155:15;168:19;275:8,10;300:3,5;306:20,21;307:11,13,16,23;308:4;314:12,14,18
**meetings (3)**
280:15;287:25;300:8
**Melvin (1)**
130:16
**member (6)**
88:22;94:12;109:14,25;203:4;206:17
**members (9)**
63:22;86:25;89:11;95:5;106:24;112:1;167:4;189:20;190:2
**memorialize (9)**
36:23;37:10;219:4;220:20;221:1;247:4,8;248:1;249:4
**memorialized (4)**
216:8;250:13;277:22;314:22
**memorializes (1)**

278:20
**memorializing (2)**
80:16;81:15
**memories (3)**
161:25;283:15;
313:4
**memory (10)**
24:9;36:22;53:24;
55:14;177:13;210:11;
211:24;232:20;
233:19;288:21
**men (5)**
40:16;53:9;132:23;
167:15;170:4
**mentally (1)**
238:3
**mention (5)**
46:10,14;48:22;
178:1;285:21
**mentioned (13)**
6:24;8:20;23:24;
47:6;58:11;74:11,16;
199:2;241:18;278:10;
280:8;291:18;317:21
**mentioning (2)**
47:8;192:25
**mesh (2)**
127:14;151:10
**meshing (1)**
127:22
**message (3)**
98:15,16,17
**met (10)**
29:21;55:17;72:3;
142:24;155:13;
176:15;205:20,21;
233:23;319:12
**Michael (2)**
5:11;282:8
**Middle (7)**
8:18;23:1;29:7;
184:18;207:10;
213:10;268:9
**midnight (1)**
112:14
**mid-thought (1)**
146:14
**might (23)**
17:20;25:21;33:19;
40:11;48:13;82:17;
87:11;97:2;99:24;
102:10,12;107:25;
132:25;159:4,4;
175:10;179:14;190:4,
12,24;214:18;271:1;
283:8
**Mike (1)**
128:12
**miles (1)**
237:8
**million (1)**
151:5
**mind (14)**
6:25;40:7;102:21;
114:3,6;119:21;
136:14;140:4;175:2;
181:11;197:23;202:8;
250:25;266:4
**mine (5)**
127:21;194:19;
282:15,16;283:14
**minimal (4)**
91:3;231:24;
263:13;268:5
**minimize (1)**
291:19
**minimum (1)**
4:10
**minute (4)**
224:23,24;240:7;
242:11
**minutes (8)**
30:7;198:6;214:11;
235:7;236:1;237:8,
11;299:9
**Miranda (16)**
98:7,9;103:6;125:8;
126:3;176:17;207:8,
17;209:17;210:21;
214:24;244:3,9,15;
247:20,21
**Mirandized (1)**
248:22
**missed (3)**
134:17;137:7;
299:11
**Missing (72)**
10:18,21,23,24;
11:1;22:3,4,8,12,21;
23:13;24:3;26:22;
33:5,12,13,22;40:1,
15,19;46:7,24;48:5;
49:3;52:22;53:6,14;
54:17,24;63:5,16,25;
64:11;69:7;71:18;
72:18;75:13;78:1;
88:21;90:13;91:8;
93:11;96:11;107:2,4;
108:8,12,13,20;
109:19;110:10;118:6;
130:10,25;131:9;
134:3;137:17;141:12;
155:7;168:2;188:21;
200:15,23;222:15,18;
269:25;295:17;304:4;
306:4,8;317:7,12
**Mister (1)**
25:10
**mistype (1)**
304:18
**misunderstood (1)**
80:5
**miswrote (1)**
304:23
**mix (1)**
229:22
**mixed (2)**
128:15;250:2
**moment (3)**
6:5;205:25;266:17
**Monday (1)**
306:19
**money (14)**
24:11;113:20,20;
114:12;116:6,7;
139:22;162:7,20;
254:12;301:15,16,17,
20
**monitor (1)**
318:6
**monitoring (1)**
318:5
**month (2)**
129:6;292:21
**monthly (1)**
262:8
**months (13)**
15:1;54:11;55:11;
79:7,12;80:6,6;81:17;
208:5;258:7;289:6,7;
292:8
**more (27)**
11:13;17:13;18:3;
30:5;51:1;57:23;
64:24;99:11;123:18,
23,25;132:19;153:4;
175:3,18;176:13,24;
205:24;210:18;237:1;
260:25;264:10;
278:13;279:10;289:6;
312:7;314:1
**morning (8)**
4:5,6,20,25;5:7,15;
6:8;28:13
**most (9)**
18:22;19:1;79:14;
103:23;164:3;219:11;
220:1;222:14;251:24
**mother (2)**
109:23;130:16
**mothers (1)**
175:3
**motive (19)**
113:14,17;114:4;
116:15;117:5,5,7,15;
119:2,17,21,22;
120:24;121:6,7,10;
123:13;143:1;169:6
**motives (5)**
119:23;120:1,13,
15;121:3
**motor (3)**
180:10,17;301:19
**mouth (1)**
298:8
**move (6)**
18:4;29:11;156:5;
202:22;217:2;290:10
**moved (3)**
15:25;157:2,18
**movement (3)**
157:6,11,24
**moving (2)**
147:7;153:11
**Mrs (2)**
84:12;130:7
**much (20)**
21:23;22:14;47:4;
61:14;64:24;67:22;
73:24;75:14,19,23;
76:1;171:17;177:23;
198:5;209:17;237:1,
1;264:9;276:23;
278:13
**muffled (2)**
189:14;265:16
**Muhammed (2)**
307:7;311:13
**multi-month (1)**
81:21
**multiple (4)**
98:11;119:11,16;
179:7
**multiple-alarm (1)**
85:12
**multi-victim (1)**
20:21
**municipalities (2)**
15:11;19:3
**municipality (2)**
19:7,12
**Murad (2)**
307:7;311:13
**murder (8)**
20:18,25;21:2;
114:4;123:14;148:1;
237:24;242:22
**murdered (2)**
46:24;108:23
**murders (6)**
105:5,21;123:24;
238:11;254:25;258:9
**Murphy (1)**
73:19
**must (2)**
178:19;208:14
**myself (9)**
4:16;88:23;236:20;
243:13;245:7;276:25;
311:11;313:18;318:2
**mystery (1)**
133:7

## N

**nail (1)**
149:23
**name (28)**
4:17;5:1,15;6:9;
8:14,15,15,17,18;
28:11,18;29:5,6,7;
49:9,10;51:18;110:1;
128:15;130:17;
131:23;168:18,25;
169:21;174:20;
178:10;248:10;
304:12
**named (7)**
7:9;31:6;116:7;
117:23;139:22;282:2;
302:1
**names (2)**
178:4;318:1
**narcotics (2)**
24:12;121:12
**narrative (10)**
35:23;40:15;41:5,
11;42:5;53:21;54:23;
77:12;84:4;144:19
**National (1)**
61:11
**natural (1)**
9:3
**nature (2)**
50:14;245:17
**necessarily (6)**
82:20;86:21;89:5;
131:13;265:13;
281:10
**necessary (1)**
33:9
**need (18)**
4:13;8:4;21:25,25;
33:5;34:18;79:25;
82:6;114:18;146:13;
164:22;198:5;225:1;
245:13,13;246:5;
279:20;289:16
**needed (1)**
18:16
**needs (1)**
70:11
**negative (2)**
93:5;140:16
**neighbor (1)**
265:15
**neighbors (1)**
257:17
**Nelson (3)**
131:21,23;152:1
**New (28)**
5:8,10,12;9:12,14,
24;11:4,18;21:10;
22:6;35:16;52:6,14;
58:23;59:2,6;109:5;
115:4;144:11;169:24;
173:17;208:6;240:21;
250:22;251:1;253:6;
297:24;298:9
**Newark (73)**
5:3;21:10,18;22:1;
33:13;63:19;66:3;
68:14,21;69:6,13,15,
17;70:24;73:3,7;
84:21;85:3;91:11,22;

92:24;94:7;95:25;
96:7,12;128:22;
130:4;131:24;185:16;
193:5;201:7;205:21;
210:7;211:18;215:8;
219:6;221:5;223:9,
22;226:21;227:1;
230:3;231:8,13,25;
233:20,23;234:7,21;
235:14,23;236:20,21;
237:4,19;238:23;
239:11;240:10;
242:12;243:6,18;
244:10;245:10;
251:14;259:19;
269:10;295:18;306:3;
307:8;308:9;315:11,
22;316:2
**Newark's (2)**
93:5,10
**newer (1)**
133:14
**news (2)**
40:20;250:22
**newspaper (3)**
66:5;252:5;263:18
**next (12)**
27:7,12;34:5;65:6;
106:25;125:20;
200:11;206:24;
263:20;268:6,7;274:3
**Nice (2)**
5:6;319:10
**niece (1)**
128:21
**night (13)**
30:7;74:1,4,15;
106:16;135:4;136:17;
151:20;154:20;155:5;
228:10;230:21;264:7
**nine (1)**
296:19
**NJDOC (1)**
156:10
**NJSP (1)**
24:25
**nobody (2)**
251:1;288:4
**noise (2)**
4:8,10
**None (3)**
106:24;310:2,3
**nonoperational (1)**
218:15
**non-prosecution (2)**
290:21;291:2
**nonthreatening (1)**
100:6
**normal (7)**
79:13;144:12;
242:18,20;252:3;
265:11;273:17
**Northwest (1)**
9:14
**nose (1)**
267:1
**notated (1)**
86:21
**note (2)**
79:25;247:7
**notebook (2)**
37:8,11
**noted (2)**
75:14;251:5
**notepad (4)**
37:5;39:10,17,17
**notes (65)**
36:24,25;37:3,11,
14,19,25,25;38:12,17,
20,23;39:1,5,6,14,21;
40:1,11;53:23;54:1;
56:2,22;57:21;66:2;
70:6;79:13;80:18,23,
24;81:1,6,13,22;82:2,
9,14,14,15,18,21;
124:12,14;209:1,5,9,
20;211:21;219:4;
220:21;283:15,15,16,
17;284:3,7,11,17;
285:4,15,19;299:9;
314:15,20;315:18
**notice (5)**
36:2;65:6;124:9;
251:25;260:24
**noticed (2)**
47:20;278:7
**notified (2)**
178:20;179:23
**November (34)**
26:1;172:17;173:1,
4;178:12;179:17;
187:12;189:9,18;
194:17;195:13;196:8;
199:13;219:7;220:2;
231:7;247:1;248:2,3;
250:14,16;270:7;
274:6,10,15;275:10;
278:21;279:11;
280:20;291:13;292:4,
15;293:16;315:10
**nowhere (1)**
148:17
**number (23)**
7:10;43:11;48:19;
49:8,9,11,17;76:16;
83:24;84:25;85:4;
95:4;122:4;137:12;
147:4;198:12;207:9;
266:1;270:10,11;
282:21;304:14;
316:24
**numbers (2)**
49:2;199:9
**numerous (1)**
163:13
**Nutley (1)**
213:13

## O

**oath (2)**
7:24;8:1
**object (3)**
69:9;92:1;221:19
**objecting (1)**
182:21
**objection (159)**
8:24;63:12;67:13,
16;68:15;69:11;
78:22;83:4;87:3,5;
88:19;90:16;91:10,
24;93:13;94:16;95:2,
7;96:20;105:7;
107:16,18;108:10,24,
25;110:25;114:17;
116:9;118:9,11,17,19;
121:22;122:10;123:6,
7;127:4;136:8;
137:19;138:7,8;
139:4;143:25;145:19,
21;148:15;150:6,16,
17;151:14,21;152:15;
156:7;157:9,21;
160:21;163:2,20;
164:6,15,17;166:6,14,
19;174:8;178:22,23;
179:1;180:3,4;181:6,
7,19;182:13,14,16;
183:13,23;184:3;
186:22;188:25;
189:25;190:6;191:1,
16;192:2,20;194:23;
195:4,5;196:18;
201:19,24;202:19;
209:24;217:8;220:17;
221:12,16;222:24;
223:19;224:10,11;
225:3;227:8;229:6;
238:25;239:6,12,17,
23;242:24;243:2,3,
16;247:11;248:5;
255:2;257:5,8;
260:21;261:15,24,25;
262:22,23;267:3,5;
276:20;283:10,12,20,
21;287:20;288:13;
292:9,16;293:2;
294:1,12,13;296:5,13;
297:16,17;298:3,4,15,
16,23;299:4;308:11;
309:11;313:11,14,15;
317:23;318:17,19
**objections (2)**
8:21;182:23
**obligated (2)**
222:22;223:17
**obligation (3)**
156:25;285:3;309:8
**obligatory (1)**
220:16
**oblige (1)**
8:5
**obliges (1)**
274:19
**observe (7)**
216:14;244:12;
271:16;272:1,3,6,8
**observed (3)**
130:13;137:23;
216:19
**observing (1)**
5:24
**obtain (1)**
63:21
**obtained (7)**
41:3;152:6;153:16;
296:25;297:1;308:2;
315:21
**obvious (1)**
10:24
**Obviously (8)**
36:5;146:9;185:10;
199:13;217:17;
220:10;223:6;310:5
**occasions (2)**
161:22;163:13
**occur (1)**
264:10
**occurred (16)**
15:11;19:11;
173:20;190:13,19;
210:2;228:10;240:2;
247:8;251:3;264:3,6,
25;265:14;266:9;
295:18
**occurrence (1)**
87:16
**occurrences (1)**
82:8
**occurring (8)**
84:22;85:6;217:23;
232:3;235:10;237:2,
20;263:7
**o'clock (22)**
106:16;112:14;
154:20;155:5;185:19,
20,20;186:20;187:11,
12,13,13,15,16,17;
228:1;229:17,17,17;
247:1,9;248:2
**October (1)**
26:15
**odd (6)**
135:8,9,21;141:23;
218:18;258:2
**off (27)**
29:9;47:24;54:16;
55:14;56:21;76:13;
90:5;91:16;99:8;
125:19;143:20;147:1;
150:3,8;197:21;
198:9;238:6,9;
244:24;257:13;265:2,
20,23;272:25;299:10,
12,14
**offender (3)**
102:17;104:9;
290:24
**offense (2)**
212:23;222:17
**offensive (1)**
127:17
**offer (2)**
43:13;290:16
**offered (3)**
13:21;63:2;295:20
**offhand (1)**
194:9
**Office (67)**
5:9,13;33:18;38:25;
44:2;45:14,20;49:25;
53:19;68:18,22;69:3;
93:16;94:3,8;155:18;
157:20;180:21;181:5,
17;182:5;183:12,19;
184:10;185:15,25;
186:3;187:11;204:25;
205:11,24;206:20;
215:8,13,22;216:4,7,
18;217:5,15,19,22;
223:13;224:22;226:9;
227:13,25;233:11;
234:9,24;235:3;
236:6;237:4;239:11;
244:5;254:15;270:13;
274:11,20;281:15;
290:1;292:7;305:8;
306:20;307:3;311:8;
312:21
**officer (11)**
6:21;31:10;61:4;
68:14;88:16;218:8;
245:9;255:19,21;
269:20;300:18
**officers (10)**
99:11;237:17;
243:7;280:21;290:16,
21;306:13;316:20;
319:2,4
**officers' (1)**
318:14
**offices (1)**
243:19
**official (2)**
271:16;272:9
**often (1)**
4:7
**old (2)**
114:23;177:25
**Olds (5)**
118:22;141:10,18;
142:11;145:1
**Olds' (1)**
150:10
**once (8)**

