# EXHIBIT C

7

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - CRIMINAL PART
ESSEX COUNTY
INDICTMENT NO: 2010-07-1728
A.D. #

- - - - - - - - - - - - - -
STATE OF NEW JERSEY, :
: TRANSCRIPT
vs. : OF
: TRIAL TESTIMONY
LEE EVANS, :
Defendant. :
- - - - - - - - - - - - - -

Place: Veterans Courthouse
50 West Market Street
Newark, New Jersey

Date: Thurs., November 3, 2011
Volume 1 of 1
Pages 1 - 120

BEFORE:

HONORABLE PATRICIA K. COSTELLO, A.J.S.C., AND JURY.

TRANSCRIPT ORDERED BY:

PETER GUARINO, ESQ. (Assistant Essex County Prosecutor)

APPEARANCES:

PETER GUARINO, ESQ. and
CHERYL CUCINELLO, ESQ. (Assistant Prosecutors)
Attorneys for the State

LEE A. EVANS, Defendant Pro Se

OLUBUKOLA O. ADETULA, ESQ.
Standby Counsel for the Defendant

INGRID DI PASQUALE, CCR, CRR
Official Court Reporter
Room 512
Veterans Courthouse
50 West Market Street
Newark, New Jersey 07102

I N D E X


| Witnesses | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| For the STATE | | | | |
| EVERETT HAIRSTON | 3 | 28 | 58<br>66 | 64<br>67 |
| JOHN SCOTT-BEY | 68 | 78 | 86 | |
| JOSEPH HADLEY | 89 | 104 | | |

| EXHIBITS | | Ident. | Evid. |
|---|---|---|---|
| S-118A | Arson Report | 102 | |
| S-118B | Property & Evidence Voucher | 102 | |

(Colloquy takes place)

E-V-E-R-E-T-T H-A-I-R-S-T-O-N, State Witness Sworn/Affirmed.

DIRECT EXAMINATION BY MR. GUARINO:

THE WITNESS: Everett Hairston, H A I R S T O N.

THE COURT: Sir, I just want you to keep your voice up nice and loud so everyone in the back can hear you. Okay?

THE WITNESS: Yes, ma'am.

THE COURT: Go ahead, sir.

MR. GUARINO: Thank you, Judge.

Q Mr. Hairston, are you currently employed?

A No, I'm not.

Q And when you were working, who were you employed by?

A Newark Police Department.

Q For how long?

A 26 years.

Q And on -- in August of 1978, what -- were you employed by the Newark Police Department?

A Yes, I was.

Q In what capacity?

A A detective with the Juvenile Bureau.

Q Now, on August 20th, 1978, how long were you

a detective with the Juvenile Bureau?
A For 22 years.
Q And what was the function of a detective in the Juvenile Bureau?
A We investigated offenses committed by juveniles. We investigated child abuse cases and missing person cases.
Q Now, do you recall about how many missing persons cases you've investigated over the years in the Youth Aid Bureau?
A We were averaging approximately 70 to 75 per month.
Q Per month?
A Yes.
Q Do you know approximately how many of those cases were resolved? And by that, I mean, where the youths were located?
A Yeah. We had a average of like 98 percent per month of clearance.
Q Now, in August of 1978, did you have an occasion to investigate the disappearance of Randy Johnson, Michael McDowell, Melvin Pittman, Ernest Taylor and Alvin Turner?
A Yes, I did.
Q And was that all a single case?

A It was a individual until the Superior Sergeant noted that it was related, and then it was combined into one.

Q Now, did you write any reports with regard to your investigation?

A Yes, I did.

Q Do you need your reports to refresh your recollection of your investigation?

A Yes, I do.

Q Did you bring copies of your reports with you?

A Yes, I have 'em.

THE COURT: What are they marked?

MR. GUARINO: They're marked S-27 for identification, Judge.

Oh, I'm sorry, Judge. It's S-27 for identification. That's a report dated September 15th, 19 -- begins with the date 9/15/78? The next exhibit is S-28 for identification, which is dated 9/28/78.

THE COURT: Okay.

You know what? That's not the marking on the list you've given us? I don't know if you're changing all your markings, but I'd prefer you go by the list.

MR. GUARINO: Okay.

S-27, S-28, S-29, S-30, S-31 and S-39 and

S-41.

THE COURT: Okay; with the dates as noted on the list?

MR. GUARINO: Yes, Judge.

Judge, I show the exhibits to the defendant.

(Defendant reviews exhibits)

MR. EVANS: Side bar?

THE COURT: Sure; bring the exhibits over.

(Side bar conference takes place)

(Colloquy takes place and recess taken)

Q Detective, I'm showing you a series of reports which are marked S-27, S-28, S-29, S-30, S-31 and S-39 for identification. Do you see those in front of you?

A Yes, I do.

Q And also, S-41. Now, would you take a moment to look at those reports and tell me if you recognize them?

A Yes, sir. I do.

Q And are those the reports that you wrote in this -- with regard to your investigation?

A Yes, they are.

Q You need your reports to refresh your recollection of your -- what you did in this investigation?

A Yes, sir, I do.

Q Sir, if you need to refresh your recollection with the reports in response to a question, would you please tell us that you're referring to your report?

A Yes.

Q Now, when did you first get this investigation?

A On ah, August the 23rd, of 1978.

Q And at that time, what was your assignment?

A I was working with the missing persons.

Q And were you partnered with anyone?

A With the particular time, Detective John Scott-Bey.

Q Now, with regard to this case, is it assigned a central complaint number?

A Yes, it was.

Q And does that number appear on all your reports?

A Yes, they are.

Q What's the central complaint number?

A 50041.

Q And that tells you that your reports refer to this particular incident?

A Yes, they are.

Q And when did this incident occur?

A On August the 20th, 1978.

Q And with regard to this incident that you were investigating, what were the names of the boys you were -- that were involved in this case?

A Randy Johnson, Ernest Taylor, Melvin Pittman, Alvin Turner and Michael McDowell.

Q Now, with regard to a missing persons investigation, what is your primary objective?

A The primary objective is to interview the family of the person that made the missing persons report and from there, whatever information we can gather, we attempt to locate the missing people.

Q Now, with regard to your investigation, who are the first people that you contacted?

A The first person we contacted were Mrs. Johnson. Miss Sara Johnson.

MR. GUARINO: Judge, I'm gonna show what's marked as S-61D for identification to the defense. Oh, I'm sorry, I apologize, Judge. It's S-6.

THE COURT: S-6D?

MR. GUARINO: Just S-6, Judge.

THE COURT: S-6, okay.

(Shown to the defendant)

MR. GUARINO: On my copy, Judge, I wrote ID, which I thought was 61-D; my mistake.

THE COURT: Oh, okay.

Q I'm showing you, sir, what's been marked as S-6 for identification and ask you if you recognize what S-6 is?

A This is a photo of Randy Johnson. This is a missing person's report.

Q And is that a report by the police of the missing person when it was reported?

A This was reported by officer from the South District Precinct.

Q And did that -- does that give the name of Randy Johnson?

A Yes, it does.

Q And his address?

A 492 Hawthorne Avenue, Newark, New Jersey.

Q And his mother's name?

A Is Miss Sara Johnson -- I think it was Miss Sara Johnson, I'm referring to the report.

THE COURT: Just keep your voice up a little, sir?

THE WITNESS: Yes.

Q Who was the next person that you talked to?

A The next family that we contacted, I'm referring to the report, was -- I think it was Mrs. Taylor. Ms. Rebecca Taylor in reference to her son, Ernest Taylor.

Q With regard, sir, going back -- excuse me, to -- with regard to S-6, does that give the date of birth for Randy Johnson?

A For Randy Johnson's date of birth was listed was 10/12/61.

Q And the date he was reported missing?

A August the 20 -- August the 20th, 1978.

Q Would you look at block -- block 18, is that the date in there?

A Yeah, I'm sorry. It was 8/21.

Q August 21st?

A Right, August the 21st.

MR. GUARINO: I'm gonna show what's been marked as S-8 for identification to the defendant, Judge.

THE COURT: Okay.

(Shown to the defendant)

Q Detective, I'm showing you what's been marked as S-8 for identification. Do you recognize what S-8 is?

A Yes.

Q And what is that?

A This was a missing person report for Ernest Taylor --

THE COURT: Louder.

THE WITNESS: Excuse me.

Q And --

THE COURT: Missing person's report for Ernest Taylor?

THE WITNESS: Ernest Taylor. Yes, ma'am.

Q And does that indicate who is it being reported by?

A This is report by Mrs. Rebecca Taylor.

Q And does it indicate his address?

A His address was 17 Leslie Street, first floor, Newark, New Jersey.

Q And the date that it was reported?

A 8/22/78.

Q Now, does it indicate the age of Ernest Taylor?

A The age listed here --

Q Or the date of birth?

A His date of birth was 8/9/60 -- on this report -- what is it 8/22/61, I'm sorry.

MR. GUARINO: Could I see your copy, sir?

THE WITNESS: Umm-hmm.

Q Could you look in block 23 where it says "date of birth"? Does there appear to be a number crossed out and one written above it?

A Yes. One crossed out, one written above it.

Q And so that number is what?
A The one that's crossed out is 8/9/60 and then it's crossed out with the 8/9/61.
Q So, does it appear that the given date of birth is 8/9/61?
A According to this report.
Q Okay. Who was the next person that you spoke with?
A I think the next person we spoke with was --
Q Or family?
A -- was Mrs. McDonald, Floria McDowell, in reference to her son, Alvin Turner.
Q Now, based on your investigation, did you establish where Michael McDowell was living at the time he disappeared?
A He was living at 816 Clinton Avenue, Newark, New Jersey.
Q If Michael McDowell was, in fact, living in East Orange at the time he disappeared, would you -- would Newark have taken a missing persons report?
A No; East Orange should have taken a report.
Q Who was the next family that you spoke with?
A Next family we responded to was ah, Mrs. Lillie Williams at 32 Beverly Street. Reference to her son, Melvin Pittman.

Q I'm gonna show you what's been marked as S --
MR. GUARINO: I'm sorry, Judge, I'm going to show S-10 for identification to the defendant.
Q Sir, I'll show you what's been marked as S-10 for identification, ask if you could -- if you recognize that document?
A Yeah. It's a missing persons report on Melvin Pittman.
Q And where did Melvin Pittman reside when he disappeared?
A 32 Beverly Street, Newark, New Jersey.
Q And this was reported by who?
A His mother, Miss Lillie Williams.
Q And what was ah, Mr. Melvin Pittman's date of birth?
A 9/4/60.
Q And who was the next family that you contacted?
A The next family we responded to was Mrs. Janet Lawson, reference to her son, Michael McDowell.
Q Now, you did indicate that if Michael was living in East Orange at that time, that Newark would not have taken a missing persons report. Correct?
A That is correct.
Q Who was the next family that you spoke with?

A Okay. I have to refer to these reports, I'm sorry. The Ernest Taylor, Miss Rebecca Taylor, I think we spoke with her.

Q On August 23rd, bringing your attention on --

MR. GUARINO: Sorry, Judge --

Q -- the bottom of the page, of the second page of your report, August 23rd, 1978? Did Detective Scott-Bey, your partner, respond to the home of Floria McDowell?

A Yes, we did.

Q And who was Floria McDowell related to?

A Alvin Turner.

MR. GUARINO: I'm gonna show what's been marked as S-4 to the defendant, Judge.

Q Showing S-4 to the witness; sir, do you recognize S-4?

A Yes. It's a report, a missing person, Alvin Turner.

Q And where did he live at the time that he went missing?

A 816 Clinton Avenue, Newark, New Jersey.

Q And who was this reported by?

A Mrs. Floria McDowell.

Q And could you tell me the date of birth for Alvin Turner?

A His date of birth was listed at 4/18/62.

Q Sir, do you know, based on your recollection as you sit here today, if you ever received a copy of a missing persons report taken by East Orange for Michael McDowell?

A I don't recall receiving a report from East Orange.

Q Now, after you contacted the families, and spoke with them, what did you do?

A Well, the information that we had received, we attempted to locate the five -- the four boys, four missing boys, and we canvassed the area and talked with several people in the neighborhood and attempted to get information where we could check, see if we could locate the kids.

Q Now, did the -- did your investigation come to involve marijuana?

A Yeah. At the home of Randy Johnson, his family had found some small bag, a plastic bag, like a sandwich bag with a small amount of marijuana. Also, at the Taylor residence, they found a small amount of marijuana -- well, that Ernest had brought to the house. And Alvin Turner also; his family found a small like sandwich bag with small amount of marijuana.

Q Now, with regard to that information, on what

day did you establish that the boys, those boys, had small amounts of marijuana in their house?

A This was established, I think, the 23rd of August.

Q Of 1978?

A 1978.

Q Now, also on that day, did you -- did you interview Robert Cutler?

A Yes, we did.

