# EXHIBIT E

5



SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - CRIMINAL PART
ESSEX COUNTY - INDICTMENT NO. 10-07-1728
A.D. #

| | |
|---|---|
| STATE OF NEW JERSEY,<br><br>vs.<br><br>LEE EVANS,<br>Defendant. | STENOGRAPHIC TRANSCRIPT<br>OF<br>TRIAL PROCEEDINGS<br>(TESTIMONY)<br>(AFTERNOON SESSION) |

Place: Veterans Courthouse
50 West Market Street
Newark, NJ 07102

Date: Tuesday, November 1, 2011
Volume 1 of 1
Pages: 1 - 79

BEFORE:

HONORABLE PATRICIA K. COSTELLO, A.J.S.C., AND JURY

TRANSCRIPT ORDERED BY:

LEE EVANS, Defendant Pro Se

A P P E A R A N C E S:

PETER GUARINO, ESQ. and
CHERYL CUCINELLO, ESQ., (Assistant Prosecutors)
Attorneys for the State

LEE EVANS, Defendant Pro Se

OLUBUKOLA O. ADETULA, ESQ.,
(Standby Counsel for the Defendant)

MARY-JO MONTELEONE, CCR, CRCR
Official Court Reporter
50 West Market Street
Room 113 Veterans Courthouse
Newark, New Jersey 07102

5



I_N_D_E_X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE STATE | | | | |
| RASHID SABUR | 3 | 46 | | |

THE COURT: The jurors are back again. Call your next witness.

MR. GUARINO: Yes, Judge. The State calls Detective Rashid Sabur.

R A S H I D S A B U R, STATE'S WITNESS, SWORN:

DIRECT EXAMINATION BY MR. GUARINO:

THE OFFICER: State your name.

THE WITNESS: Rashid Sabur. The last name is spelled S-A-B-U-R.

THE OFFICER: You may be seated.

THE WITNESS: Thank you.

MR. GUARINO: Thank you, Judge.

Q Detective Sabur, by whom are you employed?

A I'm employed by the City of Newark Police Department.

Q In what capacity?

A Right now I'm a detective currently assigned to the city's inspector general's office.

Q What is the city inspector general?

A We're responsible for conducting investigation involving corruption in the city government as well as unethical behavior in city employees.

Q How long have you been a member of the Newark Police Department?

A About 23 years.

Q Do you recall what year you joined?
A 1988.
Q Did you have occasion to work on a case that was known colloquially -- never mind -- I can't pronounce it. Did you work on a case that was called the "Five Missing Boys"?
A Yes.
Q Do you recall when you first started to work on that case?
A I received that investigation in 1998.
Q I'm going to show you what's been marked as S-45 for Identification.
I show it to defendant, Judge.
THE COURT: Sure.
Q I'm going to show you what's marked as S-45 for Identification. Do you recognize that?
A Yes, I do.
Q And what is it?
A This is a, for lack of a better term, a continuation report, better known as an investigative report from the homicide squad. This report is a report that was prepared by me during the time that I worked in homicide cold case squad in the cases connected to this case, involving the disappearance of the five individuals.

Q You began your report on October 11, 1998; is that correct?
A That's correct.
Q Do you need your report to refresh your recollection as to the details of the investigation?
A Yes, I do.
Q If you use your report to refresh your recollection as to the details of the investigation would you advise the Court?
A Yes.
Q On October 11th of 1998, who was assigned with you, if anyone, to investigate this case?
A Detective Keith Sheppard.
Q What initiated that assignment? How did that assignment begin?
A During the time that I received this investigation, I was assigned to the Newark Police Department's cold case unit.
Q Let me stop you there and ask you, Detective, what does the cold case unit do?
A The responsibility of the cold case unit, or our responsibility, was to investigate unsolved murders that occurred within the City of Newark. This case was given to Detective Sheppard and I after the cold case unit had been formed. We were successful in solving

several unsolved murders.

We were contacted by Miss Teresa Lawson, who we found to be the sister of one of the missing boys. My telephone conversation with her, she advised me that --

THE COURT: One second. Do it Q and A. Okay?

MR. GUARINO: Sure.

Q Before you get to that -- to your knowledge are you the first homicide detective to actually investigate this case?

A That's correct.

Q You're familiar with the detectives who have worked it before?

A Yes.

Q Detective Hairston?

A Yes.

Q Do you recall what unit he worked in?

A Detective Harrison worked in the City of Newark Youth Aid Bureau.

Q At that time?

A At that time.

Q And Detective Conte?

A Detective Conte was also assigned to the City of Newark Youth Aid Bureau.

Q Scott-Bey?
A Detective Scott-Bey was assigned to that unit as well.
Q Are you familiar with Tahaney and Ramos?
A Detective Tahaney and Ramos were also assigned to the City of Newark Youth Aid Bureau.
Q What does the youth aid bureau do?
A Youth aid bureau was responsible for dealing with any incidents involving juveniles within the City of Newark, and they were also responsible to investigate reports of missing persons.
Q How long had the cold case squad been in existence when you were given this assignment, if you recall?
A It was in existence for at least five to six months.
Q Now, when you were given this assignment, you indicated you spoke to one of the -- a sister of Michael McDowell, Teresa Lawson; is that correct?
A That's correct.
Q What persons were you investigating with regard to this missing person's case?
A If I can refer to my report for the names.
Q Yes.
A We were concerned about Mr. Melvin Pitman,

Mr. Alvin Turner, Mr. Ernest Taylor, Mr. Michael McDowell, as well as Mr. Randy Johnson.

Q These individuals were juveniles at the time of their disappearance?

A That's correct.

Q Do you recall on what day they were reported to have disappeared?

A August 20th of 1978.

Q Now, at some time did you have a meeting with Miss Lawson?

A Yes, I did.

Q And the individuals that were concerned?

A That's correct.

Q When did that meeting take place?

A That meeting took place on October 12, 1998.

Q Do you recall what police officers attended that meeting?

A I attended the meeting, along with my partner, Detective Sheppard, and Captain Vincent Gagliano.

Q These individuals were from what unit?

A Detective Sheppard and I were assigned to the homicide cold case squad and Captain Vincent Gagliano was the commander of that unit.

Q That's of the homicide unit?

A That's correct.

Q Do you recall where the meeting took place?
A A meeting took place, I believe it was at 205 Vassar Avenue. That was the house of the aunt of Mr. Michael McDowell.
Q Do you recall if it was 205 or 206?
A It could have been 206 Vassar Avenue.
Q Do you recall who attended the meeting?
A I would have to refer to my report for that.
Q If you could, sir.
A On the date of meeting we spoke to Miss Yvonne Beachum Johnson, she's the sister of Mr. Randy Johnson; we spoke to Teresa Lawson, who is the sister of Michael McDowell; Miss Hellen Simmons, who is the aunt of Michael McDowall; Shavonne Beachum, the niece of Randy Johnson; Lillie Williams, she is the mother of Melvin Pitman; and Ernest Taylor, the father of Ernest Taylor, who was also one of the missing boys.
Q What was the substance the meeting?
A The meeting was about my partner and I -- the family requested that my partner and I look into the matter of the disappearance of their loved ones. They provided us with certain information as it relates to the events surrounding their disappearance in 1978.
Q At the time of this meeting, which was October 12th of 1998, did they indicate to you who the

last person that they knew to have been seen with their loved ones?
A Yes, they did.
Q Who did they say?
A According to the family, they all knew their loves ones was last seen with a gentleman by the name of Lee Evans, who they also called Big Man.
Q Did they provide a description of this person to you?
A Yes, they did.
Q Now, armed with that information that you obtained at that initial interview -- strike that. Let me ask you this question first.
Did anyone that you spoke to at that initial meeting indicate that they knew what happened to their loved ones? I mean in terms of whether they were alive or dead.
A The only information that they really provided us was the fact that they were last seen with Mr. Evans, and they also said they believed that he was responsible for their disappearance.
Q But not their death; is that true?
A They did make a statement that he was responsible -- they believed him to be responsible --
THE COURT: Mr. Guarino, I don't know who is

speaking. I don't know who he is quoting from, I don't know if they are testifying. I think you should tighten up the questions.

