# EXHIBIT F

# In The Matter Of:

*Evans v.*
*Newark City*

---

*Louis Carrega*
*Vol. II*
*October 22, 2020*
*Video Deposition*

---

RIZMANRAPPAPORT
CERTIFIED COURT REPORTERS
66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

Page 252

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
NEWARK VICINAGE
14-CV-00120 (KM)(MAH)

| | |
|---|---|
| LEE EVANS, Plaintiff, v. NEWARK CITY; FORMER MAYOR, CORY A. BOOKER; FORMER POLICE DIRECTOR, GARRY McCARTHY; LIEUTENANT LOU CARREGA; DETECTIVE JOSEPH HADLEY; DETECTIVE SGT. WILLIAM TIETJEN; SGT. DARNELL HENRY; OFFICER JOE HADLEY, Defendants. | VOLUME II<br>VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF LOUIS CARREGA<br>VIA VIDEOCONFERENCE |

T R A N S C R I P T of the stenographic notes of AUDREY ZABAWA, a Certified Court Reporter of the State of New Jersey, Certificate No. XI01410, taken via videoconference, on Thursday, October 22, 2020, commencing at 10:06 a.m.

Page 253

A P P E A R A N C E S:

BONJEAN LAW GROUP, PLLC
467 Saint Johns Place
Brooklyn, New York 11238
718.875.1850
jennifer@bonjeanlaw.com
ashley@bonjeanlaw.com
BY: JENNIFER BONJEAN, ESQ.
ASHLEY COHEN, ESQ.
Counsel for Plaintiff

KENYATTA STEWART, CORPORATION COUNSEL
CITY OF NEWARK – DEPARTMENT OF LAW
920 Broad Street, Room 316
Newark, New Jersey 07102
973.733.5945
lipshutzg@ci.newark.nj.us
BY: GARY S. LIPSHUTZ, ESQ.
AQUA ETUK, ESQ.
Assistant Corporation Counsel
Attorney for Defendants City of Newark (improperly pled as "Newark City" and "Newark Police Department"), Cory A. Booker, Garry McCarthy, Darnell Henry, and Joe Hadley

STATE OF NEW JERSEY
OFFICE OF THE ATTORNEY GENERAL - DIVISION OF LAW
STATE POLICE, EMPLOYMENT, AND CORRECTIONS SECTION
Richard J. Hughes Justice Complex
25 Market Street, PO Box 112
Trenton, NJ 08625-0112
609.376.2948
Victor.DiFrancesco@njoag.gov
Michael.Vomacka@lps.state.nj.us
BY: VICTOR DiFRANCESCO, JR., DEPUTY ATTORNEY GENERAL
MICHAEL VOMACKA, DEPUTY ATTORNEY GENERAL
Counsel for Defendant William H. Tietjen Jr.

SCHENCK, PRICE, SMITH & KING
220 Park Avenue
Florham Park, New Jersey 07932
973.539.1000
jmb@spsk.com
BY: JOHN M. BOWENS, ESQ.
Counsel for Defendant Lou Carrega

Page 254

Also Present:

Darnell Henry
Joseph Hadley

Christopher LaTronica, Esq.
Of Counsel to the Bonjean Law Group

Haley Coolbaugh, Paralegal, Bonjean Law Group

Brian Durborow, Videographer

Page 255

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| LOUIS CARREGA | | | | |
| Ms. Bonjean | 257 | | | |

NOTE: Reporter digitally marked exhibits. (Attached herewith.)

E X H I B I T S

| NUMBER | DESCRIPTION | FOR IDENT. |
|---|---|---|
| Carrega-7 | transcript of Robert Cutler interview | 268 |
| Carrega-8 | Hairston reports, Bates ECPO 0003548 through 3586 | 277 |
| Carrega-9 | transcript of Roderick Royster statement, Bates ECPO 000761 through 827 | 278 |
| Carrega-10 | transcript of statement of Gregory Royster, Bates ECPO 000052 through 81 | 281 |
| Carrega-11 | Continuation Report, Bates ECPO 001711 through 1713 | 317 |
| Carrega-12 | transcript of Philander Hampton interview, Bates ECPO 000342 through 427 | 331 |
| Carrega-13 | Sabur reports, Bates 001226 to 1239 | 338 |
| Carrega-14 | Carrega affidavit, Bates ECPO 000257 through 259 | 342 |
| Carrega-15 | press conference photograph | 343 |

THE VIDEOGRAPHER: We are now on the video record. Today is Thursday, October 22nd, 2020. The time is 10:06 a.m. This is day number two of Lou Carrega's videotaped deposition regarding Lee Evans versus Newark City, et al., filed in the U.S. District Court, District of New Jersey, Newark Vicinage, Civil Action Number 14-CV-00120(KM)(MAH). This meeting is being held via Zoom. Counsel has agreed that all parties may appear remotely, including the court reporter and videographer.

My name is Brian Durburow for Rizman Rappaport, and I am the certified videographer for today. Will all counsel please state their appearances and who they represent.

MS. BONJEAN: Good morning, Jennifer Bonjean -- that's B-O-N-J-E-A-N -- on behalf of the plaintiff, Lee Evans, along with my colleague Ashley Cohen, also who represents Mr. Evans, and our paralegal Haley Coolbaugh, C-O-O-L-B-A-U-G-H.

MR. LA TRONICA: Chris LaTronica, of counsel with The Bonjean Law Group, also here on behalf of Lee Evans.

MS. BONJEAN: Oh, I'm sorry, Chris. I didn't know you were there.



MR. BOWENS: John Bowens, on behalf of the defendant, Lou Carrega.

MR. LIPSHUTZ: I'm Gary Lipshutz, Assistant Corporation Counsel. I represent the defendants, the City of Newark, Garry McCarthy, Cory Booker, Joe Hadley, Darnell Henry. And I note that Darnell Henry and Joe Hadley are observing, and co-counsel for me is Aqua Etuk, who is also observing. Thank you.

MR. DiFRANCESCO: Yes. Good morning. Victor DiFrancesco, New Jersey Attorney General's office, on behalf of the state defendants, William -- Trooper William Tietjen.

MR. VOMACKA: Michael Vomacka, spelled V, as in Victor, O, M, as in Michael, A-C-K-A. I'm with Vic from the New Jersey Office of the Attorney General.

THE VIDEOGRAPHER: Thank you. The certified court reporter, Audrey Zabawa, may swear in the witness, and all counsel may then proceed.

L O U I S C A R R E G A, called as a witness, having been first duly sworn, testified as follows:

DIRECT EXAMINATION BY MS. BONJEAN:

Q. Good morning, Mr. Carrega. My name



is Jennifer Bonjean. I think you remember me from my last deposition, and I'd like to proceed with your second half of your deposition here this morning, but I want to remind you of a few things before we get going here.

You understand, sir, that you're still under oath here today; correct?

A. Yes.

Q. And I also want to remind you to please let me finish my question before you start your answer, and I will do the same for you. Okay? Can we agree on that?

A. Yes.

Q. I would appreciate that if my question calls for a yes or no answer that you provide a yes or no answer if you are able, and I, of course, will give you the opportunity to expand. Can you agree to that?

A. Yes.

Q. Did you have a chance to read the transcript from your deposition in August?

A. No.

Q. And did you do anything to prepare for the continuation of your deposition here today?

A. No.



Q. I just want to reorient you. I don't want to rehash anything from the last deposition, but I do want to reorient you and get some clarification on a couple of things.

Prior to being assigned to Lee Evans, the Lee Evans case or the missing boys case, did you do any investigative work on the case?

A. No. And I wasn't assigned. I believe I explained that on my first deposition that there was a detective from Newark working the case. What I attempted to do was just tap into databases that were available at that time and possibly do DNA in any surviving members.

Q. You didn't work on the case without the knowledge and approval of your supervisor; right?

A. Yes.

Q. And I understand your objection to the word assigned, but you did, in fact, interview witnesses; right?

A. Yes.

Q. You interviewed Philander Hampton; correct?

A. Yes.

Q. And I understand -- so let me ask the

question this way. Prior to working on the case, whatever that work involved, did you conduct -- well, strike that.
Prior to being -- getting approval to work on the case, did you do any work on the Lee Evans investigation?
MR. BRADLEY: Objection. Asked and answered.
A. No.
Q. Okay. Are you able to provide a date on which you were approved to work on the Lee Evans investigation?
A. No.
Q. We looked at an interview that you participated in last time we -- last time we were here. Do you remember that? I think it was -- I forget the name, but it was an interview that was conducted in March of 2007. Do you remember that?
A. Which interview? I don't know which one you're referring to.
Q. Hold on one second.
MS. BONJEAN: I think it was marked, Haley, already. Do we have it?
MS. COOLBAUGH: Yes. I believe you're referring to the interview with James



Phillips on March --
MS. BONJEAN: What's the name?
MS. COOLBAUGH: James Phillips.
MS. BONJEAN: Okay. Yeah, can you pull that up? Audrey, do you have the list? It was marked at the last deposition.
THE COURT REPORTER: I don't, because it wasn't my transcript.
MS. BONJEAN: Haley, can you do me a favor and pull up Mr. Carrega's prior deposition, and on the first page it should indicate what this was marked as so we are consistent.
MS. COOLBAUGH: Yes.
MS. BONJEAN: Okay. You can leave that up.
Q. Mr. Carrega, do you remember looking at this in August when we were here before when I deposed you?
A. I don't recall, but I'll take your word.
Q. Okay. Can you look at it, please. I prefer you not "take your word."
A. Yeah, I am reading it. A transcript ordered by Thomas Fennely and an appearance by me.
Q. Okay. So that's you; right?
A. Yes, ma'am.



Q. And that indicates a transcript of a statement that was taken on March 22, 2007, at the Essex County Prosecutor's Office; correct?
A. March 22nd of '07.
Q. Correct.
A. And the place is undisclosed.
Q. Okay. But it indicates -- oh, I see. It indicates, though, that the deposition was taken on March 22, 2007; is that right?
A. Yes.
Q. Did you sometimes record interviews when you went to a location outside of the prosecutor's office?
A. Sometimes.
MR. BOWENS: Objection. Asked and answered.
Q. I'm sorry. Can you answer that again, please?
MR. BOWENS: You can answer it again.
A. Sometimes.
Q. Okay. And how would you do that?
A. A statement, a question-and-answer format.
Q. No. My question is how did you record an interview off the premises of the Essex County Prosecutor's Office back in 2007 through



2010?
A. From experience and then to back in my career, if there was an interview of substance, the subject would be brought into the office or a -- at the time, it was a typewriter would be brought, if the person was unable to respond to the office, a typewriter would be -- I would bring a typewriter to the person's location, but usually the person, if it was any interview of substance of a witness, the person would be brought to the office.
Q. My question is did you record with any audio recording device interviews that occurred outside the Essex County Prosecutor's Office?
MR. BOWENS: Objection. Asked and answered. You can answer it again.
A. Again, if there was an interview of substance, the individual would be brought in. I don't recall how this James Phillips was interviewed.
Q. I am not asking about James Phillips.
MS. BONJEAN: You can take that down now, Haley. Do you know what it was marked as?
MS. COOLBAUGH: Yes. It was Carrega-2.

MS. BONJEAN: Okay. Thank you.
Q. So you just looked at Carrega-2. Now I'm asking a different question. Did you audio record with any type of device interviews in the field? That's what I'm asking.
A. At present, I don't recall.
Q. Okay. And during this time period from March 2007 until Mr. Evans was indicted, were you working with Detective Eutsey, Jack Eutsey?
A. Yes, ma'am.
Q. And according to you, I believe, Jack Eutsey -- well, strike that.
According to you, during the entire time you were working on the case, Detective Sabur was the lead detective; am I right about that?
A. That was my understanding from the get-go, was that Detective Sabur never stopped working on the case and was actively working on the case. I don't know who else was working with him. That was my understanding.
Q. And Detective Joe Hadley was also working the case from the Newark detective side; right?
MR. LIPSHUTZ: Objection to the form.
Q. You can answer.



A. I don't know exactly Detective Hadley's assignment. I don't know if he was working on the case, or I don't know, but he was -- he did come in and start working with me because Newark obviously was surprised that I was trying to get DNA and stuff on the case.
Q. Okay. And he actually appeared and conducted interviews with you in a number of interviews; right?
A. Yes, ma'am.
Q. I just want to get some clarity on this. You determined that Lee Evans was a suspect in the missing boys case after talking with Detective -- or Agent Eutsey and Detective Sabur; right?
A. Yes, ma'am.
Q. Do you know how many times you talked to Detective Sabur about the case before you interviewed Phil Hampton?
A. I don't know.
Q. Can you estimate for me?
A. I recall talking to him in the field. I recall seeing him obviously around the office. I don't know how many times exactly I spoke to him about this.



Q. Okay. And fair to say that Agent Eutsey, I think you said Agent Eutsey had more regular contact with him?
A. That's correct.
Q. And Agent Eutsey would convey or communicate with you regarding his conversations with Detective Sabur?
A. Yes.
Q. How many times did you interview Maurice Olds?
A. One time, from what I recall. One time.
Q. And I think you testified that a very short period of time after he died -- strike that. A very short period of time after you interviewed him, he died; correct?
A. That's correct.
Q. I think you said weeks; is that your recollection?
A. Yes.
Q. So if Maurice died in late April of 2008, does that mean you interviewed him in either early April or March of 2008?
A. From my recollection, it was a short time from the time that I spoke to him until I found out that he had passed.



Q. Okay. And short time, you're saying weeks; right?
A. From what I recall, yes.
Q. I think you also indicated that you do remember interviewing Bob Cutler at Rahway Prison; right?
A. Yes.
Q. How many times did you interview Bob Cutler at Rahway Prison?
A. One time.
Q. Okay. And do you recall who you were with when you interviewed him at Rahway?
A. Detective Eutsey. And we went there to see if he would allow us to interview him. So it really wasn't an in-depth interview. We went there to see if he would allow us to -- or if he would be up to maybe coming to the office and be interviewed.
Q. Okay. But you were with Detective Eutsey; correct?
A. That's correct.
Q. I'm going to have you look at a few documents.
MS. BONJEAN: Did we already mark Cutler's interview, Haley? Can you look at Mr.

--
MS. COOLBAUGH: Yes, let me take a look very quickly.
MS. BONJEAN: If not, let's mark it.
MS. COOLBAUGH: We did not mark it, so it's going to be Carrega-7.
(Carrega-7, transcript of Robert Cutler interview, was received and marked for identification.)
MS. BONJEAN: It's in the Dropbox, but I'm going to pull it up on the screen. If you could put the first page on the screen, Haley, please. Okay.
Q. Mr. Carrega, do you see this transcript of interview of Rob Cutler? Robert Cutler.
A. Yes.
Q. And do you see that the place is Rahway State Prison?
A. Yes.
Q. And the date is June 19, 2008?
A. Yes.
Q. Do you remember how you recorded this statement in Rahway State Prison?
A. No.



Q. Obviously, you didn't -- you weren't able to, at least during this interview, bring him to the Essex County Prosecutor's Office? Do you know if you had like a little device or whether there was some facility there that you could use?
MR. BOWENS: Objection. Asked and answered. You can answer it again.
A. I don't recall how I interviewed. I know that we were led into a room, and he was led into the room with corrections officers, and that's what I recall from that.
Q. Okay. I am going to have -- and it was just you and Detective Eutsey and Mr. Cutler; correct?
A. And I believe two corrections officers. I vaguely -- I recall him being brought into the room. After we were led into the room, he was brought in by two officers.
Q. Okay. But as far as investigators who were -- I'm sorry. Let me get rid of my dog.
But as far as investigators go, it was just you and Detective Eutsey; correct?
A. That is my recollection, yeah.
Q. Okay. I am going to have you please look at page -- we'll start at page 43 of this.



Really towards the end actually of this transcript.
MR. BOWENS: You're gonna have to expand that. The witness can't see it from here. Excuse me. The defendant can't see it from here.
MS. BONJEAN: Well, there's only -- we can only expand it so much. I don't know.
MR. BOWENS: Can you see it now?
A. Do you mind if I get up?
Q. No, I don't care.
MR. BOWENS: Which line, ma'am? Which line? I'm sorry.
MS. BONJEAN: I am not at the line yet. Just page.
Q. Okay. Tell me when you are close enough to see, Mr. Carrega.
A. I'm good. I'm good.
Q. Okay. So if you will see a line 11?
A. Yes.
Q. Well, we'll just start at line 3 or 4. You see where Mr. Cutler says, "Because, like I said" -- and it says "Unidentified Male." I guess whoever was transcribing this didn't know it was you and Eutsey.
But in any event, it says, "I don't buy that they were a youth shelter."



And Mr. Cutler says, "I'm talking about the 150 bucks then." Do you see that?
A. Yes.
Q. And then it goes on to say, "You know anybody -- trying to collect a little money for the loss?"
And then this is the part I'm interested in. It says:
"UNIDENTIFIED MALE: Here's, I'll -- listen, Mrs. McDowell stated to the officers that a youth named Bob had received a telephone call from somebody, unidentified person, advising him, advising Bob -- excuse me -- advising Bob that if the marijuana was not returned to them, the youths will be killed.
"Detectives further reported that a Mrs. Johnson, sister of missing youth, Randy Johnson, was at the McDowell residence and told them, she would try to get Bob's name and address. Bob -- that he had heard about the telephone call made to Bob -- interviewed Ms. Sarah Johnson, in reference to her reported son Randy Johnson being missing.
"Also present -- this is on the 23rd, three days. Also present at Mrs. Johnson's were

her daughter Pamela Johnson and Yvonne Beacham and Bob. Bob is Robert Cutler, age 17, of 393 Irving Turner Boulevard. That's you, right?"
"MR. CUTLER: Uh-huh."
Do you see that?
A. Yes, ma'am.
Q. Do you know what you or Detective -- or Agent Eutsey were reading from when you were questioning Mr. Cutler?
A. No, ma'am.
Q. Were you reading from the original missing persons reports?
A. I don't recall what I was reading from.
Q. Okay.
A. Or I or Detective Eutsey. I shouldn't say I.
Q. I understand. Either you or Agent Eutsey?
A. Right.
Q. If the missing persons report were verbatim what you just read, would that help you figure out what you were reading from?
MR. BOWENS: Objection. It's vague and ambiguous. You can answer it if you understand it.



