# EXHIBIT G

LEE 24

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION, CRIMINAL PART
ESSEX COUNTY, GRAND JURY #1735
INDICTMENT NO. 10-7-1728
A.D. NO. ____________

STATE OF NEW JERSEY, Plaintiff,

vs.

LEE A. EVANS, ET AL, Defendant.

TRANSCRIPT of GRAND JURY HEARING

Place: Essex County Courthouse
470 Dr. Martin Luther King Jr., Blvd.
Newark, NJ 07102

Date: July 9, 2010

BEFORE:

THE GRAND JURY

TRANSCRIPT ORDERED BY:

MICHAEL ROBBINS, ESQ.

APPEARANCES:

PETER GUARINO, ASSISTANT PROSECUTOR
For the State of New Jersey

CHERYL CUCINELLO, ASSISTANT PROSECUTOR
For the State of New Jersey

G&L TRANSCRIPTION SERVICE OF NJ
40 Evans Place
Pompton Plains, New Jersey 07444

Audio Recorded
Recording Operator,

I N D E X


| WITNESSES | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| FOR THE STATE | | | | |
| Rashid Sabur | 3 | | | |
| By the Grand Jury | | 35 | | |
| Louis Carrega | 38 | | | |
| By the Grand Jury | | 135 | | |

| Exhibits | Ident | Evid |
|---|---|---|
| S-1 Newark Police Continuation Report | 4 | |
| S-2 Building Dept document | 44 | |
| S-4 Transcript | 49 | |
| S-5 Missing Persons Poster | 64 | |

RECITATION OF FACTS:

By Mr. Guarino 3

CHARGE:

By Mr. Guarino 137/149

by Ms. Cucinello 137


S-I

MR. GUARINO: Good morning, ladies and gentlemen. My name is Peter Guarino.

Will be continuing a case which you began to hear on June 11 of 2010. You heard the read back by Cheryl Cucinello of testimony that was taken before the prior grand jury.

This is the case of State v Philander Hampton and Lee Evans.

It is a case that which involves the deaths of Randy Johnson, Michael McDowell, Melvin Pittman, Ernest Taylor and Alvin Turner which occurred in August of 1978.

We are going to continue this morning with the testimony of Detective Rashid Sabur.

(Off the record)

R A S H I D S A B U R, STATE'S WITNESS, SWORN.

DIRECT EXAMINATION BY MR. GUARINO:

Q Good morning, Detective.

A Good morning.

Q Could you spell your full name, for the record?

A My name is spelled R-a-s-h-i-d. My last name is spelled S-a-b as in boy, u-r.

Q You're employed by who?

A I'm employed by the City of Newark Police

Department.

Q What is your current assignment?

A My current assignment, I'm a Detective assigned to the City of Newark Inspector Generals Office.

Q Prior to that, what was your assignment?

A Prior to that, my assignment was the Newark Police Department Homicide Squad. I spent 14 years there, several years in the Homicide Cold Case Squad.

Q As part of your responsibilities, did you investigate the case of what's commonly known as the five missing kids from Newark who were last seen on August 20, 1978?

A That's correct.

Q That involved the juveniles Randy Johnson, Michael McDowell, Melvin Pittman, Ernest Taylor, and Alvin Turner?

A That's correct.

Q Now, I'm going to show you what's been marked as S-1 for identification dated today and see if you recognize this.

A Yes. This is a Newark Police Department continuation report. It's an investigative report. This report was prepared by me.

Q When did you begin your participation in the investigation into the disappearance of these boys?

A I got involved with this investigation on October 11, 1998.

Q Okay. Now, on that date, had you reviewed and since that time, have you reviewed the reports of other detectives that preceded you in this investigation?

A Yes, I have.

Q Those reports included the reports of Detective Harriston and Detective Scotbay (phonetics). Is that correct?

A That's correct.

Q As a result of your review of the reports, you were aware from those reports that an individual by the name of Lee Evans, who was a handy-man, carpenter who worked in that area of approximately 23 years of age at that time, he was a person who was part of the investigation, that were named in the police reports as a person of interest?

A That's correct.

Q As a result of reviewing Detective Harrison's reports and Detective Scotbay's reports, you're aware that early in the investigation that Lee Evans had admitted that all five of those boys had been on his truck the day of their disappearance?

A That's correct.

Q That Lee Evans had stated to police that he had dropped the last of them off at approximately 11:00 at the corner of Clinton and Fabyan. Is that true?
A That's correct.
Q You're also aware that another witness in particular, a Carrie Turner, said that she saw the youths at 11:00 p.m. on the back of Evans truck, as he said on the corner of Clinton and FAbyan. Is that true?
A That's correct.
Q Now, I want you to explain to the grand jury, when you received this assignment, how you began your investigation and take us through what you initially did to come up to speed on this investigation.
A Okay. Well, the initial complaint began back in 1978. The initial complaint involved simply the disappearance of the five individuals that was just mentioned.

At that time, detectives looked at it as being, again, a missing persons report or perhaps youths just leaving home and getting into deviant activities that youths normally got involved with at that age. They were very young men at that time.

After several days and going into weeks that they did show up, it was a great concern within the

police department as well as the community and a full scale investigation was launched by the detectives that was just mentioned by the Prosecutor, Detective Edward Harriston and Detective Scotbay.

During the time that they were involved in the investigation, they interviewed and spoke with numerous individuals in the community, as well as out of the City, as it relates to the disappearance of the five young men that we're talking about right now. As a result of their investigation several individuals, again with what's documented in their reports.

As time went on, after the youths were not found, I believe after a few years, the case pretty much became cold. That's not to say that they didn't continue the investigation, but during the time that they had the investigation, they couldn't put together enough information to establish the whereabouts of the individuals.

However, they did develop information that the individual by the name of Lee Evans was, in fact, in contact with these five young men during the last time that they were seen. They also developed information as to other activities that these young men were doing as it relates to Mr. Evans and a couple of other individuals that Mr. Evans was involved with.

They looked into it. They documented it, however, they were not able to substantiate the information as being factual information. Then at some point in time, like I said, the investigation went cold.

Around 1998, during the time that my partner and I were assigned to the Newark Police Department Cold Case Unit, we were contacted by one of the family members of one of the missing youths, namely Miss Teresa McDowell. She expressed concerns that the case had been at a stand still for several years, or a couple of decades, so to speak, and she requested that we look into it.

When my partner and I got involved with the investigation, of course we set up a meeting with Miss McDowell, as well as the other family members of the other four individuals. We set up a meeting with them in the City of Newark, I believe on Vasser Avenue at the home of one of the aunts. They, in turn, brought us up to speed as to what they believed had taken place.

As a result of the information that they gave us, of course we looked for the case file. We did locate the case files and we reviewed the case files. What we did was we were guided -- as it relates to our

investigation, we were guided as to the information that the initial detectives had developed.

They had a list of several individuals that they had spoke with. They documented everything that these individuals had said to them, but at that time, we found that no formal statements were taken from these individuals.

However, the information that they had, it appeared to us to be very, very good information, just unfortunate that the information was not memorialized in the form of a sworn statement.

We, in turn, relocated these individuals. In other words, we went back out to find these individuals. It took some time finding them. We found them, they were re-interviewed and statements were pretty much taken from them.

In taking the statements, we were able to develop somewhat of a motive as it relates to the disappearance of the five boys, and that that motive was based on different activities that these young men had done with Mr. Evans.

We also established the fact that they were, in fact, with Mr. Evans, that their last time on this earth -- as time went on, we pretty much believed that these boys had expired somewhere. As time went on, we

found out that they were, in fact, with Mr. Evans and his cousin, that we identified, according to the initial report, as being Mr. Philander Hampton. They were the last two individuals that we believed were seen with them.

In establishing that, like I said, several statements were taken. We back tracked the steps of these young men to the point where we brought Mr. -- we found Mr. Hampton. He was also re-interviewed, because initially Mr. Hampton was interviewed by the initial detectives.

During the time that he was interviewed, he refused at that time to give a formal statement to us. However, he did say things to us that eluded to the fact that he did have personal knowledge of intimate involvement as to the disappearance of young men.

If my memory serves me correctly, I remember during the interview, he said to me during that time that if he was confess to me about being involved with something like this, his whole life would be over. So, of course -

Q That was -- I don't mean to interrupt. That was the statement that Philander Hampton made directly to you?

A That's correct.

Q Do you recall when he made that statement?
A That statement, I believe, was made back in 1998 or 1999. I would have to go to my reports to give the exact date and year, however it was made during the time that we -- my partner and I initially got involved with the investigation.
Q Was that the first time or one of the first times that you personally interviewed Philander Hampton?
A That was my first time having any personal contact with Mr. Hampton.
Q So to be clear, that occurred during your investigation and that was not a reference to the investigation of a previous investigator. That was your own work?
A Right. That was information that my partner and I had developed from Mr. Hampton.
Q Now you indicated that you had -- there was -- the detectives developed a motive in this case. What was the motive that was developed during the initial investigation?
A Okay. What was found out during the initial stage of the investigation that Mr. Evans had had what they believed to be marijuana in his apartment. And they also established the fact that these youths may have

burglarized Mr. Evans' apartment and stolen his marijuana.

Again, that information was not memorialized in the form of a statement, however, when my partner and I got involved, we did individuals who made these statements and they were interviewed and statements were taken from them. They were able to confirm to us that that information was actually true.

Q Detective, was one of those witnesses that came forward a person by the name of Robert Cutler?

A That's correct.

Q Robert Cutler confirmed that he was actually present at the time when the marijuana of the boys -- that the boys had taken from Lee Evans house was being divided up?

A That's correct.

Q He admitted to that?

A Yes, he did.

Q Okay. I just want to cover that the association between the boys and Mr. Evans was that he had a construction company called Evans and Sons Construction?

A That's correct.

Q That he would some times hire the boys to do -- help him with odd jobs during that summer. Is that

true?

A That's true.

Q I want to draw your attention in particular to an interview you had with a Miss Lawson back in October of 1998. You had a meeting on that date and you, in particular, you met with Yvonne Beecham, who is the sister of Randy Johnson; Teresa Lawson, the sister of Michael McDowell; Helen Simmons, who was an aunt of Michael McDowell; Shiobhan Beecham, who was a niece of Randy Johnson; and Lilly Williams, the mother of Melvin Pittman; and Ernest Taylor, who is the father of Ernest Taylor, who went missing.

At that meeting on October 12 of 1998, what did that meeting pertain to and what was discussed at that meeting?

A Okay. Again, my partner and I became involved with the investigation during the month of October, 1998. That meeting was in regards to the family having concerns about the stand of no activity or movement with the investigation.

During the meeting, they did provide us with information. They information wasn't factual information, but of course because they were not actual witnesses as to what actually happened to their family members. However, they were able to provide us with

information that pretty much put us in a correct direction.

Some individuals that were present in that meeting, that did, in fact, witness these young men with Mr. Evans, prior to their disappearance. Miss Teresa Lawson being one in particular. She is the brother (sic) of Michael McDowell.

She recalled Mr. Evans bringing her brother to their home in East Orange, New Jersey. She recalled him coming into the house for a few minutes, enough time to maybe was up, change clothes and then he left and got back into the pick up truck with Mr. Evans.

Shiobhan Beecham, who was seven years old at the time of the disappearance of her uncle, she had some memory of the last time she saw her uncle. Part of her memory included being with her uncle during the earlier part of the day with him, along with one of the other young men who was missing.

She couldn't remember his name, however she did remember him being in a pick up truck with this individual by the name of Lee Evans. They all knew him as Big Man. She recalled her uncle taking her with him to a location and she believed to be Mr. Evans' house, to assist him in moving some boxes.

She didn't participate in any movement, of

course, because she was seven years old and that she was pretty close with her uncle. However, she did remember being with her uncle and a couple of the other boys at a location that she believed to be Lee Evans house.

She recalled them moving boxes and in completion of them assisting Mr. Evans, she recalled being dropped off at home and let -- she went home and she recalled her uncle leaving their house with Mr. Evans in the back of the truck along with a couple of other young men.

Q Miss Shiobhan Beecham, in fact, indicated to you that the last time she saw her uncle was when he was leaving in the truck with a person who she knew as Big Man?

A That's correct.

Q Big man is the person who had been identified as Lee Evans. Correct?

A That's correct.

Q Now, can you continue? After you had spoken to the family members and Shiobhan, what did you do next with regard to your investigation?

A As our investigation continued, plus we began to develop additional information, at some point we spoke to the cousin of Mr. Alvin Turner. A sworn statement

was taken from his also.

Alvin Turner, the cousin, mentioned in his statement that he was with his cousin prior to him disappearing. He recalled being at his home with his cousin on Fabyan Place watching a movie. He recalled leaving the house with his cousin and has they were walking down the street on Fabyan Place, they run into Michael McDowell, who told Alvin that Mr. Evans, Big Man, was looking for them to help him move some boxes.

So the cousin, being a young man at that time, became excited and he saw an opportunity of making some money, along with his cousin Alvin Turner, and he decided to go with him to the location where Mr. Evans was waiting for them.

He said once he got there, he do recall seeing Mr. Evans there, Mr. McDowell, that's one of the other youth had left to go get one of the other guys who wound up missing with him.

Alvin Turner's cousin asked Mr. Evans if he can go with him to help move some boxes with him. Evans told him, no you can't go. He gave him a couple of dollars to go to an ice cream store that was a couple of blocks away on Clinton Avenue and South Eighteenth Street to get a milk shake. They said he did this in the hopes of coming back to get to the

truck with him to go with his cousin to help him move some boxes.

By the time he walked two blocks to get the ice cream and back to where he left his cousin and Mr. Evans, he said that they were gone. And that was the last time he saw his cousin.

Q so the last time he saw his cousin was with Mr. Evans. Correct?

A That's correct.

Q Now who did you speak to next?

A We spoke to a Mr. Roger Taylor. He's the brother of Ernest Taylor.

Mr. Taylor recalls one of the other youths coming to his house looking for his younger brother, Ernest Taylor. I believe he said it was Melvin Pittman who ran his bell. MR TAYLOR 11 09 11 30 P.#4 << #50041-78 MS TAYLOR P. 6 + 7

He said during that time, he was on his way out to, I believe to drop his sister in law off. As he pulled his car from the driveway, he noticed Pittman standing on his porch talking with his sister, looking for his brother Ernest.

As he continued to pull out of the driveway, he looked on the corner and he saw a pick up truck that belonged to Mr. Evans. He had personal knowledge of that. And he last -- he recalls seeing maybe two or

three other youths on the back of Mr. Evans pick up truck.

He said by the time he left home and came back, his brother Ernest had left with Mr. Pittman on Mr. Evans trucks. I believe he said, if my memory serves me correctly, that he recalled his brother getting on the back of the pick up truck with Pittman and the other youths. And that was the last time he saw his brother, with Mr. Evans.

Q Now I want to turn to approximately January 6 of '99 when you interviewed Robert Cutler. Could you summarize your interview with regard to what Robert Cutler added to your information concerning this case?
A Okay. Our interest in Mr. Cutler was because initially in the initial reports the family was pretty concerned about his strange behavior as it relates to the disappearance of the boys. MR TAYLOR P#3 CC# 50041-78

We located Mr. Cutler. At that time, in '99 he was in Trenton State Prison. We went to the prison. We interviewed him at the prison. He recalled the incident and he gave us a sworn statement.

