# EXHIBIT H

SUPERIOR COURT OF NEW JERSEY
ESSEX COUNTY
LAW DIVISION - CRIMINAL PART
INDICTMENT NO. 10-07-1728
A.D.# ____________________

- - - - - - - - - - - - - - :
THE STATE OF NEW JERSEY, :  TRANSCRIPT OF PROCEEDINGS
:
vs. :
PHILANDER HAMPTON, :  HEARING
Defendant. :
- - - - - - - - - - - - - - :

Place: Essex County Courthouse
50 West Market Street
Newark, NJ 07102

Date: March 1, 2011

B E F O R E:

HON. PATRICIA K. COSTELLO, J.S.C.

TRANSCRIPT ORDERED BY:

JOHN J. McMAHON, ESQ.
(Office of the Public Defender)

Transcriber Donna Weber
Transcriber Beverly A. Boyd
A.R.T. Agency, Inc.
4 Orchard Drive
Towaco, N.J. 07082

Recording Operator: N/A
Compressed Transcript

A P P E A R A N C E S:

PETER GUARINO, ESQ.
and
CHERYL M. CUCINELLO, ESQ.
(Assistant Prosecutors for the County of Essex)
Attorneys for the State.

JOSEPH E. KRAKORA, ESQ.
and
JOHN J. McMAHON, ESQ.
(Office of the Public Defender)
Attorneys for the Defendant.



I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| FOR THE STATE | | | |
| LOUIS CARREGA | 12 | 39 | 91 |

| EXHIBITS | | IDENT. | EVID. |
|---|---|---|---|
| S-3 | MIRANDA STATEMENT | | 34 |
| S-7 | MR. HAMPTON'S STATEMENT | 10 | |
| S-8 | PHOTO OF MIRANDA RIGHTS CARD | 15 | |
| S-9 | COPY OF CD STATEMENT | | 29 |
| S-10 | PHOTO OF LEE EVANS, "BIG MAN" | | 36 |
| D-1 | DETECTIVE TIETJEN'S REPORT | | 48 |

THE COURT: All right. This is on State versus Philander Hampton. It's 10-07-1728. Can I have your appearances?

MR. GUARINO: Peter Guarino for the State.

MR. KRAKORA: Joe Krakora and John McMahon representing Philander Hampton.

THE COURT: Okay, Mr. McMahon, while we were waiting for your client to be brought up from downstairs I know that you made an application for -- a few minutes ago for a court reporter. There are none available.

MR. McMAHON: I understand that, thank you though, Judge.

THE COURT: Okay. And you wanted -- before he got here you wanted to waive his appearance and address an issue about the camera?

MR. McMAHON: Your Honor, specifically, it's out request that the Court instruct the photographers not to take any photographs of our client until the court's in session and the Judge is on the bench. Obviously, Your Honor, is on the bench.

THE COURT: Sorry, go ahead.

MR. McMAHON: And, then, when Mr. Hampton is initially brought over by the Sheriff's Officers, we understand that he will be brought cuffed behind the



back. We would just simply ask if it's all right with the Court if he could be cuffed in front prior to Your Honor taking the bench, so that he'd be seated at counsel table, cuffed in the front when Your Honor takes the bench, so that the photo -- any photography that's taken, which obviously is permitted it won't portray our client in the light of being shackled, and published in that regards.

THE COURT: Well, a couple of things, one is that we've had to wait, unfortunately, two hours and fifteen minutes past the start of this, and you just bringing it up now. And if you want to restrict -- is the photographer from the Ledger, I don't remember?

UNIDENTIFIED: Yes, the Ledger

THE COURT: You have to, you know, notice the adversary lawyer for the Ledger have a hearing on restrictions. Nobody did that. I don't know if you can get him on the phone now. They have a standard attorney who appears in the matters. But leaping to your end game, other than not wanting him to have a picture in the paper that shows that he's shackled what is the actual legal objection to it?

MR. McMAHON: The jury is going to be -- oh, basically, that our client's picture would be then in the paper and it would be more difficult to pick a fair

impartial jury when we have jurors. Who as Your Honor knows all we need to do is Google things these days and you can gather those pictures. So even if those pictures were taken at a time remote to the trial date, which this isn't that remote, but it's at least months away, all they need to do is Google that or the press will use that picture again prior to the selection, and it will:

1) It's unfairly prejudicial for out client at that point in time. And --

2) Your Honor, and I apologize if I have been not following the correct procedure. But my understanding are that these orders allow the press in the court to take photographs and report on events while court's in session, just as if any member of the public can come in while court was in session.

All I'm asking, just so it's absolutely clear, is that nothing happen until court's in session. And, therefore, anything that happens prior to the court being in session would not be in violation of that order whatsoever.

MR. GUARINO: Judge, before we wrangle with an issue that the Court may not even have to deal with would there be any objection? I don't have any objection to counsel's request. Can I speak with the



photographer and ask him if he would voluntarily refrain from that?

THE COURT: Well, you can do that before I make a ruling, sure.

MR. GUARINO: Would the Court give me a minute?

THE COURT: Sure.

(RECORDING PAUSED - RECORDING RESUMED)

THE COURT: Wait, wait.

MR. GUARINO: Oh, I'm sorry. I spoke to the photographer outside. He says he has no problem with agreeing not to photograph Mr. Hampton with his hands cuffed behind his back. He led me to believe that if the Court asked him he may even not photograph with his hands cuffed in front of him, if that's what the Court would prefer. He's a very agreeable person.

So -- but at least he did indicate that he would not take pictures of Mr. Hampton cuffed behind his back.

THE COURT: I think the cuffing in back or in the front is the issue here, so.

MR. GUARINO: That was the issue, correct?

THE COURT: You're the photographer?

UNIDENTIFIED: No.

THE COURT: You're not? Oh, you came in with

a bag and I thought maybe you were the person. You want to bring him in, we'll ask him?

MR. GUARINO: Sure.

(PHOTOGRAPHER ENTERS THE COURTROOM)

THE COURT: Hi, good morning.

MR. SCIARRINO: Good morning, Your Honor, thank you.

THE COURT: Could I ask you just to give your name for the record please?

MR. SCIARRINO: Robert Sciarrino, S-C-I-A-R-R-I-N-O, photographer for the Star Ledger.

THE COURT: Okay. We have a request by the defense not to photograph the defendant in cuffs, meaning that not in the back of him and not in the front of him.

MR. SCIARRINO: Not a problem.

THE COURT: So they want to wait until he's seated and has his hands under the table.

MR. SCIARRINO: That's fine.

THE COURT: Do you have any objection? He has no objection.

MR. SCIARRINO: Not at all.

THE COURT: All right. By consent then?

MR. GUARINO: Yes.

THE COURT: That's okay, you want to bring



him in please.

MR. McMAHON: Could we -- Judge, could we just have a -- could we have like two minutes? I didn't realize he was that our client was sitting actually in the jury room, could we have two minutes before we start?

THE COURT: Off.

(RECORDING PAUSED - RECORDING RESUMED)

THE COURT: Yes, back on the record. Okay, can I have your appearances please?

MR. GUARINO: Peter Guarino for the State. Judge, in the middle of this proceeding we will probably be joined by Cheryl Cucinello, also, for the State.

MR. KRAKORA: Good morning, Judge, Joe Krakora and John McMahon representing Philander Hampton.

THE COURT: Okay. You have an application, Mr. McMahon, cuffs in front?

MR. McMAHON: Yes, please, Your Honor.

THE COURT: Okay. Would you do that, Beverly, please.

All right. I just want to remind all the attorneys. I think you're already aware that Court Smart was installed this week so that we have complete

running tape from, I think, 7 a.m. to 6 p.m. And anything that you're saying your microphone will be picked up and recorded, even if we're saying it's off the record. So it's most important for defense counsel if you want to talk to your client to cover the microphone.

THE CLERK: No, there's a button they could press.

THE COURT: There's a cut off. Oh, there's the cut offs already. Okay, great. I didn't know if they installed them this week too. So you need to cut that off and not leave a book on it permanently, just when you need to use it. Otherwise, everybody's on notice that we're all on record all the time.

All right. Okay. I have an exhibit list from the State. Have you talked to the defense about moving these in evidence for the purpose of the hearing? Are there any steps?

MR. GUARINO: No, I didn't discuss it in those terms, Judge. Also, with regard to the exhibit list I'm going to mark, so everyone is aware the transcript of Mr. Hampton's statement, which the Court has a copy, counsel have their copies, I assume, as that would become S-7. And just so I'm anticipating a Miranda card that's usually -- that's used by the



Detective Carrega would become S-8. But I haven't marked it yet. Just anticipated.

THE COURT: What about the CD?

MR. GUARINO: Yes, Judge, we could -- I haven't marked that but the CD that was provided along with my brief can be marked as S-9 for identification. That's the audio/video statement of Mr. Evans, and counsel have copies of that.

THE COURT: All right. I think one of those should be marked actually for evidence. Because before we started the lawyers asked me to review the CD, at least the first 8 minutes of the CD, which I did. I think I probably went into the 9th minute to make sure that I passed the pertinent part. So we'll get that at the break and mark it S-9 for evidence, one of those copies.

Okay, you want to start with your first witness, sir?

MR. GUARINO: Yes, Judge, the State calls Detective Carrega.

L O U I S C A R R E G A, STATE'S WITNESS, SWORN

THE CLERK: State your full name, spelling your first and last name?

THE WITNESS: Louis Carrega, L-O-U-I-S C-A-R-R-E-G-A.

THE COURT: Okay, go ahead, sir.
MR. GUARINO: Thank you.
DIRECT EXAMINATION BY MR. GUARINO:
Q Detective Carrega, by whom are you employed?
A Right now no one.
Q All right. What --
A I retired today.
Q You retired as of today?
A Yes.
Q And on November 12th, 2008 by whom were you employed?
A By the Essex County Prosecutor's Office.
Q In what capacity?
A I was a Lieutenant in the Homicide Squad.
Q Detective, are you familiar with the investigation into the disappearance and presumed deaths of five missing boys from Newark in 1978?
A Yes, sir.
Q And on November 12th of 2008 were you involved in an investigation of that case?
A Yes, sir I was.
Q And on November 12th of 2008 did you learn that a person of interest was at that time under arrest in Newark?
A I actually found out a few days earlier, but, yes.



