# EXHIBIT J

UNITED STATES DISTRICT COURT OF NEW JERSEY
NEWARK VICINAGE
CASE NO. 2:14-cv-00120 (KM)(MAH)

| | | |
|---|---|---|
| LEE EVANS, | ) | (VOLUME II) |
| Plaintiff, | ) | DEPOSITION OF: |
| v. | ) | PHILANDER HAMPTON |
| NEWARK CITY, FORMER MAYOR CORY A. BOOKER, in his official and individual capacity, FORMER NEWARK POLICE DIRECTOR GARRY MCCARTHY, in his official and individual capacity, DETECTIVE RASHID SABUR, in his official and individual capacity, DETECTIVE KEITH SHEPPARD, in his official and individual capacity, SERGEANT DETECTIVE DARNEL HENRY, in his official and individual capacity, DETECTIVE JOSEPH HADLEY, in his official and individual capacity, OFFICER ANGEL RAMOS, in his official and individual capacity, NEWARK POLICE OFFICER JOHN DOE, (1-10), in their official and individual capacities, ESSEX COUNTY PROSECUTOR'S OFFICE, former acting ESSEX COUNTY PROSECUTOR ROBERT D. LAURINO, in his official and individual capacity, ASSISTANT PROSECUTOR PETER GUARINO, in his official and individual capacity, ASSISTANT PROSECUTOR CHERYL CUCINELLO, in her official and individual capacity, DETECTIVE LIEUTENANT LOUIS CARREGA, in his official and individual capacity, DETECTIVE CHRISTOPHER SMITH, in his official and individual capacity, and AGENT JACK EUTSEY, in his official and individual capacity, | ) | |

DETECTIVE MICHAEL M. RECKTENWALD, in his official and individual capacity, Estate of Investigator EDWARD JONES, Investigator PATRICK DEFRANCISCI, in his official and individual capacity, DETECTIVE SERGEANT WILLIAM TIETJEN, in his official and individual capacity, NEW JERSEY STATE TROOPER JOHN DOE, (1-10), in their official and individual capacities,

Defendants.

---

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter as taken by and before MARY ANN ADAMS, a Certified Court Reporter and Notary Public of the State of New Jersey, held at CITY OF NEWARK, DEPARTMENT OF LAW, 920 Broad Street, Newark, New Jersey, on Tuesday, February 15, 2022, commencing at 10:20 a.m.



A P P E A R A N C E S:

BONJEAN LAW GROUP, PLLC
BY: JENNIFER BONJEAN, ESQ.
750 Lexington Avenue, 9th Floor
New York, New York 10022
(718) 875-1850
jennifer@bonjeanlaw.com
Attorneys for Plaintiff

CITY OF NEWARK
DEPARTMENT OF LAW
BY: GARY S. LIPSHUTZ, ESQ.
920 Broad Street, Room 316
Newark, New Jersey 07102
(973) 733-5945
lipshutzg@ci.newark.nj.us
Attorneys for Defendants
City of Newark, Detective Joseph Hadley, Sergeant Detective Darnel Henry, Cory A. Booker, and Garry McCarthy

SCHENCK, PRICE, SMITH & KING, LLP
BY: JAMES A. KASSIS, ESQ.
220 Park Avenue
P.O. Box 991
Florham Park, New Jersey 07932
(973) 539-1000
jak@spsk.com
Attorneys for Defendant
Lieutenant Louis Carrega

STATE OF NEW JERSEY
DEPARTMENT OF LAW & PUBLIC SAFETY
DIVISION OF LAW
BY: VICTOR DI FRANCESCO, ESQ. (via Zoom)
MICHAEL VOMACKA, ESQ. (via Zoom)
25 Market Street
P.O. Box 112
Trenton, New Jersey 08625-0112
(609) 633-7786
victor.difrancesco@njoag.gov
Attorneys for Defendant
Detective Sergeant William Tietjen



ALSO PRESENT:
HALEY COOLBAUGH, Paralegal (via Zoom)
Bonjean Law Group, PLLC

JOSEPH HADLEY (via Zoom)



INDEX


| | PAGE |
|---|---|
| WITNESS: PHILANDER HAMPTON | |
| EXAMINATION BY MR. LIPSHUTZ................ | 71 |
| EXAMINATION BY MR. KASSIS.................. | 174 |
| EXAMINATION BY MR. VOMACKA................. | 179 |
| EXAMINATION BY MS BONJEAN.................. | 181 |
| EXAMINATION BY MR. LIPSHUTZ................ | 199 |
| EXAMINATION BY MR. KASSIS.................. | 214 |
| EXAMINATION BY MR. VOMACKA................. | 223 |
| EXAMINATION BY MR LIPSHUTZ................. | 229 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Hampton-2 | Plea form | 86 |
| Hampton-3 | Report of Detective Everett Hairston | 103 |
| Hampton-4 | Report of Detective Rashid Sabur | 114 |
| Hampton-5 | Transcript of Trial Testimony from 11/16/2011 | 117 |
| Hampton-6 | Transcript of an interview of Philander Hampton | 125 |
| Hampton-7 | Miranda warning form | 126 |
| Hampton-8 | Photocopy of a greeting card | 157 |
| Hampton-9 | 2017 statement | 160 |
| Hampton-10 | Transcript of hearing from 10/3/2011 | 168 |
| Hampton-11 | Statement of Philander Hampton | 184 |


(Exhibits retained by counsel.)

PHILANDER HAMPTON, having been duly sworn by the Notary Public, testified as follows:

EXAMINATION BY MR. LIPSHUTZ:

Q. Good morning, Mr. Hampton. Nice to see you again. We last met on about October 20th to start the deposition questions in connection with the Lee Evans lawsuit. At one point you indicated that you might want to consult with an attorney, so we stopped the questions and rescheduled.
A. Right.
Q. So my question to you is, did you have an opportunity to speak to an attorney?
A. No.
Q. Do you -- so are you here today to answer questions without the presence of an attorney?
A. Yes.
Q. Okay. Thank you.
The court reporter placed you under oath. I just want to remind you, sir, that you are under oath and you're obligated to speak truthfully. Is there any reason that you will not be able to answer my questions or the questions of the other attorneys truthfully today?
MS. BONJEAN: Objection to the form.



A. No.
Q. Okay. Thank you.
For the benefit of the court reporter and for the people listening on the computer, I want to ask you, sir, to speak up a little bit. Okay?
A. Okay.
Q. Okay. Since we met in October, have you had any opportunity to speak with Mr. Evans?
A. No.
Q. Since we met up in October, have you had any opportunity to speak with Ms. Bonjean or anybody from her office?
A. No.
Q. How did you get here today?
A. My wife brought me.
Q. I didn't hear you, sir.
A. My wife brought me.
Q. Okay. Fantastic.
Okay. So since we met, you've not spoken to Ms. Bonjean --
A. No.
Q. -- except for maybe scheduling for the deposition?
A. Exactly.
Q. Okay.



A. That is about it.
Q. But nothing other than that?
A. Nothing other than that.
Q. Okay. Thank you very much.
Okay. Where we left off the last time was with Defendant's Exhibit 1.
MS. BONJEAN: What is it?
MR. LIPSHUTZ: It's the plea transcript.
MS. BONJEAN: I might have it.
MR. LIPSHUTZ: I can make a copy. I have copies of other stuff, but for some reason I didn't copy this.
MS. BONJEAN: It's fine. I don't want to waste time. I'm sure I have it somewhere.
MR. LIPSHUTZ: Would you like me to make -- the copy machine is out there.
MS. BONJEAN: No, I don't need it. Go ahead.
Q. Mr. Hampton, at the last deposition, I was asking you questions about the transcript of your plea of guilt to the five homicides that happened in 1978. We got through some questions, but I believe we stopped on page 13 of the transcript.
MS. BONJEAN: Can you give me the



Bates-stamp just so I'm on the right document?
MR. KASSIS: ECPO 1230.
MR. LIPSHUTZ: It starts at page 1018 through 1038.
A. 1038? You said page 13.
Q. But I --
MS. BONJEAN: Yeah, you're on the right spot.
Q. Page 13. So the questions that were being asked of you, these were questions that were posed when you pled guilty. Do you remember pleading guilty?
A. Yes.
Q. Okay. Now, if we look at page 13 and line 5 -- or line 2, the question to you was, "Okay. So would you tell the judge what -- what -- what did he say to you that he was going to do to the boys?" Did you understand that the question was talking about Lee Evans, what he said -- what Lee Evans said to you?
MS. BONJEAN: Objection to the form of that question.
A. I plead the Fifth on that, because I don't -- you know, I don't remember at this time because it's been so long.

Page 75

Q. Okay. So why -- all I asked of you was the question itself.
A. Yeah, I'm going to plead the Fifth.
Q. Okay. Your answer was, "He said he was gonna kill 'em, you know, for breaking in the house. He didn't say exactly, he just say he was gonna do something to 'em at that time. But he didn't never specifically say, 'cause he waited awhile before he did that, and when he came to me, you know, I didn't really think he was gonna do that. I didn't know, you know, what went on really, actually went on in this house at that time."
My first question is, did I read that accurately?
MS. BONJEAN: Objection to the form.
A. No, because I actually lived in the house.
Q. Say again, sir?
A. I actually lived there.
Q. I didn't hear your answer.
A. I lived there.
Q. I just said did I read this answer correctly.
A. I lived there at one time.
Q. Where?

Page 76

A. At Camden Street.
Q. Okay.
A. Yeah.
Q. Did Lee Evans tell you, "He said he was gonna kill 'em, you know, for breaking in his house. He didn't say exactly, he just say he gonna do something to 'em at that time." Did he say that to you?
A. I don't remember. I don't recall. I plead the Fifth. I don't know.
Q. The next question was at page 13, line 13.
A. Line 13?
Q. Yeah. "Okay. And then there came a time, do you remember, where he came to get you?"
Answer: "My mother's house."
Did I read that accurately?
MS. BONJEAN: Objection to the form.
A. I don't even remember exactly what happened. I plead the Fifth.
Q. What is it your understanding that you're doing by pleading the Fifth?
A. Because I understand that I don't remember after all this time. You gotta think about it.

Page 77

Q. Well, there's a difference between --
MS. BONJEAN: Objection. Objection to the --
MR. LIPSHUTZ: Let me finish, please.
MS. BONJEAN: Objection to the editorialization.
MR. LIPSHUTZ: Let me finish, please.
Q. There's a difference between not remembering --
A. I don't remember.
Q. Well --
A. It's been too long. You gotta think about it. Look. Look at this. It's been over -- how many years has it been?
Q. More than --
A. How many years it's been?
Q. More than forty.
A. Okay. I don't remember all this stuff.
Q. Okay.
A. I don't remember.
Q. It's okay for you to tell me you don't remember.
A. Yeah, I don't remember.
Q. But it's different from you saying I plead the Fifth.

Page 78

A. Yeah.
Q. So if your answer is I don't remember, that's okay.
A. Okay.
Q. But it's different --
A. Let's go on.
Q. Let's go on?
A. Let's go on.
Q. Do you remember -- let me just ask you then very clearly, do you remember if Lee Evans came to get you at your mother's house?
A. I'm old now. I don't remember all this stuff.
Q. You don't remember. Do you have any reason to believe that when you pled guilty to these homicides, you told the judge that Lee Evans came to get you at your mother's house?
MS. BONJEAN: Objection to the form.
A. I don't remember.
Q. You don't remember. Okay.
Did Lee -- on page 13, line 23 -- excuse me, line 21. "On August 20th, 1978, what happened then?"
Answer: "He took me around to the house and -- to the house she moved from."

Page 79

Question: "And what street was that on?"
Answer: "It was on Candor Street." C-A-N-D-O-R.
A. No, not Candor.
Q. Phonetic.
A. That's wrong.
Q. Wrong in what sense?
A. The spelling.
Q. Spelling. It should be Camden Street. Right? Camden?
A. Yes.
Q. Okay. So Lee Evans came and took you to Camden Street.
A. I don't know. Lee Evans helped me move that day. I don't remember exactly what happened that day.
Q. Okay.
A. But I don't remember. We moved from Camden Street to Hunterdon Street.
Q. What was the address on Camden Street?
A. I don't remember.
Q. Okay. When did you move from Camden Street to --
A. I don't remember.
Q. Okay. Did Lee Evans take you to the

Page 80

house on Camden Street that ultimately burned down?
MS. BONJEAN: Objection, foundation.
A. I don't even remember. I couldn't even tell you. I have no clue. Listen, listen, at this here time, we're too far in time now. You see what I'm saying? It's been over forty-five years or better.
Q. I got it, sir.
A. Okay.
Q. You don't remember.
A. I don't remember.
Q. Do you remember -- do you have any reason to believe -- excuse me, let me rephrase that.
Do you have any reason to doubt that when you pled guilty to the homicides, that you told the judge that Lee Evans took you to the house on Camden Street?
MS. BONJEAN: Objection, form.
A. I don't even remember.
Q. Okay.
A. I was gone for seven years, too, now. Don't get twisted.
Q. Okay.
A. I was in prison for seven years.

Page 81

Q. For the homicide.
A. For the homicide. For something that was forced upon me that I was gonna get out in a year and a half, two years, so I took it as that. So I said, well, let me -- 'cause I'm tired of the police coming back and forth in people's houses. You see what I'm saying?
Q. No, I don't understand what you said.
A. Okay.
Q. I just could not hear what you said.
A. You hear what I'm saying.
MS. BONJEAN: Go ahead and repeat it. He couldn't hear you.
A. The police were running back and forth into my house where I lived at. You know what I'm saying? So I got tired of it. And so I said, well, then, I'll get it over with or whatever, 'cause I don't know exactly what happened. I don't know exactly what happened with Evans and them boys. I don't really know exactly what happened between now and then, you know, 'cause I've forgotten about a lot of stuff. A lot of stuff is just out of my mind.
Q. You've forgotten about a lot of stuff.
A. Yeah, I've forgotten about it, yeah.

Page 82

Q. Okay. Well, let me see if I can refresh any of your recollection with the things that you said. Okay?
A. Go ahead.
Q. On page 14, line 12 -- excuse me, line 12, the judge said, "The five boys were with you, the names and --"
And you answered, "Not all five of them, no."
The judge said, "Okay."
And you answered, "Just two. Then he took me upstairs, went upstairs, went up, gets upstairs. He said -- he passed me a gun once he got upstairs. He told me to sit there and wait until you go back to."
My question to you is, did I read those sentences accurately?
MS. BONJEAN: Objection, form.
A. I couldn't tell you.
Q. You couldn't tell me if I read them accurately?
Could you tell me if this is -- this refreshes your recollection of what you told the judge when you pled guilty to these homicides?
A. I pled guilty to the homicide 'cause I was trying to get out of jail.
Q. Okay. But -- oh, because you were --

A. Because it was forced upon me. Everything was forced upon me. All the detectives, they forced it. It was a force. They already had their written statements already.
Q. I got you.
A. Okay?
Q. But I'm asking you about what you pled to.
A. I pled -- I might have pled guilty. I don't know. I don't remember. 'Cause it's over with.
Q. My question was, reading this, does this refresh your recollection --
A. No.
Q. -- of what you told the judge when you pled guilty?
A. No.
Q. Okay.
A. I'm done with that. I was done with it. Once I came out of jail, I was done with this.
Q. Okay. When you told the judge on page 15 at the first line that Lee Evans passed --
A. What did you say? Where you at? Where you at?
Q. Page 15.



A. What number?
Q. Line 1.
A. Okay.
Q. That you passed him a match, you gave him a match and left.
A. I don't remember that.
Q. Okay. You don't remember --
A. No.
Q. -- telling the judge that?
A. No.
Q. Do you remember doing that?
A. No.
Q. Okay. Let me ask you about page 15, line 20. This is where your answer was, "All right. And he went and picked up the other three boys. I guess he found my cousin Reese and they went and located the other three boys and he came back with them, and that's when he took the gun from me and they went up and he's gonna do -- stuck the gun in his back pocket and he has a fire can," next page, "a fire can with gas and he set it down, you know, and he asked me for a match."
Here's my question. Did I read that accurately?
A. I don't know.



Q. You don't know if I read that accurately?
A. No, I don't.
Q. Did you say this to the judge when you pled guilty?
A. I don't remember.
Q. You don't remember.
A. I don't remember.
Q. Do you have -- reading this now, does that refresh your recollection as to whether you said this to the judge?
A. No. That was over with. Once I came out of jail, that's it. I'm telling you, once I came out of jail, this is eliminated from my mind.
Q. I understand.
A. Okay.
Q. Did you tell the truth when you told the judge that --
A. I don't know. I don't remember. I don't even think I told the truth. It was forced. A lot of things was forced upon me.
Q. So when you told him all about --
A. At the time, what was going on at the time. I don't know. I don't remember this.
Q. When you told the judge that Lee Evans



had a can of gasoline and he came back with his cousin Reese, was that truthful?
A. I don't know. I don't remember.
Q. You don't remember.
A. No.
Q. Okay.
A. Remember this, I'm 65 years old now. We're going through a lot of stuff that I done forgot about. This here was eliminated. Once I went to jail for it, it was over with.
MR. LIPSHUTZ: Let's mark this next document Exhibit 2.
(Exhibit Hampton-2, Plea form, was received and marked for identification.)
Q. Mr. Hampton, this is marked Hampton-2. I'm going to show it to you. Okay? Let me represent to you, sir, that this is the plea form for your plea of guilt to five counts of felony murder. Okay?
A. Okay.
Q. All right. Would you mind doing me a favor, sir?
A. What's that?
Q. Turn to the last page.
A. The last page. Do you have the number

of the last page? Page 4 of 4?
Q. Page 4 of 4?
A. 4 of 4.
Q. Is that your signature there?
A. Yes.
Q. Do you recall signing this document on August 30th, 2011?
A. Oh, never. No. I have no -- I don't remember that.
Q. You don't remember signing it.
A. No.
Q. But that is your signature.
A. That is my signature.
Q. Okay. Can we turn to the first page again now? Okay. Do you see question number 2?
A. Number 2?
Q. 2A.
A. 2A.
Q. Can you read it -- could you read it out loud?
A. Did you commit the -- you are pleading guilty?
THE COURT REPORTER: I'm sorry, I can't hear you.
Q. The question 2A, "Did you commit the



offense to which you are pleading guilty?"
A. I don't even remember.
Q. Did you --
MS. BONJEAN: Wait for him to ask a question. Wait for him to ask a question.
Q. Do you see that it's circled yes?
A. Yes.
Q. And do you see at the bottom on the right-hand corner --
A. At the bottom?
Q. On the right-hand corner.
A. The right-hand corner?
Q. It has your initials there?
A. Yes.
Q. Okay. When you circled the answer yes, do you remember circling the answer yes?
A. No.
Q. You do not remember.
A. No, I don't remember that.
Q. Were you telling the truth when you pled guilty to this --
MS. BONJEAN: Objection, form.
Q. -- or were you lying?
A. I don't even know at this time, because we're too far in time now. We're too far gone in



time. I don't have no clue.
Q. Okay.
A. I really don't.
Q. Turn back to Hampton-1.
A. Hampton-1.
Q. Page 19.
A. 19. Okay. Where?
Q. Line 7.
A. Line 7.
Q. A gentleman named Mr. Krakora, do you remember Mr. Krakora?
A. Yeah, I kind of -- I don't really remember. I don't even know what -- if he walked in the door right now, I don't even know what he look like.
Q. Do you know what he was in --
A. No.
Q. Was he your attorney, your defender -- public defender or your attorney?
A. Mr. who?
Q. Mr. Krakora, was he your attorney at the time you pled guilty?
A. He might have been. I don't know.
Q. He might have been. Let's go over what he said here at page 19 and line 7. Okay? He asked



you --
A. He asked me? What line you at?
Q. Line 7.
A. Yeah, line 7.
Q. I just want to make sure we're on the same page.
A. I'm on 19.
Q. May I?
MS. BONJEAN: I think you gave him the wrong exhibit.
MR. LIPSHUTZ: How is that possible?
MS. BONJEAN: Is it right there to your left underneath your other one?
MR. LIPSHUTZ: Just for the record, Hampton-1 is two hearings.
MS. BONJEAN: Oh, okay.
MR. LIPSHUTZ: August 30th and October the 3rd. Okay? So I'm going to show him at page 1036, which is page 19.
A. 19. Now, where you -- okay.
Q. Line 7.
A. You got two -- you got two of them here. Okay. Line 7? Line 7. Krakora. Okay. We're here.
Q. Okay. Mr. Krakora said, "You and

Page 91

Mr. McMahon went over the plea form. Correct?"
And you said, "Uh-huh."
And Mr. Krakora asked you, "Are these your initials on the first three pages and is it your signature on the fourth page?"
And your answer was, "Yeah."
And then he said, "Okay. And did you sign those papers after going over the form with Mr. McMahon?"
And your answer was, "Yeah."
Did I read those things correctly?
A. You read it correctly.
Q. Okay. And the next question is, "Okay. And you understand the form?"
Answer: "Yeah."
Mr. Krakora said, "And you signed that form voluntarily?"
And the answer was, "Yeah."
Mr. Krakora said, "Okay."
And the judge said, "And all the answers are true and accurate?"
And you said on page 20, line 2, "Yes."
A. I did.
Q. Okay. So did I read those responses and those questions correctly?

Page 92

A. I don't know if you read the responses correctly, but like --
MS. BONJEAN: Objection to form of that question.
A. I don't -- I don't know. This is too far gone.
Q. It's too far in the past for you to remember?
A. I don't remember this.
Q. Okay.
MR. KASSIS: He's just asking you if he read it correctly.
THE WITNESS: I don't -- he read it correctly.
Q. That's all I asked.
A. Okay.
Q. Now, can we go back to the form, which is number 2.
A. Number 2?
Q. No, this Hampton-2.
A. Okay.
Q. So let's go back to this. And 2A, which is, "Did you" --
A. Where you at? 2A?
Q. 2A.

Page 93

A. Okay.
Q. "Did you commit the offense to which you are pleading guilty?"
And the answer is, "Yes."
So when you answered yes to that, were you telling the judge --
A. What was the offense though? You know, you should tell me what I said yes to. What was the offense?
Q. The offenses were listed right above it.
A. What's that?
Q. Here it is right there.
A. What you saying? You're not saying anything.
Q. Do you see the -- I'm going to show you where it is. The offenses are listed --
A. I see that. I see what's going on here. I read this here. "Do you understand that before the judge can find you guilty." That's where you're at.
Q. Right.
A. Right?
Q. Right.
A. Okay. I don't know, man. Don't do this to me, man. How old are you? Don't do this to me.

Page 94

Q. Could you just please try your best to answer my questions. Okay? Try your best to answer my questions.
A. Okay. I'm trying to answer.
Q. This was a long time ago. If you don't remember, you don't remember.
A. I don't recall.
Q. Okay. But let me ask the questions. Okay?
A. Okay.
Q. You know you pled guilty to five counts of felony murder. Right?
A. Exactly.
Q. You're a smart guy and you know that.
A. I did.
Q. Okay. And you know that when you pled guilty, you signed yes here.
A. I don't even know if I said -- meant yes at that time. I don't know. This happened years ago. How many years is that?
Q. I read --
A. Count the years between this. How many years is that?
Q. It's eleven years.
A. It's more than eleven years.

Q. No, it's eleven years since you signed this.
A. Eleven?
Q. Yeah.
MS. BONJEAN: Could we just ask questions and answers? I can't be here all day while you guys have this dialogue.
A. Okay. Go ahead, keep going.
Q. When you answered yes to this question, were you telling the truth or were you lying?
A. I might have been lying. I might have been telling the truth. I don't know.
Q. You might have been lying, you might have been telling the truth, you don't know.
A. I don't know.
Q. Okay.
A. At that time. Eleven years ago. Okay? I forgot about that.
Q. Okay. Turn the page, please, to page 3.
A. Page 3? What number you at?
Q. Number 13, page 3.
A. Okay. Page 3. I'm kind of illiterate, too, now. You think I'm smart. I'm not smart. I'm dumb as hell. Go ahead. Let's go.
Q. Page 3.



A. I'm on page 3.
Q. Number 13.
A. 13.
Q. "Specify the sentence the prosecutor has agreed to recommend." Do you see where I'm reading from?
A. I see it, yes.
Q. "Any custodial sentence not exceeding ten years flat."
A. Right.
Q. That was the promise, right, that you would get, any custodial --
A. They promised me other things, too, now.
Q. We can get into that in a moment. Okay? Do you remember what they promised?
A. Not exactly.
Q. Okay. But they did promise you that the prosecutor would recommend any custodial sentence not exceeding ten years flat. Right?
A. Exactly, yes.
Q. Okay. Thank you.
Let's skip to page 4.
A. Page 4. I'm here.
Q. Line number 21.
A. 20?



Q. 21.
A. 21. Okay.
Q. "List any other promises or representations that have been made by you, the prosecutor, your defense attorney, or anyone else as part of this plea of guilty."
And it says, "All promises have been placed on the record."
Here's my question. Did I read that accurately?
A. Yes.
Q. Okay. You signed this form. Right?
A. I signed it? I don't see my signature.
Q. Right at the bottom.
A. Where? Yeah, I signed it.
Q. Okay. So when you signed this form, all promises to you were put on the record. Correct?
MS. BONJEAN: Objection, form.
A. I don't know.
Q. You don't know.
A. No.
Q. Okay.
A. I didn't have this paper. I didn't have this.
Q. You signed it.



A. I signed it --
MS. BONJEAN: Objection, form.
A. -- but I didn't have it.
Q. And we just read the transcript, sir.
A. I did not have this.
MS. BONJEAN: I'm going to object to the --
A. I might have signed it.
MS. BONJEAN: Objection, argumentative.
Q. Do me a favor. She's trying to object. Okay?
A. Okay.
Q. And she has the right to object to questions.
A. Exactly.
Q. So if she says objection, I'm going to give her a chance to say what she wants to say.
A. Let's move on.
Q. All right.
MR. LIPSHUTZ: Are you finished, ma'am?
MS. BONJEAN: I am.
Q. Okay. Can you look at page -- line 22. Same page.
A. 22? Okay.
Q. You there?

A. Oh, yeah.
Q. "Have any promises other than those mentioned on this form or any threats been made in order to cause you to plead guilty?
A. No. That's what the judge ask you anyway.
Q. And did you answer no?
A. Yeah, no.
Q. Okay. So nobody threatened you?
A. No.
Q. Right?
A. But --
Q. And no other promises were made?
MS. BONJEAN: Objection to the form and foundation of that question.
Q. All right. Let me rephrase it.
Was this truthful, nobody promised or threatened you?
MS. BONJEAN: Objection to the form and foundation.
A. I don't even know that. You're taking me somewhere that I don't even know nothing about this time. I have no clue.
Q. Do you have any reason to believe that when you signed this form and --



A. I don't remember signing this form. That's how -- that's just the honest to God truth. I don't remember signing this form.
Q. You signed a form that said you're guilty to five -- let me finish, five counts of felony murder for the homicide of five boys and you're saying to me you don't remember signing it.
A. I don't remember signing this, no.
Q. Okay. Okay. So --
A. I would be retarded if I said yes to some shit like that. No.
Q. Okay. When you -- you don't remember signing it. Do you have --
A. No.
Q. Do you have any reason to believe that when you signed it --
A. That's my signature, but I don't remember signing this, no.
Q. And when you told the judge that everything on this form was accurate, were you telling the judge the truth or were you lying?
MS. BONJEAN: Objection.
A. I don't even know at this time, I really don't. I don't even know.
Q. And why is it that you don't know? You



just don't remember?
A. Don't remember.
MS. BONJEAN: Objection to the form of that question.
A. Don't remember.
Q. How is your memory?
MS. BONJEAN: Objection to the form of that question.
MR. KASSIS: How is your what?
MR. LIPSHUTZ: Memory.
A. My memory is only for me right now. You see what I'm saying? The memory, you're trying to figure out how to get this right for you. My memory only for me right now. You see what I'm saying? I gotta figure it out for me right now, because I gotta survive out there. You have it set. You already had your high school diploma, whatever degrees and whatever you got, but I gotta survive for me right now. So I'm a plumber, so I gotta figure it out, how to pay my own bills. So I'm not trying to figure it out for nobody else. It's just the way it is. That's the honest to God truth. I'm not trying to figure out nothing else.
Q. But how is your memory?
A. My memory is not on -- focused on this.



