# EXHIBIT K

**In The Matter Of:**

*Evans v.*

*Newark City*

---

*Cheryl Cucinello*

*August 05, 2020*

---

RIZMANRAPPAPORT
CERTIFIED COURT REPORTERS

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

UNITES STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
NEWARK VICINAGE
14-cv-00120(KM)(MAH)

----------------------
LEE EVANS,

Plaintiff(s),

v.

NEWARK CITY; FORMER MAYOR, CORY A. BOOKER; FORMER, NEWARK POLICE DIRECTOR GARRY MC CARTHY; LIEUTENANT LOU CARREGA; DETECTIVE JOSEPH HADLEY; DETECTIVE SGT. WILLIAM TIETJEN; SGT. DARNELL HENRY; OFFICER JOE HADLEY;

Defendant(s).
----------------------

CIVIL ACTION

Deposition of:
CHERYL CUCINELLO

VIA VIDEOCONFERENCE

T R A N S C R I P T of the stenographic notes of the proceedings in the above-entitled matter as taken by and before DIANE M. HOLMES, a Certified Court Reporter and Notary Public of the State of New Jersey, held via videoconference on Wednesday, August 5, 2020, commencing at approximately 10:10 in the morning, pursuant to notice.



A P P E A R A N C E S:

BONJEAN LAW GROUP, PLLC
467 Saint Johns Place
Brooklyn, New Jersey 11238
718.875.1850
Jennifer@bonjeanlaw.com
Ashley@bonjeanlaw.com
BY: JENNIFER BONJEAN, ESQ.
HALEY COOLBAUGH, Paralegal
Attorneys for the Plaintiff

KENYATTA STEWART, CORPORATION COUNSEL
CITY OF NEWARK - DEPARTMENT OF LAW
920 Broad Street, Room 316
Newark, New Jersey 07102
973.733.5945
lipshutzg@ci.newark.nj.us
BY: GARY S. LIPSHUTZ, ESQ.
Attorneys for Defendants City of Newark (improperly pled as "Newark City" and "Newark Police Department"), Cory A. Booker, Garry Mc Carthy, Darnell Henry and Joe Hadley

STATE OF NEW JERSEY
OFFICE OF THE ATTORNEY GENERAL - DIVISION OF LAW
STATE POLICE, EMPLOYMENT, AND CORRECTIONS SECTION
Richard J. Hughes Justice Complex
25 Market Street, PO Box 112
Trenton, New Jersey 08625-0112
609.376.2948
victor.difrancesco@njoag.gov
michael.vomacka@lps.state.nj.us
BY: VICTOR DI FRANCESCO, JR., DAG
MICHAEL VOMACKA, DAG
Attorneys for Defendant William H. Tietgen Jr.

SCHENCK, PRICE, SMITH & KING, LLP
220 Park Avenue
Florham Park, New Jersey 07932
973.539.1000
jmb@spsk.com
BY: JOHN M. BOWENS, ESQ.
Attorneys for Defendant Lou Carrega

A L S O P R E S E N T:
George Affum-Addo
Joseph Hadley
Darnell Henry



I N D E X


| EXAMINATION | PAGE |
|---|---|
| CHERYL CUCINELLO | |
| DIRECT EXAMINATION BY MS. BONJEAN | 4 |
| CROSS-EXAMINATION BY MR. VOMACKA | 149 |
| CROSS-EXAMINATION BY MR. LIPSHUTZ | 155 |
| REDIRECT EXAMINATION BY MS. BONJEAN | 158 |


E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Cucinello-1 | Affidavit in support of arrest warrants | 66 |
| Cucinello-2 | Transcript dated 3/1/11 | 93 |
| Cucinello-3 | Carrega report | 97 |
| Cucinello-4 | Philander Hampton agreement | 133 |
| Cucinello-5 | Request to recommend disposition | 147 |
| Cucinello-6 | Document Bates stamped ECPO1315 and ECPO1316 | 154 |




C H E R Y L C U C I N E L L O, address Essex County Prosecutor's Office, 50 West Market Street, Third Floor, Newark, New Jersey, 07102, is duly sworn/affirmed by a Notary Public of the State of New Jersey and testifies under oath as follows:

DIRECT EXAMINATION BY MS. BONJEAN:
Q. Good morning, Ms. Cucinello.
A. Good morning.
Q. My name is Jennifer Bonjean.
A. Hi.
Q. I represent the plaintiff in this civil litigation, Mr. Evans.
MS. BONJEAN: And before we get started today, I am going to ask that all of the attorneys that are participating in this deposition identify themselves and place their appearances on the record.
So I'm going to start with myself. I'm Jennifer Bonjean. That's B-O-N-J-E-A-N. My law firm is the Bonjean Law Group, and also present is my paralegal, Haley Coolbaugh, who is going to help me with documents, and, eventually, one of my colleagues Chris La Tronica may be joining.

So if anyone else wants to go next, please go ahead.
MR. BOWENS: John Bowens, Schenck, Price, Smith & King, counsel for the witness.
MR. LIPSHUTZ: Good morning, Ms. Cucinello. My name is Gary Lipshutz. I am the assistant corporation counsel for the City of Newark. I represent in this case the City of Newark, Joe Hadley, Darnell Henry, Senator Booker and Garry Mc Carthy.
Can you hear me okay?
THE WITNESS: Yes. Hi, Gary. I met you once before.
MR. LIPSHUTZ: We have met once before.
I believe Joe Hadley is also observing, and I'm not certain if Chief Henry is observing or not. I can't say his name on the participants as of right now.
MR. DI FRANCESCO: Good morning, Cheryl. Victor Di Francesco, Deputy Attorney General, Attorney General's Office, on behalf of Trooper William Tietjen, New Jersey State Police.
Also, I believe on the call with me, the initials from my office MV are Michael Vomacka. He is co-counsel on the case also from the Attorney



General's Office.
MR. VOMACKA: That's me. Good morning. I'll also note for the record our intern George Affum-Addo is also on the line. He doesn't represent a party. He's just observing as part of the summer intern experience. Good morning.
Q. Ms. Cucinello, let me start with some easy questions. Can you hear me okay?
A. Yes. I can hear you fine.
Q. And are you able to see -- are you seeing multiple boxes or am I your primary box?
A. No. I see everyone who introduced themselves.
Q. Okay. There is a way to pin the video so that you can see me which is who -- not that you don't need to see everybody else, but it might be less distracting for you. So you can pin the video so that I'm the main box. It's up to you.
Otherwise, I will leave it to you. I know that's how I would prefer to do it but --
A. Whatever the lawyer wants, I'm fine. I'm good.
Q. Okay. And I just want to make sure I am pronouncing your name correctly throughout the deposition today because it could go on for some



time and I don't want to be misstating it. Is it Cucinello?
A. Yes.
Q. Okay. And have you had your deposition taken before, ma'am?
A. No, never.
Q. Okay. So I'm going to go through some ground rules so that we can be on the same page and this can all go very smoothly or as smoothly as possible. Okay.
I'm going to be asking you questions related to allegations contained in a federal civil complaint that has been brought by the plaintiff in this matter, my client, Lee Evans, against a number of named law enforcement officials and the City of Newark. I am looking for full and complete answers to my questions.
Do you understand that?
A. Yes.
Q. Do you understand that you are under oath here today?
A. Yes.
Q. Do you understand that it is the same oath that you would take as if you were taking the stand in a court of law and there was a judge there



with a robe swearing you in?
A. Yes, I understand.
Q. I would ask that you do your very best to let me finish my question before you answer it because it is difficult for the court reporter to take a clean record while we are speaking over each other and that sometimes happens, and I will do my very best not to step on any of your answers as you answer. Okay?
A. Okay.
Q. If there is a question you do not understand, will you let me know?
A. Okay.
Q. We certainly want you to understand the question, but if you do answer a question, I am going to assume that you understood the question. Is that fair?
A. That's fair.
Q. And I know this case -- at least the criminal prosecution that underlies this lawsuit took place some time ago. If you need help jogging your memory in connection with dates, that's something that we might be able to do with documents. Just let me know, or if you're going to approximate a date, just please indicate that you're

approximating so the record is clear about that. All right?
A. Okay.
Q. If you need a break, please let us know. This isn't a marathon.
So you are certainly free to take breaks, and just I would ask that, if there was a question pending, that you answer that question before we break. All right?
A. Sure.
Q. And as you sit here today, is there any reason you can think of why you cannot give full, complete, truthful testimony here today at this deposition?
A. No.
Q. All right. Now, I know you already stated your name for the court reporter. So I'm going to ask you to state it one more time for this record. What is your name, ma'am?
A. My full name is Cheryl Marie Cucinello.
Q. And without providing us your home address, where do you live?
A. I live in West Caldwell.
Q. Okay. Are you currently employed?
A. Yes.



Q. By whom?
A. Essex County Prosecutor's Office.
Q. And for how long have you been employed by the Essex County Prosecutor's Office?
A. I started on May 13, 1996. So I just completed my 21st year.
Q. I think it broke up, and I should let you know that, with the connectivity issues, sometimes there are glitches. So we may ask you to repeat something. So I apologize for that.
A. 1996 May. That was my first day in May 1996. So I completed 24 years.
Q. Okay. Did you graduate high school?
A. Yes. Yes.
Q. And what year did you graduate high school?
A. 1987.
Q. And upon graduation from high school, what did you do by way of either further education or employment?
A. I went to Rutgers College right I believe September, August of 1987.
Q. And what did you study there at Rutgers?
A. My major was history and political



science.
Q. Did you graduate Rutgers?
A. Yes.
Q. What year?
A. 1991.
Q. And upon graduation from Rutgers, what did you do by way of employment or education?
A. I went to law school at Seton Hall that August or September of 1991.
Q. And did you complete your studies there?
A. Yes.
Q. What year did you graduate?
A. 1994.
Q. And after graduating Seton Hall with a law degree in 1994, did you work?
A. No, I did not. Yeah. I worked for a judge. I was a law clerk for a year.
Q. What year did you take the bar?
A. The summer of 1994.
Q. Hold on one second. I'm sorry.
A. The summer of 1994.
Q. So after taking the bar, what did you do?
A. I clerked for a judge.



Q. And what judge did you clerk for?
A. Michael Degnan.
Q. Can you spell that last name?
A. D-E-G-N-A-N.
Q. And was this a Superior Court judge?
A. Yes.
Q. Where was he assigned or she?
A. Family division.
Q. And you did that for a year?
A. Yes.
Q. And upon completing your clerkship, what did you do by way of employment?
A. I went to work for a law firm.
Q. And what law firm was that?
A. Weinstein Penza -- I think it was called Weinstein & Penza. That's it.
Q. Okay. And what type of law did they practice at Weinstein & Penza?
A. Family law, divorces. Primarily divorces.
Q. And how long did you do that?
A. Nine months.
Q. Okay. Had you already applied to the Essex County Prosecutor's Office?
A. Yes.

Q. And did you apply to the Essex County Prosecutor's Office right out of law school or right after taking the bar?
A. No, no, because I knew they wouldn't hire you. No. After my clerkship, I applied.
Q. Oh, yes. My apologies. I forgot you did a clerkship.
So after the clerkship, you applied to Essex County Prosecutor's, and while you were waiting to see if you were hired, you worked at Weinstein & Penza. Is that correct?
A. Correct.
Q. And then you, obviously, did get an offer of employment. Is that right?
A. Yes.
Q. Did you always want to be a prosecutor?
A. No. No. During my clerkship, Judge Degnan was actually the juvenile division, and he had three very, very strong females as prosecutors assigned to his court, and I really -- I had no interest. I never even knew anything about being a prosecutor, and I just kind of fell in love with what they were doing and watching them and they were all very good lawyers.
One's a judge now, and the other two



were career prosecutors. So, no, and then I was -- I got to be a prosecutor.
Q. And you said I think your first day of employment was May 13th of 1996?
A. Yes.
Q. Okay. If you could please -- and my effort here is to get you through the deposition as quickly as possible.
Perhaps you could summarize for me your assignments during, I guess, your last 24 years, if you can, in the prosecutor's office starting in May, where you started and then where you ended up?
A. Sure. My first assignment was a unit that doesn't exist anymore, but it was called the consolidated unit, and, basically, it was a beginner unit, and cases would come to the office, and we would screen them and decide, you know, did they merit going onto grand jury or were they an offense that you should downgrade. It was really a basic unit, and I did that for one year.
Then I got transferred to the grand jury unit where I would present cases to the grand jury for about a year. Then I got moved to the trial team, and I was in the trial team for six and a half years, and the trial team is basically the



bulk of the office. The majority of lawyers are in the trial team, and you try cases. You're assigned to different courts. You know, you're assigned to a courtroom with a judge, and you always go to that judge every day, plead cases out. You try cases. You do sentences, violations of probations, and I did that for six and a half years.
Then I got transferred to homicide in March of 2004, and I was in homicide from March 2004 to September of 2012, and, in 2012, Prosecutor Carol Murray at the time asked me to go to the U.S. Attorney's Office because we loaned attorneys out -- we loaned prosecutors out to the U.S. Attorney. So I went to the U.S. Attorney's Office from September 2012 to May of 2013 when I was promoted to the director of domestic violence.
So I was brought back from the U.S. Attorney's Office and made the director of that unit. Then I remained a director there for three and a half years, and during my time there, I was promoted again to deputy chief assistant prosecutor. Then I got promoted to chief assistant prosecutor, and my assignment got changed. I was doing civil discovery and OPRA requests as well as personnel issues. I was basically in charge of human -- like



issues dealing with the lawyers and the support staff for a very brief time. It was very brief that job where I was over the support staff and the lawyers.
Then another woman in my office got promoted with me, and they gave her all the personnel issues and support staff, and I deal with all the support issues with the lawyers, and I was still -- but I still continued to do OPRA and civil discovery. Then I didn't do that job very long.
The summer of -- I honestly can't remember if it's 2017 or '18. I want to say '17. I became the chief assistant prosecutor over the trial team where I remain today, but I still have some of my administrative duties from that other position.
I don't do OPRA and civil discovery, but I do all the hiring for the office of the lawyers, only the lawyers. I do all the interviewing. I set up their background checks. I'm the liaison to the AGs for some courses, the new lawyers. I order the books. I order like our 2Cs, our Rules of Evidence. So I still have administrative duties, but I run the trial team now.
Q. Do you still try cases right now or is that --

A. I tried a homicide not this year, but last year I tried a homicide. Yes.
Q. Okay. Thank you. That's going to be very helpful to us.
I have a couple follow-up questions, and then I will tell you sort of the time period of your career that we'll be focusing on here today. Okay?
When you were in the trial team I think you said for six and a half years before you went to homicide, what types of cases were you trying?
A. Everything. Robberies, drug cases, receiving stolen property, burglaries. I even tried a sex assault, and I tried -- as I got more experienced and I had X amount of jury trials under my belt, they gave me homicide. So I tried homicides in the trial team.
Q. Okay. And then in March of 2004 you were promoted or assigned, I don't know if it's a promotion, it probably is, to the homicide unit. Is that right?
A. Correct.
Q. And that is solely homicide cases that you try there?
A. Yes.



Q. How large was the homicide unit in and around that time of 2004?
A. You mean the amount of people or the physical space?
Q. Good clarification. I meant how many people were assigned to that unit?
A. Well, there was a chief, a deputy chief and a director when I was first assigned, but I was first -- when I was first assigned. So that was then three.
There was a captain for the detective side. Captain, lieutenant definitely I remember. The lawyers, I think there was eight of us. I think there was eight of us.
Q. And if that's an approximation, that's fine?
A. Yeah. There's eight. Eight lawyers. I could not tell you the amount of detectives. I mean there was definitely over 10.
Could I say there was over 20? No. I could just say there was over 10.
Q. Okay. Fair enough.
And you were in homicide from 2004 to September of 2012, and then I think you said that they loaned you out to the U.S. Attorney's Office



for a period of time. Is that right?
A. Right.
Q. What did you do at the U.S. Attorney's Office?
A. I did -- I did something we called -- it's a term of art. I don't even know what it means, but it's called trigger luck. It's, basically, they take gun cases that occurred usually in Newark, usually, and they adopt it, because they feel that that person could get a better sentence if being prosecuted by the U.S. Attorney's Office.
I did that. I actually even got moved. While I was there, they even transferred me to a different unit. I went to their like special narcotics unit, and I actually did my first and only wire tap, and when I left, the wire was still going. When I left, the wire was still going.
Q. Okay. Did you say that at some point during your time in the homicide unit you became the head of the homicide unit?
A. No. I was never head of the homicide unit.
Q. Okay. Would you say that you were an attorney in the homicide unit from 2004 to 2012 and that was your status there?



A. Yes. I was never a boss.
Q. Do you know how many trials you had while you were in the homicide unit, like jury or bench?
A. Just you want to know just when I was in the homicide unit?
Q. Yeah. I'm just trying to get a sense of -- yeah, the homicide unit. Just a ballpark, if you know. If you don't, that's fine.
A. I know overall I've tried over 75 jury trials. I don't know specifically from '04 to -- 2004 to 2012. I don't know how many were in that period. I don't -- I can't tell you exactly in that time frame. I just know overall I had about 75 jury trials.
Q. Fair enough. Fair enough.
During your tenure as a prosecutor, and I'm going to limit it -- I'm going to put the time frame on when you were on the trial team for six and a half years and then also the homicide unit. Did there ever come a time when you voluntarily dismissed a case post indictment we'll say?
A. I don't have a specific recollection, but I would say probably. Yeah. I mean --
MR. BOWENS: Don't guess.

THE WITNESS: Okay.
Q. What was the process in the office -- and we'll put the time frame again around the time that you were in the homicide unit.
If you wanted to dismiss a case, what was the process by which you did so in terms of getting approvals or how did that work?
A. You would -- first of all, you wouldn't just write it up for dismissal. You would go talk to the boss and say I think whatever, X, Y, Z. I can't prove this case because X, Y, Z, and then he or she, I guess whoever the boss was at the time, would talk to you about it, the facts, and, you know, they would make sure you did everything that was possible and that the detectives did everything possible, you know, to try and prove it and then you would write it up. You'd type it up, and you'd have to submit it to the boss, and the boss would have to get it signed off.
The boss would have to sign. You'd sign it. The boss would sign it, and I don't know if that boss -- because there's levels of bosses. So there might have been someone -- usually, you dealt with the director of the unit, and then after the director, there was a deputy chief and a chief.



So I -- my understanding is directors don't have the authority to sign-off on dismissals. You have to be either a deputy chief or a chief, and you would have to have like another signature.
Q. Okay. Let me recap, and you can tell me if I got this right.
So if you, as the line prosecutor, decided you couldn't prove a case for whatever reason and you thought dismissal was the appropriate outcome, you would talk to your direct supervisor and I think you said that would be the director of the unit you were in. Is that right?
A. Right.
Q. And you would talk it through and have a conversation about why you believed the case couldn't be proved beyond a reasonable doubt, and then the director would ask you to write something up assuming he or she concurred in that decision. Is that right?
A. Yes.
Q. And was there a form or was it just a to/from memo or what was the actual document, if you can recall?
A. There's a form to write dismissals.
Q. Okay. What's the name of the form?



A. It is called a dismissal form. Like dismissal. I don't think it's anything creative. It's just like dismissal.
Q. Is it a piece of paper that exists? Like you go to a box and you can get it or do you just create it I guess is my question?
A. No. It's like a preprinted form with boxes, and you type the defendant's name and the charges and then the body. You put your reasons in the body of it.
Q. Okay. And that's -- and you said it's a preprinted form. Does the preprinted form, if you're looking at it -- and, again, I'm sure you've seen it since you've been in this office your entire career. Does it have a title on it or a name on it?
A. Yeah. I think -- honestly, I think it says dismissal. I don't think it's anything creative. I think it just says dismissal. I can see it because I read them in my current job. I see -- I see these forms, but off the top of my head, I don't know. It says something on it. I just don't know what.
Q. You're pretty confident it has the word dismissal in it?
A. Yeah. I'm pretty sure about that.



Q. And then after you type up the dismissal form, I think you said that it's -- it has to kind of go up the chain and the captain of the unit might have to get approvals from a deputy chief or even someone higher than that possibly, I'm guessing, maybe depending on how serious the charge was, maybe even further up the chain. Would that be fair?
A. That would be fair.
Q. And do you know then, once that form is signed off on and approvals have been made, what happens to the form?
A. If it's post indictment, it's presented to a judge and the judge signs off on it.
Q. So it is presented to a judge?
A. Uh-hmm. If it's post indictment, a judge has to approve.
Once a case is indicted, we can only just ask the judge to dismiss the indictment. We write it up or write our legal reasons. A judge could refuse.
Q. He can force you to try a case that you don't think you have proof beyond a reasonable doubt on?
A. That's up to the judge. That's the

judge's call, not mine, but I mean yeah. If it's post indictment, the form has a box -- there's a box on it where the judge has to put his name/her name, signature.
Q. And does that form also go to defense counsel?
A. Yes.
Q. So it actually is a form that becomes part of the official court record. Is that right?
A. Yes.
Q. And what -- do you know what the prosecutor's office does with their form? Does it go into the file or do you have a copy somewhere?
A. It goes into the file.
Q. And since -- well, let me ask you this.
Does your office maintain any type of data or collect any data about cases that they have dismissed post indictment?
A. I don't understand. I don't know.
Q. I'm sorry?
A. I don't know the answer to that.
Q. Okay. But in any event, these forms, at least one copy is kept in the file of the case. Is that right?
A. Right.



Q. It sounds like the court might have a copy. Is that correct?
A. Yes.
Q. And defense counsel would probably have a copy, right?
A. Right.
Q. Do you know any other copies that would be out there of a form like this?
A. Not that I'm aware of.
Q. Okay. Have you ever been the subject of any ethics complaints during the course of your career by anyone?
A. No.
Q. Have you ever been sanctioned by any judge in the course of your career?
A. No.
Q. Have you ever been reprimanded by -- formally reprimanded by a judge in the course of your career?
MR. BOWENS: Objection, vague and ambiguous.
MS. BONJEAN: Mr. Bowens, we can't hear you at all, and the record is not going to reflect your objections.
MR. BOWENS: I object because it's



vague and ambiguous.
MS. BONJEAN: Okay.
MR. BOWENS: Can you hear me now?
MS. BONJEAN: I can hear that. Yes.
Q. Go ahead. You can answer if you understand.
A. No. I think you asked me was I ever reprimanded in any way?
Can you just repeat the question? I'm sorry.
Q. Sure.
Have you ever been formally reprimanded on the record for any ethics violations by a judge sitting anywhere?
A. No.
Q. Have you ever been disciplined internally in your office for any reason?
A. No.
Q. What did you do to prepare for your deposition here today?
And that's without asking you to reveal any attorney/client communications you may have had.
MR. BOWENS: That includes any documents I may have given the witness to review, any conversations we've had. You can answer.



A. My attorney sent an email the other day with a lot of documents in it the other day, a lot. I didn't have time to read them all, but it just came this week, but I just kind of scanned them, like the front page to kind of see what they all were.
So I scrolled through the email, and I looked at all the various documents that he emailed to me.
Q. Okay. So you reviewed some of the documents that were sent to you probably from us originally and then through your attorney. Is that right?
A. Correct.
Q. But it doesn't sound like you read them thoroughly. You just scanned them?
A. I also looked at the first page to see was -- like was it the grand jury transcript, was it the trial transcript? I kind of just did, wow, what is all this, and I kind of looked at all the front pages.
Q. Have you read the complaint that Mr. Evans filed in connection with this lawsuit?
A. No.
Q. Okay. Do you know -- do you know what

the nature of the allegations are that have been lodged in this federal civil complaint in this case?
A. No. I don't actually.
Q. Okay. Do you at least understand that he's complaining about being wrongfully prosecuted as a general proposition?
A. Yes. I understand that, but I don't know the specific causes of action.
Q. Okay. Fair enough.
And by the way, that prompted my memory. Have you ever been sued for any prosecution that you participated in in the course of your career?
MS. BONJEAN: Okay. I'm going to object. It's actually not -- you can't consult with -- you can't ask your attorney for --
MR. BOWENS: If it's a matter of privilege, we can discuss it.
MS. BONJEAN: Well, that is -- I mean then if she -- I will ask her, but it's not appropriate for her to get coaching from you, and you know that. So that's going to stop now.
Q. I know that's not what you're intending to do, ma'am.
MR. BOWENS: Wait a second. I was not



coaching the witness. The witness turned to me, asked me a question, and I specifically said, if it deals with some type of attorney/client privilege, we can talk about it, and, otherwise, we can't.
Kindly don't interrupt me again and don't make false accusations.
MS. BONJEAN: I didn't make a false accusation.
MR. BOWENS: You did.
MS. BONJEAN: No, I didn't.
MR. BOWENS: You said I was coaching the witness and that was a lie.
MS. BONJEAN: I did not say you were coaching the witness. What I said is it appears -- when a deponent turns -- while a question is pending, when a deponent turns to his attorney or her attorney and asks for guidance, that can appear as if there's coaching going on. I'm not saying that because we can't hear you, and I don't know what was said, but that is what the record will reflect, that I don't know, and we want to avoid that.
I am not making accusations, and I am just -- and the deponent may be -- since she has not had her deposition taken before, just needs to have



the guidance that -- and I'll be happy to provide it.
Q. It is not appropriate during a deposition while a question is pending to ask for guidance from your counsel unless there is an issue of privilege involved.
Whether you want to invoke a Fifth Amendment privilege or whether there's an attorney/client privilege that you believe the question may call for, that -- that may be the case, and I ask that you say I have an issue related to privilege and I'm going to ask to consult with my attorney. Okay?
A. Sure.
MR. BOWENS: If you don't understand the question, you can ask to have it restated in an understandable form.
MS. BONJEAN: Yes, she can. That was one of my first -- one of the first guidelines I provided.
Q. So you can ask that that be restated, but it's going to have to come from me or the court reporter.
Do you want me to read back the question or have the court reporter read back the



question?
A. No.
Q. Go ahead. You may answer.
A. When I was in domestic violence, one of my responsibilities was deciding to re-arm police officers with their weapons who were charged with crimes of domestic violence, and I chose not to re-arm this one particular police officer, and as a result, I think he lost his job, and he is suing me right now to get -- I guess to get his -- so I would reconsider to give his gun back so he could get his job back.
Q. Gotcha.
A. And it's pending, and I didn't know if I was allowed to talk about it. I didn't even get to ask the lawyer the question, to be honest, when you interrupted him. I was going to ask him am I allowed to discuss pending -- because it's pending. So I didn't know if I was allowed to talk about pending cases.
Q. Okay. So let me give you some guidance on this.
You have certain privileges that you may invoke, and the fact that a case is pending elsewhere may or may not implicate one of your

privileges. Typically, not. Just the mere fact that a case is pending, unless there is some court order or it touches on some privilege that you are guaranteed, you should answer.
If you have a question about privilege, you can let me know, and then I will be happy to give you the opportunity to consult with your attorney about privilege, but in this context, if I ask a question, you just turn to your lawyer and I can't hear what's happening, it gives the impression or -- we just can't tell what's happening, and then it is important that we make sure that those are the only issues that are being discussed with your attorney while questions are pending. Okay?
A. And I have another pending lawsuit against me and another chief assistant prosecutor who was -- who left the office, I guess, a year ago or so, and he claims that -- not me, that the other assistant prosecutor -- I'm named in the lawsuit because we had the same title at the time.
Me and this other woman had the exact same title. So he named both in the lawsuit, but he's saying that she said something to a potential employer that prevented him from getting his job. So he's suing because he's saying now, you know, he



couldn't get a job, and his wife is suing for, you know, loss of consortium, things like that.
Q. Gotcha.
A. So that's also pending.
Q. Okay. So that's like an employment issue on one of the pending cases, and then the other one is a police officer who is suing you in order to somehow manage to get his job back. Is that right?
A. Right.
Q. What's the name of that police officer?
A. Mark Patrick.
Q. Mark Patrick?
A. (Indicating.)
Q. Is that a Newark police officer?
A. No.
Q. What department?
A. East Orange.
Q. East Orange. Okay. All right. Thank you very much.
So I am now going to focus your attention, if I could, to -- I'm going to say I guess -- well, first, let me ask you this.
When did you first become aware of or hear about the five missing boys case out of Newark?



A. I don't remember when I first heard about it.
Q. Were you a prosecutor or do you remember hearing about it as a -- as a law student or even as, I guess, a kid or anything like that?
I don't know where you grew up, but do you remember hearing about it before you went to the prosecutor's office?
A. No. I learned about it when I was in the prosecutor's office.
Q. And do you know whether or not you had learned about this cold case or unsolved case prior to joining the homicide unit in 2004?
A. I did not.
Q. So at some point after you joined the homicide unit, you became knowledgeable or became aware of the five missing boys case out of Newark?
A. Yes.
Q. And I was remiss in asking. I wanted to ask a question about the homicide unit when you were there between 2004 and 2012. The homicide unit also had an investigative aspect to it or investigators that worked in the unit?
A. Yes.
Q. And how many did you say there were?



