# EXHIBIT L

**In The Matter Of:**

*Evans v.*

*Newark City*

---

*Peter Guarino*

*August 04, 2020*

---

RIZMANRAPPAPORT
CERTIFIED COURT REPORTERS

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

Min-U-Script® with Word Index

UNITES STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
NEWARK VICINAGE
14-cv-00120(KM)(MAH)

----------------------

LEE EVANS,

Plaintiff(s),

v.

NEWARK CITY; FORMER MAYOR, CORY A. BOOKER; FORMER, NEWARK POLICE DIRECTOR GARRY MC CARTHY; LIEUTENANT LOU CARREGA; DETECTIVE JOSEPH HADLEY; DETECTIVE SGT. WILLIAM TIETJEN; SGT. DARNELL HENRY; OFFICER JOE HADLEY;

Defendant(s).

----------------------

CIVIL ACTION

Deposition of:
PETER GUARINO

VIA VIDEOCONFERENCE

T R A N S C R I P T of the stenographic notes of the proceedings in the above-entitled matter as taken by and before DIANE M. HOLMES, a Certified Court Reporter and Notary Public of the State of New Jersey, held via videoconference on Tuesday, August 4, 2020, commencing at approximately 10:39 in the morning, pursuant to notice.



A P P E A R A N C E S:

BONJEAN LAW GROUP, PLLC
467 Saint Johns Place
Brooklyn, New Jersey 11238
718.875.1850
Jennifer@bonjeanlaw.com
Ashley@bonjeanlaw.com
BY: JENNIFER BONJEAN, ESQ.
ASHLEY COHEN, ESQ.
CHRISTOPHER M. LA TRONICA, ESQ.
HALEY COOLBAUGH, Paralegal
Attorneys for the Plaintiff

KENYATTA STEWART, CORPORATION COUNSEL
CITY OF NEWARK - DEPARTMENT OF LAW
920 Broad Street, Room 316
Newark, New Jersey 07102
973.733.5945
lipshutzg@ci.newark.nj.us
BY: GARY S. LIPSHUTZ, ESQ.
Attorneys for Defendants City of Newark (improperly pled as "Newark City" and "Newark Police Department"), Cory A. Booker, Garry Mc Carthy, Darnell Henry and Joe Hadley

STATE OF NEW JERSEY
OFFICE OF THE ATTORNEY GENERAL - DIVISION OF LAW
STATE POLICE, EMPLOYMENT, AND CORRECTIONS SECTION
Richard J. Hughes Justice Complex
25 Market Street, PO Box 112
Trenton, New Jersey 08625-0112
609.376.2948
victor.difrancesco@njoag.gov
michael.vomacka@lps.state.nj.us
BY: VICTOR DI FRANCESCO, JR., DAG
MICHAEL VOMACKA, DAG
Attorneys for Defendant William H. Tietgen Jr.

SCHENCK, PRICE, SMITH & KING, LLP
220 Park Avenue
Florham Park, New Jersey 07932
973.539.1000
jmb@spsk.com
BY: JOHN M. BOWENS, ESQ.
Attorneys for Defendant Lou Carrega

A L S O P R E S E N T:
George Affum-Addo
Joseph Hadley



I N D E X


| EXAMINATION | PAGE |
|---|---|
| PETER GUARINO | |
| DIRECT EXAMINATION BY MS. BONJEAN | 4 |


E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Guarino-1 | Carrega affidavit | 117 |




P E T E R G U A R I N O, address 5 Rebecca Road, East Hanover, New Jersey, is duly sworn/affirmed by a Notary Public of the State of New Jersey and testifies under oath as follows:

DIRECT EXAMINATION BY MS. BONJEAN:

Q. Good morning. My name is Jennifer Bonjean. That's B-O-N-J-E-A-N. I represent the plaintiff, Lee Evans, in this litigation, and before we start today, I'm going to identify for you and for the record who is present during this Zoom deposition.

My name is Jennifer Bonjean, B-O-N-J-E-A-N, again for the benefit of the court reporter. My colleague and associate Ashley Cohen, C-O-H-E-N, my paralegal who will be helping with documents, Haley Coolbaugh, who is also on this deposition, and my colleague Chris La Tronica who is an attorney and works as of counsel with the Bonjean Law Group.

MS. BONJEAN: I would at this time like to ask that everyone place their appearances on the record.

MR. BOWENS: John M. Bowens, Schenck, Price, Smith & King, on behalf of our client, Mr.

Guarino.

MR. DI FRANCESCO: Good morning. Mr. Victor Di Francesco, Attorney General's Office, on behalf of William Tietjen, New Jersey State Police.

MR. VOMACKA: This is Michael Vomacka spelled V, as in Victor, O-M, as in Michael, A-C-K-A, on behalf of Defendant Tietjen. I'm also with the New Jersey Office of the Attorney General.

As a heads up, we have an intern. His name is George Affum-Addo. His last name is spelled A-F-F-U-M - A-D-D-O. I don't believe he's on the call at present, but he may be joining. He does not represent the parties. He's observing as a summer intern. Thank you.

Good morning, Mr. Guarino. Can you hear me?

THE WITNESS: Yes.

MR. LIPSHUTZ: Okay. Good morning. My name is Gary Lipshutz. I am assistant corporation counsel for the City of Newark. So I represent the City of Newark, former police director Garry Mc Carthy, Senator Cory Booker and Detective Joe Hadley and then Sergeant Darnell Henry who is the chief of the Newark Police.

Joe Hadley and Darnell Henry are



present and are observing. Good morning.

THE WITNESS: Good morning.

Q. Okay. This arrangement that we have right this second, I'm just going to say, for the record, is a little difficult because you're not right next to the microphone as most of us are in front of the computer. So it is really important that you do your very best to keep your voice up.

It is also hindered by the fact that you're wearing a mask which, of course, is understandable, and we have no problem with you doing that, but just understand that the court reporter is going to be struggling to hear you and understand what you're saying.

So if you could make your best efforts to speak slowly and loudly so she can hear you and, if necessary, lean towards the microphone.

Is that acceptable to you, Mr. Guarino?

A. Yes.

Q. Okay. Mr. Guarino, have you ever had your deposition taken before?

A. Yes.

Q. How many times?

A. Probably at least twice.

Q. Okay. Well, I'll go through some



ground rules with you just as a refresher course. Although, I suspect you will have no problems following the rules I set forth.

I'm going to ask you questions today related to the allegations that are contained in a civil complaint that has been brought by Lee Evans against a number of Newark City police officers, Lieutenant Louis Carrega, Detective William Tietjen and a number of other defendants that Mr. Lipshutz has identified.

I'm going to be looking for full and complete answers to my questions today.

A. Yes.

Q. Do you understand that, sir?

A. Yes.

Q. Have you had an opportunity to read the civil complaint that was filed in this matter?

A. No.

Q. I'm going to ask that you do your very best to let me finish your question before you answer. Even though in normal conversation it would be quite normal to jump on each other, I would ask you to let me finish my question and I will do my best to let you finish your answer before I ask the next question. Is that okay?



A. Yes.

Q. If at any point you don't understand one of my questions, will you please let me know?

A. Yes.

Q. But if you do answer one of my questions, I am going to assume that you understood the question. Is that fair?

A. Yes.

Q. All right. And as you sit here today, is there any reason you cannot give full, complete and truthful testimony to the best of your ability?

A. No.

Q. And I understand that the case is somewhat aged. If you need to approximate, that is fine, but just let us know that you're approximating if you're talking about dates or times or something of that nature. Okay?

A. Yes.

Q. Okay. Sir, without giving your precise address, although I think you already did, where do you presently live?

A. East Hanover.

Q. And are you currently employed?

A. I am currently unemployed. However, I am of counsel to a law firm in West Orange, but I

don't do any work for them.
Q. And if you were to be doing work for this firm in West Orange, what type of work would you be doing?
A. Depositions, sometimes an arbitration appearance, but it might be close to a year that I haven't done any work at all.
Q. Is this civil litigation?
A. Primarily, yes.
Q. What is the name of that firm?
A. That would be Mescall & Acosta.
Q. Can you spell it for the court reporter please?
A. Mescall, M-E-S-C-A-L-L, and Acosta, A-C-O-S-T-A.
Q. Apart from doing of counsel work with this firm which you said you have not done at this time, do you engage in any other employment?
A. I drive for Uber.
Q. And how often do you drive for Uber?
A. I haven't driven since the COVID epidemic began.
Q. I also wanted to mention, I don't know if you were mistaken or what happened, but you know this deposition was supposed to commence at 10 a.m.



today, right?
A. I believe I received an email that, when it was originally scheduled at the court reporter's office at 10, I got an email saying that it had been rescheduled for this office at 11.
Q. And who sent you that email?
A. I don't know.
Q. It was someone that had your email address, though, right?
A. Yes.
Q. Okay. So -- and by the way, are you represented for the purposes of this deposition?
A. I believe that this law firm are my attorneys.
MR. BOWENS: We represent the witness.
Q. And what did you do, if anything, to prepare for your deposition here today?
MR. BOWENS: Other than speaking with me or --
MS. BONJEAN: Mr. Bowens, we cannot hear you.
MR. BOWENS: Other than discussions with me, he's free to answer the question.
Q. Do you understand that, Mr. Guarino, I'm not asking for any privileged information or



conversations regarding your attorney?
Apart from conversations with your attorney, Mr. Bowens, what exactly did you do to prepare for your deposition today?
MR. BOWENS: The instructions include any documents I may have asked the witness to review.
A. The documents that I reviewed was a Halloween card that I never knew about.
Q. Okay. So you looked at a Halloween card?
A. Yes.
Q. Did you look at any of the transcripts from the proceedings that memorialize the trial that you litigated in connection with Lee Evans' criminal prosecution?
A. I received documents --
MR. BOWENS: Let her finish the question.
THE WITNESS: I thought she finished.
Q. You can answer.
A. I received documents from my attorney. I opened most of them on my computer and looked at the cover pages to refresh my recollection -- recollection as to the witnesses that were called in



those documents. I didn't read the transcripts.
Q. Okay. No problem.
Do you recall any other documents that you reviewed in connection with this deposition here today other than transcripts?
A. Nothing other than the ones my attorney sent to email.
Q. And what about any other reports?
Did you have an opportunity to look at any investigative reports prepared by any of the law enforcement personnel who worked on this case at any point during its long history?
A. You mean in preparation for this dep?
Q. Yes, sir.
A. No. I didn't look at any other reports.
Q. Okay. So I'm just going to let you know that, if you think someone -- something would refresh your recollection in terms of a date or time or anything, you can let me know, and I might be able to do that with a document that we can put on the screen for you to view.
A. Excellent. Thank you.
Q. You are welcome.
How long have you been driving for

Uber?
A. I started I think around May 2015.
Q. Are you currently licensed to practice law?
A. Yes.
Q. In what states?
A. New Jersey.
Q. Have you ever been licensed to practice law in any other state but New Jersey?
A. No.
Q. And when was the last time that you were consistently practicing law in the State of New Jersey?
A. My last trial was in 2013 I believe.
Q. And apart from, again, doing this of counsel work that you mentioned earlier, did you engage in any regular practice of law after your last trial in 2013?
A. No.
Q. And when you said you did your last trial in 2013, in what capacity were you litigating in 2013?
A. Defense counsel.
Q. Okay. So I'm going to go in the opposite direction and bring us up to that point if



you don't mind.
Can you tell me what year you went to law school?
A. 1980.
Q. And how old are you now, sir?
A. Sixty-five.
Q. I'm sorry. Was that -- can you repeat that?
A. Six five.
Q. Six five. Okay.
And what year did you graduate from high school?
A. 1973. I want to be clear. I didn't -- you asked when I went to law school. I started in 1980. I graduated in 1983.
Q. Fair enough.
So would it be fair to say that, after you graduated high school, you went to college?
A. I did for a semester. Half a semester. No, one semester.
Q. Okay. And then what did you do after that?
A. I quit and joined the Army.
Q. Okay. What years did you serve in the Army?



A. 1974 to 1977.
Q. And did you serve overseas?
A. No.
Q. Where were you stationed primarily?
A. Primarily, I was stationed at Military Terminal in Bayonne, New Jersey.
Q. And did you have a particular role or assignment there during your time at Bayonne station?
A. Yes.
Q. What was that?
A. I was the 91R-10 veterinary food inspection specialist.
Q. And what's that, if you don't mind explaining?
A. I was the -- one of the food inspectors for the food that the Army ordered and moved through Military Ocean Terminal.
Q. Now, in 1977, were you honorably discharged from the Army?
A. Yes.
Q. And what did you do by way of either further education or employment once you were honorably discharged from the Army?
A. I resumed college.



Q. And where did you attend?
A. I went to a year or two for Kean College and then transferred to Rutgers College.
Q. Did you, in fact, graduate college from Rutgers?
A. Yes.
Q. And what year did you graduate?
A. January of 1980.
Q. And with what degree did you graduate?
A. Bachelor of Arts.
Q. Did you have a major?
A. Yes, history.
Q. And am I correct that, upon graduation from college, you went to law school?
A. No. I went to work.
Q. Okay. What did you do for work?
A. I managed a grocery store in Bound Brook.
Q. How long did you do that?
A. Probably about six months.
Q. And then after that six months was completed, what did you do?
A. Then I went to law school.
Q. All right. Where did you attend law school?

Page 17

A. Seton Hall.
Q. And you graduated law school in 1983, right?
A. That is correct.
Q. Okay. Upon graduation from law school, what employment did you obtain?
A. I was a judicial law clerk for John Dios.
Q. Can you spell that name please?
A. D-I-O-S.
Q. What court was that?
A. It was a Superior Court criminal law judge.
Q. In the State of New Jersey, correct?
A. Correct.
Q. How long did you work as a judicial law clerk for the judge there?
A. One year.
Q. And what did you do after your clerkship?
A. I went to the Essex County Prosecutor's Office.
Q. So the Essex County Prosecutor's Office, you went in 1984, '85. Is that right?
A. Yes. I believe I started around

Page 18

September 1984.
Q. Okay. And I just want to put some brackets on it. When did you leave the Essex County Prosecutor's Office?
A. I believe I left in May of 1987.
Q. May of 1987?
A. Correct.
Q. And during your time in the Essex County Prosecutor's Office from '84 to '87, what were your responsibilities?
A. I started off in the municipal court at Green Street in Newark, advanced to the juvenile section where I remained for about six months trying juvenile cases and then went to the adult trial court.
Q. And did you try cases in the adult trial court?
A. That is correct.
Q. Did you try -- I guess they don't call them felonies, but did you try serious indictable offenses when you were in the adult court?
A. Yes. I tried my first murder before I left the office in '87.
Q. Where did you go when you left in '87?
A. I went to work for Mc Cormick &

Page 19

Petrelli (ph.) in Roseland.
Q. What did you do for them?
A. I was primary trial attorney.
Q. What type of litigation -- strike that.
What type of law did Mc Cormick & Petrelli conduct?
A. General practice.
Q. Did you do litigation for them?
A. I did litigation. I learned workers compensation, civil trials, and I did their criminal work such as they got which wasn't much.
Q. And that was as a defense attorney, correct?
A. That would be correct.
Q. How long were you at Mc Cormick & Petroli?
A. One year.
Q. Why did you leave?
A. Money.
Q. Why did you leave the Essex County Prosecutor's Office in '87?
A. Money.
Q. Okay. Then where did you go after Mc Cormick & Petroli?
A. I went to work for Floyd Goldman in

Page 20

East Orange.
Q. And what type of firm was that?
A. Personal injury.
Q. How long did you work there?
A. I think two and a half years.
Q. Did you do litigation at Floyd Goldman? Is that right?
A. Floyd Goldman, yes. I did civil litigation.
Q. And did you have a specialty?
A. Personal injury.
Q. Okay. So what year was it when you left that firm?
A. I left Floyd's -- I'd have to say it was around -- around approximate 1990.
Q. Okay. Where did you go in 1990?
A. I went to work for Gordon & Gordon.
Q. And by the way, why did you leave Floyd's?
A. I think Floyd and I had a misunderstanding, and I was offered more money -- well, I was offered more salary from Gordon & Gordon but not as big a piece of my cases.
Q. And what was the misunderstanding you had?

A. I think we had a fight over the Christmas party.
Q. What type of fight, a fist fight?
A. I think Floyd invited everyone to the Christmas party, and he told us we could invite whoever we wanted, and then the next day he called the Christmas party off and it pissed me off.
Q. And what happened? Did you confront him?
A. No. I just sought other employment, and I got an offer from Gordon & Gordon.
Q. So this was a verbal argument you had. It wasn't a physical argument?
A. It was a verbal argument.
Q. Okay. Did you -- is it fair to say you did not leave on the best terms with Mr. Floyd?
A. I think in the moment I didn't, but after that we remained friends.
Q. Okay. And then you went to Gordon & Gordon. Is that right?
A. Correct.
Q. How long were you there?
A. One year.
Q. What did you do for Gordon & Gordon one year?



A. I'm their trial attorney.
Q. Why did you leave Gordon & Gordon?
A. Floyd asked me to come back and offered me a $25,000 raise.
Q. And did you come back?
A. Yes.
Q. And how long were you at Floyd your second stint there?
A. About nine months.
Q. That's not very long. Why did you leave?
A. You want to hear the story?
Q. I do.
A. Well, the year before, 1992, March, when I left -- I wasn't left. I was actually fired.
My brother -- my oldest brother got a brain tumor. He was dying of it. I was going to Sloan Kettering every other day to see him when I worked till 7 o'clock every night the way Floyd expected us to, and then I would take off every other night at 5 o'clock so I could go see my brother and anyone who wanted to come with me to see him, and it was every other night.
On a Tuesday in March I went to the hospital with my brother and then my cousin, and my



brother was dead. I came back on Wednesday. I came back home after collecting his things from the hospital and told everyone what happened, that it was over, but I had a trial call on Wednesday, and I think the trial judge -- the assignment judge might have been Cody, and I forgot to go to the call. So the case got dismissed.
The next day I went to the daily call, and I told Judge Cody what had happened Wednesday, told him that my brother died and I forgot to come to court. I think that was on Thursday actually, and he said, Pete, don't worry about it. I'll put the case back on the list.
I went to court for Floyd, and it might have been Bergen or Hudson, and he had a case on the list over there that he forgot about. I took care of it and settled that case.
My brother's funeral was Friday. It was in Brick. My friend Jeff who was the paralegal for the office came down, and I said to him, Jeff, you didn't have to come. This is really nice of you to come to my brother's funeral.
He said Floyd sent me here to tell you you're fired, and that was the second time I left Floyd's office.



Q. Well, first of all, my sympathies for the loss of your brother. I'm sure that was a difficult time for you. I appreciate you sharing that, and I just want to just make sure I understand the timing of this.
It sounds like you went back to Floyd the second time sometime in '91. Is that right?
A. Yes.
Q. Okay. And at some point your brother got very sick and you were spending time, obviously, with him as he was getting treatment and sounds like at Sloan Kettering or one of the hospitals in New York. Is that correct?
A. Correct.
Q. All right. And then in March of '92 Floyd fired you under circumstances related in at least in his mind to things you had not done or during the course of this period of time, right?
A. Over missing the trial date and the case being dismissed which was restored, but Floyd didn't care. He fired me. Yes. That's correct.
Q. Gotcha. Okay.
And when you left -- after you left Floyd the second time in March of '92, did you find different employment?

A. Yes.
Q. And tell me about that.
A. Floyd fired me on Friday. On Saturday morning I went to the office and took my 20 files that belonged to me, and I called my friend David Sussman.
I asked him if his offer of a office in his suite was still open. He said yes. I opened my practice on Monday, the following Monday.
Q. So you went into private practice in March of 1992?
A. That's correct.
Q. And those files that you took, what types of cases did you handle?
A. I handled criminal, personal injury and workers compensation cases back then.
Q. What was the name of your firm?
A. Peter Guarino.
Q. How long did you work in private practice?
A. Ten years.
Q. Did you have any employees?
A. No, just my wife.
Q. Is your wife an attorney?
A. She was a secretary. At least that's what we called them back then.



Q. So, roughly speaking, you were in private practice as a solo practitioner from '92 to 2002. Does that sound right?
A. That is correct.
Q. And you did criminal law, personal injury, workmen's comp. Is that right?
A. That's correct.
Q. Would you say most of your work was criminal defense or what percentage would you put on that?
A. I would say it was, excuse me, more like -- more personal injury than criminal defense.
Q. Okay.
A. Maybe 60/35 and 5 percent workers comp.
Q. And in 2002 you wound down your private practice. Is that right?
A. That's correct.
Q. And why did you shut your doors in 2002?
A. I was in -- by 2002, I felt that there was a -- it was hard to get new cases in East Orange because I was competing with law firms that were notorious for using runners, and as my personal injury cases dried up, I wasn't making enough money to keep going forward.



So I had it in my mind that I wanted to go back to the prosecutors. My wife and I decided that then was the time. So I went back.
Q. What's a runner?
A. A runner is a individual who gets cases and sends them to lawyers and gets paid for it.
Q. Is that -- does that comply with the Rules of Ethics in the State of New Jersey or did it?
A. I don't believe it does. I actually defended a runner criminally in Bergen at one time.
Q. Okay. So you went back to the Essex County Prosecutor's Office in 2002?
A. Yes.
Q. And did you -- well, strike that.
How did you get that job? Did you have contacts there? Did they ask you to apply?
Explain to me how you got back there.
A. I sent in a resume. Of course, there were people still there that remembered me and I interviewed, and I was hired by Campolo at a huge cut in pay, but I felt at the time it would be worth it because I still had enough files that I had referred out that I would have some additional income until my salary was brought up to par, and I had agreement -- written agreement with the prosecutor that, any cases that I had referred out prior to going back to the prosecutor's, I would be allowed to accept the fees on.



Q. How long were you at the Essex County Prosecutor's Office once you started back in 2002?
A. Back in March of 2002 and I retired 25 years of public service in October, excuse me, of 2012.
Q. So you were there for about 10 years. Is that right?
A. A little more.
Q. A little more. Yeah.
And just sounds like you left in October of 2012. You must have done some additional work somewhere. Where did you go?
A. When I left in 2012?
Q. Yeah.
A. When I left, I immediately became of counsel to Mescall & Acosta.
Q. Got it.
A. But the amount of work I was doing for them would never be enough money to live on.
That's when I took my criminal trial,

and after I decided I didn't want to do that anymore. Actually, it was hard for me because I have bronchiectasis.
Q. I'm sorry. Can you repeat that?
A. It's hard for me to do trial work because I have bronchiectasis as a result of chemo from when I was younger. That's why you hear me coughing now.
So I stopped doing the trial work, and for a brief time back then -- not brief. It was probably about a year, maybe a year and a half I did workers compensation investigations for a company that was called -- I think it was called Beck Adjusters, and then after that was when -- when you come up to March of 2015 is when I started -- I stopped working for Beck and I started working for Uber.
Q. And you said the last trial you did was in 2013, right?
A. Yes.
Q. What's the last trial you did for the Essex County Prosecutor's Office?
A. The five missing kids.
Q. The prosecution of Lee Evans?
A. That's correct.



