## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **LEE EVANS,** | Civ. No. 14-00120 (KM) (MAH) |
| **Plaintiff,** | |
| **v.** | **OPINION** |
| **CITY OF NEWARK, et al.,** | |
| **Defendants.** | |

**KEVIN MCNULTY, U.S.D.J.:**

     In August 1978, five teenage boys from Newark disappeared. More than thirty years later, in 2010, plaintiff Lee Evans and his cousin, Philander Hampton, were charged with their murder. The charges came after Hampton allegedly confessed to police that he and Evans forced the boys into the closet of a home, nailed the closet shut, and set the house on fire.

     Hampton pled guilty to the charges, while Evans was tried and acquitted in 2011. Evans then filed this lawsuit against the police officers, prosecutors, and supervisory personnel involved in his criminal case, alleging violations of his constitutional and state law rights.

     The defendants moved to dismiss the complaint in 2015 and were partially successful. Now, the case primarily concerns Evans's claim of malicious prosecution against the police officers who investigated, and ultimately obtained, the warrant pursuant to which Evans was arrested and later tried. Those officers, as well as the other remaining defendants, have moved for summary judgment. For the reasons set forth below, the motions for summary judgment are granted in part and denied in part.

## I.   Background

### A. Initial investigation

On August 20, 1978, five boys from Newark went missing and were never seen again.[1]  (Newark St. ¶36; Resp. to Newark St. ¶36.) All of the boys were

---

[1]     Certain key items from the record will be abbreviated as follows:

DE = Docket entry number in this case

Tietjen MSJ = Brief of Defendant Tietjen in support of summary judgment (DE 232)

Newark MSJ = Brief of the Newark Defendants in support of summary judgment (DE 233)

Carrega MSJ = Brief of Defendant Carrega in support of summary judgment (DE 234)

Opp. to Newark MSJ = Evans's brief in opposition to the Newark Defendants' motion for summary judgment (DE 243)

Tietjen St. = Tietjen's statement of undisputed material facts (DE 232-2)

Newark St. = Newark Defendants' statement of undisputed material facts (DE 233-2)

Carrega St. = Carrega's statement of undisputed material facts (DE 234-3)

Resp. to Tietjen St. = Evans's response to Tietjens's statement of undisputed material facts (DE 244-1)

Resp. to Newark St. = Evans's response to the Newark Defendants' statement of undisputed material facts (DE 247)

Resp. to Carrega St. = Evans's response to Carrega's statement of undisputed material facts (DE 246)

Tietjen Repl. = Brief of Defendant Tietjen in further support of summary judgment motion (DE 252)

Pl. St. = Evans's statement of disputed material facts (DE 245)

Tiet. 2008 Rep. = Tietjen's 2008 supplementary investigation report (DE 235-3)

Tiet. 2010 Rep. = Tietjen's 2010 supplementary investigation report (DE 235-9)

Hairston Rep. = 1978 report of Detective Everett Hairston (DE 234-5)

Carrega Rep. = Carrega's 2011 continuation report (DE 234-15)

Sabur Rep. = 1998 investigation report of Detective Rashid Sabur (DE 233-9)

Arson Rep. = August 21, 1978, Newark Fire Department Report (DE 234-18)

Carrega Aff. = Carrega's affidavit in support of arrest warrants (DE 234-34)

Black males, ages 16 and 17. Their names were Randy Johnson, Ernest Taylor, Melvin Pittman, Alvin Turner, and Michael McDowell. To this date, their remains have not been located. (Newark St. ¶¶1, 6; Resp. to Newark St. ¶¶1, 6; Carrega St. ¶1; Resp. to Carrega St. ¶1.)

On August 23, 1978, Newark Police Department ("NPD") Detectives Everett L. Hairston and John Scott-Bey were assigned to the missing-persons matter involving the five boys. (Newark St. ¶7; Resp. to Newark St. ¶7.) Hairston's investigation report (the "Hairston report") details several interviews that police conducted with the boys' family members and other individuals in the days following their disappearance. I will summarize certain key components of the Hairston report, noting points at which Evans disputes its accuracy.[2]

According to the report, police learned from several family members that the boys were with Evans on August 20, 1978. Alvin Turner's mother stated that her son was last seen riding in the back of Evans's pickup truck, while Ernest Taylor's mother stated that she last saw her son, along with Melvin Pittman, get into a pickup truck with two other boys already inside. She believed that the pickup truck belonged to Evans. (Newark St. ¶¶4-5, 19; Resp. to Newark St. ¶¶4-5, 19.)

---

Hampton St. = Hampton's 2017 statement (DE 232-7, p. 369)

Hampton Aff. = Hampton's 2020 affidavit (DE 232-7, p. 377)

Hadley Dep. = Deposition of Defendant Hadley (DE 233-11)

Tietjen Dep = Deposition of Defendant Tietjen (233-6, p. 2)

Evans Dep. = Deposition of Lee Evans (DE 233-6, p. 164)

Hampton Dep. = Volume II of deposition of Philander Hampton (233-7, p. 2)

Carrega Dep. = Deposition of Defendant Carrega (DE 233-10)

Laurino Dep. = Deposition of Robert Laurino (DE 235-10)

Cucinello Dep. = Deposition of Cheryl Cucinello (DE 234-28)

Cutler Int. = Transcript of 2008 interview of Robert Cutler (DE 234-14)

[2]     Evans also contends that the report should not be considered because it is hearsay. I address this argument at page 34 n.9, *infra*.

Randy Johnson's mother stated that Evans dropped Johnson off near his home at approximately 11:00 pm on August 20, 1978. (Newark St. ¶3; Resp. to Newark St. ¶3.) Michael McDowell's mother stated that she saw her son return home in a truck driven by Evans on that date, but that he stayed for about five minutes before leaving again in the same truck. (Newark St. ¶23; Resp. to Newark St. ¶23.)

Police also learned that the missing boys, just prior to their disappearance, had allegedly stolen marijuana from Evans. Robert Cutler, an apparent friend of one or more of the boys, told investigators that on August 19, 1978, Melvin Pittman and Randy Johnson admitted to him that they broke into the apartment of "Big Man"—referring to Evans[3]—and stole a pound of marijuana. According to Cutler, the five missing boys divided the marijuana amongst themselves. (Newark St. ¶¶17-18; Resp. to Newark St. ¶¶17-18.)

After hearing about the stolen marijuana, several family members searched the boys' bedrooms and located small amounts of the substance, which they turned over to police. (Newark St. ¶16 (marijuana found in Randy Johnson's room), ¶20 (marijuana found in Ernest Taylor's room), ¶21 (marijuana found in Alvin Turner's room); Resp. to Newark St. ¶¶16, 20. 21). It does not appear that the detectives developed further physical or other evidence connecting Evans to the marijuana recovered from the boys' rooms. (Pl. St. ¶7; Tietjen Dep. 115:23-116:2.)

The Hairston report reflects that on August 22, 1978, police interviewed Evans. (Newark St. ¶11; Resp. to Newark St. ¶11.) According to the report, Evans told police that the boys often helped him with construction work. (Newark St. ¶11; Resp. to Newark St. ¶11.) He stated that he brought the boys with him on several jobs on August 20 and returned with them at around

---

[3]     Evans testified at his deposition that "Big Man" was one of his nicknames. (Evans Dep. 21:6-11.)

11:00 p.m. A few days after the interview, Evans agreed to take a polygraph test, which he reportedly passed. (Carrega St. ¶10; Resp. to Carrega St. ¶10.)

Notwithstanding the Hairston report, Evans denies telling detectives that he dropped the boys off at home at 11:00 pm on August 20, 1978, although he recalls speaking with detectives and agrees that some of the boys helped him move boxes on the date in question. (Resp. to Newark St. ¶¶2, 12.) He maintains, however, that he dropped the teenagers off at an ice cream shop at around 2:30 or 3:30 p.m. (*Id.* ¶3.)

On October 19, 1978, Hairston and Scott-Bey interviewed Evans's second cousin, Philander Hampton.[4] According to the Hairston report, Hampton told the detectives that on August 20, 1978, he was at the home of Maurice Olds—another of Evans's cousins—with several of the missing boys. Hampton stated that he, Olds, and a few of the missing boys got into Evans's truck and drove to Vailsburg Park, intending to play basketball. Hampton returned home in Evans's truck at around 7:00 p.m. and did not see Evans or any of the missing boys later that night. (Newark St. ¶¶31-33; Resp. to Newark St. ¶¶31-33.; Hairston Rep. 22-23.)

As reflected in the reports of other NPD officers, police interviewed nearly 150 witnesses in the first thirteen months of the investigation. At one point, a psychic suggested that a fire was involved in the boys' disappearance. Detective Hairston checked reports of all fires that occurred in Newark in August 1978, including one at a site corresponding to 256 Camden Street. No fatalities were reported as a result of that fire. (Carrega St. ¶16; Resp. to Carrega St. ¶16; Pl. St. ¶10.)

### B. Cold case investigation

For decades, investigators continued following leads, to no avail. In 1998, the NPD officially classified the case as a homicide. Detectives Keith Sheppard

---

[4]     The report refers to Hampton as Philand Williams, but there is no dispute that the individual identified in the report as Philand Williams is Philander Hampton. (Hairston Rep. 22-23; Pl. St. ¶9.)

and Rashid Sabur of the Homicide Cold Case Unit were assigned to investigate. (Newark St. ¶¶36-41; Resp. to Newark St. ¶¶36-41.)