38:11;39:4;143:10;205:11;219:14;243:6;252:4;260:4
**one (119)**
7:14,19;9:2;38:23;43:11;51:1;58:8;59:11;61:23;62:14;63:20;64:14;66:14;75:1;76:6;84:24;87:20;88:13;91:18;94:22;96:2;98:15,16;99:25;106:4;107:25;109:23;110:16,17,22,22;111:2,7,18,24,25;113:5,6,23;115:15;120:1,14,24;121:6;122:18;124:19,21;126:13,13,17;128:8;134:16;135:14,15;136:16;137:18;138:16;143:2;149:14;152:22;154:1,7;158:10;159:4;164:2,11;165:2,5;168:5;171:22;172:11;174:12,24;180:7;186:14;192:25;195:20;196:22;200:25;201:2;202:24;207:1;209:14,15;212:19;214:7;217:3;219:12,23;223:16;224:8;238:23;241:12;248:10,12;253:18;264:13;265:15;267:24;269:25;270:17;280:9;285:7;286:10;295:13,14;301:3,4,11;302:11;303:24;304:25;311:15;312:13;315:13,14,19;316:6;319:11
**ones (3)**
81:8;87:20;108:1
**online (2)**
6:4;25:14
**Only (19)**
12:16;31:10;60:1;81:5;102:16;104:9;121:14;165:6;173:6;175:25;201:5;214:10;242:20;248:12;259:8;260:6;270:2;297:24;298:5
**on-the-job (1)**
101:12
**onto (1)**
39:5
**open (8)**
120:3;136:14;149:4;159:10;162:10,15;164:8;251:23
**open-ended (3)**
36:10;120:24;121:9
**open-minded (1)**
159:16
**operated (1)**
87:24
**operating (6)**
22:14;28:12;218:5,9;232:1;271:4
**operation (5)**
122:8;138:5;166:18,22;215:11
**operational (4)**
227:1,3,5;230:3
**opinion (6)**
115:10,11;148:3;160:16;243:5;310:8
**opinions (1)**
160:10
**order (3)**
83:9;178:19;317:1
**ordered (1)**
311:7
**orders (1)**
93:20
**organizations (1)**
25:15
**organized (1)**
315:14
**organizing (1)**
315:19
**original (10)**
36:25;37:18,25;38:23;39:1;40:10;112:22;177:15;267:9,10
**originally (1)**
180:6
**others (15)**
96:3;99:12,14;118:12;125:21;127:17;140:22;143:16;159:2;161:24;174:14;176:8;177:10;229:9;260:24
**otherwise (3)**
14:6;166:23;175:11
**out (83)**
6:2;14:22;26:6,10;28:2;34:17;58:5;70:15;72:25;75:21,22;76:9;88:23;89:20;97:20;103:14;122:7;123:22;126:2;131:7;132:20;136:15;138:3,4,10;142:4,16;143:8,16;144:22;148:9,12;151:17;156:10;162:6;163:10;167:6;172:22;173:7;174:3,12;179:6;180:9;183:8;189:3;195:22;204:1;209:2;215:10;218:5;219:2;225:15,16;227:17,24;233:7;235:13;237:10,23;240:21;241:5;250:9;255:11;256:16,19,25;262:2;266:17,24;267:16;269:20;270:2;272:25;273:3;275:10;279:12;282:17,19;288:3,10;293:5;308:5;313:16
**outrun (1)**
276:22
**outset (1)**
306:7
**outside (11)**
26:3;58:22;136:19;137:17;152:8;157:25;175:16;211:6,7;253:19;318:6
**over (40)**
24:2;25:18;28:16;38:8;88:9;99:14;101:18;123:15;128:22;158:8;160:5,7;180:21;181:4,10;182:11,25;183:25;184:6,8,9,12;185:10,15;186:19;187:10,16;189:17;217:16;218:20;219:15;262:11;266:9;269:7;270:12;281:17;283:18,24;306:6;318:1
**overnight (1)**
109:11
**overstep (1)**
103:11
**overtime (1)**
212:14
**own (25)**
18:18;48:10,11;66:22;78:25;89:19;92:13,17;101:18;127:2;135:9,9,18;137:17;157:25;163:11;183:21;185:22;205:10;218:19;226:10;232:9;264:22;282:12;293:14
**owned (1)**
269:11

## P

**pad (2)**
37:6;39:11
**page (36)**
7:4,17;34:6,24;35:14,21,22;42:4;47:21;48:3,22;49:23;77:22;78:5,9,9,11;84:1;85:11;93:19;97:24;126:7;170:14;198:18,21;200:12;229:3;246:16,17;266:4;282:3;285:25;288:20;304:14,15;306:18
**pages (6)**
35:4;78:5,10,17;142:8;304:1
**pants (1)**
133:7
**pant's (1)**
130:14
**paper (10)**
37:8;52:12;65:17,19;93:21;153:19,22;201:13;247:7,25
**paperwork (5)**
43:4;155:25;156:9;225:11;248:14
**paragraph (6)**
295:14,24;296:7,15,21;297:4
**paragraphs (2)**
296:18;297:3
**parent (2)**
97:14;110:14
**parents (4)**
108:22;109:20;110:7;118:12
**parents' (1)**
118:8
**parked (1)**
102:9
**part (42)**
9:12;14:5,10;20:22,25;25:15;30:19;48:10;51:18;52:15;54:23;60:11;82:21,25;84:4;87:18;88:4;101:3;113:16;116:20;117:4;126:2;157:17;197:11;198:25;203:25;211:3;220:1;233:17;234:8;280:14;285:8;303:10;304:3,8;305:16,19;306:1,6;312:10,23;317:6
**participate (5)**
62:25;152:11;196:12;215:12,20
**participated (4)**
24:2;95:4,11;237:24
**participating (2)**
45:17;85:24
**particular (1)**
18:8
**particularly (2)**
119:19;242:20
**parties (1)**
157:7
**parts (1)**
250:11
**party (1)**
105:10
**pass (1)**
280:6
**passed (7)**
58:16;125:22,23,24;200:21;201:16;258:19
**past (3)**
61:22;170:10;251:24
**Patricia's (4)**
64:4,7,9;109:3
**patrolled (2)**
15:4;18:20
**pause (3)**
8:24;251:16,19
**payment (1)**
254:11
**PD's (1)**
91:11
**pedophile (1)**
265:5
**pending (1)**
8:6
**penetration (1)**
265:8
**people (63)**
11:1;22:8;55:25;58:8;61:25;63:25;66:2;101:17;103:10;106:14,23;107:20;111:8;117:21,22;118:15;119:10,13,13;122:1,4;123:4,15;125:16;127:15,19;136:4,10;137:4;140:24;143:15;144:1,3,16;160:4;175:17,24;176:1,11,25;187:24;188:1;199:9,24;204:12;219:15;243:24;253:16;259:22;261:7;263:11;264:21;267:8;269:18,20;270:15,20;278:12;280:14,14;291:19;293:8;302:11
**people's (1)**
111:9
**per (3)**
97:9;210:4;241:19
**percent (3)**
206:4;214:19;262:20
**perform (1)**
62:15
**perhaps (4)**
137:10;209:22;246:1;283:6

**period (13)** 19:23;39:6,16;46:4;87:1,18;112:12;118:3;187:20;193:7;228:23,24;237:14
**perished (5)** 75:6;194:4;195:13;196:8;197:16
**permission (2)** 211:2;212:12
**permitted (1)** 252:8
**perpetrator (2)** 117:14;297:13
**Perryville (1)** 15:19
**person (45)** 60:2,6,22;82:24;96:15;98:15;99:17,19,21;103:20;105:19;107:14;108:17;111:9,14,23;113:2;115:3;116:5;117:23;118:7;123:11;130:24;131:8;132:2,3,13,20,25;133:3,17;135:15,16;139:22;145:13;163:10;173:10,15;174:13;177:1;191:7;222:18;224:23;278:15;291:8
**personal (2)** 76:2;89:9
**personality (2)** 99:13;103:20
**personally (2)** 252:1;309:1
**personnel (2)** 25:9;31:14
**Persons (23)** 10:19,21,25;22:3,5,9,12,21;23:13;24:3;26:22;33:22;46:7;49:3;62:21;64:11;75:13;88:21;91:8;96:11;222:15;304:4;306:8
**person's (1)** 306:4
**persons/homicide (1)** 93:11
**perspective (1)** 283:6
**persuade (1)** 123:3
**persuaded (3)** 119:22;286:23,24
**pertained (1)** 93:10
**pertinent (2)** 80:16,17
**Phil (10)** 120:9,9;142:14;144:25;147:14;150:10;165:7,9;178:3,6
**Philan (1)** 199:5
**Philander (175)** 40:25;47:19;50:22;51:6,7,10,17;97:22;115:4;125:9;130:21;133:11,12,14,24;145:15,18,24;146:4;147:18;148:25;149:4,16;150:20;151:19;165:10,18;166:16;173:4,9,24;174:7,15,16;175:14;176:3,12,18;178:1,2,5,9,21;181:12;182:8;183:10;184:21,24;185:13,21;186:19;187:25;188:14,24;189:6,10,21;190:4,11,15;199:1,10,11,12,21,22,23;200:6,12;202:2,24;203:5,17;204:4,18;205:1;206:19;208:9;210:3,13,14,25;211:5,10;212:2,22;214:1;215:13,21;216:3,6;217:6;218:16;227:12;228:6;229:4,16;230:7,11;231:8;232:11,15;233:24;236:4,7,10,15,17;237:17,22;238:1,22;239:9,19,21;240:4,18;243:13;245:9;246:12,24;250:4;251:16;252:8,13;255:24;257:25;258:19;263:6,7;264:14;268:13,19;270:9,17,25;272:10,13,14,15;274:6,9;275:9;279:12;280:22;288:11;289:8;290:2,11,17,22;291:7,8;292:1,25;295:22;297:1,4,14,23;298:13,21,25;299:22;306:14;309:18;310:21;311:25;314:13,19,21;317:21;318:15,24,25
**Philander's (5)** 151:11;276:4;286:19,23,25
**Phillipsburg (4)** 11:18,19,20,21
**phone (41)** 29:24,25;43:20;44:23,25;97:1;139:23;140:13;162:7;184:20;185:2;188:5;206:11,14,21;207:5,21;208:10,22;209:3,25;210:25;211:19;212:7,10,17;214:17;215:1,3,6;219:15;234:4;235:15,17,19,21;270:9,11;273:1;274:13;279:12
**phonetic (1)** 263:19
**photo (5)** 133:12,14,15,18;258:17
**physical (4)** 18:8;52:4,21;53:5
**physically (2)** 205:2;275:15
**pick (1)** 241:5
**picked (4)** 178:21;238:15;244:18;258:8
**picture (1)** 130:21
**piece (9)** 82:19;93:21;102:4,23;114:16;142:12;247:7,25;268:17
**pieces (2)** 37:8;295:12
**pile (1)** 38:25
**pinpoint (1)** 106:8
**Pittman (1)** 130:16
**place (21)** 4:15;5:20;62:3;75:4,8;97:5;101:19;155:16,17,20;193:23;216:25;222:22;225:15;227:12;237:23;245:6,9;247:3;252:7;282:10
**placed (9)** 230:17,19;231:2;233:3,4,5;253:1;275:17;277:3
**places (1)** 163:13
**placing (1)** 275:19
**plaintiff (1)** 4:18
**plan (7)** 97:5,9,10;98:23;99:3,6;308:5
**plans (1)** 268:2
**plausible (1)** 60:8
**play (2)** 132:12;220:6
**played (1)** 254:24
**please (11)** 7:15;8:13,14;28:24;29:3;35:6;63:14;101:9;186:15;198:16;294:17
**plenty (6)** 75:24;158:8;253:16;262:16;264:11;265:6
**plus (1)** 9:16
**pm (21)** 147:1,4;185:8,21;186:20;187:12,13;198:9,12;233:24;234:4;246:2,22;247:9;248:3;249:10;265:23;266:1;299:14,17;319:24
**pocket (7)** 39:11,12;130:14;132:10,11,15;152:23
**point (102)** 6:2;13:21;20:19;26:17;39:14;40:21;41:17;48:16,18;51:20;56:15;63:6;65:3;70:13;74:7,9;75:9;78:18;79:23;82:1;92:7;98:15;102:14;103:10;105:13,18;107:11;108:6,12;110:17,22;111:4,6;112:10,11,13,15;117:10;118:1;120:9;127:18;133:15;142:24,25;143:2,3,6;145:6;150:24;154:7;161:10;163:5,19;164:1;168:20;174:10;179:18;185:1,1,14;186:5,21;195:15,18;197:24;198:4;199:20;205:14,20;213:4,6;219:2;222:8;228:23;229:2;230:12;235:11;236:13;237:23;241:24;242:10;244:10,12;247:25;253:20;255:6;256:15;259:20;260:23;261:4;266:11;280:13,19;286:4;289:13,14,17,19;290:5;302:12;306:9;308:23
**pointed (3)** 57:11;240:21;297:12
**pointing (3)** 75:21;250:9;255:11
**pointing-the-finger (1)** 100:12
**points (4)** 8:21;79:24;81:3;87:11
**pole (3)** 240:17,20;241:1
**police (74)** 5:5;9:24;10:1,4,7,11,19,20;12:25;13:4,9,12,15,19;14:10;15:5,9;17:13;19:3;20:23;21:5;25:19;31:10,13;35:17;43:4;48:5;62:17;63:19;66:3;68:14,21;69:6,15;71:16;79:6;88:11,16,25;89:1;91:22;92:18,19,22,24;94:6,7;99:11;110:5;121:5;128:22;158:11;159:22,23;161:15;203:5;218:8;223:7,9,22;226:6,21;236:1;239:10;245:9;255:19,21;269:19;282:19;286:15;300:18,18;307:8;308:10
**policies (40)** 90:20,22;91:1,21,23;92:13,15,17,18,18,19,22,25;93:6,10,15,18,20;94:1,6,7,13;220:14;222:2;223:7,10,13,16,22;224:1,3,15,17,18;225:13,17;226:5,7,16,21
**policing (1)** 19:8
**policy (29)** 39:19;62:3;92:11;218:23;219:1;220:5,6,7,13;221:10,23;222:19,22;223:1,2;224:6,8,9,20,22;225:1,6,10,21,25;226:9,10,13,23
**polygamist (1)** 31:20
**polygraph (52)** 31:19,22;57:14;58:11,13,17,22;59:7,14;60:7,11,13,21,25;61:5,8,13,19;62:6;170:19,24;171:13,17,18,21,22;184:24;185:8;200:21,21;201:3,23;202:4,5,10;207:11,22;208:2;213:4;214:7,9,15,21;248:7,14,16,18;249:4;279:16,18;280:6;282:10
**polygraphed (2)** 170:16;214:4