Q And do you recall who Robert Cutler was?

A He was a friend of -- of the boys.

Q Did you note where he lived?

A Ah, we obtained a address on Robert Cutler from one of Mrs. Johnson's daughters and we interviewed him. I think he lived -- I have to check these -- look at the reports.

Q Could you check your report?

A Yes, please.

Q And if you would check Page 2, second paragraph, see if that refreshes your recollection?

A Page 2. It was 393 Belmont Avenue, apartment 1C.

Q And how old was Robert Cutler?

A 17.

Q Now, did Robert Cutler speak to you?

A Yes. He spoke ah, with me and the Detective Scott-Bey. In reference to what information he was

alleged to have taken from the -- even when he spoke with the boys that's missing? They had broken into Big Man's house, Lee Evans house, and stole some marijuana.

Q Now, at that point, was that the first time Lee Evans entered your investigation?

A Ah, we had information on him but just from the two detectives that initially interviewed him.

Q Had interviewed Mr. Evans?

A Right.

Q But now as a result of your conversation with Robert Cutler, did Mr. Cutler indicate where he was on Sunday, the day they were reported missing?

A Yeah. He stated that he had went to Atlantic City with his grandmother.

Q Based on your investigation at that point in time, had you learned anything that would have suggested to you that the boys were simply runaways?

A Well, we -- during the interview with each family, they had reported they'd check with their families and friends and they didn't see any clothing or anything missing, or anything different. They didn't know if the boys had any money with them or whatever.

Q And based on your position as a detective in the Youth Aid Bureau at that time, did you recall -- at that time in 1978, did you recall ever having contact

with any of these families with regard to their sons being missing prior to this date?

A Ah, not that I can recall that any of 'em had been reported missing prior to this.

Q Now, after you spoke to Mr. Cutler, who did you speak with next on August 23rd, of 1978?

A I'm not quite sure on that, 'cause after we spoke with him, we did interview with the families. You know, we did go to East Orange and interviewed with the family there. And then related that their son had came to the house and stayed there for a few minutes and left. He didn't take anything with him, and he left with Mr. Evans on his truck.

Q On August 23rd, of 1978, did you learn that any of the boys had been helping Mr. Evans move furniture on a pickup truck?

A Ah, according to our investigation, he was -- these boys were alleged to have been helping Mr. Evans to move some boxes or something from one place to another, and he is alleged to have dropped them off on Hawthorne -- I mean, Clinton Avenue and Fabyan Place around 11, 11:30 that -- that particular night.

Q Did you respond to -- on August 23rd, 1978, did you respond to the McDowell residence?

A Yes, we did.

Q And what, if anything, occurred there?
A We find out -- when we went to McDowell residence -- Mrs. McDowell's residence and she had related that she had spoken with Detective Rodriguez and Detective Clark, and they had found this bag containing some marijuana under the mattress of her son's bed.
Q Was Mrs. Lawson advised to file a missing persons report with East Orange --
A Yes, she was --
Q -- to your knowledge?
A She was advised to file a missing person report with East Orange, which was filed on 8/23, on teletype number 362.
Q Now, as this was unfolding, were any leads or tips coming in?
A We received information from Mrs. Johnson that they receive a telephone call from -- and stated that the young boys had been picked up in Washington D.C. for a truck heist and for a hundred 50 dollars each, they could be released. This information was checked out with the Washington D.C. Juvenile Bureau in the places there in D.C. that handle the juveniles, and it didn't lead to anything.
Q Results were negative?

A Results were negative.

Q With regard to -- now, specifically with regard to Mr. Evans, did you attempt to reach out to contact Mr. Evans?

A Yes. We left notification cards at his place of residence at the time; we didn't -- wasn't able to contact him. And on one morning, Detective Scott-Bey was on his way to work and he stopped by -- I think it was 322 Hobson Street, and he had observed a vehicle that belonged to Mr. Evans' mother, Miss Mildred Lawson, and he contacted me. I respond to that location and we did locate Mr. Evans there and transported him to our office at the Juvenile Bureau.

Q Now, at Juvenile Bureau, did you speak to Mr. Evans?

A Yes, we did.

Q And could you tell us the substance of your conversation?

A It was in reference to the boys. He had stated he had picked up the boys -- some boys to help him to move some boxes from one location to another which he was moving to, and they rode around a little while and he thought it was getting kind of late, so they decided not to do that. And he stated he had dropped the boys off on the corner of Fabyan Place and Clinton Avenue

around 11:30.

Q Sir, before you spoke to Mr. Evans on that date -- what date was that?

A On the 20 -- I think it was on the 25th of August.

Q And on August 25th, 1978, at police headquarters did you give Mr. Evans his rights?

A Yes, we did.

Q What are those rights commonly known as?

A His -- he was read his ah --

THE COURT: You know what? Let me see you over here for a second before you finish the answer.

(Side bar conference takes place)

(Following takes place in open court)

THE COURT: All right.

Don't answer that question; that's withdrawn. We're gonna move on.

THE WITNESS: Thank you.

Q Detective, when you spoke to Mr. Evans about August 20th, 1978, what did he tell you?

THE COURT: Other than what he just said?

Q I'm referring to seven lines down on your entry for August 25th, 1978. Could you tell us what he said?

A He stated he had picked up Melvin Pittman, Michael McDowell, Randy Johnson, earlier in the day dropped

them off at Clinton -- in Clinton Avenue and Fabyan Place at approximately 20 hundred hours.

Q What's 20 hundred hours?

A Eight clock, 8 p.m.

Q P.m?

A Umm-hmm. No, it's not. I'm sorry.

THE COURT: Sir, I'm sorry?

THE WITNESS: That's 10 p.m.

THE COURT: What's that?

THE WITNESS: 10 p.m.

THE COURT: 10 p.m?

THE WITNESS: Yeah.

THE COURT: Okay.

You just have to keep your voice up so everyone in the back can hear --

THE WITNESS: Yeah, I just had a throat operation --

THE COURT: Oh, I'm sorry.

THE WITNESS: If you need me loud --

THE COURT: If you need an amplifier, let me know. It will take two seconds to get it up here. And if you're having a problem hearing, you have to let me know.

Q 20 hundred hours, that's 8 p.m. Is that correct --

A I think that's 10.

Q 24 hundred is 12; 22 hundred is 10, 20 hundred would be 8; military time.

A Okay.

Q Okay. So, it was 8 p.m.?

A Right.

Q Continue.

A And he dropped 'em off at Clinton Avenue and Fabyan Place -- excuse me. He first stated at 22:30 hours --

Q And 22:30 would be 10:30 p.m.?

A 10:30 p.m.. He picked up Michael McDowell, drove him to -- home to East Orange, and then returned to Newark with him, and picked up Ernest Taylor and Alvin Turner to help him move some boxes from Irvington. So, they drove around in his pickup truck and thought it was too late to move the boxes, and he dropped the youths off in the area of Clinton Avenue and Fabyan Place.

Q And he did state that at 22:30 hours, he again picked up Michael McDowell. Is that true?

A Right.

Q Now, referring to Page 6 of your report, did you learn that umm -- of any garages owned by Mr. Evans near that location?

A Yes. Received information that it was two garages located on Beverly Street and Hawthorne Avenue.

Q And did you investigate those garages?

A Yeah. We checked both garages and negative results there.

Q Sir, as you were investigating this case, did -- how many leads and tips would you say you got throughout the course of your investigation?

A We had -- it was quite a lot. A lot, you know, telephone numbers and things were chased down, names, addresses that we investigated, interviewed lots of people.

Q Did you track down all the leads that came into your bureau?

A Mostly every one that came there, we tracked 'em down, found out it was nothing -- it was a negative -- everything was negative.

Q Now, to your recollection after that conversation with Mr. Evans, did you umm have any other conversations with him?

A We had talked with him several time. We -- you know, in the street, we saw 'em, couple places. And just ask 'em if he had any new information or if he knew anything, other than what he told us in reference to the boys been missing. And he said no.

Q Other than the information that he gave and which you learned from other witnesses that the boys had been on his truck the night they disappeared, did you have any information as to any other involvement of Mr. Evans?

A Of any other involvement with a --

Q With the boys?

A With the boys? No.

Q Did -- at that time in your investigation, did you know the name of Philander Hampton?

A No, I did not.

Q Did you know the name of Maurice Woody Olds?

A Yes.

Q Who is Maurice Woody Olds?

A I don't know if he was a relative or a friend of Mr. Evans, but we did speak with him and nothing came from that either, no results.

Q Could you estimate over how many years you worked on this case?

A I worked on this case approximately 10 years.

Q And in that 10 years, was this -- what kind of -- was this case designated a missing persons or what was it?

A It was still classified as a missing persons report.

Q Do you recall the names of any other detectives other than Scott-Bey that you worked with in regards to this case?
A Detective Conte, Detective Mason -- practically everybody in our office.
Q Is Detective Conte still alive?
A No. Detective Conte is deceased.
Q When you spoke with Mr. Evans, did you leave him a number where he could contact you if he had anything to tell you?
A Yes. He had notification cards left with him.
Q And in the 10 years that you worked on the case, other than those initial contacts with Mr. Evans, did he ever try to contact you?
A No.
Q Detective, did you contact any government agencies in an effort to determine if the boys had voluntarily left Newark or left the State?
A Yes. I think one of the families mentioned the boys joining the Marine Corps at one time and all of the branches of the military service were contacted; negative results.
Q In terms of attempting to locate the boys, what other efforts did you make? What types of establishments or places did you go? What -- what else

did you do?

A Well, we contacted the news media and had their -- you know, the information put out there in the community and in the state so that if anyone had any information, they could contact us.

MR. GUARINO: May I see S-113, Judge?

Judge, I'm showing the witness S-113 which was previously marked into evidence.

Q Sir, would you look at S-113 and tell me if you recognize it?

A Yes, I do.

Q What is it?

A It's a missing poster flyer for the five boys.

Q And would you know -- do you know where this missing persons flyer would have been distributed?

A These flyers were distributed all over the city, different states, practically everywhere we could think of.

Q In the 10 years of your investigation, have you ever -- did you ever learn where Randy, Michael, Melvin, Ernest or Alvin were?

A No, we did not.

Q Did you ever learn whether they were alive and dead during the course of your investigation?

A No, we did not.

Q When did you retire from the police department?
A In 1997.
Q And since 1997, have you had any official contact with the police department?
A Yes.
Q And when was that?
A Oh, about two, three years ago.
Q Do you recall what that was about? Was it --
A It was in reference to this particular case.
Q And you were notified?
A I was contacted by one of the detectives, I'm not sure which -- which one it was in the Homicide Bureau.
MR. GUARINO: Judge, I have no other questions.
(Colloquy takes place)
THE COURT: Okay.
We have all the jurors present. Go ahead, Mr. Evans.
CROSS EXAMINATION BY MR. EVANS:
Q Good morning, Mr. Hairston.
A Good morning, sir.
Q You said back in '78, you say you was handling how many cases a week? A day? A month?
A We were averaging -- our office was averaging 70,

75 cases per month.
Q 75?
A Right.
Q So approximately how many cases that would be like within the 10 years?
A Within the 10 years, I don't know, seven thousand something --
Q Seven thousand, right?
A Yeah.
Q Yeah, okay.
A Quite a few.
Q Yeah. Because ah, you acknowledge that you recollect the statement, that's why -- was the statement given to you, you recognize or was it a statement you had already?
A Which statement --
Q Your original statement here --
THE COURT: You mean your original police reports?
Q Your reports.
A They're reports.
Q Was those reports given to you to study or was that the report that you remember from back in '78?
A These reports was given to me, what, a week or two ago and I looked at them because I haven't seen these

reports in 20 years.

Q Right, right. Okay. You say you went to -- the first house was Miss Johnson?

A Yes. The first family we responded to, to interview, that's Mrs. Johnson's house.

Q That's off the report or you remember that?

A This is on the report, and I remember this one.

Q Okay. What date was that?

A Now, this, I have to go to the report.

Q Okay, no problem.

A Okay? That was on 8/23.

Q 23?

A Right.

Q That's was Wednesday --

A I'm not sure --

Q That was a Wednesday.

A Wednesday, I'm not sure what day it was.

Q Yeah. 21st was Monday.

A Okay.

Q Okay, that was a Wednesday. You wasn't there on the 21st?

A No.

Q From the beginning?

A No.

Q You wasn't escorted by Roger Taylor to the

houses? On the 20 -- on the 21st?

A No --

Q Not Wednesday, but a Monday.

A I received these reports on the 23rd.

Q Umm-hmm.

THE COURT: Okay.

So, you didn't go to the houses escorted by Roger Taylor on Monday the 21st?

THE WITNESS: No, no. I didn't receive this investigation until the 23rd.

Q Okay. Did you know about the report of Miss Beachum saying Roger Taylor came to the house and broke the lock -- knew exactly where the marijuana was at, broke the lock on the drawer and took 'em out?