Q At the time you initiated your investigation, did you have any information from which you could conclude the boys were dead?

A Based on the information I received at the meeting, yes.

Q You did?

A Yes.

Q As a result of that, what did you do?

A As a result of that meeting, my partner and I, we gathered up all the information that was put together in 1978.

Q And whose reports did you review at that time?

A We reviewed the reports of Detective Hairston, Detective Scott-Bey, Detectives Tahaney, I believe, and Ramos, I believe Detective Conte may have also submitted reports.

Q Was there a Detective Pabon? Does that name sound familiar, Vincent Pabon?

A Right.

Q Now, after you reviewed the reports, did you attempt to interview the persons who -- or did you

determine who appeared to be witnesses to these events?
A Based on the information that was in the report, we developed at list of people we believed to be witnesses, or people that we believe would have pertinent information to the investigation.
Q And who was the first person that you interviewed?
A The first person we interviewed was Miss Shavonne Beachum.
Q When was that?
A I believe -- if I can refer to my report, I believe Miss Beachum may have been interviewed on October 13th -- or re-interviewed on October 13th.
Q So around that time of -- that was in what year?
A 1998.
Q You interviewed Yvonne Beachum?
A Shavonne.
Q I'm sorry, Shavonne Beachum.
A Correct.
Q Who did you interview next?
A I need to refer to my report for that.
Q Yes, you may.
A (The Witness complies.)
I believe we spoke with Miss Lillie Williams.

Q Who is Lillie Williams?
A Lillie Williams is the mother of Melvin Pitman.
Q Going back for a second, did you take a formal statement from Miss Shavonne Beachum?
A Yes, we did.
Q Is that Yvonne?
A Shavonne.
Q Shavonne Beachum. There was a statement recorded from her?
A That's correct.
Q Did you take a statement from Miss Yvonne Beachum?
A No, we did not take a statement from Miss Yvonne Beachum.
Q Did you interview her?
A Yes, she was interviewed.
Q Who is the next person that you interviewed?
A The next person I interviewed was Miss Lillie Williams. A statement was not obtained from Miss Williams, but she was interviewed.
Q After you spoke to Miss Lillie Williams, did you receive from her the name of an individual by the name of Robert Cutler?
A That's correct.
Q And did you make arrangements to speak to

Robert Cutler?

A Yes, we did.

Q Based on your investigation, who was Robert Cutler with regard to this investigation?

A Robert Cutler, we found that Robert Cutler was a friend of the five missing individuals that we're talking about. In fact, we found that he was a very close friend of theirs.

Q And where was he when you learned about Robert Cutler?

A He was at Trenton State Prison.

Q And did you meet with Mr. Cutler?

A Yes, we did.

Q And did Mr. Cutler give you a statement?

A Yes, he did.

Q Now, based on the information that Mr. Cutler gave you, what did you do next?

A Based on Mr. Cutler's information, his information directed us to -- or back to the Williams house to speak to Mr. Kip Williams, who is the brother of Mr. Melvin Pitman.

Q And did you conduct an interview and obtain a formal statement from Mr. Booker Kip Williams?

A That's correct, we did.

Q When was that?

A We took a statement from Mr. Kip Williams January 18th of 1999.

Q Now, during the interview of Mr. Williams did the name of Maurice Olds come up?

A Yes.

Q Did you identify who Maurice Olds was in this investigation?

A Yes.

Q Who was Maurice Olds?

A We found that Maurice Olds was the cousin of Mr. Lee Evans.

Q And did you attempt, ever attempt to talk to Maurice Olds?

A Yes, I did.

Q And why was that?

A Based on the information that we received from Mr. Williams, we deemed it necessary to have a conversation with Mr. Olds.

Q Do you recall when you spoke to Mr. Olds?

A I would have to refer to my reports.

Q If you could.

A (The Witness complies.)

February 15, 1999, I had a conversation with Mr. Maurice Woody Olds.

Q Did Mr. Olds tell you anything that added to

your knowledge about this case?
A Yes, he did.
Q Now, prior to speaking to Mr. Olds in January, did you speak to anyone else, in 1999?
A Yes, we spoke to Miss Cathy Canady. I believe we also spoke to a Mr. Darryl Green, and I believe we spoke to a Mr. Jillie Williams, I believe.
Q Jillie Williams, or Wilson?
A Wilson.
Q Now, when you spoke to these individuals, how were their statements taken?
A Their statement was taken in a question/answer form by typewriter. The way it works is that I'll ask a person the question, they'll give me the answer. Whatever answer they give me, I type it down exactly the way they say it to me.
Q When you ask in that format, who asks the question --
A I'm sorry, I didn't hear the question.
Q When you do a statement in that format, who actually asks the question?
A The person that takes the statement.
Q I'll go through individually. Who types the answers?
A The person that's taking the statement.

Q And the person who is answering the questions, are they given an opportunity to read their answers?
A Yes, they are.
Q And is that your usual practice with every statement, to allow the person that gave the statement to read the answer?
A Yes, it is.
Q And then what do you have them do with regard to once they've read the questions and read the answers?
A Once they read their statement, and that's for the purpose of making sure that there's, you know, no incorrections or anything like that, and if they are, they would initial the area they don't agree with. If they agree with the statement, then they put their signature at the bottom of it.
MR. GUARINO: Judge, I'm going to show S-82 for Identification to the defendant.
Q Detective, I'm showing you what's been marked as S-82 for Identification and ask you if you recognize that?
A Yes.
Q And what is that?
A This is a City of Newark Police Department

statement form. This particular statement here is from Kip Williams.

Q When was it taken?

A This statement was taken January 18, 1999.

Q By whom?

A And the statement was taken by me.

Q Where was it taken?

A This statement was taken at my office.

Q And who asked the questions?

A I did.

Q And after you were done asking Mr. Williams those questions, did you ask him to review the document?

A Yes, I did.

Q And did you ask him to sign the document?

A Yes, I did.

Q Where did he sign the document?

A He signed the document at the bottom right-hand corner.

Q Every page?

A Yes, every page.

Q And at the end of that statement, what was the last question you asked?

A You swore or affirm that the information in the statement is the truth?

Q And what did he indicate?
A He said yes.
Q When you take statements from individuals, is that your custom or habit at the end of each statement, you ask them to swear or affirm that the statement is the truth?
A That is correct.
Q I'm going to show you what has been marked as -- I'm going to show S-97 for Identification to the defendant, Judge.
THE COURT: Did you say S-97?
MR. GUARINO: S-97.
THE COURT: What's the one you're handing back?
MR. GUARINO: This is -- these are his notes, which he can hold onto. The one he handed back, Judge, was S-82.
THE COURT: Okay. Thanks.
Q Detective, the number on the exhibit you were just handed --
A Yes.
Q That was S --
THE COURT: Ninety-seven.
MR. GUARINO: Ninety-seven. Thank you, Judge.

Q Do you recognize S-97?
A Yes, I do.
Q What is it?
A This is also a City of Newark Police Department statement form.
Q Who was that statement taken from?
A This statement was taken from Mr. Darryl Green.
Q When was it taken?
A The statement was taken February 9, 1999.
Q Who took it?
A Detective Keith Sheppard took the statement.
Q Were you present when the statement was taken?
A Yes, I was.
Q Did you ask Mr. Green to -- or Detective Sheppard, in your presence, did you ask Mr. Green to review the statement after he gave it?
A Yes, I did.
Q How did he indicate that he reviewed it?
A I don't understand.
Q How did he indicate that he had reviewed his statement?
A He indicated that he reviewed it by signing, putting his signature at the bottom right-hand corner of the statement.