A. It's possible.
Q. Okay. We'll go on. It says:
"UNIDENTIFIED MALE: Mrs. Johnson stated that she has not heard from her son, so she reported him missing on the 21st. Mrs. Johnson first stated, she contacted her relatives, friends. Everybody was looking for him, and nobody found him.
"UNIDENTIFIED MALE: Do you remember being there?"
A. Do I remember being there? Yes.
Q. No, no, no. This question was asked of Mr. Cutler. "Do you remember being there?" Do you see that?
A. Okay, yes. Line 10.
Q. Uh-huh. Again, do you know what you were reading from when you read that portion to Mr. Cutler or Agent Eutsey read that portion to Mr. Cutler?
A. Ma'am, I don't recall what we were reading off of.
Q. Okay. Let's go down, let's go down to page -- let's see. The next page. Right there. Perfect.
Okay. Mr. Cutler says at line 5 -- I



don't know if you want to look back. This is the last portion.
A. Line 5. Mr. Cutler, yes.
Q. Mr. Cutler says, "That's because I'm the one who went to their house."
And the unidentified male says, "And you pointed out where it was?"
"(indiscernible) believe it, so I had to go and show them where it is at."
And then the unidentified male says, "An interview with Robert Cutler, 17, of 393 Belmont Avenue, Apartment 1C, telephone number 824-3344, at 492 Hawthorne Avenue, that's where the interview took place, in which Bob Cutler stated that on Saturday the 19th -- Saturday the 19th at 11 o'clock, he was told by Melvin and Randy that they had broken into Big Man's -- Lee Evans' apartment and stole a pound of weed -- of marijuana, which they had with them at the time. Cutler further stated that Michael McDowell and Albert Turner approached them and the marijuana was divided between McDowell, Turner, Pitman, Johnson and Taylor, all of which broke into Big Man's apartment."
You answer a phone call, or Agent



Eutsey -- somebody answered a phone call, and then unidentified male says: "Getting back to this -- marijuana was divided. They had broken into Evans' apartment. Cutler stated, he then left and went home. Cutler stated, he did not see the missing youths on Sunday, the day they were reported missing because he went on a bus ride to Atlantic City with his grandmother. Cutler further stated, he did not hear the youths mention anything about running away, and he had no idea where they were."
Do you see that?
A. Yes, ma'am.
Q. Okay. And, again, are you able to identify what you were reading from or what interview or report you were reading from when you were asking Mr. Cutler about this interview or these statements?
MR. BOWENS: Objection. Asked and answered. You can answer it again.
A. I don't recall what I or Detective Eutsey were reading from.
Q. Okay.
MS. BONJEAN: Haley, is there a way to do a double screen?
MS. COOLBAUGH: I don't believe so.

THE VIDEOGRAPHER: Do you want me to make it like side by side, the document and the witness?
MS. BONJEAN: No, no. I wanted to put two documents on.
THE VIDEOGRAPHER: Oh, I'm sorry.
MS. BONJEAN: That's okay. Did we mark the Hairston reports?
MS. COOLBAUGH: I know we did not mark the entire portion of them. I know we have some missing persons reports.
MS. BONJEAN: That's what I am talking about. Can we please -- let's see. Let's mark, can you pull up -- I'm interested in -- I want him to look at page two of the missing person's reports. I call them the Hairston reports. Okay. Can you kind of make it bigger possibly.
Q. Okay. Mr. Carrega, are you able to see that, sir?
A. Yes. I'm closer to the screen.
Q. Okay. Thank you. I'm going to point you to the second paragraph. It's actually the first full paragraph, but it's the second paragraph, and it reads, "An interview with Robert



Cutler." Do you see that?
A. Yes, I do.
Q. And it's verbatim to what was in the transcript. Does this help refresh your recollection about whether you were reading from this report?
A. It doesn't refresh my recollection because I don't recall what I was reading from, but if it's verbatim, I would think it was from the initial reports.
MR. BOWENS: Don't speculate. If you don't remember, your answer is, I don't remember. Don't speculate.
Q. Okay. Thank you.
MS. BONJEAN: You can take it down now, Haley.
Q. I'm going to also have you look at --
MS. BONJEAN: Let's mark the transcript of Roderick Royster, if we could. Haley, do you have that handy?
MS. COOLBAUGH: Yes, I do. And that's going to be Carrega-9 because, Audrey, the last exhibit shown is going to be Carrega-8. It was not shown previously.
(Carrega-8, Hairston reports, Bates



ECPO 0003548 through 3586, was received and marked for identification.)
(Carrega-9, transcript of Roderick Royster statement, Bates ECPO 000761 through 827, was received and marked for identification.)
MS. BONJEAN: The Roderick Royster interview will be Carrega-9.
Q. Mr. Carrega, do you remember interviewing Roderick Royster on May 6th, 2008, at the Essex County Prosecutor's Office?
A. No.
Q. Do you see that this transcript reflects an interview of Roderick Royster on May 6th at the Essex County Prosecutor's Office?
A. Yes, I do.
Q. Do you see that there are appearances by Detective Lou, it says, Pereggin. I assume that's you. Do you know a Lou Pereggin?
A. Can you move that up? It doesn't say that on the screen.
Q. Sure, um-hum.
A. Joe Hadley and Lou, yes, I see Pereggin, yes.
Q. That's you; correct?
MR. BOWENS: Well, objection. Calls



for speculation. Do you know?
THE WITNESS: I don't know if it's me.
MR. BOWENS: Okay. That's your answer.
A. I know the first name.
Q. Did you know a Lou Pereggin that worked at the Essex County Prosecutor's Office?
A. No.
Q. Okay. Were there any other detectives with the first name Lou or Louis who worked at the Essex County Prosecutor's Office?
A. There might have been over the years. It's very possible.
Q. No. Okay. I know anything is possible. I am talking about during the period of time that you were working on the Lee Evans case, did you know any other detective with the first name Lou who were working this case in the Essex County Prosecutor's Office?
A. No.
Q. Okay. I want to draw your attention to page 21. Do you see Detective Hadley's name right there?
A. Yes.

Q. Detective -- well, we'll start with where Mr. Royster is, line 5, and he says --
A. Yes.
Q. -- "Ricky and Randy, you know, they stayed with -- oh, yeah, Phil was there too at that time. That guy Phil --"
And Detective Hadley says, "Yeah. And where was he?
"MR. ROYSTER: Who was he? I don't know exactly --"
And Detective Hadley: "No. No. No. Where --"
"MR. ROYSTER: He was fighting with us when all that stuff went down, the fighting -- cement.
"DETECTIVE HADLEY: Phil --
"MR. ROYSTER: Yeah
"Now was Phil around that day --
"He didn't look like --
" -- he came to pick up the boys.
"He didn't look like that then... He had a little bit neater appearance then."
Do you see that?
A. Yes. Lines 21, 22?
Q. Yeah. Do you know how it was that



Detective Hadley knew of a Phil during this interview?
MR. LIPSHUTZ: Objection to the form.
A. I don't know how Joe knew that.
Q. Okay.
A. I mean Detective Hadley.
MR. BOWENS: Defendant Detective Hadley.
Q. Okay. I have one other -- you know what. That's fine.
MS. BONJEAN: Could we go to the Gregory Royster interview, please.
(Carrega-10, transcript of statement of Gregory Royster, Bates ECPO 000052 through 81, was received and marked for identification.)
Q. Do you see a transcript here that reflects an interview with Gregory Royster on June 3rd, 2008?
A. Yes, ma'am.
Q. I want to go to the very first page -- well, first of all, let me ask you this. Do you remember interviewing Gregory Royster with Detective Hadley?
A. No, ma'am.
MS. BONJEAN: Can we go to the first



page of this.
Q. Okay. Let's stop here. Whoever is transcribing this has you as Unidentified Detective. But you see the first line is: "Louie's coming in, too. Louie reached out for you." Do you see that?
MR. BOWENS: Objection. Refers to evidence that's not in the record. You can answer it.
A. I see line 1 states that, line 1 and 2.
Q. And did Detective Hadley sometimes call you Louie?
A. Uh, yes.
Q. Were there any other Louie's working this case at the time of June 3rd, 2008, as far as you know?
A. No, ma'am.
Q. Okay. Okay. I want to go to page 20. It says, "Excuse me. Was your brother with you in the house?"
Are you able to see? Do you want to get up real quick?
A. Yeah, okay. Now, I see, yeah, line 1.
Q. Yes, sir. And Mr. Royster says, "Uh-huh."



And he says, "Yeah?"
He says, "Uh-huh."
And some unidentified detective says, "Well, we got it right here saying he took 15 pounds, right?" Do you see that?
A. Yes, I do, line 6.
Q. Do you know what you, or I guess Detective 1 would be Detective Hadley, but in any event, what you or Detective Hadley were looking at when you said, or he said, "We got it right here saying he took 15 pounds"?
MR. LIPSHUTZ: Objection to the form of the question.
MR. BOWENS: Objection. Compound, calls for facts not in evidence. You can answer it.
A. No, ma'am.
Q. Go ahead.
A. I don't know.
Q. Let's go to page 21. In the middle of the page, Unidentified Detective 1 says, "Let me show you a picture of somebody else. Do you know who this is? His name is Robert Cutler. Do you know him?" Do you see that?
A. Yes, line 13.

Q. Do you know where you or Detective Hadley got a picture of Robert Cutler?
MR. LIPSHUTZ: Objection to the form. Lacks foundation.
A. Ma'am --
MR. BOWENS: There's no question pending.
MS. BONJEAN: No, there was a question pending.
MR. BOWENS: He answered the question.
MS. BONJEAN: Well, I didn't hear the answer.
A. I don't know where the photo was obtained, no.
Q. Do you see at line 22 where it says, Detective Hadley, and it says, "It's a newer picture. I don't know -- we have an old picture of Cutler." Do you see that?
A. Yes, I do.
Q. Do you know where you and/or Detective Hadley obtained pictures of Robert Cutler?
MR. BOWENS: Objection. Asked and answered. You can answer it again.



MR. LIPSHUTZ: Same objection.
A. I don't know, ma'am.
Q. Okay. Let's go to page 22. Mr. Royster at line 3 says, "Yeah. He must have been like, breezing through if I didn't know. I used to know everybody --
"UNIDENTIFIED DETECTIVE: All right. Let me ask you another name. Sheila Green?
"MR. ROYSTER: Sheila Green? Yeah, I know Sheila --
"You know Sheila?
"Uh-huh."
"Who was her boyfriend at the time?
"Let's see. She go through so many guys. I even tried to get with her.
"Really?
"Uh-huh.
"Okay.
"I know her brother, Darryl.
"You know Darryl?
"Uh-huh. Yeah. We used to hang out together. That's her brother, Darryl."
Do you know where you or Detective Hadley obtained the name Sheila Green?
A. No, I do not.



Q. If you could go to the next page. Detective Hadley says, "You know a girl name Kathy --
He says, "Kathy Turner? Kathy Kennedy?
"Yeah.
"Uh-huh, Kathy Kennedy, she hang out with us, too."
Do you know where Detective Hadley got the name Kathy Kennedy?
MR. LIPSHUTZ: Objection to the form.
A. I'll answer it this way. I recall speaking to a Kathy Kennedy. I don't know where Detective Hadley got the name.
Q. Let's go to page 26. At the top, it says -- Mr. Royster says, "Huh? After the weed was taken."
And then Detective Hadley says, "Do you know this guy?
"MR. ROYSTER: Uh-uh. Who is that?
"DETECTIVE HADLEY: His name is Phil. Did you ever hear of Lee Evans having a cousin, Phil?" Do you see that?
A. Yes, line 4.
Q. Yeah.



A. Five, yes.
Q. Do you remember having a photo accessible to you on June 3rd of 2008 of Lee Evans' cousin Phil?
A. No.
Q. Do you know how Detective Hadley had a photo of Lee Evans' cousin Phil?
A. I don't know.
Q. Okay. Let's go to page 30.
MS. BONJEAN: Did someone join us?
MR. LIPSHUTZ: It just looks like Aqua jumped on.
MS. BONJEAN: Okay.
Q. There's questions about Maurice's woman. Do you see that? On the first line there. "Maurice's woman?"
A. I see it.
Q. And then, let's see, then it says,
"UNIDENTIFIED DETECTIVE 1: Oh" -- I don't know what the 5/6. Oh, 5/6. Oh, May 6th. May 6th. "We were informed that he was dead. They said it was three weeks prior -- so late April.
"Kathy -- did you speak to Kathy Kennedy she was at the funeral?"
"MR. ROYSTER: No, uh-uh."

Does this refresh your recollection about when Maurice died?
A. I don't recall when Maurice died. I don't recall the exact date. I recall finding out that he was dead.
Q. Right. Okay. Let's go to page -- let's see, page 35. We're almost done with this.
Okay. In the middle of this page, it says, "August 20th" -- page 14 -- I'm sorry, line 14.
"August 20 -- I'm sorry. Your brother and Maurice, Robert and Maurice, about two days after the boys disappeared, did you ever hear of those two going to 271 Hunterdon to move some mattresses to the basement? Your brother and Maurice and Lee Evans?" Do you see that?
A. Yes, I do.
Q. Do you know what information you or Detective Hadley had in your possession that prompted this question to Gregory Royster?
MR. LIPSHUTZ: Objection to the form.
A. No, ma'am. I don't recall.
Q. Okay. And page 45, if you don't mind. Again, it's sort of in the middle. It says, "Michael stole the weed, seven pounds. Brought it



to Robert's house, 46 Fabian. Then they took the rest of the bag, a brown bag -- they put it in a brown bag and brought it to Ricky's house. Is that true?"
Do you see where the unidentified Detective 1 is asking that question?
A. You mean line 19? "Does that sound familiar"?
Q. Yeah. Well, it starts at line 13.
A. Okay. Let me -- "Is that true?" Yes, line 17.
Q. Okay. Do you remember where you or Detective Hadley obtained the information or any information regarding this information that "Michael stole the weed, seven pounds. Brought it to Robert's house," that information that is in the question? Does that make sense?
MR. LIPSHUTZ: Objection to the form.
A. I don't recall, ma'am.
Q. Okay. That was a bad question. Let me just make it a little cleaner.
Do you know where you or Detective Hadley obtained the information that was posed in a question at line 13 through 17 in this transcript?
A. I don't.



MR. LIPSHUTZ: Objection to the form.
Q. Okay. You can have a seat now. We're done with these transcripts. Thank you.
All right. Mr. Carrega, where we left off, I think last, at the last deposition, I think you had explained that after Mr. Hampton was brought over to the Essex County Prosecutor's Office, you recall speaking with him with Agent Eutsey. Do you remember that?
A. Yes.
Q. I'm grabbing my documents. And at some point you arranged for him to be polygraphed; correct?
A. Correct.
Q. Who was present when Mr. Carrega -- strike that.
Who was present when Phil Hampton was polygraphed at the Essex County Prosecutor's Office other than the polygrapher?
A. I don't recall how many detective were around the prosecutors. I don't recall. I was there and Detective Eutsey was there.
Q. I'm sorry. What was the first person you said?
A. Detective Eutsey and I.



Q. And the polygrapher; correct?
A. Yes, I believe.
Q. Well, you didn't administer the polygraph; right?
A. No, ma'am.
Q. And Agent Eutsey didn't administer the polygraph; correct?
A. No, ma'am.
Q. Was there a polygraph administered?
A. Yes.
Q. Who was the polygrapher?
A. I don't recall which one did it.
Q. How many polygraphers did the Essex County Prosecutor's have on hand at that time?
A. I don't know, ma'am.
Q. Okay. Well, can you remember any of the names of the polygraphers who the Essex County Prosecutor's Office had available to detectives who wanted to polygraph witnesses or potential witnesses?
A. I don't know, but I know it would be more than one.
Q. Could you describe this polygrapher like physically, please?
A. I don't recall, ma'am.

Q. Was it a man?
A. Yes.
Q. How old approximately?
MR. BOWENS: Objection. Asked and answered. You can answer it.
A. I don't know.
Q. You have zero recollection of who the polygrapher was?
MR. BOWENS: Objection. Asked and answered. You can answer it again.
A. I don't know which one did it. I don't recall, but I know there's more than one.
Q. And do you remember the names of any of the polygraphers in the Essex County Prosecutor's Office?
MR. BOWENS: Objection. Asked and answered. You can answer it again.
A. Not at the present.
Q. Okay. And you're saying you don't recall what the polygrapher looked like; correct?
A. I know it was a guy, but I don't know. I don't recall which one did it.
Q. When you say which one, it sounds like you have an idea of the possibilities of who it could be; right?



MR. BOWENS: Objection. Mischaracterizes the witness's testimony. He's answered the question.
Q. Okay. And were you actually in the room where the polygraph was administered when it was administered?
A. I don't recall that. And that's not normal policy, no.
Q. Okay. And who provided the polygrapher with the information or facts that would be necessary to ask Mr. Hampton questions in the course of a polygraph?
A. I don't recall. Either I or Detective Eutsey. I don't recall who did.
Q. Do you recall where you were when that information was provided to the polygrapher?
A. It was done right in the prosecutor's homicide squad.
Q. Right. But that -- I'm talking about where you -- obviously -- strike that. I shouldn't say obviously. But were you in the room with Phil Hampton when you were providing the polygrapher with the information that he needed in order to polygraph Phil Hampton?
A. I don't recall that, no, ma'am.