In his statement he says that he admits to the fact that on several occasions these young boys had gone into Lee Evans home.

Q Now just for -- Robert Cutler was the

contemporary to the boys. True?
A That's correct.
Q He's about their age and he was one of their friends. They all hung around together?
A That's correct.
Q They played basketball together?
A That's correct.
Q Okay.
A So he said their reason for breaking into his home was, of course, to look for marijuana and things of that nature.

He says on the evening that they -- the last evening that they had broken into his home, he was supposed to have been with, but he -- I believe he said he was out of town. He was some place with his grandmother. However, when he returned, he found out these boys did, in fact, gotten into his home. I believe he said they may have taken a pound of marijuana from out his home.

How he said he knew this is that when he came back from wherever he was, they all were on, I believe, Beverly Street in front of Mr. Melvin Pittman's home and they were talking about it, dividing the marijuana or they had divided marijuana. They gave him a little bit of the marijuana, not as much as the other boys.

That was it.

Q So Robert Cutler indicated to you in his statement that he had knowledge and the names of the five boys, which he acknowledged had broken into Lee Evans' home?

A That's correct.

Q And he was able to tell you that the five boys were Randy Johnson, Michael McDowell, Melvin Pittman, Ernest Taylor and Alvin Turner. Correct?

A That's correct.

Q So he knew who they were because he saw the marijuana and divided it with them?

A That's correct.

Q In fact, at one -- in one point, Robert Cutler had stated that had he been there that night, he undoubtedly would have gone in with them?

A That's correct.

Q That's how close their friendships were?

A That's correct.

Q So as part of your investigation, one of the things you learned, which is a fact which was testified to or stated by Cutler under oath, is that he knew the names and identities of the five boys who broke into Evans house and he knew their identities and names before they went missing?

A That's correct.

Q Okay. If you could continue at that point.

A Okay. As a result of speaking with Mr. Cutler, we developed information in regards to a young lady by the name of Kathy Kennedy, who was also a friend of the boys.

Our information suggested that Miss Kennedy was very, very close with these young men. As a result of that, we located her and she was interviewed. She also gave a sworn statement.

In her statement, she admitted to the fact that she had personal knowledge that these boys had definitely burglarized Mr. Evans home. In fact, she went as far as to say that on a couple of occasions that she went into the home with them. However, she denied going with them on the evening that the pound of marijuana was supposedly stolen out of Evan's home.

In her statement, she described the manner in which they would enter into his home. In her -- the way she explained it to me was that Ernest Taylor was the smallest of the youths. So they would break in to burglarize his apartment through a bathroom window. They would climb through the -- go up a fire escape, open the bathroom window and put Ernest Taylor through the bathroom window. He, in turn, would come and open

the apartment door for them and they would go in and get what they needed to get out.

She knew, again, that they had taken the pound of marijuana from Lee Evans. She, in turn, mentioned the individual by the name of Maurice Olds, who she said was the cousin of Lee Evans. She also said that he was friends with these five individuals also.

We in turn took her information and we located Maurice Olds. He was also interviewed, however, Mr. Olds refused to give a formal statement. But he did make some admittance that -- about the young men selling marijuana for Lee Evans.

He also said to us that he had -- he knew that Lee Evans home was burglarized and he had heard that the boys had taken marijuana and possibly some cocaine as well as money from his partner. Again, Mr. Olds refused to give a formal statement, for whatever reason.

Q Now this Maurice Olds was a cousin of Lee Evans?

A That's correct.

Q He was the who Cathy Kennedy was relating to you what he had said?

A That's correct.

Q Now after you were unable to interview Maurice Olds, at that time what did you do?
A We continued the investigation. We continued developing information. We developed information about another individual. I believe his name is Jelly Wilson, who happened to be the uncle of Melvin Pittman.
At the time of the man's disappearance, Mr. Wilson lived in the same apartment building as Lee Evans on the first floor. A sworn statement was also taken from him. CC# 50041-78 JILLIE WILLSON JR
He recalled his nephew, Melvin Pittman, along with a couple of the other boys, coming to his house on the eve, on the day that Lee Evans' apartment was broken in to.
He described them as sitting his house. He says his bedroom was located in the front of the house on the first floor and he recalled them coming to his house, sitting in his house looking out the window.
He questioned them as to why they were doing that. They in turn told him that they were waiting for Big Man, Lee Evans, to leave his house so that they could break into his apartment. So pretty much he was saying that they were -- pretty much had Lee Evans under surveillance so that they could break into his apartment when he left.

He questioned them as to why they were doing this and they said that he owed them some money that he wasn't paying them. So they were going to get into his house and take his stuff.

He said at some point in time Evans did leave the building and the boys did see Evans leave the building. Once Evans left, he said his nephew and the other boys left his apartment and he didn't have knowledge as to whether or not they had burglarized Evans apartment or not, but he knows that they left. He knew what they told him they were going to do once Evans left his apartment.

He went on to say that he, himself, never purchased any marijuana or anything else from Evans, but he did have a friend of his purchase marijuana from Evans, because his friend was a frequent customer of Evans who told him, Mr. Wilson, that Evans was in the business of selling marijuana, as well as cocaine.

Q That interview was January 20, 1999 and you did that with Detective Shepherd. Correct?

A That's correct.

Q Now, subsequent to that, in February you and Detective Shepherd spoke with someone by the name of Darryl Green?

A That's correct.

Q What did you learn from Darryl Green?
A I can't remember off the top of my head, but if you can point that out to me I'll --
Q If you can refer to your report on Page 7.
A Okay.
Q And from Darryl Green you learned what?
A Okay. Mr. Green he stated that he did see the teens on the back of a green pick up truck, who he said the owner was Mr. Lee Evans.

He continued to say he first saw -- he first saw two of the teens exit 17 Leslie Street, which was the home of Ernest Taylor and that's why I spoke with you about what Roger Taylor said he saw one of the -- CC# 50041-78 ROGER TAYLOR PAGE# 2 11 OR 1130 Melvin Pittman, I believe, come to his home looking for his brother, Ernest Taylor.

So Mr. Green did see Ernest Taylor leaving -- leaving his home with Pittman. He said he knew Lee Evans was the owner of the truck, but he couldn't see who was driving the truck on the matter of -- on the IS THAT STRANGE THE DET. RASHID SABUR DO NOT ASK FOR THE TIME night in question. CC# 50041-78 MR DARRYL GREEN PAGE# 4 630PM

He said he was closer to Ernest than any of the other boys and he said Ernie would always have a large quantity of marijuana in his possession.
Q So he stated he saw two of the teens that were missing that night on the back of Lee Evans pick

up truck?

A That's correct.

Q Now, you also interviewed an individual by the name of Marvin Hall, who is the cousin of Alvin Turner?

A That's correct.

Q What -- excuse me, what information did Marvin Hall provide you?

A Right. So he spoke to you already about Mr. Marvin Hall. Marvin Hall being the cousin of Alvin Turner who says that he recalled being with his cousin on the night that he disappeared at his home. They were watching television.

TRANSCRIPT MARVIN HALL 3/20/2007

IS THAT STRANGE THE DET. RASHID SABUR DO NOT ASK FOR THE TIME
CC# 50041-78
PAGE# 1 9PM AND 10PM AUGUST 19/78

As they left the home, he recalled walking down the street and being approached by Michael McDowell, who told Alvin Turner that Lee Evans was looking for them to help him move some boxes. He, in turn, went to the location where McDowell told his cousin, Alvin Turner, that Evans would be waiting.

He gets there. He asked Evans can he go with them. Evans told him no and he sent him to the store to get some ice cream or a milk shake. By the time he returned from the store with the milk shake, he had left his cousin with Evans. He said by the time he went to the store and came back with the milk shake,

his cousin had been gone.

He said that Evans was still there. He asked his cousin where Evans -- he asked Evans where his cousin was. I believe he said Evans said he went to one of the other boys home. He said that was the last time he saw his cousin.

Q So that was the last time Marvin Hall saw his cousin alive?

A That's correct.

Q Now, from what you learned at this point, and this is, of course, in 1999, did it appear to you that as each of these individuals described their contacts and seen the boys with Lee Evans, that Lee Evans, as he came into contact with Randy Johnson, Michael McDowell, Melvin Pittman, Ernest Taylor and Alvin Turner, that he singled them out to help him what has been described allegedly helping him move boxes and if there were other boys around or there who possibly could have helped or wanted to help, that he managed to send them away? NOT Turn

A That is correct.

Q That the only boys Evans invited onto his truck or had on his truck, or admitted were on his truck were the five we've spoken about, Randy, Michael, Melvin, Ernest, and Alvin?

A That's correct.

Q Other youths were, in various ways, sent away?

A That's correct.

Q Those five youths happen to the five that Robert Cutler shared the marijuana with and Robert Cutler identified as the five kids who broke into Evans' house?

A That's correct.

Q Now, Maurice Woody Olds, was, as we previously said, he was the cousin of Evans. Correct?

A That's correct.

Q Correct me if I'm wrong. Was he a little older than these boys at the time?

A I think he was in the same age bracket as the boys.

Q He was close in their age and was also their contemporary and also was known to place sports with them and things like that of that nature?

A That's correct.

Q So he was well known to them and they would have known him?

A That's correct.

Q And -- is dead. Correct?

A That's correct.

Q But on February 15 of 199, you located and

interviewed Mr. Olds?

A That's correct.

Q Could you review again what information Olds related to you?

A Um.

Q And if you would specifically, you can refer to your report at Page 8.

A Okay. On February 15, Detective Shepherd and myself located and interviewed Mr. Maurice Woody Olds regarding his knowledge of the disappearance of these teens.

During this time, he refused to give a statement, but provided us with the following information, after being confronted with the information obtained from Miss Kathy Kennedy.

He said that he did, in fact, personally know all of the missing teens and described them as being friends of his. He confirmed that they did, in fact, sell marijuana for cousin Lee Evans and admitted that Evans told him that he found out that the teens had burglarized his apartment at 979 Clinton Avenue and stole over a pound of marijuana, money and cocaine.

He denied having personal knowledge about Evans' involvement with the teens disappearance, but did refer us to speak to his cousin, Phil, who he said

may be able to help up.

Olds further said that he had heard that the teens may have been burned in a fire on Hawthorne Avenue and Camden Streets in Newark. When asked where he got this information from, he said he couldn't remember.

He was asked if he sold marijuana or any other kind of drugs for Evans and he said no. However, he said that prior to the teens disappearance, he recalled them having a lot of marijuana, but thought nothing of it because he knew that they were selling marijuana for Evans.

Q So Detective, now that interview occurred on February 15 --

A 1999.

Q 1999?

A That's correct.

Q In that conversation, he specifically mentioned that he had heard that the teens may have been burned in a fire either on Hawthorne Avenue or Camden Street in Newark?

A That's correct.

Q Camden Street is where one of the nieces had said that the boys had gone to move boxes for Mr. Evans. Correct?

A Well, when -- I believe that was Shiobhan Beecham that your speaking to and I spoke with her and took a statement from her. She was unable to give me the name of the street that they were on, however, she did say she believed this house that they went to was Mr. Evans' house.

Q And we know from the investigation that, in fact, Philander Hampton lived on Camden Street. Correct?

A That's correct.

Q And that he had moved the day before the fire, which I believe he moved on a Saturday, the day before the fire?

A That's correct.

Q You did review the fire logs from Newark from August 21, 1978, and they indicate that the first alarm at that location went off at 0013, which military time, I believe, is 13 minutes after 12 midnight.

A That's correct.

Q That it went to a second alarm on 0017, which is 17 minutes after midnight?

A That's correct.

Q And a third alarm at 0023, which is 23 minutes after midnight on the 21st?

A That's correct.

Q 1978?
A That's correct.
Q Each of those alarms simply means that another company was asked to respond to the fire?
A That's correct.
Q This was the fire that consumed the building at 256 Camden Street and damaged the adjoining structures?
A That's correct.
Q We knew from your investigation, is it correct, that it was presumed that that structure at 256 was vacant and that as far as the fire company knew, everybody had been evacuated safely from the adjoining buildings?
A That's correct.
Q Now during the course of your investigation, Detective, did you ascertain if any of these five youths, Randy Johnson, Michael McDowell, Melvin Pittman, Ernest Taylor or Alvin Turner, had any of them ever applied for a driver's license in New Jersey?
A During the course of the investigation, of course, we obtained pertinent information as it relates to these young boys. There was no activity shown as far as their names, date of births, or social security numbers on --

Q Okay. Did you check both local, state, and national databases?
A That's correct.
Q And up until that point in your investigation, is it fair to say they had just disappeared off the face of the earth?
A Yes, it is.
Q Detective, is there -- with regard to your reports, is there anything else that you feel is pertinent and would point us to in terms of your own investigation?
A Yes. There's so many things here. I do recall having contact with Lee Evans and how that contact came about. Mr. Evans, he pretty much he was involved with community where he lives and he personally knew a lot of the family members of the youths.

He, in turn, had reached out for Roger Taylor and wanted to set up a meeting with Roger Taylor to speak with Roger Taylor, because at that time, he knew that there was activity going on in the investigation. That happened around 2007, maybe 2008.

Roger Taylor asked him, well is it okay if Detective Sabur sat in on this meeting. He agreed to it and the meeting was set up in Roger Taylor's home. During that time, I really didn't get the opportunity

to get a chance to say anything because Mr. Evans was questioning me as to the status of the investigation, which in my mind it just made me feel that perhaps he was monitoring my activity in the investigation.

He wanted to know what I know about the investigation and he wanted to know how, you know, how -- again, what do I know? What's making me come to the area in the investigation where I was at. And I pretty much wouldn't give him any information. That's what I was doing. However, I did speak to him about a little bit of what we did.

But prior to this, he says to me that he wants to talk. He said, "I want to talk to you", but I spoke with some people who tell me that perhaps I shouldn't, because again, he knew that there was some activity going on in the investigation. He made mention that this whole thing is bigger than Lee Evans.

So again, in my mind, him saying that to me just leaves me to believe that perhaps he had personal knowledge as to what's going on. Then again, he -- again, like I said, he started questioning me as to my knowledge.

So I explained to him a little bit without giving him a lot. I explained to him how the youths had broken into his apartment. How they came in

through the bathroom window and how they had broken into his apartment on several occasions. He looked at me with a smile and said, "you know, what, you're absolutely right and I'm sorry. I can't talk to you at this time".

That was extent of my conversation with Mr. Evans.

Q So -- and that conversation -- and that occurred at the house of Robert Taylor?
A That's correct.
Q And Lee Evans indicated to you that he was aware that the boys had broken into his house and then elected not to speak any further?
A That's correct.
Q At that point, the conversation was terminated?
A That's correct.

MR. GUARINO: That's all I have for you right now, Detective. Any -- are there any questions?

CROSS EXAMINATION BY THE GRAND JURY:

Q Can you just --
A I'm sorry. This gentlemen.
Q Was it at all possible to investigate the remains of the fire, even though it had taken place years earlier?

MR. GUARINO: I'm going to -- you can answer that and then the next witness, Detective Carrega, will have some pertinent information also to share. But if you want to address that, to your knowledge.