Q Okay. So a few days earlier than the 12th you had learned that someone of interest to you was under arrest?
A Correct, sir.
Q And who was that person?
A Philander Hampton.
Q Now, when you learned that Philander Hampton was under arrest, what did you -- what did you do?
A I made arrangements to -- I didn't know what Mr. Hampton was arrested for, why he was incarcerated, but I learned that he was incarcerated at the Essex County Jail on Doremus Avenue. I made arrangements to have Mr. Hampton transported to the courthouse from the County Jail, and that was to take place on the 12th.
Q And what was it that you wanted to talk to Mr. Hampton about?
A About the case that I was working on, which was the disappearance of five boys in August of 1978.
Q Now, on November 12th, specifically, 2008 do you recall how Mr. Hampton got to -- well, let me ask you this, how did you first meet with Mr. Hampton on November 12th of 2008?
A Mr. Hampton was transported from the County Jail to the courthouse. He was brought into the fourth floor office of the Prosecutor, which is where the

Homicide is located. He was brought up from the basement of the courthouse by elevator into the Grand Jury Unit and, then, walked across to the Homicide Squad.
Q Now, do you recall about what time that occurred?
A Somewhere in the afternoon. Possibly between one and two o'clock.
Q Now, when Mr. Hampton was walked over, where was he brought to?
A He was brought into -- into the Homicide Squad and he was seated in one of the interview rooms.
Q And what floor is that on?
A That's on the fourth floor of the County Courthouse.
Q And when he was brought over to the fourth floor between one and two o'clock and brought to the interview room, who was present?
A Myself and a Detective by the name of Jack Eutsey.
THE COURT: Jack what?
THE WITNESS: Eutsey, E-U-T-S-E-Y.
BY MR. GUARINO:
Q Now, when you first spoke to Mr. Hampton what is the -- what did you -- what did you do or say to him?



A Well, we introduced ourselves to Mr. Hampton. We verbally advised him of his rights and told him why we wanted to talk to him, and the reason was the disappearance of the five boys in 1978.
Q Now, how did you advise him of his rights?
A Like I always. I read him his rights from a card.
Q And the card that you read him his rights from do you have that?
A Yeah.
Q Where do you keep that?
A In my wallet.
Q Do you have it with you now?
A Yes.
Q Could I see the card, please?
MR. GUARINO: And I would like, Judge, for the record we'll mark that as S-8 for identification.
THE COURT: You want to mark that or a photocopy?
MR. GUARINO: Yes, we can mark a photocopy.
THE COURT: Do you have any objection to the photocopy instead of the actual card?
MR. KRAKORA: No, Judge.
THE COURT: Okay.
MR. GUARINO: For the record let me show it to counsel first.

THE COURT: All right, we'll bring it right back out if you can continue.
MR. GUARINO: Yes, thank you, Judge.
BY MR. GUARINO:
Q After you read Mr. Hampton his rights, what happened next?
A I asked him if he knew or had any involvement in the disappearance of the kids? And he told me that he didn't.
Q And after the denied any involvement what did you -- what happened next?
A I told him he was lying.
Q And how did he respond to that?
A He said he wasn't. And I called him a liar.
Q And how did he react to that?
A He kept saying he didn't know. And, then, I gave him a little more information and I think he was surprised by it.
Q What -- what was the additional information you told him?
A I advised him that I knew about -- that he was involved and knew about it because his cousin had told me that he knew.
Q And who was his cousin?
A Maurice, Maurice Olds, O-L-D-S.



Q And what did you tell him about Maurice Olds?
A I explained that before I got to him and the reason I even came upon speaking to him at the time was because of Maurice.
Q And how did he react to that?
A I think he was surprised.
Q Now, at the time you were speaking to him about Maurice Olds what was Maurice Olds' condition?
A He was dead.
Q How long before that interview had he died?
A Awhile. I believe possibly around six months.
Q After you told Mr. Hampton that Maurice had gave you information regarding him how did he react to that?
A Again, I think he was surprised. I, also, asked him, I said, you knew that I was looking for you because I was looking for Phil for a long time, Mr. Hampton. And I asked him if he knew that I had been looking for him. And he gave knowledge that he did.
Q Now, once you had appraised him of that ~~information, and by the way was that information true?~~
A No.
THE COURT: What information that you were looking for him?
MR. GUARINO: I'm sorry.

BY MR. GUARINO:
Q The information that Maurice -- that you had spoken to Maurice Olds and that he gave you information concerning Mr. Hampton?
A It was true that I spoke to Maurice twice before he passed. That's true. At one point Maurice, also, gave me Mr. Hampton's name, which I never had. And I knew his first name was Phil. I never knew his last name. And -- but more than that, no.
Q And at that point did Mr. Hampton indicate he wanted to talk about the case or not? What did he indicate?
A He didn't indicate anything. He kept saying that he was telling the truth. And it was getting to a point I said, okay, I still think you're a liar, but if you think that -- if you say you're telling the truth I guess you wouldn't have a problem taking a polygraph or a lie detector test.
Q And when you asked him if he would take a lie detector test what did he say?
A He said he had no problem. He -- in fact, he was certain he would pass.
Q Now, after he indicated to you that he would take a polygraph, what did you do?
A I told him to stand by. I was going to go try and



speak to someone. And I left and I attempted to get in touch with a polygraphist, which I did. A detective that works for the Prosecutor's Office by the name of Tommy -- Thomas Kelly was in the building. I contacted him by phone, asked him if he could do a polygraph, you know, with no notice. Usually polygraphs are scheduled. In this case it wasn't. There was no notice for a polygraph. But he was in the building and he said -- he came up. I met with -- myself and Detective Eutsey met with Detective Kelly, the polygraphist. I gave him a brief scenario of what was going on. I explained who Mr. Hampton was. And that Mr. Hampton was saying that he had no -- no involvement or knowledge. And I asked if he could take a polygraph of Mr. Hampton regarding any involvement or knowledge of the missing kids.
Q Now, at this point in time about how long had you been speaking with Mr. Hampton before you spoke to Mr. -- spoke to Detective Kelly?
A I don't know how long, but it wasn't -- it wasn't long. I mean Mr. Hampton was there the whole time in the interview room. He was left in the interview room by himself until I made arrangements and I met with Detective Kelly. But I don't know, not much than an hour, if that. I don't recall. But it wasn't long.

Q Now, once you asked Detective Kelly to do the polygraph and he came up to the room that Mr. Hampton was in?
A No.
Q Where -- where was the polygraph done?
A It was done, one, two, three doors down from the interview room where Mr. Hampton was seated. In the same hallway, but three -- three rooms down.
Q So he was taken from the interview room where you were speaking to him, and he was brought a few doors down to another room for the polygraph?
A I believe before that I introduced him to the polygraphist Kelly, and after that, yes, he was -- he was removed, and he went along with Detective Kelly.
Q Now, were you present in the room when the polygraph was given?
A No, sir.
Q Now, after the polygraph was given, when it was completed did you speak to Detective Kelly again?
A I did.
Q And what did you and Detective Kelly speak about?
A Well, the polygraphist informed me that he found Mr. Hampton to be deceptive and, therefore, he believed, you know, he was definitely lying and not



being truthful.
Q And when you learned that the polygrapher believed that Mr. Hampton was being deceptive, what did you do?
A I -- Mr. Hampton was brought back to the initial interview room, again, same hallway. I -- myself and Detective Eutsey went in and informed Mr. Hampton that, you know, I was surprised that he was so sure he was going to pass, but he didn't. And I told him that he failed badly and that it was the polygraphist advised us that he was deceptive and he was lying.
Q Now, after you gave Mr. Hampton that information how did he react to that?
A At first he couldn't believe that he -- he didn't pass. And -- and I told him again -- I told him again that I knew all along that he had been lying because Maurice told me that he -- he knew and was involved. So it was no surprise to me. It might have been a surprise to him but it was no surprise to me.
Q Now, once he said that he didn't believe he didn't pass was there any further conversation between him and the polygrapher?
A Yes, sir.
Q And what was -- how did that go?
A Well, just to make sure that, you know -- you

know, he knew that he didn't pass, and it wasn't just taking my word for it I had the polygraphist speak to Mr. Hampton and explain what had happened and how the results came about. So he was, again, turned over to the polygraphist and Detective Kelly -- I don't know, I wasn't -- I wasn't present, but Detective Kelly explained to him how or how the results came about and how he believed that he had lied and he was deceptive.

Q Now, after Detective Kelly spoke to Mr. Hampton and they finished what happened next?

A After Detective Kelly was done with him, again, we spoke to him, I said, we knew all along you were lying. You know, you got to stop lying. Maurice told us and, you know, this proves it and he said, okay, I'll tell you what happened. And he agreed to tell us what happened. He said, yes. And --

Q All right. When he -- how did he agree to tell you what happened, what did he say?

A He pretty much told us, all right, I'll tell you what happened. You're right, I'll tell you what happened. And I said, I know, because -- I kept telling him that I knew what had happened.

Q And --

A (Continued) And he told me, you know, it was Big Man at one time, and Big Man, he was referring to his



other cousin, Lee Evans. And --

Q And --

A (Continued) -- and I told him, I said, listen, I know, and I said but wait, I said, we'll get to that. And at that point I left and I went next door to that interview room to try and make arrangements to have -- to take a statement from Mr. Hampton.

Q Now, when you say take his statement, are you talking about an audio/video statement?

A That was my intention was to -- the room right next door had equipment set up to -- for statement taking.

Q And did -- when you checked that equipment what did you -- what happened?

A I wasn't that surprised, but it wasn't working, which was common at the time.

Q And when you found that the audio/video equipment in the Prosecutor's Office wasn't working what did you do?

A I called during -- I have to back up for a minute. ~~During -- while he was taking a polygraph I had called~~ Detective Joe Hadley (phonetic) and Detective Bill Tietjen to inform them that I had Mr. Hampton in the office and we're taking a polygraph regarding the missing kids. Detective Joe Hadley he -- I believe he

was already in the building. And Detective Tietjen was nearby. He said, I'll come up. When -- when I found out that our equipment wasn't -- wasn't working, and it wasn't -- I had no idea what was wrong with it, but it was common not to be working. I asked Detective Tietjen if there was any way he could make arrangements to either have equipment brought down to our office, or to have us go someplace else to take the statement. Detective Tietjen works for the State Police. He made one phone call. He found out that it was no problem that the barracks at, I believe, they're the Turnpike barracks, at Newark Airport on 78, they had a facility available. Detective Tietjen said we could bring him there, which was the nearest place to bring him to. And I agreed, and it was my decision to bring him there. It was the only way to get Mr. Hampton on video.