It's not even focused there. My memory is away from that, because I did the time for it, so I'm done with that. That's over with.
Q. Your memory is not focused on this.
A. No, no, no, no, no.
Q. But my question is, do you have any memory problems?
MS. BONJEAN: Objection to the form.
A. Memory for what I need to have memories for. Okay? Simple.
Q. So do you remember pleading guilty?
MS. BONJEAN: Objection.
A. No.
Q. Do you remember serving jail time?
A. Yeah.
Q. How much time did you serve?
A. Seven years.
Q. Okay. Well, listen, I understand that a lot of these events took place a long time ago and there's a lot of documents. I'm going to see if I can refresh your recollection. Okay? That's all.
A. I tell you what, if you took seven years out of anybody's life, this is the honest to God truth here, listen, if you took seven years out of anybody life, how you gonna remember this? Place

Page 103

yourself seven years ago. Do you remember everything you did seven years ago?
Q. Let me just get through and ask you some questions. Okay?
MR. LIPSHUTZ: Why don't we mark this as Hampton number 3.
(Exhibit Hampton-3, Report of Detective Everett Hairston, was received and marked for identification.)
A. You think I can remember all this stuff?
Q. Hold on.
MS. BONJEAN: There's no question pending. Just wait for him to ask you a question. Okay? You'll get through it faster if you let him ask you a question.
Q. If you don't understand my questions you can ask me.
A. Okay.
Q. Let's take a look at this document, sir, which is marked Hampton-3, and at the bottom it's got Bates stamps Newark 95 through Newark 100.
A. Where you want to start at?
Q. Okay. I'm going to represent to you that this is a report that was prepared by Detective Everett Hairston. Do you remember Everett --

Page 104

speaking to Detective Everett Hairston?
A. No.
Q. Okay. There's a notation from October 19 --
A. Where you at?
Q. -- 1978.
A. I see it, it's at the bottom.
Q. October 19, 1978. Okay?
A. Yes.
Q. And I'm going to go through it with you. That notation says, "The undersigned," which is referring to Detective Everett Hairston, "and Detective Scott Bey and Detective Conte interviewed Philand," P-H-I-L-A-N-D, "Philand Williams, BM 21," which I presume to be black male, 21, and it has a date of birth, December 4th, 1956, and a Social Security number, which I'm not going to read into the record, of 271 Hunterdon Street. Is Philand Williams with that date of birth and that Social Security number, is that you?
A. Yeah, that's me.
Q. Okay. And it says that they interviewed you at the YAB. I'm going to represent to you that stands for Youth Aid Bureau.
A. What's that? Yeah.

Page 105

Q. Youth Aid Bureau.
A. Okay.
Q. Okay. Now, my first question is, having read this out loud, do you have any recollection of speaking --
A. No.
Q. Let me finish, sir. Do you have any recollection of speaking with Detective Hairston, Detective Scott Bey --
A. No, no, no.
Q. Do me a favor, it's for the court reporter's benefit, let me finish my question.
Do you have any recollection of speaking with them at the Youth Aid Bureau on October 19, 1978?
A. No.
Q. Okay. That's good. Thank you.
Let me continue reading this. "Williams stated he was with Lee Evans" --
MS. BONJEAN: I think they lost us on the Zoom, by the way. I just got a message. I don't know if it's just Haley or -- I'm sorry.
MR. LIPSHUTZ: I appreciate you telling me, 'cause I look at my computer and nothing's on.
MS. BONJEAN: Yeah.
MR. LIPSHUTZ: So I appreciate you

Page 106

letting me know. I think my computer turned off. I know where I stopped. You can read through this. My computer turned off.
A. You stopped at the bottom. You stopped at 18 --
MR. LIPSHUTZ: Please don't talk right now.
MS. BONJEAN: Let's go off the record until he gets that figured out. I mean, if that's okay. I don't want to go off -- unless you want to stay on the record.
MR. LIPSHUTZ: This is going to take a few seconds.
(Discussion off the record.)
MR. LIPSHUTZ: Could you read back my last question, please.
(The record is read by the reporter.)
MR. LIPSHUTZ: Okay. So, gentlemen, I'm reading from Newark page -- Newark 95. It was previously evidence 7. Okay? Mike and Victor?
MR. VOMACKA: Yes, thank you.
BY MR. LIPSHUTZ:
Q. All right. So we're back on the record, sir.
So the question I was about to ask you was the

next sentence. "Williams stated he was with Lee Evans who is his cousin on August 20th, 1978, during the day." Were you with Lee Evans, your cousin, on August 20th, 1978, during the day?
A. I might have been. I don't know.
Q. You're not sure.
A. No.
Q. Do you have any recollection one way or the other?
A. No. No, I don't.
Q. Do you have any reason to believe that when you spoke to these detectives, and I understand you don't remember speaking to them, that --
A. No.
Q. Let me finish, sir. Do you have any reason to believe that you didn't tell them that you were with your cousin Lee Evans on August 20th during the day?
MS. BONJEAN: Objection, form.
A. No.
Q. Okay. Let me continue. "Williams stated that he worked with Evans off and on for a year."
A. What page you on?
Q. Same page, at the bottom.



A. Okay.
Q. "Williams stated that he worked with Evans off and on for a year." Is that true, did you work for Evans off and on for a year back in 1978?
A. I had two jobs at that time.
Q. What was your other job?
A. I used to work at the airport.
Q. Worked at the airport?
A. Yes.
Q. And then -- and you worked off and on with Evans --
A. Yes.
Q. -- for about a year?
A. I don't know exact. I couldn't tell you. I have no clue.
Q. Okay. Putting aside the about a year, you did work off and on with Lee Evans.
A. Yes.
Q. And what were you doing?
A. Whatever.
Q. Like what?
A. I was a plumber, you know.
Q. Plumber?
A. Plumber, we laid bricks and everything, so.



Q. Construction stuff?
A. Construction.
Q. Okay. Now, let's read the next sentence. Okay?
"Williams stated he was at Maurice Olds' house on August 20th, 1978, at approximately 17:00 hours," that's 5 p.m., "with all five of the missing boys and Maurice, Darryl," next page, "Greg and Evans."
First question, did I read that accurately?
A. Yes.
Q. Okay. At 5 p.m. -- at approximately 5 p.m. on August 20th, 1978, were you with all five of the missing boys, Maurice, Darryl, Greg, and Evans at Maurice Olds' house?
A. I don't know. No, I don't know.
Q. You don't know.
A. No.
Q. Is it possible you were?
MS. BONJEAN: Objection to the form of that question.
A. I don't know.
MS. BONJEAN: He answered the question.
Q. You don't know?
A. I don't know.
Q. Okay. Who is Maurice Olds?



A. My cousin.
Q. Who is Darryl?
A. Who is Darryl?
Q. I'm asking you, do you know who Darryl is?
A. I got a cousin named Darryl.
Q. Last name?
A. I don't know. Owen.
Q. Owen?
A. His last name is like woody. I don't know.
Q. Woody. Okay. The next page refers to Greg. Do you know who Greg was?
A. No.
Q. Okay. And Evans, he was talking about Lee Evans. Right?
A. Yeah.
Q. Okay. Let's continue, maybe this will refresh your recollection.
MS. BONJEAN: Yes, let's.
Q. "Williams stated they" --
A. Where you at? What line you on?
Q. Next page, sir. Top of the page. No, no.
A. The next page?

Page 111

Q. Page 2.
A. Page 2. I'm on page 2.
Q. "Williams stated they talked about going to the park to play basketball. Williams stated he left the porch and went to Clinton Avenue to go get some sodas, and when he returned to the Olds' porch, he, Maurice, Ricky, Michael, and Randy got on Evans' truck and he drove to Vailsburg Park. Do you see where I read that from?
A. I'm looking.
Q. Did I read it accurately?
A. I don't see where you read that. You said Vailsburg Park. "Williams stated when they got to the park" --
Q. No, I haven't gotten to that part yet.
A. Okay.
Q. I haven't gotten to that part yet.
A. Okay.
Q. Having read that, did you go to Vailsburg Park to play basketball with Maurice, Ricky, Michael, and Randy on Evans' truck?
A. No. No. I don't remember. I really don't.
Q. Okay. Is your answer you don't remember?

Page 112

A. I don't remember.
Q. Okay. And having read this, this does not refresh your recollection?
A. No.
Q. Okay. Let's continue. "Williams stated when they got to the park, other guys were on the basketball court and they did not get a chance to play."
Let me continue. "Williams stated some guys in the park wanted to start a fight and they got back on the truck and left the park, and Evans then dropped him off at his house at about 19:00 hours." 19:00 is 7 p.m.
A. At night?
Q. Yes, sir.
Okay. Now, having read that, does that refresh your recollection?
A. No.
Q. You don't remember this at all?
A. No.
Q. Okay. Do you have any reason to believe --
A. No.
Q. Let me finish, sir. Do you have any reason to believe that when you spoke to these

Page 113

detectives in 1978, this is what you told them?
A. I don't know what I told them in 1978. I have no clue.
MS. BONJEAN: I'm going to object to the form of that question. Late objection.
A. I have no idea. I really don't.
Q. Okay. Let me continue then. Well, did you -- do you have any recollection of going to the park at all --
A. No.
Q. -- or playing basketball? No. Okay.
Let me continue. "Williams stated he did not see Evans or any of the other boys that was with him that night."
I take it you don't remember making that statement.
A. No.
Q. Okay. Having read all of those things, none of that refreshes your recollection --
A. No.
Q. -- in any way?
A. No.
MS. BONJEAN: Objection to form, foundation.
Q. Okay. You can put that to the side.

Page 114

A. Are you on the same page?
Q. You can put it to the side.
MR. LIPSHUTZ: This will be the next exhibit.
(Exhibit Hampton-4, Report of Detective Rashid Sabur, was received and marked for identification.)
Q. Mr. Hampton, do you know who Rashid Sabur was?
A. He's dead, isn't he.
Q. He's dead. Do you know who he is?
A. He used to live next door to me.
Q. I didn't hear you, sir.
A. He used to live next door to me.
Q. So you do know Rashid Sabur?
A. Yes.
MS. BONJEAN: I'm sorry, what was the answer to the question?
MR. LIPSHUTZ: He lived next door to him.
MS. BONJEAN: Oh.
Q. And you know he worked for the Newark Police Division Or Department, Newark Police Department?
A. I didn't know at that time. It came

after. I didn't know.
Q. Okay. Well, let me ask you about the time he came to talk to you. Do you remember speaking to him?
A. I remember speaking to him somewhat, yes.
Q. Okay. Let me ask you to turn to page -- this document is marked Hampton-4.
A. He dead, too.
Q. Rashid Sabur has passed away.
A. Yeah, I know. What page?
Q. Page 9, sir.
A. 9.
Q. Page 9.
A. This is faded out so bad.
Q. If you haven't found it, I'll find it. I'll help you find it.
A. Page 9.
Q. Can I make sure you're reading from what I'm reading? Yeah.
So on page 9 of his report, Sabur's report, he says, "On February 24th, 1999, Detective Sheppard and I located Philander Hampton, cousin of Maurice Olds and Lee Evans." Do you remember meeting with Detective Sabur in approximately 1999?



A. How many years ago was that?
Q. 22.
A. No.
Q. Okay. It says in his report that you were advised of the investigation, that you were transported to the Homicide Unit at Newark Police Department, and you were interviewed but refused to give a formal statement. Okay? It continues.
"In this interview, he denied having any knowledge of the disappearance of the boys nor any involvement."
And then the next paragraph says, "At one point he denied seeing any of the teens on the day or night they disappeared, but later in the interview said he did but couldn't recall where he saw them at."
Well, let me continue. "It was at this he was advised of his rights to which he said he understood. As the interview continued, Mr. Hampton was advised that we believed him to have personal knowledge or involvement in the disappearance of the teens, and to this he said, 'If I confess to this shit, my life is over.'"
I know you remember that statement. Right?
MS. BONJEAN: Objection to the form of



that question, argumentative.
Q. Do you remember that statement?
A. I might have said it at the time, you know, I might have. I don't know.
Q. You might have said that.
A. I might have said that.
Q. You don't remember saying that. Right?
MS. BONJEAN: Objection to the form.
A. I don't remember saying that, no.
Q. Do you have any reason to believe that you didn't say that?
MS. BONJEAN: Objection to the form of that question.
A. No.
Q. Okay. That's all I have of that.
A. That's all?
(Exhibit Hampton-5, Transcript of Trial Testimony from 11/16/2011, was received and marked for identification.)
Q. The next document is Hampton-5, which is a trial transcript from November 16, 2011.
A. What page?
Q. Let me first tell you what this is. This is the transcript of the trial of Lee Evans. Okay? And this is where you're testifying at parts.



So if you would, would you turn to page 26.
A. 26. I got 25, 27. On the back?
Q. This is 26. This is 26, yes. Can you see there at page -- at line 15?
A. Yeah.
Q. Let me represent to you, sir, that this is your testimony at the trial. Okay?
"Who did you talk to?"
"Rashid."
"Who is Rashid?"
Answer: "Detective."
"How do you know Rashid?"
I'll wait till you get there.
A. I told you, I --
Q. Hold on a second.
MS. BONJEAN: What page is it again, I'm sorry?
MR. LIPSHUTZ: 26. It's transcript 13.
THE WITNESS: You got it?
MS. BONJEAN: I don't know if transcript 13 is in here, but it should be. I see 12 and then 14.
MR. LIPSHUTZ: This will be quick. I'll come around if you want.
MS. BONJEAN: No, that's all right. Go

Page 119

ahead. You know what --
MR. KASSIS: Do you need an extra copy, because I have an extra copy.
MS. BONJEAN: It's all right. Go ahead. It's fine. Go ahead. I can hear the questions.
Q. Okay. It says -- you're talking about Rashid. Right? And Rashid --
MR. KASSIS: Jen, do you want this?
MS. BONJEAN: Sure. Thank you.
MR. KASSIS: You're welcome.
MR. LIPSHUTZ: Page 26, Jen.
Q. Question was on line 17, "Who is Rashid?"
Answer: "Detective."
"How do you know Rashid?"
And you said, "He lived on the same block I lived on."
A. Exactly what I just told you.
Q. That's exactly what you just told me.
"Do you recall meeting with Rashid to talk about the case?"
Answer: "At one time, yes."
Question: "Do you recall when that one time occurred?"
"Yes."

Page 120

Next page.
A. What page?
Q. 27, right at the top.
"When did that occur?"
Answer: "Exactly when, that was in '99, something like that."
And question: "What was the substance of your conversation with Detective Rashid?"
Answer: "He just asked me about the five boys."
"And what did you tell him?"
"I told him if I told him that I would confess to something like that, I would have to get a hundred years."
Did I read all that accurately?
A. Uh-hum.
Q. Yes?
A. Yeah, you read it correctly.
Q. Having read this, does that refresh your recollection of --
A. No.
Q. This is your trial testimony.
A. I don't remember.
Q. That's okay. Let me finish my question. Having read this, does this refresh your

Page 121

recollection --
A. No.
Q. -- about your testimony at trial?
A. No.
Q. Does this refresh your recollection about your statement to Rashid that you would get a hundred years?
A. No. I don't remember that. You just bring it to my attention. I don't remember that.
Q. Okay. Let's put that aside for a few minutes.
What do you remember, sir -- what do you remember, sir, about November 2008 when you met with Detective Carrega and gave a statement, what do you remember?
MS. BONJEAN: Objection to the form of that question.
A. Nothing. No.
Q. You have no recollection?
A. No.
Q. I didn't hear your answer for the court reporter.
A. No.
Q. Do you remember -- you have no recollection of meeting with them?

Page 122

A. I met with them, yeah.
Q. Do you remember when -- how you got to be with them that day?
MS. BONJEAN: Objection to the form.
A. No.
Q. Do you have any recollection of being in jail?
A. I might have been in jail. I don't know. Yeah, I think I was in jail. Yeah, I was in jail.
Q. Do you remember what you were in jail for?
A. No.
Q. Do you remember how it was that you came to speak with them, did they come pick you up, did you get out of jail, do you have any recollection?
MS. BONJEAN: Objection to form.
A. No.
Q. Do you have any recollection of where you were when you spoke with them?
A. We were downtown Newark, I think.
Q. Do you remember if that was at the police department or at the Prosecutor's Office?
A. I have no clue. So much went on back then. I have no clue, no.

Q. Do you remember giving them a statement?
A. Did I give them a statement?
MS. BONJEAN: Objection to the form.
Q. Do you remember --
MS. BONJEAN: I'm sorry, form and foundation to that.
Q. Do you remember giving them a statement?
A. No.
MS. BONJEAN: Foundation.
Q. Do you remember giving them a video statement?
A. No.
Q. Do you remember -- do you know who Lieutenant Lou Carrega is?
A. If I see him I might remember.
Q. If what?
A. If I seen him like I just seen you, I probably -- if I seen him I might remember. I don't know what he look like no more.
Q. Do you know who he is?
A. No. Who is he?
Q. I'm asking you.
A. I don't know him.
Q. Do you know who Detective Joe Hadley is?
A. Joe Hadley? Yeah, he was here the last



time I was here.
Q. Yeah. Do you remember him?
A. Yeah, I remember him.
Q. Do you know what -- where he worked at the time, do you know if he was with the Prosecutor's Office or with the police department or something else, do you know?
A. Police department, wasn't he?
Q. Is that what you recall?
A. Yeah, police department.
Q. Do you remember speaking -- being interviewed by Joe Hadley?
A. I been interviewed by so many police, I don't even remember.
Q. I didn't hear your answer.
MS. BONJEAN: I'm going to object to --
A. I don't remember.
MS. BONJEAN: Hold on a second. Object to the foundation of that question.
Q. Do you remember?
A. No.
Q. You have no recollection of speaking to Joe Hadley?
A. Yeah I remember speaking to him.
MS. BONJEAN: Foundation.



Q. What do you recall about the conversation with Joe Hadley?
A. I don't remember the conversation.
MS. BONJEAN: Foundation.
A. No, I have no clue. I don't remember what the conversation was about.
Q. You have no idea what the conversation was?
MS. BONJEAN: Foundation.
A. No.
Q. Do you remember speaking to anybody from the State Police?
MS. BONJEAN: Objection to form and foundation.
A. No.
MR. LIPSHUTZ: Let me mark this next exhibit.
(Exhibit Hampton-6, Transcript of an interview of Philander Hampton, was received and marked for identification.)
Q. So we're up to Hampton-6. This is marked -- it's a November 13, 2008, transcript of an interview of Philander Hampton.
Let's mark this. Hampton-7 is a Miranda form.



(Exhibit Hampton-7, Miranda warning form, was received and marked for identification.)
Q. Okay, sir. I'm going to go through with you what I marked as Hampton-6 and let's see if it refreshes your recollection of anything that happened in 2008. Okay?
A. Okay.
Q. How you doing by the way? Do you need a break at all?
A. No. I just need to go to work. I still gotta pay the bills.
Q. I understand. I'm going to try to get through this as quickly as possible.
A. Okay.
Q. But do you need a break or anything?
A. No.
Q. Okay.
A. Let's go.
Q. If you do, let me know. Okay?
A. Okay.
Q. So what's before you is what I've marked Hampton-6.
A. Yeah. What page?
Q. Well, I just want to tell you what it is. It's an interview of Philander Hampton. I know

Page 127

it says November 13. It's not clear to me if it's November 12 or November 13. At one point in the transcript it says November 12th.
A. It say November 13th.
Q. I know. Just looking at the first page. Looking at this at the first page. Do you ever --
A. It says transcript.
Q. Do you ever recall seeing anything like that?
A. No.
Q. Okay. Let's go to the page 3.
A. Okay. Where you at?
Q. Line 6.
A. Line 6.
Q. I think they had given you a cup of coffee. But the question -- Lieutenant Carrega says, "You're at the State Police barracks in Newark. Okay? That's where you are."
And you say, "All right."
Having looked at that, do you have a recollection of going to the State Police barracks in Newark?
A. Do I? I probably did. Yeah, it was years ago. I don't -- yeah, where was that, by the airport somewhere. Right?

Page 128

Q. I don't -- I'm asking you if you remember.
A. I'm asking you if that's where it's at.
Q. Do you remember if in 2008 you went to the State Police barracks in Newark?
A. I don't remember 2008.
Q. Okay. Lieutenant Carrega says, "You were brought here by us, we brought you here, and we're going to talk to you about what we started to talk about before, before we drove over to," it says Campbell Street. I'm going to represent to you it should be Camden Street.
MS. BONJEAN: Objection to the form of that question and the --
MR. LIPSHUTZ: Okay.
MS. BONJEAN: The record --
MR. LIPSHUTZ: I'm going to pass over it.
MS. BONJEAN: The record speaks for itself.
A. Skip it.
Q. I'm going to move on.
A. Go to the next one.
Q. The next question is, "The time is now 8:18 p.m. The date is November 12th, 2008. I'm

Page 129

going to put your name here, Philander," spells it out, "Hampton."
And let me show you Hampton-7. Okay? Hampton-7.
A. Do I have that? What is this?
Q. Hampton-7 is a Miranda Warning form.
A. Okay. Let's go.
Q. Do you remember signing the Miranda warning?
A. No.
Q. Do you have any reason to believe you didn't sign a Miranda warning?
A. No.
MS. BONJEAN: Objection to form.
Q. You don't. Okay. Can we go to --
MR. KASSIS: Just acknowledge his signature.
Q. Is that your signature on Hampton-7?
A. Yeah.
Q. Okay. Thank you. Let's go to page 10, sir.
A. 10? Okay.
Q. Line 4.
A. What line? 4?
Q. 4.

Page 130

A. Okay. I'm here.
Q. Lieutenant Carrega says, "The date was August 20th, 1978. It was a Sunday. Do you recall that day?"
Mr. Hampton, that's you, said, "I recall that day."
And then Lieutenant Carrega says, "You recall?"
"Yes -- yeah."
Carrega asks, "Okay. Where were you living back in 1978?"
"I was living on Camden Street -- Hunterdon Street." And then you clarified, "271 Hunterdon Street."
Do you remember any of this testimony, do you remember telling Lieutenant Carrega any of this?
MS. BONJEAN: Objection to form.
A. No.
Q. No? Reading any of this, does it refresh your recollection?
A. No.
Q. Okay. Then Lieutenant Carrega says, "Okay. Before we" -- I'm sorry, line 19. I'm sorry. "Okay. Before we came here to the State Police barracks, did I take you to Camden Street?"


Veritext Legal Solutions
800-227-8440 973-410-4040

Answer: "Yes."
"In Newark. Correct?"
"Yeah, in Newark."
And Lieutenant Carrega said, "Who gave me directions to get there?"
Next page, 11. "I did."
Do you recall going to Camden Street before going to the State Police barracks?
A. Not really, no.
Q. No. Do you remember giving Lieutenant Carrega directions?
A. No.
Q. Having read any of this, does that refresh any of your recollection?
A. No.
Q. Okay. Continuing on page 11, line 3. Lieutenant Carrega says, "Okay. Why did we go there?"
And your answer was, "Because that's where the five boys was missing at, right there. A fire is set in the house that we move out of on Camden Street, and Evans, you know, wanted to kill the boys, you know. But I didn't really feel like he wanted, you know, I didn't really feel that way inside of me."



Having read that, does that refresh your recollection about giving that statement?
A. No.
Q. Did you tell Lieutenant Carrega that --
A. No.
Q. You didn't tell any of this to Lieutenant Carrega?
A. No.
Q. Why do you say no?
A. Because I don't remember.
Q. Okay. So the answer is you don't remember. Right?
MS. BONJEAN: Objection.
Q. Well, do you have any reason to believe that you didn't tell him this stuff?
MS. BONJEAN: Objection to the form of that question.
A. Any reason?
Q. Yeah.
A. No.
Q. No?
A. No.
Q. All right. You just don't remember. Right?
A. Don't remember.



Q. Okay. And then I'm going to skip to line 12.
Lieutenant Carrega says, "But hold on. But we went there. You took me there. You gave me directions there. Right?"
And you said, "Yeah."
And the Lieutenant said, "And that's where new houses" -- excuse me, I didn't read that right.
"Okay. And what's there now? New houses. Right? New houses."
And your answer was, "Right."
And he continues. "It wasn't like that back in August 20th, 1978, was it?"
And your answer was, "No."
Question: "What was there on August 20th, 1978?"
Answer: "A three-family house."
"A three-family house?"
"Yeah."
"And you lived in that house." This is on page 12. "And you lived in that house." Line 2, I'm sorry.
"I lived in that house on the third floor."
"The third floor of that house, do you remember that number?"



And your answer was, "I don't know the number."
Do you remember telling Lieutenant Carrega any of this?
A. No.
Q. Do you have any reason to believe that you didn't tell Lieutenant Carrega any of this?
A. No.
MS. BONJEAN: Objection to form.
Q. Is it just that you don't have any recollection?
A. No.
Q. I'm sorry, I phrased that as a double negative. Let me ask it differently.
Do you have any recollection of this testimony?
A. No.
Q. Okay. Do you have any reason to believe that any of this didn't occur, that you didn't tell him this?
MS. BONJEAN: Objection to the "this" --
A. No clue.
MS. BONJEAN: -- but form of the question.
Q. Sorry?

A. No clue.
Q. You have no clue.
A. No.
Q. Okay. Let's continue then.
At line 8, Lieutenant Carrega says, "You don't remember the number, but you know it was on the spot that you showed me. Right? About the --"
And then you interrupted, "Between there where I see where the lot was at."
"Right."
And your response was, "Right, because I remember there used to be a telephone pole right there. That's what I remember seeing."
Do you have a recollection of telling them about the telephone pole?
A. No.
Q. Why did you sort of snicker there?
A. Because he's talking about a telegram pole back then.
Q. I didn't understand. I couldn't hear you.
A. I don't know. No. I don't remember. I don't remember that.
Q. You don't remember telling him about a telephone pole?



A. No.
Q. Who did you live with in the Camden Street house?
MS. BONJEAN: Objection to the foundation of that question.
A. My mother.
Q. Your mother. You did live on Camden Street. Right?
A. Yeah, at one time, yeah.
Q. Okay. And you lived there with your mother.
A. My mother. She's dead.
Q. She's passed away?
A. Yes.
Q. My condolences, sir.
Did you live there with your brother?
A. My brother? My brother lived there, too, I think.
Q. He did live there.
A. Yes.
Q. The reason I asked you that is on page 13. 13, at line 17, Lieutenant Carrega asked you who you lived with, and you said, "My mother and my brother." So that's why I asked you.
A. He passed.