A. I said over 10. I wasn't sure if it was over 20.
Q. Okay. And were they assigned solely to investigating homicide cases?
A. Suspicious deaths, vehicular homicide, you know, cases where you don't know how the person died, you know, suspicious deaths, vehicular homicides and regular homicides.
Q. How did the investigators of the Essex County Prosecutor's homicide unit interface with law enforcement from municipalities that might be investigating cases?
MR. BOWENS: Objection, speculation.
Q. You could answer.
A. Great. They had a good working relationship with -- in the beginning when I first joined the homicide unit, we -- this is hard to remember exactly, but there was a time that the municipality was the lead investigative unit, and we were sort of like the backup or we assisted, but then at one point, and I do not know when, it flipped and our unit became the primary unit, and then the municipality would assist the detectives.
Q. Okay. So it's your recollection that at some point during your tenure in the homicide

unit between 2004 and 2012 the municipality would have been the lead investigative agency in a homicide case. Is that right?
A. It could have even been -- I don't remember when it changed exactly, because I don't remember how it was when I first joined, but at some point in the course of -- at least I was trying homicides because I know for a fact my first homicide that I ever tried was the primary people on the job were the Newark police officers. They were my main witnesses. I used all them. I didn't use any Essex County people.
So at some point it changed. Exactly when, I don't know.
Q. In 2000 -- let's just say in 2010-ish, we'll use that time frame, was the Essex County Prosecutor's immediately noticed -- was the office immediately notified of a homicide when it occurred?
A. Yes.
Q. So given your vast experience, I assume you would agree that, if there's a homicide that occurs in Newark, first responding officers are likely to be Newark police officers. Is that right?
A. Yes.
Q. Okay. And would you agree then that



Newark police officers have some obligation to inform Essex County Prosecutor's that a homicide has occurred promptly? Is that right?
MR. VOMACKA: Objection to form, but you can answer.
A. I don't know who -- how -- I don't know how we can even get notified that the sheriff's department because I don't know who Newark has to notify. I wouldn't know that.
Q. Okay. I guess I'm trying to understand, and I know the dates you're not exactly sure on, but when a homicide happens in Newark in and around 2010 let's just say, Newark is first responders, but how does it get decided who is going to be the lead investigative agency during that time frame, if you know?
MR. LIPSHUTZ: I'm going to object to the form of the question. You can answer.
MR. VOMACKA: I'm also objecting to the form. You can answer.
A. By that time, we were the lead. So if Newark was -- let's say Newark was the first responding people. We always had someone on call. So the on-call detective were to get notified, and he or she would immediately also respond to the



scene.
Q. I see.
So they were right on the scene from the start around that time period. Is that right?
A. Yes. He's not going to be there as quickly as the Newark Police Department. They're a municipality but -- if it was during the day, we would be there very quickly because everybody's working. We get there very quickly to the scene.
If it's the middle of the night, the on-call person in my office would be notified. They'd have to drive there.
Q. And would your office be responsible for supervising that investigation during this time period and would that involve giving direction to Newark police officers, if you know?
I'm sorry. Can you repeat that?
A. We were the lead. I don't know if they gave -- I couldn't answer if they would give direction, but I know we were the lead investigators. So we do all the -- you know, we're in charge of running the investigation.
Q. Okay. And during that time period, did Newark also have a homicide unit, if you know?
MR. LIPSHUTZ: Objection to the form of



the question.
A. I don't know. In 2010, I don't know if they had their own that was called Newark homicide. I don't know.
Q. Do you know if they had detectives who were homicide detectives back in 2010, whatever label you want to put on their unit?
MR. LIPSHUTZ: Objection.
MR. BOWENS: Objection, speculation.
MR. LIPSHUTZ: Objection to the form.
A. They've always -- they always have detectives. I just don't know what their titles are.
Q. Okay. Obviously, I don't want you to speculate, but I'm going to assume that, as someone who's spent their entire career in the Essex County Prosecutor's Office, including many years in a homicide unit, you have some familiarity with the Newark Police Department by virtue of your -- as you pointed out earlier, you had worked with them on cases, correct?
A. Yes.
MR. BOWENS: Okay. I'm going to object to that statement.
You can't ask her to speculate about

anything. Just because she had a particular position does not give you the right to infer that she has knowledge about other units and other police agencies.
MS. BONJEAN: Well, I'm going to object to your speaking objection.
Q. And I'm not asking you to speculate. I'm asking you, as someone who has vast experience as a prosecutor, who hopefully knows a little something about how Newark Police Department operates having spent a career with -- prosecuting cases, just to tell me based on your experience, not on speculation, but experience, okay, and if you don't know an answer, certainly don't guess. Okay?
Now, in 2004, when you first came to the homicide unit, would you say that that was a period of time where the Newark Police Department was leading or directing homicide cases or you just don't know?
A. I don't remember.
Q. Okay. Does the Essex County Prosecutor's Office or did the Essex County Prosecutor's Office back in 2008, let's call it, have policies and practices and protocols for its investigators?



A. Policies in what regard? I don't know what you mean.
Q. Okay. Well, you understand that police officers are obligated to follow policies, right?
A. Right.
Q. They can't just go out and do whatever the heck they want in the course of a investigation, right?
A. Right.
Q. They got to follows constitutional law. They can't beat people up. They can't coerce confessions. They can't lie to people under certain circumstances. Under some certain circumstances maybe they can. There's rules they must follow. Can we agree on that?
A. Yes.
Q. And you've now just told me that the Essex County Prosecutor's investigators conducted homicide investigations, in fact, were lead investigators in homicide investigations, correct?
A. Yes.
Q. Did they have written policies that they followed when they conducted those investigations that guided them so that they didn't violate people's constitutional rights?



MR. BOWENS: Objection, asked and answered. The witness can answer if she understands the question.
MR. VOMACKA: I'll object to just the form. You can answer.
A. If they have specific policies, I'm not familiar with them. We have standard operating procedures in our office that pertain to attorneys and to detectives, but, you know, they have a separate chain of command, and I have a separate chain of command, and I don't partake in their training. They don't partake in the lawyer's training.
So I can only say that I don't know what goes on on their end of the office as far as their policies and their training. I don't know anything about that.
I only know what my policies and my training are, but I don't know what they have to do as far as their policies and their training, what they have to do and don't have to do.
Q. Well, I didn't really ask you for any detail. I asked did they have procedures and policies? Do you know whether they have them period?



A. The office has standard operating procedures for everybody.
Q. Okay. That's good. Now we're getting somewhere.
So it's your understanding that they had standard operating procedures and that you, as an attorney, had standard operating procedures. Is that right?
A. Yes.
Q. And are these written procedures that they're on a piece of paper that you have to read and be familiar with?
A. Yes.
Q. And I know you are familiar with your own standard operating procedures as a prosecutor.
Is it your testimony that you have no knowledge and no understanding of the standard operating procedures of the investigators who work the investigative -- worked in the homicide unit when you were there between 2004 and 2012?
MR. LIPSHUTZ: Objection to the form.
A. Yeah. I couldn't say anything about -- I couldn't say what their policies and procedures were.
Q. So it sounds like you're agreeing. You

don't have any information or knowledge about the standard operating procedures of the investigators that worked in the homicide unit between 2004 and 2012?
A. Right.
Q. So you wouldn't, for instance, be able to tell an investigator, you know, I don't think you're following some standard operating procedure correctly, and I'm not saying you would do that either way, but it doesn't sound like you would have been able to do that because you're not familiar with their standard operating procedures, right?
MR. BOWENS: Objection, mischaracterizes the witness's testimony, calls for speculation. You can answer.
A. I agree. That wasn't what I was saying.
What I was saying was I'm not familiar with their exact policies and procedures, but we would work together on cases, and we worked in conjunction with each other all the time.
I mean, if I wanted them to do something, I asked them. If they wanted me to do something, they asked me, but I don't know -- I don't know what you're getting at.



Q. So you don't understand the question. Is that right?
A. Right.
Q. I want to make sure we're working with the same vocabulary here. When I say standard operating procedures, I'm actually referring to documents, a document or a booklet or whatever may exist.
Does that exist as far as you know as it relates to the investigators that worked in the homicide unit during the time period that you were there?
A. Yeah.
Q. If I wanted to subpoena it, for example, could I get my hands on it?
A. I don't know. I guess I don't know. I have no idea.
MR. BOWENS: Don't speculate if you don't know the answer.
A. I don't know.
Q. But it exists. That's all I'm asking. Does it exist?
You seem unsure whether this document exists. So I'm trying to get clarity so we don't keep going around.



A. I said yes like 17 times. I said there's standard operating procedures. I did not say it didn't exist.
Q. It exists. You just -- have you ever read it?
A. I've read the portions that pertain to me.
Q. Have you read the standard operating procedures that pertain to the investigators who investigate homicides in the homicide unit during the time period you were there?
MR. LIPSHUTZ: Objection, lack of foundation for that question.
A. No.
Q. You said no?
A. No.
Q. You mentioned that the investigators had their own chain of command. Is that right?
A. Yes.
Q. Okay. Were you part of the chain of command as a line prosecutor?
A. I was not part of the detective chain of command.
Q. Okay. Did you have any ability to direct the investigators that were investigating



homicides during your time there in the homicide unit?
A. Yes.
Q. I'm sorry?
A. Yes.
Q. And when I say direct, are you able to either ask them to do something or tell them to stop doing something?
A. I could ask them to do something.
Q. Okay. Was it more of a collaborative thing or was there -- did direction ultimately end with the prosecutor meaning the prosecutor decided what the investigators did or didn't do?
MR. BOWENS: Objection, vague and ambiguous.
Q. If you understand. If you don't, I'll rephrase.
A. It was collaborative.
Q. Did you as a prosecutor working with an investigator or investigators in the homicide unit have any supervisory control over the investigators?
A. I don't understand.
Did I have supervisory control? Can you repeat? Can you explain your question?
Q. Sure, absolutely.

When you were in the homicide unit, did you supervise investigators in any way?
A. No.
Q. So if you had a problem with an investigator, would you go to somebody else?
I'm not saying it ever happened, but if you did, would you go to his supervisor? Is that how it worked?
MR. BOWENS: Objection, calls for speculation. You can answer.
A. No. I'd have to go to my boss who is a prosecutor.
Q. Okay. So let's say you have an investigator, and this is a hypothetical, an investigator who is not doing his or her job and you're having problems with him or her.
You're saying that, if you had a complaint about some investigator's work, you would go to your own supervisor. Is that right?
A. Correct.
Q. And then from there, do you know what happened or is that just speculation as well?
A. Yeah, speculation, because that never happened to me in homicide, but if it had, you'd go to your boss and then your boss would take care of



it.
Q. What if you found out, for instance, that an investigator didn't tell you about an exculpatory piece of information? What would you do in that situation?
A. You would go to your boss immediately and report it.
Q. Okay. And then it would go up -- it would be handled by your boss in some capacity as far as you know, right?
A. Right.
Q. Now, do you recall when it was that you first learned that you would be working the five missing boys case out of Newark?
A. Yeah. It was -- I don't recall exactly when, but my boss at the time was primarily dealing with the detectives on the case, and he would mention it to me that he was working with this -- you know, working with detectives to try and solve this old homicide, and he was really the one that was working on the case.
Q. And what was your boss's name?
A. Greg De Mattia.
Q. Can you spell that for the court reporter?



A. G-R-E-G. D-E capital M-A-T-T-I-A.
Q. And would that make him the director of the homicide unit?
A. Yes, he was the director.
Q. And could you just repeat his last name one more time so I have it correct?
A. De Mattia.
Q. De Mattia. Okay. So Greg De Mattia tells you that he is working with the detectives on this old case or cold case. Is that right?
A. Yeah. They were coming to him I think for -- you know, my understanding that they were talking to him about this case. They really -- you know, they had information, and they were going to him, you know, for, I guess, legal guidance and stuff, and that's how I learned about it originally through my boss Greg.
Q. And do you remember what he told you about the case initially?
A. Yeah. That there was five boys who went missing in Newark. I had never -- I never knew about the case, and that was unsolved for many years and that, you know, it's a very interesting case and that they were working on solving it, and that was pretty much it.



Q. During that first conversation you had with him, did he give you any specifics about who they surmised was responsible for the murders or any -- at that level of detail or was it just more of a general this is an interesting case, we're working on it, an old case?
MR. BOWENS: It's a compound question. You can answer it.
A. In just general -- just general information about the history -- more the history, because it's old. You know, it's very old.
Q. Did he tell you that he was looking to you to potentially prosecute the case if an indictment could be gotten?
A. Yeah. I mean I think he was getting ready -- at some point, Greg was going to retire. So I guess he knew he wasn't going to get to the case.
So I think he asked me would it be something that I would be interested in kind of like taking over. So --
Q. And what did you say?
A. Sure.
Q. And are you able to put a date on when that conversation happened, a year or anything like

that?
A. Definitely before Greg retired, and I would say it was like 2009, maybe the tail end of 2009.
Q. Do you know when he retired?
A. I think he retired in April 2010.
Q. Okay. So your best guess is about six months before that is when this conversation happened?
A. Yeah. Maybe the fall. Maybe late fall or late -- early winter, you know.
Q. Got it.
And after that conversation, when was the next communication you had with anyone about the five missing boys case?
A. I don't remember.
Q. Did he tell you what the -- what the investigators -- who the investigators were that were working the case?
A. I know that Lieutenant Carrega was definitely working on it, and I believe Rashid Sabur from Newark was also working on it.
Q. Was it your understanding when you had this conversation with Mr. De Mattia that it was your office that was leading the investigation?



MR. BOWENS: Objection, calls for speculation.
A. Yeah. I would think that we were going to be the lead. Although, in this -- because of the age of this case, I think it was going to be a joint effort because a lot of effort had been put into this case by many members of Newark Police, you know, back in the day, and throughout the years, I know Rashid Sabur was very involved, and so I mean, technically, we'd be the lead, but I think we were going to work closely with Newark because of the amount of time and many years that had gone by.
Q. Okay. Had you worked with lieutenant Carrega previously?
A. Yes.
Q. Okay. Did he investigate any other homicide cases that you ultimately prosecuted?
A. Well, he was a boss. So I mostly, as a line prosecutor, would deal with the line detectives.
Q. Okay.
A. He wasn't -- he may be out in the streets himself investigating cases, but when I was on call and the other detective was on call, I primarily would deal with them because they would be



the ones on the street.
I'm not saying he didn't go on the street. I'm just saying I didn't deal with him on a day-to-day basis like I would say a line detective.
Q. I understand.
And Lieutenant Carrega was a supervisor in the homicide unit, right?
A. Correct.
Q. And that means he supervised other detectives that were investigating homicide cases. Is that right?
A. Correct.
Q. Do any other cases come to mind that Lieutenant Carrega actively investigated while you were a homicide prosecutor other than this case?
A. Nothing, no.
Q. Was it unusual that he was playing -- in your mind, that he was playing such a lead role in investigating this case?
MR. BOWENS: Objection, calls for speculation.
A. No.
MR. BOWENS: You can answer.
A. No. No. I don't -- that wouldn't be unusual because, you know, the bosses in our office



are very active. So, no, that's not unusual.
Q. Had you worked with Detective Sabur as a homicide prosecutor?
A. Yes.
Q. You smiled. What was his reputation?
A. Excellent. He was a great detective. He was the detective on my first homicide.
Q. Did Detective Sabur work collaboratively with the -- to the best of your knowledge, work collaboratively with the detectives in your unit?
MR. BOWENS: Objection, calls for speculation. You can answer.
A. Yes.
Q. Okay. So you have this initial conversation with Greg De Mattia about the five boys.
At some point, you are told that you're going to be more involved in the case, correct?
A. Yes.
Q. When did that take place?
A. I guess when Greg asked me to. I don't know when. When he knew, I guess, he was never going to get to try it because he knew he was gearing up to retire. So he knew at some point he

wouldn't be able to see it through.
Q. Can you put a time frame on when you understood that you would be the prosecutor on the case? Is this pre-indictment, post indictment?
A. Oh, definitely pre-indictment.
Q. So how long -- I mean I know you -- you were one of the prosecutors who presented testimony before the grand jury. That's correct, right?
A. I don't remember did Pete or did I take any testimony? I know Pete did some. I don't recall doing any, but I don't know if I took testimony in grand jury. I don't remember if grand jury I took the testimony or Pete took it.
Q. Were you assigned to the case at the time that Mr. Evans and Mr. Hampton were indicted?
A. Yes.
Q. Okay. So if they were in indicted in 2010, early 2010, are you able to tell me how much time or how long before that date you were assigned to the case?
A. I'd say approximately six months.
Q. Okay. So about six months prior to -- again, and I know it's an approximation, but approximately six months before they were indicted, you knew that you were going to be the prosecutor



assigned to the case. Is that right?
A. Yes.
Q. Okay. I want to focus on that pre-indictment time that you were assigned to the case. Okay?
A. Uh-hmm.
Q. What were your duties and responsibilities as it related to the Lee Evans prosecution in that time period that preceded his indictment?
A. Reading all the reports, meeting with a former arson detective out of Newark who knew about the fire, speaking with Philander Hampton with his lawyer, you know, talking about case strategy, you know, just becoming familiar with all the formal reports, you know, talking with the various detectives that worked on the case.
Things like that. You know, just normal investigative duties to prepare a case that you knew would most likely be going to trial.
Q. Were you aware that you were assigned -- strike that.
Did you know you were going to be involved in the case at the time that Philander Hampton made a statement to Lieutenant Carrega.



A. I don't know the date of that. It would be hard for me to say.
Q. Sure.
So I will represent to you that, according to the affidavit in support of arrest warrants, Lieutenant Carrega interviewed Philander Hampton on November 13, 2008.
So my question is, on that date, were you aware that you were going to be prosecuting this case or have any involvement in the prosecution of this case?
A. I don't think so.
Q. Okay. Were you aware who Philander Hampton was in connection with this case on November 13, 2008?
A. No.
Q. So the circumstances under which Carrega interviewed Philander Hampton on November 13, 2008, was not something that you had personal knowledge of or had any information about at that time. Is that right?
A. That's my recollection.
Q. You said in the months preceding the indictment you were doing preparatory work, reading reports, getting familiar with the case.



You said you interviewed Philander Hampton. Is that right?
A. Yes. I interviewed him with his lawyer and a detective from our office and Pete.
Q. Did you take any notes during that interview?
A. No.
Q. Do you know if anyone took any notes during that interview?
A. No. No.
Q. Do you know whether any of your investigators prepared any reports that would memorialize that interview?
A. No.
And you know what? I may have been wrong, because I remember being in like a -- in a prison now that I'm thinking about it. So he wasn't arrested until after the indictment -- until after the arrest warrant.
So you know what? I may not have met him until after he was arrested. I don't think I did meet him before he was arrested because I remember sitting at like a square table with -- like a prison cell or jail or somewhere.
So I don't know. Now, I'm thinking

maybe it wasn't pre-indictment. Maybe I didn't meet Philander Hampton until after he was arrested, formally arrested and charged with the murder. I remember he definitely had a table, and I was definitely in some sort of prison facility.
Q. Okay. So -- and, again, that's normal that a bit of information comes your way and it jogs your memory. If you want to go back at any point and clarify or change an answer, you are free to do so. Just let me know that you are doing that.
So you think it's possible that you actually didn't sit down with Philander until he was already actually in custody arrested in connection with the murders of the five boys, right?
A. Right, because, usually, I have to deal with their lawyers. So I just can't meet with people because they have rights, and I just can't go meet with defendants. So that's why we have to get a lawyer present.
So yeah. I don't think I met with him because he wasn't formally charged until March -- I think it was March of 2010.
Q. Right.
A. So I don't think I met him until he was formally charged.



Q. Okay. So, again, focusing on your pre-indictment work, it sounds like you don't think you probably interviewed Philander Hampton because you would have been getting familiar with the case, right?
A. Right.
Q. And getting familiar with the case, would mean that you were familiar with the statements that Philander had made to Lieutenant Carrega, right?
A. Definitely read those.
Q. Right.
So you knew that he had implicated Lee Evans in the murders of the boys, right?
A. Yep.
Q. And he had also implicated himself in the murder of the boys, correct?
A. Yes.
Q. Did you -- and, again, that statement was provided on November 13, 2008, which I'm happy to show you the affidavit, but would you like to see that just so you can -- so you don't have to take my word for it?
A. No.
Q. Okay.



A. You're not going to lie about that.
Q. Not about that, right?
And you know, I think, that they weren't indicted until March of 2010, right?
A. Correct.
Q. Do you have any understanding of why there was so much time elapsed between Philander Hampton providing that statement to the time he was arrested?
A. Yes.
Q. What's your understanding?
A. Well, because this was not a very cut and dry case. It wasn't like Joe shoots, you know, Melissa on the streets of Newark. You got two ID witnesses, you know. We charge that person, and it's contemporaneous usually, but this was a very, very old case, and the office -- you know, the charges had to be approved by -- you didn't just get to prove charges. You had to go through your boss.
So our boss had to talk to the prosecutor about it, and then at some point he left, and then Pete, I remember, and myself met with Prosecutor Dow, and Pete prepared like this binder of all the evidence and almost like a showcase to show her this is the evidence, and she had to think



about it and review it, because, you know, you don't want -- obviously, there was probable cause to charge both of them, and, you know, you often weigh the risks of going to a trial with a case like this because, you know, you don't know what's going to happen, and you don't know who's alive, who's not alive, and, you know, how is the evidence going to present in court. You know, there's a lot to factor into.
So there was just a lot of delay in deciding whether or not we should go forward. Was it worth it? Although everyone knew he did, the two of them did it, there was no doubt in anyone's mind that we had the right person -- persons. Nobody doubted that. There was never a doubt. Nobody ever hesitated or paused. That was not the issue.
The issue was should we go forward because, you know, often times you're -- prosecuting a case is a lot different than whether or not we believe the person did it. You have to have proof. You have to be able to go into a court of law and have evidence. You can't just go into court with nothing. So the prosecutor wanted to make sure we had enough evidence to go forward. Just going back and forth, back and forth about whether or not we

should go to -- we should charge, because it's serious charges.
Everybody takes it very seriously, and like you asked me before, we don't like to write dismissals. That's why I don't know if I ever wrote any homicide dismissals to answer the question really. It's very rare. To dismiss a homicide is not taken lightly. That is a very, very serious thing to do.
So to charge somebody, you want to make sure that you have enough proof to go forward because nobody wants the person to sign off on a dismissal. So that's why it took so much time.
Q. Well, let me ask you this. What information or evidence was developed from the -- between the time that Philander gave a statement to Lieutenant Carrega in November of 2008 to the time that you -- your office decided to seek arrest warrants in 2010?
What additional information was developed, if any?
A. I don't remember.
MS. BONJEAN: Can we mark that affidavit in support of arrest warrants, Diane?
(Exhibit Cucinello-1, Affidavit in



support of arrest warrants, is marked for Identification.)
Q. I'm going to have you look at a document, Ms. Cucinello.
A. Counselor, whenever, maybe the next five minutes or so, could I use the restroom?
Q. You can take a break right now. We'll get the document up for you, and, in fact, if you want to take a look at the document before we go back on the record, we'll pull it up so you can read it, and then we can -- that way you don't have to be reading as we're on the record.
(Whereupon, a recess was taken.)
MS. BONJEAN: Okay. We're back on the record.
Q. Ms. Cucinello, did you have an opportunity to look at the document that we've marked as Cucinello-1?
A. I did.
Q. At least skim through it, and what do you recognize the document to be?
A. The affidavit that was submitted in support of arresting Philander Hampton and Lee Evans.
Q. And do you know who prepared or



authored the affidavit?
A. I think Pete wrote it.
Q. And do you know who executed it?
A. Well, I think we present this to a judge. The judge has to sign-off, you know, on our warrant. So you go to a judge with this and then the judge signs off.
Q. I'm asking who executed the affidavit. That's Louis Carrega, right?
A. Oh, yeah. Yeah, he provides his credentials.
Q. Okay. And what is the purpose of this affidavit in support of arrest warrant?
MR. BOWENS: Objection to the question. You can answer it.
A. It's to present to a court to show that you have probable cause to arrest.
Q. Okay. And is that why this affidavit was prepared and presented to a court?
A. Yes.
Q. And was this affidavit prepared and presented to a court for the purpose of arresting two individuals by the name of Lee Evans and Philander Hampton?
A. Yes.



Q. And would you agree that the affidavit has to make out a factual basis to support probable cause for the arrest?
A. Yes.
Q. All right. Now, in this arrest warrant affidavit, there are a number of paragraphs. The first paragraph, you had a chance to look at. Can we agree that it essentially gives the background of Lieutenant Carrega?
MR. BOWENS: Objection. The document speaks for itself.
Q. You can answer.
A. Yes.
Q. Okay. I'm going to ask to go to the second paragraph, and the second and third paragraphs essentially lay out what Carrega's assignment was and what the purpose of the affidavit is, right?
A. Correct.
Q. If you can go to the next, four, five and six. Okay. The information that's contained in paragraphs -- let's say -- well, what you can see on the screen which is four through eight, if you could look at that and tell me if you agree that this is information that was available in 19 -- in the

1970s, it was available from the original investigation or came from the original investigation?
MR. BOWENS: Objection, calls for speculation. There's no foundation. You can answer.
A. It appears they have dates from 1978. So I don't -- I assume it was available. I don't know.
Q. Well, ma'am, you were the prosecutor on the case, weren't you?
A. I was, yes.
Q. Okay. So I mean we'll read through it line-by-line if that's what you'd like to do.
On or about August 20, 1978, Newark Police were notified by members of families, Randy Johnson, Michael Mc Dowell, Melvin Ricky Pittman, Ernest Taylor and Alvin Turner, that these five boys all between the ages of 16 and 17 years old had not returned home and were missing?
A. Right.
Q. That was the information that was available in August 20 --
MR. VOMACKA: Objection to the form, but you can answer.



Q. -- right?
A. Yes.
Q. The investigation revealed that each of the five boys had last been seen in the company of Lee Evans, a local contractor. Do you see that?
A. Yes.
Q. Based on your review of all the reports, you understood that Lee Evans was the person that was allegedly last seen with the boys back in 1978, correct?
A. Yes.
Q. Okay. So that information was available back in 1978, right?
What about paragraph number 6? On August 26, 1978, and August 25,1978, Lee Evans stated to place that he had commonly picked up the five boys sometimes to help him with construction work. Do you see that?
A. Yes.
Q. Would that lead you to believe that Lee Evans told the police that back in 1978?
A. Yes.
Q. It goes on to say, Lee Evans stated to police that, on the day they disappeared, he had picked up Melvin Pittman, Michael Mc Dowell and



Randy Johnson and later dropped them off along Clinton Avenue at approximately 8 p.m.
He further stated that at approximately 10:30 p.m. he picked up Michael Mc Dowell, Alvin Turner and Ernest Taylor to help move boxes but again dropped them off in the vicinity of Clinton Avenue and Fabyan Place in Newark.
Do you see all that?
A. Yes.
Q. And we agree that this is information that was provided to the police by Lee Evans allegedly in 1978, right?
MR. BOWENS: Objection, calls for speculation. There's no foundation. You can answer.
A. Yes.
MR. VOMACKA: I'll join the objection. You can answer.
A. Yes.
Q. Okay. As to paragraph 7, it says, On August 23, 1978, Ruby Taylor, sister of Ernest Taylor, stated that Melvin Pittman came to her house and asked her brother, Ernest Taylor, to go with him to pick up some boxes on Camden street. She stated that she saw her brother get on a pickup truck



belonging to Lee Evans with Melvin Pittman and several other boys. Do you see that?
A. Yes.
Q. This affidavit conveys that Ruby Taylor told this information on August 23rd of 1978, right?
MR. BOWENS: Objection. The document speaks for itself. You can answer.
A. Yes.
Q. So that was information available in 1978, correct?
MR. BOWENS: Same objection.
A. Yes.
Q. Okay. Can you read line 8 and tell me if you would agree that is also true for what Janet Lawson stated?
A. Yes.
If you could scroll up, 9, 10.
Q. Okay. And then in number 9, Marvin Hall stated on October 31, 1978, that he was on Fabyan Place at approximately 9:30 p.m. with Alvin Turner. He stated that Lee Evans came by in his pickup with Michael Mc Dowell. Evans gave him money to buy a milkshake, and Alvin stated he was going home. Alvin was never seen again. Do you see that?
A. Yes.

Page 73

Q. Again, this was information that was stated by Marvin Hall on October 31, 1978, right?
A. Yes.
Q. At least, according to this affidavit, and, therefore, this information was available in 1978?
A. Yes.
Q. All right. And, now, let's look at paragraph number 10. On or about August 21, 1978, the residential structure located at 256 Camden Street was involved in a three-alarm fire. Do you see that?
A. Yes.
Q. Fire Investigators Delk and Harris reported that it was their opinion that an incendiary fire -- incendiary was used to start the fire and that two black males had been observed by neighbors to have fled the building immediately before the fire began. Do you see that?
A. Yes.
Q. Do you know where that information came from?
A. A fire report.
Q. And do you know when that fire report was obtained by your office?

Page 74

A. Sometime in 2008 or '09.
Q. Okay. Was it before or after Philander Hampton made a statement to Louis Carrega?
A. I don't remember.
Q. On paragraph 11 now we have a conversation that -- I'm sorry. The interview is -- strike that.
Paragraph number 11 recounts an interview on November 13, 2008, between Louis Carrega, Detective Hadley, Trooper William Tietjen of Philander Hampton. Do you see that?
A. Yes.
Q. Okay. And if you could read that, paragraph 11, would you agree, recounts or summarizes what Philander Hampton told those officers?
MR. BOWENS: Objection. The document speaks for itself. You can answer.
A. Yes.
Q. Does it indicate that Philander Hampton told the detectives about the third floor of 256 Camden Street having been the place where the boys were when the fire began?
MR. BOWENS: Same objection.
A. Yes.