Q. Okay. Have you ever been disciplined as an attorney by any ethics commission anywhere?
A. I think Judge Costello filed an ethics complaint against me after that trial.
Q. After the Evans' trial?
A. Yes.
Q. And what was the basis of that ethics complaint?
A. I was late for a meeting which was supposed to take place by Skype for a defendant who was deported following his plea of guilty on a criminal case, and he wanted to come back to the country and retract his plea, and I was 20 minutes late for that Skype meeting.
Q. Okay. Judge Costello is a Superior Court judge in Essex County?
A. He was the assignment judge.
Q. And when you say after this case, you're talking about Lee Evans' case?
A. Correct.
Q. And it had nothing to do with Lee Evans' case. It was a different matter that you got -- that the judge --
A. Yes. He fined me $250.
Q. Okay. And just so I'm clear, did she



lodge a complaint with a disciplinary commission of any type or did she sanction you directly?
A. She sanctioned me $250, and then I had to go before I believe it was the Essex County Bar Association, I could be wrong, committee, because I had to -- I was interviewed by retired Judge Cohen, and he said I should write her a letter and apologize. So I did.
Q. And this ethics complaint in your mind stemmed just entirely from being late to a meeting?
A. Yeah. Yes.
Q. There was no other basis for it?
A. Well, I was late for the meeting, and I missed the Skype appointment. So she fined me $250, and when I got up there, I was sorry that I missed the meeting, and I informed the defense attorney and the court that I have already made a decision to waive any objection to the defendant retracting his plea so they could come back to the country and pursue whatever appeal he wanted so he could again get back his status as a -- whatever his status was, green card status, so he could be here legally, but she still fined me, and she asked the other attorney if he wanted to be reimbursed for his time that he was waiting for me and that attorney declined that



offer from the judge. So I was fined $250.
Q. And it was your understanding, if I'm not mistaken, that she also lodged some complaint with the disciplinary review board that you had to respond to or was that --
A. You're right. I'm conflating two issues.
Q. Okay.
A. The fine, that's the only time a judge ever fined me for anything. That was after the trial. Right after or I believe it was after the trial of Lee Evans, the judge did refer a complaint against me to the ethics board.
That's why I saw Judge Cohen, and she had three things that she said that were -- I was contemptuous of court for, and that's when I went and talked to Judge Cohen about it. That's right.
So it's two different things. You're right.
Q. Okay. So it was still Judge Costello, though, who lodged the complaint with the disciplinary review board, right?
A. Yes.
Q. And she had some itemized list of conduct that she believed was not in accordance with

the Rules of Ethics that she put in some written form and lodged to the review board to the best of your understanding. Is that right?
A. Yes. They were things like I didn't let her complete her sentences. I talked over her. I turned my back on her during the trial, and there's some other things there that Judge Cohen asked me what happened. I explained my position.
Basically, he said I don't think you did anything wrong, but I would like you to write an apology to Judge Costello. So I wrote her a very nice apology.
Q. And when you are referencing this -- these allegations by her that you turned your back on her, you talked over her, whatever they were, was that in connection with the Lee Evans' trial?
A. Yes, it was.
Q. Okay. I'm sorry. Say that again.
A. That was the only case I ever had before her.
Q. Okay. So that's what I was trying to understand.
So, in fact, Judge Costello did lodge some type of ethics complaint against you in connection with your conduct in Lee Evans' criminal



prosecution, correct?
A. Yes.
Q. All right. And separate and apart from that, there was another matter where you were sanctioned for not showing up on time for another unrelated matter. Is that right?
A. That's correct.
Q. And that was also in front of Judge Costello?
A. That's correct.
Q. All right. And did she lodge a separate complaint or did she just sanction you on that?
A. No. She just fined me $250. I paid it shortly before I retired.
Q. Okay. Now, in connection with the ethics complaint that she lodged related to your conduct in the Lee Evans' trial, you mentioned you had to be interviewed by someone. I think you said judge -- can you tell me his name again?
A. Judge Cohen. Judge Cohen was a retired appellate judge.
Q. Okay.
A. I don't remember his first name. Ben. Ben Cohen.



Q. Okay. Ben Cohen.
And where did that interview take place?
A. In the Essex County Courthouse. I think downstairs in the old courthouse where they have that attorney room or maybe it's the Essex County Bar, and it's dedicated to Fred Shadrow, that room.
Q. All right. And did you ever see a copy of the written complaint, if any, that Judge Costello filed?
A. Yeah, I think they did. Yes.
Q. Do you have a copy of it?
A. No.
Q. Okay. Do you have a copy of the apology letter that you provided to her?
A. No.
Q. All right. Have you been the subject of any other ethics complaints apart from the one -- this one that we have identified in the course of your career?
A. None that I'm aware of.
Q. All right. And have you ever been sanctioned by any judge in the course of your career apart from the incident with Judge Costello?



A. Judge Ferencz wanted to fine me $200 once.
Q. And what was that for?
A. Because a young female prosecutor named -- I don't want to get her name wrong. So I won't say it.
A young female prosecutor was afraid to try a case in front of her. The case was called shortly before lunch. I told her that I would try the case for her in front of Judge Ferencz who I knew very well because I came up with her in juvenile. She was a juvenile judge.
And I asked the judge if we could put the openings off until after lunch so that I could read the file. I did not tell Judge Ferencz that the female attorney was afraid to try the case, that it wasn't mine.
Since I hadn't read the file and Judge Ferencz insisted that we were going to open before lunch, I handed the file back to the attorney. I told her I couldn't do it because I hadn't read the file and I wouldn't be able to do an opening.
Judge Ferencz got irked by that and told me I was fined $200 but that we would begin the trial after lunch, and that's what we did.

I did my opening after lunch, tried the case, and at the end of the trial -- I lost that case by the way. At the end of the trial, the judge called my to the bench, and I went to the bench. I said, what is it, Judge, and she looked me right in the eye and leaned over and said you don't think I'm really going to make you pay that 200, do you, dimples, because I have dimples, and that was it, and I said, no, Judge. I said but you really had me going there for a while.
That's the only other time a judge wanted to fine me.
Q. Have you been orally sanctioned or verbally sanctioned other than the incidences that you already identified?
A. Those were the only two incidents in my career.
Q. Have you ever been sued in connection with your work as an attorney obviously?
Well, I'm going to start over because I want to separate out your work as an Essex County prosecutor versus in private practice.
Have you ever been sued by anyone in connection with your representation while you were in private practice during your career?



A. No.
Q. And I think, best I can tell based on your answers, no client of yours has ever filed an ethics complaint against you. Is that right?
A. That is correct.
Q. And I'm talking, again, specifically in private practice. Okay?
A. Correct. Yes. That's my answer.
Q. Okay. Now, as a prosecutor, whether it was in the '80s or when you came back in the 2000s, were you ever sued in connection with your work as a prosecutor?
A. Apart from Lee Evans?
Q. Yes, sir. Yes, apart from this case.
A. Yes.
Q. Okay. How many times?
A. One.
Q. Can you tell me what type of case it was?
A. A homicide.
Q. All right. And did you prosecute the homicide?
A. Yes.
Q. And was the individual convicted or acquitted?



A. He was indicted, and subsequent to going to trial, I dismissed the case.
Q. Okay. And then he sued you. Is that right?
A. Correct.
Q. And was that in federal court or state court?
A. State court. I'm not a member of the federal bar.
Q. What's that?
A. I'm not a member of the federal bar. I never was.
Q. Well, that doesn't mean he wouldn't have potentially sued you in federal court, though.
A. You're correct. That's possible.
Q. Okay. Because Lee Evans is suing you in federal court, right?
A. That's correct.
Q. And you're still not a member of the Federal Bar, right?
A. No.
Q. What was the name of the individual that sued you?
A. Peter La Brada.
Q. Can you spell it?



A. Peter, P-E-T-E-R. La Brada, L-A-B-R-A-D-A.
Q. And just, generally speaking, what were the theories of liability that he advanced in his complaint against you specifically?
A. I guess he thought it was a malicious prosecution.
Q. Okay. I'm assuming that you succeeded on a motion to dismiss?
A. I dismissed the case on a motion which was actually put through by -- I think Paula Dow herself put that through, but I wrote it up for dismissal.
Q. Okay. What year did you dismiss the criminal charges post indictment against Mr. La Brada?
A. I don't recall. It was sometime between 2006 and 2010.
Q. Okay. Was -- and what municipality was involved in investigating Mr. La Brada's case?
A. Newark.
Q. And then he brought a civil suit against you under some malicious prosecution theory in state court, correct?
A. Correct.

Page 41

Q. And -- and what I was asking earlier, although maybe it was a bad question, did you ultimately get dismissed out of that civil case?
A. I think the entire case was dismissed.
Q. Okay. And were you represented in connection with that?
A. Yes.
Q. Who was your lawyer?
A. Someone from Essex County.
Q. Okay. Do you know if there were any other police officers who were sued?
I'm sorry. You can complete your answer.
A. I won't. I don't remember if it's -- I met with lawyers on that case. I met with lawyers on this case, and I don't really remember the difference.
Q. Do you recall what police officers were involved in Mr. La Brada's prosecution or the investigation that led to the prosecution?
A. Well, the main investigator in my case was Jimmy Marinaro. He was dismissed. Everyone was dismissed out of the case. The Newark officers I don't really recall.
Q. Okay. And why did you ultimately

Page 42

dismiss that case after obtaining an indictment?
A. I obtained the indictment, and the subsequent investigation, when we started looking at the cell phone towers where certain calls hit and where that put the defendant, I made a -- I found a phone call that pinned off of a tower in Woodbridge. That would have meant that the defendant, assuming he had his cell phone with him, and there was no reason to think he didn't, could not have been at Newark at the location where the murder was. It was impossible.
And based on that discovery in my -- in my evidence, I decided that we could not obtain a conviction, and in my mind, I believe that he was -- he could not have done the murder. It was someone else, and, therefore, I wrote it up for dismissal.
Q. All right. So to recap -- just correct me where I'm wrong, if I got it wrong.
This was a case that was investigated by the Newark Police Department, right?
A. Initially, yes.
Q. Initially, right.
And then after it was charged, you were then -- conducted your own, I guess, investigation and concluded that there was exculpatory evidence

Page 43

that suggested that you couldn't sustain your burden, right?
A. Correct. Yes.
Q. And you did what a good prosecutor does, and you dismissed the case, correct?
A. Correct.
Q. Do you know how much time Mr. La Brada spent in custody prior to you discovering that there was exculpatory evidence that suggested he was not responsible for the crime?
A. I don't think it was long because he was out on bail.
Q. Okay.
A. And then he had to go back into custody because he had a pending drunk driving where he killed someone or substantially injured someone. I think the person died, and the judge down where he lived, South Jersey, sentenced him to six months.
Q. Got it.
And that lawsuit was brought in Essex County Superior Court. Do you remember the time -- the year the lawsuit was brought roughly?
A. It was brought around that period of time when I was in homicide. It was -- I think it was ultimately dismissed maybe during the evidence

Page 44

case. I don't really recall.
I just know it was around -- the case was from around 2008 or '9, and it was dismissed before 2012. Maybe around 2011. I'm not really sure.
Q. Great. Thank you.
A. I know the attorney was Michael Critchley, if that helps.
Q. I'm sorry. Say that again.
A. His attorney was Michael Critchley.
Q. Can you spell that last name please?
A. C-R-I-T-C-H-L-E-Y, and Joe Ferrante, F-E-R-R-A-N-T-E.
Q. Michael Critchley and Joe Ferrante was the accused's attorneys, correct?
A. They were, and they brought the civil case.
Q. Okay. During your second stint at the Essex County Prosecutor's Office, were there any other instances where you voluntarily dismissed an indictment because you discovered that an individual who had been charged might have not done -- did not do the crime or that you couldn't sustain your burden as a prosecutor?
A. Yes.

Q. How many times do you think you did that?
A. I can think of definitely one other time. There may have been others.
Q. What was the other time that you can recall?
A. I can't recall the names of the parties. I didn't have the case that long. I think I dismissed it shortly after an indictment because the witness that I had called to grand jury came to me and said that he made up his testimony to get a better deal on his own case, and so I dismissed the homicide charges against the defendant who gave a statement that I thought at the time was a very credible statement.
Q. So this was -- I'm sorry. Go ahead. I didn't mean to interrupt.
A. I dismissed the case. It was a one-witness case. Actually, it was a double homicide, but there was really only one eyewitness, and once he recanted, obviously, we couldn't sustain the burden. I dismissed that case.
Q. And I assume you were assigned to the homicide unit of the Essex County Prosecutor's Office at that time, right?



A. Yes.
Q. What years did you serve in the homicide unit of the Essex County Prosector's Office?
A. I believe it was November 2005 until three months before I retired 2012.
Q. Okay. And this double homicide that you dismissed because of this witness that recanted, do you recall what year it was or where in that time period?
A. The only thing I can tell you is that it was sometime after Louie Portella retired, if I remember. It was probably around -- jeez, I really couldn't say. It was towards the end I think.
Q. Okay. And who's Louie Portella?
A. The detective.
Q. For what municipality?
A. I'm sorry. He was a prosecutor's detective.
Q. Okay.
A. He was friends with the victim's family. That's how I remember.
Q. The detective who was investigating the case was friends with the victim's family. Is that right?



A. No. He was just someone that knew the family, the victim.
Q. I see.
And as you sit here today, you don't recall the name of the accused or the defendant?
A. No, I don't. I don't recall really much. I remember the facts about the case. I just can't remember the names.
Q. Sure.
Do you know who he was represented by?
A. No.
Q. And do you know which municipality investigated the case?
A. Newark.
Q. You said Newark?
A. Newark.
Q. When you dismiss a case as a prosecutor -- and let me make it even more narrow than that.
When you dismiss a homicide case or we'll call it a serious like a rape or a homicide or something serious, are there certain approvals that you must get in your office, and we'll put the time frame between 2005, 2012 when you were in the homicide unit?



A. Yes, and that question jogged my memory. There was also a rape case that I specifically remember I dismissed before I went to homicide.
Q. So that would have been before 2005?
A. Yes.
Q. And what prompted you to dismiss the rape case?
A. I polygraphed the victim.
Q. You had -- not you personally, but you had the victim polygraphed?
A. Correct, because their story just didn't make sense to me, and I requested she take a polygraph and she agreed.
After she then failed the polygraph, she told the truth about the circumstances that happened, and the defendant was released from jail after spending four months in custody.
Q. Gotcha. And thank you. I appreciate that.
If anything jogs your memory that relates back to a prior question, I appreciate the opportunity -- I give you the opportunity to expand on it. Okay?
A. Okay.

Q. When you were in the homicide unit between 2005 and 2012 and you decided to dismiss a case, did you have to get approvals from supervisors or was it a decision you could make without that?
A. Yes. If we dismissed a case in the adult trial section, it had to be approved by your immediate trial supervisor.
If it was a homicide, you ran it through with the director, and then the director would have to go to the prosecutor, and the prosecutor would have to sign-off on it.
Q. I see. So let me -- let me recap what I think I understand the protocol to be, but please correct me if I'm wrong, if you would.
If the assigned prosecutor determines that a case should be dismissed post indictment, the process is you have to -- and a homicide case, right? We'll talk homicide cases.
The process is you have to get approval from your immediate supervisor, correct?
A. It would be the director of homicide.
Q. Which is the director of homicide, right?
A. Right.
Q. And do you have to make a case as to



why you think the case should be dismissed?
A. Yes. You have to fill out a form.
Q. Okay. So what type of form do you fill out that goes to the director?
A. It was a form where you fill in the information, the heading of the case and then reasons for the dismissal, and then there's boxes that have to be checked, and then you sign it. I believe the director signs it, and there's places for the prosecutor to sign it, and then, normally, if it was approved, you would go back to the judge whose court it was and put the dismissal on the record, and the judge would ask the defense attorney if he had any objection, and they always said no, and the case would be dismissed.
Q. And did this form have a name?
A. It might, but it's not one that I recall anymore.
Q. Okay. But to be clear, this was a piece of paper form or was it electronic?
A. No. It was a form. They were going electronic right around when I left, but it was a paper form we filled out, and it might have just said something like -- like request to recommend disposition or something.



Q. Right.
A. It was an innocuous form.
Q. Right.
It was an internal form, though, right?
A. Yes.
Q. And it served as some type of request to get approval to dismiss a case. Is that right?
A. Correct.
Q. And it would go up to your immediate supervisor and then up the chain to the prosecutor if it involved a homicide case, right?
A. That was my understanding.
Q. And you had to explain why it was that you believed the case would -- should be dismissed, right?
A. Right.
Q. And were there any follow-up conversations, meetings, if necessary?
A. Yeah. I would say that, if necessary, if the prosecutor was concerned or didn't understand, they might call you into the office to discuss it.
I know that the director would always have a meeting with you about the request, and then it was the director that would go into the



prosecutor, not the attorney, and then if the prosecutor wanted to see you, they could.
Q. Understood.
Now, do you know where those forms would go then after they were filled out and then ultimately signed off on?
A. I think they would stay with the file.
Q. I see.
A. I think the judge would keep a copy, because, in a sense, it's a motion. So the court probably kept a copy in the state file and the prosecutor would keep a copy in our file.
I don't know if the defense got a copy. I don't think they did. It wasn't like a formal motion. It was just a request.
What I recall is that the judge would review that. They also would be reviewing the reasons on the record. I mean the reasons for your dismissal.
They would look at that, and if everything looked okay, then the judge would dismiss the case, but I don't think that we even put -- it's not like we put the reasons for the dismissal on the record in court. It's just an application, and it was -- if that was our application and the other

side didn't oppose it, it was granted. Simple as that.
Q. Right.
I guess I'm just trying to understand whether this form was just simply an internal form used by the Essex County Prosecutor's Office or -- because I heard both things. You said yes, but also the judge would get a copy of it which, of course, is a little contradictory.
A. I could be confusing that form with the plea forms which the judge does get a copy of.
Q. Right.
A. Honestly, I don't know if the judge got a copy of the reason for dismissal. That might have been just an internal form that we used and then we went on the record --
Q. Got it.
A. -- of what happened.
Q. Okay. So apart from the Peter La Brada case and this double homicide that you referenced, do you recall ever dismissing voluntarily any other homicide cases or serious rape, what I would call felony cases, but I think you get the idea, during your tenure in the Essex County Prosecutor's Office?
A. I did tell you about the rape.



Q. You mentioned the double homicide, the Peter La Brada case and then the rape. Any others that come to mind?
A. Nothing else comes to mind right now.
Q. Okay.
A. Well, this was one was a dismissal. There might have been several of these, but they wouldn't have involved -- it's hard to say.
I had cases which I dismissed on the original charges that might not have even been indicted. That's possible.
Q. Okay.
A. Besides, the reasons weren't just -- just because I didn't think the case could be proved, sometimes it would be dismissed kind of like a alternative disposition.
There were several times I dismissed serious cases against people for assault and other things because the defendant, who are usually young, decided that they would -- wanted to go into the military, and I always looked on that as a good alternate disposition.
If a recruiter came to court and said they were willing to take this person if the charges were dismissed, they would take them into the



military. There were several instances when I did that.
Q. Nothing specific comes to mind, though, in terms of who those people would be. It's just something you know that you did in the past, right?
A. Very specific. It was a 17-year-old kid who broke a cop's leg.
Q. And that's the case that you dismissed because you believed he should be given a second chance of some type?
A. Yeah. He was already -- he wasn't looking into the military on my suggestion. He was looking into the military prior to getting into the fight with the police officer, and after talking to the police officer, the attorney for the defendant, young defendant, was a juvenile who I believe was waived up, and they had the recruiter and the judge. They all decided we could dismiss the case if he, in fact, joined the Army, and he did.
Q. All right. Did you ever have any disciplinary issues within the Essex County Prosecutor's Office?
Not a very good question.
Did you ever get disciplined or reprimanded in any way while you were an Essex



County prosecutor?
A. Yeah, I think I did get reprimanded.
Q. And tell me about that.
A. I believe I received a written reprimand for calling John Martin, a Star Ledger reporter, an asshole.
Q. And why did you call the reporter from the Star Ledger an asshole?
A. Because after I dismissed the Peter La Brada case, he was arguing with me and suggesting that the reason why La Brada spent six months in jail on his drunk driving charge was because of me, and, of course, I had nothing to do with his drunk driving charge.
Q. Okay. And was it a verbal reprimand?
A. It was a written reprimand.
Q. Any other reprimand you received while you were an Essex County prosecutor?
A. There might have been one other one, but I don't recall what it was for.
Q. Okay. And did you leave the Essex County Prosecutor's Office in 2012 on good terms?
A. Yes. I accumulated 25 years, and I put in for my retirement.
Q. All right. Okay. That went a little

longer than I had expected because your history -- employment history is kind of long and sometimes those things happen.

So if you need a break, we can take a break if you like, a few minutes.

A. Yeah. Five minutes now would be great.
Q. Sure. No problem.

MS. BONJEAN: We're going to go off the record so Mr. Guarino can take a break.

(Whereupon, a recess was taken.)

Q. Focusing in on your time as a homicide prosecutor, did you have any other acquittals apart from the Lee Evans and the Peter La Brada case?
A. You say acquit as you mean did I lose any other cases?
Q. Yeah.
A. Occasionally.
Q. Any that come to mind?
A. Let's see. Yeah. I lost one to a lawyer who we ultimately referred to as Jenny Jen. I don't remember her last name.
Q. I'm sorry. What did you refer to her as?
A. Jenny Jen. Her name was Jennifer. I can't remember her last name, but we called her



Jenny Jen.
Q. Jenny Jen?
A. Well, that was her nickname. She beat me on a homicide. That would have been in Judge Nelson's court. I don't remember the cases, and then there was one I lost --
Q. I'm sorry. Could you just tell me what her -- it was Jennifer. Do you know what her last name was?
A. Jennifer. I just remember her as Jenny Jen. I don't remember her last name.
Q. All right. Go ahead.
A. She was a public defender.
Q. She was a public defender or she was not?
A. At the time, she was.
Q. Okay.
A. I lost a case to her, and then there was another case. It might have been to Jennifer Soletti, a different Jennifer, and that was interesting, because by the time she was done with her summation, I was already thinking that that summation made a lot of sense, and I lost that case, and then there were other cases that I lost which were not homicides, you know, but there was some.



Q. Do you recall losing any cases that involved cooperating co-defendants?
A. Losing a case with a cooperating co-defendant?
Q. Yes.
A. No. Just the Lee Evans' case.
Q. And in the case that you lost against the woman that you remember her nickname to be Jenny Jen, the homicide case, do you recall generally what the evidence was in that case?

And I don't -- I'm not looking for a long -- just a quick summary, if you recall.

A. I recall that case.
Q. Okay.
A. I remember losing to her.
Q. Okay. What about the Jennifer Soletti case?
A. That facts of the case, there was a shooting in the parking lot. The car -- the driver had long braids, and the witness in court testified that he didn't remember long braids. He remembered short hair. He was found not guilty.
Q. Okay. It was an ID case kind of, right?
A. Yes.



Q. Have you ever been reversed by the Appellate Division or any conviction you've obtained been reversed by the Appellate Division?
A. I think I had one reversed.
Q. And what were the grounds? Do you know?
A. I think it had something to do with evidence that was found in a shed that might not have been on the property of the house that was the target of the investigation. Something like that.
Q. So it was evidence that should have been quashed. Is that right?
A. Could have been, but the Appellate Division said you shouldn't have let that in and the case was dismissed.
Q. And what about any allegations of prosecutorial misconduct?

Do you know whether or not you have been the subject of any such allegations by opposing counsel or defendants in any appellate briefs or any other formal way?

A. I think just the La Brada case.
Q. Okay.
A. I'm not sure that in an appeal the defense argued I said something that I shouldn't

have, that that's your prosecutorial misconduct, but only in that sense. It was never a charge that I got charged with.
Q. No. I understand, and you may not even be aware of what a person may allege on an appeal. So I understand that.
But I guess I'm just asking if you're aware of any cases in which you have been the subject of a claim of prosecutorial misconduct, but that's kind of broad. So let me ask it this way.
Have you ever, to the best of your knowledge, been the subject of a complaint by any accused or his counsel as it relates to concealing exculpatory evidence otherwise known as a Brady violation?
A. No, none that I can think of.
Q. All right. So at this time, I guess we can turn our attention to the Lee Evans matter.
First, let me ask you this. When did you first become aware of the missing boys case either as a person in private practice or as the Essex County prosecutor?
What was the very first time you became aware of it?
A. When it happened in 1978.



Q. Okay. And how old were you?
Forgive me. My math is bad.
A. I was about 21, 22. Probably 22 at that time.
Q. And what do you remember about it?
A. I remember reading about it in the paper.
Q. And it stuck with you?
A. Yes.
Q. And after reading about it in the paper -- and I'm guessing, if my memory serves me correctly, you were not a prosecutor yet. You were either in school or working or something, right?
A. At that time, I was in college. Married and in college.
Q. And as we all know, the case ultimately -- the case was not solved in and around the time that it occurred.
When is the next time that you heard that this case was either being reinvestigated or relooked at or --
A. Well, during my first quarter of the prosecutor's office, I heard of the case. I wasn't assigned to homicide then, and they were very -- you know, the unit was very tight back then.