According to Sabur's investigation report ("the Sabur report"), detectives met in 1998 with the missing teens' family members, many of whom expressed their belief that Evans was involved in the boys' disappearance. (Newark St. ¶42-43; Resp. to Newark St. ¶42-43.) Detectives also re-interviewed Robert Cutler, who had been interviewed in 1978. Cutler recounted that Evans often sold marijuana in the area and sometimes sold to the missing teenagers. Cutler also stated that he had broken into Evans's apartment with the missing teenagers on at least ten separate occasions before their disappearance. (Newark St. ¶¶46-47; Resp. to Newark St. ¶¶46-47.)

On February 15, 1999, Detectives Sabur and Sheppard spoke with Maurice Olds. Olds denied having knowledge of the boys' disappearance but stated that the boys sold marijuana for Evans and that Evans knew that they had burglarized his apartment. Olds also stated that he had heard that the boys burned in a fire either on Hawthorn Avenue or Camden Street in Newark. He could not recall where he obtained this information. (Newark St. ¶49; Resp. to Newark St. ¶49; Sabur Rep. 8.)

The Sabur report reflects that on February 24, 1999, Sabur and Sheppard interviewed Philander Hampton at the NPD station. Hampton initially denied having any knowledge of or involvement in the boys' disappearance, but later stated, "If I confess to this shit, my life is over." Hampton was released after failed attempts to elicit any more information. (Newark St. ¶50; Resp. to Newark St. ¶50; Sabur Rep. 10.) At his 2022 deposition, Hampton testified that he did not remember meeting with Detectives Sabur and Sheppard or making those statements. (Hampton Dep. 115:21-117:9.)

The Sabur report further reflects that Sabur met with Evans on April 16, 2008. At some point Evans asked how the investigation was going, and Sabur stated that he knew that the missing teens had burglarized Evans's home and stolen large amounts of marijuana from him. Evans responded that the "situation was bigger than him" and "he was only a middleman." Evans

6

currently denies making those statements. (Newark St. ¶¶52-54; Resp. to Newark St. ¶¶52-54; Sabur Rep. 12-13.)

In 2007, the Essex County Prosecutor's Office (ECPO) began to conduct its own investigation, led by Defendant Detective Lieutenant Louis Carrega. (Newark St. ¶58; Resp. to Newark St. ¶58.) Carrega testified at his 2020 deposition about Jack Eutsey, a retired Newark police detective who by 2007 had been hired by the ECPO. Carrega testified that Eutsey played a significant role in the ECPO investigation. Eutsey never worked on the case while employed by the NPD, but he harbored strong personal feelings about the case having never been solved. According to Carrega, Eutsey felt that the investigation by the NPD had been "fumbled from the beginning." (Newark St. ¶¶60-61; Resp. to Newark St. ¶¶60-61.)

Carrega re-interviewed many of the same witnesses that Sabur had interviewed a decade earlier. (Newark St. ¶84; Resp. to Newark St. ¶84.) In particular, Carrega re-interviewed Robert Cutler, who again stated that he had broken into Evans's apartment shortly before the boys' disappearance. (Cutler Int., 9:3-12:25.) Carrega also located Maurice Olds in an attempt to interview him, but Olds asked for "some time" to decide whether to give a statement and never returned. When Carrega tried to locate Olds again, he learned that Olds had passed away. (Newark St. ¶67; Resp. to Newark St. ¶67.)

In May 2008, Carrega requested assistance with the investigation from the New Jersey State Police (NJSP) Missing Persons Unit. (Carrega St. ¶33; Resp. to Carrega St. ¶33.) Defendant Detective William Tietjen was assigned to help. (Tietjen St. ¶2; Resp. to Tietjen St. ¶2.) According to Tietjen's investigation report, Carrega and Tietjen met in May 2008 to discuss the case. Carrega advised Tietjen that Evans, who remained a suspect in the case, still had ties to the Newark area. Carrega also informed Tietjen that Evans had submitted to a polygraph exam in 1978 and that the results were initially interpreted to mean that Evans was being truthful about having no involvement in the boys' disappearance. Later, however, a re-examination of the results indicated that Evans had failed the polygraph. Carrega admitted at his deposition that he had

no firsthand knowledge that Evans had failed the polygraph, but relied on the representation of Eutsey, who had apparently learned this information from Sabur. (Carrega St. ¶37; Resp. to Carrega St. ¶37; Tiet. 2008 Rep. 3; Newark St. ¶74; Resp. to Newark St. ¶74.)

At some point, Carrega advised Tietjen that he was looking for Evans's cousin, Philander Hampton. Tietjen assisted by searching databases to see if he could obtain any information on Hampton. (Tietjen St. ¶5; Resp. to Tietjen St. ¶5.)

Sometime in May or June 2008, Defendant Detective Joseph Hadley of the NPD Homicide Unit became involved in the investigation. (Newark St. ¶¶75-76; Resp. to Newark St. ¶¶75-76.) There is a dispute among the witnesses as to whether the ECPO or the NPD led the investigation from that point on. (Newark St. ¶¶79-81; Resp. to Newark St. ¶¶79-81.)

### C. Hampton's confession

In November 2008, Carrega learned that Hampton had been arrested pursuant to a traffic warrant and was being held at Essex County Jail. As Hampton remained a person of interest in the case, Carrega arranged for Hampton to be transported to the ECPO for an interview. (Carrega St. ¶¶43-44; Resp. to Carrega St. ¶¶43-44; Newark St. ¶¶87-88; Resp. to Newark St. ¶¶87-88.) Who was present for this interview, and what occurred during it, are both highly contested.

With respect to the first question, it is undisputed that when Hampton first arrived at the prosecutor's office, only Carrega and Eutsey were present. (Newark St. ¶91; Resp. to Newark St. ¶91.) According to Evans (relying on a sworn statement from Hampton), at some point Tietjen and Hadley entered the interview room and participated in the questioning. (Pl. St. ¶35.) According to the defendants, Tietjen and Hadley were not involved in any questioning that occurred at the prosecutor's office, but were present during a recorded statement that Hampton gave at the State Police Barracks later that day. (Carrega Rep. 1-2; Newark St. ¶¶91-102; Tietjen St. ¶¶9-11.)

With respect to the content of the interview, the defendants' version is as follows. Carrega and Eutsey questioned Hampton about his knowledge regarding the disappearance of the five teenagers, and Hampton initially stated that he had no information. (Carrega St. ¶46.) Carrega and Eutsey told Hampton that they did not believe him and asked if he would be willing to submit to a polygraph test. (Carreg Rep. 1-2.) Hampton agreed to do so. (Carrega St. ¶46.) A polygraph test was conducted in a separate room by ECPO Detective Thomas Kelly. (Carrega Rep. 2.) After the test, Kelly explained to Hampton that the results revealed that he had been deceitful in his answers. (*Id.*) Confronted with these results, Hampton stated, "OK, I guess it had to come out someday, I'll tell you what happened but you know it was Big Man right?" (*Id.*) Carrega then asked if Hampton was willing to give a recorded statement, and Hampton responded that he was. (*Id.*)

Carrega then contacted Tietjen and Hadley so that they could be present for Hampton's statement. (*Id.*) Carrega soon realized, however, that the video recording equipment at the prosecutor's office was not functioning. (*Id.*) By that time, Tietjen and Hadley had arrived at the office, and Tietjen stated that the recording equipment at the Newark State Police Barracks could be used instead. Hampton consented to being transported there for the purpose of providing a statement. (*Id.*)

En route to the barracks, Hampton, who was in a car with Carrega, asked if Carrega wanted "to see where the kids were killed." (*Id.*) Hampton then directed Carrega to a location on Camden Street in Newark. Hampton stated that he used to live on the top floor of a three-story house that was no longer there, and that the missing boys were taken to that floor before they were killed. (*Id.*) Upon hearing this, Carrega contacted ECPO's crime scene unit. A detective from the unit arrived and took photographs. Carrega and Hampton then drove to the State Barracks, where Hampton was brought into an interview room equipped with audio/visual equipment. (*Id.*) Hampton gave a

recorded statement at that time in the presence of Carrega, Tietjen, and Hadley. (*Id.*)

In the recorded interview, a transcript of which is in the record, Hampton stated that Evans picked him up on August 20, 1978, with Maurice Olds and two of the missing boys already in Evans's truck. (Hampton St. 39:2-21; 49:19-25.) Evans had already told Hampton that he intended to kill the five boys because they had stolen marijuana from him. Hampton repeatedly indicated that he did not believe Evans was serious; he thought Evans was only trying to scare the boys. (*Id.* 40:12-14; 36:8-17; 51:23-52:1-9.)

Evans drove to the house on Camden Street where Hampton had lived until that day, when he moved out. (*Id.* 14:11-21, 44:14-25.) Inside the house, Evans passed Hampton a gun and told him to watch the boys until he got back. (*Id.* 49:1-11.) Evans then went with Maurice Olds to pick up the other three boys, after which he dropped Olds off at home. (*Id.* 49:15-21.) When Evans returned with the three other boys, he forced all five boys into a closet and nailed the closet shut. He poured gas all around the door and then asked Hampton for a match. Hampton gave him a match, which Evans struck, and a fire started. (*Id.* 54:7-18, 61:1-2.) Hampton and Evans then exited from the house through the back entryway, and Evans drove Hampton home. (*Id.* 61:10-17.) At the end of the interview, Hampton swore that everything he stated was the truth and that he was not coerced into providing testimony. (*Id.* 74:1-19, 79:18-22.)