**polygraphist (6)**
31:16,22;62:4,14;200:25;202:11
**polygraphists (1)**
248:11
**polygraphs (8)**
59:25;60:16;61:21;172:2;201:6,16,17;202:13
**poor (1)**
133:13
**pop (1)**
265:15
**popping (1)**
265:17
**portion (4)**
192:6;216:16,19;218:24
**portions (1)**
26:2
**position (8)**
13:3,21,24,25;16:1;18:24;21:17;22:17
**positive (3)**
38:5;206:14;311:15
**possess (2)**
105:3;129:24
**possession (1)**
85:18
**possibilities (8)**
75:17;120:4,7;135:14;136:14;144:18;151:17;262:3
**possibility (13)**
137:11,13,18,21;140:4,5;162:10,16;194:24;195:2,9;196:4;197:1
**possible (17)**
40:4;121:3;137:6,9;139:12;144:8,15,17;145:12;150:13;196:16,22;209:8,13;255:25;315:6,8
**possibly (6)**
43:1;84:24;135:12;195:25;206:8;276:2
**post (1)**
103:6
**potential (20)**
47:18;52:17;105:24;106:1;113:14,17;114:4;116:14;120:17;144:24;159:8;165:13;169:20;211:7;252:3,5;263:3;264:22;283:13;286:5
**potentially (17)**
43:13;49:7,14,17;102:6;120:7;132:14;137:18;145:3;169:4;173:10;174:11;175:17;178:6;213:11;264:18;273:17
**pound (2)**
119:11;153:21
**pour (1)**
276:22
**practice (10)**
39:3,16,20;79:14,18;86:14;100:22,23;284:6,10
**practices (1)**
90:20
**Pray (5)**
138:20,24;139:7,13;169:13
**preceded (1)**
42:6
**preceding (1)**
228:6
**predated (1)**
36:21
**predecessors (1)**
132:5
**preempted (1)**
157:11
**preparation (2)**
29:16,22
**prepare (9)**
29:12;54:4;77:13;78:25;79:15,19;81:19;82:6;247:18
**prepared (14)**
36:9,11;41:22;71:16;72:17,21;77:14;80:7;83:1;94:2;247:9;282:9;283:7;295:5
**preparing (4)**
55:9;71:22;81:17,22
**present (28)**
5:21,24;6:3;55:22,25;120:4;126:21;133:19;152:3;159:18;186:2,4;187:19;188:1;238:24;243:8;245:5;249:5;255:8,12;275:2;294:10;299:24;300:7;306:21;307:3;317:21;318:4
**presented (9)**
118:2;149:5;258:22;275:25;276:14;286:16;310:13,14;318:21
**preservation (1)**
39:22
**press (1)**
308:17
**pressed (1)**
281:10
**pressure (1)**
238:9
**presumably (2)**
97:23;196:15
**presumed (6)**
57:18;105:5,20;123:24;317:16,18
**presuming (1)**
114:7
**pretty (19)**
38:5;47:3;59:22;75:23;153:25;161:25;162:23;200:9,13;206:14;213:14;237:1;244:24;251:22;259:21;260:4;284:2,4;311:15
**previous (4)**
30:6;77:10;158:24;174:21
**previously (14)**
43:5;123:25;128:5;141:21;142:9;158:13,15;160:6;169:21;183:4;236:23;240:6;250:24;258:20
**previously-given (1)**
61:7
**Price (1)**
5:16
**primarily (1)**
43:3
**primary (2)**
64:15,15
**prime (3)**
57:1;58:7;164:5
**principal (1)**
301:11
**principle (1)**
102:20
**prints (1)**
136:1
**prior (68)**
6:22,23;10:10;33:20;36:6;40:18;46:20;56:14;59:8;63:10,17;65:14;66:20,24;67:2,10,23;70:3;77:10;78:18,20;94:18;95:1;96:1,12;97:8;98:10;103:5,6;104:21;125:9;134:17;141:25;142:1;157:20;161:22;168:8,23;173:1,4;176:10;185:11,15;186:21;188:23;189:9,18;191:14;194:17;195:13;196:8;200:1,2;203:6;212:21,25;219:7;220:2;231:7;233:21;241:3,18;245:10;258:16;259:15;280:19;300:8;313:20
**prisoner (1)**
157:4
**privy (3)**
180:24;190:3;231:18
**Probable (7)**
55:11;253:11;255:9,16,19,23;295:9
**probably (35)**
11:11;19:1;22:11;32:8,19;56:16;65:24;75:1;101:22;107:25;135:14,19;136:16;165:16;184:18;185:17;195:14;201:10,13;213:19;234:5;235:4,8,22;237:7;242:4;249:16;250:11;259:8;261:12;273:7,10;293:22;314:24;315:2
**problem (2)**
146:16;198:7
**problems (2)**
215:4;217:25
**proceed (2)**
28:24;299:12
**proceedings (3)**
28:10;80:9;302:19
**process (6)**
16:16;27:23;90:13;117:20;156:13;207:3
**processes (1)**
55:19
**product (1)**
37:15
**profile (1)**
261:7
**profiling (1)**
301:18
**profound (1)**
119:19
**program (1)**
26:3
**progress (1)**
188:11
**progressed (1)**
70:1
**progression (1)**
281:8
**promise (2)**
290:21;291:1
**promises (3)**
290:11,16,22
**promoted (1)**
27:25
**promotion (5)**
16:8;26:18,18;28:2;257:11
**promotions (1)**
26:19
**prompted (1)**
292:6
**prompts (1)**
79:21
**proof (1)**
121:15
**proofs (1)**
256:3
**proper (1)**
227:1
**properly (3)**
218:5,9;232:1
**property (1)**
240:22
**prosecution (1)**
146:5
**prosecutor (2)**
38:8;306:21
**prosecutors (6)**
280:12,16,22;284:7;318:10,13
**Prosecutor's (64)**
33:18;44:2;45:13,20;49:25;53:19;68:18,22;69:3;93:16;94:3,8;96:8;155:18;157:20;180:21;181:5,17;182:5;183:12,19;184:10;185:15,25;186:3;187:11;204:25;205:10,24;206:20;215:8,13,22;216:4,7,18;217:5,14,19,22;223:13;224:17,22;226:16;227:13,25;233:11;234:9,24;235:3;237:4;239:11;244:4;254:15;270:13;274:11,20;281:15;290:1;292:7;305:8;306:20;307:2;312:21
**protocol (1)**
242:17
**protracted (1)**
56:12
**prove (5)**
121:11;166:23,25;263:13;301:20
**proved (1)**
192:13
**proves (1)**
202:16
**provide (16)**
17:14;64:25;65:3;102:3,12;151:2;155:14;158:11;160:17;170:2;172:7;173:17;190:22;248:25;284:2;285:4
**provided (49)**
29:13;37:25;44:22;57:8;58:1;65:9,13,16;66:12;70:9;72:14;76:1,10,24;93:9,25;101:25;115:4;120:6;121:25;124:1;135:22;

142:1,5,9;143:21;144:22;147:11;148:11;164:24;165:3;178:10;184:25;212:2,6,8;213:7;229:12;241:17;248:15;253:21;267:7;284:15;285:8,13;291:3;293:4;310:16;318:22
**provides (3)** 102:16;147:14;262:16
**providing (5)** 140:22;202:9;210:15;279:22;295:9
**psychic (12)** 74:6,10,14,20,25;75:4,12;84:11;192:24;193:3;261:22;314:24
**psychics (6)** 75:12,24;76:3;262:2,8,11
**public (1)** 254:21
**pull (5)** 34:17;70:15;76:8;193:8;258:2
**pulled (3)** 56:21;72:25;196:2
**pulling (1)** 193:18
**pun (1)** 250:18
**purely (2)** 220:22,25
**purpose (5)** 29:4;48:24;63:24;158:3,19
**purposes (4)** 28:15,18;172:4;187:4
**pursuant (1)** 220:5
**pursue (5)** 121:2;287:13,16;290:2;292:7
**pursued (1)** 166:17
**push (2)** 112:14;281:6
**put (29)** 16:9;28:8,22;38:11;39:4;44:19;54:18;75:14,25;80:25;86:2;105:12;109:3;134:24;143:18;144:18;145:11;149:17,21;171:12,16;216:9;242:9;243:22;265:3;276:4,15;291:2;298:8
**putting (5)** 52:20,23;104:4;230:15;247:24

## Q

**quarrel (2)** 186:21,25
**quibble (1)** 217:16
**quick (6)** 84:8;132:16,17;244:22;277:1;303:5
**quickly (4)** 109:4;258:18,24;279:10
**quite (2)** 99:3;251:20
**quote (1)** 148:8