A No.

Q And she say she gave it to him. He left with it?

A No. I didn't receive any information pertaining to that.

Q You like to see that report?

A I'd love to see that report.

Q No, I don't think it's there. I don't think it's there.

A I -- I never received any information pertaining to that.

Q Right, right. Did you get any kind of report that Lee Evans was going around pickin' 'em up, comin' direct to they house, pickin' 'em up 11:30 at night, loadin' 'em up on the truck? From Miss Taylor house?

A From Miss Taylor house.

Q Yeah, we'll start there.

A Right.

Q And puttin' 'em all on the truck.

A One of the boys came out to Miss Taylor's house and got to the truck with you.

Q That's just in the report though?

A That's in the report.

Q Okay, on the report.

A This is what was reported to me.

Q Right. Off this report.

A This report.

Q All right. Do you recollect when I volunteered and went downtown -- came downtown.

MR. GUARINO: Objection, Judge.

Just can we be heard at side bar?

THE COURT: Sure.

(Side bar conference takes place)

(Following takes place in open court)

Q Mr. Hairston, when you came into contact with me, do you remember when I volunteer anything that you

wanted? Ah, any information you wanted at the time?

A The first time I contacted you was when Detective Scott-Bey and I picked you up from Hobson Street?

Q Okay.

A Transport you to the Youth Aid Bureau.

Q All right. You don't -- go ahead.

A And after Youth Aid Bureau, we interviewed you and you had related that you picked up the boys to help you move some boxes and ah, you rode around --

THE COURT: I'm just gonna slow you down 'cause he's not asking you to repeat his statement; he's saying did he come in and cooperate and give you information.

THE WITNESS: Oh, right. Yes, he did.

Q Right. Also, I didn't say it was the exact boys -- the boys is missing, I say I had picked up the boxes, right? And moved.

A You had mentioned the boys names.

Q Couple of 'em, yes.

A Right.

Q Yes. Also, you came -- you was familiar when I closed that next day, that was a Monday and they came up missing Monday. I closed on my house on that Monday morning -- no, Sunday night -- Monday morning. You recollect that?

A I have no knowledge of you and your house and being close -- closing on your house.

Q You came to the house -- both houses.

A We came to Clinton Avenue address, left a card there.

Q Right.

A We came to Payne Avenue --

Q That was the house.

A Right. But I don't remember you closing or anything like that towards your house business.

Q Mr. Scott-Bey came back there and questioned, he seen the boxes and everything all piled in the back there.

A Well, that was Mr. Scott-Bey, I'm sorry --

Q Oh, all right. Okay. Okay. Did anybody report to you that I picked the boys up on Fabyan Place?

A On Fabyan Place?

Q Yeah. Picked up five boys.

A Ah, I'm not sure if they said you picked them up on Fabyan Place but from what I understand, the boys were with you and were supposed to be move -- helping you move some boxes.

Q Well, that was information I gave you, that's my information.

A That's your information you gave us.

Q Right. Right. No, I was talking about new information, from other -- from other witnesses?

A No. The only information that we had that lady did say that she saw Alvin Turner and some other boys on your truck at Fabyan Place and Clinton Avenue around 11 o'clock, 11:30 that particular night.

Q Okay. You remember that. Right?

A Yes.

Q Also, that same lady was said she was lookin' out the window and she saw Alvin go by. Is that correct?

A She didn't tell me that. She said she saw Alvin on the back of your truck.

Q No, okay, but I'm saying, she said she was lookin' out the window on one statement -- she made two different statements. She said one statement, she was lookin' out the window and seein' Alvin go by and it was one boy in the truck.

The second statement, she said she was downstairs, Alvin went by and said -- waved at her and she waved at him, it was two boys on the truck. Is that correct?

A I don't have no knowledge of that statement.

Q Okay. All right.

A The only thing I know is the lady told me she saw Alvin on the back of your truck.

Q All right. Thank you. Now, Mr. Hairston, where did you get the information from that I had the garage on Hawthorne Avenue, or whichever avenue I had?

A Ah, to go back to my report --

Q Yes, sir. Yes, sir --

A I think that information was given to us by Roger.

Q Absolutely.

A Roger Taylor.

Q Absolutely. Where did you get the information from that I was living on Hobson Street, 342 Hobson Street?

A Okay, now; that information was given to us by -- I think it was a --

Q You could read the report --

A A super that was at the Clinton Avenue address.

Q Nah, you can read the report.

A Yeah. Okay. Let me find it here. I'm not sure, but I think it was the super where the place we was on --

Q No --

A -- on Clinton Avenue.

MR. EVANS: Just a minute, Judge?

THE COURT: Yeah.

MR. GUARINO: Sir, you can't make marks on the documents.

THE WITNESS: I'm sorry, okay.

THE COURT: Did you find the reference?

THE WITNESS: Yes, I found it.

Q You found it?

A Yeah.

THE COURT: Before you answer, just tell me what page you're on.

THE WITNESS: On Page 3 --

THE COURT: Of the -- what's the date of that one?

MR. EVANS: Yeah, I'm on Page 3 --

THE WITNESS: 10/21.

THE COURT: Okay. Oh, no, the September 15th incident report, 1978, Page 3.

THE WITNESS: Right.

THE COURT: All right. And just point to roughly where the info is?

THE WITNESS: Right here.

THE COURT: Okay. He's talking about seven lines from the bottom.

MR. EVANS: Seven lines from the bottom? Okay. Okay.

THE COURT: Is that what you want him to --

MR. EVANS: Yes. Yes, read that out loud.

THE COURT: Does that refresh your memory?

THE WITNESS: Yes.

THE COURT: Where did you get that information from?

THE WITNESS: From Police Officer Alvin Slade, who resides on Hobson Street.

Q You go from the top -- I mean, not the top; ah, from 8/23 --

THE COURT: Are you talking about --

Q -- to contact Lee Evans who was not home.

THE COURT: Are you talking about the same page?

MR. EVANS: Yeah, same page; Page 3.

THE COURT: Okay. The paragraph that starts on August 23rd?

MR. EVANS: Yes.

THE COURT: Okay.

See that, sir?

THE WITNESS: Right. Right here.

THE COURT: No, no. Up at the top. Up top.

THE WITNESS: Up here? All the way at the top? This is --

THE COURT: I'm just pointing. See August 23rd, right there?

THE WITNESS: Right.

MR. EVANS: It's down, not the top.

THE COURT: You want him down on that last paragraph, not the top?

MR. EVANS: Yeah.

THE WITNESS: He want the last paragraph here, where Slade --

Q Ah, no, Scott-Bey.

A All right. You want me to start there at Scott-Bey?

Q Yeah. Yes, sir.

A Okay. "Detective Scott-Bey and myself, Detective Hairston, responded to 797 Clinton Avenue in a effort to contact Lee Evans, who was not home. We were unable to locate and interview the super of the building. However, an address of 337 Hobson Street was ascertained from Roger Taylor as the address of Evans' girlfriend. Responded to 337 Hobson Street and spoke to T H Williams who stated he did not know Evans and Evans did not live at 337 Hobson Street. We spoke to Police Officer Al Slade, who resides at 341 Hobson Street, who stated he did not know Evans, although he had seen the green pickup truck parked in the area and believed he visited 342 Hobson Street. Detective Scott-Bey went to 342 Hobson Street and spoke to Mr.

Frank Richards, who stated Lee Evans lived there with his wife. Richard stated that neither Evans nor his wife were home, and his wife was probably at 93 Payne Avenue, Irvington, New Jersey, where they had just purchased a home -- a house".

Q Umm.

A Continue?

Q Yeah.

THE COURT: Is that it?

MR. EVANS: Is that it?

THE COURT: No, I'm asking you, is that all you want him to read?

MR. EVANS: The bottom, he finished the bottom.

THE COURT: Except D-66.

Q Yeah, so it's confirm, I just purchased the home. That's the main thing.

THE COURT: You have ask him a question, sir. No comments to the jury about the testimony. It's up to them to decide what's confirmed or not --

MR. EVANS: Yes, yes: Okay.

THE COURT: Mr. Evans, I don't want --

MR. EVANS: Yes.

THE COURT: -- to give that instruction again, so stop the comments.

MR. EVANS: Yes.

Q Miss McDowell, that was Alvin Turner mother?

A Yes.

Q I want to know did you get the report that it was a man standing out there with a gun that Sunday morning, before they came missing?

A No, I had no knowledge and no reports of that.

Q All right. Did you get the report that Bob Cutler -- Roger Taylor said, not Bob Cutler but Roger Taylor said -- let me go back a little bit. Let me go back a little bit. Roger Taylor woke up that morning, this is his statement, I want to know did you get it.

He woke up that morning, that Monday morning when his brother -- his mother woke him up, said Bob Cutler was calling all night long and when he say he called 'em all night long, Roger Taylor got up out his bed and went down to Bob Cutler house, that was 393 Belmont Avenue. And he went there, he rung the bell. His mother said he's not home so he stood outside, he said, and then the mother come out -- or no, then Bob Cutler came out. Roger Taylor asked him, hey, my mother say you been calling all night long, did Ernie get home? Did Ernie get home? Bob Cutler said well, what happened was three nights, or two nights before, somebody was shootin' at us on Big Man's truck. I

jumped off the truck and I ran and I left 'em. Did you get that report?

A I have no knowledge of any report to that fact.

Q Umm-hmm, okay. All right. Is it true -- is it true when you and Mr. Scott-Bey came to Hobson Street and asked me did I want to come downtown and answer some questions. Right?

A Yes.

Q Okay. I came downtown and I asked everything you wanted -- whatever you wanted, I was -- I was let you expose you right from the beginning, I'm ready to be jump right in with you. Right?

A Yes --

THE COURT: He answered yes, but I think that was asked and answered so I want you to go to a different area --

MR. EVANS: Okay --

THE COURT: -- if you have any other questions --

MR. EVANS: Okay.

Q After you finished questioning me, then you said -- you and Mr. Scott-Bey say oh, I'm sorry, but we're gonna have to arrest you. Is that right?

A You were record checked and you had a traffic warrant.

Q That's right.
A You was slated for the traffic warrant.
Q Okay. So, I was volunteer my help at the time though. Right?
A You came --
THE COURT: Okay. Just so the jury understands, a traffic warrant means that he didn't answer a ticket.
THE WITNESS: Right.
THE COURT: And when you don't show up in Municipal Court for any kind of a traffic ticket, the system will -- the Court will issue a warrant --
THE WITNESS: Issue a warrant, yes, ma'am.
THE COURT: Okay.
Q I like to ask you this question: Was you aware on that warrant that it wasn't Lee Evans; it was Lavert Evans with that warrant?
A I was not aware of that. The warrant came back to Lee Evans, that's why you was slated for it.
Q Are you aware that that warrant came back to Lee Evans address?
A I wasn't aware of that. It came -- it had to come back to your address.
Q Right. But the warrants was Lavert Evans -- you wasn't aware, okay, we'll go to the next one.

A No, I wasn't.

Q Because I thought you was investigating because when I -- you wasn't aware I went to court? On that warrant?

THE COURT: Did you continue to follow it after he went to court to clear up a warrant?

THE WITNESS: No.

A You posted bail, I think.

Q Oh, no, okay. Yeah. Yeah.

A And that was it. I had no -- no other reason to deal with the warrant.

Q Well, I like to ask you this question here: What was the purpose then bringing that warrant up and if we had a serious situation here and I'm trying to volunteer my time.

A You --

MR. GUARINO: Judge, objection.

Bringing a warrant up when? Today? Or 33 years ago?

THE COURT: No, bringing the warrant up at the time of the interview.

MR. GUARINO: Thank you.

THE COURT: Why did you bring a traffic warrant up at the time of the interview to a case like this?

THE WITNESS: A case like this, we always record check a person. We had did a record check on Lee Evans and it came back as a traffic warrant, the Record Bureau.

Q It was a $35 bail. Right?

A I have no idea what the bail was, if you went to court.

Q Okay, no. No, I mean, no. I have to give you the bail before I left.

A You didn't have to give me the bail. You had to go to court for that.

Q No. I had to pay a bail --

A You didn't -- yeah, but you didn't have to pay it to me.

THE COURT: No, no. He's just saying he had to pay the bail at the police station and he remembers it, obviously, as something -- you don't remember any of the bail arrangements or anything --

THE WITNESS: I don't remember the bail.

THE COURT: All right.

Q Another question I'd like to ask you: Why was it important for you to let Roger Taylor escort you everywhere through this investigation?

A Ah, Roger Taylor did not escort us everywhere we went on the investigation. He was one of the ears and

the eyes in the community that we relied on because it was very, very quiet there as far as getting the information. He escorted us up to ah, East Orange to Miss Lawson's house, and I think we met him at Miss Johnson's house one time. That's the only two times that we were with Roger Taylor.