Q And he signed every page?
A Yes, he did.
Q Did he also swear or affirm that was the statement that he gave at that time was the truth?
A Yes, he did.
MR. GUARINO: I'm going to show S-91 to the defendant, for Identification, Judge.
Q Detective, I'm showing you what's marked as S-91 for Identification. Do you recognize that?
A Yes, I do.
Q What is it?
A This is a City of Newark Police Department statement form.
Q Who gave that statement?
A This is a statement that was taken from Mr. Jillie Wilson.
Q Who did he give a statement to?
A He gave the statement to me.
Q And after that statement was completed, did Mr. Wilson review his statement?
A Yes, he did.
Q And how did he indicate he reviewed it?
A He put his signature at the bottom right-hand corner of the statement.
Q And did you ask him if that statement -- to

swear or affirm that that statement was the truth?
A Yes, he did.
Q Did he indicate it was?
A Yes, he did.
Q Did he sign his name to the back?
A Yes, he did.
Q I'm going to show you what's been marked as S-83 for Identification. I'm sorry, I'm showing it to the defendant, Judge. S-83.
Detective, I'm showing you what is marked S-83 for Identification and ask if you recognize that document?
A Yes, I do.
Q What is it?
A This is a City of Newark Police Department statement form.
Q Who was that a statement from?
A This is a statement from Shavonne Beachum.
Q And who is that statement given to?
A The statement was given to me.
Q Where was it taken?
A This statement was taken at Mrs. Beachum's home.
Q Who was present with you when you took that statement?
A Detective Sheppard.

Q And did Miss Beachum answer questions?
A Yes, she did.
Q And did you give her an opportunity to review the report?
A Yes, I did.
Q Did she indicate that she reviewed it?
A Yes, she did.
Q How did she do that?
A She placed her signature at the right-hand corner of the statement.
Q Did ask you her to swear or affirm that the statement was the truth?
A Yes, she did.
Q How did you do that?
A She -- swear or affirm. She affirmed that the information in the statement was the truth and the conclusion of that, she put her signature at the bottom right-hand corner on each page.
MR. GUARINO: I'm going to show to the defendant, Judge, what's marked as S-90 for Identification. I'm showing it to the defendant, Judge.
I'm showing to the witness S-90 for Identification.
Q Detective, do you recognize S-90?

A Yes, I do.
Q What is it?
A This is a City of Newark Police Department statement form.
Q Who is it a statement from?
A This is a statement from Cathy Canady.
Q Who took that statement?
A I took the statement.
Q When did you take it?
A The statement was taken January 28, 1999.
Q Where did you take it?
A This was taken at my office.
Q Did Miss Canady have a chance to review her statement?
A Yes, she did.
Q Did she indicate that she reviewed each page of the statement?
A Yes, she did.
Q How did she do that?
A She did that by placing her signature at the bottom right-hand corner on each page.
Q And did you ask her if she would swear or affirm that her statement was the truth?
A Yes, I did.
Q Did she do that?

A Yes, she did.

Q Did she sign the last page?

A Yes, she did.

MR. GUARINO: I'm going to show to the defendant what's marked as S-78 for Identification.

Q Detective, I'm showing you what's marked as S-78 for Identification. Do you recognize that document?

A Yes, I do.

Q What is it?

A This is a City of Newark Police Department statement form.

Q Who is it a statement from?

A This statement is from a Mr. Robert Lee Cutler.

Q When was that taken?

A January 6, 1999.

Q Do you recall where it was taken?

A This statement was taken at Trenton State Prison.

Q Who was present?

A Detective Sheppard was present, and I was the person that took the statement.

Q Now, you said you took several of these statements at people's houses and you took this statement at the State prison. How did you prepare the statement? How did you do your typing?

A Portable computer. Had a portable computer, or laptop computer with a portable printer that I normally carried around in a bag. If I had to travel, I would normally take those pieces of equipment with me. The statements are printed out immediately after -- after the statement. The individual who gave the statement is given the opportunity to review it and make any correction, if necessary, and that's how it was done.

Q Now, did you give Mr. Cutler the opportunity to review his statement?

A Yes.

Q And did he do so?

A Yes, he did.

Q How did he indicate to you that he reviewed his statement?

A By placing his signature at the bottom right-hand corner of each page.

Q Did you ask Mr. Cutler if he would swear or affirm that that statement was the truth?

A Yes, I did.

Q Did he?

A Yes, he did.

Q Did he sign the last page?

A Yes, he did.

MR. GUARINO: I show to the defendant, Judge,

what's been marked as S-87 for Identification.
Q Detective, I'm showing you what's been marked as S-87 for Identification. Do you recognize that?
A Yes, I do.
Q What is that?
A This is a City of Newark Police Department statement form.
Q And whose statement was that?
A This is the statement that was taken from Mr. Rogers Taylor.
Q When was that taken?
A This statement was taken February 16, 1999.
Q Who took the statement?
A I did.
Q Who was present with you?
A I believe Detective Sheppard was present with me.
Q Now, after you took that statement, do you recall where it was taken?
A This statement was taken at my office.
Q And after the statement was given, did Mr. Rogers Taylor have the opportunity to review his statement?
A Yes, he did.
Q And how did he indicate he reviewed his statement?

A He placed his signature at the bottom right-hand corner of the statement on each page.

Q Did you ask Mr. Rogers Taylor if he would swear or affirm that that statement he gave you was the truth?

A Yes, he did.

Q Did he do so?

A Yes, he did.

MR. GUARINO: I'm going to show to the defendant at this time, Judge, what is marked as S-79 for Identification.

THE COURT: Could I see you over at sidebar for a moment here, everybody?

(Sidebar discussion out of the jury's presence.)

Q Detective, I'm going to show you what is marked as S-79 for Identification. Do you recognize S-79, Detective?

A Yes. This is a City of Newark Police Department statement form.

Q And who was it taken of?

A This is a statement taken from Mr. Marvin Hall.

Q When was it taken?

A February 15, 1999.

Q Who took that statement?

A Detective Keith Sheppard.

Q Were you present when that was taken?
A Yes, I was.
Q Where was it taken?
A Taken at our office.
Q And was Mr. Hall allowed to review that statement?
A Yes, he was.
Q And did he indicate that he reviewed each page by signing it?
A Yes, he did.
Q Did he indicate whether or not he swore or affirmed that the statement was true by signing the last page?
A Yes, he did.
MR. GUARINO: I'm going to show you what is marked -- I'm going to show to the defendant, Judge, what is marked S-85 for Identification.
I'm showing the witness what is marked S-85 for Identification.
Q Detective, do you recognize what's been marked as S-85 for Identification?
A Yes, I do.
Q What is that?
A City of Newark Police Department statement form.
Q And who was it a statement of?

A This is a statement from Teresa Lawson.
Q Who took that statement?
A I took the statement.
Q When did you take it?
A April 11, 2000.
Q Where was it taken?
A At my office.
Q Did Miss Lawson have the opportunity to review her statement?
A Yes, she did.
Q And did she indicate that she reviewed the statement by signing each page?
A Yes, she did.
Q And did you ask her if she swore or affirmed that that statement was true, and did you ask her to, if she agreed to it that it was true, that she would sign the last page?
A Yes, I did.
Q Did she do that?
A Yes, she did.
Q Detective, to your recollection or knowledge, were there any other detective statements which you were able to review that were taken in the question and answer format that you used?
A No.

Q I'm going to show you a statement which I'll show to the defendant what is marked S-86.

I'm showing you what is marked S-86 for Identification. Do you recognize that document, sir?

A It's a City of Newark Police Department statement form.

Q What is it?

A This is a statement that was taken from Miss Cathy Turner.

Q And who took that statement?

A I took this statement on May 24, 2000.

Q Where?

A At my office.

Q And did Miss Turner review her statement?

A Yes, she did.

Q Did she sign each page?

A Yes, she did.

Q You asked her, as you usually did, did she swear or affirm that statement was the truth?

A That's correct.

Q Did she sign that page?

A Yes, she did.

Q Now, Detective, what was the purpose of you going through all these witnesses that you interviewed and typing up their statements in the Q and A fashion?