Q. And you mentioned policy earlier. What is the policy, or what was your understanding of the policy of the Essex County Prosecutor's Office about when it was appropriate to polygraph somebody?
A. If someone agrees to be -- to take a polygraph, that person gets pretty much turned over to that individual, and so you pass information on obviously before the polygraph is underway, and then the polygraphist handles it from then on, so your involvement is none actually. That's between the polygraphist and the person being -- or taking the polygraph.
Q. Okay. I understand that. But my question is how does -- when is a detective pursuant to policy permitted to ask that a witness be -- consent to a polygraph?
MR. BOWENS: Objection. Assumes facts not in evidence. You can answer.
A. If a witness is asked, Would you be willing to take a polygraph, and they agree to it, then you reach out to whoever, and, you know, who they send, I don't know. It could be any one of the polygraphists. Then they come up. You give them information as to what the case pertains to, and



then they take the individual and they do their -- they do their test.
Q. Well, okay. Well, you don't polygraph every witness you interview; right?
A. No.
Q. Okay. And what is your process for deciding whether or not it is -- you want to polygraph a witness?
A. Well, if you get to a point where it's an investigative tool, and you like to use it. If the person consents, then like I said, you contact the unit, see who is available, and then they send somebody up, and they take over from there. So, again, your involvement then is minimal. You're not in the room. You're not -- you know. When they're completed, you know, they inform me, Okay, we're done.
Q. My question, though, is not about the polygraph process itself, but how did you -- what made you want to polygraph Phil Hampton?
A. From what I recall, he agreed to it.
Q. Yeah, I understand he agreed to it, according to you, but what made you want to polygraph him?
A. Well --

MR. BOWENS: Objection to the form of the question. If you can answer it, you can answer it.
A. It's an investigative tool, ma'am.
Q. No, I understand. But a lot of things might be investigative tools that would be appropriate in one scenario but not appropriate in another. So, again, I'm going to ask my question. Why did you think that the investigative tool, the polygraph, would prove helpful to your investigation when you arranged to have Mr. Hampton polygraphed, presumably with his consent?
A. It was with his consent. And again, I don't know if it was I or Jack, or both, but it was a consensus that it would be a good question to put to the witness if he agreed to it, and obviously he agreed to it, and it was done. I can't explain it any better than that.
Q. Well, do you try to polygraph people who you believe are telling the truth?
A. You know, it doesn't -- you got to go by what case you're working on and everything that's surrounding that. It's not necessarily, you know, Oh, yeah, I believe 100 -- everything coming out of his mouth is a lie, so I'm going to polygraph



him, no. It could be somebody that's giving you half truths or some truths, or, you know, it really -- unless you are in a moment and looking at the surrounding investigation and what's going on, it's a determination that -- and again, the most important thing is the person, you know, volunteering or agreeing. If he had said no, there would be no polygraph.
Q. Yeah, I know. I'm not talking about the consent issue right now. I really haven't asked anything about that. I'm asking why it was that only Phil Hampton and -- well, I'm going to ask it differently.
Were there any other witnesses other than Phil Hampton and Lee Evans who were polygraphed in the course of this investigation?
A. I don't recall.
Q. Can you name one?
MR. BOWENS: Objection. Asked and answered.
A. I don't recall, ma'am.
Q. Can you recall whether any other witness in this investigation was asked to take a polygraph test other than Phil Hampton and Lee Evans?



A. I wouldn't know, ma'am. Not that I recall.
Q. Okay. And did you have Mr. Hampton sign a written consent to take the polygraph test?
A. The polygraphist, I don't know what -- I really don't know what their policies are and how they go about it, but I'm sure there's Miranda involved in a consent.
Q. What is Miranda, Mr. Carrega?
MR. BOWENS: Objection. Calls for a legal conclusion. You can answer it.
A. If you are going to ask someone questions, and you let them know their rights. I usually carry the card with me that I read from, and you let someone know that they don't have to answer your questions, that they may ask for counsel.
Q. What happens if they ask for counsel?
A. That's it. You're done.
Q. And do you get written waivers to Miranda rights when you Mirandize somebody?
A. You may verbally Mirandize someone, and you can read off a written Miranda sheet and have them sign it if they want to sign it. If they say no, they don't want to sign, then it's over.
Q. And what evidence do you have to demonstrate that you Mirandized Mr. Hampton while



you questioned him at the Essex County Prosecutor's Office?
A. I don't know. I don't recall, ma'am.
Q. So can you point me to anything that would reflect that you Mirandized Phil Hampton at the Essex County Prosecutor's Office?
MR. BOWENS: Objection. Asked and answered. You can answer it again.
A. I don't know, ma'am. I don't recall.
Q. So that's a no, you can't point me to anything?
A. I have nothing in my possession, no, ma'am.
Q. Have you seen anything that reflects that he consented?
MR. BOWENS: Objection. Asked and answered. You can answer it again.
A. I have not seen any documents.
Q. Okay. Now, I think we discussed the fact that Mr. Hampton was brought over in the afternoon to the Essex County Prosecutor's Office. And then I believe that you recalled that he was -- he gave a recorded statement in the evening at the barracks, state police barracks; is that something you recall?
A. Yes, ma'am, that's correct.

Q. Okay. After Mr. Hampton was polygraphed at the Essex County Prosecutor's Office, did you have a conversation with the polygrapher?
A. Yes.
Q. And can you tell me what the polygrapher said to you and what you said to him in the course of that conversation after Mr. Hampton was polygraphed?
A. I don't recall. I know that, you know, obviously, you speak right after the polygraph, but I don't recall.
Q. Have you completed your answer?
A. Yes. I don't recall.
Q. Okay. And what did you do after you spoke with the polygrapher in connection with Mr. Hampton?
A. After -- sometime after the polygraph, it was determined that he would be willing to give us a statement, and I proceeded to -- from my recollection, I proceeded to make arrangements to have an interview room that was audio and video capable, and we ran into some problems and so we had to use the Turnpike barracks.
Q. You said it was determined that he



was willing to make a statement. How was it determined that he was willing to make a statement?
A. By speaking to him.
Q. And what did he say?
A. Well, he had offered to give a statement.
Q. Okay. How did that come about? What did you say to him, and what did he say to you that resulted in him saying, I'm willing to give a statement?
A. I don't recall. I don't even recall if it was me or Detective Eutsey, and I don't even know if Detective Hadley and Darnell -- and Chief Henry was there by then.
Q. Okay.
A. They might have.
Q. At any point during your interview with Phil Hampton at the Essex County Prosecutor's Office, did he indicate his involvement in the murders of the five missing boys?
A. Can you repeat that, please?
Q. At any point during your interview with Mr. Hampton at the Essex County Prosecutor's Office, did Phil Hampton admit his involvement in the murders of the missing boys?
A. From what I can recall, he said he was



willing to tell us what happened, and that's when I proceeded to, again, go make arrangements to set up a room because, obviously, I wanted to get it on video.
Q. So your testimony is that all he said to you is, "I'm willing to make a statement." Is that right?
A. That's -- I'm not saying that's the only thing he said. That's what I recall, that he said he was willing to give a statement.
Q. When he said, "I'm willing to make a statement," at the Essex County Prosecutor's Office, did you have any idea what the substance of that statement would be?
A. No.
Q. So then it's fair to say that he did not implicate himself in the crime at the Essex County Prosecutors's Office according to you; correct?
MR. BOWENS: Objection. It mischaracterizes the witness's testimony.
A. That's not what I said.
Q. Okay. Did he implicate himself in the crime at the Essex County Prosecutor's Office?
MR. BOWENS: Would you please refrain



from shouting at the witness?
MS. BONJEAN: Mr. Bowens, we're not going to do this today. I am not shouting --
MR. BOWENS: Counsel, you're not telling me what I'm going to do.
MS. BONJEAN: You're the only one shouting.
MR. BOWENS: You're raising your voice at the witness, and I'm telling you to stop it or I'm going to call the judge.
MS. BONJEAN: You can call the judge. The video speaks for itself, Mr. Bowens. I am not yelling.
Audrey, can you read back the question, please?
(Question read back as follows:
(QUESTION: Did he implicate himself in the crime at the Essex County Prosecutor's Office?)
A. I do not recall what was said. He agreed to be interviewed. I made arrangements. I don't recall if I or if it was Detective Eutsey to whom he said, you know, he was willing to give a statement.
Q. Do you remember whether he implicated

Lee Evans in his statement to you at the Essex County Prosecutor's Office?
MR. BOWENS: Objection. Asked and answered.
A. I don't recall. I truthfully don't recall what exactly he said. I know he was agreeable to giving a statement and saying -- you know, telling us what he knew.
Q. And when you left the Essex County Prosecutor's Office, did you have any knowledge that he was going to implicate himself or Mr. Evans in the murders of the five boys?
MR. BOWENS: Objection. Asked and answered. You can answer it again.
A. I didn't know what he was going to say. That's why I wanted to get it on video.
Q. Okay. So what time was it when you left the Essex County Prosecutor's Office?
A. The closest I could tell you is was it was in the afternoon.
Q. And after -- strike that. Was Mr. -- or Trooper Tietjen at the Essex County Prosecutor's Office when you were interviewing Mr. Hampton?
A. I don't recall if he came straight there or if he went to the barracks.



Q. Okay. Hold on one second. So describe for me how it was that Mr. Hampton was transported to the trooper barracks?
A. He was transported in a car.
Q. I'm sorry?
A. In a car.
Q. Okay. And -- I'm sorry. Go ahead.
A. Again, I don't know if Tietjen came straight there, or if he went straight to the barracks, but he was transported in the car, in the back seat of a car.
Q. Okay. In whose car was he transported in?
MR. BOWENS: Objection. This was all covered in the first day of the deposition with this witness.
MS. BONJEAN: No, it wasn't. Mr. Bowens, if you would like to look at the deposition transcript, you can, but we really --
MR. BOWENS: Counsel, I don't need any kind of information from you.
MS. BONJEAN: Mr. Bowens, I'm going to ask that you stop.
MR. BOWENS: I put it on the record, and that's what happened. If you don't like it,



too bad.
MS. BONJEAN: Okay. I'm not going to tolerate the way you're speaking to me, Mr. Bowens. Please stop.
MR. BOWENS: I'm not going to tolerate the way you act. You have been reprehensible on so many levels. And trust me, I am not going to suffer through it anymore.
MS. BONJEAN: Okay. Mr. Bowens, I'm going to ask you to stop.
MR. BOWENS: I made my objection, and you don't get to pass on my objection.
MS. BONJEAN: I'm going to ask you to stop, sir.
MR. BOWENS: I'm going to ask you to stop.
MS. BONJEAN: I'm just conducting my deposition.
MR. BOWENS: No, you're being obnoxious.
MS. BONJEAN: Okay. You've called me reprehensible and obnoxious now. Would you like to call me any other names before we proceed?
MR. BOWENS: No. I think that will cover it for now.



MS. BONJEAN: Okay. Thank you.
Q. Please answer my question, Mr. Carrega.
A. I don't recall the question.
Q. Okay.
A. Can you repeat the question?
Q. Sure. Who drove Mr. Hampton to the barracks?
MR. BOWENS: Objection. Asked and answered. You can answer it.
A. He was taken in a car, ma'am.
Q. I heard that. Who drove him?
A. I was driving the car.
Q. Okay. Who were you with, if anyone, when you drove Mr. Hampton to the barracks?
A. Well, from what I recall, it was Detective Hadley, and possibly Detective Henry -- Sergeant Henry; and, again, I don't recall if Tietjen was there and then left for the barracks or if he went straight to the barracks. He might have been there.
Q. Do you need to take a break?
A. No, it's all right.
Q. Okay.
A. He was in the back seat of a car, ma'am.

Q. He was in the back seat of a car you were driving; is that right?
A. Yes, ma'am.
Q. And were there any other detectives in your car with you?
A. No, not from what I recall. They were behind me.
Q. So Joe Hadley and Henry were in a different car; is that correct?
A. I don't know if it was two cars. I don't recall, but they were behind me, and I don't recall, again, if Tietjen was there and then he left for the barracks.
Q. Okay. And on the way to the barracks, tell me whether or not you made any statements to Phil Hampton or Phil Hampton made any statements to you?
A. My recollection is that while I'm driving out and heading south, he says something to the effect that, "Would you like me to show you where it happened?"
And I was like, "What do you mean?"
He goes, "I'll take you to the location where the house was, where the family house was."



Q. What did you interpret or what did you -- what did you understand that to mean when he said that to you?
A. I wasn't going to pass up on the opportunity for him to point out what I believe to be where the crime occurred.
Q. And when he said, Do you want to know where it happened, your understanding was that he was going to tell you where the crime occurred?
A. It was a good presumption. I mean, you know, that's what I took it to be.
Q. Okay. And at that point, did you have -- well, strike that.
At that point, did he indicate to you that he was involved, or just do you want to see where it happened?
A. My recollection is he directed me to Camden Street, and as I'm going, I believe, south on Camden, he pointed to like a telephone pole, and he said, "See where that pole is, that's where it was." And again, I had other detectives with me, and also Detective Eutsey, and we stopped there, and then from there, took down the location, and I had noted the phone pole that he pointed to, and from there we went to the barracks.



Q. Okay. But my question related to what he told you. Okay. I will ask you what happened. But first I want to know what precisely he told you other than, Do you want to know where it happened? Did he say anything else?
A. No, that's what I recall him saying. "Do you want me to show you where it happened?" Something to that effect. And he directed me. He's the one that said, you know, "Go here," and he told me where to go and where to stop.
Q. Okay. And did you communicate what he told you to any of the other detectives who were in this parade or caravan going to the barracks?
A. I believe I did.
Q. And how did you do that?
A. I stopped the car when he told me to stop, and, you know, I possibly had three cars behind me. I don't know who was driving what.
Q. Did Phil Hampton tell you where to go, or did you just happen to be going by the location, and he said, Oh, that's where it happened?
A. I was not going by the location. I was on my route, and he directed me to go, you know, go down Camden.



Q. Okay. So in addition to telling you, Do you want to know where it happened, he provided you with directions to get there; is that what you're saying?
A. I know where Camden Street is, that's what I am saying. I know where it is. But he directed me to Camden Street.
Q. So he told you the address; is that right? Or the cross streets?
A. No.
Q. So what did he say?
MR. BOWENS: Objection. Asked and answered. You can answer it again.
A. He said, "Go down Camden Street." So I know -- I mean, I worked in Newark. I lived in Newark. I know Newark pretty well, you know, some of the wards anyway, and so I knew where Camden Street was he was talking about, and I went down Camden Street, and he told me where to stop, and he pointed to a telephone pole.
Q. So he told you to stop. Did you stop?
A. Of course, yes.
Q. And then what did he say after you stopped the vehicle?

A. My recollection is that he said, "This is where it happened." He said, "See that telephone pole. That's about where it happened."
Q. And did he tell you what had happened at that location?
A. He said that that's where the crime -- I'm not saying verbatim, but that's where the crime occurred, in the house that used to be standing there.
Q. Did he tell you how the crime happened in the house that used to be there?
A. Later he did, yes.
Q. No. I'm -- sir, I'm asking in the car, did he tell you how the crime occurred as you were parked outside that location on your way to the barracks?
A. I don't recall that.
Q. Did you ask him as you were at that location looking at where the crime allegedly occurred how it occurred?
A. I don't recall carrying on any further conversation other than trying to get him to the barracks where I could, you know, conduct a formal interview.
Q. Why didn't you ask him when you were



out there in front of the alleged crime scene how the crime actually occurred?
A. Ma'am, I was -- to explain it, I was taking him to a location where I would attempt to have the witness in his own words live on, you know, the same way I'm here now. So, you know, it's not something I would do to conduct any type of interview since I was taking him to conduct a proper interview.
Q. Okay. But you waited there for a good period of time; didn't you?
MR. BOWENS: Objection. Assumes facts not in evidence. You can answer that.
A. I don't recall waiting there. I mean, I stopped -- we stopped, yes.
Q. You don't recall calling for forensic people to come out and photograph, et cetera?
A. I don't.
Q. Okay. Well, maybe if we looked at some testimony, that would help you.
A. Okay.
Q. Do you recall as you sit here today how long you were parked on Camden Street with Mr. Hampton?
A. I don't recall.



Q. Do you recall getting out of the car?
A. I did get out of the car.
Q. Did you get out of the car with Mr. Hampton?
A. I don't recall it. I had other detectives behind me. You know, I stopped where he told me to stop.
Q. I understand. And you're saying you don't recall whether Mr. Hampton got out of the car also; right?
A. I don't recall.
Q. Okay. Do you recall speaking to other detectives at that location?
A. I believe I did, yes.
Q. Okay. And which detectives did you speak to?
A. I don't recall which.
Q. And what did you say to the other detectives that you don't recall, and what did they say back to you?
A. I don't -- you know, I don't recall exactly what I told him. Obviously, I told him the reason for my stop, but other than that, I don't think there was anything else, and I don't recall who was where or how -- you know, I had three or four



cars behind me.
Q. Right. And everyone stopped at the location; correct?
A. Yes, because -- you know, I stopped where, you know, where I stopped the car, so they stopped behind me.
Q. And you don't have a recollection of how long you and the other detective were outside that location prior to continuing to the state barracks; correct?
A. Correct.
Q. Now, when you gave testimony at the trial or at any pretrial hearings in this case, it was truthful testimony; correct?
A. Yes, ma'am.
Q. And at that time, you're memory was more fresh; can we say that?
A. That's a true statement.
Q. And it's your recollection that you were standing at a location that Mr. Hampton had told you to stop at, but you had no idea what had happened at that location, is that right, other than that's where the crime allegedly occurred; correct?
A. Correct.

Q. Did you know there had been a fire at that location when you stopped with Mr. Hampton?
A. I had no clue of a fire.
Q. Okay. Eventually -- strike that. And you don't remember seeing any other either Essex County or Newark Police personnel arrive at the scene when you were there with Mr. Hampton on Camden Street?
MR. BOWENS: Objection. Mischaracterizes the witness's testimony. You can answer it.
A. Ma'am, I had several cars behind me. I don't know if there were any more or any less. I don't know.
Q. Okay. And I just want to make sure you're understanding my question. I am not talking about the detectives that had been working on the case. Did you see any other crime scene or forensic-type police personnel at the scene when you were there with Mr. Hampton on your way to the state barracks?
A. At present, I don't recall.
Q. Okay. Okay. I am going to have you look at, I think --
MS. BONJEAN: Where are we at? We



are at Carrega --
MS. COOLBAUGH: 11.
(Carrega-11, Continuation Report, Bates ECPO 001711 through 1713, was received and marked for identification.)
Q. Let's look at this.
MS. BONJEAN: You said it's 11, Haley?
MS. COOLBAUGH: Yes, 11.
Q. Okay. I'm going to have you look at what's been marked as Carrega-11, sir. Do you recognize this document, Mr. Carrega?
A. I see it's a document from Essex County. I don't recognize it. I see it's Tom Kelly and Lieutenant DeMaio.
Q. Okay. Do you know who Thomas Kelly is?
A. Yes.
Q. Who is he?
A. I don't know if he's still there. He was a detective in the prosecutor's office. He was also a polygraph examiner.
Q. Who was Michael DeMaio?
A. He was a lieutenant.
Q. Do you see the date of this report?