A Yes. As it relates to this investigation, period, no stone is unturned. In 1978, nor in 1998, nor at the present date. Every stone was turned.

Any information that came in, regardless of how minute or important the information may have seemed, or how silly it may have seemed to anybody that was involved within it, it was looked in to. And it was either confirmed that it was factual information or confirmed that it was information that wasn't needed in the investigation. So, yes. Those aspects were looked in to.

Even when it was mentioned to us about a fire on Hawthorne Avenue, we looked into that aspect also. We found that there was a fire on Hawthorne Avenue and there was a fatality on Hawthorne Avenue. But the individual that was burned in the fire on Hawthorne Avenue, he had been identified as an adult. It was one adult who was identified in it and I believe that was a result of some type of homicide, not related to the disappearance of these other boys. Yes, sir.

Q The conversation between Evans in 2007?

A I believe that was in 2008.

Q Approximately. So you covered the case since 1998 in person?

A Yes.

JURY FOREPERSON: Anything else?

BY THE GRAND JURY:

Q Where is Mr. Evans now?

MR. GUARINO: His present location is not relevant to your consideration.

JUROR: So, nobody has spoke with him --

MR. GUARINO: The -- legally, that would be between Mr. Evans and his attorney. It's of no relevance to your consideration and the Detective should really not answer that question.

JURY FOREPERSON: Anything else? Okay, thank you for coming.

(Witness exits courtroom)

MR. GUARINO: Carrega is on the road. We're off the record.

(Prosecutor moves to other matters)

MR. GUARINO: Okay. This is Peter Guarino. We're back on the record with regard to the matter of State v Lee Evans and Philander Hampton.

Next we will hear from Detective Louis Carrega.

(Off the record)

L O U I S C A R R E G A, STATE'S WITNESS, SWORN.

DIRECT EXAMINATION BY MR. GUARINO:

Q Detective, could you spell your name, for the record?

A Louis Carrega, C-a-r-r-e-g-a.

Q By whom are you employed?

A The Prosecutors Office here in Essex.

Q In what capacity?

A I'm a Lieutenant currently with Gangs.

Q Prior to Gangs, what was your assignment?

A I was assigned to Homicide.

Q Were you assigned to investigate the homicide or, excuse me, at that time it was the investigation into the disappearance of five missing youths from Newark?

A Yes.

Q And that occurred in 1978. Correct?

A Yes, sir.

Q Now, -- and that was the investigation into the disappearance of Randy Johnson, Michael McDowell, Melvin Pittman, Ernest Taylor and Alvin Turner. Correct?

A Correct.

Q On November 13 of 2008, you had the

opportunity to come into contact with a person of interest in this investigation. Who was that?
A Philander Hampton.
Q Could you explain to the jury how you came to come into contact with Mr. Hampton on that date?
A We had been looking for Mr. Hampton for quite a while. I came to learn that Mr. Hampton was currently being housed at the Essex County Jail on Doremus Avenue.
Once I found that out, I made arrangements for Mr. Hampton to be transported to my office. Mr. Hampton was transported up here. I had the occasion to speak to him on the night of November 13.
Q That was November 13 of '08?
A Correct.
Q So at that time, he was actually in custody on some unrelated matter. Is that true?
A That is true.
Q When he was transported to your office, you mean your office in this building?
A Yes, sir. Right across the hall.
Q And what happened?
A Mr. Hampton was brought in. I explained to him why I needed to speak to him. He was read his rights. At one point he decided that he wanted to speak to us

about the case and he just started talking about it.

Q You told him you wanted to talk about the disappearance of the five boys?

A That's correct, sir. I explained to him that I had spoken to one of his family members regarding the case.

Q Do you recall who that was?

A Yes. That was Maurice Olds, O-l-d-s.

Q At the time you spoke to Philander on November 13 of 2008, to your recollection was Maurice Olds still alive or had he died?

A I had spoken to Maurice prior to his death, but he had died by then.

Q Okay. And so Mr. Hampton was aware that Maurice had died?

A Yes, he was. They were cousins.

Q They were cousins. So now you spoke to Phil Hampton on that date, November 13 of '08, and indicated you wanted to talk about the five kids. How did he react to that?

A He was quiet at first. But, you know, we told him that we had -- my partner and I at the time had spoken to his cousin and that we knew about the case. At one point, Mr. Hampton decided that he wanted to get it out and tell us what happened.

Q Now once he told you or you became aware that

the was going to speak to you about the case, what did you do?

A What I did, I actually stopped him from talking about it right away because I wanted to make sure the conversation was recorded.

Q So what did you do with regard to that?

A I wanted to record him right in my office across the hall, and I found out that our equipment wasn't working, which is normal here. But so all I had was a tape recorder and but because this case was so old and involved five kids, I wanted to make sure that it was video taped and not just recorded.

So I contacted the State Police and they made arrangements for me to actually go down there to the Airport, by their barracks by Newark Airport, where they have video tape equipment, where any type of statement made by Mr. Hampton would be on video and not just on voice. So that's what I did. I ended up taking him down to the barracks.

Q Prior to getting to the barracks, did you discuss anything?

A Yes. I told him -- I explained to him why we were taking him out of the office. I told him I was going to bring him down. I did, I put him in the back of my car and, you know, I started driving.

While -- when I pulled out of the parking lot here and in the back he said, "you want me to show you where it was?" I said, "what do you mean"?

He goes, "I can take you right to where the house was". There was a telephone pole. I remember exactly where it was". I said, "sure".

So he actually took me, or directed me, I should say. I was driving he was in the back seat. And he took me -- he directed me over to Camden Street. He told me to stop right by the telephone pole, facing south on Camden and he told me that's where the house was.

Q Now, when he pointed to where the house was, that was the location which was previously known as 256 Camden Street?

A Correct.

Q That's the house where --

A That was his house. It was his family's house. ? NO

Q That was his family's house? He actually had lived there?

A Correct, sir.

Q He told you that?

A He told me. Yes, he did.

Q Now, when you got there on November 13 of 2008, was his house still there?

A No, sir.

Q What was on that location?

A It's a row of all new townhouses. Those houses, most of them were burned in a large fire and others were torn down so many years ago. So now it's all new townhouses.

Q So on the site where Mr. Hampton's -- that house had stood, and that was a three family house. Is that correct?

A Correct.

Q There is now newer townhouses?

A Correct.

Q Those, to your information, are they on concrete slabs?

A Yes.

Q Now, when you got to That location, tell me what happened. What did Mr. Hampton do?

A He told me to stop. He was handcuffed in the back seat and he said, "stop right there". He said, "there was a telephone pole there" and we stopped right just passed the telephone pole and he said, "that's where it was. It was a three family home.

He stated they had come in through the back, which would be on the Bergen Street side. It wouldn't be actually on Camden, Camden through Bergen.

Obviously, everything is different now, you know, because of the new construction.

And he told me that that's where the kids had been taken, to the third floor of their house.

Q Now I'm just going to skip ahead for a minute. I'm going to show you what's been marked as S-2 for identification. Do you recognize what S-2 is?

A If I"m not mistaken, this is from the building department, it might be from Newark. I'm not sure. I don't recall seeing this.

Q This is from the building department, signed off by the owner of 256 Camden Street, who at that time was a Mrs. Dozier?

A There's no date on this one.

Q The address is 256 Camden.

A Correct. Correct.

Q Correct?

A Yes.

Q It shows a plot on the grass of the location of 256 Camden Street?

A Yeah. I believe we got these graphs from the building department down at City Hall. It's -- this one refers to 256 Camden, which is where Hampton used to live.

Q This one is dated for that location 4/29/57

at the bottom. Do you see that?
A Correct, sir.
Q Now this also indicates the type of structure. Under basement it's checked off dirt floor. Is that true?
A Correct.
Q Correct. Indicating that 256 Camden Street had a dirt floor for a basement?
A At the time.
Q At the time. Now I want to bring your attention -- I skip ahead for the moment to March 20 of 2009. On March 20, 2009, do you recall responding to 256 Camden Street, along with Detective Witkowski, myself, Detective Tejian, Sargent Henry and Detective Hadley (phonetics) of the Newark Police Department?
A I don't recall the exact date, but I was there on numerous times.
Q Do you recall going there for the purposes of conducting a search using ground penetrating radar?
A Yes, I do.
Q I'm going to show you what I've marked as S-3 for identification. Do you recognize what S-3 is?
A Yes. This is a report that was done or written by Detective Rechtenbald (phonetic) and it's dated January 4 of 2010.

Q That was a report from Detective Rechtenbald prepared regarding his investigation. Correct?
A Yes.
Q You were one of his supervisors --
(Tape #14 ends abruptly)
(Continued on Tape #15)
BY MR. GUARINO:
Q -- March 20 of 2009, does that memorialize the date that you went out to conduct the ground penetrating radar search?
A Correct.
Q And ground -- the technician that performed the actual ground penetrating radar, that was an independent person that was contracted by the Prosecutors Office. Correct?
A They were contacted by us and they agreed to assist us in doing the ground penetration.
Q We had obtained a search warrant and we also had obtained the consent of the people that lived at the house to use ground penetrating radar. Correct?
A In the basement. Yes.
Q If you recall, that was a machine that, kind of, looks like almost the size of a lawn mower. The individual who operated it actually went over the premises inside and out and used it to analyze the dirt

underneath the house. Is that true?

A Correct.

Q He used that machine to generate an image, which he indicated in his report that he indicated that he could actually see the level of where the original basement to that dwelling was below ground. True?

A True.

Q His conclusion and in his report that he gave us for that day was that he didn't find any disturbances in the dirt floor, which was at the original basement level to the house.

A There were no disturbances that the found.

Q So that would mean that there were no bodies and no graves detected underneath that location? 17

A There were no -- correct. There were no graves. That if bodies were there, there would be graves and there were none.

Q So going back to your conversation with Philander Hampton, after he took you to 256 Camden and said that's where -- what exactly did he say? Why did he bring you to that location?

A He brought us to that location to tell me that that's where he lived and that that's where they had taken the kids.

Q So he said that this is where -- that's where

they took the kids?
A Right.
Q Now after he took you to that location, did he get out of the car at all?
A Did he get out of the car at the location? No.
Q Okay. Then you went and took him where?
A I was by myself. He stayed in the car. After he told me where the location was and that's where the kids had been taken, I took him to the State Police barracks.
Q The ones located by the airport?
A Yes, sir. On Route 78 by the airport.
Q Now, once you were at the State Police barracks, it was there that you were met by Detective Tejian?
A Detective Tejian? Yes. He was present and Detective Joe Hadley from the Newark Police.
Q And now when you interviewed Mr. Hampton, he was read his Miranda rights?
A Yes, he was. He was read his Miranda here at the office. He was read his Miranda again prior to starting the statement at the State Police barracks.
Q And he indicated, after getting his rights, that he agreed to talk to you?
A Correct.

MR. GUARINO: Okay. Off the record.

(Prosecutor moves to other matters)

MR. GUARINO: This is the continuation of State v Philander Hampton and Lee Evans. My name is Peter Guarino.

We will continue with the testimony of Detective Carrega.

(Off the record)

L O U I S C A R R E G A, STATE'S WITNESS, PREVIOUSLY SWORN.

DIRECT EXAMINATION BY MR. GUARINO:

Q Detective, do you recognize what I've placed in front of you, which has been marked S-4 for identification?

A Yes. This is a transcript of the interview taken November 13, 2008, at the New Jersey State Police barracks -- back in Newark.

Q This is the statement you spoke of earlier that you took of Philander Hampton and that was done in your presence, Detective Joe Tejian of the New Jersey State Police, and Officer Joe Hadley or Detective Joe Hadley from the Newark Homicide. Correct?

A Alright. I'll correct you, sir. It was me, Lou Carrega, it was Bill Tejian from the State Police, and Joe Hadley, from Newark. They misspelled Joe's name --

I mean, Bill Tejian's name on it. They made his name Joe Cashe. That's a typo.

Q It's actually Tejian.

A It's Tejian, and Joe.

Q Okay. Detective, I'm going to draw your attention to Page 3 at Line 11.

A Yes.

Q You begin the interview -- I'm going to read the questions and if you would just please read along and read Mr. Hampton's answers?

A Okay.

(S-4 is read into the record)

"Q You were brought here by us. We brought you here and we're going to talk to you about what we started to talk about before, before we drove over to Camden Street. Okay?

A Uh huh.

Q The time -- the time now is 8:18 p.m. The date is November 12, 2008. Okay. I'm going to put your name here, Philander. Right? P-h-i-l-a-n-d-e-r?

A Uh huh.

Q Hampton, H-a-m-p-t-o-n?

A Uh huh.

Q I'm Lieutenant Carrega of the Essex County Prosecutors Office. I'll read this to you and you can

read it back. The Essex County Prosecutors Office, Newark, New Jersey.

I'm going to ask you certain questions regarding five missing kids and the year was 1978. Okay? So I'm writing that down. However, before beginning, I advise you of your rights. You've heard your rights many times before?

A Yes.

Q You've seen it on TV. You've been read before, right?

A Yeah.

Q You have the right to remain silent. Anything you say can be used against you in a court of law.

You have the right to talk to a lawyer, have him present with you while you -- while to hire a lawyer, if you wish one.

You have the right to stop answering questions or giving a statement.

If you cannot afford a lawyer, one will be -- these are your rights for Miranda.

The bottom part of this form that's in front of you is the waiver. Like I said, you can read it and I'm going to have you initial each one.

I've been advised of my rights and I have

read the statement of my rights shown above. I understand what my rights -- I do not want a lawyer at this time and understand that I may have one at any time, if I so desire. I also stand -- no threat of any kind has been used against me.

Okay. You understand the way I've read it. Right?

A Yes.

Q Now, you can read and write, Philander?

A Uh huh.

Q Okay. Again, this is what I filled out. Right? What's this, November 12, 2008. Right? Philander Hampton, right? I'm Lieutenant Lou Carrega, Essex County Prosecutors Office. I'm going to ask you questions regarding this case. Okay. You have to read these outright, okay, and then initial each one, okay? One through five, read them out loud.

A Okay. You have the right to remain silent.

Q Okay.

A Anything you say can be used against you in a court of law.

You have the right to talk to a lawyer and to have him present with you while you are being questioned.

If you cannot afford to hire a lawyer, one

will be appointed to you.

Q Okay.

A You're represented. What's that?

Q Before any questioning --

A Yeah. Okay.

Q You need glasses. You're getting old. You have the right to stop answering questions or giving a statement or the answering of questions. Initial one through five.

A Where do I initial my first.

Q Initial each one, first name and last name. Right? P and an H. PH. The bottom is the waiver that I read to you. You read it and then you signed the bottom.

A I have read the statement of my rights shown above. I understand What my rights are. I am willing to answer. I am not want a lawyer at this time. Okay? Alright?

Q Alright. You do not want a lawyer at this time, but you know that you may have one if you so desire. Also understand, no promises, threats have been made to you?

A No.