Q Do you recall about how long it was before you were able to arrange and knew you could bring him to the State Police Barracks, about what time that was?

A I think we got to the barracks around between seven and eight. I think before that it took us about maybe an hour and a half to get there from the office.

Q Now, when --

A So I --



Q Let me ask you a question. When -- after you had -- you knew you were going to take him to the State Police Barracks what happened next?

A I -- I informed Mr. Hampton that we're -- to interview him and take a statement I couldn't do that and we had to go someplace else.

Q And did he agree to go with you --

A Yeah.

Q -- to the other place?

A He was no problem. He was cooperative the whole time. He was no problem.

Q And once you advised him that you were going to another building to take the statement how did you do that logistically?

A I brought him downstairs, walked -- we walked downstairs. I put him in my car. He sat in the back of my car. I drove. Detective Hadley was in his own car. Detective Tietjen went directly down to -- to the barracks, and -- because my car was in the parking lot. I pulled out of the parking lot.

When I pulled out of the parking lot Mr. Hampton says -- said to me, you want me to show you where it happened?

Q Who was in your car when he said that?

A Myself and Mr. Hampton.

Q And when he said, do you want me to show you where it happened, what did you say?
A I said, what do you mean? He goes -- he goes where the house where -- where the kids -- I said, sure. And he directed me. He goes -- asked me to go up past Bergen, which usually if I was going to the airport I wouldn't go past Bergen. He asked me to go past Bergen, told me to make a left on Camden Street. And as I was going down Camden Street he asked me to stop in front of a telephone pole. And I stopped in front of the telephone pole and he pointed out that behind that telephone pole is where his house used to be, which was a three family house. And he told me that they had brought the kids in there through the back, which was actually on Bergen.
Q And after he brought you to the location where the house used to be -- by the way do you recall what's there -- was there when you saw it?
A Just new townhouses.
Q And after he pointed out the telephone pole that marked where the house used to be what did you do?
A I mean that was a new development. I -- I had no idea, you know, what was -- what had occurred or, you know, where the house was. So it was a new development in the investigation. So I called our dispatch through



to get to our Crime Scene. I got -- I got through to the on call Crime Scene Detective, and I asked the Crime Scene Detective to respond to Camden Street for the purpose of taking photos of the area that Mr. Hampton was describing.
Q And did they respond?
A The Detective did respond. Mr. Hampton directed, you know, he explained where the house used to be, explained the telephone pole. He explained what had been there at the time were three family homes. The detective took several photos of the telephone pole and the surrounding area.
Q About how long did that all take?
A That had to take, I'm going to say conservatively, an hour and a half. Because the detective had to be dispatched and come down to Camden Street and -- so I'm going to -- I'm going to say possibly around an hour and a half.
Q Now, after the Crime Scene detective came and took photos where did you go?
A ~~After the photos were taken we left the~~ we left. I went down Bergen and went right to the airport.
Q And when you arrived at the police barracks there, what did you do?

A Got to the police barracks. We walked up with Mr. Hampton. Detective Tietjen was already there, and he met us at the door, we walked up. He showed us -- he showed myself and Detective Hadley through a room where he said there was a desk and some chairs and he said we could conduct the interview there. Mr. Hampton was brought in a few minutes later. And we started to -- the interview.
Q Now, that interview was recorded on audio/video tape, correct?
A That's correct.
MR. GUARINO: And, Judge, for the record a copy of that tape has been entered and marked into evidence, it's S-9 in evidence.
THE COURT: A copy of the CD.
MR. GUARINO: A copy of the CD.
BY MR. GUARINO:
Q Now, Detective, I'm going to show you what I've marked as S-7 for identification.
THE COURT: Let me interrupt you for a second. Patrick, is ours still in the recorder?
UNIDENTIFIED: Yes, it is.
THE COURT: Do you want me to mark the one you gave with your brief as S-9?
MR. GUARINO: Yes, Judge.



THE COURT: Could you pop that out and give it to Marybeth? Thanks. Okay, that's going to be S-9 in evidence.
Go ahead, sir.
BY MR. GUARINO:
Q Detective, I'm going to show you what's been marked as S-7 for identification, do you recognize what that is?
A This is a copy of the transcript that was requested by -- by then Assistant Prosecutor De Mattia of the CD --
Q And --
A (Continued) -- it's the transcript of the CD.
Q -- and the date of the transcript has November 13th, 2008, is that correct?
A Yes, it did.
Q And when was the actual date that the statement was taken?
A It was the evening of November 12th.
MR. GUARINO: Judge, may I show him a copy of the disk?
BY MR. GUARINO:
Q Detective, I'm showing you what was marked as --
THE COURT: S-9.

BY MR. GUARINO:
Q -- S-9 for iden -- in evidence, do you recognize what that is?
A This is a copy of the CD of the statement of Mr. Philander Hampton.
Q And that was the one that you took on November 12th of 2008, correct?
A Right.
MR. GUARINO: I'll return it to the Court, Judge.
THE COURT: Thanks.
BY MR. GUARINO:
Q Now, when you arrived at the police barracks -- State Police barracks in Newark with Mr. Hampton for the purpose of recording his statement, do you recall if any other officers were present?
A Yes.
Q Who was present?
A In the interview room?
Q At the time -- in general at the time you arrived there, who else was there for that purpose of this statement?
A Detective Tietjen, Sergeant Henry from Newark, Detective Joe Hadley, myself --
Q And --



A (Continued) -- I think that's -- and there was a trooper on the desk when we walked in.
Q Now, when you actually brought Mr. Hampton into the room to take the statement did he indicate that he still wanted to talk to you?
A Mr. Hampton was cooperative. You know, although he said he had no knowledge at first he was cooperative throughout the night.
Q And did Mr. Hampton know why he was brought to the State Police barracks --
A That's correct.
Q -- for the purposes of his statement?
A Yes, sir.
Q Was he advised of what the issue is that you were investigating?
A Yes, sir.
Q What did you tell him you were investigating?
A The missing five kids from August of 1978.
Q And did he indicate that he understood that?
A He understood it.
Q Now -- thank you -- at the time prior to taking his statement did you advise him of his rights?
A I did.
Q Do you recall how that was done?
A It was done from a standard form that the

Prosecutor's Office generates.

Q I'm going to show you what's been marked as S-3 for identification, do you recognize what S-3 is?

A Yes, sir, this is the Miranda Warning form or Preamble form that -- that was used November 12th of 2008 prior to starting the statement with Mr. Hampton.

Q And could you, for the record, tell us were those -- were those rights read to Mr. Hampton or did he read them to himself, how as it done?

A I read the form and I had -- I filled in his name, my name and what the questions I was going to be asking, I filled in five missing kids in 1978. And, then, after Mr. Hampton was done with the form I had him initial each one of the five main rights, and he did initial them P.H. for each one, 1 through 5.

Q For the record would you read the form as you read it to Mr. Hampton?

A I filled in the date and the time. Time was 8:18 p.m. I filled in Philander Hampton. I am Lieutenant Lou Carrega of the Essex County Prosecutor's Office in Newark, New Jersey. I'm going to ask you certain questions regarding five missing kids in 1978. However, before beginning I advise you of your rights:

No. 1) You have the right to remain silent.

No. 2) Anything you say can be used against you in a court of law.



No. 3) You have the right to talk to a lawyer and have him present with you while you're being questioned.

No. 4) If you cannot afford to hire a lawyer one will be appointed to represent you before any questioning, if you wish one.

Q You --

A No. --

Q Go ahead.

A (Continued) -- No. 5) Is you have the right to stop answering questions or giving a statement or the answering of any of questions, then, you stop until he arrives. If you cannot afford a lawyer one will be appointed to represent you.

Below that there's our wavier statement which reads:

I've been advised and I have read the statement of my rights shown above. I understand what my rights are. I am willing to answer questions and make a statement. I do not want a lawyer at this time, but understand that I may have one at any time I so desire. I, also, understand that I may stop answering questions at any time. I understand and know what I am doing. No promises or threats have been made to me and no

pressure of any kind has been used against me.
And the form was signed by Mr. Hampton and, also, by detectives that were present.
Q And those detectives were who?
A Detective Joe Hadley from Newark Police, and Detective Bill Tietjen from the Sate Police.
Q Now, how did Mr. Hampton indicate that he understood his rights?
A Well, he had been read his rights verbally before. And I made sure to do it again in written form, just so there was no misunderstanding that Mr. Hampton could not read or did not understand what I was reading to him.
Q And on the form itself --
A Mr. -- Mr. --
Q -- how did he indicate?
A He indicated he understood. He initialed each one and he signed the form.
MR. GUARINO: Judge, for purposes of our hearing I would move S-3 into evidence at this time.
THE COURT: Anything moved for evidence is just for the purpose of this hearing. Any objection?
MR. KRAKORA: No, Judge.
THE COURT: Okay.
BY MR. GUARINO:



Q Detective Carrega, after Mr. Hampton signed and initialed that he understood his rights what happened next?
A I began the statement.
Q Now, how did Mr. Hampton physically appear to you as you began the statement?
A Pretty much the same way he looks now.
Q And with regard to his physical needs were they attended to prior to beginning the statement?
A Yes.
Q What did you do for him?
A He -- he was allowed to use the bathroom. He -- he drank soda. He was offered coffee. I believe he was offered food. I mean that's something we normally do.
Q Oh, I do have -- there's another question, to, Detective, with regard to this case and the events of that day did you file -- prior to today did you file any reports?
A No.
Q Why not?
A I had three detectives, Detective Reckentwald, Detective Hadley, and Detective Tietjen submitting reports, so I did not, no.
THE COURT: I'm sorry, what's the first name?