Q. And your brother passed in the '80s. Right?
A. Uh-hum.
Q. Yes?
A. Yes.
Q. And that's what you told Lieutenant Carrega. Do you have any reason to believe you didn't tell Lieutenant Carrega that?
A. No.
MS. BONJEAN: Objection to the form of that question.
Q. What -- before we continue reading, do you remember moving out of that house?
A. Yeah.
Q. Was there anybody else living in that house when you moved out?
A. I don't know. I don't know.
Q. You don't have a recollection sitting here today?
A. No.
Q. Was it vacant, do you remember that?
A. I don't know. No, I don't know.
Q. Why don't you look at page 15 and see if that refreshes your recollection.
At 15, line 1, Lieutenant Carrega says, "After



you moved here, what was the condition of that house?"
And then another detective whose name is in the records, it says Cassian -- do you know who Detective Cassian is?
A. No, no, no, no.
Q. "Was anyone living in the house when you went there?"
Answer: "No, there was no one living in there."
Does that refresh your recollection that there was no one living in the Camden Street house after you moved out?
MS. BONJEAN: Objection to the form of that question.
A. No.
Q. It doesn't refresh your recollection. Okay.
So the detectives asked you --
A. Where you at?
Q. On page 15.
A. What number?
Q. 21. 19, starting at 19. And they're asking you about the night of the homicide. And they -- one of the lieutenant -- Lieutenant Carrega

Page 139

says, "How did you get in and out of the house?"
Mr. Hampton said, "I had the key to get in the bottom door."
Answer at line -- he repeats, "The bottom door, you had a key?"
And at page -- line 25, you said, "I had a key to get in."
Do you remember having a key?
A. No.
Q. Do you have any reason to believe that when you told Lieutenant Carrega you had a key that -- does that refresh your recollection of that?
A. It's possible I had a key. I don't know.
MS. BONJEAN: Objection to the form of the question.
A. I don't remember that.
Q. Mr. Hampton, can you turn to page 23.
A. 23?
Q. Yeah.
A. Okay.
Q. Line 6.
A. 6. Okay.
Q. Lieutenant Carrega is asking you about the missing boys. Okay? He says, "Did these boys

Page 140

do anything to Lee?"
MS. BONJEAN: Objection.
Q. Do you see that?
MS. BONJEAN: Sorry.
A. Where you at? Okay. I got you.
Q. Line 6. "Did these boys do anything to Lee?"
And your answer was, "They broke into his house."
And line 9, Lieutenant Carrega says, "They broke in his house?"
And your answer was, "Yes."
And then line 11, "Why did they break in his house?"
And your answer was, "I can't tell you that. I have no idea. I have no idea."
Reading this, does this refresh your recollection that the boys broke into Lee Evans' house?
A. I don't really remember what happened there. You see what I'm saying?
Q. So reading this does not refresh your recollection?
A. Not so much, you know. But I don't remember that. I don't remember what -- if I -- I

Page 141

remember saying they broke in his house, that's about it.
Q. I can't hear you.
A. I understand they broke into his house. Yeah, they had broke in his house, but I don't remember that too much. I don't remember a lot about that, because, you know, I'm too far gone in life to even think about this.
Q. I understand. But I'm confused by your answer. You remember?
A. No.
Q. Well, what do you remember about breaking -- them breaking into his house?
MS. BONJEAN: Objection to the form and foundation of that question.
A. No.
Q. Nothing?
A. No.
MS. BONJEAN: Please don't yell at the witness. Don't yell at the witness.
MR. LIPSHUTZ: I wasn't yelling at the witness.
MS. BONJEAN: You were.
A. No.
Q. Well, you just said you remember

Page 142

something about it.
A. I remember something about them breaking in his house, but I said, you know, other than, that. You're trying to take it further than that. I'm done with it, you know. I don't remember exactly what happened.
Q. You don't remember exactly what happened, but you --
A. No.
Q. -- remember something about them breaking into his house.
A. Breaking into his house, yeah.
Q. Okay. Well, let's continue.
Line 17. "He said he broke in his house. He told me that. I didn't know."
19. "Did they take anything from his house?"
21. "He said they did. He said they took a bunch of weed."
Question: "A bunch of weed?"
"Yeah."
Next question, "What is weed?"
A. Where you at? What page you at?
Q. Same page. Right at the bottom. Then it goes to the next page, page 24.
A. Where you going? Go ahead. Keep going.


Veritext Legal Solutions
800-227-8440 973-410-4040

Q. And the question was, page 24, "What is weed?"
And your answer was, "Reefer or marijuana."
"So they took a bunch of weed?" At line 7.
And your answer was, "Yeah."
The question was, "About what time was this?"
Your answer was, "It was like two or almost a week before, you know, before this happened."
And then Lieutenant Carrega says, "A week before what happened?"
And your answer was, "Before they got missing."
Having read this, does this refresh your recollection that the missing boys broke into Lee Evans' house --
MS. BONJEAN: Objection.
Q. -- and took some weed from him?
A. No.
MS. BONJEAN: Objection to the form of that question.
Q. It doesn't refresh your recollection?
A. No.
MS. BONJEAN: Objection, asked and answered.
Q. Okay. Well, we've looked through this.



Do you have any reason to believe that you didn't tell Lieutenant Carrega and the other detectives this information?
MS. BONJEAN: Objection to the form of that question.
A. No. I have no reason not to believe it. I don't know. I don't remember.
Q. You don't remember.
A. No.
Q. Okay. We've looked through a few pages of this. Do you have any recollection of seeing any of this before today?
A. No.
Q. You don't remember seeing this --
A. Oh, no. No, no.
Q. Let me finish. Do you have any recollection of seeing this at the time you confessed to the murder of the five boys?
MS. BONJEAN: Objection. Remember seeing what?
Q. This statement.
A. No.
MS. BONJEAN: At the time? Objection to the form of that question. Foundation as well.
Q. Did you understand my question?



A. Yeah, I understand. You're saying did I see this here.
Q. When you pled guilty to the murder of the five boys.
A. No.
MS. BONJEAN: Confessed or pled guilty? Those are different questions.
MR. LIPSHUTZ: Okay. That's fine.
Q. At the time you pled guilty to the murder of the five boys, do you remember seeing this statement?
A. No.
Q. And have you seen it before today ever?
A. I don't know. No.
Q. Okay.
A. Let's go.
Q. You ready?
A. Yeah, I'm ready.
Q. Page 30.
A. Page 30. Okay.
Q. I'm going to ask you about line 5.
A. Line 5.
Q. Lieutenant Carrega asks you now, "Maurice rode around with him that Sunday looking for these boys."



And your answer was, "Yeah. And they found -- I guess he must have told Reese that they were going, you know, wanting to help him do some work this summer, and eventually, you know, Reese wanted to help him look for the guys. You know, eventually he found them all. But, you know, he had two. And I was sitting there at the house when he first -- I was at my mother's house. He came and got me when he got the first two. Then we went around the corner and he gave me a gun."
Do you see where I read that from?
A. What line you on?
Q. Well, I read from line 5 through 16.
A. Through 16. Yeah, I see it.
Q. Did I read it accurately?
A. "Around the corner and he gave me a gun." No.
Q. I didn't read it accurately?
A. Yeah, you read it accurate.
Q. Okay. Reading this, does this refresh your recollection of telling Lieutenant Carrega this information in 2008?
A. No.
Q. Okay. Do you have any reason to believe that you didn't tell him this?

A. No.
Q. You just don't remember.
A. Don't remember.
Q. Okay. And then a detective named Cassian says, "Hold on. You were at your mother's house on Hunterdon. Right?"
And then your answer was, "Yeah, my mother's house on Hunterdon. Then he went upstairs, we went upstairs, and then he passed me a gun. And he said, keep an eye on them until I get back. I'll be right back. And he left them. When he got the other three, him and Reese, and brought them back. But he had to drop Reese off somewhere. I don't know." And then it continues. "I don't know. I guess he took Reese home. And when he came back with the other three, he came back" --
A. Where you at."
Q. I'm sorry, I didn't realize you -- it's the next page. Just flip it over.
A. Okay. Go ahead.
Q. "And he came back with the other three and he came back with a five-gallon can of gas, too.
A. Where you at?
Q. 31.
A. You're jumping ahead of me.



Q. Sorry, sir.
A. Go ahead.
Q. "And he came" -- 31?
A. 31.
Q. "And he came back with the other three, and he came back with a five-gallon can of gas, too. And when he came back with the other three, he took the gun from me and he made them get in the car. And he came through back off of Bergen Street, another car, the Chevy, and poured gas all around the car and the door and poured gas all around the room and poured gas out in the kitchen and left the gas can sitting right there by the kitchen door and struck a match."
A. Now, that's confusing.
MS. BONJEAN: What was the answer?
A. I don't know.
Q. Do you remember telling him any of this?
A. No.
Q. Having read any of this --
A. No.
Q. -- does this refresh your recollection?
A. No.
Q. Do you have any reason to believe you didn't say any of this to the lieutenant?



A. I don't know.
Q. You just don't recall.
A. I don't recall.
Q. Okay. It continues where it says, "I gave him," that's Hampton gave Lee --
A. What number you at?
Q. 11.
A. Okay.
Q. "I gave him a match and he strike the match, but I was going down the stairs before he really."
And then Carrega says, "Did you see the flames?"
Answer: "Yeah, I see the flames. It was blazing."
A. Oh, man. No, I don't remember that. I don't know.
Q. Can you look at me?
A. No.
Q. You don't remember saying this?
A. No.
Q. Do you have any reason to believe you didn't say this to him?
A. Might have been coerced.
Q. Might have been?



A. Yeah, it might have been coerced. I don't remember.
Q. What do you mean?
A. The police might have coerced this. I don't remember this.
Q. You don't remember it.
A. No.
Q. Well, why do you say it might have been?
A. It might have been. I don't remember.
Q. So it's possible.
A. It was coerced.
Q. Okay. Well, it was coerced or it might have been coerced?
A. It was coerced with the police. Police already had a picture in their minds what happened. I don't know. I have no clue.
Q. How do you know it was coerced?
A. I don't know. No, I don't know. No, I don't know.
Q. Well, what -- why do you say to me it was coerced?
A. I don't remember because -- I don't remember. I don't remember.
Q. So you don't remember.
A. Okay. I don't remember.

Q. Well, I'm asking you.
A. I don't remember. No, I don't remember.
Q. Okay. So you don't know whether it was coerced or not.
A. No.
MS. BONJEAN: Objection to the form of that question.
A. I don't know. No, I don't remember.
Q. Let me ask you a question. If we were sitting before a jury today and someone asked you was this coerced, what would you say?
MS. BONJEAN: Objection to the --
A. No, I don't --
MS. BONJEAN: Let me put my objection on the record. Okay?
THE WITNESS: Okay.
MS. BONJEAN: Objection to the incomplete hypothetical of that question, form, foundation. If you understand it, you can answer it.
A. I don't understand it, no.
Q. We've been going for --
A. I don't want to go to court for this mess. I'm done with it.
Q. I've got you. Let me ask you a



question.
A. It's done. If I go in front of the, judge, I won't remember nothing we're doing right here, you know, at this time.
Q. Let me ask you a question.
A. Okay. Go ahead.
Q. If we were to go before a jury and a court again and you were in the jury box and you were testifying and someone said to you, Mr. Hampton, was this statement that you gave in 2008, was this statement coerced, what would you your answer be?
A. I wouldn't know at this time. 'Cause I'm talking to you right now. You're taking me somewhere else.
Q. You --
A. You're taking me somewhere else. You're taking me somewhere that you shouldn't be at right now. We're talking about what's going on right now.
Q. I don't understand your answer.
A. What you don't understand? You gotta be crazy. We're talking about what's going on right now, what you're talking about right now. I don't remember none of this stuff. All right?
Q. My question was very simple.



A. I know. Bur I wouldn't know what I would say if we got in front of the prosecutor or the judge or whatever. I wouldn't know. I have no clue. I ain't jumping ahead of time. We're here right now doing this right now.
Q. Okay. Well, let me ask you now.
A. Okay.
Q. I'm asking you now.
A. Okay. What you ask me? What you ask me?
Q. Was this a coerced statement from you?
A. I don't know.
MR. LIPSHUTZ: Okay. I want to take five minutes. Okay? Five-minute break.
(A break was taken.)
BY MR. LIPSHUTZ:
Q. Okay. We just took a short break. I was asking you questions about the 2008 statement that you gave.
A. Right.
Q. But I guess my overall question is you don't really remember giving this statement at all sitting here today. Right?
A. No.
Q. Okay. Turn to page 74, will you?



A. 74? Okay.
Q. You on page 74?
A. Yes.
Q. At line 2. Lieutenant Carrega says to you, "Philander, everything you've told us here, is it the truth?"
Do you see where I read that?
A. Yeah, I see it.
Q. And your answer was, "Yes, it's the truth."
Mr. Carrega said, "You swear?"
The answer was, "I swear."
"You affirm?"
And the answer was, "Yes."
Lieutenant Carrega says, "I don't know if you believe in God. Do you believe in God?"
And your answer was, "Yes."
"Do you swear everything you told us is the truth?"
The answer was, "Yes."
"No bullshit?"
"No."
First of all, having read any of this, does it refresh your recollection about telling --
A. About the bullshit and all that together

Page 155

with God, that's what you're telling me, I don't remember this stuff.
Q. Well, here's my question, sir.
A. I'm telling you --
Q. Do you remember --
A. No.
Q. Okay. Having looked at this --
A. No.
Q. -- does this refresh your recollection?
A. No, no, no, no, no, no.
Q. Mr. Hampton, when you told them that you were there when Lee Evans started the fire, was that the truth?
A. No.
Q. It was a lie?
A. It was a lie.
Q. Were you there when Lee Evans started the fire with these boys?
A. No. No.
Q. Let's turn to page 79.
A. I'm here.
Q. Would you look at line 18.
A. 18. Okay.
Q. The lieutenant --
MR. KASSIS: What page is this?

Page 156

MR. LIPSHUTZ: 79.
A. I'm here.
Q. The lieutenant says, "Did we threaten you here today?"
And your answer was, "No."
"Did we promise you stuff here today?"
And your answer is, "No."
Looking at that, do you recall giving that testimony?
A. No.
Q. Having read this, does this refresh your recollection?
A. No.
Q. Do you have any reason to believe that in 2008 you didn't tell the officers, you didn't say you haven't threatened me or promised me anything?
MS. BONJEAN: Objection, form.
A. Where you at?
Q. Page 79.
A. Okay.
Q. Line 18 through 23.
A. To 23. I said no. No.
Q. You don't recall saying that.
A. No.
Q. Look at me, sir. I'm sorry.

Page 157

MS. BONJEAN: Objection.
Q. Do you have any recollection --
MS. BONJEAN: Argumentative.
Q. Do you have any recollection of saying this?
A. No.
Q. Okay.
A. I don't remember what I said yesterday, how about that.
Q. I didn't hear what you said, sir.
A. I don't remember what I said yesterday.
Q. You don't remember what you said yesterday.
A. No.
Q. Okay.
(Exhibit Hampton-8, Photocopy of a greeting card, was received and marked for identification.)
MR. LIPSHUTZ: I'm marking as Hampton-8 a two-page photocopy of a greeting card.
Q. Let me show you Hampton-8. Okay? You can put that one down, sir. Take a look at that.
A. Okay.
Q. Look at the next page.
MS. BONJEAN: Is there a question?

Page 158

MR. LIPSHUTZ: I'm letting him look at it.
MS. BONJEAN: Oh.
A. I looked at it.
Q. Have you ever seen it before?
A. No. No.
Q. All right. I'm going to represent to you that a prosecutor said in this case he believes it's from Lee Evans.
MS. BONJEAN: Objection to the form.
A. I don't know.
MS. BONJEAN: Irrelevant to what a prosecutor believes.
Q. But my question to you is, you've never seen this greeting card?
A. No.
Q. Okay. And do you know whether this was sent by Lee Evans or not to the prosecutor?
A. No, I don't remember.
Q. Okay. That's all.
A. I don't remember.
Q. It doesn't have your name on it. I just asked if you knew.
A. No.
Q. All right.

A. No, I never seen that before, no.
Q. Okay.
A. Oh, man. I got bills to pay. You're paying yours 'cause you're sitting there talking to me. I gotta go further than this. They don't stop coming.
Q. We don't have much longer, sir. Hang with me.
A. I'm trying.
Q. Okay.
A. You'll have me out on the street, living on the street out there panhandling, begging for quarters and dollars. I doubt if I'd get one from you. That's why I'm gonna be in the street if I keep sitting here. I gotta go to work. Like you all work, I gotta go to work, too.
Q. I'm sorry, I'm looking for a particular thing here. I'm sorry.
A. Oh, my God.
Q. You testified at Lee Evans' trial. Right?
A. I don't know.
Q. You don't know?
A. No.
Q. Did you testify at Lee Evans' trial that



you were there when Lee Evans started the fire with the boys?
A. I don't know.
Q. You don't know?
A. No.
Q. When you told the jury that you were there when Lee Evans started the fire, was that the truth or a lie?
A. A lie.
MS. BONJEAN: Objection to the form.
A. That's a lie.
Q. Why was that a lie?
MS. BONJEAN: Objection --
A. I don't know.
MS. BONJEAN: Objection to the form of that question.
A. I don't know.
Q. Well, why did you tell the jury that?
A. I don't know.
Q. Okay. You don't know?
A. No.
MR. LIPSHUTZ: I'm marking as Hampton-9 a 2017 statement.
(Exhibit Hampton-9, 2017 statement, was received and marked for identification.)



A. Oh, man.
Q. All right, Mr. Hampton. Did you --
A. We're on page 1?
Q. Yeah, I'm just going to ask you, looking at this document, the top of it says FNI, First Nation Investigations. Do you have a recollection --
A. No, no.
Q. Well, have you looked at it?
A. I'm looking at it. I've never seen this.
Q. Okay. Well, let me ask you to turn to page 5.
A. 5. I'm here.
Q. You see the signature line?
A. All them signature? Where is my signature?
Q. I can't hear your answer, sir.
A. It's not my signature. You said on page 5. Right?
MS. BONJEAN: Did you say 5 or 9?
MR. LIPSHUTZ: I said 5.
Q. I want to make sure you're on the right page.
A. Okay. I'm on 5. Okay. That's my



signature.
Q. Is that your signature?
A. Yeah, that's my signature.
Q. Do you remember giving a statement to Maxwell Martins?
A. Oh, no.
Q. No?
A. No.
Q. Well, let's go back to the first page then.
A. The beginning.
Q. It asks you, I guess the fourth question down --
A. Fourth question?
Q. -- it says, "Where do you live?"
And it says, "114 Maple Avenue, Montclair."
Did you ever live there?
A. You said first page.
Q. Yeah.
A. Maple Ave? Okay. I see it. Fourth question.
Q. It says, "Where do you live?"
A. It's nothing here.
Q. Hold on.
A. I see where it says Maple Avenue.

Page 163

Q. It says, "Where do you live?"
"114 Maple Avenue."
A. Yeah. Okay, I see that.
Q. You see that.
A. I see that.
Q. Did you live at 114 Maple Avenue in Montclair?
A. When I first came up there, yeah.
Q. Okay. It has your date of birth right there under that. Right?
A. Yeah.
Q. Okay. You don't have any recollection of giving this man a statement?
A. No.
Q. Okay.
A. Who is this anyway?
Q. I'm asking you if you have a recollection.
A. No.
Q. Okay. Why don't you look through it a little bit and tell me if it refreshes your recollection in any way.
A. No.
Q. Well, you can look through it.
A. I'm looking through it. I'm reading it

Page 164

now.
Q. It's not long.
A. I don't even remember this. I never even --
Q. Remember, everything you say she's got to take down, so.
MS. BONJEAN: Wait for a question.
A. Okay.
Q. I've asked you to look through it. Do you recall this at all?
A. No. When was this taken? I don't know. What's the date on this?
Q. This young lady has got to take down everything that comes out of your mouth.
A. I just want to know what the date is on this. I don't know.
Q. If you look at the last page, page 5 again, it says -- that's not the last page. The one with your signature on it. It says June 6, 2017.
A. I don't remember.
Q. You don't remember?
A. No. Don't remember. I don't remember even taking this picture.
Q. You don't remember giving Mr. Martins a statement?

Page 165

A. No.
Q. Okay. Well, having looked through it, does that refresh your recollection that you gave this statement?
A. No, no.
Q. No?
A. No.
Q. Let me ask you, you met Joe Hadley here at the last deposition. Right? Yes? You have to answer out loud.
A. Yes.
Q. Did Joe Hadley do anything to you in connection with this, did he coerce you, did he threaten you, did he promise you, did he do anything to get you to testify?
A. I couldn't even remember, man, no. I don't remember. I don't remember. I didn't talk to him in over eleven, twelve years.
Q. But what I want to know is, did Joe Hadley do anything to you, threaten you, coerce you, compel you, tell you to testify untruthfully?
A. I do not --
MS. BONJEAN: Hold on a second. I object to the foundation of that question. You can answer.

Page 166

A. I do not know. No, I don't remember.
Q. You don't remember.
A. No.
Q. It says here on page 4 --
A. 4?
Q. Page 4.
A. Okay. Hold on. Number 4?
Q. Yeah. Page 4.
A. I'm here. What question you at?
Q. Right at the bottom.
A. At the bottom.
Q. Let me read it to you, Mr. Hampton.
A. Read it.
Q. "Mr. Hampton" -- and this is the statement from 2008. I'm holding up Hampton-6.
All right. "Mr. Hampton, is it true that the statement you gave to Lieutenant Lou Carrega" --
A. Where you at?
Q. The last question on the fourth page.
A. Okay. Go ahead.
Q. Can I see what you're looking at?
A. I got you.
Q. Yeah. "Is it true that the statement you gave to Lieutenant Lou Carrega from the Essex County Prosecutor's Office in 2008 and the testimony

Page 167

you gave in court before Judge Patricia Costello from the Essex County Superior Court during your and Mr. Evans' trial in 2011 were completely fabricated and orchestrated by multiple New Jersey criminal justice system agencies for the purpose of fabrication of evidence and false accusation for the prosecution of Mr. Evans? If so, which agencies and individuals were involved in this fabrication of evidence and the false statement against Mr. Lee Evans?"

The answer, let me read it, "Yes. The New Jersey State Police and the Essex County Prosecutor's Office. The people involved were Mr. Peter Guarino, Detective Joe Hadley, Lieutenant Carrega -- Correglia, Trooper Tietjen, and others that I cannot recall their names."

Now, I read that. Is that your testimony?

A. I don't remember, man.

Q. Well, did you tell this investigator this?

A. I don't know, man. I'm telling you, I don't know. No, I don't know. Yeah, I might have did. I don't know.

Q. You're not certain, you don't recall?

A. No.

Page 168

MS. BONJEAN: Asked and answered. I mean, he's answered it.

Q. Well, let me ask you this. It says -- well, what was fabricated and orchestrated by multiple New Jersey --

A. Where you at?

Q. It's part of the same question. What was fabricated and orchestrated by multiple New Jersey criminal justice system agencies?

A. I don't know.

Q. You don't know?

A. No.

Q. In that, answer, you talk about Detective Joe Hadley. And now I'm asking you, what did Joe Hadley do?

A. I don't know.

Q. Okay. All right. Almost done.

A. You want this?

Q. You can put it away.

(Exhibit Hampton-10, Transcript of hearing from 10/3/2011, was received and marked for identification.)

MR. LIPSHUTZ: Okay. What we marked, I'll just identify it for the record, Hampton-10 is October 3rd, 2011, transcript of hearing, ECPO 1041

Page 169

through 1061.

Q. This is for you, sir. This is one extra copy?

MR. KASSIS: Just describe the document.

MS. BONJEAN: I don't need a copy.

MR. LIPSHUTZ: It's the transcript of his sentencing.

MR. KASSIS: I got it. You can have it.

MS. BONJEAN: I have it.

Q. Okay. Mr. Hampton, on October the 3rd, 2011 --

A. What page you on?

Q. I'm just at the beginning. It's a hearing that happened where you were sentenced to prison for the homicide of the five missing boys. Right? So this is the transcript of the sentencing hearing. Correct?

A. I guess so.

Q. You guess so. Okay. In this deposition, you have told me that you had nothing to do with the homicide of the five boys. Right?

A. I don't remember.

Q. Well, I asked you, were you there when they -- when Lee Evans started the fire?

A. You just asked me that. You asked me

Page 170

that over and over again. I don't remember.

Q. You don't remember?

A. I don't know who started the fire, no.

Q. Well, let me ask it this way.

A. I don't remember who started no fire.

MS. BONJEAN: I'm going to object. We've been going over and over again. I mean, this is --

A. He's starting back over where we started.

MS. BONJEAN: He's already answered those questions.

Q. I just want to -- before I ask one question about this transcript, all right, you were innocent of the murder of these five boys. Right? That's what you've told us.

A. Yeah.

Q. Okay. Look at page 5.

A. Page 5.

Q. In 2011 -- at line 2.

A. Line 2.

Q. The Court said, "Okay, Mr. Hampton. Could you stand up, sir? Would you like to be heard? Would you like to say anything before I sentence you?"



Veritext Legal Solutions

800-227-8440 973-410-4040

And your answer was, "No."
Did I read that correctly?
A. Yeah. I guess so. I don't remember.
Q. You don't remember.
A. No.
Q. Is there any reason why you didn't say anything to the court --
A. I don't know.
Q. Let me ask my question. Is there any reason why you didn't say anything to the court before you were sentenced --
A. No.
Q. -- to prison -- let me finish my question.
MS. BONJEAN: Listen to his question and then answer.
Q. Is there any reason why you didn't say anything to the court before you were sentenced to prison where you were innocent of the homicide charges?
MS. BONJEAN: I'm going to object to the form of that question. Now you can answer.
A. Repeat the question again?
Q. Is there any reason why, before you were sentenced to prison for the homicide of the five



missing boys, you didn't say anything to the court?
MS. BONJEAN: Okay. I'm going to object also --
A. I don't remember.
MS. BONJEAN: Hold on, let me object. Let me object. Okay? And then you can answer.
First of all, it also infringes on his Fifth Amendment right. He still enjoys the Fifth Amendment right on that. So I'm going to object on form and also it is a Fifth Amendment implication.
Go ahead. Now you can answer.
A. I don't remember. I know I did time for it, but as much time as I did for it, I wasn't expecting all the time I did for it.
Q. You weren't expecting all the time you did for it?
A. No, 'cause I was trying to get out of jail, that's all it was.
Q. What do you mean you were trying to get out of jail?
A. They told me I would do only ten years -- I would do two years on the ten years.
Q. That was what --
A. 16 months. I would do 16 months on a ten-year sentence. It was a flat ten.



Q. All right.
A. So I was sitting in the county jail for over two years.
Q. Right.
A. But I did get ten years.
Q. You did get ten years?
A. I got ten years.
Q. All right.
A. And when I got the ten years, I copped out to it, but I was trying to get out of jail. I want out of jail as fast as possible. You understand that, don't you? Do you understand that?
Q. I do understand that.
A. Okay then. I was trying to get out of jail as fast as possible. So I accepted the ten years, which I didn't have to really accept it, because eventually they threw me out of jail anyway. But I was trying to get away from that. You see what I'm saying? I was in the county jail for two years. I was sitting in that county jail for two years. Anybody sit in jail for two years.
Q. Why were you sitting in the county jail for two years?
A. 'Cause I have nothing to do with it.
Q. So are you saying to me you were held



for two years in the county jail before you were sentenced? Yes? You're nodding, but you have to answer.
A. Yes.
Q. Okay. You were not out on the street?
A. No.
Q. You spent two years in custody.
A. In custody.
Q. So you were willing to say whatever you had to say to get out of jail?
A. Get out of there.
Q. Anything at all to get out of jail. Right?
A. Get out of jail.
Q. Mr. Hampton, I don't have any questions -- any more now; however, the other attorneys can ask you questions. Okay, sir? Thank you.
EXAMINATION BY MR. KASSIS:
Q. Mr. Hampton, I don't have a lot of questions for you. I think we've covered what we need to cover here today, but I do want to ask you a few.
Do you recognize the individual by the name of Louis Carrega?

A. Huh?
Q. Do you recognize the name Louis Carrega?
A. Yeah, I recognize the name, yes.
Q. What do you remember?
MS. BONJEAN: Objection to the form and foundation of that question.
A. I remember the name, that's all.
Q. You just know the name?
A. I can't place him. If you brought him in here right now, I wouldn't even put him with his name.
Q. Do you know if he had any role in this case?
A. Who?
MS. BONJEAN: Objection to the form of that question, foundation.
Q. Do you recall if he was involved in your prosecution?
A. I don't remember.
Q. You don't remember?
A. No.
Q. Okay.
A. No.
Q. And that's fine. If you don't remember, that's fine.