Page 75

MS. BONJEAN: Okay. Can you go on?
Q. And then 12 simply states that the unit was -- 256 was demolished, right?
MR. BOWENS: Objection.
A. Yes, demolished.
Q. Okay. And then paragraph 13 indicates some efforts that were made to determine whether there was any activity or that could be associated with the boys, right?
A. Correct.
Q. Okay. So, again, based on this, are you aware -- can you point me to any information whatsoever that was developed after Philander Hampton's interview in 2008 that provided evidence in support of an arrest warrant or charges against Mr. Philander Hampton and Mr. Evans?
MR. BOWENS: Objection. It's asked and answered. You can answer.
A. There's nothing in the affidavit besides what you just previously stated.
Q. Okay. And, again, I know you don't have necessarily complete memory of the case at this juncture.
Putting aside what you see in the affidavit, are you able to point me to any piece of

Page 76

evidence that your office or any law enforcement agency developed after their interview with Mr. Hampton in 2008 that supported a probable cause finding in connection with Lee Evans?
MR. VOMACKA: Objection to the form and foundation. You can answer.
A. I don't remember.
Q. So you're not able to point me to any piece of evidence as you sit here today, right?
MR. VOMACKA: Objection.
MR. BOWENS: Objection.
MR. VOMACKA: And asked and answered.
Q. Is that right?
A. I don't remember.
Q. I know you don't remember. So, therefore, you're not able to point me to any evidence that you can point to that was developed post November 2008 to support a finding of probable cause as to Lee Evans, right?
MR. BOWENS: Objection.
MR. VOMACKA: Objection. Same objection, asked and answered again.
MR. BOWENS: So can I finish my objection please?
MS. BONJEAN: We can't hear you. So

why don't you sit up and get closer to the microphone. We might be able to hear you better.
MR. BOWENS: Okay. Well, thank you for that.
Objection. It was argumentative. It was asked and answered, mischaracterizes the witness's testimony.
MS. BONJEAN: Well, I'm trying not to mischaracterize it.
MR. BOWENS: You're doing a good job of it.
MS. BONJEAN: Am I?
Q. All right. Just answer the question, Ms. Cucinello. It's a yes or no.
Can you point me to any piece of evidence that was developed post 2008 --
MR. LIPSHUTZ: Same objection.
Q. -- that's supporting a finding of probable cause as to Lee Evans?
MR. LIPSHUTZ: I'm sorry for interrupting. It was the same objection. You can answer.
Excuse me, Ms. Bonjean. I don't want to be argumentative with you, but she did say she couldn't remember, and now you phrased the question



as a yes or no.
You can leave your question as it's posed, but I think it's improper. So I'm going to object. Okay?
MS. BONJEAN: Okay. Well, thank you.
Q. Go ahead. You can answer.
A. No.
Q. So going back to what we had talked to about earlier, you had indicated that --
MS. BONJEAN: You can take the exhibit down.
Q. You had testified, again, to the best of your recollection, about why there was a lapse in time from when Carrega interviewed Mr. Hampton and obtained this recorded statement to the time that arrest warrants were sought, and your recollection was that it was just, you know, something you took seriously and it took some time, right?
A. Yes.
Q. Do you know what ultimately led to the decision to actually seek an arrest warrant and an indictment as to Lee Evans in March of 2010?
A. I think the prosecutor felt that there was enough to go forward with the case.
Q. It was enough to go forward with the



case in 2008?
It's the same evidence. What changed?
MR. LIPSHUTZ: Objection to the form. Objection to the form, argumentative.
MR. BOWENS: I'm sorry. I said that it was argumentative, and it was mischaracterizing the witness's testimony.
Q. You could answer.
MR. BOWENS: Do you need to have the question reread?
MS. BONJEAN: No. Thank you as well.
A. No. I really don't know how to answer it. I don't know how to answer the question. I don't know what to tell you what changed between 2000 -- whatever you said, the two years.
I don't know what specifically changed because I can't get into the thought processes of Paula Dow, and then as you see from the affidavit, then it was Bob Laurino as the prosecutor. So at some point prosecutors changed in my office.
Q. So is it -- so is it your testimony that it was ultimately the prosecutor, the top prosecutor who was making that decision and that -- I don't want to put words in your mouth. Is that what you're saying?



A. Yes.
Q. And in 2010, it was Robert Laurino according to the arrest warrant affidavit?
A. Yes.
Q. Okay. So does that change your answer about who you went to to pitch the case or who Guarino went to to pitch seeking an indictment?
MR. BOWENS: Objection, mischaracterizes the witness's testimony. It's vague and ambiguous, compound question. You can answer it.
A. Originally, I just remember Pete preparing this book and presenting it to Paula Dow. I remember that Paula Dow was looking at this book or he gave it to her, this book, to look at.
Whether or not -- you know, she obviously wasn't the prosecutor at the time when the arrest warrant was obtained. So I don't know what happened, what their conversations were.
Q. So she declined at that time to the best of your recollection?
MR. BOWENS: Objection, mischaracterizes the witness's testimony. She just said she doesn't know what went on.
MS. BONJEAN: Okay. Well --

MR. VOMACKA: I'll join the objection.
MS. BONJEAN: Okay. Don't hurt yourself over there. Relax. I mean I'm asking the question. She can -- she can answer it or correct it. She is perfectly capable of doing so. I can see that with my own eyes.
MR. BOWENS: Okay. I don't appreciate your snide comments. Although, I am certainly used to them.
MS. BONJEAN: Well, you're screaming. So I'm asking you to relax. That's it.
MR. BOWENS: You complained that I wasn't being heard. So I'm trying to speak up, and now you're complaining that I'm speaking up.
MS. BONJEAN: Now, I'm complaining that you're screaming, but I will move on.
Q. Let me ask it this way, Ms. Cucinello. You said you had a recollection of being with Mr. Guarino and that he had prepared a book in connection with this case and the book detailed evidence about the case and that it was presented to Prosecutor Dow, right?
A. Correct.
Q. But you would agree that it wasn't Dow who was the prosecutor that ultimately signed off on



the arrest warrants or seeking the arrest warrants. Is that correct?
MR. VOMACKA: Objection to the form. I'm sorry if I cut off the end. Objection to the form. You can answer.
A. Yes, it was Bob Laurino.
Q. My question is do you have a recollection as to why Dow did not sign-off on seeking arrest warrants for Hampton and Evans?
MR. VOMACKA: Objection to form, calls for speculation. You can answer.
THE WITNESS: Thank you.
A. No, I do not.
Q. So you don't remember or is it that you don't remember or it's --
A. I don't know why she didn't sign-off. There could be a million reasons. She could have been getting ready to go. I don't know when she left.
She had a lot going on. She was becoming the AG. I don't know. She had a whole world ahead of her. So I don't know why.
Q. Do you remember her saying I'm not going to approve this? I guess that's my question.
A. No, absolutely not.



Q. So after Pete presented this big binder of stuff and you had this interview, what did she say?
A. I don't think she said anything to me. She was the prosecutor. They don't talk to the line APs. I don't really have access to her. She already talked to my boss as far as I know, but she never spoke to me personally about the case.
Q. Okay. So that clarifies things for me. I got the impression when you were testifying that Pete had prepared this book, that maybe there was some type of meeting or something, but are you saying that you never actually even spoke to her directly?
A. I can't remember. There may have been a meeting, but I know her, and I never had a personal one-on-one where she expressed thoughts about charging or not charging.
Q. Okay. But, ultimately, she did not green light seeking arrest warrants for Hampton and Evans, right?
MR. VOMACKA: Objection to the form. You can certainly answer if you're able to.
MR. LIPSHUTZ: I object to the form as well.



A. Yeah. I can't say that she didn't green light it because it could be that she never got to it. I just don't remember.
Just because she's not the prosecutor at the time doesn't mean she doesn't agree with the charges. She was moving on to her next position and didn't have time to deal with this of one of millions of cases that as a prosecutor you have to talk about. So I don't know.
Q. Did she agree with the charges?
MR. BOWENS: Objection, calls for speculation.
A. I don't know.
MR. VOMACKA: I'll join the objection. You can answer.
Q. So you don't know whether she agreed or didn't agree with pursuing arrest warrants and charges against Evans and Hampton. Am I right?
A. Correct.
Q. Do you know when Robert Laurino became acting county prosecutor?
A. No.
Q. Do you know when she left the office?
A. No.
Q. All right. I guess, when you were

first assigned to the case, did you have an understanding of who the lead detective was or lead investigator was on the case?
MR. LIPSHUTZ: Objection.
A. Yes. I mean it thought it was Carrega was very involved. I thought Rashid Sabur was heavily involved.
Q. I just want to go back to something. Does it sound right that Paula Dow left the office in January of 2010? Any reason to quarrel with that?
A. No.
Q. Okay. And you would agree that that arrest warrant was sought and obtained in March of 2010, right?
A. Yes.
Q. Okay. You also indicated that you looked at -- in preparation for the case, you looked at all the reports that have been prepared. Is that right?
A. You mean when I was going to try it? You're talking about back in the day?
Q. I'll lay some foundation for you.
A. Okay.
Q. You indicated that, when you were first



assigned to the case, you became familiar with the case. Am I right?
A. Yes.
Q. And you did so by reviewing the reports that had been prepared in connection with the investigation, right?
A. Right.
Q. And would that have included the original missing persons reports?
A. Yes.
Q. Would it have included any subsequent work that was done on the case?
A. Yes.
Q. Would it have included, for instance, Detective Sabur's reports?
A. You know, I don't know who got them all immediately. There are a lot of statements. There are statements from a lot of witnesses like the ones you just saw in the affidavit you showed. So that jogged my memory.
There were a lot of statements from family members, people who last saw the boys, you know, things like that. There were a lot of statements from family.
Whether Rashid Sabur's reports were



there, I don't know. I don't know if we saw them right away because I feel as if he had a lot of reports, and he had to get them signed off on, and I don't know if they were -- if I had them in the very early on, you know, the very early stages.
Q. Did you eventually get them?
A. Yes.
Q. And why did he have to have them signed off on?
A. Because when you submit a report, you have to have a boss sign-off on it.
Q. Right.
And you're supposed to do that shortly after you prepare the report, right?
A. Typically, yes.
Q. I mean according to those SOPs that you haven't read but -- right?
MR. BOWENS: Objection, calls for speculation. It's argument.
MR. LIPSHUTZ: Objection to the form and foundation, but you can answer. Answer if you're able to.
I don't think those kind of questions advance at all because they're really improper.
Could you rephrase your question



because I object to the form?
MS. BONJEAN: I will not rephrase my question because you asked me to, but I will rephrase my question, and it's not improper.
Q. You haven't read the SOPs according to you, but is it your understanding that reports are supposed to be signed off on shortly after they're prepared?
A. Yes.
MR. LIPSHUTZ: Okay. Objection to the form because there's no foundation for that question.
MS. BONJEAN: Okay.
MR. VOMACKA: Objection to form and foundation.
MS. BONJEAN: You can randomly throw out objections, but there was foundation because we went through this at great length earlier. So I'm not going to go back through it.
MR. LIPSHUTZ: That's fine. Your question may or may not be struck then. So --
MS. BONJEAN: I'm not worried about it.
MR. LIPSHUTZ: I will remind you Rashid Sabur is a Newark Police officer, and you're asking her, Cheryl Cucinello, about operating procedures

with regard to Rashid Sabur.
So the question lacks foundation. You can leave it stand if you'd like.
MS. BONJEAN: Fair enough.
Q. Putting aside standard operating procedures of your office or Newark Police Department, it is your understanding that police officers, detectives who prepare reports are supposed to submit those reports shortly after they're prepared to their supervisors for approval, right?
MR. LIPSHUTZ: Objection to the form, lack of foundation.
MR. VOMACKA: Objection to the form and foundation. You can answer.
A. Yeah, typically.
Q. I mean you've seen a few Newark Police reports in your time, haven't you?
A. Yes.
Q. Okay. Did you have an understanding of why his reports were not promptly submitted for approval?
And when I say him, I'm talking about Detective Sabur. Did you ever find out why that was?



A. No.
MR. LIPSHUTZ: Objection, lacks foundation for that question.
Q. Did you ask him?
A. No. I never asked him.
Q. Now, Louis Carrega got involved in the case in 2008. Is that correct?
A. I know he was involved before I was involved. Whether he got involved in 2008 or earlier, I don't know. I just know he was involved when I was.
Q. Well, we've already established we know that he interviewed Philander Hampton in November of 2008, right?
A. Right. I just don't know how soon before that.
Q. But you have no reason to disagree that he was involved at least in 2008, correct?
A. Yes.
Q. And when you were preparing for the case -- well, let's talk about when you were preparing to present to the grand jury. Okay.
Did you -- did you at that point look at all the reports that were available to you?
A. Definitely.



Q. Okay. That's something you would have done in preparation for your presentation to the grand jury, right?
A. Yes.
Q. And that occurred in 2010, right?
A. Right.
Q. Did you ask Lieutenant Carrega for all of his reports?
A. Yeah. We had them all.
Q. Okay. So it's your -- your recollection that, when you presented to the grand jury in 2010, you had all of Carrega's reports?
MR. VOMACKA: Objection to the form and foundation. You can certainly answer.
A. Anything that he had written, if he had written it, submitted, we had it. Yeah. I don't know if there was a subsequent report. I mean we still continued to do work, and I'm sure someone wrote a report at some point about the ground penetrating radar. I don't know when that was written. I just know there would be a report about it.
So, you know, reports are constantly being written. It's not like you're going to be getting one like, you know, August 12. A detective



or a lieutenant or anyone -- any law enforcement officer can write a report at any time, and to supplement and to, you know, continue an investigation, they can keep writing a report.
They can write a report. I've had reports given to me like during trial. When I'm on trial, I'm getting reports. So it's like a fluid situation.
So I mean when I went to grand jury, I reviewed everything that was written and signed off on up to that point. So do I have all of those reports? I can't say. I can say that I had whatever he had done at that point that I said I was aware of that he submitted and was signed.
Q. Do you recall that in March of 2011 during Philander Hampton's Miranda hearing it was discovered that Lieutenant Carrega had not prepared any reports in connection with his investigation on the case?
Why don't we look at some testimony maybe that will help jog your testimony -- I'm sorry, jog your memory.
(Whereupon, a discussion was held off the record.)
(Exhibit Cucinello-2, Transcript dated

3/1/11, is marked for Identification.)
Q. Can you see what's marked as Cucinello-2 in front of you?
A. Yes.
Q. Does this at least purport to be transcripts in the State of New Jersey versus Hampton?
A. Yes.
Q. And you see where it says Carrega - cross?
A. Yes.
Q. I want to review this testimony with you and see if it refreshes your recollection about Carrega's report. The question, "Now, when in relation to November of 2008 did you first become involved in the five missing boys?
"Answer: Possibly around 18 months prior to that."
Do you see that?
A. Yes.
Q. Okay. And I will skip down to line 18.
"Question: I'm showing you what's been marked S-1. I take it this is the report that you recently did?
"Answer: Correct.



"And that was provided to me today?
"Answer: Correct.
"Question: Now during the time starting I think you said 18 months prior to November until you did this report, did you put anything in writing with respect to any of the work that you've done on this case?
"Answer: No.
"Question: And does the prosecutor's office have some kind of policy or protocol for preparation of reports by detectives who are actively involved in a homicide case?
"Answer: Reports are generated -- were generated by detectives.
"Question: I'm asking you if there was a policy or practice in the prosecutor's office that detectives working on homicide cases prepare reports?
"Answer: Correct."
Do you see that?
A. Yes.
Q. Does this refresh your recollection during his 18 months prior to, while working on the case, he did not put anything in writing related to his investigation?



MR. VOMACKA: Objection to the form and foundation. You can certainly answer.
A. That's what he says.
Q. Do you remember that?
A. No. I don't remember that until you pointed that out.
MS. BONJEAN: Okay. You can take that down.
Q. Now that you've had an opportunity to look at that, do you remember that or is it still not something that you have any recollection of?
MR. VOMACKA: Objection.
A. I don't have any independent recollection that there were no reports until that time.
Q. So you don't remember having an impression or an opinion in any way at the time about the fact that Lou Carrega had failed to prepare a single piece of writing to document his investigation in the case during his 18-month work on the case?
MR. VOMACKA: Objection to form and asked and answered. You can answer the question.
A. That's correct. I did not remember that until you showed me that testimony.



Q. Okay. So having looked at that transcript, do you recall that there was actually a hearing in connection with Philander Hampton's effort to, I guess, suppress his statements?
Does that sound right?
A. Yes. That was a Miranda hearing.
Q. Did you speak with Lou Carrega about the circumstances under which he took the statement of Mr. Hampton?
A. Definitely prepped him for the Miranda hearing.
Q. Okay. And when you prepped him for the Miranda hearing, you did so without the benefit of any of his reports, correct?
A. I don't remember, but now that you pointed out, I would guess so. I don't know if he was the only witness we called either.
We may have called someone else. I don't remember, but I guess it says in the report. I guess we prepped him without a report.
MR. BOWENS: Don't guess. If you know, answer it. If you don't know, the answer to the question is I don't know.
THE WITNESS: Thank you.
A. I don't know.

Q. And do you recall that -- do you recall the timeline of when Mr. Hampton was brought in to custody to the time that he actually provided this recorded statement? Does that ring a bell at all?
A. Can you repeat your question?
Q. Yeah.
Do you -- let me start over. Maybe I can provide something that can --
MS. BONJEAN: Can we please mark as Cucinello-3 Carrega report.
(Exhibit Cucinello-3, Carrega report, is marked for Identification.)
MR. BOWENS: It's 12:30. How much longer do you intend to go?
I'd like to know if the witness needs a break to get something to eat.
MS. BONJEAN: Sure. I don't know that we'll be going too much longer, but if you want to take a lunch break, we can do that. That's -- would that be to your liking?
MR. BOWENS: Well, when you say you don't think you're going to go too much longer, can you give us a number so we can make a determination as to whether we should proceed?
MS. BONJEAN: I don't think we're going



to have to go much longer than 30, 45 minutes. Something like that.
THE WITNESS: I'm fine with that as long as everyone else is fine.
MR. BOWENS: All right. Let's proceed.
MR. LIPSHUTZ: Actually, I wouldn't mind a 10- or 15-minute just break, quick break here. We're off the record.
(Whereupon, discussion was held off the record.)
MS. BONJEAN: Okay. We're going to go back on the record.
Q. Ms. Cucinello, I'm going to have you look at a document, but before I do so, I want to ask you some questions.
As a prosecutor in the homicide division or really any case, sometimes you're in a position of presenting evidence in the form of admissions by the accused, right?
A. Yes.
Q. Okay. Now, sometimes we call those confessions. Sometimes we call them oral statements. They can come in any number of ways or any number of forms. Would you agree with that?
A. Yes.



Q. And when you are going to admit a statement or a confession in a case, do you believe that it's part of your responsibility to ensure that that statement was voluntarily provided by the accused?
A. Yes.
Q. And in most cases -- well, strike that.
Would you agree that in most cases you're not present when a statement or a confession is taken by a police officer or detective?
A. That's correct.
Q. And what is your methodology or how do you ensure that the statement was taken in accordance with the constitutional guarantees of the accused?
A. Well, I look at the statement and see what led up to it, the manner, how they got to that point when they questioned the defendant, whether he or she wanted to give the statement, were they properly read their Miranda rights, did they have an opportunity to, you know, review what they said, and then, you know -- or ask questions, and, you know, as long as they comported with the Miranda rights and all the -- and then was the statement a voluntary knowing waiver of those rights, I'm then



pretty confident I can go forward with it in a court of law.
Q. All right. So -- and consistent with Miranda would be to ensure that, if somebody invoked their right to remain silent, that that was scrupulously honored, right?
MR. BOWENS: Objection, calls for a legal conclusion. You can answer.
A. I didn't hear the last two words. I couldn't hear what you said. Could you repeat it?
Q. Would it be fair to say that part of your thinking or your analysis would be to make sure that, if an accused had invoked his Fifth Amendment right to remain silent, that the police officer's scrupulously honored that invocation?
A. Yes.
Q. And do you also want to ensure that no promises were -- promises -- strike that.
Do you want to ensure that, if promises were made, that you understand what those promises were and make sure that they are in accordance with the -- whether they can be honored or whether they were induced to promises that can't be honored?
A. Absolutely.
MR. VOMACKA: Objection to form, but

you can answer.
A. Absolutely.
Q. Okay. Would you agree that you can't promise -- police officers are prohibited to promise either witnesses or accused -- or an accused money, for instance, in exchange for statements?
A. Yeah. You're not going to offer money. No.
Q. Would you agree that, if some promise was made, that it should be memorialized somewhere if a detective has made a promise to either a witness or an accused in exchange for his statement?
MR. BOWENS: Objection.
MR. VOMACKA: Objection to form, but you can answer.
A. Yes.
Q. Would you agree that, for instance, if a police officer promised a witness anything of benefit in exchange for his statement that that is information that the defense would be entitled to under Brady versus Maryland?
A. Yes.
Q. And that a police officer would be obligated to disclose that both to you and so you could disclose it to defense counsel, right?



A. Yes.
Q. And are those the type of things you would look at to make sure that a statement was voluntarily provided either by a witness or a defendant?
A. Yes.
Q. Back in 2008, what was your understanding of the policy of the Essex County Prosecutor's Office regarding the video or audio taping of witness statements and/or defendant statements?
A. At some point, the laws required that they had -- we had to record all statements. I don't remember when, but it required all statements be recorded, especially defendant's statements.
Those were the priority, of course, but they wanted everything recorded to the best of your ability, and that was our goal. You know, we had to honor the law. So whenever the law got instituted, we had to make sure that all our statements were recorded.
Q. Would you agree that, when Philander Hampton was interviewed in 2008, November of 2008, he was not only a witness but he was actually a defendant, right?



He was an accused, right?
A. Yes.
Q. Okay.
A. I guess he was a target. I don't know if he was charged, but he was the target. Yeah.
Q. And he did, in fact, give inculpatory statements that made him liable, criminally liable for the deaths of these young men. We agree on that?
A. Yes.
Q. You charged him with murder, right?
A. Yes.
Q. And so, in 2008, do you recall whether or not the law -- either the law or the policy -- let's -- I'm going to start over because I want to be clear on both those things.
You mentioned the law. Are you saying that there is actually case law that required prosecutors or law enforcement agencies to record statements of criminal defendants or suspects at some point that went into effect?
A. Yeah. I mean I don't know if it's a AG directive or AG mandate or is it actual case law. I just know that we have to record our statement of a defendant. We have to do it. There's no excuse.



It can't -- then we're really basically prohibited from using it. Then we have to have a hearing to show why we didn't use that, why we didn't use the video equipment or audio equipment, and then we get an instruction to the jury saying we didn't follow the proper, you know, protocols.
When it happened, I don't know. I just know it happened at some point, and that's the policy.
Q. So whether it was via directive or some case law or however the mandate came down, do you -- do you know whether or not that law or mandate was in place in November of 2008?
A. I believe it was.
Q. Okay. And do you -- and does the mandate require or did it require as of November of 2008 that the entire interrogation from start to finish be recorded or just the actual statement itself?
A. I think it was a recommendation that it's best practice to record, you know, the whole thing. It's feasible -- it's best to do the whole entire thing, you know, if you talk to the person before the reading of the Miranda rights, any prior discussions and then the statements till its

conclusion.
Q. Right.
What leads up to the actual statement is important in determining whether or not the statement is voluntary. Would you agree?
A. Yes.
MR. VOMACKA: Objection to form and foundation, but you can answer.
Q. Just putting it in stark terms. If someone was physically beaten before they gave a statement and that wasn't captured on video, that would not give you much information about whether or not that statement was voluntarily provided as the prosecutor, right?
MR. VOMACKA: Same objection, but you can answer.
MR. BOWENS: It calls for speculation. You can answer it.
A. Yeah. It would be good if the whole thing was recorded.
Q. And that's why it was a recommendation to record the entire interrogation from start to finish. Is that correct?
A. Yes.
MR. VOMACKA: Objection to form and



foundation, but you can answer.
THE WITNESS: Thank you.
A. Yes.
Q. And just so I'm clear, it's your recollection that at least, as of November 2008, it wasn't -- that piece of it wasn't a mandate. It was just a recommendation that the entire interrogation be recorded?
A. I don't remember. I just know it's best practice and may be either required now, but I don't know what it was in 2008.
Q. Do you know whether it's required now?
A. Yes. All our statements are taped now.
Q. Right.
Do you tape them from the beginning of the interrogation or just the statement? What's the practice of your office today?
MR. BOWENS: Objection. It's a compound question. You can answer it.
A. They record the reading -- well, if it's just a witness, you know, Q and A, question and answer.
If it's a person who is a person of interest, a target, they record the Miranda hearing -- I mean the reading of the Miranda rights



and then the question and answer session as well.
Q. Okay. But some -- most interrogations -- strike that.
Interrogations do not necessarily just sit down, here's your Miranda, question and answer, right?
A. Detectives don't speak to defendants. I mean, other than like do you want a cup of coffee or do you need to use the rest room, they don't discuss the facts.
If there's a target, they have to limit what they're going to say to that person other than to the basic human needs, like I said, using the rest room or getting a drink of water, but, no, there's not -- it's improper.
They do not have conversations with potential targets/defendants that are not taped or recorded because they're not allowed to do that.
Q. Right.
So the entire interview is now recorded. At least that's your understanding of the policy, right?
A. Yes.
Q. And I just want to be clear. Back in November of 2008, you're not sure if that was a



mandate or if it was just a recommendation back then, right?
A. Yeah. I don't remember. I don't remember.
Q. Okay. Fair enough.
I am now going to show you that document which is Cucinello-3 which is Carrega report.
Okay. Let's start at the first page. Are you able to see that, Ms. Cucinello?
A. Yes.
Q. Okay. Can you see that it says Essex County Prosecutor's Office continuation report at the top?
A. Yes.
Q. And that it seems to be prepared by Lieutenant Carrega to Captain Michael De Maio. Is that right?
A. Yes.
Q. And that's his boss?
A. Yes, that was his boss.
Q. And do you notice that the date is February 23, 2011, that that is the date the report is prepared?
A. Yes.

Q. I'm sorry. And if you could, just I'm going to ask you to read starting with, sir. Do you see that?
A. Yes.
Q. And just read through the first paragraph after that.
A. Okay. I read it.
Q. Okay. You see that?
A. Yes.
Q. And then keep going. If you could keep reading?
Just read to the end where those signatures are and let me know when you've gotten there.
A. Okay. I read it.
Q. Okay. So this report is -- what you've read and will continue reading purports to memorialize Carrega's interview of Mr. Hampton on November 12th of 2008. Do you see that?
A. Yes.
Q. And you would agree that November 12, 2008, is more than two years before this report was prepared, right?
A. Yes.
Q. And are you aware of any reports that



were prepared contemporaneous or near contemporaneous at that time with the taking of the statement of November 12, 2008, by Carrega or any other detective.
A. You said November 8. I'm not sure where you get the number 8 from.
Q. 2008.
A. Oh, 2008. Okay. I apologize. I heard November 8. Okay. So I'm sorry. Can you repeat your last question?
Q. Sure.
As you sit here today, are you aware of any written report or document that memorializes the interview of Mr. Hampton on November 12, 2008, by any detective other than the actual statement itself?
A. I don't remember.
Q. Okay. So did you ever speak with Lieutenant Carrega about how he was -- how he was able to prepare a report over two years after his interview with Mr. Hampton?
A. No.
MS. BONJEAN: Okay. I'm going to keep going. If you could go to the next page? Stop right there.



Q. I'll read. You can read along with me.
He says Mr. Hampton stated that he was not involved and didn't know what happened to the boys. Detective Eutsey and I both told him we did not believe him. We then asked him if he would be willing to take a polygraph.
Do you see that?
A. Yes.
Q. And he's detailing what happened during this interview with Mr. Hampton. Do you see that?
A. Yes.
Q. Okay. And even in the middle page where it says he was confronted with the polygraph results, Mr. Hampton said, okay, I guess it had to come out some day. I'll tell you what happened but you know it was Big Man, right?
Do you see that?
A. Yes.
Q. You see how that's in quotations?
A. Yes.
Q. Did you ever ask Mr. Carrega how it was that he remembered the exact words Mr. Hampton stated to him over two years after this interview happened?
A. No.



Q. Did you ever ask him if he had any notes, for instance, that captured this exact quote that he put into his report?
A. No.
Q. Did you find it odd that he could remember the precise words that were used by someone over two years earlier and that he was able to include that in his report?
Did you find that unusual?
A. No.
Q. Was Lieutenant Carrega known for having an incredible memory?
MR. BOWENS: Objection, calls for speculation, argumentative.
A. These guys that I work for -- these detectives have the best memory of anyone I've ever met in my life. Just not Carrega. All of them. They remember everything.
I don't know if their training helps them or what, but they have great memories, and it didn't surprise me at all that he remembered the exact quote because I think it's something that he was working on this case for years and it probably was ingrained in his mind.
Q. Right.

And having worked on the case for years, did you say, Lou, why didn't you prepare any reports, you've been working on the case for years?
A. I never said that to him.
Q. Did you ever ask him why he was unable to record either via audio or video this portion of his interview with Mr. Hampton?
A. I know they recorded something with him. I guess this is not the one that's recorded. I know of something with Mr. Hampton was recorded.
I'm relying on you the way you're phrasing your questions. I don't remember that this was not recorded.
Q. Okay. Fair enough.
Let's go back to that first page. I want to just get the timeline for you so that maybe it will help you to remember.
Do you see that Lou Carrega states that at approximately 1:30 p.m. he brought Mr. Hampton over to the prosecutor's office?
A. Well, sheriff's office I think transported him. Yes. Right. I don't think he physically took him. I thought he's brought over.
Q. He arranged for him to be transferred, right?



A. Yes.
Q. Do you know under what authority he arranged for Mr. Hampton to be transported?
A. That was the job of the sheriff's department. You have to put in a request, and they would bring people for you.
Q. Okay. So it's your understanding that a detective could just call over to the sheriff's office and say you have a guy over there, I want to talk to him, bring him over?
A. I don't know if it was as informal as you just expressed. There might have been a form that you had to fill out.
Q. What if the person didn't want to come over and talk to you? Did he have a choice in the matter?
A. Surely. They could say no.
Q. So it's your understanding that the sheriff would say the prosecutor wants to talk to you, you don't have to go, but if you want to go, you can come over?
MR. BOWENS: Objection, asked and answered.
A. I can't speak for the conversation the sheriff's department has with a potential -- with an



inmate. I don't know what they say.
Q. So you don't know whether Mr. Hampton had the option to decline coming over to the Essex County Prosecutor's Office on November 12th of 2008, right?
A. No.
Q. All right. So we have read a portion of this report. If Lieutenant Carrega testified that it's actually the assistant prosecutors who had arranged for someone to come over, does that sound right or --
A. That could be, yeah.
Back in the day, I remember myself asking the sheriff's department to arrange for that. I remember there was a time -- I know that policy was changed. It was changed when I was up there, and I can't recall what it was, but when I first joined homicide, we would sometimes order them as well. So, yeah, that could be true.
Q. And did you let the sheriff's department know that they should let the person -- make the person aware that they were not obligated to come over for an interview?
A. I never said that, because, mostly, when I was ordering something, it was because they



were going to be a witness in my trial, and they already knew that they were going to be a witness in my trial.
Mostly, if I was ordering somebody, it was someone I previously consulted their attorney or something like that, but, no, I never -- but I never remember saying those words to the sheriff's department.
Q. Because in this case, Mr. Hampton was not already a witness. He just happened to be in custody on a traffic warrant. Do you remember that?
A. Yes. I remember when I read this report. I had forgotten he was in custody. They were looking for him.
Q. And he was in custody on a traffic warrant. Do you remember that?
A. Yes.
Q. Okay. And would you agree that Mr. Hampton had every right to decline to come over and speak to Lieutenant Carrega?
A. Maybe he wanted a break. Maybe he was looking -- I'm sorry.
Q. Could you say that again?
A. I don't know why or what he said when he was approached to come to the prosecutor's

office.
So whether or not he could have said no or said no, I don't know. I don't know what transpired when they approached him and asked him to come.
Q. Was Mr. Hampton obligated to come speak to Lieutenant Carrega on November 12, 2008, at 1:30 p.m.?
MR. BOWENS: Objection, argumentative, asked and answered.
A. No. He was not obligated at all.
Q. And you don't know what was conveyed to him when they went to transport him over to the prosecutor's office. Fair?
A. Yes, fair.
Q. Okay. Now, I'm going to have you look at the last page, and if you look, it says, After photographs were taken, we proceeded directly to the Newark State Police Barracks where we met Detective Tietjen. It was now approximately 1930, 7:30 p.m., right?
A. Hold on. You know what? Because it starts with a sentence that continues, can I just read the last sentence of the paragraph before that?
Q. You can read whatever you want.