Trial attorneys weren't even allowed to walk through the room unless they got business there. So I didn't really hear much about the case, but I remember detectives like Jack Eutsey.
Q. That's E-U-T-S-E-Y.
A. Correct.
I remember hearing about it from him back in the '80s, but nothing in real detail because I was not a member of the homicide squad.
Q. Fair enough.
So back in the '80s, it was something that was on your radar just because it was in the office, but, yet, you didn't have any direct involvement in the case. Is that correct?
A. Correct, and it was still being investigated.
Q. And Detective Jack Eutsey was a Newark Police detective, correct?
A. Correct.
Q. And would you agree that he was a lead detective on the case at least back in the '80s?
A. I think he was. I might not have understood that back then. I just thought that he was a seasoned detective and very knowledgeable.
Q. Did you work with Jack Eutsey on any



other homicide cases or serious cases as a prosecutor?
A. I worked a case for a short time that involved the murder of his brother.
Q. Okay. So you leave the office in '87, and you go into private practice for a number of years.
During that period of time prior to coming back to the prosecutor's office, do you remember hearing anything about the missing boys case?
A. I read things about it occasionally. I remember being aware of Dorothy Allen, her involvement and things of that nature.
Q. What do you know about Dorothy Allen or recall?
A. I remember her being a medium that had solved a couple cases. I knew that Newark had consulted her on several cases.
Q. Are you talking about Dorothy Allison?
A. Yeah. Dorothy Allison, the psychic.
Q. Okay. Were you aware of Dorothy Allison in the '80s when you worked there?
A. I could have been.
Q. Okay. And was she a well-known medium?

A. I think she was well-known back then to people that were familiar with, you know, the things she did. It's not like everybody knew her, but if you were familiar with this case, and I think she had real good insight into a missing person case that she -- my recollection she said you'll find the person in a pipe, and that's where they found him. That's what I recall somewhat, but she hit one.
I'm not saying that it was like I really believe in psychics because I don't.
Q. Sure.
A. I think this was a person that could read the fact of a case and somehow intuit where to look for bodies. She had a little talent at that.
A few of them she hit, and some were total misses like this case, but, you know, once you hit one or two, you're good just like Jean Dixon.
Q. Okay. So prior to coming back to the Essex County Prosecutor's Office in 2002, you had some information or knew through whatever sources that the Newark Police Department was using Dorothy Allison as a medium. Is that right?
A. Yes, and there was another one too, but I didn't learn about that until after I was involved in the case.



Q. And what specifically do you recall during that time about what Dorothy Allison had conveyed or predicted, I guess, about this case?
A. Dorothy Allison interestingly talked about fire, that they were in a fire. She wasn't helpful as to where the bodies were, but she did mention fire, and, in fact, fire was key to the case.
So I always thought that was interesting, but anybody who read that case should have been able to glean that.
Q. And why is that?
A. Because the fire at Philander Hampton's house which everybody knew about it. The parents knew about it the night the boys disappeared.
Q. So this was information that was available -- readily available prior to even your involvement in the case?
A. Yeah. I think it was already public information. I think that's where she picked it up and intuited it out that somehow the fire was involved. Of course, it was.
But, see, the case was going on. It was kind of like the Judge Crater case. These are the longest missing person cases in this case.



Judge Crater is even older than this case.
Q. And anything else you remember about the missing boys case, again, prior to you coming back to the prosecutor's office?
And to recap -- well, strike that.
Did you maintain contact within the Essex County Prosecutor's Office after you left in 1987?
A. I'm not sure what you mean.
Q. Meaning did you have friendships or colleagues that you would speak to at least on a semi-regular basis from the office?
A. I would say yes. I made some friendships there, but when I went back and tried cases, there were always people that I knew there.
Q. Sure.
What about Newark Police detectives? Did you have any friendships or relationships with them that you maintained after you left the prosecutor's office in '87?
A. Yeah, one or two. They were friends of my cousin who had a shop down on Frelinghuysen Avenue. A lot of the cops -- I wouldn't say a lot of the cops, but some of the people that hung there regularly were cops. We all stayed in touch.



Q. And just so I get some clarity, how did you learn that Newark was using this Dorothy Allison?
Was that through private sources or was that publicly made available?
A. Dorothy Allison was in the papers. That's how I -- from time to time when a story came out.
Q. So you would read about it in the papers, and she was interviewed in those papers?
A. Yes.
Q. And she gave her insights into what had happened to the boys in those reports that you read?
A. Yes. They would talk about this case and other cases that she helped solve and that some departments took her serious.
Q. Right.
And one of the facts that she discussed about this case was her belief or feeling, I don't know how mediums work exactly, that the boys had died in the fire, correct?
A. Well, yeah. I don't recall she said they died in the fire, but she said there was a fire involved. You know, it's kind of like vague.
Q. Right. Okay.

Now, after getting that information, again, through mostly news reports, did you learn any other additional information about the case prior to actually being assigned to prosecute it?
A. I don't think I had ever developed any other information about the case other than what I read myself in the paper up until that time. I just knew it was an active investigation.
Q. Right.
And it was one you were familiar with going back to its inception, correct?
A. Correct.
Q. All right. Now, you went back to the Essex County Prosecutor's Office I think you said in 2002, correct?
A. Correct.
Q. When you came back to the Essex County Prosecutor's Office, were you aware whether or not the missing boys case was still actively being investigated at that time?
A. I would say that I knew it was. I can't cite a specific memory of talking about it back then, but I knew it was still a missing persons case.
Q. And do you know who was investigating



it back in 2002 when you returned to the Essex County Prosecutor's Office?
A. I don't know who from our office was investigating it. I just know it was being investigated by our office and by Newark, and I know that Jack Eutsey -- I don't know if he was actively involved in the investigation.
At some point, I heard that Rashid Sabur was pursuing the investigation. Those were the people from Newark.
Q. Right.
A. I don't think I was really aware of any detectives in Essex County. Our prosecutor's detectives, when I first came back, those people that were actively investigating the case.
Q. So back in 2002-ish when you returned to the Essex County Prosecutor's Office was your best understanding of the case was still an open investigation being handled primarily by the Newark Police Department at that time, right?
A. That was may belief, yes.
Q. At some point is it your understanding that the Essex County Prosecutor's Office became more actively involved in the investigation of the five missing boys?



A. There was a point I learned they had been involved in it for quite a while.
Q. Okay. When did you learn that the Essex County Prosecutor's Office had been involved in the investigation of the missing boys?
A. When I became the lead prosecutor.
Q. All right. When did you become the lead prosecutor of the case?
A. I think -- I think it was probably around 2008 or '09.
Q. And just to be clear, at some point it went from being a missing persons case to a homicide investigation. Would you agree?
A. Yes.
Q. And do you know when that happened approximately?
A. Well, I mean, historically, it was first investigated as a missing persons by the juvenile division in Newark, but way back, and it was probably a few years after that, it became a homicide investigation that was -- the homicide unit took over the investigation from the juvenile section.
Q. I'm sorry. Go ahead.
A. My office, before they have a body or



are going to charge someone, will sometimes refer to these as special prosecution, and this case, if my memory is correct, had always been handled as a special prosecution, and it was handled by homicide, but I don't think -- it was not given an H number, a homicide number.
Q. Who gives a homicide number? Is that an Essex County Prosecutor's number?
A. Yeah. We give it an H, a homicide number. When a case comes in, it's given a P number, and then the H number is designated -- is actually considered -- hold on.
Sometimes you might get a case that circumstances are funny, looks like a suicide, they're not sure. It's a special case. It's a special prosecution until you develop the evidence, and then it either stays a special case or it becomes a homicide.
Q. And you say in your office there were cases that were called special prosecution cases. What makes a case a special prosecution case or how does it become a special prosecution case?
A. That's where maybe you find a body, but you have no evidence it was a homicide.
Q. Okay. Let's go back to 2008-ish.

Okay. You were assigned to the homicide division, right?
A. Yes.
Q. At some point you become aware that the five missing boys case is an active homicide investigation, right?
A. Correct.
Q. And who -- did you say correct?
MS. BONJEAN: Is it pouring?
MR. BOWENS: Just for the record, we lost power apparently. We got a black screen for about 30 seconds.
MS. BONJEAN: All right. If at any point you're uncomfortable proceeding because of the weather, I mean -- I'm afraid that -- we'll do our best to get done today.
I don't know what's going to happen, and I know Mr. Lipshutz is going to have to leave at some point. I don't know what it's like there. It's a little rainy where I'm at, but it's not too bad.
MR. BOWENS: It's rainy and breezy, but it's okay. I'm not far.
A. Can you repeat the last question?
Q. Maybe the court reporter can because



I've forgotten myself.
(Whereupon, record read as follows:)
"Question: At some point you become aware that the five missing boys case is an active homicide investigation, right?
"Answer: Correct."
A. Yes, and by that, I take that to mean I became aware that it was like really actively being investigated, that new leads were developed and they were pursuing it vigorously you might say.
Q. And this was sometime in 2008 to the best of your recollection?
A. Yeah, 2008, 2009.
Q. And at what point did you learn that you were going to be involved in the prosecution of this case down the line?
A. Well, I believe, because I was homicide and heard what was going on, I talked to Cheryl Cucinello, and I -- I told her I wanted to second chair her, more or less, to get involved in a case that I was very interested in, and I did that for a while, and, eventually, I -- we discussed me becoming a lead prosecutor, and we basically switched roles. I gave her one of my homicides.
We're black again.



MR. LIPSHUTZ: It's not clear that they can hear us. Just for the record, it's Gary Lipshutz. I am going to turn on my video.
MS. BONJEAN: Sure.
MR. LIPSHUTZ: We're still able to see you, Mr. Bowens and Mr. Guarino, and maybe you're going black. I've lost power a few times here too.
Just be mindful that, if we can still hear you, I don't know what you guys are going to say when you're in a black mode on that end. Okay.
MR. BOWENS: Thank you.
MR. LIPSHUTZ: Yeah. Thanks.
A. Okay. So continuing, I wanted to be the lead prosecutor on the case, and I had a case that Cheryl was interested in trying, Abidijal Sloan. Abidijal, I think it was A-B-I-D-I-J-A-L. Abidijal Sloan, S-L-O-A-N.
That was a homicide that was recorded on a 10 minute 911 call. It was a domestic violence case. Cheryl was interested in prosecuting it, and I said I would give her the -- I would give her the case if I became the lead prosecutor on the five missing kids, and that's how I became a lead prosecutor on the five missing kids.
Q. And do you recall approximately what



year it was that you became interested in becoming the lead prosecutor or even second chairing the case? Was that in 2008?
A. Yeah. It was in that period of 2008, 2009, right around there.
I'd have to see when the Abidijal Sloan murder happened. I indicted it, and she tried it. So right in that time slot is when we agreed that I would be the lead prosecutor on the five missing kids.
Q. Okay. And when did you first become aware -- well, strike that.
Let me ask this first. In 2008, whatever month it was when you became aware that the five missing boys case was being very actively investigated, what was your understanding of who was responsible or in charge of that investigation during that time?
A. I mean the way I always understood it, the lead prosecutor was in charge. The way it worked, if someone was murdered the week you're on call, you're assigned the case.
The detectives who were on call, they're assigned the investigation, but the lead prosecutor on the case is in charge of the case.

The detectives do their job, and we do our job.
We review things and then do everything that you have to do to investigate to prepare for the case. I don't know how Cheryl became the designated attorney on that case. I don't know. It could have just been done through the office. I have no knowledge of why she was the lead prosecutor on a case.
Q. Okay. I guess my -- I'm just going to put a little time frame on this for you, okay, so maybe it will help.
Mr. Evans wasn't indicted until 2011 I believe. Okay?
A. It was '10.
Q. 2010?
A. I'd have to check.
Q. You know what? You might be right. You are right. I'm sorry. I looked at the wrong date. You're right.
So he's not indicted until 2010. So the case is being investigated prior to his indictment, of course, and, again, back in 2008, that investigation was largely being conducted by law enforcement personnel. Would you agree?
A. Yes.



Q. Meaning law enforcement personnel were the individuals who were going out and interviewing witnesses?
A. Yes.
Q. And developing the leads that may have --
A. Yes.
Q. -- evolved, right?
Okay. And do you know which law enforcement agency was involved in that part of the investigation back in 2008?
A. Up to that point, I believe it was Newark that did the most work.
Q. And, specifically, I know we mentioned Detective Jack Eutsey. Any other detectives or supervisors from Newark that, to your understanding, were conducting the investigation of the presumed homicide of the five boys in 2008?
MR. LIPSHUTZ: Let me object to the form of the question please. You can answer it, sir.
A. Sure. Rashid Sabur, S-A-B-U-R.
Q. Anybody else?
A. There are other detectives here and there that did something. They might have



interviewed somebody, but no one did it to the extent that Rashid Sabur did --
Q. Okay.
A. -- for a long period of time. Probably like 10 years.
Q. Do you recall Detective Hadley being involved in the investigation?
A. He had some involvement.
Q. What about, I believe maybe he was a sergeant at the time, Henry?
A. Darnell Henry?
Q. Yeah.
A. Some involvement.
Q. Now, at some point there were law enforcement personnel from the Essex County Prosecutor's Office who also got involved in the investigation. Is that right?
A. Yes.
Q. Do you recall who those individuals were?
A. Over the years there were several, but in my time period, it would have been Lieutenant Carrega.
Q. And that's -- and you're talking about the 2008 time period, right?



A. Right.
Q. And what role did the investigators in the Essex County Prosecutor's Office play in the investigation as compared to the detectives from the Newark Police Department to the best of your understanding?
A. To my understanding, they were investigating leads as they developed. They might have gone back and interviewed some witnesses based on leads, but it was -- Rashid Sabur was really doing the legwork and talking to everyone, going back over the case, taking statements and doing -- really doing most of the investigation.
Q. In 2008, do you know whether Rashid Sabur was still involved in the investigation?
A. Yes.
Q. You believe he was?
A. Yes.
Q. And it's your belief that he was, for lack of a better word, the lead detective in 2008 on the investigation?
A. Well, I think he was the lead for the Newark Police.
Q. Okay.
A. He was the one that really took over

the case. Of course, when you have two agencies involved, I mean our office didn't have supervisory authority over what Rashid was doing.
They worked together to some extent, but Rashid was really the primary guy from Newark, and he did far more than anybody in my office did in my opinion. He had a lot of information that he gathered over the years.
Q. Right.
And there was also even State Police that were involved in some capacity, right?
A. Yeah. The State Police did things that we normally don't do. Like they would do Social Security searches, tax ID searches to see if -- if the social securities of the individual victims had ever been used and things of that nature. That's what I recall.
Q. So in 2008 when you started becoming involved or are familiar with the case, to the best of your knowledge, it was still a Newark Police investigation assisted by your office and other agencies, correct?
A. I think that would be a fair way to characterize it.
Q. You said that Essex County Prosecutor



law enforcement didn't have the authority to supervise, for instance, Newark Police detectives. Is that right?
A. Right, not if they were strictly assigned to Newark. Sometimes Newark homicide detectives worked as part of a task force with our detectives, but Rashid Sabur, to my knowledge, was never part of the task force.
MR. VOMACKA: I apologize for interrupting for a moment. This is Michael Vomacka. I just want to briefly put on the record I got a call from Vic Di Francesco, the other attorney from my office. He said he's in North Jersey. He lost power and is not on the deposition at the moment.
We're okay to proceed. Just for record purposes, he's currently not on the call. He'll try to join back in if he can, but you can proceed. I apologize for the interruption.
MS. BONJEAN: No problem. If anyone gets kicked off or needs -- this, obviously, needs to be adjourned for that if someone is able to participate, just I guess -- I don't know how they would let us know, maybe an email or something or text.
Q. So tell me -- you knew who Lieutenant



Carrega was, correct?
A. Yes.
Q. And what unit did Lieutenant Carrega work in 2008, 2009?
A. Homicide.
Q. He was an investigator for the Essex County Prosecutor's Office as a homicide investigator, correct?
A. That's my recollection.
Q. And have you heard of the term of a cold case unit?
A. Yes.
Q. And do you know whether or not the Newark Police Department had a cold case unit back in 2008, 2009?
A. Not specifically. I don't have direct knowledge of that.
Q. And to the best of your understanding, as far as Newark's involvement in the missing boys homicide investigation, these were homicide detectives that were working on the case in 2008, 2009 from Newark, right?
A. Yes.
Q. And do you have a vivid -- strike that.
Do you have a specific recollection of



when you first learned that the case was actively a homicide investigation with an identifiable suspect?
A. Yes. I'd say yes.
Q. And approximately when was that?
A. When I heard that they had interviewed Philander Hampton and he actually gave a confession.
Q. Okay. Prior to the interview with Philander Hampton, did you know Lee Evans was the prime suspect or the person of primary interest in the missing boys case?
A. Yes. He was always the person of interest.
Q. And this was information that you were aware of that went back to probably even before you were in the prosecutor's office. Is that fair to say?
A. Yes. I became aware in the '80s that he was the person of interest. Back then, I don't think anyone ever heard of Philander Hampton that I was aware of.
Although, he was thought of as someone who might have knowledge because they knew he was a relative of Evans, but no one really knew what happened, and, therefore, they didn't know that Philander was directly involved.

Q. Got it.
While the case was being investigated in 2008 and 2009 and I'd say pre-indictment, were you given updates about the progress of the investigation?
A. Well, by the time I got involved and was -- when it became -- I started to assist Cheryl in the case, I knew what was going on in the case. Yes.
Q. But I'm trying to the best of my ability to understand when that was. Was this before -- this was obviously before they were indicted, correct?
A. It was before they were indicted but after the confession.
Q. So would you say that you started becoming actively involved in keeping up with the investigation after Philander had made the statements that he did? Is that right?
A. That would be the best of my recollection.
Q. So if I put a time frame on it that Philander I believe made his statement in I think November of 2008, that would have been around the time that you became more engaged in the case. Is



that fair to say?
A. Yes. I think that's fair to say that.
Q. Do you have an understanding of how investigators working on this case from different agencies were supervised in terms of -- well, strike that.
Let me ask this. Was there one agency that trumped another agency in the course of the investigation to the best of your knowledge?
A. By trumped, do you mean that one agency could dictate to another agency how to proceed?
Q. Yeah.
Let me ask it this way. They say the buck stops somewhere, right?
A. Right.
Q. And in terms of this investigation into the missing boys pre-indictment in 2008, 2009, whose investigation was it? Where did the buck stop?
MR. LIPSHUTZ: Objection to the form.
A. It's only an opinion, but I think the buck has to stop with the county prosecutor, because, ultimately, we make the decision to indict or not, but it's also my opinion that these are two separate investigations going on, and a lot of what Rashid Sabur was doing no one knew about.



He wasn't sharing a lot of his information with the prosecutor's office.
Q. So Newark -- Newark Police -- Police Detective Sabur was conducting an investigation related to this, but it wasn't being supervised by the county prosecutors, right?
A. I think that's correct.
Q. Okay. And I assume that you would agree that there may have been other detectives who were working with Sabur who also were not being directly supervised by the County Prosecutor's Office in this investigation, right?
MR. LIPSHUTZ: Objection. Calls for speculation. You can answer it.
MR. VOMACKA: Objection. You can answer.
A. I would think that there were, but the reports that I read were all prepared by Sabur.
Q. You understand, of course, as a former prosecutor that police officers are expected to follow policies and procedures and protocols of their department, right?
A. Yes.
Q. And do you have an opinion or any knowledge about whether or not this multi-agency



investigative group had a single set of policies and procedures they were following or do you know if they were following the policies of their own departments?
Do you have any understanding of how that worked?
A. I can't opine if Sabur is following his department's policy, but he was following his own investigation, and our office was following our investigation.
Q. Right.
So the people conducting the investigation in the respective agencies were following, presumably, if they were, but presumably, they were following their own policies. Is that right?
MR. LIPSHUTZ: Objection, lacks foundation. You can answer.
A. I don't think you can ask me if I presume they were following policies. I can only say what I observed.
Q. I may not be being clear. I know you can't speculate on whether they were following policies or not following policies.
I guess what I'm trying to get at is

whether you have any knowledge about the Essex County Prosecutor's Office saying, okay, this is an Essex County Prosecutor's investigation and here are the policies. We want you to follow our policies, for instance, as opposed to your own law enforcement agency's policies?
MR. VOMACKA: Objection, compound question.
MR. LIPSHUTZ: Objection to the form. You can answer.
A. To my knowledge, my office -- the prosecutor's office always followed policy.
Q. I'm sorry.
A. I'm not so sure that Rashid Sabur always followed policy.
Q. Okay. Let me put it this way. When reports were being prepared, they were being prepared by -- investigators were using the report formats of their own departments. Would that be fair to say?
MR. BOWENS: Objection, calls for speculation. You can answer.
A. The prosecutor's office detectives prepared reports and Rashid Sabur prepared reports, but we were -- Rashid Sabur did not share his



reports with other agencies during that time until we got ready to actually indict and try the case.
Q. When you got ready to indict and try the case, you eventually got to see all the reports that were prepared in connection with this case, right?
A. Right. The difference is that Rashid Sabur's reports were never submitted.
Q. What do you mean they were never submitted?
A. Submitted reports. He wrote reports and submitted them for review by his superior officer.
Q. I'm sorry. You were breaking up. So I just want to make sure that we get your testimony correct for the benefit of everybody but including yourself.
You said Rashid Sabur would prepare reports and he did or did not submit those to his supervisor?
A. It appeared to me that he did not.
Q. Okay. And do you know where he was maintaining these reports that he was not submitting?
A. He had a file.



Q. Like a personal file?
A. The police file -- could have been the police file or it could have been a personal file that he kept with him. I don't know. I have no knowledge of that.
I just know when I looked at the reports, they were not signed off on.
Q. And what did you make of that?
A. I didn't make anything of it. I told him that these reports have to be submitted in the present course of the investigation and he accomplished that.
Q. Did you ask him why he had never submitted his reports in the course of the investigation?
A. I don't recall if I had that conversation. I just noticed that they weren't signed off. I told him they had to be submitted. That's what he did.
Q. And would you agree that it was unusual to have reports provided to you as a prosecutor getting ready to indict a case that had never been approved, right?
A. Yes, that was unusual.
Q. And as you sit here today, do you have



any basis for or understanding as to why he did that?
A. Are you asking for my opinion?
Q. I'm asking for your opinion. Yeah. I'm asking for your opinion.
If it's speculation, you can indicate it's speculation. If you have some factual basis for it, I'd ask you to provide that, but yes.
MR. LIPSHUTZ: Objection to form.
MR. BOWENS: Don't speculate. If you know the answer, answer it, but don't guess.
A. I can't guess what was in his head. That was just my opinion.
Q. And that's fine. I know you can't guess what's in his head unless you had a conversation with him about it. Maybe he told you what was in his head.
If that's not the case, I would ask for your opinion based on your, I'm assuming, intimate knowledge of the entire investigation of why he did that.
MR. BOWENS: Objection, calls for speculation.
Q. You can answer.
MR. BOWENS: If you can answer, answer

Page 93

it again.
A. My opinion was that he was personally invested in the investigation and wanted to break the case before anyone else did.
Q. I see.
MR. LIPSHUTZ: Mr. Bowens, it's very hard to hear your objections. So if you want them on the record, I would suggest that you speak up.
MR. BOWENS: Yes, sir, Mr. Lipshutz. Thank you.
MR. LIPSHUTZ: Just trying to be helpful.
MR. BOWENS: I know.
Q. And I know this is just an opinion, but your opinion, respectively, may be speculation, is that this was sort of an ego thing that he sort of wanted to be the one that broke the case?
MR. BOWENS: Same objection. You can answer.
MR. LIPSHUTZ: Yeah. I'm going to object to the form, but you can answer.
A. I'm not going to use the word ego. I'm just thinking he wanted to break the case before anyone else because he put a lot of work and time in it, and I think there was a little competitiveness

Page 94

may be a good word as to who was going to break the job first.
Q. And because Mr. Sabur had these reports that had not been signed off on, you it sounds like said to him at some point he has to get them approved. Is that what happened?
A. Rashid had a file that he kept on a case. He did a lot of investigative work. He re-interviewed many witnesses.
When I was preparing the case for trial, I noticed that most, if not all, of the reports weren't signed off on. Usually, they have to be reviewed by a sergeant who signs off on the report and that means it was -- whatever it means to Newark, it was entered into their log or whatever, and most of them weren't, and my feeling back then was that there was some sort of an antagonism between Sabur and my office.
And when I took over as lead prosecutor, I knew that Rashid and all the work he did was going to be important to the development of the facts of the case because he recorded people's memories going years back, and when I reviewed his work, which he shared openly, I noted -- I saw that he hadn't signed off on reports. I didn't ask him

Page 95

why he didn't sign-off -- have the reports signed off on, and I told him, before I could admit these into the record and use them in court, I wanted them to be signed off on in the proper course of business.
Q. When you say signed off on, you're talking about his direct supervisor?
A. Yes, a Newark supervisor.
Q. A Newark sergeant or a supervising --
A. I'm sorry. Yes.
Q. Okay. And the reports to which you are referencing, these are reports that were provided to you directly by Detective Sabur?
A. Not in the sense that he had handed me the reports. He supplied the reports to the office, and I had a package of discovery.
Q. I see.
So these were reports that you obtained from where?
A. They were obtained from Newark.
Q. Okay. Your office obtained them and then someone handed them to you. Is that how it happened?
A. Yes.
Q. And do you know where your office

Page 96

obtained these reports that had not been approved by Newark supervisors?
A. It would have had to come from Newark. There's a little box at the bottom of every report, and the sergeant signs, and it says approved or cleared or whatever it says, and he dates it, and then you know that that report was submitted with all of his other reports.
I'm probably the first one that noticed Rashid never had his reports signed off on.
Q. And having been a homicide detective for any number of years and worked pretty intimately with the Newark Police Department, you're used to the protocols of how reports get prepared and approved and then ultimately provided to you for use in your prosecutions, right?
A. I learned that as a prosecutor, not a detective, but, yes, I was aware of how that worked.
Q. And as a detective who is working a case in the Newark Police Department that prepares a report, is it your understanding that they submit it to a supervisor and then do you know what happens to it after it gets approved?
A. It goes into the case file. It becomes part of the case.