Evans's version of the events leading up to Hampton's recorded statement differs significantly. Although Evans was not present for these events, he relies on a sworn affidavit that Hampton executed in October 2020. (Pl. St. ¶¶33-43.) According to the affidavit, after Hampton arrived at the prosecutor's office, Carrega and Eutsey told him that they knew that he had helped Evans kill the boys in a fire on Camden Street. (Hampton Aff. ¶¶7-9.) Hampton repeatedly responded that he knew nothing about the boys' disappearance. (*Id.* ¶10.) Hadley and Tietjen arrived at the ECPO later on and

joined in the interview. While Carrega did most of the questioning, Hadley and Tietjen questioned Hampton as well. (*Id.* ¶11.)

Hampton continued to deny knowledge, while the defendants continued to say that they already knew what had happened. (*Id.* ¶12.) Hampton then agreed to take a polygraph test to prove that he was telling the truth, but after the test, he was told that he failed. (*Id.*) At this point, Carrega became more aggressive. (*Id.* ¶13.) Carrega, and later Hadley and Tietjen as well, told Hampton that if he did not implicate Evans, he would be charged. (*Id.* ¶14.) After many hours of questioning, it became clear to Hampton that the officers would not let him go unless he told them something about Evans. (*Id.* ¶15.) Eventually, he repeated the story that the officers had told him—about the boys dying in a fire—in order to get out of custody. (*Id.*) Hampton told the officers that he would say what they wanted him to say but that it was a lie. (*Id.*)

After he agreed to repeat the false story, Hampton was transported to a police station in a car driven by Carrega. (*Id.* ¶16.) On the way there, Carrega went through the story that he wanted Hampton to repeat on video. He explained what questions he would ask Hampton and then coached Hampton as to how he should respond. (*Id.*) The story consisted of the following elements: (1) Evans wanted to kill the boys because they stole his marijuana; (2) Evans and Maurice Olds picked up two of the boys and brought them to Hampton's apartment on Camden Street and picked Hampton up on the way; (3) Evans gave Hampton a gun to watch the boys and then left before returning with the other boys, placing all five in a closet, and nailing the closet shut; (4) Evans had a can of gasoline that he poured around the apartment; and (5) Hampton gave Evans the match that he used to ignite the gasoline and the building burned down. (*Id.* ¶17.)

Carrega also indicated on the way to the police station that he wanted to stop at the Camden Street address where Hampton had lived. Once Carrega and Hampton arrived at the Camden Street location, Hadley and Tietjen met

them there. The latter two asked Hampton questions about what the building looked like, what floor he lived on, and how someone would enter and leave the building. As they asked him these questions, they also told him the story they wanted him to repeat about Evans bringing the boys there and starting a fire. (*Id.* ¶18.) Hampton was subsequently taken to the police station where he relayed the false story in a recorded interview. (*Id.* ¶19.)

### D. Continued investigation

Reports authored by Tietjen and Hadley detail their investigative activities following Hampton's alleged confession.

According to Tietjen's report, several days after Hampton's confession, Tietjen located an article published in the Newark Star-Ledger in August 1978. The article described a large fire that occurred on Camden Street at 12:54 A.M. on August 21, 1978. (Newark St. ¶67; Resp. to Newark St. ¶67; Tiet. 2008 Rep. 9.)

According to Hadley's report, in April 2009, Hadley and Defendant Detective Sergeant Darnell Henry met with an officer who had investigated the case of the missing boys in 1978. The officer provided them with a copy of a Newark Fire Department report dated August 21, 1978. The report contained statements from witnesses, one of whom indicated that he saw two Black males running from the second floor of the home on Camden Street before the building went up in flames. (Arson Rep. 1-2.)

Hadley also reported that he, along with other detectives, conducted interviews with potential witnesses in December 2008 and January 2009. These witnesses, some of whom had been interviewed by Hairston and Scott-Bey decades earlier, confirmed that Evans was the last person to be seen with the boys prior to their disappearance. (Hadley Rep.)

### E. March 2010 meeting

On March 22, 2010, Carrega met with Acting Prosecutor Robert Laurino, Director of the Prosecutor's Homicide Unit Gregoria DeMattia, and Chief of Detectives Anthony Ambrose. (Newark St. ¶127; Resp. to Newark St. ¶127.) Laurino testified that this meeting was "essentially a charging conference,"

during which he received input from the individuals involved in the investigation and ultimately made the decision to seek arrest warrants for Hampton and Evans. (Laurino Dep. 22:22-23:09). Tietjen's continuation report states that Tietjen and Hadley were also present at this meeting. (Tiet. 2010 Rep. 1-2.) Tietjen testified, however, that the decision to charge Hampton and Evans was made prior to the March 22, 2010, meeting and that he was not involved in the decision-making process. (Tietjen Dep. 299:19-300:12.) Hadley also denied involvement in any meetings or discussions regarding the decision to seek arrest warrants for Hampton and Evans. (Hadley Dep. 259:16-19.)

That same day, March 22, 2010, Carrega signed a sworn affidavit in support of arrest warrants for Hampton and Evans. (Carrega Aff.) Superior Court Judge Peter Vazquez issued the requested warrants, and the two were subsequently arrested. (Newark St. ¶¶131-32; Resp. to Newark St. ¶¶131-32.)

### F. Hampton's plea and Evans's murder trial

On August 30, 2011, Hampton agreed to plead guilty to five counts of felony murder and to testify against Evans at his criminal trial. In return, the prosecutor agreed to recommend that Hampton's sentence not exceed ten years, and to support his release on parole after two years. Hampton's plea agreement was placed on the record before Judge Patricia Costello. During the plea hearing, Hampton testified to the same facts as he did in his November 2008 statement. He also confirmed that the statement was accurate and that he had not been coerced into pleading guilty. (Carrega St. ¶¶90-102; Resp. to Carrega St. ¶¶90-102.) Prior to pleading guilty, Hampton moved to suppress his confession on the ground that the defendants did not properly administer a *Miranda* warning, but Judge Costello ruled that no *Miranda* violation had occurred. (Newark St. ¶¶133-35; Resp. to Newark St. ¶¶133-35.)

Evans's trial for the murder of the five boys began on October 28, 2011. (Carrega St. ¶104; Resp. to Carrega St. ¶104.) Hampton provided two days of sworn testimony, during which he repeated much of what he told to investigators in November 2008. In particular, he stated that he was with Evans when Evans locked the boys in a closet, nailed the closet shut, and

started a fire. (Carrega St. ¶¶105-106; Resp. to Carrega St. ¶¶105-106.) When asked why he confessed, Hampton responded: "'Cause it was wearin' me out – he was wearin' me down. You know, I been with this on my mind for 32 years." (Carrega St. ¶107; Resp. to Carrega St. ¶107.)

On November 23, 2011, Evans was acquitted of all charges. (Carrega St. ¶112; Resp. to Carrega St. ¶112.) Hampton, meanwhile, served seven years in jail for his role in the murder of the five boys. Hampton's convictions were never overturned, and it does not appear that he ever appealed his convictions. (Newark St. ¶¶155-57; Resp. to Newark St. ¶¶155-57.)

### G. Evans sues, Hampton recants

On November 21, 2013, Evans commenced this lawsuit against the police, prosecutors, and supervisory personnel involved in his criminal case. (Newark St. ¶158; Resp. to Newark St. ¶158.) Nearly a year later, Evans filed an amended complaint containing eight counts. (DE 33.) On May 10, 2016, the Court granted in part and denied in part the defendants' motions to dismiss the amended complaint. (DE 71.)

The Court's decision on the motions to dismiss left intact Evans's claims of malicious prosecution against Defendants Henry, Hadley, Carrega, and Tietjen, asserted under New Jersey common law, the New Jersey Civil Rights Act (NJCRA), and 42 U.S.C. § 1983. As to these four defendants, a § 1983 conspiracy claim also survived. With respect to the other defendants, the opinion left intact a § 1983 supervisory liability claim against Defendant Mayor Cory Booker and Police Director Gary McCarthy, as well as a § 1983 *Monell* claim against the City of Newark.

On June 6, 2017, Hampton provided a notarized statement to Investigator Maxwell Martins. (Newark St. ¶162; Resp. to Newark St. ¶162.) In the statement, Hampton indicated that his November 2008 confession was fabricated. He claimed that the "people involved were Mr. Peter Guarino,[5] Det.

---

[5]     Peter Guarino was an Assistant Prosecutor at the ECPO.

Joe Hadley, Lt. Correglia *[sic]*, Trooper Tietjen, and others that I cannot recall their names." (Newark St. ¶163; Resp. to Newark St. ¶163.)

On October 27, 2020, Hampton signed an affidavit detailing the manner in which his November 2008 confession was coerced and fabricated. (Newark St. ¶165; Resp. to Newark St. ¶165.) Evans's version of what occurred during the 2008 interview of Hampton, described above, is based on this affidavit. Hampton also indicated in his 2020 affidavit that his testimony at Evans's trial was false as well. (Hampton Aff. ¶22.)