## R

**racially (1)** 301:18
**raise (3)** 28:23;280:20;281:1
**raised (2)** 7:8;281:12
**ran (1)** 122:8
**rank (4)** 14:22;17:16;26:23;27:7
**ranking (1)** 25:14
**rapport (1)** 270:16
**rather (5)** 91:3;136:5;141:25;158:10;238:6
**reach (4)** 60:7;88:23;162:8;215:10
**reached (5)** 61:8;209:2;279:11;282:17,19
**reaches (1)** 60:24
**read (22)** 30:9;44:20;66:15;74:1,4,15;84:7,25;92:15,24;93:5;98:6,8;173:18;176:16;179:4;186:17;192:6;193:9;200:9;244:25;304:19
**readily (3)** 59:22;162:24;251:12
**reading (5)** 60:11;112:25;288:24;304:22,24
**ready (1)** 185:17
**real (4)** 84:8;159:12;244:22;263:9
**realize (3)** 80:12;195:17;291:15
**realized (1)** 291:16
**really (24)** 51:20;101:12;119:4;122:24;127:24;132:19;138:4;160:17;189:13;194:17;195:8;208:5;210:20;233:14;234:18;247:14,15;263:15;271:25;276:5;297:13;298:20,21;305:4
**rear (1)** 39:11
**reason (16)** 30:22;44:18;49:19;109:19;141:5;156:22;176:23;186:20,24;208:25;217:20;239:4;258:23;278:10;309:19,24
**reasons (1)** 8:9
**Rebecca (2)** 5:16;302:24
**rebooted (1)** 146:15
**recall (129)** 20:2;33:11;37:24;38:3,13;39:23,25;40:3;42:13;43:22,23;44:25;45:18;47:5,8;55:24;56:8;57:19;59:12;61:2,9;64:21;68:4;73:9,11,12,14,15;74:17,19,22,23;75:2,3,7;87:10;96:10;99:8;100:23;111:22;112:3;115:1;117:12;127:20;129:3;134:16;140:23;141:22;158:6;159:24;169:7;170:8;181:9;183:8,15;184:5,8;186:4,11;188:5;196:10;197:6;199:14,17;203:1,2,7,15;204:8;205:3,7,13,16,17;209:18;210:8,20,24;211:15,18;212:6,10;215:23,24;216:2;217:15;220:6,12;222:2,5,19;223:1;224:2,5;225:8,13,16,25;227:15,19,20;228:5;229:24;231:23;232:23;233:2,17;234:13;236:7,12;237:1,20;241:18,19;243:22,24;266:18;272:12;273:16;282:3;284:16,20;289:2;307:10,12,14,15,19,20
**recalled (1)** 266:16
**recalling (4)** 161:24,24;172:11;234:16
**receive (4)** 14:11;90:14;101:13;140:16
**received (22)** 24:25;25:18;26:1,18;34:16;70:17;73:4;90:18;94:18,24;110:11;137:24;138:17;145:9;206:16,20;207:5;211:25;212:17;246:14;294:22;303:21
**recent (3)** 26:8,8;60:15
**recently (1)** 30:15
**Recktenwald (4)** 275:3,15;277:18,20
**Recktenwald's (1)** 282:9
**recognize (6)** 25:5,12;71:9,12;73:6;319:15
**recollection (27)** 30:25;33:6;40:22;44:13,16;65:21;68:3,12;72:16,20;104:5;141:7;161:5;187:6;205:9;206:1;212:5;214:16;216:1;217:23;226:18;229:23;235:9;304:20;311:24;312:13,25
**recommenced (1)** 69:2
**recommend (1)** 8:22
**reconvene (1)** 76:11
**record (30)** 4:16;5:20;8:16;28:18;41:23;50:24;73:17;76:13,17;119:19;147:1,5;198:9,13;220:1,9,9,11,16;221:21,25;222:23;231:6;252:21;265:20,23;266:2;299:12,14,17
**recorded (12)** 218:25;219:9,9,22,25;220:19;226:25;245:6;249:9;277:23,24;297:5
**recording (5)** 215:5;218:8;221:10;222:8;247:3
**Records (2)** 24:21,24
**recovered (7)** 52:5;64:1;115:15,25;128:8,21;167:21
**REDIRECT (1)** 316:15
**refer (12)** 33:9;34:17;35:20;48:23;81:12;82:24;83:6;124:9;160:1;214:5;228:11;279:20
**reference (7)** 60:17;84:10;86:3;199:4;249:14;266:12;284:18
**referenced (2)** 58:1;75:5
**references (1)** 199:1
**referencing (1)** 200:3
**referred (2)** 37:14;210:5
**referring (3)** 83:9;103:3;125:12
**reflect (16)** 25:17,25;81:23;107:11;111:13;115:23;204:15;208:18,22;209:9;210:2;222:13;236:18;248:17;278:22;283:16
**reflected (6)** 36:19;44:17;53:23;78:19;107:6;298:1
**reflecting (2)** 35:17;111:7
**reflection (1)** 28:6
**reflective (1)** 52:24
**reflects (9)** 26:14;36:5,19;54:7;70:20;246:1,1;252:18,21
**refresh (6)** 33:6;44:13;102:1,4;104:5;304:20
**Regarding (3)** 96:3;176:18;203:4
**regular (3)** 37:8;86:25;87:8
**regularly (1)** 87:7
**regurgitating (2)** 102:24;104:11
**reignited (1)**

250:18
**reinitiate (1)** 103:17
**re-interview (7)** 62:20,21;67:18,19;196:13;197:13;199:25
**re-interviewed (1)** 203:11
**re-interviewing (2)** 67:12;175:24
**reintroduce (1)** 28:17
**reinvestigate (1)** 70:4
**re-investigating (1)** 63:4
**reinvestigation (1)** 69:7
**related (18)** 7:7;16:20;24:8;27:23;48:5;67:6;96:5;140:15;171:23;172:22;231:9;248:8;286:6;301:3,4,5,6;302:9
**relates (2)** 295:17;296:21
**relation (1)** 149:1
**relative (4)** 110:4;174:11;177:10;188:20
**release (1)** 254:10
**released (4)** 253:25;254:20;256:15;301:17
**relevance (1)** 135:2
**relevant (3)** 81:3;189:7;213:25
**reliability (3)** 201:23;202:13;283:8
**reliable (2)** 172:5;201:17
**relied (1)** 318:13
**re-look (1)** 197:12
**relying (1)** 83:17
**remain (1)** 251:24
**remained (1)** 256:16
**Remains (18)** 46:8;52:5,13,16;63:25;64:17;164:2;195:21;196:2;251:22,23;269:4,12,15,17,24;270:2;286:14
**remember (46)** 5:22,23;9:2;17:24;32:6;33:7;38:7;55:15;65:16;74:4,6,9,12,13;75:9,11;111:20,21;127:24;130:18;162:1;168:17,19,24,25;170:7;171:2;196:5;205:2,12;206:5;229:15,20;232:3;240:24,25;242:2;278:9;285:14;288:18,24;302:17;306:22;307:22;314:8,17
**remembered (1)** 185:1
**remove (1)** 254:12
**removed (2)** 222:11;289:19
**reopened (1)** 46:16
**repeat (14)** 4:12,13;12:7;21:25;26:4;47:25;52:9;63:14;79:17;101:9;114:18;180:13;194:1;302:6
**rephrase (5)** 7:16;182:20,24;247:13,16
**report (173)** 34:8,15;35:3,7,8,10,14;36:3,9,13,15,19;38:12;39:5;41:13,16,22;42:5;44:11,21;47:20;48:3,22;49:4;53:23;54:7,8,16,20;55:9,14;56:3,21;58:14,19;62:18;65:7;71:21;73:2,18;74:5;77:4,6,9,10,21;78:4;79:7,15,19,22;80:2,3,7,21,22;81:2,4,6,13,17,19;82:2,6,13,21;83:2,6,6,9;84:4,20;85:24;86:4,5,8;88:1;105:15;108:14,20;109:4,8,13;111:3,17;112:25;113:1;114:25;124:10,24;125:2,4,7,12,13,13,19,20,21;126:1,3,8;134:24;135:22;151:10;153:6,8;170:13;174:20;175:25;176:5;179:5;192:7;193:9;197:19;199:1;204:15;207:18;208:21;209:5,23;210:2;211:22;214:5,14;216:8,9,10;220:22;227:21;233:22;242:15;247:7,18;248:7,16;249:4;263:4,20;266:4,18;267:7,7,20;277:13,18,20;278:9,19;279:20;280:8;282:2,9,12,16;283:2,7,9;284:24;286:5;292:22;293:20,23;303:8,9,11,20;304:3,14;306:17,18;314:22;315:18
**reported (16)** 71:17;78:1;85:14;88:5;106:14;107:4;109:14,20;110:9;119:10;128:5;131:19;265:14;267:17;270:3;287:2
**reportedly (1)** 270:4
**Reporter (30)** 31:17;42:3;62:13;64:5;69:14;74:8;92:5;102:2;112:8;134:13;147:17;170:22;180:8,14;189:14,16;191:2;201:11;203:21;234:14;246:9;254:6;257:22;265:1;272:22;298:6;301:14;303:18;312:17;315:16
**reporting (9)** 90:24;91:3,4,13,15,17;109:9;114:11;153:24
**reports (76)** 33:9,19;43:2;54:4;59:2,11;61:7;66:4,15;70:7,9,14,16;71:2,13,16,23;72:8,16,21;76:20,23;77:12;78:4,25;79:6,10,12;81:7;85:17;89:25;106:15,18;107:1,6,11,13,21;110:5;111:7,13,21;112:1,22;113:8,9,19,23;114:15;115:8,13,23;116:11,19;117:11;120:16;121:5,8;134:11,14;174:21;177:8,14,22,25;192:1;198:17;207:8;208:18;210:1;248:23;257:17;263:4;267:13;277:15;314:16
**represent (3)** 4:18;5:3;34:22
**representing (1)** 5:13
**request (2)** 155:25;235:21
**requested (26)** 31:17;42:3;62:13;64:5;69:14;74:8;92:5;102:2;112:8;131:19;134:13;170:22;180:8;191:2;201:11;203:21;212:12;234:14;254:6;257:22;265:1;272:22;284:21;298:6;301:14;312:17
**requests (1)** 147:17
**require (1)** 26:9
**required (6)** 17:16;39:20;64:10;221:10,25;224:22
**requirement (1)** 79:8
**requires (1)** 255:18
**rescuing (1)** 269:22
**research (2)** 47:21;48:4
**reservations (2)** 263:22,25
**residence (11)** 116:21,24;121:1;130:9;132:7;134:2;240:22;241:2,3,5;268:6
**residences (1)** 241:19
**residents (1)** 269:22
**resolution (2)** 134:15;158:18
**resolve (1)** 306:3
**resolved (2)** 117:25;286:8
**respect (5)** 204:3,6;270:18,19,20
**respond (1)** 235:22
**responded (1)** 312:19
**response (4)** 62:4;158:14;260:15;318:9
**responses (3)** 60:18;61:24;99:22
**responsibilities (6)** 10:17;63:20;87:13,18;89:17;93:22
**responsibility (1)** 82:11
**responsible (8)** 57:17;71:22;124:22;126:2;148:1;152:19;160:19;291:22
**rest (2)** 88:6;278:20
**result (3)** 60:7,12;61:8
**results (7)** 48:24;59:7,19;60:9,22,25;200:22
**resume (3)** 16:13,15;26:7
**retired (4)** 10:1;31:24;32:25;68:21
**return (5)** 109:10;136:5;137:4;172:8;304:13
**returned (5)** 11:9;135:12;136:17;232:24;256:12
**returning (1)** 259:22
**reuse (1)** 144:11
**revealed (2)** 133:25;297:5
**revealing (1)** 29:20
**review (15)** 16:15;46:3;59:9,10;61:20;65:8;66:10;67:10;72:10;85:19,22;93:15;114:23;219:16,18
**reviewed (11)** 18:17;29:13;61:7;72:9;85:19;90:1;100:25;112:22;177:24;219:18;239:2
**reviewing (8)** 48:20;57:13;72:16,21;73:9,11,12,15
**reviews (1)** 62:2
**ride (1)** 233:19
**right (414)** 5:19;7:19;10:1;12:25;13:13,22;14:17,22;17:5;19:20;20:12;22:15;24:4;25:10;26:18;31:24;33:3;35:4,10,11,20;36:2;37:16;38:9;40:2,9,25;41:5,25;42:2;47:14;48:6,21;49:20;50:6;51:25;53:10,17,19,24;54:2,19,22,25;55:6;56:17,20;58:13,24;59:1,20;64:8,18;65:9;67:8;68:7,19,25;72:14;73:20;74:5;77:22;78:14;80:7;81:24;82:3,22;84:17,22;85:25;86:13;88:21;89:4;90:8;

92:22,25;97:21;
98:12,18;99:14;
100:1,16;102:20;
104:16,25;105:12;
106:9,11,19;107:1,4;
108:8;110:23;111:10,
15;112:17;113:22;
114:1,13,16,22;
115:16;116:1,7,8;
117:2,5,5,16;118:3,8,
14,16,24;121:3,7,13,
21;122:5,8,20;123:5,
15;124:2,4;126:5;
127:8;128:6,9,12,17,
23,25;129:2,9,17;
130:5,11,21,25;
132:16;133:3,8,12;
134:3,24;135:15;
136:13,23;137:7,11,
13;138:1,6,12,20,24,
25;139:3,7,17,23;
140:23;142:22;143:6,
12;144:5,20;145:17;
148:6,13,17;149:9,11,
18,21,24;150:5,15,23;
151:12,13,20,25;
152:20;153:2,9,11,17,
19;154:3,4,8,23;
155:7,11;157:4,8;
160:11,19;161:9,12,
17;162:17;163:15,17,
24;164:4,23;165:18;
166:10,12,13,18;
167:18;168:11,14;
169:6,9;171:6;
172:16,19;173:25;
175:5;178:8,21;
179:13;180:2,22,25;
181:11,22,25;182:12;
183:20,21;185:8;
187:7;188:24;189:23;
192:1;193:2,10,14;
195:3;196:13,20;
197:11,13;199:2,5,13,
22;201:1,23;203:1;
204:4;205:8;206:13,
25;207:16;208:11,12,
16,23;212:18;213:11,
18;214:1,23;216:10,
24;217:1;219:10;
220:3;223:7,13;
225:2;226:22;227:6,
23;228:20;229:5,13;
230:1,4;231:10;
232:6,7;233:16,25;
234:5;235:17,20;
237:12,14;240:19;
241:13;242:15,23;
243:6,11;244:5;
245:4,18;246:22,23;
247:4,10,18,22;
248:16,18;249:3,6,10;
250:6,18;251:9,10;
252:23;253:9,11,15,
23;254:1,20,25;
255:1;256:9,17;
257:3,7;259:5,10;
260:2,19;261:6,12,14,
20,23;262:7,7,20;
263:10,16,23;265:12,
18,21;266:9,24;267:2,
18,19;268:20;269:18,
19;270:6,9,11;272:7;
274:1,16,21;275:1,4,
6,22;276:6;277:4,6,7;
279:13;281:9;284:8,
12;286:19;287:7,11;
288:16;289:9;290:3;
291:20;292:15;293:1,
11,18,24;294:11;
295:14,18,22;296:19;
297:6,10,20;298:2,14;
299:3,7;300:7;304:5,
24;305:4;308:6;
310:6;315:18;316:18;
317:12,18;318:24;
319:8