Q Wouldn't it be practical when you come into investigation everybody's a suspect?

A No.

Q Aight. When you went to Miss Lillie Williams house, what time was the last time she seen her son?

A This, I would have to refer back to the report.

Q Yes, sir.

A Okay. Miss Williams stated -- excuse me -- that her -- excuse me -- that her son went outside front of her house approximately 13:30 hours on 8/20/78. That was the last time --

Q 1:30 right?

A Right.

Q That's 1:30 p.m.--

A Last time she seen 'em -- right.

Q So, you didn't get a statement from Kip Williams --

A No.

Q -- that a brother came back in the house at

five o'clock? Six o'clock?
A No.
Q You didn't get a statement from her brother that his -- he was living right at 90 -- I mean, 979 Clinton Avenue also?
A No --
Q And I say his son -- his brother -- his nephew was watching out the window?
A No.
Q For me to walk -- okay. You didn't get a statement from Miss Jones at 54 Fabyan Place?
A Miss --
Q Stating that she seen all the boys jump on the truck --
A Miss Jones?
Q Miss Jones?
MR. EVANS: Yesterday was Jones? Was yesterday Jones? At 54 Fabyan Place James?
MS. CUCINELLO: Judge, I think he means Miss James.
Q Miss James? Ms. James.
THE COURT: Geraldine James; did you take a statement from her?
THE WITNESS: I don't recall taking a statement from Mrs. Jones -- Mrs. James rather.

Q Okay. Did you get a statement from Darryl Green on Leslie Street saying that he seen the boys jump off the truck -- was on the truck when he pulled off and his dog -- he was taking his dog out and he tripped over the dog?

A I don't recall getting a statement from Mr. Green.

MR. ADETULA: Can I have a minute, Judge?

THE COURT: Sure.

(Mr. Adetula confers with defendant off record)

MR. ADETULA: Thank you, Judge.

Q Also, Mr. Hairston, you made a statement 'cause as far as I think it might be different. You and Mr. Scott-Bey was the only investigators that I encounter at that time.

A Ah, you may have been. I'm not sure, 'cause it -- like I said, just about practically every detective in our bureau at that particular time did some type of a investigation work on this case. Now, I don't know -- I don't have all reports of everybody; I only have my reports.

Q Yeah, but I'm saying you made a statement earlier that it was two other investigators before you.

A It was two detectives, yes, were before me.

Q What was their name? I never knew.

A Detective Rodriguez and Detective Clark. They

spoke with you -- excuse me -- according to the reports, they had contacted you and spoke to you.

Q Let me ask you this here: The report I got, they said they made phone calls -- some of the parents made phone calls to the police department that Monday and they said you have to wait 72 hours for a missing person. Is that true, before they come out?

A I have no knowledge of that.

Q Well, that -- okay. Why did you wait till Wednesday to come out?

A Wednesday -- these -- when these reports came to our office, okay? They were assigned to two different people. Two different detectives. When one of the Sergeants got together with the two detectives and they realized all these things came together as one, okay? And this is when on the 23rd, I think it was, when I took this job -- when they gave it to me.

Q What was the date of the other detectives?

A The other detectives were the 20 -- this is report on the 20th, it was probably the 21st. It was probably the 21st, I'm not sure.

Q The 21st the day was notified, you mean?

A The reports was filed on the 21st.

Q Right. No, I acknowledge that.

A Right.

Q They were called in on the 21st.
A Right.
Q But the information was given that no one can do anything because a missing person, you got to wait 72 hours before we move 'cause they might have just went somewhere and come back, or whatever the nature?
A No, I -- that's not true.
Q What's not true? What?
A The 72 hour thing.
Q What's the standard?
A The standard is you get a missing person report, we follow it up the same day we get it.
Q You run right out?
A Same day we get it.
Q Oh, the report or the call?
A The report.
Q Okay. Well, what happened to the call? The call was Monday?
A The call? Which call?
Q The telephone call. It was reported Monday that they was missing.
A Right.
Q They didn't come out --
A The report was made on the 21st. Now, we got the report on the 21st, something was done. We got it on

the 22nd, then it's something done to it. Each day we get a report, it's a follow-up done. We don't wait 72 hours to do anything.

Q No, I'm not talking about the report, that was the information was given, whoever the dispatch or whoever he was talkin' to --

A You see, I have no knowledge of that --

THE COURT: You can't question him --

MR. EVANS: Okay --

THE COURT: -- about something he does not know anything about.

That was the policy as you knew it. Right?

THE WITNESS: That's true.

THE COURT: Okay. Keep going.

Q So, Mr. Hairston, only thing you really know about that report is what you got in front of you right now. Right?

A This report, yes.

Q Yes, okay. Because I like to ask you this question here: Why is it on one page here, you got 393 Belmont Avenue; and on another page, you got 393 Irvine Turner Boulevard?

A Belmont Avenue and Irvine Turner Boulevard?

Q Yes, sir. Here you go, right here.

A Well, Irvine Turner Boulevard was Belmont Avenue,

wasn't it?

Q Right in the front. Front page. You got to High -- you know what I mean?

THE COURT: I think he said the first page.

A We have 393 Belmont Avenue for --

THE COURT: And you said Belmont Avenue turned into Irvine Turner Boulevard?

Q Not on the same --

THE COURT: Just repeat your last answer?

THE WITNESS: No. I think Belmont Avenue turned into Irvine Turner Boulevard and they changed Belmont Avenue to Irvine Turner Boulevard?

Q Yeah, but not on this report. I mean, you gonna change it out report if you write --

A It's 383 Belmont Avenue --

Q Huh?

THE COURT: Where does he have Irvine Turner Boulevard on the report? You have to be more specific. What part of the first page?

MR. EVANS: The bottom.

THE COURT: Okay. And this is the report --

A No, 393 Irvine Turner Boulevard. Correct.

Q Right, right.

A All right. Probably a misprint.

Q Also, you got the docket numbers here, I

would like to ask you this here. I like to ask you this; when you arrested me under Lee Anthony Evans, but the summons and everything else was Lavert Evans --

THE COURT: You talking about the traffic matter?

MR. EVANS: The traffic matter.

Q But they took Lavert Evans out and put Lee Evans in there.

A I don't -- I don't have an arrest report on you for a traffic warrant, so I have no knowledge of it.

Q All right. Go to page -- go to Page 4.

THE COURT: What paragraph you want him to look at?

MR. EVANS: It's the top.

THE WITNESS: Okay. You want me to read this?

Q Yes, sir.

A Okay. "8/24/78, record check by Rodriguez on Lee Evans revealing address of 797 Clinton Avenue, Irvington, New Jersey, date of birth 6/14/53. One open traffic warrant LAN number 334886, summons number B 0 97630, and W T warrant number 7 5389 1, issued 9/15/76.

Q I like to -- I like to ask you this here, another question. My brother was born 11/17 and I was born 6/14. And when they took a -- I'm asking you did

they take 11 out and left one of the one's in? Why one of them one's still in there and they crossed it, one of the ones?

THE COURT: Okay, sir, you're asking him about something he doesn't have any personal knowledge of. You're gonna have to move on.

MR. EVANS: Yeah. Yeah.

Q Mr. Hairston, is it possible you could do your own -- just go and do ah, background on that warrant there, follow up on it?

A No, I -- sir, I have no knowledge of who issued traffic warrants or whatever. The Court issues the traffic warrant if you don't show up for your -- your court day --

Q No, no, I'm not denying that. I'm talking about far as the -- the docket numbers, the docket numbers will clearly say the name. Right?

THE COURT: Are you asking him to do the investigation now?

MR. EVANS: No, I'm asking about --

THE COURT: Did he check the warrant and make sure it was for the right person back then? Is that what you're saying?

MR. EVANS: No.

I'm saying right now, I was asking the

question if he checked them docket numbers, that will bring the right name up. Right? That's what I'm asking, your Honor.

THE COURT: Okay. You're asking him if he had done that in '78?

MR. EVANS: No, no, no. I'm asking him a question about procedures. If he checked the docket number and the warrant number, will the right name come up with it, match up with it?

THE COURT: Today? If he checked it today?

MR. EVANS: Yes. That's what I'm asking.

THE COURT: Do you know if you can check those warrants and docket numbers today and have -- check the names?

THE WITNESS: I don't know. This is like 30 years ago. I don't know if they got this stuff still in the computers.

Q Mrs. Johnson -- I mean, no, no, yeah, yeah, yeah. Mrs. Johnson, that's Randy Johnson mother. When was the last time she seen her son?

A The last time she seen her son, gotta refer back to the reports here. Okay. She stated she last saw her son at 12:30 hours on 8/20 stating he was going to visit sister on South 6th Street.

Q When she seen her son, what address that

is -- what address is Miss Johnson located at, at the time she seen her son?

A 342 Hawthorne Avenue.

Q 3 4 2 Hawthorne Avenue?

A Yeah. I think that's where they live, 342 Hawthorne Avenue -- 492, sorry. 492 Hawthorne Avenue.

Q Did you get a report from the sister on 6th Street that her brother was there eleven o'clock?

A Excuse me?

Q That morning?

A Ah, no.

Q Umm-hmm. Did you get a report of Roger Taylor going into Irvington Park that Sunday or Saturday, whichever?

A Irvington Park?

Q Yeah, playing basketball -- no, they were playing football between two and five or six?

A Somebody -- I'm not sure who it was that reported that umm -- that the guys had went to West Side Park, what I understand, to play basketball and the courts were crowded or something and they didn't play --

Q That's a different -- that was a different statement. That was a different statement.

A Well, that's the only statement I have for them playing any type of sports.

Q Right, yeah, yeah. That was my statement to you. But ah, no, I was talking about Roger Taylor statement?

A No.

Q Not from two to six, right? Okay --

A No, no.

Q Okay. I want to ask you another question: In that statement, Miss Ruby Taylor stated that ah -- in the statement that she went to -- Ernie came and ah, left and went to ah, Camden Street to pick up some boxes -- I mean, pick up some furniture. And she testified she didn't. Is that correct, on that statement?

A Mrs. Ruby Taylor?

Q No, as far as pick the boxes up in the statement?

THE COURT: Are you talking about the statement or the police report?

MR. EVANS: The report here.

THE COURT: Okay. Did Ruby Taylor tell him that --

MR. EVANS: No, I'm saying it's there.

THE COURT: What's the question?

MR. EVANS: Oh. The question is --

Q Is it in that statement where Ruby Taylor

said that she went to Camden Street --

THE COURT: She went?

MR. GUARINO: No.

MR. EVANS: No, no. Ernie went to Camden Street.

THE COURT: Okay. Did Mrs. Taylor tell you Ernie went to Camden Street to move some furniture?

THE WITNESS: No.

Q In your statement, did anybody tell you Ernie had got his hand cut, or arm cut or something, his hand cut?

A No, they did not.

Q Mr. Hairston, I want to thank you.

THE COURT: Okay.

Mr. Guarino, you have anything else?

MR. GUARINO: Yeah, Judge.

REDIRECT EXAMINATION BY MR. GUARINO:

Q Detective, draw your attention to Page 5 of S-27, that's dated August 25th, 1978 entry. Did Mr. Evans give you the names of the five boys that were on his truck at various points of the time on that evening?

A Yes, he did.

Q What were the five names that he told you were on his truck?

A Stated he picked up Melvin Pittman, Michael McDowell, Randy Johnson.

Q And when did he say he picked them up?

A When?

Q He said he picked them up when? Early in the day?

A Let me see; at approximately 22:30 hours -- 20 hours, yeah, off Clinton Avenue, Fabyan Place.

Q And then did he mention any other boys names that he picked up?

A He picked up Ernest Taylor and Alvin Turner to help him move some boxes on Irvington.

Q So he told you he picked them up, those three boys, earlier in the day and dropped them all up on Clinton and Fabyan at approximately ten o'clock. Is that correct?

A That's correct.

Q And then he said he again picked up Michael McDowell and drove him home to East Orange. Isn't that true?

A That's true.

Q That's what he told you.

A Right.

Q And he said at 22:30, which -- I'm sorry, that was at 8 o'clock, 20:00 hours. And at 10:30

hours, he again picks up Michael and drives him home to East Orange and then returns with him to Newark. Isn't that what Mr. Evans said?

A That's correct.

Q And he says then, he picked up Ernest and Alvin to help him move boxes, drove around and decided it was too late. Isn't that what Mr. Evans said?

A That's correct.

Q Did you put those words in Mr. Evans' mouth?

A No, I did not.

Q You testified after being asked why you relied on Rogers Taylor, you said it was very quiet in the community. What did you mean by that statement?

A Well, when we started this investigation, very few people, two or three would only talk with us in reference to this investigation.

Q Did Rogers Taylor introduce you to people in the neighborhood?

A Well, Roger was a great help to us, as far as the neighborhood in trying to interview people.

Q Now, with regard to your investigation, you use the word "interview" and the word "statements". Is there a difference between an interview and a statement to you as a detective?