Why did you do that?
A Based on the information that we had received already as relates to the initial investigation, each one of these individuals had information that we felt was very important to the successful conclusion of the investigation.
Q And is it a common practice of homicide detectives to use -- at that time -- to use the Q and A format, or the question and answer format?
A That's correct.
Q Now, at some point were you able to or did you learn of the identity of a person by the name of Philander Hampton?
A Yes.
Q And do you recall if you were ever able to locate or speak to Philander Hampton?
A Yes, we did locate Mr. Hampton and we did speak with him.
Q When was that?
A That was in 1999.
Q Do you recall what month?
A No, I don't. I'll have to refer to my reports.
Q Could you?
A (The Witness complies.)
That was February 24, 1999.

Q Prior to February 24, 1999, had you spoken to Maurice Woody Olds?
A Yes, I did.
Q Who was Maurice Woody Olds?
A Maurice -- Mr. Olds is the cousin of Lee Evans.
Q And you located and spoke to Mr. Olds before you spoke to Mr. Hampton; is that true?
A That's correct.
Q What was the substance of your discussion with -- first of all, when did you talk to Mr. Olds?
A I believe that was in 1999 as well.
Q Do you recall the date?
A No, I don't.
Q Could you refresh your recollection with your report, if possible? Referring to page eight.
A Page eight?
Q Yes.
A February 15, 1999.
Q And you indicated he was who?
A Mr. Olds was the cousin of Mr. Lee Evans.
Q Why did you want to talk to Mr. Olds?
A I'm sorry?
Q Why did you want to talk to Mr. Olds?
A Mr. Olds' name was mentioned in the initial reports that was prepared in 1978, and it was our

intention to see if we could locate anyone the police spoke to in 1978.

Q In February 1999, when you interviewed Mr. Olds, what happened?

A We developed information from Mr. Olds that lead us to have an interest to speaking to Mr. Philander Hampton.

Q Did you attempt to take a formal statement from Mr. Olds, as you had your other witnesses?

A Yes, we did.

Q What happened?

A He refused to give a formal statement.

Q Do you know where Mr. Olds is today?

A Mr. Olds --

MR. ADETULA: Judge, can we go to sidebar, please?

THE COURT: Come on over.

(Sidebar discussion out of the jury's presence.)

THE COURT: Do you want to repeat the question?

MR. GUARINO: Can I rephrase it, Judge?

THE COURT: Sure.

Q Detective, do you know if Mr. Olds is alive or dead at this time?

THE COURT: Yes or no?

A Yes.
Q What is it?
A He's deceased.
Q Thank you.
Now, you indicated that on February 24, 1999 you located Mr. Philander Hampton. Who is Mr. Philander Hampton?
A Philander Hampton is another cousin of Mr. Evans.
Q Why did you want to talk to Mr. Hampton?
A The information we received in the investigation suggests to us -- or suggested that we should speak to Mr. Hampton.
Q Did Mr. -- when you say you located him, did Mr. Hampton indicate that he would speak with you?
A Yes.
Q Did you ask him if he would give a formal statement in the format that you had used with the other witnesses?
A Yes, we did.
Q Did he wish to do so?
A He refused.
Q Now, although he did refuse to give a formal question and answer statement, he did speak to you; is that correct?
A That's correct. He did refuse to give a formal

statement but he did give an interview.
Q Do you recall how long that interview lasted?
A I don't know. Around 45 minutes, an hour at most.
Q And did he indicate whether or not he had information or knowledge of the boys?
A He denied having any knowledge of the disappearance of the boys, however, during the interview we noticed some conflicting response to our questions.
Q And at this point in time was Mr. Hampton -- how was he being treated? What was he, in your investigation? Was he a suspect or a witness?
A No, he was not a suspect.
Q Did that change during the course of your interview?
A Yes, it did.
Q Why did it change?
A Based on the conflicting responses to our questions, in my mind, as an investigator, he became a suspect. As a result of that, he was advised of his Constitutional rights.
Q Once you had to advise him of his Constitutional rights because he shifted from being a witness to a suspect, what happened?
A We continued the interview. And during the

interview he said to me that if he was to confess to this particular matter, that his life would be over.

Q And after -- what happened to the interview after he said that?

A Well, we continued to talk, and that was as far as we got with Mr. Hampton. We had no reason to hold him for anything, so he was released.

Q After you spoke to Mr. Hampton, what did you do next?

A We continued the investigation.

Q How?

A By speaking to other individuals.

Q Those would be the persons whom we identified your statements that you took?

A Correct.

Q Now, at what point was your work on this case concluded?

A Somewhere around 2008.

Q Did there ever come a time when you were contacted by Rogers Taylor with regard to this case?

A Yes.

Q Why did Rogers Taylor contact you?

A Rogers -- he contacted me, as he would do over the course of the years, but this particular time he contacted me and he told me that Mr. Evans wanted to

have a meeting with him and myself.
Q And when did that occur?
A That occurred, if I can refresh -- I'm having difficulty finding it, but if you can direct me to the page you're interested in.
Q Would it refresh your recollection if I referred you to page 12?
A Okay. That was April 16, 2008.
Q And what happened on that date?
A I agreed to meet with Mr. Taylor at his home, where he was supposed to meet with Mr. Evans.
Q Do you recall when you arrived at Mr. Rogers Taylor's house?
A I'm sorry?
Q Do you recall when you arrived there?
A I don't recall the exact time but it was after 5 o'clock.
Q When you got there, who was there?
A Mr. Taylor was there, along with Mr. Evans.
Q Is Mr. Evans present in court today?
A Yes, he is.
Q Where is he?
A That's the gentleman sitting at the defense table.
Q What is he wearing?
A The pants suit.

MR. GUARINO: For the record, Judge, indicating Mr. Evans.

THE COURT: Yes.

Q When you arrived there with Mr. Evans and Mr. Taylor, what happened next?

A We engaged in conversation. Pretty much Mr. Evans engaged in conversation as to the direction in which the investigation was going.

Q Now, at this time Mr. Evans was not in custody, was he?

A No, he was not.

Q He was not under your arrest or anything like that, was he?

A No, he was not.

Q Was he free to leave at any time?

A Yes.

Q Did Mr. Evans understand he was free to leave?

A Mr. Evans called the meeting. I didn't call the meeting.

Q What happened next?

A Our conversation continued and he had some concerns about what I knew about the investigation, or what I knew about what took place, because he was having some issues with whatever problems he was having

with law enforcement. I explained to him the information that I developed as relates to a burglary that occurred at his house back in 1978. I explained how the burglary was committed and the individuals that was involved. As a result of that he became --

Q Did you explain to him how they entered his house?

A Yes, I did.

Q What did you tell him?

A I explained to him that I learned that during the time that his house was burglarized, it was burglarized by a few of the individuals that was missing. The smallest of the individuals, I explained to him, was Mr. Ernest Taylor, who would climb through his bathroom window and open the front door to allow the other individuals in. I explained to him that during the time that they burglarized his house they were taking marijuana from his house. I also explained to him that wasn't the only time they had burglarized his home, based on the information I got, that they had burglarized his home several times prior to that.

Q Did you tell him anything about this bathroom window during this burglary?

A Yes, I did.

Q What did you tell him?

A I told him Mr. Ernest Taylor, being the smallest of the boys, was put through the bathroom window because the others were too big to fit. He was small enough to get into the bathroom window.

Q And what happened next?

A What happened next is Mr. Evans told me that he saw that he knew -- he knew I knew what I was talking about, and he said something to the effect that he would like to talk to me, however, but there were other law enforcement who was making him feel uncomfortable, for whatever reason. And he says he was advised by someone just not to say anything. But he did say I knew what I was talking about, and he also made a mention this thing was bigger than Lee Evans.

Q Now, who terminated the conversation?

A Mr. Evans did.

Q And about how long did this conversation last?

A About 30 minutes.

Q And after the conversation was done what happened?

A I gave him my cell phone number and I told him if at any time in the future he decides he wants to talk, he can reach out for me at any time.