A. Yes, I do.
Q. Is that November 25th, 2008?
A. Yes.
Q. Okay. And do you see the narrative of this report from Detective Kelly?
A. "On November 12th, Phil... responded to Essex County... agreed to submit to a polygraph."
Q. Okay. And then does this refresh your recollection that Thomas Kelly was the polygrapher?
A. Yes.
Q. No reason to believe that Thomas Kelly would prepare a report indicating that he was the polygrapher if he did not, in fact, polygraph Mr. Hampton; right?
A. That's correct.
Q. And in the second paragraph, do you see that Detective Kelly indicated that he reviewed the case file related to the investigation to familiarize himself with the facts of the investigation and then conducted a pre-test interview of Mr. Hampton?
A. Yes, ma'am.
Q. Okay. Were you there when Mr. -- or Detective Kelly reviewed the case file in this



case?
A. I have no recollection -- when Detective Kelly reviewed the file?
Q. Yes. He said he reviewed --
A. I don't recall that. I'm sure he did, but I don't recall.
Q. Okay. Thank you. Now, eventually you and your fellow detectives arrive at the state police barracks; right?
A. Yes.
Q. Were you able to interview Philander Hampton there at the state police barracks?
A. Yes.
Q. Apart from yourself, who participated in that interview?
A. It was Detective Hadley for sure and Detective Tietjen, and I believe it was the three of us.
MR. BOWENS: Okay. Counsel, your time is up. Does anybody else have any questions for the witness?
MS. BONJEAN: Sir, my time is not up.
MR. BOWENS: It definitely is.
MS. BONJEAN: It is not. Okay. Please stop. If you believe --

MR. BOWENS: Don't tell me what to do. The first deposition was 5 hours and 43 minutes.
MS. BONJEAN: There were breaks in between, sir. Let's --
MR. BOWENS: I don't care if there were breaks. That's not according to the rules. He's not going to answer any more questions.
MS. BONJEAN: Okay. We're going to get the judge on the phone. I am not dealing with your abuse anymore. Please, Audrey, Madam Court Reporter --
MR. BOWENS: Let me tell you something. I have been practicing law for more than 40 years, and I have never had to file an ethics complaint against anybody until you met you.
MS. BONJEAN: Well, you didn't file an ethics complaint.
MR. BOWENS: If you want to get the judge on the phone, you go right ahead.
MS. BONJEAN: Okay. Go ahead and speak. Did you file an ethics complaint against me?
MR. BOWENS: Yes, I did.



MS. BONJEAN: Okay. Well, I guess they didn't take it very seriously because I haven't received any word of that.
But anyway, Audrey, how much time on the record, or maybe the court reporter -- or videographer can tell us?
THE VIDEOGRAPHER: Today we have been on for an hour and 26.
MS. BONJEAN: And how long were we on the record at the last deposition?
MR. BOWENS: 5 hours and 43 minutes.
MS. BONJEAN: Sir, I'm asking the videographer. Please.
THE VIDEOGRAPHER: It's going to take me a minute or two to pull up the thing here.
MS. BONJEAN: That's fine.
THE VIDEOGRAPHER: I can give you the run times of the video unit because to do the math in my head might be a little tough. But we were an hour and 31.
MS. BONJEAN: Okay. I'll do the math as you tell me.
THE VIDEOGRAPHER: Yeah. So it's an hour and 31.
MS. BONJEAN: Okay. Let me get my



calculator. Hour and 31.
THE VIDEOGRAPHER: And then 43. So that's like two and a quarter.
MS. BONJEAN: Okay.
THE VIDEOGRAPHER: Then we have an hour and one, which would make it three and a quarter.
MS. BONJEAN: Hour one. Okay.
THE VIDEOGRAPHER: And then the next is an hour and five, which would make it, say, four and a quarter.
MS. BONJEAN: Okay.
THE VIDEOGRAPHER: And then another 31 minutes.
MS. BONJEAN: Okay. We are not at 7 hours, Mr. Bowens.
MR. BOWENS: Well, I don't care what the court reporter has to say. The transcript is the record, and it shows that the deposition the first day took 5 hours and 43 minutes.
MS. BONJEAN: Sir, it doesn't include breaks.
MR. BOWENS: The rule doesn't say anything about breaks.
MS. BONJEAN: Sir, I have been



practicing a long time, too, and the rule does. Okay. Now, if you got want to get Judge Hammer on the phone, or we can just push through. I really don't care. It's up to you. It's either Judge Hammer on the phone, or we are going to push through, but we haven't been 7 hours on the record, and that is the rule.
MR. BOWENS: Okay. Well, if you want to get the judge on the phone, then you go right ahead, but absent a court order, he's not going to answer any more of your questions.
MS. BONJEAN: Okay. That's fine.
MR. BOWENS: Does anybody else have questions for the witness?
MS. BONJEAN: I am putting on the record that we are not going to -- I am not done questioning, and we are going to get Judge Hammer on the call, on the phone, and this deposition is not -- I am not waiving any rights to continue my deposition, so we'll take a break.
THE VIDEOGRAPHER: At 11:32 a.m. we are going off the video record.
(Off video record.)
MR. LIPSHUTZ: What does that mean we are taking a break?

MS. BONJEAN: Who just asked that?
MR. LIPSHUTZ: It was Gary. What does that mean we're taking a break? I didn't understand what you meant by that.
MS. BONJEAN: I'm getting the judge on the phone.
MR. LIPSHUTZ: Okay. That's clear.
(Break taken.)
MS. BONJEAN: Mr. Bowens, I spoke to the judge's clerk, and the judge is going to call us back in hopefully less than 15 minutes. According to the court reporter -- the videographer, we have been on the record 6 hours and 18 minutes, and according to Rule 30, if you look at the Committee Notes, the rule allows 7 hours of on the record, the actual deposition. It does not include breaks. So you may want to familiarize yourself with that so when the judge gets on the phone we can resolve this.
(Off the record.)
MS. BONJEAN: Can everybody hear me?
MR. LIPSHUTZ: I can hear you. I don't know if Mr. Bowens is back.
MS. BONJEAN: I can't hear you. We have a number to call in. The judge asked us to



call in to a conference number. If you want to take the number down.
(Off the record.)
(The following is a telephone conference call with Judge Hammer:
JUDGE HAMMER: Good morning everyone. This is Judge Hammer. Has the witness been excused from the room?
MR. BOWENS: Yes.
JUDGE HAMMER: Is the court reporter transcribing?
COURT REPORTER: Yes.
JUDGE HAMMER: Okay. So as I understand it from my law clerk Jason, there seems to be a dispute between the parties as to whether the plaintiff has exhausted all of their time deposing one of defendants; is that right?
MS. BONJEAN: Yes, judge. That's correct, your Honor.
JUDGE HAMMER: All right. So why don't I start with the plaintiff taking the deposition. Perhaps plaintiff's counsel can state their position first, and then the defense can respond.
MS. BONJEAN: Your Honor, Jennifer



Bonjean, on behalf of the plaintiff.
According to the court reporter, or the videographer, we have been on the record with this defendant for 6 hours and 18 minutes. That is not 7 hours. According to Rule 30, the notes of Advisory Committee under the 2000 amendments, the 7-hour durational limit only includes time actually on the record during your deposition. This is, by the way, a continued deposition from another day where the parties broke. So yes, there have been breaks, but breaks are not part of the calculation. The rule expressly says in the notes to be binding to the 2000 amendments. So it's pretty -- you know, we've only been on the record 6 hours 18 minutes. That's not my calculation. That's the videographer and the court reporter's calculation.
JUDGE HAMMER: Okay. That seems pretty straightforward. What does the defense want to tell me?
MR. BOWENS: Judge, the transcript from the first day shows that we were on the record, or that the deposition lasted 5 hours and 43 minutes. I believe that counsel has mischaracterized what's in the Advisory Committee



Notes because that is discussing the 7-hour rule. It's specifically says that we assume that there will be breaks. And more to the point, Judge, counsel has gone over and over the same things. I can't tell you how many objections I've made for asked and answered. I think that to, quickly, answer any more of this is simply unfair and inconsistent with the rules.
JUDGE HAMMER: All right. So how much time is the plaintiff still looking to take, assuming no breaks, from now until completion?
MS. BONJEAN: Judge, I told Mr. -- that we were close to finishing. I don't imagine it'd be more than 30 minutes, but, you know, I do think the record needs to reflect that the rule, and I will read it, I want to read from it, because I am not mischaracterizing anything, and I am growing leery of accusations by Mr. Bowens.
The rules says, the Advisory Note says, "This limitation contemplates that there will be" --
JUDGE HAMMER: I don't need the direct quote. Let's first make sure we are all on the same page --
MS. BONJEAN: Sure.

JUDGE HAMMER: -- where in the rule we are.
MS. BONJEAN: Sure.
JUDGE HAMMER: So that will make it easier for me to follow along in the Advisory Committee Note. So we're talking about, I assume it's Rule 30(b)(1)?
MS. BONJEAN: It is. It's Rule 30, and then this paragraph two to the Notes of Advisory Committee on 2000 amendments.
JUDGE HAMMER: Okay. Hold on. Just give me one second.
MR. LIPSHUTZ: There is a lot of feedback. Excuse me, your Honor. This is Gary Lipshutz. There is a lot of feedback. So if anybody is not speaking, would it be possible to mute your phones? I don't know why.
JUDGE HAMMER: Yeah.
MR. LIPSHUTZ: Thank you, your Honor. Nice to talk to you.
JUDGE HAMMER: Likewise. Okay. Go ahead. So I'm looking at the 2000 amendment, subdivision (d).
MS. BONJEAN: And then if you look down to where paragraph two starts, your Honor.



JUDGE HAMMER: Yeah. "Imposes a presumptive durational limitation." Yes.
MS. BONJEAN: Yes. " -- of one day of 7 hours running deposition. The committee has been informed that overly long depositions can result in undue costs and delays in some circumstances. The limitation contemplates that there will be reasonable breaks during the day for lunch and other reasons and that the only time to be counted is the time occupied by the actual deposition."
JUDGE HAMMER: It does say that, Mr. Bowens. It does say that.
Look, I'm going to allow the plaintiff to finish. I'm going to allow her -- it's not really even the additional time, because she's right, under the 2000 amendment to Rule 30(d)(1), it does indicate that the fact that breaks is contemplated by the rule, but the calculation time does not include those breaks.
Counsel has already indicated she's not imagining going much more than 30 minutes. This is a defendant. It's a party witness. Even if one were to factor the breaks, given that it's a party witness, I would say that she's looking



for a modest amount of time, I would be inclined to allow it. But here -- and I understand, she's not used the allotted 7 hours.
I understand that the parties may have differing opinions on whether there have been a lot of asked and answered, but honestly -- obviously rather, I'm in no position to assess that. I'm sure defense counsel has fairly stated their objection. And it strikes that it's in the best interests of all concerned that I allow the parties to resume and complete the deposition, and I will talk to you folks on November 16.
One thing I would like, by the way, in advance of the November 16th conference, because I know we are going to deal with the motion to quash, I want to get that taken care of, if I understand it, counsel is basing part of that motion, defense counsel is, on my ruling back in August. If so, if I recall correctly, that was by way of an oral opinion. Counsel needs to provide me with a copy of that oral opinion.
MR. BOWENS: Okay, Judge, I will do that.
JUDGE HAMMER: Yeah, if you could just get that on the docket by a week ahead of



time, that'll be fine.
MR. BOWENS: Okay. We'll do it, Judge.
JUDGE HAMMER: All right. Thank you, Counsel. Have a good day.
MS. BONJEAN: Thank you, your Honor.
MR. BOWENS: Thank you, your Honor.
(Teleconference concluded.)
THE VIDEOGRAPHER: At 12:04 p.m., we are back on the video record.
MS. BONJEAN: Thank you. Haley, can we mark Mr. Hampton's transcript of the interview.
MS. COOLBAUGH: Yes. It has not been marked. I got 12.
(Carrega-12, transcript of Philander Hampton interview, Bates ECPO 000342 through 427, was received and marked for identification.)
Q. Mr. Carrega, do you see this transcript? Mr. Carrega, are you there?
MS. BONJEAN: Is Mr. Carrega there? Is he on mute? We can't hear anybody. Can Mr. Carrega unmute?
THE VIDEOGRAPHER: Did you want to go off record?
MS. BONJEAN: Yeah. Going off the

record.
THE VIDEOGRAPHER: Going off video.
(Off the record.)
THE VIDEOGRAPHER: At 12:11 p.m. we are back on the video record.
Q. Mr. Carrega, I'm showing you what we have marked as Carrega-12?
COURT REPORTER: Yes.
Q. Do you see that it's a transcript of the interview of Philander Hampton?
A. Yes, ma'am.
Q. And it was taken at the state police barracks?
A. Yes, ma'am.
Q. Okay. I'd like to go to page 3 of that transcript. Do you see at line 16 that it says, "The time now is 8:18 p.m.," sir?
A. Yes.
Q. Okay. Do you know why the interview did not start until 8:18 p.m.?
A. Whatever time we got set up, and he got to the barracks, and they got set, that's whatever time it was when he was ready to go.
Q. I'd like you to -- page 11 -- or actually bottom of page 10, do you see page line



19, it says, "Okay. Before we came here to the State Barracks, did I take you to Camden Street?" And Mr. Hampton says, "Yes." Do you see that?
A. Yes.
Q. Okay. Go to the next page. And you asked him: "Okay. Why did we go there?" Do you see that?
A. Yes.
Q. And he answers, "Because that's where the five boys were missing at, right there. A fire set in the house that we moved out off on Camden Street and Evans, you know, wanted to kill the boys, you know, but I didn't really feel that he wanted, you know -- I didn't really feel that way inside of me." And you said, "Okay. I understand." Do you see that?
A. Yes.
Q. Is that the very first time that Mr. Hampton told you that the boys perished in a fire?
A. I don't know. I believe so.
Q. It's your testimony that prior to this interview that was audio recorded, Mr. Hampton didn't tell you any substantive information about the crime; is that correct?



MR. BOWENS: Objection. Mischaracterizes his testimony. You can answer it.
A. No, ma'am. He said he had knowledge, but I did not know about the fire.
Q. Okay. So the very first time you learned of any of the details of how the boys perished was when he first told you that in this recorded interview; is that your testimony?
A. That's what I recall, ma'am.
Q. Okay. Did you show Mr. Hampton photographs during this interview with him?
A. I don't recall, ma'am.
Q. Any reason to -- if the record reflects that, any reason to doubt that?
MR. BOWENS: Objection. Asked and answered.
A. It would be on the video if I showed him photographs. I just don't recall.
Q. Do you know where you got the photos to show Mr. Hampton during the course of this interview?
MR. BOWENS: Objection. Mischaracterizes the witness's testimony. You can answer it.



A. I don't recall showing the photographs. If it's on the video, yes.
Q. Okay. Can you look at page 22, please? Okay. I'm going to draw your attention to line 15 where it says: "LIEUTENANT CORREGLIA:" --
A. Yes.
Q. -- "Do you know what floor?
"MR. HAMPTON: No. I think it was the top floor.
"Top floor? Okay. Do you know this individual?
"Yeah. That's Reese. Maurice."
Do you see that?
A. Yes, I do.
Q. Do you know what you were referring to when you asked Mr. Hampton, "Do you know this individual?"
A. Well, the only Maurice that I was -- you know, I would think, Maurice Olds.
Q. Okay. But what I'm asking you is when you asked Mr. Hampton, "Do you know this individual," what were you referring to in that moment?
A. I guess I was either pointing to a name or a photo or something. I don't know.

Q. And he said, "Yeah. That's Reese."
Correct?
A. Did I say that?
Q. No. Mr. Hampton said, "Yeah. That's Reese -- Maurice." Correct?
A. Yes.
Q. Let's go to the next page.
Mr. Hampton says, "Yes."
You said, "Maurice Olds, was his name?
"Yeah.
"Right. Okay. You want to sign that picture, 11/12/08."
Do you see that?
A. Yes, I do.
Q. Okay. Where did you get a picture of Maurice Olds prior to your interview with Mr. Hampton?
A. I don't know, ma'am.
Q. Why did you have a picture of Maurice Olds in your possession prior to your interview with Mr. Hampton at the barracks?
A. I don't know. Possibly in the case file. I don't know.
Q. Okay. And did you bring the case



file to your interview with Mr. Hampton?
A. I don't recall doing it personally. I might have. I don't know.
Q. Did you keep pictures of people of interest anywhere else other than the case file?
A. Whatever was attached to this case would be in the case file.
Q. Right. Did you keep pictures of Maurice Olds or any other parties of interest in your personal --
A. Did I keep them personally?
Q. Yeah.
A. No, ma'am.
Q. Okay. So --
A. Just my kids.
Q. I'm sorry?
A. Just my kids.
(Reporter requested clarification.)
A. My children. That's the only pictures I kept personally.
Q. So if you had a picture of Maurice Olds that you were showing Mr. Hampton, you would have gotten that from the case file is your best understanding?
A. Yes, ma'am.



Q. Okay.
MS. BONJEAN: Okay. We can go off this document now. Okay. I would like to mark as Carrega-13 the Sabur reports.
(Carrega-13, Sabur reports, Bates 001226 to 1239, was received and marked for identification.)
Q. Mr. Carrega, you said Detective Sabur was consistently involved in investigating the missing boys case; correct?
A. That's correct.
Q. And Detective Eutsey and yourself communicated with him during your involvement in the case; correct?
A. More Detective Eutsey than I, but sporadically, yes.
Q. And then Detective Eutsey would communicate with you about his conversations with Detective Sabur?
MR. BOWENS: Objection. Calls for speculation. Facts not in evidence. You can answer it.
A. He may or may not, ma'am. I don't know what his -- all his conversations.
Q. No. Sir, you testified earlier that,



for instance, you came to believe that Lee Evans was a suspect based on your conversations with Detective Eutsey and Detective Sabur. Do you remember that?
A. Yes.
Q. Okay. And that's why you were interested in speaking with Phil Hampton; correct?
A. Yes.
Q. Okay. I want to have you look at this Carrega-13 and tell me if you recognize these reports? If you need Ms. Coolbaugh to scroll through it, she can do that.
A. I don't recall ever seeing these reports until recently. My attorney forwarded me these. But before that, I don't recall.
MR. BOWENS: Don't state what I may have done.
Q. Okay. So it's your testimony that you don't recall ever seeing these reports at the time you were investigating the case; right?
A. That's correct.
Q. But you did have communications at least through Agent Eutsey with Sabur?
A. Yes.
Q. I want to draw your attention --

Okay. Great. I guess it's page 8. Do you see on page 8, it says, "Also on this date (February 15th, 1999)" --
A. Yes.
Q. -- "Detective Sheppard and I located and interviewed Mr. Maurice Woody Olds regarding his knowledge of the disappearance of the missing teens"?
A. Yes, I do.
Q. And is it your understanding that that's the same Maurice Olds that you interviewed back in April of 2000-and, I guess, 8?
A. Possibly.
Q. Okay.
A. It's the only Maurice Olds I knew.
Q. All right. I'm going to read this and tell me, read from there on, it says, "During this time he refused to give a statement but provided us with the following information after being confronted with the information obtained from Ms. Canady." Do you see that?
A. Yes, I do.
Q. "He said he did in fact personally know all of the missing teens and described them all as being friends of his. He confirmed that



they did in fact sell marijuana for his cousin Lee Evans and admitted that Evans told him that he found out that the teens had burglarized his apartment at 979 Clinton Avenue and stole over a pound of marijuana, money and cocaine. He denied having personal knowledge about Evans involvement with the teens disappearance but did refer to us speak to his cousin Phil who he said may be able to help us. Olds further said that he had heard that the teens may have been burned in a fire either on Hawthorne or Camden Street in Newark." Do you see that?
A. Yes, ma'am.
Q. Okay. Any reason to doubt Detective Sabur's summary of his interview with Mr. Olds on February 15th, 1999?
A. No, ma'am.
Q. Okay. You can put that aside.
MS. BONJEAN: And finally, did we mark the affidavit that was executed by Mr. Carrega?
MS. COOLBAUGH: Give me one second. We did not.
MS. BONJEAN: Okay. Can you mark this, please?