Q Alright. Sign it over here on this side. Today's date is Wednesday, November 12. The time is

now 8:24 p.m.
A 8:24?
Q Correct.
A That's the time. I put time is 8:24.
Q Yes, that's fine. That's fine right there. Don't worry about it. Alright. Joe Hadley, Newark Police Homicide. Okay? Joe Tejian, State Trooper, Detective from Missing Persons Unit. Okay?
A Yeah.
Q You know who I am, I already told you?
A Yeah.
Q Alright. We've done that before. Okay. Just so they're going to witness this form, okay, and then we can start. I just want a little background on you. Where are you living now?
A I live at 36 Underwood.
Q You live there?
A That's my address.
Q That's your address?
A Yeah.
Q Where are you living now?
A Okay. I live at 136 Monticello.
Q Monticello Avenue?
A Yeah.
Q Where is that?

A In Jersey City.
Q Who do you live there with?
A My girlfriend.
Q What is your girlfriend's name?
A Joanne Waymer.
Q Joanne Laymor?
A Waymer.
Q Waymer, W-a-y-m-e-r."
THE WITNESS: Okay. How long have you lived there in Jersey city?
MR. GUARINO: That's my question.
THE WITNESS: I'm sorry.
(Resumes reading S-4)
"Q How long have you lived there in Jersey City?
A About six years.
Q Six years?
A Yeah.
Q Okay. How far did you go in school? What grade did you go to in school?
A Tenth.
Q Tenth grade. What school?
A Westside.
Q Westside. Westside High?
A Uh huh.
Q Alright. I know you can read. You can also

write?"

MR. GUARINO: Top of Page 9. Top of Page 9.

THE WITNESS: Yeah, I'm on Page 9.

MR. GUARINO: At the very top, Hampton says.

THE WITNESS: "Where you currently live right now. Today?"

MR. GUARINO: Hampton says, "Uh huh". The question is,

(Resumes reading S-4)

"Q Where do you currently live right now. I mean today?

A I'm in Jail now.

Q You're in jail. Okay. Listen, one thing, the whole time we're here, I don't want to know about what you're in jail for. I don't want to talk about it, alright. None of us are going to talk about that.

A Okay.

Q You understand why you're here. Right?

A I understand.

Q We're here to talk about the five missing children.

A Alright.

Q From 1978, nothing else. You know what I mean? Okay. So we're not going to ask you other questions, is just concerning this and nothing else.

Okay?
A Okay.
Q Is there anything you've done in the past on any other stuff, I really don't want to know about?
A Yeah.
Q This is why we're here. Okay?
A Uh huh.
Q The date was August 20, 1978. It was a Sunday. Do you recall that day?
A I recall that day.
Q You recall?
A Yeah.
Q Okay. Where were you living back in 1978?
A I was living on Camden Street and Hunterdon Street.
Q Okay.
A 271 Hunterdon Street.
Q Okay. Alright.
A Around the exact time.
Q Exact time?
A Yeah.
Q Okay. Before we came here to the State Police barracks, did I take you to the Camden Street?
A Yes.
Q In Newark. Correct?
A Yeah, in Newark.

Q Who gave me directions to get there?
A I did.
Q Okay. Why did we go there?
A Because that's where the boys was missing at, right there. A fire set in the house. Then we moved out of Camden Street. And Evans, you know, he wanted to kill the boys. You know, but I didn't really feel that he wanted, you know, I didn't really feel that way inside of me.
Q Okay. I understand.
A Yeah.
Q But hold on. But we went there. You took me there. You gave me directions there. Right?
A Yeah.
Q Okay. And what's there now? New houses, right? New housing?
A Right.
Q It wasn't like that back then on August 20, 1978. Was it?
A No.
Q What was there on August 20, 1978?
A A three family house.
Q A three family house?
A Yeah.
Q And you lived in that house?

A I lived in the house on the third floor.
Q The third floor of That house. Do you remember the number?
A I don't know the number.
Q You don't remember the number, but you know it was on that spot that you showed me, right? About the --
A Between there where I see where the lot was at.
Q Right.
A Right. Because I remember there used to a telephone pole right there. That's what I remember seeing.
Q Alright. I saw the telephone pole there.
A Yeah.
Q So it's pretty much the middle of the block?
A Yeah.
Q If you're going south.
A Yes.
Q The middle of the block on your left hand side?
A Right.
Q If you're going south --
A Right.
Q -- right where you showed me. Okay.
DETECTIVE TEJIAN: Do you remember who owned

the house?

THE WITNESS: Who owned the house?

BY DETECTIVE CARREGA:

Q Let me ask you. August 20, 1978 or before, you told me you just moved to 271 Hunterdon Street?

A Yes.

Q Who lived there with you on Camden Street?

A My mother.

Q Just you and your mom?

A My mother and my brother.

Q And your brother that passed, that's in the '80's. Right?

A Yeah.

Q Okay. He died in New York City. Right?

A Yeah.

Q Did anybody else live in that residence? You said it was a three family?

A Somebody lived there on the first floor, but I didn't know that all that well.

Q Let me ask -- we're going to start asking you more questions and I'm not going to be the only one asking these questions. But do you know the exact date when you moved to 271 Hunterdon?

A Not the exact date. No.

Q No?

A I don't know exactly in '78.

Q Alright. Alright. On August 20, what was the condition of the house on Camden Street. Were there people living in it?

A Yeah. People were living in there, but --

Q On August 20?

A Yeah, but it was -- I never knew the landlord that owned that house.

OFFICER HADLEY: On the date --

BY DETECTIVE CARREGA:

Q On August 20?

A Yeah.

Q On August 20. Okay. Were there people living in it? What was the condition of the house after you moved there?

DETECTIVE TEJIAN: After you moved out --

DETECTIVE CARREGA: After you moved there, what was the condition of That house?

BY DETECTIVE TEJIAN:

Q Was anyone living in the house when you went there?

A No, there was no one living in there.

Q In none of the apartments?

A Everybody moved out.

BY DETECTIVE CARREGA:

Q Everybody moved?
A Yes.
Q Was it boarded up?
A No, it wasn't boarded up.
Q It wasn't boarded up?
A Everybody just moved out.
Q Everybody moved out?
A Yeah. Everybody just moved out.
Q How did you get in and out of That house?
A I had a key to get in the bottom door.
Q The bottom door. You had a key?
A I had a key to get in.
Q Okay.
A Since we moved out, we had left the door upstairs open.
Q Okay. Listen. I'm going to show you this. This is -- truthfully, I don't know who made it up. I believe it's a long time ago and it's a really -- it's a missing persons poster and it had a picture of five -- a picture of five boys. One is Ernest Taylor, one is Melvin Ricky Pittman, another one is Randy Johnson, another one is Alvin Turner and another one is Michael McDowell.
A Yeah.
Q Do you recognize these boys?

A I recognize Michael.
Q Do you know Michael?
A I recognize him.
Q Personally?
A No, I don't know him personally.
Q How do you know him? What is his relationship with Lee?
A He just worked for Lee.
Q He works for Lee?
A Like, cleaning up, you know.
Q Alright. Do you recall the date and these boys? Did you ever see these photos before?
A No.
Q No? Okay.
A No, I never seen the photos before.
Q These are the boys we're talking about though. Alright?
A Yeah.
Q This is the first time you saw this. Right?
A Yeah. The last time I seen them, you know.
Q Okay. But you know Michael. Right?
A I knew Michael. I knew another kid, too.
Q You do?
A The other kid, where he at. Brown skin, big kid."
THE WITNESS: He's looking at the poster at

this time.

MR. GUARINO: The question is -- hold on one second.

BY MR. GUARINO:

Q I'll show you what's been marked as S-5 for identification. Do you recognize what S-5 is?

A Yeah. This was a poster that was made up years back by Detective Harriston, I believe, of the Newark Police Department. He was one of the first detectives to look at this case back in '78.

Q These are the pictures of the five boys?

A And it has the pictures of the five boys. I don't know if this is the exact one that I showed him. I don't believe that's it.

Q It's not the one you showed him, but it's similar to that. Correct?

A Similar. Similar. And what happened, when I was showing Mr. Hampton the poster, actually Randy and Ernie were reversed. They had their names reversed. I believe it was -- I'm sorry, Ricky and Ernie were reversed on the poster and that's what I was trying to explain to him.

Q Okay. I'm going to show this to the GRAND jurors so they can take a look at this as we continue. We can read back and you can just look at the pictures

to see what we're talking about. If you just pass that around.

A The actual one that I showed them should be in evidence. A copy of it should be in evidence.

MR. GUARINO: Alright. Continuing at Line -- Page 17, Line 7.

(Resumes reading S-4)

"Q These are the boys we're talking about though, right?

A Yes.

Q This is the first time you saw this. Right?

A Yeah. The last time I seen them, you now.

Q But you know Michael. Right?

A I knew Michael. I knew another kid, too.

Q You do?

A The other kid, where he at?"

THE WITNESS: He's looking at the -- the poster.

MR. GUARINO: Let's just read through the --

(Resumes reading S-4)

"A Brown skin, big kid.

Q Ernie?

A Ernie.

Q I think this is actually Ernie. Let me see if we can find him. Ernest. Right. Ernie. Right,

they're backwards. Ernie is actually this one here. See, they got them backwards on the poster. These are -- these two are all right here. This is the phot. So just put your initials there next to Michael's photo.

A Who is Ricky?

Q Ricky is this kid. That's Ricky.

A Yeah. Yeah. I --

Q You know Ricky?

A Yeah.

Q Alright. Put your initials next to him. Okay. Write down Ricky because you know why, they messed up. The inverted the name, R-i-c-k-u-i.

A I can't see that writing on that.

Q Okay. That's Ricky. Okay. Yes, that's Ricky. They inverted him. Alright. Now, Lee Anthony Evans, do you know him?

A Yes, I know him.

Q How is Lee Anthony Evans?

A My cousin.

Q He's your cousin?

A Yeah.

Q How long have you known your cousin?

A Ever since I was about four or five.

Q Four or five years old. How old are you?

A 52.

Q 52. You've known him a long time.
A Because they moved up here.
Q Maybe 47, 48 years you've known him?
A But they moved up here.
Q Okay.
A They left us and were still down south.
Q Oh, you were down -- okay.
A Yeah. They moved from down south to here.
Q When did you move up here?
A We moved up here.
Q A long time ago?
A Yeah.
Q Okay. So you've know him all your life. Right?
A Yes.
Q Okay.
BY DETECTIVE TEJIAN:
Q Where did yo move from?
A Mobile.
Q Alabama?
A Yeah.
BY DETECTIVE CARREGA:
Q Who is that?
A Lee Evans.
Q Okay. Okay. Sign this down there. Sign

your name and put today's date."

MR. GUARINO: At this point, Detective, is that where he identified a photograph of Lee Evans?

THE WITNESS: This is another photo, so this would be the second one. The set of photos I showed you --

MR. GUARINO: And in that --

THE WITNESS: -- and he identified Lee Evans as being his cousin the has known since he was four years old.

MR. GUARINO: Lee Evans is the person who has been testified to as being also known as Big Man?

THE WITNESS: Correct.

MR. GUARINO: Continuing on Page 20, Line 12. Excuse me, Line 13. No, let me restart from 9.

(Resumes reading S-4)

"Q Okay. Okay. Sign this down there. Sign your name and put today's date. Did Lee have a brother?

A Yeah, he's dead.

Q He's dead?

A Yeah.

Q Put today's date 11/12/08. How long did you Lavert (phonetic)?

A About the same time.

Q About the same time? All you life, right? Who is that, it's an old photo? It's an old, man, who is that? This photo is very old from 1977.

A I don't know who that is.

Q That's not Lavert?

A No.

Q Are you sure?

BY DETECTIVE TEJIAN:

Q Or do you not know the name Lavert?

A Yeah, that's not Lavert.

BY DETECTIVE CARREGA:

Q That's not Lavert?

A No.

Q Okay. Well, again, these are old records and I had this attached to this that says it Lavert Evans, brother of Lee Evans from 611 High Street born in Mobile, Alabama.

A It's not him.

Q Okay. I believe you. It may not be.

A No, it's not.

Q It may be the wrong photo. But it was attached. Somebody put the wrong photo here. That could be."

THE WITNESS: This is the third -- just to explain to the jury, this is the third photo that I

showed him and it was an old photo that was on the records from 1977 and it had Lavert Evans under the photo. It ends up it wasn't Lavert Evans.

MR. GUARINO: And Lavert Evans was just the brother of Lee Evans.

THE WITNESS: He was just the brother of Lee Evans, who is deceased.

MR. GUARINO: Okay. Line 17, Page 21. Continuing.

(Resumes reading S-4)

"Q Okay. It could be like I said, as going back to 1971. So it could very well be, so we'll --

BY DETECTIVE TEJIAN:

Q But you knew that he died and had previously passed away and was Lee Evans brother. Correct?

A Yeah.

BY DETECTIVE CARREGA:

Q Where did Williams -- where did William live at the time in 1978. Again, everything I'm going to ask you is regarding, you know, 1978.

A Yes, 1978. Okay.

Q Where did he live at that time?

A On Glen Avenue.

Q Glen Avenue?

A Yeah.

Q In a house or a building?
A Building.
Q Building?
A Building.
Q In one of the apartments?
A Yes.
Q Do you know what floor?
A No. I think it was the top floor.
Q The top floor. Okay. Do you know this individual?
A Yeah."

MR. GUARINO: At this point, you showed another picture. Correct?

THE WITNESS: At this point I showed another picture. This would be the fourth set and that picture was of Maurice Olds.

MR. GUARINO: So the question is asked, "do you know this individual?" And at Line 20, Mr. Hampton answers?

THE WITNESS: "Yeah, that Reese, or Reesey. Maurice."

(Resumes reading S-4)

"Q Maurice. Right?
A Yeah.
Q He's also your cousin?

A Yeah. He's my cousin.
Q He's deceased now also. Right?
A Yes. Yes.
Q Maurice Olds was his name?
A Yeah.
Q Right. Okay. You want to sign that picture 11/12/08. Did these boys do anything to Lee?
A They broke in his house.
Q They broke in his house?
A Yes.
Q Why did they break into his house?
A I can't tell you that. I have no idea. I have no idea.
Q Did they bring something into the house?
A He said they broke in his house. He told me that. I don't know.
Q Did they take anything from him?
A He said they did. He said they took a bunch of weed.
Q A bunch of weed?
A Yes.
Q What is weed?
A Ha?
Q What is weed?
A Reefer.

BY DETECTIVE TEJIAN:

Q Marijuana?

A Yes.

BY DETECTIVE CARREGA:

Q So they took a bunch of weed?

A Yes.

Q Around what time was this?

A It was, like, two -- almost a week before, you know, this happened.

Q A week before what happened?

A Before they got missing.

Q They got missing?

A Yeah.

Q A week before they got missing they broke in this house and took weed?

A Yeah.

Q Okay. And Lee told you this?

A Yeah, Lee told me.

Q What was Lee driving at that time? We know he was living on Clinton and Grove. What was he driving?

A A Chevy pick up.

Q Chevy pick up? What color?

A Green. Green.

Q Green?