THE WITNESS: The first one is Michael Reckentwald, R-E-C-K-E-N-T-W-A-L-D, I believe.
THE COURT: Okay. And Tietjen and Hadley.
THE WITNESS: Tietjen and the other one is Hadley.
THE COURT: Okay.
BY MR. GUARINO:
Q Now, with regard to not writing a formal report yourself, at some point did I request you to write a report?
A Yes.
Q And was that report completed and provided to me today?
A Yes, it was.
Q And you signed the report today?
A Yes.
MR. GUARINO: Judge, for the record I received a report today and turned it over to counsel prior to the hearing.
THE COURT: Okay. Is that S-1?
MR. GUARINO: That -- the -- excuse me, Judge?
THE COURT: Is that S-1?
MR. GUARINO: Yes, that's what we marked for identification S-1. I'm going to mark this as S-10.



Judge, I'm going to show to counsel what I've just marked as S-10 for identification.
May I approach, Judge?
THE COURT: Sure.
BY MR. GUARINO:
Q Detective, I'm showing you what's been marked as S-10 for identification, do you recognize what S-10 is?
A Yes, that's a photo of Lee Evans, a/k/a, Big Man. He's known as Big Man. I showed this to Mr. Hampton on the date that I took the statement. And I asked if Mr. Hampton would sign it as his identification of Lee Evans.
Q And he -- he voluntarily signed that?
A Yes.
Q To identify Lee Evans?
A Correct.
Q Who he called Big Man?
A Yes.
Q Detective, I'll show you what I've marked as S-1 for identification, do you recognize S-1?
A Yes, that's the report that I submitted at your request.
Q Today?
A Yes.

Q Detective, do you recall what time the statement of -- the formal videotaped statement of Mr. Hampton, do you recall what time that began?
A I think we got there like around -- between seven and eight o'clock some time. Some time after seven.
Q Is the time that you began the Miranda statement is that -- does that appear on the Miranda form, which I believe has been marked into evidence?
A I think I read it. I think I said eight o'clock or somewhere around eight.
Q I want to show you what was marked into evidence as S-3, does that indicate what time the Miranda began?
A 8:18 p.m.
Q And at what point had Mr. Hampton been read his rights and signed the statement -- I mean the Miranda Warning?
A 8:26 p.m.
Q And how soon after he signed his Miranda did you begin the statement?
A Right away. I -- actually the videotape and the audio were started before Miranda was read.
Q So -- and about how long did the statement take?
A An hour, over an hour.



MR. GUARINO: I have no other questions.
THE COURT: Mr. Krakora, cross?
MR. KRAKORA: Thank you, Judge.
THE COURT: Mr. Krakora?
MR. KRAKORA: Thank you, Judge.
CROSS-EXAMINATION BY MR. KRAKORA:
Q Lieutenant Carrega, that was your position back at the time of this investigation in 2008, Lieutenant?
A Yes, sir.
Q In Homicide Squad?
A Yes, sir.
Q How long had you been in the Homicide Squad?
A Several years. I'm going to say four.
Q And how long had you been a lieutenant as of November of 2008?
A Since 1995.
Q Now, I take it that during the time that you were assigned to the Homicide Unit you investigated hundreds of cases? Is that fair?
A ~~As a detective, yes.~~
Q Okay. And, obviously, familiar with the policies and protocol of the Prosecutor's Office insofar as investigating homicide cases is concerned?
A Yes, sir.

Q Now, when in relation to November of 2008 did you first become involved in the five missing boys case?
A Possibly around 18 months prior to that.
Q Now, I take it other than this report -- I don't note that this one was actually -- oh, yeah, it's S-1.
MR. KRAKORA: Do you have S-1 that's marked? Should I use that?
MR. GUARINO: Which is?
MR. KRAKORA: Lieutenant Carrega's report?
Judge, may I approach the witness, Your Honor?
THE COURT: Sure. If you're going to approach with an exhibit don't even ask. Just do it.
MR. KRAKORA: Okay.
BY MR. KRAKORA:
Q I'm showing you what's been marked S-1. I take it this is the report that you recently did?
A Correct.
Q And that was provided to me today.
A Correct.
Q Okay. Now, during the time starting, I think you said, 18 months prior to November until you did this report, did you put anything in writing with



respect to any of the work that you've done on this case?
A No.
Q And does the Prosecutor's Office have some kind of policy or protocol for preparation of reports by detectives who are actively involved in a homicide case?
A Reports are generated and reports were generated by detectives.
Q I'm asking you if there is a policy or practice in the Prosecutor's Office that detectives working on homicide cases prepare reports?
A Correct.
Q That's a standard --
A Right.
Q -- routine, daily occurrence in the Prosecutor's Office.
A Right, sir.
Q If I told you I've defended hundreds of people in homicide cases in this county and never seen a case where the detective didn't do a report, you'd probably take that at face value.
MR. GUARINO: Objection, Judge.
THE COURT: What's the objection.
MR. GUARINO: I don't know that that's a

question that he can answer. He doesn't know what Mr. Krakora's --
THE COURT: Just stand up if you're going to make an objection, please.
MR. GUARINO: He doesn't know what Mr. Krakora's done in the past, Judge.
THE COURT: I think it's a fair question. In fact, he already answered it. He said he'd accept it as routine.
BY MR. KRAKORA:
Q Now, as of November 12th, 2008 you told us that you had been making some efforts to locate Philander Hampton.
A Correct, sir.
Q And for about how long a period of time prior to November 12th, 2008 had you been looking for him?
A I looked for him for about a year, could not find him.
Q Okay. And --
A In fact, I'm going to retract that. I did not have him identified. I knew him as Phil, so I was looking for a Phil. But for about a year I was trying to find out who Phil was.
Q So for about a year you were trying to figure out first who Phil is and then find the person Phil



that you're looking for.
A That's correct.
Q All right. Now, by the time November 12, 2008 came I gather from what you said on direct that you believed that Mr. Hampton was involved in the disappearance of the five boys.
A I believed that he had knowledge of or was involved. He was a person of interest.
Q Okay. So to that extent there's no question but that he was a suspect in your eyes.
A Well, yes and no. My suspect -- main suspect was Lee Evans. I knew -- I found out that Mr. Hampton and Maurice Olds (phonetic) were his cousins and blood relatives. And initially my thought was if these were the closest people to Big Man, maybe Big Man confided in them and to what had happened.
Q Let's come back to my question. You've told us that you believed as of November 12, 2008 that Mr. Hampton was involved, your word, in the disappearance of the five boys; is that correct?
~~A I believed he had knowledge or was involved, yes.~~
Q Okay. And to that extent he was a suspect as potentially someone who participated in the disappearance of the five boys.
A Again, I have to answer the same way, because it's

the way I felt.
Q Well, the answer to the question could be yes or no.
A No, it can't be yes or no, because --
Q Okay.
A -- you know, I gave you my answer.
Q Now, prior to November of 2008 you had done some other investigation concerning your efforts to locate Mr. Hampton; correct?
A Yes, sir.
Q And back, in fact, on June 6 of 2008, as I understand it, you interviewed Floria McDowell, who is the mother of one of the missing boys. Do you recall that?
MR. GUARINO: Judge, I'm going to object to questions concerning interviews of witnesses that occurred prior to the Miranda Hearing. We're here to establish whether or not Mr. Hampton understood his rights when he gave the Miranda. These are wonderful trial issues, wonderful trial questions. This is not the trial. I don't see how they're relevant to our narrow focus here today.
THE COURT: Okay. I have a relevance objection. Do you want to give me a proffer where you're going?



MR. KRAKORA: Yes, Judge. According to the discovery on June 6th and June 9th, two interviews were of potential witnesses were conducted during which photographs of Mr. Philander were shown to the witnesses. One, because they had information that he was potentially washing bloody clothes with Maurice Olds after the homicide. It goes to the issue, Judge, of whether or not he was, in fact, a suspect in light of the somewhat ambiguous answer given by Lieutenant Carrega.
THE COURT: Yes, I'm going to allow it. Is it F-l-o-r-i-a, last name?
MR. KRAKORA: F-l-o- -- yes, Judge. F-l-o-r-i-a.
THE COURT: M-c-D-o-w-e-l-l?
MR. KRAKORA: Correct.
THE COURT: Okay. Go ahead.
BY MR. KRAKORA:
Q Do you recall that interview?
A No, I don't. I recall speaking to many of the relatives. In fact, that's one of the first things I did, was to attempt to locate and speak to the relatives of all missing kids.
Q And, again, I take it you -- you have no report that you could refer to to refresh your

recollection --
A No.
Q -- about the work that you've done during this case.
A No, sir.
Q I'm showing you what's been marked S-2 for identification. This is a report by Detective Tietjen.
A Okay.
Q Is that one of the three gentlemen that you referenced before --
A Yes.
Q -- as doing reports?
A Yes, sir.
Q Okay. And directing your attention to Page 5, if you could take a look at that.
MR. GUARINO: Judge, I'm going to object.
THE COURT: Just a minute. I'm just going to stop you for a moment.
MR. KRAKORA: Yes, I'm sorry.
THE COURT: S-2 is just Pages 8 and 9.
MR. KRAKORA: Oh, it's not the complete report of Lieutenant --
THE COURT: Not according to the list.
MR. KRAKORA: I'm sorry. Then I'm going to ask that this one be marked as D-1. This is -- I saw



-- I saw reference to State Police Detective Tietjen's report. I didn't notice that the exhibit itself was only Pages 8 and 9. I'm sorry.
THE COURT: And how many pages is that one?
MR. KRAKORA: Nineteen, Judge.
THE COURT: Eighteen?
MR. KRAKORA: Nineteen, I'm sorry.
THE COURT: Nineteen. Okay. And your objection was --
MR. GUARINO: That this witness did not author the report. It's not his report. And he should not be cross-examined on the basis of Detective Tietjen's report. He's not here to testify to what Detective Tietjen knew, didn't know or put in his report.
THE COURT: Mr. Krakora?
MR. KRAKORA: Judge, it's the only report that details this interview. It indicates that Lieutenant Carrega was present. And in any event I'm entitled to see if it refreshes his recollection in any event.
THE COURT: Yes, I haven't even heard --
MR. KRAKORA: Whether he authored it or not is really of no moment on that issue.
THE COURT: I haven't heard a question yet,

except look at Page 5, so I'm going to hold the objection for any questions. But he certainly is entitled to ask him to refresh his memory. And the detective testified that he didn't author reports, but other people did on the job.