Do you remember meeting him?
A. No.
Q. And as you sit here, you don't know what he looks like. Correct?
A. What's that?
Q. As you sit here, do you know what he looks like?
A. No.
Q. So you don't -- okay. So let me ask you this. At your sentencing -- let's start with the plea hearing, which occurred on August 30, 2011. Do you remember that?
A. I'm aware, yeah, yeah.
Q. You were represented by an attorney. Correct? At that sentence -- at that plea hearing?
A. Yes.
Q. Do you remember your attorney's name?
A. What was his name. What was the name.
Q. I'm going to try to refresh your recollection. Was it Joseph Krakora?
A. I don't know if he was there or not. I don't remember.
Q. You remember you were represented by an attorney?
A. I was represented by him, but I don't



remember him being there.
Q. And then at the sentencing hearing, which occurred on October 3, 2011, do you remember that?
A. No.
Q. Okay. At that sentencing hearing -- you do remember being at a sentencing hearing. Correct?
A. Yes.
Q. Okay. And were you represented by an attorney?
A. I don't really remember.
Q. I'm looking at the transcript of your sentencing hearing, which we marked for identification as Hampton-1, and it's Bates-stamped page ECPO 1041.
MR. LIPSHUTZ: What page do you want?
MR. KASSIS: The cover page.
MR. LIPSHUTZ: Can you look at that, sir?
A. What page are you on?
Q. So it's 1041.
A. What page?
Q. It's the first page. It's not -- there are two transcripts that are connected with that document. So let me see if I can give you my



document. I'm going to represent to you that what you're looking at is the same thing I'm looking at here. Is it okay if I'm approaching you?
A. No, you're all right.
Q. It indicates here that you were represented at the sentencing hearing by two attorneys, Joseph J. McMahon and Joseph E. Krakora. Do you see that?
A. Where's that?
Q. It indicates here, "Attorneys for Defendant Philander Hampton," do you see that?
A. I see that.
Q. And above where it says, "Attorneys for Defendant Philander Hampton," it has two individuals, John McMahon, Esquire, and Joseph Krakora. Do you see that?
A. Yes.
Q. Do you have any reason to believe that they were not there present with you at this hearing?
A. There was only one lawyer there.
Q. Pardon? There was only one lawyer there?
A. Yes.
Q. Okay. But there was a lawyer there with

Page 179

you. Correct?
A. Yes.
Q. To the best of your recollection, it was only one lawyer.
A. It was him, McMahon.
Q. McMahon? Okay.
MR. KASSIS: I don't think I have any further questions. I'm just going through my notes.
MR. VOMACKA: I just want to make sure I heard properly, you said you're done. Right, James?
MR. KASSIS: Yeah, I'm just going through my notes, so if you want to go, you can.
MR. LIPSHUTZ: Mike, hold on a second.
MR. VOMACKA: Sure.
MR. LIPSHUTZ: What I want to do is turn the camera around so that Mr. Hampton can see you. Okay?
MR. VOMACKA: Okay.
MR. LIPSHUTZ: So, Mr. Hampton, Mr. Vomacka is on the video here. Okay?
THE WITNESS: Okay.
EXAMINATION BY MR. VOMACKA:
Q. Mr. Hampton, my name is Michael Vomacka. I'll try and be brief. If you could just answer a couple questions. If you remember the answer,

Page 180

please let us know. If you don't, that's a perfectly acceptable answer.
So I'm wondering, do you remember who Trooper Tietjen is?
A. Who?
Q. Trooper Tietjen?
A. No, not offhand, no.
Q. Okay. So I'm sorry, this is somewhat of an obvious question, but I'm going to ask you anyway, do you remember what he looks like?
A. No.
Q. Okay. And do you remember any specific conversations with him?
A. No.
Q. Do you remember him ever giving you money?
A. No.
Q. Do you remember any other interaction with him?
A. No.
MR. VOMACKA: Okay. I'll pass the witness.
MS. BONJEAN: Anybody else?
MR. LIPSHUTZ: Are you done?
MR. VOMACKA: That's all I wanted to

Page 181

ask.
MR. LIPSHUTZ: Oh, okay. So now, Ms. Bonjean?
MS. BONJEAN: Yes.
EXAMINATION BY MS. BONJEAN:
Q. Okay. I have a few questions for you. Okay, Philander?
Mr. Hampton, you don't want to be here today, do you?
A. No.
Q. Okay. Do you still have a little bit of fear that you could be prosecuted in connection with this whole situation?
A. If I say what they want to hear, they can prosecute me. I don't know.
Q. Tell her what you just said.
A. If I say what they want to hear, they can prosecute me. That's the way it goes. I can't say what they want to hear because I don't know anything. I'm done.
Q. Okay.
A. I'm done.
Q. So you want to be done with this whole thing. Right?
A. I'm done with this.

Page 182

Q. Okay. I want to draw your attention back to like a year and a half ago, 2020. Do you recall when I came to your house with my partner, Ashley Cohen, the blonde girl?
A. I thought you came by yourself the first time.
Q. Well, is that what you recall? That's all right.
A. I don't remember.
Q. Okay. You do recall me coming to your house.
A. Yes.
Q. Okay. And do you remember -- how did I know where to come?
A. I told you.
Q. And I didn't force you to talk to me. Right?
A. No.
Q. Okay. And I came to your house and we talked about the case. Right?
A. That's exactly the way it was, yes.
Q. All right. And then -- and we talked -- would you agree we talked at length about the case. Correct?
A. Yes.

Page 183

Q. Okay. And I asked you questions and you answered questions?
A. Yes.
Q. Okay. And then do you remember that I came back again, this time with Ms. Cohen?
A. Yes.
Q. All right. And I had prepared a statement based on our conversations. Do you remember that?
A. Yes.
Q. Okay.
MS. BONJEAN: You guys have this, so.
MR. LIPSHUTZ: Do you have it?
MR. KASSIS: What is it?
MS. BONJEAN: Evans 6196.
MR. LIPSHUTZ: I'm not sure I do.
MS. BONJEAN: Well, it definitely was produced.
MR. LIPSHUTZ: I'm not sure I do.
MS. BONJEAN: Well, it was produced is all I'm saying.
MR. VOMACKA: It doesn't ring a bell for me. Let me take a look. Did you send it electronically?
MS. BONJEAN: Haley, can you put on the

Page 184

record any information about when this was sent?
MS. COOLBAUGH: Yes, of course. I sent this production on November 19th, 2020. We received notification through our share file account that each counsel has downloaded the production. The range was Evans 717 to 8120.
MR. VOMACKA: Give me just a minute. I just want to make sure. One moment.
MS. BONJEAN: If you want her to e-mail it to you right away, just that document, I'm sure she can.
MR. LIPSHUTZ: Do you have any other copies of this?
MS. BONJEAN: Do you need -- well, I have one more, but I want to mark it.
MR. LIPSHUTZ: I'm just going to go to the copy machine.
MS. BONJEAN: Sure.
(Off the record.)
MR. LIPSHUTZ: You haven't asked any questions. Right?
MS. BONJEAN: No.
MR. LIPSHUTZ: Okay.
(Exhibit Hampton-11, Statement of Philander Hampton, was received and marked for

Page 185

identification.)
MR. VOMACKA: I'm sorry, could you just repeat the number? I think I have the document, but I'm just trying to find the number for the Bates cycle.
MS. BONJEAN: It's Evans 6196.
MR. VOMACKA: Thank you.
BY MS. BONJEAN:
Q. Okay. Philander, I'm going to show you what we've marked as Hampton-11. Okay?
A. Okay.
Q. And you've indicated that you really want to get out of here 'cause you have somewhere to go for work. Right?
A. Yeah, right. I gotta do something. I gotta pay my bills.
Q. Okay. I understand. Can you hang in here for a few minutes while I ask you a couple of questions?
A. I'm trying.
Q. Okay. I appreciate that.
So I want you to look at the last page of what has been marked as --
A. Which one, 23?
Q. Yeah.

Page 186

A. 22.
Q. Right. Do you see, sir, your signature line and your signature there at the bottom of that?
A. Yes.
Q. Okay. And do you see the date that says October 27th, 2020?
A. Yes.
Q. All right. And do you recall that when you signed this statement, I was with my partner, Ashley Cohen, and then there was also a notary public, the person that signed this --
A. She stamped it.
Q. Yeah, stamped it. Right? Do you remember that?
A. Yes.
Q. You remember at least three people in your house?
A. Yes.
Q. And do you remember we went through the statement line by line?
A. Yes.
Q. And I asked you to confirm that it was accurate, do you remember that?
A. Yes.
Q. And then you put your initials to the

Page 187

right of it?
A. Yes.
Q. And then you signed it at the end. Correct?
A. Yes.
Q. And I asked you a lot of questions about what happened when you were brought to the Essex County Prosecutor's Office. Do you remember that?
A. Yes.
Q. Okay. And you explained to me at least then in detail about what happened. Right?
A. Yes.
Q. And you confirmed that the statement that you signed was accurate. Right?
A. Yes.
Q. Okay. And I just want to draw your attention to a couple of lines here. We won't go through the whole thing because I know you're very eager to get out of here.
Okay. I want to draw your attention to number 9. Okay?
A. Number 9?
Q. Yeah. It's right here. Actually, let's start with number 7. Okay?
A. 7.

Page 188

Q. It says, "During the early afternoon of November 12th, 2008, I was transported to the Essex County Prosecutor's Office and I wasn't told -- I was not told why I was being brought to the Prosecutor's Office or told that I did not have to go. Had I known that I was being brought to the Prosecutor's Office to be interviewed about the missing boys, I would not have consented, because I had already told the detectives everything I knew."
A. Exactly.
Q. Is that true?
A. That's true.
Q. Okay. And then I want to go to number 9.
A. Okay.
Q. Do you see where it says, "Lieutenant Carrega told me they already knew what happened to the boys, because my cousin Maurice Olds had told them what happened. They told me they knew that Lee had killed the boys and they knew I was present -- also present. They told me they knew Lee had killed the boys because the boys had stole marijuana from him. They also told me that they knew I had helped Lee by bringing the boys to my apartment on Camden Street and that the boys had died in the fire."

Page 189

Do you remember Lou Carrega telling you those things?
A. Yeah, he explained it to me, yes.
Q. Okay. And do you remember reading this at the time?
A. I remember that vaguely, you know, but I remember it.
Q. I understand. And do you remember telling Lou Carrega or Lieutenant Carrega that you had no knowledge about the boys or any knowledge about why Maurice would be telling him that?
A. Right.
Q. Is that correct?
A. Yes.
Q. And then do you see at number 11, you said, "At some point Joe Hadley came into the interview room. He was a black detective, Newark Police detective." Do you see that?
A. I see it, yes.
Q. And you also identified another white police officer as the State Trooper Tietjen who came?
MR. VOMACKA: Objection to the form. I'm sorry, go ahead.
Q. Do you see that? It's number 11.

Page 190

A. Yeah, I got you.
Q. Okay. But you also stated that it was Lou Carrega or Lieutenant Carrega who did most of the questioning of you. Right?
A. Yes.
Q. Is that accurate?
A. Yes. That I know, yes.
Q. Yes. Okay. Do you remember that they gave you a polygraph test and they told you --
A. Yes.
Q. And they told you you failed the polygraph test. Right?
A. Yes.
Q. Okay. And I'm going to read --
A. Where you reading at?
Q. 12. Number 12. Okay?
A. Okay. I'm there.
Q. "The questioning went on for a period of time and I told the detectives that I did not have knowledge about the boys' disappearance and could not assist in their investigation. They continued to say they already knew what happened and that Lee and I brought the boys to the Camden apartment and that the boys died in a fire there. But they wanted me to tell them from my own mouth what happened. I

told them again that I did not know what happened. I was asked whether I would take a lie detector test. I agreed because I wanted to prove that I was telling the truth so I could leave. But after the polygraph, I was told I failed."
A. Yes.
Q. Do you remember that happening?
A. Yes, I remember.
MR. LIPSHUTZ: Objection to the form.
Q. Okay. And you put your initials next to that particular paragraph. Right?
A. Yeah.
Q. And then at paragraph 13, you said -- or it's here and you signed at the bottom. You see your signature at the bottom of the page. Right?
A. Yes.
Q. "Carrega started getting more aggressive with me after he told me I had failed the polygraph. I was very nervous and scared when Carrega told me I failed the test. Carrega told me he was getting tired of me denying what happened and that he already had enough evidence to convict me and send me to prison for life. He said that he knew that Lee was the mastermind behind the boys' murders, but if I did not cooperate with them, I was going to get



charged. Carrega told me that if I told them Lee did it, I would not be charged."
A. Yes.
Q. Okay. And is that accurate?
MR. KASSIS: Objection to the form.
A. Accurate.
Q. And --
A. That I know of, yes.
Q. Yeah. And you signed that paragraph. Correct?
A. Uh-hum.
Q. All right. I'm going on to 14. "I told Carrega and the other detectives, including Hadley and Tietjen, that I didn't know what happened to the boys and had no knowledge that Lee was involved. Carrega and the other detectives kept telling me that I had to help myself, and that if I didn't implicate Lee that I would be charged, since they already had Maurice's testimony."
A. Exactly, yes.
Q. Okay. And then you signed -- or initialed paragraph 15. I'm trying to go through this as quickly as I can.
"The questioning went on for many hours."
A. Yes.



Q. Is that correct?
A. Yes.
Q. "I was scared and exhausted and it was clear they were not going to let me go until I told them something about Lee." Is that right?
A. Yes.
Q. "Eventually I agreed to do repeat the story they wanted me to say about Lee even though it wasn't true because I did not want to get charged with the boys' murder and I wanted to get out of the police custody."
A. Exactly.
Q. Is that correct?
A. Yes.
Q. All right. Okay. Paragraph 16. "After I agreed to repeat the false story, I was transported to another police station in a car driven by Carrega." Do you remember that?
A. Yes.
Q. "On the way to the police station, Carrega went through the story that he wanted me to say on video. He told me that he was going to ask me and then coach me about how I should respond." Do you remember that car ride?
A. Yes.



Q. All right. Going on to the next paragraph. "Carrega made it clear that he wanted me to repeat" --
MR. LIPSHUTZ: Okay. I'm sorry.
Q. -- "the following statements in my own words. Lee wanted to kill the boys because they stole his marijuana. Lee and Maurice Olds got a couple of the boys and brought them to my apartment on Camden Street and that they picked me up on the way. Lee gave me a gun to watch the boys and then he left and came back with the other boys and placed them all in a closet that he nailed shut. Lee had a can of gasoline that he poured around the apartment. And 5, I gave him a match that ignited the gasoline and that the building burned." Do you see that paragraph?
A. Yes, I see it.
Q. Okay. And are those the statements that Carrega wanted you to say?
MR. KASSIS: Objection to form.
A. That's what he wanted me to say.
MS. BONJEAN: Did you get his answer?
THE COURT REPORTER: Yes.
A. It was coerced.
Q. I'm sorry, what did you say?

Page 195

A. It was coerced.
Q. Okay. Almost done.
"And on the way to the police station, Carrega told me he wanted to stop at the Camden Street address where I used to live. He drove us to that location and we got out of the car." Do you see that?
A. Yes.
Q. Okay. Did Carrega bring you to that location?
MR. KASSIS: Objection to the form.
A. Yes.
Q. And then it says, "Defendant Hadley and another Newark detective and State Trooper Tietjen arrived at that same -- at that Camden address -- at the Camden address." My apologies. "They asked me questions about what the building looked like, what floor my apartment was on, the location of the front and back doors, and how someone would enter and leave the building, and they asked me these questions -- as they were asking" -- strike that. "As they asked me these questions, they were telling me the story they wanted me to repeat about Lee bringing the boys to the apartment and starting the fire."

Page 196

Okay. I read that correctly. Right?
A. Yes.
MR. LIPSHUTZ: Objection to the form.
Q. Do you remember being brought to that location and Detectives Hadley, Tietjen, and Carrega --
A. Yes.
Q. -- asking you questions about --
A. I remember that.
Q. -- the Camden --
A. Somewhat. Yes, somewhat.
Q. Okay. Let's see. At some point later -- I just want to bring you to paragraph 21. It says, "The prosecutor later worked out a deal with me that if I testified against Lee consistent with my video statement, I'd only get ten years and be eligible for parole in two years." Was that right?
A. Yeah, you're right.
Q. Was that the deal that they offered you?
A. Yes.
Q. Was that the deal you got?
A. No.
Q. Okay.
A. I got ten years and did the whole ten.

Page 197

Q. And did the prosecution promise to support your parole efforts after two years and also financially support you when you got released?
A. Yes.
Q. Did they do that?
A. No.
Q. And paragraph 22 lastly is, "I did not want to testify consistent with the video-recorded statement because the statement was false, but I did testify for the prosecution at Lee's trial and again repeated the false statements that were fed to me by Carrega, Hadley, and Tietjen." Do you see that?
A. Yes.
Q. And did you do that?
A. Yes.
Q. All right. Okay. Let's see. Hold on one second. That may be all I have.
And, Mr. Hampton, Lee didn't make you sign this statement, did he?
A. No.
Q. Okay. When's the last time you spoke to Lee?
A. I don't know. I don't remember.
Q. And, sir, isn't it true you -- what exhibit number was this? I'm going to just -- here

Page 198

it is. Yeah.
Do you remember counsel asking you questions about the old police report that's marked as Hampton-3?
A. What's this?
Q. Do you remember reading about that from --
A. Yeah.
Q. -- October 19th, '78?
A. '78, yeah.
Q. Okay. I just want to draw your attention to one line of it. First of all, on October 19th of 1978, you cooperated with the police investigation, didn't you?
A. Yes.
Q. Okay. In fact, they asked you to take a polygraph test. Right?
A. Yes.
Q. And you agreed. Correct?
A. Yes.
Q. And you passed that polygraph test. Right?
A. Yes.
MR. KASSIS: Objection to form.
MS. BONJEAN: I have nothing further.

EXAMINATION BY MR. LIPSHUTZ:
Q. Mr. Hampton, I have some follow-up questions about this affidavit.
A. All right.
Q. Okay?
A. Go ahead.
Q. There's a lot of times that you talk about people in here as "they." Okay? You talk about Carrega and Hadley and I think you mentioned some of the other detectives, Tietjen. I'm asking you a very specific question. What did Hadley do? Tell me exactly what he did and where --
MS. BONJEAN: Objection to the foundation of that question.
Q. What did Hadley do?
MS. BONJEAN: When? Foundation.
Q. When you were picked up and gave your statement on -- the statement that you now claim was coerced. What did Hadley do, Joe Hadley?
A. I couldn't tell you right now. I don't know what he did. I don't know.
Q. How did he coerce you?
A. It was coerced.
Q. Yes, I know.
A. I couldn't tell you exactly word for



word, no.
Q. What did --
A. I don't know.
Q. You don't know what Hadley did.
A. I don't know, but it was coerced, a lot of it was coerced.
Q. What did Hadley do?
A. Who's Hadley right now? Oh, he was the guy last time that was here. Right?
Q. Yeah, the black man.
A. The only time I remember him if I see his face. I don't know him other than that.
Q. Okay. You say in this affidavit that we just marked --
A. Where is he at?
MS. BONJEAN: Give him a line number.
A. Where is he at?
Q. Let's say --
A. Where are you at?
Q. Paragraph 14.
A. 14. Okay. I'm there.
Q. Actually, let me back up a bit.
A. You said 14.
Q. I know. Let me back up a bit.
When you first -- let's look at line --



paragraph 8. Paragraph 8.
A. I'm looking.
Q. You were at the Prosecutor's Office.
A. When I arrived at the Prosecutor Office.
Q. "I was met by two investigators, Lieutenant Carrega" --
A. I don't remember what even happened that time. What date is this?
Q. November 11, 2008. You were met by Jack Eutsey and Lieutenant Carrega.
A. Oh, yeah, I remember Jack Eutsey.
Q. Eutsey.
A. Whatever. He's dead. Right?
Q. Yes.
A. Okay.
Q. Do you remember Jack Eutsey?
A. Yeah, 'cause he used to hang in the bar where my mother was at.
Q. Okay. What race was Jack Eutsey?
A. Black.
Q. Now, it says here you were meeting with Carrega and Eutsey.
The next paragraph says, "Lieutenant Carrega told me they already knew what happened to the boys."



A. Right.
Q. "They told me they knew that Lee Evans had killed the boys." This is paragraph 9.
A. 9.
Q. Now, are you talking about Carrega and Eutsey or Carrega and somebody else?
A. I couldn't separate the two.
Q. Well, you signed this. Who were you referring to?
A. I don't know exactly. I just sign it. Listen, I don't remember. Let me tell you something, I don't remember.
Q. Wait a minute. This is a sworn statement under oath. I'm asking you who is "they"?
A. I don't know who they are. I couldn't separate the two.
Q. Was it Eutsey or Carrega?
A. I don't remember. I can't separate the two.
Q. Was it Hadley?
A. I can't separate it. It's been too long.
Q. Paragraph 11.
A. You're going somewhere else. You're going somewhere else with this right now.

Q. Sir --
A. I can't separate the two.
Q. -- I'm going to ask you questions about this document.
A. I can't separate them.
Q. Well, let's look and see if we can try.
Paragraph 11. "At some point Newark Police detectives came into the interview room. One of the detectives was Joe Hadley who was a black detective. There was another white police officer present who was a State Trooper named Tietjen. Lieutenant Carrega did most of the questioning, but occasionally one of the other detectives would question me, too." Right?
What did Hadley do, did he ask you questions?
A. You're asking me names. I'm telling you, I don't remember the names.
Q. Well, did Hadley ask you questions?
A. I can't separate them.
Q. Okay. So you don't know what Hadley did.
A. No.
Q. Okay.
A. I can't separate them right now.
Q. Okay.



A. It's been too long.
Q. Now --
A. I didn't hang out with him.
Q. Now, you're certain that Hadley was there in that room with you.
A. It was so many of them. There was a lot of them. I can't remember.
Q. Are you certain Hadley was in that room with you?
MS. BONJEAN: Objection to the form.
A. No.
MS. BONJEAN: You've already asked him.
MR. LIPSHUTZ: Please let him answer.
MS. BONJEAN: He's answering.
Q. You don't know?
A. I don't know.
Q. Okay. So you don't know if Hadley was there.
A. If you want to put him there, put him there.
Q. Sir, you've sworn --
MR. VOMACKA: I'm sorry, I can't hear Mr. Hampton. Can I ask you to speak up a little, sir?
MR. LIPSHUTZ: His answer was, if you want to put him there, you can put him there, something like that.



Q. Was Hadley in the room with you?
A. I don't remember, man. Listen, now you're asking me something over and over again, and I don't remember. I don't remember who you're even really talking about because they're not my friends, like you're not my friend. When I leave here, I'll forget about you, him, her, her. I'm done. I'm done. Okay? Don't get it twisted with nothing else. Okay? I don't remember these people. I don't remember none of them. I don't want to know them no more. Okay? I'm done.
Q. Thank you.
A. Okay.
Q. What did Joe Hadley do?
A. I don't know.
Q. Did Joe Hadley coerce you into giving this statement?
A. It was coerced.
Q. I asked you if Joe --
A. I don't know if Joe Hadley did it or what. I don't know. They would come in and say stuff like that when they were questioning me.
Q. What was it that --



A. I didn't know who Carrega was until the time we go to jail.
Q. Who coerced you, was it a white officer or --
MS. BONJEAN: Objection.
Q. -- a black officer?
A. I don't know.
MS. BONJEAN: Objection to the foundation and form of that question.
A. I don't know.
Q. You don't know.
A. No.
Q. Okay.
A. What you want to do? If you want to call him in, or whatever, bring him in the door, maybe I can recognize him or something. I don't know. It's been too long. Forget about it. I'm done. When I leave here, I don't even remember you. How about that? Her neither. Him, her neither. I'm done. I'm out the door. I got too many bills to pay. Just like you gotta pay bills, I gotta pay them, too. Don't get twisted with nothing else. What you do is your profession. What I do with my profession is my profession. What you do with your profession is your profession. What you do with

your profession is your profession.
Q. Why did you write Hadley in this affidavit though?
A. I don't know. You ask me some crazy stuff.
Q. Why did you put Hadley's name in this affidavit that you prepared -- that you signed just like two years ago if you don't know who he is?
MS. BONJEAN: Objection. That misstates his testimony. He didn't say he didn't know who he was. He just identified him as the guy that came to his deposition last time.
A. He was here.
Q. Right. But I'm asking you, what did Hadley do?
A. I don't know.
MS. BONJEAN: Objection, asked and answered, it's argumentative. It's becoming harassing. I know you don't like the answers, but you can't keep asking it over and over again.
MR. LIPSHUTZ: I'll do what I want to do. Okay?
MS. BONJEAN: No, you --
MR. LIPSHUTZ: You don't have the right to tell him not to answer anything. Okay?



MS. BONJEAN: Well, you can do what you want to do, but it doesn't make it correct or --
MR. LIPSHUTZ: I have the right to know what Hadley did and he's not telling me, so.
MR. KASSIS: Well, this is about helping, Mr. Hampton --
A. What can I do about Hadley. I don't know about Hadley. I'll tell you what, I don't want to know who he married to. How about that? Who is his wife? I wouldn't tell you who my wife is. But I don't know, like you probably tell me who my wife is. I don't know.
Q. I don't want to know about your wife.
A. Okay. I don't want to know about Hadley either, how about that.
Q. All I'm asking you is Joe Hadley, I want to know --
A. I don't remember, man. You understand that?
Q. Well, you wrote in this thing a lot of statements about the detectives.
A. No, it's something you want to write.
Q. No, you --
MS. BONJEAN: Objection. Stop fighting with the witness. He testified to -- you're asking



him --
MR. LIPSHUTZ: Please stop it. Objection to form.
MS. BONJEAN: Objection, form. Quit harassing and quit being argumentative. He answered the question.
MR. LIPSHUTZ: Objection to form.
MS. BONJEAN: Don't scream at me, stop.
MR. LIPSHUTZ: You're the one screaming at me.
MR. KASSIS: Let's move on. Enough.
A. All right. You're all yelling at each other. Do what -- I guess you all gotta do what you gotta do. I'm done. I'm really done.
Q. It says here --
A. I did ten years for this shit.
MR. KASSIS: Mr. Hampton, listen to the questions.
Q. Mr. Hampton, let me refer you to paragraph 20.
A. What?
Q. Paragraph 20.
A. What is it? Go ahead, speak. Go ahead.
Q. The last sentence in paragraph 20.
A. I'm listening.