MS. BONJEAN: Go to the second page. I want her to feel comfortable.
A. Right there is fine.
MS. BONJEAN: Let her read the whole thing.
A. Right there is fine. Okay. I'm good.
Q. And it says it was now approximately 1930 hours which is 7:30 p.m., right?
A. Yes. Okay. I'm good.
Q. Okay. So based on Carrega's report, does this refresh your recollection that Hampton was in the care and custody of Lieutenant Carrega and any other number of law enforcement personnel from 1:30 p.m. to 7:30 p.m. before he was provided his interview that was audio and video recorded?
MR. LIPSHUTZ: Objection to form.
A. Yes.
Q. Okay. Do you recall that there was allegedly something wrong with the audio or video recording equipment in the Essex County Prosecutor's Office?
A. Yes, I remember that.
Q. Did you ever find out what was wrong with that equipment?
A. No.



Q. Did you ever inquire?
A. No. I just know it was fixed at some point, but, no, I don't know what was wrong with it.
Q. Did you confirm that it was actually broken?
A. It was broken.
Q. How do you know?
A. Because they would have -- it would have been much more convenient to take the statement there. I know they were searching for equipment with the -- just rules of convenience which it's just easier to take a statement right there in the office.
Q. Okay. So you're assuming it was broken. That doesn't mean, you know, it was broken. That means you're assuming based on inferences you're making, right?
A. They didn't take the statement there because it was broken.
Q. All right. But did you ever speak to someone, a technical person who said, yes, it's broken and this is broken and this is how it was broken?
A. No.
Q. Where did you get your information that



it was broken?
A. I don't remember.
Q. Did you get it from Lieutenant Carrega?
MR. BOWENS: Objection, asked and answered.
MR. VOMACKA: Objection, foundation. You can answer.
A. I just know it was broken.
Q. You believed it was broken based on information that was provided to you. Is that fair?
MR. BOWENS: Objection, mischaracterizes the witness's testimony. You can answer the question.
A. I was told it was broken.
Q. Right.
That's my question. You were told it was broken, correct?
A. Yes.
Q. You didn't inspect it yourself to confirm it was broken, right?
A. No.
Q. You didn't speak with someone in your technical department who described the manner in which it was broken or prepared a report explaining how it was broken or anything like that, correct?

Page 121

A. No.
Q. Okay. And did you have -- do you know if you had audio -- audiotape cassette devices in your office in 2008?
A. No. I don't remember. It was becoming a rarity. I'm going with no because it's just rare because those things were being faded out.
Q. Do you know whether there were -- well, strike that.
How many -- how was the audio and video -- how -- how was it -- strike that.
Were there rooms that had audio and video recording equipment in it? How did it work?
A. They were interview rooms that were equipped with cameras and recording devices, and then the main equipment where like the source is where all the discs get put into record is in a different room.
Q. Right.
And how many interview rooms were there in the Essex County Prosecutor's Office with this type of recording equipment?
A. I think -- I don't remember. I think there were two interview rooms and then one room with all the equipment.

Page 122

I will say this. I never, ever touched that equipment or operated it because I had never taken a statement. So I'm just -- I can't say how many. I don't know.
Q. Okay. To the best of your knowledge, having spent 24 years in this office --
A. Thank you.
Q. -- there is two interview rooms and like a control room, is that right, back in 2008?
A. Yes.
Q. And do you know whether or not there were any other devices in the office that could have been used to either audio or video record an interview?
A. No. I don't know.
Q. Right.
Do you know why it took Carrega so long to figure out that he didn't have operating audio or video equipment?
A. No.
Q. All right. So you have no -- strike that.
You didn't have the benefit of any audio or video recording of the interview with Mr. Hampton between 1:30 p.m. and 7:30 p.m. Is that

Page 123

correct?
MR. BOWENS: Objection, vague and ambiguous. You can answer it if you understand it.
A. I don't have anything during that time frame you just mentioned.
Q. Right.
And that means you have no firsthand knowledge about what transpired during the interview between Carrega and Eutsey that preceded his formal statement that was provided at the New Jersey State Barracks, State Police Barracks, correct?
A. Yes.
Q. And, in fact, you have to -- you had to rely on the lieutenant and the detective's account on what transpired because you didn't have video or audio to refer to yourself, right?
A. Yes.
Q. And, in fact, the account that you had to rely on was an account that was provided over two years after the fact, correct?
A. No.
Q. Well, when -- what account did you rely on before Carrega prepared his report in February of 2011?
A. As you just said, we talked to them.

Page 124

We talked to these people. Just because he didn't write a report for two years didn't mean we didn't talk to them in the two years.
Q. So you spoke to Carrega. Is that what you're saying?
A. Yes.
Q. How many times?
A. I don't remember.
Q. What did he say the first time you spoke with him?
A. I don't remember word-for-word.
Q. Where were you when you had that conversation?
A. In the office.
Q. What office?
A. The homicide floor, the 4th floor of the Essex County Prosecutor's Office where the homicide squad was.
Q. Who was present?
A. Me and Pete.
Q. Anyone else?
A. I don't remember.
Q. Well, Carrega was there, right, or were you --
A. Yeah. You knew what happened. In his

report, you knew that he implicated Big Man and that all this happened with the videotape and he had to go to the other place because he told us.
Q. Right.
And did you say, hey, maybe you might want to prepare a report about that because we're going to be going to trial and I think this might become an issue?
A. I never said that to him.
Q. Okay. Did it ever occur to you that a defense attorney might find it very suspicious that there's no recording, no report, no nothing to memorialize six hours of an interrogation of your key witness?
MR. BOWENS: Objection. It's argumentative, calls for speculation. You can answer it.
MR. VOMACKA: Objection to form and foundation. You can answer.
A. Defense attorneys find everything suspicious.
Q. And they would find it less suspicious, though, if there was a report prepared contemporaneous, right?
MR. VOMACKA: Objection to the form and



foundation. You can answer.
MR. LIPSHUTZ: Objection.
A. Same answer. They think everything is suspicious. They think the state is not believable ever. So I don't know if that would help them, hurt them or they feel the same way.
Q. All right. So it was of no concern of yours?
A. That's not accurate.
Q. Okay. Was it a concern of yours or not?
You're giving me mixed messages. So I'm asking did it concern you that Lou Carrega had not -- there is no report for this period of time and there was no recording, there was no nothing, and during these conversations, did it concern you that you had no contemporaneous memorialization of this very large gap in time when he was being interviewed?
MR. VOMACKA: Objection to the form of the question. You can answer.
MR. BOWENS: Objection, argumentative, mischaracterizes the witness's testimony. You can answer.
A. It's always helpful to have the report



written right after, but I wasn't concerned.
Q. Were you concerned after the jury came back with a not guilty verdict?
MR. BOWENS: Objection.
A. I'm not answering that. That's a stupid question.
Q. Did Lieutenant Carrega or any law enforcement official tell you that they had -- I'm going to start with -- I'm going to strike that. Let's do it one-by-one.
MS. BONJEAN: You can take that document down.
Q. During your meetings with Lieutenant Carrega, did he ever tell you that he had made monetary promises to Philander Hampton in exchange for his cooperation in the case in implicating Lee Evans?
A. I don't remember that.
Q. So that's a no?
A. I don't remember him ever talking about money and Philander in one sentence.
Q. Okay. Well, if he had told you that he offered to pay him money, do you think you might have remembered that?
MR. BOWENS: Objection, asked and



answered.
MR. VOMACKA: I'll object to the form. You can answer.
A. I think I would have remembered that.
Q. Do you recall whether Lieutenant Carrega ever admitted to you that he had fed Philander Hampton a narrative that he asked him to repeat to implicate Lee Evans in the murders of the five boys?
A. He never said that.
Q. That's not information you were privy to, right?
A. No.
Q. Did Lou Carrega ever admit to you that he had made a deal with Philander Hampton prior to taking his formal statement that, if he implicated Lee Evans, he himself would not bear any criminal responsibility for the deaths of the boys?
MR. VOMACKA: Objection to the form of the question. You can answer.
A. I never heard him say that.
Q. Did Lou Carrega ever tell you that he had coerced Mr. Hampton into making statements that both implicated himself and Mr. Evans in the murders of the five boys?

A. No.
Q. Did Lieutenant Carrega ever tell you that he had negotiated or tried to negotiate a deal with Mr. Hampton in terms of leniency on a sentence in exchange for his cooperation in the case prior to you and Mr. Guarino getting involved in the case?
A. Not that I'm aware of.
Q. Are police officers -- do they have the discretion or the authority to make plea deals with defendants or suspects --
MR. LIPSHUTZ: Objection to form.
Q. -- without the involvement of prosecutors?
MR. VOMACKA: Objection to the form of the question.
MR. LIPSHUTZ: Objection.
A. They could say they would do their best. There would be nothing improper if someone was going to say I'll do my best to help you out.
I'm not saying that's what he said in this case, but I'm just saying that's not improper. If they said, you know what, I'm going to do my best to tell the prosecutor you really helped us out, you gave information, you know, yeah, they could say something like that. You did right by us. You led



us to X, Y, Z. Yeah, they can say that.
Q. They can say they would make a recommendation to the prosecutor, right?
A. Right.
Q. They can't promise a set of years or a term of years, right --
A. No.
Q. -- in exchange for involvement -- for cooperation?
A. No.
Q. And I don't know if I asked this. If I did, I apologize.
But did Defendant Carrega admit to you or tell you that he had made promises of financial assistance to Philander Hampton?
MR. BOWENS: Objection, asked and answered.
A. No, and he never said that.
Q. Okay. So you're unaware of any -- you're unaware of Carrega having ever made any promises or threats or coercion or offering benefits to Mr. Hampton during this period of time that was -- that preceded his formal statement, right?
A. Right.
Q. Now, eventually, a deal was made with



Mr. Hampton, right?
A. Yes.
Q. Okay. How did this come to be?
A. Well, you talk with the lawyer and see -- first, I feel there was one lawyer. Then it switched to John Mc Mann, and then, you know, we interviewed -- at some point, we definitely interviewed him to see if he would make a good witness and what his information was, and then we negotiated a deal with defendant's attorney that we thought might be acceptable to his client, and then I guess he presented it to his client and then he pled guilty.
Q. Were you aware that in November of 2008 your office offered assistance in the form of so-called relocation assistance to Mr. Hampton?
A. I don't remember, but that wouldn't surprise me if we did. I mean he just implicated somebody in the death of five murders. So that's not surprising.
Q. Well, he also implicated himself in five murders, right?
MR. LIPSHUTZ: Object to the form of the question.
Q. And, in fact, after he implicated



himself in five murders, he walked around the streets for over, what, close to two years with assistance from your office, right?
MR. LIPSHUTZ: Objection to the form.
MR. VOMACKA: Objection to the form of the question. You can answer.
A. I don't know what you mean by assistance there.
MS. BONJEAN: Okay. Let's pull it. I have a document that should help. Ashley, what do we call this document? It's one Haley just emailed.
A. Why don't you just tell me to save time? What does it say in the statement that we offered him assistance?
I mean can we just -- you don't have to show me. If you just read it, I'm fine with that.
Q. No. It's a letter from your office I'm going to have you look at.
MS. BONJEAN: Diane, it's an email. It's called Philander agreement. It says Office of the Essex County Prosecutor on the front. I think we're at Cucinello-4. We'll have her look at it.
Haley, if you could -- feel free to talk. You can share it with her so she can look at it.

JMS. COOLBAUGH: No problem. I'm going to pull it up now on the screen.
(Exhibit Cucinello-4, Philander Hampton agreement, is marked for Identification.)
Q. Okay. Ms. Cucinello, do you see the date on that?
A. Yeah, November 19.
Q. And can we agree that we've looked at enough documents by now that we know that Mr. Philander Hampton was interviewed by Lou Carrega on November 12, 2008, gave a formal statement on November 12, 2008?
A. Yes.
Q. And do you see that this is a letter that was written to Mr. Hampton a few days later, right?
A. Yes.
Q. We also agree, I think, that the statement that Mr. Hampton provided was a statement that implicated himself in the murder of five children, right?
A. Yes.
Q. And, in fact, that's a statement on which you relied in order to get an arrest warrant and indict Mr. Hampton for the murders of five



children, correct?
A. Yes.
Q. And after he provided that statement, he wasn't arrested, right?
A. Right.
Q. And, instead, your office offered him assistance, correct?
A. Yes. Right.
Q. You have no reason to doubt this letter?
A. No.
Q. Do you know why your office would offer a man that has been murdered -- for which there's probable cause to believe he murdered five children assistance in the form of alleged relocation?
A. Because they were probably concerned that, for his safety, if Lee Evans found out about it, that he might be mad at him.
Q. Do you know whether he actually relocated anywhere?
A. Not that I am aware of. No.
Q. Okay. Do you know -- do you know what type of assistance was provided to Mr. Hampton specifically?
A. No. The way I'm reading it looks



like -- if you scroll up -- I don't know. It doesn't seem like he -- it looks like he declined.
Q. Okay.
A. It looks like he was being offered relocation assistance and is deciding not to have it.
Q. Where do you -- where do you see that?
A. It says, nonetheless, you have declined.
Q. Declined to be assessed for relocation, right?
A. Yes.
Q. And do you know what is involved in the assessment for relocation?
A. No. That's victim witness, but I assume they said do you want to be relocated, do you want help, and he said no.
Q. Okay. So your office just offered to relocate him and he declined. That's at least how you read this letter, right?
A. Yes.
Q. And go to the last page. Do you know -- do you know -- well, we see Philander Hampton's signature there. Do you know who the witness's signature is?



A. It looks like an N, but I don't know. It looks like an N. I see Carrega's and Philander himself, but, no, I can't tell. I don't know who that is.
Q. And do you know whether Carrega offered any other assistance or benefit during this time in addition to the potential relocation assistance?
MR. VOMACKA: Objection to the form of the question. You can answer.
A. No. No. I'm not aware of anything else.
Q. All right. Now, I think we discussed the fact that, eventually, you did -- did you make a formal agreement?
MS. BONJEAN: You can take that down, Haley. Thank you.
Q. You did make a formal agreement with Mr. Hampton, right?
A. Correct.
Q. After he was charged some years later, correct?
A. Yes.
Q. How did that agreement come to be?
A. We talked to the defense attorney and told them what we need him to do which would be

Page 137

testify at the trial, made a plea offer, and he pled guilty and agreed to testify at the trial.
Q. You didn't -- you wouldn't have been able to sustain your burden of proof against Mr. Evans without Philander Hampton's testimony, right?
A. No.
Q. No what?
A. No, we wouldn't have.
Q. Okay. Correct, right? That's what I was just -- correct?
A. Yes, correct.
Q. In fact, Philander Hampton is the only witness that identified Lee Evans as the person responsible for committing the crimes against the boys, correct?
A. Yes.
Q. And what was the deal that you agreed to with Mr. Hampton? Do you recall?
A. I think we made him plead guilty to all the counts of murder. I don't remember the sentence recommendation, and he had to testify at the trial.
I want to say -- I don't know. I don't remember the sentence. I'd have to see the plea agreement, but I don't know. I know it was something specific. It wasn't like probation or

Page 138

something. It was definitely a state prison sentence.
Q. Does 10 years ring a bell?
A. I'd have to see the plea agreement. If that's what it says, that's fine. I don't remember.
MS. BONJEAN: Haley, can you pull up the plea agreement? Do you have that handy?
MS. COOLBAUGH: I do. One second.
MS. BONJEAN: If you could go to the number a few pages down.
A. Counts of murder and -- yep. There you go. Ten years. Not to exceed 10 years flat.
Q. Any custodial sentence not to exceed 10 years flat, correct?
A. Yes.
Q. Is that even a legal sentence for the murder of five children in the State of New Jersey?
MR. BOWENS: Objection, calls for a legal conclusion.
MS. BONJEAN: She's a lawyer. I hope she knows but --
MR. BOWENS: She's not here as an expert.
A. I don't know if you realize this, but the charge of the 2A, when this happened in 1978, we

Page 139

had to charge under the old murder statute.
So it wouldn't be appropriate today because you have to serve 85 percent, but back then, unfortunately, there was no 85 percent.
Q. Well, this isn't about time served. This is about the actual sentence.
A. Any custodial sentence not to exceed 10 years.
Q. Okay. Was 10 years -- again, to your understanding, was 10 years a sentence that was -- a court had the discretion to give for a murder -- one murder in 1970 -- I guess it would be 1978?
MR. BOWENS: Same objection. You can answer.
Q. If you know.
A. I don't remember 2A at this point. I reviewed it back then, but I don't remember now.
Q. Okay. And was it your understanding that all of these charges would run concurrent with one another?
A. Yes.
Q. And do you know what type of credit someone served for a crime that would have occurred in 1978?
Did they get day-for-day time or how

Page 140

much time did they serve on a 10-year sentence? Do you know?
A. No. I have no idea. I don't know.
Q. Do you know how much actual time in custody Philander Hampton did for murdering five children?
A. He did more than Lee Evans. I can tell you that. I don't know.
Q. Because a jury found Lee Evans not guilty.
A. Right.
Q. I mean do you know of anyone going to prison when they're found not guilt?
A. He took responsibility and pled guilty. So he served more time.
Q. Philander Hampton was guilty. He plead guilty. He was guilty, right?
A. And so was Lee Evans.
Q. But Lee Evans was acquitted. Do you understand what acquitted means?
MR. BOWENS: Objection, because it's argumentative.
Q. A jury found him not guilty, right?
A. That doesn't mean -- that doesn't mean innocent. It says not guilty. There's a

difference.
Q. Yeah. You didn't meet your burden of proof and he was found not guilty, correct?
A. That doesn't mean someone didn't do it.
Q. Well, that's for lay people to debate, but I'm talking, as a lawyer, you understand he is legally not guilty, correct?
A. Exactly, and that's why he's a free man today, and that's why I think this whole lawsuit is ridiculous. He was found not guilty.
Q. He was found not guilty, and that's the reason he didn't do prison time because he was found not guilty.
A. Right. I'm not asking him to have done prison time.
And I'm going to tell you right now, I have to be -- I'm meeting a judge at 3 o'clock on a case.
Q. We're almost finished. We're almost finished.
Were you present when Philander Hampton pled guilty?
A. Yes.
Q. Okay. So were you aware that there were certain representations put on the record of



what the prosecutor's office would do for him in connection with his plea?
A. I don't remember if he made representations. I don't remember that we made representations what would we do. I mean about what he's pleading guilty to, I mean we always state that and what his sentence recommendation is if that's what you mean.
Other recommendations other than that and that he testified --
Q. Okay. We can pull it up, but I'll try to move it along quickly for you and just tell me if this rings a bell.
The state also will represent on the record that, because of his cooperation and because of our concern for his continued safety in prison, that when he does become eligible for parole, assuming that he does what he has agreed to do with regard to his testimony and the trial of his co-defendant, that the state would affirmatively recommend that he should be paroled.
Does that sound right?
MR. VOMACKA: Objection to form. You can answer the question.
A. Yeah, that sounds reasonable.



Q. It doesn't strike you as unusual that you promised to actually affirmatively -- you, as in your office, promised to affirmatively recommend his eligible -- that he would be paroled upon -- being eligible for parole once he had served his minimum sentence, right?
A. Right. I don't think we ever did, though.
Q. But that was a promise that was made to him prior to him actually testifying against Lee Evans?
A. Yes. I'm saying I don't recall that ever came to fruition. Pete would remember.
Q. Do you recall that there was also a promise that there would be assistance again with witness relocation upon his release from custody?
Does that sound like something that the office would have done?
MR. VOMACKA: Objection to form, but you can answer.
A. That sounds reasonable. I'm not surprised if we did that.
Q. Okay. I asked you a series -- we're almost finished. I asked you a series of questions earlier about whether Lieutenant Carrega ever told



you about other promises --
MS. BONJEAN: You can take that document down, by the way, Haley.
Q. -- whether Lieutenant Carrega told you about other promises that he made to Philander Hampton during the questioning of him prior to his formal statement. Do you remember that series of questions?
A. I do.
Q. And I think you universally had said that Lieutenant Carrega never made any such statements to you, correct, that there were any promises of monetary promises, promises of financial assistance, for example. Do you remember that?
A. I remember it, yes, and nothing -- I'm not aware of any of those types of promises.
Q. And just so -- I know this sounds a little bit repetitive, but it's really for the record sake.
Putting aside Lieutenant Carrega, did any law enforcement official, whether it was a Newark Police officer, a state trooper, an Essex County prosecutor, investigator, any law enforcement person ever disclose to you that there were monetary promises made to Philander Hampton prior to his

formal statement on November 12th of 2008?
A. No.
Q. Did any law enforcement personnel from any agency ever tell you or tell anyone in your presence that -- that either Lieutenant Carrega or any one of them had fed the story of how the boys died to Philander Hampton prior to him making his statement on November 12, 2008?
A. No.
Q. Did any law enforcement official disclose to you that Philander Hampton had been coerced into making the statement that he provided on November 12, 2008?
A. No.
Q. Did November -- did any law enforcement official disclose to you that their -- that any one law enforcement official, including Lieutenant Carrega, had made a promise that he would not face any criminal responsibility for the boys' deaths if he made the statement that he did on November 12, 2008?
A. No.
Q. Okay. And had any law enforcement official provided you with such information, would you have provided that information to defense



counsel?
MR. BOWENS: Objection, calls for speculation. You can answer it.
MR. VOMACKA: Objection to the foundation. You can answer.
A. If any of that had occurred, we wouldn't even charge anyone.
Q. You would agree that it's all the constitute Brady material and that it would have to be disclosed if you decided to proceed, right?
A. We wouldn't have even gotten to the point of charging if any of that was ever true or told or proved.
MS. BONJEAN: Okay. If you would give me about one minute so I can just look over my notes, and then I don't know if anyone else has any questions, but I think I'm finished, but I just want to quickly look at my notes, literally 60 seconds, if you don't mind. Okay?
MR. LIPSHUTZ: Off the record.
(Whereupon, discussion was held off the record.)
Q. Ms. Cucinello, I am finished. I have one last question. I'm going to have my parallel pull up one document, and I'm just going to ask you



to identify it for me and tell me what it is.
MS. BONJEAN: Haley, when you can, if you could just pull up -- it's marked Evans 314 to 316.
JMS. COOLBAUGH: Yes, I am going to pull it up right now.
MS. BONJEAN: Thank you.
JMS. COOLBAUGH: You said it was Evans.
MS. BONJEAN: 314. It says Essex County Prosecutor's Office request to recommend disposition. Do you see that?
JMS. COOLBAUGH: Yes.
Q. Ms. Cucinello, can you take a look at this document, if you would?
MS. BONJEAN: I'm going to mark it and we'll send it to you, Diane, if that's okay.
(Exhibit Cucinello-5, Request to recommend disposition, is marked for Identification.)
Q. This is Cucinello-5. Can you take a look at this document?
Do you recognize this document, what type of document it is?
A. Yes.
Q. And is this a document that is an



internal document for the Essex County Prosecutor's Office or does this go into an official file?
A. It's our plea offer that we give to the court and the defense attorney.
Q. Do you remember very early in this deposition I asked you about a form that you filled out when you were seeking to dismiss charges? Do you remember that?
A. Yes.
Q. Does it look a little bit like this?
A. Slightly different, but I think it has a similar top. You know, the caption is similar, but the base of the body is slightly different.
Q. The substance or content of it is different, but the -- it's kind of the same idea of a request to dismiss or something like that?
A. Yes.
MS. BONJEAN: Okay. I have no further questions for you. Thank you.
MR. BOWENS: Anybody have any other questions?
MR. VOMACKA: I'd like to ask for a 5- or 10-minute break to speak with Vic, if that would be all right, before we resume questioning.
MR. LIPSHUTZ: It's okay with me. I

have a few questions, and I could use a bathroom break, and so that's fine.
MS. BONJEAN: Fine by me.
(Whereupon, a recess was taken.)
MR. VOMACKA: It sounds like you have more than me. So I'll let you go first.
MR. LIPSHUTZ: Would you go first for me please?
MR. VOMACKA: Not a problem.
CROSS-EXAMINATION BY MR. VOMACKA:
Q. Good afternoon. My name is Michael Vomacka. I apologize. You can't see my video. When I'm looking at the document, it turns off the camera, but I'm here.
I represent Defendant Tietjen. Victor Di Francesco is also from my office representing Defendant Tietjen. He may have stepped off for another call. I just want to ask a couple questions of what we've talked about earlier.
I mentioned I represent Defendant Tietjen. Do you recall who that is?
A. Yes.
Q. I just want to talk about sort of what his role is versus what the prosecutor's role is.
So let me first ask how does the office



decide to present a case to a grand jury?
What's that process like for this kind of case?
A. Well, you have to -- after the charging, it was the next step in the process to get the indictment.
Q. Okay. That's helpful.
Who would you say was involved in the charging in this case?
MR. BOWENS: I'm going to object as vague and ambiguous.
MR. VOMACKA: I'm sorry. What was the objection? I couldn't hear you.
MR. BOWENS: Vague and ambiguous.
MR. VOMACKA: Thank you.
A. Pete and I were involved and my boss was involved and the prosecutor was involved.
Q. Okay. Anybody else who you can remember being involved?
A. We may have spoken with the law enforcement, but, generally, when we spoke about charges, the lawyers generally talk about themselves, but the detective can suggest charges, but, you know, it's generally the lawyers who decide the charges.



Q. Got it.
Is there -- for this case, was there a specific person who decided which charges to bring or was it more a team effort?
A. When you're trying these types of cases, it's generally the standard charges, but in this case, it was slightly different because of the year of the offense.
So we had to do research on the statutes back in 1978. So, in this case, it was definitely a collaborative effort.
Q. Just to put a bow on this, did Trooper Tietjen have any decision-making power for what charges to bring?
A. I don't remember him being involved with the charging.
Q. Okay. As far as Philander Hampton's statement, you asked a couple questions about the importance, and you talked about how sort of the case was before and after.
So this is sort of basic. Would you just tell us, in your view, how did Philander Hampton's statement change the strength of the case against Lee Evans?
A. Because then you had a person



identifying not only himself but also Lee Evans as putting the boys in the closet, locking it and setting the house on fire, because without that -- this was like you needed this. This was sort of like a spark.
You needed this evidence to at least have probable cause, because without Philander Hampton, you didn't have probable cause. You had -- you know, you had circumstantial evidence of a bunch of kids being last seen with Defendant Evans, but that's not really enough to charge somebody with murder.
Q. Okay. As far as maybe this is sort of obvious, but let me just ask you. It's still your opinion that Lee Evans committed the crime he was charged with, right?
MS. BONJEAN: Objection to form.
A. I don't know how good my personal opinion is, if that's even -- that doesn't warrant anything in a court of law, but yes.
I think more appropriately would be to say I think we charged the correct people, and I think we had, you know, followed all the procedures and protocols that we could to the best of our ability and we charged the right people.