Q. And Newark Police Department has a case file, right?
A. Yes.
MR. LIPSHUTZ: Objection to form. Objection to form.
A. Yes, they do. They have their own file.
Q. And do you know where their case files are maintained?
I'm sorry. Let me put some foundation on this.
We're talking specifically in around 2008, 2009 right now. Did you have any understanding of where Newark Police detectives maintained police files?
A. I have no idea where they maintain their official case files.
Q. So do you have any theory about how Sabur was able to -- I don't want to say avoid, but was collecting these reports without getting them approved?
Do you know whether he was keeping the case file or whether he had a parallel file? Do you have any idea how he did that?
A. My recollection is he had his own



Redweld.
Q. He had his own Redweld, right?
A. That's what I think, yes.
Q. And did you ever have an opportunity to look at the contents of that Redweld with your own eyes?
A. Did I -- I don't think I went through his Redweld, but he gave me -- he viewed all his reports. I can't actually recall if he was pulling them out of his Redweld or I already had them. I think I already had them.
Q. Okay. But you, obviously, couldn't tell me every report that was in his Redweld, right?
A. I couldn't, because when I interviewed or talked to Sabur face-to-face, he always had a Redweld. I never went through his Redweld. I would go into the reports that I had in my hands.
Q. Right.
So you don't know that what you were being provided formally by the Newark Police Department were the same reports that were in his Redweld, right?
MR. LIPSHUTZ: Objection to form.
A. It's possible.
Q. I'm sorry. Could you repeat that



answer?
A. It's possible that I went through his Redweld. I just have no real recollection of it.
Q. Okay. And is it fair to say that you would have no idea whether or not what was in his Redweld was identical to what was in the official case file of the Newark Police Department, correct?
A. That's correct. Some people thought he had more and that he -- there was stuff he never gave anyone. I don't know if that's true or not. That was just a rumor going around.
Q. And were you -- was that rumor going around at the time?
A. It was going around at the time. People thought Sabur wasn't sharing everything he knew. I think that was part of the hostility towards Sabur between the offices.
Q. And did you ever confront -- and I don't mean that in any aggressive way, but did you ever ask Sabur whether or not he was withholding any reports from your office?
A. I don't think I phrased it that way.
Q. What did you ask him?
A. I said is this everything you have, and he said yes.



Q. Okay.
A. And my personal opinion was that he was very forthcoming and gave me all the work that he did.
Q. All right.
A. Sabur and I got along well because he respected what I did and he appreciated that.
Q. So, again, to recap, you did inquire, and he told you that he provided your office with all the reports that he had prepared. Is that right?
A. Yes. Verbally, yes.
Q. Verbally.
But you weren't able to confirm that one way or the other because you weren't able to, I assume, compare his Redweld with the formal Newark Police Department file, right?
MR. BOWENS: Objection, calls for speculation.
MR. LIPSHUTZ: Objection to form.
A. The only good thing I can say is that I never -- I don't think I ever physically looked at the Newark Police Department's file. I would never do that. I've never done that in any case.
Q. Well, how do you ensure that what has

been provided to you by the Newark Police Department is the entire case file?
A. Because that's -- I assumed that, when they do their reports, they are all turned over to our office and then I look at the reports that are given to me by my detectives.
Q. So you're relying on the Newark Police Department to provide you with the reports, and when they say these are the full panoply of reports, you rely on that representation, correct?
A. I rely on my office. I never get a representation from Newark that these are all the reports. I never rarely, if ever, speak directly to Newark homicide in terms of let me see your file.
I think I've gone there I remember once on a case in the robbery squad, but I don't think I've ever -- you know, when I get a file, I get a file. I have to assume that my detectives got me the complete file.
Q. And I'm just trying to make -- understand that. This is more a hypothetical. I'm not talking about in this case, but if a police detective prepared a report of a witness interview and put it in either his personal file or even the case file and that was never tendered over to you,



you would have no way of knowing that, right?
A. It's a fair statement.
Q. So, again, my point is you have no way of knowing one way or the other whether Sabur gave you all of the reports that he prepared. You were relying on his representation that he did it, correct?
A. I rely on his representation, and there's no way to know if someone didn't give you something that they were supposed to.
MR. BOWENS: At a convenient point, I'd like to take a couple minute break.
MS. BONJEAN: We can do that now.
(Whereupon, a recess was taken.)
MR. VOMACKA: Just for the record, it looks like George, our intern, has joined as well.
MS. BONJEAN: Hi, George. Welcome.
MR. LIPSHUTZ: I'm back as well.
Q. Mr. Guarino, what do you understand Lieutenant Carrega's role to be in the investigation that preceded the indictment of Mr. Evans and Mr. Hampton in 2010?
A. I think that at that point Carrega was probably in charge of our office's investigation as far as the detective side.



Q. Could you repeat that last part for the court reporter?
A. He was a lieutenant back then or he might have been a captain, but he was the one on the investigator side that was running the investigation.
Q. And is this --
A. I'm going to be honest with you. I never really understood why other than I think he got the tip that Philander was in jail.
Q. Right. Got it.
So I'm going to try to make this clear. Prior to the tip that Philander is in jail, was it your understanding that Carrega was involved in the investigation with Newark Police personnel and I guess some state personnel?
MR. BOWENS: Objection, calls for speculation. You can answer.
A. My opinion is he was minimally involved.
MR. LIPSHUTZ: I'm sorry. I didn't get a chance to pose my objection to the form of that prior question. I'm sorry.
Q. Your understanding that was prior to the taking of Philander Hampton's statement, Carrega



was minimally involved in the investigation of the five missing boys and presumed homicide, right?
MR. LIPSHUTZ: Objection, lacks foundation. You can answer, sir.
A. My opinion is that the prosecutor's office was not actively pursuing the case the way Rashid Sabur was, and although they did work on a case from time to time, there were many people that were involved.
Pat De Francisi was a detective that worked the job when he was in the office, and there were other people that did work. They interviewed a statement here or there. A tip would come in. They would work on it.
These things never amounted to anything, and I don't think Carrega did anything that ever amounted to anything until he got the tip that Philander was in jail, and they decided that it was a good time to see if they could talk to him.
Q. And do you remember where Sabur was during this time period when Carrega got the tip that Philander was in custody?
A. I was not actively involved in the case at that point. So I don't know where Sabur was.
Q. Okay. All right. And Sabur was still

living, though, at that time, obviously, because you presented his testimony at the grand jury, right?
A. That's correct.
Q. Do you know why Sabur was still involved in the taking of the Philander Hampton statement?
A. I can't say directly. I don't know.
Q. Did you ever ask?
It seems like a question I would have asked as a prosecutor. Maybe that's editorializing but --
MR. VOMACKA: Objection to the form, but you can answer.
A. It was talked about.
Q. What was talked about?
A. I hope that they wanted to invite Sabur to that interview.
Q. And what was your understanding of why they did not want to include the Newark's lead detective in the interview of Philander Hampton?
MR. LIPSHUTZ: Objection to form.
A. My opinion is that it goes back to another time Sabur tried to set up an interview with Philander and it didn't go very well. That's my opinion. He bungled it.



Q. So Philander was someone -- strike that.
Prior to the interview with Carrega, Philander was someone who was known to the investigators. Fair?
A. He was.
MR. LIPSHUTZ: Objection, lack of foundation. You can answer.
A. He was.
MR. VOMACKA: I'll join the objection. You can answer.
A. I answered. He was.
Q. Okay. And do you have an understanding or a recollection of when Philander Hampton came on the scene as someone who was a potential suspect in the case or at least someone with firsthand knowledge about the underlying events?
MR. LIPSHUTZ: Objection to form.
A. I think the two people that were known for a long time or felt had information were Philander Hampton and Michael Olds. I think it was Michael Olds was his name.
Q. Maurice. Maurice.
A. And that was basically from the very beginning. They wanted to talk to those people, but



they never could. I think Philander actually took a polygraph way back when and passed it.
Q. And who -- who was -- is that when Sabur was involved in the case when -- do you know --
A. I think that was before Sabur's time. That was in the '70s.
Q. So, again, as the lead prosecutor on the case -- and we keep getting foundation objections. So I want to make this clear.
You were the lead prosecutor on the case, right?
A. I was.
Q. And while I know you didn't investigate the case yourself in the '70s, the '80s or really at any time, you were intimately familiar with the investigative material that was prepared that memorialized the investigation once you were preparing to indict the case. Is that fair?
MR. BOWENS: Objection, compound question, assumes facts not in Evidence, calls for speculation. You can answer.
MR. VOMACKA: I couldn't hear the objection, but I'll also object.
A. What's not fair to say is that I was



the lead prosecutor and did not participate in the investigation. I did participate in the investigation once I became the lead prosecutor.
I interviewed witnesses in the field. I inspected locations in the field and -- and worked the job as I would any other case that I was assigned to.
Q. Okay. So --
A. If it happened, it would have never happened but for my involvement.
Q. Okay. So I thank you for that clarification.
I'm partially trying to get the timing correct on this, but you were intimately familiar with the case once you became the lead prosecutor because you worked the case yourself, right?
A. Correct.
Q. And that included field investigations, correct?
A. Correct.
Q. You interviewed witnesses. Is that correct?
A. Correct.
Q. Presumably, you became familiar with the reports that had already been prepared in

connection with the case, right?
A. Correct.
Q. Would it be fair to say that you tried to gather as much information as you could about the case once you knew that you were going to be the lead prosecutor and working the case?
A. Correct.
Q. Including developing information that had not even previously been developed, right?
A. Correct.
Q. Okay. So when I'm asking these questions of you, I'm assuming -- and, again, I know it's many years ago, but you are relying on your own personal knowledge about this investigation having been the lead prosecutor. Is that right?
MR. BOWENS: Objection, mischaracterizing the witnesses testimony. You can answer it.
MR. LIPSHUTZ: Objection to form.
A. I think that was a fair statement. Yes.
Q. All right. So tell me what was your understanding of how Sabur had fumbled the interview with Philander Hampton?
A. I believe that there was a point in



time that Philander wanted to cooperate and that they were -- it was Philander, not my call, Philander, and that they were going to make a phone call to Lee Evans and record it, and they just missed the mark by a mile.
They just fumbled it, and, in my opinion, from then on, Lee Evans was always on the defensive with anything that had to with Philander.
Q. Do you know how they missed the mark and can you elaborate more on that?
A. Because the way I recall it -- and it's in the reports somewhere. He didn't call anyone. He didn't tell anyone. He didn't try to -- he didn't ask our office for help. He did it all on his own, and he just fumbled it.
It could have gone better if someone who knew what they were doing handled the call, but it ended up that the call actually -- I don't think they ever connected with Lee because of the way it was handled. The whole thing was a disaster. It was just done badly.
Q. Would you agree you were unable to use any evidence from that call to make your case against Lee Evans?
MR. BOWENS: Objection,



mischaracterizes the witness's testimony. You can answer.
A. It might have been used, but it wasn't -- it didn't help. It might have even gave up.
Lee Evans -- if you want to talk specifically about, you know, what we used, Lee Evans agreed to everything. When I submitted my list of evidence and exhibits, he agreed to everything, and most of it all came in, and, unfortunately, one particular piece didn't, but I think everything was talked about in the trial.
There's very little we didn't talk about. My recollection is Lee made a point that, you know, we did that and nothing came of it. That was like one of his points. Not a bad point either.
Q. I guess my question was a little different, though, that focusing specifically on this attempt to have Philander Hampton call Lee Evans, was this going to be a surreptitiously recorded phone call? Was that the idea?
A. Yes.
Q. And I thought I heard two different things. Did it actually occur and it was unsuccessful or that it just never happened?



A. As I recall, and I hope I'm not conflating two different incidents, but Philander had spoken to Evans and then was going to call him back.
So there was no recording of the first conversation that Evans wanted to talk to Philander, and then when they tried to talk up the second call, it just fell apart.
Q. Got it.
A. I think when the detectives on our side reviewed that piece of work, they lost confidence in Sabur, and that's just my opinion. They all may feel differently.
Q. Sure.
And to put a finer point on it, the purpose of the phone call was to hopefully get Lee Evans to make some admissions I assume, right?
A. Yes.
Q. And when this phone call eventually was recorded for whatever reasons, Lee Evans didn't make the admissions that the team had hoped he would make. Is that right?
A. I don't know that he even -- that the phone call -- the actual phone call that they were going to record -- I don't know if Evans was even

there or it could have been a meeting. I'm not sure, but whatever it was, that took place, and it was handled badly by Sabur.
Q. All right. Now, I want to -- as you sit here today, are you familiar with the investigative actions that your office or Lieutenant Carrega took in connection with this case prior to the Philander Hampton meeting?
MR. BOWENS: Objection. You can answer.
A. I don't have any recollection that anything significant happened prior to the Philander statement by Carrega.
He might have done things here and there, but in my opinion, nothing was significant until that meeting.
Q. All right. So in your mind, Philander Hampton had been taken into custody, and then being brought over to the Essex County Prosecutor's Office for the interview was the big break. Would that be fair to say?
A. I would say that was the break.
Q. And prior to that, your office did not indict Mr. Evans or Mr. Hampton for any crimes, right?



A. No. They were never charged.
Q. Prior to the Philander Hampton statement, to the best of your knowledge, there was no evidence that would -- strike that.
Let me start over. I want to make sure I get the question accurate.
Prior to the Philander Hampton statement, the Essex County Prosecutor's Office did not pursue charges against Mr. Evans, right?
A. True. Yes.
Q. And the Essex County Prosecutor's Office certainly was aware of and involved in the investigation up until the point of -- to some degree, more or less, I don't know how much, but until the Philander Hampton statement was taken, correct?
A. Yes. I think they were always involved.
Q. And would you agree that your office would not have sought an indictment if it did not believe that it had at least probable cause to charge, correct?
A. That's true.
Q. And, in fact, your office would be at least ethically -- ethically bound to seek an



indictment only with evidence that reached the probable cause standard, right?
A. That is true.
Q. And, in fact, would you agree that -- would you have indicted the case if you had anything less than evidence that you thought could prove him guilty beyond a reasonable doubt?
A. No.
Q. So was it via the practice of the office that you would seek an indictment if you thought you could sustain the ultimate charge beyond a reasonable doubt? Is that right?
A. Yes.
Q. All right. Now, I'd like to talk about what you understand the circumstances were of how Lieutenant Carrega came to interview Philander Hampton. Let me get the dates. Okay.
So if you want to see the report, I can show you a report, or if you want to take my word for it that it was November 12th of 2008 that Ms. Hanna Carrega had Philander Hampton brought over to the Essex County Prosecutor's Office. Does that sound right?
THE WITNESS: I can take her word for it?



MR. BOWENS: Well, do you have any recollection at the time?
Q. Do you have any reason to quarrel with November 12th of 2008?
MR. BOWENS: Well, objection, asked and answered.
Q. Do you have any quarrel with that date?
A. My question is really to my counsel. If you are representing that that's the date on the report, I wouldn't challenge it.
Q. Okay. You could look at any bit of testimony that you elicited yourself if you really wanted to confirm that. I'm trying to save you time. If you want to fight me on a date --
A. That's my point. I'm not fighting you. If you're reading the date and that's it, then I agree with you.
Q. You know 2008 sounds right at least, right?
A. I think that was around when he got -- yes.
Q. And let's -- why don't we -- actually, why don't we mark it as an exhibit. I'm going to mark as -- I guess we'll call it Guarino-1. Let's mark Carrega's affidavit please?

(Exhibit Guarino-1, Carrega affidavit, is marked for Identification.)
Q. Mr. Guarino, I'm going to have you look at this document. If you could just take a look, tell me if you can see it, first of all?
A. Yes.
Q. Okay. And do you recognize it?
A. Yes.
Q. And what do you recognize it to be?
A. It's the affidavit in support of arrest warrants.
Q. And do you know who executed this affidavit?
A. I think it was executed by Louis Carrega. It was either written by me or Cheryl Cucinello.
Q. Okay. And is that common practice in your office to draft the affidavit in support of arrest warrants so that the detective can swear to it?
A. The way I did it.
Q. And why did you do it that way as opposed to say just having Carrega draft it himself?
A. Because in my opinion, it's a legal document, and it should be drafted the way I want it



and the way I intend to pursue the case.
Q. And how did you get the information that was included in this affidavit?
A. I gleaned it from the file, from the reports and from speaking to the detective.
Q. And it's Carrega signing off on it. Obviously, he has to agree with the truth and voracity of its contents, right?
A. Right. For example, I wouldn't know things that he's a member of the office since 1985. That's one of the things I would ask him personally so I would be able to put that in my affidavit.
Q. So you would interview the detectives and prepare this based on information from the detective and then he would swear to it or make any corrections first and then swear to it. Is that how basically the process works?
A. Yes, exactly.
Q. All right. And I'm going to have you look at the second page, paragraph 11, if you would. If you could read that to yourself? Just read the first sentence.
Do you see that?
A. Yes, I see the date.
Q. Okay. So I don't know if it was



November 12 or November 13. I've seen two different things.
But would you agree, at least according to this affidavit, that you apparently drafted but was signed by Louis Carrega that Philander Hampton was interviewed by Carrega on or about November 13, 2008?
A. Yes.
Q. Does that sound right?
A. That sounds right.
MS. BONJEAN: Okay. You can take that down for now.
Q. When did you first learn that Lieutenant Carrega had Philander Hampton in custody and available for interview?
A. After the fact. When it was happening, I didn't know about it.
Q. Do you know if any prosecutor knew about it?
A. I can only speculate.
MR. BOWENS: Don't speculate.
Q. Well --
A. That would be a pure speculation because I don't recall ever talking to him.
Q. You did not know that Philander Hampton



had been interviewed until after the fact. Is that right?
A. Right.
Q. Do you have any knowledge how Lieutenant Carrega would have been able to get Mr. Hampton over to the Essex Count Prosecutor's, move him from wherever he was being detained for the purpose of an interview?
A. My understanding was that someone called Carrega, advised him that Philander was in custody on some other charge, and he had been in the wind for quite a long time, and then he decided to interview him and that they brought him over and that Philander was very cooperative with that. Well, he denied everything at the time, but he was cooperative.
Q. My question is different in terms of the authority of Lieutenant Carrega to move a person who is being held in custody by a different agency for an interview. Do you know how that happened?
MR. VOMACKA: Objection to the form, but you can answer.
A. I don't know what steps Carrega has to do to do that.
Q. Would you agree that you just can't

Page 121

move bodies as a law enforcement officer because you want to interview somebody?
MR. VOMACKA: Same objection. You can answer.
MR. BOWENS: You can answer.
A. I don't know that I would agree with that statement.
Q. Okay. Well, do you recall what Mr. Hampton was being detained for at the time that he was brought into custody?
A. I just remember that it had nothing to do with this case.
Q. Right.
And do you remember that it was a traffic warrant?
A. I don't specifically recall.
Q. And at the time that Philander Hampton was brought over to the Essex County Prosecutor's Office for an interview, did you have an understanding of what his role may have been in the missing boys case?
A. At that point in time, no.
Q. Did you know his name?
A. No.
Q. You didn't have any idea who the guy

Page 122

was. Is that right?
A. No, because at that time, I had not reviewed any reports. I wasn't involved in the case.
Q. Your knowledge of the case was a more generalized knowledge. You didn't know the evidence in any specificity, right?
A. No. I did not know all that.
Q. And did you later learn whether or not Carrega and the other detective -- Philander -- let me start over. Strike that.
Did you ever speak to Carrega about what he understood Hampton's role to be when he was brought over to the Essex County Prosecutor's Office for an interview?
A. Yes.
Q. And what did Carrega tell you?
A. That he was Lee Evans' cousin and that they were very tight, him, Michael and Lee Evans, and that he possibly had knowledge of what happened.
Q. Okay. Did Carrega indicate that he thought Hampton might have been involved in the case?
A. I don't think up to that point in time that anyone thought that Philander Hampton was a

Page 123

direct participant. They just thought he was someone that knew Lee, that Lee might have confided in him and that he was a person that might know what happened because they suspected the same about Mike Olds, and Mike Olds wanted to talk to the prosecutors.
And when they went to talk to him, Mike Olds -- Maurice Olds' mother kicked everybody out off her property, and Olds died shortly thereafter, and I think, from all that, they surmised that they did know about what happened and wanted to talk about it but not that either one -- they didn't know that either one of those two were particularly involved. Just they were people that might know what happened.
MR. LIPSHUTZ: Excuse me for interrupting. I'm hoping we can stop at 1:40. I've got to get something to eat and get ready for my 2 o'clock, and it doesn't look like I'm going to get a chance to ask questions. So it doesn't look like there's a rush.
MS. BONJEAN: Yeah.
Q. Mr. Guarino, I apologize, but given the fact that -- a couple things. One, we got a late start. It looks like we need to stop a little

Page 124

early. Plus, we spent a little more time which sometimes happens and is unpredictable, and despite my best efforts, we're going to need to continue this.
I hope you don't have too much of an objection to that because I'm sure there will be other attorneys who would like to ask you questions as well.
A. No worries. It's fine with me.
Q. We certainly will accommodate your schedule, and it would be again --
A. I have no set schedule.
MS. BONJEAN: Okay. So, Gary, I'm okay stopping now if you want.
MR. LIPSHUTZ: I didn't want to interrupt. I just wanted a hard stop time.
MS. BONJEAN: No. That's fine if Mr. Bowens is okay with it and the deponent is okay with it.
MR. BOWENS: I'm fine with it.
MS. BONJEAN: All right. It's really up to you. It's just a matter of 10 minutes.
MR. LIPSHUTZ: Okay. So let's bring him back.
MS. BONJEAN: Yeah, and, Mr. Guarino,

if you can just confirm with your counsel, and Mr. Bowens will let us know your availability so we can wrap this up.

I don't expect more than a couple hours, but I think that would be fair to say.

THE WITNESS: I'm going away on the 16th of August. So any time before then is fine.

MS. BONJEAN: That's fine. If you could let Mr. Bowens know, we will take it from there.

THE WITNESS: Okay. Thank you.

MS. BONJEAN: Thank you for your time, sir.

(Deposition concludes at 1:41 p.m.)