The parties completed fact discovery in March 2021. (DE 181.) In August 2022, three separate summary judgment motions were filed by the remaining defendants. One motion was filed by Defendant Tietjen of the NJSP (DE 232); another was filed by Defendant Carrega of the ECPO (DE 234); and a third was filed by Defendants Hadley, Henry, and McCarthy of the NPD, as well as former Mayor Booker. I will refer to this third set of defendants collectively as the "Newark Defendants". (DE 233.)

## II.   Legal standard

Summary judgment is proper if "there is no genuine dispute as to any material fact [and] the movant is entitled to a judgment as a matter of law." See *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000) (quoting Fed. R. Civ. P. 56(a)). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998).

The moving party bears the burden of establishing that no genuine issue of material fact remains. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). "A fact is material if—taken as true—it would affect the outcome of the case under governing law. And a factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *M.S. by and through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) (quotation marks and citation omitted).

A court's role in deciding a summary judgment motion is "circumscribed in that in that it is inappropriate for a court to resolve factual disputes and to make credibility determinations." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). Those are issues for the jury. The critical question at the summary judgment stage is whether there is a need for a trial so that the jury can consider disputed facts or credibility questions. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). If yes, the motion must be denied.

### III.   Discussion

A handful of threshold issues warrant discussion at the outset. To start, the defendants[6] offer two arguments as to why Hampton's 2017 statement and 2020 affidavit would be inadmissible at trial and thus cannot be considered at the summary judgment stage. First, they argue that both documents contain hearsay statements that cannot be introduced at trial because Hampton is not a competent witness. (Carrega MSJ 28-22; Tietjen Repl. 2-5.) Second, they contend that the 2020 affidavit is a sham affidavit. (Carrega MSJ 34-41; Newark MSJ 19-21.)

Separately, the defendants argue that Evans is barred from bringing his malicious prosecution claim by two distinct but related doctrines: collateral estoppel and the *Heck* doctrine. I will address the arguments related to the admissibility of the 2017 statement and 2020 affidavit before turning to whether Evans is barred from bringing a malicious prosecution claim on grounds of collateral estoppel or *Heck*. Finally, I will address the defendants' argument that Evans's claim under the New Jersey Civil Rights Act (NJCRA) must be dismissed because malicious prosecution is not a constitutional claim under New Jersey law.

---

[6]     Although they filed separate motions for summary judgment, the defendants generally make the same arguments and have aligned interests. I therefore will refer to the defendants collectively for the most part. Where it makes sense to do so, I will refer to the defendants individually.

### A. Are Hampton's 2017 statement and 2020 affidavit inadmissible as hearsay?

"It is well settled that only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." *Countryside Oil Co., Inc. v. Travelers Ins. Co.,* 928 F. Supp. 474, 482 (D.N.J. 1995). Indeed, Fed. R. Civ. P. 56(c) provides that a party may argue that certain material in the record "cannot be presented in a form that would be admissible in evidence" and that, as a result, the material cannot be relied on to create or negate a genuine factual dispute.

Nonetheless, material that is "*capable* of being admissible at trial" can be considered on a summary judgment motion. *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.,* 998 F.2d 1224, 1234, n. 9 (3d Cir. 1993) (emphasis added). To take the most obvious example, an affidavit itself is an out-of-court statement, but it is commonly considered as a proffer of what the affiant would testify to at trial. More broadly, even if evidence is not admissible in the form submitted by the party on summary judgment, it may be considered if it could meet the requirements for admissibility at trial. For instance, "hearsay evidence produced in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present that evidence through direct testimony, i.e. 'in a form that would be admissible at trial.'" *Williams v. Borough of W. Chester, Pa.*, 891 F.2d 458, 465, n. 12 (3d Cir. 1989).

Of course, the defendants are correct that Hampton's 2017 statement and 2020 affidavit are not by themselves admissible at trial. Both documents are, and contain, out-of-court statements that would be offered to prove the truth of what they assert: most pertinently, that Hampton was coerced into giving a false confession in November 2008. *See* Fed. R. Evid. 801(c). The underlying question is whether Hampton, as declarant, could present this evidence on the witness stand at trial. The answer is no, according to the defendants, because Hampton lacks a present recollection of his 2008 statement and thus is not competent to testify about it. (Carrega MSJ 33.)

Under Federal Rule of Evidence 601, every witness is presumed to be competent to testify. A witness may not be competent, however, if the witness does not have personal knowledge of the matter about which he or she will testify. *See* Fed. R. Evid. 602. "Knowledge as required by Rule 602 includes 'awareness of objects or events,' comprised of (1) sensory perception; (2) comprehension about what was perceived; (3) present recollection; and (4) the ability to testify about what was perceived." *Keiser v. Borough of Carlisle*, No. 1:15-CV-450, 2017 WL 4075057, at *5 (M.D. Pa. Sept. 14, 2017) (quoting C. Wright and V. Gold, *27 Federal Practice and Procedure* § 6023 (West 1990)).

During his deposition, Hampton testified that he could not remember many of the particulars of his allegedly coerced confession. For example, when initially asked if he remembered giving a statement to Carrega in 2008, he stated multiple times that he did not. (Hampton Dep. 121:12-20, 130:15-18, 134:3-5, 15-17.) He similarly testified that he had no memory of having a conversation with Tietjen or of Tietjen asking him any questions on the day of his confession. (*Id.* 224:23-25, 227:8-10.) While he did recall speaking with Hadley at some point, he said he currently had "no clue" what the conversation was about. (*Id.* 124:11-125:6.)

Similarly, when presented with his 2017 statement -- in which he asserted that his confession was fabricated and that the people involved included Hadley, Carrega, and Tietjen -- Hampton testified that he could not remember if he had actually told the investigator that. (*Id.* 166:23-167:25.) He testified that he "might have" done so, but he could not recall. (*Id.*)

On the other hand, Hampton testified that he *did* remember signing his 2020 affidavit and confirming its accuracy. (*Id.* 186:19-187:5.) When plaintiff's counsel read aloud portions of the 2020 affidavit and asked Hampton if what she read was true, Hampton confirmed that it was. (*Id.* 188:1-197:15.) In particular, he confirmed that Carrega fabricated a statement and that Carrega and the other detectives, including Hadley and Tietjen, coerced Hampton into giving that statement. (*Id.* 192:12-20, 194:1-24.)

18

It should be noted that whether a witness is competent to testify is left to the discretion of the district court. *See United States v. Lake*, 150 F.3d 269, 273 (3d Cir. 1998). The Advisory Committee Notes to Rule 601 provide that this "[d]iscretion is generally exercised in favor of allowing the testimony." As the Notes explain, "[t]he question is one particularly suited to the jury as one of weight and credibility, subject to judicial authority to review the sufficiency of the evidence." Thus, as another court in this Circuit has observed, the Federal Rules of Evidence "largely convert issues of competency into ones of credibility." *United States v. Bevans*, 728 F. Supp. 340, 347 (E.D. Pa. 1990), *aff'd*, 914 F.2d 244 (3d Cir. 1990).

It cannot be denied that Hampton provided conflicting testimony at his deposition. At points he insisted that he could not remember his 2008 confession at all, while at other points he represented that he could. In light of this conflicting testimony, the issue is one of credibility rather than competency. Whether Hampton can remember his 2008 confession is a question that will appropriately be put to a jury should the case proceed to trial.

Hampton consistently testified that he could not remember giving his 2017 statement, rendering its admissibility highly problematic.[7] Evans seems to concede as much; his opposition briefs suggest that he is relying solely on Hampton's 2020 affidavit to support his argument that Hampton will testify, in admissible form, that his 2008 confession was coerced. I will therefore treat the content of the 2020 affidavit, but not the 2017 statement, as material that is "capable of being admissible at trial." *Petruzzi's*, 998 F.2d at 1234.

### B. Is Hampton's 2020 affidavit a sham affidavit?

The defendants argue that even if Hampton is a competent witness, the Court still may not consider the 2020 affidavit when ruling on the summary judgment motions because it is a sham affidavit.

---

[7]     I do not opine as to whether his lack of memory could be used as impeachment material.

Under the "sham affidavit doctrine," "'a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict.'" *Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 251 (2007) (quoting *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004)). In a seminal case on the doctrine, the Second Circuit observed that "'[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.'" *Jimenez, supra*, at 252 (quoting *Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572, 577-78 (2d Cir. 1969)). The sham affidavit doctrine is thus a means of "sorting the wheat from the chaff." *Jimenez, supra*, at 253.

The main reasoning behind the doctrine is that the "'deposition of a witness will usually be more reliable than his affidavit.'" *Jimenez, supra* (quoting *Perma Research*, 410 F.2d at 578). Depositions carry an increased level of reliability given that they are adversarial in nature and provide the opportunity for cross-examination. *Jimenez, supra* (citing *Darnell v. Target Stores*, 16 F.3d 174, 176 (7th Cir. 1994). Affidavits, by contrast, are typically drafted by counsel and often consist of "'efforts to patch up a party's deposition with his own subsequent affidavit.'" *Jimenez, supra* (quoting *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995)).