**right-hand (2)**
70:20;83:24
**Rights (2)**
301:24;302:2
**ring (2)**
116:7;264:16
**risk (2)**
259:11,17
**river (1)**
136:6
**road (2)**
15:3;18:14
**Robbery (2)**
304:10,10
**Robbery/Homicide (2)**
304:9,11
**Robert (3)**
181:18,21;182:8
**Roger (3)**
138:18;147:10,25
**Rogers (8)**
137:25;139:16;
140:21;147:8,9,9,15,
19
**role (8)**
69:6,13,15,22;
147:12;254:24;
305:23;308:22
**room (32)**
115:25;128:9,21;
149:18;153:17;
185:17;205:5;215:9;
216:15,16;218:4,12;
221:6;224:24,25;
227:1;231:23;232:4;
236:3,7,9,14;243:22;
244:1;245:5,21;
276:5;277:4,7;
311:17;313:17;318:5
**rooms (2)**
115:15;218:13
**ROSEN (22)**
5:15,16;67:13,16;
95:2;127:4;174:8;
178:22;181:6;186:22;
188:25;189:25;190:6;
196:18;209:24;
238:25;239:6;303:1,
4;311:1,3;316:4
**roughly (2)**
21:13;252:22
**route (1)**
189:3
**routine (1)**
87:14
**routinely (2)**
109:6;284:23
**Royster (6)**
118:24;168:13,17;
288:19,25;289:1
**rule (1)**
109:16
**rules (1)**
7:4
**rumor (1)**
138:22
**rumors (1)**
160:22
**run (3)**
120:17,20;241:11
**running (2)**
21:6;293:5
**rush (4)**
103:22;179:16;
180:19;237:10
**Rutgers (4)**
11:24,25;12:2,21

## S

**Safe (1)**
11:2
**salary (1)**
88:25
**same (41)**
7:4,16;8:1;15:16;
20:5,13,15;21:17;
32:19;35:3;93:19;
97:24;98:1,2;118:19;
128:16;129:15;
136:19;166:14;
167:11;182:22;
198:25;200:24;202:6,
9;221:12;222:24;
229:3;239:17,23;
240:20;251:13;262:9;
266:21;283:8;292:14;
296:18;298:3,4,23;
299:4
**sample (1)**
155:14
**samples (2)**
63:21;64:2
**Sarah (1)**
155:9
**sat (2)**
120:9;310:15
**saved (1)**
269:18
**saving (1)**
74:2
**saw (46)**
22:22;30:11;40:23;
98:14;102:10;106:24,
24;107:21;108:7,17;
110:15,16;111:4;
112:2;121:8;154:5,5,
19,23;155:4;167:4;
183:6;185:21;205:9,
13,19;214:9;232:5;
241:15;244:3;258:3,
4,12,13,17;259:3;
260:9;262:12;268:2;
271:11;293:11,13;
294:7;310:17;311:22,
23
**saying (36)**
19:10;82:6;95:11,
14;122:4;129:23;
143:9;167:10,12;
168:8;179:15;189:8;
195:19;197:4,7;
199:18;201:5;209:4,
5;210:8,9;213:15;
221:9;225:7;226:2;
251:17;271:15,23,25;
286:22;288:1,2;
291:17;307:12,16;
318:2
**scenario (1)**
75:17
**scene (3)**
152:10;198:2;
311:21
**Schenck (1)**
5:16
**school (5)**
11:15,17,18;17:11,
22
**Science (1)**
12:5
**screen (1)**
28:22
**scripted (1)**
97:19
**se (3)**
97:9;210:4;241:19
**search (5)**
48:20,23;204:16;
285:22;286:2
**searching (1)**
285:16
**second (16)**
11:13;48:21;49:23;
60:6;72:15;76:7;
113:16;186:14;222:9;
223:6;243:20;274:4;
279:18;280:6;304:14,
15
**secondhand (1)**
154:3
**section (5)**
40:15;42:5;83:7,10;
200:10
**securing (1)**
318:14
**security (3)**
48:19;49:2;199:9
**seeing (12)**
67:4;74:5,12;
134:16;158:21;
168:24;205:16,17;
206:2;236:12;258:25;
293:21
**seek (6)**
89:19,20;218:5;
235:13;308:23;309:8
**seeking (1)**
127:6
**seem (12)**
96:21;145:12,13;
162:23;226:3;238:1,
3,17;259:4;264:14;
278:7,22
**seemed (4)**
99:2;136:3;158:13;
268:2
**seems (3)**
9:1;86:14;162:17
**selected (3)**
16:14,18;26:20
**selling (1)**
121:21
**senior (1)**
131:24
**sense (6)**
15:22;46:16;67:20;
121:6;144:19;261:10
**sent (1)**
29:17
**sentence (1)**
52:3
**separate (2)**
13:12;236:4
**separately (1)**
231:3
**separation (2)**
268:3,5
**September (6)**
23:23;28:3;77:22;
78:14,19,20
**sergeant (53)**
4:21,22,23,25;5:5,
9;9:23;10:13;25:10;
27:9,11,17,17,19,21,
25;28:1;30:10;34:25;
48:2;69:21;76:18;
89:24;92:17;147:6;

179:1;180:12;182:25;186:6;195:12;198:15;205:20;206:2;266:3;294:25;299:19;301:7;302:22;303:7;304:3,7;305:19,24;307:12;309:7;310:25;311:4,11;316:11,18;317:5;319:10,13
**sergeant's (1)** 202:4
**serious (3)** 20:24;158:17;180:2
**served (1)** 254:9
**service (3)** 13:10,11;27:5
**set (9)** 34:3;44:1;60:14;79:12;110:8;185:13;218:13;280:10;314:11
**setting (1)** 30:6
**seven (4)** 78:5,10,17;296:18
**seven-something (1)** 274:23
**several (5)** 79:12;120:7;158:16;208:5;209:2
**Sex (1)** 24:10
**sexual (1)** 222:17
**shall (1)** 6:5
**shape (1)** 215:14
**share (3)** 134:21;159:4;175:13
**shared (1)** 141:24
**shed (4)** 132:25;152:19;155:2;176:13
**shift (1)** 79:10
**shoot (1)** 264:19
**short (2)** 260:10;314:11
**shortly (6)** 57:6;71:5;202:7;228:1;230:1;233:25
**shot (1)** 280:2
**show (7)** 100:6;107:14;136:21;159:1;248:6;270:19;275:15
**showed (5)** 130:20;133:11;240:13;275:12,18
**showing (1)** 34:24
**shows (6)** 102:25;110:6;177:21;178:7;180:17;284:5
**side (1)** 242:6
**sides (2)** 264:25;275:19
**sightings (2)** 105:25;106:17
**sights (1)** 106:23
**sign (2)** 157:12;219:18
**signature (1)** 35:13
**signed (4)** 64:9;222:4;244:16;300:6
**significance (5)** 80:12;132:17;175:3;188:14,19
**significant (11)** 123:3,10;154:1;161:20;162:1;199:18;213:24;250:11;251:22;283:4;286:13
**significantly (1)** 289:19
**signing (2)** 64:12;90:5
**similar (5)** 77:8;86:11,11;127:10;268:2
**simple (1)** 132:19
**simply (4)** 99:15;135:18;151:17;155:13
**simulations (1)** 100:21
**single (7)** 61:5;111:24;165:19;179:13;219:25;247:7;286:20
**sit (12)** 39:24;57:24;80:20;82:1;98:24;99:15;103:13;125:6;194:2;201:21;291:25;300:10
**sites (1)** 85:12
**sitting (2)** 229:23;256:6
**situation (2)** 60:20;128:20
**six (6)** 15:1;65:24;129:25;289:6,7;296:15
**size (1)** 153:22
**sketch (3)** 277:6,19,21
**sketched (1)** 277:8
**skip (2)** 204:16;279:9
**skipped (1)** 265:2
**slightly (1)** 216:13
**smack (1)** 268:8
**small (3)** 39:17;119:9;268:1
**smaller (1)** 31:7
**Smith (1)** 5:16
**smoothly (1)** 7:5
**so-called (1)** 122:18
**social (3)** 48:19;49:2;199:9
**sold (1)** 167:7
**solution (1)** 62:5
**solve (2)** 166:24;317:7
**solved (1)** 165:16
**solving (1)** 317:11
**somebody (30)** 38:4;39:21;43:10;49:8;82:6;99:15,24;101:24;103:14;113:19;119:15;120:22;136:17;142:13;143:19;149:8;167:7,11;176:7;177:2;179:19;196:2;222:13;250:2;253:14;255:6;286:25;287:2;288:8,9
**somehow (1)** 179:21
**someone (41)** 18:19;42:13;81:14;82:10,13,19;88:11;89:3;96:15;98:17;101:14;106:5;108:15;114:11;119:7,18;131:3;135:3,22;136:4,24;140:11;151:2;162:2;172:12,13;203:13;225:10;242:21;261:6;264:6;270:3;284:4;301:9;308:16;313:3;315:7,20,23;316:7;318:12
**someone's (3)** 9:4;104:5;227:5
**sometime (7)** 69:8;185:11,18,23;207:20;211:13;289:22
**sometimes (12)** 4:11;75:17;80:10;87:12;99:17;101:16;103:4,19,20,25;172:8;291:19
**somewhat (1)** 84:23
**somewhere (7)** 55:11;109:12;136:6;150:4;178:7;187:13;207:10
**son (6)** 128:12,16;132:8;281:24;282:5,5
**son's (2)** 128:9;134:1
**sorry (28)** 12:7;21:22;25:8;26:4;41:7;42:19;67:14;68:16;73:10;88:3;91:15;93:4;95:13;111:1;113:16;159:14;165:8;189:12;190:7;193:25;210:23;239:25;244:2;252:11;268:4;297:4;298:7;313:15
**sort (9)** 35:23;43:4;78:24;138:22;210:18;245:18;248:12;250:6;269:9
**sought (3)** 26:17,19;308:18
**sound (1)** 153:20
**Sounds (5)** 27:2;40:4;62:9;281:11;319:9
**South (1)** 13:19
**SP (1)** 26:3
**space (2)** 8:22;236:7
**speak (21)** 33:25;43:16;47:18;50:18,20;102:5;111:22;117:24,25;139:6;156:25;169:15;172:1;173:8;231:17;236:2;256:6;281:25;282:1;293:13;313:23
**speaking (7)** 127:16;141:21;172:3;189:21;202:2;269:13;293:15
**specific (15)** 16:19;49:14;57:23,25;94:19;99:9;100:5;103:3;115:20,24;151:8;171:21;175:2;191:9;206:1
**specifically (6)** 39:25;67:5;101:21;129:23;171:23;195:11
**specificity (1)** 176:2
**specifics (2)** 57:22;74:17
**speculating (1)** 191:22
**speculation (2)** 137:20;225:4
**speculative (1)** 182:18
**spell (3)** 8:15;28:17;29:4
**spend (2)** 177:23;289:3
**spent (2)** 158:16;160:7
**SPI (1)** 212:14
**split (2)** 153:25;154:2
**spoke (30)** 30:7;32:7,17;33:1;34:3,6;42:13,14;46:12;50:20;51:1;68:6;86:24;87:7;115:4;122:17;123:21;127:15;130:10;131:15;132:8;133:6;173:15;219:14;282:4,17;293:8;313:9,13;314:10
**spoken (3)** 158:15;265:13;319:12
**sporadic (1)** 87:12
**spot (3)** 41:12;115:1;258:24
**spouse (1)** 49:14
**spreadsheet (1)** 52:15
**spreadsheets (1)** 52:13
**squabble (1)** 144:14
**squad (1)** 15:4
**square (1)** 288:3
**stacked (5)**