A Yes. A interview is just a verbally speaking.

Statement is typing ah, reports in when you talk with someone.

Q By statement, would that refer to what we call a Q and A?

A Yes.

Q Question and answer?

A Yes.

Q Did you, yourself, take any formal question and answer statements from any witness?

A No, I did not.

Q Did you interview people with regard to your investigation?

A Yes.

Q Do you have any idea how many?

A Probably a hundred or so.

Q On Page 2 of your report, that would be on the date that corresponds to August 23rd, '78, from the previous page; but on Page 2, it continues and you mention Yvonne Beachum.

A Right.

Q Where did Yvonne Beachum live?

A She lived at 254 South 6th Street.

Q And she's -- indicated she spoke to Robert Cutler. Correct?

A That's correct.

Q And she -- did she indicate to you that she did anything with regard to Randy's room?
A Yes. Ah, stated that she searched Randy's room, found a plastic bag which contained small amount of marijuana in his dresser drawer.
Q And what happened with that marijuana?
A It was turned into me and Detective Scott-Bey.
Q I direct your attention to Page 4 of your report. On the third -- third entry down for the date August 24th, 1978. Can you tell us what you did that day?
A The third paragraph down?
Q Third paragraph.
A Yeah. We responded to 611 High Street and interviewed Mrs. Lawson --
Q Who is Mrs. Lawson?
A Lee Evans' mother.
Q And what happened?
A She stated that on 8/23, approximate 9:30 hours that Lee Evans borrowed her car, a red and white 1976 Olds.
Q And who did she say he was with, if anybody?
A With his cousin, Phil.
Q Did you know who Phil was at that time?
A No, I did not.

Q Now, on the next entry for August 24th, at 1978. Did you interview -- excuse me, Judge -- did you interview two other people?
A Yes, I did.
Q Who did you interview?
A Maurice Olds and Roderick Royster.
Q And what did they indicate?
A They indicated they had responded to umm 271 Hunterton Street and helped Lee Evans to move some furniture.
Q Did they say when they did that?
A I don't think it was indicated when they did that.
Q And 271 was the address that corresponded with the person called Phil?
A Phil, I think so.
Q Is that reference in the previous paragraph?
A Ah, yes.
Q You worked this job with Detective Scott-Bey?
A Yes.
Q Do you remember Scott-Bey?
A Yes.
Q Prior to this case and coming here today, when was the last time you saw Scott-Bey?
A Approximately 14 years ago.
Q Do you have any recollection of why Scott-Bey

was asked to work this job back in '78?

A At the time when it was noted that these four guys -- four boys were friends and that's when Detective Scott-Bey was asked to assist in this investigation.

MR. GUARINO: I have no other questions.

THE COURT: Is there anything else, sir?

MR. EVANS: Yeah.

RECROSS EXAMINATION BY MR. EVANS:

Q Mr. Hairston, are you familiar with -- this is the question I want to ask: Are you familiar with what Detective Joe Hadley is -- is ah -- made the statement that you and Mrs. Scott -- you and Detective Scott-Bey shouldn't have been there because you didn't know what you was doing?

A I'm not aware of the Detective Hadley making any type of statement to that matter.

Q Okay. Now, when you came into the neighborhood, you say it wasn't nobody comin' with information. Right?

A That is correct.

Q Are you aware that it's like 30 or 40 peoples got information now?

A No, I'm not.

Q Okay.

MR. EVANS: Thank you.

THE COURT: Anything else, sir?

MR. GUARINO: No other questions --

MR. EVANS: Oh, one other question, Judge.

THE COURT: What's that?

MR. EVANS: One more question?

THE COURT: Sure. Sorry, I thought you were done --

Q That statement you were readin', it was given to you by the Prosecutor. Right?

THE COURT: The police report?

MR. EVANS: Police report.

A The police report?

Q Yeah?

A Yes.

Q So that's somethin' you're readin' off. You're not a hundred percent sure whether it was fact or not. Right?

A No. This is the report that I filed. I made this report.

Q No, I understand that, but who gave you that report?

A The Prosecutor's Office.

Q That's what I'm askin'. Thank you.

A You're welcome.

THE COURT: Anything else?

REDIRECT EXAMINATION BY MR. GUARINO:

Q Sir, is that the reports that you prepared, yourself?

A That's -- these are reports that I prepared myself.

Q Copies of the original?

A That is correct.

Q Does your signature appear on each page of your report?

A On each -- each page, my signature's posted.

Q And that indicates that you reviewed the report. Correct?

A Yes, I did.

Q And you signed those back in 1978?

A Yes --

THE COURT: Sir, don't lead him.

MR. GUARINO: Sorry, Judge, it's just --

THE COURT: Anything else?

MR. GUARINO: -- speeding things along.

No other questions.

THE COURT: You're not speeding them along by leading him; that's not the way to do it.

Anything else?

MR. EVANS: Yes.

RECROSS EXAMINATION BY MR. EVANS:

Q Is it possible -- I want to ask this question, Detective: Is it possible that statements could be altered? Somethin' could have been changed in there that you're not aware of? Yes or no?

A No.

Q So that mean everything is correct in there, you sayin'?

A Everything I put on these reports is correct and has not been altered.

Q I think earlier statement, I think you made a statement that you don't remember. You going off the report.

A I don't re -- it's been 20 years since I seen these reports, 30 years since this investigation, and it's certain things that I don't remember --

Q That's what I'm saying --

A -- about this, so I have to read from my reports.

MR. EVANS: That's all I'm saying.

Thank you.

THE COURT: Anything else, sir?

MR. GUARINO: No other questions, Judge.

THE COURT: Okay, sir.

You can step down. Don't discuss your testimony with any other witness. Thank you.

THE WITNESS: Thank you.

THE COURT: Next witness.

(Witness steps down)

MR. GUARINO: Judge, the State would call Detective Scott-Bey.

THE COURT: Right up here, sir.

THE WITNESS: Thank you, your Honor.

J-O-H-N S-C-O-T-T-B-E-Y, State Witness Sworn/Affirmed.

DIRECT EXAMINATION BY MR. GUARINO:

THE WITNESS: John Scott-Bey, S C O T T dash B E Y.

THE COURT: Have a seat.

THE WITNESS: Thank you.

(Colloquy takes place)

MR. GUARINO: Your Honor, I'm gonna show what's been marked as S-33, S-34, S-35, S-36 and S-36A to the defendant.

THE COURT: And B?

MR. GUARINO: Oh, and B, Judge, yes. I'm sorry.

Q Detective, are you presently employed?

A Ah, no. No, retired.

Q And where did you retire from?

A Newark Police Department.

Q How long did you work for the Newark Police Department?
A 34 years.
Q And what was your last assignment in Newark Police Department?
A I was Captain of Homicide and Robbery.
Q Drawing your attention back to August of 1978, you were employed at the Newark Police Department?
A Yes, I was.
Q And what was your assignment in August of 1978?
A I was a detective in the Juvenile Division, Youth Aid Bureau at that time.
Q Do you recall in 1978 how long you had worked for the police department?
A I came on in 1971 after coming home from Vietnam.
Q Now, with regard to your assignment in August of 1978, did you have cause to investigate the disappearance of Randy Johnson, Michael McDowell, Melvin Pittman, Ernest Taylor and Alvin Turner?
A Yes, sir.
Q And you recall who you worked with on that case?
A I worked with Charles Conte, Everett Hairston --

quite a few detectives that were assigned to the Juvenile Division.

Q Did you prepare reports with regard to your activities in the course of that investigation?

A Yes, sir.

Q Will you need your reports to refresh your recollection as to what you did in terms of that case?

A From 1978? I believe so.

Q Sir, I'm gonna show you S-33, 34, 35 and 36A and B, ask if you recognize these?

A Oh, yes. Those are the reports I submitted, my signatures on the reports.

Q And those are the reports that you filed?

A Yes, sir.

Q Sir, if you need to refer to your reports to refresh your recollection, will you indicate that to the Court?

A Ah, depends on what you ask me.

Q Exactly. And when you're referring, you'll let us know.

A Yes, sir.

Q When did you begin working on the case?

THE COURT: Can I ask you a question?

I know you've got the Prosecutor set with the red labels. Is that the same set that you have right

in front of you?

THE WITNESS: Yes, ma'am, I believe so.

THE COURT: Okay. Do you want your set back then?

MR. GUARINO: Probably better if he refers to the marked exhibits, Judge.

THE WITNESS: Sure.

THE COURT: Okay.

THE WITNESS: I'm easy.

THE COURT: Okay. Just use his then set.

MR. GUARINO: Okay.

Q Sir, when did you -- your first entry with regard to this investigation, when does it begin?

A Ah, in 12/18/79 --

THE COURT: Okay. And you're referring to the reports?

THE WITNESS: Yeah. I'm referring to the reports. I was -- actually, I was involved prior too because the whole Juvenile Division was lookin' for these individuals. But --

Q And tell me what you -- what you did? When you began?

A Well, I began maybe a few weeks after they were missing. At that time, my Lieutenant was John Murphy. And the Chief was Deputy Chief George Hemmer. They

came to me, I think it was Everett Hairston was in charge of missing persons; but they came to me and asked me to get involved in the investigation.

Q And why did they ask you to get involved in the investigation?

A Back at that time, I was like the -- when I was transferred to Juvenile, I was transferred from night DB Homicide and Robbery, and I was like the little hotshot at that time. And I was born and raised in Newark and I knew everyone, so they said get, out there and see if you could find something.

Q Now, in a missing persons investigation, what's your goal?

A Ah, to find the individuals as soon as possible.

Q And how did you begin your investigation?

A Well, we went up into the area and spoke to people where these individuals lived, where the kids lived.

Q Do you recall who you began speaking with?

A We spoke to all the family members first. We spoke to all the mothers and sisters and brothers of these individuals that were missing. People throughout the neighborhood, stores, people just walkin' up and down the street. We spoke to a lot of people.

Q Do you recall approximately how many people you spoke with?

A Oh, I talked to over a thousand people, I'm sure.
Q And in speaking to these individuals, did you ever learn the whereabouts of the five boys?
A No. No.
Q Did your investigation lead you to speak to any persons who were of interest to you? Of particular interest to you?
A We only had one person of interest.
Q And who is that?
A It was Mr. Evans.
Q Why was that?
A Because everything counter led back to him, they said that -- people said that they saw him with the kids on the truck and so on so forth, that was the original information that came in prior to me being involved in the case. So, he was a person of interest.
Q Did you ever speak with Mr. Evans?
A I've spoke to Evans before, yes.
Q Do you recall when you spoke to 'em?
A I spoke to him several times. I spoke to him once at his house, I think it was 94 Payne Avenue --
MR. EVANS: 93 --
THE WITNESS: 93 Payne; thank you, sir.
THE COURT: Don't do that.
MR. EVANS: Oh, okay --

A 93 Payne. I spoke to him on, you know, several -- just in the neighborhood because we were trying to find these individuals. He was the last person saw with them, according to the information we had, so every time I saw him, I stopped him and talked to him.

Q Did Mr. Evans ever indicate to you that the five boys had been on his truck prior to their disappearance?

A I think he said that he had used the kids from time to time to help him with things, so they had been on the truck before.

Q And did Mr. Evans know how to reach you in case he had any other information that he wanted to give?

A Everyone knew how to reach me, yes. He knew how to reach me.

Q Now, did there come a time in your investigation when you made a conclusion as to your ability to locate the five boys?

A Ah, yeah. It was about three weeks after I was asked to help out with the investigation.

Q And what were your thoughts at that point?

A That they were not alive.

Q Why did you think that?

A Well, it was several reasons. One of 'em because,

like I said, I'm born -- I was born and raised in Newark. I knew just about everybody in Newark. I've never had really any problems with any investigation in Newark. I went to school in Newark and everything, but this particular investigation, we couldn't find anything out. I mean, you know, about the actual whereabouts, nothing. And to me, that -- matter of fact, I was called in -- I was called in by my Lieutenant and the Chief, Hemmer and Murphy, and they sat down and they asked me the same question. They asked me, what did you think? And I told 'em --

Q What did you tell them?

A They're not alive.

Q And did you make any recommendations based on your opinion?

A Well, I said to the Chief, I think we -- it should be turned over to Homicide.

Q Was it?

A Eventually.

Q Was it turned over -- do you recall when it was turned over to Homicide?

A I think it wasn't turned over to Homicide till almost a year later, maybe, six months later.

Q Now, as you were investigating this case, did -- were leads coming in?

A From all over.

Q And when these leads would come in, what would you do?

A We'd follow 'em up. We'd go and check to see if they were -- you know, led us to anything.

Q Did anything that was phoned in, called in or sent to you in terms of a lead or a tip at this point pan out in this case?

A No, but I got a lot of phone calls. I got leads. I got a lot of tips from ah -- we checked the military. Ah, we checked prisons. We checked letters that were sent to us anonymously, phone calls. Matter of fact --

THE COURT: Just a second.