Q After that conversation did you ever have any

other meetings with Lee Evans?
A Yes.
Q When did that occur?
A That occurred, again, sometime in 2008. Mr. Evans reached out for me, wanted to meet with me at a Dunkin' Donuts located in Newark on Lyons Avenue.
Q As a result of that, when you say "reached out," how did he reach out?
A By my cell phone.
Q After you -- did you speak to Mr. Evans on the cell phone?
A Yes, I did.
Q Did you meet with him as a result of that cell phone call?
A Yes, I did.
Q Where did you meet?
A I met him at his choice of locations, Dunkin' Donuts on Lyons Avenue in Newark.
Q Do you recall if you had any conversation with Mr. Evans at that time?
A Yes, I did.
Q What was it?
A Again, Mr. Evans wanted to know the direction the investigation was going.
Q At any time did Mr. Evans ever indicate to

you that he wanted to tell you his side of the story?
A No, he didn't.
Q Did he ever indicate to you that he had any side of the story?
A No, he did not.
Q Did he indicate -- did he try to do anything other than try to elicit information from you?
A It appeared to me he was only interested to know the direction the investigation was going. That's the way it seemed to me.
Q If Mr. Evans had indicated that he wanted to talk to you about the case, would you have listened?
A Absolutely.
MR. GUARINO: Judge, could we take a break?
THE COURT: Sure. We'll get a 15 minute break a little earlier. We'll be back at 2:30. Don't discuss the case. Go to the jury room. We'll be back at 2:30.
(Whereupon the Jury is excused.)
(Off the record.)
THE COURT: Bring out the jury.
(Whereupon the Jury is brought in.)
Q Detective Sabur, when was the last time you heard from Mr. Evans?
A About maybe a week or two weeks ago.

Q Can you explain what happened?
A What happened was, I realized that I had a voicemail, a voice message on my cell phone. And I also have Mr. Evans' number logged in my cell phone. I looked at the phone and it shocked me that he would call. So I played the message back, and he obviously thought that I was somebody else that he know by the name of Rashid, because he didn't refer to me as Detective Rashid or Detective Sabur, he referred to whoever he wanted to talk to as Brother Rashid.
Q What was the message that he left for Brother Rashid?
A The message was about a meeting that was going to be held at 971 Clinton Avenue the very next day, due to the message coming in, and he wanted this Brother Rashid to be there and bring a couple people with him. He didn't get into the details of what the meeting was about, but all I know, there was going to be a meeting at 971 Clinton Avenue.
Q Did he identify himself when he called you on the cell phone -- or when he meant to call the Brother Rashid, did he identify himself?
A Yes. He says, Brother Rashid, this is Lee Evans, and he proceeded to talk about what he was looking for Brother Rashid to do for him.

Q Did you recognize his voice?
A Yes, I did.
Q And after you received that call were you satisfied that it was in fact from Mr. Evans?
A Yes, I was.
MR. GUARINO: Judge, we have the technical people bringing it up to set a computer so that the phone call could be played. They should be on their way up.
THE COURT: Is that them?
MR. GUARINO: Yes.
THE COURT: Is it going to take long? We'll just sit here while they do it.
MR. GUARINO: Judge, where would you like it played from? There's electricity right here.
THE COURT: You're going to have to mark this.
(Off the record.)
THE COURT: Are you ready?
(Whereupon the telephone call is played.)
THE COURT: Okay. The record will reflect the recording was played. When we have an opportunity, you'll label that S-117.
Any other questions?
MR. GUARINO: No, Judge.

THE COURT: Was that the recording you heard on your cell phone?

THE WITNESS: Yes, Ma'am, it is.

THE COURT: Okay.

MR. GUARINO: Just for the record, so the Court is clear, what they refer to as a stick was a pretty fancy device. I thought it was a little stick that can go in a computer. We will mark the exhibit, download the exhibit on a disk, so it can be become part of the record, and the disk will be S-117.

THE COURT: We'll discuss at the break if that's sufficient because that's what you decided to play. Hold on now.

MR. EVANS: It was clearly stated that I made a wrong error in the number.

THE COURT: Yes.

MR. EVANS: I didn't call him direct or nothing.

THE COURT: Understood. It was an accident.

MR. EVANS: Yeah.

THE COURT: Do you have any questions, sir?

MR. EVANS: He is finished?

THE COURT: Yes.

CROSS-EXAMINATION BY MR. EVANS:

Q Good evening, Detective.

A How are you, sir?

Q Great. Great. I'd like to go back on a few things.

When you took the statement from Miss Shavonne Beachum --

A Yes, sir.

Q What was the time?

A I'm sorry?

Q What was the time?

A That she gave the statement?

Q No, the time she was involved with me.

A According to her, she was about maybe seven years old at the time.

Q I understand her age. But seven years, she was seven years old and she had a four year old sister, or three year old sister helping me move, right?

A I believe that's what she said in the statement.

Q Right. What I'm saying, what time was it when she was helping me? What time of the day? I understand it's the 20th. It was Sunday. That's established already. What time was it?

A I understand what you're saying. I would have to refer to her statement to see if she referred to a time. I do recall her saying it was the early part of the day that she, along with a couple family members,

went with her uncle to help you move some boxes.

THE COURT: Do you want to see the statement to help you refresh your memory?

THE WITNESS: Yes, Ma'am.

THE COURT: If you want to show him, it's D-72.

MR. EVANS: D-72?

THE COURT: Yes. Or you can pull out your copy, Mr. Guarino. Either way.

MR. GUARINO: Judge, for the record, that would correlate to S-83 of our records, to facilitate this.

THE COURT: Yes. Take a look at that. You're talking about Shavonne's statement, right?

MR. GUARINO: Yes.

THE COURT: Take a look at that. That's D-71. Seventy-two was Yvonne. This is Shavonne. Take a look at that and see if it indicates what time she says the event took place.

THE WITNESS: Okay. I asked her a question, was this during the night, speaking of her being with her uncle to move boxes. And she said it was during the daytime. She never gave me an exact time. She just recalled it being during the daytime.

Q During the daytime?

A Correct.

Q That means after 12?

A I couldn't give you an exact time because she didn't give me one. She said it was during the daytime.

Q Okay. What time did the mother, her statement, what time was she in the presence of Randy and -- Randy Johnson, her brother, and Ernie Taylor, came to her house on Sixth Street?

A I'm sorry, sir, I don't follow your question.

THE COURT: That's Yvonne's statement?

MR. EVANS: Yes, Yvonne.

THE COURT: Now we're on S-72.

THE WITNESS: That's Yvonne?

THE COURT: Yes.

THE WITNESS: I didn't take a statement from Yvonne. I took a statement from Shavonne Beachum.

THE COURT: You're looking for Yvonne's statement?

MR. EVANS: Yes.

THE COURT: Do you have a copy of it there? You have it marked with a different number. You have it marked as S-84. Do you have it available?

MR. GUARINO: Yes, Judge.

MS. CUCINELLO: But it wasn't this detective

that took the statement.

THE COURT: I know. You don't have your copy?

MR. EVANS: I know the time.

THE COURT: He can't answer a question about a statement he didn't take. You'll have to ask that detective the question. Someone else took her statement.

MR. EVANS: Okay.

Q Miss Lillie Williams, what time was her statement that the last time she took her son?

A I didn't take a statement from Miss Williams, however, I did conduct an interview with her. I don't recall her giving me a time, the time of day she saw her son.

Q Yeah.

A I recall the last time she recalls seeing her son was the day before he went missing.

Q Right. That's 1:30?

A I'm sorry?

Q That's 1:30 p.m., right?

MR. GUARINO: Objection, Judge. That was a statement. Is it a statement or question?

THE COURT: He said it was 1:30 p.m..

THE WITNESS: I don't follow the question.

THE COURT: Do you have your report where you interviewed her, and does it say the time she last saw her son the day before he went missing, and give the number of what you're looking at.

THE WITNESS: I'm on page four, where we came in contact with Miss Lillie Williams.