MS. COOLBAUGH: It's going to be marked as Carrega-14.
(Carrega-14, Carrega affidavit, Bates ECPO 000257 through 259, was received and marked for identification.)
Q. I'd like you to look at Carrega-14 as soon as she can get that up there.
Do you recognize this document, Mr. Carrega.
A. It's an affidavit in support of arrest warrants.
Q. Okay. Can you go to the last page of that? And that's your signature there; correct, sir?
A. Yes. Yes, it is.
Q. Okay. And you swore to the truth of the contents of that affidavit; is that correct?
A. Yes, I did.
Q. Okay. And the information that was contained in that affidavit was based on your firsthand knowledge about the statement that Mr. Hampton provided to you on November 12, 2008; correct?
A. That's right.
MS. BONJEAN: Okay. And lastly,



Haley, can you mark that photo so that Mr. Carrega can look at it?
MS. COOLBAUGH: Yes. It's going to be Carrega-15.
(Carrega-15, press conference photograph, was received and marked for identification.)
Q. Mr. Carrega, do you remember being at this press conference?
A. I don't know which press conference this is.
Q. I'm sorry. I can't hear you, sir.
A. I don't. There was a press conference. I don't see myself there.
Q. Okay. Can you identify who the man is at the podium?
A. That's the prosecutor at the time. Peter Lur -- L-U-R-I-N-G.
Q. Can you identify who is to the right as we're looking at this photo of the prosecutor?
A. To the right -- to the left of the prosecutor, you mean? Oh, to the right. Okay. Yeah, that's Mayor Booker.
Q. Okay. And to the -- I guess it would be to Mayor Booker's left, but right as we're

looking at it, can you identify that individual?
A. That would be Joe Hadley just behind him, and chief, now Chief Darnell Henry.
Q. And where is Chief Darnell Henry?
A. Right next to -- Sergeant Henry is right next to the mayor.
Q. Right next to him, or right behind him?
A. No. Right behind him is Joe Hadley. Right next to him is Chief Henry.
Q. Got it. Okay. So right next to him. Do you recognize any other individuals in this press conference?
A. Yes.
Q. Can you tell me who you recognize, and identify them, please?
A. We got Joe Hadley. You have in the back, I think that's Mike Tietjen. You got director of homicide, Greg DeMattia. You have the first assistant above him, Judy Gagliano. You have prosecutor, Peter Guarino. You have Chief Ambrose. The sheriff, the sheriff of Essex County, of course, Armando Fontoura. All the way, the last one as I'm facing the photo as I'm looking at it, that's deputy chief of Newark PD,



Schneider. I can't see anybody else that I know.
Q. Okay. And do you see the mug shots that are being displayed for Philander Hampton and Lee Evans?
A. Yes, I do.
Q. Do you remember attending this press conference in the gallery, even if you weren't in this photograph?
MR. BOWENS: Objection. Asked and answered. You can answer it again.
A. I remember a press conference. I don't remember if I was there.
Q. Do you remember there being more than one press conference in which Mayor Booker appeared?
A. Not that I know. That's very possible, but not that I know.
MS. BONJEAN: Okay. All right. I thank you for your time. I have nothing further.
THE WITNESS: Thank you.
MR. BOWENS: Does anyone else have any questions for the witness?
MR. DiFRANCESCO: I have no questions.
MR. BOWENS: Hearing nothing --



MR. LIPSHUTZ: Sorry, Mr. Bowens. I was just thinking about it. I think I have no further questions -- or no questions right now.
MR. BOWENS: All right. The deposition is over. Thank you.
THE VIDEOGRAPHER: This will conclude the videotaped deposition at 12:30 p.m. We are going off the video record.
(Concluded at 12:30 p.m.)



CERTIFICATE OF OFFICER

I CERTIFY that the foregoing is a true and accurate transcript of the testimony and proceedings as reported stenographically by me at the time, place and on the date as hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney or counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

AUDREY ZABAWA, C.C.R.
Certificate No. XI01410

I, LOUIS CARREGA, have read the foregoing transcript and hereby certify that it is a true and accurate transcript of my testimony.

LOUIS CARREGA

Sworn and subscribed to before me
this day of , 2020.

A Notary Public of the
State of .
My Commission Expires:

## A

**able (8)** 258:16;260:10; 269:2;275:13;276:19; 282:21;319:11;341:8
**above (1)** 344:20
**absent (1)** 323:10
**abuse (1)** 320:11
**accessible (1)** 287:3
**according (9)** 264:11,13;295:23; 302:18;320:7;324:12, 14;326:2,5
**accusations (1)** 327:18
**A-C-K-A (1)** 257:16
**act (1)** 306:6
**Action (1)** 256:7
**actively (1)** 264:18
**actual (2)** 324:16;329:10
**actually (8)** 265:7;270:1; 276:23;293:4;294:12; 313:2;326:8;332:25
**addition (1)** 311:1
**additional (1)** 329:16
**address (2)** 271:19;311:8
**administer (2)** 291:3,6
**administered (3)** 291:9;293:5,6
**admit (1)** 301:23
**admitted (1)** 341:2
**advance (1)** 330:14
**advising (3)** 271:12,13,13
**Advisory (5)** 326:6,25;327:19; 328:5,10
**affidavit (5)** 341:20;342:3,10, 17,20
**afternoon (2)** 299:20;304:20
**again (26)** 262:18,19;263:16, 17;269:7;273:16; 275:13,19;284:25; 288:24;292:10,17; 295:14;296:8,13; 297:5;299:8,16; 302:2;304:14;305:8; 307:18;308:12; 309:21;311:13; 345:10
**against (2)** 320:16,23
**age (1)** 272:2
**Agent (11)** 265:14;266:1,2,5; 272:8,17;273:18; 274:25;290:8;291:6; 339:23
**agree (3)** 258:12,18;294:21
**agreeable (1)** 304:6
**agreed (7)** 256:9;295:21,22; 296:16,17;303:20; 318:7
**agreeing (1)** 297:7
**agrees (1)** 294:6
**ahead (7)** 283:18;305:7; 320:21,22;323:10; 328:22;330:25
**al (1)** 256:5
**Albert (1)** 274:21
**alleged (1)** 313:1
**allegedly (2)** 312:19;315:23
**allotted (1)** 330:3
**allow (6)** 267:14,16;329:14, 15;330:2,10
**allows (1)** 324:15
**almost (1)** 288:7
**along (2)** 256:18;328:5
**ambiguous (1)** 272:24
**Ambrose (1)** 344:22
**amendment (2)** 328:22;329:17
**amendments (3)** 326:6,13;328:10
**amount (1)** 330:1
**and/or (1)** 284:21
**answered (23)** 260:8;262:16; 263:16;269:7;275:1, 19;284:10,25;292:5, 10,17;293:3;297:20; 299:8,16;304:4,14; 307:10;311:13;327:6; 330:6;334:17;345:10
**anymore (2)** 306:8;320:11
**Apart (1)** 319:14
**Apartment (5)** 274:12,18,24; 275:4;341:4
**appear (1)** 256:10
**appearance (2)** 261:23;280:22
**appearances (2)** 256:15;278:16
**appeared (2)** 265:7;345:15
**appreciate (1)** 258:14
**approached (1)** 274:21
**appropriate (3)** 294:4;296:7,7
**approval (2)** 259:15;260:4
**approved (1)** 260:11
**approximately (1)** 292:3
**April (4)** 266:20,22;287:22; 340:12
**Aqua (2)** 257:8;287:12
**Armando (1)** 344:23
**around (3)** 265:23;280:18; 290:21
**arranged (2)** 290:12;296:11
**arrangements (3)** 300:21;302:2; 303:21
**arrest (1)** 342:10
**arrive (2)** 316:6;319:8
**Ashley (1)** 256:19
**aside (1)** 341:18
**assess (1)** 330:7
**assigned (3)** 259:5,8,19
**assignment (1)** 265:2
**Assistant (2)** 257:4;344:20
**assume (3)** 278:17;327:2;328:6
**Assumes (2)** 294:18;313:12
**assuming (1)** 327:11
**Atlantic (1)** 275:7
**attached (1)** 337:6
**attempt (1)** 313:4
**attempted (1)** 259:11
**attending (1)** 345:6
**attention (3)** 279:22;335:4; 339:25
**Attorney (3)** 257:11,17;339:14
**audio (4)** 263:13;264:3; 300:22;333:23
**Audrey (6)** 257:19;261:5; 277:22;303:14; 320:11;321:4
**August (5)** 258:21;261:17; 288:9,11;330:19
**available (3)** 259:12;291:18; 295:12
**Avenue (3)** 274:12,13;341:4
**away (1)** 275:10

## B

**back (17)** 262:25;263:2; 274:1;275:2;303:14, 16;305:11;307:25; 308:1;314:20;324:11, 23;330:18;331:10; 332:5;340:12;344:17
**bad (2)** 289:20;306:1
**bag (3)** 289:2,2,3
**barracks (24)** 299:23,23;300:24; 304:25;305:3,10; 307:8,15,19,20; 308:13,15;309:25; 310:13;312:16,23; 315:10;316:21;319:9, 12;332:13,22;333:2; 336:22
**based (2)** 339:2;342:20
**basement (1)** 288:15
**basing (1)** 330:17
**Bates (7)** 277:25;278:4; 281:14;317:4;331:16; 338:5;342:3
**Beacham (1)** 272:1
**behalf (5)** 256:17,23;257:1, 12;326:1
**behind (10)** 308:7,11;310:17; 314:6;315:1,6; 316:12;344:2,7,9
**Belmont (1)** 274:12
**best (2)** 330:10;337:24
**better (1)** 296:18
**Big (2)** 274:17,23
**bigger (1)** 276:17
**binding (1)** 326:13
**bit (1)** 280:22
**Bob (10)** 267:5,8;271:11,13, 13,20,21;272:2,2; 274:14
**Bob's (1)** 271:19
**BONJEAN (87)** 256:16,17,22,24; 257:24;258:1;260:22; 261:2,4,9,14;263:22; 264:1;267:24;268:4, 10;270:5,12;275:23; 276:4,7,12;277:15,18; 278:6;281:11,25; 284:8,12;287:10,13; 303:2,6,11;305:17,22; 306:2,9,13,17,21; 307:1;316:25;317:7; 319:22,24;320:4,9,18, 22;321:1,9,12,16,21, 25;322:4,8,12,15,21, 25;323:12,15;324:1,5, 9,21,24;325:18,25; 326:1;327:12,25; 328:3,8,24;329:3; 331:6,11,20,25;338:2; 341:19,24;342:25;

345:18
**B-O-N-J-E-A-N (1)**
256:17
**Booker (3)**
257:6;343:23;
345:14
**Booker's (1)**
343:25
**both (1)**
296:14
**bottom (1)**
332:25
**Boulevard (1)**
272:3
**BOWENS (86)**
257:1,1;262:15,19;
263:15;269:6;270:2,
7,10;272:23;275:18;
277:11;278:25;279:4;
281:7;282:7;283:14;
284:6,10,24;292:4,9,
16;293:1;294:18;
296:1;297:19;298:9;
299:7,15;302:20,25;
303:2,4,8,12;304:3,
13;305:14,18,20,22,
24;306:4,5,9,11,15,
19,24;307:9;311:12;
313:12;316:9;319:19,
23;320:1,6,13,20,25;
321:11;322:16,17,23;
323:8,13;324:9,23;
325:9;326:21;327:18;
329:13;330:22;331:2,
7;334:1,16,23;
338:20;339:16;345:9,
21,25;346:1,4
**boyfriend (1)**
285:13
**boys (12)**
259:6;265:13;
280:20;288:13;
301:19,24;304:12;
333:10,13,19;334:7;
338:10
**BRADLEY (1)**
260:7
**break (5)**
307:22;323:20,25;
324:3,8
**breaks (13)**
320:4,7;322:22,24;
324:17;326:11,11;
327:3,11;329:8,19,20,
24
**breezing (1)**
285:5
**Brian (1)**
256:12
**bring (3)**
263:7;269:2;336:25
**broke (2)**
274:23;326:10
**broken (2)**
274:17;275:3
**brother (5)**
282:19;285:19,22;
288:12,15
**brought (11)**
263:4,6,10,18;
269:16,18;288:25;
289:3,15;290:7;
299:19
**brown (2)**
289:2,3
**bucks (1)**
271:2
**burglarized (1)**
341:3
**burned (1)**
341:10
**bus (1)**
275:7
**buy (1)**
270:25

## C

**calculation (4)**
326:12,16,17;
329:20
**calculator (1)**
322:1
**call (14)**
271:11,20;274:25;
275:1;276:16;282:12;
303:10,11;306:23;
323:18;324:10,25;
325:1,5
**called (2)**
257:21;306:21
**calling (1)**
313:16
**calls (5)**
258:15;278:25;
283:15;298:9;338:20
**Camden (13)**
309:17,19;310:25;
311:5,7,14,17,19;
313:23;316:8;333:2,
11;341:11
**came (5)**
280:20;304:24;
305:8;333:1;339:1
**Can (83)**
258:12,18;261:4,9,
14,20;262:17,19;
263:16,22;264:25;
265:21;267:25;269:7;
270:6,7;272:24;
275:19;276:13,14,17;
277:15;278:19;
281:25;282:8;283:15;
284:25;290:2;291:16;
292:5,10,17;294:19;
296:2,2;297:18,22;
298:10,21;299:4,8,16;
300:6;301:20,25;
303:11,14;304:14;
305:19;307:6,10;
311:13;313:13;
315:17;316:10;321:6,
17;323:3;324:19,21,
22;325:22,23;329:5;
331:11,21;334:2,24;
335:3;338:2,21;
339:12;341:18,24;
342:7,12;343:1,2,15,
19;344:1,15;345:10
**Canady (1)**
340:21
**capable (1)**
300:23
**car (18)**
305:4,6,10,11,12;
307:11,13,25;308:1,5,
9;310:16;312:14;
314:1,2,3,9;315:5
**caravan (1)**
310:13
**card (1)**
298:13
**care (5)**
270:9;320:6;
322:17;323:4;330:16
**career (1)**
263:3
**Carrega (24)**
257:2,25;261:16;
268:14;270:15;
276:19;278:8;290:4,
15;298:8;307:3;
317:1,12;331:18,19,
20,22;332:6;338:8;
341:21;342:3,9;
343:1,8
**Carrega-10 (1)**
281:13
**Carrega-11 (2)**
317:3,11
**Carrega-12 (2)**
331:15;332:7
**Carrega-13 (3)**
338:4,5;339:10
**Carrega-14 (3)**
342:2,3,6
**Carrega-15 (2)**
343:4,5
**Carrega-2 (2)**
263:25;264:2
**Carrega-7 (2)**
268:6,7
**Carrega-8 (2)**
277:23,25
**Carrega-9 (3)**
277:22;278:3,7
**Carrega's (2)**
256:4;261:10
**carry (1)**
298:13
**carrying (1)**
312:21
**cars (4)**
308:10;310:17;
315:1;316:12
**case (34)**
259:6,6,7,10,14;
260:1,5;264:14,18,18,
22;265:3,6,13,18;
279:17,19;282:15;
294:25;296:22;
315:13;316:18;
318:19,25;319:1;
336:23,25;337:5,6,7,
23;338:10,14;339:20
**cement (1)**
280:15
**certified (2)**
256:13;257:19
**cetera (1)**
313:17
**chance (1)**
258:20
**Chief (7)**
301:12;344:3,3,4,
10,21,25
**children (1)**
337:19
**Chris (2)**
256:21,24
**circumstances (1)**
329:7
**City (3)**
256:5;257:5;275:8
**Civil (1)**
256:7
**clarification (2)**
259:4;337:18
**clarity (1)**
265:11
**cleaner (1)**
289:21
**clear (1)**
324:7
**clerk (2)**
324:10;325:14
**Clinton (1)**
341:4
**close (2)**
270:14;327:13
**closer (1)**
276:21
**closest (1)**
304:19
**clue (1)**
316:3
**cocaine (1)**
341:5
**co-counsel (1)**
257:8
**Cohen (1)**
256:19
**colleague (1)**
256:18
**collect (1)**
271:5
**coming (3)**
267:17;282:5;
296:24
**Committee (6)**
324:15;326:6,25;
328:6,10;329:4
**communicate (3)**
266:6;310:11;
338:18
**communicated (1)**
338:13
**communications (1)**
339:22
**complaint (3)**
320:16,19,23
**complete (1)**
330:11
**completed (2)**
295:16;300:13
**completion (1)**
327:11
**Compound (1)**
283:14
**concerned (1)**
330:10
**conclude (1)**
346:6
**concluded (2)**
331:8;346:9
**conclusion (1)**
298:10
**conduct (4)**
260:2;312:23;
313:7,8
**conducted (3)**
260:18;265:8;
318:21
**conducting (1)**
306:17
**conference (11)**
325:1,5;330:14;
343:5,9,10,13;344:13;
345:7,11,14
**confirmed (1)**
340:25
**confronted (1)**
340:20
**connection (1)**
300:16
**consensus (1)**
296:15
**consent (6)**
294:17;296:12,13;
297:10;298:3,7
**consented (1)**
299:14
**consents (1)**
295:11
**consistent (1)**