A Light green. Like, a light green.
Q Any writing on his truck? You drove it?
A I have drove it. Yes.
Q Yes? You rode in it and you drove it, August 20, 1978. Okay.
DETECTIVE TEJIAN: I want to back up just for a minute.
DETECTIVE CARREGA: Yes. Go ahead. Go.
BY DETECTIVE TEJIAN:
Q You talked about the weed that you said was stolen from his residence?
A Yeah.
Q You think it's a week prior to this event of August 20?
A Yes.
Q Just tell me about how that came up to you? What did he say to you? What -- how did he sound?
A No. He was upset about it. You know, actually he told the police or whatever investigating, se what was, you know -- but he know all the time who broke in the house. So what he tells me, he would take care of it.
Q He would take care of it?
A Yes.
Q Now, was he all pissed off about this?
A He was pissed off, but he didn't show it.

Q Okay.
A He didn't show it.
Q How did you know he was pissed off?
A Because he didn't say a lot about it. He just said he would take care of it, but I didn't know exactly who broke into his house until later on.
Q Now, when he told you it was weed, did he say how much weed?
A He did say exactly how much weed.
Q Did you ever see any weed in his residence?
A Yes.
Q Okay. How much would he have, typically?
A I would say half an ounce. Something like that.
Q What do you mean you got it? He gave it to you?
A He gave it to me.
Q Would you see other amounts of weed in --
A No, I didn't see it.
Q Do you remember where he stored that?
A No.
Q If he had a bunch of weed, what was he doing? Was he selling it? Was he using it?
A Most likely he was selling it. He didn't get high.
Q He didn't get high?
A Never. He never got high.

Q Do you know that for a fact?
A Yeah. I know for a fact that he was selling. Who have that much weed -- who have that much weed and don't see.
Q Well, no, we're asking if you knew for a fact?
A I didn't know for a fact whether he's selling or not. No.
BY DETECTIVE CARREGA:
Q When he gave you the half, did you pay him?
A No. Some times I did, some times I didn't.
Q So he was selling to you?
A Yeah. Some times. But I wouldn't give him a lot of money for a half ounce.
BY JOE HADLEY:
Q How much would you give him for a half ounce?
A About $30 here. You know, a half ounce at that time cost, what, about $60?
BY DETECTIVE TEJIAN:
Q Okay. So he told you about this weed and that's missing from his house and he said he's going to take care of it?
A He said he's missing a lot.
Q Okay. A lot?
A Yeah.

Q Did he tell you how much was a lot to him?
A No.
Q Now a half ounce, that wouldn't be considered a lot. Right?
A No. No.
Q So you knew the boys took the weed?
A He said he knew he took it. He didn't exactly say who did it. You know, eventually, it came around to that because I knew the boys took the weed.
Q Did you ever have any -- prior to the 20th, did you ever go out with Lee Evans to look for these boys who took his weed?
A No, I didn't go looking for them. No, I never went with him.
Q Who went to look for these boys?
A Reesey went to look with him to look for the boys.
BY DETECTIVE TEJIAN:
Q Reesey?
A Reese.
Q Maurice?
A Yeah, Maurice.
Q And this is August 20th?
A Yeah.
BY DETECTIVE CARREGA:
Q Sunday?

A That Sunday the 28th.

BY DETECTIVE HADLEY:

Q Before when you say Reese and you say Maurice, are we talking about the same Maurice Olds that you signed pictures of?

A Yes.

BY DETECTIVE TEJIAN:

Q His other cousin Maurice Olds. Right?

A Yes.

BY DETECTIVE CARREGA:

Q Now, Maurice rode around with him that Sunday looking for these boys?

A Yeah, and they found them. I guess he must have told Reese that they was going, you know, they wanted to help him do some work this summer. And eventually, you know, Reese wanted to help him look for the boys.

You know, eventually he found them all, but, you know, he had two and I was sitting there up at the house when he first -- I was at my mother's house. He came in and he got me when he got the first two. Then we went around the corner and he gave me a gun.

BY DETECTIVE TEJIAN:

Q Hold on. You were at your mother's house on Hunterdon?

A Yeah, my mother's house on Hunterdon. Then he went

upstairs. We went upstairs and then he passed me a gun. He said, "keep an eye on them until I get back. I'll be right back". He left them.

When he got the other three, him and Reese brung them back, but he had to drop Reese off somewhere. I don't know. I guess he took Reese home and he came back with the other three and he came back with a five gallon can of gas, too.

When he got back with the other three, he took the gun from me and he made them get in the --

Q He made them get in --

A -- get in the car and he came through the back of Bergen Street in another car, the Chevy, and poured gas all around the car and the door. And then he poured gas all around the room and poured" --

THE WITNESS: Where they're meaning car, it actually should be closet, not a car.

MR. GUARINO: Okay.

The witness: This is the company that transcribed it.

MR. GUARINO: So he's talking about the closet?

THE WITNESS: He's putting them in the closet at gunpoint. He put them in the closet and he ends up nailing the closet shut.

MR. GUARINO: Let's continue with the statement --

THE WITNESS: Right. Well --

MR. GUARINO: -- where he says, poured the gas all around the room.

THE WITNESS: He says,

(Resumes reading S-4)

"around the car and the door and poured gas all around the room. We poured gas out in the kitchen and left the gas can sitting right by the kitchen door and struck a match."

He had his match. I told him I didn't have a match. He said you got matches cause you smoke. So I gave him a match and he strike the match and -- but I was going down the stairs before he really --

Q Did you see the flames?

A Yeah. I seen the flames. It was blazing.

Q Blazing?

A Yeah.

Q The house?

A Yes.

Q What floor was this?

A Third floor.

BY DETECTIVE TEJIAN:

Q The kitchen was on the third floor, so it was

a third floor unit?
A Yeah. Yeah. The third floor.
Q Let me ask you. When he -- when you said he came in through Bergen Avenue, the house?
A Yeah.
Q With the last three boys?
A Yeah, with the last.
Q Do you remember who the two boys were that you were sitting up there with with the gym (sic)?"
MR. GUARINO: Well, I'm sorry, that must be with the gun.
THE WITNESS: It's not the gym, it's with a gun.
MR. GUARINO: With the gun.
(Resumes reading S-4)
"Q Do you remember who the two boys you were sitting up there with with the gun?
A I don't know exactly.
Q Do you remember the names? Line 11.
A I don't know exactly.
Q Michael was one of them?
A I know Michael was one of the names.
Q One of the first two?
A Yeah, one of the first two but I'm trying to think who was the -- I don't know exactly.

Q We're talking about these five boys. Right? The ones that you saw?
A Yeah, the same five boys.
Q The same five boys?
A Yes.
Q Detective Tejian. How long did you have to sit there before the other three came?
A Came?
BY DETECTIVE CARREGA:
Q How long did you keep the gun on the two?
A About 45 minutes.
Q 45 minutes you held them at gunpoint?
A Not exactly at gunpoint, but I -- they knew that was -- that they was at bey. Then, you know, nobody got shot in that. I didn't shoot anyone. It's just that he just --
Q Now, when you were holding the two boys at bey, were they in the room? Were they in the closet already or what?
A They were in the room. They were in the room.
BY DETECTIVE TEJIAN:
Q In the kitchen or?
A No, not in the kitchen. In the bedroom where the closet's at.
Q Okay. So it was in the bedroom. Where was

the bedroom located on the third floor?
A In the back of the house.
Q The back of the house is -- would be the -- the back of the house would be Bergen?
A Yeah. The back of the house would be on Bergen.
Q Because Camden and then Camden in the first block passed Bergen?
A Yes.
BY DETECTIVE CARREGA:
Q West of Bergen. Right?
A Yes.
Q So it would be the back of the house would be Bergen. Right?
A Yes.
Q So it was a back bedroom towards Bergen?
A Yes. Uh huh.
Q There was one closet in that bedroom?
A Yeah, one closet.
Q Was there furniture in the bedroom?
A No.
Q Was there --
A It was empty.
Q It was empty. The whole thing was empty?
A It was a nice size. It was a nice size closet.
BY DETECTIVE TEJIAN:

Q Like as big as the table here?
A You could say it wasn't as long as this table, but it was just as deep as this table. But it wasn't as long as this table.
BY DETECTIVE CARREGA:
Q And five boys fit in there?
A Yeah. He placed them in there, situated them in there but I never thought he was going to burn the house down. Because I didn't have no thoughts to him going to really kill them because I didn't feel that way, you know. They took something from me and I'm gonna kill them.
Q What kind of gun did he give you?
A I think --
Q What color was the gun?
A Nickel plated.
Q A revolver or a hand" --
THE WITNESS: It's supposed to be an automatic.
"A Revolver.
Q Revolver?
A Yes.
Q When you say nickel plated, it's silver? Chrome?
A Silver. Yes. Chrome.

Q I'm going to --

BY DETECTIVE TEJIAN:

Q I'm going to bring you back. When he picked you up at your house, what did he say he was doing that night?

A He didn't say exactly. He didn't say what he was doing. He was just taking a ride, but he already mentioned that before he got to that point. You know, he had mentioned what he was going to do.

Q What did he say?

A He said he's going to get rid of them. He's going to kill them.

BY DETECTIVE CARREGA:

Q He was going to get rid of them?

A Yes.

Q He was going to kill them?

A Yes.

BY DETECTIVE TEJIAN:

Q He said that to you?

A Yeah, he said it to me, but I didn't really think he was serious about it.

DETECTIVE CARREGA: Okay.

BY OFFICER HADLEY:

Q How long before that day or that time did he say that?

A It happened all in the same -- you know, I don't -- he told me that before, you know, that -- about maybe the same day in the daytime.

Q Okay. I understand this was 30 years ago so take your time when you think about it.

A Yeah. It may have been the same day. I don't know.

Q Real quick, describe the house, if you can. If you think back to the house you used to live in on Camden Street, what color was it? You don't know?

A I ain't gonna tell that now.

Q Did it have a porch?

A It had a little porch you come out to. A little porch you can walk out on to.

Q Onto Camden?

A Yeah, where you come off of.

Q Steps coming down to the street and then steps going up. Right?

A Yes.

Q I guess a three family. Right?

A Two flights of steps.

Q Two flights? But it was a three family house?

A Yes.

Q Okay. It had steps or a door coming in

through the back?
A It had a back door. Yes.
Q Did you take the same steps to go up through the front that you did if you came in through the back?
A No.
Q What I'm saying is, was there a set of steps in the back hall or --
A There were two sets of stairs.
Q So there were two sets of steps to get up there?
A Yes.
Q Okay. So --
BY DETECTIVE TEJIAN:
Q I want to bring you back to this when he picks you up. When he picks you up, he's got the truck. He's driving his green truck. Correct?
A Yes.
Q Alright. He's got two with him. Right?
A Yes.
Q He picks you up at your house. What does he say to you that night when he picks you up there?
A He didn't really say anything. I don't exactly remember what he said. I just know he had already, you know, rehearsed it.
DETECTIVE TEJIAN: Planned it?

BY DETECTIVE CARREGA:

Q Let me ask you something because I'm a little confused. Does he pick you up with the two boys in the truck already?

A Yes.

Q Or he dropped you off already at the house? You know what I mean, were you already at the house when he brings the two boys there?

A No. No. No.

Q No?

A No. He picked me up at my mother's house.

DETECTIVE CARREGA: He picked you up.

BY DETECTIVE TEJIAN:

Q He had two boys with you in the truck?

A There was two boys in the truck with him.

BY DETECTIVE CARREGA:

Q With him?

A Yes.

Q Where were the boys? Inside the cab or in the back or where?

A They were in the back.

Q It was a pick up truck. Right?

A Yeah. They was in the back.

Q They were in the back of the pick up truck?

A Yes.

Q So you got in next to him?
A Yeah, I got in next to him.
Q Were you two guys talking or you already knew what was going to happen?
A I already knew because he had already, you know, rehearsed it what he was going to do.
Q What did he rehearse. Tell me.
A He said he was going to get rid of them, going to kill them. You know, I didn't really think he was, you know, going to do that.
Q But did he tell you, "hey, I'm gonna take them into the house?" How did he come up with that house?
A Because he know we had just moved out of the house.
Q Did he come up with the house or did you come up with the house?
A He came up with the house.
Q He came up with the house?
A Yeah, I didn't.
Q What did he say?
A He said -- he just said, I'm gonna take a ride to where your mother moved from. It's been so long I'm trying to remember exactly how he put that, but because he orchestrated the whole thing. You know, I ain't -- I wasn't gonna kill nobody.

A Straight out of Hunterdon Street, came around and came through the back on Bergen.

BY DETECTIVE HADLEY:

Q Okay. So at that point, you walked the guys upstairs from the back?

A Yeah, from the back.

Q If you recall who led and who followed, how would that have gone?

A Oh, God. I couldn't tell you.

Q Do you recall --

A He was behind them.

BY DETECTIVE CARREGA:

Q Well, let me ask you. I know where Joe is going. Was the gun out already?

A No. There wasn't no gun.

BY DETECTIVE HADLEY:

Q What was your position, if you remember?

A I might have been in front.

DETECTIVE HADLEY: Just take your time.

BY DETECTIVE TEJIAN:

Q No, we don't want you to -- if you remember. If you remember.

A I don't remember that well.

Q Do you recall him being in the back saying anything to the boys, like, they were going in the

BY DETECTIVE HADLEY:

Q In short, when you got into the car with the three guys, or two other guys and Lee, did you know Lee was coming for you at the time or had Lee just knocked on the door and said let's go? Or did he tell you to wait here or anything to let you know that Lee was coming to pick you up?

A I think he called me to tel me he was coming by the house. He came by my mothers house to pick me up/

Q When he picked you up --

A Yes.

Q -- or even before that, during That phone call, did he tell you he had the boys with him?

A No, he didn't tell me. He didn't.

Q Hold on a second. After he picked you up and you saw the two boys in the car, in the truck --

A Yeah. Yeah. Then I knew exactly What he was doing.

Q Okay. At that point is where you realized what was about to happen?

A Yes. Uh huh.

Q And you --

BY DETECTIVE TEJIAN:

Q I'm sorry. You went directly from your house on Hunterdon then to Camden. Correct?

house to move something? Going to do something?
A He might have been saying something like that.
Q I mean, do you recall that?
A I don't know. I can't recall because it's been so long.
Q But you're ceratin at this point, coming up to the house, there's no gun out? Nobody is being --
A No. No gun out. No.
BY DETECTIVE HADLEY:
Q So at this point, it's pretty much free will walking. Right?
A Right. Free will walking.
Q Do you know if they believed that they were going there because he wanted to question them about the marijuana that was stolen, or if they believed they were going to do some work?
A They were going to do some work. He was going to do some work.
Q Throughout their ride, because I'm understanding now that they were in the back cab, which is opened up. Throughout their ride, did anybody ever talk to these two boys that were in the back?
A He talked to them before he picked me up.
Q Okay. But after he picked you up?
A He didn't say anything else.

Q Okay. Now, on the way upstairs, did anybody make any reference to why we're coming to an abandoned house?

A I guess. They already knew where they was coming to.

BY DETECTIVE TEJIAN:

Q Yeah, I mean you're going to an abandoned -- you're coming to an abandoned house, but you lived on the third floor. Correct?

A Yes.

Q You're going up to your apartment?

A My old apartment. Yeah.

BY DETECTIVE CARREGA:

Q To do some work. What type of work? What was --

A I don't really --

DETECTIVE CARREGA: If it was a set up?

DETECTIVE TEJIAN: Was no furniture on the first or second --

BY DETECTIVE CARREGA:

Q If Lee said to them we're going to do some work, do you know What type of work the boys thought they were -- they'd do?