MR. KRAKORA: I suppose I should have this one marked D-1 for identification, the complete report.

THE COURT: Mark it yourself, D-1, ID with today's date. She'll take it for evidence if it gets that far.

MR. KRAKORA: Okay.

BY MR. KRAKORA:

Q You recognize this as Detective Tietjen's report?

A Yes, sir.

Q Have you seen this before?

A Yes, I believe I did.

Q Okay. Directing your attention to Page 5, I'd like you to take a look at that main paragraph there concerning the interview of Floria McDowell back on June 6th, I believe, 2008 and tell me if it refreshes your recollection of your having been present and participating in that.

A I recall, because that's one of the first things we do is to try and get DNA samples from the families.



Which reference are you talking about?

Q Well, about halfway through this main paragraph, Detective Tietjen makes some comments about what Mrs. McDowell told you about a handgun and a man's -- on the date that her son went missing.

A Okay.

Q Just take a look at that portion.

A Okay, sir.

Q So does that refresh your recollection as to the discussion with Ms. McDowell at that time?

A I recall a discussion with Ms. McDowell when the DNA samples -- and I did -- I was present at her home once.

Q And do you recall that she was shown a picture of Mr. Hampton and asked if she could identify him as the man she saw at the front door talking to her son, who had a handgun in his waistband?

A I don't recall her being shown a photo of Philander Hampton, but if Detective Tietjen showed a photo and he placed it on his report, I have to believe Detective Tietjen.

Q Okay. Well, you were there.

A I was there, yes.

Q Yeah, okay. Do you recall a subsequent interview on June 9th with Mr. Rogers Taylor?

THE COURT: Mr. Krakora, I'm sorry. It's maybe not necessary that I understand this, but who had the handgun, according to her, in the waistband? The son or --
THE WITNESS: We have no idea. I could clear that, 'cause I recall that. Someone came to the door, I believe, with a gun, but we never found out who did.
MR. KRAKORA: She had told -- she had told, according to this report, that a man came to the front door of their house with a gun on the day her son disappeared.
THE COURT: Okay.
BY MR. KRAKORA:
Q Do you recall this subsequent interview on June 9th of 2008 with Mr. Rogers Taylor at his home in Newark? Do you recall that?
A Sir, I can't recall the dates, but I did speak to Rogers Taylor more than once.
Q Okay. And do you --
A Possibly around three times, if not more.
Q All right. And Mr. Taylor's the gentleman that advised you that Maurice Olds and an unknown cousin had washed bloody clothing in Lee Evans' building after the boys were missing? Do you recall that?



A That is -- yes, I do.
Q And for that reason he was shown a picture of Mr. Hampton to determine if he could be identified by Mr. Taylor as the person who was washing the bloody clothes with Maurice Olds. Do you recall that?
A Yes, sir.
Q Okay. This is all information that you gathered prior to November 12th, 2008.
MR. GUARINO: Objection. He's showing him Detective Tietjen's report. My same objection, Judge. The detective is not responsible for what Tietjen puts in his report.
THE COURT: If he wants to repudiate it he can, but he's adopting it. He's indicating he was there and to a certain extent reading Tietjen's report, the only report of the day, refreshes his memory. If you want to re- -- you know, redirect --
MR. GUARINO: I -- Judge, I agree with the Court that that can refresh his recollection. But by no means is there any suggestion here, and there's been no question put by Mr. Krakora, that Detective Carrega adopts the report of Detective Tietjen. I think that's a little more --
THE COURT: Adopts -- adopts might be a little strong, but refreshing his memory, it's

certainly happening here.

MR. GUARINO: I agree with it refreshing his recollection, Judge. And I would hope that counsel could characterize his questions and frame them that way.

THE COURT: I think he did. I misspoke, not him.

BY MR. KRAKORA:

Q Was there any other information specifically that you can recall seeing today that you had before November 12th of 2008 that would suggest that Mr. Hampton was involved in the disappearance of the five boys? What else did you -- what else led you to that conclusion?

A Not -- sir, again, I didn't have Philander Hampton's name for a long time. I had -- I tried other names, Philander Olds, Philander Evans, Phil. I tried a combination of many names until we finally got the correct name. My -- I knew that or I came to find out through speaking to several people that Philander Hampton and Maurice Olds were the blood relatives of Lee Evans a/k/a Big Man.

They were the closest to him. That's why I wanted to speak to Phil Evans and Maurice Olds. And that's what led me to Maurice Olds and --



Q Can I come back --

A -- ultimately that's what led me to Phil Hampton.

Q Can I come back to my question? My question is --

THE COURT: He said Phil Evans. You meant Phil Hampton?

THE WITNESS: Philander Hampton; correct.

THE COURT: Go ahead.

Q Let me come back to my question. My question was was there any other specific information beyond what we just discussed of the two interviews of Ms. McDowell and Mr. Taylor that led you to believe that Mr. Hampton was involved in the disappearance of the five missing boys?

MR. GUARINO: Objection, relevance, for this hearing, Judge.

THE COURT: No, same ruling, same objection, same response, same ruling. It's relevant to whether he was a suspect on November 12th.

MR. GUARINO: I believe the question is asked and answered and it's conceded he was a suspect. He was a suspect and a person of interest. That's why we're here.

THE COURT: I think you're mischaracterizing --

MR. GUARINO: He wasn't grabbed from the mist.

THE COURT: You're mischaracterizing his answers. I'm going to allow it. Anything else? Any other evidence?

MR. KRAKORA: I mean, I can get to the point, Judge.

BY MR. KRAKORA:

Q Do you have any problem with the assertion of Mr. Guarino that he was a suspect?

A No. I have no problem.

Q Okay. All right.

THE COURT: And when we say that he was a suspect we're talking about by November 12th.

THE WITNESS: By November 12th, Your Honor. I tried to explain before. People of interest that were the closest to Lee Evans or Philander Hampton and Maurice Olds, so definitely he was -- he was a main -- main player that I needed to speak to.

Q Now, in 2008 at the time of this interview the protocol for taping interviews and interrogations of suspects in criminal cases was in place; correct?

A Correct.

Q And you were quite well aware of that, I'm sure.



A Yes, sir.

Q As a lieutenant in the Homicide Squad, as in the Prosecutor's Office.

A Yes, sir.

Q And I take it you were aware of the fact that that protocol required that these interviews be taped from the outset.

A Correct.

Q Not after some period of discussion at which point someone agrees to give a statement, but from the beginning of the interview. That's the protocol; correct?

A Of the -- yes.

Q Okay. Now, on November 12th, 2008 you brought -- you had made arrangements to have Mr. Hampton brought from the Essex County Jail; true?

A Correct, sir.

Q To the building here, to the courthouse.

A Right, sir.

Q Now, by what procedure did you do that?

A I got him up. The procedure is to order him up through the Sheriff's Department. And the Sheriff's Department does the transportation.

Q Now, is that a -- is the practice that the Prosecutor's Office merely calls the Sheriff and says,

Bring someone from the jail that we want to talk to to the courthouse?
A No. The arrangements are made through the office, through -- usually the Assistant Prosecutors or so forth.
Q All right. Well, in this particular case what arrangements were made? Who contacted who and who got authority to have someone in jail on an unrelated matter brought to the courthouse? Who did that?
A I don't recall, sir. But he was brought up through -- through what's normal channels, which is transportation by the Sheriff's Department.
Q Well, did you get authority from a judge? Did you have a judge order him as if he had a case in court? Is that how it was done?
A I don't recall how it was done. And not that I don't recall. I don't think I know how exactly what was done.
Q Okay. Did you ask one of the Assistant Prosecutors to have him brought to court?
A I believe I did.
Q Okay. Do you have any idea by what legal authority he was transported to the courthouse to the Prosecutor's Office to be questioned?
A No, I don't.



Q Okay. And at any point did you see any paperwork, writs, any kind of documents, court orders, anything that would authorize your office to move Mr. Hampton from the county jail to the Essex County Prosecutor's Office to be questioned?
A No, I don't, sir. I don't know if he was scheduled for something. I don't -- I never saw any writ.
Q And to the extent you were dealing with one or more of the Assistant Prosecutors, who was that? Who did you work with in order to say we need to bring Mr. Hampton from the jail to the courthouse?
A I don't -- I don't recall, sir.
Q And as far as you know, the Sheriff's Department transported him from the jail to the courthouse?
A Yes, sir.
Q Do you know how they did that?
A No, sir.
Q Do you have any idea whether Mr. Hampton was asked whether he -- well, obviously you have no way of knowing what was said to Mr. Hampton by whoever from the Sheriff's Office went to get him.
A I didn't see Mr. Hampton or had contact until he came into the squad.

Q And so your first contact with him was after he was brought to the fourth floor interview room?
A Right.
Q And that interview room is on the fourth floor and it's commonly used by the Homicide Unit to conduct interviews of not only witnesses, but suspects?
A Yes, sir.
Q And there's an equipment room adjacent to that?
A Correct.
Q And that's where, for example, audio and video taping equipment would be stored?
A Yes, sir.
Q Now, you told us that there was no -- the video taping equipment was not functioning that day in the Prosecutor's Office?
A That's correct.
Q How many video cameras or setups does the Prosecutor's Office have?
A How many --
THE COURT: Did they have then?
MR. KRAKORA: Back in -- true Judge.
Q That's, yes, in 2008. How many cameras, how many setups were available to the --
A I believe one. Oh, you mean interview room set up



with cameras? I believe one.
Q Well, no, my question is more than that. Throughout the Prosecutor's Office.
A Right.
Q Which encompasses the third and fourth floors.
A Right.
Q How many video cameras are available to be used for interviews of witnesses or suspects?
A I don't believe there's any.
Q So you're saying there's -- there was simply one camera, one setup?
A I don't believe there are any cameras. And I was with the Prosecutor's Office a long time. I don't believe there are any cameras. There are rooms set up with cameras, but I don't believe there were any cameras.
Q How many such rooms were available in the Prosecutor's Office in November of 2008 for video taping statements? How many?
A I believe one.
Q Only the one on the fourth floor?
A That's the only one I know of.
Q Okay.
A There may be two now.