Q. It starts, the last line, "As stated above, I repeated" --
A. I will not charge.
Q. And turn to -- I'm just walking around.
MS. BONJEAN: I turned it.
Q. "I repeated the false narrative fed to me by Carrega, Hadley, and Tietjen, because they threatened to charge me with the murder and promised me that I would not be charged at all if I cooperated with their plan to charge Lee Evans."
Now I'm asking you, what did Hadley feed to you?
MS. BONJEAN: Objection.
A. I wish you would tell me.
MS. BONJEAN: Objection to form.
Q. I'm sorry?
A. I wish you would tell me.
Q. What do you mean?
A. You say what did Hadley feed to me.
Q. It's what you wrote. That's what you signed here.
A. They wrote that. I didn't write none of that shit.
Q. Well, did Hadley feed you anything?
A. He fed me -- it was fed to me. I didn't

Page 211

do none of this.
Q. What --
A. I didn't write none of this.
Q. You didn't write none of this.
A. I didn't write none of that, no.
Q. Do you know who wrote this?
A. I have no clue.
Q. Do you know --
A. Do you know who wrote it?
Q. Did you --
A. Do you know who wrote that?
Q. No.
A. Okay. I don't know either.
Q. Did you sign it?
A. I might have signed it.
Q. Is it truthful?
A. It's truthful.
Q. So what did Hadley feed to you?
A. I don't know who the hell Hadley is right now, because I don't know.
Q. You signed it.
MS. BONJEAN: Objection. Harassing the witness, argumentative.
A. Oh, man.
MS. BONJEAN: He answered the question

Page 212

to the best of his ability. Please.
A. I don't know. It's been too many years. It's been too many years.
Q. In paragraph 22 it says, "Statements that were fed to me by Carrega, Hadley, and Tietjen -- false statements that were fed to me by Carrega, Hadley, and Tietjen." What did Hadley feed you that was false?
A. I don't know.
Q. You don't know? I'm asking you, what did Hadley feed you that was false?
MS. BONJEAN: Objection.
Q. Can you answer the question, please?
MS. BONJEAN: Asked and answered.
A. I said I do not know, no. I don't know.
Q. Did he feed you anything that was false?
A. Tell me what he fed me since you're so, you know, consistent with what you're saying right now. Tell me what he fed me and I can kind of communicate with you on what you're talking about right this moment.
Q. Here's your statement. You tell me in your statement --
MS. BONJEAN: Objection.
Q. -- what Mr. Hadley fed you that was

Page 213

false.
MS. BONJEAN: Objection to the form of that question.
A. I'm not going on with this. We're done.
Q. I'm asking you, what did Hadley feed you?
MS. BONJEAN: You've asked it over and over again. Okay? It's harassing. You need to stop.
MR. LIPSHUTZ: He's not answering the question.
MS. BONJEAN: He said he doesn't know. He doesn't have to answer it the way you want him to.
A. I don't know.
Q. All right. Let me ask you -- I'm going to ask you a different -- not what he fed you. Did he feed you something that was false, Joe Hadley?
A. All of them did, yes.
Q. Okay. But you don't know what Hadley fed you that was false. No?
A. Been too long.
Q. You don't know.
A. Don't know.
MR. LIPSHUTZ: Okay. Thank you. I'm sure the other attorneys have questions.

Page 214

EXAMINATION BY MR. KASSIS:
Q. Mr. Hampton, would it be fair to say that, I think you've already acknowledged this, you did not type this document up that we're referring to.
A. Exactly.
Q. Correct?
A. Correct.
Q. And for the record, it's Evans -- Bates-stamped Evans 6196. Correct?
A. I don't have the form.
Q. Okay. That's just for the record, sir.
A. Okay.
Q. Where did you get this document?
MS. BONJEAN: Objection to the form of that question.
Q. How did this document get presented to you?
A. He just presented it to me.
Q. When's the first time you saw it?
A. Just now. Never seen it.
Q. This document.
A. I might have seen it when I signed it, but I don't remember.
Q. Okay. So --

A. I don't remember. I don't remember this. I really don't.

Q. Look at the last page, sir.

A. I don't remember. I don't remember none of this.

MS. BONJEAN: Just listen to the question.

Q. If you look at the last page, it's dated October 27th, 2020.

A. Oh, God.

Q. Did you see this document on October 27th, 2020?

A. Where we at now?

MS. BONJEAN: Right here. He's just asking you about this statement.

A. I don't remember.

Q. You don't remember seeing this document? Ever? Is today the first day you recall seeing this document?

A. Exactly, yes.

Q. There's signatures that are on there.

A. Yeah. I might have signed it at that time when I got it. I don't remember.

Q. Do you have a recollection of signing it at that time?



A. No.

Q. Do you have a recollection of initialing the individual paragraphs on this document?

A. I initialed a lot of things, but I don't remember exactly what I initialed.

Q. You don't.

A. No.

Q. How is it that this was presented to you to sign?

A. I don't know.

Q. Who gave it to you to sign?

A. I don't know. I still don't remember that name. I got too many other things going on to try and remember this here. This don't work for me. This ain't working for me. If it were working for me, I might remember, but I don't remember.

Q. What do you mean when you say it's not working for me?

A. I mean it don't pay my bills.

Q. Understood.

A. Understood? That's understandable. Right?

Q. Do you specifically recall Lieutenant Louis Carrega coercing you?

A. Yes.



Q. You testified earlier when I initially was asking you questions you didn't even know who he was or what he looked like.

A. I don't remember him. I don't know if I would recognize him now. I think I seen him last time.

Q. Sir, do you remember when I asked you do you recognize the name Louis Carrega and you said no?

A. No, if I see him, I might recognize him, but I haven't seen him.

Q. I asked you if you recognized the name and you said no.

A. I said no, I don't recognize -- I recognize the name, yes.

Q. Now --

A. I don't know what he look like.

Q. What did he specifically do -- did he coerce you?

A. Yeah.

MS. BONJEAN: Objection, asked and answered.

Q. What did he specifically do?

A. Yeah.

Q. What did he specifically do?



A. I don't remember exactly. He did police work, that's what he did.

Q. He what?

A. Did police work.

Q. He did police work.

A. Yes.

Q. So he's guilty because he's a cop.

MS. BONJEAN: Objection to that inappropriate question. He's guilty? Are we talking about Carrega's guilt right now?

A. I don't know how you deal with all this crazy. I don't know.

Q. You told us before you were represented by attorneys at your sentencing hearing and at the plea hearing. Correct?

A. Yes.

Q. Did you ever tell Mr. McMahon that you were coerced to give that confession in November 2018?

A. I don't know. I don't remember. I'm telling you I don't remember. All them years, come on man.

Q. Did you ever tell --

A. No.

Q. -- the other attorneys that you were

Page 219

coerced to give the statement --
A. I don't know.
Q. -- that you gave in November 2018?
A. I don't remember. I was coerced though.
Q. Did you tell your attorneys that?
A. I don't know. I don't remember. I don't remember.
Q. Did you tell Judge Costello -- do you know who Judge Costello is?
A. The lady judge?
Q. Yes.
A. Yes.
Q. Did you ever tell her that you were coerced in giving the statement?
A. No. Not that I remember. Not that I know of. I don't remember though.
Q. Would it be fair that the only two times you ever told anybody you were coerced was when you signed this affidavit, which is Bates-stamped 6196 --
A. I was coerced. I was really coerced though, yes.
Q. The first time you told anybody you were coerced is when you were asked to sign this document that starts with the Bates-stamp Evans 6196.

Page 220

MS. BONJEAN: Objection. Also misstates the record.
A. Yes.
Q. And I'm going to show you what we referred to earlier as Hampton-9. Hampton-9 was the voluntary statement of Philander Hampton taken by Investigator Maxwell Martins. Was that the first time that you told someone you were coerced to give your statement?
A. I don't remember.
Q. Do you know which document I'm holding up in my hand?
MS. BONJEAN: Objection, asked and answered.
Q. Do you know what document that I'm holding up in my right hand currently?
A. No.
Q. This document has been identified as Hampton-9. It's titled Voluntary Statement of Philander Hampton taken by Investigator Maxwell Martins. You don't remember giving this statement correct?
A. No.
Q. So would it be fair to say you don't remember whether this was the first time or not you

Page 221

told someone you were allegedly coerced to give your statement -- confession?
A. I don't remember.
Q. You don't remember. Other than Hampton-9 and the affidavit of Philander Hampton which we just went over Bates-stamped 6196, that's the first page, is there any other document that memorializes your allegation that you were coerced to give a false statement?
A. Who coerced --
MS. BONJEAN: Objection to the form of that question.
Q. You don't understand the question?
A. I don't understand what you said.
Q. Okay. Other than these two documents, sir, is there any other document --
A. I don't know.
Q. -- that --
A. Don't ask me about no paper. I don't keep no paper. I don't keep that kind of stuff.
Q. Who else did you tell that you were coerced to give that statement?
A. I don't know. It's been a hundred years. How many years it's been? It might be old as you. I might have been 22, some shit like that,

Page 222

when it happened. How many years it been?
Q. Sir, you're making serious allegations against individuals --
MS. BONJEAN: Objection. Stop editorializing. Stop editorializing. I object to the --
MR. KASSIS: Are you making an objection?
MS. BONJEAN: I'm objecting to the form.
MR. KASSIS: I'm trying to determine -- let's move on.
MS. BONJEAN: Object to the form. Stop editorializing and lecturing people and harassing this witness. It's enough.
Q. Who are the individuals that you told that you were coerced to give the statement --
A. I don't know. You tell me.
Q. -- in November 2018?
A. Oh, man.
MS. BONJEAN: I'm going to object to the asked and answered.
Q. You don't know, sir?
MS. BONJEAN: He said he doesn't know.
A. That's how you guys make your money.
MR. KASSIS: I don't have any questions.

Page 223

MR. LIPSHUTZ: Hold on, sir.
A. I understand.
MR. LIPSHUTZ: Hold on a second.
Jim, you don't have any questions?
MR. KASSIS: No.
MR. LIPSHUTZ: Michael?
MR. VOMACKA: I've got a couple of follow-up.
MR. LIPSHUTZ: Hold on a second.
MR. VOMACKA: Can you turn the camera?
MR. LIPSHUTZ: It's not pointed. Hold on a second. Can you see him?
THE WITNESS: Yeah, I see him.
MR. LIPSHUTZ: Go ahead, Mike.
EXAMINATION BY MR. VOMACKA:
Q. All right. Mr. Hampton, so I just want to explain one of my questions before.
MS. BONJEAN: I'm going to object.
MR. LIPSHUTZ: Please, let him ask a question first. Okay?
Q. Yes, I'm just going to explain what I'm asking you, then I'll present the question.
So earlier in this deposition, I asked you some brief questions about Defendant Tietjen. And at that time, my understanding -- I might have

Page 224

misunderstood and you can explain. My understanding at that time was that you were saying you didn't remember any involvement with him or any interactions with him or any conversations. So I'm going to ask you -- first I'll ask that again. I understand from my point of view you've asked and answered these questions, but I'm a little confused about your answers.
A. Okay.
Q. So I'll first ask, do you remember Defendant Tietjen?
A. Who?
Q. Do you remember Defendant Tietjen?
MS. BONJEAN: I'm going to object to the form of that question. His first name is not Defendant, so.
Q. I also said Trooper Tietjen.
A. I don't know. Who is he? Show him to me.
Q. All right. And I'm going to ask again, do you remember what he looks like?
A. No.
Q. Okay. Do you remember any specific conversations with him?
A. No.

Page 225

Q. Do you remember any other communications with Tietjen? So that you understand, I mean letters or phone calls, things like that.
A. No.
Q. Okay. Aside from the things that I just talked about, do you remember any other interactions with him?
A. No.
Q. Okay. So let me ask you a question or two about the statement that you were just looking at. So in that statement, you talked about how Defendant Tietjen was present. So let me ask you, do you remember when Defendant Tietjen was present for the statement that you gave to Newark Police detectives around November 11th, 2008?
A. You already got the date. You already know.
MS. BONJEAN: I'm going to object. This was asked and answered.
MR. VOMACKA: I don't believe I've asked that or that question was asked about Defendant Tietjen, but maybe I misunderstood and I'll restate it.
Q. As to Defendant Tietjen, do you remember when he appeared, when his involvement started back

Page 226

then?
A. I don't keep up with that kind of stuff, man. Come on, man, you're doing too much.
Q. I understand. You can tell me that you don't remember.
A. I don't. I don't remember that.
Q. So I apologize if I'm asking some of these things that may seem obvious.
MS. BONJEAN: Just ask the question. Just ask the question.
A. I don't keep up with that kind of stuff. I gotta be retarded to keep up with stuff like that.
Q. I understand. Please just let her make her objections and I'll try to continue.
A. Okay.
MS. BONJEAN: I'm going to ask that you not editorialize. Ask a question.
MR. VOMACKA: I think that's appropriate for me to explain why I'm asking certain questions to Mr. Hampton.
MS. BONJEAN: It's not.
A. I explained already.
MR. VOMACKA: I apologize if it seems like editorialization. I'm just trying to get to the question and the information we're asking about.

Page 227

So I'll continue moving forward.
Q. So my next question relates to the conversations that you had on that date, specifically, November 11th, 2008. So do you remember who was the primary person asking the questions on that day?
A. No.
Q. Okay. Do you remember any questions that day that Defendant Tietjen asked?
A. Okay. No.
Q. I'm sorry, sometimes it must be the remote. Did you say no?
A. Yeah, I said no.
Q. Okay. Thank you. Do you remember anything that defendant Tietjen promised you on that day?
A. No.
Q. Okay. Do you remember any -- if he gave you any documents to sign on that day?
A. Oh, come on, man.
Q. You can just -- sorry, go ahead.
A. No.
Q. Okay. When you talk in your statement about promises from the prosecution, so if you want to look at the statement I'll refer you specifically

Page 228

to paragraph 21, but I'll read it as well to save you time if you prefer.
So in 21 you say, "The prosecution later worked out a deal with me that if I testified against Lee consistent with my video statement, I would get only ten years and be eligible for parole in two years. Prosecution promised to support my parole after two years and financially support me upon my release." There's a following portion that's crossed out.
So my question to you is, do you remember if Defendant Tietjen was involved with that, that promise from the prosecution?
A. I don't know. I don't know. No, I don't know.
Q. You don't remember what he said?
A. No.
Q. Okay. Next, there's some contents, and this is sort of throughout that, about false statements that were given to you. Do you remember if any of those false statements were specifically from Defendant Tietjen?
A. I don't know.
Q. Okay. Do you remember any actions specifically that Defendant Tietjen took to coerce

Page 229

you when you were giving this statement? I'm sorry, I should clarify. When I say "this statement," I mean the statement to detectives, not the written statement. So do you remember anything like that?
A. No.
MR. VOMACKA: All right. I think I can pass the witness.
MR. LIPSHUTZ: I have one more follow-up.
THE WITNESS: No, I'm done.
MR. LIPSHUTZ: I have one more follow-up, sir.
THE WITNESS: I'm done.
EXAMINATION BY MR. LIPSHUTZ:
Q. I asked Joe Hadley to turn on his video so you could take a look at him. Okay? Can you see him?
A. Yeah, I see him.
Q. Did you have a chance to look at him?
A. Yeah.
Q. Do you recognize him?
A. He's sitting too far away.
Q. Would you like me to bring it closer?
A. I said he's sitting too far away.
MR. LIPSHUTZ: Can you bring your

Page 230

picture a little closer, Joe? You're appearing by video.
A. Now I recognize him, yes.
Q. You do recognize him.
A. Yes.
Q. Now that you've had a chance to look at him, now that you've seen him, can you tell me, sir, what did Joe Hadley do --
MS. BONJEAN: Objection.
Q. -- to --
MS. BONJEAN: Objection. This is so inappropriate.
A. You're taking it too far.
Q. Excuse me.
A. You're going too far.
MS. BONJEAN: Asked and answered.
Q. Excuse me.
A. This is not what --
Q. Excuse me.
A. Go ahead.
Q. Let me ask my question and you can get out of here sooner. Okay?
A. Okay. Go ahead.
Q. You said you didn't know what Joe Hadley looked like.


Veritext Legal Solutions
800-227-8440 973-410-4040

Page 231

MS. BONJEAN: Objection, misstates his prior testimony.
Q. Now that you look at him --
A. You're talking about following people.
Q. One question. One question.
A. I don't follow nobody but me.
Q. What did Joe Hadley do --
A. I don't know.
MS. BONJEAN: Okay. He answered it.
A. I don't know.
Q. You don't know? Did Joe Hadley coerce you to confess to the murder of the five boys, did Joe Hadley do that?
A. I don't know. I don't remember. See, I don't remember all these names, you know. You're talking about I'm walking around and we hang out together. I don't hang out with him. I don't hang out with you. I don't hang out with nobody in here. Right or wrong? I don't hang out with nobody in here. I don't remember all this shit a hundred years ago. Come on, man, I'm not crazy. I won't convict myself. That's stupid as hell. I don't remember him. I don't follow him. He's not my friend.
Q. I didn't ask you --

Page 232

A. He don't hang with me.
Q. I didn't ask you if he was your friend.
A. I don't know a name till you bring it up to me.
Q. That's why I put his picture up on there.
A. Okay. Now you're going somewhere else with it. I don't remember him doing anything at that point in time. Too far back for me. You went too far -- you're too far back. You're going too far back, too many years. I don't know what the hell he said then. I don't know what the hell he said just then if he said anything. I don't know what the hell you said a minute ago. How about that? Now, let's get the fuck out. You're going too far now. Let's get the fuck out.
MS. BONJEAN: Okay. Let's -- any more questions?
Q. So is it fair to say sitting here today --
A. What you said a minute ago? What you said a minute ago?
MS. BONJEAN: This is not okay.
Q. Is it fair --
MR. LIPSHUTZ: Excuse me, this is a

Page 233

subpoenaed witness.
MS. BONJEAN: You are badgering him. You are harassing him. You have asked the questions over and over again about specifically what Hadley did, and he's answered them.
MR. LIPSHUTZ: This is not appropriate.
MS. BONJEAN: No, you're not appropriate.
THE WITNESS: I answered it correctly. I think I did.
MR. KASSIS: Let's just get this done, Mr. Hampton.
THE WITNESS: I answered everything he asked.
MS. BONJEAN: He keeps asking the same questions.
MR. KASSIS: It's a few questions. He can answer them.
Q. Mr. Hampton --
MS. BONJEAN: He's not my witness. Ask your questions. I don't have any control over it.
MR. KASSIS: Jen, let him ask the question and he can answer.
THE WITNESS: He just keeps going over and over again. I'm done with it.

Page 234

MR. KASSIS: Let's get a clean record. Just let him ask the question and you answer it, sir.
MS. BONJEAN: Ask.
Q. So now that you've seen his face on this video today --
A. I don't know what he said twenty years ago.
Q. Let me finish my question, sir.
Now that you've seen his face, you don't recall anything that he did to coerce you into giving -- into confessing to the murder of the five boys?
A. No.
MR. LIPSHUTZ: Thank you. That's all.
Okay. Thank you. You're done. Unless anybody else has any final thing.
(Deposition adjourned at 1:15 p.m.)

J U R A T

I DO HEREBY CERTIFY that I have read the foregoing transcript of my deposition testimony and I certify that it is true and correct to the best of my knowledge.

______________________________________

PHILANDER HAMPTON

SWORN AND SUBSCRIBED
BEFORE ME ON THIS _______
DAY OF __________2022
____________________________________
Notary Public of the State of



ATTACH TO DEPOSITION OF: PHILANDER HAMPTON
IN THE MATTER OF: EVANS vs. NEWARK CITY
DATE TAKEN: FEBRUARY 15, 2022

E R R A T A S H E E T

INSTRUCTIONS: After reading the transcript of testimony, please note any change, addition or deletion on this sheet. DO NOT make any marks or notations on the transcript itself.

Please sign and date this errata sheet and return it to the court reporter whose name is shown below.

PAGE LINE CHANGE

DATE and SIGNATURE: __________________________

RETURN TO: MARY ANN ADAMS, C.C.R.
Veritext/Doerner & Goldberg, Inc.
290 West Mt. Pleasant Avenue
Livingston



CERTIFICATE

I, MARY ANN ADAMS, a Certified Court Reporter and Notary Public of the State of New Jersey, License No. X101026, do hereby certify that prior to the commencement of the examination, PHILANDER HAMPTON was duly sworn by me to testify as to the truth, the whole truth, and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place, and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

Mary Ann Adams, C.C.R.
Notary Public of the State of New Jersey
My Commission expires August 10, 2024

**&**

**&** 68:13,19 236:21

**0**

**00120** 66:2
**07102** 68:8
**07932** 68:15
**08625-0112** 68:22

**1**

**1** 73:6 84:2 89:4,5 90:15 137:25 161:3 177:14
**1-10** 66:16 67:6
**10** 70:22 129:20,22 168:20,24 237:23
**10/3/2011** 70:22 168:21
**100** 103:21
**10022** 68:3
**1018** 74:3
**103** 70:13
**1036** 90:19
**1038** 74:4,5
**1041** 168:25 177:15,21
**1061** 169:1
**10:20** 67:16
**11** 70:23 131:6,16 140:13 149:7 184:24 185:10 189:15,25 201:9 202:23 203:7
**11/16/2011** 70:16 117:18
**112** 68:21
**114** 70:14 162:16 163:2,6
**117** 70:16
**11th** 225:15 227:4
**12** 82:5,6 118:21 127:2 133:2,21 190:16,16
**1230** 74:2
**125** 70:17
**126** 70:19
**12th** 127:3 128:25 188:2
**13** 73:23 74:5,9,14 76:11,12,13 78:21 95:21 96:2,3 118:18,21 125:22 127:1,2 136:22,22 191:13
**13th** 127:4
**14** 82:5 118:22 192:12 200:20,21 200:23
**15** 67:15 83:22,25 84:13 118:4 137:23,25 138:21 192:22 236:3
**157** 70:20
**16** 117:21 146:13 146:14 172:24,24 193:15
**160** 70:21
**168** 70:22
**17** 119:12 136:22 142:14
**174** 70:4
**179** 70:5
**17:00** 109:6
**18** 106:5 155:22,23 156:21
**181** 70:5
**184** 70:23
**19** 89:6,7,25 90:7 90:19,20 104:4,8 105:14 130:23 138:23,23 142:16
**1956** 104:16
**1978** 73:22 78:22 104:6,8 105:14 107:2,4 108:4 109:6,12 113:1,2 130:3,11 133:13 133:16 198:13
**199** 70:6
**1999** 115:22,25
**19:00** 112:12,13
**19th** 184:3 198:9 198:13
**1:15** 234:18

**2**

**2** 70:12 74:15 86:12,13,15 87:15 87:16 91:22 92:18 92:19,20 111:1,2,2 133:21 154:4 170:20,21
**20** 84:14 91:22 96:25 209:20,22 209:24
**2008** 121:13 125:22 126:6 128:4,6,25 146:22 152:11 153:18 156:15 166:15,25 188:2 201:9 225:15 227:4
**2011** 87:7 117:21 167:3 168:25 169:11 170:20 176:11 177:3
**2017** 70:21 160:23 160:24 164:19
**2018** 218:19 219:3 222:18
**2020** 182:2 184:3 186:6 215:9,12
**2022** 67:16 235:19 236:3
**2024** 237:23
**20th** 71:5 78:22 107:2,4,17 109:6 109:12 130:3 133:13,15
**21** 78:22 96:24 97:1,2 104:14,15 138:23 142:17 196:13 228:1,3
**214** 70:6
**22** 98:22,24 116:2 186:1 197:7 212:4 221:25
**220** 68:14
**223** 70:7
**229** 70:7
**23** 78:21 139:18,19 156:21,22 185:24
**24** 142:24 143:1
**24th** 115:22
**25** 68:21 118:2 139:6
**26** 118:1,2,3,3,18 119:11
**27** 118:2 120:3
**271** 104:18 130:13
**27th** 186:6 215:9 215:12
**290** 236:22
**2:14** 66:2
**2a** 87:17,18,25 92:22,24,25

**3**

**3** 70:13 95:19,20 95:21,22,25 96:1 103:6,7,20 127:11 131:16 177:3 198:4
**30** 145:19,20 176:11

**30th** 87:7 90:17
**31** 147:24 148:3,4
**316** 68:8
**3rd** 90:18 168:25 169:10

**4**

**4** 70:14 87:1,1,2,2 87:3,3 96:22,23 114:5 115:8 129:23,24,25 166:4,5,6,7,8
**4th** 104:16

**5**

**5** 70:16 74:15 109:7,11,11 117:17,20 145:21 145:22 146:13 161:13,14,20,21 161:22,25 164:17 170:18,19 194:14
**539-1000** 68:15

**6**

**6** 70:17 125:18,21 126:4,22 127:13 127:14 139:22,23 140:6 164:19 166:15
**609** 68:22
**6196** 183:15 185:6 214:10 219:20,25 221:6
**633-7786** 68:22
**65** 86:7

**7**

**7** 70:19 89:8,9,25 90:3,4,21,23,23 106:20 112:13 125:24 126:1 129:3,4,6,18 143:4 187:24,25
**71** 70:4
**717** 184:6
**718** 68:4
**733-5945** 68:9
**74** 153:25 154:1,2
**750** 68:3
**78** 198:9,10
**79** 155:20 156:1,19

**8**

**8** 70:20 135:5 157:16,19,21 201:1,1
**8097** 237:22
**80s** 137:1
**8120** 184:6
**86** 70:12
**875-1850** 68:4
**8:18** 128:25

**9**

**9** 70:21 115:12,13 115:14,18,21 140:10 160:22,24 161:21 187:21,22 188:14 202:3,4 220:5,5,19 221:5
**920** 67:14 68:8
**95** 103:21 106:19
**973** 68:9,15
**99** 120:5
**991** 68:14
**9th** 68:3

**a**

**a.m.** 67:16
**ability** 212:1
**able** 71:22
**accept** 173:16
**acceptable** 180:2
**accepted** 173:15
**account** 184:4
**accurate** 91:21 100:20 146:19 186:23 187:14 190:6 192:4,6 237:10
**accurately** 75:14 76:17 82:15,19 84:24 85:2 97:10 109:9 111:11 120:15 146:15,18
**accusation** 167:6
**acknowledge** 129:16
**acknowledged** 214:3
**acting** 66:18
**action** 237:15,18
**actions** 228:24
**adams** 67:12 236:21 237:3
**addition** 236:5
**address** 79:20 195:5,15,16
**adjourned** 234:18
**advised** 116:5,18 116:20
**affidavit** 199:3 200:13 207:3,7 219:19 221:5
**affirm** 154:13
**afternoon** 188:1
**agencies** 167:5,7 168:9
**agent** 66:24
**aggressive** 191:17
**ago** 94:5,20 95:17 102:19 103:1,2 116:1 127:24 182:2 207:8 231:21 232:14,21 232:22 234:8
**agree** 182:23
**agreed** 96:5 191:3 193:7,16 198:19
**ahead** 73:18 81:12 82:4 95:8,24 119:1,4,5 142:25 147:20,25 148:2 152:6 153:4 166:20 172:11 189:24 199:6 209:23,23 223:14 227:21 230:20,23
**aid** 104:24 105:1 105:14
**ain't** 153:4 216:15
**airport** 108:7,8 127:25
**allegation** 221:8
**allegations** 222:2
**allegedly** 221:1
**amendment** 172:8 172:9,10
**angel** 66:14
**ann** 67:12 236:21 237:3
**answer** 71:15,22 75:4,20,22 76:16 78:2,24 79:2 84:14 88:15,16 91:6,10,15,18 93:4 94:2,2,4 99:7 111:24 114:18 118:11 119:14,22 120:5,9 121:21 124:15 131:1,19 132:11 133:11,14 133:17 134:1 138:9 139:4 140:8 140:12,15 141:10 143:3,5,7,11 146:1

147:7 148:16 149:14 151:19 152:12,20 154:9 154:12,14,17,20 156:5,7 161:18 165:10,25 167:11 168:13 171:1,16 171:22 172:6,11 174:3 179:24,25 180:2 194:22 204:13,25 207:25 212:13 213:13 233:18,23 234:2
**answered** 82:8,10 93:5 95:9 109:22 143:24 168:1,2 170:11 183:2 207:18 209:5 211:25 212:14 217:22 220:14 222:21 224:7 225:19 230:16 231:9 233:5,9,13
**answering** 204:14 213:10
**answers** 91:20 95:6 207:19 224:8
**anybody** 72:11 102:25 125:11 137:15 173:21 180:23 219:18,23 234:17
**anybody's** 102:23
**anyway** 99:6 163:16 173:17 180:10
**apartment** 188:24 190:23 194:8,13 195:18,24
**apologies** 195:16
**apologize** 226:7,23
**appeared** 225:25
**appearing** 230:1
**appreciate** 105:22 105:25 185:21
**approaching** 178:3
**appropriate** 226:18 233:6,8
**approximately** 109:6,11 115:25
**argumentative** 98:9 117:1 157:3 207:18 209:5 211:23
**arrived** 195:15 201:4
**ashley** 182:4 186:10
**aside** 108:16 121:10 225:5
**asked** 74:10 75:1 84:22 89:25 90:2 91:3 92:15 120:9 136:21,22,24 138:19 143:23 151:10 158:23 164:9 168:1 169:23,25,25 183:1 184:20 186:22 187:6 191:2 195:16,20 195:22 198:16 204:12 205:21 207:17 212:14 213:7 217:7,12,21 219:24 220:13 222:21 223:23 224:6 225:19,20 225:21 227:9 229:15 230:16
233:3,14
**asking** 73:20 83:7 92:11 110:4 123:22 128:1,3 138:24 139:24 151:1 153:8,18 163:17 168:14 195:21 196:8 198:2 199:10 202:14 203:16 205:5 207:14,20 208:16,25 210:11 212:10 213:5 215:15 217:2 223:22 226:7,19 226:25 227:5 233:15
**asks** 130:10 145:23 162:12
**assist** 190:21
**assistant** 66:19,21
**attach** 236:1
**attention** 121:9 182:1 187:17,20 198:12
**attorney** 71:8,12 71:16 89:18,19,21 97:5 176:14,24 177:10 237:14,16
**attorney's** 176:17
**attorneys** 68:5,10 68:16,23 71:23 174:17 178:7,10 178:13 213:25 218:14,25 219:5
**august** 78:22 87:7 90:17 107:2,4,17 109:6,12 130:3 133:13,15 176:11 237:23
**ave** 162:20
**avenue** 68:3,14 111:5 162:16,25 163:2,6 236:22
**aware** 176:13
**awhile** 75:8