Page 153

I have no doubt in my mind that we didn't charge the right people, and I feel confident as a prosecutor saying that we went to trial with the best intentions doing the right thing with the right people.
Q. Understood.
I want to ask one question. A document, I'm not sure if it's been marked in a specific deposition, but if the court reporter can mark it, it's Tietjen sup 421210, the Bates label is ECPO1315. It extends -- it extends past this, but I'm asking about 1315 and 1316.
MS. BONJEAN: Hold on. Are you pulling this up?
MR. VOMACKA: I don't have control over screen share.
MS. BONJEAN: Can you share it so that we can see it as well?
JMS. COOLBAUGH: I have it pulled up already.
MS. BONJEAN: We can thank my paralegal.
JMS. COOLBAUGH: If I'm permitted, if that's allowed.
MS. BONJEAN: We'll make it easy. Go

Page 154

right ahead.
(Exhibit Cucinello-6, Document Bates stamped ECPO001315 and ECPO001316, is marked for Identification.)
MR. VOMACKA: Okay. That's the right document. Just for the record, we're looking at a page marked ECPO001315, and if you scroll down just to the bottom of that page to beginning of the next. Perfect.
Q. Basically, I want to ask you a quick question on this March 22, 2010, entry. I guess, if Ms. Bonjean's paralegal would assist, I just want you to take a look at this, and you can have a chance to read through the language of this entry.
The question I want to ask you to answer when you have a chance to review is do you recall being present at the meeting on March 22, 2010, that's referred to in this document?
Take as much time as you need to review the document, and if you want to ask the parallel to move it, then please do.
A. Yeah. I don't recall being present at that meeting.
MR. VOMACKA: Okay. Then I don't have any further questions at this time and will pass the

Page 155

witness.
MR. LIPSHUTZ: Okay. Thank you. I was going to ask about that meeting as well. So that shortens this up.
CROSS-EXAMINATION BY MR. LIPSHUTZ:
Q. Ms. Cucinello, my name is Gary Lipshutz. I know we met before maybe at the prosecutor's office a long time ago. I can't remember what it was about.
I am an attorney with the City of Newark. I represent four -- five clients here, the City of Newark, Senator Booker, Garry Mc Carthy and Chief Henry, although, at the time, detective sergeant, and Detective Joe Hadley. Okay.
A few questions for you please. Actually, very few questions.
From your testimony, my understanding is that some point after Hampton confessed, you and Peter Guarino had a meeting with Paula Dow, Guarino had a binder about the case and the issue was you were going to ask Dow to make a determination whether to bring charges. Did I sum that up right?
A. Yes.
Q. Okay. At some point -- at some point it switched to Bob Laurino as the acting prosecutor,

Page 156

right?
A. Right.
Q. And am I correct that at some point Acting Prosecutor Laurino authorized the charges against the two defendants here?
A. Yes.
Q. Okay. I have -- again, I'm going to ask you about all the four individuals I spoke to -- I have spoke about. Okay?
Let's start with Corey Booker, then mayor, present U.S. senator. Did Corey Booker as the mayor of Newark have any input whatsoever on the Essex County Prosecutor's Office determination to bring charges against Lee Evans? Question one.
MS. BONJEAN: Objection, foundation, form.
A. Not to my knowledge. Not to my knowledge.
Q. Okay. So let me follow that up. Did you ever discuss it with Cory Booker?
A. No.
Q. Do you know anybody in the prosecutor's office who ever had a discussion with Cory Booker?
A. No.
Q. Okay. Garry Mc Carthy was the police

director at the time. Did you know that?
A. No. I thought he was gone at that point. No. I don't even remember that the police -- I never remember hearing anything being mentioned during any discussions.
Q. So I take it that your recollection then is that Garry Mc Carthy had no input on the prosecutor's office determination to bring charges against Lee Evans or Philander Hampton?
MS. BONJEAN: Objection, foundation, form.
A. Yes, I don't -- they had no input to my knowledge. Garry Mc Carthy had no input.
Q. Now, about Joe Hadley and Sergeant Henry, of course, at the time, Newark police officers. You understood that, right?
A. Uh-hmm.
Q. And also had some involvement in the investigatory side of the cold case, correct?
A. Yes.
Q. Okay. Do you have any -- let's ask about Joe Hadley. Did you ever have any conversations with Joe Hadley where he had any input on the prosecutor's office determination to bring charges against Lee Evans? I'm talking about Joe



Hadley now.
A. No.
Q. And my last question is about Sergeant Darnell Henry. Did you ever have any conversations with Sergeant Henry where he had any input on the prosecutor's office decision to bring charges against Lee Evans?
A. I never did. No.
Q. And I know I said last question. I made that mistake.
Did you ever -- were you aware of anybody in the prosecutor's office who had any conversations with either of those two, Hadley or Henry, where they gave their input as to the prosecutor's office decision to bring charges against Lee Evans?
MS. BONJEAN: Objection, form, foundation.
A. No. I'm not aware of any conversations.
MR. LIPSHUTZ: Thank you very much. I have no other questions. Thank you.
REDIRECT EXAMINATION BY MS. BONJEAN:
Q. I have one follow-up, Ms. Cucinello, based specifically on that.



Do you have any idea whether Prosecutor Dow ever spoke to Cory Booker about the case?
A. No, I do not know.
Q. And do you have any idea whether Prosecutor Dow ever spoke to Mr. Mc Carthy about the five missing boys case?
A. No.
Q. Do you have any knowledge about whether or not Prosecutor Dow -- strike that. I'm sorry.
Do you have any knowledge about whether or not Prosecutor Laurino or Acting Prosecutor Laurino ever spoke to Cory Booker about the five missing boys case?
A. No.
Q. And last question. Do you have any knowledge about whether or not Prosecutor Laurino ever spoke to Mc Carthy about the five missing boys case?
A. I do not have any knowledge.
MS. BONJEAN: Okay. Nothing further.
MR. BOWENS: Okay. Done. Let's go.
THE WITNESS: Okay. Great. Thank you.
(Deposition concludes at 2:15 p.m.)



CERTIFICATE OF OFFICER

I CERTIFY that the foregoing is a true and accurate transcript of the testimony and proceedings as reported stenographically by me at the time, place and on the date as hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney or counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

DIANE M. HOLMES, C.C.R.
Certificate No. XI01660

## A

**ability (3)** 47:24;102:18;152:25
**able (19)** 6:10;8:23;45:6,11;48:6;52:24;57:1,18;64:21;75:25;76:8,16;77:2;83:23;87:22;108:10;110:20;112:7;137:4
**absolutely (4)** 48:25;82:25;100:24;101:2
**acceptable (1)** 131:11
**access (1)** 83:6
**accordance (2)** 99:14;100:21
**according (5)** 59:5;73:4;80:3;87:16;88:5
**account (4)** 123:14,18,19,22
**accurate (1)** 126:9
**accusation (1)** 30:8
**accusations (2)** 30:6,23
**accused (8)** 98:19;99:5,15;100:13;101:5,5,12;103:1
**acquitted (2)** 140:19,20
**acting (4)** 84:21;155:25;156:4;159:11
**action (1)** 29:8
**active (1)** 56:1
**actively (2)** 55:14;94:12
**activity (1)** 75:8
**actual (7)** 22:22;103:23;104:18;105:3;110:15;139:6;140:4
**actually (22)** 13:18;19:12,15;25:8;29:3,15;46:6;61:12,13;78:21;83:13;96:2;97:3;98:6;102:24;103:18;115:9;119:4;134:19;143:2,10;155:16
**addition (1)** 136:7
**additional (1)** 65:20
**address (2)** 4:1;9:22
**administrative (2)** 16:15,23
**admissions (1)** 98:19
**admit (3)** 99:1;128:14;130:13
**admitted (1)** 128:6
**adopt (1)** 19:9
**advance (1)** 87:24
**affidavit (20)** 59:5;62:21;65:24,25;66:22;67:1,8,13,18,21;68:1,6,17;72:4;73:4;75:19,25;79:18;80:3;86:19
**affirmatively (3)** 142:20;143:2,3
**Affum-Addo (1)** 6:4
**afternoon (1)** 149:11
**AG (3)** 82:21;103:22,23
**again (19)** 15:21;21:3;23:13;30:5;57:23;61:6;62:1,19;71:6;72:24;73:1;75:11,21;76:22;78:12;116:23;139:9;143:15;156:7
**against (14)** 7:14;33:16;75:15;84:18;137:4,14;143:10;151:24;156:5,14;157:9,25;158:7,16
**age (1)** 54:5
**agencies (2)** 41:4;103:19
**agency (4)** 37:2;38:15;76:2;145:4
**ages (1)** 69:19
**ago (3)** 8:21;33:17;155:8
**agree (28)** 37:21,25;42:15;45:16;68:1,8,24;71:10;72:14;74:14;81:24;84:5,10,17;85:13;98:24;99:8;101:3,9,17;102:22;103:8;105:5;109:21;116:18;133:8,18;146:8
**agreed (4)** 84:16;137:2,17;142:18
**agreeing (1)** 44:25
**agreement (8)** 132:20;133:4;136:14,17,23;137:24;138:4,7
**AGs (1)** 16:20
**ahead (6)** 5:2;27:5;32:3;78:6;82:22;154:1
**alive (2)** 64:6,7
**allegations (2)** 7:12;29:1
**alleged (1)** 134:15
**allegedly (3)** 70:9;71:12;118:19
**allowed (5)** 32:15,18,19;107:18;153:24
**almost (4)** 63:24;141:19,19;143:24
**along (3)** 71:1;111:1;142:12
**Although (4)** 54:4;64:12;81:8;155:13
**Alvin (5)** 69:18;71:4;72:20,23,24
**always (7)** 13:16;15:4;38:23;40:11,11;126:25;142:6
**ambiguous (7)** 26:21;27:1;48:15;80:10;123:3;150:11,14
**Amendment (2)** 31:8;100:13
**amount (4)** 17:15;18:3,18;54:12
**analysis (1)** 100:12
**and/or (1)** 102:10
**answered (11)** 43:2;75:18;76:12,22;77:6;95:23;114:23;117:10;120:5;128:1;130:17
**anymore (1)** 14:14
**apologies (1)** 13:6
**apologize (4)** 10:10;110:8;130:12;149:12
**appear (1)** 30:17
**appearances (1)** 4:18
**appears (2)** 30:14;69:7
**applied (3)** 12:23;13:5,8
**apply (1)** 13:1
**appreciate (1)** 81:7
**approached (2)** 116:25;117:4
**appropriate (4)** 22:9;29:21;31:3;139:2
**appropriately (1)** 152:21
**approval (2)** 89:10,22
**approvals (3)** 21:7;24:4,11
**approve (2)** 24:17;82:24
**approved (1)** 63:18
**approximate (1)** 8:25
**approximately (8)** 57:21,24;71:2,3;72:20;113:19;117:20;118:7
**approximating (1)** 9:1
**approximation (2)** 18:15;57:23
**April (1)** 53:6
**APs (1)** 83:6
**argument (1)** 87:19
**argumentative (9)** 77:5,24;79:4,6;112:14;117:9;125:16;126:22;140:22
**around (7)** 18:2;21:3;38:13;39:4;46:25;93:17;132:1
**arrange (1)** 115:14
**arranged (3)** 113:24;114:3;115:10
**arrest (21)** 59:5;60:19;65:18,24;66:1;67:13,17;68:3,5;75:15;78:16,21;80:3,18;82:1,1,9;83:20;84:17;85:14;133:24
**arrested (8)** 60:18,21,22;61:2,3,13;63:9;134:4
**arresting (2)** 66:23;67:22
**arson (1)** 58:12
**art (1)** 19:6
**Ashley (1)** 132:10
**aside (3)** 75:24;89:5;144:20
**aspect (1)** 35:22
**assault (1)** 17:14
**assessed (1)** 135:10
**assessment (1)** 135:14
**assigned (16)** 12:7;13:20;15:2,3;17:19;18:6,8,9;36:3;57:14,19;58:1,4,22;85:1;86:1
**assignment (3)** 14:13;15:23;68:17
**assignments (1)** 14:10
**assist (2)** 36:23;154:12
**assistance (14)** 130:15;131:15,16;132:3,8,14;134:7,15,23;135:5;136:6,7;143:15;144:14
**assistant (7)** 5:7;15:21,22;16:13;33:16,19;115:9
**assisted (1)** 36:20
**associated (1)** 75:8
**assume (5)** 8:16;37:20;40:15;69:8;135:16
**assuming (4)** 22:18;119:14,16;142:18
**attention (1)** 34:22
**Attorney (20)** 5:20,21,25;15:13;19:24;28:1,12;29:16;30:16,17;31:13;33:8,14;44:7;116:5;125:11;131:10;136:24;148:4;155:10
**attorney/client (3)**

27:22;30:3;31:9
**attorneys (4)**
4:16;15:12;43:8;
125:20
**Attorney's (6)**
15:12,14,18;18:25;
19:3,11
**audio (12)**
102:9;104:4;113:6;
118:15,19;121:3,10,
12;122:13,18,24;
123:16
**audiotape (1)**
121:3
**August (10)**
10:22;11:9;69:15,
23;70:15,15;71:21;
72:5;73:9;91:25
**authored (1)**
67:1
**authority (3)**
22:2;114:2;129:9
**authorized (1)**
156:4
**available (8)**
68:25;69:1,8,23;
70:13;72:9;73:5;
90:24
**Avenue (2)**
71:2,7
**avoid (1)**
30:21
**aware (19)**
26:9;34:24;35:17;
58:21;59:9,13;75:12;
92:14;109:25;110:12;
115:22;129:7;131:14;
134:21;136:10;
141:24;144:16;
158:11,19
**away (1)**
87:2

## B

**back (32)**
15:17;31:24,25;
32:11,12;34:8;40:6;
41:23;54:8;61:8;
64:24,25;66:10,14;
70:10,13,21;78:8;
85:8,22;88:19;98:12;
102:7;107:24;108:1;
113:15;115:13;122:9;
127:3;139:3,17;
151:10
**background (2)**
16:19;68:8
**backup (1)**
36:20
**ballpark (1)**
20:8
**bar (3)**
11:19,23;13:3
**Barracks (3)**
117:19;123:11,11
**base (1)**
148:13
**based (7)**
41:12;70:7;75:11;
118:10;119:16;120:9;
158:25
**basic (3)**
14:19;107:13;
151:21
**basically (6)**
14:15,25;15:25;
19:8;104:1;154:10
**basis (2)**
55:4;68:2
**Bates (2)**
153:10;154:2
**bathroom (1)**
149:1
**bear (1)**
128:17
**beat (1)**
42:11
**beaten (1)**
105:10
**became (7)**
16:13;19:19;35:16,
16;36:22;84:20;86:1
**become (4)**
34:24;93:15;125:8;
142:17
**becomes (1)**
25:8
**becoming (3)**
58:15;82:21;121:5
**began (2)**
73:19;74:23
**beginner (1)**
14:15
**beginning (3)**
36:16;106:15;154:8
**behalf (1)**
5:21
**believable (1)**
126:4
**bell (3)**
97:4;138:3;142:13
**belonging (1)**
72:1
**belt (1)**
17:16
**bench (1)**
20:4
**benefit (4)**
96:13;101:19;
122:23;136:6
**benefits (1)**
130:21
**besides (1)**
75:20
**best (17)**
8:3,8;53:7;56:9;
78:12;80:21;102:17;
104:21,22;106:10;
112:16;122:5;129:18,
19,22;152:24;153:4
**better (2)**
19:10;77:2
**beyond (2)**
22:16;24:23
**big (3)**
83:1;111:16;125:1
**binder (3)**
63:23;83:1;155:20
**bit (3)**
61:7;144:18;148:10
**black (1)**
73:17
**Bob (3)**
79:19;82:6;155:25
**body (3)**
23:9,10;148:13
**BONJEAN (67)**
4:8,11,15,21,22;
26:22;27:2,4;29:14,
19;30:7,10,13;31:18;
41:5;65:23;66:14;
75:1;76:25;77:8,12,
23;78:5,10;79:11;
80:25;81:2,10,15;
88:2,13,16,22;89:4;
95:7;97:9,17,25;
98:11;110:23;118:1,
4;127:11;132:9,19;
136:15;138:6,9,20;
144:2;146:14;147:2,
7,9,15;148:18;149:3;
152:17;153:13,17,21,
25;156:15;157:10;
158:17,23;159:20
**B-O-N-J-E-A-N (1)**
4:21
**Bonjean's (1)**
154:12
**book (6)**
80:13,14,15;81:19,
20;83:11
**Booker (8)**
5:9;155:12;156:10,
11,20,23;159:2,12
**booklet (1)**
46:7
**books (1)**
16:21
**boss (23)**
20:1;21:10,12,18,
18,20,21,22;49:11,25,
25;50:6,9,16;51:17;
54:18;63:19,20;83:7;
87:11;108:20,21;
150:16
**bosses (2)**
21:22;55:25
**boss's (1)**
50:22
**both (6)**
33:22;64:3;101:24;
103:16;111:4;128:24
**bottom (1)**
154:8
**bow (1)**
151:12
**BOWENS (77)**
5:3,3;20:25;26:20,
22,25;27:3,23;29:17,
25;30:9,11;31:15;
36:13;40:9,23;43:1;
45:13;46:18;48:14;
49:9;52:7;54:1;55:20,
23;56:12;67:14;
68:10;69:4;71:13;
72:6,11;74:17,24;
75:4,17;76:11,20,23;
77:3,10;79:5,9;80:8,
22;81:7,12;84:11;
87:18;96:21;97:13,
21;98:5;100:7;
101:13;105:17;
106:18;112:13;
114:22;117:9;120:4,
11;123:2;125:15;
126:22;127:4,25;
130:16;138:18,22;
139:13;140:21;146:2;
148:20;150:10,14;
159:21
**box (5)**
6:11,18;23:5;25:2,2
**boxes (4)**
6:11;23:8;71:5,24
**boys (28)**
34:25;35:17;50:14;
51:20;53:15;56:17;
61:14;62:14,17;
69:18;70:4,9,17;72:2;
74:22;75:9;86:22;
93:16;111:4;128:9,
18,25;137:15;145:6;
152:2;159:6,13,17
**boys' (1)**
145:19
**Brady (2)**
101:21;146:9
**break (10)**
9:4,9;66:7;97:16,
19;98:7,7;116:21;
148:23;149:2
**breaks (1)**
9:7
**brief (2)**
16:2,2
**bring (10)**
114:6,10;151:3,14;
155:22;156:14;157:8,
24;158:6,15
**broke (1)**
10:7
**broken (16)**
119:5,6,15,15,19,
22,22,23;120:1,8,9,
14,17,20,24,25
**brother (2)**
71:23,25
**brought (5)**
7:13;15:17;97:2;
113:19,23
**building (1)**
73:18
**bulk (1)**
15:1
**bunch (1)**
152:9
**burden (2)**
137:4;141:2
**burglaries (1)**
17:13
**buy (1)**
72:23

## C

**Caldwell (1)**
9:23
**call (12)**
5:23;25:1;31:10;
38:23;41:23;54:24,
24;98:21,22;114:8;
132:11;149:18
**called (9)**
12:16;14:14;19:5,7;
23:1;40:3;96:17,18;
132:20
**calls (16)**
45:14;49:9;54:1;
55:20;56:12;69:4;
71:13;82:10;84:11;
87:18;100:7;105:17;
112:13;125:16;
138:18;146:2
**Camden (3)**
71:24;73:10;74:22
**came (9)**
28:4;41:15;69:2;
71:22;72:21;73:21;
104:11;127:2;143:13
**camera (1)**
149:14
**cameras (1)**
121:15
**Can (160)**
5:11;6:8,9,15,17;
7:8,9;9:12;12:3;
14:11;22:5,23;23:5,
18;24:18,22;27:3,4,5,
9,25;29:18;30:4,17;
31:16,18,21;33:6;
38:5,7,18,20;39:17;
42:14,15;43:2,5,14;
45:15;48:23,24;
49:10;50:24;52:8;

55:23;56:13;57:2;62:22;65:23;66:7,10,11;67:15;68:7,12,20,22;69:5,25;71:14,18;72:7,13;74:18;75:1,12,18;76:6,17,23;77:15,21;78:2,6,10;80:10;81:4,4,5;82:5,11;83:23;84:15;87:21;88:16;89:3,15;91:14;92:2,4,5,12;93:2;95:2,7,23;97:5,8,8,9,19,22,23;98:23;100:1,8,22;101:1,15;105:8,16,18;106:1,19;108:12;110:9;111:1;114:21;117:23,25;120:7,12;123:3;125:16,19;126:1,21,23;127:11;128:3,20;130:1,2;132:6,15,24,24;133:8;136:9,15;138:6;139:13;140:7;142:11,24;143:20;144:2;146:3,5,15;147:2,13,20;150:18,23;153:9,17,18,21;154:13
**capable (1)** 81:5
**capacity (1)** 50:9
**capital (1)** 51:1
**captain (4)** 18:11,12;24:3;108:17
**caption (1)** 148:12
**captured (2)** 105:11;112:2
**care (2)** 49:25;118:12
**career (9)** 14:1;17:7;23:15;26:12,15,19;29:13;40:16;41:11
**Carol (1)** 15:10
**Carrega (58)** 53:20;54:14;55:6,14;58:25;59:6,18;62:10;65:17;67:9;68:9;74:3,10;78:14;85:5;90:6;91:7;92:17;93:9;95:18;96:7;97:10,11;108:7,17;110:3,19;111:21;112:11,17;113:18;115:8;116:20;117:7;118:12;120:3;122:17;123:9,23;124:4,23;126:13;127:7,14;128:6,14,22;129:2;130:13,20;133:10;136:5;143:25;144:4,11,20;145:5,18
**Carrega's (6)** 68:16;91:12;93:14;109:18;118:10;136:2
**Carthy (7)** 5:10;155:12;156:25;157:7,13;159:5,17
**case (109)** 5:8,25;8:19;20:22;21:5,11;22:8,15;24:18,22;25:23;29:2;31:10;32:24;33:2;34:25;35:12,12,17;37:3;50:14,17,21;51:10,10,13,19,22,23;52:5,6,13,18;53:15,19;54:5,7;55:15,19;56:19;57:4,14,20;58:1,5,14,17,19,24;59:10,11,14,25;62:4,7;63:13,17;64:4,19;69:11;75:22;78:24;79:1;80:6;81:20,21;83:8;85:1,3,18;86:1,2,12;90:7,21;92:19;94:7,12,24;95:20,21;98:17;99:2;103:18,23;104:11;112:23;113:1,3;116:9;127:16;129:5,6,21;141:18;150:1,3,9;151:2,7,10,20,23;155:20;157:19;159:2,6,13,18
**cases (29)** 14:16,22;15:2,5,5;16:24;17:11,12,23;19:8;25:17;32:20;34:6;36:4,6,12;40:21;41:12,18;45:20;54:17,23;55:10,13;84:8;94:17;99:7,8;151:6
**cassette (1)** 121:3
**cause (9)** 64:2;67:17;68:3;76:3,19;77:19;134:14;152:7,8
**causes (1)** 29:8
**cell (1)** 60:24
**certain (5)** 5:16;32:23;42:12,13;141:25
**certainly (7)** 8:14;9:6;41:14;81:8;83:23;91:14;95:2
**chain (7)** 24:3,7;43:10,11;47:18,20,22
**chance (3)** 68:7;154:14,16
**change (3)** 61:9;80:5;151:23
**changed (9)** 15:23;37:5,13;79:2,14,16,20;115:16,16
**charge (12)** 15:25;24:6;39:22;63:15;64:3;65:1,10;138:25;139:1;146:7;152:11;153:2
**charged (10)** 32:6;61:3,21,25;103:5,11;136:20;152:16,22,25
**charges (23)** 23:9;63:18,19;65:2;75:15;84:6,10,18;139:19;148:7;150:22,23,25;151:3,6,14;155:22;156:4,14;157:8,25;158:6,15
**charging (6)** 83:18,18;146:12;150:5,9;151:16
**checks (1)** 16:19
**Cheryl (3)** 5:20;9:20;88:25
**Chief (13)** 5:16;15:21,22;16:13;18:7,7;21:25,25;22:3,3;24:4;33:16;155:13
**children (5)** 133:21;134:1,14;138:17;140:6
**choice (1)** 114:15
**chose (1)** 32:7
**Chris (1)** 4:25
**circumstances (4)** 42:13,13;59:17;96:8
**circumstantial (1)** 152:9
**City (5)** 5:7,8;7:15;155:10,12
**civil (6)** 4:13;7:12;15:23;16:9,16;29:2
**claims (1)** 33:18
**clarification (1)** 18:5
**clarifies (1)** 83:9
**clarify (1)** 61:9
**clarity (1)** 46:24
**clean (1)** 8:6
**clear (4)** 9:1;103:16;106:4;107:24
**clerk (2)** 11:18;12:1
**clerked (1)** 11:25
**clerkship (5)** 12:11;13:5,7,8,17
**client (3)** 7:14;131:11,12
**clients (1)** 155:11
**Clinton (2)** 71:2,6
**close (1)** 132:2
**closely (1)** 54:11
**closer (1)** 77:1
**closet (1)** 152:2
**coaching (5)** 29:21;30:1,11,14,18
**co-counsel (1)** 5:25
**co-defendant (1)** 142:20
**coerce (1)** 42:11
**coerced (2)** 128:23;145:12
**coercion (1)** 130:21
**coffee (1)** 107:8
**cold (3)** 35:12;51:10;157:19
**collaborative (3)** 48:10,18;151:11
**collaboratively (2)** 56:9,10
**colleagues (1)** 4:25
**collect (1)** 25:17
**College (1)** 10:21
**comfortable (1)** 118:2
**coming (2)** 51:11;115:3
**command (5)** 43:10,11;47:18,21,23
**comments (1)** 81:8
**committed (1)** 152:15
**committing (1)** 137:14
**commonly (1)** 70:16
**communication (1)** 53:14
**communications (1)** 27:22
**company (1)** 70:4
**complained (1)** 81:12
**complaining (3)** 29:5;81:14,15
**complaint (4)** 7:13;28:22;29:2;49:18
**complaints (1)** 26:11
**complete (4)** 7:16;9:13;11:10;75:22
**completed (2)** 10:6,12
**completing (1)** 12:11
**comported (1)** 99:23
**compound (3)** 52:7;80:10;106:19
**concern (5)** 126:7,10,13,16;142:16
**concerned (3)** 127:1,2;134:16
**concludes (1)** 159:23
**conclusion (3)** 100:8;105:1;138:19
**concurred (1)** 22:18
**concurrent (1)** 139:19
**conducted (2)** 42:18,23
**confessed (1)** 155:18
**confession (2)** 99:2,9
**confessions (2)** 42:12;98:22
**confident (3)** 23:23;100:1;153:2
**confirm (2)** 119:4;120:20
**confronted (1)** 111:13

**conjunction (1)**
45:21
**connection (10)**
8:22;28:23;59:14;
61:13;76:4;81:20;
86:5;92:18;96:3;
142:2
**connectivity (1)**
10:8
**consistent (1)**
100:3
**consolidated (1)**
14:15
**consortium (1)**
34:2
**constantly (1)**
91:23
**constitute (1)**
146:9
**constitutional (3)**
42:10,25;99:14
**construction (1)**
70:17
**consult (3)**
29:15;31:12;33:7
**consulted (1)**
116:5
**contained (2)**
7:12;68:21
**contemporaneous (5)**
63:16;110:1,2;
125:24;126:17
**content (1)**
148:14
**context (1)**
33:8
**continuation (1)**
108:13
**continue (2)**
92:3;109:17
**continued (3)**
16:9;91:18;142:16
**continues (1)**
117:23
**contractor (1)**
70:5
**control (4)**
48:21,23;122:9;
153:15
**convenience (1)**
119:11
**convenient (1)**
119:9
**conversation (10)**
22:15;52:1,25;53:8,
13,24;56:16;74:6;
114:24;124:13
**conversations (8)**
27:25;80:19;
107:16;126:16;
157:23;158:4,13,20
**conveyed (1)**
117:12
**conveys (1)**
72:4
**Coolbaugh (8)**
4:23;133:1;138:8;
147:5,8,12;153:19,23
**cooperation (4)**
127:16;129:5;
130:9;142:15
**copies (1)**
26:7
**copy (4)**
25:13,23;26:2,5
**Corey (2)**
156:10,11
**corporation (1)**
5:7
**correctly (2)**
6:24;45:9
**Cory (4)**
156:20,23;159:2,12
**counsel (7)**
5:4,7;25:6;26:4;
31:5;101:25;146:1
**Counselor (1)**
66:5
**counts (2)**
137:20;138:11
**County (26)**
4:2;10:2,4;12:24;
13:1,9;36:10;37:12,
16;38:2;40:16;41:21,
22;42:18;84:21;
102:8;108:13;115:4;
118:20;121:21;
124:17;132:21;
144:23;147:10;148:1;
156:13
**couple (3)**
17:5;149:18;151:18
**course (8)**
26:11,15,18;29:12;
37:7;42:7;102:16;
157:15
**courses (1)**
16:20
**court (22)**
7:25;8:5;9:17;12:5;
13:20;25:9;26:1;
31:22,25;33:2;50:24;
64:8,21,22;67:16,19,
22;100:1;139:11;
148:4;152:20;153:9
**courtroom (1)**
15:4
**courts (1)**
15:3
**create (1)**
23:6
**creative (2)**
23:2,18
**credentials (1)**
67:11
**credit (1)**
139:22
**crime (2)**
139:23;152:15
**crimes (2)**
32:7;137:14
**criminal (4)**
8:20;103:20;
128:17;145:19
**criminally (1)**
103:7
**cross (1)**
93:10
**CROSS-EXAMINATION (2)**
149:10;155:5
**Cucinello (17)**
4:9;5:6;6:7;7:2;
9:20;66:4,16;77:14;
81:17;88:25;98:13;
108:10;133:5;146:23;
147:13;155:6;158:24
**Cucinello-1 (2)**
65:25;66:18
**Cucinello-2 (2)**
92:25;93:3
**Cucinello-3 (3)**
97:10,11;108:7
**Cucinello-4 (2)**
132:22;133:3
**Cucinello-5 (2)**
147:17,20
**Cucinello-6 (1)**
154:2
**cup (1)**
107:8
**current (1)**
23:19
**currently (1)**
9:24
**custodial (2)**
138:13;139:7
**custody (8)**
61:13;97:3;116:11,
13,15;118:12;140:5;
143:16
**cut (2)**
63:12;82:4

## D

**Darnell (2)**
5:9;158:4
**data (2)**
25:17,17
**date (8)**
8:25;52:24;57:19;
59:1,8;108:22,23;
133:6
**dated (1)**
92:25
**dates (3)**
8:22;38:11;69:7
**day (11)**
10:11;14:3;15:5;
28:1,2;39:7;54:8;
70:24;85:22;111:15;
115:13
**day-for-day (1)**
139:25
**days (1)**
133:15
**day-to-day (1)**
55:4
**De (7)**
50:23;51:7,8,8;
53:24;56:16;108:17
**D-E (1)**
51:1
**deal (11)**
16:7;54:19,25;55:3;
61:15;84:7;128:15;
129:3;130:25;131:10;
137:17
**dealing (2)**
16:1;50:16
**deals (2)**
30:3;129:9
**dealt (1)**
21:24
**death (1)**
131:19
**deaths (5)**
36:5,7;103:8;
128:18;145:19
**debate (1)**
141:5
**decide (3)**
14:17;150:1,24
**decided (6)**
22:8;38:14;48:12;
65:18;146:10;151:3
**deciding (3)**
32:5;64:11;135:5
**decision (5)**
22:18;78:21;79:23;
158:6,15
**decision-making (1)**
151:13
**decline (2)**
115:3;116:19
**declined (5)**
80:20;135:2,9,10,
19
**defendant (10)**
99:18;102:5,10,25;
103:25;130:13;
149:15,17,20;152:10
**defendants (5)**
61:18;103:20;
107:7;129:10;156:5
**defendant's (3)**
23:8;102:15;131:10
**defense (9)**
25:5;26:4;101:20,
25;125:11,20;136:24;
145:25;148:4
**definitely (13)**
18:12,19;53:2,21;
57:5;61:4,5;62:11;
90:25;96:10;131:7;
138:1;151:11
**Degnan (2)**
12:2;13:18
**D-E-G-N-A-N (1)**
12:4
**degree (1)**
11:16
**delay (1)**
64:10
**Delk (1)**
73:14
**demolished (2)**
75:3,5
**department (13)**
34:17;38:8;39:6;
40:19;41:10,17;89:7;
114:5,25;115:14,21;
116:8;120:23
**depending (1)**
24:6
**deponent (3)**
30:15,16,24
**deposition (11)**
4:17;6:25;7:4;9:14;
14:7;27:20;30:25;
31:4;148:6;153:9;
159:23
**Deputy (6)**
5:20;15:21;18:7;
21:25;22:3;24:4
**described (1)**
120:23
**detail (2)**
43:23;52:4
**detailed (1)**
81:20
**detailing (1)**
111:9
**detective (26)**
18:11;38:24;47:22;
54:24;55:4;56:2,6,7,
8;58:12;60:4;74:10;
85:2;86:15;89:24;
91:25;99:10;101:11;
110:4,15;111:4;
114:8;117:19;150:23;
155:13,14
**detectives (21)**
18:18;21:15;36:23;
40:5,6,12;43:9;50:17,
19;51:9;54:20;55:10;
56:10;58:17;74:21;
89:8;94:11,14,17;
107:7;112:16
**detective's (1)**
123:14
**determination (5)**
97:23;155:21;
156:13;157:8,24
**determine (1)**