CERTIFICATE OF OFFICER

I CERTIFY that the foregoing is a true and accurate transcript of the testimony and proceedings as reported stenographically by me at the time, place and on the date as hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney or counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

DIANE M. HOLMES, C.C.R.
Certificate No. XI01660

## $

**$200 (2)**
36:1,24
**$25,000 (1)**
22:4
**$250 (5)**
30:24;31:3,14;32:1;34:14

## A

**Abidijal (4)**
75:15,16,17;76:6
**A-B-I-D-I-J-A-L (1)**
75:16
**ability (2)**
8:11;85:11
**able (10)**
12:21;36:22;66:11;75:5;82:21;97:19;100:14,15;118:12;120:5
**accept (1)**
28:5
**acceptable (1)**
6:18
**accommodate (1)**
124:10
**accomplished (1)**
91:12
**accordance (1)**
32:25
**according (1)**
119:3
**accumulated (1)**
56:23
**accurate (1)**
114:6
**accused (2)**
47:5;61:13
**accused's (1)**
44:15
**A-C-K-A (1)**
5:7
**Acosta (3)**
9:11,14;28:21
**A-C-O-S-T-A (1)**
9:15
**acquit (1)**
57:14
**acquittals (1)**
57:12
**acquitted (1)**
38:25
**actions (1)**
113:6
**active (3)**
69:8;73:5;74:4
**actively (10)**
69:19;70:6,15,24;74:8;76:15;84:1;85:17;104:6,23
**actual (1)**
112:24
**actually (15)**
22:15;23:11;27:11;29:2;40:11;45:19;69:4;72:12;84:6;90:2;98:9;107:1;110:18;111:24;116:22
**additional (3)**
27:25;28:16;69:3
**A-D-D-O (1)**
5:11
**address (3)**
4:1;8:20;10:9
**adjourned (1)**
82:21
**Adjusters (1)**
29:14
**admissions (2)**
112:17,21
**admit (1)**
95:2
**adult (4)**
18:14,16,21;49:6
**advanced (2)**
18:12;40:4
**advised (1)**
120:10
**affidavit (8)**
116:25;117:1,10,13,18;118:3,12;119:4
**A-F-F-U-M (1)**
5:11
**Affum-Addo (1)**
5:10
**afraid (3)**
36:7,16;73:15
**again (17)**
4:14;13:15;31:20;33:18;34:20;38:6;44:9;67:3;69:2;74:25;77:22;93:1;100:8;102:3;107:8;109:12;124:11
**against (13)**
7:7;30:4;32:13;33:24;38:4;40:5,15,23;45:13;54:18;59:7;110:24;114:9
**aged (1)**
8:14
**agencies (5)**
81:1,22;86:5;88:13;90:1
**agency (6)**
78:10;86:7,8,10,11;120:19
**agency's (1)**
89:6
**aggressive (1)**
99:19
**ago (1)**
109:13
**agree (13)**
63:20;71:13;77:24;87:9;91:20;110:22;114:19;115:4;116:17;118:7;119:3;120:25;121:6
**agreed (4)**
48:14;76:8;111:8,9
**agreement (2)**
28:2,2
**ahead (3)**
45:16;58:12;71:24
**allegations (4)**
7:5;33:14;60:16,19
**allege (1)**
61:5
**Allen (2)**
64:13,15
**Allison (8)**
64:20,21,23;65:22;66:2,4;68:3,6
**allowed (2)**
28:5;63:1
**along (1)**
100:6
**alternate (1)**
54:22
**alternative (1)**
54:16
**Although (5)**
7:2;8:20;41:2;84:21;104:7
**always (13)**
50:14;51:23;54:21;66:9;67:15;72:3;76:19;84:11;89:12,15;98:15;110:7;114:17
**amount (1)**
28:23
**amounted (2)**
104:15,17
**answered (2)**
106:12;116:6
**antagonism (1)**
94:17
**anymore (2)**
29:2;50:18
**Apart (11)**
9:16;11:2;13:15;34:3;35:19,25;38:13,14;53:19;57:12;112:8
**apologize (4)**
31:8;82:9,18;123:23
**apology (3)**
33:11,12;35:16
**apparently (2)**
73:11;119:4
**appeal (3)**
31:20;60:24;61:5
**appearance (1)**
9:6
**appearances (1)**
4:22
**appeared (1)**
90:21
**appellate (5)**
34:22;60:2,3,13,20
**application (2)**
52:24,25
**apply (1)**
27:18
**appointment (1)**
31:14
**appreciate (3)**
24:3;48:19,22
**appreciated (1)**
100:7
**approval (2)**
49:19;51:7
**approvals (2)**
47:22;49:3
**approved (9)**
49:6;50:11;91:23;94:6;96:1,5,15,23;97:21
**approximate (2)**
8:14;20:15
**approximately (3)**
71:16;75:25;84:4
**approximating (1)**
8:15
**arbitration (1)**
9:5
**argued (1)**
60:25
**arguing (1)**
56:10
**argument (3)**
21:12,13,14
**Army (6)**
14:23,25;15:17,20,24;55:19
**around (19)**
13:2;17:25;20:15,15;43:23;44:2,3,4;46:13;50:22;62:17;71:10;76:5;85:24;97:12;99:11,13,14;116:20
**arrangement (1)**
6:3
**arrest (2)**
117:10,19
**Arts (1)**
16:10
**Ashley (1)**
4:15
**assault (1)**
54:18
**asshole (2)**
56:6,8
**assigned (9)**
45:23;49:15;62:24;69:4;73:1;76:22,24;82:5;108:7
**assignment (3)**
15:8;23:5;30:17
**assist (1)**
85:7
**assistant (1)**
5:19
**assisted (1)**
81:21
**associate (1)**
4:15
**Association (1)**
31:5
**assume (6)**
8:6;45:23;87:8;100:16;101:18;112:17
**assumed (1)**
101:3
**assumes (1)**
107:21
**assuming (4)**
40:8;42:7;92:19;109:12
**attempt (1)**
111:19
**attend (2)**
16:1,24
**attention (1)**
61:18
**attorney (26)**
4:19;5:3,8;11:1,3,22;12:6;19:3,12;22:1,25:24;30:2;31:16,23,25;35:6;36:16,20;37:19;44:7,10;50:13;52:1;55:15;77:5;82:12
**attorneys (4)**
10:14;44:15;63:1;124:7
**August (1)**
125:7
**authority (3)**
81:3;82:1;120:18
**availability (1)**
125:2
**available (4)**
66:17,17;68:5;119:15
**Avenue (1)**
67:23
**avoid (1)**
97:19
**aware (19)**
35:22;61:5,8,20,24;64:13,22;69:18;70:12;73:4;74:4,8;76:12,14;84:14,17,20;96:18;114:12
**away (1)**
125:6

## B

**Bachelor (1)**
16:10
**back (61)**
22:3,5;23:1,2,13;24:6;25:16;26:1;27:3,4,13,19;28:4,7,8;29:10;30:12;31:19,21;33:6,14;36:20;38:10;43:14;48:22;50:11;62:25;63:8,11,21,23;64:9;65:1,18;67:4,14;69:11,13,17,23;70:1,14,16;71:19;72:25;77:22;78:11;80:9,12;82:17;83:14;84:14,18;94:16,23;102:18;103:3;105:22;107:2;112:4;124:24
**bad (4)**
41:2;62:2;73:21;111:16
**badly (2)**
110:21;113:3
**bail (1)**
43:12
**Bar (5)**
31:4;35:7;39:9,11,20
**based (5)**
38:2;42:12;80:9;92:19;118:14
**Basically (4)**
33:9;74:23;106:24;118:17
**basis (5)**
30:7;31:12;67:12;92:1,7
**Bayonne (2)**
15:6,8
**beat (1)**
58:3
**became (17)**
28:20;61:23;70:23;71:6,20;74:8;75:22,23;76:1,14;77:4;84:17;85:7,25;108:3,15,24
**Beck (2)**
29:13,16
**become (6)**
61:20;71:7;72:22;73:4;74:3;76:11
**becomes (2)**
72:18;96:24
**becoming (4)**
74:23;76:1;81:18;85:17
**began (1)**
9:22
**begin (1)**
36:24
**beginning (1)**
106:25
**behalf (3)**
4:25;5:4,7
**belief (3)**
68:19;70:21;80:19
**belonged (1)**
25:5
**Ben (3)**
34:24,25;35:1
**bench (2)**
37:4,4
**benefit (2)**
4:14;90:16
**Bergen (2)**
23:15;27:12
**Besides (1)**
54:13
**best (20)**
6:8,15;7:20,24;8:11;21:16;33:2;38:2;61:11;70:18;73:16;74:12;80:5;81:19;83:18;85:10,20;86:9;114:3;124:3
**better (3)**
45:12;80:20;110:16
**beyond (2)**
115:7,11
**big (2)**
20:23;113:20
**bit (1)**
116:11
**black (4)**
73:11;74:25;75:7,10
**board (4)**
32:4,13,22;33:2
**bodies (3)**
65:14;66:6;121:1
**body (2)**
71:25;72:23
**BONJEAN (21)**
4:6,8,13,19,21;10:20;57:8;73:9,13;75:4;82:19;102:13,17;119:11;123:22;124:13,17,21,25;125:8,12
**B-O-N-J-E-A-N (2)**
4:8,14
**Booker (1)**
5:22
**both (1)**
53:7
**bottom (1)**
96:4
**Bound (2)**
16:17;114:25
**BOWENS (36)**
4:24,24;10:15,18,20,22;11:3,5,18;73:10,22;75:6,11;89:21;92:10,22,25;93:6,9,13,18;100:18;102:11;103:17;107:20;109:16;110:25;113:9;116:1,5;119:21;121:5;124:18,20;125:2,9
**box (1)**
96:4
**boxes (1)**
50:7
**boys (18)**
61:20;64:10;66:15;67:3;68:13,20;69:19;70:25;71:5;73:5;74:4;76:15;78:18;83:19;84:10;86:17;104:2;121:21
**brackets (1)**
18:3
**Brada (10)**
39:24;40:1,16;43:7;53:19;54:2;56:10,11;57:13;60:22
**Brada's (2)**
40:20;41:19
**Brady (1)**
61:14
**braids (2)**
59:20,21
**brain (1)**
22:17
**break (9)**
57:4,5,9;93:3,23;94:1;102:12;113:20,22
**breaking (1)**
90:14
**breezy (1)**
73:22
**Brick (1)**
23:19
**brief (2)**
29:10,10
**briefly (1)**
82:11
**briefs (1)**
60:20
**bring (2)**
13:25;124:23
**broad (1)**
61:10
**broke (2)**
55:7;93:17
**bronchiectasis (2)**
29:3,6
**Brook (1)**
16:18
**brother (9)**
22:16,16,22,25;23:1,10;24:2,9;64:4
**brother's (2)**
23:18,22
**brought (13)**
7:6;28:1;40:22;43:20,22,23;44:16;113:19;115:21;120:13;121:10,18;122:14
**buck (3)**
86:14,18,21
**bungled (1)**
105:25
**burden (3)**
43:2;44:24;45:22
**business (2)**
63:2;95:5

## C

**call (30)**
5:12;18:19;23:4,6,8;42:6;47:21;51:21;53:22;56:7;75:19;76:22,23;82:12,16;110:2,4,12,17,18,23;111:19,21;112:3,7,16,19,24,24;116:24
**called (12)**
11:25;21:6;25:5;26:1;29:13,13;36:8;37:4;45:10;57:25;72:20;120:10
**calling (1)**
56:5
**calls (7)**
42:4;87:13;89:21;92:22;100:18;103:17;107:21
**came (14)**
23:1,1,20;36:11;38:10;45:10;54:23;68:7;69:17;70:14;106:14;111:10,15;115:16
**Campolo (1)**
27:22
**Can (66)**
5:15;6:16;9:12;11:21;12:20,21;14:2,7;17:9;29:4;34:20;38:2,18;39:25;41:12;44:11;45:3,5;46:11;57:4,9;61:16,18;73:24,25;75:2,8;78:20;82:17,17;87:14,15;88:18,19,20;89:10,22;92:6,24,25;93:18,21;100:21;102:13;103:18;104:4;105:13;106:8,11;107:22;109:17;110:10;111:1;113:9;115:18,24;117:5,19;119:11,20;120:22;121:3,5;123:17;125:1,2
**capacity (2)**
13:21;81:11
**captain (1)**
103:4
**car (1)**
59:19
**card (3)**
11:9,11;31:22
**care (2)**
23:16;24:21
**career (4)**
35:21,24;37:17,25
**Carrega (29)**
7:8;79:23;83:1,3;102:23;103:14,25;104:16,21;106:3;113:7,13;115:16,21;117:1,15,23;118:6;119:5,6,14;120:5,10,18,23;122:10,12,17,21
**Carrega's (2)**
102:20;116:25
**Carthy (1)**
5:22
**case (200)**
8:13;12:11;23:7,13,15,17;24:20;30:12,18,19,22;33:19;36:8,8,10,16;37:2,3;38:14,18;39:2;40:10,20;41:3,4,15,16,21,23;42:1,19;43:5;44:1,2,17;45:8,12,18,19,22;46:24;47:7,13,17,20;48:2,8;49:3,5,16,17,25;50:1,6,15;51:7,11,14;52:22;53:20;54:2,14;55:8,18;56:10;57:13;58:18,19,23;59:3,6,7,9,10,13,17,18,23;60:15,22;61:20;62:16,17,20,23;63:3,14,21;64:3,11;65:4,5,13,16,25;66:3,8,10,18,23,24,25;67:1,3;68:14,19;69:3,6,19,24;70:15,18;71:8,12;72:2,10,13,15,17,21,21,22;73:5;74:4,16,20;75:14,14,20,22;76:3,15,22,25,25;77:4,5,8,21;80:12;81:1,19;83:11,14,21;84:1,10;85:2,8,8,25;86:4;90:2,4,5;91:22;92:18;93:4,17,23;94:8,10,22;96:20,24,25;97:1,8,17,23;99:7;100:24;101:2,16,22,25;104:6,8,23;

106:16;107:4,9,12,15,19;108:6,15,16;109:1,5,6;110:23;113:7;115:5;118:1;121:12,21;122:4,5,23
**cases (28)**
18:14,16;20:23;25:14,16;26:22,25;27:6;28:3;49:18;53:22,23;54:9,18;57:15;58:5,24;59:1;61:8;64:1,1,18,19;66:25;67:15;68:15;72:20,20
**cause (2)**
114:21;115:2
**cell (2)**
42:4,8
**certain (2)**
42:4;47:22
**certainly (2)**
114:12;124:10
**chain (1)**
51:10
**chair (1)**
74:20
**chairing (1)**
76:2
**challenge (1)**
116:10
**chance (3)**
55:10;103:22;123:20
**characterize (1)**
81:24
**charge (11)**
56:12,14;61:2;72:1;76:17,20,25;102:24;114:22;115:11;120:11
**charged (4)**
42:23;44:22;61:3;114:1
**charges (5)**
40:15;45:13;54:10,24;114:9
**check (1)**
77:16
**checked (1)**
50:8
**chemo (1)**
29:6
**Cheryl (6)**
74:18;75:15,20;77:4;85:7;117:15
**chief (1)**
5:23
**Chris (1)**
4:18
**Christmas (3)**
21:2,5,7
**circumstances (4)**
24:16;48:16;72:14;115:15
**cite (1)**
69:22
**City (3)**
5:20,21;7:7
**civil (8)**
7:6,17;9:8;19:10;20:8;40:22;41:3;44:16
**claim (1)**
61:9
**clarification (1)**
108:12
**clarity (1)**
68:1
**clear (8)**
14:13;30:25;50:19;71:11;75:1;88:22;103:12;107:10
**cleared (1)**
96:6
**clerk (2)**
17:7,17
**clerkship (1)**
17:20
**client (2)**
4:25;38:3
**close (1)**
9:6
**co-defendant (1)**
59:4
**co-defendants (1)**
59:2
**Cody (2)**
23:6,9
**Cohen (9)**
4:15;31:6;32:14,17;33:7;34:21,21,25;35:1
**C-O-H-E-N (1)**
4:16
**cold (2)**
83:11,14
**colleague (2)**
4:15,18
**colleagues (1)**
67:11
**collecting (2)**
23:2;97:20
**college (8)**
14:18;15:25;16:3,3,4,14;62:14,15
**coming (3)**
64:9;65:18;67:3
**commence (1)**
9:25
**commission (2)**
30:2;31:1
**committee (1)**
31:5
**common (1)**
117:17
**comp (2)**
26:7,15
**company (1)**
29:12
**compare (1)**
100:16
**compared (1)**
80:4
**compensation (3)**
19:10;25:16;29:12
**competing (1)**
26:23
**competitiveness (1)**
93:25
**complaint (16)**
7:6,17;30:4,8;31:1,9;32:3,12,21;33:24;34:12,17;35:10;38:4;40:5;61:12
**complaints (1)**
35:19
**complete (5)**
7:12;8:10;33:5;41:12;101:19
**completed (1)**
16:22
**comply (1)**
27:8
**compound (2)**
89:7;107:20
**computer (2)**
6:7;11:23
**concealing (1)**
61:13
**concerned (1)**
51:20
**concluded (1)**
42:25
**concludes (1)**
125:14
**conduct (4)**
19:6;32:25;33:25;34:18
**conducted (2)**
42:24;77:23
**conducting (3)**
78:17;87:4;88:12
**confession (2)**
84:6;85:15
**confided (1)**
123:2
**confidence (1)**
112:11
**confirm (3)**
100:14;116:13;125:1
**conflating (2)**
32:6;112:2
**confront (2)**
21:8;99:18
**confusing (1)**
53:10
**connected (1)**
110:19
**connection (12)**
11:15;12:4;33:16,25;34:16;37:18,24;38:11;41:6;90:5;109:1;113:7
**considered (1)**
72:12
**consistently (1)**
13:12
**consulted (1)**
64:19
**contact (1)**
67:6
**contacts (1)**
27:18
**contained (1)**
7:5
**contemptuous (1)**
32:16
**contents (2)**
98:5;118:8
**continue (1)**
124:3
**continuing (1)**
75:13
**contradictory (1)**
53:9
**convenient (1)**
102:11
**conversation (4)**
7:21;91:17;92:16;112:6
**conversations (3)**
11:1,2;51:18
**conveyed (1)**
66:3
**convicted (1)**
38:24
**conviction (2)**
42:14;60:2
**Coolbaugh (1)**
4:17
**cooperate (1)**
110:1
**cooperating (2)**
59:2,3
**cooperative (2)**
120:14,16
**cops (3)**
67:23,24,25
**cop's (1)**
55:7
**copy (10)**
35:9,13,15;52:9,11,12,13;53:8,11,14
**Cormick (4)**
18:25;19:5,15,24
**corporation (1)**
5:19
**corrections (1)**
118:16
**correctly (1)**
62:12
**Cory (1)**
5:22
**Costello (8)**
30:3,15;32:20;33:11,23;34:9;35:11,25
**coughing (1)**
29:8
**counsel (11)**
4:19;5:20;8:25;9:16;13:16,23;28:21;60:20;61:13;116:8;125:1
**Count (1)**
120:6
**country (2)**
30:13;31:19
**County (50)**
17:21,23;18:3,9;19:20;27:14;28:6;29:22;30:16;31:4;35:4,7;37:21;41:9;43:21;44:19;45:24;46:3;53:6,24;55:21;56:1,18,22;61:22;65:19;67:7;69:14,17;70:2,13,17,23;71:4;72:8;79:15;80:3;81:25;83:7;86:21;87:6,11;89:2,3;113:19;114:8,11;115:22;121:18;122:14
**couple (4)**
64:18;102:12;123:24;125:4
**course (16)**
6:10;7:1;24:18;27:20;35:20,24;53:8;56:13;66:22;77:22;81:1;86:8;87:19;91:11,14;95:4
**court (31)**
4:14;6:12;9:12;10:3;17:11,12;18:11,15,17,21;23:11,14;30:16;31:17;32:16;39:6,7,8,14,17;40:24;43:21;50:12;52:10,24;54:23;58:5;59:20;73:25;95:3;103:2
**Courthouse (2)**
35:4,5
**cousin (3)**
22:25;67:22;122:18
**cover (1)**
11:24
**COVID (1)**
9:21
**Crater (2)**
66:24;67:1
**credible (1)**
45:15

**crime (2)**
43:10;44:23
**crimes (1)**
113:24
**criminal (11)**
11:15;17:12;19:10;25:15;26:6,10,13;28:25;30:12;33:25;40:15
**criminally (1)**
27:12
**Critchley (3)**
44:8,10,14
**C-R-I-T-C-H-L-E-Y (1)**
44:12
**Cucinello (2)**
74:19;117:16
**currently (4)**
8:23,24;13:3;82:16
**custody (9)**
43:8,14;48:18;104:22;113:18;119:14;120:11,19;121:10
**cut (1)**
27:23

## D

**daily (1)**
23:8
**Darnell (3)**
5:23,25;79:11
**date (8)**
12:19;24:19;77:19;116:7,9,14,16;118:24
**dates (3)**
8:16;96:6;115:17
**David (1)**
25:5
**day (3)**
21:6;22:18;23:8
**De (1)**
104:10
**dead (1)**
23:1
**deal (1)**
45:12
**decided (8)**
27:3;29:1;42:13;49:2;54:20;55:18;104:18;120:12
**decision (3)**
31:17;49:4;86:22
**declined (1)**
31:25
**dedicated (1)**
35:7
**Defendant (11)**
5:7;30:10;31:18;42:5,7;45:13;47:5;48:17;54:19;55:15,16
**defendants (2)**
7:9;60:20
**defended (1)**
27:12
**defender (2)**
58:13,14
**Defense (8)**
13:23;19:12;26:10,13;31:16;50:13;52:13;60:25
**defensive (1)**
110:8
**definitely (1)**
45:3
**degree (2)**
16:9;114:14
**denied (1)**
120:15
**dep (1)**
12:13
**Department (14)**
42:20;65:21;70:20;80:5;83:14;87:22;96:13,20;97:1;98:21;99:7;100:17;101:1,8
**departments (3)**
68:16;88:4;89:19
**department's (2)**
88:8;100:23
**deponent (1)**
124:18
**deported (1)**
30:11
**deposition (10)**
4:12,18;6:21;9:25;10:12,17;11:4;12:4;82:14;125:14
**Depositions (1)**
9:5
**designated (2)**
72:11;77:5
**despite (1)**
124:2
**detail (1)**
63:8
**detained (2)**
120:7;121:9
**Detective (25)**
5:22;7:8;46:16,19,23;63:17,18,21,24;78:15;79:6;80:20;87:4;95:13;96:11,18,19;101:23;102:25;104:10;105:20;117:19;118:5,15;122:10
**detectives (20)**
63:4;67:17;70:13,14;76:23;77:1;78:15,24;80:4;82:2,6,7;83:21;87:9;89:23;97:14;101:6,18;112:10;118:13
**determines (1)**
49:15
**develop (1)**
72:16
**developed (4)**
69:5;74:9;80:8;109:9
**developing (2)**
78:5;109:8
**development (1)**
94:21
**DI (3)**
5:2,3;82:12
**dictate (1)**
86:11
**died (5)**
23:10;43:17;68:21,23;123:9
**difference (2)**
41:17;90:7
**different (11)**
24:25;30:22;32:18;58:20;86:4;111:18,23;112:2;119:1;120:17,19
**differently (1)**
112:13
**difficult (2)**
6:5;24:3
**dimples (2)**
37:8,8
**Dios (1)**
17:8
**D-I-O-S (1)**
17:10
**DIRECT (5)**
4:6;63:13;83:16;95:7;123:1
**direction (1)**
13:25
**directly (6)**
31:2;84:25;87:11;95:13;101:13;105:7
**director (9)**
5:21;49:9,9,21,22;50:4,9;51:23,25
**disappeared (1)**
66:15
**disaster (1)**
110:20
**discharged (2)**
15:20,24
**disciplinary (4)**
31:1;32:4,22;55:21
**disciplined (2)**
30:1;55:24
**discovered (1)**
44:21
**discovering (1)**
43:8
**discovery (2)**
42:12;95:16
**discuss (1)**
51:22
**discussed (2)**
68:18;74:22
**discussions (1)**
10:22
**dismiss (10)**
40:9,14;42:1;47:17,20;48:7;49:2;51:7;52:21;55:18
**dismissal (8)**
40:13;42:16;50:7,12;52:19,23;53:14;54:6
**dismissed (30)**
23:7;24:20;39:2;40:10;41:3,4,22,23;43:5,25;44:3,20;45:9,12,18,22;46:8;48:3;49:5,16;50:1,15;51:14;54:9,15,17,25;55:8;56:9;60:15
**dismissing (1)**
53:21
**disposition (3)**
50:25;54:16,22
**Division (5)**
60:2,3,14;71:19;73:1
**Dixon (1)**
65:17
**document (3)**
12:21;117:4,25
**documents (7)**
4:17;11:6,8,17,22;12:1,3
**domestic (1)**
75:19
**done (12)**
9:7,17;24:17;28:16;42:15;44:22;58:21;73:16;77:6;100:24;110:21;113:14
**doors (1)**
26:19
**Dorothy (10)**
64:13,15,20,21,22;65:21;66:2,4;68:2,6
**double (4)**
45:19;46:7;53:20;54:1
**doubt (2)**
115:7,12
**Dow (1)**
40:11
**down (6)**
23:20;26:16;43:17;67:22;74:16;119:12
**downstairs (1)**
35:5
**draft (2)**
117:18,23
**drafted (2)**
117:25;119:4
**dried (1)**
26:25
**drive (2)**
9:19,20
**driven (1)**
9:21
**driver (1)**
59:19
**driving (4)**
12:25;43:15;56:12,14
**drunk (3)**
43:15;56:12,13
**duly (1)**
4:2
**during (16)**
4:11;12:12;15:8;18:8;24:18;33:6;37:25;43:25;44:18;53:23;62:22;64:8;66:2;76:18;90:1;104:21
**dying (1)**
22:17