The defendants maintain that Hampton's 2020 affidavit contradicts his November 2008 statement to investigators, his testimony at his plea hearing, and his testimony at Evans's trial. They claim that the affidavit is being introduced solely for the purpose of defeating summary judgment and therefore qualifies as a sham affidavit. (Carrega MSJ 36-37.)

In concluding that an affidavit is a sham affidavit, a judge essentially determines that no reasonable jury could accord it evidentiary weight. *See Jimenez*, 503 F.3d at 253. I cannot make such a conclusion here, particularly

20

in light of the fact that Hampton was deposed two years *after* executing the 2020 affidavit, and was questioned at length about its substance.

Because Hampton was deposed after he executed the 2020 affidavit, each of the defendants' attorneys had an opportunity to conduct cross-examination regarding the affidavit and its contents. As discussed above, Hampton affirmed the accuracy of the affidavit at his deposition. True, Hampton also testified at times that he could not remember the events detailed in the affidavit, but Hampton's deposition testimony may be used at trial to discredit him in front of the jury. The jury can then decide whether to accord the affidavit any evidentiary weight.

I also note that Hampton has put forth an explanation as to why his 2020 affidavit contradicts his prior sworn testimony. *See Jimenez*, 503 F.3d at 254 (a contradictory affidavit is not a sham if the affiant offers a "satisfactory explanation" for the conflict between the prior testimony and the affidavit). The affidavit itself states that Hampton agreed to give a false statement because the defendants promised that he would not be charged if he did so. With respect to pleading guilty and testifying at Evans's trial, the affidavit indicates that he agreed to do both in exchange for a favorable sentencing recommendation from the prosecutor. The affidavit states, "I knew that if I did not go along with the story, I would lose my deal and possibly spend the rest of my life in prison." (Hampton Aff. ¶22.)

The defendants reject this explanation on the ground that Hampton never alleged that his confession was coerced during the time he spent in prison. Rather, Hampton completed his sentence, and only after Evans sued did Hampton change his story. (Newark MSJ 20.) Whether Hampton's explanation is "satisfactory," however, is a question I need not and should not decide, as it goes to the heart of Hampton's credibility, which will be central to any trial of this case. At any rate, the timing of his deposition defeats the argument that his 2020 affidavit may be disregarded as a sham, produced after the fact to defeat summary judgment. Such arguments may, however, be made to the jury.

### C. Is Evans's claim barred by collateral estoppel?

The defendants argue that Hampton (and derivatively Evans) is collaterally estopped from claiming that Hampton's confession was coerced. Although Hampton challenged the admissibility of his confession in his criminal case under *Miranda*, he did not challenge its admissibility on the ground that it was coerced, despite having the opportunity to do so. Moreover, in the course of denying his *Miranda* challenge, the Superior Court Judge ruled that Hampton's confession was knowing and voluntary. The defendants maintain that Hampton may not now relitigate this issue, and that therefore, neither can Evans. (Newark MSJ 22-23.)

"Collateral estoppel operates to bar 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination.'" *Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299, 310 (3d Cir. 2009) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001)). Congress has instructed federal courts to give preclusive effect to State court judgments whenever the courts of the State from which the judgment was entered would do so. *Delaware River Port Auth. v. Fraternal Ord. of Police*, 290 F.3d 567, 572-573 (3d Cir. 2002) (citing *Allen v. McCurry*, 449 U.S. 90, 96 (1980)). As a result, "[a] federal court looks to the law of the adjudicating state to determine its preclusive effect." *Delaware River*, *supra*, at 573 (citing *Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 357 (3d Cir.1999)).

In New Jersey, "courts apply a five-pronged test to determine whether collateral estoppel should bar relitigation of an issue: (1) the issue must be identical; (2) the issue must have actually been litigated in a prior proceeding; (3) the prior court must have issued a final judgment on the merits; (4) the determination of the issue must have been essential to the prior judgment; and (5) the party against whom collateral estoppel is asserted must have been a party or in privity with a party to the earlier proceeding." *Delaware River*, *supra* (quoting *In re Estate of Dawson*, 641 A.2d 1026, 1034-35 (N.J. 1994)). Even assuming *arguendo* that the first four elements of this test are met, collateral

estoppel does not bar Evans's claim because he was neither a party to Hampton's criminal proceeding nor in privity with Hampton at the time of the proceeding.

The notion that collateral estoppel only bars the claim of a party to the earlier proceeding, or a party in privity with a party to the earlier proceeding, arises from principles of due process. *Nationwide*, 571 F.3d at 310. Every litigant is entitled to a day in court and to be heard. *State v. K.P.S.*, 221 N.J. 266, 277–78 (2015). To protect this basic right, courts will not apply collateral estoppel to a party who did not have a "'full and fair opportunity to litigate the issue.'" *Id.* (Quoting *Zirger v. Gen. Accident Ins. Co.*, 144 N.J. 327, 338 (1996)).

While the collateral estoppel concept of "privity" is ill-defined, *Nationwide*, 571 F.3d at 310, the New Jersey Supreme Court has suggested that the determinative question is whether one party was the "virtual representative" of the other, in the sense that the former could control the arguments of the latter. *K.P.S.*, 221 N.J. at 278. In a somewhat analogous case, the Court held that privity did not exist between two co-defendants where each "was represented by his own attorney, each submitted a separate brief, and each had the right to advance arguments with supporting authority emphasizing his individual viewpoint." *Id.* at 278-79.

Here, there is no evidence in the record that Hampton was Evans's "virtual representative" during Hampton's criminal proceeding. Indeed, there is no indication that Evans had any involvement in or control over Hampton's litigation of his criminal case. Consequently, Evans did not have a "full and fair opportunity to litigate" the issue of whether Hampton's confession was coerced. I therefore conclude that collateral estoppel does not bar Evans from litigating this issue now.

### D. Is Evans's § 1983 claim barred by the *Heck* doctrine?

In *Heck v. Humphrey*, 512 U.S. 477 (1994), the Supreme Court held that in order to recover damages pursuant to § 1983 for an allegedly unconstitutional conviction or term of imprisonment, a plaintiff must prove

23

that the conviction or sentence has been invalidated. *Id.* at 486-87. Under what has come to be known as the "*Heck* preclusion doctrine", a plaintiff cannot maintain a § 1983 claim if the success of that claim would necessarily imply the invalidity of a prior conviction or sentence. *Jefferson v. Lias*, 21 F.4th 74, 86 (3d Cir. 2021).

The defendants argue that Evans's § 1983 malicious prosecution claim is barred by *Heck* because it would necessarily imply the invalidity of Hampton's criminal conviction. Evans's claim can succeed only if he proves that Hampton was coerced into confessing, the defendants say. But that same evidence would be inconsistent with Hampton's conviction, which was based entirely on his confession having been found to be truthful and voluntary. (Newark MSJ 23-27; Carrega MSJ 42-45; Tietjen MSJ 32-35.)

As Evans points out, the *Heck* decision concerned the relationship between a prisoner's § 1983 suit and *his own* criminal conviction. While he was serving a fifteen-year sentence for manslaughter, Heck brought a § 1983 action against prosecutors and police on the ground that they engaged in an unlawful investigation that led to his arrest, knowingly destroyed exculpatory evidence, and used an unlawful voice identification procedure at his trial. *Heck*, 512 U.S. at 478-79. The Court concluded that because Heck's conviction had not been overturned or otherwise invalidated, his suit for damages could not succeed. Evans thus argues that the *Heck* doctrine only bars a § 1983 claim that, if successful, would imply the invalidity of the plaintiff's own conviction or sentence; it does not apply here, where a successful claim would imply the invalidity of an accomplice's conviction. (Opp. to Newark MSJ 22-24.)

The defendants rely on a Ninth Circuit decision to support extension of the *Heck* bar to the § 1983 claims of an accomplice. In *Beets v. County of Los Angeles*, 669 F.3d 1038 (9th Cir. 2012), a police officer fatally shot a man who was driving a truck toward him, prompting the parents of the deceased driver to bring a § 1983 action against the officer on the ground of excessive force. *Id.* at 1040. Prior to the commencement of the civil suit, the passenger in the truck

was convicted of aiding and abetting the driver's assault on the officer. *Id.* at 1040-41. The Ninth Circuit concluded that *Heck* barred the parents' § 1983 claim because its success would necessarily imply the invalidity of the passenger's criminal conviction. *Id.* at 1046-48.

The *Beets* Court reasoned that the jury that convicted the passenger of aiding and abetting the driver's assault had necessarily found facts that would be inconsistent with a successful claim by the driver's parents. *Beets*, 669 F.3d at 1045. In particular, the jury found that the passenger acted willfully against a police officer who was lawfully performing his duties and not using excessive force. *Id.* Consequently, any recovery by the drivers' parents on the ground that the officer used excessive force would be contrary to the jury's determination. *Id.*

The Third Circuit has yet to consider this precise application of *Heck*. However, in *Eberhardinger v. City of York*, 782 F. App'x 180 (3d Cir. 2019), the Court recognized in a footnote that *Heck* "has been applied to bar a *third party's* § 1983 suit only where the convict was the third party's accomplice." *Id.* at 183, n. 2. (Emphasis in original.) The Court cited *Beets*, as well as a Sixth Circuit decision holding that *Heck* does not apply to third-party § 1983 claims. *See Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 616 (6th Cir. 2014). In the Sixth Circuit decision, the § 1983 plaintiffs were not the accomplices of the convicted person.