275:13,16,20,20;277:2
**stacking (1)** 279:24
**stages (2)** 105:25;163:14
**stamp (5)** 34:22;70:19;73:7;303:23;304:15
**stamped (4)** 83:23;126:8;198:18;246:18
**stand (2)** 276:16;285:20
**standards (2)** 61:11,11
**standing (2)** 240:22;275:20
**Star (3)** 266:8,8;267:17
**start (12)** 4:16;9:5;10:7;25:24;31:9;41:5;55:9;84:1;88:9;99:8;182:25;189:17
**started (19)** 4:14;6:6;11:8;22:13;54:6,10,11;69:8;85:24;123:17;164:4;165:14;188:12;220:10;237:16;257:13;276:12;278:4;306:5
**starts (2)** 35:23;54:16
**stash (1)** 116:1
**State (46)** 5:10;8:13,14;9:24;10:1,4,7,11,19,20;11:4;12:25;13:4,9,12,15;15:5;17:13;19:5;20:23;21:5,23;25:19;31:10,13;35:16;43:4;48:4;79:6;88:11,16,21,25;89:1;92:18,19,21;94:5;109:5;110:17;223:7;224:16;226:6;282:18;300:18;302:13
**stated (16)** 30:24;61:19;74:18;111:2;136:25;154:5;210:21;214:21;220:20;236:23;239:24;240:1,6;253:6;264:24;289:18
**statement (59)** 101:10;103:3,17,18;145:12,23;148:25;149:17;151:11,18;168:16;202:23;203:5,8;205:22;220:24;226:25;230:8;234:12;244:13,15;245:2,4,6,10,22,24;246:7,11,18;249:10,15;250:13;252:14,18,19,22,25;253:10,22;254:24;257:1,7;268:19;276:4,7;287:5,6;289:7;292:3;293:19,23;297:6,14;298:11,14;299:1;309:18;317:22
**statements (23)** 66:6;103:25;121:14,17,20;122:1;123:1;158:12,22;159:21,22;160:5;162:19;163:12;166:22;219:16,17;230:22;249:17;253:18;262:14;298:10;310:15
**states (1)** 77:5
**state's (1)** 295:21
**stating (2)** 31:3;210:25
**Station (49)** 14:20;15:15,19;16:1;18:9,10,12,15;19:22;20:4;21:2,10,18,21,22;22:2;185:16;205:22;211:18;215:8;218:19;219:6;222:13;230:3;231:8,13,25;232:21;233:7,12,20,23;234:7,16,21;235:14;236:21,22;237:4,19;238:23;239:11;240:11;242:12;243:7,18;244:10;245:10;250:8
**status (1)** 16:9
**stay (3)** 19:22;173:6;311:8
**staying (1)** 109:11
**stealing (6)** 119:1,9,15;123:4;161:7;167:5
**step (7)** 9:9;99:14,16,21;103:18;117:20;264:23
**stepping (1)** 231:21
**steps (11)** 57:10;172:10;197:18;224:24;251:2;257:9,15;260:23;261:17;263:8;289:21
**Steve (2)** 164:25;165:1
**sticking (1)** 213:9
**sticks (2)** 58:5;227:23
**still (41)** 7:3;9:25;21:17;25:8;38:16,24;40:5;42:4;48:14;55:20;56:25;57:4,11;87:13;90:3,4;99:4;113:1;118:1;120:24;121:9;122:2;135:18;144:5;164:2;169:23;195:20;203:10;219:19;230:13;232:17,21,22;237:10;261:13;265:7;266:13;269:1;275:12;279:5;310:19
**stock (2)** 171:12,17
**stole (8)** 117:19;120:14;167:1,9,10,13;168:1,14
**stolen (9)** 113:11,18,25,25;115:13;116:15;123:11;129:15;167:17
**stop (7)** 113:22;178:19;258:1;301:3,4,12,18
**stopped (3)** 146:14;237:22;240:3
**stops (2)** 15:7,10
**story (8)** 103:22;145:18;213:9;262:9;264:14;286:19,23,25
**straight (1)** 258:5
**Street (25)** 85:13;103:14,15;108:16;160:22;194:5,8,9,10,13,13;199:2;240:18;241:5;252:8;258:1,11,17;260:9;263:3;266:9;267:21;287:2;293:6;296:22
**Streets (5)** 192:8;194:6,7;242:2;261:9
**stress (1)** 238:5
**strike (16)** 38:20;42:19;45:9;53:2;64:20;118:4;121:17;175:8;187:23;230:10,18;242:10;245:20;250:15;269:2;287:5
**stripped (3)** 145:16;150:3,8
**strong (2)** 160:16;173:23
**structure (2)** 195:18;278:14
**struggle (1)** 137:10
**stuck (1)** 195:20
**studies (1)** 17:3
**study (1)** 11:25
**stuff (11)** 57:20;75:25;90:23;119:13;125:23;191:22;207:18;210:4;262:4;263:13;281:17
**stunning (1)** 243:1
**style (13)** 100:4;101:18,23;127:1,9,9,10,17,20,25;128:1;248:20;270:14
**styles (2)** 100:2;127:14
**stylistically (1)** 127:8
**subject (6)** 32:18;91:22;226:5,7;300:20;302:18
**submit (2)** 16:13;26:10
**submitted (4)** 58:12;78:18;284:21,23
**subsequent (5)** 43:19;47:13;159:22;277:13;291:13
**subsequently (3)** 253:25;261:19;297:10
**substance (1)** 274:9
**substantive (2)** 75:10;245:16
**success (1)** 202:15
**successful (1)** 276:9
**sudden (1)** 182:10
**sued (2)** 30:18;301:23
**sufficient (1)** 255:5
**suggested (2)** 234:23;275:22
**suggesting (2)** 86:20;110:7
**suggests (1)** 199:25
**suit (1)** 301:25
**sum (1)** 236:24
**summarize (1)** 17:8
**summarizes (1)** 297:4
**summary (2)** 41:21;210:19
**Summer (1)** 12:19
**summons (3)** 180:10,11,17
**Sup (2)** 34:11;283:1
**supervise (1)** 90:7
**supervises (1)** 89:21
**supervisor (5)** 38:1;69:25;82:7;89:25;90:4
**supervisors (3)** 61:20;89:14;212:13
**supplemental (4)** 35:8;303:11,19;306:18
**supplementary (2)** 34:14;77:8
**supplier (3)** 122:11;138:25;139:2
**suppliers (2)** 122:18;139:13
**support (13)** 57:8;149:12;160:18;162:22,24;163:25;264:3;269:13;294:21;295:3,9,21;298:2
**suppose (2)** 114:6;153:23
**supposed (1)** 191:3
**supposedly (2)** 118:21;152:22
**sure (44)** 14:10;30:13;35:2;38:3;44:12;48:1;76:22;83:10;88:6;96:9;101:11;106:20;118:20;128:11;130:17;133:20;139:5;144:16;176:21;180:13;185:16;191:17,23;198:5,7,25;206:4;208:17;225:16,24;231:4;234:11;

244:24;261:11,13;264:5;266:14;274:8;278:16;279:15;281:13;299:10;305:1,5
**surmise (1)** 132:10
**surmising (2)** 259:8;315:4
**surprised (3)** 136:12;143:17;259:9
**surviving (1)** 63:22
**suspect (27)** 44:6;46:10;47:3,7,9;50:2;55:21;57:1,9;58:2,7;102:16,22;104:8;115:6,7;158:9;159:8;164:2,5,9,10;165:12,13;222:8;314:4,6
**suspects (14)** 17:19;40:24,25;41:12,17;46:11;54:17,24;101:7;103:4;117:23;164:8;221:11;222:1
**Sussex (6)** 14:20;15:5;20:4,7,20;21:8
**sworn (3)** 4:2;7:1;25:9
**system (8)** 23:20;179:3,9,10;180:15,17;218:15;234:18
**systems (1)** 218:19

## T

**table (2)** 192:19;197:21
**tabs (4)** 260:11,13,15,19
**takeaway (1)** 163:1
**talk (16)** 99:25;144:24;155:15;172:16;174:25;176:2,25;212:25;213:1;250:20;258:1;270:22;273:8;274:5,12;293:10
**talked (4)** 161:6;259:2;303:8;319:12
**talking (30)** 18:23;29:9;61:16;84:15;86:7;92:17;93:18,20;98:3;101:22;104:6;129:22;130:24;132:22;177:14;192:5;198:25;201:25;207:2,4,21,25;208:1,15;209:19;210:13,19;213:10;252:23;269:5
**talks (1)** 262:4
**tape (2)** 160:2;244:18
**taped (5)** 103:5;219:22;220:20,23;227:14
**taping (1)** 224:23
**task (4)** 20:22;21:1,6;257:24
**tasks (4)** 51:23;260:25;279:3;317:10
**taught (1)** 101:21
**tax (1)** 211:24
**Taylor (15)** 116:25;138:1,18;139:16;140:21;141:9,19;147:8,9,9,16,20,22,25;148:3
**Taylor's (1)** 138:17
**teach (1)** 276:8
**team (19)** 63:4;86:25;95:5;96:17;146:5;168:24;189:20;190:2;191:14;194:21;203:4;206:18;223:17;260:19;262:18;305:22;306:2;312:11;316:23
**teams (2)** 312:5,8
**team's (1)** 64:15
**technically (1)** 219:20
**teenage (1)** 53:8
**teenagers (5)** 129:18,24;276:6;309:21;310:1
**teens (1)** 130:1
**telephone (3)** 237:19;240:17;241:1
**telling (5)** 83:19;147:20;161:21;171:24;228:5
**tells (1)** 264:6
**Ten (3)** 9:16;22:11;296:21
**tend (6)** 89:10;99:11;101:19,23;103:18;265:3
**tendency (1)** 9:4
**tenure (1)** 10:21
**term (5)** 23:21;26:8;91:6;172:9;275:16
**termed (1)** 64:13
**terms (9)** 6:25;10:16;38:22;51:21;58:6;87:24;95:10;248:17;297:12
**terrible (1)** 19:8
**terrorism (1)** 24:12
**test (13)** 13:20;23:15,16;58:23;59:3;60:13,15,23;61:6;62:1,7,15;248:18
**testified (16)** 4:3;54:15;125:10;149:16;183:4;186:18;187:2,5;207:7;224:2;237:13;239:3;284:1;317:14;318:25;319:1
**testify (1)** 231:15
**testifying (1)** 174:23
**testimony (13)** 7:1;8:11;141:2;176:17,21;179:4;181:2;186:21;190:23;194:15;238:22;252:14;259:15
**testing (3)** 23:19;177:12;214:20
**tests (2)** 13:17;59:14
**thankful (3)** 263:17,18,19
**that'd (1)** 227:22
**theft (2)** 24:11;102:9
**thefts (1)** 19:1
**theories (2)** 46:22;191:15
**theory (28)** 124:3;142:20,22,25;143:10;145:15;146:4;149:13;150:13;154:10;160:18;162:22,24;163:10;169:5;190:9;192:16,16;194:17,20;196:7;197:16,25;202:16;250:17;263:23;264:1;270:19
**therefore (1)** 129:13
**thereof (1)** 264:7
**thinking (1)** 205:6
**third (7)** 153:20;157:6;222:10;246:17;263:8;277:8;293:5
**thorough (2)** 83:1;204:11
**though (34)** 44:14;77:20;80:5;82:17;90:2;97:4;110:9;112:4;115:12,13;117:2;125:12;127:24;141:19;143:9,23;144:14;160:14;162:5,14;172:3;189:8;197:7;238:10;250:4;260:12,18;262:18,19;263:22;276:17;283:17;292:12;315:24
**thought (24)** 46:23;75:19;80:4;102:11;109:16;121:6;130:13,15;132:9,18;134:21,23;135:21;160:8;178:14;191:19;195:20;197:20;207:12;218:18;236:17;250:23;280:3;310:18
**thoughts (6)** 55:18;97:7;135:9,10;159:10;191:17
**threat (1)** 131:13
**threatening (1)** 140:13
**three (12)** 30:2;77:24,25,25;112:6;127:12;135:14;136:15;147:4;213:11;254:13;303:25
**threw (2)** 135:5,17
**throughout (22)** 16:25;25:15;39:10;41:15;57:10;66:5;75:18;105:25;109:5;111:17;113:2;125:22;158:11;159:1;161:4;163:8,12;164:3;173:12;200:13;220:7,11
**throw (4)** 39:14;136:6,6;262:2
**throwing (1)** 135:13
**thrown (2)** 39:18;305:21
**ticket (2)** 172:22;254:16
**tidbits (1)** 143:15
**tie (1)** 226:14
**tied (1)** 138:19
**Tietjen (24)** 4:5;5:10,14;6:8;8:17;9:11;24:21,24;25:6,10;28:19;29:6;30:10;34:11,14;48:2;147:6;183:1;195:12;198:15;249:23;299:20;302:23;303:19
**T-I-E-T-J-E-N (1)** 29:8
**Tietjen-1 (3)** 24:24;25:5;28:5
**Tietjen-2 (7)** 34:13,14,21;40:14;62:18;198:17;202:25
**Tietjen-3 (4)** 70:13,16;71:8;76:21
**Tietjen-4 (2)** 73:3,6
**Tietjen-5 (2)** 246:10,12
**Tietjen-6 (2)** 294:20,24
**Tietjen-7 (1)** 303:19
**Tietjen's (2)** 92:18;316:11
**timeline (1)** 111:18
**times (17)** 6:13,17;87:12;103:10;107:9;119:16;151:5;158:16;207:19;209:18;214:17;224:2;258:3,4,13;260:8;291:14
**timing (1)** 214:6
**today (21)** 7:5,24;8:11;29:12,16,23;39:24;57:24;108:13;109:2;119:12;125:6;161:23;194:3;201:21;225:19,25;