You have to wait for a question. He just asked whether anything panned out.

THE WITNESS: Sure.

A No, nothing panned out.

THE WITNESS: Sorry, your Honor.

Q And in the course of your investigation, did you ever come across the name Philander Hampton?

A I don't think so. I don't remember that name.

Q Did you ever come across the name Maurice Olds? Or Maurice Woody?

A I don't remember that name either.

Q Did you ever take any formal statements, by

that meaning a question and answer statement, from any of the witnesses that you interviewed?

A No.

Q Why not?

A It wasn't relevant. If any information that we found, if it wasn't relative to the case, I wouldn't take a statement from 'em.

Q And in terms of the Youth Aid Bureau, what was your job at Youth Aid Bureau?

A It's detective, investigating juvenile offenses.

Q Did there come a point in time when your involvement in the investigation concluded?

A Ah, yes. Yeah.

Q When -- do you recall when that was?

A Well, when I got transferred.

Q When was that?

A Oh, I don't know. It's a few years later. I was transferred to Robbery.

Q Now, prior to your testimony here today, you were shown your reports. Correct?

A Yes.

Q Were you shown the testimony, statements taken by any other witnesses later on in the years?

A Ah, Charles Conte, I believe.

Q His -- one of your partners that you worked

with?

A Yes, matter of fact, it's my mentor, yeah.

Q Would anyone have shown you any statements of other witnesses who gave statements to the police, say in the 1990's with regard to this case?

A No.

Q Would you have any involvement with witnesses who gave statements to detectives in the 1990's with regard to this case?

A No.

Q Were you still a police officer in the '90's?

A In the '90's, I believe I was a Lieutenant. Teaching at the Police Academy.

MR. GUARINO: I have no other questions.

THE COURT: All right.

(Colloquy takes place)

CROSS EXAMINATION BY MR. EVANS:

Q Detective Bey, how you doing?

A Mr. Evans, how are you?

Q Good, good. For the record, you know why we lost the contact? I want you to answer why we lost the contact?

A I don't understand.

Q The last meetin' we had, you know, the reason why we never made contact from that last meetin'?

A No, I don't -- I don't know the reason. No, sir.

Q Oh, okay. In '78, you recall when we -- you approach me and you wanted me to come downtown and answer some questions?

A Yes.

Q Okay. You remember I answered all your questions, anything you wanted at the time?

A You answered questions. Yes, you did.

Q Right. And after I finished answering the questions, you gave me umm -- you told me I was under arrest because of a ticket, open ticket.

A Ah, I didn't tell you anything.

Q Well --

A No, I didn't -- I didn't arrest you.

Q Wasn't you there with Mr. Harriston?

A I was there.

Q I didn't leave the building till I paid that $30.

A I don't recall what --

Q You don't recall? All right. Well, that's what broke the contact because at that time --

THE COURT: Sir.

MR. EVANS: Yeah. Yes, yes --

THE COURT: This is absolutely not your opportunity to say anything to the jury.

MR. EVANS: Yes.

THE COURT: It's a question and answer.

You are to disregard that.

I want to see you at side bar.

(Side bar conference takes place)

(Following takes place in open court)

THE COURT: Next question.

Q Who was the first family that you interviewed?

A I don't recall who I interviewed first. I interviewed all of 'em, though.

Q What date did you come -- what date?

A Well, I don't remember. It was 1978. You know, when they put me on it, I started investigatin', sir.

Q Do you recall anyone saying that I came to the house and picked them up?

A Yes --

Q Five -- all five boys, or something to that nature?

A That's -- everybody in the neighborhood was saying. Everybody in the neighborhood said that you picked the boys up.

Q Did you get a statement from everybody in the neighborhood?

A No, I didn't because we had to check everything

out and some people, you know, weren't sure; some people were hearsay. So, we were still investigating.

Q But at that time, and I'm asking you this here, was that a rumor in the neighborhood?

A Big time.

Q Right. It wasn't nothing factual. Right?

A Ah, I couldn't prove it because I didn't see you pick 'em up.

Q Right. At that time, did you have any witness can prove it?

A Ah, me, myself? No. I didn't have a witness. Myself, I didn't take a statement from anyone.

Q How long you was on the case?

A As long as I was at Juvenile and then ah, when they started task force, they put me in the room in the office and I field phone calls for awhile. It was quite a while. Different -- in different capacities though.

Q Yeah.

A Yeah.

Q Was it 10 years? 15 years?

A No, it wasn't 15 years but the case was revisited, you know, back and forth over the years.

Q Okay. Do you remember me -- do you remember visiting me at both locations? At 979 Clinton Avenue,

also 93 Payne Avenue?
A I remember 93 Payne.
Q Okay.
A I don't remember the other one, sir.
Q You don't remember visiting me at 93?
A I came to your house on Payne Avenue, sir.
Q Okay. But what about 979?
A I don't remember --
Q You don't remember? Okay.
A I don't remember visiting you there.
Q You remember talkin' to my wife at the time? At 93 Payne?
A Ah, I don't believe she was your wife at the time.
Q Yes.
A Oh, that's right; you did marry her, didn't you -- I didn't know. We talked to a lady for a minute but she didn't have anything to say. She had very little to say. She just said you're not here or something -- I don't recall. But we didn't question her in-depth.
Q And she didn't explain to you I was with her all night that night?
A Not that I recall.
Q I mean, on the 20 -- the 20 -- the 20th?
A If she would have said that to me, I definitely would have put that down, sir.

Q You did?
A I don't remember her saying anything like that.
Q Do you remember her saying that we was prepared to go to a closing the next morning?
A I don't remember your wife saying anything to me about a closing, sir.
Q But you was aware of the house we just purchased. Right?
A I didn't know you purchased the house. I know you moved to that location. Later on, I came there to see you in the basement. I don't -- you know, I don't even think I asked you did you purchase the house or not, sir.
Q Do you remember speakin' to Mr. Frank Richards?
A No.
Q So at this point, you don't have no other recollection of that --
A Of what, sir? Of speaking to who?
Q Frank Richards?
A I don't recall speaking to any Frank Richards, sir.
Q What about Frank Richards, he was at 342 Hobson Street?
A Rings no bells, sir.

Q How did you get the information that I was on 93 Payne Avenue?

A I think I got it from people in the neighborhood that you moved up there.

Q You don't know who, Pacific (sic), right?

A No, I don't know Pacific (sic) but I came there and you were there.

Q Right. Well -- yeah. You say you was at Homicide already. Right?

A No, I wasn't --

Q That time?

A No, I wasn't in Homicide, sir. I came on the police department in 1971. Umm, I was in the precinct, I was in the Tactical Force, I was in Night -- Homicide, Robbery; then I'm with the Juvenile and when I was with Juvenile, that's when I got involved with this case, sir, when I was in the Juvenile Division, Youth Aid Bureau, Missing Persons.

Q Do you -- I want to ask you a question: Do you agree with Detective Hadley saying you all F'd the case up and you all doesn't know what you was doing?

A Beg your pardon?

MR. GUARINO: Objection, Judge.

THE COURT: Just a second.

I'll see you over here and bring any report

that you have to that effect.

MR. EVANS: You want me to bring it?

THE COURT: Yes.

MR. EVANS: Yes.

(Side bar conference takes place)

(Following takes place in open court)

THE COURT: I'm going to apologize for interrupting that question but there is a slight correction to the question; just rephrase it. You want me to remind you what it was?

MR. EVANS: Yes. You want the -- you want me to give you the statement?

THE COURT: No. I want the three names again: Eutsey, Carrega or Tijetian?

MS. CUCINELLO: Eutsey -- the three people are Carrega, Tijetian and/or Eutsey.

THE COURT: Are you familiar with the statement made by one of those detectives that you -- excuse the vernacular but it's used in the statement -- F'd up the original investigation?

THE WITNESS: No.

THE COURT: Okay.

Q At that time, Detective Scott-Bey, you took all matters -- you took every lead that was available to you at that time?

A Ah, well, it was several detectives -- all -- you know, either Everett, or Chuck Conte, or one of us took the information and followed it up.

Q Right. No, my question was: You did the most thorough job you can do as a professional?

A Based on the equipment we had in 1978, I did what I could, and the best of my knowledge, yes, sir. Always.

Q All right.

MR. EVANS: Thank you.

THE COURT: Anything else?

REDIRECT EXAMINATION BY MR. GUARINO:

Q Detective, what equipment did you have in 1978?

A Ourselves. We didn't have dogs or anything like that. We didn't have radar. It was a lot of equipment that they have now that we didn't have in those days, sonar and stuff like that. We didn't have stuff like that.

Q Did you investigate other buildings, or based on information that you developed, other buildings, other abandoned buildings, burned buildings or anything like that?

A Sure.

Q What did you do?

A We checked a lot of abandoned buildings. We checked burnt out buildings. We checked out burnt out supermarket, quite a few places around. Some of 'em, we only could get like two feet in the door because it was so badly -- we had to back out because -- you know, we had -- you couldn't go in, police lines and, you know, the place was like falling apart and stuff. So as far as we could get in, some of 'em we got and others, we didn't get in. And then the City came and knocked it down.

Q You indicated that eventually the case was passed to Homicide. Did you mention -- I thought you mentioned Cold Case? Am I correct?

A Well, no -- they -- Sar -- Bobby McQueen and Sergeant Gibson were on the task force. They were in Homicide, but the case all stayed at the Juvenile Division. It never was passed onto Homicide and then later, years later, it was passed to Cold Case. And then Cold Case revisited with the information they had, information that we had and the equipment that they had at hand in today's society.

Q And when you say they revisited, did anyone from Cold Case speak to you?

A At that time, I was Chief Investigator for The Board of Education, yes. I don't remember who; but I

was visited a couple of times by Cold Case detectives.

Q And following that, did you have any other active involvement in the case?

A No.

Q Were you present when any witnesses were formally interviewed and statements were taken?

A No.

Q And --

MR. GUARINO: I have no more questions.

THE COURT: Mr. Evans?

MR. EVANS: No questions.

THE COURT: Nothing?

MR. EVANS: No.

THE COURT: You can step down. Don't discuss your testimony with any other witnesses that's waiting to testify.

THE WITNESS: Thank you, your Honor.

THE COURT: Thank you.

(Witness steps down)

THE COURT: Next witness?

MR. GUARINO: Judge, the State calls Detective Joseph Hadley to the stand.

J-O-S-E-P-H H-A-D-L-E-Y, J-R., State Witness Sworn/Affirmed.

DIRECT EXAMINATION BY MR. GUARINO:

THE WITNESS: Joseph Hadley Junior, H A D L E Y.

Q Detective Hadley, by whom are you employed?
A City of Newark.
Q In what capacity?
A Ah Police Department, Detective, currently working for the Essex County Prosecutor's Office on loan.
Q And what's your current assignment?
A Umm, Homicide Task Force for the Prosecutor's Office.
Q How long have you been there?
A I've been here since June of this year.
Q Where were you before that?
A The Newark Police Department North District Detective Squad.
Q And how long have you been a member of that squad?
A That squad I came to in December of 2010.
Q And for how long have you been a police officer?
A Since October of 1989.
Q And that whole time with Newark?
A Yes.
Q Did there come a time when you became involved in the investigation of the disappearance of

five boys from the City of Newark?

A Yes.

Q And were those boys: Randy Johnson, Michael McDowell, Melvin Pittman, Ernest Taylor and Alvin Turner?

A Yes, they were.

Q And did you prepare reports with regard to your work in that case?

A Yes, I did.

Q I'm gonna show Mr. Evans S-46, 47, 48, 50. Is there a 49?

THE COURT: There's a 46A and B. There's a 46A and a 46B, but not a 46.

MR. GUARINO: Well, right now, Judge, I'm showing 46A, 47, S-48, S-49, S-50 and S-46B, to the defendant.

THE COURT: Okay.

Q Detective, I'm gonna show you what's been marked as S-46A and B, 47, 48, 49 and 50. I ask you to look at those documents.

A Thank you.

Q Do you recognize what they are?

A Yes, sir.

Q Are those your reports with regard to your investigation in this case?

A Yes, they are.

Q Do you need those reports to refresh your recollection?

A Yes, I do.

Q If you refer to the report to refresh your recollection, will you tell the Court?

A Yes, I will.

Q Thank you. Drawing your attention to umm June 2nd, of 2008, did that begin your involvement in the active investigation of this case?

A One second -- yes. Referring to a report.

Q And do you recall what you did that day?

A Okay. On this day, myself and Detective William Tijetian went to the house of Miss Lillie Williams to administer or to comply with Patricia's Law.

Q What is that?

A Patricia's Law is a legislation that was passed that if there's a missing person, DNA is taken from one of the surviving family members and put into a CODIS and, thereafter, put into the umm NCIC to inform people that the DNA is available.