THE COURT: Page four of S-45?

THE WITNESS: Okay.

THE COURT: Okay. Does it tell you in there what time Miss Williams said she saw her son the day before he was missing?

THE WITNESS: No, Ma'am, it doesn't.

THE COURT: It's not in her interview?

THE WITNESS: No.

Q Okay. You interviewed Bob Cutler?

A That is correct.

Q And what time -- what time -- the last time he was with the boys, seen, before they came missing, when was the last --

A If my memory serves me correctly, he says during the evening, I believe it was the day before. I believe he says he may have seen them like around 11:30 p.m. the night before.

Q The night before?

A I believe that's what he said.

Q Isn't it true you went back and forth with him? He thought it was the 19th, and you said no, it was the 20th? Isn't that true?
A No, I don't think that's true, sir.
Q Is it true also -- is it true also Mr. Cutler told you the boys went missing the same time they broke into a property, the same night, on the 20th?
A I would have to refer to Mr. Cutler's statement to confirm your answer -- or your question.
Q That's the statement you took in Rahway State Prison?
A Trenton State Prison.
Q No, Rahway.
THE COURT: That's D-63, right?
Q You took two statements, you didn't take one. You have two statements.
THE COURT: Correct?
THE WITNESS: No, Ma'am. That's incorrect.
MS. CUCINELLO: Judge, to clarify, this detective took one statement. If you want to help facilitate, we'll provide S-78.
THE COURT: You took the statement at Rahway or Trenton?
THE WITNESS: I took the statement at Trenton State Prison in 1999 from Mr. Robert Cutler, and that

was the only statement I took from him.

THE COURT: That's S-78 A.

Q Who is the unidentified male?

A I'm sorry, I don't follow you, sir.

Q In statement here.

THE COURT: Show him a copy. This is the Trenton State?

MR. EVANS: This is the Rahway.

THE COURT: You're showing him a document. You didn't take the statement. Were you present when someone else took the Rahway State Prison, the statement?

THE WITNESS: No, Ma'am, I was not.

MR. EVANS: Isn't it -- your Honor, here's a transcript with no name on it, the unidentified male.

THE COURT: What's the document number, though? On the blue tag.

MR. EVANS: It's D-63 B.

THE COURT: B?

MR. EVANS: B.

THE COURT: Do you have a copy of that one?

MS. CUCINELLO: Yes, Judge. I provided that one.

THE COURT: What's that called?

MS. CUCINELLO: S-78.

THE COURT: Who took this statement?

MR. GUARINO: This statement was taken by Detective Sabur on January 6, Judge, 1999.

THE COURT: Are you looking at the same document?

MR. EVANS: No. We're talking about June 19, 2008.

MR. GUARINO: I think he's talking about -- he is talking about a different statement, Judge, taken by someone else.

THE COURT: Who took that one? The June 19th of '08.

MR. GUARINO: Judge, could we be heard at sidebar?

THE COURT: Is it unidentified?

MR. GUARINO: It says unidentified male.

THE COURT: Okay. Show it to him and see if he recognizes it.

I'm going to show you S-69 A, which is a statement taken --

MR. EVANS: I have a copy.

THE COURT: You want to show it to him and see if he recognizes it?

I'm going to show you S-69 A, which is a statement of Robert Cutler, which was taken on June 16,

at the Trenton State --

MR. EVANS: That's Rahway, your Honor.

THE WITNESS: Again, I took one statement from Mr. Cutler in 1999. I couldn't tell you who interviewed him in 2008, in June.

MR. EVANS: Your Honor --

THE COURT: Your statement was taken, repeat for me, where?

THE WITNESS: 1999, at Trenton State Prison.

THE COURT: Do you know who took that statement?

THE WITNESS: No, Ma'am, I do not.

MR. EVANS: We need to find out the officer that took the statement.

THE COURT: I'm going to have them do that at the break.

MR. EVANS: Okay.

Q Detective Sabur, how did you discover the break-in of my place?

A By interviewing individuals who my partner and I seeked out, based on the information that was put in the initial incident report, or reports, from 1978. As a result of that, we gathered the names of those individuals that we felt we needed -- needed to be spoken with that we feel would be crucial in the

success of the investigation.

Q And who was the individuals?

A I believe we spoke to Miss Cathy Canady, we spoke to Mr. Robert Cutler, and we spoke to Mr. Kip Wilson, I believe his name is.

Q Yes.

A And as a result of their information, that's how we concluded that your apartment was broken into.

Q You concluded? That's as far as you went?

A I'm sorry?

Q That's as far as you went with your investigation?

A That's in 1998. We couldn't do a burglary investigation then because all evidence was gone.

Q So did they ever do a burglary investigation?

A I have no idea what they did in 1978.

Q No, I'm talking about with you, in your investigation.

A You got to -- I'm not clear what you're asking.

Q I'm trying to get to the point of how did you get to the information that somebody broke into my place, into my apartment in '78.

A Okay. I got that.

Q August the 20th.

A One individual, which is Cathy Canady, who

implicated herself being there during the time your apartment was broken into, she pretty much gave us the information. Now, the only way a burglary report would have been done, back in 1978, is if you had reported it to the police.

Q That's the only -- that's the only witness you had?

A I'm sorry?

THE COURT: Is that the only witness you had, about a burglary, Cathy Canady?

THE WITNESS: That was the only person that was there at the time of the burglary, yes.

Q And what was told on the process of the burglary?

THE COURT: By Canady?

MR. EVANS: No, his final conclusion.

THE WITNESS: I'm sorry, I don't -- I don't follow you.

Q How it was committed? How the burglary was committed.

A Oh. According to our information, the burglary was committed by a few of the individuals who turned up missing. One of the individuals, who we identified as being Ernest Taylor, was the smallest of the group and he was the only one that was able to fit through the

bathroom window of Mr. Evans' apartment. It was to our understanding that once Ernie Taylor was helped through the bathroom window, he opened the door for the other boys, who went inside and stole whatever it was that they were looking for.

Q Isn't it also true that you announced to the grand jury that you had new motive? That was July; July 9th, 2010?

A I'm sorry, I don't follow your question.

Q All right. May the 13th grand jury didn't go through. You took -- you went to the grand jury May 13, 2010.

A Okay.

Q What happened from that date?

A Well, the way grand jury works is that we go to grand jury, and the same thing that we're doing here, we state the case to the individuals that listen --

THE COURT: The question is, what happened May 13th?

THE WITNESS: I still don't follow the question.

THE COURT: Did you make another appearance after May 13th?

THE WITNESS: To grand jury?

THE COURT: Yes.

THE WITNESS: No.

Q Okay. You didn't make another appearance July, July the 9th?

THE COURT: Of 2010.

Q Of 2010?

A I recall going to grand jury for this matter once.

Q July. July the 9th, you made a statement that we got a new motive and the new motive is burglary. You don't remember that?

A Mr. Evans, I don't follow your question. And as a result of grand jury proceedings, yes, we did find a motive.

Q No. I'm talking about you went to grand jury July the 9th and said you had a new motive, right? July 9th I'm talking.

A I don't recall being in grand jury July 9th. I don't recall the date being in grand jury. I do know that I appeared in grand jury and I expressed to the jurors the information which we gathered which brought us to the point for the grand jury to listen to.

MR. EVANS: I'd like for the detective to read this here.

THE COURT: What is it? What's the number?

MR. EVANS: This is D-82, grand jury, C.

THE COURT: I'm up to D-81 on my list.

That's D-82 --

MR. EVANS: C.

THE COURT: Okay. You show that to the Prosecutor. That's a grand jury transcript from July 9th of 2010?

MR. EVANS: Yes, from Detective Sabur.

THE COURT: Okay.

MR. EVANS: July 9th.

THE COURT: What part do you want him to read?

MR. EVANS: Everything. All three.

THE COURT: Three pages. Read it to yourself.

MR. EVANS: No, read it out.

THE COURT: The entire three pages?

MR. EVANS: The entire three pages.