261:12
**consistently (1)** 338:9
**contact (2)** 266:3;295:11
**contacted (1)** 273:6
**contained (1)** 342:20
**contemplated (1)** 329:19
**contemplates (2)** 327:20;329:7
**contents (1)** 342:17
**continuation (2)** 258:24;317:3
**continue (1)** 323:19
**continued (1)** 326:9
**continuing (1)** 315:9
**conversation (3)** 300:3,8;312:22
**conversations (4)** 266:6;338:18,24;339:2
**convey (1)** 266:5
**Coolbaugh (17)** 256:20;260:24;261:3,13;263:24;268:2,5;275:25;276:9;277:21;317:2,9;331:13;339:11;341:22;342:1;343:3
**C-O-O-L-B-A-U-G-H (1)** 256:20
**copy (1)** 330:21
**Corporation (1)** 257:4
**corrections (2)** 269:10,15
**correctly (1)** 330:19
**CORREGLIA (1)** 335:5
**Cory (1)** 257:6
**costs (1)** 329:6
**Counsel (19)** 256:9,14,22;257:4,20;298:15,16;303:4;305:20;319:19;325:22;326:24;327:4;329:21;330:8,17,18,20;331:5
**counted (1)** 329:10
**County (33)** 262:3,25;263:14;269:3;278:10,14;279:8,12,20;290:7,18;291:14,17;292:14;294:3;299:1,6,20;300:2;301:17,22;302:12,18,24;303:18;304:2,9,18,22;316:6;317:13;318:7;344:23
**couple (1)** 259:4
**course (7)** 258:17;293:12;297:16;300:8;311:23;334:21;344:23
**Court (14)** 256:6,10;257:19;261:7;320:11;321:5;322:18;323:10;324:12;325:10,12;326:2,17;332:8
**cousin (5)** 286:22;287:4,7;341:1,8
**cover (1)** 306:25
**covered (1)** 305:15
**crime (15)** 302:17,24;303:18;309:6,9;312:6,7,10,14,19;313:1,2;315:23;316:18;333:25
**cross (1)** 311:9
**Cutler (29)** 267:5,9;268:8,15,16;269:13;270:20;271:1;272:2,4,9;273:13,18,19,25;274:3,4,11,14,20;275:4,5,8,16;277:1;283:23;284:2,19,23
**Cutler's (1)** 267:25

## D

**Darnell (5)** 257:6,7;301:12;344:3,4
**Darryl (3)** 285:19,20,22
**databases (1)** 259:11
**date (5)** 260:10;268:21;288:4;317:25;340:2
**daughter (1)** 272:1
**day (10)** 256:3;275:6;280:18;305:15;322:20;326:10,22;329:3,8;331:5
**days (2)** 271:25;288:13
**dead (2)** 287:21;288:5
**deal (1)** 330:15
**dealing (1)** 320:10
**deciding (1)** 295:7
**defendant (5)** 257:2;270:4;281:7;326:4;329:23
**defendants (3)** 257:5,12;325:17
**defense (4)** 325:23;326:19;330:8,18
**definitely (1)** 319:23
**delays (1)** 329:6
**DeMaio (2)** 317:15,23
**DeMattia (1)** 344:19
**demonstrate (1)** 298:25
**denied (1)** 341:5
**deposed (1)** 261:18
**deposing (1)** 325:17
**deposition (29)** 256:4;258:2,3,21,24;259:2,9;261:6,10;262:8;290:5;305:15,19;306:18;320:2;321:10;322:19;323:18,20;324:16;325:22;326:8,9,23;329:4,11;330:11;346:5,7
**depositions (1)** 329:5
**deputy (1)** 344:25
**describe (2)** 291:23;305:2
**described (1)** 340:24
**details (1)** 334:7
**detective (81)** 259:10;264:9,14,15,17,21,22;265:1,14,14,18;266:7;267:13,19;269:13,22;272:7,15;275:20;278:17;279:18,23;280:1,7,11,16;281:1,6,7,23;282:4,11;283:3,8,8,9,21;284:1,17,22;285:7,23;286:2,9,13,18,21;287:6,19;288:19;289:6,13,22;290:20,22,25;293:13;294:15;301:11,12;303:22;307:16,17;309:22;315:8;317:21;318:5,18,25;319:2,16,17;338:8,12,15,17,19;339:3,3;340:5;341:14
**Detectives (12)** 271:16;279:11;291:18;308:4;309:21;310:12;314:5,13,15,19;316:17;319:8
**determination (1)** 297:5
**determined (4)** 265:12;300:19,25;301:2
**device (3)** 263:13;264:4;269:4
**died (5)** 266:13,15,20;288:2,3
**different (2)** 264:3;308:9
**differently (1)** 297:13
**differing (1)** 330:5
**DiFRANCESCO (3)** 257:10,11;345:23
**DIRECT (2)** 257:24;327:23
**directed (4)** 309:17;310:8,24;311:6
**directions (1)** 311:3
**director (1)** 344:18
**disappearance (2)** 340:7;341:7
**disappeared (1)** 288:13
**discussed (1)** 299:18
**discussing (1)** 327:1
**displayed (1)** 345:3
**dispute (1)** 325:15
**District (2)** 256:6,6
**divided (2)** 274:22;275:3
**DNA (2)** 259:13;265:6
**docket (1)** 330:25
**document (5)** 276:2;317:12,13;338:3;342:8
**documents (4)** 267:23;276:5;290:11;299:17
**dog (1)** 269:20
**done (8)** 288:7;290:3;293:17;295:17;296:17;298:17;323:16;339:17
**double (1)** 275:24
**doubt (2)** 334:15;341:14
**down (11)** 263:22;273:22,22;277:15;280:14;309:23;310:25;311:14,18;325:2;328:25
**draw (3)** 279:22;335:4;339:25
**driving (4)** 307:13;308:2,18;310:18
**Dropbox (1)** 268:10
**drove (3)** 307:7,12,15
**duly (1)** 257:22
**durational (2)** 326:7;329:2
**Durburow (1)** 256:12
**during (13)** 264:7,13;269:2;279:16;281:1;301:16,21;326:8;329:8;334:12,21;338:13;340:17

## E

**earlier (2)** 294:1;338:25
**early (1)** 266:22
**easier (1)** 328:5
**ECPO (6)** 278:1,4;281:14;317:4;331:16;342:4
**effect (2)** 308:20;310:8
**either (7)**

266:21;272:17;
293:13;316:5;323:4;
335:24;341:10
**else (9)**
264:19;283:22;
310:5;314:24;319:20;
323:13;337:5;345:1,
21
**end (1)**
270:1
**enough (1)**
270:15
**entire (2)**
264:13;276:10
**Essex (33)**
262:3,24;263:14;
269:3;278:10,14;
279:8,12,19;290:7,18;
291:13,17;292:14;
294:3;299:1,6,20;
300:2;301:17,22;
302:12,17,24;303:18;
304:1,9,18,22;316:6;
317:13;318:7;344:22
**estimate (1)**
265:21
**et (2)**
256:5;313:17
**ethics (3)**
320:16,19,23
**Etuk (1)**
257:8
**Eutsey (31)**
264:9,9,12;265:14;
266:2,2,5;267:13,20;
269:13,22;270:23;
272:8,15,18;273:18;
275:1,20;290:9,22,25;
291:6;293:14;301:11;
303:22;309:22;
338:12,15,17;339:3,
23
**Evans (23)**
256:5,18,19,23;
259:5,6;260:6,11;
264:8;265:12;279:17;
286:22;288:16;
297:15,25;304:1,11;
333:12;339:1;341:2,
2,6;345:4
**Evans' (4)**
274:17;275:3;
287:3,7
**even (6)**
285:15;301:10,11;
329:16,23;345:7
**evening (1)**
299:22
**event (2)**
270:24;283:9
**Eventually (2)**
316:4;319:7
**Everybody (3)**
273:7;285:6;324:21
**everyone (2)**
315:2;325:6
**evidence (6)**
282:8;283:15;
294:19;298:24;
313:13;338:21
**exact (1)**
288:4
**exactly (5)**
265:1,24;280:10;
304:6;314:21
**EXAMINATION (1)**
257:24
**examiner (1)**
317:22
**Excuse (4)**
270:4;271:13;
282:19;328:14
**excused (1)**
325:8
**executed (1)**
341:20
**exhausted (1)**
325:16
**exhibit (1)**
277:23
**expand (3)**
258:17;270:3,6
**experience (1)**
263:2
**explain (2)**
296:18;313:3
**explained (2)**
259:9;290:6
**expressly (1)**
326:12

## F

**Fabian (1)**
289:1
**facility (1)**
269:5
**facing (1)**
344:24
**fact (6)**
259:19;299:19;
318:14;329:18;
340:23;341:1
**factor (1)**
329:24
**facts (6)**
283:15;293:10;
294:19;313:13;
318:20;338:21
**fair (2)**
266:1;302:16
**fairly (1)**
330:8
**familiar (1)**
289:8
**familiarize (2)**
318:20;324:18
**family (1)**
308:24
**far (3)**
269:19,21;282:15
**favor (1)**
261:10
**February (2)**
340:2;341:16
**feedback (2)**
328:14,15
**feel (2)**
333:13,14
**fellow (1)**
319:8
**Fenney (1)**
261:23
**few (2)**
258:4;267:22
**field (2)**
264:5;265:22
**fighting (2)**
280:13,14
**figure (1)**
272:22
**file (11)**
318:19,25;319:3;
320:15,18,23;336:23;
337:1,5,7,23
**filed (1)**
256:6
**finally (1)**
341:19
**finding (1)**
288:4
**fine (4)**
281:10;321:16;
323:12;331:1
**finish (2)**
258:10;329:15
**finishing (1)**
327:13
**fire (6)**
316:1,3;333:10,20;
334:5;341:10
**first (26)**
257:22;259:9;
261:11;268:12;273:6;
276:24;279:6,11,18;
281:20,21,25;282:4;
287:15;290:23;
305:15;310:3;320:2;
322:20;325:23;
326:22;327:23;
333:18;334:6,8;
344:19
**firsthand (1)**
342:21
**Five (5)**
287:1;301:19;
304:12;322:10;
333:10
**floor (3)**
335:7,9,10
**folks (1)**
330:12
**follow (1)**
328:5
**following (2)**
325:4;340:19
**follows (2)**
257:23;303:16
**Fontoura (1)**
344:23
**forensic (1)**
313:16
**forensic-type (1)**
316:19
**forget (1)**
260:17
**form (9)**
264:24;281:3;
283:12;284:3;286:11;
288:21;289:18;290:1;
296:1
**formal (1)**
312:23
**format (1)**
262:22
**forwarded (1)**
339:14
**found (3)**
266:24;273:7;341:3
**foundation (1)**
284:4
**four (2)**
314:25;322:11
**fresh (1)**
315:17
**friends (2)**
273:6;340:25
**front (1)**
313:1
**full (1)**
276:24
**funeral (1)**
287:24
**further (7)**
271:16;274:20;
275:8;312:21;341:9;
345:19;346:3

## G

**Gagliano (1)**
344:20
**gallery (1)**
345:7
**Garry (1)**
257:5
**Gary (3)**
257:3;324:2;328:14
**gave (2)**
299:22;315:12
**General (1)**
257:17
**General's (1)**
257:11
**get-go (1)**
264:16
**gets (2)**
294:7;324:19
**girl (1)**
286:2
**given (1)**
329:24
**giving (2)**
297:1;304:7
**goes (2)**
271:4;308:23
**gonna (1)**
270:2
**Good (10)**
256:16;257:10,25;
270:16,16;296:15;
309:10;313:11;325:6;
331:5
**grabbing (1)**
290:11
**grandmother (1)**
275:8
**Great (1)**
340:1
**Green (3)**
285:8,9,24
**Greg (1)**
344:19
**Gregory (5)**
281:12,14,17,22;
288:20
**Group (1)**
256:22
**growing (1)**
327:18
**Guarino (1)**
344:21
**guess (7)**
270:21;283:7;
321:1;335:24;340:1,
12;343:24
**guy (3)**
280:6;286:19;
292:21
**guys (1)**
285:15

## H

**Hadley (34)**
257:6,7;264:21;
278:22;280:7,11,16;
281:1,6,8,23;282:11;
283:8,9;284:2,17,22;
285:24;286:2,9,14,18,
21;287:6;288:19;
289:13,23;301:12;
307:17;308:8;319:16;
344:2,9,17
**Hadley's (2)**

265:1;279:23
**Hairston (3)**
276:8,16;277:25
**Haley (12)**
256:20;260:23;
261:9;263:23;267:25;
268:12;275:23;
277:16,20;317:8;
331:11;343:1
**half (2)**
258:3;297:2
**Hammer (21)**
323:2,5,17;325:5,6,
7,10,13,20;326:18;
327:9,22;328:1,4,11,
18,21;329:1,12;
330:24;331:4
**Hampton (58)**
259:22;265:19;
290:6,17;293:11,22,
24;295:20;296:11;
297:12,15,24;298:2,
25;299:5,19;300:1,8,
17;301:17,22,23;
304:23;305:2;307:7,
15;308:16,16;310:19;
313:24;314:4,9;
315:20;316:2,7,20;
318:15,22;319:12;
331:16;332:10;333:3,
19,23;334:11,21;
335:8,16,21;336:4,8,
18,22;337:1,22;
339:7;342:22;345:3
**Hampton's (1)**
331:12
**hand (1)**
291:14
**handles (1)**
294:10
**handy (1)**
277:20
**hang (2)**
285:21;286:7
**happen (1)**
310:20
**happened (15)**
302:1;305:25;
308:21;309:8,16;
310:3,5,7,22;311:2;
312:2,3,4,11;315:22
**happens (1)**
298:16
**Hawthorne (2)**
274:13;341:11
**head (1)**
321:19
**heading (1)**
308:19
**hear (9)**
275:9;284:12;
286:22;288:13;
324:21,22,24;331:21;
343:12
**heard (4)**
271:20;273:4;
307:12;341:9
**Hearing (1)**
345:25
**hearings (1)**
315:13
**held (1)**
256:8
**help (4)**
272:21;277:4;
313:20;341:9
**helpful (1)**
296:10
**Henry (10)**
257:6,7;301:12;
307:17,18;308:8;
344:3,4,5,10
**Here's (1)**
271:9
**himself (5)**
302:17,23;303:17;
304:11;318:20
**Hold (3)**
260:21;305:1;
328:11
**home (1)**
275:5
**homicide (2)**
293:18;344:19
**honestly (1)**
330:6
**Honor (7)**
325:19,25;328:14,
19,25;331:6,7
**hopefully (1)**
324:11
**hour (7)**
321:8,20,24;322:1,
6,8,10
**hours (13)**
320:2;321:11;
322:16,20;323:6;
324:13,16;326:4,5,15,
23;329:4;330:3
**house (10)**
274:5;282:20;
289:1,3,16;308:24,25;
312:8,11;333:11
**Huh (1)**
286:16
**Hunterdon (1)**
288:14

## I

**idea (4)**
275:10;292:24;
302:13;315:21
**identification (9)**
268:9;278:2,5;
281:15;317:5;331:17;
338:7;342:5;343:7
**identify (5)**
275:14;343:15,19;
344:1,16
**imagine (1)**
327:13
**imagining (1)**
329:22
**implicate (4)**
302:17,23;303:17;
304:11
**implicated (1)**
303:25
**important (1)**
297:6
**Imposes (1)**
329:1
**inclined (1)**
330:1
**include (3)**
322:21;324:17;
329:20
**includes (1)**
326:7
**including (1)**
256:10
**inconsistent (1)**
327:8
**in-depth (1)**
267:15
**indicate (4)**
261:11;301:18;
309:14;329:18
**indicated (3)**
267:4;318:18;
329:21
**indicates (3)**
262:1,7,8
**indicating (1)**
318:13
**indicted (1)**
264:8
**indiscernible (1)**
274:8
**individual (7)**
263:18;294:8;
295:1;335:11,17,22;
344:1
**individuals (1)**
344:12
**inform (1)**
295:16
**information (16)**
288:18;289:13,14,
14,16,23;293:10,16,
23;294:9,25;305:21;
333:24;340:19,20;
342:19
**informed (2)**
287:21;329:5
**initial (1)**
277:10
**inside (1)**
333:15
**instance (1)**
339:1
**interest (2)**
337:5,9
**interested (3)**
271:8;276:14;339:7
**interests (1)**
330:10
**interpret (1)**
309:1
**interview (49)**
259:19;260:14,17,
19,25;262:24;263:3,9,
17;266:9;267:8,14,15,
25;268:8,15;269:2;
274:11,14;275:15,16;
276:25;278:7,13;
281:2,12,17;295:4;
300:22;301:16,21;
312:24;313:8,9;
318:22;319:11,15;
331:12,16;332:10,19;
333:23;334:9,12,22;
336:17,21;337:1;
341:15
**interviewed (12)**
259:22;263:20;
265:19;266:14,21;
267:12,18;269:8;
271:21;303:21;340:6,
11
**interviewing (4)**
267:5;278:9;
281:22;304:23
**interviews (5)**
262:11;263:13;
264:4;265:8,9
**into (10)**
259:11;263:4;
269:9,9,16,17;274:17,
23;275:3;300:23
**investigating (2)**
338:9;339:20
**investigation (8)**
260:6,12;296:11;
297:4,16,23;318:19,
21
**investigative (5)**
259:7;295:10;
296:4,6,9
**investigators (2)**
269:19,21
**involved (4)**
260:2;298:7;
309:15;338:9
**involvement (6)**
294:11;295:14;
301:18,23;338:13;
341:6
**Irving (1)**
272:2
**issue (1)**
297:10

## J

**Jack (3)**
264:9,11;296:14
**James (4)**
260:25;261:3;
263:19,21
**Jason (1)**
325:14
**Jennifer (3)**
256:16;258:1;
325:25
**Jersey (3)**
256:7;257:11,16
**Joe (9)**
257:6,7;264:21;
278:22;281:4;308:8;
344:2,9,17
**John (1)**
257:1
**Johnson (8)**
271:17,18,21,22;
272:1;273:3,5;274:22
**Johnson's (1)**
271:25
**join (1)**
287:10
**judge (36)**
303:10,11;320:10,
21;323:2,4,9,17;
324:5,10,18,25;325:5,
6,7,10,13,18,20;
326:18,21;327:3,9,12,
22;328:1,4,11,18,21;
329:1,12;330:22,24;
331:3,4
**judge's (1)**
324:10
**Judy (1)**
344:20
**jumped (1)**
287:12
**June (4)**
268:21;281:18;
282:15;287:3

## K

**Kathy (8)**
286:2,4,4,7,10,13;
287:23,23
**keep (3)**
337:4,8,11
**Kelly (8)**
317:14,16;318:5,9,
13,18,25;319:3
**Kennedy (5)**
286:5,7,10,13;
287:24
**kept (1)**
337:20

kids (2)
337:15,17
kill (1)
333:12
killed (1)
271:15
kind (2)
276:17;305:21
knew (5)
281:1,4;304:8;
311:17;340:15
knowledge (6)
259:15;304:10;
334:4;340:7;341:6;
342:21