A There might have been something to clean up. Who knows.

BY DETECTIVE HADLEY:
Q Clean up?
A Yes.
Q Had they ever cleaned up for Lee Evans any other --
A Yes.
Q Is it my understanding that they worked for Lee Evans in the capacity as clean up kids, or kids that actually did construction work?
A No, just clean up. Just clean up.
Q Just clean up?
A Just clean up.
BY DETECTIVE TEJIAN:
Q Clean up junk?
A Yeah. Like, he wanted to move some of his stuff for trash or some stuff of that nature.
BY DETECTIVE CARREGA:
Q Now to your knowledge, had those boys ever been to that house before? It would have been your house at the time that they were --
A No, I don't think they had ever been there. They might have ben there riding there, but with them for me or whatever. I don't know.
BY DETECTIVE HADLEY:
Q Now at the time that these boys were working

with Lee, were you also working with Lee in the same capacity?

A Yes.

Q So you were doing clean up, too, or were you doing construction?

A No. I was a mason and stuff of that nature.

Q How many times have you worked with Lee and those boys have worked at the same time?

A I can't tell you. It wasn't a lot of times. It wasn't a lot of times. They would never be around all the time. He would even go get them on his own and I wouldn't even be around. But they had worked with me and Lee together.

BY DETECTIVE CARREGA:

Q Okay. All of them or just a couple of them.

A Just a couple of them. He never brought, like --

BY DETECTIVE HADLEY:

Q It sounds like it might be one or two of them, other times it might have been two or other ones, or any variation?

A Yeah. It's never been all five together unless he did that while I wasn't around. I don't know.

BY DETECTIVE TEJIAN:

Q Now, to the house. You're coming to this house under the pre-text to do work, at least in your

mind. There's been no threats that you stated or observed outside or in the vehicle. Now we're getting to the third floor. You're walking up to the two floors that are empty?
A Right.
Q There's nobody living there. Right?
A Right.
Q You get to the third floor, I presume it's empty because you said you moved out?
A Uh huh.
Q What transpires immediately upon entering in your old apartment?
A We just go into the apartment. The back door was open, so we went straight into the apartment. We went through the kitchen. We go through the kitchen first and then to the room to the left -- to the room.
Q That's the bedroom?
A That's the bedroom. That was my bedroom.
Q Okay. So the boys are going to --
BY DETECTIVE CARREGA:
Q What happened. What's going on? Where's the furniture. It's, like, all are working or is that --
A No, it was just -- it was smooth. It was just, like, smooth.
BY DETECTIVE TEJIAN:

Q It went smooth?
A Really smooth. There was no getting excited like that.
Q Like, the boys didn't question what was going on at all.
A They might -- I can't -- but they didn't get excited about it.
BY DETECTIVE CARREGA:
Q Who pulled the ratchet on them?
A Evans passed me the rachet, that's what it was.
Q Ratchet being a handgun?
A Yes, a gun.
BY DETECTIVE TEJIAN:
Q Now, did he pull it out first and point it at them or did he pull it out and then hand it to you and tell them?
A He pointed it at them and told them to sit down on the floor. That's what it was. Then he gave me the gun. He said, "watch them until I get back" and he went and got the other three guys.
Q Okay. And that's --
A Yes.
Q So they sat on the floor?
A They sat on the floor. Yeah. But he -- once he went and got the other three guys, once he found the

three guys, they must have dropped Reese off at home.

Q Okay. Reese was with you with the first two?

A The first two he was.

Q Okay. What was Reese doing, do you know?

A Reese stayed in the truck from what I gathered.

Q Okay. You don't remember him coming upstairs in the house at all?

A I don't remember him coming upstairs.

Q Okay. So it's just you, Lee Evans and the two boys upstairs at first?

A Yes.

Q Now Lee Evans give you the gun and tells you to watch them?

A Watch them until he get back. He's coming right back.

BY DETECTIVE CARREGA:

Q And Maurice was in the truck?

A Yeah, Maurice was there.

Q Let me ask you something. Did Maurice known that this was going on, too? That he was --

A No, he didn't know it. I don't think he really knew. He just knew that, you know, Lee didn't give nobody -- did it stress it. Like, this what he was going to do to these -- you know.

BY DETECTIVE HADLEY:

Q But you're going there. You -- I knew that he had that on his mind. You understand What I'm saying? But I didn't think that he was going to do it.
BY DETECTIVE TEJIAN:
Q He was going to carry it out?
A Carry it out.
Q Now Maurice was much younger than you and Lee Evans at the time. Right?
A No, he's not much younger.
Q He was still a teen then, correct? Maurice was, like, 16 then. Right?
A Well, he's about 48 or something like that. Right?
Q You're only in your 20s at the time, 22. Right?
A Twenty one.
Q Twenty one?
A Lee is about 48.
DETECTIVE CARREGA: Reese was born in, yeah, '61 so he'd be about --
BY DETECTIVE TEJIAN:
Q Sixteen. Sixteen or 17, depending on -- right?
A Seventeen.
Q Yeah, 17. So he's a little bit younger than you. Now when Lee leaves, what's the 45 minutes like

going by and these kids asking what's going on?
A Yeah. But it's -- I was trying to convince them that Lee wasn't going to do anything to them.
Q Okay.
A That's what I was doing. I said, "Lee isn't gonna do nothing to you. He's just scaring you". That's what I told them. That's, you know, I was trying to explain it to them. He's not going to hurt you all.
BY DETECTIVE CARREGA:
Q So these boys are sitting on the floor. You got the gun out?
A Yeah. He's just scaring you all.
Q Then you're telling them that Lee is just going to scare them?
A Yeah. Yeah. But when Lee got back, I said, "Lee, are you really going to go all the way through with this?"
BY DETECTIVE TEJIAN:
Q Now, what were the other -- he walks into the -- how were the three boys with himself. Right?
A Yeah. But he gets them in the room first before, you know, he let them know What was going on.
Q Okay. So they come up all not like --
A All three were nice, not even thinking like that.
Q -- thinking anything? Just thinking that

they're gonna go to work now. Do you know what time of day this was?
A This was at night.
BY DETECTIVE HADLEY:
Q Okay. About what time at night?
A 8:30, 9:00.
Q Was it dark out?
A It was dark.
Q Let me ask you something. Was it dark in the house?
A No. I have lights in the house.
Q The house still had lights?
A Yes.
Q Okay. There was nobody living there, but it still had lights?
A Yeah, lights.
Q Okay. Did the boys ever, during the time that you were talking to the two that you had there, acknowledge that they had taken anything from Lee?
A Yeah. The way I gave it to them, like, he's just going to scare them. He wasn't going to hurt them or nothing. I didn't even have -- I didn't even think he was gonna kill them boys, you know.
It wasn't even on my mind, I said because when he came in and Lee said he did what he did, I

said, "Lee, you're really gonna carry this out?" And he puts them in the closet and he nails the closet shut and starts pouring gas all around and he has me striking the match.

I said, "I ain't striking no match". He said, "well, he had started pouring the gas all around the door". I said, "I ain't striking no match" and he poured the gas in the kitchen because he didn't have a match because he didn't smoke". And I was on my way down the steps, the first five steps, and when he did strike the match, you know -- you know how you get back draft on a fire? It blew back and I just jumped down a whole flight of steps. The house was on fire instantly. That gas set the house on fire instantly.

BY DETECTIVE TEJIAN:

Q Now back to the room, if I could. When he came back -- when he comes back with the three boys and now they become aware of what's going on, they walk in the room and you're there with a gun.

A Yes.

Q What are they saying?

A They didn't say -- you know, they might have said something but, I don't know.

Q Are you sure there's only one gun?

A There is only one gun. I had it until Evans took

it away from me.

Q So he came back and how did That work out?

A When Lee came back, yo know, he might have said something to them before he attempted to put them in the closet. He might have said something to them.

I said, "Evans, you really going to carry this out"? He said, "yeah". You know, it had been a week later. I don't know that exact date they broke into his house, but I know it wasn't later. It was just days later.

Q Right. Right.

A You know.

Q They're going in his closet?

A He didn't struggle with them at first. He did a little bit, you know, getting them in there, getting them into the closet.

Q How did he nail the closet?

A He nailed it into the jam.

BY DETECTIVE CARREGA:

Q How did he nail it? Did he bring tools or hammers?

A He had a hammer and a nail. He had a hammer.

BY DETECTIVE TEJIAN:

Q One?

A One nail.

BY DETECTIVE CARREGA:

Q One nail?

A One big nail. One long ass nail.

Q And he nailed one nail through the door?

A Yeah, through the side.

Q Now you just showed me a nail, like --

A He says, I don't know exactly how long it was, but I know it was a big nail.

Q Okay. Okay.

A He nailed it all the way in.

Q Did he have any tools in the car, in the truck, in the pick up truck?

A Yeah, he always has tools in the truck.

Q He always had them?

A Yes.

BY DETECTIVE TEJIAN:

Q Did he come in with the hammer and the nail?

A The last time he came with the kids.

Q With the three?

A Yes.

Q When did he come in with the gasoline?

A He came in with the gasoline at the same time.

Q So he's walking in the house --

A Yes.

Q -- with three boys, a hammer and a jug of

gas?
A Yes.
Q Now is it -- describe the can of gas.
A It was a red can.
Q A red can?
A It's a metal red can.
Q I'm going to assume it's a metal can. Right?
A It's a metal red can.
BY DETECTIVE CARREGA:
Q How big of a can?
A I'd say about a five gallon can.
BY DETECTIVE HADLEY:
Q If you was to show that in size, how would you do it?"

THE WITNESS: He describes the can how tall and wide it was.

MR. GUARINO: And then he continues. I'd say about -- you can read his answer at about Line 8.

(Resumes reading S-4)

"A I'd say that it's about that tall and that wide.
BY DETECTIVE CARREGA:
Q Let me ask you, was that can -- that can wasn't there before? You guys didn't bring that can there before?
A No. No.

Q No?
A No.
Q Maurice didn't bring that can up?
A No.
Q No?
A No.
Q That was Evans that brought that can up?
A Evans brought that can up.
Q Do you recall seeing the can in the truck when you were on your --
A It was on the back of the truck.
BY DETECTIVE TEJIAN:
Q In the bed?
A Yeah, in the bed.
BY DETECTIVE HADLEY:
Q How many times you've been on that truck, the question is, was that can always in the truck? Is that a part of the truck? Part of the tools?
A No.
DETECTIVE CARREGA: No?
BY DETECTIVE TEJIAN:
Q Were you with him when he bought the gasoline?
A No, I wasn't with him. I think he bought the gasoline when he went out to get the three boys the

last time he went out. He didn't buy the gas when I was with him.

Q Which way did the door open on the closet? I'm assuming one way but I want you to --

A It opened out.

Q Out?

A Out.

BY DETECTIVE CARREGA:

Q Okay. All five went into that closet?

A All five.

Q Now you say -- when did he strike the match? Let me ask you this. You say from the floor, from what I gather from what you are saying, he poured gasoline around the door to the closet?

A Yeah. He poured a lot of gas around the door to the closet.

Q The door to the closet?

A Yes.

Q Did gasoline go into the closet?

A He poured a stream of gas all the way out and into the kitchen. But he set the gas can down right by the kitchen, the door going out to the front steps.

Q Okay.

A When he asked me for the match, I was on my way out.

Q Where were you when you were in the -

A I was standing -- I was standing outside the door by the kitchen when he asked me for the match. I said I didn't have no match and he said, "I know you got matches, you smoke". I said, "I ain't striking no match".

Q Alright.

A I gave him the matches and he striked the match.

Q Did he strike it?

A Yes.

Q And what happened?

A It took off -- I took off.

Q But you saw the flames?

A I saw the flames. I took off and he took off.

Q Did you sit around and watch the house burn?

A No.

Q How did you exit the house?

A I exited the house through the back. I went all the way down to the first floor and went out the back.

Q How did he exit the house?

A The same way.

Q The same way? What did you guys do?

A Ha?

Q What did you do, ran out the back of the house?

A We ran out the back of the house and get in the truck and leave because it was blazing.
Q It was blazing? The house?
A Yeah. It was blazing when we got out of there.
Q Did you hear any screams? Any yells?
A No. By then, I didn't pay no mind.
Q Okay. Did you guys go anywhere to watch the fire at all?
A No.
Q Where did you after you got in the truck?
A He took me home.
Q What, two blocks away?
A Yes.
Q Did you watch the fire from your house or go back down and see the fire trucks by car?
A I know I heard a lot of trucks around there.
Q Do you remember what time you got home in your house?
A No, I don't know exactly. I wasn't even thinking about the time. I took a bath, washed up and cleaned up.
Q Did you have gasoline all over yourself?
A No. I didn't have no gasoline, unless it splashed on my feet. There was no gas on me.
Q Was Maurice with you?

A No.

Q He wasn't at the house waiting or anything like that?

A No.

(Mr. Hampton is shaking his head no)"

MR. GUARINO: That's in the transcript.

(Resumes reading S-4)

"DETECTIVE CARREGA: After this day, did you guys talk about it again?

BY DETECTIVE TEJIAN:

Q This is over 30 years?

A Yes.

Q In these 30 years, how many times have you seen him in 30 years? You guys never worked together again after this?

A After that, no, because he had took me -- my sister to court because she wasn't fixing things in the house she stayed in on Nineteenth Street. So she put up money for rent and the deed was in my uncle's name. But my uncle must have been at work that day and he evicted out of the house.

When we went in front of the judge and the judge said, is this your uncle's signature, she looked at it and she said no. That's my brother's signature. The judge said, well, you know I can give you time for

forging the deed on the house. And you know, naturally, I said I signed it and that day we left.

BY DETECTIVE CARREGA:

Q Let me ask you this. You're speaking about your sister. What's her name?

A Veronica Williams.

Q Veronica Williams?

A Yes.

Q Have you ever mentioned this to Veronica about the fire and the boys?

A No.

Q Never said anything to her?

A No.

Q Why you never talking about it?

A I didn't say.

Q Never? You didn't tell your sister? Are you sure?

A Positive.

Q Did you ever meet up with Lee after the fire, go for any rides, any cars or shortly after the fire?

A No.

Q Let me ask you something. For your participation, your assistance, What did he pay you?

A No.

Q He didn't pay you, he just --

BY DETECTIVE TEJIAN:

Q Did he give you any weed?

A No.

BY OFFICER HADLEY:

Q Okay. Just on that little note, you ended your statement when you said you came out of court. He told you to let your sister look after you from now on?

A I asked him for some money that day. That's what it was. I asked him for some money.

Q How much did you ask for?

A I didn't ask for a lot, you know.

Q How much?

A A couple of whatever. He said, get it from your sister. That's what it was.

BY DETECTIVE CARREGA:

Q So your sister got evicted by him?

A She didn't get evicted.

Q Oh, she didn't get evicted?

A No, the judge gave her time to move out.

Q He gave her -- the judge told her to move out?

A Yeah.

DETECTIVE CARREGA: Okay.

BY DETECTIVE TEJIAN:

Q You had a relationship over the years where

you would normalcy borrow money from Lee?

A I didn't exactly borrow money, I worked for him.

Q You worked for the money he gave you?

A Uh huh.