Q And what was the equipment specifically that wasn't functioning that day?
A There's -- there's, I think, more than one recorder. And it's kind of elaborate and it was not functional at the time. And I'm sure you recall at the time the Homicide Squad moved from the third floor to the fourth and it was a fairly new setup.
Q And you mentioned that there were multiple recorders?
A There's -- there's more than one machine, yes, sir.
Q Okay. How many machines are there?
A I don't know, two, three. I don't know. Different components, headphones --
Q And none of them worked?
A Sir, the one I tried to get to work was not working, was not functioning.
Q Did you try to get another one if there were more than one available to you?
A There were no more available. That was the room with the equipment. And --
Q Do you have anyone in the Prosecutor's Office like the equivalent of technology assistants that you could ask to assist you?
A Yes.



Q Did you do that?
A No, sir.
Q Okay. Why not?
A It was easier to just get the State Police, who I know have their stuff together and they -- their equipment would be working. So that's what I did. It was easier to do that than to try and get a technician in to -- to set up the video equipment.
Q There's nobody on staff in the Prosecutor's Office who you could call to come to the fourth floor interview room and assist you in getting the recording machine on?
A Sure there are. Sure there are.
Q But you didn't call any such person.
A Again, and the reason I didn't it's because it was easier to go to the State Police and quicker than to try and get someone in.
Q Okay.
A Find out where they are and what they're doing and to try and get someone to do that.
Q Now, obviously, you made arrangements beforehand to bring Mr. Hampton to the courthouse. So you knew in advance that you were going to attempt to question him, true?
A Correct. Yes, sir.

Q Did you check on the status of the video taping equipment prior to having him brought here, given the requirement that these interviews be taped?
A No, sir. And it was my belief that the equipment was operable.
Q My question is whether you checked to see if the equipment was --
A No.
Q -- operable knowing that you were bringing the suspect in the five missing boys case for questioning.
A No.
Q Okay. Is there any reason why you didn't check to make sure since it's a requirement that you do so?
A It's not a requirement I do so. I believed that the system was operable.
Q Okay.
A So there was no need for me to check prior to that.
Q All right. And there was, I take it, tape recording capability, audio taping --
A Correct.
Q -- available to you; correct?
A Yes, sir.



Q You could have audio taped any portion of the discussion with Mr. Hampton that day. You had that available to you.
A It's the same system. I believe the audio was workable, but because it wasn't fully operable I didn't want to take the chance.
Q Let me refer you to S-1 again, which is your report. And directing yourself to the one, two, three, four, fifth paragraph, about halfway into that paragraph.
THE COURT: On Page 1?
MR. KRAKORA: I'm sorry. That's on Page 2 of the three-page report.
A Yes. "At this time" -- I will go right to the point you're trying to make. "At this time I found that only the audio recorder was operational, not the video."
Q Okay. That's what I'm trying to be clear on. You did have the ability to audio tape any and all portions of your interview with Mr. Hampton.
A Yes, sir.
Q Okay. Now --
A And, again, I didn't want to take the chance, because it was not fully operational. So I didn't want to take the chance on clicking a button on and then it

would not record. So that's the reason I took him to the State Police Barracks.
Q Just so I'm clear, you wrote in this report, which you did within the last week roughly; right?
A Yes.
Q That the audio system was operational. True?
A I don't think it's separate --
Q Is that what you wrote in your report that it was --
MR. GUARINO: He has to let him answer the question.
A You're trying to get me to say, sir -- the system is one. I don't think there's one from the other. When I tested it on November 12th, when I tried to turn it on, I could hear audio. I could not see a picture.
Q Right.
A So because it wasn't fully operational I didn't want to take the chance and record only what I -- try to record only what I could hear.
Q I understand. You don't have any quarrel with what you wrote though, that the audio system was operational. That's what you wrote.
A That's what I wrote, sir, yes.
Q Okay. And I'm assuming that there would be plenty of tape recorders available to personnel in the



Essex County Prosecutor's Office.
A Correct.
Q In other words, putting aside the system that's in place in that interview room, you certainly could have had access to any number of tape recorders --
A I have one personally.
Q Let me --
A I have one personally.
Q Exactly. Put it on the table and tape the interview; correct?
A Yes, sir.
Q Now, when you first brought Mr. Hampton into the room you told us it was between 1 and 2 p.m.?
A That's my recollection, sir.
Q Do you have anywhere written down, dates, times to verify that?
A No.
Q Are you relying strictly on your recollection from two and a half years ago as to the time?
A Yes, yes.
Q Okay.
A Detective Hadley or Detective Tietjen may have it on their reports.
Q Well, I'm asking you if you have any record

of it anywhere.
A No, sir. No, sir.
Q In anything other than your recollection.
A No, sir.
Q And you haven't read anything about it in any of those reports before testifying today, have you?
A No.
Q Now, when you first had him in the room you mentioned that Detective Eutsey was there as well.
A Correct, sir.
Q It was the two of you and him.
A Correct, sir.
Q And it's at that time you tell us that you verbally advised Mr. Hampton of his rights.
A Correct.
Q Now, showing you what's been marked D-3, this is the Miranda form which Mr. Hampton executed at 8:18 p.m., according --
THE COURT: Can I interrupt? You said D-3. You mean S-3?
MR. KRAKORA: I mean -- I'm sorry, Judge, S-3.
Q That's the -- now this form is the standard Essex County Prosecutor's Office, Newark, New Jersey preamble to sign statements, Miranda warning.



A Yes, sir.
Q Okay. And, obviously, these are available to you at any time in the Prosecutor's Office.
A Correct, sir.
Q There's probably hundreds of these somewhere in the vicinity of the fourth floor; right?
A They're in the system. I can print them out, yes, sir.
Q Right? You could print them off the computer in two seconds.
A Yes, sir.
Q All right. And yet when you had Mr. Hampton in there with Detective Eutsey you did not have one of these forms to go over with Mr. Hampton. Is that your testimony?
A In the room, no.
Q No. You didn't have him execute a form.
A No, I didn't.
Q And you didn't have the tape recorder on, either video or audio, to record your interaction with him in that room when he was initially brought to the fourth floor.
A No.
Q So we have no way of knowing, other than your saying so, that Mr. Hampton was advised of his rights.

A Well, that's the truth. He was read his rights.
Q It's not on tape.
A No, sir.
Q And you didn't execute one of these Miranda forms.
A No, sir.
Q Is it standard practice and procedure in the Essex County Prosecutor's Office to utilize these forms when questioning the suspect?
A Well, again, you're going back to suspect. My main focus was Lee Evans. I needed to speak to him because he's a blood relative. I didn't know if Lee Evans confided in him or not. He was a person of interest.
Q Can you answer my question?
A It's a yes or no question, sir.
Q No, my question was not a yes -- it was a very simple question. Is it standard practice and procedure in the Essex County Prosecutor's Office to utilize the Miranda form when initiating an interrogation with a suspect in a murder case?
A With a suspect, yes.
Q Okay. And notwithstanding the fact that you've told us that the -- your understanding of the policy concerning the recording of -- of statements by



witnesses or suspects is to be recorded. Notwithstanding your understanding of that policy you chose not to either use an audio tape or video tape of your initial conversations with Mr. Hampton when you say you verbally advised him of his rights.
A Sir, all I asked him is if he had knowledge. I believed he had knowledge.
Q My question is did you --
A That's it. So I didn't feel that he needed to be on audio or video at the time.
Q You didn't -- you chose not to follow the policy that requires the session with a witness or the suspect in a criminal investigation to be video taped or audio taped.
A I --
Q You chose not to follow that; is that fair?
A No.
Q But you didn't do it.
A No, sir.
MR. GUARINO: Objection. That's not a question, Judge, that's an argument.
THE COURT: That's what?
MR. GUARINO: It was not a question. His last comment was not even in the form of a question. It was a statement arguing with the witness.

THE COURT: And it's cross-examination. I think it was a question and I think he answered it.
BY MR. KRAKORA:
Q Now, you told us that you, as you put it, verbally advised Mr. Hampton of his rights from the card that you keep in your wallet.
A Yes.
Q Okay. And after that you confronted Mr. Hampton with your belief that he was involved in the disappearance of the five missing boys.
A He had knowledge or he was involved.
Q And, by the way, it's no understatement to say that this was a rather substantial case that had been lingering for over 20 years or whatever the timeframe is in the Prosecutor's Office, a cold case. A case that had obtained national headlines, news reports for years --
A It was never a homicide, by the way, sir. It was never considered a homicide by this office.
Q Well, we'll characterize it then as the five missing boys case. Okay?
A Correct.
Q A case of some national attention, been in the news, an enormous case, in short. That's fair to say, isn't it?



A Yes, sir.
Q Okay. I mean, this was not -- I'll ask another question.
So you confronted him with your belief that he was involved after you verbally advised him of his rights, according to what you're saying.
A All my -- again, I told him that he had knowledge or was involved.
Q Well, he said that he -- he initially denied having knowledge or being involved.
A Right.
Q And you called him a liar.
A Correct.
Q All right. So it was your belief that he was -- had knowledge or was involved.
A Right.
Q In fact, do you still have --
A Sure.
Q Do you still have your report in front of you?
A Yes.
Q If you look at the first page, the last paragraph, you wrote, I then confronted Mr. Hampton telling him I knew he was involved in the disappearance of the boys and that his cousin, Maurice Olds, had told

me.
A Yes.
Q Not that he had knowledge of. You directly confronted him with your belief that he was involved.
A Sir, I told him that I knew that he had knowledge or that he was involved and that his cousin, Maurice, had told me so.
Q My question is that, at least according to your report, you said that you confronted him with having been involved. You did not write in your report that you confronted him with potentially having knowledge. You said very specifically that he was involved. Is that what you wrote?
A That's what I wrote.
Q Okay. Now, do you have any -- you mentioned that you had spoken twice in the past to Maurice Olds.
A Right.
Q Do you have any documentation as to where, when, what time?
A No.
Q Did you make any notes concerning those interviews at the time?
A No.
Q Is there any reason -- is there any -- was there anyone with you when you did that that put it in



a report?
A I don't believe there's a report.
Q There's no report -- there's a no report by anyone involved in this case pertaining to the discussions with Maurice Olds.
A No.
Q Okay. And Maurice Olds, in fact, did not tell you that Philander Hampton was involved in the disappearance of the five missing boys.
A That's correct, sir.
Q So that when you told Mr. Hampton that or gave him that impression you were lying to him.
A Yes.
Q And you indicated that your recollection is that Maurice Olds had died about six months before November? Do you have any documentation about that?
A Of when he died?
Q Yeah.
A I knew the date that he died and I even contacted the Medical Examiner's Office.
Q Is it written down anywhere?
A No.
Q Now, at some point you've told us that you proposed to Mr. Hampton that he take a polygraph.
A Yes.