**b**

**back** 81:6,14 82:13 84:17,20 86:1 89:4 92:17 92:22 106:15,23 108:4 112:11 118:2 122:24 130:11 133:12 135:19 147:10,11 147:12,15,16,21 147:22 148:5,6,7,9 162:9 170:9 182:2 183:5 194:11 195:19 200:22,24 225:25 232:9,10 232:11
**bad** 115:15
**badgering** 233:2
**bar** 201:17
**barracks** 127:17 127:21 128:5 130:25 131:8
**based** 183:8
**basketball** 111:4 111:20 112:7 113:11
**bates** 74:1 103:21 177:14 185:4 214:10 219:19,25 221:6
**becoming** 207:18
**begging** 159:12
**beginning** 162:11 169:13

**believe** 73:23 78:15 80:13 99:24 100:15 107:11,16 112:22,25 117:10 129:11 132:14 134:6,18 137:7 139:10 144:1,6 146:24 148:24 149:22 154:16,16 156:14 178:18 225:20
**believed** 116:20
**believes** 158:8,13
**bell** 183:22
**benefit** 72:3 105:12
**bergen** 148:9
**best** 94:1,2 179:3 212:1 235:7
**better** 80:7
**bey** 104:13 105:9
**bills** 101:20 126:11 159:3 185:16 206:20,21 216:19
**birth** 104:16,19 163:9
**bit** 72:5 163:21 181:11 200:22,24
**black** 104:15 189:17 200:10 201:20 203:9 206:6
**blazing** 149:15
**block** 119:16
**blonde** 182:4
**bm** 104:14
**bonjean** 68:2,2 69:2 70:5 71:25 72:11,20 73:7,9,13 73:17,25 74:7,21 75:15 76:18 77:2 77:5 78:18 80:2 80:19 81:12 82:16 88:4,22 90:9,12,16 92:3 95:5 97:18 98:2,6,9,21 99:14 99:19 100:22 101:3,7 102:8,12 103:12 105:19,24 106:8 107:19 109:19,22 110:20 113:4,23 114:17 114:21 116:25 117:8,12 118:16 118:20,25 119:4,9 121:16 122:4,17 123:3,5,9 124:16 124:18,25 125:4,9 125:13 128:13,16 128:19 129:14 130:17 132:13,16 134:9,21,23 136:4 137:10 138:14 139:15 140:2,4 141:14,19,23 143:16,19,23 144:4,19,23 145:6 148:16 151:6,12 151:14,17 156:17 157:1,3,25 158:3 158:10,12 160:10 160:13,15 161:21 164:7 165:23 168:1 169:5,9 170:6,11 171:15 171:21 172:2,5 175:5,15 180:23 181:3,4,5 183:12 183:15,17,20,25 184:9,14,18,22 185:6,8 194:22 198:25 199:13,16 200:16 204:10,12 204:14 206:5,8 207:9,17,23 208:1 208:24 209:4,8 210:5,13,15 211:22,25 212:12 212:14,24 213:2,7 213:12 214:15 215:6,14 217:21 218:8 220:1,13 221:11 222:4,9,12 222:20,23 223:18 224:14 225:18 226:9,16,21 230:9 230:11,16 231:1,9 232:17,23 233:2,7 233:15,20 234:4
**bonjeanlaw.com** 68:4
**booker** 66:7 68:11
**bottom** 88:8,10 97:14 103:20 104:7 106:4 107:25 139:3,4 142:23 166:10,11 186:3 191:14,15
**box** 68:14,21 152:8
**boys** 74:17 81:19 82:6 84:15,17 100:6 109:7,13 113:13 116:10 120:10 131:20,23 139:25,25 140:6 140:18 143:14 144:18 145:4,10 145:25 155:18 160:2 169:15,21 170:15 172:1 188:8,18,20,22,22 188:24,25 189:10 190:20,23,24 191:24 192:15 193:10 194:6,8,10 194:11 195:24 201:25 202:3 231:12 234:13
**break** 126:9,15 140:13 153:14,15 153:17
**breaking** 75:5 76:5 141:13,13 142:2,11,12
**bricks** 108:24
**brief** 179:24 223:24
**bring** 121:9 195:9 196:13 206:15 229:23,25 232:3
**bringing** 188:24 195:24
**broad** 67:14 68:8
**broke** 140:8,11,18 141:1,4,5 142:14 143:14
**brother** 136:16,17 136:17,24 137:1
**brought** 72:15,17 128:8,8 147:12 175:9 187:7 188:4 188:6 190:23 194:8 196:4
**building** 194:15 195:17,20
**bullshit** 154:21,25
**bunch** 142:18,19 143:4
**bur** 153:1
**bureau** 104:24 105:1,14

**burned** 80:1 194:15

**c**

**c** 68:1 79:3
**c.c.r.** 236:21
**call** 206:15
**calls** 225:3
**camden** 76:1 79:9 79:10,13,19,20,22 80:1,17 128:12 130:12,25 131:7 131:21 136:2,7 138:12 188:24 190:23 194:9 195:4,15,16 196:10
**camera** 179:16 223:10
**campbell** 128:11
**candor** 79:2,4
**capacities** 66:17 67:7
**capacity** 66:8,9,10 66:12,13,14,15,19 66:20,22,23,24,25 67:2,4,5
**car** 148:8,10,11 193:17,24 195:6
**card** 70:20 157:17 157:20 158:15
**carrega** 66:22 68:17 121:14 123:14 127:16 128:7 130:2,7,10 130:16,22 131:4 131:11,17 132:4,7 133:3 134:3,7 135:5 136:22 137:7,8,25 138:25 139:11,24 140:10 143:9 144:2 145:23 146:21 149:12 154:4,11 154:15 166:17,24 167:15 174:25 175:2 188:17 189:1,9,9 190:3,3 191:17,19,20 192:1,13,16 193:18,21 194:2 194:19 195:3,9 196:6 197:12 199:9 201:6,10,22 201:23 202:5,6,17 203:12 206:1 210:7 212:5,7 216:24 217:8
**carrega's** 218:10
**case** 66:2 119:21 158:8 175:13 182:20,23
**cassian** 138:4,5 147:5
**cause** 75:8 81:5,17 81:21 82:23 83:10 99:4 105:23 152:13 159:4 172:17 173:24 185:13 201:17
**certain** 167:24 204:4,8 226:19
**certificate** 237:1
**certified** 67:12 237:3
**certify** 235:4,6 237:5,9,13
**chance** 98:17 112:7 229:19 230:6
**change** 236:5,9
**charge** 210:3,8,10
**charged** 192:1,2 192:18 193:9 210:9
**charges** 171:20
**cheryl** 66:21
**chevy** 148:10
**christopher** 66:23
**ci.newark.nj.us** 68:9
**circled** 88:6,15
**circling** 88:16
**city** 66:7 67:14 68:6,10 236:2
**claim** 199:18
**clarified** 130:13
**clarify** 229:2
**clean** 234:1
**clear** 127:1 193:4 194:2
**clearly** 78:10
**clinton** 111:5
**closer** 229:23 230:1
**closet** 194:12
**clue** 80:4 89:1 99:23 108:15 113:3 122:24,25 125:5 134:22 135:1,2 150:16 153:4 211:7
**coach** 193:23
**coerce** 165:13,20 199:22 205:18 217:19 228:25 231:11 234:11
**coerced** 149:24 150:1,4,11,12,13 150:14,17,21 151:4,11 152:11 153:11 194:24 195:1 199:19,23 200:5,6 205:20 206:3 218:18 219:1,4,14,18,21 219:21,24 220:8 221:1,8,10,22 222:16
**coercing** 216:24
**coffee** 127:16
**cohen** 182:4 183:5 186:10
**come** 118:24 122:15 182:14 205:23 218:21 226:3 227:20 231:21
**comes** 164:14
**coming** 81:6 159:6 182:10
**commencement** 237:6
**commencing** 67:16
**commission** 237:23
**commit** 87:21,25 93:2
**communicate** 212:20
**communications** 225:1
**compel** 165:21
**completely** 167:3
**computer** 72:4 105:23 106:1,3
**condition** 138:1
**condolences** 136:15
**confess** 116:22 120:12 231:12
**confessed** 144:18 145:6

**confessing** 234:12
**confession** 218:18 221:2
**confirm** 186:22
**confirmed** 187:13
**confused** 141:9 224:7
**confusing** 148:15
**connected** 177:24
**connection** 71:6 165:13 181:12
**consented** 188:8
**consistent** 196:15 197:8 212:18 228:5
**construction** 109:1,2
**consult** 71:8
**conte** 104:13
**contents** 228:18
**continue** 105:17 107:21 110:18 112:5,9 113:7,12 116:17 135:4 137:12 142:13 226:14 227:1
**continued** 116:19 190:21
**continues** 116:8 133:12 147:14 149:4
**continuing** 131:16
**control** 233:21
**conversation** 120:8 125:2,3,6,7
**conversations** 180:13 183:8 224:4,24 227:3
**convict** 191:22 231:22
**coolbaugh** 69:2 184:2
**cooperate** 191:25
**cooperated** 198:13 210:10
**cop** 218:7
**copies** 73:11 184:13
**copped** 173:9
**copy** 73:10,12,16 119:2,3 169:3,5 184:17
**corner** 88:9,11,12 146:10,16
**correct** 91:1 97:17 131:2 169:17 176:4,15 177:7 179:1 182:24 187:4 189:13 192:10 193:1,13 198:19 208:2 214:7,8,10 218:15 220:22 235:6
**correctly** 75:23 91:11,12,25 92:2 92:12,14 120:18 171:2 196:1 233:9
**correglia** 167:15
**cory** 66:7 68:11
**costello** 167:1 219:8,9
**counsel** 70:25 184:5 198:2 237:14,16
**count** 94:22
**counts** 86:18 94:11 100:5
**county** 66:17,18 166:25 167:2,12 173:2,19,20,22 174:1 187:8 188:3
**couple** 179:25 185:18 187:17 194:8 223:7
**course** 184:2
**court** 66:1 67:12 71:19 72:3 87:23 105:11 112:7 121:21 151:23 152:8 167:1,2 170:22 171:7,10 171:18 172:1 194:23 236:8 237:3
**cousin** 84:16 86:2 107:2,3,17 110:1,6 115:23 188:18
**cover** 174:22 177:17
**covered** 174:21
**crazy** 152:22 207:4 218:12 231:21
**criminal** 167:4 168:9
**crossed** 228:10
**cucinello** 66:21
**cup** 127:15
**currently** 220:16
**custodial** 96:8,12 96:18
**custody** 174:7,8 193:11
**cv** 66:2
**cycle** 185:5

**d**

**d** 66:18 79:3 104:14
**darnel** 66:12 68:11
**darryl** 109:8,13 110:2,3,4,6
**date** 104:16,19 128:25 130:2 163:9 164:12,15 186:5 201:8 225:16 227:3 236:3,7,20 237:12
**dated** 215:8
**day** 79:15,16 95:6 107:3,4,18 116:13 122:3 130:4,6 215:18 227:6,9,16 227:19 235:19
**dead** 114:10,11 115:9 136:12 201:13
**deal** 196:14,20,22 218:11 228:4
**december** 104:16
**defendant** 68:16 68:23 178:11,14 195:13 223:24 224:11,13,16 225:12,13,21,24 227:9,15 228:12 228:22,25
**defendant's** 73:6
**defendants** 67:8 68:10
**defender** 89:18,19
**defense** 97:5
**definitely** 183:17
**defrancisci** 67:3
**degrees** 101:18
**deletion** 236:6
**denied** 116:9,13
**denying** 191:21
**department** 67:14 68:7,19 114:23,24 116:7 122:23 124:6,8,10

**deposition** 66:5 71:6 72:23 73:19 165:9 169:20 207:12 223:23 234:18 235:5 236:1
**describe** 169:4
**description** 70:11
**detail** 187:11
**detective** 66:9,11 66:12,13,22,23 67:1,4 68:10,11,24 70:13,14 103:7,24 104:1,12,13,13 105:8,9 114:5 115:22,25 118:11 119:14 120:8 121:14 123:24 138:3,5 147:4 167:14 168:14 189:17,18 195:14 203:9
**detectives** 83:2 107:12 113:1 138:19 144:2 188:9 190:19 192:13,16 196:5 199:10 203:8,9,13 208:21 225:15 229:3
**detector** 191:2
**determine** 222:10
**di** 68:20
**dialogue** 95:7
**died** 188:25 190:24
**difference** 77:1,8
**different** 77:24 78:5 145:7 213:16
**differently** 134:14
**diploma** 101:17
**directions** 131:5 131:11 133:5
**director** 66:8
**disappearance** 116:10,21 190:20
**disappeared** 116:14
**discussion** 106:14
**district** 66:1
**division** 68:19 114:23
**document** 74:1 86:12 87:6 103:19 115:8 117:20 161:5 169:4 177:25 178:1 184:10 185:3 203:4 214:4,14,17 214:22 215:11,17 215:19 216:3 219:24 220:11,15 220:18 221:7,16
**documents** 102:20 221:15 227:19
**doe** 66:16 67:6
**doerner** 236:21
**doing** 76:22 84:11 86:21 108:19 126:8 152:3 153:5 226:3 232:8
**dollars** 159:13
**door** 89:14 114:12 114:14,19 139:3,5 148:11,13 206:15 206:20
**doors** 195:19
**double** 134:13
**doubt** 80:15 159:13
**downloaded** 184:5
**downtown** 122:21
**draw** 182:1 187:16 187:20 198:11
**driven** 193:18
**drop** 147:13
**dropped** 112:12
**drove** 111:8 128:10 195:5
**duly** 71:1 237:7
**dumb** 95:24

**e**

**e** 68:1,1 178:7 184:9 236:4,4,4
**eager** 187:19
**earlier** 217:1 220:5 223:23
**early** 188:1
**ecpo** 74:2 168:25 177:15
**editorialization** 77:6 226:24
**editorialize** 226:17
**editorializing** 222:5,5,13
**edward** 67:2
**efforts** 197:2
**either** 208:15 211:13
**electronically** 183:24
**eleven** 94:24,25 95:1,3,17 165:18
**eligible** 196:17 228:6
**eliminated** 85:14 86:9
**em** 75:5,7 76:5,7
**employee** 237:14 237:16
**enjoys** 172:8
**enter** 195:19
**entitled** 67:11
**errata** 236:7
**esq** 68:2,7,13,20 68:20
**esquire** 178:15
**essex** 66:17,18 166:24 167:2,12 187:7 188:2
**estate** 67:2
**eutsey** 66:25 201:10,11,12,16 201:19,22 202:6 202:17
**evans** 66:4 71:7 72:8 74:19,19 76:4 78:10,16 79:12,14,25 80:17 81:19 83:22 85:25 105:18 107:2,3,17 107:22 108:3,4,11 108:17 109:8,13 110:15,16 111:7 111:21 112:11 113:13 115:24 117:24 131:22 140:18 143:15 155:12,17 158:9 158:18 159:20,25 160:1,7 167:3,7,10 169:24 183:15 184:6 185:6 202:2 210:10 214:9,10 219:25 236:2
**events** 102:19
**eventually** 146:4,5 173:17 193:7
**everett** 70:13 103:8,25,25 104:1 104:12

**evidence** 106:20 167:6,9 191:22
**exact** 108:14
**exactly** 72:24 75:6 76:6,19 79:15 81:18,19,20 94:13 96:16,20 98:15 119:18,19 120:5 142:6,7 182:21 188:10 192:20 193:12 199:12,25 202:10 214:6 215:20 216:5 218:1
**examination** 70:4 70:4,5,5,6,6,7,7 71:3 174:19 179:22 181:5 199:1 214:1 223:15 229:14 237:6
**exceeding** 96:8,19
**excuse** 78:21 80:13 82:5 133:8 230:14,17,19 232:25
**exhausted** 193:3
**exhibit** 73:6 86:12 86:13 90:10 103:7 114:4,5 117:17 125:17,18 126:1 157:16 160:24 168:20 184:24 197:25
**exhibits** 70:10,25
**expecting** 172:14 172:15
**expires** 237:23
**explain** 223:17,21 224:1 226:19
**explained** 187:10 189:3 226:22
**extra** 119:2,3 169:2
**eye** 147:10

**f**

**fabricated** 167:3 168:4,8
**fabrication** 167:6 167:8
**face** 200:12 234:5 234:10
**fact** 198:16
**faded** 115:15
**failed** 190:11 191:5,18,20
**fair** 214:2 219:17 220:24 232:19,24
**false** 167:6,9 193:16 197:9,11 210:6 212:6,8,11 212:16 213:1,17 213:20 221:9 228:19,21
**family** 133:17,18
**fantastic** 72:18
**far** 80:5 88:25,25 92:6,7 141:7 229:22,24 230:13 230:15 232:9,10 232:10,11,16
**fast** 173:11,15
**faster** 103:14
**favor** 86:22 98:10 105:11
**fear** 181:12
**february** 67:15 115:22 236:3
**fed** 197:11 210:6 210:25,25 212:5,6 212:17,19,25 213:16,20
**feed** 210:11,19,24 211:18 212:7,11 212:16 213:5,17
**feel** 131:23,24
**felony** 86:18 94:12 100:6
**fifth** 74:23 75:3 76:10,20,22 77:25 172:8,8,10
**fight** 112:10
**fighting** 208:24
**figure** 101:13,15 101:20,21,23
**figured** 106:9
**file** 184:4
**final** 234:17
**financially** 197:3 228:8 237:17
**find** 93:19 115:16 115:17 185:4
**fine** 73:13 119:5 145:8 175:24,25
**finish** 77:4,7 100:5 105:7,12 107:15 112:24 120:24 144:16 171:13 234:9
**finished** 98:20
**fire** 84:20,21 131:20 155:12,18 160:1,7 169:24 170:3,5 188:25 190:24 195:25
**first** 75:13 83:22 87:14 91:4 105:3 109:9 117:23 127:5,6 146:7,9 154:23 161:5 162:9,18 163:8 172:7 177:23 182:5 198:12 200:25 214:20 215:18 219:23 220:7,25 221:7 223:20 224:5,10 224:15
**five** 73:21 80:6 82:6,8 86:18 94:11 100:5,5,6 109:7,12 120:9 131:20 144:18 145:4,10 147:22 148:6 153:14,14 169:15,21 170:15 171:25 231:12 234:12
**flames** 149:13,14
**flat** 96:9,19 172:25
**flip** 147:19
**floor** 68:3 133:23 133:24 195:18
**florham** 68:15
**fni** 161:5
**focused** 101:25 102:1,4
**follow** 199:2 223:8 229:9,12 231:6,23
**following** 194:5 228:9 231:4
**follows** 71:2
**force** 83:3 182:16
**forced** 81:3 83:1,2 83:3 85:20,21
**foregoing** 235:5 237:9
**forget** 205:9 206:17
**forgot** 86:9 95:18
**forgotten** 81:21,24 81:25

**form** 70:12,19 71:25 74:21 75:15 76:18 78:18 80:19 82:16 86:13,17 88:22 91:1,8,14,16 92:3,17 97:12,16 97:18 98:2 99:3 99:14,19,25 100:1 100:3,4,20 101:3,7 102:8 107:19 109:19 113:5,23 116:25 117:8,12 121:16 122:4,17 123:3,5 125:13,25 126:2 128:13 129:6,14 130:17 132:16 134:9,23 137:10 138:14 139:15 141:14 143:19 144:4,24 151:6,18 156:17 158:10 160:10,15 171:22 172:10 175:5,15 189:23 191:9 192:5 194:20 195:11 196:3 198:24 204:10 206:9 209:3,4,7 210:15 213:2 214:11,15 221:11 222:9,12 224:15
**formal** 116:8
**former** 66:7,8,17
**forth** 81:6,14 237:12
**forty** 77:17 80:6
**forward** 227:1
**found** 84:16 115:16 146:1,6
**foundation** 80:2 99:15,20 113:24 123:6,9 124:19,25 125:4,9,14 136:5 141:15 144:24 151:19 165:24 175:6,16 199:14 199:16 206:9
**fourth** 91:5 162:12 162:14,20 166:19
**francesco** 68:20
**friend** 205:8 231:24 232:2
**friends** 205:7
**front** 152:2 153:2 195:18
**fuck** 232:15,16
**further** 142:4 159:5 179:8 198:25 237:9,13

**g**

**gallon** 147:22 148:6
**garry** 66:8 68:11
**gary** 68:7
**gas** 84:21 147:22 148:6,10,11,12,13
**gasoline** 86:1 194:13,14
**gentleman** 89:10
**gentlemen** 106:18
**getting** 191:17,20
**girl** 182:4
**give** 73:25 98:17 116:8 123:2 177:25 184:7 200:16 218:18 219:1 220:8 221:1 221:9,22 222:16
**given** 127:15 228:20
**giving** 123:1,7,10 131:10 132:2 153:22 156:8 162:4 163:13 164:24 180:15 205:18 219:14 220:21 229:1 234:12
**go** 73:17 78:6,7,8 81:12 82:4,13 89:24 92:17,22 95:8,24,24 104:10 106:8,10 111:5,19 118:25 119:4,5 126:3,10,18 127:11 128:23 129:7,15,20 131:17 142:25 145:16 147:20 148:2 151:23 152:2,6,7 159:5,15 159:16 162:9 166:20 172:11 179:12 184:16 185:14 187:17 188:6,13 189:24 192:22 193:4 199:6 206:2 209:23,23 223:14 227:21 230:20,23
**god** 100:2 101:22 102:23 154:16,16 155:1 159:19 215:10
**goes** 142:24 181:18
**going** 74:17 75:3 85:23 86:8,16 90:18 91:8 93:15 93:17 95:8 98:6 98:16 102:20 103:23 104:10,17 104:23 106:12 111:3 113:4,8 124:16 126:3,12 127:21 128:9,11 128:17,22 129:1 131:7,8 133:1 142:25,25 145:21 146:3 149:10 151:22 152:19,22 158:7 161:4 170:6 170:7 171:21 172:2,9 176:19 178:1 179:8,11 180:9 184:16 185:9 190:14 191:25 192:12 193:4,22 194:1 197:25 202:24,25 203:3 213:4,15 216:13 220:4 222:20 223:18,21 224:5,14,20 225:18 226:16 230:15 232:7,10 232:15 233:24
**goldberg** 236:21
**gonna** 75:5,6,10 76:5,6 81:3 84:19 102:25 159:14
**good** 71:4 105:16
**gotta** 76:24 77:12 101:15,16,18,19 126:11 152:21 159:5,15,16 185:15,16 206:21 206:21 209:13,14 226:12
**gotten** 111:15,17
**greeting** 70:20 157:17,20 158:15

**greg** 109:8,13 110:13,13
**group** 68:2 69:2
**guarino** 66:20 167:14
**guess** 84:16 146:2 147:14 153:21 162:12 169:18,19 171:3 209:13
**guilt** 73:21 86:18 218:10
**guilty** 74:11,12 78:15 80:16 82:22 82:23 83:9,16 85:5 87:22 88:1 88:21 89:22 93:3 93:19 94:11,17 97:6 99:4 100:5 102:11 145:3,6,9 218:7,9
**gun** 82:12 84:18 84:19 146:10,17 147:9 148:8 194:10
**guy** 94:14 200:9 207:11
**guys** 95:7 112:6,9 146:5 183:12 222:24

**h**

**h** 104:14 236:4
**hadley** 66:13 68:10 69:3 123:24 123:25 124:12,23 125:2 165:8,12,20 167:14 168:14,15 189:16 192:13 195:13 196:5 197:12 199:9,11 199:15,19,19 200:4,7,8 202:20 203:9,15,18,20 204:4,8,17 205:3 205:16,18,22 207:2,15 208:4,7,8 208:14,16 210:7 210:11,19,24 211:18,19 212:5,7 212:7,11,25 213:5 213:17,19 229:15 230:8,24 231:7,11 231:13 233:4
**hadley's** 207:6
**hairston** 70:13 103:8,25 104:1,12 105:8
**haley** 69:2 105:21 183:25
**half** 81:4 182:2
**hampton** 66:6 70:3,12,13,14,16 70:17,18,19,20,21 70:22,23,23 71:1,4 73:19 86:13,15,15 89:4,5 90:15 92:20 103:6,7,20 114:5,8 115:8,23 116:19 117:17,20 125:18,19,21,23 125:24 126:1,4,22 126:25 129:2,3,4,6 129:18 130:5 139:2,18 149:5 152:10 155:11 157:16,19,21 160:22,24 161:2 166:12,14,15,16 168:20,24 169:10 170:22 174:15,20 177:14 178:11,14 179:16,19,23 181:8 184:24,25 185:10 197:18 198:4 199:2 204:23 208:6 209:17,19 214:2 220:5,5,6,19,20 221:5,5 223:16 226:20 233:12,19 235:12 236:1 237:6
**hand** 88:9,11,12 220:12,16
**hang** 159:7 185:17 201:17 204:3 231:16,17,17,18 231:19 232:1
**happened** 73:22 76:20 78:22 79:15 81:18,19,20 94:19 126:6 140:20 142:6,8 143:8,10 150:15 169:14 187:7,11 188:17 188:19 190:22,25 191:1,21 192:14 201:7,24 222:1
**happening** 191:7
**harassing** 207:19 209:5 211:22 213:8 222:13 233:3
**hear** 72:16 75:20 81:10,11,13 87:24 114:13 119:5 121:21 124:15 135:20 141:3 157:10 161:18 181:14,17,19 204:22
**heard** 170:24 179:10
**hearing** 70:22 168:21,25 169:14 169:17 176:11,15 177:2,6,7,13 178:6 178:20 218:14,15
**hearings** 90:15
**held** 67:14 173:25
**hell** 95:24 211:19 231:22 232:12,12 232:14
**help** 115:17 146:3 146:5 192:17
**helped** 79:14 188:23
**helping** 208:6
**henry** 66:12 68:11
**hereinbefore** 237:12
**high** 101:17
**hold** 103:11 118:15 124:18 133:3 147:5 162:24 165:23 166:7 172:5 179:13 197:16 223:1,3,9,11
**holding** 166:15 220:11,16
**home** 147:15
**homicide** 81:1,2 82:23 100:6 116:6 138:24 169:15,21 171:19,25
**homicides** 73:21 78:16 80:16 82:22
**honest** 100:2 101:22 102:23
**hours** 109:6 112:12 192:24
**house** 75:5,12,17 76:5,16 78:11,17

78:24,25 80:1,17 81:15 109:5,14 112:12 131:21 133:17,18,20,21 133:23,24 136:3 137:13,16 138:2,7 138:12 139:1 140:9,11,14,19 141:1,4,5,13 142:3 142:11,12,14,16 143:15 146:7,8 147:6,8 182:3,11 182:19 186:17
**houses** 81:6 133:8 133:9,10
**huh** 91:2 175:1
**hum** 120:16 137:3 192:11
**hundred** 120:14 121:7 221:23 231:20
**hunterdon** 79:19 104:18 130:12,13 147:6,8
**hypothetical** 151:18