75:7
**determining (1)**
105:4
**developed (6)**
65:15,21;75:13;
76:2,17;77:16
**devices (3)**
121:3,15;122:12
**DI (3)**
5:19,20;149:16
**Diane (3)**
65:24;132:19;
147:16
**died (2)**
36:7;145:7
**difference (1)**
141:1
**different (8)**
15:3;19:14;64:19;
121:18;148:11,13,15;
151:7
**difficult (1)**
8:5
**DIRECT (4)**
4:8;22:10;47:25;
48:6
**directing (1)**
41:18
**direction (3)**
39:15,20;48:11
**directive (2)**
103:23;104:10
**directly (2)**
83:14;117:18
**director (11)**
15:16,18,19;18:8;
21:24,25;22:11,17;
51:2,4;157:1
**directors (1)**
22:1
**disagree (1)**
90:17
**disappeared (1)**
70:24
**disciplined (1)**
27:16
**disclose (5)**
101:24,25;144:24;
145:11,16
**disclosed (1)**
146:10
**discovered (1)**
92:17
**discovery (3)**
15:24;16:10,16
**discretion (2)**
129:9;139:11
**discs (1)**
121:17
**discuss (4)**
29:18;32:18;
107:10;156:20
**discussed (2)**
33:13;136:12
**discussion (4)**
92:23;98:9;146:21;
156:23
**discussions (2)**
104:25;157:5
**dismiss (5)**
21:5;24:19;65:7;
148:7,16
**dismissal (10)**
21:9;22:9;23:1,2,3,
17,18,24;24:2;65:13
**dismissals (4)**
22:2,24;65:5,6
**dismissed (2)**
20:22;25:18
**disposition (2)**
147:11,18
**distracting (1)**
6:17
**division (3)**
12:8;13:18;98:17
**divorces (2)**
12:19,20
**document (32)**
22:22;46:7,23;66:4,
8,9,17,21;68:10;72:6;
74:17;95:19;98:14;
108:7;110:13;127:12;
132:10,11;144:3;
146:25;147:14,21,22,
23,25;148:1;149:13;
153:8;154:2,6,18,20
**documents (8)**
4:24;8:24;27:24;
28:2,8,11;46:7;133:9
**domestic (3)**
15:16;32:4,7
**done (7)**
86:12;91:2;92:13;
94:7;141:14;143:18;
159:21
**doubt (6)**
22:16;24:23;64:13,
15;134:9;153:1
**doubted (1)**
64:15
**Dow (13)**
63:23;79:18;80:13,
14;81:22,24;82:8;
85:9;155:19,21;
159:2,5,9
**Dowell (4)**
69:17;70:25;71:4;
72:22
**down (11)**
61:12;78:11;93:21;
95:8;104:11;107:5;
127:12;136:15;
138:10;144:3;154:7
**downgrade (1)**
14:19
**drink (1)**
107:14
**drive (1)**
39:12
**dropped (2)**
71:1,6
**drug (1)**
17:12
**dry (1)**
63:13
**duly (1)**
4:4
**During (32)**
13:17;14:10;15:20;
19:19;20:17;26:11;
31:3;36:25;38:15;
39:7,14,23;46:11;
47:10;48:1;52:1;60:5,
9;92:6,16;94:3,23;
95:20;111:9;123:4,8;
126:16;127:13;
130:22;136:6;144:6;
157:5
**duties (4)**
16:15,23;58:7,19

## E

**earlier (7)**
40:20;78:9;88:18;
90:10;112:7;143:25;
149:19
**early (5)**
53:11;57:18;87:5,5;
148:5
**easier (1)**
119:12
**East (2)**
34:18,19
**easy (2)**
6:8;153:25
**eat (1)**
97:16
**ECPO001315 (2)**
154:3,7
**ECPO001316 (1)**
154:3
**ECPO1315 (1)**
153:11
**education (2)**
10:19;11:7
**effect (1)**
103:21
**effort (6)**
14:7;54:6,6;96:4;
151:4,11
**efforts (1)**
75:7
**eight (5)**
18:13,14,17,17;
68:23
**either (14)**
10:19;22:3;45:10;
48:7;96:17;101:5,11;
102:4;103:14;106:10;
113:6;122:13;145:5;
158:13
**elapsed (1)**
63:7
**eligible (3)**
142:17;143:4,5
**else (9)**
5:1;6:16;49:5;
96:18;98:4;124:21;
136:11;146:16;
150:18
**elsewhere (1)**
32:25
**email (3)**
28:1,7;132:19
**emailed (2)**
28:8;132:11
**employed (2)**
9:24;10:3
**employer (1)**
33:24
**employment (6)**
10:20;11:7;12:12;
13:14;14:4;34:5
**end (5)**
43:15;48:11;53:3;
82:4;109:12
**ended (1)**
14:12
**enforcement (15)**
7:15;36:11;76:1;
92:1;103:19;118:13;
127:8;144:21,23;
145:3,10,15,17,23;
150:21
**enough (13)**
18:22;20:16,16;
29:9;64:24;65:11;
78:24,25;89:4;108:5;
113:14;133:9;152:11
**ensure (5)**
99:3,13;100:4,17,
19
**entire (7)**
23:14;40:16;
104:17,23;105:22;
106:7;107:20
**entitled (1)**
101:20
**entry (2)**
154:11,14
**equipment (11)**
104:4,4;118:20,24;
119:10;121:13,16,22,
25;122:2,19
**equipped (1)**
121:15
**Ernest (4)**
69:18;71:5,21,23
**especially (1)**
102:15
**essentially (2)**
68:8,16
**Essex (25)**
4:1;10:2,4;12:24;
13:1,9;36:9;37:12,16;
38:2;40:16;41:21,22;
42:18;102:8;108:12;
115:3;118:20;121:21;
124:17;132:21;
144:22;147:9;148:1;
156:13
**established (1)**
90:12
**ethics (2)**
26:11;27:13
**Eutsey (2)**
111:4;123:9
**Evans (48)**
4:14;7:14;28:23;
57:15;58:8;62:14;
66:24;67:23;70:5,8,
15,21,23;71:11;72:1,
21,22;75:16;76:4,19;
77:19;78:22;82:9;
83:21;84:18;127:17;
128:8,17,24;134:17;
137:5,13;140:7,9,18,
19;143:11;147:3,8;
151:24;152:1,10,15;
156:14;157:9,25;
158:7,16
**even (18)**
13:21;17:13;19:6,
12,13;24:5,7;32:15;
35:5;37:4;38:7;83:13;
111:12;138:16;146:7,
11;152:19;157:3
**event (1)**
25:22
**eventually (4)**
4:24;87:6;130:25;
136:13
**everybody (3)**
6:16;44:2;65:3
**everybody's (1)**
39:8
**everyone (3)**
6:12;64:12;98:4
**Evidence (17)**
16:22;63:24,25;
64:7,22,24;65:15;
75:14;76:1,9,17;
77:16;79:2;81:21;
98:18;152:6,9
**exact (5)**
33:21;45:19;
111:22;112:2,22
**exactly (7)**
20:13;36:18;37:5,
13;38:11;50:15;141:8
**EXAMINATION (2)**
4:8;158:23
**example (2)**
46:15;144:14

**exceed (3)**
138:12,13;139:7
**Excellent (1)**
56:6
**exchange (6)**
101:6,12,19;
127:15;129:5;130:8
**exculpatory (1)**
50:4
**Excuse (2)**
77:23;103:25
**executed (2)**
67:3,8
**Exhibit (7)**
65:25;78:10;92:25;
97:11;133:3;147:17;
154:2
**exist (5)**
14:14;46:8,9,22;
47:3
**exists (4)**
23:4;46:21,24;47:4
**experience (5)**
6:6;37:20;41:8,12,
13
**experienced (1)**
17:15
**expert (1)**
138:23
**explain (1)**
48:24
**explaining (1)**
120:24
**expressed (2)**
83:17;114:12
**extends (2)**
153:11,11
**eyes (1)**
81:6

## F

**Fabyan (2)**
71:7;72:20
**face (1)**
145:18
**facility (1)**
61:5
**fact (14)**
32:24;33:1;37:8;
42:19;66:8;95:18;
103:6;123:13,18,20;
131:25;133:23;
136:13;137:12
**factor (1)**
64:8
**facts (2)**
21:13;107:10
**factual (1)**
68:2
**faded (1)**
121:7
**failed (1)**
95:18
**fair (15)**
8:17,18;18:22;
20:16,16;24:8,9;29:9;
89:4;100:11;108:5;
113:14;117:14,15;
120:10
**fall (2)**
53:10,10
**false (2)**
30:6,7
**familiar (11)**
43:7;44:12,14;
45:11,18;58:15;
59:25;62:4,7,8;86:1
**familiarity (1)**
40:18
**families (1)**
69:16
**Family (4)**
12:8,19;86:22,24
**far (7)**
43:15,20;46:9;
50:10;83:7;151:17;
152:13
**feasible (1)**
104:22
**February (2)**
108:23;123:23
**fed (2)**
128:6;145:6
**federal (2)**
7:12;29:2
**feel (7)**
19:10;87:2;118:2;
126:6;131:5;132:23;
153:2
**fell (1)**
13:22
**felt (1)**
78:23
**females (1)**
13:19
**few (6)**
89:17;133:15;
138:10;149:1;155:15,
16
**Fifth (2)**
31:7;100:13
**figure (1)**
122:18
**file (4)**
25:13,14,23;148:2
**filed (1)**
28:23
**fill (1)**
114:13
**filled (1)**
148:6
**financial (2)**
130:14;144:13
**find (7)**
89:24;112:5,9;
118:23;125:11,20,22
**finding (3)**
76:4,18;77:18
**fine (13)**
6:9,21;18:16;20:9;
88:20;98:3,4;118:3,6;
132:16;138:5;149:2,3
**finish (4)**
8:4;76:23;104:18;
105:23
**finished (5)**
141:19,20;143:24;
146:17,23
**fire (10)**
58:13;73:11,14,16,
17,19,23,24;74:23;
152:3
**firm (3)**
4:22;12:13,14
**first (37)**
10:11;14:3,13;18:8,
9,9;19:15;21:8;28:17;
31:19,19;34:23,24;
35:1;36:16;37:6,8,22;
38:13,22;41:15;
50:13;52:1;56:7;68:7;
85:1,25;93:15;108:9;
109:5;113:15;115:17;
124:9;131:5;149:6,7,
25
**firsthand (1)**
123:7
**five (27)**
34:25;35:17;50:13;
51:20;53:15;56:16;
61:14;66:6;68:20;
69:18;70:4,17;93:16;
128:9,25;131:19,22;
132:1;133:20,25;
134:14;138:17;140:5;
155:11;159:6,12,17
**fixed (1)**
119:2
**flat (2)**
138:12,14
**fled (1)**
73:18
**flipped (1)**
36:22
**Floor (4)**
4:3;74:21;124:16,
16
**fluid (1)**
92:7
**focus (2)**
34:21;58:3
**focusing (2)**
17:7;62:1
**follow (4)**
42:4,14;104:6;
156:19
**followed (2)**
42:23;152:23
**following (1)**
45:8
**follows (2)**
4:7;42:10
**follow-up (2)**
17:5;158:24
**force (1)**
24:22
**forgot (1)**
13:6
**forgotten (1)**
116:13
**form (68)**
22:21,24,25;23:1,7,
12,12;24:2,10,12;
25:2,5,8,12;26:8;
31:17;38:4,18,20;
39:25;40:10;43:5;
44:21;69:24;76:5;
79:3,4;82:3,5,10;
83:22,24;87:20;88:1,
11,14;89:12,14;
91:13;95:1,22;98:18;
100:25;101:14;105:7,
25;114:12;118:16;
125:18,25;126:20;
128:2,19;129:11,14;
131:15,23;132:4,5;
134:15;136:8;142:23;
143:19;148:6;152:17;
156:16;157:11;
158:17
**formal (9)**
58:15;123:9;
128:16;130:23;
133:11;136:14,17;
144:7;145:1
**formally (5)**
26:18;27:12;61:3,
21,25
**former (1)**
58:12
**forms (3)**
23:20;25:22;98:24
**forth (2)**
64:25,25
**forward (7)**
64:11,17,24;65:11;
78:24,25;100:1
**found (9)**
50:2;134:17;140:9,
13,23;141:3,10,11,12
**foundation (24)**
47:13;69:5;71:14;
76:6;85:23;87:21;
88:11,15,17;89:2,13,
15;90:3;91:14;95:2;
105:8;106:1;120:6;
125:19;126:1;146:5;
156:15;157:10;
158:18
**four (4)**
68:20,23;155:11;
156:8
**frame (7)**
20:14,19;21:3;
37:16;38:16;57:2;
123:5
**FRANCESCO (3)**
5:19,20;149:16
**free (4)**
9:6;61:9;132:23;
141:8
**front (4)**
28:5,20;93:3;
132:21
**fruition (1)**
143:13
**full (3)**
7:16;9:12,20
**further (6)**
10:19;24:7;71:3;
148:18;154:25;
159:20

## G

**gap (1)**
126:18
**Garry (5)**
5:10;155:12;
156:25;157:7,13
**Gary (3)**
5:6,12;155:6
**gave (10)**
16:6;17:16;39:19;
65:16;72:22;80:15;
105:10;129:24;
133:11;158:14
**gearing (1)**
56:25
**General (5)**
5:21;29:6;52:5,9,9
**generally (4)**
150:21,22,24;151:6
**General's (2)**
5:21;6:1
**generated (2)**
94:13,14
**George (1)**
6:3
**given (3)**
27:24;37:20;92:6
**gives (2)**
33:10;68:8
**giving (2)**
39:15;126:12
**glitches (1)**
10:9
**goal (1)**
102:18
**goes (3)**
25:14;43:15;70:23
**Good (18)**
4:9,10;5:5,19;6:2,6,
22;13:24;18:5;36:15;

44:3;77:10;105:19;
118:6,9;131:8;
149:11;152:18
**Gotcha (2)**
32:13;34:3
**graduate (4)**
10:13,15;11:2,13
**graduating (1)**
11:15
**graduation (2)**
10:18;11:6
**grand (12)**
14:18,21,22;28:18;
57:8,12,12;90:22;
91:3,11;92:9;150:1
**Great (5)**
36:15;56:6;88:18;
112:20;159:22
**green (2)**
83:20;84:2
**Greg (7)**
50:23;51:8,17;
52:16;53:2;56:16,22
**G-R-E-G (1)**
51:1
**grew (1)**
35:6
**ground (2)**
7:8;91:19
**Group (1)**
4:22
**guaranteed (1)**
33:4
**guarantees (1)**
99:14
**Guarino (5)**
80:7;81:19;129:6;
155:19,19
**guess (29)**
14:10;20:25;21:12;
23:6;32:10;33:17;
34:23;35:5;38:10;
41:14;46:16;51:15;
52:17;53:7;56:22,23;
82:24;84:25;96:4,16,
19,20,21;103:4;
111:14;113:9;131:12;
139:12;154:11
**guessing (1)**
24:6
**guidance (5)**
30:17;31:1,5;32:21;
51:15
**guided (1)**
42:24
**guidelines (1)**
31:19
**guilt (1)**
140:13
**guilty (18)**
127:3;131:13;
137:2,19;140:10,14,
16,17,17,23,25;141:3,
7,10,11,13,22;142:6
**gun (2)**
19:8;32:11
**guy (1)**
114:9
**guys (1)**
112:15

## H

**Hadley (9)**
5:9,15;74:10;
155:14;157:14,22,23;
158:1,13
**Haley (7)**
4:23;132:11,23;
136:16;138:6;144:3;
147:2
**half (5)**
14:25;15:7,20;
17:10;20:20
**Hall (4)**
11:8,15;72:19;73:2
**Hampton (72)**
57:15;58:13,25;
59:7,14,18;60:2;61:2;
62:3;63:8;66:23;
67:24;74:3,11,15,20;
75:16;76:3;78:14;
82:9;83:20;84:18;
90:13;93:7;96:9;97:2;
102:23;109:18;
110:14,21;111:2,10,
14,22;113:7,10,19;
114:3;115:2;116:9,
19;117:6;118:11;
122:25;127:15;128:7,
15,23;129:4;130:15,
22;131:1,16;133:3,10,
15,19,25;134:23;
136:18;137:12,18;
140:5,16;141:21;
144:6,25;145:7,11;
152:8;155:18;157:9
**Hampton's (7)**
75:14;92:16;96:3;
135:24;137:5;151:17,
23
**handled (1)**
50:9
**hands (1)**
46:15
**handy (1)**
138:7
**happen (1)**
64:6
**happened (16)**
49:6,22,24;52:25;
53:9;80:19;104:7,8;
111:3,9,15,24;116:10;
124:25;125:2;138:25
**happening (2)**
33:10,11
**happens (3)**
8:7;24:12;38:12
**happy (3)**
31:1;33:6;62:20
**hard (2)**
36:17;59:2
**Harris (1)**
73:14
**head (3)**
19:20,21;23:21
**hear (14)**
5:11;6:8,9;26:22;
27:3,4;30:19;33:10;
34:25;76:25;77:2;
100:9,10;150:13
**heard (4)**
35:1;81:13;110:8;
128:21
**hearing (10)**
35:4,7;92:16;96:3,
6,11,13;104:3;
106:25;157:4
**heavily (1)**
85:7
**heck (1)**
42:7
**held (3)**
92:23;98:9;146:21
**help (10)**
4:23;8:21;70:17;
71:5;92:21;113:17;
126:5;129:19;132:10;
135:17
**helped (1)**
129:23
**helpful (3)**
17:4;126:25;150:7
**helps (1)**
112:19
**Henry (7)**
5:9,16;155:13;
157:15;158:4,5,14
**here's (1)**
107:5
**hesitated (1)**
64:16
**hey (1)**
125:5
**Hi (2)**
4:12;5:12
**high (3)**
10:13,15,18
**higher (1)**
24:5
**himself (9)**
54:23;62:16;
128:17,24;131:21;
132:1;133:20;136:3;
152:1
**hire (1)**
13:5
**hired (1)**
13:10
**hiring (1)**
16:17
**history (3)**
10:25;52:10,10
**Hold (3)**
11:21;117:22;
153:13
**home (3)**
9:21;69:20;72:24
**homicide (66)**
15:8,9;17:1,2,11,16,
20,23;18:1,23;19:19,
20,21,24;20:3,6,8,20;
21:4;35:13,16,20,21;
36:4,5,10,17,25;37:3,
9,18,21;38:2,12;
39:24;40:3,6,18;
41:16,18;42:19,20;
44:19;45:3;46:11;
47:10;48:1,20;49:1,
24;50:20;51:3;54:17;
55:7,10,15;56:3,7;
65:6,7;94:12,17;
98:16;115:18;124:16,
18
**homicides (6)**
17:17;36:8,8;37:8;
47:10;48:1
**honest (1)**
32:16
**honestly (2)**
16:11;23:16
**honor (1)**
102:19
**honored (4)**
100:6,15,22,23
**hope (1)**
138:20
**hopefully (1)**
41:9
**hours (2)**
118:8;125:13
**house (2)**
71:22;152:3
**human (2)**
15:25;107:13
**hurt (2)**
81:2;126:5
**hypothetical (1)**
49:14

## I

**ID (1)**
63:14
**idea (5)**
46:17;140:3;
148:15;159:1,4
**Identification (6)**
66:2;93:1;97:12;
133:4;147:19;154:4
**identified (1)**
137:13
**identify (2)**
4:17;147:1
**identifying (1)**
152:1
**immediately (6)**
37:17,18;38:25;
50:6;73:18;86:17
**implicate (2)**
32:25;128:8
**implicated (9)**
62:13,16;125:1;
128:16,24;131:18,21,
25;133:20
**implicating (1)**
127:16
**importance (1)**
151:19
**important (2)**
33:12;105:4
**impression (3)**
33:10;83:10;95:17
**improper (6)**
78:3;87:24;88:4;
107:15;129:18,21
**incendiary (2)**
73:16,16
**include (1)**
112:8
**included (3)**
86:8,11,14
**includes (1)**
27:23
**including (2)**
40:17;145:17
**incredible (1)**
112:12
**inculpatory (1)**
103:6
**independent (1)**
95:13
**indicate (2)**
8:25;74:20
**indicated (3)**
78:9;85:17,25
**indicates (1)**
75:6
**Indicating (1)**
34:14
**indict (1)**
133:25
**indicted (5)**
24:18;57:15,17,24;
63:4
**indictment (14)**
20:22;24:13,16,19;
25:2,18;52:14;57:4;
58:10;59:24;60:18;
78:22;80:7;150:6
**individuals (2)**
67:23;156:8
**induced (1)**
100:23
**infer (1)**

41:2
**inferences (1)**
119:16
**inform (1)**
38:2
**informal (1)**
114:11
**information (28)**
45:1;50:4;51:14;52:10;59:20;61:7;65:15,20;68:21,25;69:22;70:12;71:10;72:5,9;73:1,5,21;75:12;101:20;105:12;119:25;120:10;128:11;129:24;131:9;145:24,25
**ingrained (1)**
112:24
**initial (1)**
56:15
**initially (1)**
51:19
**initials (1)**
5:24
**inmate (1)**
115:1
**innocent (1)**
140:25
**input (7)**
156:12;157:7,12,13,23;158:5,14
**inquire (1)**
119:1
**inspect (1)**
120:19
**instance (6)**
45:6;50:2;86:14;101:6,17;112:2
**instead (1)**
134:6
**instituted (1)**
102:19
**instruction (1)**
104:5
**intend (1)**
97:14
**intending (1)**
29:23
**intentions (1)**
153:4
**interest (2)**
13:21;106:24
**interested (1)**
52:20
**interesting (2)**
51:23;52:5
**interface (1)**
36:10
**intern (2)**
6:3,6
**internal (1)**
148:1
**internally (1)**
27:17
**interrogation (5)**
104:17;105:22;106:7,16;125:13
**interrogations (2)**
107:3,4
**interrupt (1)**
30:5
**interrupted (1)**
32:17
**interrupting (1)**
77:21
**interview (24)**
60:6,9,13;74:6,9;75:14;76:2;83:2;107:20;109:18;110:14,21;111:10,23;113:7;115:23;118:15;121:14,20,24;122:8,14,24;123:8
**interviewed (12)**
59:6,18;60:1,3;62:3;78:14;90:13;102:23;126:19;131:7,8;133:10
**interviewing (1)**
16:19
**into (13)**
25:13,14;54:6;64:9,21,22;79:17;103:21;112:3;121:17;128:23;145:12;148:2
**introduced (1)**
6:12
**investigate (2)**
47:10;54:16
**investigated (1)**
55:14
**investigating (6)**
36:4,12;47:25;54:23;55:10,19
**investigation (12)**
39:14,22;42:7;53:25;69:2,3;70:3;86:6;92:4,18;94:25;95:20
**investigations (3)**
42:19,20,24
**investigative (6)**
35:22;36:19;37:2;38:15;44:19;58:19
**investigator (8)**
45:7;48:20;49:5,14,15;50:3;85:3;144:23
**investigators (20)**
35:23;36:9;39:21;41:25;42:18,20;44:18;45:2;46:10;47:9,17,25;48:13,20,21;49:2;53:18,18;60:12;73:14
**investigator's (1)**
49:18
**investigatory (1)**
157:19
**invocation (1)**
100:15
**invoke (2)**
31:7;32:24
**invoked (2)**
100:4,13
**involve (1)**
39:15
**involved (24)**
31:6;54:9;56:19;58:24;73:11;85:6,7;90:6,8,9,9,10,18;93:16;94:12;111:3;129:6;135:13;150:8,16,17,17,19;151:15
**involvement (4)**
59:10;129:12;130:8;157:18
**issue (7)**
31:5,11;34:6;64:16,17;125:8;155:20
**issues (6)**
10:8;15:25;16:1,7,8;33:13

## J

**jail (1)**
60:24
**Janet (1)**
72:14
**January (1)**
85:10
**Jennifer (2)**
4:11,21
**Jersey (6)**
4:4,6;5:22;93:6;123:10;138:17
**JMS (6)**
133:1;147:5,8,12;153:19,23
**job (12)**
16:3,10;23:19;32:9,12;33:24;34:1,8;37:10;49:15;77:10;114:4
**Joe (8)**
5:9,15;63:13;155:14;157:14,22,23,25
**jog (2)**
92:21,22
**jogged (1)**
86:20
**jogging (1)**
8:21
**jogs (1)**
61:7
**John (2)**
5:3;131:6
**Johnson (2)**
69:17;71:1
**join (3)**
71:17;81:1;84:14
**joined (4)**
35:15;36:17;37:6;115:18
**joining (2)**
4:25;35:13
**joint (1)**
54:5
**judge (25)**
7:25;11:18,25;12:1,5;13:17,25;15:4,5;24:14,14,15,17,19,20,25;25:3;26:15,18;27:13;67:5,5,6,7;141:17
**judge's (1)**
25:1
**juncture (1)**
75:23
**jury (20)**
14:18,22,23;17:15;20:3,10,14;28:18;57:8,12,13;90:22;91:3,12;92:9;104:5;127:2;140:9,23;150:1
**juvenile (1)**
13:18

## K

**keep (5)**
46:25;92:4;109:10,10;110:23
**kept (1)**
25:23
**key (1)**
125:14
**kid (1)**
35:5
**kids (1)**
152:10
**kind (11)**
13:22;24:3;28:4,5,19,20;52:20;87:23;94:10;148:15;150:2
**Kindly (1)**
30:5
**King (1)**
5:4
**knew (15)**
13:4,21;51:21;52:17;56:23,24,25;57:25;58:12,20;62:13;64:12;116:2;124:25;125:1
**knowing (1)**
99:25
**knowledge (14)**
41:3;44:17;45:1;56:10;59:20;122:5;123:8;156:17,18;157:13;159:8,10,16,19
**knowledgeable (1)**
35:16
**known (1)**
112:11
**knows (2)**
41:9;138:21

## L

**La (1)**
4:25
**label (2)**
40:7;153:10
**lack (2)**
47:12;89:13
**lacks (2)**
89:2;90:2
**language (1)**
154:14
**lapse (1)**
78:13
**large (2)**
18:1;126:18
**last (17)**
12:3;14:10;17:2;51:5;70:4,9;86:22;100:9;110:10;117:17,24;135:22;146:24;152:10;158:3,9;159:15
**late (2)**
53:10,11
**later (3)**
71:1;133:15;136:20
**Laurino (9)**
79:19;80:2;82:6;84:20;155:25;156:4;159:11,12,16
**law (40)**
4:21,22;7:15,25;11:8,16,18;12:13,14,17,19;13:2;35:4;36:10;42:10;64:21;76:1;92:1;100:2;102:19,19;103:14,14,17,18,19,23;104:11,12;118:13;127:7;144:21,23;145:3,10,15,17,23;150:20;152:20
**laws (1)**
102:12
**Lawson (1)**
72:15
**lawsuit (6)**
8:20;28:23;33:15,19,22;141:9
**lawyer (10)**
6:21;32:16;33:9;58:14;60:3;61:19;