## E

**earlier (2)**
13:16;41:1
**early (1)**
124:1
**East (4)**
4:2;8:22;20:1;26:22
**eat (1)**
123:18
**editorializing (1)**
105:10
**education (1)**
15:23
**efforts (2)**
6:15;124:3
**ego (2)**
93:16,22
**either (10)**
15:22;61:21;62:13,20;72:17;101:24;111:16;117:15;123:12,13
**elaborate (1)**
110:10
**electronic (2)**
50:20,22
**elicited (1)**
116:12
**else (6)**
42:16;54:4;67:2;78:23;93:4,24
**email (6)**
10:2,4,6,8;12:7;82:23
**employed (1)**
8:23
**employees (1)**

25:22
**employment (6)** 9:18;15:23;17:6;21:10;24:25;57:2
**end (4)** 37:2,3;46:14;75:10
**ended (1)** 110:18
**enforcement (8)** 12:11;77:24;78:1,10;79:15;82:1;89:5;121:1
**engage (2)** 9:18;13:17
**engaged (1)** 85:25
**enough (5)** 14:16;26:25;27:24;28:24;63:10
**ensure (1)** 100:25
**entered (1)** 94:15
**entire (3)** 41:4;92:20;101:2
**entirely (1)** 31:10
**epidemic (1)** 9:22
**Essex (48)** 17:21,23;18:3,8;19:20;27:13;28:6;29:22;30:16;31:4;35:4,6;37:21;41:9;43:20;44:19;45:24;46:3;53:6,24;55:21,25;56:18,21;61:22;65:19;67:7;69:14,17;70:1,13,17,23;71:4;72:8;79:15;80:3;81:25;83:6;89:1,3;113:19;114:8,11;115:22;120:6;121:18;122:14
**ethically (2)** 114:25,25
**Ethics (11)** 27:9;30:2,3,7;31:9;32:13;33:1,24;34:17;35:19;38:4
**Eutsey (5)** 63:4,17,25;70:6;78:15
**E-U-T-S-E-Y (1)** 63:5
**Evans (26)** 4:9;7:6;29:24;32:12;38:13;39:16;57:13;61:18;77:12;84:8,23;102:21;110:4,7,24;111:6,8,20;112:3,6,17,20,25;113:24;114:9;122:19
**Evans' (9)** 11:15;30:5,19,22;33:16,25;34:18;59:6;122:18
**Even (16)** 7:21;47:18;52:22;54:10;61:4;63:1;66:17;67:1;76:2;81:10;84:14;101:24;109:9;111:4;112:23,25
**events (1)** 106:17
**eventually (3)** 74:22;90:4;112:19
**everybody (4)** 65:3;66:14;90:16;123:8
**everyone (5)** 4:22;21:4;23:3;41:22;80:11
**evidence (17)** 42:13,25;43:9,25;59:10;60:8,11;61:14;72:16,24;107:21;110:23;111:9;114:4;115:1,6;122:6
**evolved (1)** 78:8
**exactly (3)** 11:3;68:20;118:18
**EXAMINATION (1)** 4:6
**example (1)** 118:9
**Excellent (1)** 12:23
**exculpatory (3)** 42:25;43:9;61:14
**excuse (3)** 26:12;28:9;123:16
**executed (2)** 117:12,14
**exhibit (2)** 116:23;117:1
**exhibits (1)** 111:9
**expand (1)** 48:23
**expect (1)** 125:4
**expected (3)** 22:20;57:1;87:20
**Explain (2)** 27:19;51:13
**explained (1)** 33:8
**explaining (1)** 15:15
**extent (2)** 79:2;81:4
**eye (1)** 37:6
**eyes (1)** 98:6
**eyewitness (1)** 45:20

**F**

**face-to-face (1)** 98:15
**fact (11)** 6:9;16:4;33:23;55:19;65:13;66:7;114:24;115:4;119:16;120:1;123:24
**facts (5)** 47:7;59:18;68:18;94:22;107:21
**factual (1)** 92:7
**failed (1)** 48:15
**fair (19)** 8:7;14:16,17;21:15;63:10;81:23;84:15;86:1,2;89:20;99:4;102:2;106:5;107:19,25;109:3,20;113:21;125:5
**familiar (8)** 65:2,4;69:10;81:19;107:16;108:14,24;113:5
**family (3)** 46:22,24;47:2
**far (4)** 73:23;81:6;83:19;102:25
**federal (6)** 39:6,9,11,14,17,20
**feel (1)** 112:13
**feeling (2)** 68:19;94:16
**fees (1)** 28:5
**fell (1)** 112:8
**felonies (1)** 18:20
**felony (1)** 53:23
**felt (3)** 26:21;27:23;106:20
**female (3)** 36:4,7,16
**Ferencz (5)** 36:1,10,15,19,23
**Ferrante (2)** 44:12,14
**F-E-R-R-A-N-T-E (1)** 44:13
**few (4)** 57:5;65:15;71:20;75:7
**field (3)** 108:4,5,18
**fight (5)** 21:1,3,3;55:14;116:14
**fighting (1)** 116:15
**file (29)** 36:15,18,20,22;52:7,11,12;90:25;91:1,2,3,3;94:7;96:24;97:2,7,23,23;99:7;100:17,23;101:2,14,17,18,19,24,25;118:4
**filed (4)** 7:17;30:3;35:11;38:3
**files (6)** 25:4,13;27:24;97:8,15,17
**fill (3)** 50:2,3,5
**filled (2)** 50:23;52:5
**find (3)** 24:24;65:6;72:23
**fine (10)** 8:15;32:9;36:1;37:12;92:14;124:9,17,20;125:7,8
**fined (7)** 30:24;31:14,23;32:1,10;34:14;36:24
**finer (1)** 112:15
**finish (4)** 7:20,23,24;11:18
**finished (1)** 11:20
**fire (9)** 66:5,5,7,7,13,21;68:21,23,23
**fired (5)** 22:15;23:24;24:16,21;25:3
**firm (8)** 8:25;9:3,10,17;10:13;20:2,13;25:17
**firms (1)** 26:23
**first (19)** 18:22;24:1;34:24;61:19,20,23;62:22;70:14;71:18;76:11,13;84:1;94:2;96:9;112:5;117:5;118:16,22;119:13
**firsthand (1)** 106:16
**fist (1)** 21:3
**five (13)** 14:9,10;29:23;57:6;70:25;73:5;74:4;75:22,24;76:9,15;78:18;104:2
**Floyd (16)** 19:25;20:6,8,20;21:4,16;22:3,7,19;23:14,23;24:6,16,20,24;25:3
**Floyd's (3)** 20:14,19;23:25
**Focusing (2)** 57:11;111:18
**follow (2)** 87:21;89:4
**followed (2)** 89:12,15
**following (13)** 7:3;25:9;30:11;88:2,3,7,8,9,14,15,20,23,24
**follows (2)** 4:5;74:2
**follow-up (1)** 51:17
**food (3)** 15:12,16,17
**force (2)** 82:6,8
**Forgive (1)** 62:2
**forgot (3)** 23:6,10,16
**forgotten (1)** 74:1
**form (29)** 33:2;50:2,3,5,16,20,21,23;51:2,4;53:5,5,10,15;78:20;86:19;89:9;92:9;93:21;97:4,5;98:23;100:20;103:22;105:12,21;106:18;109:19;120:21
**formal (3)** 52:14;60:21;100:16
**formally (1)** 98:20
**formats (1)** 89:19
**former (2)** 5:21;87:19
**forms (2)** 52:4;53:11
**forth (1)** 7:3
**forthcoming (1)** 100:3
**forward (1)** 27:1
**found (4)** 42:5;59:22;60:8;

65:7
**foundation (5)**
88:18;97:10;104:4;
106:8;107:9
**four (1)**
48:18
**frame (3)**
47:24;77:10;85:22
**FRANCESCO (3)**
5:2,3;82:12
**Francisi (1)**
104:10
**Fred (1)**
35:7
**free (1)**
10:23
**Frelinghuysen (1)**
67:22
**Friday (2)**
23:18;25:3
**friend (2)**
23:19;25:5
**friends (4)**
21:18;46:21,24;
67:21
**friendships (3)**
67:10,14,18
**front (4)**
6:7;34:8;36:8,10
**full (3)**
7:11;8:10;101:9
**fumbled (3)**
109:23;110:6,15
**funeral (2)**
23:18,22
**funny (1)**
72:14
**further (1)**
15:23

## G

**Garry (1)**
5:21
**Gary (3)**
5:19;75:2;124:13
**gather (1)**
109:4
**gathered (1)**
81:8
**gave (9)**
45:13;68:12;74:24;
84:6;98:8;99:10;
100:3;102:4;111:4
**General (2)**
5:8;19:7
**generalized (1)**
122:6
**generally (2)**
40:3;59:9
**General's (1)**
5:3
**George (3)**
5:10;102:16,17
**gets (4)**
27:6,7;82:20;96:23
**given (6)**
55:9;72:5,10;85:4;
101:6;123:23
**gives (1)**
72:7
**giving (1)**
8:19
**glean (1)**
66:11
**gleaned (1)**
118:4
**goes (3)**
50:4;96:24;105:22
**Goldman (3)**
19:25;20:6,8
**Good (15)**
4:7;5:2,15,18;6:1,2;
43:4;54:21;55:23;
56:22;65:5,17;94:1;
100:21;104:19
**Gordon (12)**
20:17,17,22,22;
21:11,11,19,20,24,24;
22:2,2
**Gotcha (2)**
24:22;48:19
**graduate (4)**
14:11;16:4,7,9
**graduated (3)**
14:15,18;17:2
**graduation (2)**
16:13;17:5
**grand (2)**
45:10;105:2
**granted (1)**
53:1
**Great (2)**
44:6;57:6
**Green (2)**
18:12;31:22
**grocery (1)**
16:17
**ground (1)**
7:1
**grounds (1)**
60:5
**Group (2)**
4:20;88:1
**Guarino (12)**
5:1,15;6:18,20;
10:24;25:18;57:9;
75:6;102:19;117:3;
123:23;124:25
**Guarino-1 (2)**
116:24;117:1
**guess (16)**
18:19;40:6;42:24;
53:4;61:7,17;66:3;
77:9;82:22;88:25;
92:11,12,15;103:16;
111:17;116:24
**guessing (1)**
62:11
**guilty (3)**
30:11;59:22;115:7
**guy (2)**
81:5;121:25
**guys (1)**
75:9

## H

**Hadley (3)**
5:22,25;79:6
**hair (1)**
59:22
**Haley (1)**
4:17
**Half (3)**
14:19;20:5;29:11
**Hall (1)**
17:1
**Halloween (2)**
11:9,10
**Hampton (26)**
84:6,8,19;102:22;
105:5,20;106:14,21;
109:24;111:19;113:8,
18,24;114:2,7,15;
115:17,21;119:5,14,
25;120:6;121:9,17;
122:22,25
**Hampton's (3)**
66:13;103:25;
122:13
**handed (3)**
36:20;95:14,22
**handle (1)**
25:14
**handled (7)**
25:15;70:19;72:3,4;
110:17,20;113:3
**hands (1)**
98:17
**Hanna (1)**
115:21
**Hanover (2)**
4:2;8:22
**happen (2)**
57:3;73:17
**happened (23)**
9:24;21:8;23:3,9;
33:8;48:17;53:18;
61:25;68:13;71:15;
76:7;84:24;94:6;
95:23;108:9,10;
111:25;113:12;
120:20;122:20;123:4,
11,15
**happening (1)**
119:16
**happens (2)**
96:22;124:2
**hard (6)**
26:22;29:2,5;54:8;
93:7;124:16
**head (3)**
92:12,15,17
**heading (1)**
50:6
**heads (1)**
5:9
**hear (11)**
5:16;6:13,16;10:21;
22:12;29:7;63:3;75:2,
9;93:7;107:23
**heard (9)**
53:7;62:19,23;70:8;
74:18;83:10;84:5,19;
111:23
**hearing (2)**
63:7;64:10
**held (1)**
120:19
**help (3)**
77:11;110:14;111:4
**helped (1)**
68:15
**helpful (2)**
66:6;93:12
**helping (1)**
4:16
**helps (1)**
44:8
**Henry (4)**
5:23,25;79:10,11
**herself (1)**
40:12
**Hi (1)**
102:17
**high (2)**
14:12,18
**himself (1)**
117:23
**hindered (1)**
6:9
**hired (1)**
27:22
**historically (1)**
71:17
**history (4)**
12:12;16:12;57:1,2
**hit (4)**
42:4;65:8,15,17
**hold (1)**
72:12
**home (1)**
23:2
**homicide (52)**
38:20,22;43:24;
45:13,20,24;46:3,7;
47:20,21,25;48:4;
49:1,8,17,18,21,22;
51:11;53:20,22;54:1;
57:11;58:4;59:9;
62:24;63:9;64:1;
71:12,21,21;72:4,6,7,
9,18,24;73:1,5;74:5,
17;75:18;78:18;82:5;
83:5,7,20,20;84:2;
96:11;101:14;104:2
**homicides (2)**
58:25;74:24
**honest (1)**
103:8
**Honestly (1)**
53:13
**honorably (2)**
15:19,24
**hope (3)**
105:16;112:1;124:5
**hoped (1)**
112:21
**hopefully (1)**
112:16
**hoping (1)**
123:17
**hospital (2)**
22:25;23:3
**hospitals (1)**
24:12
**hostility (1)**
99:16
**hours (1)**
125:5
**house (2)**
60:9;66:14
**Hudson (1)**
23:15
**huge (1)**
27:22
**hung (1)**
67:24
**hypothetical (1)**
101:21

## I

**ID (2)**
59:23;81:14
**idea (6)**
53:23;97:16,24;
99:5;111:21;121:25
**identical (1)**
99:6
**identifiable (1)**
84:2
**Identification (1)**
117:2
**identified (3)**
7:10;35:20;37:15
**identify (1)**
4:10
**immediate (3)**
49:7,20;51:9
**immediately (1)**
28:20
**important (2)**
6:7;94:21

**impossible (1)**
42:11
**inception (1)**
69:11
**incidences (1)**
37:14
**incident (1)**
35:25
**incidents (2)**
37:16;112:2
**include (2)**
11:5;105:19
**included (2)**
108:18;118:3
**including (2)**
90:16;109:8
**income (1)**
28:1
**indicate (2)**
92:6;122:21
**indict (6)**
86:22;90:2,3;91:22;
107:19;113:24
**indictable (1)**
18:20
**indicted (8)**
39:1;54:11;76:7;
77:12,20;85:13,14;
115:5
**indictment (11)**
40:15;42:1,2;44:21;
45:9;49:16;77:22;
102:21;114:20;115:1,
10
**individual (5)**
27:6;38:24;39:22;
44:21;81:15
**individuals (2)**
78:2;79:19
**information (16)**
10:25;50:6;65:20;
66:16,20;69:1,3,6;
81:7;84:13;87:2;
106:20;109:4,8;
118:2,14
**informed (1)**
31:16
**Initially (2)**
42:21,22
**injured (1)**
43:16
**injury (6)**
20:3,11;25:15;26:7,
13,25
**innocuous (1)**
51:2
**inquire (1)**
100:8
**insight (1)**
65:5
**insights (1)**
68:12
**insisted (1)**
36:19
**inspected (1)**
108:5
**inspection (1)**
15:13
**inspectors (1)**
15:16
**instance (2)**
82:2;89:5
**instances (2)**
44:20;55:1
**instructions (1)**
11:5
**intend (1)**
118:1
**interest (3)**
84:9,12,18
**interested (4)**
74:21;75:15,20;
76:1
**interesting (2)**
58:21;66:10
**interestingly (1)**
66:4
**intern (3)**
5:9,14;102:16
**internal (3)**
51:4;53:5,15
**interrupt (2)**
45:17;124:16
**interrupting (2)**
82:10;123:17
**interruption (1)**
82:18
**interview (18)**
35:2;84:7;101:23;
105:17,20,23;106:3;
109:23;113:20;
115:16;118:13;
119:15;120:8,13,20;
121:2,19;122:15
**interviewed (13)**
27:22;31:6;34:19;
68:10;79:1;80:9;84:5;
98:14;104:12;108:4,
21;119:6;120:1
**interviewing (1)**
78:2
**intimate (1)**
92:19
**intimately (3)**
96:12;107:16;
108:14
**into (19)**
25:10;43:14;51:21,
25;54:20,25;55:12,13,
13;64:6;65:5;68:12;
86:16;94:15;95:3;
96:24;98:17;113:18;
121:10
**intuit (1)**
65:13
**intuited (1)**
66:21
**invested (1)**
93:3
**investigate (2)**
77:3;107:14
**investigated (10)**
42:19;47:13;63:16;
69:20;70:5;71:18;
74:9;76:16;77:21;
85:2
**investigating (6)**
40:20;46:23;69:25;
70:4,15;80:8
**investigation (54)**
41:20;42:3,24;
60:10;69:8;70:7,9,19,
24;71:5,13,21,22;
73:6;74:5;76:17,24;
77:23;78:11,17;79:7,
17;80:4,13,15,21;
81:21;83:20;84:2;
85:5,18;86:9,16,18;
87:4,12;88:9,10,13;
89:3;91:11,15;92:20;
93:3;102:20,24;
103:6,15;104:1;
107:18;108:2,3;
109:14;114:13
**investigations (3)**
29:12;86:24;108:18
**investigative (5)**
12:10;88:1;94:8;
107:17;113:6
**investigator (4)**
41:21;83:6,8;103:5
**investigators (4)**
80:2;86:4;89:18;
106:5
**invite (2)**
21:5;105:16
**invited (1)**
21:4
**involved (37)**
40:20;41:19;51:11;
54:8;59:2;64:4;65:24;
66:22;68:24;70:7,24;
71:2,4;74:15,20;
78:10;79:7,16;80:15;
81:2,11,19;84:25;
85:6,17;103:14,20;
104:1,9,23;105:5;
107:4;114:12,18;
122:3,22;123:14
**involvement (7)**
63:14;64:14;66:18;
79:8,13;83:19;108:10
**irked (1)**
36:23
**issues (2)**
32:7;55:21
**itemized (1)**
32:24

## J

**Jack (5)**
63:4,17,25;70:6;
78:15
**jail (5)**
48:17;56:12;
103:10,13;104:18
**January (1)**
16:8
**Jean (1)**
65:17
**jeez (1)**
46:13
**Jeff (2)**
23:19,20
**Jen (6)**
57:20,24;58:1,2,11;
59:9
**Jennifer (8)**
4:7,13;57:24;58:8,
10,19,20;59:16
**Jenny (6)**
57:20,24;58:1,2,10;
59:8
**Jersey (12)**
4:2,4;5:4,8;13:7,9,
13;15:6;17:14;27:9;
43:18;82:13
**Jimmy (1)**
41:22
**job (6)**
27:17;77:1,1;94:2;
104:11;108:6
**Joe (4)**
5:22,25;44:12,14
**jogged (1)**
48:1
**jogs (1)**
48:21
**John (3)**
4:24;17:7;56:5
**join (2)**
82:17;106:10
**joined (3)**
14:23;55:19;102:16
**joining (1)**
5:12
**judge (52)**
17:13,17;23:5,5,9;
30:3,15,16,17,23;
31:6;32:1,9,12,14,17,
20;33:7,11,23;34:8,
20,21,21,22;35:10,24,
25;36:1,10,12,13,15,
18,23;37:3,5,9,11;
43:17;50:11,13;52:9,
16,21;53:8,11,13;
55:17;58:4;66:24;
67:1
**judicial (2)**
17:7,16
**jump (1)**
7:22
**jury (2)**
45:10;105:2
**juvenile (7)**
18:12,14;36:12,12;
55:16;71:19,22

## K

**Kean (1)**
16:2
**keep (5)**
6:8;27:1;52:9,12;
107:9
**keeping (2)**
85:17;97:22
**kept (3)**
52:11;91:4;94:7
**Kettering (2)**
22:18;24:12
**key (1)**
66:7
**kicked (2)**
82:20;123:8
**kid (1)**
55:7
**kids (4)**
29:23;75:23,24;
76:10
**killed (1)**
43:16
**kind (6)**
54:15;57:2;59:23;
61:10;66:24;68:24
**King (1)**
4:25
**knew (23)**
11:9;36:11;47:1;
64:18;65:3,20;66:14,
15;67:15;69:8,21,23;
82:25;84:22,23;85:8;
86:25;94:20;99:16;
109:5;110:17;119:18;
123:2
**knowing (2)**
102:1,4
**knowledge (19)**
61:12;77:7;81:20;
82:7;83:17;84:22;
86:9;87:25;89:1,11;
91:5;92:20;106:17;
109:14;114:3;120:4;
122:5,6,20
**knowledgeable (1)**
63:24
**known (3)**
61:14;106:4,19

## L

**La (13)**
4:18;39:24;40:1,15,

20;41:19;43:7;53:19;54:2;56:9,11;57:13;60:22
**L-A-B-R-A-D-A (1)**
40:2
**lack (2)**
80:20;106:7
**lacks (2)**
88:17;104:3
**largely (1)**
77:23
**last (14)**
5:10;13:11,14,18,20;29:18,21;44:11;57:21,25;58:8,11;73:24;103:1
**late (5)**
30:9,14;31:10,13;123:24
**later (1)**
122:9
**Law (28)**
4:20;8:25;10:13;12:10;13:4,9,12,17;14:3,14;16:14,23,24;17:2,5,7,12,16;19:5;26:6,23;77:24;78:1,9;79:14;82:1;89:5;121:1
**lawsuit (2)**
43:20,22
**lawyer (2)**
41:8;57:20
**lawyers (3)**
27:7;41:15,15
**lead (23)**
63:20;71:6,8;74:23;75:14,22,23;76:2,9,20,24;77:7;80:20,22;94:19;105:19;107:8,11;108:1,3,15;109:6,15
**leads (4)**
74:9;78:5;80:8,10
**lean (1)**
6:17
**leaned (1)**
37:6
**learn (7)**
65:24;68:2;69:2;71:3;74:14;119:13;122:9
**learned (4)**
19:9;71:1;84:1;96:17
**least (10)**
6:24;24:17;25:25;63:21;67:11;106:16;114:21,25;116:18;119:3
**leave (10)**
18:3;19:18,20;20:18;21:16;22:2,11;56:21;64:5;73:18
**led (1)**
41:20
**Ledger (2)**
56:5,8
**Lee (30)**
4:9;7:6;11:15;29:24;30:19,21;32:12;33:16,25;34:18;38:13;39:16;57:13;59:6;61:18;84:8;110:4,7,19,24;111:6,7,14,19;112:16,20;122:18,19;123:2,2
**left (16)**
18:5,23,24;20:13,14;22:15,15;23:24;24:23,23;28:15,18,20;50:22;67:7,19
**leg (1)**
55:7
**legal (1)**
117:24
**legally (1)**
31:22
**legwork (1)**
80:11
**less (3)**
74:20;114:14;115:6
**letter (2)**
31:7;35:16
**liability (1)**
40:4
**licensed (2)**
13:3,8
**Lieutenant (11)**
7:8;79:22;82:25;83:3;102:20;103:3;113:6;115:16;119:14;120:5,18
**line (1)**
74:16
**LIPSHUTZ (31)**
5:18,19;7:9;73:18;75:1,3,5,12;78:19;86:19;87:13;88:17;89:9;92:9;93:6,9,11,20;97:4;98:23;100:20;102:18;103:21;104:3;105:21;106:7,18;109:19;123:16;124:15,23
**list (4)**
23:13,16;32:24;111:9
**litigated (1)**
11:15
**litigating (1)**
13:21
**litigation (7)**
4:9;9:8;19:4,8,9;20:6,9
**little (14)**
6:5;28:13,14;53:9;56:25;65:14;73:20;77:10;93:25;96:4;111:13,17;123:25;124:1
**live (2)**
8:21;28:24
**lived (1)**
43:18
**living (1)**
105:1
**location (1)**
42:10
**locations (1)**
108:5
**lodge (3)**
31:1;33:23;34:11
**lodged (4)**
32:3,21;33:2;34:17
**log (1)**
94:15
**long (20)**
12:12,25;16:19;17:16;19:15;20:4;21:22;22:7,10;25:19;28:6;43:11;45:8;57:2;59:12,20,21;79:4;106:20;120:12
**longer (1)**
57:1
**longest (1)**
66:25
**look (13)**
11:13;12:9,15;52:20;65:14;98:5;101:5;116:11;117:3,4;118:20;123:19,20
**looked (8)**
11:10,23;37:5;52:21;54:21;77:18;91:6;100:22
**looking (5)**
7:11;42:3;55:12,13;59:11
**looks (3)**
72:14;102:16;123:25
**lose (1)**
57:14
**losing (3)**
59:1,3,15
**loss (1)**
24:2
**lost (11)**
37:2;57:19;58:6,18,23,24;59:7;73:11;75:7;82:13;112:11
**lot (9)**
58:23;59:19;67:23,23;81:7;86:24;87:1;93:24;94:8
**loudly (1)**
6:16
**Louie (2)**
46:12,15
**Louis (3)**
7:8;117:14;119:5
**lunch (5)**
36:9,14,20,25;37:1