The footnote in *Eberhardinger* suggests that the Third Circuit might follow the lead of *Beets* and *Hayward* if presented with the opportunity. In other words, the Third Circuit might decide that *Heck* bars the § 1983 suit of a third party where that third party is the convicted person's accomplice. Nonetheless, the circumstances at issue here involve a factual wrinkle that has not, as far as this Court is aware, been addressed. Namely, Evans himself was acquitted of the criminal charges he faced for the murder of the five boys. Evans's acquittal is thus already at odds with Hampton's conviction. And if Evans were to succeed on his malicious prosecution claim, it would be entirely

consistent with the jury's conclusion in *his own* criminal case. The real inconsistency, then, is between the results of the two criminal cases. Where the plaintiff's own acquittal is consistent with the theory of his civil suit, it makes little sense to bar that same suit as being inconsistent with someone else's conviction; that would press the *Heck* doctrine beyond its reasonable rationale.

It is also worth noting that the *Heck* rule is already incorporated in the elements of a malicious prosecution claim. To prevail on a malicious prosecution claim under § 1983, a plaintiff must show that the criminal proceeding ended in his or her favor. *Zimmerman v. Corbett*, 873 F.3d 414, 418 (3d Cir. 2017). This requirement avoids parallel litigation over issues of probable cause and guilt, and prevents a convicted individual from mounting a collateral attack on his or her conviction through the vehicle of a civil suit. *Heck*, 512 U.S. at 484. Indeed, the Supreme Court's decision in *Heck* was in part motivated by the recognition that this same requirement should apply to other § 1983 claims that present similar concerns for finality and consistency. *Id.* at 486 ("We think the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments applies to § 1983 damages actions that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement, *just as it has always applied to actions for malicious prosecution*.") (Emphasis added.) One could reasonably conclude that the *Heck* doctrine, as such, is redundant as to malicious prosecution claims, which contain their own quasi-*Heck* requirement to ensure finality and consistency. *See Poventud v. City of New York*, 750 F.3d 121, 131 (2d Cir. 2014) ("In the context of § 1983 malicious prosecution cases, *Heck*'s bar is coextensive with the favorable termination requirement.")

There is another factual wrinkle that weighs against applying *Heck* in the present circumstances: Hampton is no longer in custody. In *Heck*, the Supreme Court discussed the overlap between the federal habeas corpus statute, which requires a state prisoner to exhaust state remedies before challenging his or

her confinement, and § 1983, which contains no exhaustion requirement. 512 U.S. at 480-81. Recognizing the potential for conflict between these two provisions, the Court concluded that a § 1983 claim is not cognizable where the underlying conviction or confinement is still valid. In a later decision, five justices of the Supreme Court proposed, in dicta, a sort of division of labor between the two provisions: *Heck,* they stated, does not bar the § 1983 claim of a former prisoner who is no longer in custody and thus has no means of challenging his conviction through a habeas petition. *Spencer v. Kemna*, 523 U.S. 1, 21, 25, n. 8 (1998) (Souter, J., concurring), (Ginsburg, J., concurring), (Stevens, J., dissenting). As Justice Souter explained, a former prisoner is entitled to seek relief under § 1983 "without being bound to satisfy a favorable-termination requirement that it would be impossible as a matter of law for him to satisfy." *Id.* at 21.

Although the Third Circuit has yet to rule on this issue, district courts within the Second Circuit have adopted the *Spencer* Justices' division-of-labor view. *See Opperisano v. P.O. Jones*, 286 F. Supp. 3d 450, 458 (E.D.N.Y. 2018) (noting that while "district courts within the Second Circuit have reached different conclusions as to whether a claimant may bring a section 1983 damages claim when the claimant is no longer in custody . . . many district courts routinely allow section 1983 claims to proceed whenever habeas relief is unavailable"). Applying this view here, because Hampton is no longer in custody and has no means of invalidating his conviction, *Heck* would not bar Hampton from pursuing a § 1983 action alleging that his conviction was unlawful. By the same token, *Heck* should not bar Evans from pursuing a § 1983 claim out of some concern that Evans's success would imply the invalidity of Hampton's conviction.

In sum, even if the Third Circuit were to apply the *Heck* doctrine to the § 1983 claims of an accomplice—which it has yet to do—there are good reasons not to apply *Heck* here. Chief among them is that Evans was acquitted of all charges related to the underlying alleged crime, and thus there would be no

inconsistency between Evans's malicious prosecution claim, should it succeed, and the termination of his own criminal proceeding. I therefore conclude that Evans's § 1983 malicious prosecution claim is not barred by *Heck*.

### E. Must Evans's NJCRA claim be dismissed?

The defendants argue that Evans's NJCRA claim fails because malicious prosecution is not a constitutional claim under New Jersey law as it is under federal law. (Tietjen MSJ 30-31.) Evans offers no argument in response. It appears that the defendants are correct.

Section 1983 and the NJCRA are usually interpreted in parallel, often with little discussion or analysis. *Martin v. Unknown U.S. Marshals*, 965 F. Supp. 2d 502, 548 (D.N.J. 2013), *aff'd sub nom. Est. of Martin v. U.S. Marshals Serv. Agents*, 649 F. App'x 239 (3d Cir. 2016). Nevertheless, the New Jersey Supreme Court has identified "two distinct differences" between the two statutes. *Tumpson v. Farina*, 218 N.J. 450, 477 (2014). As relevant here, the Court has observed that while § 1983 "provides remedies for deprivation of both procedural and substantive rights," the NJCRA "provides remedies only for the violation of substantive rights." *Tumpson*, *supra*.

A malicious prosecution claim is grounded in a denial of procedural due process. The claim requires a showing that a criminal proceeding was initiated against the plaintiff without probable cause, and that the plaintiff was deprived of his or her liberty as a result. That is the essence of a procedural due process claim. *See Hill v. Borough of Kutztown,* 455 F.3d 225, 233–34 (3d Cir. 2006) (citing *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)) ("To state a claim under § 1983 for deprivation of procedural due process rights, a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'")

In *Falat v. Cnty. of Hunterdon*, No. A-2479-15T1, 2018 WL 3554139, at *7 (N.J. Super. Ct. App. Div. July 25, 2018), the New Jersey Appellate Division noted that "malicious prosecution under New Jersey law has developed

through case law, and it is not a constitutional claim as it is under federal law." The Court thus concluded that the plaintiff's NJCRA claim for malicious prosecution was properly dismissed and could not be legally salvaged by an amended complaint. In line with this decision and with the New Jersey Supreme Court precedent discussed above, I conclude that Evans cannot pursue a malicious prosecution claim under the NJCRA, but only under § 1983 and New Jersey common law. I will therefore grant summary judgment dismissing Count 4.

\*   \*   \*

Having addressed those threshold issues, I proceed to the defendants' arguments that there is insufficient evidence in the record to support Evans's claims. Before doing so, however, I note that Evans has conceded that his claims against Defendant Henry of the NPD lack evidentiary support.[8] In addition, Evans has conceded that summary judgment must be granted as to his *Monell* claim against the City of Newark as he did not obtain meaningful discovery on the issue. (Opp. to Newark MSJ 25.) Finally, as to the motion for summary judgment on the claim of supervisory liability against former Mayor Booker and Police Director McCarthy, Evans did not offer any argument in opposition. I will therefore treat this claim, as well as the *Monell* claim and all

---

[8]     In his opposition brief to the Newark Defendants' summary judgment motion, Evans expressly notes that "[a]lthough Defendant Henry was present at the New Jersey State Police Barracks when Hampton made his 2008 video-recorded statement, the transcript does not reflect that he participated in the interview." Evans also notes that "Hampton does not identify Henry in his 2020 affidavit or his 2022 deposition testimony as having participated in his interrogation at the Essex County Prosecutor's Office." (Opp. to Newark MSJ 8, n. 2.) Thus, Evans argues only that a reasonable jury could find that Defendant *Hadley* maliciously prosecuted Evans; he does not appear to dispute that no reasonable jury could find that Henry engaged in malicious prosecution.

With respect to the claim of conspiracy, Evans does not expressly state that there is no evidence to support this claim against Henry, but he implies as much. He does not mention Henry's name at all in his argument, focusing solely on "Carrega, Hadley, and Tietjen." (Opp. to Newark MSJ 24.)

claims against Defendant Henry, as having been voluntarily withdrawn. The remaining analysis proceeds on that basis.

### F. Malicious prosecution

To succeed on a § 1983 malicious prosecution claim, a plaintiff must establish by a preponderance of the evidence that "(1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in [his] favor; (3) the defendants initiated the proceeding without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) [he] suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Zimmerman*, 873 F.3d at 418. Under New Jersey common law, a malicious prosecution tort claim consists of these first four elements, but the plaintiff need not show the fifth, *i.e.,* that he suffered a deprivation of liberty. *Trabal v. Wells Fargo Armored Serv. Corp.,* 269 F.3d 243, 248 (3d Cir. 2001).