273:19;291:25;
300:11;309:23
**together (10)**
95:20;127:23;
144:18,19;191:4,6;
242:9;276:15;316:25;
317:6
**told (54)**
42:24;44:5;45:1,10;
46:9;51:2;58:15;75:1;
102:24;103:7;104:6,
11;109:10;120:11;
151:19;154:15,16;
161:15;162:3;170:9,
9;179:3;181:9;183:8;
188:6;189:4;196:11;
208:22;209:1,9,22;
210:12;215:7;218:4,
14;225:1;227:2;
228:22;229:16,16,24;
235:11;240:10;251:1;
263:1,7;264:1,3;
273:22;306:14;
314:24,25;316:3;
319:2
**toll (1)**
243:20
**Tom (1)**
8:19
**tomorrow (1)**
273:8
**took (26)**
13:8,16,20;56:22;
75:4;87:20;124:14;
126:15,16,22;142:7;
145:17;155:17;
159:17;193:23;201:3;
216:25;227:5,12;
228:16;245:6,9;
251:2;252:18;282:10;
314:20
**tool (1)**
59:17
**toothbrush (1)**
166:10
**top (3)**
77:5;78:9,10
**topic (1)**
309:17
**topics (1)**
191:23
**total (3)**
30:2;236:24;250:12
**totally (1)**
229:24
**touched (2)**
120:16;215:1
**towns (1)**
15:5
**trace (1)**
204:16
**track (2)**
83:25;278:4
**tracking (1)**
23:9
**traffic (16)**
15:7,9;172:19,22;
180:1,6,11,16;237:6;
238:15;254:1,16;
258:8;301:3,4,12
**trafficking (2)**
121:12;122:24
**trained (1)**
27:22
**training (30)**
14:6,11;16:20,22;
17:4,9,10;18:4,6;
23:25;24:2,7,7,20,24;
25:25;26:14;94:18,
24;100:14,18,19,20;
101:3,6,11,12,12;
171:20;172:15
**trainings (1)**
25:17
**transcribes (1)**
249:17
**transcript (8)**
18:2;187:3;239:3;
244:21;245:25;
246:12;310:17;
319:23
**transcripts (2)**
160:1;186:18
**transferred (2)**
257:11;261:1
**transpired (5)**
187:15;206:18;
227:24;239:15;248:1
**transport (3)**
156:11;311:22;
312:20
**transported (5)**
155:24;157:14,14;
311:13,20
**transports (1)**
311:16
**trapped (1)**
270:3
**trash (1)**
191:21
**Trenton (1)**
22:6
**trial (5)**
32:8,10,19;33:2;
310:14
**tricks (1)**
62:1
**tried (5)**
142:4;205:6;221:3;
301:17;313:18
**trip (1)**
161:5
**Troop (1)**
14:20
**Trooper (6)**
14:23,24;15:21;
16:3,4;19:5
**troopers (1)**
18:14
**trouble (4)**
125:11;154:16;
161:19;182:9
**troubling (1)**
125:15
**truck (3)**
108:2,5;137:2
**Trucks (1)**
24:12
**true (11)**
41:8;49:9;57:4;
58:12;145:13;148:9,
12;201:17;257:20;
263:24;264:16
**truly (4)**
228:10;250:1;
279:25;281:6
**trusted (1)**
192:12
**truth (1)**
171:24
**truthful (8)**
8:11;61:24;170:21,
25;171:9;172:1;
203:6,8
**truthfulness (1)**
280:5
**try (24)**
33:7;40:8;48:13;
62:1;64:17;100:5;
101:19,20,23,24;
106:7;120:3;141:15;
143:8;200:10;203:25;
251:2;259:25;261:19;
266:7;268:23;278:4;
279:9;280:4
**trying (34)**
61:25;84:16;87:10;
97:13;98:2,23;
103:24;105:12;
109:25;110:8;113:19;
114:12;116:6;138:3,
10;139:22;144:18;
145:5,6;151:6,17;
169:22;203:9,9;
205:23;211:9;234:11;
236:20;257:16,19;
281:24;282:3;306:3;
313:16
**Tuesday (1)**
226:14
**turn (4)**
34:5;39:21;85:11;
210:6
**turned (10)**
148:9,12;212:12;
213:21;214:23;
277:19,21;283:24;
297:14;306:9
**Turner (5)**
128:13,14;153:12,
13;154:25
**Turner's (1)**
167:22
**Turnpike (4)**
21:11;215:9;
234:21;302:10
**turns (2)**
142:16;174:12
**two (27)**
16:23;17:4,9;23:1;
30:5;41:16;76:16;
85:12;107:25;112:7;
134:2,16;135:16;
136:19;175:25;
185:22;204:22;
205:10;235:17;
263:10;293:4,14;
295:16;299:9;300:24,
25;316:7
**two-minute (2)**
76:8,11
**two-week (2)**
23:25;24:7
**type (36)**
9:22;12:4,18;13:2,
6,10;14:1;15:16;20:5,
13;22:22;24:6;36:15;
62:3;79:7,12,13;
87:16;100:12,18,19;
101:1,4;122:7;153:1;
154:16;160:23;
178:19,20;201:8;
204:16,17;205:5;
290:12,17;291:3
**typed (1)**
36:13
**types (3)**
18:21;20:15;174:2
**typically (9)**
46:5;75:15,16;82:5;
88:23;96:25;97:12;
193:6;222:17
**typing (3)**
54:6,10,11
**typo (2)**
25:21,22

## U

**ultimately (11)**
139:6;146:6;
151:10;171:9;193:23;
255:15;292:13;
299:21;300:11;318:8,
10
**Um (1)**
277:17
**Um-hum (4)**
54:9;126:10,14;
173:22
**unable (8)**
8:10;52:7;106:8;
108:7;129:1;130:23;
147:11;294:8
**unaware (5)**
91:1;92:7;197:3;
224:17;226:11
**unclear (2)**
101:9;247:12
**uncovered (1)**
195:24
**under (19)**
7:24;33:16;53:13;
183:10;196:3;226:8;
230:16,17,19,20;
231:1,2;232:17,22,25;
253:1;267:1;271:4;
301:22
**undergo (1)**
16:19
**underlying (2)**
115:11;120:24
**undermining (1)**
301:8
**Understood (6)**
7:17,20;12:20;
150:12;229:3;292:1
**undertook (1)**
63:18
**underwent (1)**
23:25
**unidentified (5)**
11:2;46:8;52:5,13;
193:7
**uniform (1)**
262:4
**un-include (1)**
151:3
**uninvolved (1)**
242:23
**unique (2)**
191:10,12
**unit (64)**
10:18,19,21,25;
11:7;21:5;22:3,5,12,
14,21;23:8,9,13,14,
15,16;24:3;26:22;
27:23;28:1;31:22;
33:18,22,23;42:11,12,
14;45:13,21,24;46:2,
7;61:13,20;62:15;
75:20;87:13;88:22;
89:7,22;94:12;
251:20;257:11,14;
259:21;262:8;282:23;
301:4,7,10;302:19;
304:4,7,12,16,17,21;
305:5,7,9,11,12;
306:24
**units (1)**
23:1
**University (2)**
11:24;269:21
**unknowing (1)**
102:6

**unknown (8)**
101:24;109:8;111:3;133:16;141:10;240:21;253:6;263:1
**unless (5)**
94:21;145:16;164:21;238:21;316:7
**unreliable (2)**
172:4;201:16
**unsolved (1)**
261:8
**unsuccessful (1)**
281:19
**unusual (2)**
129:18,23
**up (89)**
4:13;11:13;18:15;22:8;27:7;30:6;34:3;44:1;51:24;56:14;60:14;62:5;63:11;75:24;78:5;87:20;88:4;89:3;102:3;115:18,20,22;119:24;125:24;127:22;128:15;134:11;136:21;144:2;149:15;151:10;153:25;154:2;161:9;163:7,7;164:1;165:18;166:16,18,21,24;169:21;174:14;177:21;178:5,5,7,21;179:3;181:16;182:10;191:19;193:4;205:20;213:15;218:13;223:5,6;237:8;238:15,17;241:14,20;242:14;244:18;249:1,23;251:6,11;252:4;258:2,8;262:15;266:12,15;270:12;272:17;273:19;274:4,7;275:16,20;280:10,12;286:16;312:5,8;314:11
**upbringing (1)**
103:21
**update (3)**
188:16;206:12,24
**uploaded (1)**
303:25
**upon (12)**
11:21;12:20;13:25;103:23;172:14,15;224:18,19;253:17;270:5;283:14;313:4
**upset (3)**
123:13,14;158:10
**upstairs (1)**
243:19
**use (10)**
62:12;90:5;144:5,7;172:9;215:11;234:18;245:13;277:3;316:24
**used (12)**
21:23;35:16;39:10;59:22;61:21;62:9;74:20,25;75:5;149:23;275:15;292:13
**useful (7)**
59:16;60:1,2;152:14,18;166:9,11
**uses (1)**
251:7
**using (5)**
49:8,8,11;52:21;53:4
**usually (3)**
20:24,25;255:18

## V

**vacant (3)**
268:12,14,15
**vague (4)**
75:15,19;91:4;102:13
**value (8)**
22:23;75:14;76:1,3;79:24;102:18;135:2;166:4
**various (4)**
8:21;16:24;174:19;178:4
**varying (3)**
107:6,9;127:11
**Vassar (5)**
285:23;286:3;287:1;288:2,3
**vehicle (12)**
108:3,4;112:9;135:17;152:9;180:10,17;232:9;239:10,21;301:19;316:2
**vehicles (2)**
232:7;233:8
**Velazques (4)**
233:23;234:12,15;236:15
**verbal (1)**
315:21
**verifiable (1)**
148:13
**verified (4)**
147:18,19;148:22;292:21
**verifies (1)**
147:15
**verify (9)**
62:3;147:11,24;251:3;253:5,8;261:18;262:25;264:8
**version (1)**
292:25
**versus (2)**
19:6;161:21
**VHS (1)**
218:20
**via (5)**
97:1;188:4;237:18;274:12;279:12
**viable (2)**
52:7;106:22
**Vic (1)**
5:12
**victims' (2)**
150:8;175:3
**Victor (1)**
5:8
**video (31)**
28:15,18;103:3,12,16,17;127:19;205:22;215:5,7;217:11;218:8,12,16;219:6,9;221:6;226:25;229:23,25;230:2;231:25;234:12;236:22;244:20,21;246:1;247:3;277:23;297:5;318:6
**Videographer (15)**
28:10,11,21;76:12,15;146:21,25;147:3;198:8,11;265:22,25;299:13,16;319:20
**videographer's (1)**
29:4
**video-recorded (5)**
253:10;254:23;268:19;287:6;289:7
**videos (3)**
100:24,25;101:1
**videotape (3)**
28:12;235:9;238:8
**videotaped (7)**
185:17;217:3;221:7;222:16;244:13,14;250:13
**videotaping (1)**
217:25
**view (10)**
57:8;58:23;59:2;76:2;115:9;159:7;175:14;190:24;224:25;291:21
**viewed (1)**
176:18
**violation (2)**
301:19;302:3
**violations (1)**
301:24
**voluntarily (1)**
248:22
**VOMACKA (87)**
5:11,12;47:24;69:11;83:4;87:5;92:1;105:7;107:18;108:9,25;110:25;118:9,17;121:22;123:7;136:8;138:8;145:21;146:10;148:15;150:16;151:14,21;152:15;156:7;157:9,21;163:2,20;164:6,17;166:6,14,19;178:23;180:3;181:7;182:16,22;183:13,23;184:3;191:1;192:20;193:25;195:5;201:19,24;202:19;217:8;220:17;221:12;222:24;224:11;225:3;227:8;229:6;239:12,17,23;243:3;260:22;261:15,25;262:23;267:3;276:20;283:10,21;287:20;288:13;292:9,16;293:2;294:13;297:16,19;298:3,15,17,23;299:4;317:23;318:17,20;319:18

## W

**wait (4)**
109:7,7,10;274:3
**waited (1)**
109:15
**waiver (1)**
157:13
**walk (1)**
251:24
**walked (5)**
258:21;259:1;272:25;273:3,3
**walking (2)**
258:10;261:9
**walk-up (1)**
97:2
**wallet (10)**
134:2,6;135:4,13,25;136:5,21;137:1,2;162:21
**wants (4)**
127:7;144:2;176:6;196:15
**warnings (3)**
244:3,9,15
**warrant (23)**
172:19,22;178:21;180:1,6,6,9;204:16;230:14,15,17;232:23;238:16;254:2,16;258:8;261:5;295:10,22;308:9,19,23;309:8
**warrants (10)**
174:3;203:14,17,23;204:2,9,10;294:21;295:4;307:25
**washed (5)**
141:11;144:25;150:4,11,15
**washing (1)**
148:20
**Washington (5)**
18:9,10,12;19:22;120:22
**watch (1)**
127:19
**watched (1)**
100:24
**way (25)**
4:21;11:22;46:18;73:7;86:2;93:19;94:6;95:24;116:11;131:14;151:11;154:11;159:17;185:2;211:11;213:13;215:14;227:14;238:3;275:14;280:1,11;288:11;304:25;319:11
**Wayne (2)**
138:19;139:13
**ways (2)**
140:11;179:7
**wear (1)**
226:13
**week (4)**
87:12;109:13;270:8;275:9
**weekly (2)**
87:9,16
**weeks (6)**
14:4,15;16:24;17:5,9;77:25
**weight (2)**
52:17;238:13
**weird (1)**
277:3
**welcoming (1)**
163:9
**weren't (27)**
53:9;104:1,2;107:3;108:1;110:8;115:18;121:19;133:2;142:17;166:18;214:13;225:12;231:18;234:24;235:19;253:15;259:10,16;260:14,15;262:20;263:16;280:2;286:22;300:7;301:16
**West (1)**
22:6
**what-if's (1)**
262:3
**what's (19)**
14:21;23:18;27:7;30:17;31:1;34:21;76:1;83:13;87:8;135:7;193:12,22;194:2;200:11;208:6;210:11;223:15;276:14;312:4
**whatsoever (8)**