Q And that's a data bank?

A Yes.

Q And what's the purpose of putting a family member's DNA into the data bank?

A In the event that someone is located who is either deceased or otherwise, their DNA can be compared to the data base to see if there's a family member that's already in the data base to locate a family member.

Q And on June 6th, 2008, what did you do?

A Referring to reports of June 6th. We responded to the residence of Floria McDowell, myself, Lieutenant Carrega and Detective Tijetian for the same purpose.

Q Was the efforts to submit DNA to the database, did that aid in the investigation of the case?

A Ah, no. Because the decedents weren't located, or the missing persons weren't located.

Q Now, on November 12th, 2008, what happened?

A Referring to report, November 12th?

Q Yes.

A Okay. November the 12th, I was here at the Prosecutor's Office talking with Detective Theodore Zangari and Sergeant Darnell Henry with respect to a cold case which was unrelated to this case --

Q No, there -- where were you?

A Here, Prosecutor's Office.

Q Prosecutor's Office, here in the court building?

A Yes.

Q I'm sorry. And were you here involved in this case or a different case?

A I was here on a different case.

Q Oh. What happened?

A I got a call from Lieutenant Carrega who informed me that Philander Hampton was in the building and wanted to provide an interview.

Q And did you know or recognize the name of Philander Hampton?

A Yes.

Q How -- what did you recognize? How did you know him?

A Well, early on in this investigation, we were actually looking for Mr. Hampton to interview to see if he had any knowledge of this case.

Q And what was that based upon?

A Simply based upon his relationship with Mr. Evans. Umm, there was nothing to suggest that he was a suspect or nothing to suggest that he really had any knowledge; but the fact that he was related to Mr. Evans, we figured we'd talk to him. If something came out of it, then something came out of it.

Q Did you know the nature of the relationship?

A Ah, they're cousins.

Q Was -- what happened next?

A Well, I excused myself from the interview room, went and talked to Lieutenant Carrega and during the conversation, we agreed to call Bill Tijetian and await for him to come down before we did any interviews.

Q And what happened next?

A Well, after that, Bill Tijetian got to Newark. We all talked. We set up for Mr. Hampton's interview. We found that the systems downstairs weren't able to record, so we made arrangements to go to the State Police Barracks. In route to the State Police Barracks, Mr. Hampton rode with Lou Carrega, and myself and Darnell Henry rode in the same car. In route to the State Police Barracks, we stopped up on Camden Street --

Q Why'd you stop on Camden Street?

A Well, once we got to Camden Street, you know, I talked to Lieutenant Carrega and he informed me that this is the location that Phil Hampton said that the boys were killed at.

Q Were you following their car at that time?

A Yes, I was.

Q Were there any radio communications going on or did you simply follow their car?

A No, we simply followed their car. We had a Newark car and he had a Prosecutor's car. We had two

different frequencies.
Q You followed them and stopped -- what happened next -- when you got to Camden Street, what did you observe?
A Well, what I observed was the new construction there, which wouldn't have been there 30 years ago, and umm Lou Carrega got out of the car and he pointed to a location where the house used to be, which was stated by Mr. Hampton. And umm, he also pointed to a telephone pole and said that telephone pole was there at the time --
Q Who said that --
A This is what I'm getting from Lieutenant Carrega, 'cause Phil remained in the car.
Q So, there's a reference to a telephone pole?
A Yes.
Q And what happened next --
MR. EVANS: Object, your Honor.
THE COURT: What's the objection? What's the objection? Stand up.
MR. EVANS: Hearsay.
THE COURT: Mr. Guarino? It's a hearsay objection?
MR. GUARINO: Judge, I'm not using the hearsay to prove that there was a telephone pole there;

simply that a telephone pole was mentioned.

THE COURT: Okay.

It's not relevant unless it's true, so I'm not sure it's relevant anyway and it's also an objection to the statement about the house. I'm going to sustain it. You are to disregard those statements. You'll have to call the other witness for that.

MR. GUARINO: Thank you, Judge.

Q Do you recall the address on Camden Street that you stopped at?

A Just referring to my report? Okay. The addresses I list here -- I'm sorry, the addresses I have here is 254, 256, 258 and 260 Camden Street in Newark.

Q And that was where your car stopped, that area:

A Yes.

Q After you stopped at Camden Street, did you's get back in your car?

A Yeah -- no. Actually, we waited for a few 'cause we waited for the Essex County Prosecutor's Crime Scene Unit to come and take photographs of the location.

Q And did you observe them taking photographs?

A Yes.

Q What did you do next?

A Once they got through with their part of the

investigation, we headed to the State Police Barracks.

Q Where was that located?

A Off of 1 & 9 on the Turnpike.

Q When you got there, what took place?

A When we got there, the interview room was being set up. Once we set up everything, we went in and conducted the interview with Mr. Hampton.

Q Now, when -- do you recall if when Mr. Hampton came in or when Mr. Hampton was there, did he indicate that he wished to give a statement?

A Yes, he did.

Q Did he indicate that he needed anything, accommodation, before giving his statement?

A Yes, sir. I believe he had a cup of coffee, something to drink; and I believe he was a little chilly, so we gave him something to cover himself.

Q Who conducted the interview?

A The interview was conducted by the -- the primary conductor was Lieutenant Carrega. But umm, myself and Bill Tijetian also asked questions during the interview.

Q Do you recall about how long the interview took?

A I would only be guessing. I couldn't give you the timeframe.

Q After Mr. Hampton gave his statement and it was concluded, what happened next?
A One second, just referring to my report. I believe that was it for the day.
Q And where did Mr. -- do you recall where Mr. Hampton was taken after the interview was concluded?
A I'm not sure, but I believe -- no, I'm not sure because I went with Sergeant Henry. We left.
Q Was he in custody at that time?
A Yes, he was.
Q Was he in custody on any charges related to this case?
A No.
Q Now, following that interview which occurred on November 12th, what did you do next?
A Referring to my reports. Okay, do you want a specific date that you're working with because --
Q On December 12, 2008?
A I'm sorry, your question one more time please?
Q What did you do next with regard to your investigation?
A Okay. As far as that day we're talking, that was pretty much it.
Q No, not November; December 12th.
A Oh, I'm sorry. I'm sorry, my apology. Referring

to the report from December 12th? Okay. On December the 12th, myself, Sergeant Henry and umm Detective Recktenwald went down to a couple of the southern states to talk to a couple of family members and ah, some people related to the case. Specifically, Yvonne Beachum and Frankie Miller. Frankie Miller from Virginia, and Miss Beachum from Columbus, Maryland.

Q And did they give statements with regard to this case?

A Yes, they did.

Q Were they formally recorded?

A Yes, they were.

Q Your next entry is January 31st, 2009. Is that correct?

A Yes.

Q What did you do at that time?

A Okay. On this date, we ah, went to Rutgers Street in Hillside and conducted a interview with a William Lawson, which is biological father of Michael McDowell; and Shelly McDowell, the biological sister of Mr. McDowell. At the same time with respect to this case, we took a statement umm of what they recall from this time.

Q Now, your next entry is March 20th, 2009. What did you do with regard to March 20th?

A Okay, referring to the reports? On March 20th, we conducted a examination of the grounds where the bodies were to have alleged to have met their demise to see if there was any remains inside the soil, and that was done through a ground penetration radar.

Q Were you present?

A Yes, I was.

Q Do you recall how that was conducted?

A That was conducted through a machine, which I'm not familiar with. The person who owns the machine owns the company. He conducted the surveillance.

Q And what parts of the property did you go on to?

A We went on to the outside grounds which was next to the new development. We went inside a couple of houses and we moved furniture around, went through those floors and swept.

Q On the day of that examination, were there any recoveries or any positive information developed?

A No.

Q Do you recall the person who was the contact for the ground penetrating radar?

A Yes. His first name -- spell his last name, first name is Ron; last name is L A B A R C A.

Q Your next entry is April 29th, of 2009. What

happened on that day?
A Okay. Referring to reports again?
Q Yes.
A On that day, we met with Police Officer Angel Ramos, who had a document in his possession related to a fire that occurred at the location where we were taken to by Mr. Hampton, and that fire occurred on the date that the five people went missing. That report had indications in it. Do you want the indications or?
Q Now, who is Angel Ramos?
A Angel Ramos is a police officer with the Newark Police Department who, at one time, worked on this case.
Q And do you recall what prompted you to contact Detective Ramos?
A At the time, we contacted Detective -- Officer Ramos, we were going through the list of people who had worked on this assignment throughout the years, to see if anybody had anything relevant to the case that would help us at this time.
MR. GUARINO: Judge, I'm going to show what we marked as S-118 for identification to the defendant. It's the envelope and three pages.
THE COURT: That's not the description on the list. The description on the list is not an envelope.

MR. GUARINO: That's where we stuck this sticker, Judge. We can --

THE COURT: Is that one report in your right hand?

MR. GUARINO: It's -- this is -- actually, what it is, it consists, Judge, of a report -- two page report, the property voucher and the envelope it was placed in?

THE COURT: All right.

The report's 118 -- 118 -- the envelope's 118. The report has to be 118A and the voucher has to be B. Okay?

MR. GUARINO: Okay; thank you.

(S-118A and S-118B are marked for identification)

MR. GUARINO: Judge, I'm showing to defendant the envelope marked S-118; the report, which is marked S-118A, 2 pages; and the property and evidence receipt, which is marked 118B. And so that's for the clarification of the Court, the report referred to by Mr. Delk, in his testimony, it was a photocopy and that has previously been marked S-119 for identification. It's the same two page report.

THE COURT: It's S-19 right?

MR. GUARINO: S-19 for identification, the same two page report.

THE COURT: Same as S-118A.

MR. GUARINO: Correct.

Q Detective, I'm showing you what's been marked as S-118, 118A, B and -- 118A and -- 118A and B. Do you recognize the -- first of all, the envelope?

A Yes.

Q What is it?

A It's a Newark Police property envelope.

Q And who submitted that?

A This would have been submitted by myself.

Q And what was inside of it?

A Two Newark fire reports -- I'm sorry; two Newark, New Jersey, Fire Department Investigator reports.

Q And are those the reports you obtained from Officer Angel Ramos?

A Yes.

Q What are they dated?

A The date on the bottom is August 21st, 1978.

Q And who authored the reports?

A Investigator W. Harris and J. Bulk -- umm, Delk; I'm sorry.

Q And what was the date that you placed them into evidence?

A The date was April the 29th, 2009.

Q Prior to that date, had you ever seen those

reports before?

A Prior to this date, no. This -- no.

MR. GUARINO: No other questions.

THE COURT: Mr. Evans?

Do you need a few minutes?

MR. EVANS: No, I wanted to know.

CROSS EXAMINATION BY MR. EVANS:

Q Was that a Frankie Miller or -- or Evans?

THE COURT: What was Frankie Miller --

MR. EVANS: Witness, Clinton Avenue.

Q Was that a Frankie Miller? I got two names; she's a Evans or Miller?

A Frankie Miller aka Frankie Evans.

Q Oh. Are you familiar with the visit? From Miss Miller?

A Yes, I was there.

Q And what was that address?

A Frankie Miller was 3020 -- I'll spell the street name, A S H W O O R Circle, and that's in Roanoke, Virginia, 24012.

THE COURT: Okay. Checking your report.

THE WITNESS: Yes, checking my report.

Q No. I'm talking about the time -- '78.

A What --

THE COURT: Do you know where she was living

back in '78?

THE WITNESS: Not without her statement. I believe she listed it in her statement, which is a audio recording.

Q Do we have the statement?

THE COURT: Is there a transcript of that?

MS. CUCINELLO: Judge, if I could just have a stapler; it's not stapled.

THE COURT: Is that marked yet?

MS. CUCINELLO: Yes, Judge.

We gave it marking -- we did not use it in court, but we did give it a marking. We gave it --

THE COURT: S-96?

MS. CUCINELLO: Yes, Judge.

THE COURT: That's a statement dated what date?

MS. CUCINELLO: It was December 12th, 2008.

THE COURT: Okay.

Looking at that statement will refresh your memory about what her address was in '78?

THE WITNESS: Yes.

THE COURT: You want him to look at the statement?

MR. EVANS: Yeah.

(Handed to the witness)

THE WITNESS: All right. Referring to statement dated December the 12th, 2008.

MR. GUARINO: Judge, if it would help, we could direct his attention to Page 3, I believe line 15?

THE COURT: Okay.

MR. EVANS: No, I --

THE COURT: Is that where you want him to look?

MR. EVANS: No. Go to Page 3, number 13 to 25.

THE COURT: Okay. Read them to yourself.

THE WITNESS: 13 to 25?

Q You could read it out.

A You want me to stop at 25?

Q You can read that --

A Oh, you want me to read it out loud, from 13 to 25?

Q Yes.

THE COURT: I'm not going to allow that, unless you want to be heard over there.