THE COURT: Okay. First of all, do you recognize that as your excerpt of your grand jury testimony?

THE WITNESS: I see my name on it and it certainly looks like something that may have come from the grand jury. I can't actually represent this is from the grand jury unless you have the full document, what you have there.

THE COURT: Yes. What did you do, take the

pages apart?

MR. EVANS: Yeah. I just took the pages and gave him the pages.

THE COURT: You should keep the day together. What is that stack in your hand? What did you mark that?

MR. EVANS: This is the one DC -- I mean D-82 C. I took it loose for him to read from nine to 12. I pulled it out of there. He can take the whole stack.

THE COURT: The entire day is D-82 C?

MR. EVANS: Yes.

THE COURT: Take the whole day, and then go to whatever page you're on, which is page nine.

A (The Witness complies.)

Okay.

THE COURT: Page nine starts in the middle of a sentence. Where do you want him to start, the first full sentence?

MR. EVANS: Yes, the whole thing. Read out loud.

THE COURT: Start with the sentence that starts, "They had a list..."

THE WITNESS: I'm sorry, where do you see that?

THE COURT: The first full sentence, on line

three.

THE WITNESS: Okay.

"They had a list of several individuals that they had spoke with. They documented everything that these individuals had said to them, but at that time we found that no formal statements were taken from these individuals. However, the information that they had, it appeared to -- it appeared to us to be very, very good information. Just unfortunate that the information was not memorialized in the form of a sworn statement. We, in turn, relocated these individuals. In other words, we went back out to find these individuals. It took some time finding them. We found them, they were re-interviewed and statements were pretty much taken from them. In taking the statements, we were able to develop somewhat of a motive as it relates to the disappearance of the five boys and that motive was based on different activities that these young men had done for Mr. Evans."

THE COURT: "... with Mr. Evans."

THE WITNESS: "... with Mr. Evans. We also established a fact that they were in fact with Mr. Evans, that their last time on this earth. As time went on, we pretty much believed that these boys had expired somewhere. As time went on, we found out that

they were in fact with Mr. Evans and his cousin, that we identified, according to the initial report, as being Mr. Philander Hampton. They were the last two individuals that we believe were seen with them. In establishing that, like I said, several statements were taken. We backtracked the steps of these young men to the point where we brought Mr. -- we found Mr. Hampton. He was also re-interviewed, because initially Mr. Hampton was interviewed by the initial detectives. During the time that he was interviewed, he refused, at that time, to give a formal statement to us. However, he did say things to us --" I'm sorry my eyes are burning a little bit -- "... say things to us that alluded to the fact that he did have personal knowledge or intimate involvement as to the disappearance of the young men.

"If my memory serves me correctly, I remember during the interview he said to me during that time that if he was to confess to me about being involved with something like this, his whole life would be over. So of course --"

THE COURT: There's a question.

THE WITNESS: There's a question.

The question was that was, "I don't mean to interrupt, that was the statement that Philander

Hampton made directly to you?"

And I responded, "That's correct."

"QUESTION: Do you recall when he made that statement?"

My answer was, "That statement, I believe, was made back in 1989 or 1999. I would have to go to my reports to give the exact date and year. However, it was made during the time that we, my partner and I, initially got involved with the investigation."

The next question was, "Was that the first time, or one of the first times that you personally interviewed Philander Hampton?"

My answer was, "That was my first time having any personal contact with Mr. Hampton."

The next question is, "So to be clear, that occurred during your investigation and that was not a reference to the investigation or the previous investigator? That was your own work?

And I responded, "Right. That was information that my partner and I had developed from Mr. Hampton."

The next question, "Now, you indicated that you had -- you had -- there was -- the detectives developed a motive in this case. What was the motive that was developed during the initial investigation?"

My answer was, "Okay. What was found out during the initial stage of the investigation, that Mr. Evans had had what they believed to be marijuana in his apartment, and that also established the fact that these youths may have... " and that's it.

Q So that's July? July 9th, right?

MR. GUARINO: Judge, for the sake of the completeness of the statement, can we continue to page 12, where he finishes that sentence?

THE COURT: He doesn't have page 12 in front of him.

MR. GUARINO: I can give it to the Court.

THE COURT: Do you have any objection if he finishes the sentence?

MR. EVANS: Page 12?

THE COURT: He only has 11. He has nine, 10 and 11.

MR. EVANS: Twelve is there.

THE COURT: It might be in the big stack that's out of order. Do you have any objection to him reading the 12th?

MR. EVANS: No, no objection.

THE COURT: Give it to him and let him finish page 12.

"The fact is these youths may have... "

that's where you paused.

A "... may have burglarized Mr. Evans's apartment and stolen his marijuana."

THE COURT: Go ahead. Anything else?

MR. EVANS: Yeah.

Q That was July 9th?

A If that's when I went to grand jury, yes.

Q What happened to May 13th?

THE COURT: In the grand jury you mean?

MR. EVANS: Yes.

THE COURT: Were you in the grand jury on May 13th?

THE WITNESS: I only went to grand jury once.

MR. EVANS: Page 26, 15 to 21.

THE COURT: What's that?

MR. EVANS: This is D-82 A. This is grand jury, May the 13th. May the 13th, 2010.

THE COURT: Okay. Mare, hand that to the witness. Maybe you should give him back the other ones so they don't get mixed up. One of those is the Prosecutor's.

You have D-82 A for her?

MR. EVANS: Yeah.

THE COURT: Take your time.

Now you're going to look at D-82 A. Is that

the grand jury transcript from May 13th?

MR. EVANS: Yes, page 26.

THE COURT: Just a second. Is that the grand jury transcript from May 13, 2010?

THE WITNESS: Yes.

THE COURT: He wants you to look at page 10.
Is that your testimony?

MR. EVANS: That's page 26?

THE COURT: I'm sorry, page 26. Sorry.

MR. EVANS: Fifteen to 21. Read the whole page.

THE COURT: If it's his testimony.

MR. EVANS: Yeah.

THE COURT: That's also your testimony on that date?

THE WITNESS: Yes.

THE COURT: What lines?

MR. EVANS: Twenty-six you're on?

THE COURT: Twenty-six to what?

MR. EVANS: No, no. Page 26, 15 to 21.

THE COURT: Read out lines 15 to 21.

THE WITNESS: Okay.

THE COURT: Fifteen starts in the middle of a sentence, sir.

MR. EVANS: Start at the top.

THE COURT: "Cutler --" you want him to start with the word "Cutler?"

MR. EVANS: I don't have it in front of me.

THE COURT: Start with line 15, where it starts with "Cutler."

THE WITNESS: Right here?

THE COURT: Yup.

A "Cutler stated that he then left them and went home. Cutler stated that he did not see the missing youths on Sunday, the day they were reported missing, because he went to -- he went on a bus ride to Atlantic City with his grandmother. Cutler further stated he did not hear the youths mention anything about running away and had no idea where they were."

MR. EVANS: Your Honor --

THE COURT: Yes?

MR. EVANS: That's page 20. Page 20.

THE COURT: What lines?

MR. EVANS: Just the whole page. I mean the whole page. Correction.

THE COURT: Okay. That's also your testimony on that May date?

THE WITNESS: Yes.

THE COURT: All right. Where do you want him to start?

MR. EVANS: Page 20.

THE COURT: I know. But it starts in the middle of the sentence. Do you want him to start on the first full question?

MR. EVANS: Can he start in the middle of the sentence?

THE COURT: It does. It starts in the middle of an answer, actually.

MR. EVANS: Can I take a look?

THE COURT: Mary Beth, hand it to him so he can figure out where he wants to start and stop.

Do you still have that red pen over there? Mark it wherever you want him to start and stop.

MR. EVANS: All right. We'll go to 19, your Honor.

THE COURT: Mark it with the red pen where you want him to start and where you want him to stop. Okay?

Read where he has it marked. See line 22, where it has it starting, page 19?

THE WITNESS: Right here?

THE COURT: Yup. Okay. You've got him starting in the middle of a sentence and we can't do that.