L

LA (1)
256:21
Lacks (1)
284:4
last (12)
258:2;259:2;
260:15,15;261:6;
274:2;277:23;290:5,
5;321:10;342:12;
344:24
lasted (1)
326:23
lastly (1)
342:25
late (2)
266:20;287:22
Later (1)
312:12
LaTronica (1)
256:21
Law (3)
256:22;320:14;
325:14
lead (1)
264:15
learned (1)
334:7
least (2)
269:2;339:23
leave (1)
261:14
led (3)
269:9,9,17
Lee (20)
256:5,18,23;259:5,
6;260:5,11;265:12;
274:17;279:17;
286:22;287:3,7;
288:16;297:15,24;
304:1;339:1;341:1;
345:4
leery (1)
327:18
left (8)
275:4;290:5;304:9,
18;307:19;308:13;
343:21,25
legal (1)
298:10
less (2)
316:13;324:11
levels (1)
306:7
lie (1)
296:25
Lieutenant (3)
317:15,24;335:5
Likewise (1)
328:21
limit (1)
326:7
limitation (3)
327:20;329:2,7
line (27)
270:10,11,12,17,19;
273:15,25;274:3;
280:2;282:4,10,10,23;
283:6,25;284:16;
285:4;286:24;287:15;
288:9;289:7,9,11,24;
332:16,25;335:5
Lines (1)
280:24
Lipshutz (20)
257:3,3;264:24;
281:3;283:12;284:3;
285:1;286:11;287:11;
288:21;289:18;290:1;
323:24;324:2,7,22;
328:13,15,19;346:1
list (1)
261:5
listen (1)
271:10
little (5)
269:4;271:5;
280:22;289:21;
321:19
live (1)
313:5
lived (1)
311:15
located (1)
340:5
location (16)
262:12;263:8;
308:24;309:23;
310:21,23;312:5,15,
19;313:4;314:13;
315:3,9,20,22;316:2
long (5)
313:23;315:8;
321:9;323:1;329:5
look (21)
261:20;267:22,25;
268:3;269:25;274:1;
276:15;277:17;
280:19,21;305:18;
316:24;317:6,10;
324:15;328:24;
329:14;335:3;339:9;
342:6;343:2
looked (4)
260:14;264:2;
292:20;313:19
looking (11)
261:16;273:7;
283:9;297:3;312:19;
327:10;328:22;
329:25;343:20;344:1,
25
looks (1)
287:11
loss (1)
271:6
lot (4)
296:5;328:13,15;
330:6
Lou (8)
256:4;257:2;
278:17,18,22;279:7,
11,19
Louie (2)
282:5,12
Louie's (2)
282:5,14
Louis (1)
279:11
lunch (1)
329:9
Lur (1)
343:18
L-U-R-I-N-G (1)
343:18

M

ma'am (47)
261:25;264:10;
265:10,16;270:10;
272:6,10;273:20;
275:12;281:19,24;
282:17;283:17;284:5;
285:2;288:22;289:19;
291:5,8,15,25;293:25;
296:4;297:21;298:1;
299:3,9,12,25;307:11,
25;308:3;313:3;
315:15;316:12;
318:23;332:11,14;
334:4,10,13;336:19;
337:13,25;338:23;
341:13,17
Madam (1)
320:11
Male (7)
270:21;271:9;
273:3,9;274:6,10;
275:2
man (2)
292:1;343:15
Man's (2)
274:17,23
many (9)
265:17,24;266:9;
267:8;285:14;290:20;
291:13;306:7;327:5
March (7)
260:18;261:1;
262:2,4,9;264:8;
266:22
marijuana (6)
271:14;274:19,21;
275:3;341:1,5
mark (12)
267:24;268:4,5;
276:8,10,14;277:18;
331:12;338:3;341:20,
24;343:1
marked (17)
260:22;261:6,12;
263:23;268:8;278:1,
5;281:15;317:5,11;
331:14,17;332:7;
338:6;342:2,4;343:6
math (2)
321:18,21
mattresses (1)
288:15
Maurice (19)
266:10,20;288:2,3,
12,12,16;335:12,18,
19;336:5,9,17,20;
337:9,22;340:6,11,15
Maurice's (2)
287:14,16
may (16)
256:9;257:19,20;
278:9,13;287:20,21;
298:15,20;324:17;
330:4;338:23,23;
339:16;341:8,10
maybe (3)
267:17;313:19;
321:5
Mayor (4)
343:23,25;344:6;
345:14
McCarthy (1)
257:5
McDowell (4)
271:10,18;274:20,
22
mean (11)
266:21;281:6;
289:7;308:22;309:2,
10;311:15;313:14;
323:24;324:3;343:22
meant (1)
324:4
meeting (1)
256:8
Melvin (1)
274:16
members (1)
259:13
memory (1)
315:16
mention (1)
275:9
mentioned (1)
294:1
met (1)
320:16
Michael (6)
257:14,15;274:20;
288:25;289:15;
317:23
middle (3)
283:20;288:8,24
might (6)
279:13;296:6;
301:15;307:20;
321:19;337:3
Mike (1)
344:18
mind (2)
270:8;288:24
minimal (1)
295:14
minute (1)
321:15
minutes (11)
320:3;321:11;
322:14,20;324:11,14;
326:4,15,24;327:14;
329:22
Miranda (4)
298:6,8,19,21
Mirandize (2)
298:19,20
Mirandized (2)
298:25;299:5
mischaracterized (1)
326:25
Mischaracterizes (5)
293:2;302:21;
316:10;334:2,24
mischaracterizing (1)
327:17
missing (17)
259:6;265:13;
271:17,23;272:12,20;
273:5;275:5,7;
276:11,15;301:19,24;
333:10;338:10;340:7,
24
modest (1)
330:1
moment (2)
297:3;335:23
money (2)
271:5;341:5
more (14)
266:2;291:21;
292:12;315:17;
316:13;320:8,14;

323:11;327:3,7,14;
329:22;338:15;
345:13
**morning (5)**
256:16;257:10,25;
258:4;325:6
**most (1)**
297:6
**motion (2)**
330:16,18
**mouth (1)**
296:25
**move (2)**
278:19;288:14
**moved (1)**
333:11
**Mrs (5)**
271:10,17,25;
273:3,5
**much (5)**
270:6;294:7;321:4;
327:10;329:22
**mug (1)**
345:2
**murders (3)**
301:19,24;304:12
**must (1)**
285:4
**mute (2)**
328:17;331:21
**myself (1)**
343:14

## N

**name (19)**
256:12;257:25;
260:17;261:2;271:19;
279:6,11,19,23;
283:23;285:8,24;
286:2,10,14,21;
297:18;335:24;
336:10
**named (1)**
271:11
**names (3)**
291:17;292:13;
306:23
**narrative (1)**
318:4
**neater (1)**
280:22
**necessarily (1)**
296:23
**necessary (1)**
293:11
**need (4)**
305:20;307:22;
327:22;339:11
**needed (1)**
293:23
**needs (2)**
327:15;330:20
**New (3)**
256:6;257:11,16
**Newark (12)**
256:5,7;257:5;
259:10;264:22;265:4;
311:15,16,16;316:6;
341:11;344:25
**newer (1)**
284:17
**next (10)**
273:23;286:1;
322:9;333:5;336:7;
344:5,6,7,10,11
**Nice (1)**
328:20
**nobody (1)**
273:7
**none (1)**
294:11
**normal (1)**
293:7
**note (3)**
257:7;327:19;328:6
**noted (1)**
309:24
**Notes (5)**
324:15;326:5,13;
327:1;328:9
**November (5)**
318:2,6;330:12,14;
342:22
**number (7)**
256:3,7;265:8;
274:12;324:25;325:1,
2

## O

**oath (1)**
258:7
**objection (46)**
259:18;260:7;
262:15;263:15;
264:24;269:6;272:23;
275:18;278:25;281:3;
282:7;283:12,14;
284:3,24;285:1;
286:11;288:21;
289:18;290:1;292:4,
9,16;293:1;294:18;
296:1;297:19;298:9;
299:7,15;302:20;
304:3,13;305:14;
306:11,12;307:9;
311:12;313:12;316:9;
330:9;334:1,16,23;
338:20;345:9
**objections (1)**
327:5
**obnoxious (2)**
306:20,22
**observing (2)**
257:8,9
**obtained (6)**
284:14,22;285:24;
289:13,23;340:20
**obviously (11)**
265:5,23;269:1;
293:20,21;294:9;
296:17;300:11;302:3;
314:22;330:7
**occupied (1)**
329:10
**occurred (9)**
263:13;309:6,9;
312:8,14,20,20;313:2;
315:23
**o'clock (1)**
274:16
**October (1)**
256:2
**off (15)**
262:24;273:21;
290:5;298:21;323:22,
23;324:20;325:3;
331:24,25;332:2,3;
333:11;338:2;346:8
**offered (1)**
301:5
**office (37)**
257:12,16;262:3,
13,25;263:4,7,11,14;
265:23;267:17;269:3;
278:10,14;279:8,12,
20;290:8,18;291:18;
292:15;294:4;299:2,
6,20;300:3;301:18,
23;302:13,18,24;
303:19;304:2,10,18,
23;317:21
**officers (4)**
269:10,15,18;
271:10
**old (2)**
284:18;292:3
**Olds (12)**
266:10;335:19;
336:9,17,21;337:9,22;
340:6,11,15;341:9,15
**one (29)**
260:19,21;266:11,
11;267:10;274:5;
281:9;291:12,22;
292:11,12,22,23;
294:23;296:7;297:18;
303:6;305:1;310:9;
322:6,8;325:17;
328:12;329:3,24;
330:13;341:22;
344:24;345:14
**only (11)**
270:5,6;297:12;
302:8;303:6;326:7,
14;329:9;335:18;
337:19;340:15
**opinion (2)**
330:20,21
**opinions (1)**
330:5
**opportunity (2)**
258:17;309:5
**oral (2)**
330:20,21
**order (2)**
293:23;323:10
**ordered (1)**
261:23
**original (1)**
272:11
**out (19)**
266:25;272:22;
274:7;282:5;285:21;
286:7;288:4;294:22;
296:24;308:19;309:5;
313:1,17;314:1,2,3,9;
333:11;341:3
**outside (4)**
262:12;263:14;
312:15;315:8
**over (10)**
279:13;290:7;
294:8;295:13;298:23;
299:19;327:4,4;
341:4;346:5
**overly (1)**
329:5
**own (1)**
313:5

## P

**page (34)**
261:11;268:12;
269:25,25;270:13;
273:23,23;276:15;
279:23;281:20;282:1,
18;283:20,21;285:3;
286:1,15;287:9;
288:6,7,8,9,23;
327:24;332:15,24,25,
25;333:5;335:3;
336:7;340:1,2;342:12
**Pamela (1)**
272:1
**parade (1)**
310:13
**paragraph (6)**
276:23,24,25;
318:17;328:9,25
**paralegal (1)**
256:20
**parked (2)**
312:15;313:23
**part (3)**
271:7;326:11;
330:17
**participated (2)**
260:15;319:14
**parties (6)**
256:9;325:15;
326:10;330:4,11;
337:9
**party (2)**
329:23,25
**pass (3)**
294:8;306:12;309:4
**passed (1)**
266:25
**PD (1)**
344:25
**pending (2)**
284:7,9
**people (3)**
296:19;313:17;
337:4
**Pereggin (4)**
278:17,18,22;279:7
**Perfect (1)**
273:24
**Perhaps (1)**
325:22
**period (5)**
264:7;266:13,14;
279:16;313:11
**perished (2)**
333:19;334:8
**permitted (1)**
294:16
**person (9)**
263:6,9,10;271:12;
290:23;294:7,13;
295:11;297:6
**personal (2)**
337:10;341:6
**personally (4)**
337:2,11,20;340:23
**personnel (2)**
316:6,19
**persons (3)**
272:12,20;276:11
**person's (2)**
263:8;276:16
**pertains (1)**
294:25
**Peter (2)**
343:17;344:21
**Phil (26)**
265:19;280:5,6,16,
18;281:1;286:21,23;
287:4,7;290:17;
293:21,24;295:20;
297:12,15,24;299:5;
301:17,23;308:16,16;
310:19;318:6;339:7;
341:8
**Philander (5)**
259:22;319:11;
331:15;332:10;345:3
**Phillips (4)**
261:1,3;263:19,21
**phone (11)**
274:25;275:1;

309:24;320:10,21;
323:3,5,9,18;324:6,19
**phones (1)**
328:17
**photo (7)**
284:14;287:2,7;
335:25;343:1,20;
344:24
**photograph (3)**
313:17;343:6;345:8
**photographs (3)**
334:12,19;335:1
**photos (1)**
334:20
**physically (1)**
291:24
**pick (1)**
280:20
**picture (8)**
283:22;284:2,18,
18;336:13,16,20;
337:21
**pictures (4)**
284:22;337:4,8,19
**Pitman (1)**
274:22
**place (3)**
262:6;268:18;
274:14
**plaintiff (6)**
256:18;325:16,21;
326:1;327:10;329:15
**plaintiff's (1)**
325:22
**please (20)**
256:14;258:10;
261:20;262:18;
268:13;269:24;
276:13;281:12;
291:24;301:20;
302:25;303:15;306:4;
307:2;319:25;320:11;
321:13;335:4;341:25;
344:16
**pm (6)**
331:9;332:4,17,20;
346:7,9
**podium (1)**
343:16
**point (11)**
276:22;290:12;
295:9;299:4,10;
301:16,21;309:5,12,
14;327:3
**pointed (4)**
274:7;309:19,24;
311:20
**pointing (1)**
335:24
**pole (5)**
309:19,20,24;
311:20;312:3
**police (6)**
299:23;316:6,19;
319:9,12;332:12
**policies (1)**
298:5
**policy (5)**
293:8;294:1,2,3,16
**polygraph (29)**
291:4,7,9,19;293:5,
12,24;294:4,7,9,13,
17,21;295:4,8,19,20,
24;296:10,19,25;
297:8,24;298:3;
300:11,18;317:22;
318:7,14
**polygraphed (6)**
290:12,18;296:12;
297:16;300:2,9
**polygrapher (14)**
290:19;291:1,11,
23;292:8,20;293:10,
16,22;300:4,7,16;
318:10,14
**polygraphers (3)**
291:13,17;292:14
**polygraphist (3)**
294:10,12;298:4
**polygraphists (1)**
294:24
**portion (4)**
273:17,18;274:2;
276:10
**posed (1)**
289:23
**position (2)**
325:23;330:7
**possession (3)**
288:19;299:12;
336:21
**possibilities (1)**
292:24
**possible (5)**
273:1;279:14,16;
328:16;345:16
**possibly (6)**
259:12;276:18;
307:17;310:17;
336:23;340:13
**potential (1)**
291:19
**pound (2)**
274:18;341:5
**pounds (4)**
283:5,11;288:25;
289:15
**practicing (2)**
320:14;323:1
**precisely (1)**
310:3
**prefer (1)**
261:21
**premises (1)**
262:24
**prepare (2)**
258:23;318:13
**present (7)**
264:6;271:24,25;
290:15,17;292:18;
316:22
**press (8)**
343:5,9,10,13;
344:13;345:6,11,14
**presumably (1)**
296:12
**presumption (1)**
309:10
**presumptive (1)**
329:2
**pre-test (1)**
318:21
**pretrial (1)**
315:13
**pretty (4)**
294:7;311:16;
326:14,19
**previously (1)**
277:24
**Prior (9)**
259:5;260:1,4;
261:10;287:22;315:9;
333:22;336:17,21
**Prison (4)**
267:6,9;268:19,24
**problems (1)**
300:23
**proceed (3)**
257:20;258:2;
306:23
**proceeded (3)**
300:20,21;302:2
**process (2)**
295:6,19
**prompted (1)**
288:20
**proper (1)**
313:9
**prosecutor (4)**
343:17,20,22;
344:21
**prosecutors (1)**
290:21
**Prosecutor's (31)**
262:3,13,25;
263:14;269:3;278:10,
14;279:8,12,20;290:7,
18;291:14,18;292:15;
293:17;294:3;299:1,
6,20;300:2;301:17,
22;302:12,24;303:18;
304:2,10,18,22;
317:21
**Prosecutors's (1)**
302:18
**prove (1)**
296:10
**provide (3)**
258:16;260:10;
330:20
**provided (5)**
293:9,16;311:2;
340:19;342:22
**providing (1)**
293:22
**pull (5)**
261:5,10;268:11;
276:14;321:15
**pursuant (1)**
294:16
**push (2)**
323:3,5
**put (6)**
268:12;276:5;
289:2;296:16;305:24;
341:18
**putting (1)**
323:15

**Q**

**quarter (3)**
322:3,7,11
**quash (1)**
330:16
**question-and-answer (1)**
262:22
**quick (1)**
282:22
**quickly (2)**
268:3;327:6
**quote (1)**
327:23

**R**

**Rahway (5)**
267:5,9,12;268:19,
24
**raising (1)**
303:8
**ran (1)**
300:23
**Randy (4)**
271:17,22;274:16;
280:4
**Rappaport (1)**
256:13
**rather (1)**
330:7
**reach (1)**
294:22
**reached (1)**
282:5
**read (12)**
258:20;272:21;
273:17,18;298:13,21;
303:14,16;327:16,16;
340:16,17
**reading (12)**
261:22;272:8,11,
13,22;273:17,20;
275:14,15,21;277:5,8
**reads (1)**
276:25
**ready (1)**
332:23
**real (1)**
282:22
**really (11)**
267:15;270:1;
285:16;297:3,10;
298:5;305:19;323:3;
329:16;333:13,14
**reason (5)**
314:22;318:12;
334:14,15;341:14
**reasonable (1)**
329:8
**reasons (1)**
329:9
**recall (88)**
261:19;263:19;
264:6;265:22,23;
266:11;267:3,11;
269:8,11,16;272:13;
273:20;275:20;277:8;
286:12;288:3,4,4,22;
289:19;290:8,20,21;
291:12,25;292:12,20,
22;293:7,13,14,15,25;
295:21;297:17,21,22;
298:1;299:3,9,24;
300:10,12,14;301:10,
10,25;302:9;303:20,
22;304:5,5,24;307:4,
16,18;308:6,11,12;
310:6;312:17,21;
313:14,16,22,25;
314:1,5,9,11,12,17,19,
21,24;316:22;319:5,
6;330:19;334:10,13,
19;335:1;337:2;
339:13,15,19
**recalled (1)**
299:21
**received (11)**
268:8;271:11;
278:1,5;281:15;
317:4;321:3;331:17;
338:6;342:4;343:6
**recently (1)**
339:14
**recognize (6)**
317:12,14;339:10;
342:8;344:12,15
**recollection (15)**
266:18,23;269:23;
277:5,7;288:1;292:7;
300:21;308:18;
309:17;312:1;315:7,
19;318:9;319:2
**record (30)**
256:2;262:11,24;
263:12;264:4;282:8;