BY DETECTIVE CARREGA:

Q Let me ask you something, if I speak to your sister Veronica, she'll remember What you're saying?

A Yeah, she would. She would.

Q Is she sick, your sister?

A She got -- she gets seizures a lot. She had it all her live. Most likely, she can remember.

Q Okay. Other than you and Evans and Maurice, who is dead, other than yourself and Evans, who else knows about this?

A His brother.

Q Lavert?

A Yes.

Q But he's also dead?

A Yes.

Q Why would Lavert know about it?

A Because, you know, that's his brother. They, you know -- I know they talk when they see each other.

Q How do you know that Lavert knew?

A I don't know exactly, but I know he talks to his brother about confidential stuff. I knew he talks to

his brother. Also in the car, I rode passed them. He as just sitting in the car.

Q How long ago?

A In the Home Depot on Bergen Street when it first opened up.

Q So a few years. Right? Like, two or three years?

A Yeah.

OFFICER HADLEY: Yeah. It hasn't been open that long. Two years. The one on Bergen. Right? It's the only one in Newark.

BY DETECTIVE CARREGA:

Q What did he say when he spoke to you then?

A He just spoke to me and asked me how I was going to get my own money.

Q Did you think you were owed anything for what you did that day?

A I wouldn't say that. See, there's a truck -- I have a van that belongs to him that was in my name. He left it parked on the street and it went to --

Q That green van?

A Yes.

Q And that was in your name?

A It was in my name.

Q But it was his?

A It was his and it went up to about 800 and something dollars in parking."

MR. GUARINO: Tickets? Is that what he was talking about?

THE WITNESS: Yeah, parking tickets.

(Resumes reading S-4)

"BY DETECTIVE CARREGA:

Q Why would he put it in your name?

A I guess because he has so much other stuff, you know. Other papers in his name, but he put it in my name because I was supposed to be getting the van. But it never happened.

Q Did you -- where was your mom living at the time? Did she drive?

A No. When she's down south she does. She didn't drive when she was up here.

Q And not up here. What about Lee's mom?

A She drove.

BY DETECTIVE TEJIAN:

Q Do you remember her car?

A She had a red and white '98.

BY DETECTIVE CARREGA:

Q Okay. Did you ever remember riding around in that with Lee at all?

A No. I used to drive that for her.

Q Okay. For her?
A Yes. She used to gamble a lot.
Q Did you ever borrow that car?
A No. Not that I can recall. I was in there together. Never with Lee."
MR. GUARINO: Continue at Page 69, we're at Line 22.
(Resume reading S-4)
"BY DETECTIVE TEJIAN:
Q Did you and Lee ever talk about this investigation once it started, if you remember back 30 years ago. It was pretty public, right?
A Well, we --
BY DETECTIVE CARREGA:
Q Before we get passed --
A I think he did say something about this. You've got to be ready for them. He tried to explain to me how to do the polygraph. That's what he was doing.
Q He was telling you how to deal with a polygraph?
A Yes.
Q What did he say, if you remember?
A He said, just think about something that's dead that you --
Q That you would beat the polygraph?

A The polygraph.
Q Okay. Now you took a polygraph how long after this happened?
A I'd say about a couple of weeks.
Q You were questioned by the police back then?
A Yes.
Q Okay. You didn't tell the police anything at the time. Let me ask you one thing after we get passed this. After the fire, you only lived a couple of blocks away. Right?
A Right.
Q From 271 Hunterdon?
A Right.
Q It's pretty much the same block and the 300 block canvass. So you're talking Hunterdon, Bergen, Camden?
A Right.
Q Alright.
A Like, around -- like, around on the same side.
Q Around on the other side, then?
A On the other side. Yes.
Q The next day, the next two days, the next week, did you go past that house and look at the condition of That house?
A I did. Yes.

Q What was the condition of the house after the fire?
A It was burnt all the way down.
Q What do you mean all the way down?
A To the ground. Burnt down to the bottom floor.
Q All the way to the bottom floor?
A Yes.
Q Like, to the basement bottom floor of the --
A The first floor. Right to the first floor.
Q The first floor was still partially standing?
A It was partially standing.
Q Partially standing. Okay. So it was burned on the back of the house then?
A All the way --
BY DETECTIVE HADLEY:
Q All the way to the basement?
A Yes, all the way to the basement.
Q Now just for my clarification, you say the house was burned down to the ground. Does that mean if you were standing outside, you could see from the top floor to the bottom floor burnt or are you saying --
(Tape #15 ends abruptly. Tape #16 begins)
A That's all I can probably remember. Yeah. But there are -- but there are any parts to the back. There weren't any parts to the back there.

Q Okay. So the back would be charred rubble into the basement?
A Charcoal.
Q Right. Oh, charcoal. Now let me get one step further. How long did that house stay like that for, do you recall?
A I don't know.
Q You don't know. Do you remember the house itself being completely gone? They went at it with bull dozers. They took down whatever was left?
A I don't know.
Q You were 21 at the time. It was till there when you were 22 or 23? If you don't recall --
A I think so. It might have been. I don't know.
Q Okay. But you can't recollect the house sitting there abandoned, burned out. I mean, a shell of a house?
A For a long period of time.
Q I think they would have cleaned that up --
BY DETECTIVE TEJIAN:
Q I think they would have cleaned that up quick.
A Yes.
BY DETECTIVE CARREGA:
Q It would have been several days, if not

weeks, before the clean up, Philander. Everything You've told us here is the truth?

A Yes. It's the truth.

Q Do you swear?

A I swear.

Q Do you affirm?

A Yes.

Q I don't know if you believe in God. Do you believe in God?

A Yes.

Q Do you swear everything you've told us is the truth?

A Yes.

Q No bull shit?

A No.

Q Right?

A No.

DETECTIVE CARREGA: Okay.

BY OFFICER HADLEY:

Q Before I go, I just want to ask him a couple of questions. This incident happened 30 years ago and you've been questioned by the police how many times about?

A About three -- third or fourth time.

Q Now during this time, you never eluded to the

police that you may have been there at the time this happened?

A No.

Q Today why do you feel it's more different than any other time?

A I don't know.

Q You mentioned --

A Thirty years. No, not -- in 30 years, you know, as you get older --

Q It's been 30 years. Let me ask you -- let me ask -- just ask you. How often do you think about this?

A Cause you know it's still coming around. You know, they had mentioned the other people.

BY DETECTIVE CARREGA:

Q You knew we were looking for you. Right?

A Yes.

Q When was the last time you thought about this case before today?

A The last time?

BY DETECTIVE TEJIAN:

Q Yesterday?

A No.

Q How many times would you say you've thought about it this year?

A I don't know, when it crossed my mind.

Q The mother of some of these dead kids, what would you tell them if they were there? What do you think you would come up with?"

THE WITNESS: I asked if he could speak to the mom of these kids, what would he say to them. He said, "well, I didn't".

(Resumes reading S-4)

"Q Okay. Well, if that's your answer. That's your answer. Anything else you want to add? Anything you left out? Anything you left out? Anything you left out that maybe you want to add?

A No.

BY DETECTIVE CARREGA:

Q Are you sure that the gun was never fired at these kids?

A No.

Q Never fired? Never shot one of the kids, nothing? Just put them in the closet?

A Yes.

DETECTIVE CARREGA: At gunpoint and never shot?

BY DETECTIVE HADLEY:

Q Why wouldn't you have fired?

A I didn't have no reason.

Q Let me ask you, did Lee hold onto that gun? Does he still have it?
A I don't know if he still has it. No.
BY DETECTIVE TEJIAN:
Q Do you think you would be able to identify it, if he still had that weapon? Anything in particular about it? The grip? You know, oyster handle cover, you know?
A No.
Q What color grip was it, do you remember?
A No. It might have been --
Q Okay. Alright. Now I'm just asking you this. Now the fact that I just want to ask you one more thing. With that home being there and charred, did you ever walk up to the house to look in it to see if you could find any bones or anything like that?
A No.
Q Nothing. Do you remember Lee ever going back there at all or talking about it?
A No, I don't. No. I never went there looking for nothing back there. That was it. Everything -- because I didn't know, you know, I had no clue that he was going to do that. I tried to talk him out of it but he was, you know, sincere about what he was planning to do.

BY DETECTIVE CARREGA:

Q Let me ask you one quick question. I got you out on midday. Were you given a sandwich, apple juice?

A Yes.

BY DETECTIVE TEJIAN:

Q And several drinks? Correct? You've been here?

A Yes.

DETECTIVE TEJIAN: How do you feel now after talking about this?

BY DETECTIVE CARREGA:

Q Do you feel better that you told us?

A I still feel the same.

Q You still feel the same?

A Yeah.

BY DETECTIVE HADLEY:

Q Let me ask you, at any point did you feel remorseful for any of this?

A No, I --

Q Do you know was remorse is? Feel sorry?

A Oh, yeah. I felt sorry for the families in some way. Yeah.

BY DETECTIVE CARREGA:

Q When you say "some way"?

A Yeah. But I didn't really know them, so I don't

even know what the mothers look like. You couldn't even tell me if that's the mother or whatever.

Q Okay.

A I didn't know. Lee might have known, but I didn't.

DETECTIVE CARREGA: Okay. Anything else?

BY OFFICER HADLEY:

Q If we talked to Lee Evans and he decided to tell us the accounts of what happened that day, would they be --

A I couldn't exactly tell you.

Q If he was telling the truth?

A If he was telling the truth, he should be exactly right.

BY DETECTIVE CARREGA:

Q He would try to put this off on you and change up anything, saying it was the truth?

A I wouldn't say he wouldn't.

Q I mean, what you're telling us is that --

A Yes, it's true.

Q Did we threaten you here?

A No.

Q Did we promise you stuff here today?

A No.

DETECTIVE CARREGA: Okay. Thanks.

DETECTIVE TEJIAN: Is there anything -- is

there anything you want to add to this or know of? Do you want to say anything about it?

OFFICER HADLEY: Take your time and think about it.

DETECTIVE TEJIAN: I mean, think about it. Did we forget to ask you anything?

OFFICER HADLEY: The reason why I say this, it's 30 years have passed and you've repressed a lot of stuff and it's all --

MR. HAMPTON: No.

BY DETECTIVE TEJIAN:

Q Any type of events in the room? I'm interested about that, the room because I'm just trying to, you know, you've got five boys in the room. The stress level has to go -- to be high. What were they saying? Were they trying to give back his stuff? Were they trying or was he asking about his stuff?

A He might have been.

Q I'm just asking you if remember that?

A I don't remember. I don't recall too well because it's been so long.

Q No, it's a stressful event for you as well, so --

A It is.

Q If you have, um" --

MR. GUARINO: I can't make it out.

(Resumes reading S-4)

"-- behind this event. I know you're a grown man and everything.

A I'm just trying to tell -- I'm just telling you the truth now.

Q But you acknowledged that you thought about this case at least 30 time this year and plenty of times over the 30 years?

A Yes.

BY OFFICER HADLEY:

Q Did you ever think there would come a time when you would tell the police what happened?

A I don't know.

Q Do you feel that you would repress it for so long? In other words, is this something that you would have been willing to take to your grave?

A Yes.

OFFICER HADLEY: I just want to, you know, get the full feel because at some point I think, you know, would you have wanted the parents to know what ever happened to them?

BY DETECTIVE TEJIAN:

Q We all met with the surviving families just this year and spoke with them all. There have been big

concerns to try and locate the remains. That's why I asked you if you ever returned to the residence to remove anything, or if anybody ever did. You know, any recollect of any of those remains being removed from that house?

A No.

Q Okay. I have just one closing question I just thought about. If Lee told you that he was going to kill them, why did you think he wasn't going to carry it out?

A I just didn't.

BY DETECTIVE CARREGA:

Q Okay. That's it. You just did?

A Because he ain't killed nobody in his family.

Q If he didn't kill anybody in his own family? Because he hasn't killed anybody in his family?

A I didn't see no reason to.

BY DETECTIVE TEJIAN:

Q All they did was taken some weed. Right?

A Yeah. I didn't see no reason -- I didn't see no reasons to kill the kids. I really --

Q Okay.

A Deep down inside me, I didn't see no reason.

BY DETECTIVE CARREGA:

Q I know you didn't see no reason, but I was

just asking why you didn't believe him if he told you he was going to kill them.
A I just don't believe him. I just don't believe him.
Q Okay.
A He never gave me that impression to believe.
BY DETECTIVE TEJIAN:
Q Do you have any knowledge of him killing anybody else before this?
A No.
Q What about since this?
A What?
Q What about since this event?
A No.
Q Has he ever threatened you?
A No.
DETECTIVE CARREGA: Okay. Alright. Anything else?
DETECTIVE TEJIAN: Do you want to call? Do you want to wait for Joe?
BY DETECTIVE CARREGA:
Q No, we can close it. Thank you. You know -- what's the matter, you cold? You want another coffee or something?
A Yeah, get me another cup.

DETECTIVE CARREGA: I'll get you another cup of coffee.

DETECTIVE TEJIAN: The time is now 9:23 p.m.

BY DETECTIVE CARREGA:

Q 9:23, okay. I'll write that down. Alright. I'm going to take you back to the, you know, the County, r one of us will take you back to the County.

A I'm in Delaney Hall.

Q You're in Delaney?

A Yeah, Delaney Hall.

Q Okay. He says he has his clothes there.

A I have my clothes over there."

(End of S-4)

MR. GUARINO: Okay. That was it. Basically, it's the conclusion of the pertinent parts of the statement.

BY MR. GUARINO:

Q Detective, do you recall What was the significance of asking him questions about his sister, Veronica Williams?

A The house on -- there was a house that -- the reason that Lee and Philander weren't speaking was because there was a house involved where Lee and his sister lived. And through some forgery of a document, Lee ended up getting the house and his sister had to

move out. Because Lee got them somewhat evicted out of that house, they weren't speaking at one time.

I actually located his sister in the projects, the Seth Boyden Projects down on South Fifth Street, and spoke to his sister and I verified that. She verified that she was his sister and she verified that she had been evicted from the house because of something that had been done, or there was some problem between the two of them.

Q Now, okay --

A So what he said in the statement regarding his sister and the house, her being evicted, that's true.

Q Based on your knowledge of the case and you're review of the documents that exist with this case, there's no -- there was no inspection or digging out of the basement and looking for actual bones or bodies back in '78. Is that true?

A Back in '78, there was -- no one ever tied the fire to this investigation back then. And I don't think that we would be there if it wasn't for Philander Hampton coming forth at -- bringing these two to the location of the house.

Q Was the understanding of the police all along that the house that Philander explained that he had lived in, that at the time of the fire, it had become

vacant?
A The house was, I don't want to say vacant or abandoned.
Q Not abandoned but vacant.
A The residents left recently prior to the fire.
Q Right. He had just moved out that Saturday.
A He had just moved out to three blocks away on Hunterdon. So the house still had lights on, so.
Q But no people lived there?
A There was no one in the house. The house was vacant. Not abandoned but vacant.
Q People lived in the two adjacent houses?
A People lived -- there were houses adjacent on either side and they all burned down. It was a massive fire and all three homes burned to the ground.
Q So would it be fair to say that based on your understanding of the police reports and the fire reports, as well as the newspaper accounts that existed at that time, that the fire department and inspectors and the police were satisfied that all the persons who lived in those houses were accounted for, were safe, and that there was -- they had no reason at that time to suspect there might be bodies in the middle house, which was 256. Is that true?
A There was no suspicion of it because the residents

from the adjoining houses, who spoke to the fire department, told them there was no one living in that house. That that house was vacant. So there was no suspicion. There was no need for anyone to go in there looking for anyone because the house was vacant, wasn't being lived in.