Q And about what time was that?
A It was shortly after he got to the squad.
Q Do you have anything -- any record of what time that was?
A You could find out by the polygraphist.
Q I'm asking you if you can tell us.
A No, sir.
THE COURT: I'm sorry. You could find out from the --
THE WITNESS: The polygraphist. I'm sure he has the time down that he started the polygraph.
THE COURT: Oh.
Q Now, you mentioned that you had some conversation with -- is it Detective Kelly?
A Yes.
Q Okay. Prior to the polygraph being administered to Mr. Hampton.
A Yes, I did.
Q And I think you told us that you told him that Mr. Hampton had denied both knowledge and involvement in -- in the disappearance of the five missing boys.
A Right. And I asked if he could pretty much -- his questions be asked to any involvement or knowledge of.
Q Right. So the -- so he knew that it was not



just a question of whether or not he was withholding information, but you wanted to know whether he was being truthful in his denial of having been personally involved in their disappearance.
A Knowledge or involvement, yes, sir. Those were my requests.
Q My point is he knew that that's -- that you wanted the questions to cover both issues.
A Yes.
Q Now, after the polygraph you first spoke to Detective Kelly to get his opinion that Mr. Hampton was not telling the truth on the test.
A After the polygraph?
Q Correct. First you spoke to Kelly. He told you that Philander Hampton had failed the polygraph test essentially.
A Right.
Q Right?
A Yes.
Q Okay. And then you were the one that communicated that to Mr. Hampton?
A Correct.
Q And you told him that he had failed the polygraph and that he was lying about his denials of knowledge or --

A Right.
Q -- involvement.
A Right. Right.
Q Okay. And you said, I think if I wrote these correctly on your direct examination, that Mr. Hampton couldn't believe that he didn't pass. Those are your words.
A It was -- he seemed surprised that he didn't pass.
Q What were his words?
A To me he seemed surprised that he didn't pass.
Q What did he say?
A He seemed shocked. I don't know what he said.
Q I know he seemed shocked or surprised. What words did he use?
A I don't know.
Q Did you make any notes at the time?
A No. But I did have the polygraphist speak to him directly and explain to him.
Q My question is -- my question is do you have any record of what words Mr. Hampton used when you told him that he had failed the polygraph?
A No.
Q And at that point you were not -- you were not using any form of audio or video taping equipment.
A No, sir.



Q And I take it it was your purpose in telling him that he failed the polygraph in addition to the fact that you knew information from Maurice Olds to get him to tell you what you believed he knew.
A Right.
Q And I'm assuming that the fact that he failed the polygraph reinforced your view that he, in fact, knew about what happened to the boys.
A That's correct, sir.
Q And that's why you continued to press Mr. Hampton that you believed that he had knowledge and that he should tell you what happened.
A Well, that's why I had Detective Kelly speak to him.
Q Right. To make certain that -- that Mr. Hampton knew that it was on the up and up, your claim that he failed the test.
A Correct.
Q Now, what did -- at what point did Mr. Hampton tell you that he knew what happened to the boys?
A In -- actually -- I guess he knew what happened when he told me to drive up to the house and he showed me where the house was.
Q Well, I take it at some point before the

decision was made to take him to the State Police Barracks to use the video equipment there.
A He told me that he would tell me what happened.
Q Right. He told you that -- that he knew what happened. He mentioned Big Man.
A Yes.
Q Okay. And what else did he tell you about what had happened?
A He didn't tell me anything else. He told me, I'll tell you what happened. And, you know something to the effect, you know it was big, man. And I said -- I again told him I know what happened. And that's it.
Q And did you know -- did you know what happened?
A Nope.
Q Okay. Now, obviously, at the time that you made the decision to take the video tape statement you knew that he was going to tell you how these boys were killed.
A Correct.
Q Because he told you that he knew how they were killed.
A He told me where it happened.
Q Right.
A When I was driving him to the airport.



Q And he told you that he knew what happened before you even got in the car.
A Correct.
Q Now, can you tell us what time it was on the afternoon of November 12th, first of all, that Mr. Hampton first told you that he would tell you what happened and that Big Man was involved?
A I don't recall what time, sir.
Q And, obviously, you don't have that written down anywhere.
A No.
Q And can you tell us what time you left the Prosecutor's Office to go to the State Police Barracks?
A I would say around -- I believe we got to the barracks around 7, 7:30. I would say after 5.
Q Because as you pointed out before you were at the scene for about an hour and a half.
A I believe so, yes.
Q The scene being Camden Street.
A Correct, sir.
Q Now, Mr. Hampton was obviously in custody at the time.
A Yes, he was.
Q And did you seek any authorization to transport him outside the courthouse building?

A No, sir. He was in custody and he remained in custody.
Q So you had no specific authority to take him elsewhere, to leave the Prosecutor's Office.
A No.
Q And you told us that it was you driving and he was the only person in the car?
A Yes.
Q And would it normally be appropriate to have at least two officers with someone in the car?
A With someone in the car?
Q With someone who's under arrest.
A Absolutely.
Q Yeah, but you just went by yourself. You didn't take someone else along with you to --
A I had Detective Hadley and Sergeant Henry in the car behind me.
Q My point is there was no one else in the car other than you and Mr. Hampton.
A Correct, sir.
Q So, again, we're left -- we're left with what you're telling us about how this conversation about showing him the scene started.
MR. GUARINO: Objection to the form of that question.



THE COURT: What's the objection?
MR. GUARINO: Well, it's argumentative, left with? What does that mean to a witness? So we're left with -- I don't know what Mr. Krakora --
THE COURT: The answer's no corroboration because -- no corroboration other than your statement right now, because there was no one else in the car.
THE WITNESS: There was nobody else in the car.
THE COURT: Yes, I don't think it's argumentative. I'll allow it.
BY MR. KRAKORA:
Q Now, prior to leaving the Prosecutor's Office did you tell Mr. Hampton the reason that you were taking him to another location?
A Yes, I did.
Q You told him that the video taping equipment in the Prosecutor's Office was not functioning?
A No. I told him that -- not to that effect. I said, Listen, I can't take a statement from you here. I don't have the proper facilities. And I have to take you to Newark Airport, which is only a couple of minutes away.
Q So let me come back to my question. I'll ask you again. Did you tell him why you had -- you were

taking -- the real reason?
A I told him that I had to take him to Newark Airport for the purpose of him giving me a statement as to what happened.
Q Well, did you tell him that the specific reason was that there was a glitch with the video taping equipment in the Prosecutor's Office?
A No, no, no.
Q Okay. In fact, at no time, either then or at the State Police Barracks did you tell him that he was being video taped.
A No.
Q He never knew that, did he?
A I don't believe so.
Q Right. So, in reality, the real reason that you took him to the State Police Barracks was withheld from him.
A Well, if he asked I would have told him.
Q But you didn't tell him.
A He didn't ask.
Q But you didn't tell him.
A But he didn't ask.
Q Okay. Fair enough.
THE COURT: Mr. Krakora, just on scheduling, I intend to go straight through if everybody can manage



that, because we lost the first two and a half hours. Otherwise I've got time problems. Okay with that?
MR. KRAKORA: I'm at your pleasure, Judge.
THE COURT: Okay.
MR. KRAKORA: As long as the court staff doesn't want to kill me for interrupting their lunch.
THE COURT: They'll rotate out, I guess, if they have to.
BY MR. KRAKORA:
Q Now, the form, S-3, the Miranda form that you used with Mr. Hampton at the State Police Barracks --
A Yes, sir.
Q -- I take it that you had taken this from the Prosecutor's Office with you when you left to drive to the State Police Barracks?
A Yes, sir.
Q Okay. You didn't have that previously.
A Did I have it previously?
Q Well, earlier in the day you didn't have the form. I'm asking you whether at some point --
A I --
Q Let me finish the question. When you made the decision to take him to the State Police Barracks you went and got a form to take with you.
A I didn't go and get a form. I had forms in my

file.
Q Which you took with you to the State Police Barracks.
A I took the file with me, yes, sir.
Q And that file was available to you all day?
A Yes, sir.
Q Now, the prosecutor asked you some questions about the fact that until the last couple days you had not prepared any reports on this case. And you mentioned that there were three other individuals who were doing reports along the way; correct?
A Correct, sir. Yes.
Q None of those three is employed by the Essex Prosecutor's Office.
A Yes, Detective Beckentwald.
Q Okay. And he's the one who was not even there on November 12th.
A Right.
Q Right. He had nothing to do with the interview process on November 12th.
A Correct.
Q And the other two, one gentleman's from the State Police, Detective Tietjen; right?
A Yes.
Q He wasn't present during the first part of



this, when you talked to Mr. Hampton in the fourth floor interview room with Detective Eutsey.
A No, sir.
Q Okay. He wasn't there when you talked to Detective Kelly about the polygraph.
A No, sir.
Q He arrived at some point later in the day.
A Right around when the polygraph was done.
Q And the other individual would be Detective Hadley from the Newark Police Department?
A Yes, sir.
Q And he was not present in the early part of this process when you spoke to Mr. Hampton with Detective Eutsey on the fourth floor interview room.
A No, sir.
Q All right. And he, too, arrived at some point later in the day.
A During the polygraph, I believe, is when I reached out to both of them.
Q And were either or both of them present when ~~you confronted Mr. Hampton about his having failed the~~ polygraph?
A Present in the room?
Q Correct.
A No, sir.