**i**

**idea** 113:6 125:7 140:16,16
**identification** 86:14 103:9 114:7 117:19 125:20 126:2 157:18 160:25 168:22 177:14 185:1
**identified** 189:20 207:11 220:18
**identify** 168:24
**ignited** 194:14
**ii** 66:4
**illiterate** 95:22
**implicate** 192:18
**implication** 172:10
**inappropriate** 218:9 230:12
**including** 192:13
**incomplete** 151:18
**index** 70:1
**indicated** 71:7 185:12
**indicates** 178:5,10
**individual** 66:8,9 66:10,11,13,14,15 66:16,19,20,22,23 66:24,25 67:2,4,5 67:7 174:24 216:3
**individuals** 167:8 178:15 222:3,15
**information** 144:3 146:22 184:1 226:25
**infringes** 172:7
**initialed** 192:22 216:4,5
**initialing** 216:2
**initially** 217:1
**initials** 88:13 91:4 186:25 191:10
**innocent** 170:15 171:19
**inside** 131:25
**instructions** 236:5
**interaction** 180:18
**interactions** 224:4 225:6
**interested** 237:17
**interrupted** 135:8
**interview** 70:17 116:9,15,19 125:19,23 126:25 189:17 203:8
**interviewed** 104:13,22 116:7 124:12,13 188:7
**investigation** 116:5 190:21 198:14
**investigations** 161:6
**investigator** 67:2 67:3 167:19 220:7 220:20
**investigators** 201:5
**involved** 167:8,13 175:17 192:15 228:12
**involvement** 116:11,21 224:3 225:25
**irrelevant** 158:12

**j**

**j** 178:7 235:1
**jack** 66:25 201:9 201:11,16,19
**jail** 82:24 83:20 85:13,14 86:10 102:14 122:7,8,9 122:10,11,16 172:18,20 173:2 173:10,11,15,17 173:19,20,21,22 174:1,10,12,14 206:2
**jak** 68:16
**james** 68:13 179:10
**jen** 119:8,11 233:22
**jennifer** 68:2,4
**jersey** 66:1 67:5 67:13,15 68:8,15 68:18,22 167:4,12 168:5,9 237:4,22
**jim** 223:4
**job** 108:6
**jobs** 108:5
**joe** 123:24,25 124:12,23 125:2 165:8,12,19 167:14 168:14,15 189:16 199:19 203:9 205:16,18 205:21,22 208:16 213:17 229:15 230:1,8,24 231:7 231:11,13
**john** 66:16 67:6 178:15
**jones** 67:2
**joseph** 66:13 68:10 69:3 176:20 178:7,7,15
**judge** 74:16 78:16 80:17 82:6,9,21 83:15,21 84:9 85:4,11,18,25 91:20 93:6,19 99:5 100:19,21 152:3 153:3 167:1 219:8,9,10
**jumping** 147:25 153:4
**june** 164:19
**jury** 151:10 152:7 152:8 160:6,18
**justice** 167:5 168:9

**k**

**kassis** 68:13 70:4,6 74:2 92:11 101:9 119:2,8,10 129:16 155:25 169:4,8 174:19 177:17 179:7,11 183:14 192:5 194:20 195:11 198:24 208:5 209:11,17 214:1 222:7,10,25 223:5 233:11,17 233:22 234:1
**keep** 95:8 142:25 147:10 159:15 207:20 221:20,20 226:2,11,12
**keeps** 233:15,24
**keith** 66:11
**kept** 192:16
**key** 139:2,5,6,8,11 139:13
**kill** 75:5 76:5 131:22 194:6
**killed** 188:20,21 202:3
**kind** 89:12 95:22 212:19 221:20 226:2,11
**king** 68:13
**kitchen** 148:12,13
**km** 66:2
**knew** 158:23 188:9,17,19,20,21 188:23 190:22 191:23 201:24 202:2
**know** 74:24 75:5,9 75:10,11 76:5,10 79:14 81:15,18,18 81:20,21 83:10 84:21,25 85:1,19 85:24 86:3 88:24 89:13,14,16,23 92:1,5 93:7,24 94:11,14,16,18,19 95:12,14,15 97:19 97:20 99:21,22 100:23,24,25 105:21 106:1,2 107:5 108:14,22 109:15,15,16,21 109:23,24 110:4,8 110:11,13 113:2 114:8,11,15,22,25 115:1,11 116:24 117:4,4 118:12,20 119:1,15 122:9 123:13,19,20,23 123:24 124:4,5,7 126:19,25 127:5 131:22,23,24 134:1 135:6,22 137:17,17,22,22 138:4 139:14 140:24 141:7 142:3,5,15 143:8 144:7 145:14 146:3,4,5,6 147:13 147:14 148:17 149:1,17 150:16 150:17,18,18,19 151:3,8 152:4,13 153:1,1,3,12 154:15 158:11,17 159:22,23 160:3,4 160:14,17,19,20 164:11,15,16 165:19 166:1 167:21,22,22,23 168:10,11,16 170:3 171:8 172:12 175:8,12 176:3,6,21 180:1 181:15,19 182:14 187:18 189:6 190:7 191:1 192:8 192:14 197:23 199:21,21,24 200:3,4,5,12,24 202:10,15 203:20 204:15,16,17 205:12,17,22,23 206:1,7,10,11,17 207:4,8,10,16,19 208:3,8,9,11,12,13 208:14,17 211:6,8 211:9,11,13,19,20 212:2,9,10,15,15 212:18 213:12,14 213:19,22,23 216:10,12 217:2,4 217:17 218:11,12 218:20 219:2,6,9 219:16 220:11,15 221:17,23 222:17 222:22,23 224:18 225:17 228:14,14 228:15,23 230:24 231:8,10,11,14,15 232:3,11,12,13 234:7
**knowledge** 116:10 116:21 189:10,10 190:20 192:15 235:7
**known** 188:6
**krakora** 89:10,11 89:21 90:23,25 91:3,16,19 176:20 178:7,16

**l**

**l** 104:14
**lady** 164:13 219:10
**laid** 108:24
**lastly** 197:7
**late** 113:5
**laurino** 66:18
**law** 67:14 68:2,7 68:19,19 69:2
**lawsuit** 71:7
**lawyer** 178:21,22 178:25 179:4
**leave** 191:4 195:20 205:8 206:18
**lecturing** 222:13
**lee** 66:4 71:7 74:19 74:19 76:4 78:10 78:16,21 79:12,14 79:25 80:17 83:22 85:25 105:18 107:1,3,17 108:17 110:16 115:24 117:24 140:1,7,18 143:14 149:5 155:12,17 158:9 158:18 159:20,25 160:1,7 167:9 169:24 188:19,21 188:24 190:22 191:24 192:1,15 192:18 193:5,8 194:6,7,10,12 195:23 196:15 197:18,22 202:2 210:10 228:5
**lee's** 197:10
**left** 73:5 84:5 90:13 111:5 112:11 147:11 148:12 194:11

**length** 182:23
**letters** 225:3
**letting** 106:1 158:1
**lexington** 68:3
**license** 237:4
**lie** 155:15,16 160:8 160:9,11,12 191:2
**lieutenant** 66:22 68:17 123:14 127:16 128:7 130:2,7,16,22 131:4,10,17 132:4 132:7 133:3,7 134:3,7 135:5 136:22 137:6,8,25 138:25,25 139:11 139:24 140:10 143:9 144:2 145:23 146:21 148:25 154:4,15 155:24 156:3 166:17,24 167:14 188:16 189:9 190:3 201:6,10,23 203:11 216:23
**life** 102:23,25 116:23 141:8 191:23
**line** 74:15,15 76:11,13 78:21,22 82:5,5 83:22 84:2 84:14 89:8,9,25 90:2,3,4,21,23,23 91:22 96:24 98:22 110:22 118:4 119:12 127:13,14 129:23,24 130:23 131:16 133:2,21 135:5 136:22 137:25 139:4,6,22 140:6,10,13 142:14 143:4 145:21,22 146:12 146:13 154:4 155:22 156:21 161:15 170:20,21 186:3,20,20 198:12 200:16,25 210:1 236:9
**lines** 187:17
**lipshutz** 68:7 70:4 70:6,7 71:3 73:8 73:10,15 74:3 77:4,7 86:11 90:11,14,17 98:20 101:10 103:5 105:22,25 106:6 106:12,15,18,22 114:3,19 118:18 118:23 119:11 125:16 128:15,17 141:21 145:8 153:13,16 156:1 157:19 158:1 160:22 161:22 168:23 169:6 177:16,18 179:13 179:15,19 180:24 181:2 183:13,16 183:19 184:12,16 184:20,23 191:9 194:4 196:3 199:1 204:13,25 207:21 207:24 208:3 209:2,7,9 213:10 213:24 223:1,3,6,9 223:11,14,19 229:8,11,14,25 232:25 233:6 234:15
**lipshutzg** 68:9
**list** 97:3
**listed** 93:10,16
**listen** 80:4,4 102:18,24 171:15 202:11 205:4 209:17 215:6
**listening** 72:4 209:25
**little** 72:5 163:21 181:11 204:23 224:7 230:1
**live** 114:12,14 136:2,7,16,19 162:15,17,22 163:1,6 195:5
**lived** 75:16,19,21 75:24 81:15 114:19 119:16,17 133:20,21,23 136:10,17,23
**living** 130:10,12 137:15 138:7,9,12 159:11
**livingston** 236:22
**llp** 68:13
**located** 84:17 115:23
**location** 195:6,10 195:18 196:5
**long** 74:25 77:12 94:5 102:19 164:2 202:22 204:1 206:17 213:21
**longer** 159:7
**look** 74:14 77:13 77:13 89:14 98:22 103:19 105:23 123:19 137:23 146:5 149:18 155:22 156:25 157:22,24 158:1 163:20,24 164:9 164:17 170:18 177:18 183:23 185:22 200:25 203:6 215:3,8 217:17 227:25 229:16,19 230:6 231:3
**looked** 127:20 143:25 144:10 155:7 158:4 161:9 165:2 195:17 217:3 230:25
**looking** 111:10 127:5,6 145:24 156:8 159:17 161:4,10 163:25 166:21 177:12 178:2,2 201:2 225:10
**looks** 176:4,7 180:10 224:21
**lost** 105:19
**lot** 81:22,22,24 85:21 86:8 102:19 102:20 135:9 141:6 174:20 187:6 199:7 200:5 204:6 208:20 216:4
**lou** 123:14 166:17 166:24 189:1,9 190:3
**loud** 87:20 105:4 165:10
**louis** 66:22 68:17 174:25 175:2 216:24 217:8
**lying** 88:23 95:10 95:11,13 100:21

**m**

**m** 67:1
**ma'am** 98:20
**machine** 73:16 184:17
**mah** 66:2
**mail** 184:9
**making** 113:15 222:2,7
**male** 104:15
**man** 93:24,25 149:16 159:3 161:1 163:13 165:16 167:18,21 200:10 205:4 208:18 211:24 218:22 222:19 226:3,3 227:20 231:21
**maple** 162:16,20 162:25 163:2,6
**marijuana** 143:3 188:22 194:7
**mark** 86:11 103:5 125:16,24 184:15
**marked** 86:14,15 103:8,20 114:6 115:8 117:18 125:20,22 126:2,4 126:21 157:17 160:25 168:21,23 177:13 184:25 185:10,23 198:3 200:14
**market** 68:21
**marking** 157:19 160:22
**marks** 236:6
**married** 208:9
**martins** 162:5 164:24 220:7,21
**mary** 67:12 236:21 237:3
**mastermind** 191:24
**match** 84:4,5,22 148:14 149:9,10 194:14
**matter** 67:11 236:2
**maurice** 109:5,8 109:13,14,25 111:7,20 115:23 145:24 188:18 189:11 194:7
**maurice's** 192:19
**maxwell** 162:5 220:7,20
**mayor** 66:7
**mccarthy** 66:9 68:11
**mcmahon** 91:1,9 178:7,15 179:5,6 218:17
**mean** 106:9 150:3 168:2 170:7 172:19 210:18 216:17,19 225:2 229:3
**meant** 94:18
**meeting** 115:24 119:20 121:25 176:1 201:21
**memorializes** 221:8
**memories** 102:9
**memory** 101:6,10 101:11,12,13,24 101:25 102:1,4,7,9
**mentioned** 99:3 199:9
**mess** 151:24
**message** 105:20
**met** 71:5 72:7,10 72:19 121:13 122:1 165:8 201:5 201:9
**michael** 67:1 68:20 111:7,21 179:23 223:6
**mike** 106:20 179:13 223:14
**mind** 81:23 85:14 86:21
**minds** 150:15
**minute** 153:14 184:7 202:13 232:14,21,22
**minutes** 121:11 153:14 185:18
**miranda** 70:19 125:24 126:1 129:6,8,12
**missing** 109:7,13 131:20 139:25 143:12,14 169:15 172:1 188:8
**misstates** 207:9 220:1 231:1
**misunderstood** 224:1 225:22
**moment** 96:14 184:8 212:21
**money** 180:16 222:24
**montclair** 162:16 163:7
**months** 172:24,24
**morning** 71:4
**mother** 136:6,7,11 136:12,23 201:18
**mother's** 76:16 78:11,17 146:8 147:5,7
**mouth** 164:14 190:25
**move** 79:14,22 98:18 128:22 131:21 209:11 222:11
**moved** 78:25 79:18 137:16 138:1,13
**moving** 137:13 227:1
**mt** 236:22
**multiple** 167:4 168:5,8
**murder** 86:19 94:12 100:6 144:18 145:3,10 170:15 193:10 210:8 231:12 234:12
**murders** 191:24

**n**

**n** 68:1 79:3 104:14
**nailed** 194:12
**name** 110:7,10 129:1 138:3 158:22 174:24 175:2,3,7,8,11 176:17,18,18 179:23 207:6 216:13 217:8,12 217:15 224:15 232:3 236:8
**named** 89:10 110:6 147:4 203:11
**names** 82:7 167:16 203:16,17 231:15

**narrative** 210:6
**nation** 161:6
**need** 73:17 102:9 119:2 126:8,10,15 169:5 174:22 184:14 213:8
**negative** 134:14
**neither** 206:19,19 237:13,15
**nervous** 191:19
**never** 75:7 87:8 158:14 159:1 161:10 164:3 214:21
**new** 66:1 67:5,13 67:15 68:3,3,8,15 68:18,22 133:7,9 133:10 167:4,11 168:5,9 237:4,22
**newark** 66:1,7,8 66:15 67:14,15 68:6,8,10 103:21 103:21 106:19,19 114:22,23 116:6 122:21 127:18,22 128:5 131:2,3 189:17 195:14 203:7 225:14 236:2
**nice** 71:4
**night** 112:14 113:14 116:14 138:24
**njoag.gov** 68:23
**nodding** 174:2
**notary** 67:13 71:2 186:10 235:20 237:4,22
**notation** 104:3,11
**notations** 236:6
**note** 236:5
**notes** 67:10 179:8 179:12
**nothing's** 105:23
**notification** 184:4
**november** 117:21 121:13 125:22 127:1,2,2,3,4 128:25 184:3 188:2 201:9 218:18 219:3 222:18 225:15 227:4
**number** 84:1 86:25 87:15,16 92:18,19 95:20,21 96:2,24 103:6 104:17,20 133:25 134:2 135:6 138:22 149:6 166:7 185:3,4 187:20,22,24 188:13 189:15,25 190:16 197:25 200:16

**o**

**o** 79:3
**oath** 71:19,21 202:14
**object** 98:6,10,13 113:4 124:16,18 165:24 170:6 171:21 172:2,5,6,9 222:5,12,20 223:18 224:14 225:18
**objecting** 222:9
**objection** 71:25 74:21 75:15 76:18 77:2,2,5 78:18 80:2,19 82:16 88:22 92:3 97:18 98:2,9,16 99:14,19 100:22 101:3,7 102:8,12 107:19 109:19 113:5,23 116:25 117:8,12 121:16 122:4,17 123:3 125:13 128:13 129:14 130:17 132:13,16 134:9,21 136:4 137:10 138:14 139:15 140:2 141:14 143:16,19 143:23 144:4,19 144:23 151:6,12 151:14,17 156:17 157:1 158:10 160:10,13,15 175:5,15 189:23 191:9 192:5 194:20 195:11 196:3 198:24 199:13 204:10 206:5,8 207:9,17 208:24 209:3,4,7 210:13,15 211:22 212:12,24 213:2 214:15 217:21 218:8 220:1,13 221:11 222:4,8 230:9,11 231:1
**objections** 226:14
**obligated** 71:21
**obvious** 180:9 226:8
**occasionally** 203:13
**occur** 120:4 134:19
**occurred** 119:24 176:11 177:3
**october** 71:5 72:7 72:10 90:17 104:3 104:8 105:14 168:25 169:10 177:3 186:6 198:9 198:13 215:9,11
**offense** 88:1 93:2,7 93:9
**offenses** 93:10,16
**offered** 196:20
**offhand** 180:7
**office** 66:17 72:12 122:23 124:6 166:25 167:13 187:8 188:3,5,7 201:3,4
**officer** 66:14,15 189:21 203:10 206:3,6
**officers** 156:15
**official** 66:7,9,10 66:11,12,14,15,16 66:19,20,21,23,24 66:25 67:1,3,5,6
**oh** 82:25 87:8 90:16 99:1 114:21 144:15 149:16 158:3 159:3,19 161:1 162:6 181:2 200:8 201:11 211:24 215:10 222:19 227:20
**okay** 71:18 72:2,5 72:6,7,18,19,25 73:4,5 74:14,15 75:1,4 76:2,14 77:18,19,21 78:3,4 78:20 79:12,17,22 79:25 80:9,21,24

81:9 82:1,3,9,25
83:6,18,21 84:3,7
84:13 85:16 86:6
86:16,19,20 87:14
87:15 88:15 89:2
89:7,25 90:16,18
90:20,23,23,25
91:7,13,13,19,24
92:10,16,21 93:1
93:24 94:2,4,8,9
94:10,16 95:8,16
95:17,19,22 96:14
96:17,21 97:2,12
97:16,22 98:11,12
98:22,24 99:9
100:9,9,12 102:10
102:18,21 103:4
103:14,18,23
104:3,8,22 105:2,3
105:16 106:10,18
106:20 107:21
108:1,16 109:3,4
109:11,25 110:12
110:15,18 111:16
111:18,24 112:2,5
112:16,21 113:7
113:11,18,25
115:2,7 116:4,8
117:15,25 118:7
119:6 120:24
121:10 126:3,6,7
126:14,17,19,20
127:11,12,18
128:7,15 129:3,7
129:15,20,22
130:1,10,22,23,24
131:16,17 132:11
133:1,9 134:18
135:4 136:10
138:18 139:21,23
139:25 140:5
142:13 143:25
144:10 145:8,15
145:20 146:20,24
147:4,20 149:4,8
150:12,25 151:3
151:15,16 152:6
153:6,7,9,13,14,17
153:25 154:1
155:7,23 156:20
157:7,15,21,23
158:17,20 159:2
159:10 160:20
161:12,25,25
162:20 163:3,9,12
163:15,20 164:8
165:2 166:7,20
168:17,23 169:10
169:19 170:18,22
172:2,6 173:14
174:5,17 175:22
176:9 177:6,9
178:3,25 179:6,17
179:18,20,21
180:8,12,21 181:2
181:6,7,11,21
182:1,10,13,19
183:1,4,11 184:23
185:9,10,11,17,21
186:5 187:10,16
187:20,21,24
188:13,15 189:4
190:2,8,14,16,17
191:10 192:4,21
193:15 194:4,18
195:2,9 196:1,12
196:24 197:16,21
198:11,16 199:5,8
200:13,21 201:15
201:19 203:20,23
203:25 204:17
205:10,11,13,15
206:13 207:22,25
208:14 211:13
213:8,19,24
214:12,13,25
221:15 223:20
224:9,23 225:5,9
226:15 227:8,10
227:14,18,23
228:18,24 229:16
230:22,23 231:9
232:7,17,23
234:16

**old** 78:12 86:7 93:25 198:3 221:24

**olds** 109:5,14,25 111:6 115:24 188:18 194:7

**once** 82:12 83:20 85:12,13 86:9

**opportunity** 71:12 72:8,11

**orchestrated** 167:4 168:4,8

**order** 99:4

**overall** 153:21

**owen** 110:8,9

**p**

**p** 68:1,1 104:14

**p.m.** 109:7,11,12 112:13 128:25 234:18

**p.o.** 68:14,21

**page** 70:2,11 73:23 74:3,5,9,14 76:11 78:21 82:5 83:21 83:25 84:13,20 86:24,25 87:1,1,2 87:14 89:6,25 90:6,18,19 91:5,22 95:19,19,20,21,22 95:25 96:1,22,23 98:22,23 106:19 107:24,25 109:8 110:12,23,23,25 111:1,2,2 114:1 115:7,11,12,14,18 115:21 117:22 118:1,4,16 119:11 120:1,2 126:23 127:5,6,11 129:20 131:6,16 133:21 136:21 137:23 138:21 139:6,18 142:22,23,24,24 143:1 145:19,20 147:19 153:25 154:2 155:20,25 156:19 157:20,24 161:3,13,19,24 162:9,18 164:17 164:17,18 166:4,6 166:8,19 169:12 170:18,19 177:15 177:16,17,20,22 177:23 185:22 191:15 215:3,8 221:7 236:9

**pages** 91:4 144:10

**panhandling** 159:12

**paper** 97:23 221:19,20

**papers** 91:8

**paragraph** 116:12 191:11,13 192:9 192:22 193:15 194:2,16 196:13 197:7 200:20 201:1,1,23 202:3 202:23 203:7 209:20,22,24

212:4 228:1
**paragraphs** 216:3
**paralegal** 69:2
**pardon** 178:22
**park** 68:14,15 111:4,8,13,14,20 112:6,10,11 113:9
**parole** 196:17 197:2 228:6,8
**part** 97:6 111:15 111:17 168:7
**particular** 159:17 191:11
**parties** 237:15
**partner** 182:3 186:9
**parts** 117:25
**pass** 128:17 180:21 229:7
**passed** 82:12 83:22 84:4 115:10 136:13,25 137:1 147:9 198:21
**patricia** 167:1
**patrick** 67:3
**pay** 101:20 126:11 159:3 185:16 206:21,21,21 216:19
**paying** 159:4
**pending** 103:13
**people** 72:4 167:13 186:16 199:8 205:11 222:13 231:4
**people's** 81:6
**perfectly** 180:2
**period** 190:18
**person** 186:11 227:5
**personal** 116:20
**peter** 66:20 167:14
**philand** 104:14,14 104:18
**philander** 66:6 70:3,18,23 71:1 115:23 125:19,23 126:25 129:1 154:5 178:11,14 181:7 184:25 185:9 220:6,20 221:5 235:12 236:1 237:6
**phone** 225:3
**phonetic** 79:5
**photocopy** 70:20 157:16,20
**phrased** 134:13
**pick** 122:15
**picked** 84:15 194:9 199:17
**picture** 150:15 164:23 230:1 232:5
**place** 102:19,25 175:9 237:12
**placed** 71:19 97:7 194:11
**plaintiff** 66:5 68:5
**plan** 210:10
**play** 111:4,20 112:8
**playing** 113:11
**plea** 70:12 73:8,21 86:13,17,18 91:1 97:6 176:11,15 218:15
**plead** 74:23 75:3 76:10,20 77:25 99:4
**pleading** 74:12 76:22 87:21 88:1 93:3 102:11
**pleasant** 236:22
**please** 77:4,7 94:1 95:19 106:6,16 141:19 180:1 204:13 209:2 212:1,13 223:19 226:13 236:5,7
**pled** 74:11 78:15 80:16 82:22,23 83:7,9,9,16 85:5 88:20 89:22 94:11 94:16 145:3,6,9
**pllc** 68:2 69:2
**plumber** 101:19 108:22,23,24
**pocket** 84:20
**point** 71:7 116:13 127:2 189:16 196:12 203:7 224:6 232:9
**pointed** 223:11
**pole** 135:12,15,19 135:25
**police** 66:8,15 81:6 81:14 114:23,23 116:6 122:23 124:6,8,10,13 125:12 127:17,21 128:5 130:25 131:8 150:4,14,14 167:12 189:18,21 193:11,17,20 195:3 198:3,13 203:7,10 218:1,4,5 225:14
**polygraph** 190:9 190:12 191:5,18 198:17,21
**porch** 111:5,6
**portion** 228:9
**posed** 74:11
**possible** 90:11 109:18 126:13 139:13 150:10 173:11,15
**poured** 148:10,11 148:12 194:13
**prefer** 228:2
**prepared** 103:24 183:7 207:7
**presence** 71:15
**present** 69:1 178:19 188:20,21 203:10 223:22 225:12,13
**presented** 214:17 214:19 216:8
**presume** 104:15
**previously** 106:20
**price** 68:13
**primary** 227:5
**prior** 231:2 237:5
**prison** 80:25 169:15 171:13,19 171:25 191:23
**probably** 123:18 127:23 208:11
**problems** 102:7
**proceedings** 67:11
**produced** 183:18 183:20
**production** 184:3 184:5
**profession** 206:23 206:24,24,25,25 207:1,1
**promise** 96:11,17 156:6 165:14 197:1 228:13

**promised** 96:13,15 99:17 156:16 210:8 227:15 228:7
**promises** 97:3,7 97:17 99:2,13 227:24
**properly** 179:10
**prosecute** 181:15 181:18
**prosecuted** 181:12
**prosecution** 167:7 175:18 197:1,10 227:24 228:3,7,13
**prosecutor** 66:18 66:19,21 96:4,18 97:5 153:2 158:8 158:13,18 196:14 201:4
**prosecutor's** 66:17 122:23 124:6 166:25 167:13 187:8 188:3,5,7 201:3
**prove** 191:3
**public** 67:13 68:19 71:2 89:19 186:11 235:20 237:4,22
**purpose** 167:5
**put** 97:17 113:25 114:2 121:10 129:1 151:14 157:22 168:19 175:10 183:25 186:25 191:10 204:19,19 205:1,1 207:6 232:5
**putting** 108:16

**q**

**quarters** 159:13
**question** 71:11 74:15,18,22 75:2 75:13 76:11 79:1 82:14 83:12 84:23 87:15,25 88:5,5 91:13 92:4 95:9 97:9 99:15 101:4 101:8 102:6 103:12,13,15 105:3,12 106:16 106:25 109:9,20 109:22 113:5 114:18 117:1,13 119:12,23 120:7 120:24 121:17 124:19 127:16 128:14,24 132:17 133:15 134:24 136:5 137:11 138:15 139:16 141:15 142:19,21 143:1,6,20 144:5 144:24,25 151:7,9 151:18 152:1,5,25 153:21 155:3 157:25 158:14 160:16 162:12,14 162:21 164:7 165:24 166:9,19 168:7 170:14 171:9,14,15,22,23 175:6,16 180:9 199:11,14 203:14 206:9 209:6 211:25 212:13 213:3,11 214:16 215:7 218:9 221:12,13 223:20 223:22 224:15 225:9,21 226:9,10 226:17,25 227:2 228:11 230:21 231:5,5 233:23 234:2,9
**questioning** 190:4 190:18 192:24 203:12 205:24
**questions** 71:6,9 71:15,23,23 73:20 73:22 74:9,10 91:25 94:2,3,8 95:6 98:14 103:4 103:16 119:5 145:7 153:18 170:12 174:16,17 174:21 179:8,25 181:6 183:1,2 184:21 185:19 187:6 195:17,21 195:22 196:8 198:2 199:3 203:3 203:15,18 209:18 213:25 217:2 222:25 223:4,17 223:24 224:7 226:19 227:6,8 232:18 233:3,16 233:17,21
**quick** 118:23
**quickly** 126:13 192:23
**quit** 209:4,5