131:4,5;138:20;141:6
**lawyers (13)**
13:24;15:1;16:1,4,8,18,18,21;18:13,17;61:16;150:22,24
**lawyer's (1)**
43:12
**lay (3)**
68:16;85:23;141:5
**lead (13)**
36:19;37:2;38:15,21;39:18,20;42:19;54:4,10;55:18;70:20;85:2,2
**leading (2)**
41:18;53:25
**leads (1)**
105:3
**learned (4)**
35:9,12;50:13;51:16
**least (12)**
8:19;25:23;29:4;37:7;66:20;73:4;90:18;93:5;106:5;107:21;135:19;152:6
**leave (3)**
6:19;78:2;89:3
**led (3)**
78:20;99:17;129:25
**Lee (35)**
7:14;58:8;62:13;66:23;67:23;70:5,8,15,20,23;71:11;72:1,21;76:4,19;77:19;78:22;127:16;128:8,17;134:17;137:13;140:7,9,18,19;143:10;151:24;152:1,15;156:14;157:9,25;158:7,16
**left (7)**
19:16,17;33:17;63:21;82:19;84:23;85:9
**legal (5)**
24:20;51:15;100:8;138:16,19
**legally (1)**
141:7
**length (1)**
88:18
**leniency (1)**
129:4
**less (2)**
6:17;125:22
**letter (4)**
132:17;133:14;134:10;135:20
**level (1)**
52:4
**levels (1)**
21:22
**liable (2)**
103:7,7
**liaison (1)**
16:20
**lie (3)**
30:12;42:12;63:1
**lieutenant (32)**
18:12;53:20;54:13;55:6,14;58:25;59:6;62:9;65:17;68:9;91:7;92:1,17;108:17;110:19;112:11;115:8;116:20;117:7;118:12;120:3;123:14;127:7,13;128:5;129:2;143:25;144:4,11,20;145:5,17
**life (1)**
112:17
**light (2)**
83:20;84:2
**lightly (1)**
65:8
**likely (2)**
37:23;58:20
**liking (1)**
97:20
**limit (2)**
20:18;107:11
**line (9)**
6:4;22:7;47:21;54:19,19;55:4;72:13;83:5;93:21
**line-by-line (1)**
69:14
**LIPSHUTZ (34)**
5:5,6,14;38:17;39:25;40:8,10;44:21;47:12;77:17,20;79:3;83:24;85:4;87:20;88:10,20,23;89:12;90:2;98:6;118:16;126:2;129:11,16;131:23;132:4;146:20;148:25;149:7;155:2,5,7;158:21
**literally (1)**
146:18
**litigation (1)**
4:14
**little (3)**
41:9;144:18;148:10
**live (2)**
9:22,23
**loaned (3)**
15:12,13;18:25
**local (1)**
70:5
**located (1)**
73:10
**locking (1)**
152:2
**lodged (1)**
29:2
**long (9)**
10:3;12:21;16:10;57:6,19;98:4;99:23;122:17;155:8
**longer (4)**
97:14,18,22;98:1
**look (24)**
66:3,9,17;68:7,24;73:8;80:15;90:23;92:20;95:10;98:14;99:16;102:3;117:16,17;132:18,22,24;146:15,18;147:13,21;148:10;154:13
**looked (7)**
28:8,17,20;85:18,18;96:1;133:8
**looking (8)**
7:16;23:13;52:12;80:14;116:14,22;149:13;154:6
**looks (5)**
134:25;135:2,4;136:1,2
**loss (1)**
34:2
**lost (1)**
32:9
**lot (12)**
28:2,2;54:6;64:8,10,19;82:20;86:17,18,21,23;87:2
**Lou (8)**
95:18;96:7;113:2,18;126:13;128:14,22;133:10
**Louis (4)**
67:9;74:3,9;90:6
**love (1)**
13:22
**luck (1)**
19:7
**lunch (1)**
97:19

## M

**ma'am (4)**
7:5;9:19;29:24;69:10
**mad (1)**
134:18
**main (3)**
6:18;37:11;121:16
**maintain (1)**
25:16
**Maio (1)**
108:17
**major (1)**
10:25
**majority (1)**
15:1
**making (6)**
30:23;79:23;119:17;128:23;145:7,12
**males (1)**
73:17
**Man (4)**
111:16;125:1;134:13;141:8
**manage (1)**
34:8
**mandate (6)**
103:23;104:11,12,16;106:6;108:1
**Mann (1)**
131:6
**manner (2)**
99:17;120:23
**many (12)**
18:5;20:2,12;35:25;40:17;51:22;54:7,12;121:10,20;122:4;124:7
**marathon (1)**
9:5
**March (11)**
15:9,9;17:18;61:21,22;63:4;78:22;85:14;92:15;154:11,17
**Marie (1)**
9:20
**Mark (6)**
34:12,13;65:23;97:9;147:15;153:10
**marked (12)**
66:1,18;93:1,2,23;97:12;133:4;147:3,18;153:8;154:3,7
**Market (1)**
4:3
**Marvin (2)**
72:18;73:2
**Maryland (1)**
101:21
**material (1)**
146:9
**matter (3)**
7:14;29:17;114:16
**Mattia (6)**
50:23;51:7,8,8;53:24;56:16
**M-A-T-T-I-A (1)**
51:1
**may (28)**
4:25;10:5,9,11,11;14:4,11;15:15;27:22,24;30:24;31:10,10;32:3,24,25,25;46:7;54:22;60:15,20;83:15;88:21,21;96:18;106:10;149:17;150:20
**maybe (18)**
24:6,7;42:14;53:3,10,10;61:1,1;66:5;83:11;92:21;97:7;113:16;116:21,21;125:5;152:13;155:7
**mayor (2)**
156:11,12
**Mc (12)**
5:10;69:17;70:25;71:4;72:22;131:6;155:12;156:25;157:7,13;159:5,17
**mean (35)**
18:3,19;20:24;25:1;29:20;42:2;45:22;52:15;54:9;57:6;62:8;69:13;81:3;84:5;85:5,21;87:16;89:17;91:17;92:9;103:22;106:25;107:8;119:15;124:2;131:18;132:7,15;140:12,24,24;141:4;142:5,6,8
**meaning (1)**
48:12
**means (5)**
19:7;55:9;119:16;123:7;140:20
**meant (1)**
18:5
**meet (5)**
60:22;61:1,16,18;141:2
**meeting (8)**
58:11;83:12,16;141:17;154:17,23;155:3,19
**meetings (1)**
127:13
**Melissa (1)**
63:14
**Melvin (4)**
69:17;70:25;71:22;72:1
**members (3)**
54:7;69:16;86:22
**memo (1)**
22:22
**memorialization (1)**
126:17
**memorialize (3)**
60:13;109:18;125:13
**memorialized (1)**
101:10
**memorializes (1)**
110:13
**memories (1)**
112:20
**memory (8)**
8:22;29:11;61:8;75:22;86:20;92:22;112:12,16

**men (1)**
103:8
**mention (1)**
50:18
**mentioned (5)**
47:17;103:17;
123:5;149:20;157:5
**mere (1)**
33:1
**merit (1)**
14:18
**messages (1)**
126:12
**met (9)**
5:12,14;60:20;
61:20,24;63:22;
112:17;117:19;155:7
**methodology (1)**
99:12
**Michael (8)**
5:24;12:2;69:17;
70:25;71:4;72:22;
108:17;149:11
**microphone (1)**
77:2
**middle (2)**
39:10;111:12
**might (14)**
6:16;8:23;21:23;
24:4;26:1;36:11;77:2;
114:12;125:5,7,11;
127:23;131:11;
134:18
**milkshake (1)**
72:23
**million (1)**
82:17
**millions (1)**
84:8
**mind (7)**
55:13,18;64:13;
98:7;112:24;146:19;
153:1
**mine (1)**
25:1
**minimum (1)**
143:5
**minute (1)**
146:15
**minutes (2)**
66:6;98:1
**Miranda (11)**
92:16;96:6,10,13;
99:20,23;100:4;
104:24;106:24,25;
107:5
**mischaracterize (1)**
77:9
**mischaracterizes (6)**
45:14;77:6;80:9,23;
120:12;126:23
**mischaracterizing (1)**
79:6
**missing (11)**
34:25;35:17;50:14;
51:21;53:15;69:20;
86:9;93:16;159:6,13,
17
**misstating (1)**
7:1
**mistake (1)**
158:10
**mixed (1)**
126:12
**monetary (3)**
127:15;144:13,24
**money (5)**
72:22;101:5,7;
127:21,23
**months (9)**
12:22;53:8;57:21,
22,24;59:23;93:17;
94:4,23
**more (14)**
9:18;17:14;48:10;
51:6;52:4,10;56:19;
109:22;119:9;140:7,
15;149:6;151:4;
152:21
**morning (6)**
4:9,10;5:5,19;6:2,6
**most (4)**
58:20;99:7,8;107:2
**mostly (3)**
54:18;115:24;116:4
**mouth (1)**
79:24
**move (4)**
71:5;81:16;142:12;
154:21
**moved (2)**
14:23;19:12
**moving (1)**
84:6
**much (15)**
34:20;51:25;57:18;
63:7;65:13;97:13,18,
22;98:1;105:12;
119:9;140:1,4;
154:19;158:21
**multiple (1)**
6:11
**municipalities (1)**
36:11
**municipality (4)**
36:19,23;37:1;39:7
**murder (11)**
61:3;62:17;103:11;
133:20;137:20;
138:11,17;139:1,11,
12;152:12
**murdered (2)**
134:13,14
**murdering (1)**
140:5
**murders (9)**
52:3;61:14;62:14;
128:8,24;131:19,22;
132:1;133:25
**Murray (1)**
15:11
**must (1)**
42:14
**MV (1)**
5:24
**myself (3)**
4:20;63:22;115:13

## N

**name (18)**
4:11;5:6,17;6:24;
9:17,19,20;12:3;
22:25;23:8,15;25:3;
34:11;50:22;51:5;
67:23;149:11;155:6
**name/her (1)**
25:3
**named (3)**
7:15;33:19,22
**narcotics (1)**
19:15
**narrative (1)**
128:7
**nature (1)**
29:1
**near (1)**
110:1
**necessarily (2)**
75:22;107:4
**need (7)**
6:16;8:21;9:4;79:9;
107:9;136:25;154:19
**needed (2)**
152:4,6
**needs (3)**
30:25;97:15;107:13
**negotiate (1)**
129:3
**negotiated (2)**
129:3;131:10
**neighbors (1)**
73:18
**New (7)**
4:3,5;5:22;16:20;
93:6;123:10;138:17
**Newark (42)**
4:3;5:8,9;7:16;
19:9;34:15,25;35:17;
37:10,22,23;38:1,8,
12,13,22,22;39:6,16,
24;40:3,19;41:10,17;
50:14;51:21;53:22;
54:7,11;58:12;63:14;
69:15;71:7;88:24;
89:6,17;117:19;
144:22;155:11,12;
156:12;157:15
**next (8)**
5:1;53:14;66:5;
68:20;84:6;110:24;
150:5;154:8
**night (1)**
39:10
**Nine (1)**
12:22
**Nobody (3)**
64:14,15;65:12
**nonetheless (1)**
135:8
**normal (2)**
58:19;61:6
**Notary (1)**
4:5
**note (1)**
6:3
**notes (5)**
60:5,8;112:2;
146:16,18
**notice (1)**
108:22
**noticed (1)**
37:17
**notified (5)**
37:18;38:7,24;
39:11;69:16
**notify (1)**
38:9
**November (32)**
59:7,14,18;62:20;
65:17;74:9;76:18;
90:13;93:15;94:5;
102:23;104:13,16;
106:5;107:25;109:19,
21;110:3,5,9,14;
115:4;117:7;131:14;
133:7,11,12;145:1,8,
13,15,20
**number (12)**
7:14;68:6;70:14;
72:18;73:9;74:8;
97:23;98:23,24;
110:6;118:13;138:10

## O

**oath (3)**
4:6;7:21,24
**object (12)**
26:25;29:15;38:17;
40:23;41:5;43:4;78:4;
83:24;88:1;128:2;
131:23;150:10
**objecting (1)**
38:19
**Objection (106)**
26:20;36:13;38:4;
39:25;40:8,9,10;41:6;
43:1;44:21;45:13;
47:12;48:14;49:9;
54:1;55:20;56:12;
67:14;68:10;69:4,24;
71:13,17;72:6,11;
74:17,24;75:4,17;
76:5,10,11,20,21,22,
24;77:5,17,21;79:3,4;
80:8,22;81:1;82:3,4,
10;83:22;84:11,14;
85:4;87:18,20;88:10,
14;89:12,14;90:2;
91:13;95:1,12,22;
100:7,25;101:13,14;
105:7,15,25;106:18;
112:13;114:22;117:9;
118:16;120:4,6,11;
123:2;125:15,18,25;
126:2,20,22;127:4,25;
128:19;129:11,14,16;
130:16;132:4,5;
136:8;138:18;139:13;
140:21;142:23;
143:19;146:2,4;
150:13;152:17;
156:15;157:10;
158:17
**objections (2)**
26:24;88:17
**obligated (5)**
42:4;101:24;
115:22;117:6,11
**obligation (1)**
38:1
**observed (1)**
73:17
**observing (3)**
5:15,16;6:5
**obtained (4)**
73:25;78:15;80:18;
85:14
**obvious (1)**
152:14
**obviously (4)**
13:13;40:14;64:2;
80:17
**occur (1)**
125:10
**occurred (6)**
19:8;37:18;38:3;
91:5;139:23;146:6
**occurs (1)**
37:22
**o'clock (1)**
141:17
**October (2)**
72:19;73:2
**odd (1)**
112:5
**off (21)**
21:19;23:20;24:11,
14;65:12;67:7;71:1,6;
81:25;82:4;87:3,9;
88:7;92:10,23;98:8,9;
146:20,21;149:13,17
**offense (2)**
14:18;151:8

**offer (5)**
13:14;101:7;
134:12;137:1;148:3
**offered (7)**
127:23;131:15;
132:14;134:6;135:4,
18;136:5
**offering (1)**
130:21
**Office (89)**
4:2;5:21,24;6:1;
10:2,4;12:24;13:2;
14:11,16;15:1,12,14,
18;16:5,17;18:25;
19:4,11;21:2;23:14;
25:12,16;27:17;
33:17;35:8,10;37:17;
39:11,13;40:17;
41:22,23;43:8,15;
44:1;53:25;55:25;
60:4;63:17;65:18;
73:25;76:1;79:20;
84:23;85:9;89:6;
94:10,16;102:9;
106:17;108:13;
113:20,21;114:9;
115:4;117:1,14;
118:21;119:13;121:4,
21;122:6,12;124:14,
15,17;131:15;132:3,
17,20;134:6,12;
135:18;142:1;143:3,
18;147:10;148:2;
149:16,25;155:8;
156:13,23;157:8,24;
158:6,12,15
**officer (10)**
32:8;34:7,11,15;
88:24;92:2;99:10;
101:18,23;144:22
**officers (12)**
32:6;37:10,22,23;
38:1;39:16;42:4;
74:16;89:8;101:4;
129:8;157:16
**officer's (1)**
100:14
**official (8)**
25:9;127:8;144:21;
145:10,16,17,24;
148:2
**officials (1)**
7:15
**often (2)**
64:3,18
**old (8)**
50:20;51:10;52:6,
11,11;63:17;69:19;
139:1
**on-call (2)**
38:24;39:11
**once (5)**
5:13,14;24:10,18;
143:5
**one (34)**
4:24;9:18;11:21;
14:20;25:23;31:19,
19;32:4,8,25;34:6,7;
36:21;50:20;51:6;
57:7;84:7;91:25;
113:9;121:24;127:21;
131:5;132:11;138:8;
139:11,20;145:6,16;
146:15,24,25;153:7;
156:14;158:24
**one-by-one (1)**
127:10
**one-on-one (1)**
83:17
**ones (2)**
55:1;86:18
**One's (1)**
13:25
**only (10)**
16:18;19:15;24:18;
33:13;43:14,18;
96:17;102:24;137:12;
152:1
**onto (1)**
14:18
**operated (1)**
122:2
**operates (1)**
41:11
**operating (15)**
43:7;44:1,6,7,15,
18;45:2,8,12;46:6;
47:2,8;88:25;89:5;
122:18
**opinion (4)**
73:15;95:17;
152:15,19
**opportunity (4)**
33:7;66:17;95:9;
99:21
**OPRA (3)**
15:24;16:9,16
**option (1)**
115:3
**oral (1)**
98:22
**Orange (2)**
34:18,19
**order (6)**
16:21,21;33:3;34:8;
115:18;133:24
**ordering (2)**
115:25;116:4
**original (3)**
69:1,2;86:9
**originally (3)**
28:12;51:16;80:12
**Otherwise (2)**
6:19;30:4
**out (29)**
13:2;15:5,12,13;
18:25;26:8;34:25;
35:17;40:20;42:6;
50:2,14;54:22;58:12;
68:2,16;88:17;89:24;
95:6;96:16;111:15;
114:13;118:23;121:7;
122:18;129:19,23;
134:17;148:7
**outcome (1)**
22:10
**over (33)**
8:6;16:3,13;18:19,
20,21;20:10;36:1,2;
48:21;52:21;81:3;
97:7;103:15;110:20;
111:23;112:7;113:20,
23;114:8,9,10,15,21;
115:3,10,23;116:19;
117:13;123:19;132:2;
146:15;153:15
**overall (2)**
20:10,14
**own (5)**
40:3;44:15;47:18;
49:19;81:6

## P

**page (12)**
7:8;28:5,17;108:9;
110:24;111:12;
113:15;117:17;118:1;
135:22;154:7,8
**pages (2)**
28:21;138:10
**paper (2)**
23:4;44:11
**paragraph (11)**
68:7,15;70:14;
71:20;73:9;74:5,8,14;
75:6;109:6;117:24
**paragraphs (3)**
68:6,16,22
**paralegal (3)**
4:23;153:22;154:12
**parallel (2)**
146:24;154:20
**parole (2)**
142:17;143:5
**paroled (2)**
142:21;143:4
**part (6)**
6:5;25:9;47:20,22;
99:3;100:11
**partake (2)**
43:11,12
**participants (1)**
5:17
**participated (1)**
29:12
**participating (1)**
4:17
**particular (2)**
32:8;41:1
**party (1)**
6:5
**pass (1)**
154:25
**past (1)**
153:11
**Patrick (2)**
34:12,13
**Paula (5)**
79:18;80:13,14;
85:9;155:19
**paused (1)**
64:16
**pay (1)**
127:23
**pending (13)**
9:8;30:16;31:4;
32:14,18,18,20,24;
33:2,14,15;34:4,6
**penetrating (1)**
91:20
**Penza (4)**
12:15,16,18;13:11
**people (16)**
18:3,6;37:9,12;
38:23;42:11,12;
61:17;86:22;114:6;
124:1;141:5;152:22,
25;153:2,5
**people's (1)**
42:25
**percent (2)**
139:3,4
**Perfect (1)**
154:9
**perfectly (1)**
81:5
**Perhaps (1)**
14:9
**period (13)**
17:6;19:1;20:13;
39:4,15,23;41:17;
43:25;46:11;47:11;
58:9;126:14;130:22
**permitted (1)**
153:23
**person (20)**
19:10;36:6;39:11;
63:15;64:14,20;
65:12;70:9;104:23;
106:23,23;107:12;
114:14;115:21,22;
119:21;137:13;
144:24;151:3,25
**personal (3)**
59:19;83:17;152:18
**personally (1)**
83:8
**personnel (4)**
15:24;16:7;118:13;
145:3
**persons (2)**
64:14;86:9
**pertain (3)**
43:8;47:6,9
**Pete (13)**
57:9,10,13;60:4;
63:22,23;67:2;80:12;
83:1,11;124:20;
143:13;150:16
**Peter (1)**
155:19
**Philander (47)**
58:13,24;59:6,13,
18;60:1;61:2,12;62:3,
9;63:7;65:16;66:23;
67:24;74:2,11,15,20;
75:13,16;90:13;
92:16;96:3;102:22;
127:15,21;128:7,15;
130:15;132:20;133:3,
10;135:23;136:2;
137:5,12;140:5,16;
141:21;144:5,25;
145:7,11;151:17,22;
152:7;157:9
**photographs (1)**
117:18
**phrased (1)**
77:25
**phrasing (1)**
113:12
**physical (1)**
18:4
**physically (2)**
105:10;113:23
**pick (1)**
71:24
**picked (3)**
70:16,25;71:4
**pickup (2)**
71:25;72:22
**piece (8)**
23:4;44:11;50:4;
75:25;76:9;77:15;
95:19;106:6
**pin (2)**
6:14,17
**pitch (2)**
80:6,7
**Pittman (4)**
69:17;70:25;71:22;
72:1
**place (9)**
4:18;8:21;56:21;
70:16;71:7;72:20;
74:22;104:13;125:3
**plaintiff (2)**
4:13;7:13
**playing (2)**
55:17,18
**plea (7)**
129:9;137:1,23;
138:4,7;142:2;148:3
**plead (3)**

15:5;137:19;140:16
**pleading (1)**
142:6
**please (9)**
5:2;8:25;9:4;14:6;
76:24;97:9;149:8;
154:21;155:15
**pled (4)**
131:13;137:1;
140:14;141:22
**pm (12)**
71:2,4;72:20;
113:19;117:8,20;
118:8,14,14;122:25,
25;159:23
**point (35)**
19:18;35:15;36:21,
25;37:7,13;52:16;
56:18,25;61:8;63:21;
75:12,25;76:8,16,17;
77:15;79:20;90:23;
91:19;92:11,13;
99:18;102:12;103:21;
104:8;119:3;131:7;
139:16;146:12;
155:18,24,24;156:3;
157:3
**pointed (3)**
40:20;95:6;96:16
**Police (37)**
5:22;32:5,8;34:7,
11,15;37:10,23;38:1;
39:6,16;40:19;41:3,
10,17;42:3;54:7;
69:16;70:21,24;
71:11;88:24;89:6,7,
17;99:10;100:14;
101:4,18,23;117:19;
123:11;129:8;144:22;
156:25;157:4,15
**policies (11)**
41:24;42:1,4,22;
43:6,16,18,20,24;
44:23;45:19
**policy (7)**
94:10,16;102:8;
103:14;104:9;107:22;
115:15
**political (1)**
10:25
**polygraph (2)**
111:6,13
**portion (2)**
113:6;115:7
**portions (1)**
47:6
**posed (1)**
78:3
**position (4)**
16:15;41:2;84:6;
98:18
**possible (5)**
7:10;14:8;21:15,16;
61:11
**possibly (2)**
24:5;93:17
**post (8)**
20:22;24:13,16;
25:2,18;57:4;76:18;
77:16
**potential (4)**
33:23;107:17;
114:25;136:7
**potentially (1)**
52:13
**power (1)**
151:13
**practice (5)**
12:18;94:16;
104:21;106:10,17
**practices (1)**
41:24
**preceded (3)**
58:9;123:9;130:23
**preceding (1)**
59:23
**precise (1)**
112:6
**prefer (1)**
6:20
**pre-indictment (5)**
57:4,5;58:4;61:1;
62:2
**preparation (3)**
85:18;91:2;94:11
**preparatory (1)**
59:24
**prepare (9)**
27:19;58:19;87:14;
89:8;94:17;95:19;
110:20;113:2;125:6
**prepared (19)**
60:12;63:23;66:25;
67:19,21;81:19;
83:11;85:19;86:5;
88:8;89:10;92:17;
108:16,24;109:23;
110:1;120:24;123:23;
125:23
**preparing (3)**
80:13;90:20,22
**prepped (3)**
96:10,12,20
**preprinted (3)**
23:7,12,12
**presence (1)**
145:5
**present (14)**
4:22;14:22;61:19;
64:8;67:4,16;90:22;
99:9;124:19;141:21;
150:1;154:17,22;
156:11
**presentation (1)**
91:2
**presented (9)**
24:13,15;57:7;
67:19,22;81:21;83:1;
91:11;131:12
**presenting (2)**
80:13;98:18
**pretty (4)**
23:23,25;51:25;
100:1
**prevented (1)**
33:24
**previously (3)**
54:14;75:20;116:5
**Price (1)**
5:4
**Primarily (3)**
12:19;50:16;54:25
**primary (3)**
6:11;36:22;37:9
**prior (12)**
35:12;57:22;93:18;
94:4,23;104:24;
128:15;129:5;143:10;
144:6,25;145:7
**priority (1)**
102:16
**prison (8)**
60:17,24;61:5;
138:1;140:13;141:12,
15;142:16
**privilege (9)**
29:18;30:3;31:6,8,
9,12;33:3,5,8
**privileges (2)**
32:23;33:1
**privy (1)**
128:11
**probable (9)**
64:2;67:17;68:2;
76:3,18;77:19;
134:14;152:7,8
**probably (7)**
17:20;20:24;26:4;
28:11;62:3;112:23;
134:16
**probation (1)**
137:25
**probations (1)**
15:6
**problem (3)**
49:4;133:1;149:9
**problems (1)**
49:16
**procedure (1)**
45:8
**procedures (18)**
43:8,23;44:2,6,7,10,
15,18,23;45:2,12,19;
46:6;47:2,9;88:25;
89:6;152:23
**proceed (3)**
97:24;98:5;146:10
**proceeded (1)**
117:18
**process (4)**
21:2,6;150:2,5
**processes (1)**
79:17
**prohibited (2)**
101:4;104:2
**promise (8)**
101:4,4,9,11;130:5;
143:9,15;145:18
**promised (3)**
101:18;143:2,3
**promises (15)**
100:18,18,19,20,23;
127:15;130:14,21;
144:1,5,13,13,13,16,
25
**promoted (5)**
15:15,21,22;16:6;
17:19
**promotion (1)**
17:20
**prompted (1)**
29:10
**promptly (2)**
38:3;89:21
**pronouncing (1)**
6:24
**proof (5)**
24:23;64:20;65:11;
137:4;141:3
**proper (1)**
104:6
**properly (1)**
99:20
**property (1)**
17:13
**proposition (1)**
29:6
**prosecute (1)**
52:13
**prosecuted (3)**
19:11;29:5;54:17
**prosecuting (3)**
41:11;59:9;64:18
**prosecution (4)**
8:20;29:11;58:9;
59:10
**prosecutor (56)**
13:16,22;14:2;
15:10,21,22;16:13;
20:17;22:7;33:16,19;
35:3;41:9;44:15;
47:21;48:12,12,19;
49:12;54:19;55:15;
56:3;57:3,25;63:21,
23;64:23;69:10;
78:23;79:19,22,23;
80:17;81:22,25;83:5;
84:4,8,21;98:16;
105:14;114:19;
129:23;130:3;132:21;
144:23;150:17;153:3;
155:25;156:4;159:1,
5,9,11,11,16
**prosecutors (8)**
13:19;14:1;15:13;
57:7;79:20;103:19;
115:9;129:13
**Prosecutor's (40)**
4:2;10:2,4;12:24;
13:2,9;14:11;25:12;
35:8,10;36:10;37:17;
38:2;40:17;41:22,23;
42:18;94:9,16;102:9;
108:13;113:20;115:4;
116:25;117:14;
118:20;121:21;
124:17;142:1;147:10;
148:1;149:24;155:8;
156:13,22;157:8,24;
158:6,12,15
**protocol (1)**
94:10
**protocols (3)**
41:24;104:6;152:24
**prove (4)**
21:11,16;22:8;
63:19
**proved (2)**
22:16;146:13
**provide (2)**
31:1;97:8
**provided (19)**
31:20;62:20;71:11;
75:14;94:1;97:3;99:4;
102:4;105:13;118:14;
120:10;123:10,19;
133:19;134:3,23;
145:12,24,25
**provides (1)**
67:10
**providing (2)**
9:21;63:8
**Public (1)**
4:5
**pull (8)**
66:10;132:9;133:2;
138:6;142:11;146:25;
147:3,5
**pulled (1)**
153:19
**pulling (1)**
153:13
**purport (1)**
93:5
**purports (1)**
109:17
**purpose (3)**
67:12,22;68:17
**pursuing (1)**
84:17
**put (16)**
20:18;21:3;23:9;
25:3;40:7;52:24;54:6;
57:2;79:24;94:5,24;
112:3;114:5;121:17;

141:25;151:12
**Putting (5)**
75:24;89:5;105:9;
144:20;152:2

## Q

**quarrel (1)**
85:10
**quick (2)**
98:7;154:10
**quickly (6)**
14:8;39:6,8,9;
142:12;146:18
**quotations (1)**
111:19
**quote (2)**
112:2,22

## R

**radar (1)**
91:20
**randomly (1)**
88:16
**Randy (2)**
69:16;71:1
**rare (2)**
65:7;121:6
**rarity (1)**
121:6
**Rashid (6)**
53:21;54:9;85:6;
86:25;88:23;89:1
**read (34)**
23:19;28:3,15,22;
31:24,25;44:11;47:5,
6,8;62:11;66:10;
69:13;72:13;74:13;
87:17;88:5;99:20;
109:2,5,7,12,15,17;
111:1,1;115:7;
116:12;117:24,25;
118:4;132:16;135:20;
154:14
**Reading (9)**
58:11;59:24;66:12;
104:24;106:20,25;
109:11,17;134:25
**ready (2)**
52:16;82:18
**realize (1)**
138:24
**really (14)**
13:20;14:19;43:22;
50:20;51:13;65:7;
79:12;83:6;87:24;
98:17;104:1;129:23;
144:18;152:11
**re-arm (2)**
32:5,8
**reason (7)**
9:12;22:9;27:17;
85:10;90:17;134:9;
141:12
**reasonable (4)**
22:16;24:23;
142:25;143:21
**reasons (3)**
23:9;24:20;82:17
**recall (18)**
22:23;50:12,15;
57:11;92:15;96:2;
97:1,1;103:13;
115:17;118:18;128:5;
137:18;143:12,14;
149:21;154:17,22
**recap (1)**
22:5
**receiving (1)**
17:13
**recently (1)**
93:24
**recess (2)**
66:13;149:4
**recognize (2)**
66:21;147:22
**recollection (16)**
20:23;36:24;59:22;
78:13,16;80:21;
81:18;82:8;91:11;
93:13;94:22;95:11,
14;106:5;118:11;
157:6
**recommend (4)**
142:21;143:3;
147:10,18
**recommendation (7)**
104:20;105:21;
106:7;108:1;130:3;
137:21;142:7
**recommendations (1)**
142:9
**reconsider (1)**
32:11
**record (32)**
4:19;6:3;8:6;9:1,
19;25:9;26:23;27:13;
30:20;66:10,12,15;
92:24;98:8,10,12;
102:13;103:19,24;
104:21;105:22;
106:20,24;113:6;
121:17;122:13;
141:25;142:15;
144:19;146:20,22;
154:6
**recorded (15)**
78:15;97:4;102:15,
17,21;104:18;105:20;
106:8;107:18,21;
113:8,9,10,13;118:15
**recording (7)**
118:20;121:13,15,
22;122:24;125:12;
126:15
**recounts (2)**
74:8,14
**REDIRECT (1)**
158:23
**refer (1)**
123:16
**referred (1)**
154:18
**referring (1)**
46:6
**reflect (2)**
26:23;30:21
**refresh (2)**
94:22;118:11
**refreshes (1)**
93:13
**refuse (1)**
24:21
**regard (3)**
42:1;89:1;142:19
**regarding (1)**
102:9
**regular (1)**
36:8
**related (4)**
7:12;31:11;58:8;
94:24
**relates (1)**
46:10
**relation (1)**
93:15
**relationship (1)**
36:16
**Relax (2)**
81:3,11
**release (1)**
143:16
**relied (1)**
133:24
**relocate (1)**
135:19
**relocated (2)**
134:20;135:16
**relocation (7)**
131:16;134:15;
135:5,10,14;136:7;
143:16
**rely (3)**
123:14,19,22
**relying (1)**
113:11
**remain (3)**
16:14;100:5,14
**remained (1)**
15:19
**remember (80)**
16:12;18:12;35:1,4,
7;36:18;37:5,6;41:20;
51:18;53:16;57:9,12;
60:16,23;61:4;63:22;
65:22;74:4;76:7,14,
15;77:25;80:12,14;
82:14,15,23;83:15;
84:3;95:4,5,10,16,24;
96:15,19;102:14;
106:9;108:3,4;
110:17;112:6,18;
113:12,17;115:13,15;
116:7,11,12,16;
118:22;120:2;121:5,
23;124:8,11,22;
127:18,20;131:17;
137:20,23;138:5;
139:16,17;142:3,4;
143:13;144:7,14,15;
148:5,8;150:19;
151:15;155:9;157:3,4
**remembered (4)**
111:22;112:21;
127:24;128:4
**remind (1)**
88:23
**remiss (1)**
35:19
**repeat (9)**
10:10;27:9;39:17;
48:24;51:5;97:5;
100:10;110:9;128:8
**repetitive (1)**
144:18
**rephrase (4)**
48:17;87:25;88:2,4
**report (39)**
50:7;73:23,24;
87:10,14;91:17,19,21;
92:2,4,5;93:14,23;
94:5;96:19,20;97:10,
11;108:8,13,23;
109:16,22;110:13,20;
112:3,8;115:8;
116:13;118:10;
120:24;123:23;124:2;
125:1,6,12,23;126:14,
25
**reported (1)**
73:15
**reporter (6)**
8:5;9:17;31:23,25;
50:25;153:9
**reports (31)**
58:11,16;59:25;
60:12;70:8;85:19;
86:4,9,15,25;87:3;
88:6;89:8,9,18,21;
90:24;91:8,12,23;
92:6,7,12,18;94:11,
13,18;95:14;96:14;
109:25;113:3
**represent (8)**
4:13;5:8;6:5;59:4;
142:14;149:15,20;
155:11
**representations (3)**
141:25;142:4,5
**representing (1)**
149:16
**reprimanded (4)**
26:17,18;27:8,12
**reputation (1)**
56:5
**request (4)**
114:5;147:10,17;
148:16
**requests (1)**
15:24
**require (2)**
104:16,16
**required (5)**
102:12,14;103:18;
106:10,12
**reread (1)**
79:10
**research (1)**
151:9
**residential (1)**
73:10
**respect (1)**
94:6
**respond (1)**
38:25
**responders (1)**
38:14
**responding (2)**
37:22;38:23
**responsibilities (2)**
32:5;58:8
**responsibility (4)**
99:3;128:18;
140:14;145:19
**responsible (3)**
39:13;52:3;137:14
**rest (2)**
107:9,14
**restated (2)**
31:16,21
**restroom (1)**
66:6
**result (1)**
32:9
**results (1)**
111:14
**resume (1)**
148:24
**retire (2)**
52:16;56:25
**retired (3)**
53:2,5,6
**returned (1)**
69:20
**reveal (1)**
27:21
**revealed (1)**
70:3
**review (7)**
27:24;64:1;70:7;
93:12;99:21;154:16,
19
**reviewed (3)**
28:10;92:10;139:17