## M

**main (1)**
41:21
**maintain (2)**
67:6;97:16
**maintained (3)**
67:19;97:9,15
**maintaining (1)**
90:23
**major (1)**
16:11
**makes (1)**
72:21
**making (1)**
26:25
**malicious (2)**
40:6,23
**managed (1)**
16:17
**many (6)**
6:23;38:16;45:1;94:9;104:8;109:13
**March (7)**
22:14,24;24:15,24;25:11;28:8;29:15
**Marinaro (1)**
41:22
**mark (5)**
110:5,9;116:23,24,25
**marked (1)**
117:2
**Married (1)**
62:15
**Martin (1)**
56:5
**mask (1)**
6:10
**material (1)**
107:17
**math (1)**
62:2
**matter (6)**
7:17;30:22;34:4,6;61:18;124:22
**Maurice (3)**
106:23,23;123:8
**may (16)**
5:12;11:6;13:2;18:5,6;45:4;61:4,5;70:21;78:5;87:9;88:22;93:15;94:1;112:12;121:20
**Maybe (14)**
26:15;29:11;35:6;41:2;43:25;44:4;72:23;73:25;75:6;77:11;79:9;82:23;92:16;105:10
**Mc (5)**
5:21;18:25;19:5,15,24
**mean (14)**
12:13;39:13;45:17;52:18;57:14;67:9;71:17;73:15;74:7;76:19;81:2;86:10;90:9;99:19
**Meaning (2)**
67:10;78:1
**means (2)**
94:14,14
**meant (1)**
42:7
**medium (3)**
64:17,25;65:22
**mediums (1)**
68:20
**meeting (9)**
30:9,14;31:10,13,16;51:24;113:1,8,16
**meetings (1)**
51:18
**member (5)**
39:8,11,19;63:9;118:10
**memorialize (1)**
11:14
**memorialized (1)**
107:18
**memories (1)**
94:23
**memory (5)**
48:2,21;62:11;69:22;72:3
**mention (2)**
9:23;66:7
**mentioned (4)**
13:16;34:18;54:1;78:14
**Mescall (3)**
9:11,14;28:21
**M-E-S-C-A-L-L (1)**
9:14
**met (2)**
41:15,15
**Michael (9)**
5:5,6;44:7,10,14;82:10;106:21,22;122:19
**microphone (2)**
6:6,17
**might (29)**
9:6;12:20;23:5,14;44:22;50:17,23;51:21;53:14;54:7,10;56:19;58:19;60:8;63:22;72:13;74:10;

77:17;78:25;80:8;
84:22;103:4;111:3,4;
113:14;122:22;123:2,
3,14
**Mike (3)**
123:4,5,7
**mile (1)**
110:5
**Military (6)**
15:5,18;54:21;55:1,
12,13
**mind (11)**
14:1;15:14;24:17;
27:2;31:9;42:14;54:3,
4;55:3;57:18;113:17
**mindful (1)**
75:8
**mine (1)**
36:17
**minimally (2)**
103:19;104:1
**minute (2)**
75:19;102:12
**minutes (4)**
30:13;57:5,6;
124:22
**mischaracterizes (1)**
111:1
**mischaracterizing (1)**
109:17
**misconduct (3)**
60:17;61:1,9
**missed (4)**
31:14,15;110:5,9
**misses (1)**
65:16
**missing (24)**
24:19;29:23;61:20;
64:10;65:5;66:25;
67:3;69:19,23;70:25;
71:5,12,18;73:5;74:4;
75:23,24;76:9,15;
83:19;84:10;86:17;
104:2;121:21
**mistaken (2)**
9:24;32:3
**misunderstanding (2)**
20:21,24
**mode (1)**
75:10
**moment (3)**
21:17;82:10,14
**Monday (2)**
25:9,9
**Money (5)**
19:19,22;20:21;
26:25;28:24
**month (1)**
76:14
**months (8)**
16:20,21;18:13;
22:9;43:18;46:6;
48:18;56:11
**more (18)**
20:21,22;26:12,13;
28:13,14;47:18;
70:24;74:20;81:6;
85:25;99:9;101:21;
110:10;114:14;122:5;
124:1;125:4
**morning (7)**
4:7;5:2,15,18;6:1,2;
25:4
**most (8)**
6:6;11:23;26:9;
78:13;80:13;94:11,
16;111:10
**mostly (1)**
69:2
**mother (1)**
123:8
**motion (4)**
40:9,10;52:10,15
**move (3)**
120:6,18;121:1
**moved (1)**
15:17
**much (7)**
19:11;43:7;47:7;
63:3;109:4;114:14;
124:5
**multi-agency (1)**
87:25
**municipal (1)**
18:11
**municipality (3)**
40:19;46:17;47:12
**murder (5)**
18:22;42:10,15;
64:4;76:7
**murdered (1)**
76:21
**must (2)**
28:16;47:23
**myself (2)**
69:7;74:1

## N

**name (22)**
4:7,13;5:10,10,19;
9:10;17:9;25:17;
34:20,24;36:5;39:22;
44:11;47:5;50:16;
57:21,24,25;58:9,11;
106:22;121:23
**named (1)**
36:5
**names (2)**
45:7;47:8
**narrow (1)**
47:18
**nature (3)**
8:17;64:14;81:16
**necessary (3)**
6:17;51:18,19
**need (4)**
8:14;57:4;123:25;
124:3
**needs (2)**
82:20,20
**Nelson's (1)**
58:5
**New (13)**
4:2,4;5:4,8;13:7,9,
12;15:6;17:14;24:12;
26:22;27:9;74:9
**Newark (53)**
5:20,21,24;7:7;
18:12;40:21;41:23;
42:10,20;47:14,15,16;
63:17;64:18;65:21;
67:17;68:2;70:5,10,
19;71:19;78:13,16;
80:5,23;81:5,20;82:2,
5,5;83:14,22;87:3,3;
94:15;95:8,9,20;96:2,
3,13,20;97:1,14;
98:20;99:7;100:16,
23;101:1,7,12,14;
103:15
**Newark's (2)**
83:19;105:19
**news (1)**
69:2
**next (5)**
6:6;7:25;21:6;23:8;
62:19
**nice (2)**
23:21;33:12
**nickname (2)**
58:3;59:8
**night (4)**
22:19,21,23;66:15
**nine (1)**
22:9
**None (2)**
35:22;61:16
**normal (2)**
7:21,22
**normally (2)**
50:10;81:13
**North (1)**
82:13
**Notary (1)**
4:3
**noted (1)**
94:24
**noticed (3)**
91:17;94:11;96:9
**notorious (1)**
26:24
**November (7)**
46:5;85:24;115:20;
116:4;119:1,1,6
**number (11)**
7:7,9;64:6;72:5,6,7,
8,10,11,11;96:12

## O

**oath (1)**
4:5
**object (3)**
78:19;93:21;107:24
**objection (35)**
31:18;50:14;86:19;
87:13,15;88:17;89:7,
9,21;92:9,22;93:18;
97:4,5;98:23;100:18,
20;103:17,22;104:3;
105:12,21;106:7,10,
18;107:20,24;109:16,
19;110:25;113:9;
116:5;120:21;121:3;
124:6
**objections (2)**
93:7;107:10
**observed (1)**
88:21
**observing (2)**
5:13;6:1
**obtain (2)**
17:6;42:13
**obtained (6)**
42:2;60:2;95:18,20,
21;96:1
**obtaining (1)**
42:1
**obviously (8)**
24:10;37:19;45:21;
82:20;85:12;98:12;
105:1;118:7
**Occasionally (2)**
57:17;64:12
**occur (1)**
111:24
**occurred (1)**
62:18
**Ocean (1)**
15:18
**o'clock (3)**
22:19,21;123:19
**October (2)**
28:9,16
**off (21)**
18:11;21:7,7;22:20;
36:14;42:6;52:6;57:8;
82:20;91:7,18;94:4,
12,13,25;95:2,4,6;
96:10;118:6;123:9
**offenses (1)**
18:21
**offer (3)**
21:11;25:7;32:1
**offered (3)**
20:21,22;22:3
**Office (85)**
5:3,8;10:4,5;17:22,
24;18:4,9,23;19:21;
23:20,25;25:4,7;
27:14;28:7;29:22;
44:19;45:25;46:4;
47:23;51:21;53:6,24;
55:22;56:22;62:23;
63:13;64:5,9;65:19;
67:4,7,12,20;69:14,
18;70:2,3,5,17,23;
71:4,25;72:19;77:6;
79:16;80:3;81:2,6,21;
82:13;83:7;84:15;
87:2,12;88:9;89:2,11,
12,23;94:18;95:15,21,
25;99:21;100:9;
101:5,11;104:6,11;
110:14;113:6,19,23;
114:8,12,19,24;
115:10,22;117:18;
118:10;121:19;
122:14
**officer (4)**
55:14,15;90:13;
121:1
**officers (5)**
7:7;41:11,18,23;
87:20
**offices (1)**
99:17
**office's (1)**
102:24
**official (2)**
97:17;99:6
**often (1)**
9:20
**old (3)**
14:5;35:5;62:1
**older (1)**
67:1
**oldest (1)**
22:16
**Olds (6)**
106:21,22;123:5,5,
8,9
**Olds' (1)**
123:8
**O-M (1)**
5:6
**once (10)**
15:23;28:7;36:2;
45:21;65:16;101:15;
107:18;108:3,15;
109:5
**one (46)**
8:3,5;14:20;15:16;
17:18;19:17;21:23,
24;24:12;27:12;
35:19,20;38:17;45:3,
20;50:17;54:6;56:19,
19;57:19;58:6;60:4;
65:8,17,23;67:21;
68:18;69:10;74:24;
79:1;80:25;84:23;
86:7,10,25;93:17;
96:9;100:15;102:4;

103:4;111:11,16;
118:11;123:12,13,24
**ones (1)**
12:6
**one-witness (1)**
45:19
**only (12)**
32:9;33:19;37:11,
16;45:20;46:11;61:2;
86:20;88:20;100:21;
115:1;119:20
**open (3)**
25:8;36:19;70:18
**opened (2)**
11:23;25:8
**opening (2)**
36:22;37:1
**openings (1)**
36:14
**openly (1)**
94:24
**opine (1)**
88:7
**opinion (21)**
81:7;86:20,23;
87:24;92:3,4,5,13,19;
93:2,14,15;100:2;
103:19;104:5;105:22,
25;110:7;112:12;
113:15;117:24
**opportunity (5)**
7:16;12:9;48:23,23;
98:4
**oppose (1)**
53:1
**opposed (2)**
89:5;117:23
**opposing (1)**
60:19
**opposite (1)**
13:25
**orally (1)**
37:13
**Orange (4)**
8:25;9:3;20:1;
26:22
**ordered (1)**
15:17
**original (1)**
54:10
**originally (1)**
10:3
**others (2)**
45:4;54:2
**otherwise (1)**
61:14
**out (15)**
27:25;28:3;37:21;
41:3,23;43:12;50:2,4,
23;52:5;66:21;68:8;
78:2;98:10;123:8
**over (25)**
21:1;23:4,16;24:19;
33:5,15;37:6,20;
71:22;79:21;80:12,
25;81:3,8;94:19;
101:4,25;113:19;
114:5;115:21;120:6,
13;121:18;122:11,14
**overseas (1)**
15:2
**own (13)**
42:24;45:12;88:3,8,
15;89:5,19;97:6,25;
98:2,5;109:13;110:15

## P

**package (1)**
95:16
**page (1)**
118:20
**pages (1)**
11:24
**paid (2)**
27:7;34:14
**panoply (1)**
101:9
**paper (5)**
50:20,23;62:7,11;
69:7
**papers (3)**
68:6,10,10
**par (1)**
28:1
**paragraph (1)**
118:20
**paralegal (2)**
4:16;23:19
**parallel (1)**
97:23
**parents (1)**
66:14
**parking (1)**
59:19
**part (6)**
78:10;82:6,8;96:25;
99:16;103:1
**partially (1)**
108:13
**participant (1)**
123:1
**participate (3)**
82:22;108:1,2
**particular (2)**
15:7;111:11
**particularly (1)**
123:13
**parties (2)**
5:13;45:8
**party (3)**
21:2,5,7
**passed (1)**
107:2
**past (1)**
55:5
**Pat (1)**
104:10
**Paula (1)**
40:11
**pay (2)**
27:23;37:7
**pending (1)**
43:15
**people (16)**
27:21;54:18;55:4;
65:2;67:15,24;70:10,
14;88:12;99:8,15;
104:8,12;106:19,25;
123:14
**people's (1)**
94:22
**percent (1)**
26:15
**percentage (1)**
26:10
**period (9)**
24:18;43:23;46:10;
64:8;76:4;79:4,22,25;
104:21
**person (13)**
43:17;54:24;61:5,
21;65:5,7,12;66:25;
84:9,11,18;120:18;
123:3
**Personal (11)**
20:3,11;25:15;26:6,
13,24;91:1,3;100:2;
101:24;109:14
**personally (3)**
48:10;93:2;118:11
**personnel (6)**
12:11;77:24;78:1;
79:15;103:15,16
**persons (3)**
69:23;71:12,18
**Pete (1)**
23:12
**Peter (7)**
25:18;39:24;40:1;
53:19;54:2;56:9;
57:13
**P-E-T-E-R (1)**
40:1
**Petrelli (2)**
19:1,6
**Petroli (2)**
19:16,24
**ph (1)**
19:1
**Philander (44)**
66:13;84:6,8,19,25;
85:18,23;103:10,13,
25;104:18,22;105:5,
20,24;106:1,4,14,21;
107:1;109:24;110:1,
2,3,8;111:19;112:2,6;
113:8,12,17;114:2,7,
15;115:16,21;119:5,
14,25;120:10,14;
121:17;122:10,25
**phone (9)**
42:4,6,8;110:3;
111:21;112:16,19,24,
24
**phrased (1)**
99:22
**physical (1)**
21:13
**physically (1)**
100:22
**picked (1)**
66:20
**piece (4)**
20:23;50:20;
111:11;112:11
**pinned (1)**
42:6
**pipe (1)**
65:7
**pissed (1)**
21:7
**place (4)**
4:22;30:10;35:3;
113:2
**places (1)**
50:9
**plaintiff (1)**
4:9
**play (1)**
80:3
**plea (4)**
30:11,13;31:19;
53:11
**please (7)**
8:3;9:13;17:9;
44:11;49:13;78:20;
116:25
**Plus (1)**
124:1
**pm (1)**
125:14
**point (28)**
8:2;12:12;13:25;
24:9;70:8,22;71:1,11;
73:4,14,19;74:3,14;
78:12;79:14;94:5;
102:3,11,23;104:24;
109:25;111:14,16;
112:15;114:13;
116:15;121:22;
122:24
**points (1)**
111:16
**Police (38)**
5:4,21,24;7:7;
41:11,18;42:20;
55:14,15;63:18;
65:21;67:17;70:20;
80:5,23;81:10,12,20;
82:2;83:14;87:3,3,20;
91:2,3;96:13,20;97:1,
14,15;98:20;99:7;
100:17,23;101:1,7,22;
103:15
**policies (10)**
87:21;88:1,3,15,20,
24,24;89:4,4,6
**policy (3)**
88:8;89:12,15
**polygraph (3)**
48:14,15;107:2
**polygraphed (2)**
48:9,11
**Portella (2)**
46:12,15
**pose (1)**
103:22
**position (1)**
33:8
**possible (4)**
39:15;54:11;98:24;
99:2
**possibly (1)**
122:20
**post (2)**
40:15;49:16
**potential (1)**
106:15
**potentially (1)**
39:14
**pouring (1)**
73:9
**power (3)**
73:11;75:7;82:14
**practice (16)**
13:3,8,17;19:7;
25:9,10,20;26:3,17;
37:22,25;38:7;61:21;
64:6;115:9;117:17
**practicing (1)**
13:12
**practitioner (1)**
26:3
**preceded (1)**
102:21
**precise (1)**
8:19
**predicted (1)**
66:3
**pre-indictment (2)**
85:3;86:17
**preparation (1)**
12:13
**prepare (5)**
10:17;11:4;77:3;
90:18;118:14
**prepared (13)**
12:10;87:18;89:17,
18,24,24;90:5;96:14;
100:10;101:23;102:5;
107:17;108:25
**prepares (1)**
96:20
**preparing (2)**

94:10;107:19
**present (4)**
4:11;5:12;6:1;
91:11
**presented (1)**
105:2
**presently (1)**
8:21
**presumably (3)**
88:14,14;108:24
**presume (1)**
88:20
**presumed (2)**
78:17;104:2
**pretty (1)**
96:12
**previously (1)**
109:9
**Price (1)**
4:25
**Primarily (4)**
9:9;15:4,5;70:19
**primary (3)**
19:3;81:5;84:9
**prime (1)**
84:9
**prior (20)**
28:4;43:8;48:22;
55:13;64:8;65:18;
66:17;67:3;69:4;
77:21;84:7;103:13,
23,24;106:3;113:7,12,
23;114:2,7
**private (10)**
25:10,19;26:3,16;
37:22,25;38:7;61:21;
64:6;68:4
**privileged (1)**
10:25
**probable (2)**
114:21;115:2
**Probably (12)**
6:24;16:20;29:11;
46:13;52:11;62:3;
71:9,20;79:4;84:14;
96:9;102:24
**problem (4)**
6:11;12:2;57:7;
82:19
**problems (1)**
7:2
**procedures (2)**
87:21;88:2
**proceed (3)**
82:15,17;86:11
**proceeding (1)**
73:14
**proceedings (1)**
11:14
**process (3)**
49:17,19;118:17
**progress (1)**
85:4
**prompted (1)**
48:7
**proper (1)**
95:4
**property (2)**
60:9;123:9
**Prosector's (1)**
46:3
**prosecute (2)**
38:21;69:4
**prosecuting (1)**
75:20
**prosecution (14)**
11:16;29:24;34:1;
40:7,23;41:19,20;
72:2,4,16,20,21,22;
74:15
**prosecutions (1)**
96:16
**prosecutor (50)**
28:3;36:4,7;37:22;
38:9,12;43:4;44:24;
47:18;49:10,11,15;
50:10;51:10,20;52:1,
2,12;56:1,18;57:12;
61:22;62:12;64:2;
71:6,8;74:23;75:14,
22,24;76:2,9,20,25;
77:7;81:25;86:21;
87:20;91:21;94:20;
96:17;105:10;107:8,
11;108:1,3,15;109:6,
15;119:18
**prosecutorial (3)**
60:17;61:1,9
**prosecutors (3)**
27:3;87:6;123:6
**Prosecutor's (48)**
17:21,23;18:4,9;
19:21;27:14;28:4,7;
29:22;44:19;45:24;
46:18;53:6,24;55:22;
56:22;62:23;64:9;
65:19;67:4,7,20;
69:14,18;70:2,13,17,
23;71:4;72:8;79:16;
80:3;83:7;84:15;87:2,
11;89:2,3,12,23;
104:5;113:19;114:8,
11;115:22;120:6;
121:18;122:14
**protocol (1)**
49:13
**protocols (2)**
87:21;96:14
**prove (1)**
115:6
**proved (1)**
54:15
**provide (2)**
92:8;101:8
**provided (7)**
35:16;91:21;95:12;
96:15;98:20;100:9;
101:1
**psychic (1)**
64:21
**psychics (1)**
65:10
**Public (5)**
4:3;28:9;58:13,14;
66:19
**publicly (1)**
68:5
**pulling (1)**
98:9
**pure (1)**
119:23
**purpose (2)**
112:16;120:8
**purposes (2)**
10:12;82:16
**pursue (3)**
31:20;114:9;118:1
**pursuing (3)**
70:9;74:10;104:6
**put (23)**
12:21;18:2;23:12;
26:10;33:1;36:13;
40:11,12;42:5;47:23;
50:12;52:22,23;
56:23;77:10;82:11;
85:22;89:16;93:24;
97:10;101:24;112:15;
118:12

## Q

**quarrel (2)**
116:3,7
**quarter (1)**
62:22
**quashed (1)**
60:12
**quick (1)**
59:12
**quit (1)**
14:23
**quite (3)**
7:22;71:2;120:12

## R

**radar (1)**
63:12
**rainy (2)**
73:20,22
**raise (1)**
22:4
**ran (1)**
49:8
**rape (6)**
47:21;48:2,8;53:22,
25;54:2
**rarely (1)**
101:13
**Rashid (18)**
70:8;78:22;79:2;
80:10,14;81:3,5;82:7;
86:25;89:14,24,25;
90:7,18;94:7,20;
96:10;104:7
**reached (1)**
115:1
**read (15)**
7:16;12:1;36:15,18,
21;64:12;65:13;
66:10;68:9,13;69:7;
74:2;87:18;118:21,21
**readily (1)**
66:17
**reading (3)**
62:6,10;116:16
**ready (4)**
90:2,3;91:22;
123:18
**real (3)**
63:8;65:5;99:3
**really (25)**
6:7;23:21;37:7,9;
41:16,24;44:1,4;
45:20;46:13;47:6;
63:3;65:10;70:12;
74:8;80:10,13,25;
81:5;84:23;103:9;
107:15;116:8,12;
124:21
**reason (5)**
8:10;42:9;53:14;
56:11;116:3
**reasonable (2)**
115:7,12
**reasons (6)**
50:7;52:18,18,23;
54:13;112:20
**Rebecca (1)**
4:1
**recall (33)**
12:3;40:17;41:18,
24;44:1;45:6,7;46:9;
47:5,6;50:18;52:16;
53:21;56:20;59:1,9,
12,13;64:16;65:8;
66:1;68:22;75:25;
79:6,19;81:17;91:16;
98:9;110:11;112:1;
119:24;121:8,16
**recanted (2)**
45:21;46:8
**recap (4)**
42:17;49:12;67:5;
100:8
**received (5)**
10:2;11:17,22;56:4,
17
**recess (2)**
57:10;102:14
**recognize (2)**
117:7,9
**recollection (14)**
11:24,25;12:19;
65:6;74:12;83:9,25;
85:21;97:25;99:3;
106:14;111:14;
113:11;116:2
**recommend (1)**
50:24
**record (18)**
4:11,23;6:5;50:13;
52:18,24;53:16;57:9;
73:10;74:2;75:2;
82:11,15;93:8;95:3;
102:15;110:4;112:25
**recorded (4)**
75:18;94:22;
111:21;112:20
**recording (1)**
112:5
**recruiter (2)**
54:23;55:17
**Redweld (12)**
98:1,2,5,8,10,13,16,
16,22;99:3,6;100:16
**refer (3)**
32:12;57:22;72:1
**referenced (1)**
53:20
**referencing (2)**
33:13;95:12
**referred (3)**
27:25;28:3;57:20
**refresh (2)**
11:24;12:19
**refresher (1)**
7:1
**regarding (1)**
11:1
**regular (1)**
13:17
**regularly (1)**
67:25
**reimbursed (1)**
31:24
**re-interviewed (1)**
94:9
**reinvestigated (1)**
62:20
**related (4)**
7:5;24:16;34:17;
87:5
**relates (2)**
48:22;61:13
**relationships (1)**
67:18
**relative (1)**
84:23
**released (1)**
48:17
**relooked (1)**
62:21
**rely (3)**
101:10,11;102:8