The defendants do not dispute that the criminal proceeding against Evans ended in his favor, nor do they dispute that he suffered a deprivation of liberty. Rather, Tietjen and Hadley argue that the record does not support a finding that they personally initiated a criminal proceeding against Evans, as Carrega, not they, signed the affidavit in support of Evans's arrest warrant. (Tietjen MSJ 13; Newark MSJ 12.) Tietjen and Hadley further argue, as does Carrega, that there is insufficient evidence to support a finding that they acted without probable cause and with malice. (Tietjen MSJ 6-11, 29-30; Carrega MSJ 12-18; Newark MSJ 11.) I will address these arguments in turn.

### i.   Could a reasonable jury find that Tietjen and Hadley initiated a criminal proceeding against Evans?

The Third Circuit has instructed that if an officer "influenced or participated in the decision to institute criminal proceedings," that officer can be liable for malicious prosecution. *Halsey v. Pfeiffer*, 750 F.3d 273, 297 (3d Cir. 2014) (citing *Sykes v. Anderson*, 625 F.3d 294, 308–09, 317 (6th Cir. 2010)). Based on the evidence in the record, a reasonable jury could find that both Tietjen and Hadley initiated a criminal proceeding against Evans by either

participating in or influencing the decision to charge Evans with the murder of the five boys.

The record indicates that on March 22, 2010—earlier on the same day that Carrega presented his affidavit in support of the arrest warrants to the Superior Court—a meeting was held at the Essex County Prosecutor's Office. Present at the meeting were Prosecutor Laurino, other senior officials from the ECPO, and Defendants Tietjen, Carrega, and Hadley. Defendant Henry and another NPD detective were also present. (Tiet. 2010 Rep. 1-2.) The record contains conflicting evidence as to what occurred at this meeting.

Tietjen's investigative report states generally that "[t]he purpose of the meeting was to discuss the progress of the investigation and the authorization of arrest warrants for both Lee A. Evans and Philander Hampton." (*Id.* at 2.) At his deposition, Tietjen testified that the decision to initiate charges against Evans and Hampton had already been made by the time of the meeting and that he had no knowledge of who made the decision or what led to it. (Tietjen Dep. 299:19-300:12.) Similarly, Hadley testified that he was not part of any meetings or discussions that involved deciding whether to seek the arrest warrants. (Hadley Dep. 259:16-19.)

On the other hand, according to Prosecutor Laurino, the March 2010 meeting was "essentially a charging conference." (Laurino Dep. 22:23-23:5.) Laurino—who made the final decision to seek the warrants (*Id.* 19:17-21.)—testified that during the meeting they "went through the evidence" and he "got everybody's opinion and as to the case and then ultimately decided to go forward with the – the prosecution as there is sufficient probable cause to go forward to do so." (*Id.* 23:5-9.) When asked if there were any prior meetings on the subject of seeking arrest warrants, Laurino stated that although he had materials to review in advance and ask questions about, the March 2010 meeting "was the formal sit-down that we had prior to actual charging." (*Id.* 25:11-22.) While Laurino was not able to recall the exact day of the meeting or

all of the individuals who attended, he confirmed that Tietjen's report provided an "accurate rendering of . . . [the] charging conference." (*Id.* 24:9-25:10.)

Viewing this evidence in its entirety, there is a genuine dispute of fact as to what occurred at the March 2010 meeting. A reasonable jury could find, based on Laurino's testimony, that the meeting was a discussion that resulted in Laurino's decision to seek an arrest warrant for Evans. A reasonable jury could also find that Hadley and Tietjen participated in or influenced that decision, as they were both present at the meeting and had knowledge of the investigation, and Laurino stated that he "got everybody's opinion" at the meeting as to whether there was probable cause to move forward. Cumulatively, this evidence is sufficient to support a conclusion that Hadley and Tietjen were personally involved in initiating a criminal proceeding against Evans.

### ii. Could a reasonable jury find that Carrega, Tietjen, and Hadley acted without probable cause and with malice?

"Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 483 (3d Cir. 1995) (citing *United States v. Cruz,* 910 F.2d 1072, 1076 (3d Cir. 1990)). Put differently, "probable cause exists if there is a 'fair probability' that the person committed the crime at issue." *Wilson v. Russo*, 212 F.3d 781, 789–90 (3d Cir. 2000) (citing *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997)).

To demonstrate a lack of probable cause where, as here, an officer applied for and was issued a warrant by a judge, a plaintiff must show "(1) that the police officer 'knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant;' and (2) that 'such statements or omissions are material, or necessary, to the finding of probable cause.'" *Wilson*, 212 F.3d at 786-787 (quoting *Sherwood*,113 F.3d at 399). "An assertion is made with

reckless disregard when 'viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'" *Wilson*, *supra*, at 788 (quoting *United States v. Clapp*, 46 F.3d 795, 801, n. 6 (8th Cir.1995)). And an assertion is material if, after excising the inaccuracies or inserting the recklessly omitted information, the warrant affidavit would not establish probable cause. *Wilson*, *supra*, at 789.

I begin with the involvement of Carrega, who drafted the affidavit. The affidavit contains the following paragraph regarding Hampton's confession:

> On November 13, 2008, Philander Hampton was interviewed by Lt. Louis Carrega, ECPO, Det. Joseph Hadley, NPD and Det. Trooper William Tietjen, NJSP. Hampton stated to officers that he resided on the third floor of 256 Camden Street aforesaid and that he moved out on Saturday, August 19, 1978. Hampton stated that he participated in the murder of the five missing boys and that he was assisting his cousin Lee Evans, who he knew wanted to kill the boys. Philander Hampton stated that he held two of the boys at gun point at 256 Camden Street while Lee Evans rounded up the other three boys. Hampton stated that the five boys were then put in a closet, the closet was nailed shut and the room was doused with gasoline. Lee Evans lit the house on fire. Hampton further stated that he and Lee Evans ran out from the back of the house.

(Carrega Aff. ¶11.)

Construing the disputed facts in favor of Evans, which I must do at this stage, this paragraph contains an obvious omission: that Hampton repeatedly denied involvement in or knowledge of the boys' disappearance and merely agreed to repeat a false story fed to him by the investigating officers. Assuming as I must on this motion that the story was concocted, the omission of that fact would undoubtedly be reckless, as Carrega participated in the interview and would have known that the affidavit was inaccurate.

I next consider whether Tietjen and Hadley, despite not having actually drafted the affidavit, may also be liable for this omission. As discussed in Part F.i, *supra*, a reasonable jury could find that Tietjen and Hadley influenced or participated in the decision to seek arrest warrants for Hampton and Evans. The record suggests that both officers attended the "charging conference" in March 2010, after which Prosecutor Laurino made the ultimate decision to pursue the warrants. (Laurino Dep. 19:17-21, 22:23-23:5.) In addition, Laurino testified that at the time he sought charges against Evans, he was unaware of any allegations that Hampton's confession was coerced. (*Id.* 33:14-19.) A reasonable jury could infer from this evidence that, despite knowing that Hampton's confession was fabricated, Tietjen and Hadley did not share this information with Laurino at the charging conference. Thus, although they did not draft the affidavit in support of Evans's arrest warrant, a reasonable jury could nonetheless find that Tietjen and Hadley made a reckless omission.

Carrega argues in the alternative that any omission would not have been material, as the officers had probable cause to arrest Evans even without Hampton's confession. (Carrega MSJ 17-18.) The affidavit states that several witnesses, including close family members of the missing boys, said that they last saw the boys with Evans on the night of their disappearance. (Carrega Aff. ¶¶7-9.) The affidavit also states that Evans admitted to picking up at least three of boys on that date so that they could help him move boxes. (*Id.* ¶6.) Finally, the affidavit notes that there was a fire at 256 Camden St. on the date of the boys' disappearance, and that neighbors observed two Black males fleeing the building immediately before the fire began. (*Id.* ¶10.)[9]

---

[9]     Evans argues that much of this information is hearsay, as it is gleaned from police reports and a fire report that were authored in 1978 by individuals that are either unknown or deceased. Whatever its merits, the hearsay argument is irrelevant for purposes of evaluating the probable cause possessed by the police. Police may rely on hearsay evidence to supply the probable cause necessary to make an arrest. *See Franks v. Delaware*, 438 U.S. 154, 164–65 (1978) (Fourth Amendment does not require "that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants . . . ."); *United States v. Mathis*, 357 F.3d 1200, 1205 (10th Cir. 2004)

Carrega also argues that additional facts, not included in the affidavit, further supported probable cause. Primarily, several witnesses—including Evans himself—told police that the missing boys had broken into Evans's apartment to steal marijuana prior to their disappearance. This information, says Carrega, established Evans's motive for killing the boys. (Carrega MSJ 17.)

The totality of this probable-cause evidence (subtracting Hampton's confession) is thus that Evans was with the boys on the day of their disappearance, that the boys stole marijuana from Evans at some point, and that there was a fire on the day of the boys' disappearance, from which two Black males were seen running. This evidence is certainly enough to arouse suspicion, but probable cause "requires more than mere suspicion." *Orsatti*, 71 F.3d at 482. I cannot conclude that the evidence so clearly establishes probable cause that no reasonable jury could find otherwise. *See Halsey*, 750 F.3d at 302 (evidence that plaintiff failed polygraph exam coupled with the fact that he had the opportunity to commit the crimes and failed to contact police did not conclusively establish probable cause).