187:8;190:9;197:25;198:1;201:22;245:15;310:2,3
**whenever (2)** 75:3;228:1
**whole (7)** 101:9;103:22;243:14;253:8;267:2;270:19;315:20
**wholeheartedly (3)** 202:3,11;310:20
**whoop (1)** 238:16
**who's (3)** 99:19;160:2;261:6
**whose (3)** 220:14;295:5;299:20
**William (3)** 8:17;28:19;29:6
**W-I-L-L-I-A-M (2)** 8:18;29:7
**Williams (11)** 104:16,22;123:21;130:16;131:15,22,23;132:23;152:1;199:5;200:12
**willing (6)** 120:10;158:22;162:23,25;207:11,22
**window (1)** 116:23
**wish (3)** 208:17;214:5;293:15
**withdraw (1)** 202:21
**within (12)** 15:11;18:19;21:2;39:9;55:11;66:1;112:11;247:9;282:18;292:21;293:20;305:8
**without (9)** 9:11;29:20;55:13;89:2;157:3;193:2;249:25;298:13,25
**witness (17)** 4:2,22;28:19,23;31:19;47:18;93:7;181:13,13;203:12;204:7;211:7;220:19;221:15;293:21;294:5;319:14
**witnesses (17)** 17:19;67:11;85:25;97:4;99:1;101:7;141:3;156:5,5,24;173:12;174:24;197:13;204:17;219:10;221:11;257:16
**woman (2)** 153:15,16
**wondering (2)** 178:8;234:3
**wonderment (1)** 281:2
**woods (1)** 251:23
**word (12)** 17:3;90:5;162:2,2;192:25;217:17;227:5;238:21;265:14;277:3;291:2;316:24
**words (7)** 247:7,25;259:16;298:8,25;305:21;313:20
**work (63)** 6:20;9:1,22;10:9;12:14,19;15:16;19:2;20:5,13;25:25;33:4;35:17,24;36:5,20;37:10;43:21;47:13;51:22;52:11;54:5;55:5;59:14;61:3;67:22;78:20;83:2;88:16,20;89:2,7,13,17,21;90:15,19;92:21,22;94:14;101:4;106:21;125:16;147:7;158:11;164:11,13;171:19;191:3;192:19;193:4;212:13;221:24;278:20,23;286:16;289:12,17;305:16,19;318:14,14,22
**worked (19)** 10:3;12:25;16:3;20:18;31:10,14;62:10;67:24;68:2;95:20,22;117:19;133:20;138:4;164:14;191:6;257:24;282:20,20
**working (32)** 10:10;18:23;22:21;26:21;32:1;33:23;39:12;46:20;53:12;68:6,9;69:2;80:1;81:6;87:11;88:24;95:22;105:11;116:4;117:16;135:11;154:10;169:5;194:17,21;208:5;221:5;228:3;230:3;234:13;316:25;317:6
**works (1)** 101:4
**world (2)** 144:16;151:16
**worry (4)** 50:25;192:12;261:3;284:23
**worthwhile (1)** 212:16
**worthy (3)** 89:15;90:6,11
**write (14)** 80:23;124:24;126:1;207:18;208:25;209:4,5;214:22;231:16;242:14;255:12;288:5;312:12,22
**writing (1)** 109:3
**writted (1)** 181:14
**written (15)** 13:7;53:22;56:21;66:8;93:20,25;99:6;125:22;126:3;209:15,20,23;210:1;232:2;315:18
**written-down (1)** 211:22
**wrong (11)** 17:3;72:6;73:18;82:16;160:9;163:1,4;164:12;218:18;278:23,25
**wrongfully (1)** 31:3
**wrote (14)** 52:3;125:18,20;173:18;193:21;210:4;267:20;277:12,18,20;283:14,16;312:14,18

## Y

**yards (1)** 251:24
**year (18)** 10:7,8;12:21;20:1,8;22:10;27:5;52:17;54:2,12;64:10;86:5;247:10;257:2,12;263:20;282:22;283:7
**years (31)** 6:16;9:16;10:5;27:14;30:11;54:12;61:3,18;127:18,20;133:14;158:14;209:19;218:20;220:8,12,24;238:13;240:25;242:23;251:21;261:8;263:12;264:8,12;276:25;284:22;285:2,10;300:25;302:1
**Yep (4)** 199:3;208:8,13;223:11
**yield (1)** 152:13
**young (7)** 40:15;147:13;153:15;159:10;167:15;170:3;276:5

## Z

**zero (1)** 239:8
**Zoom (2)** 8:22,22

## 0

**000342 (1)** 246:13
**001343 (1)** 34:23
**003548 (3)** 70:17,20;71:6
**003569 (1)** 198:19
**003586 (1)** 70:17

## 1

**1 (11)** 26:24;27:16;78:9;186:19;187:11,15,16;229:17;247:1,8;248:1
**1:00 (1)** 207:20
**1:14 (1)** 146:25
**1:27 (1)** 147:3
**10 (3)** 28:3;151:5;284:22
**100 (3)** 206:4;214:19;262:20
**10th (1)** 152:3
**11 (3)** 106:16;297:3,4
**11/13/08 (1)** 246:13
**11:00 (3)** 108:16,18;112:1
**11:39 (1)** 76:12
**11:45 (1)** 76:15
**117 (1)** 85:2
**12 (24)** 23:23;127:20;187:12;189:9,18;195:13;199:13;209:19;220:2;231:7;247:1;248:2,3;250:14,16;284:22;285:20,22;288:10;292:4,15;297:3,8;315:10
**12th (6)** 179:17;194:17;196:8;219:7;275:10;291:13
**13 (1)** 23:23
**1315 (2)** 303:20,25
**1316 (1)** 304:15
**1317 (2)** 303:21,25
**1343 (1)** 34:15
**1347 (1)** 126:8
**1361 (1)** 34:16
**137 (5)** 285:23;286:3;287:1;288:2,3
**15 (3)** 30:7;235:4;237:11
**15th (13)** 73:19;77:22;78:14,19,20;85:13;192:8;194:13;242:1;251:7,9,11;266:12
**16 (5)** 65:7,14;72:10;246:19;285:25
**16th (2)** 85:13;242:2
**18 (3)** 274:6,10;292:8
**18th (3)** 270:7;274:7,12
**19 (5)** 35:4;170:14;266:4;285:25;292:22
**1970s (1)** 129:19
**1970-whatever (1)** 251:13
**1978 (49)** 33:13;58:13,21;60:19;62:22;66:4;71:14;72:17;78:14,21;84:22;85:7;104:23;106:10,15;107:6;109:2,18;116:4,19;120:16;121:15;123:1;129:14;130:4;132:3;133:16;162:3;165:20;167:14;173:20;174:18;177:17;193:10;200:6;201:8;208:7;228:25;240:20;267:18;269:5,10;282:23;295:18,25;296:3,8,16,16
**1979 (3)** 73:20;84:5;197:8

**1984 (1)**
282:24
**1988 (2)**
31:16;282:16
**1994 (1)**
13:8
**1995 (5)**
10:8;12:23,24;16:3;22:13
**1999 (6)**
15:25;16:3,7;18:23;101:23;222:6
**19th (3)**
274:13,15,19

## 2

**2 (8)**
27:16;47:21;48:3;186:20;187:11,16;247:1;248:2
**2:28 (1)**
198:8
**2:38 (1)**
198:11
**20 (7)**
106:10;235:5,7;236:1;237:8;295:18,24
**2000 (2)**
21:13;27:22
**2000s (1)**
20:10
**2001 (5)**
21:13;23:12;26:22;282:7;303:10
**2006 (4)**
11:8;21:14;23:3;26:22
**2007 (1)**
26:15
**2007/2008 (1)**
63:17
**2008 (92)**
11:9;23:4,7;33:14;36:6;37:4;38:22;39:16;41:15,20;42:6,9,21;43:17,25;44:23;45:24;46:12;49:24;51:2,24;52:2;55:3,16;56:15;58:3,20;64:10,23;65:7,14;67:2,21;69:8;70:1;72:10;85:23;95:1;104:15;105:3;114:7;120:2;123:17;124:7;141:25;142:7;161:21;172:17;173:1,4,21;175:23,23;187:12;189:9,18;194:18;195:13;196:9;199:13;219:7;220:3,7,12;221:24;222:3,6,19,22;223:17;225:8,18,19,20,24;226:19;231:7;248:2,3;250:14,16;274:6,10;279:11;280:20;282:11;288:10;291:13;292:4,15;314:3;315:10
**2009 (12)**
36:6,16,21;37:14;41:23;54:19,21;55:10;225:18;289:5,22;292:23
**2010 (8)**
28:3;214:25;256:21;282:10;289:23;300:4;303:10;306:19
**2011 (1)**
32:4
**2012 (1)**
26:15
**2013 (1)**
11:10
**2016 (1)**
285:10
**2017 (1)**
26:1
**2018 (1)**
247:1
**20th (5)**
107:2,10;109:20;264:4,7
**21st (2)**
279:11;303:10
**22 (3)**
198:19;267:18;306:19
**22nd (4)**
107:3;109:21;110:10;303:9
**23rd (2)**
107:4;110:11
**24 (4)**
10:5;109:7,15;280:20
**24-hour (2)**
109:16;112:11
**25 (5)**
54:19;61:3;289:5,22;300:25
**254 (1)**
267:20
**256 (14)**
194:5;241:3,16,21;252:8,15;263:2,4;267:21;268:8,12,16;270:4;296:22
**257 (1)**
294:21
**258 (1)**
267:21
**259 (1)**
294:22
**25th (8)**
10:8;28:3;36:16,21;37:14;54:18,20;55:10
**26 (2)**
14:4,15
**260 (1)**
267:21
**271 (3)**
178:7;199:2;241:15
**2nd (13)**
34:4;41:20;42:6,9,21;43:17,25;44:23;46:12;104:15;105:3;175:22;314:13

## 3

**3:00 (2)**
109:24;110:4
**3:57 (1)**
265:23
**30 (9)**
64:12;133:14;238:13;240:25;242:23;243:24;261:8;263:12;264:8
**30-year-old (1)**
257:19
**33 (1)**
84:1
**334 (1)**
246:18
**34 (1)**
83:24
**3580 (1)**
83:25
**3581 (1)**
83:23
**3rd (1)**
84:5

## 4

**4 (1)**
229:17
**4/21/10 (1)**
303:20
**4:06 (1)**
265:25
**4:15 (24)**
184:23;185:5,7,8;188:10,15;189:5;206:10,21,25;207:12,13,14,21;211:13;212:18,19;213:20,23;214:6,14;215:1,3;234:4
**4:47 (1)**
299:13
**4:52 (1)**
299:16
**426 (1)**
246:14
**45 (1)**
214:11
**4th (1)**
282:10

## 5

**5 (7)**
126:7;185:19,20;187:13,16;228:1;229:17
**5:00 (2)**
234:5,8
**5:16 (1)**
319:20
**5:44 (1)**
319:24
**503 (1)**
24:25
**506 (1)**
24:25

## 6

**6/25/09 (1)**
34:15
**6/25/2009 (2)**
34:12;36:3
**60 (3)**
70:24;73:3,8
**62 (2)**
73:4,8
**6th (1)**
124:7

## 7

**7 (9)**
78:11;172:17;173:1,4;185:19,20;187:13,17;304:14
**7:30 (5)**
233:24;234:8,8,22;274:24
**7:39 (1)**
275:1
**70s (2)**
128:5;129:24
**78 (10)**
77:22;78:19;105:9;117:11;177:18;189:3;191:25;196:4;203:5;267:11
**79 (1)**
84:14
**7th (1)**
179:17

## 8

**8 (7)**
51:24;52:2;112:14;154:20;155:5;170:14;175:23
**8:00 (1)**
274:20
**8:18 (5)**
246:2,22;247:9;248:3;249:10
**88 (1)**
282:24
**89 (1)**
25:20
**8th (9)**
47:17;50:5,12;51:2;173:21;176:6,14;314:10,13

## 9

**9 (2)**
58:3;266:4
**9/15 (1)**
78:4
**9:00 (2)**
108:14,15
**9:23 (1)**
252:22
**9:30 (1)**
275:11
**90s (1)**
128:6
**95 (2)**
25:24;26:1
**9th (12)**
44:1;49:24;50:8,9,11;53:17;55:15;58:20;64:23;67:9;137:24;314:14