MR. EVANS: Okay.

THE COURT: Come on over.

MR. EVANS: You want me to read it, your Honor?

THE COURT: No. I want to talk to you about this page.

MR. EVANS: Oh.

(Side bar conference takes place)

(Following takes place in open court)

THE COURT: Okay. Question/answer, okay?

THE WITNESS: Yes.

THE COURT: And this is Miss Miller's statement?

THE WITNESS: Yes.

THE COURT: Start at 13 and go to 25.

THE WITNESS: At the first word?

THE COURT: 13 isn't the beginning of the question. You want it from 11?

MR. EVANS: Yeah, okay. Go to 11.

THE WITNESS: Okay. At line 11, "Detective Recktenwald Question: Okay. On August the 20th, the year 2000 -- of the year 2000 -- correction, 1978, there was an incident with five -- excuse me -- there was an incident with five young men went missing in the City of Newark. One of which who -- one of which used to live downstairs from your residence at 816 Clinton Avenue. Correct"?

"Answer, Miss Miller: Yes, that's right".

"Question, Detective Recktenwald: Do you

remember that young man's name"?

"Answer Miss Miller: Alvin Turner".

"Question Detective Recktenwald: Okay. On that date, do you remember seeing Alvin Turner"?

"Answer Miss Miller: Yes, I do".

"Question Detective Recktenwald: Okay. Can you explain to me what you saw that day"?

"Answer Miss Miller: Well, it had got like dark and" --

THE COURT: You want him to keep going on the next page?

MR. EVANS: Yeah.

THE COURT: How far you want him to go?

MR. EVANS: Well, you got -- well, yeah, 13, 25 and 4, 1 to 25.

THE WITNESS: 1 to 25?

THE COURT: Whole page.

THE WITNESS: Miss Miller -- "Answer Miss Miller: Well, it had got like dark and I was downstairs and he came by on the green truck -- on his green truck; he and three boys, and Alvin waved at me and I have never did see him since".

"Question Detective Recktenwald: Okay. The green truck, can you describe it"?

"Answer Miss Miller: All I know is -- all I

know, it was, I really -- it was open in the back just so, you know, a green truck".

"Question Detective Recktenwald: Would you describe it as a pickup truck"?

"Answer Miss Miller: Sure, it's a pickup truck".

"Question Detective Recktenwald: Okay. Do you -- did you recognize any of the little boys that were on the truck"?

"Answer Miss Miller: No, I didn't".

"Question Detective Recktenwald. Okay. Had -- since that day, and I'm assuming that it was on August the 20th, 1978".

"Answer Miss Miller: Umm -- correction, umm, so true".

"Question Detective Recktenwald: Since that day, had you seen Alvin return back to this area or back to the area"?

"Answer Miss Miller: Never seen him any more".

"Question Detective Recktenwald: Okay. Did you know whose truck that was"?

"Answer Miss Miller: No, I don't".

Q That's the end of 25?

A That's 25.

Q Okay. She said she was -- I'm asking you -- her statement was that she was down -- down -- upstairs or downstairs?

A Okay. Going back to line number 1, I was downstairs and he came by on this green truck.

Q Okay. Go to 26, Page 26 -- no, no. Excuse me, Page 9, from 17 to 25.

A 17. Answer -- do you want the question before that at 16?

Q All right. You can go to 16 -- I mean, 17, 25 is --

THE COURT: 17's an answer. Do you want the question read?

MR. EVANS: All right.

Q Go to 16.

MS. CUCINELLO: Judge, if we could just have one moment; thank you.

THE COURT: You have an objection or can he start?

MR. GUARINO: I'm not sure what is he reading, Judge?

THE COURT: Okay. He's on Page 9. Reading from 15 to 25 -- okay. Actually, 16 to 25. Let me see this.

MR. GUARINO: From line 8? Starting at

line --

MS. CUCINELLO: Judge, can I be heard at side bar on this?

THE COURT: Yeah. Let me borrow this for a second. Come on over.

(Side bar conference takes place)

(Colloquy takes place)

(Following takes place in open court)

THE COURT: Go ahead, sir.

THE WITNESS: All right. "Question Detective Hadley: Do you remember a Detective Hairston, Everett Hairston, by any chance"?

"Answer Miss Miller: Umm-hmm -- no, umm".

"Question Detective Hadley: He wrote -- he wrote in the report that -- two ticks -- the word 'now'. This was September, 1978" --

THE COURT: Louder.

THE WITNESS: Louder? I'm sorry.

"This was September, 1978. So about the month later that he responded to the Clinton Avenue area, checked with parents, negative. And also checked again with Miss Frankie Evans and he -- and he gave a phone number of 372-8596; a friend of Miss McDowell's at 816 Clinton Avenue third floor".

"Answer: Umm-hmm".

"Question Detective Hadley: That would be you, right"?

"Answer Ms. Miller: Umm-hmm".

"Question Detective Hadley: Who stated at approximately 23 hundred, which is eleven o'clock at night, she was looking out of her window and saw two boys on the back of Lee Evans' truck. Miss Evans stated that one of the youths -- one of the youths was Alvin Turner, and the other youth she did not know. Miss Evans stated Alvin had on a -- has two ticks -- described some clothing -- two ticks -- before I read that to you, do you -- two ticks -- do you remember --"

"Answer Ms. Miller: Umm".

"Question Detective Hadley: Do you remember describing his clothing to anybody"?

"Answer Ms. Miller: Umm. I don't remember that".

"Detective Hadley: Do you remember telling the detective that he was on the back of Lee Evans' truck"?

"Ms. Miller: Lee Evans? Umm".

"Question Detective Hadley: Do you know a Lee Evans"?

"Answer Miss Miller: I don't know Lee Evans, that's the name that the truck -- that's the name of

the truck -- that's the name of the truck or something".

"Question Detective Hadley: Well, it says here that -- two ticks -- that referring to you, that you stated at eleven o'clock, or 11 hundred that you were looking out your window and saw two boys on the back of Lee Evans' truck. She stated one of the youths was Alvin Turner and the other youth, she did not, period. Miss Evans stated that Alvin had on a blue shirt and was sitting -- two ticks -- that's a real bad copy -- two ticks -- was sitting -- two ticks".

"Answer Ms. Miller: Lee Evans -- two ticks -- who would that be"?

"Question Detective Hadley: Now, where were you when you saw Alvin? When he waved at you"?

"Answer Miss Miller: I was downstairs. I remember -- two ticks -- I weren't lookin' out the window though -- two ticks -- like I remember, I was -- I walked downstairs -- two ticks. I think I walked downstairs. I couldn't -- I could have been looking out of the window, but I -- two ticks -- I remember that he did wave at me. I'm trying to think. I may have been looking out the window. I thought I was downstairs".

"Question Detective Hadley: That's okay.

It's been 30 years so, you know"?

"Answer Miss Miller: Yeah, but I'm thinking, I thought I walked -- I might have been looking out of the window, you know"?

"Question Detective Hadley: Umm-hmm".

"Answer Miss Miller: That's possible".

"Question Detective Hadley: But you're -- two ticks -- you're positive that he did wave at you and he did"?

"Answer Miss Miller: Yes, I'm positive".

"Question Detective Hadley: Okay. Did you at one point, did you ever recall speaking to his mom and explaining to Alvin Turner's mother that you saw him on that truck"?

"Answer Miss Miller: Umm-hmm".

"Question Detective Hadley: And that he waved at you"?

"Answer Miss Miller: Umm-hmm".

"Question Detective Hadley: Did you tell -- correction; did she tell you who's -- correction -- that may -- whose truck that was maybe by -- maybe back then"?

"Answer Miss Miller: Maybe she did, I can't remember. Maybe she did. I can't remember. I was trying to think who was Lee Evans".

"Question Detective Recktenwald: Does this say that they were together when she talked to the police? Was she with Miss Turner"?

Q I'm asking you; in one statement, she says she was downstairs and he waved at her. And ah, did she say she think? Or she said she -- he had waved at her and it was two boys on the truck -- it was three all together, right?

A It's like a three part question, I'm not sure which one you're looking for.

THE COURT: Break it up.

MR. EVANS: Okay.

Q In one statement, she say she was downstairs and he waved at her. She's by her door, she was downstairs.

THE COURT: Is that right?

Q Is that right?

A She said that -- in one statement, she said she was downstairs but she couldn't remember whether she was upstairs or downstairs. She couldn't remember whether she was lookin' out the window or going downstairs.

Q Was that after the detective had questioned her about the other statement that she made contradicting it --

A Which detective are you talking about?

Q Hairston; the same statement you read the first statement. One statement, she was upstairs waving -- no; one statement, she was lookin' out the window --

A Okay, I'm sorry. Is your question did she make that statement to me after she made it to Detective Hairston?

Q No, no; that's not the question.

A What's your question? Sorry.

Q The question was, I'm saying you interviewed her and did you investigate the statement?

A Did I investigate the statement?

Q Did you check the statement out? Was it accurate? You know.

A I'm kind of lost at what you're asking me. The best I can do with that is the statement that she may have given to Detective Hairston was back in 19 -- I'm not sure, but it was back when he had the investigation --

Q '78 --

A My investigation would not be checking his investigation because it's almost impossible for us to do that. I can only take the information that she has at the time she's giving it to me. Her recollection of

the information at that time is what it is. What she may have told him 30 years ago, would have been what that was and I can't -- I would not say it's a contradiction; I would say it's a time span that goes on and if she recollects it correctly, that would be her decisions.

THE COURT: Just so the jury understands, this when she's being questioned in '08.

THE WITNESS: Yes.

THE COURT: She's being shown her '78 statement and that questioning goes back and forth with what she said before.

THE WITNESS: Yes.

THE COURT: And what she said at the time the statement is given.

THE WITNESS: Yes.

THE COURT: So, it's the jury's decision whether she's recollecting it incorrectly, whether it's inconsistent for other reasons; you have to decide that.

MR. EVANS: Okay.

Q Page 8? 17 to 20.

A Page 8?

Q Yeah. Before you read that, I want to ask you a question: Are you familiar with a truck they was

talkin' about, the pickup truck? The green truck?

A In conversation, familiar; but as far as seeing the truck, no.

Q What's the conversation on the truck? How you can describe the truck?

A As a green pickup truck.

Q That's it?

A That's pretty much it.

Q Was there any writing on the truck, Evans & Son, and telephone numbers and to that nature?

A I have no idea.

Q All right. You could read it.

A I'm sorry; where would you like me to read?

THE COURT: 17 to 20.

Q Yeah, Page 9.

A 17: "Question Detective Hadley: Let's just take a moment, back to the green truck, if you remember. Was there any writing on the truck that you recall"?

"Answer Miss Miller: I can't recall any".

THE WITNESS: Was that it?

THE COURT: Yes.

MR. EVANS: Wait a minute.

Q Was the statement no? Or I can't recall?

A Her answer is, on line 20: I can't recall any.

Q I like to ask you a question: Did you

interview a Bob Cutler?
A No, I don't believe so.
Q You don't believe so? Or you're positive you didn't?
A I don't believe I did.
Q You know Bob Cutler?
A I've heard the name throughout the investigation.
Q You was there on the interview of Philander Hampton. Right?
A Yes.
Q Umm. You positive you didn't interview Bob Cutler?
A If you have any evidence that showed that I interviewed Mr. Cutler, if you can show it to me, it will recollect my recollection; outside of that, there's no recollection.
MR. EVANS: Your Honor, I do have the tape.
THE COURT: Do we have it up here? Do you have it with you?
MR. EVANS: Yes. Not in here --
THE COURT: Do you have a player?
MR. EVANS: Huh?
THE COURT: Do you have a player?
MR. EVANS: Nah, I don't have the player but I can get the tape real quick.

THE COURT: Is it a cassette player --

MR. EVANS: No, CD.

THE COURT: It's a CD. I can get a CD player here. You want to play it for 'em?

MR. EVANS: Yeah --

MR. ADETULA: Can I have a minute, Judge?

THE COURT: Sure.

(Mr. Adetula confers with the defendant off record)

MR. EVANS: Do they have a CD here? Or I'll go get mines.

THE COURT: A player?

MR. EVANS: No, no; just the CD.

THE COURT: I would not have it.

MR. EVANS: You have the CD with you?

MR. ADETULA: You have the only copy that we were given.

THE COURT: You need a player up here?

MR. ADETULA: I have my computer here, Judge. It may play it.

THE COURT: Why don't I give you a five minute stretch break and we'll set it up for you.

(Recess is taken)

(End of testimony with jury for the day)

CERTIFICATION

I, Ingrid DiPasquale, C.C.R., License Number XI01394, an Official Court Reporter in and for the State of New Jersey, do hereby certify the foregoing to be prepared in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate non-compressed transcript to the best of my knowledge and ability.

Ingrid DiPasquale 11-3-11

Official Court Reporter Date

ESSEX County Courthouse