MR. EVANS: In the middle? Where? Nineteen?

THE COURT: Page 19, in the middle of a sentence. Start with the full question on line 16.

THE WITNESS: Okay. The question is --

MR. EVANS: What page is that, your Honor?

THE COURT: Page 19.

MR. EVANS: Yes.

THE COURT: Line 16.

MR. EVANS: All right.

THE WITNESS: The question is, "And do you -- did you read where he came into contact with Cutler originally?"

My answer was, "Yes, I did. And Detective Hairston's report, he writes that during the course of this investigation they develop information about a gentleman by the name of Robert Cutler, who had given the family of the missing youths information as to activities they were -- they may have been involved with that possibly caused their disappearance. They, in turn, located Mr. Cutler and they interviewed him, at which time he provided them with the same information. This is, according to his information, that the five youths had burglarized an apartment owned by Mr. Lee Evans. As a result of the burglary, they left his apartment with about a pound of marijuana. And according to him, that was possibly the reason that

they disappeared."

So the next question is, "So it was known to the police early in the investigation, almost immediately, that five youths were involved in a burglary of Mr. Evans's apartment; is that correct."

My answer is, "That's correct."

The next question, "Was it known to the police that they had broken into his apartment through a bathroom window?"

And my answer was, "Correct. That's correct."

Next question, "And the allegations had been made that they took a quantity of marijuana, which was previously described to us by Robert Cutler that it would have fit into a shoebox, correct, or not?"

And my answer was, "Correct."

THE COURT: Wait a second. Did you leave off the last half of a sentence?

THE WITNESS: "... into the shoebox, correct, or not? That was the understanding of the police?"

My answer was, "That's correct."

The next question, "And it has been the understanding of the police by that the assumption is it appeared to be about a pound of marijuana had been taken from Mr. Evans's residence?"

You want me to stop there?

MR. EVANS: That was it.

THE COURT: That's the end of page 20.

MR. EVANS: Okay.

Q Why did you make a statement that you only spoke to one grand jury?

A Looking at this report and the dates that you're giving me, I do recall that the first time we went to grand jury, grand jury started maybe about two o'clock in the afternoon and they had to break. And I believe that one of the jurors may have gotten sick, and as a result of that, they rescheduled me to come back. You're absolutely correct. I was there twice.

Q There was three grand jury hearings? May 11th. There was three grand jury hearings?

A I don't remember.

Q You don't remember?

A No.

Q I want to ask the question, why did it take three grand juries to indict me, to get an indictment?

MR. GUARINO: Object to that question, Judge.

THE COURT: Three dates?

MR. EVANS: Three dates.

MR. GUARINO: Objection. That's a legal question which is beyond the scope of a witness.

THE COURT: Can't be in the understanding of this officer why it was spread over three days. Sustained.

Q I like to know why you didn't want to give the information at first?

A I'm sorry, I don't follow your question.

Q I like to know why you didn't give up this information first?

A What information are you referring to?

Q The three grand juries.

A Again, I didn't remember. It's been some time ago. And now that you mention it to me, I do remember being at grand jury a couple times. The first time, like I said, we started late and it was time to get out of there. They didn't want to go past four or five o'clock, and it was rescheduled. If I returned to grand jury and you have subpoenas and information that says I did, then I did, but I don't recall.

(Sidebar discussion out of the jury's presence.)

THE COURT: Show that to the Prosecutor.

MR. GUARINO: Judge, I have no objection to it being used as an exhibit for identification at this time.

THE COURT: Okay.

I want you to take a look at this D-24.

What do you want to ask him about that?

Q Do you see the center window, smallest window to the right, Detective?

A Yes.

Q Can you put your finger on it?

A Which window?

Q To your right. The smallest one, to the third floor?

A Right here?

Q No, to your right.

MR. GUARINO: Could we first establish if the witness -- I didn't mean to speak over you, Mr. Evans.

Can we first establish that the witness knows what he is looking at?

THE COURT: He did point to the window with the arrow by it. Do you know what building that is?

THE WITNESS: No.

Q I was referring to the bathroom --

THE COURT: You have to ask him first if he knows that's what it is.

Q Did you know that was the bathroom window?

A Again, I don't know that is a bathroom.

Q That's the window they came --

THE COURT: You can't testify. He's got to answer the question. If he doesn't know, he is not the

right witness for this exhibit.

Q That means you didn't do your full investigation?

A No, that means that I don't know if this picture was taken in Newark or Timbuktu.

Q No, that picture was Irvington.

MR. GUARINO: Objection.

THE COURT: You can't testify. That's stricken. All your comments about this picture are stricken. If he's not the right witness, you have to do it with a different witness.

Q Are you familiar with the picture?

A No, sir, I'm not.

Q Okay. Have you ever been to 979 Clinton Avenue, Irvington?

A I pass 979.

Q Have you been inside?

A No, sir, I have not.

Q So your statement, basically, you came to your conclusion based on statements, right?

A I came to my conclusion based on information that we received from individuals that we took statements from. That's correct.

Q And that's what led up to my arrest?

A Based -- your arrest led up to a statement that

was given by Mr. Philander Hampton.

Q It still was broken into the bathroom; is that correct?

A I'm sorry?

Q Broken into the apartment through the bathroom window, right?

A That's the information I received.

Q Right.

MR. EVANS: Your Honor, I would like to know how long -- if we take a five minute break -- no, I need to know who the unknown is. That's very important right now.

THE COURT: Can you find out who took the statement? It would be D-69.

MR. GUARINO: Yes, Judge, I think we could.

THE COURT: D-63 B.

MR. GUARINO: Yes, we could.

THE COURT: Can you do it right now in five minutes?

MR. GUARINO: Yes, I think we could.

THE COURT: Okay. Five minute stretch break. We'll bring you back out.

(Whereupon the Jury is excused.)

(Recess.)

(Whereupon the Jury is brought in.)

THE COURT: The jurors are all back in their seats. Have a seat.

Go ahead, sir.

Q Mr. Sabur, with you getting the statement from Mr. Bob Cutler, did you and him ever have a disagreement between the 19th and the 20th?

A Not that I recall.

Q Yes? No?

A Not that I recall.

MR. GUARINO: Judge, it's belated, but I'm going to object to the form of the question because the insertion of the word "additional agreement," I don't think there was ever established --

THE COURT: Repeat it. We might have heard it differently. Did you ask him if he ever had a disagreement?

MR. EVANS: Disagreement.

THE WITNESS: Not that I recall.

MR. EVANS: Your Honor, can I get a second?

THE COURT: Sure.

THE COURT: Mr. Evans, we're at the end of the day here anyway. Do you want to take the time overnight to get your last thoughts organized for this witness?

MR. EVANS: Yes, I can do that. Is it

possible I get that other information?

THE COURT: We're going to get it right now.

MR. EVANS: If I can get that.

THE COURT: All right. You've had a couple exercise breaks in and out. We're going to break for the day because it is four o'clock.

Don't discuss the case amongst yourselves or with anyone else, or do any research.

Just a reminder, tomorrow is a short day, nine to 12:30, and full days Thursday and Friday. Probably on Thursday I can tell you where we're going, but I can tell you we are gling much more rapidly than the attorneys expected.

So I appreciate your patience. Thank you.

(Whereupon the Jury is excused.)

THE COURT: Can you step down, sir. Don't discuss your testimony with any witnesses.

(Whereupon the witness is excused.)

(Whereupon the proceedings are adjourned.)

C E R T I F I C A T E

I, MARY-JO MONTELEONE, CCR, CRCR, License Number XI01370, CRCR License Number XR000184, an Official Court Reporter in and for the State of New Jersey, do hereby certify the foregoing to be prepared in full compliance with the current Transcript Format for Judicial Proceedings, and is a true and accurate noncompressed transcript of my stenographic notes to the best of my knowledge and ability.

Mary Jo Monteleone, CCR, CRCR 11-1-11
Official Court Reporter Date
Veterans Courthouse