305:24;321:5,10;322:19;323:7,16,22,23;324:13,16,20;325:3;326:3,8,15,23;327:15;331:10,24;332:1,3,5;334:14;346:8
**recorded (4)** 268:23;299:22;333:23;334:9
**recording (1)** 263:13
**Reese (3)** 335:12;336:1,5
**refer (1)** 341:7
**reference (1)** 271:22
**referring (4)** 260:20,25;335:15,22
**Refers (1)** 282:7
**reflect (2)** 299:5;327:15
**reflects (4)** 278:13;281:17;299:13;334:15
**refrain (1)** 302:25
**refresh (4)** 277:4,7;288:1;318:8
**refused (1)** 340:18
**regarding (4)** 256:5;266:6;289:14;340:6
**regular (1)** 266:3
**rehash (1)** 259:2
**related (2)** 310:1;318:19
**relatives (1)** 273:6
**remember (26)** 258:1;260:16,18;261:16;267:5;268:23;273:9,11,13;277:12,12;278:8;281:22;287:2;289:12;290:9;291:16;292:13;303:25;316:5;339:4;343:8;345:6,11,12,13
**remind (2)** 258:4,9
**remotely (1)** 256:10
**reorient (2)** 259:1,3
**repeat (2)** 301:20;307:6
**report (7)** 272:20;275:15;277:6;317:3,25;318:5,13
**reported (4)** 271:16,22;273:5;275:6
**reporter (12)** 256:10;257:19;261:7;320:12;321:5;322:18;324:12;325:10,12;326:2;332:8;337:18
**reporter's (1)** 326:17
**reports (12)** 272:12;276:8,11,16,17;277:10,25;338:4,5;339:11,13,19
**reprehensible (2)** 306:7,22
**represent (2)** 256:15;257:4
**represents (1)** 256:19
**requested (1)** 337:18
**residence (1)** 271:18
**resolve (1)** 324:19
**respond (2)** 263:6;325:24
**responded (1)** 318:6
**rest (1)** 289:2
**result (1)** 329:6
**resulted (1)** 301:8
**resume (1)** 330:11
**returned (1)** 271:14
**reviewed (4)** 318:18,25;319:3,4
**Ricky (1)** 280:4
**Ricky's (1)** 289:3
**rid (1)** 269:20
**ride (1)** 275:7
**right (63)** 259:16,20;261:24;262:9;264:15,23;265:9,15;267:2,6;272:3,19;273:23;279:24;283:4,5,10;285:7;288:6;290:4;291:4;292:25;293:17,19;295:4;297:10;300:11;302:7;307:23;308:2;311:9;314:10;315:2,22;318:15;319:9;320:21;323:9;325:17,20;327:9;329:17;331:4;333:10;336:12;337:8;339:20;340:16;342:24;343:19,21,22,25;344:5,5,7,7,9,9,11;345:18;346:3,4
**rights (3)** 298:12,19;323:19
**Rizman (1)** 256:12
**Rob (1)** 268:15
**Robert (9)** 268:7,15;272:2;274:11;276:25;283:23;284:2,22;288:12
**Robert's (2)** 289:1,16
**Roderick (5)** 277:19;278:3,6,9,13
**room (10)** 269:9,10,17,17;293:5,21;295:15;300:22;302:3;325:8
**route (1)** 310:24
**Royster (20)** 277:19;278:4,6,9,13;280:2,9,13,17;281:12,14,17,22;282:24;285:4,9;286:16,20;287:25;288:20
**rule (14)** 322:23;323:1,7;324:14,15;326:5,12;327:1,15;328:1,7,8;329:17,19
**rules (3)** 320:7;327:8,19
**ruling (1)** 330:18
**run (1)** 321:18
**running (2)** 275:10;329:4

**S**

**Sabur (11)** 264:14,17;265:14,18;266:7;338:4,5,8,19;339:3,23
**Sabur's (1)** 341:15
**same (6)** 258:11;285:1;313:6;327:4,24;340:11
**Sarah (1)** 271:21
**Saturday (2)** 274:15,15
**saying (12)** 267:1;283:4,11;292:19;301:8;302:8;304:7;310:6;311:4,6;312:7;314:8
**scenario (1)** 296:7
**scene (4)** 313:1;316:7,18,19
**Schneider (1)** 345:1
**screen (5)** 268:11,12;275:24;276:21;278:20
**scroll (1)** 339:11
**seat (4)** 290:2;305:11;307:25;308:1
**second (8)** 258:3;260:21;276:23,24;305:1;318:17;328:12;341:22
**seeing (4)** 265:23;316:5;339:13,19
**seems (2)** 325:14;326:18
**sell (1)** 341:1
**send (2)** 294:23;295:12
**sense (1)** 289:17
**Sergeant (2)** 307:17;344:5
**seriously (1)** 321:2
**set (4)** 302:2;332:21,22;333:11
**seven (2)** 288:25;289:15
**several (1)** 316:12
**sheet (1)** 298:21
**Sheila (5)** 285:8,9,10,11,24
**shelter (1)** 270:25
**Sheppard (1)** 340:5
**sheriff (2)** 344:22,22
**short (4)** 266:13,14,23;267:1
**shots (1)** 345:2
**shouting (3)** 303:1,3,7
**show (6)** 274:9;283:22;308:20;310:7;334:11,21
**showed (1)** 334:18
**showing (3)** 332:6;335:1;337:22
**shown (2)** 277:23,24
**shows (2)** 322:19;326:22
**side (3)** 264:22;276:2,2
**sign (5)** 298:3,22,22,23;336:12
**signature (1)** 342:13
**simply (1)** 327:7
**sister (1)** 271:17
**sit (1)** 313:22
**somebody (7)** 271:12;275:1;283:22;294:5;295:13;297:1;298:19
**someone (5)** 287:10;294:6;298:11,14,20
**sometime (1)** 300:18
**sometimes (4)** 262:11,14,20;282:11
**son (2)** 271:22;273:4
**soon (1)** 342:7
**sorry (13)** 256:24;262:17;269:20;270:11;276:6;288:9,11;290:23;305:5,7;337:16;343:12;346:1
**sort (1)** 288:24
**sound (1)** 289:7
**sounds (1)** 292:23
**south (2)** 308:19;309:18
**speak (5)**

287:23;300:11;
314:16;320:23;341:8
**speaking (7)**
286:12;290:8;
301:3;306:3;314:12;
328:16;339:7
**speaks (1)**
303:12
**specifically (1)**
327:2
**speculate (2)**
277:11,13
**speculation (2)**
279:1;338:21
**spelled (1)**
257:15
**spoke (4)**
265:24;266:24;
300:16;324:9
**sporadically (1)**
338:16
**squad (1)**
293:18
**standing (2)**
312:8;315:20
**start (7)**
258:10;265:4;
269:25;270:19;280:1;
325:21;332:20
**starts (2)**
289:9;328:25
**state (13)**
256:14;257:12;
268:19,24;299:23;
315:9;316:21;319:8,
12;325:22;332:12;
333:2;339:16
**stated (9)**
271:10;273:4,6;
274:14,20;275:4,5,8;
330:8
**statement (21)**
262:2,22;268:24;
278:4;281:13;299:22;
300:20;301:1,2,5,9;
302:6,10,12,14;
303:24;304:1,7;
315:18;340:18;
342:21
**statements (3)**
275:17;308:16,17
**states (1)**
282:10
**stayed (1)**
280:5
**still (3)**
258:7;317:20;
327:10
**stole (4)**
274:18;288:25;
289:15;341:4
**stop (16)**
282:2;303:9;
305:23;306:4,10,14,
16;310:10,16;311:19,
21,22;314:7,23;
315:21;319:25
**stopped (12)**
264:17;309:22;
310:16;311:25;
313:15,15;314:6;
315:2,4,5,5;316:2
**straight (4)**
304:24;305:9,9;
307:20
**straightforward (1)**
326:19
**Street (11)**
309:18;311:5,7,14,
18,19;313:23;316:8;
333:2,12;341:11
**streets (1)**
311:9
**strike (8)**
260:3;264:12;
266:13;290:16;
293:20;304:21;
309:13;316:4
**strikes (1)**
330:9
**stuff (2)**
265:6;280:14
**subdivision (1)**
328:23
**subject (1)**
263:4
**submit (1)**
318:7
**substance (4)**
263:3,9,18;302:13
**substantive (1)**
333:24
**suffer (1)**
306:8
**summary (1)**
341:15
**Sunday (1)**
275:6
**supervisor (1)**
259:15
**support (1)**
342:10
**Sure (10)**
278:21;298:6;
307:7;316:15;319:5,
16;327:23,25;328:3;
330:8
**surprised (1)**
265:5
**surrounding (2)**
296:23;297:4
**surviving (1)**
259:13
**suspect (2)**
265:12;339:2
**swear (1)**
257:19
**swore (1)**
342:16
**sworn (1)**
257:22

**T**

**talk (2)**
328:20;330:12
**talked (1)**
265:17
**talking (10)**
265:13,22;271:1;
276:13;279:16;
293:19;297:9;311:18;
316:16;328:6
**tap (1)**
259:11
**Taylor (1)**
274:23
**teens (5)**
340:8,24;341:3,7,
10
**Teleconference (1)**
331:8
**telephone (7)**
271:11,20;274:12;
309:19;311:20;312:2;
325:4
**telling (5)**
296:20;303:5,9;
304:7;311:1
**test (3)**
295:2;297:24;298:3
**testified (3)**
257:22;266:12;
338:25
**testimony (12)**
293:2;302:5,21;
313:20;315:12,14;
316:10;333:22;334:2,
9,24;339:18
**that'll (1)**
331:1
**thinking (1)**
346:2
**Thomas (4)**
261:23;317:16;
318:9,12
**though (2)**
262:8;295:18
**three (6)**
271:25;287:22;
310:17;314:25;
319:17;322:6
**Thursday (1)**
256:2
**Tietjen (7)**
257:13;304:22;
305:8;307:18;308:12;
319:17;344:18
**times (5)**
265:17,24;266:9;
267:8;321:18
**Today (7)**
256:2,14;258:7,24;
303:3;313:22;321:7
**together (1)**
285:22
**told (18)**
271:18;274:16;
310:2,4,10,12,16;
311:8,19,21;314:6,22,
22;315:21;327:12;
333:19;334:8;341:2
**tolerate (2)**
306:3,6
**Tom (1)**
317:14
**took (7)**
274:14;283:4,11;
289:1;309:11,23;
322:20
**tool (3)**
295:10;296:4,9
**tools (1)**
296:6
**top (3)**
286:15;335:9,10
**tough (1)**
321:19
**towards (1)**
270:1
**transcribing (3)**
270:22;282:3;
325:11
**transcript (22)**
258:21;261:8,22;
262:1;268:7,15;
270:1;277:4,19;
278:3,12;281:13,16;
289:24;305:19;
322:18;326:21;
331:12,15,19;332:9,
16
**transcripts (1)**
290:3
**transported (4)**
305:3,4,10,13
**trial (1)**
315:13
**tried (1)**
285:15
**TRONICA (1)**
256:21
**Trooper (3)**
257:13;304:22;
305:3
**true (3)**
289:4,10;315:18
**trust (1)**
306:7
**truth (2)**
296:20;342:16
**truthful (1)**
315:14
**truthfully (1)**
304:5
**truths (2)**
297:2,2
**try (2)**
271:19;296:19
**trying (3)**
265:5;271:5;312:22
**turned (1)**
294:7
**Turner (4)**
272:3;274:21,22;
286:4
**Turnpike (1)**
300:24
**two (12)**
256:4;269:15,18;
276:5,15;288:12,14;
308:10;321:15;322:3;
328:9,25
**type (2)**
264:4;313:7
**typewriter (3)**
263:5,7,8

**U**

**Uh (1)**
282:13
**Uh-uh (2)**
286:20;287:25
**um-hum (1)**
278:21
**unable (1)**
263:6
**under (3)**
258:7;326:6;329:17
**underway (1)**
294:10
**undisclosed (1)**
262:6
**undue (1)**
329:6
**unfair (1)**
327:7
**Unidentified (14)**
270:21;271:9,12;
273:3,9;274:6,10;
275:2;282:3;283:3,
21;285:7;287:19;
289:5
**unit (2)**
295:12;321:18
**unless (1)**
297:3
**unmute (1)**
331:22
**up (20)**
261:5,10,15;
267:17;268:11;270:8;
276:14;278:19;
280:20;282:22;

294:24;295:13;302:3;309:4;319:20,22;321:15;323:4;332:21;342:7
**use (3)** 269:5;295:10;300:24
**used (5)** 285:6,21;312:8,11;330:3
**usually (2)** 263:8;298:12

## V

**vague (1)** 272:23
**vaguely (1)** 269:16
**vehicle (1)** 311:25
**verbally (1)** 298:20
**verbatim (4)** 272:21;277:3,9;312:7
**versus (1)** 256:5
**via (1)** 256:9
**Vic (1)** 257:16
**Vicinage (1)** 256:7
**Victor (2)** 257:11,15
**video (14)** 256:2;300:22;302:4;303:12;304:16;321:18;323:22,23;331:10;332:2,5;334:18;335:2;346:8
**VIDEOGRAPHER (25)** 256:1,11,13;257:18;276:1,6;321:6,7,13,14,17,23;322:2,5,9,13;323:21;324:13;326:3,16;331:9,23;332:2,4;346:6
**videotaped (2)** 256:4;346:7
**voice (1)** 303:9
**volunteering (1)** 297:7
**Vomacka (2)** 257:14,14

## W

**waited (1)** 313:10
**waiting (1)** 313:14
**waivers (1)** 298:18
**waiving (1)** 323:19
**wards (1)** 311:17
**warrants (1)** 342:11
**way (14)** 260:1;275:23;286:12;306:3,6;308:14;312:15;313:6;316:20;326:9;330:13,20;333:14;344:23
**weed (4)** 274:18;286:16;288:25;289:15
**week (1)** 330:25
**weeks (3)** 266:17;267:2;287:22
**weren't (2)** 269:1;345:7
**What's (4)** 261:2;297:4;317:11;326:25
**whose (1)** 305:12
**William (2)** 257:12,13
**willing (10)** 294:20;300:19;301:1,2,8;302:1,6,10,11;303:23
**without (1)** 259:14
**witness (23)** 257:20,21;263:10;270:3;276:3;279:2;294:16,20;295:4,8;296:16;297:23;303:1,9;305:16;313:5;319:21;323:14;325:7;329:23,25;345:20,22
**witnesses (4)** 259:20;291:19,20;297:14
**witness's (4)** 293:2;302:21;316:10;334:24
**woman (2)** 287:15,16
**Woody (1)** 340:6
**word (4)** 259:19;261:19,21;321:3
**words (1)** 313:5
**work (6)** 259:7,14;260:2,5,5,11
**worked (3)** 279:8,12;311:15
**working (15)** 259:10;260:1;264:9,14,17,18,19,22;265:2,4;279:17,19;282:14;296:22;316:17
**written (3)** 298:3,18,21

## Y

**years (2)** 279:13;320:15
**yelling (1)** 303:13
**youth (3)** 270:25;271:11,17
**youths (3)** 271:14;275:6,9
**Yvonne (1)** 272:1

## Z

**Zabawa (1)** 257:19
**zero (1)** 292:7
**Zoom (1)** 256:9

## 0

**000052 (1)** 281:14
**000257 (1)** 342:4
**000342 (1)** 331:16
**0003548 (1)** 278:1
**000761 (1)** 278:4
**001226 (1)** 338:6
**001711 (1)** 317:4
**07 (1)** 262:4

## 1

**1 (7)** 282:10,10,23;283:8,21;287:19;289:6
**10 (2)** 273:15;332:25
**10:06 (1)** 256:3
**100 (1)** 296:24
**11 (6)** 270:17;274:16;317:2,7,9;332:24
**11/12/08 (1)** 336:13
**11:32 (1)** 323:21
**12 (2)** 331:14;342:22
**12:04 (1)** 331:9
**12:11 (1)** 332:4
**12:30 (2)** 346:7,9
**1239 (1)** 338:6
**12th (1)** 318:6
**13 (3)** 283:25;289:9,24
**14 (2)** 288:9,10
**14-CV-00120KMMAH (1)** 256:8
**15 (4)** 283:5,11;324:11;335:5
**150 (1)** 271:2
**15th (2)** 340:2;341:16
**16 (2)** 330:12;332:16
**16th (1)** 330:14
**17 (4)** 272:2;274:11;289:11,24
**1713 (1)** 317:4
**18 (3)** 324:14;326:4,15
**19 (3)** 268:21;289:7;333:1
**1999 (2)** 340:3;341:16
**19th (2)** 274:15,15
**1C (1)** 274:12

## 2

**2 (1)** 282:10
**20 (2)** 282:19;288:11
**2000 (5)** 326:6,13;328:10,22;329:17
**2000-and (1)** 340:12
**2007 (5)** 260:18;262:2,9,25;264:8
**2008 (9)** 266:21,22;268:21;278:9;281:18;282:15;287:3;318:2;342:22
**2010 (1)** 263:1
**2020 (1)** 256:3
**20th (1)** 288:9
**21 (3)** 279:23;280:24;283:20
**21st (1)** 273:5
**22 (6)** 262:2,9;280:24;284:16;285:3;335:3
**22nd (2)** 256:2;262:4
**23rd (1)** 271:24
**259 (1)** 342:4
**25th (1)** 318:2
**26 (2)** 286:15;321:8
**271 (1)** 288:14

## 3

**3 (3)** 270:19;285:4;332:15
**30 (6)** 287:9;324:14;326:5;327:14;328:8;329:22
**30b1 (1)** 328:7
**30d1 (1)** 329:18
**31 (4)** 321:20,24;322:1,14
**35 (1)** 288:7
**3586 (1)** 278:1
**393 (2)** 272:2;274:11
**3rd (3)** 281:18;282:15;287:3

## 4

**4 (2)**
270:20;286:24
**40 (1)**
320:15
**427 (1)**
331:16
**43 (6)**
269:25;320:3;
321:11;322:2,20;
326:24
**45 (1)**
288:23
**46 (1)**
289:1
**492 (1)**
274:13

## 5

**5 (7)**
273:25;274:3;
280:2;320:2;321:11;
322:20;326:23
**5/6 (2)**
287:20,20

## 6

**6 (4)**
283:6;324:13;
326:4,15
**6th (4)**
278:9,14;287:20,21

## 7

**7 (6)**
322:16;323:6;
324:15;326:5;329:4;
330:3
**7-hour (2)**
326:7;327:1

## 8

**8 (3)**
340:1,2,12
**8:18 (2)**
332:17,20
**81 (1)**
281:14
**824-3344 (1)**
274:13
**827 (1)**
278:4

## 9

**979 (1)**
341:4