Q The only other reference to people in the house was the report to Fire Investigators Delk and Harris, in which it was reported back then that a neighbor saw two people running from the back of the house and he suspected -- those Investigators suspected an accelerant was used in some type of arson. Is that true?

A That's correct. I'm going to add something to that. Over all these years, several detectives looked at this case and the case never came up with suspects.

I believe one of the reasons is that -- these kids are actually officially reported missing, it's after the fire not before. So once they're reported after the fire, no one put together the disappearance with the fire that had already burned.

If the fire happened after the kids were reported, I think they would looked due to the official reporting this incident and after these houses were burned to the ground. But no one put the fire to the

disappearance together.

Q Now, the state -- when Philander gave you the statement, he knew that he wanted to talk to him again about the five missing boys. True?

A I gave the impression to Philander, and I believe that's one of the reasons why he talked to me and not ever spoke about it to anyone else, because he was under the impression that Maurice had told me. I said that to him, I said I know what happened because Maurice told me before he died.

So he was under the impression that I knew what happened and that's one of the reasons I believe he decided to talk.

Q But at That point in time, he was not charged with anything having to do with this case?

A Nothing having to do with this case. That's why -- we were looking for him for a long time, because I knew there were three cousins, Lee, Maurice and Philander. Lavert -- so I know that's Lee's brother, so if he was around, he would have been the fourth person to help with this case.

So that brought it down to three. Maurice died and brought that to two. I felt that going after Phil and not Lee would be the thing to do. The problem was, I couldn't locate him for a long time. When I did

find out he was at County, I didn't care what charges he was on, just as long as it didn't have to do with this case.

That's one of the things that I expressed to him. When I had him in the office and I also him down at the State Police barracks that I don't want to talk to you about anything for what you're under arrest for. I just want to talk about this case. So I can say here today, I don't know what he was arrested for.

Q So and then when you were done questioning him that day, he told you what happened, you simply brought him back to Delaney Hall?

A He went right back.

Q At that point in time, he still was not formally charged in this case?

A No. Not at all.

MR. GUARINO: I have nothing else of this detective. Are there any questions?

CROSS EXAMINATION BY THE GRAND JURY:

Q Do you have an idea or an opinion about -- I don't know if I can ask for an opinion, but why he would voluntarily chose to incriminate himself so, so elaborately?

A I'll try to explain it this way. My partner and I had been questioning Maurice and we felt, you know,

through our experience we felt that he knew about it and was involved. We also felt that we were very close to getting him to talk because at one time, he put his head down when he was talking to us and said, "okay.

I want to talk to my mother about it". And, you know, we let him go after talking to him and we thought he was going to go home and talk to his mother about, you know, I'm going to get this off my chest and I'm going to talk to the police.

The problem is, he died on us. At that point, we thought this case would never go forward because Maurice died on us. We knew that he was close to telling us.

When I brought Phil in, again, I gave him the impression, a false impression, but an impression that Maurice had told us and that I knew what happened. Although I didn't. I think he truly believed that, and he believed that Maurice had told -- had talked.

So since somebody talked, somebody ratted. In his mind I believe he said, okay my cousin already ratted so if I tell you now, it won't be that bad. You know, so he wouldn't be the first one up to ratting, or telling what happened. I think that's really what broke the case.

JURY FOREPERSON: Okay. Thank you. You can

return to the witness room.

THE WITNESS: Thanks.

(Off the record)

MR. GUARINO: Ladies and gentlemen, that concludes my presentation and the facts of the case. Now Miss Cucinello is going to read you and charge you the law on homicide and homicide involving arson, which would be the equivalent of our felony murder as it existed in 1978. That's the law you will apply to the charges that you will consider in this case.

MS. CUCINELLO: Okay. Ladies and gentlemen, I ask you before you, before you begin you begin your deliberations, just to disregard any of the law that you've been previously given. You have to simply rely on the law that I'm going to read to you right now. It only really applies to this case. When you go back to your deliberations on other cases, you know, please be advised accordingly. But for this particular case, we're going to go to the law for 1978.

Now, just so you understand, they wrote the law for murder and what we call now felony murder in one statute, but they called it just murder. But the State was allowed to have indictments returned for those two types of murder that we commonly refer to as murder, felony murder. There was no bar to the State

for doing that, even though it didn't delineate them as murder, felony murder. They just called them murder and a felonious murder. It was just a little bit different terminology.

Basically one of the commons say, under murder indictment, in short form, the State could property proceed on the thesis either of felony murder or pre-meditated murder or both.

Now just so you know, ladies and gentlemen, the statute of limitations does not apply to murder and felony murder. So therefore, that is why we can actually still bring you the case because there is no statute of limitations or murder and felony murder.

What I'm going to do to you is I'm going to read to you from the model jury charge from -- it was published in 1977. I'm going to first you the model jury charge -- well, it's the same for murder and felony murder.

It reads, willful, deliberate and premeditated first degree and second degree. Murder is the unlawful killing of one person by another with malice and without reasonable provocation or justifiable cause or excuse.

Malice in this connection does not connote hatred, ill-will, or malevolence, although one or more

of these may be present. Malice, as I've used the word, means that there must be a concurrence of an evil meaning mind with an evil doing hand.

Malice means either one or both of the following states of mind, preceding or co-existing with the act by which death is caused, and it may exist even where the act is unpremeditated.

A) An intention to cause the death of or grievous bodily harm to any person, whether such person is the person actually killed or not, or

B) knowledge that the act, which causes death, would probably cause the death of, or grievous bodily harm to some person, whether such person is the person actually killed or not, although such knowledge is accompanied by indifference, whether death or grievous bodily harm is caused or not, or by a wish that it may not be caused.

In New Jersey, the crime of murder is divided into two degrees. That is to say, murder of the first degree and murder of the second degree.

The statute provides that murders in the first degree are murders which are perpetrated by means of poison, which is not the situation here, or by lying in wait, which is not the situation here, or by any other kind of willful, deliberate and pre-meditated

killing and other specifically designated unlawful killings, not pertinent here.

The State contends that this killing was intention and that it was willful, deliberate, and premeditated. Whether it was for you to decide, I will explain those terms, willful, deliberate and premeditated in just a moment.

Under the statute, other kinds of murder are murder in the second degree. The statute provides the jury before whom any person indicted for murder is tried, if they find such person guilty thereof, designate by their verdict, whether it be murder in the first or the second degree.

The law presumes that all unlawful homicides or killings are murders in the second degree. That presumption, of course, is a rebuttable one and is your province, as jurors, to determine whether or not the presumption of murder in the second degree has been rebutted, assuming, of course, you find that the defendant committed an unlawful homicide.

Before the presumption arises, however, the State must prove a murder. Murder requires proof of a malicious killing, which is unlawful. That is a killing without justification or excuse.

Without justification means that the killing

may not have occurred at the command or with the permission of the law, as when a police officer kills in discharge of his duty.

Without excuse means that the killing may not have occurred by accident or in self preservation. Only when the essential elements of murder have been proved beyond a reasonable doubt.

Now in this case, you would use the standard of probable cause. That's the presumption of murder in the second degree arise.

The State's burden of proving beyond a reasonable doubt that the homicide was murder includes the burden of proving beyond a reasonable doubt that the killing was not accidental, justified, or excusable, or manslaughter. The State must bear this burden throughout the entire presentation and the presumption of murder in the second degree comes into play only after the State has satisfied this mandate.

Now the presumption that an unlawful killing is second degree can be rebutted upward or downward. It can be rebutted upward by the State showing beyond a reasonable doubt that the killing was first degree murder.

It is rebutted downward if the evidence shows that, in deed, it was not second degree murder but no

more than manslaughter.

Now if the State proposes to raise the criminal responsibility for unlawful homicide from murder in the second to murder in the first, the State must sustain the burden of proving by probable cause that the killing of the decedent by the defendant was willful, intentional and that it was deliberate and premeditated. That would be what we will be seeking in this case. We will be seeking murder in the first degree.

Now, What do we mean by willful, deliberate, and premeditated killing, which the statute describes as murder in the first degree? The statutory language is actually a statement in reverse order of the natural sequence of the required mental operations.

The first element is premeditation which consists of the conception of the design or plan to kill.

Next is deliberation. The statutory word deliberate does not here mean willful or intentional, as the word is frequently used in daily conversation or parlance. Rather, it conveys the meaning of deliberation. It requires a reconsideration of the design to kill, a weighing of the pros and cons with respect to it.

Finally, the word willful signifies an intentional execution of the plan to kill, which has been conceived and deliberated upon.

The law does not require that any particular length of time shall intervene between the formation of the design to kill and its ultimate execution. It requires the design to kill be conceived, that it be deliberated upon and we willfully executed. If these mental operations did, in fact, occur, the period of time involved is of no significance. The murder is a killing in the first degree.

Where there are these three mental operations which I have just described by the defendant, are questions of fact for you, the jury, to determine.

Intent to kill is not by itself sufficient to raise second degree murder to first. All the other elements, premeditation, deliberation and willfulness must, in addition to the intent to kill, be present in order to constitute murder in the first degree.

Now the intent to take life is not a necessary element required to constitute the crime of murder in the second degree. The intent to do grievous bodily harm is sufficient.

If the intent was merely to do the deceased grievous bodily harm, or if the intent was to kill the

deceased, but the killing was not deliberate or premeditated, then the crime is murder in the second degree.

Murder in the second degree includes all cases of murder, which do not constitute first degree. It is distinguished by the actions of one or more of the mental operations of willfulness, deliberateness, or premeditation required by the law to constitute murder in the first degree. Thus, where the design or plan is to do grievous bodily harm without an intent to take a life, or the killing be intentionally done, but without deliberation or premeditation, or where the act is done in the heat of anger, but without reasonable provocation, then the crime is murder in the second degree.

The State is not required to prove motive. If the State has proved the essential elements of any of the offenses beyond a reasonable doubt, the defendant must be found guilty of that offense, regardless of his motive. In this case, you're just deciding is there probable cause.

If the State has proved a motive, though, you can consider that motive in so far as it gives meaning to the other circumstances. On the other hand, the absence of motive may be considered in weighing whether

or not the defendant participated in the crimes charged.

You will note that you heard the word intent. The nature of the intent, which the defendant acted toward the decedent, is a question of fact for the jury to decide.

Intent is a condition of the mind. It is not necessarily for the State to produce a witness or witnesses who could testify that the defendant stated, for example, that he intended to kill or that he intended to inflict grievous bodily harm. It is within the power of the jury to find that the proof of intent is to be furnished beyond a reasonable doubt, by inferences which may arise in the nature of the acts and circumstances surrounding the conduct under investigations.

Such things as the place where the acts occurred, the weapon used, the location, the number and nature of the wounds inflicted, and all that was done or said by the defendant preceding, connected with, and immediately succeeding the events leading to the death of the decedent are among the circumstances to be considered.

Some of the evidence introduced may have been circumstantial. Circumstantial evidence may be

sufficient to convict. In deed, in many instances, it may be more certain and satisfying and persuasive than direct evidence.

Circumstantial evidence, of course, should be scrutinized carefully, but a conviction may be based on circumstantial evidence alone, provided you are convinced of the defendants -- that there's probable cause here.

The essential determination for you to make in regards to murder in the first degree is whether the killing was accomplished with liberation and premeditation.

The State contends the defendant's actions indicated an intent to take life in willfulness, deliberation, and premeditation. These mental operations may be performed at any time along the sequence of the events. If they are performed prior to the time the fatal wound was inflicted, than a case of first degree murder is made out.

If, ladies and gentlemen, after consideration and comparison of all the evidence that has been presented to you in this case, you are convinced that there's probable cause that the defendant conceived a design to kill, delivered upon, and willfully executed his design to kill, than he is guilty of murder in the

first degree.

If any of these mental operations do not occur, than the crime committed would be -- would not be murder in the second degree and then your attention should be directed to whether the defendant is guilty of murder in the second degree.

If you conclude that there's only probable cause that the killing is done by this defendant -- by these defendants willfully, but so suddenly as to preclude premeditation or deliberation, than the degree would be murder in the second degree.

That is the law, like I said, the model jury charge that jurors would hear, petit jurors would hear, that's when they would be deliberating. But like I said here, your standard is only probable cause so sections where I might have said beyond a reasonable doubt -- sections where I might have said beyond a reasonable doubt, you here as grand jurors only need to use the probable cause standard.

Now lastly that, like I said, was the model jury charge. I'm going to read to you the actual law. It was under a number called 2A:113-1 Murder.

If any person, in committing or attempting to commit arson, burglary, kidnaping, rape, robbery, sodomy or any unlawful act against the peace of this

state, of which the probable consequences may be bloodshed, kills another, or if the death of anyone ensues from the committing or attempting to commit any such crime or act, then such person so killing is guilty of murder.

Then we have to just read you the second portion of it, which is the degrees 2A:113-2. Degrees of murder; designation in verdict.

Murder is perpetrated by means -- murder, which is perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which is committed in perpetrating or attempting to perpetrate arson, burglary, kidnaping, rape, robbery or sodomy, or which is perpetrated in the course or for the purpose of resisting, avoiding or preventing a lawful arrest, or of effecting or assisting an escape or rescue from legal custody, is murder in the first degree.

The other kind of murder is murder in the second degree. Okay. Ladies and gentlemen, does anybody need the law reread?

Does everybody understand that we, as the State, have charged them with murder and felony murder and we are seeking to have an indictment returned for five counts against each of these individuals for

felony murder and five counts of murder, and five counts for each of the boys killed.

Okay. I'll turn it over to the foreman. Madam Forelady.

(Off the record)

JURY CLERK: Can you just ask you question, again, for the record?

JUROR: My question is, for murder in the first degree, the way I understood it was that if must be, like, premeditated, with intent and in such like that. But I don't feel that both -- and then second degree would not be necessarily premeditated and intent, but it still had the same end result.

MR. GUARINO: Alright. The answer to your question is that under the accomplice theory of liability, because Philander Hampton was the accomplice in the actions that he -- that Lee Evans undertook, which was to commit murder, he's charged as a principle.

Whether he knew that Evans himself intended to commit murder is not really attested. He acted in concert with him, assisted him prior to the act and then after the act. Therefore, he's charged as a principle. He's charged and held to the same standard and level as his accomplice may have.

Are there any other questions of law?

(Proceedings concluded)

CERTIFICATION

I, R. T. Barba, the assigned transcriber, do hereby certify that the foregoing transcript of proceedings on tape number 014, index number from 0000 to 2808, and index number from 3928 to 4726, and tape number 015, from 0000 to 0202, and from 1729 to end, and tape number 016, index number from 0000 to 2055, is prepared in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate non-compressed transcript of the proceedings as recorded.

RT Barba

R. T. Barba

451

AOC No.

8-4-10

Date

G&L Transcription Service of NJ
Pompton Plains, NJ 07444