Q So neither one of them can tell us what you said to Mr. Hampton or what Mr. Hampton said to you.
A Correct.
Q And there was no other person present during that discussion either?
A Myself and Detective Eutsey and Mr. Hampton.
Q Right. Was Detective Eutsey there after the polygraph when you confronted Mr. Hampton about his having failed it?
A Yes. Yes.
Q But he didn't do any reports about that, did he?
A No, sir.
MR. KRAKORA: If I could just have one minute, Judge?
THE COURT: Sure. Off the record.
(TAPE OFF - TAPE ON)
THE COURT: Back on the record.
MR. KRAKORA: I'm sorry. I'm sorry, yes, Judge.
THE COURT: Okay. And my apology, the cutoff only works if the light's on. If the light's off the system's going to automatically take everything.
MR. KRAKORA: Okay.
THE COURT: Okay.



MR. KRAKORA: Well, listen, I've been in meetings with many high ranking people who assure all of us defense attorneys that this system can only be accessed under extraordinary circumstances. So we need not fear disclosure of confidential information.
THE COURT: And only by one -- only by one person and the first day. The very first day before four o'clock, the first say we had it installed was the first application.
MR. KRAKORA: Oh, okay, well --
THE COURT: But I denied it, so --
BY MR. KRAKORA:
Q You still have S-1, right, in front of you?
THE COURT: Hold on. Give me one second.
MR. KRAKORA: Sure.
(TAPE OFF - TAPE ON)
Q Lieutenant Carrega, is it -- is it fair to say that -- and you have that report in front of you, which is dated 2/23/11 at the top, your continuation report.
A Yes. What page?
Q No, I'm looking at the first page. The date at the top of the first page is 2/23/11; right?
A Yes, sir.
Q And it looks like it was --

THE COURT: This is S-1?

MR. KRAKORA: S-1, I'm sorry, yes.

Q S-1 and it looks like at the bottom of that is an indication that it was signed off by a supervising attorney on 2/29/11, meaning yesterday.

A No. There are only 28 days in the month.

Q 2/29, yeah, that can't be right. It must be 2/28?

MR. GUARINO: Judge, I'm going to interrupt just to apologize to the Court and Mr. Krakora. And I asked if this was a leap year this morning. I signed that this afternoon and I put February 29.

THE COURT: That's okay. It should have been March 1st?

MR. KRAKORA: Yes.

MR. GUARINO: That's correct, Judge.

Q Okay. So it's literally done today by Mr. Guarino.

A Yes.

Q Approved today.

A Yes.

Q Okay. Is it fair to say that until this report was finalized there was no documentation of any kind concerning what happened between you, Detective Eutsey and Philander Hampton on November 12th, 2008



before the polygraph.

A That's correct, sir.

Q And similarly there's no documentation anywhere in this case prior to the submission of this report today that you verbally advised him of his rights during that initial interview with Detective Eutsey on November 12th, 2008.

A Yes.

Q Showing you what's been marked S-7. This, I think, you'll recognize as the transcript from the interview.

MR. KRAKORA: Can I use the actual one that's marked? It's S-7 for identification, Judge.

THE COURT: Okay.

Q And you testified on direct about the manner in which you -- turn to Page 4. You'll see at the top you start out by saying, "I'm going to ask you certain questions regarding five missing kids and the year was 1978. Okay? So I'm writing that down." Do you see that? Top of Page 4.

A Yes.

Q Okay. And then, at least according to the transcript, which obviously we can all watch on the video tape, but it says, "Before beginning, I advise you of your rights. You've heard your rights many

times before." Do you recall saying that?
A Possibly.
Q Well, do you have any reason to dispute the transcript?
A No. Transcript's not 100 percent, but, yeah, possibly.
Q All right. Well, do you have an independent recollection of telling him you've heard your rights many times before?
A Yeah, I could have said that.
Q Okay. And I take it that you're referring to the fact that you knew he'd been arrested in the past and --
A That's correct.
Q -- probably heard his rights previously, years earlier.
A Right.
Q Okay. Then he says, "Yes." That's Mr. Hampton's answer. And then, according to the transcript at least, "You've seen it on TV."
A Right.
Q "You've been read before; right?"
A You've been read before.
Q Right.
A Right.



Q Meaning that because he's been in and out of the system in the past he was familiar with the Miranda Rights.
A I don't know if that's what I meant, but I said it.
Q Okay.
A You've been read before; right?
Q Right. Okay. And at no point on the video tape statement or reflected in the transcript is any mention by you of actually having read him his rights that very day, hours earlier.
A I don't believe there is any mention about any of that. I think I went into -- into what actually he knew about the case.
Q Okay.
MR. KRAKORA: Judge, that's all the questions I have. Thank you.
THE COURT: Any redirect?
MR. GUARINO: Yes, Judge.

REDIRECT EXAMINATION BY MR. GUARINO:

Q Detective, you specifically -- you said, and it's recorded in the transcript, that you've been read your rights before. Do you agree with that?
A Yes.
Q And he indicated his rights were read before;

correct?
A Correct, sir.
Q How would you characterize his demeanor during this whole process from the time he was brought from the jail to the time he was read his Miranda Rights on the video? How would you characterize his demeanor?
A Sir, the way Mr. Hampton sits there today is the way -- we had a good rapport. I believe we still have a good rapport to this day. As soon as he walked in and he acknowledged me. I acknowledged him. I believe there are no ill feelings between the two of us.
Q And would you agree with me, Counsel -- I mean, I'm sorry. Would you agree with me, Detective, that as Mr. Hampton sits here today that he is alert?
A He seems just the way I saw -- How you doing, Phil? The way he was back then.
Q And attentive?
A And attentive.
Q And he appears to understand what's going on around him.
A Yes.
MR. KRAKORA: Judge, I think --
A He's naturally quiet the way he is, but he's --
MR. KRAKORA: -- these rather leading



questions. Towards what end, I don't know.
THE COURT: Well, I know toward what end, but they're leading. Don't lead your witness.
BY MR. GUARINO:
Q You were asked questions about your interview with Maurice Olds. Did Maurice Olds give you any detailed information about what actually he might have known about this case?
A No, sir.
Q Did he indicate to you in any way that he wanted to give you detailed information about what he knew about this case?
A No.
Q Did you ask him if he had information about what happened in this case?
A We're speaking of Maurice?
Q Maurice Olds.
A Yes, sir.
Q What did he do when you asked him that question?
A During my second interview he began to cry.
Q How old was he when he began to cry?
A I think he had to be close to 50, I believe.
Q And did he say anything to you about whether or not he was willing to talk to you about this case?

A He wanted to go home and speak to his mother.
MR. KRAKORA: Judge, I think I'm objecting to the relevancy of these questions.
THE COURT: What's the relevance?
MR. GUARINO: Counsel brought it up.
THE COURT: Brought what up? The --
MR. GUARINO: The interviews with Maurice Olds.
THE COURT: Only -- he didn't bring up the interview with Olds other than to expand on what you said -- you elicited on direct that he had -- the officer had misled Mr. Hampton about the substance, but I don't know what your relevance is now to go into the details.
MR. GUARINO: He brought it up to infer whether or not the detective had any information to base his interview of Mr. Hampton upon and to decide whether Mr. Hampton should be a suspect or if he should be only a person of interest. And therefore, Judge, I think Mr. Olds' reply and his actions and demeanor are relevant to the understanding, to the mental processes of the detective.
THE COURT: Mr. Krakora?
MR. KRAKORA: Judge, I thought the, at least from my perspective, the point I was trying to make is



that whether it's of any legal moment notwithstanding that the detective lied to our client when he said that Maurice suggesting to him that Maurice Olds had implicated him in the crime in order to get him to confess.
THE COURT: This is actually in response to a different point, when he brought up the interview with Floria McDowell and, I forget the name of the gentleman. At that moment in time back in June of '08, five months before this interview date with the CD, he was pursuing information and had at least made somewhat of an identification of Mr. Hampton and whether his mind set was he was a suspect or somebody who was involved -- knew something. So I'll allow it for that reason.
Okay. He started to cry. He wanted to talk to his mother.
A He began to cry and before -- my understanding was before he told us anything he wanted to go home and speak to his mother. And we let him go home and speak to his mother. By the time we tried to catch up to Maurice again, he had died.
Q So when you spoke to Mr. Hampton and advised him that Maurice had told you things, this conversation that you had with Maurice had actually taken place.

A Correct.
MR. GUARINO: No other questions, Judge.
THE COURT: Okay. Any recross?
MR. KRAKORA: No, thank you, Judge.
THE COURT: Okay. You can step down, sir. Thank you.
THE WITNESS: Thank you, Your Honor.
THE COURT: Got your card?
THE WITNESS: Yes, sir, I did. I always have it. I don't think I'll need it anymore. I'm retired.
THE COURT: All right. Can I have those exhibits?
THE WITNESS: Yes, ma'am.
THE COURT: Thank you. Okay. These are actually for ID, not in evidence, so leave them right here.
MR. GUARINO: Thank you, Judge.
THE COURT: Any other witnesses?
MR. GUARINO: Yes. Judge, if I can -- all right.
THE COURT: Off the record on scheduling. It's one.
(TAPE OFF - TAPE ON)
THE COURT: Take a break. We'll start Thursday morning, 9 a.m. with the last three witnesses.



Are you anticipating any witnesses? No. Okay. The only thing we have in evidence, just to remind you, is the CD, which is S-9 and -- do you have S-3?
THE COURT ADMINISTRATOR: I don't.
THE COURT: Okay. We need the preamble back. And that's all MaryBeth has. And these are yours. Yes, these go back to the prosecutor.
* * *

CERTIFICATES

I, Beverly A. Boyd, the assigned transcriber, do hereby certify that the foregoing transcript of proceedings in the Essex County Superior Court on 3/1/11, CD No. 2011-03-01, Index No. 12:02 to 1:09, is prepared in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate compressed transcript of the proceedings as recorded, to the best of my knowledge and ability.

Beverly A. Boyd

BEVERLY A. BOYD A.O.C. 329
A.R.T. AGENCY, INC.

I, Donna Weber, the assigned transcriber, do hereby certify that the foregoing transcript of proceedings in the Essex County Superior Court on 3/1/11, CD 2011-03-01, Index No. 11:15:57 to 12:02:25, is prepared in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate compressed transcript of the proceedings as recorded, to the best of my knowledge and ability.

Donna Weber

DONNA WEBER A.O.C. 390
A.R.T. AGENCY, INC.

Date: 3/3/11