**r**

**r** 68:1 79:3 235:1 236:4,4
**race** 201:19
**ramos** 66:14
**randy** 111:7,21
**range** 184:6
**rashid** 66:10 70:14 114:6,8,15 115:10 118:9,10,12 119:7 119:7,13,15,20 120:8 121:6
**read** 75:13,22 76:17 82:14,18 84:23 85:1 87:19 87:19 91:11,12,24 92:1,12,13 93:18 94:21 97:9 98:4 104:17 105:4 106:2,15,17 109:3 109:9 111:9,11,12 111:19 112:2,16 113:18 120:15,18 120:19,25 131:13 132:1 133:8 143:13 146:11,13 146:15,18,19 148:20 154:7,23 156:11 166:12,13 167:11,17 171:2 190:14 196:1 228:1 235:4
**reading** 83:12 85:9 96:5 105:17 106:19 115:19,20 130:19 137:12 140:17,22 146:20 163:25 189:4 190:15 198:6 236:5
**ready** 145:17,18
**realize** 147:18
**really** 75:10,11 81:20 89:3,12 100:23 111:22 113:6 131:9,23,24 140:20 149:11 153:22 173:16

177:11 185:12 205:7 209:14 215:2 219:21
**reason** 71:22 73:11 78:15 80:13 80:15 99:24 100:15 107:11,16 112:21,25 117:10 129:11 132:14,18 134:6,18 136:21 137:7 139:10 144:1,6 146:24 148:24 149:22 156:14 171:6,10 171:17,24 178:18
**recall** 76:9 87:6 94:7 116:15 119:20,23 124:9 125:1 127:8 130:3 130:5,8 131:7 149:2,3 156:8,23 164:10 167:16,24 175:17 182:3,7,10 186:8 215:18 216:23 234:11
**received** 86:14 103:8 114:6 117:18 125:19 126:2 157:17 160:25 168:21 184:3,25
**recktenwald** 67:1
**recognize** 174:24 175:2,3 206:16 217:5,8,10,14,15 229:21 230:3,4
**recognized** 217:12
**recollection** 82:2 82:21 83:13 85:10 102:21 105:4,8,13 107:8 110:19 112:3,17 113:8,19 120:20 121:1,5,19 121:25 122:6,16 122:19 124:22 126:5 127:21 130:20 131:14 132:2 134:11,15 135:14 137:18,24 138:11,17 139:12 140:18,23 143:14 143:21 144:11,17 146:21 148:22 154:24 155:9 156:12 157:2,4 161:7 163:12,18 163:22 165:3 176:20 179:3 215:24 216:2
**recommend** 96:5 96:18
**record** 90:14 97:8 97:17 104:18 106:8,11,14,17,23 128:16,19 151:15 168:24 184:1,19 214:9,12 220:2 234:1
**recorded** 197:8
**records** 138:4
**reefer** 143:3
**reese** 84:16 86:2 146:2,4 147:12,13 147:15
**refer** 209:19 227:25
**referred** 220:5
**referring** 104:12 202:9 214:4
**refers** 110:12
**refresh** 82:1 83:13 85:10 102:21 110:19 112:3,17 120:19,25 121:5 130:20 131:14 132:1 138:11,17 139:12 140:17,22 143:13,21 146:20 148:22 154:24 155:9 156:11 165:3 176:19
**refreshes** 82:20 113:19 126:5 137:24 163:21
**refused** 116:7
**relates** 227:2
**relative** 237:14,16
**release** 228:9
**released** 197:3
**remember** 74:11 74:24 76:9,15,19 76:24 77:10,18,20 77:22,23 78:2,9,10 78:12,14,19,20 79:15,18,21,24 80:3,10,11,12,20 83:10 84:6,7,11 85:6,7,8,19,24 86:3,4,7 87:9,10 88:2,16,18,19 89:11,13 92:8,9 94:6,6 96:15 100:1,3,7,8,12,18 101:1,2,5 102:11 102:14,25 103:1 103:10,25 107:13 111:22,25 112:1 112:19 113:15 115:3,5,24 116:24 117:2,7,9 120:23 121:8,9,12,13,15 121:24 122:2,11 122:14,22 123:1,4 123:7,10,13,15,18 124:2,3,11,14,17 124:20,24 125:3,5 125:11 128:2,4,6 129:8 130:15,16 131:10 132:10,12 132:23,25 133:25 134:3 135:6,12,13 135:22,23,24 137:13,21 139:8 139:17 140:20,25 140:25 141:1,6,6 141:10,12,25 142:2,5,7,10 144:7 144:8,14,19 145:10 147:2,3 148:18 149:16,20 150:2,5,6,9,22,23 150:23,24,25 151:2,2,8 152:3,24 153:22 155:2,5 157:8,11,12 158:19,21 162:4 164:3,5,20,21,22 164:22,24 165:16 165:17,17 166:1,2 167:18 169:22 170:1,2,5 171:3,4 172:4,12 175:4,7 175:19,20,24 176:1,12,17,22,23 177:1,3,7,11 179:25 180:3,10 180:12,15,18 182:9,13 183:4,9 186:14,16,19,23 187:8 189:1,4,6,7 189:8 190:8 191:7 191:8 193:18,24 196:4,9 197:23 198:2,6 200:11

201:7,11,16 202:11,12,18 203:17 204:7 205:4,6,6,11,12 206:18 208:18 214:24 215:1,1,4,4 215:16,17,23 216:5,12,14,16,16 217:4,7 218:1,20 218:21 219:4,6,7 219:15,16 220:10 220:21,25 221:3,4 224:3,10,13,21,23 225:1,6,13,24 226:5,6 227:5,8,14 227:18 228:11,16 228:20,24 229:4 231:14,15,20,23 232:8
**remembering** 77:9
**remind** 71:20
**remote** 227:12
**repeat** 81:12 171:23 185:3 193:7,16 194:3 195:23
**repeated** 197:11 210:2,6
**repeats** 139:4
**rephrase** 80:13 99:16
**report** 70:13,14 103:7,24 114:5 115:21,21 116:4 198:3
**reporter** 67:13 71:19 72:3 87:23 106:17 121:22 194:23 236:8 237:3
**reporter's** 105:12
**represent** 86:17 103:23 104:23 118:6 128:11 158:7 178:1
**representations** 97:4
**represented** 176:14,23,25 177:9 178:6 218:13
**rescheduled** 71:9
**respond** 193:23
**response** 135:11
**responses** 91:24 92:1
**restate** 225:22
**retained** 70:25
**retarded** 100:10 226:12
**return** 236:8,21
**returned** 111:6
**ricky** 111:7,21
**ride** 193:24
**right** 71:10 74:1,7 79:10 84:14 86:21 88:9,11,12 89:14 90:12 93:10,12,21 93:22,23 94:12 96:10,11,19 97:12 97:14 98:13,19 99:11,16 101:11 101:13,14,15,19 106:6,23 110:16 116:24 117:7 118:25 119:4,7 120:3 127:19,25 131:20 132:12,23 132:24 133:5,8,10 133:11 135:7,10 135:11,12 136:8 137:2 142:23 147:6,10 148:13 152:3,14,18,19,22 152:23,24 153:5,5 153:20,23 158:7 158:25 159:21 161:2,20,23 163:9 163:10 165:9 166:10,16 168:17 169:16,21 170:14 170:15 172:8,9 173:1,4,8 174:13 175:10 178:4 179:10 181:24 182:8,17,20,22 183:7 184:10,21 185:14,15 186:2,8 186:13 187:1,11 187:14,23 189:12 190:4,12 191:11 191:15 192:12 193:5,15 194:1 196:1,18,19 197:16 198:17,22 199:4,20 200:8,9 201:13 202:1,25 203:14,24 207:14 207:24 208:3 209:12 211:20 212:18,21 213:15 215:14 216:22 218:10 220:16 223:16 224:20 229:6 231:19
**rights** 116:18
**ring** 183:22
**robert** 66:18
**rode** 145:24
**role** 175:12
**room** 68:8 148:12 189:17 203:8 204:5,8 205:3
**running** 81:14

**s**

**s** 68:1,7 236:4
**sabur** 66:10 70:15 114:6,9,15 115:10 115:25
**sabur's** 115:21
**safety** 68:19
**save** 228:1
**saw** 116:16 214:20
**saying** 77:24 80:6 81:7,11,16 93:13 93:13 100:7 101:12,14 117:7,9 140:21 141:1 145:1 149:20 156:23 157:4 173:19,25 183:21 212:18 224:2
**says** 97:7 98:16 104:11,22 115:22 116:4,12 119:6 127:1,3,7,17 128:7 128:10 130:2,7,22 131:17 133:3 135:5 137:25 138:4 139:1,25 140:10 143:9 147:5 149:4,12 154:4,15 156:3 161:5 162:15,16 162:22,25 163:1 164:18,19 166:4 168:3 178:13 186:5 188:1,16 195:13 196:14 201:21,23 209:15 212:4
**scared** 191:19 193:3

**scheduling** 72:22
**schenck** 68:13
**school** 101:17
**scott** 104:13 105:9
**scream** 209:8
**screaming** 209:9
**second** 118:15 124:18 165:23 179:13 197:17 223:3,9,12
**seconds** 106:13
**security** 104:17,20
**see** 71:4 80:5 81:7 82:1 87:15 88:6,8 93:15,17,17 96:5,7 97:13 101:12,14 102:20 104:7 111:8,12 113:13 118:4,21 123:15 126:4 135:9 137:23 140:3,21 145:2 146:11,14 149:12,14 154:7,8 161:15 162:20,25 163:3,4,5 166:21 173:18 177:25 178:8,11,12,16 179:16 186:2,5 188:16 189:15,18 189:19,25 191:14 194:15,17 195:6 196:12 197:12,16 200:11 203:6 215:11 217:10 223:12,13 229:16 229:18 231:14
**seeing** 116:13 127:8 135:13 144:11,14,17,20 145:10 215:17,18
**seen** 123:17,17,18 145:13 158:5,15 159:1 161:10 214:21,23 217:5 217:11 230:7 234:5,10
**send** 183:23 191:22
**sense** 79:7
**sent** 158:18 184:1 184:2
**sentence** 96:4,8,18 107:1 109:4 170:25 172:25 176:15 209:24
**sentenced** 169:14 171:11,18,25 174:2
**sentences** 82:15
**sentencing** 169:7 169:16 176:10 177:2,6,7,13 178:6 218:14
**separate** 202:7,16 202:18,21 203:2,5 203:19,24
**sergeant** 66:12 67:4 68:11,24
**serious** 222:2
**serve** 102:16
**serving** 102:14
**set** 84:21 101:16 131:21 237:12
**seven** 80:22,25 102:17,22,24 103:1,2
**share** 184:4
**sheet** 236:6,7
**sheppard** 66:11 115:22
**shit** 100:11 116:23 209:16 210:23 221:25 231:20
**short** 153:17
**show** 86:16 90:18 93:15 129:3 157:21 185:9 220:4 224:18
**showed** 135:7
**shown** 236:8
**shut** 194:12
**side** 113:25 114:2
**sign** 91:7 129:12 197:18 202:10 211:14 216:9,11 219:24 227:19 236:7
**signature** 87:4,12 87:13 91:5 97:13 100:17 129:17,18 161:15,16,17,19 162:1,2,3 164:19 186:2,3 191:15 236:20 237:22
**signatures** 215:21
**signed** 91:16 94:17 95:1 97:12,13,15 97:16,25 98:1,8 99:25 100:4,16 186:9,11 187:3,14 191:14 192:9,21 202:8 207:7 210:21 211:15,21 214:23 215:22 219:19
**signing** 87:6,10 100:1,3,7,8,13,18 129:8 215:24
**simple** 102:10 152:25
**sir** 71:20 72:5,16 75:18 80:8 86:17 86:22 98:4 103:19 105:7 106:24 107:15 110:23 112:15,24 114:13 115:12 118:6 121:12,13 126:3 129:21 136:15 148:1 155:3 156:25 157:10,22 159:7 161:18 169:2 170:23 174:17 177:19 186:2 197:24 203:1 204:21,24 214:12 215:3 217:7 221:16 222:2,22 223:1 229:12 230:7 234:3,9
**sit** 82:13 173:21 176:3,6
**sitting** 137:18 146:7 148:13 151:10 153:23 159:4,15 173:2,20 173:22 229:22,24 232:19
**situation** 181:13
**skip** 96:22 128:21 133:1
**smart** 94:14 95:23 95:23
**smith** 66:24 68:13
**snicker** 135:17
**social** 104:16,19
**sodas** 111:6
**somebody** 202:6
**somewhat** 115:5 180:8 196:11,11

**sooner** 230:22
**sorry** 87:23 105:21 114:17 118:17 123:5 130:23,24 133:22 134:13,25 140:4 147:18 148:1 156:25 159:17,18 180:8 185:2 189:24 194:4,25 204:22 210:16 227:11,21 229:1
**sort** 135:17 228:19
**speak** 71:12,21 72:5,8,11 122:15 204:23 209:23
**speaking** 104:1 105:5,8,13 107:13 115:4,5 124:11,22 124:24 125:11
**speaks** 128:19
**specific** 180:12 199:11 224:23
**specifically** 75:8 216:23 217:18,23 217:25 227:4,25 228:21,25 233:4
**specify** 96:4
**spelling** 79:8,9
**spells** 129:1
**spent** 174:7
**spoke** 107:12 112:25 122:20 197:21
**spoken** 72:19
**spot** 74:8 135:6
**spsk.com** 68:16
**stairs** 149:10
**stamp** 74:1 219:25
**stamped** 177:14 186:12,13 214:10 219:19 221:6
**stamps** 103:21
**stand** 170:23
**stands** 104:24
**start** 71:6 103:22 112:10 176:10 187:24
**started** 128:9 155:12,17 160:1,7 169:24 170:3,5,10 191:17 225:25
**starting** 138:23 170:9 195:24
**starts** 74:3 210:1 219:25
**state** 67:6,13 68:18 125:12 127:17,21 128:5 130:24 131:8 167:12 189:21 195:14 203:11 235:20 237:4,22
**stated** 105:18 107:1,22 108:2 109:5 110:21 111:3,4,13 112:5,9 113:12 190:2 210:1
**statement** 70:21 70:23 113:16 116:8,24 117:2 121:6,14 123:1,2,7 123:11 132:2 144:21 145:11 152:10,11 153:11 153:18,22 160:23 160:24 162:4 163:13 164:25 165:4 166:15,17 166:23 167:9 183:8 184:24 186:9,20 187:13 196:16 197:9,9,19 199:18,18 202:14 205:19 212:22,23 215:15 219:1,14 220:6,9,19,21 221:2,9,22 222:16 225:10,11,14 227:23,25 228:5 229:1,2,3,4
**statements** 83:4 194:5,18 197:11 208:21 212:4,6 228:20,21
**states** 66:1
**station** 193:17,20 195:3
**stay** 106:11
**stenographic** 67:10
**stenographically** 237:11
**stole** 188:22 194:7
**stop** 159:5 195:4 208:24 209:2,8 213:9 222:4,5,12
**stopped** 71:9 73:23 106:2,4,4
**story** 193:8,16,21 195:23
**street** 67:15 68:8 68:21 76:1 79:1,2 79:9,13,19,19,20 79:23 80:1,18 104:18 128:11,12 130:12,13,14,25 131:7,22 136:3,8 138:12 148:9 159:11,12,14 174:5 188:25 194:9 195:4
**strike** 149:9 195:21
**struck** 148:14
**stuck** 84:19
**stuff** 73:11 77:18 78:13 81:22,22,24 86:8 103:10 109:1 132:15 152:24 155:2 156:6 205:24 207:5 221:20 226:2,11 226:12
**stupid** 231:22
**subpoenaed** 233:1
**subscribed** 235:17
**substance** 120:7
**summer** 146:4
**sunday** 130:3 145:24
**superior** 167:2
**support** 197:2,3 228:7,8
**sure** 73:14 90:5 107:6 115:19 119:9 161:23 179:9,14 183:16 183:19 184:8,10 184:18 213:25
**survive** 101:16,18
**swear** 154:11,12 154:18
**sworn** 71:1 202:13 204:21 235:17 237:7
**system** 167:5 168:9

**t**

**t** 235:1 236:4,4
**take** 79:25 103:19 106:12 113:15 130:25 142:4,16

153:13 157:22 164:6,13 183:23 191:2 198:16 229:16
**taken** 67:11 153:15 164:11 220:6,20 236:3 237:11
**talk** 106:6 115:3 118:8 119:20 128:9,10 165:17 168:13 182:16 199:7,8 227:23
**talked** 111:3 182:20,22,23 225:6,11
**talking** 74:18 110:15 119:6 135:18 152:14,19 152:22,23 159:4 202:5 205:7 212:20 218:10 231:4,16
**teens** 116:13,22
**telegram** 135:18
**telephone** 135:12 135:15,25
**tell** 74:16 76:4 77:21 80:4 82:17 82:18,20 85:17 93:8 102:22 107:16 108:14 117:23 120:11 126:24 132:4,6,15 134:7,19 137:8 140:15 144:2 146:25 156:15 160:18 163:21 165:21 167:19 181:16 190:25 199:12,20,25 202:11 207:25 208:8,10,11 210:14,17 212:17 212:19,22 218:17 218:23 219:5,8,13 221:21 222:17 226:4 230:7
**telling** 84:9 85:13 88:20 93:6 95:10 95:12,14 100:21 105:22 130:16 134:3 135:14,24 146:21 148:18 154:24 155:1,4 167:21 189:1,9,11 191:4 192:16 195:22 203:16 208:4 218:21
**ten** 96:9,19 172:21 172:22,25,25 173:5,6,7,9,15 196:16,25,25 209:16 228:6
**test** 190:9,12 191:3 191:20 198:17,21
**testified** 71:2 159:20 196:15 208:25 217:1 228:4
**testify** 159:25 165:15,21 197:8 197:10 237:7
**testifying** 117:25 152:9
**testimony** 70:16 117:18 118:7 120:22 121:3 130:15 134:16 156:9 166:25 167:17 192:19 207:10 231:2 235:5 236:5 237:10
**thank** 71:18 72:2 73:4 96:21 105:16 106:21 119:9 129:20 174:17 185:7 205:14 213:24 227:14 234:15,16
**thing** 159:18 178:2 181:24 187:18 208:20 234:17
**things** 82:2 85:21 91:11 96:13 113:18 189:2 216:4,13 225:3,5 226:8
**think** 75:10 76:24 77:12 85:20 90:9 95:23 103:10 105:19 106:1 122:9,21 127:15 136:18 141:8 174:21 179:7 185:3 199:9 214:3 217:5 226:18 229:6 233:10
**third** 133:23,24
**thought** 182:5
**threaten** 156:3 165:14,20
**threatened** 99:9 99:18 156:16 210:8
**threats** 99:3
**three** 84:15,17 91:4 133:17,18 147:12,16,21 148:5,7 186:16
**threw** 173:17
**tietjen** 67:5 68:24 167:15 180:4,6 189:21 192:14 195:14 196:5 197:12 199:10 203:11 210:7 212:6,7 223:24 224:11,13,17 225:2,12,13,22,24 227:9,15 228:12 228:22,25
**till** 118:13 232:3
**time** 73:5,14 74:24 75:7,12,24 76:7,15 76:24 80:5,5 85:23,24 88:24,25 89:1,22 94:5,19 95:17 99:23 100:23 102:2,14 102:16,19 108:5 114:25 115:3 117:3 119:22,23 124:1,5 128:24 136:9 143:6 144:17,23 145:9 152:4,13 153:4 172:12,13,14,15 182:6 183:5 189:5 190:19 197:21 200:9,11 201:8 206:2 207:12 214:20 215:23,25 217:6 219:23 220:8,25 223:25 224:2 228:2 232:9 237:11
**times** 199:7 219:17
**tired** 81:5,16 191:21

**titled** 220:19
**today** 71:14,24 72:14 137:19 144:12 145:13 151:10 153:23 156:4,6 174:22 181:8 215:18 232:20 234:6
**told** 78:16 80:16 82:13,21 83:15,21 85:17,20,22,25 100:19 113:1,2 118:14 119:18,19 120:12,12 137:6 139:11 142:15 146:2 154:5,18 155:11 160:6 169:20 170:16 172:21 182:15 188:3,4,5,9,17,18 188:19,21,23 190:9,11,19 191:1 191:5,18,19,20 192:1,1,12 193:4 193:22 195:4 201:24 202:2 218:13 219:18,23 220:8 221:1 222:15
**top** 110:23 120:3 161:5
**transcript** 67:10 70:16,17,22 73:8 73:20,24 98:4 117:17,21,24 118:18,20 125:18 125:22 127:3,7 168:20,25 169:6 169:16 170:14 177:12 235:5 236:5,6 237:10
**transcripts** 177:24
**transported** 116:6 188:2 193:17
**trenton** 68:22
**trial** 70:16 117:17 117:21,24 118:7 120:22 121:3 159:20,25 167:3 197:10
**trooper** 67:6 167:15 180:3,6 189:21 195:14 203:11 224:17
**truck** 111:8,21 112:11
**true** 91:21 108:3 166:16,23 188:11 188:12 193:9 197:24 235:6 237:10
**truth** 85:17,20 88:20 95:10,12,14 100:2,21 101:22 102:24 154:6,10 154:19 155:13 160:8 191:4 237:7 237:8,8
**truthful** 86:2 99:17 211:16,17
**truthfully** 71:21 71:24
**try** 94:1,2 126:12 176:19 179:24 203:6 216:14 226:14
**trying** 82:24 94:4 98:10 101:12,21 101:23 142:4 159:9 172:17,19 173:10,14,18 185:4,20 192:22 222:10 226:24
**tuesday** 67:15
**turn** 86:24 87:14 89:4 95:19 115:7 118:1 139:18 153:25 155:20 161:12 179:15 210:4 223:10 229:15
**turned** 106:1,3 210:5
**twelve** 165:18
**twenty** 234:7
**twisted** 80:23 205:10 206:22
**two** 81:4 82:10 90:15,22,22 108:5 143:7 146:6,9 157:20 172:22 173:3,19,20,21,23 174:1,7 177:24 178:6,14 196:17 197:2 201:5 202:7 202:16,19 203:2 207:8 219:17 221:15 225:10 228:7,8
**type** 214:4

**u**

**u** 235:1
**uh** 91:2 120:16 137:3 192:11
**ultimately** 80:1
**underneath** 90:13
**undersigned** 104:11
**understand** 74:18 76:23 81:8 85:15 91:14 93:18 102:18 103:16 107:12 126:12 135:20 141:4,9 144:25 145:1 151:19,21 152:20 152:21 173:12,12 173:13 185:17 189:8 208:18 221:13,14 223:2 224:6 225:2 226:4 226:13
**understandable** 216:21
**understanding** 76:21 223:25 224:1
**understood** 116:19 216:20,21
**unit** 116:6
**united** 66:1
**untruthfully** 165:21
**upstairs** 82:11,11 82:11,12 147:8,9

**v**

**v** 66:6
**vacant** 137:21
**vaguely** 189:6
**vailsburg** 111:8,13 111:20
**veritext** 236:21
**vicinage** 66:1
**victor** 68:20 106:20
**victor.difrancesco** 68:23
**video** 123:10 179:20 193:22 196:16 197:8 228:5 229:15 230:2 234:6
**view** 224:6

**volume** 66:4
**voluntarily** 91:17
**voluntary** 220:6 220:19
**vomacka** 68:20 70:5,7 106:21 179:9,14,18,20,22 179:23 180:21,25 183:22 184:7 185:2,7 189:23 204:22 223:7,10 223:15 225:20 226:18,23 229:6
**vs** 236:2

**w**

**wait** 82:13 88:4,5 103:13 118:13 164:7 202:13
**waited** 75:8
**walked** 89:13
**walking** 210:4 231:16
**want** 71:8,20 72:4 73:13 90:5 103:22 106:10,10 118:24 119:8 126:24 151:23 153:13 161:23 164:15 165:19 168:18 170:13 173:11 174:22 177:16 179:9,12,15 181:8 181:14,17,19,23 182:1 184:8,9,15 185:13,22 187:16 187:20 188:13 193:9 196:13 197:8 198:11 204:19 205:1,12 206:14,14 207:21 208:2,8,13,14,16 208:22 213:13 223:16 227:24
**wanted** 112:10 131:22,24 146:4 180:25 190:24 191:3 193:8,10,21 194:2,6,19,21 195:4,23
**wanting** 146:3
**wants** 98:17
**warning** 70:19 126:1 129:6,9,12
**waste** 73:14
**watch** 194:10
**way** 101:22 105:20 107:8 113:21 126:8 131:24 163:22 170:4 181:18 182:21 193:20 194:10 195:3 213:13
**we've** 143:25 144:10 151:22 170:7 174:21 185:10
**weed** 142:18,19,21 143:2,4,17
**week** 143:8,9
**welcome** 119:10
**went** 75:11,11 82:11,11 84:15,16 84:19 86:10 91:1 111:5 122:24 128:4 133:4 138:8 146:9 147:8,8 186:19 190:18 192:24 193:21 221:6 232:9
**west** 236:22
**when's** 197:21 214:20
**white** 189:20 203:10 206:3
**wife** 72:15,17 208:10,10,11,13
**william** 67:4 68:24
**williams** 104:14 104:19 105:17 107:1,21 108:2 109:5 110:21 111:3,4,13 112:5,9 113:12
**willing** 174:9
**wish** 210:14,17
**witness** 70:3 92:13 118:19 141:20,20 141:22 151:16 179:21 180:22 208:25 211:23 222:14 223:13 229:7,10,13 233:1 233:9,13,20,24
**wondering** 180:3
**woody** 110:10,12
**word** 199:25 200:1
**words** 194:6
**work** 108:4,7,17 126:10 146:3 159:15,16,16 185:14 216:14 218:2,4,5
**worked** 107:22 108:2,8,10 114:22 124:4 196:14 228:4
**working** 216:15 216:15,18
**write** 207:2 208:22 210:22 211:3,4,5
**written** 83:4 229:3
**wrong** 79:6,7 90:10 231:19
**wrote** 208:20 210:20,22 211:6,9 211:11

**x**

**x101026** 237:5

**y**

**yab** 104:23
**yeah** 74:7 75:3 76:3,14 77:23 78:1 81:25,25 89:12 90:4 91:6 91:10,15,18 95:4 97:15 99:1,8 102:15 104:21,25 105:24 110:17 115:11,20 118:5 120:18 122:1,9,9 123:25 124:2,3,10 124:24 126:23 127:23,24 129:19 130:9 131:3 132:19 133:6,19 136:9,9 137:14 139:20 141:5 142:12,20 143:5 145:1,18 146:1,14 146:19 147:7 149:14 150:1 154:8 161:4 162:3 162:19 163:3,8,11 166:8,23 167:22 170:17 171:3 175:3 176:13,13 179:11 185:15,25 186:13 187:23 189:3 190:1 191:12 192:9 196:19 198:1,8,10 200:10 201:11,17 215:22 217:20,24

223:13 227:13 229:18,20
**year** 81:4 107:23 108:3,4,13,16 172:25 182:2
**years** 77:14,16 80:6,22,25 81:4 86:7 94:19,20,22 94:23,24,25 95:1 95:17 96:9,19 102:17,22,24 103:1,2 116:1 120:14 121:7 127:24 165:18 172:22,22,22 173:3,5,6,7,9,16 173:20,21,21,23 174:1,7 196:16,17 196:25 197:2 207:8 209:16 212:2,3 218:21 221:24,24 222:1 228:6,7,8 231:21 232:11 234:7
**yell** 141:19,20
**yelling** 141:21 209:12
**yesterday** 157:8 157:11,13
**york** 68:3,3
**young** 164:13
**youth** 104:24 105:1,14

**z**

**zoom** 68:20,20 69:2,3 105:20

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.