**reviewing (1)**
86:4
**Ricky (1)**
69:17
**ridiculous (1)**
141:10
**right (193)**
5:18;9:2,9,16;10:21;13:2,2,14;16:24;17:21;19:1,2;22:6,12,13,19;25:9,24,25;26:5,6;28:13;32:10;34:9,10,19;37:3,23;38:3;39:3,4;41:2;42:4,5,8,9;44:8;45:5,12;46:2,3;47:18;49:19;50:10,11;51:10;55:7,11;57:8;58:1;59:21;60:2;61:14,15,23;62:5,6,10,12,14;63:2,4;64:14;66:7;67:9;68:5,18;69:21;70:1,13;71:12;72:5;73:2,8;75:3,9;76:9,13,19;77:13;78:18;81:22;83:21;84:18,25;85:9,15,20;86:2,6,7;87:2,12,14,17;89:11;90:14,15;91:3,5,6;96:5;98:5,19;100:3,5,6,14;101:25;102:25;103:1,11;105:2,14;106:14;107:6,19,22;108:2,18;109:23;110:25;111:16;112:25;113:22,25;115:5,7,11;116:19;117:21;118:3,6,8;119:12,17,20;120:15,20;121:19;122:9,16,21;123:6,16;124:23;125:4,24;126:7;127:1;128:12;129:25;130:3,4,6,23,24;131:1,22;132:3;133:16,21;134:4,5,8;135:11,20;136:12,18;137:5,9;140:11,17,23;141:14,16;142:22;143:6,7;146:10;147:6;148:24;152:16,25;153:2,4,5;154:1,5;155:22;156:1,2;157:16
**rights (7)**
42:25;61:17;99:20,23,25;104:24;106:25
**ring (2)**
97:4;138:3
**rings (1)**
142:13
**risks (1)**
64:4
**Robberies (1)**
17:12
**robe (1)**
8:1
**Robert (2)**
80:2;84:20
**role (3)**
55:18;149:24,24
**room (5)**
107:9,14;121:18,24;122:9
**rooms (5)**
121:12,14,20,24;122:8
**Ruby (2)**
71:21;72:4
**rules (4)**
7:8;16:22;42:14;119:11
**run (2)**
16:23;139:19
**running (1)**
39:22
**Rutgers (4)**
10:21,24;11:2,6

**S**

**S-1 (1)**
93:23
**Sabur (8)**
53:21;54:9;56:2,8;85:6;88:24;89:1,24
**Sabur's (2)**
86:15,25
**safety (2)**
134:17;142:16
**sake (1)**
144:19
**same (16)**
7:8,23;33:20,22;46:5;72:11;74:24;76:21;77:17,21;79:2;105:15;126:3,6;139:13;148:15
**sanctioned (1)**
26:14
**save (1)**
132:12
**saw (4)**
71:25;86:19,22;87:1
**saying (21)**
30:18;33:23,25;45:9,17,18;49:6,17;55:2,3;79:25;82:23;83:13;103:17;104:5;116:7;124:5;129:20,21;143:12;153:3
**scanned (2)**
28:4,16
**scene (3)**
39:1,3,9
**Schenck (1)**
5:3
**school (5)**
10:13,16,18;11:8;13:2
**science (1)**
11:1
**screaming (2)**
81:10,16
**screen (4)**
14:17;68:23;133:2;153:16
**scroll (3)**
72:17;135:1;154:7
**scrolled (1)**
28:7
**scrupulously (2)**
100:6,15
**searching (1)**
119:10
**second (6)**
11:21;29:25;68:15,15;118:1;138:8
**seconds (1)**
146:18
**seeing (1)**
6:11
**seek (2)**
65:18;78:21
**seeking (5)**
80:7;82:1,9;83:20;148:7
**seem (2)**
46:23;135:2
**seems (1)**
108:16
**Senator (3)**
5:9;155:12;156:11
**send (1)**
147:16
**sense (1)**
20:7
**sent (2)**
28:1,11
**sentence (16)**
19:10;117:23,24;127:21;129:4;137:20,23;138:2,13,16;139:6,7,10;140:1;142:7;143:6
**sentences (1)**
15:6
**separate (2)**
43:10,10
**September (5)**
10:22;11:9;15:10,14;18:24
**sergeant (4)**
155:14;157:14;158:3,5
**series (3)**
143:23,24;144:7
**serious (3)**
24:6;65:2,8
**seriously (2)**
65:3;78:18
**serve (2)**
139:3;140:1
**served (4)**
139:5,23;140:15;143:5
**session (1)**
107:1
**set (2)**
16:19;130:5
**Seton (2)**
11:8,15
**setting (1)**
152:3
**several (1)**
72:2
**sex (1)**
17:14
**share (3)**
132:24;153:16,17
**sheriff (1)**
114:19
**sheriff's (8)**
38:7;113:21;114:4,8,25;115:14,20;116:7
**shoots (1)**
63:13
**shortens (1)**
155:4
**shortly (3)**
87:13;88:7;89:9
**show (6)**
62:21;63:25;67:16;104:3;108:6;132:16
**showcase (1)**
63:24
**showed (2)**
86:19;95:25
**showing (1)**
93:22
**side (2)**
18:12;157:19
**sign (4)**
21:20,21,21;65:12
**signature (4)**
22:4;25:4;135:24,25
**signatures (1)**
109:13
**signed (8)**
21:19;24:11;81:25;87:3,8;88:7;92:10,14
**sign-off (5)**
22:2;67:5;82:8,16;87:11
**signs (2)**
24:14;67:7
**silent (2)**
100:5,14
**similar (2)**
148:12,12
**simply (1)**
75:2
**single (1)**
95:19
**sister (1)**
71:21
**sit (6)**
9:11;61:12;76:9;77:1;107:5;110:12
**sitting (2)**
27:14;60:23
**situation (2)**
50:5;92:8
**six (10)**
14:24;15:7;17:10;20:19;53:7;57:21,22,24;68:21;125:13
**skim (1)**
66:20
**skip (1)**
93:21
**Slightly (3)**
148:11,13;151:7
**smiled (1)**
56:5
**Smith (1)**
5:4
**smoothly (2)**
7:9,9
**snide (1)**
81:8
**so-called (1)**
131:16
**solely (2)**
17:23;36:3
**solve (1)**
50:19
**solving (1)**
51:24
**somebody (6)**
49:5;65:10;100:4;116:4;131:19;152:11
**somehow (1)**
34:8
**someone (16)**
21:23;24:5;38:23;40:15;41:8;91:18;96:18;105:10;112:6;115:10;116:5;119:21;120:22;129:18;139:23;141:4
**Sometime (1)**
74:1
**sometimes (7)**
8:7;10:9;70:17;98:17,21,22;115:18
**somewhere (4)**
25:13;44:4;60:24;101:10
**soon (1)**
90:15
**SOPs (2)**
87:16;88:5

sorry (15)
11:21;25:20;27:10;39:17;48:4;74:6;77:20;79:5;82:4;92:22;109:1;110:9;116:22;150:12;159:9
sort (8)
17:6;36:20;61:5;149:23;151:19,21;152:4,13
sought (2)
78:16;85:14
sound (7)
28:15;45:10;85:9;96:5;115:10;142:22;143:17
sounds (7)
26:1;44:25;62:2;142:25;143:21;144:17;149:5
source (1)
121:16
space (1)
18:4
spark (1)
152:5
speak (10)
81:13;96:7;107:7;110:18;114:24;116:20;117:6;119:20;120:22;148:23
speaking (4)
8:6;41:6;58:13;81:14
speaks (3)
68:11;72:7;74:18
special (1)
19:14
specific (6)
20:23;29:8;43:6;137:25;151:3;153:9
specifically (5)
20:11;30:2;79:16;134:24;158:25
specifics (1)
52:2
speculate (4)
40:15,25;41:7;46:18
speculation (19)
36:13;40:9;41:13;45:15;49:10,22,23;54:2;55:21;56:13;69:5;71:14;82:11;84:12;87:19;105:17;112:14;125:16;146:3
spell (2)
12:3;50:24
spent (3)
40:16;41:11;122:6
spoke (11)
83:8,13;124:4,10;150:21;156:8,9;159:2,5,12,17
spoken (1)
150:20
squad (1)
124:18
square (1)
60:23
staff (3)
16:2,3,7
stages (1)
87:5
stamped (1)
154:3
stand (2)
7:25;89:3
standard (14)
43:7;44:1,6,7,15,17;45:2,8,12;46:5;47:2,8;89:5;151:6
stark (1)
105:9
start (11)
4:20;6:7;39:4;73:16;97:7;103:15;104:17;105:22;108:9;127:9;156:10
started (3)
4:15;10:5;14:12
starting (3)
14:11;94:4;109:2
starts (1)
117:23
State (14)
4:5;5:22;9:18;93:6;117:19;123:10,11;126:4;138:1,17;142:6,14,20;144:22
stated (14)
9:17;70:16,23;71:3,22,24;72:15,19,21,23;73:2;75:20;111:2,23
statement (48)
40:24;58:25;62:19;63:8;65:16;74:3;78:15;96:8;97:4;99:2,4,9,13,16,19,24;101:12,19;102:3;103:24;104:18;105:3,5,11,13;106:16;110:3,15;119:9,12,18;122:3;123:10;128:16;130:23;132:13;133:11,19,19,23;134:3;144:7;145:1,8,12,20;151:18,23
statements (20)
62:9;86:17,18,21,24;96:4;98:23;101:6;102:10,11,13,14,15,20;103:7,20;104:25;106:13;128:23;144:12
states (2)
75:2;113:18
status (1)
19:25
statute (1)
139:1
statutes (1)
151:10
step (2)
8:8;150:5
stepped (1)
149:17
still (10)
16:9,9,14,22,24;19:16,17;91:18;95:10;152:14
stolen (1)
17:13
stop (3)
29:22;48:7;110:24
story (1)
145:6
strategy (1)
58:14
Street (6)
4:3;55:1,3;71:24;73:11;74:22
streets (3)
54:23;63:14;132:2
strength (1)
151:23
strike (11)
58:22;74:7;99:7;100:18;107:3;121:9,11;122:21;127:9;143:1;159:9
strong (1)
13:19
struck (1)
88:21
structure (1)
73:10
student (1)
35:4
studies (1)
11:10
study (1)
10:23
stuff (2)
51:16;83:2
stupid (1)
127:6
subject (1)
26:10
submit (3)
21:18;87:10;89:9
submitted (4)
66:22;89:21;91:16;92:14
subpoena (1)
46:14
subsequent (2)
86:11;91:17
substance (1)
148:14
sued (1)
29:11
suggest (1)
150:23
suing (4)
32:9;33:25;34:1,7
sum (1)
155:22
summarize (1)
14:9
summarizes (1)
74:15
summer (4)
6:6;11:20,22;16:11
sup (1)
153:10
Superior (1)
12:5
supervise (1)
49:2
supervised (1)
55:9
supervising (1)
39:14
supervisor (4)
22:10;49:7,19;55:6
supervisors (1)
89:10
supervisory (2)
48:21,23
supplement (1)
92:3
support (12)
16:1,3,7,8;59:5;65:24;66:1,23;67:13;68:2;75:15;76:18
supported (1)
76:3
supporting (1)
77:18
supposed (3)
87:13;88:7;89:9
suppress (1)
96:4
sure (27)
6:23;9:10;14:13;21:14;23:13,25;27:11;31:14;33:12;36:1;38:12;46:4;48:25;52:23;59:3;64:23;65:11;91:18;97:17;100:12,21;102:3,20;107:25;110:5,11;153:8
Surely (1)
114:17
surmised (1)
52:3
surprise (2)
112:21;131:18
surprised (1)
143:22
surprising (1)
131:20
suspects (2)
103:20;129:10
Suspicious (6)
36:5,7;125:11,21,22;126:4
sustain (1)
137:4
swearing (1)
8:1
switched (2)
131:6;155:25
sworn/affirmed (1)
4:4

## T

table (2)
60:23;61:4
tail (1)
53:3
talk (20)
21:9,13;22:10,14;30:4;32:15,19;63:20;83:5;84:9;90:21;104:23;114:10,15,19;124:3;131:4;132:24;149:23;150:22
talked (7)
78:8;83:7;123:25;124:1;136:24;149:19;151:19
talking (8)
51:13;58:14,16;85:22;89:23;127:20;141:6;157:25
tap (1)
19:16
tape (1)
106:15
taped (2)
106:13;107:17
taping (1)
102:10
target (4)
103:4,5;106:24;107:11
targets/defendants (1)
107:17
Taylor (6)
69:18;71:5,21,22,23;72:4
team (10)
14:24,24,25;15:2;16:14,23;17:9,17;20:19;151:4
technical (2)
119:21;120:23
technically (1)
54:10
tells (1)
51:9

**Ten (1)**
138:12
**tenure (2)**
20:17;36:25
**term (2)**
19:6;130:6
**terms (3)**
21:6;105:9;129:4
**testified (3)**
78:12;115:8;142:10
**testifies (1)**
4:6
**testify (3)**
137:1,2,21
**testifying (2)**
83:10;143:10
**testimony (21)**
9:13;44:16;45:14;57:7,10,12,13;77:7;79:7,21;80:9,23;92:20,21;93:12;95:25;120:12;126:23;137:5;142:19;155:17
**therefore (2)**
73:5;76:16
**thinking (3)**
60:17,25;100:12
**Third (3)**
4:3;68:15;74:21
**thoroughly (1)**
28:16
**though (2)**
125:23;143:8
**thought (7)**
22:9;79:17;85:5,6;113:23;131:11;157:2
**thoughts (1)**
83:17
**threats (1)**
130:21
**three (3)**
13:19;15:19;18:10
**three-alarm (1)**
73:11
**throughout (2)**
6:24;54:8
**throw (1)**
88:16
**Tietjen (8)**
5:22;74:10;117:20;149:15,17,21;151:13;153:10
**till (1)**
104:25
**timeline (2)**
97:2;113:16
**times (3)**
47:1;64:18;124:7
**title (3)**
23:15;33:20,22
**titles (1)**
40:12
**to/from (1)**
22:22
**today (14)**
4:16;6:25;7:21;9:11,13;16:14;17:7;27:20;76:9;94:1;106:17;110:12;139:2;141:9
**together (1)**
45:20
**told (16)**
42:17;51:18;56:18;70:21;72:5;74:15,21;111:4;120:14,16;125:3;127:22;136:25;143:25;144:4;146:13
**took (12)**
8:21;57:11,13,13;60:8;65:13;78:17,18;96:8;113:23;122:17;140:14
**top (4)**
23:20;79:22;108:14;148:12
**touched (1)**
122:1
**touches (1)**
33:3
**traffic (2)**
116:11,15
**training (6)**
43:12,13,16,19,20;112:19
**transcript (4)**
28:18,19;92:25;96:2
**transcripts (1)**
93:6
**transferred (4)**
14:21;15:8;19:13;113:24
**transpired (3)**
117:4;123:8,15
**transport (1)**
117:13
**transported (2)**
113:22;114:3
**trial (22)**
14:24,24,25;15:2;16:13,23;17:9,17;20:19;28:19;58:20;64:4;92:6,7;116:1,3;125:7;137:1,2,21;142:19;153:3
**trials (4)**
17:15;20:2,11,15
**tried (8)**
17:1,2,13,14,16;20:10;37:9;129:3
**trigger (1)**
19:7
**Tronica (1)**
4:25
**Trooper (4)**
5:22;74:10;144:22;151:12
**truck (1)**
71:25
**true (3)**
72:14;115:19;146:12
**truthful (1)**
9:13
**try (10)**
15:2,5;16:24;17:24;21:16;24:22;50:19;56:24;85:21;142:11
**trying (8)**
17:11;20:7;37:7;38:10;46:24;77:8;81:13;151:5
**turn (1)**
33:9
**turned (1)**
30:1
**Turner (3)**
69:18;71:5;72:21
**turns (3)**
30:15,16;149:13
**two (19)**
13:25;63:14;64:12;67:23;73:17;79:15;100:9;109:22;110:20;111:23;112:7;121:24;122:8;123:19;124:2,3;132:2;156:5;158:13
**type (12)**
12:17;21:17;23:8;24:1;25:16;30:3;83:12;102:2;121:22;134:23;139:22;147:23
**types (3)**
17:11;144:16;151:5
**Typically (3)**
33:1;87:15;89:16

**U**

**Uh-hmm (3)**
24:16;58:6;157:17
**ultimately (6)**
48:11;54:17;78:20;79:22;81:25;83:19
**unable (1)**
113:5
**unaware (2)**
130:19,20
**under (10)**
4:6;7:20;17:15;42:12,13;59:17;96:8;101:21;114:2;139:1
**underlies (1)**
8:20
**understandable (1)**
31:17
**understands (1)**
43:2
**understood (5)**
8:16;57:3;70:8;153:6;157:16
**unfortunately (1)**
139:4
**unit (49)**
14:13,15,16,20,22;15:19;17:20;18:1,6;19:14,15,19,20,22,24;20:3,6,8,20;21:4,24;22:12;24:4;35:13,16,20,21,23;36:10,17,19,22,22;37:1;39:24;40:7,18;41:16;44:19;45:3;46:11;47:10;48:2,20;49:1;51:3;55:7;56:11;75:2
**units (1)**
41:3
**universally (1)**
144:10
**unless (2)**
31:5;33:2
**unsolved (2)**
35:12;51:22
**unsure (1)**
46:23
**unusual (5)**
55:17,25;56:1;112:9;143:1
**up (43)**
6:18;10:7;14:12;16:19;21:9,17,17;22:18;24:1,3,7,20,25;35:6;42:11;50:8;56:25;66:8,10;70:16,25;71:4,24;72:17;77:1;81:13,14;92:11;99:17;105:3;115:16;133:2;135:1;138:6;142:11;146:25;147:3,6;153:14,19;155:4,22;156:19
**upon (5)**
10:18;11:6;12:11;143:4,16
**use (7)**
37:11,16;66:6;104:3,4;107:9;149:1
**used (5)**
37:11;73:16;81:8;112:6;122:13
**using (2)**
104:2;107:13
**usually (5)**
19:8,9;21:23;61:15;63:16

**V**

**vague (7)**
26:20;27:1;48:14;80:10;123:2;150:11,14
**various (2)**
28:8;58:16
**vast (2)**
37:20;41:8
**vehicular (2)**
36:5,7
**verdict (1)**
127:3
**versus (3)**
93:6;101:21;149:24
**via (2)**
104:10;113:6
**Vic (1)**
148:23
**vicinity (1)**
71:6
**victim (1)**
135:15
**Victor (2)**
5:20;149:15
**video (15)**
6:14,17;102:9;104:4;105:11;113:6;118:15,19;121:11,13;122:13,19,24;123:15;149:12
**videotape (1)**
125:2
**view (1)**
151:22
**violate (1)**
42:25
**violations (2)**
15:6;27:13
**violence (3)**
15:16;32:4,7
**virtue (1)**
40:19
**vocabulary (1)**
46:5
**voluntarily (4)**
20:21;99:4;102:4;105:13
**voluntary (2)**
99:25;105:5
**Vomacka (49)**
5:24;6:2;38:4,19;43:4;69:24;71:17;76:5,10,12,21;81:1;82:3,10;83:22;84:14;88:14;89:14;91:13;95:1,12,22;100:25;101:14;105:7,15,25;120:6;125:18,25;126:20;128:2,19;129:14;132:5;136:8;142:23;143:19;146:4;148:22;149:5,9,10,12;150:12,15;153:15;154:5,24

## W

**Wait (1)** 29:25
**waiting (1)** 13:10
**waiver (1)** 99:25
**walked (1)** 132:1
**wants (4)** 5:1;6:21;65:12; 114:19
**warrant (13)** 60:19;67:6,13;68:5; 75:15;78:21;80:3,18; 85:14;116:11,16; 133:24;152:19
**warrants (10)** 59:6;65:19,24;66:1; 78:16;82:1,1,9;83:20; 84:17
**watching (1)** 13:23
**water (1)** 107:14
**way (16)** 6:14;10:19;11:7; 12:12;27:8;29:10; 45:10;49:2;61:7; 66:11;81:17;95:17; 113:11;126:6;134:25; 144:3
**ways (1)** 98:23
**weapons (1)** 32:6
**week (1)** 28:4
**weigh (1)** 64:3
**Weinstein (4)** 12:15,16,18;13:11
**weren't (2)** 63:4;69:11
**West (2)** 4:2;9:23
**What's (10)** 22:25;33:10,11; 34:11;63:11;64:5; 93:2,22;106:16;150:2
**whatsoever (2)** 75:13;156:12
**whenever (2)** 66:5;102:19
**Whereupon (5)** 66:13;92:23;98:9; 146:21;149:4
**whole (6)** 82:21;104:21,22; 105:19;118:4;141:9
**who's (3)** 40:16;64:6,6
**wife (1)** 34:1
**William (2)** 5:22;74:10
**willing (1)** 111:6
**winter (1)** 53:11
**wire (3)** 19:16,16,17
**without (8)** 9:21;27:21;96:13, 20;129:12;137:5; 152:3,7
**witness (31)** 5:4,12;21:1;27:24; 30:1,1,12,14;43:2; 82:12;96:17,24; 97:15;98:3;101:12, 18;102:4,10,24;106:2, 21;116:1,2,10; 125:14;131:9;135:15; 137:13;143:16;155:1; 159:22
**witnesses (4)** 37:11;63:15;86:18; 101:5
**witness's (8)** 45:14;77:7;79:7; 80:9,23;120:12; 126:23;135:25
**woman (2)** 16:5;33:21
**word (2)** 23:23;62:23
**word-for-word (1)** 124:11
**words (5)** 79:24;100:9; 111:22;112:6;116:7
**work (18)** 11:16;12:13;21:7; 44:18;45:20;49:18; 54:11;56:8,10;59:24; 62:2;70:18;86:12; 91:18;94:6;95:20; 112:15;121:13
**worked (13)** 11:17;13:10;35:23; 40:20;44:19;45:3,20; 46:10;49:8;54:13; 56:2;58:17;113:1
**working (18)** 36:15;39:9;46:4; 48:19;50:13,18,19,21; 51:9,24;52:6;53:19, 21,22;94:17,23; 112:23;113:3
**world (1)** 82:22
**worried (1)** 88:22
**worth (1)** 64:12
**wow (1)** 28:19
**write (10)** 21:9,17;22:17,24; 24:20,20;65:4;92:2,5; 124:2
**writing (4)** 92:4;94:6,24;95:19
**written (10)** 42:22;44:10;91:15, 16,21,24;92:10; 110:13;127:1;133:15
**wrong (4)** 60:16;118:19,23; 119:3
**wrongfully (1)** 29:5
**wrote (3)** 65:5;67:2;91:19

## Y

**year (14)** 10:6,15;11:4,13,18, 19;12:9;14:20,23; 17:1,2;33:17;52:25; 151:8
**years (35)** 10:12;14:10,25; 15:7,20;17:10;20:20; 40:17;51:22;54:8,12; 69:19;79:15;109:22; 110:20;111:23;112:7, 23;113:2,3;122:6; 123:20;124:2,3; 130:5,6;132:2; 136:20;138:3,12,12, 14;139:8,9,10
**Yep (2)** 62:15;138:11
**young (1)** 103:8

## 0

**04 (1)** 20:11
**07102 (1)** 4:4
**09 (1)** 74:1

## 1

**1:30 (4)** 113:19;117:7; 118:14;122:25
**10 (11)** 18:19,21;36:1; 72:17;73:9;138:3,12, 13;139:7,9,10
**10- (1)** 98:7
**10:30 (1)** 71:4
**10-minute (1)** 148:23
**10-year (1)** 140:1
**11 (3)** 74:5,8,14
**12 (11)** 75:2;91:25;109:21; 110:3,14;117:7; 133:11,12;145:8,13, 20
**12:30 (1)** 97:13
**12th (3)** 109:19;115:4;145:1
**13 (7)** 10:5;59:7,15,19; 62:20;74:9;75:6
**1315 (1)** 153:12
**1316 (1)** 153:12
**13th (1)** 14:4
**15-minute (1)** 98:7
**16 (1)** 69:19
**17 (3)** 16:12;47:1;69:19
**18 (5)** 16:12;93:17,21; 94:4,23
**18-month (1)** 95:20
**19 (2)** 68:25;133:7
**1930 (2)** 117:20;118:8
**1970 (1)** 139:12
**1970s (1)** 69:1
**1978 (18)** 69:7,15;70:10,13, 15,21;71:12,21;72:5, 10,19;73:2,6,9; 138:25;139:12,24; 151:10
**1987 (2)** 10:17,22
**1991 (2)** 11:5,9
**1994 (4)** 11:14,16,20,22
**1996 (4)** 10:5,11,12;14:4

## 2

**2:15 (1)** 159:23
**20 (4)** 18:20;36:2;69:15, 23
**2000 (2)** 37:15;79:15
**2004 (13)** 15:9,9;17:18;18:2, 23;19:24;20:12; 35:13,21;37:1;41:15; 44:20;45:3
**2008 (44)** 41:23;59:7,15,19; 62:20;65:17;74:1,9; 75:14;76:3,18;77:16; 79:1;90:7,9,14,18; 93:15;102:7,23,23; 103:13;104:13,17; 106:5,11;107:25; 109:19,22;110:3,7,8, 14;115:4;117:7; 121:4;122:9;131:14; 133:11,12;145:1,8,13, 21
**2009 (2)** 53:3,4
**2010 (17)** 38:13;40:2,6;53:6; 57:18,18;61:22;63:4; 65:19;78:22;80:2; 85:10,15;91:5,12; 154:11,18
**2010-ish (1)** 37:15
**2011 (3)** 92:15;108:23; 123:24
**2012 (10)** 15:10,10,15;18:24; 19:24;20:12;35:21; 37:1;44:20;45:4
**2013 (1)** 15:15
**2017 (1)** 16:12
**21 (1)** 73:9
**21st (1)** 10:6
**22 (2)** 154:11,17
**23 (2)** 71:21;108:23
**23rd (1)** 72:5
**24 (3)** 10:12;14:10;122:6
**25,1978 (1)** 70:15

**256 (3)**
73:10;74:21;75:3
**26 (1)**
70:15
**2A (2)**
138:25;139:16
**2Cs (1)**
16:21

**3**

**3 (1)**
141:17
**3/1/11 (1)**
93:1
**30 (1)**
98:1
**31 (2)**
72:19;73:2
**314 (2)**
147:3,9
**316 (1)**
147:4

**4**

**421210 (1)**
153:10
**45 (1)**
98:1
**4th (1)**
124:16

**5**

**5- (1)**
148:22
**50 (1)**
4:2

**6**

**6 (1)**
70:14
**60 (1)**
146:18

**7**

**7 (1)**
71:20
**7:30 (4)**
117:20;118:8,14;
122:25
**75 (2)**
20:10,14

**8**

**8 (5)**
71:2;72:13;110:5,6,
9
**85 (2)**
139:3,4

**9**

**9 (2)**
72:17,18
**9:30 (1)**
72:20