**relying (3)**
101:7;102:6;109:13
**remained (2)**
18:13;21:18
**remember (29)**
34:24;41:14,16;43:21;46:13,22;47:7,8;48:3;57:21,25;58:5,10,11;59:8,15,21;62:5,6;63:4,7;64:10,13,17;67:2;101:15;104:20;121:11,14
**remembered (2)**
27:21;59:21
**repeat (5)**
14:7;29:4;73:24;98:25;103:1
**report (10)**
89:18;94:14;96:4,7,21;98:13;101:23;115:18,19;116:10
**reporter (7)**
4:15;6:13;9:12;56:6,7;73:25;103:2
**reporter's (1)**
10:4
**reports (49)**
12:8,10,16;68:13;69:2;87:18;89:17,24,24;90:1,4,8,11,11,19,23;91:7,10,14,21;94:3,12,25;95:1,11,12,15,15,18;96:1,8,10,14;97:20;98:9,17,21;99:21;100:10;101:4,5,8,9,13;102:5;108:25;110:12;118:5;122:3
**represent (4)**
4:8;5:13,20;10:15
**representation (5)**
37:24;101:10,12;102:6,8
**represented (3)**
10:12;41:5;47:10
**representing (1)**
116:9
**reprimand (4)**
56:5,15,16,17
**reprimanded (2)**
55:25;56:2
**request (4)**
50:24;51:6,24;52:15
**requested (1)**
48:13
**rescheduled (1)**
10:5
**respected (1)**
100:7
**respective (1)**
88:13
**respectively (1)**
93:15
**respond (1)**
32:5
**responsibilities (1)**
18:10
**responsible (2)**
43:10;76:17
**restored (1)**
24:20
**result (1)**
29:6
**resume (1)**
27:20
**resumed (1)**
15:25
**retired (6)**
28:8;31:6;34:15,21;46:6,12
**retirement (1)**
56:24
**retract (1)**
30:13
**retracting (1)**
31:18
**returned (2)**
70:1,16
**reversed (3)**
60:1,3,4
**review (7)**
11:7;32:4,22;33:2;52:17;77:2;90:12
**reviewed (6)**
11:8;12:4;94:13,23;112:11;122:3
**reviewing (1)**
52:17
**right (145)**
6:4,6;8:9;10:1,9;16:24;17:3,24;20:7;21:20;24:7,15,18;26:4,7,17;28:12;29:19;32:6,11,17,19,22;33:3;34:3,6,11;35:9,18,23;37:5;38:4,21;39:4,17,20;42:17,20,22;43:2;45:25;46:25;49:18,23,24;50:22;51:1,3,4,7,11,15,16;53:3,12;54:4;55:5,20;56:25;58:12;59:24;60:12;61:17;62:13;65:22;68:17,25;69:9,13;70:11,20;71:7;73:2,6,13;74:5;76:5,8;77:17,18,19;78:8;79:17,25;80:1;81:9,11;82:3,4;83:22;85:19;86:14,15;87:6,12,22;88:11,16;90:6,7;91:23;96:16;97:2,13;98:2,13,18,22;100:5,11,17;102:1;103:11;104:2,25;105:2;107:12;108:16;109:1,9,15,22;112:17,22;113:4,17,25;114:9;115:2,12,14,23;116:18,19;118:8,9,19;119:9,10;120:2,3;121:13;122:1,7;124:21
**Road (1)**
4:1
**robbery (1)**
101:16
**role (5)**
15:7;80:2;102:20;121:20;122:13
**roles (1)**
74:24
**room (3)**
35:6,8;63:2
**Roseland (1)**
19:1
**roughly (2)**
26:2;43:22
**rules (4)**
7:1,3;27:9;33:1
**rumor (2)**
99:11,12
**runner (3)**
27:5,6,12
**runners (1)**
26:24
**running (1)**
103:5
**rush (1)**
123:21
**Rutgers (2)**
16:3,5

## S

**Sabur (36)**
70:9;78:22;79:2;80:10,15;82:7;86:25;87:4,10,18;88:7;89:14,24,25;90:18;94:3,18;95:13;97:19;98:15;99:15,17,20;100:6;102:4;104:7,20,24,25;105:4,16,23;107:4;109:23;112:12;113:3
**S-A-B-U-R (1)**
78:22
**Sabur's (2)**
90:8;107:6
**salary (2)**
20:22;28:1
**Same (4)**
93:18;98:21;121:3;123:4
**sanction (2)**
31:2;34:12
**sanctioned (5)**
31:3;34:5;35:24;37:13,14
**Saturday (1)**
25:3
**save (1)**
116:13
**saw (2)**
32:14;94:24
**saying (4)**
6:14;10:4;65:9;89:2
**scene (1)**
106:15
**schedule (2)**
124:11,12
**scheduled (1)**
10:3
**Schenck (1)**
4:24
**school (10)**
14:3,12,14,18;16:14,23,25;17:2,5;62:13
**screen (2)**
12:22;73:11
**searches (2)**
81:14,14
**seasoned (1)**
63:24
**second (11)**
6:4;22:8;23:24;24:7,24;44:18;55:9;74:19;76:2;112:7;118:20
**seconds (1)**
73:12
**secretary (1)**
25:25
**section (3)**
18:13;49:6;71:23
**securities (1)**
81:15
**Security (1)**
81:14
**seek (2)**
114:25;115:10
**seems (1)**
105:9
**semester (3)**
14:19,19,20
**semi-regular (1)**
67:12
**Senator (1)**
5:22
**sends (1)**
27:7
**sense (5)**
48:13;52:10;58:23;61:2;95:14
**sent (4)**
10:6;12:7;23:23;27:20
**sentence (1)**
118:22
**sentenced (1)**
43:18
**sentences (1)**
33:5
**separate (4)**
34:3,12;37:21;86:24
**September (1)**
18:1
**Sergeant (5)**
5:23;79:10;94:13;95:9;96:5
**serious (7)**
18:20;47:21,22;53:22;54:18;64:1;68:16
**serve (3)**
14:24;15:2;46:2
**served (1)**
51:6
**serves (1)**
62:11
**service (1)**
28:9
**set (4)**
7:3;88:1;105:23;124:12
**Seton (1)**
17:1
**settled (1)**
23:17
**several (5)**
54:7,17;55:1;64:19;79:21
**Shadrow (1)**
35:7
**share (1)**
89:25
**shared (1)**
94:24
**sharing (3)**
24:3;87:1;99:15
**shed (1)**
60:8
**shooting (1)**
59:19
**shop (1)**
67:22
**short (2)**
59:22;64:3
**shortly (4)**
34:15;36:9;45:9;123:9
**show (1)**
115:19
**showing (1)**
34:5
**shut (1)**
26:19
**sick (1)**
24:10
**side (4)**

53:1;102:25;103:5;
112:10
**sign (2)**
50:8,10
**signed (11)**
52:6;91:7,18;94:4,
12,25;95:1,4,6;96:10;
119:5
**significant (2)**
113:12,15
**signing (1)**
118:6
**sign-off (2)**
49:11;95:1
**signs (3)**
50:9;94:13;96:5
**Simple (1)**
53:1
**simply (1)**
53:5
**single (1)**
88:1
**sit (4)**
8:9;47:4;91:25;
113:5
**Six (7)**
14:9,10;16:20,21;
18:13;43:18;56:11
**Sixty-five (1)**
14:6
**Skype (3)**
30:10,14;31:14
**Sloan (5)**
22:18;24:12;75:16,
17;76:6
**S-L-O-A-N (1)**
75:17
**slot (1)**
76:8
**slowly (1)**
6:16
**Smith (1)**
4:25
**Social (2)**
81:13,15
**Soletti (2)**
58:20;59:16
**solo (1)**
26:3
**solve (1)**
68:15
**solved (2)**
62:17;64:18
**somebody (2)**
79:1;121:2
**somehow (2)**
65:13;66:21
**someone (21)**
10:8;12:18;34:19;
41:9;42:15;43:16,16;
47:1;72:1;76:21;
82:21;84:21;95:22;
102:9;106:1,4,15,16;
110:16;120:9;123:2
**sometime (4)**
24:7;40:17;46:12;
74:11
**sometimes (7)**
9:5;54:15;57:2;
72:1,13;82:5;124:2
**somewhat (2)**
8:14;65:8
**somewhere (3)**
28:17;86:14;110:12
**sorry (19)**
14:7;29:4;31:15;
33:18;41:12;44:9;
45:16;46:18;57:22;
58:7;71:24;77:18;
89:13;90:14;95:10;
97:10;98:25;103:21,
23
**sort (3)**
93:16,16;94:17
**sought (2)**
21:10;114:20
**sound (3)**
26:4;115:23;119:9
**sounds (6)**
24:6,11;28:15;94:4;
116:18;119:10
**sources (2)**
65:20;68:4
**South (1)**
43:18
**speak (5)**
6:16;67:11;93:8;
101:13;122:12
**speaking (4)**
10:18;26:2;40:3;
118:5
**special (8)**
72:2,4,15,16,17,20,
21,22
**specialist (1)**
15:13
**specialty (1)**
20:10
**specific (4)**
55:3,6;69:22;83:25
**specifically (10)**
38:6;40:5;48:3;
66:1;78:14;83:16;
97:12;111:7,18;
121:16
**specificity (1)**
122:7
**speculate (4)**
88:23;92:10;
119:20,21
**speculation (10)**
87:14;89:22;92:6,7,
23;93:15;100:19;
103:18;107:22;
119:23
**spell (4)**
9:12;17:9;39:25;
44:11
**spelled (2)**
5:6,10
**spending (2)**
24:10;48:18
**spent (3)**
43:8;56:11;124:1
**spoken (1)**
112:3
**squad (2)**
63:9;101:16
**standard (1)**
115:2
**Star (2)**
56:5,8
**start (5)**
4:10;37:20;114:5;
122:11;123:25
**started (11)**
13:2;14:14;17:25;
18:11;28:7;29:15,16;
42:3;81:18;85:7,16
**State (13)**
4:4;5:4;13:9,12;
17:14;27:9;39:6,8;
40:24;52:11;81:10,
12;103:16
**statement (13)**
45:14,15;85:23;
102:2;103:25;104:13;
105:6;109:20;113:13;
114:3,8,15;121:7
**statements (2)**
80:12;85:19
**states (1)**
13:6
**station (1)**
15:9
**stationed (2)**
15:4,5
**status (3)**
31:21,21,22
**stay (1)**
52:7
**stayed (1)**
67:25
**stays (1)**
72:17
**stemmed (1)**
31:10
**steps (1)**
120:23
**still (16)**
25:8;27:21,24;
31:23;32:20;39:19;
63:15;69:19,23;
70:18;75:5,8;80:15;
81:20;104:25;105:4
**stint (2)**
22:8;44:18
**stop (5)**
86:18,21;123:17,
25;124:16
**stopped (2)**
29:9,16
**stopping (1)**
124:14
**stops (1)**
86:14
**store (1)**
16:17
**story (3)**
22:12;48:12;68:7
**Street (1)**
18:12
**strictly (1)**
82:4
**strike (9)**
19:4;27:16;67:5;
76:12;83:24;86:5;
106:1;114:4;122:11
**struggling (1)**
6:13
**stuck (1)**
62:8
**stuff (1)**
99:9
**subject (4)**
35:18;60:19;61:9,
12
**submit (2)**
90:19;96:21
**submitted (9)**
90:8,10,11,12;
91:10,14,18;96:7;
111:8
**submitting (1)**
90:24
**subsequent (2)**
39:1;42:3
**substantially (1)**
43:16
**succeeded (1)**
40:8
**sued (7)**
37:18,23;38:11;
39:3,14,23;41:11
**suggest (1)**
93:8
**suggested (2)**
43:1,9
**suggesting (1)**
56:10
**suggestion (1)**
55:12
**suicide (1)**
72:14
**suing (1)**
39:16
**suit (1)**
40:22
**suite (1)**
25:8
**summary (1)**
59:12
**summation (2)**
58:22,23
**summer (1)**
5:13
**Superior (4)**
17:12;30:15;43:21;
90:12
**supervise (1)**
82:2
**supervised (3)**
86:5;87:5,11
**supervising (1)**
95:9
**supervisor (7)**
49:7,20;51:10;
90:20;95:7,8;96:22
**supervisors (3)**
49:3;78:16;96:2
**supervisory (1)**
81:2
**supplied (1)**
95:15
**support (2)**
117:10,18
**supposed (3)**
9:25;30:10;102:10
**sure (18)**
24:2,4;44:5;47:9;
57:7;60:24;65:11;
67:9,16;72:15;75:4;
78:22;89:14;90:15;
112:14;113:2;114:5;
124:6
**surmised (1)**
123:10
**surreptitiously (1)**
111:20
**suspect (4)**
7:2;84:2,9;106:15
**suspected (1)**
123:4
**Sussman (1)**
25:6
**sustain (4)**
43:1;44:23;45:21;
115:11
**swear (3)**
117:19;118:15,16
**switched (1)**
74:24
**sworn/affirmed (1)**
4:3
**sympathies (1)**
24:1

**T**

**talent (1)**
65:14
**talk (12)**
49:18;68:14;
104:19;106:25;111:6,
13;112:6,7;115:14;

123:5,7,11
**talked (9)**
32:17;33:5,15;66:4;74:18;98:15;105:14,15;111:12
**talking (12)**
8:16;30:19;38:6;55:14;64:20;69:22;79:24;80:11;95:7;97:12;101:22;119:24
**target (1)**
60:10
**task (2)**
82:6,8
**tax (1)**
81:14
**team (1)**
112:21
**Ten (1)**
25:21
**tendered (1)**
101:25
**tenure (1)**
53:24
**term (1)**
83:10
**Terminal (2)**
15:6,18
**terms (8)**
12:19;21:16;55:4;56:22;86:5,16;101:14;120:17
**testified (1)**
59:20
**testifies (1)**
4:4
**testimony (7)**
8:11;45:11;90:15;105:2;109:17;111:1;116:12
**Thanks (1)**
75:12
**theories (1)**
40:4
**theory (2)**
40:23;97:18
**thereafter (1)**
123:9
**therefore (2)**
42:16;84:24
**thinking (2)**
58:22;93:23
**though (8)**
7:21;10:9;32:21;39:14;51:4;55:3;105:1;111:18
**thought (14)**
11:20;40:6;45:14;63:23;66:9;84:21;99:8,15;111:23;115:6,11;122:22,25;123:1
**three (2)**
32:15;46:6
**Thursday (1)**
23:11
**Tietjen (3)**
5:4,7;7:8
**tight (2)**
62:25;122:19
**till (1)**
22:19
**times (6)**
6:23;8:16;38:16;45:1;54:17;75:7
**timing (2)**
24:5;108:13
**tip (5)**
103:10,13;104:13,17,21
**today (12)**
4:10;7:4,12;8:9;10:1,17;11:4;12:5;47:4;73:16;91:25;113:5
**together (1)**
81:4
**told (14)**
21:5;23:3,9,10;36:9,21,24;48:16;74:19;91:9,18;92:16;95:2;100:9
**took (11)**
23:16;25:4,13;28:25;68:16;71:22;80:25;94:19;107:1;113:2,7
**total (1)**
65:16
**touch (1)**
67:25
**towards (3)**
6:17;46:14;99:17
**tower (1)**
42:6
**towers (1)**
42:4
**traffic (1)**
121:15
**transcripts (3)**
11:13;12:1,5
**transferred (1)**
16:3
**treatment (1)**
24:11
**trial (32)**
11:14;13:14,18,21;18:14,17;19:3;22:1;23:4,5;24:19;28:25;29:5,9,18,21;30:4,5;32:11,12;33:6,16;34:18;36:25;37:2,3;39:2;49:6,7;63:1;94:11;111:12
**trials (1)**
19:10
**tried (7)**
18:22;37:1;67:14;76:7;105:23;109:3;112:7
**Tronica (1)**
4:18
**true (4)**
99:10;114:10,23;115:3
**trumped (2)**
86:8,10
**truth (2)**
48:16;118:7
**truthful (1)**
8:11
**try (11)**
18:16,19,20;36:8,9,16;82:16;90:2,3;103:12;110:13
**trying (10)**
18:13;33:21;53:4;75:15;85:10;88:25;93:11;101:20;108:13;116:13
**Tuesday (1)**
22:24
**tumor (1)**
22:17
**turn (2)**
61:18;75:3
**turned (3)**
33:6,14;101:4
**twice (1)**
6:24
**two (14)**
16:2;20:5;32:6,18;37:16;65:17;67:21;81:1;86:23;106:19;111:23;112:2;119:1;123:13
**type (11)**
9:3;19:4,5;20:2;21:3;31:2;33:24;38:18;50:3;51:6;55:10
**types (1)**
25:14

## U

**Uber (4)**
9:19,20;13:1;29:17
**ultimate (1)**
115:11
**ultimately (8)**
41:3,25;43:25;52:6;57:20;62:17;86:22;96:15
**unable (1)**
110:22
**uncomfortable (1)**
73:14
**under (3)**
4:5;24:16;40:23
**underlying (1)**
106:17
**understandable (1)**
6:11
**understood (6)**
8:6;52:3;63:23;76:19;103:9;122:13
**unemployed (1)**
8:24
**unfortunately (1)**
111:11
**unit (9)**
45:24;46:3;47:25;49:1;62:25;71:21;83:3,11,14
**unless (2)**
63:2;92:15
**unpredictable (1)**
124:2
**unrelated (1)**
34:6
**unsuccessful (1)**
111:25
**unusual (2)**
91:20,24
**up (29)**
5:9;6:8;13:25;26:25;28:1;29:15;31:15;34:5;36:11;40:12;42:16;45:11;51:9,10;55:17;66:20;69:7;78:12;85:17;90:14;93:8;105:23;110:18;111:5;112:7;114:13;122:24;124:22;125:3
**updates (1)**
85:4
**upon (2)**
16:13;17:5
**use (4)**
93:22;95:3;96:15;110:22
**used (6)**
53:6,15;81:16;96:13;111:3,7
**using (4)**
26:24;65:21;68:2;89:18
**usually (2)**
54:19;94:12

## V

**vague (1)**
68:24
**verbal (3)**
21:12,14;56:15
**verbally (3)**
37:14;100:12,13
**versus (1)**
37:22
**veterinary (1)**
15:12
**via (1)**
115:9
**Vic (1)**
82:12
**victim (3)**
47:2;48:9,11
**victims (1)**
81:15
**victim's (2)**
46:21,24
**Victor (2)**
5:3,6
**video (1)**
75:3
**view (1)**
12:22
**viewed (1)**
98:8
**vigorously (1)**
74:10
**violation (1)**
61:15
**violence (1)**
75:19
**vivid (1)**
83:24
**voice (1)**
6:8
**voluntarily (2)**
44:20;53:21
**Vomacka (12)**
5:5,5;82:9,10;87:15;89:7;102:15;105:12;106:10;107:23;120:21;121:3
**voracity (1)**
118:8

## W

**waiting (1)**
31:25
**waive (1)**
31:18
**waived (1)**
55:17
**walk (1)**
63:2
**warrant (1)**
121:15
**warrants (2)**
117:11,19
**way (29)**
10:11;15:22;20:18;22:19;37:3;55:25;60:21;61:10;71:19;76:19,20;81:23;86:13;89:16;99:19,22;100:15;102:1,3,4,9;104:6;107:2;110:11,19;117:21,22,

25;118:1
**wearing (1)**
6:10
**weather (1)**
73:15
**Wednesday (3)**
23:1,4,9
**week (1)**
76:21
**welcome (2)**
12:24;102:17
**well-known (2)**
64:25;65:1
**weren't (7)**
54:13;63:1;91:17;94:12,16;100:14,15
**West (2)**
8:25;9:3
**what's (7)**
15:14;27:5;29:21;39:10;73:17;92:15;107:25
**Whereupon (3)**
57:10;74:2;102:14
**wherever (1)**
120:7
**whole (1)**
110:20
**who's (1)**
46:15
**whose (2)**
50:12;86:17
**wife (3)**
25:23,24;27:3
**William (2)**
5:4;7:8
**willing (1)**
54:24
**wind (1)**
120:12
**withholding (1)**
99:20
**within (2)**
55:21;67:6
**without (3)**
8:19;49:4;97:20
**WITNESS (12)**
5:17;6:2;10:15;11:6,20;45:10;46:8;59:20;101:23;115:24;125:6,11
**witnesses (7)**
11:25;78:3;80:9;94:9;108:4,21;109:17
**witness's (1)**
111:1
**woman (1)**
59:8
**Woodbridge (1)**
42:6
**word (5)**
80:20;93:22;94:1;115:19,24
**work (36)**
9:1,2,3,7,16;13:16;16:15,16;17:16;18:25;19:11,25;20:4,17;25:19;26:9;28:17,23;29:5,9;37:19,21;38:11;63:25;68:20;78:13;83:4;93:24;94:8,20,24;100:3;104:7,12,14;112:11
**worked (13)**
12:11;22:19;64:3,23;76:21;81:4;82:6;88:6;96:12,18;104:11;108:5,16
**workers (4)**
19:9;25:16;26:15;29:12
**working (8)**
29:16,16;62:13;83:21;86:4;87:10;96:19;109:6
**workmen's (1)**
26:7
**works (2)**
4:19;118:17
**worries (1)**
124:9
**worry (1)**
23:12
**worth (1)**
27:23
**wound (1)**
26:16
**wrap (1)**
125:3
**write (2)**
31:7;33:10
**written (6)**
28:2;33:1;35:10;56:4,16;117:15
**wrong (7)**
31:5;33:10;36:5;42:18,18;49:14;77:18
**wrote (4)**
33:11;40:12;42:16;90:11

**Y**

**year (17)**
9:6;14:2,11;16:2,7;17:18;19:17;20:12;21:23,25;22:14;29:11,11;40:14;43:22;46:9;76:1
**years (15)**
14:24;20:5;25:21;28:9,11;46:2;56:23;64:7;71:20;79:5,21;81:8;94:23;96:12;109:13
**York (1)**
24:13
**young (4)**
36:4,7;54:19;55:16
**younger (1)**
29:7

**Z**

**Zoom (1)**
4:11

**0**

**09 (1)**
71:10

**1**

**1:40 (1)**
123:17
**1:41 (1)**
125:14
**10 (7)**
9:25;10:4;28:11;75:19;77:14;79:5;124:22
**11 (2)**
10:5;118:20
**12 (1)**
119:1
**12th (2)**
115:20;116:4
**13 (2)**
119:1,6
**16th (1)**
125:7
**17-year-old (1)**
55:6
**1973 (1)**
14:13
**1974 (1)**
15:1
**1977 (2)**
15:1,19
**1978 (1)**
61:25
**1980 (3)**
14:4,15;16:8
**1983 (2)**
14:15;17:2
**1984 (2)**
17:24;18:1
**1985 (1)**
118:10
**1987 (3)**
18:5,6;67:8
**1990 (2)**
20:15,16
**1992 (2)**
22:14;25:11

**2**

**2 (1)**
123:18
**20 (2)**
25:4;30:13
**200 (1)**
37:7
**2000s (1)**
38:10
**2002 (10)**
26:4,16,20,21;27:14;28:7,8;65:19;69:15;70:1
**2002-ish (1)**
70:16
**2005 (4)**
46:5;47:24;48:5;49:2
**2006 (1)**
40:18
**2008 (25)**
44:3;71:10;74:11,13;76:3,4,13;77:22;78:11,18;79:25;80:14,20;81:18;83:4,15,21;85:3,24;86:17;97:13;115:20;116:4,18;119:7
**2008-ish (1)**
72:25
**2009 (8)**
74:13;76:5;83:4,15,22;85:3;86:17;97:13
**2010 (4)**
40:18;77:15,20;102:22
**2011 (2)**
44:4;77:12
**2012 (8)**
28:10,16,18;44:4;46:6;47:24;49:2;56:22
**2013 (5)**
13:14,18,21,22;29:19
**2015 (2)**
13:2;29:15
**21 (1)**
62:3
**22 (2)**
62:3,3
**25 (2)**
28:8;56:23

**3**

**30 (1)**
73:12

**5**

**5 (3)**
4:1;22:21;26:15

**6**

**60/35 (1)**
26:15

**7**

**7 (1)**
22:19
**70s (2)**
107:7,15

**8**

**80s (7)**
38:10;63:8,11,21;64:23;84:17;107:15
**84 (1)**
18:9
**85 (1)**
17:24
**87 (6)**
18:9,23,24;19:21;64:5;67:20

**9**

**9 (1)**
44:3
**91 (1)**
24:7
**911 (1)**
75:19
**91R-10 (1)**
15:12
**92 (3)**
24:15,24;26:3