A reasonable jury could also find that the officers acted with malice. In the context of a malicious prosecution claim, malice is a term of art, which includes "lack of belief by the actor himself in the propriety of the prosecution." *Lee v. Mihalich*, 847 F.2d 66, 70 (3d Cir. 1988) (abrogated on other grounds). "The element of malice may be inferred from lack of probable cause." *Morales v. Busbee*, 972 F. Supp. 254, 261 (D.N.J. 1997). "As a result, fact issues precluding a finding on probable cause will generally also preclude a finding on malice." *Sanders v. Jersey City*, , Civ. No. 18-01057, 2021 WL 1589464 at *21 (D.N.J. Apr. 23, 2021).

Here, because a reasonable jury could find that the officers knew that Hampton's confession was fabricated, a jury could infer that the officers did not

---

("[H]earsay from unknown or unnamed individuals has been recognized as acceptable support for a finding of probable cause."); *Hart v. Parks*, 450 F.3d 1059, 1066 (9th Cir. 2006) ("Police may rely on hearsay and other evidence that would not be admissible in a court to determine probable cause.").

believe in the propriety of the prosecution. It is also telling that key government actors did not believe that there was probable cause to arrest Evans absent Hampton's confession. Both Laurino and Assistant Prosecutor Cucinello, who tried the case against Evans along with Assistant Prosecutor Guarino, testified at their depositions that without Hampton's confession probable cause did not exist. (Laurino Dep. 62:19-24; Cucinello Dep. 151:21-152:12.) This at least suggests that fair-minded jurors could find the same.

In sum, a reasonable jury could find that Carrega, Tietjen and Hadley made a reckless, material omission that led to the initiation of criminal proceedings against Evans without probable cause, and that the element of malice is met. Accordingly, I will deny the defendants' motion for summary judgment on the malicious prosecution claims, asserted in Counts 3 and 5 under New Jersey common law and § 1983.[10]

### G. Conspiracy

The defendants also move for summary judgment on Evans's § 1983 conspiracy claim, asserted in Count 8. They argue that there is insufficient evidence in the record to support the claim. (Tietjen MSJ 35.)

"To prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law 'reached an understanding' to deprive him of his constitutional rights." *Jutrowski v. Twp. of Riverdale*, 904

---

[10]    Tietjen and Hadley also argue that there is insufficient evidence of their personal involvement in obtaining a false confession from Hampton. They note that at his deposition, Hampton could not identify any acts that either of them took individually to coerce his confession. (Tietjen MSJ 18-19; Newark MSJ 28-29.) Regardless of whether this assessment of the record is correct, Evans does not need to show that Tietjen and Hadley were personally involved in coercing Hampton's confession in order to succeed on his malicious prosecution claim. Coercing a confession is not an element of such a claim. Evans merely must show that Tietjen and Hadley initiated proceedings against him without probable cause and with malice, because they knew of or recklessly disregarded the falsity of the confession. For purposes of this motion, it must be assumed that both officers were present during the interview of Hampton and witnessed any alleged coercion that would have rendered the confession unreliable.

F.3d 280, 293–94 (3d Cir. 2018) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150-52 (1970)). Such rights include those protected by the Due Process Clause of the Fourth Amendment, one of which is the right to be free from a malicious prosecution. *See Jutrowski, supra*, at 294.

Once it is established that the object of the conspiracy was the deprivation of a federally protected right, "the plaintiff 'must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action.'" *Jutrowski*, 904 F.3d at 295 (quoting *Capogrosso v. Supreme Court of N.J.*, 588 F.3d 180, 184–85 (3d Cir. 2009)). In the absence of direct proof of an agreement, a "meeting of the minds" or joint understanding can be inferred from circumstantial evidence. *Jutrowski, supra* (citing *Startzell v. City of Philadelphia*, 533 F.3d 183, 205 (3d Cir. 2008)).

To be sure, "inferring mental state from circumstantial evidence is among the chief tasks of factfinders." *Jutrowski, supra*. (Citation omitted.) For this reason, the Third Circuit has cautioned that "an allegation of conspiracy can only be overcome at summary judgment when the moving parties' submissions foreclose the possibility of the existence of certain facts from which it would be open to a jury to infer from the circumstances that there had been a meeting of the minds." *Jutrowski, supra*. (Citations omitted; cleaned up.)

Although the evidence is by no means overwhelming, a reasonable jury could infer the existence of an agreement between Carrega, Tietjen, and Hadley. The three officers were all present during Hampton's interview at the Essex County Prosecutor's Office and during the charging conference with Laurino. Despite the fact that they each would have known that the confession was fabricated, none of them shared this information with Laurino. A jury could infer from these circumstances that the three officers overtly or tacitly agreed to give false information or omit true information to bring about the arrest of Evans. *See Adickes*, 398 U.S. at 158-59.

Indeed, if a jury credits Hampton's recantation, which they are entitled to do, then the conclusion that there was some agreement between Carrega,

Tietjen, and Hadley is difficult to deny. The alternative would be that each officer independently decided to supply Laurino with false information regarding Hampton's confession. Such a coincidence seems unlikely.

Construing the evidence in Evans's favor, the circumstances also suggest concerted action, as Carrega, Tietjen, and Hadley all failed to disclose to Laurino that Hampton's confession was falsified. For reasons similar to those expressed above, that is sufficient to permit a jury finding for Evans on the concerted action element of a conspiracy claim.

I will therefore deny summary judgment on Count 8.

### H. Qualified immunity

Tietjen and Carrega offer the affirmative defense of qualified immunity as an alternative ground for summary judgment. They argue that they are immune from Evans's claims against them both under federal law and New Jersey law.

I begin with qualified immunity under federal law. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). While a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft, supra.*

"The Third Circuit has held that the right to be free from prosecution absent probable cause is clearly established." *Sanders*, 2021 WL 1589464, at *21 (citing *Gallo v. City of Philadelphia*, 161 F.3d 217, 220 n. 4 (3d Cir. 1998)).

By 2010, and surely long before, any reasonable officer would have known that by fabricating evidence for use in a criminal prosecution, a state actor would violate a defendant's constitutional rights. *See Halsey*, 750 F.3d at 296; *Napue v. People of State of Ill.,* 360 U.S. 264, 269 (1959) (recognizing that "a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty.") It would have been similarly obvious that conspiring to fabricate evidence for use in a prosecution violates a defendant's constitutional rights as well. The defendants are therefore not entitled to qualified immunity on the § 1983 malicious prosecution and conspiracy claims.

As to the state law malicious prosecution claim, the New Jersey Tort Claims Act (TCA) immunizes public employees from liability for actions taken "in good faith in the execution or enforcement of any law." *See* N.J. Stat. Ann. 59:3-3. In order to benefit from this immunity, "a public employee must demonstrate either that he acted with objective reasonableness or establish that he acted with subjective good faith." *Villari v. Twp. of Wall,* No. CIV. A. 06-0004 FLW, 2009 WL 2998135, at *14 (D.N.J. Sept. 15, 2009).

In assessing objective reasonableness under the TCA, "the court applies the same standards . . . that are used in federal civil rights cases." *N.E. for J.V. v. State Dep't of Child. & Fams., Div. of Youth & Fam. Servs.*, 449 N.J. Super. 379, 404 (App. Div. 2017). In other words, "[o]bjective reasonableness will be established if the actor's conduct did not violate a clearly established constitutional or statutory right." *Id.* at 405 (citing *Gormley v. Wood–El*, 218 N.J. 72, 113 (2014)). Having already determined that the officers' actions did violate a clearly established constitutional right, I conclude that the defendants are not entitled to qualified immunity under the TCA on the grounds of objective reasonableness.

As mentioned, however, "[a] defendant who cannot establish that his or her conduct was objectively reasonable may still invoke qualified immunity if his or her actions were carried out in good faith." *N.E. for J.V.*, 449 N.J. Super.

at 405. A public employee who establishes that he or she acted in good faith is entitled to a grant of summary judgment. *Id.*

As discussed in Part F.ii, *supra*, there is evidence in the record that the defendant officers acted with malice in initiating a criminal prosecution against Evans. In light of that evidence, I cannot conclude that the officers have established that they acted in subjective good faith. *See N.E. for J.V.*, 449 N.J. Super. at 407 ("A public employee's good faith under *N.J.S.A.* 59:3–3 is to be judged in relation to whether his act violated *N.J.S.A.* 59:3–14 in that it involved crime, actual fraud, actual malice, or willful misconduct.") (Citation omitted. Cleaned up.) That presents an issue of fact for the jury.

Accordingly, the defendants are not entitled to qualified immunity on the state law malicious prosecution claim.

## IV.  Conclusion

The motions for summary judgment (DE 232, 233, 234) are granted in part and denied in part. Specifically, summary judgment is granted as to Counts 4, 6 and 7, and as to the claims asserted against Defendant Henry in Counts 3, 5 and 8. Still remaining are the following defendants and counts:

Count 3 (common law malicious prosecution) against Defendants Hadley, Carrega and Tietjen;

Count 5 (§ 1983 malicious prosecution) against Defendants Hadley, Carrega and Tietjen;

Count 8 (§ 1983 conspiracy) against Defendants Hadley, Carrega and Tietjen.

An appropriate order will issue.

Dated: March 16, 2023

/s/ Kevin McNulty

_____

**KEVIN MCNULTY**
**United States District Judge**